IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LEXINGTON INSURANCE COMPANY,<br><br>       Plaintiff,<br><br>- against -<br><br>DAVID FORREST and T. BEAUCLERC ROGERS IV,<br><br>       Defendants. | Civil Action<br><br>No. 02-CV-4435 |

## DECLARATION OF MICHELLE GEORGE

  I, Michelle George, declare under penalty of perjury under the laws of the United States of America as follows:

  1. I am a partner in the law firm of Denton Wilde Sapte, solicitors, located at 5 Chancery Lane, Clifford's Inn, London EC4A 1 BU, England. I appear of record for Lexington Insurance Company ("Lexington") in various proceedings involving film finance issues in the United Kingdom. I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

  2. I submit this declaration in support of Lexington's opposition to the motions of T. Beauclerc Rogers IV ("Rogers") and David Forrest ("Forrest") to dismiss or stay prosecution of the Complaint filed in this Court by Lexington against them.

*The Proceedings in England Relating to
Flashpoint*

  3. In December 2000, Lexington brought injunctive proceedings in England against Flashpoint to require Flashpoint to place all unspent money into "holding accounts" with

respect to what are known as the Hollywood Funding ("HF") 4, HF5 and HF6 film finance transactions and to prevent Flashpoint from dealing with those accounts.[1]  This proceeding was premised on the alleged misuse of funds by Flashpoint.  In connection with each HF transaction there was a Special Purpose Vehicle that borrowed money to finance the production and distribution of motion picture and television films backed by insurance, and issued bonds for the repayment of the amount borrowed.  It was intended that insurance policies issued by Lexington would respond if sales revenues of the films to be produced and/or distributed were insufficient to repay the amounts of money obtained by the financings.

4.     Lexington was successful in obtaining injunctive relief freezing Flashpoint's assets up to about $8.4 million, requiring Flashpoint to pay monies into the holding accounts and preventing Flashpoint from dealing with those accounts.  Flashpoint, however, did not pay any monies into the holding accounts, which resulted in Lexington obtaining a summary judgment against Flashpoint in the amount of $8.8 million.

5.     In March 2001, Flashpoint put itself into administration (which is the equivalent of bankruptcy proceedings in the United States).  As a result, there are no existing or ongoing proceedings of any sort in which claims against Flashpoint are being litigated.  When a company is in administration, no proceedings can be brought against it without permission of the court, which, in my experience, is rarely given.

6.     Currently pending before the Commercial Court in England are three proceedings brought by Law Debenture Trust (Channel Islands) Ltd. ("LDT"), the trustee for the bondholders, against Lexington with respect to HF4, HF5 and HF6.  The HF4 and HF5 proceedings are being dealt with together before the English Court and a trial date for the first phase of the combined actions, pertaining to insurance issues, has been set for April 29, 2003.  The HF6

---

[1] HF1, 2 and 3, which also are film finance transactions involving Flashpoint, were until recently in litigation in England, but Lexington is not a direct insurer or reinsurer on any of these transactions.

proceedings are being dealt with separately; no trial date for these proceedings has been scheduled. In HF6, Lexington has filed a summary judgment application seeking to dismiss some, but not all, of the claims in those proceedings, but this application will not be heard by the Court until after the trial in HF4 and HF5.

    7.  The claim in England involving a television series entitled "The New Professionals" with which Flashpoint was involved has now been settled and no proceedings with respect to this series are now pending.

    8.  Flashpoint is not a party to any of the HF4, HF5 or HF6 proceedings before the English Court nor is Rogers or Forrest a party in any of these proceedings. No other insurers or reinsurers are parties to the HF4, HF5 or HF6 proceedings.

    9.  In the combined HF4 and HF5 proceedings, currently pending, before the English Court, Lexington's substantive defenses include:

  (a)  fraud in the inducement as a result of the manipulation of sales estimates;
  (b)  lack of insurable interest;
  (c)  breach of warranty as to the number of films to be made as part of the slates of films that comprise HF5;
  (d)  breach of warranty as to the identity of the films to be made;
  (e)  failure of the broker to procure "unconditional reinsurance" for Lexington in HF4; and
  (f)  inevitability/lack of fortuity.

The HF6 proceedings, which are being dealt with separately and will not get into gear until after the trial of HF4 and HF5, will include all of these defenses plus at least an additional breach of warranty defense relating to the identities of the producers of several of the films. I am advised that Rogers claims in his memorandum of law in support of his motion to dismiss that "the overriding issue in dispute in the LDT proceedings is [Lexington's] defense of fraud in the inducement." As can be seen from the above list of substantive defenses, that clearly is not so. Moreover, the misuse of funds by Rogers and Forrest acting as Flashpoint, which I understand is a

central issue in the United States litigation, is only being used in the English proceedings as but one example of Flashpoint's unreliability and untrustworthiness.

10. In addition, it is possible that the English proceedings may not turn at all on whether Flashpoint or its principals committed fraud. The insurance policies at issue contain an exculpatory clause (known as "clause 8") that LDT contends (and Lexington disputes) insulates LDT from any defense based on fraudulent conduct by Flashpoint.

11. As a result of the advanced stage of the English proceedings with a trial in HF4 and HF5 scheduled to begin on April 29, 2003, it is extremely unlikely that the English Court would permit Forrest and Rogers to be joined in these proceedings. At an April 19, 2002 case management conference before the England Court (involving HF4 and HF5), counsel representing LDT, the claimant in the British proceedings, objected quite strongly to any possible attempt by the defendants (who include Lexington) to add any United States entities as additional defendants. Counsel for LDT said:

> "Insofar as Lexington have in mind bringing, as was indicated this morning, a deceit claim against United States entities, it is truly unlikely that that makes any sense at all. The jurisdiction would be hard-fought. If they have a case, they can bring it in the United States. There is absolutely no reason why that should delay this particular trial date."

A copy of the relevant portion of the transcript from the April 19, 2002 case management conference is annexed hereto as Exhibit A.

12. It would, in any event, be extremely expensive and not cost effective for Rogers and Forrest to join in the English proceedings (assuming the Court would let them do so, which is extremely unlikely). There are seven different parties in these proceedings and the trial which is scheduled to begin in April 2003 is expected to last 20 to 25 weeks (an estimate now shared by all parties). And, most importantly, a vast number of issues that will be litigated in the English proceedings are irrelevant to the activities of Rogers, Forrest and Flashpoint.

*Discovery in the English Proceedings*

13.  I am advised that Rogers in his memorandum of law has stated that "absent an Order of the English Courts, those documents [*i.e.*, the Flashpoint documents] cannot be divulged to persons who are not parties to the English proceedings," and that Forrest has made a similar statement in a declaration he has filed.  This statement is incorrect.  The documents produced by Flashpoint's administrators, in approximately 250 boxes, are not subject to any confidentiality requirements as they were produced voluntarily.  The Flashpoint documents were supplied to Lexington by Flashpoint's administrators without any conditions.  Lexington is legally able to make all of those documents available to Rogers and Forrest without any Court order or agreement from the other parties to the English proceedings.  Thus, Rogers and Forrest can have access to all 250 boxes of Flashpoint documents.

14.  The disclosure of documents by other parties to the English proceedings is subject to a rule of the English Court, CPR 31.22, formerly known as the "implied undertaking" which provides that a document may only be used in the proceedings in which it was disclosed unless it has been referred to in a public hearing or upon an order of the Court or agreement by the party who disclosed the document.  In addition, documents received by Lexington from a significant number of third parties who provided documents voluntarily for use in the English proceedings are not subject to any confidentiality strictures and can be made available to Rogers and Forrest.

*Witnesses and Documents in the United States*

15.  While a number of witnesses relevant to the transactions set forth in Lexington's RICO complaint are located in England, a number of relevant witnesses are based in the United States and a vast number of documents relevant to such transactions emanate from individuals and entities in the United States.  Documents and witnesses pertaining to the various sales agents who functioned on the various motion pictures and television series in question, such as Media Ventures, Showcase and Filmwave, are all located in the United States.  A number of

the film projects discussed in the RICO complaint have substantial United States connections. For example:

    (a)    "Award" (which was HF3) was an American project as the producers, Award Entertainment, and the sales agent, Showcase, were both located in the United States. The key individuals of these entities are Paul Maslak of Award Entertainment and David Jackson and Cara Shapiro of Showcase, all of whom are located in California. All of the documents of these entities are in the United States.

    (b)    "Regent" (part of the HF5 proceeding) was principally a United States project. The key individuals in Regent are Paul Colichman, Steve Jarchow, Mark Harris and Helen Sarlui, all of whom are located in the United States.

    (c)    Jules Verne (HF4) also has significant United States connections. A key witness with respect to the Jules Verne project is Rich Grove, the sales agent of Media Ventures. He and all the Media Ventures' documents are located in the United States. Other important individuals with respect to this film project include Larry Selander (Media Ventures lawyer), Pierre DeLespinois (a principal of Crest Productions which was the producer of Jules Verne) and Michael Huffington of Crest, all of whom I believe are located in the United States.

16. In addition, there are a number of Lexington employees or former employees with knowledge of the relevant insurance issues pertaining to HF4, HF5 or HF6. These individuals include Rob Brace and John Iannucci, both of whom are located in the United States.

17. Finally, the film "It Had To Be You," which I understand is referred to in the Complaint against Rogers and Forrest does not involve Lexington and is not in issue in the HF4, HF5 and HF6 proceedings.

*Recovery of Attorneys' Fees in the English Proceedings*

18. In practice, Lexington will not be able to recover all the costs that it incurs in the HF4, HF5 and HF6 proceedings. Whatever the outcome of the HF4, HF5 and HF6 proceedings, Lexington will certainly incur some loss. One order for costs has already been made in favor of Lexington with respect to the proceedings seeking an injunction and subsequently summary judgment against Flashpoint (*see* ¶ 4, above). However, Lexington will not recover all such

costs from Flashpoint given that Flashpoint essentially has no funds, has numerous creditors, and is in administration.  To date, Lexington has not recovered any monies from Flashpoint.

19. The general rule in England is that a successful party in litigation will be able to recover his costs from his opponent (CPR 44.3(2)).  However, the court has discretion to depart from that general rule.  CPR 44.3(4) states that when a court is considering an award of costs, it must consider all the circumstances, including the conduct of the parties and whether a party has succeeded on part of this case, even if he has not been wholly successful.  (A copy of CPR 44 is annexed hereto as Exhibit B.)

20. In *Phonographic Performance Limited v. A.E.I. Rediffusion Limited,* [1999] All ER 299 (a copy of which is annexed hereto as Exhibit C), the Court of Appeal said:

> "I draw attention to the new rules, because, while they make clear that the general rule remains, that the successful party will normally be entitled to costs, they at the same time indicate the wide range of considerations which will result in the Court making different orders as to costs . . . .  The most significant change of emphasis of the new rules is to require Courts to be more ready to make separate orders which reflect the outcome of different issues.  In doing this the new rules are reflecting a change of practice which has already started.  It is now clear that a too robust application of the 'follow the event principle' encourages litigants to increase the costs of litigation, since it discourages litigants from being selective as to the points they take.  If you recover all your costs as long as you win you are encouraged to leave no stone unturned in your efforts to do so."  (Ex. C at p. 313)

In the *Phonographic* case, the successful party was awarded only two-thirds of the costs it sought (Ex. C at 303).

21. As a result of the new rules and the above decision, courts in England have been more ready than before to look carefully at who has actually won a case and to what extent.  If a claimant chooses to advance a number of issues and only succeeds on some of them a court will be likely to award a claimant only a proportion of his costs (based on the number of issues on which he has succeeded) or may even award a "losing" party part of his costs to reflect the issues on which that party has succeeded.  The effect of the court following either alternative will be that a "successful" party will only recover part of his total costs.

22. It has been recognized by the courts that, when an order for costs is made in favor of a successful party, that party may not be able to recover all of its costs. In *General of Berne Insurance Co. v. Jardine Insurance Management Ltd.*, [1998] 2 All ER 301 (a copy of which is annexed hereto as Exhibit D), the Court of Appeal said:

> "The amounts which the receiving party is obligated to pay his own solicitors may nonetheless not be recovered on a taxation on a standard basis if they were not reasonably incurred or not reasonable in amount.
>
> "Recovery of costs from another party is never assured, let alone in any amount which can be assessed in advance . . . . [T]here is always the likelihood that costs will be taxed at a lesser amount than the client has to pay his solicitor. That is the nature of taxation of costs." (Ex. D at 304.311)

"Taxation" was the name for "assessment" prior to the changes in the rules that came into effect in April, 1999. The change, however, did not affect the level of costs payable by an unsuccessful litigant to his successful opponent, but was simply an attempt at plain English.

This 24th day of December, 2002, I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.

                                               /s/ Michelle George
                                                     Michelle George