**THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

LEXINGTON INSURANCE COMPANY,

                Plaintiff,

       - against -

DAVID FORREST and T. BEAUCLERC ROGERS IV,

              Defendants.

Civil Action

No. 02-CV-4435

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTIONS TO DISMISS OR STAY**

Edward P. Krugman
Ira J. Dembrow
Scott M. Mory
CAHILL GORDON & REINDEL
Eighty Pine Street
New York, New York  10005
(212) 701-3000

Jeffrey R. Lerman
Glenn F. Rosenblum
MONTGOMERY, MCCRACKEN, WALKER &
   RHOADS, LLP
123 South Broad Street
Philadelphia, Pennsylvania  19109
(215) 772-1500

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ................................................................................................ iv

STATEMENT OF THE CASE ...........................................................................................1

    The Complaint ...........................................................................................................1

    The Canard That Defendants Did Not Run Flashpoint.....................................4

    The English Proceedings............................................................................................5

SUMMARY OF THE ARGUMENT ...............................................................................7

ARGUMENT

I.    THIS COURT HAS PERSONAL JURISDICTION OVER
    DEFENDANT FORREST ........................................................................................9

        A.    Forrest Is Subject to Jurisdiction Pursuant to
               Rule 4(k)(1)(A) and the Pennsylvania Long-Arm
               Statute ...................................................................................................9

               1.    Forrest's Contacts With Pennsylvania
                        Compel the Exercise of Jurisdiction ................................9

               2.    Jurisdiction Also Exists Because Forrest
                        Conspired With a Pennsylvania Resident
                        and Actively Communicated With Him in
                        Pennsylvania in Furtherance of the
                        Conspiracy ...........................................................................13

               3.    The Exercise of Jurisdiction Does Not
                        Offend Traditional Notions of Fair Play
                        and Substantial Justice ....................................................15

        B.    The Impact of Rule 4(k)(2) .................................................................16

        C.    Forrest Cannot Hide Behind the "Corporate Shield".....................19

II.    LEXINGTON'S FRAUD PLEADING MORE THAN
    SATISIFIES THE STRICTURES OF RULE 9(B) ...........................................20

        A.    The Complaint Adequately Particularizes the
                Fraudulent Conduct Alleged ...........................................................22

                1.    Fraudulent Sales Estimates .......................................................23

                2.    Misappropriations of Funds .......................................................24

                3.    Fraudulent Inducement of Collateral
                        Agreements ...............................................................................25

*Page*

    4.     Use of Jurisdictional Means............................................................26

  B.    The Complaint Properly Sets Forth the Conduct
       Alleged Against Each Defendant......................................................28

  C.    The Complaint Adequately Identifies the
       Transmissions That Constitute the Predicate Acts of
       Mail Fraud, Wire Fraud, and Transportation of
       Stolen Property................................................................................30

III.  Lexington's Damages Are Recoverable Under
     RICO and Are Not Speculative.................................................................33

  A.    Lexington's Cost of Defending Claims of Third
       Parties Is Recoverable Injury Under RICO......................................33

  B.    Lexington's Injury Is Not Speculative or Contingent
       on a Future Event............................................................................34

  C.    This Matter Is Ripe .........................................................................37

IV.  The Eastern District of Pennsylvania Is the
     Appropriate Forum for This Action ..........................................................39

  A.    The Doctrine of Forum Non Conveniens Does Not
       Preclude Litigation in This Forum....................................................39

    1.     Relief under RICO Is Available Only in
          the United States .................................................................40

    2.     Plaintiff's Choice of Forum Deserves
          "Considerable Deference"....................................................41

    3.     The Private Interest Factors Do Not
          Favor Dismissal ..................................................................43

        (a) Location of Documents and Evidence................................43

        (b) Location of Witnesses/Situs of
            Conduct .........................................................................45

    4.     The Public Interest Factors Do Not Favor
          Dismissal.............................................................................49

        (a) Interest of the Forum ........................................................49

        (b) Burden of Jury Duty on Local
            Citizens .........................................................................50

        (c) Conflict of Laws ...............................................................50

        (d) Relative Congestion of Court Dockets................................51

*Page*

B.    International Comity Does Not Require Dismissal
of This Action ........................................................................................52

C.    Any Stay Would Be Inappropriate........................................................55

CONCLUSION................................................................................................................57

# TABLE OF AUTHORITIES

*Page*

## Cases

*800537 Ontario, Inc.* v. *World Imports U.S.A., Inc.*, 145 F. Supp. 2d 288 (W.D.N.Y. 2001) ................................................. 55n

*Abdullah Sayid Rajab Al-Rifai & Sons W.L.L.* v. *McDonnell Douglas Foreign Sales Corp.*, 988 F. Supp. 1285 (E.D. Mo. 1997) ................................................. 55

*Aero Systems Engineering, Inc.* v. *Opron, Inc.*, 21 F. Supp. 2d 990 (D. Minn. 1998) ................................................. 42n

*Agency Holdings, Corp.* v. *Malley-Duff & Assocs.,Inc* , 483 U.S. 143 (1987) ......... 19n

*Allstate Life Insurance Co.* v. *Linter Group Ltd.*, 994 F.2d 996 (2d Cir. 1993) ....... 55n

*American Trade Partners, L.P.* v. *A-1 International Importing Enterprises. Ltd.*, 755 F. Supp. 1292 (E.D. Pa. 1990) ................................................. 13, 19

*In re Arthur Treacher's Franchisee Litig.*, 92 F.R.D. 398 (E.D. Pa. 1981) ............. 13, 14

*Asahi Metal Indus. Co.* v. *Superior Court*, 480 U.S. 102 (1987) ............................ 15

*Berardi* v. *Swanson Memorial Lodge*, 920 F.2d 198 (3d Cir. 1990) ....................... 38n

*Burger King Corp.* v. *Rudziewicz*, 471 U.S. 462 (1985) ........................................ 15

*Carteret Savings Banks* v. *Shushan*, 954 F.2d 141 (3d Cir.), *cert. denied*, 506 U.S. 817 (1992) ................................................. 10, 15

*Cedric Kushner Promotions, Ltd.* v. *King*, 533 U.S. 158 (2001) ............................ 20

*Central Trust Co.* v. *Goldman*, 417 N.Y.S.2d 359 (App. Div. 1979) ....................... 33

*China Trade and Development Corp.* v. *M.V. Choong Yong*, 837 F.2d 33 (2d Cir. 1987) ................................................. 52-53

*Cinkutis* v. *Confederation Life Insurance Co.*, 1990 WL 161260 (E.D. Pa. Oct. 19, 1990) ................................................. 34

*Contact Lumber Co.* v. *P.T. Moges Shipping Co.*, 918 F.2d 1446 (9th Cir. 1990) ................................................. 42n

*In re Corel Corp. Inc. Securities Litig.*, 147 F. Supp. 2d 363 (E.D. Pa. 2001) ......... 39, 41, 43, 44, 48, 50, 50n, 51

*Davis* v. *Thornburgh*, 903 F.2d 212 (3d Cir.), *cert. denied, Davis* v. *Cohen*, 498 U.S. 970 (1990) ................................................. 38n

*Page*

*Deck* v. *Engineered Laminates*, 2001 WL 487940 (D. Kan. Apr. 10, 2001)............ 38

*Department of Environmental Protection* v. *Ventron Corp.*, 468 A.2d 150 (N.J. 1983) .................................................................................................................. 33

*DiRienzo* v. *Philip Services Corp.*, 294 F.3d 21 (2d Cir. 2002) .............................. 44, 48, 50n

*Donohue* v. *Armco Inc.*, 2001 WL 1479758, [2002] 1 Lloyd's Rep. 425 (H.L. 2001) ................................................................................................................. 40n

*Dow Chemical Co.* v. *Exxon Corp.*, 30 F. Supp. 2d 673 (D. Del. 1998) ................. 37

*Eagle Traffic Control, Inc.* v. *James Julian, Inc.*, 933 F. Supp. 1251 (E.D. Pa. 1996) .................................................................................................................. 18, 19

*Eggear* v. *Shibusawa Warehouse Co.*, 2001 WL 267881 (E.D. Pa. Mar. 19, 2001) .................................................................................................................. 17

*E.I. DuPont de Nemours & Co.* v. *Rhodia Fiber & Resin Intermediates, S.A.S.*, 197 F.R.D. 112 (D. Del. 2000), *aff'd in part, appeal dismissed in part*, 269 F.3d 187 (3d Cir. 2001)......................................................................................... 42

*ePlus Tech. Inc.* v. *Aboud*, 2002 WL 31689452 (4th Cir. Dec. 3, 2002) ................. 12

*Ethanol Partners Accredited* v. *Wiener, Zuckerbrot, Weiss & Brecher*, 635 F. Supp. 15 (E.D. Pa. 1985) ..................................................................................... 13

*In re Foundation For New Era Philanthropy Litig.*, 1996 WL 585577 (E.D. Pa. Sept. 4, 1996)........................................................................................................ 35, 36, 38

*Founds* v. *Shedaker*, 278 F. Supp. 32 (E.D. Pa. 1968) ........................................... 18

*General Environmental Science Corp.* v. *Horsfall*, 753 F. Supp. 664 (N.D. Ohio 1990) ........................................................................................................... 49

*Grand Entertainment Group, Ltd.* v. *Star Media Sales, Inc.*, 988 F.2d 476 (3d Cir. 1993)............................................................................................................. 9, 12, 15, 16

*Gulf Oil Corp.* v. *Gilbert*, 330 U.S. 501 (1947)........................................................ 40, 43

*Hanson* v. *Denckla*, 357 U.S. 235 (1958) ................................................................ 10

*Herbstein* v. *Bruetman*, 743 F. Supp. 184 (S.D.N.Y. 1990) .................................... 52

*Hilton* v. *Guyot*, 159 U.S. 113 (1895)...................................................................... 52

*Hishon* v. *King & Spalding*, 467 U.S. 69 (1984) ..................................................... 3n

*Holmes* v. *Securities Investor Protection Corp.*, 503 U.S. 258 (1992).................... 33, 34

*Page*

*Huth* v. *Hillsboro Ins. Mgmt.*, 72 F. Supp. 2d 506 (E.D. Pa. 1999).......................... 20

*I.J.A., Inc.* v. *Marine Holdings Ltd.*, 524 F. Supp. 197 (E.D. Pa. 1981).................. 55, 56

*International Shoe Co.* v. *Washington*, 326 U.S 310 (1945) .................................... 10

*Karp* v. *U.S. Billing, Inc.*, No. 99-4784, 2000 U.S. Dist. LEXIS 571 (E.D. Pa. Jan. 27, 2000)........................................................................................................ 38n

*Kempe* v. *Ocean Drilling & Exploration Co.*, 876 F.2d 1138 (5th Cir.), *cert. denied*, 493 U.S. 918 (1989) ................................................................................ 41n

*Lacey* v. *Cessna Aircraft Co.*, 932 F.2d 170 (1991) ................................................ 39, 42, 51

*Lacey* v. *Cessna Aircraft Co.*, 862 F.2d 38 (3d Cir. 1988), *rev'd after remand*, 932 F.2d 170 (1991)........................................................................................ 39

*La Fata* v. *Raytheon Co.*, 223 F. Supp. 2d 668 (E.D. Pa. 2002)............................. 3

*Law Debenture Trust Corp.* v. *Lexington Insurance Co.*, 2001 WL 1423026 (Q.B.D. Comm. Ct. Nov. 2, 2001) ........................................................ 54, 54n, 55n

*Lehman* v. *Humphrey Cayman, Ltd.*, 713 F.2d 339 (8th Cir. 1983), *cert. denied*, 464 U.S. 1042 (1984)........................................................................................ 51

*Lemelson* v. *Wang Laboratories, Inc.*, 874 F. Supp. 430 (D. Mass. 1994)............... 34

*Lockman Foundation* v. *Evangelical Alliance Mission*, 930 F.2d 764 (9th Cir. 1991) ........................................................................................................... 41n

*Lony* v. *E.I. DuPont de Nemours & Co.*, 935 F.2d 604 (3d Cir. 1991).................... 39, 40, 41, 51

*Lony* v. *E.I. DuPont de Nemours & Co.*, 886 F.2d 628 (3d Cir. 1989), *appeal after remand*, 935 F.2d 604 (1991)........................................................................ 39n, 50

*Ludgate Insurance Co.* v. *Becker*, 906 F. Supp. 1233 (N.D. Ill. 1995) .................... 52n

*Lumen Construction, Inc.* v. *Brant Construction Co.*, 780 F.2d 691 (7th Cir. 1985) ............................................................................................................... 54

*Madanes* v. *Madanes*, 981 F. Supp. 241 (S.D.N.Y. 1997) ....................................... 43, 50, 52

*Maio* v. *Aetna, Inc.*, 221 F.3d 472 (3d Cir. 2000)................................................... 35

*Marlee Electronics Corp.* v. *Eclectic Technologies Corp.*, 1993 WL 30081 (E.D. Pa. Feb. 5, 1993)..................................................................................... 21

*Page*

*Massachusetts School of Law* v. *American Bar Assoc.*, 846 F. Supp. 374 (E.D. Pa. 1994) ..................................................................................... 13, 14

*Matthews* v. *Kidder, Peabody & Co., Inc.,* 2000 WL 33726916 (W.D. Pa. Aug. 18, 2000) ......................................................................................... 35

*McCarron* v. *British Telecom*, 2001 WL 632927 (E.D. Pa. June 5, 2001).............. 17n

*Mellon Bank (East) PSFS, Nat'l Ass'n* v. *Farino*, 960 F.2d 1217 (3d Cir. 1992) .... 11

*Merchants National Bank* v. *Safrabank*, 1991 WL 173781 (D. Kan. Aug. 28, 1991) ..................................................................................................... 19

*Murray* v. *British Broadcasting Corp.*, 81 F.3d 287 (2d Cir. 1996)....................... 51n

*National Precast Crypt* v. *Dy-Core*, 785 F. Supp. 1186 (W.D. Pa. 1992) .............. 20

*Nelson* v. *Commonwealth Dep't of Public Welfare*, 2002 WL 31778803 (E.D. Pa. Dec. 12, 2002)................................................................................. 2-3, 3n

*Nepera Chemical, Inc.* v. *Sea-Land Service, Inc.*, 794 D.2d 688 (D.C. Cir. 1986) ..................................................................................................... 33

*Nordic Bank PLC* v. *Trend Group, Ltd.*, 619 F. Supp. 542 (S.D.N.Y. 1985)........... 20

*North Carolina ex rel. Long* v. *Alexander & Alexander Services, Inc.*, 680 F. Supp. 746 (E.D.N.C. 1988)..................................................................... 41

*Obee* v. *Teleshare, Inc.*, 725 F. Supp. 913 (E.D. Mich. 1989) ............................... 19, 20

*P&P Marketing, Inc.* v. *Ditton*, 746 F. Supp. 1354 (N.D. Ill. 1990) ...................... 55n

*Paraschos* v. *YBM Magnex International, Inc.*, 2000 WL 325945 (E.D. Pa. Mar. 29, 2000)........................................................................................ 52, 54

*Peregrine Myanmar Ltd.* v. *Segal*, 89 F.3d 41 (2d Cir. 1996)................................ 42, 50

*Piper Aircraft Co.* v. *Reyno*, 454 U.S. 235 (1981).................................................. 40, 41-42, 45

*Potomac Electric Power Co.* v. *Electric Motor and Supply, Inc.*, 262 F.3d 260 (4th Cir. 2001), *cert. denied*, 122 S. Ct. 1297 (2002) ............................................ 35

*Prime Leasing, Inc.* v. *CMC Lease, Inc.*, 1999 WL 1285847 (N.D. Ill. Dec. 29, 1999) ..................................................................................................... 19

*Raymark Industries, Inc.* v. *Baron*, 1997 WL 359333 (E.D. Pa. June 23, 1997)...... 14

*Page*

*Regent National Bank* v. *K-C Insurance Premium Finance Co.*, 1997 WL 137309 (E.D. Pa. Mar. 21, 1997)............................................................. 21, 29, 30, 32

*Reid-Walen* v. *Hansen*, 933 F.2d 1390 (8th Cir. 1991) ............................................. 42, 42n

*Remick* v. *Manfredy*, 238 F. 3d 248 (3d Cir. 2001) .................................................. 9, 10

*Renner* v. *Lanard Toys Ltd.*, 33 F.3d 277 (3d Cir. 1994) ......................................... 14

*Republic of Panama* v. *BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935 (11th Cir. 1997) .................................................................................................................. 17, 41n

*Resource Ventures, Inc.* v. *Resources Management International, Inc.*, 42 F. Supp. 2d 423 (D. Del. 1999)................................................................................... 21

*Romann* v. *Geissenberger Manufacturing Corp.*, 865 F. Supp. 255 (E.D. Pa. 1994) .................................................................................................................... 18

*Rosner* v. *Daniels*, 1999 WL 601011 (E.D. Pa. July 28, 1999)................................ 11, 13n

*Sandvik AB* v. *Advent Int'l Corp.*, 83 F. Supp.2d 442 (D. Del. 1999) ...................... 14

*Saporito* v. *Combustion Engineering, Inc.*, 843 F.2d 666 (3d Cir. 1988), *vacated on other grounds*, 489 U.S. 1049 (1989)........................................................ 27n, 29, 30

*Seaboard Surety Co.* v. *Permacrete Construction Corp.*, 221 F.2d 366, *reh'g denied*, (3d Cir. 1955).......................................................................................... 33

*Sedima, S.P.R.L.* v. *Imrex Co., Inc.*, 473 U.S. 479 (1985)........................................ 33, 48

*Seidel* v. *Gordon A. Gundaker Real Estate Co.*, 904 S.W.2d 357 (Mo. App. 1995) ...................................................................................................................... 33

*Seville Industrial Machinery Corp.* v. *Southmost Machinery Corp.*, 742 F.2d 786 (3d Cir. 1984), *cert. denied*, 469 U.S. 1211 (1985) ........................................ 20, 21, 22, 29

*Seville Industrial Machinery Corp.* v. *Southmost Machinery Corp.*, 567 F. Supp. 1146 (D.N.J. 1983), *aff'd in part, rev'd in part*, 742 F.2d 786 (3d Cir. 1984), *cert. denied*, 469 U.S. 1211 (1985)............................................................ 22n

*Shaw* v. *Williams*, 676 F. Supp. 168 (N.D. Ill. 1987) .............................................. 55n

*Stochastic Decisions, Inc.* v. *DiDomenico*, 995 F.2d 1158 (2d Cir.), *cert. denied*, 510 U.S. 945 (1993).................................................................................... 34

*In re Sumitomo Copper Litig.*, 995 F. Supp. 451 (S.D.N.Y. 1998) .......................... 20, 21

*Supra Medical Corp.* v. *McGonigle*, 955 F. Supp. 374 (E.D. Pa. 1997) ................. 40, 42, 49

*Page*

*Telespectrum Worldwide, Inc.* v. *MBNA Canada Bank*, 1999 WL 239112 (E.D. Pa. Apr. 16, 1999) ................................................... 10

*Temtex Products, Inc.* v. *Kramer*, 479 A.2d 500 (Pa. Super. Ct. 1984) ................... 13

*Terra Nova Insurance Co.* v. *Distefano*, 663 F. Supp. 809 (D.R.I. 1987)............... 38

*Thomas* v. *Tramiel*, 105 F.R.D. 568 (E.D. Pa. 1985) ............................................... 32n

*Transunion Corp.* v. *PepsiCo, Inc.*, 811 F.2d 127 (2d Cir. 1987) ........................... 41n

*In re Union Carbide Corp. Gas Plant Disaster*, 634 F. Supp. 842 (S.D.N.Y. 1986) ........................................................................................................... 45

*United Feature Syndicate, Inc.* v. *Miller Features Syndicate, Inc.*, 216 F.Supp. 2d 198 (S.D.N.Y. 2002)........................................................................ 55n

*United Power Ass'n* v. *L.K. Comstock & Co.*, 1992 WL 402906 (D. Minn. Oct. 27, 1992) .......................................................................................... 19

*United Refining Co.* v. *Dep't of Energy*, 486 F. Supp. 99 (W.D. Pa. 1980)............. 56

*United States* v. *Arrow Medical Equipment Co.*, 1990 WL 210601 (E.D. Pa. Dec. 18, 1990)....................................................................................... 13

*United States* v. *Gilboe*, 684 F.2d 235 (2d Cir. 1982), *cert. denied,* 459 U.S. 1201 (1983)....................................................................................... 12

*United States* v. *Goldberg*, 830 F.2d 459 (3d Cir. 1987)........................................ 12

*Vetrotex Certainteed Corp.* v. *Consolidated Fiber Glass Products Co.*, 75 F.3d 147 (3d Cir. 1996)........................................................................ 12n, 13n

*Vicom, Inc.* v. *Harbridge Merchant Services, Inc.*, 20 F.3d 771 (7th Cir. 1994) ..... 30n

*Vons Cos.* v. *Seabest Foods, Inc.*, 926 P.2d 1085 (Cal.), *cert. denied*, 522 U.S. 808 (1997)....................................................................................... 18

*Ward* v. *Hampton Psychiatric Hosp.*, 1993 WL 419143 (E.D. Pa. Oct. 19, 1993) .......................................................................................... 19

*Warden* v. *McLelland*, 288 F.3d 105 (3d Cir. 2002)................................................ 20, 21

*Weiner* v. *Quaker Oats Co.*, 129 F.3d 310 (3d Cir. 1997)....................................... 3n

*Wiwa* v. *Royal Dutch Petroleum Co.*, 226 F.3d 88 (2d Cir. 2000), *cert. denied,* 532 U.S. 941 (2001)................................................................................. 42, 45

*Page*

**Statutes and Rules**

Cal. Code Civ. Proc. § 410.10 (West 1973)................................................................ 18

Fed. R. Civ. P. 4 (West Cum. Supp. 2001) ............................................................... 9, 12, 16, 17, 17n, 18

Fed. R. Civ. P. 9 (West 1992) ................................................................................... 20, 21

Fed. R. Civ. P. 12 (West 2000) ................................................................................. 1n

42 Pa. C.S.A. § 5322 (Purdon Supp. 2002) .............................................................. 9

18 U.S.C. § 1341 (West 2000) .................................................................................. 11, 26

18 U.S.C. § 1343 (West 2000) .................................................................................. 11, 26

18 U.S.C. § 1961 (West Cum. Supp. 2002) .............................................................. 3

18 U.S.C. § 1962 (West 2000) .................................................................................. 4, 20

18 U.S.C. § 1964 (West 2000) .................................................................................. 33

18 U.S.C. § 1965 (West 2000) .................................................................................. 19n

18 U.S.C. § 2314 (West 2000) .................................................................................. 26

18 U.S.C. § 3237 (West 2000) .................................................................................. 12

28 U.S.C. § 1404 (West 2000) .................................................................................. 18

28 U.S.C. § 1631 (West 2000) .................................................................................. 18, 18n

28 U.S.C. § 1782 (West Cum. Supp. 2002) .............................................................. 46

**Other Authorities**

*Annot.*, 45 A.L.R.4th 776 (1995 & Supp. 2002)...................................................... 33n

Black's Law Dictionary (6th ed. 1990; 7th ed. 1999)............................................... 35

*Restatement (Second) of Torts* (1979)...................................................................... 33, 34

1 Summ. Pa. Jur. 2d *Torts* (1999) ............................................................................ 33n

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

LEXINGTON INSURANCE COMPANY,

     Plaintiff,

   - against -

DAVID FORREST and T. BEAUCLERC ROGERS IV,

     Defendants.

Civil Action

No. 02-CV-4435

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTIONS TO DISMISS OR STAY**

   Plaintiff, the Lexington Insurance Company ("Lexington"), respectfully submits this memorandum in opposition to the separate motions to dismiss or stay this action made by the defendants, David Forrest ("Forrest") and T. Beauclerc Rogers IV ("Rogers"). For the reasons stated herein, both motions should be denied in their entirety.[1]

**STATEMENT OF THE CASE**

*The Complaint*

   Messrs. Forrest and Rogers are the principals — the majority owners — of a set of companies that went by the generic name of "Flashpoint" (¶¶ 2, 11-14 & Ex. A). Defendant Rogers is a resident of this District, and several of the Flashpoint companies are located at his home in Gladwyne (¶¶ 7, 14). Defendants were in the business of arranging for the financing of

---

[1]   By agreement, Lexington is submitting this single opposition to both motions. Apart from arguing that this Court lacks personal jurisdiction over him, Forrest, in large measure, simply adopts the arguments raised by Rogers.

  Submitted with this memorandum are the Declarations of Michelle George, Stuart Cotton, and Scott M. Mory, all of which are submitted in opposition to the portions of the motions seeking dismissal on jurisdictional and/or *forum non conveniens* grounds. To the extent the motions seek relief under Rule 12(b)(6), plaintiff relies solely on the Complaint, which is cited in this memorandum by paragraph number only.

motion pictures: through Flashpoint, they persuaded insurance companies, including plaintiff, to provide "credit enhancement" for film production loans through policies that picked up any shortfall between the revenue stream generated by the film and the face amount of the loan (¶¶ 17, 18). As part of the inducement to the insurers to issue the loans, defendants promised to monitor the film productions on the insurers' behalf (¶¶ 19, 27, 31-35).

Defendants' operation was corrupt from beginning to end. As alleged in the Complaint, they masterminded a "multi-year, multi-party, multi-transaction Ponzi scheme that has already cost plaintiff several million dollars and has placed it at risk of losing close to $200 million" (¶ 1). Forrest and Rogers are alleged — specifically and in detail — to have used the Flashpoint companies to commit numerous distinct frauds (¶¶ 23, 29, 31-34), in connection with at least eight separate film finance transactions ("The New Professionals," "Hollywood Funding No. 1" through "Hollywood Funding No. 6," and "It Had To Be You"), over a period of well over two years (¶ 44(a)). Specifically:

- On five separate occasions defendants induced the issuance of film finance insurance policies by fraudulently inflating the "sales estimates" by which the insurers evaluated the likelihood that the loans would be repaid (¶¶ 20-23). Three of these frauds were perpetrated by defendant Forrest (¶ 23(a), (c), (e)); two of them by both defendants acting together (¶ 23(b), (d)).

- On three occasions Forrest and Rogers, acting together, caused Flashpoint to misappropriate funds dedicated to the production of one set of films and apply the funds to another set (¶ 29(a), (b), (f)).

- On three occasions Forrest and Rogers, acting together, simply stole money dedicated to production of specific films and used it to finance projects of their own (¶ 29(c), (d), (e)).

- Forrest and Rogers concealed from the insurers for whose benefit they were supposedly "monitoring" the film productions that they were in fact the owners of one of the production companies they were "monitoring" (¶ 26).

- On at least one occasion, defendants "pulled" a profitable film from a slate insured by Lexington, hoping to keep the revenues for themselves instead of using them to repay the loans plaintiff had insured (¶ 29(f)(iii)).

- Defendants repeatedly concealed their prior defalcations in order to induce Lexington to issue insurance policies covering additional projects (¶¶ 31-35).

These allegations must be taken as true on this motion to dismiss. *E.g.*, *Nelson* v. *Commonwealth Dep't of Public Welfare*, 2002 WL 31778803, at *1 (E.D. Pa. Dec. 12, 2002)

(Brody, J.); *La Fata* v. *Raytheon Co.*, 223 F.Supp.2d 668, 672 (E.D. Pa. 2002) (Brody, J.).[2]  So too, must:

- the factual allegations underlying the claims that the collection of Flashpoint companies constituted an "enterprise" within the meaning of the RICO statute, 18 U.S.C. § 1961(4) (¶¶ 11-14 & Ex. A);

- the allegations that defendants' scheme depended on the use of the mails and/or wire transmissions in interstate and foreign commerce, and that numerous such communications, in four specifically defined categories, took place in further-ance of the scheme (¶ 39);

- the allegations that, in four specific instances (¶ 40(a), (b), (c)), and two broad categories of additional instances (¶¶ 40(d), 41), defendants knowingly caused the transportation in interstate of foreign commerce of funds taken by fraud;

- the allegations that defendants were busily proceeding with the next step of their Ponzi scheme until Flashpoint's entry into bankruptcy finally put a stop to their criminal conduct (¶ 44(c));

- the allegations that "[d]efendants agreed and conspired with one another to commit the acts of racketeering activity alleged above and, more broadly, to op-erate Flashpoint in the Ponzi-like fashion alleged herein" (¶ 52) and that "such conspiracy was implemented, in part, through communications between defen-dant Forrest in the United Kingdom and defendant Rogers in this District" (¶ 53).

Paragraphs 52 and 53 (and paragraph 39(d) as well[3]) are not merely significant substantively.  As set forth in Point I below, they establish that defendant Forrest is subject to personal jurisdiction in this District.  It is important to note, therefore, that Mr. Forrest does not merely not deny such contacts but, in fact, affirmatively admits that they took place (without, of course, admitting the scheme or conspiracy).  Specifically, Forrest states that he had fax and telephone communica-tions with his co-defendant — in Pennsylvania — concerning the operations of Flashpoint (Forrest Dec. ¶ 10).

---

[2]    As this Court held in *Nelson*: "When considering a Rule 12(b)(6) motion, the Court must accept as true all of the allegations set forth in the complaint and must draw all reasonable inferences in favor of the plaintiff."  2002 WL 31778803, at *1.  This standard requires the Court to construe the complaint in the light most favorable to the plaintiff.  *Hishon* v. *King & Spalding*, 467 U.S. 69, 73 (1984); *Weiner* v. *Quaker Oats Co.*, 129 F.3d 310, 315 (3d Cir.1997).  "Dismissal of plaintiff's claim is appropriate only if plaintiff 'can prove no set of facts in support of his claim which would entitle him to relief.'  The court need not, however, accept conclusory allegations or legal conclusions."  *Nelson*, 2002 WL 31778803, *1 (citations omitted).

[3]    Paragraph 39(d) alleges, as part of the mail and wire fraud allegations, that the uses of the mails and wires included "numerous faxes and telephone calls between defendant Forrest in the United Kingdom and defendant Rogers in this District for the purpose of coordinating and implementing the scheme."

*Nowhere* in their motion papers do defendants deny that the allegations set out above allege each of the elements of two substantive RICO offenses under 18 U.S.C. § 1962(c) (Count I) and 18 U.S.C. § 1962(a) (Count II), a RICO conspiracy under 18 U.S.C. § 1962(d) (Count III), common law fraud (Count IV), or tortious interference with contract (Count V). Rather, faced with a fact-intensive, well pleaded Complaint alleging in detail their perpetration of a massive, multi-year fraud, defendants initially seek to impugn the motives of Lexington and the other film finance insurers[4] and then raise a number of arguments that, they claim, preclude this Court from adjudicating Lexington's causes of action against them. As discussed below (and pretermitting as unnecessary any rebuttal to defendants' anti-insurer rhetoric), none of defendants' various attacks on the Complaint can withstand legal and factual scrutiny; neither separately nor together do they begin to justify or require dismissal either of the Complaint or of the action as a whole.

### The Canard That Defendants Did Not Run Flashpoint

Realizing the weakness of their attacks on the sufficiency of the Complaint, both defendants go to great lengths to minimize their roles in the Flashpoint enterprise.[5] The facts, however, put the lie to defendants' assertions.[6]

---

[4]     *See*, *e.g.*, Rogers Mem. 4 ("Insurers were more than happy to provide such coverage, albeit for substantial premiums"); ("insurers seized on the only possible defense to payment of claims — fraud in the procurement of the policies").

[5]     Rogers states that Forrest was the former Chief Executive Officer, and that he was only a "former director" (Rogers Mem. 2), and one of "four members" of Flashpoint (Rogers Mem. 3). Forrest denies that he ever held the title "Chief Executive Officer" and states only that he was "involved" in "the day-to-day operations" of some, but not all, of the Flashpoint entities (Forrest Dec. ¶¶ 4, 7; Forrest Mem. Ex. A). Aside from disputing his role in the Flashpoint companies, Forrest adopts Rogers's rendition of the facts with slight supplementation (Forrest Mem. 4-6).

[6]     To the extent the instant motions are brought under Rule 12(b)(6), of course, the Court cannot even consider these assertions. Forrest's efforts to pretend that he wasn't there when the Flashpoint frauds supposedly didn't happen may be intended to support his invocation of the "corporate shield" doctrine in support of his motion to dismiss for want of personal jurisdiction. As set forth in Point I.C below that doctrine is not available as a matter of law in this RICO case; as discussed in text here, it is factually baseless as well.

In the first place, of course, the Flashpoint "Family" Chart attached as Exhibit A to the Complaint indicates that Rogers and Forrest each owns 43.75% of various Flashpoint-affiliated companies, with two other individuals owning only a total of 12.50% of these companies. Forrest concedes that he ran the "day to day operations" of the Flashpoint UK entities, but says he had nothing to do with anything in the United States (Forrest Mem. 2-3). False.

Defendants' efforts to distance themselves from Flashpoint are refuted by a Flashpoint brochure that appeared as a supplement in *The Hollywood Reporter*, apparently in connection with the May 1999 Cannes Film Festival. A copy of this brochure is attached to this Memorandum and is cited by Bates number (TBR 1 to TBR 34). The brochure opens with a one-page statement of Flashpoint's "strategy" that is signed at the bottom, "T. Beauclerc Rogers IV" on the left and "David Forrest" on the right (TBR 2). A subsequent page in the brochure summarizing Flashpoint's accomplishments "[i]n the short time since we began operations" repeats this same pattern. Rogers's picture, reproduced signature, and the name "Beau Rogers" appear on the left side of the page; Forrest's picture, reproduced signature, and name are on the right side (TBR 20). Rogers and Forrest sought to present themselves to the entertainment community as the two individuals who operated, directed, and controlled Flashpoint. At the top, Flashpoint was a two-man operation, and the two men were these two defendants.

### The English Proceedings

Throughout their memoranda, defendants make frequent reference to proceedings pending in England that, they assert, are similar to the instant action. They have not, of course, provided any affidavits or declarations from anyone with personal knowledge of those proceedings. Accompanying this Memorandum is the Declaration of Michelle George, a solicitor who is handling on behalf of Lexington the various English lawsuits referred to by defendants. As set forth in the George Declaration, the English proceedings are suits by the policyholder (Law Debenture Trust, or "LDT," as trustee for investors) in three series of financings (Hollywood Funding Nos. 4, 5, and 6) that are also at issue here. LDT has sued its insurer, Lexington, for payment

on the policies, and Lexington is defending.  The lawyers, investment bankers, insurance brokers, and underlying beneficial owner of the notes are also parties, and numerous claims and cross claims are asserted.  Significantly, neither Forrest, Rogers, nor Flashpoint is a defendant in the English proceedings, nor will they be.

In addition to the complete non-overlap of parties (other than Lexington) between the English proceedings and this one, the underlying issues are not identical.  Flashpoint's fraudulent conduct is at issue in the English proceedings, but the legal and factual issues there are far broader and more diverse.  In the HF4 and HF5 proceedings, which are scheduled to go to trial on April 29, 2003, Lexington's substantive defenses include:

     a.      fraud in the inducement as a result of the manipulation of sales estimates;

     b.      lack of insurable interest;

     c.      breach of warranty as to the number of films to be made as part of the slates of films that comprise HF5;

     d.      breach of warranty as to the identity of the films to be made;

     e.      the failure of the broker to procure unconditional reinsurance for Lexington; and

     f.      inevitability/lack of fortuity  (George Dec. ¶ 9).

The HF6 proceedings, which are being dealt with separately[7] and will not get into gear until after the trial of HF4 and HF5, will include all of these defenses plus at least an additional breach of warranty defense relating to the identities of the producers of several of the films.  Many of these defenses focus on the interpretation and construction of the insurance agreements at issue in the various English proceedings — matters that are not at issue in the instant litigation.  Although Rogers claims that "the overriding issue in dispute in the LDT proceedings is [Lexington's] defense of fraud in the inducement" (Rogers Mem. 6), that clearly is not so.

---

[7]    The claim in England involving "The New Professionals" has now been settled and no proceedings with reference to this television series are now pending.  The English proceedings do not and will not involve claims relating to "It Had To Be You."

The other "English proceedings" adverted to by Rogers have even less to do with this action. In December 2000, prior to the commencement of the English Hollywood Funding litigations, Lexington brought injunctive proceedings in England against Flashpoint to require Flashpoint to account and to freeze any unspent money. Lexington obtained injunctive relief requiring Flashpoint to pay about $8.4 million into the appropriate holding accounts and preventing Flashpoint from dealing with those accounts. Flashpoint, however, did not pay any monies into the holding accounts; the funds were gone (George Dec. ¶ 4). In March 2001, Flashpoint put itself into "administration," which is similar to bankruptcy proceedings in the United States. When a company is in administration, no proceedings can be brought against it without permission of the court, which is rarely given (George Dec. ¶ 5). As a result, there are no existing or ongoing "administration" proceedings of any sort in which claims against Flashpoint are being litigated.

## SUMMARY OF THE ARGUMENT

None of the numerous arguments presented by Rogers or Forrest justifies dismissal of Lexington's Complaint. Rogers is a resident of this District and the Court has personal jurisdiction over Forrest, a non-resident, under Pennsylvania's long-arm statute. The "corporate shield" doctrine offers Forrest no protection from this Court's exercise of personal jurisdiction over him. (*See* Point I, below)

The Complaint provides a wealth of particularization regarding the fraudulent activities that form the basis of the RICO and state law claims against Rogers and Forrest. Paragraph after paragraph provides a detailed itemization, with a description of the transactions that constitute the fraud and the names, dates, and dollar amounts involved. When the Complaint intends to refer to one defendant or the other, it does that; when it intends to refer to the two of them together, it does that, too. The Complaint more than adequately identifies the numerous transmissions that constitute the predicate acts of mail and wire fraud. There is, thus, no merit to defen-

dants' arguments that the Complaint should be dismissed on the ground of lack of particularity with respect to the fraud allegations.  (*See* Point II, below)

Lexington has suffered real, present, compensable injury through the amounts it has already been required to expend in defending the English proceedings.  That it may have additional damages if it loses those proceedings and must pay on its insurance policies does not mean that this action is not ripe.  Moreover, even if Lexington is successful in avoiding liability under the various insurance agreements at issue in the English litigations, it still will have been damaged by the amount of attorneys' fees and other expenses it has incurred, and it will not be able to recover all of its attorneys' fees even if it prevails in England.  Lexington, therefore, has suffered an injury that is certain and not speculative or contingent on future events and, under applicable standards, the instant lawsuit is "ripe" for adjudication by this Court.  (*See* Point III, below)

Finally, this Court is an appropriate forum for this lawsuit.  Defendants have failed to demonstrate, as they must, that the doctrine of *forum non conveniens* should be applied.  The trial of the action in this Court will not create the "oppressiveness and vexation out of all proportion" to defendants' convenience that is required for a dismissal on *forum non conveniens* grounds. Considering the significant deference accorded a plaintiff's choice of forum, the unavailability of an alternative forum, and the substantial volume of witnesses and documents that exist in the United States, defendants' motion to dismiss on the ground of *forum non conveniens* should be denied.  (*See* Point IV(A), below)  Further, principles of international comity do not require dismissal as the parties and issues are not the same in the instant lawsuit and the pending English proceedings that involve some of the same films or film slates.  (*See* Point IV(B), below)  Finally, any stay of this lawsuit pending completion of the proceedings in England is wholly inappropriate and would severely prejudice Lexington in its claims against Forrest and Rogers.  (*See* Point IV(C), below)

**ARGUMENT**

**I.**

**THIS COURT HAS PERSONAL JURISDICTION
OVER DEFENDANT FORREST**

**A.**    *Forrest Is Subject to Jurisdiction Pursuant to
Rule 4(k)(1)(A) and the Pennsylvania Long-Arm Statute*

Under Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure, non-resident defendants such as Forrest are subject to personal jurisdiction to the same extent that they "could be subjected to the jurisdiction of a court of general jurisdiction in the state in which the district court is located."  Accordingly, if Forrest is subject to personal jurisdiction under Pennsylvania's long-arm statute, the motion to dismiss for want of personal jurisdiction must be denied.

Subsection (a) of the Pennsylvania long-arm statute, 42 Pa. C.S.A. § 5322(a) (Purdon Supp. 2002), contains a laundry list of types of conduct that subject non-residents to the personal jurisdiction of Pennsylvania courts, and subsection (b) provides:

> "In addition to the provisions of subsection (a) the jurisdiction of the tribunals of this Commonwealth shall extend to all persons who are not within the scope of section 5301(relating to persons) to the fullest extent allowed under the Constitution of the United States and may be based on the most minimum contact with this Commonwealth allowed under the Constitution of the United States."  *Id.* § 5322(b).

Pennsylvania thus asserts jurisdiction over non-residents "to the fullest extent allowed" by due process, and jurisdiction "may be based on the most minimum contact with this Commonwealth allowed under the Constitution of the United States."  *E.g.*, *Grand Entertainment Group, Ltd.* v. *Star Media Sales, Inc.*, 988 F.2d 476, 481 (3d Cir. 1993).

1.    Forrest's Contacts With Pennsylvania
       Compel the Exercise of Jurisdiction

The test for the exercise of full constitutional jurisdiction is familiar:  "Due process requires that the defendant have 'minimum contacts' in the forum state, and that the exercise of jurisdiction comport with 'traditional notions of fair play and substantial justice.'"  *Remick* v.

*Manfredy*, 238 F.3d 248, 255 (3d Cir. 2001) (quoting *International Shoe Co.* v. *Washington*, 326 U.S. 310, 316 (1945) (quotations omitted)).  In determining whether there are sufficient minimum contacts to justify the exercise of personal jurisdiction, a court should consider "(1) whether defendant 'purposefully avail[ed] itself of the privilege of conducting business' with Pennsylvania; and (2) if defendant's relationship with plaintiff and the forum state is such that the defendant 'should reasonably anticipate being haled into court . . . .'" *Telespectrum Worldwide, Inc.* v. *MBNA Canada Bank*, 1999 WL 239112, at *1 (E.D. Pa. Apr. 16, 1999) (citations omitted).  Or, as the Court of Appeals said in *Grand Entertainment*, the "defendant must engage in some affirmative act 'by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'"  988 F.2d at 482 (quoting *Hanson* v. *Denckla*, 357 U.S. 235, 253 (1958)).

In *Grand Entertainment*, the Third Circuit permitted personal jurisdiction over a Spanish defendant who had, "in his individual and corporate capacity, directed at least twelve communications to the forum . . . engaged in negotiations for an agreement which would have created rights and obligations among citizens of the forum and contemplated significant ties with the forum."  *Id.* at 482-83 (citations omitted).  This was evidence that the defendant had "deliberately and personally directed significant activities toward the state."  *Id.* at 483.  The court pointed out that "[w]here the contacts evaluated are those that give rise to the litigation, even one contact with the forum may be enough to justify jurisdiction," that defendant's "personal, intentional communications [into the forum were what] gave rise to the underlying suit," and that having "voluntarily decided to negotiate with [a resident in the forum, he] cannot now be heard to complain about answering a suit concerning the effect of negotiations in the jurisdiction in which some of those negotiations occurred."  *Id.*; *accord, e.g.*, *Carteret Savings Banks* v. *Shushan*, 954 F.2d 141, 147-48 (3d Cir.), *cert. denied*, 506 U.S. 817 (1992) (telephone calls and correspondence sent into New Jersey from Louisiana by representative of Louisiana real estate developer, coupled with a meeting in New Jersey to facilitate the closing of a loan, pro-

-10-

vided minimum contacts necessary to satisfy due process).  As *Grand Entertainment* makes clear, the defendant's physical presence in the state is *not* required.  *Accord, e.g.*, *Mellon Bank (East) PSFS, Nat'l Ass'n* v. *Farino*, 960 F.2d 1217, 1225 (3d Cir. 1992) ("When a defendant has received the benefits and protections of the forum's laws by engaging in business activities with a forum resident, the courts have 'consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.'"); *Rosner* v. *Daniels*, 1999 WL 601011 (E.D. Pa. July 28, 1999) (Brody, J.) ("Telephone calls and correspondences can constitute minimum contacts.").

The analysis in *Grand Entertainment* requires the exercise of personal jurisdiction over defendant Forrest here.  Not only has Forrest "deliberately directed" significant activities towards Pennsylvania, but *the very communications that Forrest directed to Pennsylvania are RICO predicate acts.*  As alleged in the Complaint:

> 39.    In furtherance of the foregoing scheme, defendants on numerous occasions caused the transmission of documents and/or information through the United States Postal Service, through private or commercial interstate carriers, and/or through wire or radio communication in interstate or foreign commerce.  Such transmissions include but are not limited to the following:
>
> . . . .
>
> (d)    on information and belief, numerous faxes and telephone calls between defendant Forrest in the United Kingdom and defendant Rogers in this District for the purpose of coordinating and implementing the scheme.
>
> . . . . .
>
> 43.    Each defendant committed predicate acts of racketeering activity in connection with his conduct of the affairs of the Flashpoint Enterprise, in that:
>
> (a)    having devised the scheme to defraud alleged above, defendants caused the use of the jurisdictional means alleged in paragraph 39 above, thereby in each instance violating 18 U.S.C. § 1341 and/or 18 U.S.C. § 1343, and
>
> (b)    having devised a scheme to obtain money and/or property (the proceeds of the Hollywood Funding Nos. 4, 5, and 6 financings) by means of false and fraudulent pretenses as alleged above, defendants caused the use of the jurisdictional means alleged in paragraph 39, thereby in each instance violating 18 U.S.C. § 1341 and/or 18 U.S.C. § 1343 . . . .

Forrest has admitted that the telephone conversations and faxes took place, he has admitted that they related to the operation of Flashpoint,[8] and he nowhere disputes the allegation of paragraph 39(d) that they were "numerous." That by itself is sufficient to support personal jurisdiction under *Grand Entertainment*, for the contacts here were at least as significant as those in the Third Circuit case and are alleged to have lasted for much more than the four months at issue there.

In this RICO case, however, the answer is even simpler. Forrest has not disputed — nor, of course, could he — that the allegations quoted above plead the crime of wire fraud. That he says he did nothing wrongful is, for purposes of this motion to dismiss, completely beside the point. On the allegations of the Complaint, ***Forrest could be indicted and tried for wire fraud in the Eastern District of Pennsylvania***. 18 U.S.C. § 3237(a); *United States* v. *Goldberg*, 830 F.2d 459, 465 (3d Cir. 1987) (wire fraud prosecution properly brought in Eastern District of Pennsylvania where "the wire transfer of funds from New York to Wilmington . . . passed through the Federal Reserve Bank in Philadelphia"); *United States* v. *Gilboe*, 684 F.2d 235, 239 (2d Cir. 1982) (wire fraud prosecution of Hong Kong defendant proper in New York where, *inter alia*, "there were numerous telexes and telephone calls between New York and Hong Kong and other parts of the world"), *cert. denied*, 459 U.S. 1201 (1983). It follows that Forrest could "reasonably anticipate being haled into court" in this district in connection with his Flashpoint activities. For this reason too, therefore, this Court has jurisdiction over defendant Forrest pursuant to Rule 4(k)(1)(A) and the Pennsylvania long arm statute. *See ePlus Technology, Inc.* v. *Aboud*, 2002 WL 31689452, at *7 (4th Cir. Dec. 3, 2002) (RICO case; because defendant's communications with the forum constituted the predicate acts on which plaintiff was suing, "these acts alone are sufficient to justify the court's exercise of jurisdiction over Aboud").[9]

---

[8]    In his Declaration Forrest admits "with regard to Flashpoint . . . telephone conversations and telefaxes between [himself] from outside Pennsylvania and most often England, and . . . Rogers in Pennsylvania" (Forrest Dec. ¶ 10).

[9]    *Vetrotex Certainteed Corp.* v. *Consolidated Fiber Glass Products Co.*, 75 F.3d 147, 151-52 (3d Cir. 1996), which Forrest argues stands for the proposition that communications by telephone

*Footnote continued on next page.*

2.    Jurisdiction Also Exists Because Forrest Conspired With a
Pennsylvania Resident and Actively Communicated With
Him in Pennsylvania in Furtherance of the Conspiracy

It is settled that, under appropriate circumstances, the contacts of a co-conspirator may be attributed to other members of the conspiracy for the purpose of establishing jurisdiction. In upholding conspiracy-based personal jurisdiction in *United States* v. *Arrow Medical Equipment Co.*, 1990 WL 210601 (E.D. Pa. Dec. 18, 1990), Judge Giles stated:

> "[Plaintiff] alleges that . . . defendants were all involved in a coordinated effort to defraud the government of its recovery of Medicare overpayments. Plaintiff also alleges that substantial acts in furtherance of that conspiracy took place in Pennsylvania, namely, the billing of Medicare for equipment sold but not medically necessary." 1990 WL 210601, at *8.

*Accord Ethanol Partners Accredited* v. *Wiener, Zuckerbrot, Weiss & Brecher*, 635 F. Supp. 15, 18 (E.D. Pa. 1985) (upholding jurisdiction on co-conspirator theory); *Temtex Products, Inc.* v. *Kramer*, 479 A.2d 500, 506-07 (Pa. Super. Ct. 1984) (jurisdiction based on a conspiracy appropriate where "the cause of action arises out of the conspiracy to defraud, a material part of which was performed in [Pennsylvania]"); *see also American Trade Partners, L.P.* v. *A-1 International Importing Enterprises, Ltd.*, 755 F. Supp. 1292, 1304 (E.D. Pa. 1990) (RICO venue appropriate on co-conspirator basis).

To be sure, mere membership in a conspiracy does not automatically make a member subject to the jurisdiction of every other member's forum. *Massachusetts School of Law* v. *American Bar Ass'n*, 846 F. Supp. 374, 379 (E.D. Pa 1994) (citing *In re Arthur Treacher's Fran-*

---

*Footnote continued from previous page*

and mail directed at the forum by a non-forum resident are insufficient to establish personal jurisdiction (Forrest Mem. 10), is inapposite here. *Vetrotex* held that "'informational communications' in furtherance of a contract between a resident and non-resident were not the 'purposeful activity necessary for a valid assertion of personal jurisdiction over [the non-resident defendant.]'" 75 F.3d at 152 (citation omitted). As this Court has held in rejecting a similar attempt to rely on *Vertrotex*, however, courts in this circuit take a "highly realistic" view when making personal jurisdiction determinations, *Rosner* v. *Daniels*, *supra*, 1999 WL 601011, at *3, and any "realistic" view of Forrest's numerous communications with Rogers in Pennsylvania, over a period of years, which are both independent RICO predicate acts (¶ 39(d)) and were undertaken to coordinate the running of a racketeering enterprise (¶ 53), requires subjecting Forrest to personal jurisdiction in this district.

*chisee Litigation*, 92 F.R.D. 398, 411 (E.D. Pa. 1981)).  Rather, plaintiff must allege "the performance of substantial acts within the forum in furtherance of the conspiracy . . . of which the out-of-state defendant was or should have been aware."  *Arthur Treacher's*, 92 F.R.D. at 411 (citation omitted); *see also Massachusetts School of Law*, 846 F. Supp. at 379-80.  We submit that Lexington has done that here.

Paragraph 53 of the Complaint alleges that the RICO conspiracy pleaded in Count III "was implemented, in part, through communications between defendant Forrest in the United Kingdom and defendant Rogers in this District."  Moreover, Rogers was not merely a resident of Pennsylvania; two elements of the Flashpoint Enterprise were physically located here (¶¶ 13(g), 14; TBR 17).  It is a fair inference from the facts alleged in the Complaint that a substantial part of Rogers's participation in the "conduct of the affairs of the Flashpoint Enterprise" (¶ 43) — *i.e.*, the object of the conspiracy alleged in paragraph 54 of the Complaint — took place in and through his Pennsylvania operations.  And, of course, Forrest's admitted communications with his business partner in Pennsylvania mean that Forrest knew it.

To the extent the Court has any doubt as to the implementation of the conspiracy through Pennsylvania conduct, Lexington requests leave to conduct discovery on this point.  The discovery would include written and oral discovery of both defendants, focused on (a) Rogers's conduct vis-à-vis Flashpoint while present in Pennsylvania and (b) the communications between Rogers in Pennsylvania and Forrest elsewhere.  We submit that, for the reasons set forth above, the Court can and should deny Forrest's motion to dismiss without ordering discovery.  Should the Court disagree, however, the Third Circuit has expressly sustained "the right of plaintiffs to conduct discovery before the court dismissed for lack of personal jurisdiction."  *Renner* v. *Lanard Toys Ltd.*, 33 F.3d 277, 283 (3d Cir. 1994); *see Sandvik AB* v. *Advent Int'l Corp.*, 83 F. Supp. 2d 442, 447 (D. Del. 1999) (collecting authority).  In *Raymark Industries, Inc.* v. *Baron*, 1997 WL 359333, *4-*5 (E.D. Pa. June 23, 1997), Judge Cahn deferred ruling on a motion to dismiss for lack of personal jurisdiction to allow discovery on potential bases for co-conspirator

-14-

jurisdiction. If the Court does not simply deny Forrest's motion to dismiss, it should follow that course here.

> 3.    The Exercise of Jurisdiction Does Not Offend Traditional
>        Notions of Fair Play and Substantial Justice

Once the minimum contacts requirement has been satisfied the question then turns to whether "the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Burger King Corp.* v. *Rudzewicz*, 471 U.S. 462, 476 (1985) (citations omitted). If the plaintiff has made out a prima facie case of minimum contacts, "the defendant '*must present a compelling case* that the presence of some other considerations would render jurisdiction unreasonable.'" *Grand Entertainment*, 988 F.2d at 483 (quoting *Carteret Savings Bank*, 954 F.2d at 150, quoting *Burger King*, 471 U.S. at 477; emphasis added). In determining whether a defendant has met this heavy burden, the court must weigh the claimed inconvenience to the defendant against a variety of factors, including "the interests of the forum State, . . . the plaintiff's interest in obtaining relief[,] . . . 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies[,] and the shared interest of the several States in furthering of fundamental social policies.'" *Grand Entertainment*, 988 F.2d at 483 (quoting *Asahi Metal Indus. Co.* v. *Superior Court*, 480 U.S. 102, 113 (1987)).

This is not an even-handed balancing test: there is to be a heavy thumb on the side of exercising jurisdiction. As the Supreme Court has said, "[w]hen minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant." *Asahi Metal*, 480 U.S. at 114. The *Grand Entertainment* court concluded that the burden of defending a lawsuit in Pennsylvania was not so severe as to deprive Spanish defendants of due process when an officer of the defendant corporation had "shown his ability to conduct business in the United States and had actively carried on substantial activities" in the United States. *Grand Entertainment*, 988 F.2d at 483.

The holding in *Grand Entertainment* is dispositive of any claim by Forrest that the exercise of jurisdiction here would impose undue hardship on him.  Forrest has shown the ability and willingness over a thirty-year business career to travel to and to conduct business with clients, brokers, and others in Pennsylvania (Forrest Dec. ¶¶ 10, 11).  He has ongoing personal relationships with, and continues to visit, individuals in Pittsburgh (*id.* ¶ 11(d)).  More broadly, he repeatedly traveled to and stayed for long periods in California while running Flashpoint, spending significant time there on at least 7 separate trips, over the course of two years (Mory Dec. ¶¶ 3, 5 & Exs. A, C).  He also spent substantial time in Montreal in connection with Flashpoint's involvement with Ice Storm (*id.* ¶ 4 & Ex. B).[10]  The California and Canada trips, though not Pennsylvania contacts, are factually relevant in rebutting any claim by Forrest of undue hardship.  Here, as in *Grand Entertainment*, Forrest cannot be considered a person "without a significant presence or ability to act in the United States."  *Grand Entertainment*, 988 F.2d at 483.  He has not begun to make a "compelling case" that the exercise of jurisdiction here would violate due process.

**B.      *The Impact of Rule 4(k)(2)***

For the reasons set forth above, we believe it is clear that the Court has jurisdiction over defendant Forrest under Rule 4(k)(1)(A) and the Pennsylvania long-arm statute.  Should the Court disagree with this conclusion, however, it must then consider the impact of Rule 4(k)(2), which provides:

> "If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state."

---

[10]    As alleged in the Complaint, Ice Storm is one of the recipients of the funds misappropriated by defendants (¶ 29(e)).

The second and third requirements of Rule 4(k)(2) are plainly met here: Forrest does not challenge the effectiveness of the service of the summons,[11] and Lexington's RICO claims unquestionably arise under federal law. We address the fourth requirement (lack of jurisdiction in "the courts of general jurisdiction of any state") below. First, however, we demonstrate what, we submit, is absolutely clear — that Forrest "possess[es] sufficient contacts with the nation as a whole to subject [him] to United States' law." *Eggear* v. *Shibusawa Warehouse Co*., 2001 WL 267881, at *4 (E.D. Pa. March 19, 2001) (citation omitted). Under this "national contacts" test, "a defendant's contacts with the forum state play no magical role in the Fifth Amendment analysis"; instead, courts must "examine a defendant's aggregate contacts with the nation as a whole rather than his contacts with the forum state." *Republic of Panama* v. *BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 946-47 (11th Cir. 1997) (citation omitted).

In the first place, of course, there are all of Forrest's telephone calls and faxes with Rogers in Pennsylvania. As alleged in the Complaint, moreover, Forrest knowingly caused misappropriated funds to be delivered to Regent Entertainment, The Building LLC, New Beginnings/Filmworks, and New Standard Post, all based in Los Angeles (¶¶ 14, 40, 41). Indeed, through The Building, New Beginnings, and New Standard Post, the Flashpoint Enterprise had a permanent physical location in California (¶ 14; TBR 17). Flashpoint co-produced "in excess of ten films" with the Los Angeles-based Regent Entertainment production company, produced four movies with the Los Angeles-based Award Entertainment production company, and was involved with financing for Edgewood Studios, a Vermont-based production company (TBR 6, 13). The film "It Had To Be You" was an American film that was financed by the Silicon Valley Bank in California (Cotton Dec. ¶ 3).

---

[11]  Lexington served its summons and complaint by international registered mail with a return receipt requested, a method permitted under Fed. R. Civ. P. 4(f) and the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters. *See*, *e.g*., *McCarron* v. *British Telecom*, 2001 WL 632927, at *2 (E.D. Pa. June 6, 2001).

Crucially with respect to national contacts, Forrest did not merely pull these United States strings from abroad. Rather, he repeatedly traveled to California to administer these various activities first hand. As noted above, Forrest spent significant time in California on at least 7 separate trips over the course of two years (Mory Dec. ¶ 1 & Ex. A). There can be, we submit, no doubt that Forrest had sufficient "national contacts" to subject him to jurisdiction under Rule 4(k)(2).

As the litany of United States contacts makes clear, however, Forrest is almost certainly subject to jurisdiction in California, since that state, like Pennsylvania, asserts personal jurisdiction over non-residents to the fullest extent permitted by the Constitution. Cal. Code Civ. Proc. § 410.10; *Vons Cos.* v. *Seabest Foods, Inc.*, 926 P.2d 1085, 1091 (Cal. 1996), *cert. denied*, 522 U.S. 808 (1997). If this is true, then jurisdiction does *not* exist under Rule 4(k)(2), since it will *not* be the case that there is no jurisdiction over Forrest in "the courts of general jurisdiction of any state." In these circumstances, however, the appropriate course is not to dismiss but to transfer this action to the Central District of California pursuant to 28 U.S.C. § 1631.[12] *See Founds* v. *Shedaker*, 278 F. Supp. 32, 33 (E.D. Pa. 1968) ("It is clear that this Court does have the power . . . to transfer . . . despite the lack of personal jurisdiction over the defendant" and that transfer was appropriate since dismissal would preclude plaintiffs from bringing their claim due to the statute of limitations) (collecting authority); *Romann* v. *Geissenberger Manufacturing Corp.*, 865 F. Supp. 255, 263-64 (E.D. Pa 1994) (Joyner, J.) (transferring under 28 U.S.C. §§ 1404(a), 1631 to cure want of personal jurisdiction), *partially abrogated on other grounds in Ea-*

---

[12]    Section 1631 provides:

> "Whenever a civil action is filed in a court as defined in section 610 of this title or an appeal, including a petition for review of administrative action, is noticed for or filed with such a court and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court in which the action or appeal could have been brought at the time it was filed or noticed, and the action or appeal shall proceed as if it had been filed in or noticed for the court to which it is transferred on the date upon which it was actually filed in or noticed for the court from which it is transferred."

*gle Traffic Control, Inc.* v. *James Julian, Inc.*, 933 F. Supp. 1251 (E.D. Pa. 1996).[13] As this Court held in *Ward* v. *Hampton Psychiatric Hosp.*, 1993 WL 419143 (E.D. Pa. Oct. 19, 1993), transfer instead of dismissal is particularly appropriate where, as here, a statute of limitations may have run since the filing of the original action.[14]

We reiterate that we do not believe that the Court will need to reach this point, because we believe that jurisdiction over Forrest in Pennsylvania is clear. If the Court disagrees, however, we respectfully submit that it should transfer this action to California *in lieu* of dismissal.

## C.    *Forrest Cannot Hide Behind the "Corporate Shield"*

Forrest's invocation of the "corporate shield" or "fiduciary shield" doctrine as a defense to personal jurisdiction is without merit. This doctrine, Forrest argues, prevents any contacts undertaken in his corporate capacity from serving as a basis for personal jurisdiction over him as an individual. Forrest does not cite any RICO cases in support of this proposition, however, and for good reason. It is well settled that the fiduciary shield doctrine simply does not apply in RICO cases. *See, e.g.*, *American Trade Partners, L.P.* v. *A-1 International Importing Enterprises, Ltd.*, *supra*, 755 F. Supp. at 1303 n.17; *Prime Leasing, Inc.* v. *CMC Lease, Inc.*, 1999 WL 1285847, at *5-6 (N.D. Ill. Dec. 29, 1999); *United Power Ass'n* v. *L.K. Comstock & Co.*, 1992 WL 402906, at *5 (D. Minn. Oct. 27, 1992); *Merchants National Bank* v. *Safrabank*, 1991 WL 173781, at *2 (D. Kan. Aug. 28, 1991); *Obee* v. *Teleshare, Inc.*, 725 F. Supp. 913, 915 (E.D.

---

[13]    If there is jurisdiction over Forrest in California then the Central District of California is plainly a district where this action "could have been brought," since Rogers is also subject to jurisdiction there, both by reason of his own Flashpoint contacts with California (Mory Dec. Ex. A) and, more simply, because as a United States resident he is subject to RICO's nationwide service of process provisions, 28 U.S.C. § 1965(b), (d).

[14]    The RICO statute of limitations is four years, *Agency Holding, Corp.* v. *Malley-Duff & Associates, Inc.*, 483 U.S. 143, 156 (1987), and the Jules Verne transaction (Hollywood Funding 4) closed in July 1998, more than four years ago. Although plaintiff has pleaded equitable tolling on the basis of defendants' fraudulent concealment (¶¶ 65-68), and it may be argued that Lexington's claims did not accrue in any event until is incurred the out-of-pocket losses discussed in Point III below, it is obviously undesirable for there to be any risk at all that the statute will be held to have run on a newly commenced action.

Mich. 1989); *Nordic Bank PLC* v. *Trend Group, Ltd.*, 619 F. Supp. 542, 569 n.30 (S.D.N.Y. 1985).

The "corporate shield" doctrine does not apply for yet another reason: "individuals may not take refuge behind the corporate shield if they are charged 'with violating a statutory scheme that provides for personal, as well as corporate liability.'" *Huth* v. *Hillsboro Ins. Mgmt.*, 72 F. Supp. 2d 506, 511 (E.D. Pa. 1999) (quoting *National Precast Crypt* v. *Dy-Core*, 785 F. Supp. 1186, 1191 (W.D. Pa. 1992)). This is paradigmatically true in RICO cases, where defendants are charged as the "persons" who conducted the affairs of an enterprise through a pattern of racketeering activity. Under 18 U.S.C. § 1962(c), the "enterprise" (here, the collection of Flashpoint entities whose "shield" Forrest seeks to invoke) *cannot* be the defendant; only the "persons" who conducted the affairs of the enterprise may be charged. *E.g.*, *Cedric Kushner Promotions, Ltd.* v. *King*, 533 U.S. 158 (2001). For RICO purposes, therefore, Forrest's conduct is his own, and "corporate shield" is simply irrelevant.

## II.

### LEXINGTON'S FRAUD PLEADING MORE THAN SATISIFIES THE STRICTURES OF RULE 9(B)

Rule 9(b) of the Federal Rules of Civil Procedure provides that "[in] all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." This provision applies to the pleading of RICO predicate acts to the extent that they sound in fraud. *Warden* v. *McLelland*, 288 F.3d 105, 114 (3d Cir. 2002).

The Third Circuit has held that Rule 9(b) is not to be construed "too strictly," since "Rule 8(f) requires a court scrutinizing pleadings to construe them 'as to do substantial justice.'" *Seville Industrial Machinery Corp.* v. *Southmost Machinery Corp.*, 742 F.2d 786, 791 (3d Cir. 1984), *cert. denied*, 469 U.S. 1211 (1985). *See also In re Sumitomo Copper Litigation*, 995 F. Supp. 451, 455 (S.D.N.Y. 1998) (Rule 9(b) "should not be applied in a manner which would, in

effect, obstruct all plaintiffs, including those with valid claims, from initiating civil RICO actions."). In *Warden* v. *McLelland*, *supra*, the court, in reversing and remanding for further consideration the dismissal below of a RICO complaint on Rule 9(b) grounds, held that the complaint could well be sufficient since it "provide[d] a reasonably clear overall picture of what has been alleged." 288 F.3d at 114. District courts in the Third Circuit have applied *Seville*'s flexible approach to sustain complaints alleging fraud against attacks under Rule 9(b). *See Regent National Bank* v. *K-C Insurance Premium Finance Co., Inc.*, 1997 WL 137309, at *4 (E.D. Pa. Mar. 21, 1997) (RICO allegations); *Marlee Electronics Corp.* v. *Eclectic Technologies Corp.*, 1993 WL 30081, at *15-16 (E.D. Pa. Feb. 5, 1993) (RICO allegations); *Resource Ventures, Inc.* v. *Resources Management International, Inc.*, 42 F. Supp. 2d 423, 441 (D. Del. 1999) (allegations of fraud and misrepresentation).

The *Seville* case illustrates the Third Circuit's approach to determining whether RICO pleadings satisfy Rule 9(b). In *Seville*, plaintiff's RICO claim was based on its allegations that it was "induced by defendants to enter into a number of sale and other transactions involving over seven hundred pieces of industrial machinery" and that "Defendants never fulfilled their promises to pay [under] consignment, joint venture, purchase and service contracts." 742 F.2d at 788. The district court dismissed the complaint under Rule 9(b), holding "the allegations of fraud . . . deficient because [plaintiff] did not describe the date, place or time of the phone calls and letters that defendants allegedly used in furtherance of their fraudulent scheme." *Id.* at 791. The Third Circuit reversed.

The Court of Appeals admonished "that in applying Rule 9(b), focusing exclusively on its 'particularity language' is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules." *Id.* (citation and internal quotation marks omitted). The purpose of Rule 9(b), the Court held, is "to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Id.* Although "allegations of 'date, place or time'

-21-

fulfill these functions, . . . nothing in the rule requires them. Plaintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Id.* The allegations in Lexington's Complaint here are squarely in accord with the mandate of *Seville* and, indeed, are far more detailed than were the allegations that were held to *satisfy* Rule 9(b) there.[15]

**A.    The Complaint Adequately Particularizes the Fraudulent Conduct Alleged**

The Complaint here injects both precision and a wealth (not merely "some measure") of substantiation into Lexington's allegations of fraud. They more than adequately provide Rogers and Forrest with explicit notice of the conduct for which they must answer. Far beyond a mere general description, there is a lengthy itemization of the alleged fraudulent conduct.

First, the Complaint identifies both Rogers and Forrest as the principals of Flashpoint, a "cluster of related companies" that form the RICO enterprise (¶¶ 2, 7-8). The Complaint further alleges that the Flashpoint enterprise was "majority owned, directly or indirectly, by defendants" (¶ 14). The Complaint then proceeds to allege three types of fraudulent activity: fraudulent sales estimates, misappropriation of funds, and fraudulent inducement of certain collateral agreements (to be entered into by the parties to the insurance transaction). Lexington's

---

[15]    The district court in *Seville* summarized the fraud allegations as follows:

"In its complaint, plaintiff alleges that between May 1981 and the date of the complaint, defendants used the telephone, the mail, and other facilities of interstate commerce, to knowingly provide plaintiff with false and misleading information to induce plaintiff to enter into purchase, consignment, joint venture and service contracts with defendants in connection with its industrial machinery. Plaintiff further alleges that since May 1981 defendants have transported and sold or caused to be transported and sold in interstate commerce, the industrial machinery fraudulently obtained from plaintiff." *Seville Industrial Machinery Corp.* v. *Southmost Machinery Corp.*, 567 F. Supp. 1146, 1155 (D.N.J. 1983) (citations to complaint omitted), *aff'd in part, rev'd in part*, 742 F.2d 786 (3d Cir. 1984), *cert. denied*, 469 U.S. 1211 (1985).

The district court had relied on Rule 9(b) as one reason for dismissing the complaint, finding that the complaint did not "set forth with even minimal particularity the details of the alleged fraud or misrepresentations." 567 F. Supp. at 1156.

allegations as to each of these types of activity are detailed and thorough — as even a cursory review of the Complaint will demonstrate.

1.  Fraudulent Sales Estimates

In laying the groundwork for the first type of fraud, the Complaint sets forth the central role of sales estimates in underwriting film finance insurance (¶ 20) and points out that many films could not legitimately be financed with an expectation of profit because they could not be expected to realize sufficient revenues to pay off the loans (¶ 21).  It then alleges that Flashpoint was determined to push the transactions through regardless:  it "took to inflating sales estimates in its presentations in order to induce lenders — and, more particularly, insurers — to go forward with film financing transactions so that Flashpoint could earn its fees" (¶ 22).

With this background, paragraph 23 sets forth the details of five instances in which Flashpoint fraudulently inflated sales estimates in order to induce insurers to provide backing for specific projects.  In the twenty-two subparagraphs of paragraph 23, containing approximately 100 lines of single-spaced text, names are named, dates are given, and dollar amounts are specified with respect to four of the five transactions — "The New Professionals," "Award," "The Secret Adventures of Jules Verne," and "It Had To Be You."  Only with respect to "Regent I" are the precise details not available, and even there paragraph 23(d) alleges a solid basis for believing that the sales estimates were inflated:

> "(ii)  It is not possible to trace all of individual components of these estimates back to source documents, which is itself an indication of fraud.
>
> "(iii)  Where it has been possible to trace back individual components, the component as presented exceeded a reasonable value for the component by a factor of between two and three." (¶ 23(d)(ii), (iii))

Paragraph 23 also identifies which of the two defendants was involved in each of the five falsifications.  Both defendants cooked the Award and Regent I sales estimates; Forrest alone is asserted to have falsified those for The New Professionals, Jules Verne, and It Had To Be You.

2.    Misappropriations of Funds

As alleged in the Complaint, the defendants planned and executed a series of six financing transactions known as Hollywood Funding No. 1 to Hollywood Funding No. 6.  Each Hollywood Funding transaction used a "special purpose vehicle" ("SPV") to borrow money to finance the films (¶ 24).  Each SPV "would have no assets other than (a) the revenue stream generated by the movies when produced and (b) the proceeds of an insurance policy insuring against the risk that the revenue stream would not be sufficient to repay the notes when due" (¶ 25).

The scheme was an out-and-out fraud.  As alleged in the Complaint:

"The funds so raised would not be paid over directly to the producers but would be funneled through Flashpoint and would — unbeknownst to either the investors or the insurers — be treated as Flashpoint's own equity" (¶ 25).

In addition, defendants failed to disclose to Lexington that Flashpoint had an irreconcilable conflict of interest in several of the transactions, since defendants were both the designated risk manager for the insurers (through Flashpoint (UK)) and the owners of one of the production companies being insured (¶¶ 26, 27).  Flashpoint failed to "maintain funds it raised in segregated accounts and use them only for the purposes for which they had been raised" (¶ 28).

With the stage thus set, the Complaint proceeds to lay out, in over twenty paragraphs and sub-paragraphs, an extensive and detailed description of defendants' fraudulent conduct.  Once again, the names of the specific film projects, the entities involved, the dates, and the dollar amounts in the fraud are all expressly alleged:  Thus:

- In March - June 1998, the defendants caused over $9 million dedicated for 7.23 Productions, Rojak, and/or Award (Hollywood Funding Nos. 1, 2, and 3) to be used for projects in Regent Enterprises (part of Hollywood Funding No. 5) (¶ 29(a)(i)).
  - These funds had not been maintained in segregated accounts and their diversion was contrary to the operating agreements (¶ 29(a)(ii)).
- In March - June 1998, the defendants caused almost $5 million dedicated for 7.23 Productions, Rojak, and/or Award (Hollywood Funding Nos. 1, 2, and 3) to be used for projects in New Beginnings/Filmworks (part of Hollywood Funding No. 5) (¶ 29(b)(i)).
  - Once again, these funds had not been maintained in segregated accounts and their diversion was contrary to the operating agreements (¶ 29(b)(ii)).

-24-

- Because defendants were the owners of New Beginnings/Filmworks, the diversions in this case enriched them personally (¶ 29(b)(iv)).

- In August 1998, the defendants transferred over $3 million of funds to The Building LLC and New Standard Post, LLC, for the purpose of purchasing and occupying real estate in California for use as an office and post-production facility (¶ 29(c)(i), (ii)).

  - Here too, these funds had not been maintained in segregated accounts and their diversion was contrary to the operating agreements ((¶ 29(c)(iii)).

  - Just as with New Beginnings/Filmworks, defendants are alleged to have been indirect owners of The Building LLC and New Standard Post, LLC, further enriching themselves (¶ 29(c)(v)).

- During 1998 and/or 1999, defendants misappropriated approximately $760,000 of improperly commingled funds to invest in a chain of movie theaters in and around Moscow (¶ 29(d)).

- Between August 1999 and December 1999, in connection with the production of "The Secret Adventures of Jules Verne," defendants transferred US$824,000 to a company known as "Ice Storm" for items not within the production budget and posted other substantial amounts as security for Ice Storm equipment and leases, amounts that were eventually drawn against by the lessor (¶ 29(e)(i), (ii)).

  - These funds were maintained in improperly commingled accounts and their diversion was contrary to the Jules Verne Collateral Agreement (¶ 29(e)(iii).

  - Just as with New Beginnings/Filmworks, The Building LLC and New Standard Post, LLC, defendants were indirect owners of Ice Storm, further enriching themselves (¶ 29(e)(v)).

- Throughout 1999, defendants are alleged to have used the funds raised in connection with the Hollywood Funding No. 6 transaction for projects that were completely outside the scope of the transaction (¶ 29(f)).

3.    Fraudulent Inducement of Collateral Agreements

The Complaint alleges that during negotiations between Flashpoint and Lexington in connection with Hollywood Funding No. 4 ("Jules Verne") and Hollywood Funding No. 5 ("Regent I" and "Prosperity I"), defendants concealed from Lexington that they had not complied with the segregation requirements of the previous Hollywood Funding transactions and that they had formed the intent to continue not to comply with their obligations to maintain segregated accounts for each transaction and to use funds only for the purpose for which they were raised (¶¶ 31, 32).   The same conduct is alleged with regard to the Hollywood Funding No. 6 transaction (¶¶ 33, 34).   As the Complaint summarizes:

"The Collateral Agreement for a given Hollywood Funding transaction was a material element of the entire transaction.   Absent a Collateral Agreement that was satisfactory to the insurer, the transaction would not take place at all.   Accordingly,

-25-

defendants' fraudulent inducement of the Collateral Agreements constitutes fraudulent inducement of the transaction as a whole." (¶ 35)

4.    Use of Jurisdictional Means

After having detailed the content of the fraudulent conduct undertaken by the defendants, the Complaint then thoroughly details the defendants' use of the jurisdictional means that transform their frauds into federal crimes. The basic crimes charged are mail fraud, 18 U.S.C. § 1341, wire fraud, *id*. § 1343, and interstate transportation of stolen property, *id*. § 2314. As the Complaint states:

"39.    In furtherance of the foregoing scheme, defendants on numerous occasions caused the transmission of documents and/or information through the United States Postal Service, through private or commercial interstate carriers, and/or through wire or radio communication in interstate or foreign commerce. Such transmissions include but are not limited to the following:

(a)    transmission of sales estimates, during the period 1997-1999, from Flashpoint's California operations to Flashpoint UK in England, and telephone calls and faxes back to California to obtain the necessary 'revisions' to such sales estimates;

(b)    numerous faxes and telephone calls between and among various entities in the United Kingdom (principally Lexington's London office and Messrs. Ince & Co., a firm of solicitors), and Lexington's Boston office and its Boston and Delaware counsel (Morrison, Mahoney & Miller and The Bayard Firm) concerning the placement and the documentation of Hollywood Funding Nos. 4 and 5, in the period March – August 1998;

(c)    numerous similar faxes and telephone calls concerning the placement and the documentation of Hollywood Funding No. 6, in the period October 1998 – February 1999; and

(d)    on information and belief, numerous faxes and telephone calls between defendant Forrest in the United Kingdom and defendant Rogers in this District for the purpose of coordinating and implementing the scheme.[16]

In each instance, defendants either participated directly in the listed communications or knew or anticipated that such communications would take place. Defendants' scheme to defraud depended upon communications such as those alleged herein.

"40.    Defendants knowingly caused the transportation in interstate and/or foreign commerce of funds having been taken by fraud in at least the following instances:

---

[16]    As noted above, Forrest admits that there were telephone calls and faxes between himself from outside Pennsylvania and Rogers in Pennsylvania (Forrest Dec. ¶ 10).

     (a)    the March 1998 transmission to and/or for the benefit of Regent Entertainment (located in and around Los Angeles, California) of funds that had been raised for, and were for the exclusive use and benefit of, 7.23 Productions;

     (b)    the August 1998 and April 1999 transmissions to The Building LLC, for use in purchasing real property located at 6855 Santa Monica Boulevard, in Los Angeles, of funds that had been raised for, and were for the exclusive use and benefit of, Regent Entertainment and New Beginnings/Filmworks;

     (c)    the August 1998 transmission to New Standard Post, for use in purchasing post-production equipment, of funds that had been raised for, and were for the exclusive use and benefit of, Regent Entertainment and New Beginnings/Filmworks; and

     (d)    the payments, throughout 1999, to those United States-based production entities that were not entitled to receive funding from the Hollywood Funding No. 6 transaction but did in fact do so.

"41.    In addition, because (at the very least) the Award Transaction (Hollywood Funding No. 3) and each of the Hollywood Funding transactions in which plaintiff was insurer (Hollywood Funding Nos. 4, 5, and 6) was fraudulently induced, each payment to a producer in the United States with respect to any of these transactions constituted the transmission in foreign commerce of funds taken by fraud. Such payments and transmissions occurred on a routine basis beginning in late 1997 and continuing throughout 1998 and 1999." (¶¶ 39-41)

The extensive description in the Complaint of Rogers's and Forrest's fraudulent conduct provides each defendant with a clear, particularized itemization of the fraudulent acts alleged against each of them by Lexington and against which they will have to defend.[17] Indeed, Rogers does not challenge the fraud pleading as such, merely the alleged deficiencies in identi-

---

[17]    *Saporito* v. *Combustion Engineering Inc.*, 843 F.2d 666 (3d Cir. 1988), *vacated on other grounds*, 489 U.S. 1049 (1989), is not to the contrary. In *Saporito*, thirty-two former employees of defendant ("C-E") complained that "C-E and four of its officers . . . induced appellants to retire under one retirement plan while at the same time concealing from them but disclosing to certain other employees the development of a second, more generous plan." *Id.* at 667. The Third Circuit stated that the key allegation was "[a]t bottom" only that "[u]pon information and belief, defendants and/or persons acting under their direction or control provided notice to certain C-E employees other than plaintiffs, during the [early retirement] option period, that C-E was in the process of planning and promulgating [another retirement plan]." *Id.* at 673. Plaintiffs also accused C-E of a willful omission of information. *Id.* at 673 n.12. C-E successfully moved to dismiss on the ground that this allegation did not give sufficient notice as to what acts constituted the fraud, and the Third Circuit affirmed: "Although the appellant's complaint does indicate the general content of the representations . . ., it does not indicate who the speakers were . . . or who received the information . . . ." *Id.* at 675 (citations to the record omitted). The dismissal, however, was without prejudice; leave to amend was granted. *Id.* at 675. The extremely minimal allegations of fraud in *Saporito* are dwarfed by the extensive details of the fraud perpetrated by Rogers and Forrest that are set forth in the Complaint here.

fying the defendant responsible for each act and the asserted failure to sufficiently specify the predicate mailings and wire transmissions (Rogers Mem. 35-36). As is apparent from the recitals above and as set forth in the next two sections, these objections are without merit.

Forrest concedes that the Complaint is pleaded with sufficient particularity as to him with regard to Hollywood Funding Numbers Four, Five, and Six but asserts that it is not with regard to "Award" and "Regent I" (Forrest Mem. 21). This assertion is largely beside the point, because the Complaint would continue to plead the requisite "pattern of racketeering activity" with respect to Forrest even if these allegations were wholly omitted, and Forrest never even suggests that it would not. Forrest's assertion, however, is not merely irrelevant; it is also wrong. The allegations regarding "Award" (¶ 23(b)) detail how, "at the direction of both defendants," the insurance broker put together a five-film sales presentation as to which the sales estimates, "as defendants well knew," were overstated by 56% with respect to four of the films and by more than that with respect to the fifth. The allegations regarding "Regent I" (¶ 23(d)) are sufficiently detailed as well. They allege that the sales estimates for this project "were made up out of whole cloth" and provide strong circumstantial reasons for believing that this is true. These allegations give both defendants sufficient notice as to the fraud alleged in connection to both of these transactions. At this pleading stage, no more is required.

**B.    The Complaint Properly Sets Forth the Conduct Alleged Against Each Defendant**

Defendant Rogers argues that the Complaint, "although replete with allegations of wrongdoing by defendant Forrest and other alleged conspirators and agents that are not parties to this suit, fails to refer to any acts or misrepresentations specifically made by Rogers in connection with the estimates concerning Hollywood Funding Numbers Four, Five and Six, the presentation of those estimates to insurers, or the alleged misrepresentations in connection with misappropriation of funds earmarked for certain production slates" (Rogers Mem. 35). Lexington, however, was not required to preface each of its allegations with the rubric "Rogers and Forrest

did [ . . . ]."  The undeniable tenor of the entire Complaint is that Rogers and Forrest were engaged in and together constituted and perpetuated an enterprise known as Flashpoint, through which they committed or directed others to commit the fraudulent acts enumerated in the Complaint.  The repeated references to "Flashpoint" and "defendants" both emphasize and more than adequately describe the concerted actions of both Forrest and Rogers.

Where the Complaint means to identify one defendant or the other, it does so.  Where it says "defendants," it means both of them.  The Complaint's terminology is precise and consistent and amply suffices to give Rogers and Forrest notice as to the fraudulent conduct charged against each of them.

It is well established that consistent groupings may be used to identify the perpetrators of alleged frauds.  In *Regent National Bank* v. *K-C Insurance Premium Finance Co.*, 1997 WL 137309 (E.D. Pa. Mar. 21, 1997), plaintiff ("Regent") and defendants ("K-C," "Chanin," and "Cesaro") started a business to provide loans to people who could not afford to pay their automobile insurance premiums.  K-C would market the loan service, Regent would make the loans, and the parties would then split the profits.  When Regent concluded that the defendants were submitting financial statements that intentionally overstated the loan program's profits, it brought a RICO suit.

In denying defendants' motion to dismiss the RICO allegations under Rule 9(b), the Court focused on the two leading Third Circuit cases, *Seville* and *Saporito*.  It recounted *Seville*'s admonition regarding "'use [of] alternative means of injecting precision'" into allegations of fraud, 1997 WL 137309, at *2 (citation omitted), and then noted that the *Saporito* court had distinguished *Seville* because the complaint in *Saporito* did not "indicate who the speakers were ('defendants and/or persons acting under their direction and control') or who received the information ('certain . . . employees other than plaintiffs')."  1997 WL 137309, at *3 (emphasis and citation omitted).  The court then analyzed the information found in the paragraphs of the complaint comprising Regent's fraud allegations:

> "Regent has disclosed the subject of the allegedly fraudulent misrepresentations (overstated 'profits' generated through [the loan program], as well as false and fraudulent aging reports) and identified itself as the recipient of the misrepresentations. However, with the exception of identifying Cesaro as creator of the aging reports, Plaintiff has consistently grouped three defendants (two individuals and a corporation) together as a source of the alleged misrepresentations." *Regent National Bank*, 1997 WL 137309, at *3 (citations to complaint omitted).

In rejecting defendants' argument that this pleading was insufficient, the court distinguished other cases in which groupings were rejected because they "contained allegations regarding 'defendants' collectively without further specification, despite the numerous defendants involved." *Id.* In contrast, the allegations in *Regent National Bank* were specific enough "in that they 'simply involve two named individuals and the corporate entity they controlled.'" *Id.*

*Regent National Bank* is directly on point and disposes of Rogers's Rule 9(b) motion.[18] As in *Regent National Bank*, Lexington's Complaint involves "two named individuals [Rogers and Forrest] and the corporate entity they controlled [Flashpoint]." Numbers matter. There were 32 defendants in *Saporito*, and the court was correctly concerned that plaintiff supply some specificity as to which ones were involved in what conduct. Here, as in *Regent National Bank*, there are only two defendants. The Complaint here is specific as to when it means one, the other, or both, and that is all that is required.

## C. The Complaint Adequately Identifies the Transmissions That Constitute the Predicate Acts of Mail Fraud, Wire Fraud, and Transportation of Stolen Property

Rogers and Forrest also argue that the Complaint is insufficient because it "fails to identify the specific transmissions being transmitted, who actually made the representations,

---

[18]    In support of his argument that "[w]here a claim involves alleged multiple wrongdoers, as here, a claimant must make specific and separate allegations against each party" (Rogers Mem. 35), Rogers cites *Vicom, Inc.* v. *Harbridge Merchant Services, Inc.*, 20 F.3d 771 (7th Cir. 1994). However, *Vicom* is not contrary to the consistent grouping of defendants permitted in *Regent National Bank*. Although the Seventh Circuit in *Vicom* rejected the "lumping . . . together" of multiple defendants in that case, it apparently did so because "'the complaint *vaguely* attribute[d] the alleged fraudulent statements to 'defendants,''" and the overall complaint was "'*bereft of any detail* concerning who was involved in each allegedly fraudulent activity.'" *Vicom*, 20 F.3d at 778 (emphasis added) (citations omitted). Such concerns are not applicable in this case as Lexington's Complaint is neither vague nor bereft of details as to the precise fraudulent conduct attributed to each of these defendants.

when the misrepresentations or their transmission occurred, or the content of the misrepresenta-tions" (Rogers Mem. 36; Forrest Mem. 22). The Court should reject this argument summarily in view of the amount of detail pled in the Complaint, as described above.

As to the circumstances of each transmission, Lexington has alleged a master plan of fraud, which was executed in part through use of the mails and wires. In such cases,

> "Rule 9(b) does not require that the temporal or geographic particulars of each mailing or wire transmission made in furtherance of the fraudulent scheme be stated with particularity. In such cases, Rule 9(b) requires only that the plaintiff delineate, with adequate particularity in the body of the complaint, the specific circumstances constituting the overall fraudulent scheme." *Sumitomo Copper Litigation*, 995 F. Supp. at 456 (citations omitted).

Lexington has most assuredly "delineate[d], with adequate particularity in the body of the complaint, the specific circumstances constituting the overall fraudulent scheme" (*see* pp. 22-28, above). However, in addition, Lexington has provided considerable identification of the transmissions at issue. For example, allegations in the Complaint allege that the transmissions include (but are not limited to):

- transmission of sales estimates, during the period 1997-1999, from Flashpoint's California operations to Flashpoint UK in England, and telephone calls and faxes back to California to obtain the necessary "revisions" to such sales estimates;
- numerous faxes and telephone calls between and among various entities in the United Kingdom (principally Lexington's London office and Messrs. Ince & Co., a firm of solicitors), and Lexington's Boston office and its Boston and Delaware counsel (Morrison, Mahoney & Miller and The Bayard Firm) concerning the placement and the documentation of Hollywood Funding Nos. 4 and 5, in the period March - August 1998;
- numerous similar faxes and telephone calls concerning the placement and the documentation of Hollywood Funding No. 6, in the period October 1998 - February 1999; and
- on information and belief, numerous faxes and telephone calls between defendant Forrest in the United Kingdom and defendant Rogers in this District for the purpose of coordinating and implementing the scheme. (¶ 39)

Lexington also alleges in the Complaint that funds obtained by fraud were transported in interstate and/or foreign commerce in at least the following instances:

-31-

- the March 1998 transmission to and/or for the benefit of Regent Entertainment (located in and around Los Angeles, California) of funds that had been raised for, and were for the exclusive use and benefit of, 7.23 Productions;

- the August 1998 and April 1999 transmissions to The Building LLC, for use in purchasing real property located at 6855 Santa Monica Boulevard, in Los Angeles, of funds that had been raised for, and were for the exclusive use and benefit of, Regent Entertainment and New Beginnings/Filmworks;

- the August 1998 transmission to New Standard Post, for use in purchasing the post-production equipment, of funds that had been raised for, and were for the exclusive use and benefit of, Regent Entertainment and New Beginnings/Filmworks; and

- the payments, throughout 1999, to those United States-based production entities that were not entitled to receive funding from the Hollywood Funding No. 6 transaction but did in fact do so. (¶ 40)

In *Regent National Bank*, *supra*, the court concluded that the plaintiff was not required to "list each document in which alleged fraudulent omissions occurred." 1997 WL 137309, at *4.[19] According to the court, the complaint was sufficient as it "referred to limited sets of documents which are clearly related to the financial condition of [the loan program]," and "said documents were submitted during the entire time the parties did business together." 1997 WL 137309, at *4. Finally, the court in *Regent* concluded that the two-year time period, although longer than the time period in *Saporito* and *Thomas*, was reasonable under Rule 9(b). *Id.* Lexington's Complaint surely meets this burden. As the circumstances in this case and *Regent National Bank* are so similar, their results should be as well.

---

[19] The *Regent National Bank* court relied on *Thomas* v. *Tramiel*, 105 F.R.D. 568, 573 (E.D. Pa. 1985), in which this Court said that "a claim [of investor fraud] inherently involves every document through which defendants communicated with their investors. Plaintiffs need not list every press release or financial statement, describe its contents, and explain how the absence of certain information rendered it misleading. 'Such prolixity is not compelled — indeed is discouraged — by the Federal Rules of Civil Procedure.' It is enough that the information said to have been concealed is described with some particularity, and that the time frame during which the concealment operated is relatively short." (citations omitted).

### III.

### LEXINGTON'S DAMAGES ARE RECOVERABLE
### UNDER RICO AND ARE NOT SPECULATIVE

A.    *Lexington's Cost of Defending Claims of Third*
      *Parties Is Recoverable Injury Under RICO*

   Compensable injury in RICO cases is that proximately caused by the predicate acts. *Sedima, S.P.R.L.* v. *Imrex Co.,* 473 U.S. 479, 496-97 (1983).  The causation standard arises from the "by reason of" language in 18 U.S.C. § 1964(c) and is essentially the same as that of the common law.   *Holmes* v. *Securities Investor Protection Corp.*, 503 U.S. 258, 265-66 (1992). And it is well established that where a defendant's fraud has required the plaintiff to litigate with third parties, either to defend itself or to mitigate the harm, the costs of that litigation are recoverable from the fraudster.  *E.g.*, *Seaboard Surety Co.* v. *Permacrete Construction Corp.*, 221 F.2d 366, 371-72 (3d Cir. 1955) (affirming award of attorney's fees as part of damages for fraudulent misrepresentation where the fees were incurred in the investigation and preparation for trial in a prior action that plaintiff was required to defend as a result of the fraud); *Department of Environmental Protection* v. *Ventron Corp.*, 468 A.2d 150, 166-67 (N.J. 1983) ("[I]n a fraud action, . . . if a third party sues one who has been defrauded, . . . the defrauded party 'may recover from the tortfeasor the expenses of that litigation, including counsel fees, as damages flowing from the tort.'"); *Central Trust Co.* v. *Goldman*, 417 N.Y.S.2d 359, 361 (App. Div. 1979);  *Seidel* v. *Gordon A. Gundaker Real Estate Co*., 904 S.W.2d 357, 362-63 (Mo. App. 1995); *Nepera Chemical, Inc.* v. *Sea-Land Service, Inc.*, 794 F.2d 688, 695-97 (D.C. Cir. 1986) (collecting cases).

   This is black letter law.  As set forth in the *Restatement (Second) of Torts* § 914(2):

> "(2) One who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover reasonable compensation for loss of time, attorney fees and other expenditures thereby suffered or incurred in the earlier action."[20]

---

[20] *Accord* 1 Summ. Pa. Jur. 2d *Torts* § 9:24 (1999) ("[O]ne who has been forced by another's wrongful conduct to prosecute or defend a legal action [to] recover from the tortfeasor reasonable compensation for loss of time, attorney's fees, and other expenditures thereby suffered or incurred."); *Annot*., 44 A.L.R.4th 776, § 8 (1995 & Supp. 2002).

In RICO cases, as under the common law, the issue is one of proximate cause. *Holmes* v. *SIPC*, *supra*. When legal fees in prior actions with third parties are proximately caused by the RICO violation, they are recoverable; when not, not. *E.g.*, *Stochastic Decisions, Inc.* v. *DiDomenico*, 995 F.2d 1158, 1167 (2d Cir.), *cert. denied*, 510 U.S. 945 (1993)); *Lemelson* v. *Wang Laboratories, Inc.*, 874 F. Supp. 430, 433 (D. Mass. 1994) ("costs incurred in investigating and defending . . . litigation are a sufficient RICO injury").

  *Stochastic Decisions* neatly illustrates the application of the proximate cause test. There, the court held that where the racketeering activity was designed to prevent a judgment creditor from collecting judgments, the judgment creditor could recover as RICO damages the attorneys' fees expended in collection, but it could not recover those attorneys' fees spent in obtaining the judgment in the first place. As the court reasoned, "it cannot plausibly be contended that efforts to impede the *collection* of the . . . judgments proximately caused Stochastic's prior expenditure of legal fees in *obtaining* the judgments." 995 F.2d at 1167.

  In the case at bar, it is the most obvious, predictable, and direct result of an insurer's having been defrauded into issuing a policy that it will be forced to defend coverage litigation brought by the policyholder. Accordingly, Lexington's attorneys' fees and other costs in connection with the English proceedings are the proximate result of the alleged fraud here and are recoverable as damages under RICO.

**B.** *Lexington's Injury Is Not Speculative or Contingent on a Future Event*

  A RICO claim must be predicated on an actual, present injury, or an inevitable future injury. *Cinkutis* v. *Confederation Life Insurance Co*., 1990 WL 161260, at *3 (E.D. Pa. Oct. 19, 1990). As set forth above, Lexington has already suffered a cognizable injury — it has had to expend a substantial amount of legal fees in order to establish its rights in the English proceeding. Accordingly, plaintiff has alleged a present injury sufficient to confer RICO standing.

Contrary to Rogers's argument that Lexington is required to plead a precise dollar amount to maintain its RICO cause of action (Rogers Mem. 16-17), this Circuit only requires that RICO plaintiffs exhibit a concrete, actual *injury*, as opposed to an ethereal or speculative one. Speculative damages are those "which depend upon future developments which are contingent, conjectural, or improbable," *Black's Law Dictionary* 392 (6th ed. 1990); and "are so uncertain that they will not be awarded." *Black's Law Dictionary* 396 (7th ed. 1999). In reviewing the sufficiency of the complaint, the focus is not on the precise amount of the injury, but on whether the plaintiff has, in fact, suffered a tangible economic injury. *See Maio* v. *Aetna, Inc.*, 221 F.3d 472, 483 (3d Cir. 2000) (holding that § 1964(c) is satisfied by "proof of actual monetary loss, i.e., an out-of-pocket loss"); *Matthews* v. *Kidder, Peabody & Co., Inc.*, 2000 WL 33726916, at *20 (W.D. Pa. Aug. 18, 2000) ("the law does not require that a potential plaintiff must be able to calculate his loss down to the last penny before his RICO injury can be said to exist; all that is required is that the injury not be speculative") (citation and internal quotation marks omitted); *accord Potomac Electric Power Co.* v. *Electric Motor and Supply, Inc.*, 262 F.3d 260, 265 (4th Cir. 2001) ("The best reading of § 1964(c)'s injury to business or property requirement is that it refers to the fact of injury and not the amount."), *cert. denied*, 122 S. Ct. 1297 (2002).

That the result of another court proceeding may determine the precise amount of one aspect of a plaintiff's injury does not negate the fact that an injury exists. For example, in *In re Foundation For New Era Philanthropy Litigation*, 1996 WL 585577 (E.D. Pa. Sept. 4, 1996), the court refused to dismiss as premature plaintiffs' RICO claim even though plaintiffs' RICO damage claim could be affected — even potentially abrogated — by the outcome of parallel bankruptcy proceedings. The court specifically held:

> "We can, therefore, discern no constitutional or statutory reason to halt this suit merely because plaintiffs' [RICO] damages cannot be fixed with certainty at this juncture since, in many cases, damages are not concrete at the commencement of suit and become fixed only by a judgment of the Court; . . . we believe that the pendency of the parallel bankruptcy proceedings should not preclude this RICO action, when all that defendants can say is that there is a "distinct possibility" that plaintiffs will recover completely in bankruptcy court[.]" *Id.* at *2.

In the case at bar, whatever the outcome of the English proceedings, Lexington will sustain some loss — its expenditures for legal fees.  The existence of a loss is certain; it is only the precise amount of the loss that, at the present time, is uncertain.  Lexington will never be able to "recover completely" all the sums it has spent for attorneys' fees and, even if it could do so, the possibility of a complete recovery was held not to preclude a RICO action in *New Era Philanthropy*.

Even if Lexington is successful in the English litigation and avoids having to respond under the insurance policies it issued, it will, nevertheless, have spent an enormous amount of money in legal fees to achieve this result.  Although, as Rogers notes (Rogers Mem. 14), British law in general allows a successful litigant to recover its attorneys' fees from the losing party, as a practical matter and as recent English authority makes clear, a successful litigant in England will never be able to recover all of the money it was compelled to spend for attorneys' fees (s*ee* George Dec. ¶¶ 18-20 and Exs. D, E).  As a result of new practice rules in England and recent English judicial decisions, courts in England have been far more ready than before to look carefully at who has actually won a case and to what extent a party has won his case.  If a claimant chooses to advance a number of issues and only succeeds on some of them, a court will be inclined now to award a claimant only a proportion of his costs (based on the number of issues on which he has succeeded) or may even go as far as to award a defendant part of his costs to reflect the issues on which he has succeeded.  The obvious result of this approach by the English courts is that a claimant will only recover part of his costs (George Dec. ¶ 21).

To obtain RICO standing, this jurisdiction requires simply that a plaintiff exhibit some tangible, concrete injury.  Lexington's injury is actual — as a result of defendants' fraudulent conduct, Lexington has *already* spent millions of dollars in legal fees and expenses to avoid exposure on the insurance contracts it was defrauded into issuing.  Even if it is successful in the English litigation as to its liability under the insurance contracts, it will not be able to recover all

of its expenses. This certain loss satisfies RICO pleading requirements as to the existence of an actual, present injury.

## C.    *This Matter Is Ripe*

As Lexington has suffered a present, cognizable injury as a result of defendants' conduct, its RICO claims are ripe notwithstanding that the precise amount of the damages will be determined by the pending English proceedings and cannot be completely ascertained at this point in time. The viability of Lexington's RICO claims depends on no further event, occurrence, or adjudication. The fraud happened, injury has happened, and Lexington is suing to recover for that injury. We are aware of no cases — and defendants have cited none — in which the claims of a RICO plaintiff with present, cognizable injury were held to be unripe.

Most of the cases cited by Rogers and Forrest in support of their claims that the instant action is not ripe involve the ripeness of judicial review of administrative proceedings and are inapposite. *Dow Chemical Co.* v. *Exxon Corp.*, 30 F. Supp. 2d 673, 690 (D. Del. 1998), one of only three cases cited by Rogers that discuss the ripeness of RICO claims, says no more than that a complaint is not ripe if the ability to establish elements of the claim depends entirely on a related proceeding. The *Dow Chemical* court actually concluded that a RICO claim *was* ripe despite defendants' assertion that the claim's underlying allegations of fraud — concerning misrepresentations to the Patent and Trademark Office (PTO) — could be discharged in parallel PTO proceedings. The court in *Dow Chemical* reasoned that any adjudication as to such fraudulent misrepresentation by the PTO would not be binding on the court in the RICO action, and therefore the resolution of the PTO proceedings would not "eliminate the justification for litigation under RICO." 30 F. Supp. 2d at 690-91. Similarly, the allegations against Rogers and Forrest in the present case will not be eliminated by the outcome of the English proceedings, which focus on whether Lexington is liable under certain insurance policies that it issued. As shown above, Lexington has already suffered, and will inevitably continue to suffer some damages (*i.e.*, nonre-

coverable attorneys' fees) whatever the result of those proceedings. The injury suffered by Lexington will not be abrogated or discharged by the pending English proceeding.

The other two RICO cases cited by Rogers[21] also support the ripeness of Lexington's complaint. *Terra Nova Insurance Co.* v. *Distefano*, 663 F. Supp. 809, 810-12 (D.R.I. 1987) (Rogers Mem. 15), involved a RICO action that could have been rendered moot by a parallel state court action. This possibility was sufficient to render the RICO claim unripe because the court concluded that the claim "'may not occur at all.'" *Id*. at 811. Here, injury to Lexington — in the form of nonrecoverable attorneys' fees — has most definitely occurred. Similarly, in *Deck* v. *Engineered Laminates*, 2001 WL 487940, at *4 (D. Kan. Apr. 10, 2001) (Rogers Mem. 15), the court held that a plaintiff's RICO claim was unripe for adjudication because plaintiff had not yet suffered any injury. The plaintiff in *Deck*, who claimed unspecified damages resulting from an alleged breach of contract, could not suffer a RICO injury without first adjudicating the breach of contract action. *Id*. *Terra Nova* and *Deck* both concerned the nonexistence of an injury by a plaintiff, not the *amount* of the damages. Both cases are inapplicable to the present case because Lexington, as discussed above, has suffered an injury that is cognizable in a RICO action.

The bottom line, once again, is expressed in *New Era Philanthropy*, where even a "distinct possibility" that a party might recover all of its damages in bankruptcy court was held to be insufficient to preclude a RICO action. Here there is no "distinct possibility," or any possibility at all, that Lexington will recover all of its RICO damages in the English proceedings. Lexington's injury is actual and cognizable and is not contingent upon and will not be extinguished

---

[21]    Three additional cases cited by Forrest are woefully inapposite. In *Karp* v. *U.S. Billing, Inc.*, 2000 U.S. Dist. LEXIS 571 (E.D. Pa. Jan. 27, 2000) (Buckwalter, J.) a complaint was dismissed for failure to plead that defendant was a telecommunications carrier, *Berardi* v. *Swanson Memorial Lodge,* 920 F.2d 198, 200 (3d Cir. 1990), focused on what papers can properly be considered by the court in its consideration of a motion to dismiss, and *Davis* v. *Thornburgh,* 903 F.2d 212 (3d Cir.), *cert. denied,* 498 U.S. 970 (1990), involved a § 1983 challenge to the constitutionality of the Pennsylvania Adoption Act that was dismissed as moot because plaintiff no longer had custody of the child in question and, consequently, no longer had standing. What any of these cases has to do with any issue in this action is, quite frankly, beyond us.

by some future event.  Accordingly, Lexington's RICO claim is ripe for adjudication by this Court.

## IV.

### THE EASTERN DISTRICT OF PENNSYLVANIA IS THE APPROPRIATE FORUM FOR THIS ACTION

**A.**    *The Doctrine of Forum Non Conveniens Does Not Preclude Litigation in This Forum*

Dismissal of a plaintiff's complaint on the ground of *forum non conveniens* is "the exception rather than the rule." *Lony* v. *E.I. DuPont de Nemours & Co*., 935 F.2d 604, 609 (3d Cir. 1991) (citation and internal quotation marks omitted) ("*Lony II*");[22] *In re Corel Corp. Inc. Securities Litigation*, 147 F. Supp. 2d 363, 365 (E.D. Pa. 2001) (Brody, J.).  The defendant[23] bears the burden of persuasion on all elements of the *forum non conveniens* analysis.  *Lony II*, 935 F.2d at 609. The defendant first must demonstrate that an adequate alternative forum exists. *Lacey* v. *Cessna Aircraft Co*., 862 F.2d 38, 43-44 (3d Cir. 1988) ("*Lacey I*"), *rev'd after remand*, 932 F.2d 170 (1991) ("*Lacey II*").  If an adequate alternative forum exists, then the defendant must show that several private and public interest factors weigh heavily in its favor, taking into account the considerable deference due to a plaintiff's choice of forum.  *Id.*  And, most importantly, if the evidence on the various factors considered by the court "are in equipoise, or even if they lean only slightly toward dismissal, the motion to dismiss must be denied," *Lacey II*, 932 F.2d at 180, and the plaintiff's choice of forum not disturbed.  As set forth below, application of these standards can produce but one result:  Lexington's RICO action against Rogers and Forrest should remain and proceed in this Court.

---

[22]    *Lony* v. *E.I. DuPont de Nemours & Co.*, 886 F.2d 628 (3d Cir. 1989) ("*Lony I*"), *appeal after remand*, 935 F.2d 604 (1991) ("*Lony II*").

[23]    As Forrest adopts Rogers's argument with regard to *forum non conveniens* (Forrest Mem. 18), Lexington addresses Rogers's arguments on this topic.

Because defendants bear the burden of proof, Rogers and Forrest are required to show that "trial of the action in Pennsylvania would result in 'oppressiveness and vexation' . . . 'out of all proportion' to plaintiff['s] convenience."  *Corel*, 147 F. Supp. 2d at 365 (quoting *Piper Aircraft Co.* v. *Reyno*, 454 U.S. 235, 241 (1981)).  Rogers has not made and cannot make this showing, as demonstrated below.  Indeed, Rogers takes a position that is quite unusual in *forum non conveniens* jurisprudence — that the case should be dismissed from *the district in which he resides*.  *Cf. Gulf Oil Corp.* v. *Gilbert*, 330 U.S. 501, 510 (1947) (referring to plaintiff who objected to suit in his home community as making a "strange argument"); *Lony II*, 935 F.2d at 608 (situation is "puzzling" when a local defendant seeks to move to a distant forum).

1.     Relief under RICO Is Available Only in the United States

The first issue in a *forum non conveniens* analysis is whether there is an adequate alternative forum.  Ordinarily, the alternative forum requirement will be satisfied if the defendant is amenable to process in a foreign forum, except where the alternative forum affords no remedy or an unsatisfactory remedy for plaintiff's injury.  *See, e.g.*, *Piper Aircraft*, 454 U.S. at 254 n.22.  English courts cannot be considered an adequate alternative forum for the adjudication of Lexington's civil RICO claims because England has no corresponding cause of action and would not entertain a claim based upon the statute.[24]

In *Supra Medical Corp.* v. *McGonigle*, 955 F. Supp. 374 (E.D. Pa. 1997), a Pennsylvania corporation brought a RICO action against four British and three American defendants.  The court held that the British defendants had failed to meet the burden of showing that an adequate alternative forum existed, in part out of concern whether the plaintiff could receive an adequate remedy in England.  *Id.* at 384.  The court also relied heavily upon the fact that the plaintiff's choice of its home forum was "entitled to great deference" and that the U.S. defendants

---

[24]     In a recent decision of the House of Lords, it was "common ground that a RICO Act claim could not be brought in an English Court."  *Donohue* v. *Armco Inc.*, 2001 WL 1479758, [2002] 1 Lloyd's Rep. 425, 442 (H.L. 2001) (speech of Lord Scott of Foscote).

played principal roles in the alleged scheme.  *Id.*; *see also North Carolina ex rel. Long* v. *Alexander & Alexander Services, Inc.*, 680 F. Supp. 746, 752 (E.D.N.C. 1988) (RICO claim would not be dismissed under *forum non conveniens*, in part because England has no comparable RICO statute).

To be sure, a number of courts of appeals have held that the inability to assert a RICO claim in a foreign forum does not automatically preclude a *forum non conveniens* dismissal,[25] although the Third Circuit has yet to reach the issue.  In this case an American plaintiff is suing an American defendant under an American statute that has no counterpart under the law of the supposed alternative forum.  Even if that fact, all by itself, does not "automatically" preclude a *forum non conveniens* dismissal, it surely comes very close.  And when this factor is combined with the other factors relevant to the *forum non conveniens* analysis, the result cannot be in doubt.

    2.    Plaintiff's Choice of Forum Deserves
            "Considerable Deference"

There is a strong presumption in favor of a plaintiff's choice of forum.  A court's analysis is not to be approached as a scholarly exercise in which a so-called "best" forum is sought focusing on location of witnesses, documents, convenience to the parties, etc.  In *forum non conveniens* jurisprudence, a plaintiff's choice of forum is granted "considerable deference" and "'should rarely be disturbed.'"  *Lony II*, 935 F.2d at 608-09 (citation omitted); *Corel*, 147 F. Supp. 2d at 365.  This is especially true when the plaintiff selecting the federal forum is an American citizen, because a court can reasonably assume the choice is convenient.  *See Piper Aircraft*, 454 U.S. at 255-56 n.23; *Wiwa* v. *Royal Dutch Petroleum Co.*, 226 F.3d 88, 102 (2d Cir. 2000) ("[C]ourts should offer greater deference to the selection of a U.S. forum by U.S. resi-

---

[25]    *See*, *e.g.*, *Panama* v. *BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 952 (11th Cir. 1997); *Lockman Foundation* v. *Evangelical Alliance Mission*, 930 F.2d 764, 769 (9th Cir. 1991); *Kempe* v. *Ocean Drilling & Exploration Co.*, 876 F.2d 1138, 1143-44 (5th Cir.), *cert. denied*, 493 U.S. 918 (1989); *Transunion Corp.* v. *PepsiCo, Inc.*, 811 F.2d 127, 129 (2d Cir. 1987).

dent plaintiffs."), *cert. denied*, 532 U.S. 941 (2001); *Lacey II*, 932 F.2d at 178 (citing *Piper Aircraft* for the proposition that there is a "strong presumption" in favor of plaintiff's choice). Where, as here, a defendant seeks dismissal in favor of a foreign, non-United States jurisdiction, the "home" forum for the plaintiff is not the judicial district in which he resides, but includes any federal district in the United States. *See Reid-Walen* v. *Hansen*, 933 F.2d 1390, 1394 (8th Cir. 1991).

Because Lexington is a United States corporation, with its principal place of business in Boston (¶ 6), its choice of forum is entitled to "considerable deference." Courts routinely grant this deference to a corporate plaintiff's choice of forum, and the standard should be no different in this case. *See*, *e.g.*, *Peregrine Myanmar Ltd.* v. *Segal*, 89 F.3d 41 (2d Cir. 1996) (presumption in favor of corporate plaintiff's choice); *E.I. DuPont de Nemours & Co.* v. *Rhodia Fiber & Resin Intermediates, S.A.S.*, 197 F.R.D. 112, 125 (D. Del. 2000) (same), *aff'd in part, appeal dismissed in part*, 269 F.3d 187 (3d Cir. 2001); *Supra Medical*, 955 F. Supp. at 384 (corporate plaintiff's choice due "great deference").[26]

Furthermore, that Rogers is a resident of this district weighs heavily against dismissal, and supports deference to Lexington's choice of this forum. *Peregrine Myanmar Ltd.* v. *Segal*, 89 F.3d 41, 46 (2d Cir. 1996); *Reid-Walen*, 933 F.2d at 1395 ("where the forum resident

---

[26]    Rogers asserts that the burden of proof for a defendant seeking dismissal "is far less stringent where the U.S. 'citizen' [Plaintiff] is a corporate entity." (Rogers Mem. 18 n.12)  However, the two court of appeals cases cited in support of this proposition simply state that a "part[y] who choose[s] to engage in international transactions should know that when their *foreign operations* lead to litigation they cannot expect always to bring their *foreign opponents* into a United States forum when every reasonable consideration leads to the conclusion that the site of the litigation should be elsewhere." *Contact Lumber Co.* v. *P.T. Moges Shipping Co.*, 918 F.2d 1446, 1450 (9th Cir. 1990) (emphasis added); *Reid-Walen* v. *Hansen*, 933 F.2d 1390, 1395 (8th Cir. 1991) (quoting *Contact Lumber*).  *Reid-Walen* actually *reversed* a trial court's decision to dismiss under *forum non conveniens*, reasoning that not enough consideration was given to the fact that *both* the plaintiff and the defendants were United States citizens. *See Reid-Walen*, 933 F.2d at 1396.  That, of course, is true here as well.  Furthermore, *Aero Systems Engineering, Inc.* v. *Opron, Inc.*, 21 F. Supp. 2d 990, 999 (D. Minn. 1998), the other case cited by Rogers on this issue, only held that the scrutiny of a defendant's challenge to a corporate citizen's choice of forum is "not quite as stringent" as when the plaintiff is a natural person.  However, this benign statement is of little consequence here, where all the other factors either lean in favor of Lexington's choice or are neutral.

seeks dismissal, this fact should weigh strongly against dismissal"); *Madanes* v. *Madanes*, 981 F. Supp. 241, 265 (S.D.N.Y. 1997).

To overcome Lexington's choice of forum, Rogers must show that "trial of the action in Pennsylvania will result in 'oppressiveness and vexation' to [Rogers] 'out of all proportion' to plaintiff['s] convenience." *Corel*, 147 F. Supp. 2d at 365. In his discussion of the *forum non conveniens* doctrine (Rogers Mem. 18-26), Rogers does not even attempt to argue (let alone offer evidence to support a finding) that litigating this action in this forum would be oppressive or vexatious. As shown below, the evidence strongly supports the opposite conclusion — that this Court is an appropriate jurisdiction in which to resolve Lexington's Complaint against the defendants.

3.       The Private Interest Factors Do Not Favor Dismissal

The Supreme Court has listed the following private interest factors to be considered when evaluating a motion to dismiss for *forum non conveniens*:

> "[T]he relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Gulf Oil Corp.*, 330 U.S. at 508.

(a)       Location of Documents and Evidence

Defendants' racketeering enterprise, which involved fraud, misrepresentation and misappropriation of funds, had an international scope. The sources of proof in this case will involve documents, emails, phone conversations and other forms of communication taking place in multiple jurisdictions at multiple times. Lexington's corporate offices are located in Massachusetts and numerous documents relating to the transactions are located there. Rogers resides in this district. According to Rogers's own memorandum, there are relevant witnesses (including Rogers) and sources of material in the United States, Canada and England (Rogers Mem. 6, 22).

-43-

As such, documents and other relevant evidence exist in multiple jurisdictions, and the choice of any one jurisdiction will necessarily require some transportation of documents.

The transportation of various documents to this jurisdiction from England, Canada and other United States districts does not constitute "oppressiveness and vexation" to Rogers which, as noted above (at p. 40), must be established before an action will be dismissed on *forum non conveniens* grounds. As this Court recently stated: "[w]hile the initial repository of most relevant documents may be in [a foreign country], this fact is of lesser significance in the modern electronic age. Documents can easily be photocopied or otherwise transferred to this jurisdiction." *Corel*, 147 F. Supp. 2d at 366 (involving witnesses and evidence located primarily in Canada); *see also DiRienzo* v. *Philip Services Corp.*, 294 F.3d 21, 30 (2d Cir. 2002) ("defendants have failed to explain how transporting the documents or copies of them would be 'oppressive' or 'vexatious'").

The ease with which Rogers can obtain copies of all relevant Flashpoint documents refutes Rogers's repeated claim that he previously sent all of the Flashpoint documents in his possession to Flashpoint's administrators (Rogers Mem. 5, 6 n.7, 8), as if his professed lack of documents will somehow preclude Lexington's claims against him. Rogers acknowledges that he could retrieve the documents he sent to Flashpoint's administrator by obtaining an order from the English court (Rogers Mem. 8), but that would not be necessary here. Lexington obtained all of the Flashpoint documents from the administrator, and there is no confidentiality restriction preventing Lexington from providing them to Rogers (George Dec. ¶ 13).[27]

Also, many of the documents produced in the English proceedings by various third parties are not subject to any confidentiality restrictions and can be produced to Rogers by Lexington (George Dec. ¶ 14). And even documents in the English proceeding which are considered

---

[27]    As set forth in the cited portion of the George Declaration, Forrest is mistaken in his belief that "Lexington is not permitted to use documents in the actions in England to support its Complaint in this action, nor will Lexington be permitted to divulge documents obtained in the actions in England in an attempt to prove its allegations in this action" (Forrest Mem. 6).

to be confidential can be made available with the consent of the relevant parties or by an order of the English court (George Dec. ¶ 14).

> (b)    *Location of Witnesses/Situs of Conduct*

We treat these two items together because they both relate to the same underlying issue — access to sources of proof.  This Court's asserted remoteness from the situs of the disputed events is overstated and must in any event be considered a neutral factor, considering that the conspiracy and fraud took place over a period of years and spanned multiple jurisdictions, including England, the United States and Canada (¶ 39).  In addition, there are no premises that require viewing, with the possible exception of the Los Angeles real estate purchased by defendants using misappropriated funds (¶ 29).

Furthermore, this is not a case involving a single tortious physical act such as a plane crash or an environmental disaster, in which physical evidence and relevant witnesses are likely to be located in one circumscribed area.  *See Piper Aircraft*, 454 U.S. at 238-39 (plane crash in Scotland); *In re Union Carbide Corp. Gas Plant Disaster*, 634 F. Supp. 842 (S.D.N.Y. 1986) (gas leak in India).  Nor does this case "involve substantial physical evidence that is difficult or expensive to transport."  *Wiwa* v. *Royal Dutch Petroleum Co.*, 226 F.3d 88, 107 (2d Cir. 2000) (distinguishing sources of proof for claim under Alien Tort Claims Act from sources of proof involved in *Piper Aircraft* and *Union Carbide*).

And, critical to the *forum non conveniens* analysis, a substantial amount of the conduct at issue took place within the United States.  Rogers fails to mention, let alone deny, that the following acts alleged in the Complaint all occurred in the United States:

- Defendants financed motion pictures and invested misappropriated proceeds of various financing transactions in the U.S (¶ 9).
- Defendants involved various United States entities in the conspiracy, all of which were under their control (¶¶ 13-14).  New Beginnings Enterprises, whose ownership defendants concealed from plaintiff, was a California entity (¶¶ 13-14, 26-27).
- Defendants transferred funds taken by fraud to various United States entities on a routine basis (¶¶ 40-41).

- Defendants misappropriated funds, diverting them to various California entities to purchase real estate in Los Angeles and to furnish unauthorized post-production facilities (¶¶ 28-30).

- Defendants perpetuated their conspiracy and committed fraud through numerous faxes and telephone calls between the United States, including Rogers's home in Pennsylvania, and the United Kingdom (¶ 39).

The above allegations set forth in the Complaint, which are not disputed in any manner by Rogers (nor by Forrest), are confirmed and expanded upon by the Flashpoint brochure produced by Rogers pursuant to a subpoena issued by this Court under 28 U.S.C. § 1782 (TBR, *see* p. 5, above) and by the Declaration of Michelle George, who represents Lexington in the English proceedings involving HF4, HF5 and HF6, both of which demonstrate that many of the entities and individuals with evidence to give concerning the fraudulent conduct alleged in the Complaint and their documents are located in the United States, and so are their documents.

We begin with the Flashpoint brochure, in which Flashpoint's United States connections are emphasized.  A chart entitled "the Flashpoint family" (TBR 3) indicates that:

- Premier Home Entertainment/New Spirit Entertainment is a "US based video distribution company for Flashpoint and external projects."

- New Beginnings Enterprises Inc. is "[t]he parent company of the Los Angeles operation providing administrative and management services."

- On the chart under New Beginnings Enterprises is New Standard Post, "[a] self-contained production facility located in the heart of Hollywood, capable of providing services for up to six films simultaneously."

- Also on the chart under New Beginnings Enterprises is "The Building", which is identified as "[o]wners of The Building in Hollywood in which NBE and all of its subsidiaries are located."

Additional pages in the Flashpoint brochure state that:

- Prosperity Pictures (involved in the HF5 proceeding) is "the in-house production company of New Beginnings Enterprises. (TBR 6)

- Regent Entertainment (also involved in the HF5 proceeding), Rojak Films (HF2) and Award Entertainment (HF3) each is a "Los Angeles based production company."  (TBR 6)

- There are three sales agents within the "Flashpoint family," two in the United States, Artist View "[o]n the "West Coast of USA" and AKA Movies "on the East Coast [of the United States]."  (TBR 11)

- Edgewood Productions (part of HF6) is "a Vermont based production company." (TBR 13)

Finally, the brochure identifies lawyers and accountants for Flashpoint who are located in London, Los Angeles, and Beverly Hills (TBR 17).

Similarly, Michelle George, in her Declaration accompanying the instant Memorandum, also sets forth the significant United States connections of many of the entities and individuals involved in the pending litigation in England pertaining to HF4, HF5 and HF6. George notes that a number of witnesses and a large amount of the relevant documents are located in the United States. Most importantly, the Martin Fink documents, the Regent and Media Ventures documents, and documents from other sales agents for the motion pictures in question, such as Showcase and Filmwave, are all located in the United States (Mory Dec. ¶ 5; George Dec. ¶ 15).

In particular:

- "Award" (HF3) was an American project as the producers, Award Entertainment, and the sales agent, Showcase, were both located in the United States. The key individuals of these entities are Paul Maslak of Award Entertainment and David Jackson and Cara Shapiro of Showcase, all of whom are located in California. All of the documents of these entities are in the United States.

- "Regent" (part of the HF5 proceeding) was principally a United States project. The key individuals are Paul Colichman, Steve Jarchow, Mark Harris and Helen Sarlui, all of whom are located in the United States.

- Jules Verne (HF4) also has significant United States connections. A key witness with respect to the Jules Verne project is Rich Grove, the sales agent of Media Ventures. He and all the Media Ventures' documents are located in the United States. Other important individuals with respect to this film project include Larry Selander (Media Ventures lawyer), Pierre DeLespinois (a principal of Crest Productions which was the producer of Jules Verne) and Michael Huffington of Crest, all of whom are believed to be located in the United States (George Dec. ¶ 15).

As set forth in the Declaration of Stuart Cotton, submitted herewith, the film "It Had To Be You" (¶ 23(e)(i)) was financed by a California bank, Silicon Valley Bank ("SVB"), and litigation relating to an insurance policy issued with respect to this film was bought by SVB in California (but has now been resolved). Many of the individuals who have relevant knowledge pertaining to the insurance aspects of this film and who were deposed in the litigation or were scheduled to be deposed are United States-based and, in particular, California-based. These individuals include various SVB employees (Carole Diane Lemay, Paul Wyckoff), the film's pro-

ducer (Neil Kaplan), sales representatives (Gene George, Ian Jessel), the insurers' "designee" (Martin Fink) and the Completion Guarantor (Steve Ransohoff) (Cotton Dec. ¶ 3).

Finally, there are a number of Lexington employees or former employees with knowledge of the relevant insurance issues. These individuals include Rob Brace and John Iannucci, both of whom are located in the United States (George Dec. ¶ 16).

Rogers has failed to show and, in fact, is unable to show "oppressiveness and vexation" with regard to the testimony of witnesses. Rogers himself, and several of Lexington's officers and employees are located in the United States, and Lexington could make any of its relevant employees who reside in England available for this litigation as needed. Rogers identifies four English citizens — Gordon Dawson, Rupert Lywood, Stanley Munson and Susan Wright — as possible witnesses, and states his belief that they are unlikely to want to travel to the United States (Rogers Mem. 22). However, these individuals are not unrelated third parties, but are defendants' present or former confidantes and/or associates. Even if these witnesses should be unwilling or unable to travel to the United States, that would not be grounds for a *forum non conveniens* dismissal. As this Court has recognized, "the need to resort to videotaped depositions, obtained through letters rogatory, should not mandate dismissal." *Corel*, 147 F. Supp. 2d at 366; *see also DiRienzo*, 294 F.3d at 30.

The evidence in this action will be mainly composed of testimony and documents. Defendants engaged in an international conspiracy involving conversations and representations, emails, and document distributions taking place in multiple jurisdictions. Some of the parties necessarily will be inconvenienced regardless of where the trial is held. Rogers has failed to show that the private interests in this case weigh heavily, if at all, in favor of a *forum non conveniens* dismissal.

4.       The Public Interest Factors Do Not Favor Dismissal

A defendant seeking dismissal of a complaint on *forum non conveniens* grounds also must show that the public interest factors favor dismissal.  Those factors include:

> "the administrative difficulties flowing from court congestion; the 'local interest in having localized controversies decided at home'; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty." *Piper Aircraft*, 454 U.S. at 241 n.6.

(a)       Interest of the Forum

The Third Circuit has stated that the district court must consider the locus of the alleged culpable conduct and the connection of that conduct to the chosen forum.  *See Lony II*, 935 F.2d at 612.  Because the federal government has a strong interest in adjudicating claims brought under its laws and because the conspiracy at issue has a sufficient nexus to the United States, the public interest strongly favors local adjudication of this dispute.

This Court has a compelling interest in having this dispute adjudicated here.  Lexington's civil RICO claims are a federal cause of action, and there is no question that Congress intended the federal courts to exercise jurisdiction over these claims.  Indeed, the United States Supreme Court declared that RICO should be applied broadly.  "This is the lesson not only of Congress' self-consciously expansive language and overall approach, but also of its express admonition that RICO is to 'be liberally construed to effectuate its remedial purposes.'" *Sedima, S.P.R.L.* v. *Imrex Co., Inc.*, 473 U.S. 479, 497-98 (1985) (citations omitted).

In *General Environmental Science Corp.* v. *Horsfall*, 753 F. Supp. 664, 674 (N.D. Ohio 1990), the court held that RICO and state tort claims by an Ohio corporation against a Swiss corporation and Swiss residents should not be dismissed, noting that "of the various conflicting interests involved, one of the most weighty is the interest of the United States in a uniform application of RICO."  Similarly, in *Supra Medical*, *supra*, the court concluded that "the

-49-

courts of the United States, not Great Britain, are best suited to entertain an action based solely on United States law such as the present RICO action." 955 F. Supp. at 384.

This Court has a strong interest in litigating disputes when critical events occur in the United States and when a resident of this district participated in these critical events.[28]  *See Peregrine Myanmar Ltd.* v. *Segal*, 89 F.3d 41, 47 (2d Cir. 1996) (stating that the forum "has a countervailing 'strong interest in this litigation' since [the defendant] lives here and critical events took place here").  As stated in *Madanes*, the United States "'has a definite interest in correcting wrongs committed on its soil, and in deterring similar actions by other individuals and corporations.'"  981 F. Supp. 267 (citation omitted); *see also Lony I*, 886 F.2d at 642 (stating that the jurisdiction has an interest in ensuring that businesses operating within its borders abide by the law).

### (b)    *Burden of Jury Duty on Local Citizens*

If a defendant's actions are related to the forum, then the concern about burdening citizens with jury duty is not implicated.  *See Peregrine Myanmar*, 89 F.3d at 47.  In addition, where an American company has suffered harm from a conspiracy involving an American defendant, local juries have an interest in hearing the dispute.  *Cf. Corel*, 147 F. Supp. 2d at 367 n.2 (noting that local juries have an interest when American investors have suffered harm from purchases made in the United States).

### (c)    *Conflict of Laws*

Because this is a RICO case, this court will not be unduly burdened with unnecessary problems of conflict of laws or the application of foreign laws.  The RICO claims are governed by federal law, and the pendent tort claims are routine common law claims that should not re-

---

[28]    The court should consider as part of the "local interest" the interest of the United States, not simply the Eastern District of Pennsylvania.  *See Corel*, 147 F. Supp. 2d at 367 (finding a local interest when alleged misstatements were disseminated throughout the U.S.); *DiRienzo*, 294 F.3d at 31-32 (2d Cir. 2002) (finding a local interest when transactions were conducted in the U.S. by Americans on American stock exchanges).

quire extensive legal analyis.  Even if English law should be deemed to apply to portions of the common law claims, "the fact that a federal court may be required to apply foreign law is not dispositive on the *forum non conveniens* issue."  *Lehman* v. *Humphrey Cayman, Ltd.*, 713 F.2d 339, 345 (8th Cir. 1983), *cert. denied*, 464 U.S. 1042 (1984).  "Federal courts are quite capable of applying foreign law when required to do so, and a district court's application of foreign law is a factual matter reviewable on appeal."  *Id.*

(d)    *Relative Congestion of Court Dockets*

Finally, the factor regarding court congestion does not favor Rogers.  As this Court recently stated in a similar case: "Whether or not the docket of the Eastern District of Pennsylvania is more congested than that of the Canadian courts, this case can be adjudicated here without undue administrative difficulties."  *Corel*, 147 F. Supp. 2d at 367.  This statement should apply here even if Rogers were to claim that the English courts are less congested — a claim that Rogers has not made.  Indeed, defendants' failure to adduce proof on this subject requires weighing this factor *against* dismissal.

As noted above, this circuit subscribes to the standard that "[i]f, when added together, the relevant private and public interest factors are in equipoise, or even if they lean only slightly toward dismissal, the motion to dismiss must be denied."  *Lacey II*, 932 F.2d at 180; *see also Lony II*, 935 F.2d at 613; *Corel*, 147 F. Supp. 2d at 365.  Considering the deference that must be accorded to Lexington's choice of forum, the absence of any "oppressiveness and vexation" as a result of that choice, the unavailability of an adequate alternative forum, and the demonstrated equipoise of the private and public factors (if not a discernible tilt toward the United States), Rogers's motion to dismiss on the grounds of *forum non conveniens* should be denied.[29]

---

[29]    Rogers attempts to compare the current case to *Murray* v. *British Broadcasting Corp.*, 81 F.3d 287 (2d Cir. 1996) (Rogers Mem. 24), in which the court affirmed the district court's dismissal of a case under *forum non conveniens*.  Rogers's motion fails to point out, however, that the plaintiff in *Murray* was a British national, as opposed to Lexington, which is an American corporation.  As the plaintiff in *Murray* was a foreign national, the court held, understandably, that his choice of forum was entitled to less deference, *id.* at 290, and the defendant did not have to overcome the same presumptions in favor of plaintiff's choice of forum.

*Footnote continued on next page.*

### B.    *International Comity Does Not Require Dismissal of This Action*

International comity, which Rogers argues should result in dismissal of the Complaint (Rogers Mem. 27), is "the recognition which one nation allows within its Territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or other persons who are under the protection of its laws." *Madanes* v. *Madanes*, 981 F. Supp. 241, 263 (S.D.N.Y. 1997) (quoting *Hilton* v. *Guyot*, 159 U.S. 113, 164 (1895)); *see also Paraschos* v. *YBM Magnex International, Inc.*, 2000 WL 325945, at *5 (E.D. Pa. Mar. 29, 2000).[30]

Despite this broad principle, comity does not mandate dismissal of domestic litigation simply because of related ongoing proceedings in a foreign forum. American courts regularly exercise jurisdiction concurrently with foreign courts and generally will not surrender their jurisdiction absent "exceptional circumstances" or a final judgment which has some preclusive effect. *Madanes*, 981 F. Supp. at 263-64 (citing *Herbstein* v. *Bruetman*, 743 F. Supp. 184, 188 (S.D.N.Y. 1990)).[31]

The evaluation of whether a domestic court should defer to an ongoing foreign proceeding necessarily begins with whether the parties and issues are identical or substantially similar. *Madanes*, 981 F. Supp. at 264; *see also China Trade & Development Corp.* v. *M.V. Choong*

---

*Footnote continued from previous page*

Even if *Murray* applied here, it would not be dispositive of the issue. In *Ludgate Insurance Co.* v. *Becker*, 906 F. Supp. 1233 (N.D. Ill. 1995) the court was faced with facts which weighed more in favor of the defendant, and yet *still refused to dismiss the case*. In *Ludgate*, the plaintiff was a British company entitled to less deference than a U.S. plaintiff. There was an existing related litigation in England; English law would likely govern all of the claims; the defendants had agreed to accept service in England; and the court determined that trial in England would ultimately be a more convenient venue for the parties and witnesses. *Id.* at 1238. The court nonetheless refused to dismiss the action, holding that "the presumption in favor of a plaintiff's chosen forum, however diminished by the fact that it is not an American citizen, tips the balance in favor of maintaining the case in this court." *Id.* at 1241-42.

[30]  Once again Forrest simply adopts Rogers's argument with regard to international comity (Forrest Mem. 19), so our response is directed to Rogers's argument on this topic.

[31]  There has been no final judgment in the English litigation. At this point in time, the first trial is not scheduled until April 2003. Thus, comity based on *res judicata* is inapplicable, and there are no other exceptional circumstances to warrant dismissal or a stay.

*Yong*, 837 F.2d 33, 36 (2d Cir. 1987).  The parties and issues in this case are *not* identical to those in the English proceeding.  Rogers and Forrest are *not* parties to the proceedings in the United Kingdom, nor is Flashpoint, their controlled entity and the vehicle for their fraudulent conduct.  Although the suits there involve activities of the Flashpoint enterprise, those suits are essentially contract disputes between third party investors and the insurer that issued policies allegedly to protect the investments.  No claims have been asserted against Rogers or Forrest by any of the parties in the English proceeding, nor have Rogers or Forrest sought to intervene in such proceedings.

Nor is it likely that Rogers and Forrest could be added to the English proceedings at this point in time given the pretrial schedule that is already in place in that litigation (George Dec. ¶ 11).  At an April 19, 2002 case management conference before the court in the English litigation (involving HF4 and HF5), counsel representing the Law Debenture Trust, the claimant (*i.e.* the plaintiff) in the British proceedings objected quite strongly to any possible attempt by the defendants (who include Lexington) to add any United States entities as additional defendants.  Counsel for LDT said:

> "Insofar as Lexington have in mind bringing, as was indicated this morning, a deceit claim against United States entities, it is truly unlikely that that makes any sense at all.  The jurisdiction would be hard-fought.  *If they have a case, they can bring it in the United States.  There is absolutely no reason why that should delay this particular trial date*."  (George Dec. Ex. A (emphasis added))

While LDT counsel at the April 19, 2002 case management conference was not referring to Rogers or to the RICO claim against him in her comment about "United States entities," her objection undoubtedly would be the same if individuals, one from the United States (Rogers) and one from England (Forrest), were sought to be added to the English litigation now or in the immediate future.

The issues presented in both courts are no more similar than the parties.  Although Lexington in the English lawsuits has raised fraudulent inducement to contract as a defense to

liability, it is not the sole focus of the litigation.[32]  As set forth above, there are a number of other issues raised by Lexington as defenses in the English litigation that are not involved in the RICO complaint.  (*See* p. 6, above)  Furthermore, in order to be substantially similar, there must be a "'substantial likelihood that the [foreign] litigation will dispose of all claims presented in the federal case.'"  *Paraschos*, 2000 WL 325945, at *5 (quoting *Lumen Construction, Inc.* v. *Brant Construction Co.*, 780 F.2d 691, 695 (7th Cir. 1985)).  No matter how the *Law Debenture Trust* litigation is resolved, there is no substantial likelihood that all issues in this case will be resolved.

In the first place, the English Court may never even reach Lexington's fraud defense if it concludes (as LDT contends and Lexington disputes) that the defense is barred by an exculpatory clause in the insurance policy (George Dec. ¶ 10).  Going in the other direction, if the court finds that JLT Risk Solutions Limited ("JLT"), the insurance broker, made fraudulent or negligent representations, then Lexington might avoid liability under its insurance contracts without any finding as to Flashpoint's conduct.  Also, if the court in England decides the lawsuit on the basis that Lexington is discharged from its insurance contracts by virtue of a breach of a warranty (*e.g.*, as to the number of motion pictures to be made, etc.), the issue of fraud in the inducement of the insurance contract may not be resolved in the English litigation.

Furthermore, even if the English court makes a finding as to whether Flashpoint made fraudulent or negligent representations, that finding only determines whether Lexington has a defense to the insurance contract.  The English court is not considering whether Rogers and Forrest have inflicted injury to Lexington by their fraudulent conduct, such that Lexington is entitled to damages under RICO or under a pendent state law theory of liability.  Rogers's attempt to muddy the waters cannot erase the clear distinction between Lexington's defense(s) to its purported obligations under a contract of insurance and Lexington's affirmative right to damages

---

[32]    *See Law Debenture Trust Corp.* v. *Lexington Insurance Co.*, 2001 WL 1423026 (Q.B.D. Comm. Ct. Nov. 2, 2001) (describing the various claims between the parties) (attached to Rogers Memorandum as Exhibit B).

arising from defendants' tortious conduct. This result is consistent with *I.J.A., Inc.* v. *Marine Holdings Ltd.*, 524 F. Supp. 197, 198-99 (E.D. Pa. 1981) (declining to dismiss in favor of parallel Canadian litigation where plaintiff sought different relief not claimed in Canada, where the defendants were not parties to the Canadian proceeding, and where the Canadian litigation was in its incipiency).[33]

## C.    *Any Stay Would Be Inappropriate*

Finally, any stay of this litigation due to the actions pending in England would be inappropriate. A stay will not foster judicial economy nor save the parties' resources because the two proceedings are not substantially similar and involve different claims and issues. At such point in time as the dispute in England is resolved, Lexington "would be forced to return to this forum and litigate claims not litigated in [the foreign jurisdiction] against parties not named in, and bound by, the [foreign] suit." *I.J.A., Inc.* v. *Marine Holdings, Ltd.*, *supra*, 524 F. Supp. at 199 (holding that this factor militated strongly against staying the action). *See also Abdullah Sayid Rajab Al-Rifai & Sons W.L.L.* v. *McDonnell Douglas Foreign Sales Corp.*, 988 F. Supp.

---

[33]    Several of the cases cited by Rogers are noticeably inapposite to this case. *Shaw* v. *Williams*, 676 F. Supp. 168 (N.D. Ill. 1987), and *P&P Marketing, Inc.* v. *Ditton*, 746 F. Supp. 1354 (N.D. Ill. 1990), both involved comity with state court proceedings involving almost identical issues. In one of the cases, the court held that plaintiff's RICO claim could have been brought as part of its state-court counterclaim. 746 F. Supp. at 1372. That is hardly the case here.

In *800537 Ontario, Inc.* v. *World Imports U.S.A. Inc.*, 145 F. Supp. 2d 288 (W.D.N.Y. 2001), the court stayed a RICO claim based on tax fraud because a parallel Canadian criminal case was trying the very issue of whether anyone had actually violated Canadian tax law in connection with the business transaction at the heart of plaintiff's case. As such, it is not a basis on which this Court should dismiss the present case.

And finally, contrary to Rogers's argument, the proceeding in England is not a bankruptcy proceeding, which might be entitled to special deference under principles of international comity. *See, e.g.*, *United Feature Syndicate, Inc.* v. *Miller Features Syndicate, Inc.*, 2002 WL 389155, at *10-12 (S.D.N.Y. Mar. 11, 2002) (according Canadian bankruptcy proceeding same status as U.S. bankruptcy proceeding for the purpose of determining whether plaintiff's causes of action were part of the bankruptcy estate); *Allstate Life Insurance Co.* v. *Linter Group Ltd.*, 994 F.2d 996, 999 (2d Cir. 1993). While Flashpoint is in administration, the British equivalent of bankruptcy, the *Law Debenture Trust* case is a contract dispute between Flashpoint's creditors and insurers. As evidenced by the November 2001 case management order, 2001 WL 1423026, the matter is in commercial court, not in bankruptcy proceedings, and will try issues of contract liability not related to either the actual Flashpoint bankruptcy proceeding or the issues raised in the instant RICO action. Thus it is not entitled to the special deference which the courts might accord a foreign bankruptcy proceeding.

1285, 1292 (E.D. Mo. 1997) (holding that a stay was not warranted in part because the defendant was not a party to the foreign action and would not be bound by the judgment in that case); *United Refining Co.* v. *Dep't of Energy*, 486 F. Supp. 99, 100 (W.D. Pa. 1980) (denying motion to stay pending parallel state proceeding when the parties to the litigation were not identical with those in case sub judice).

The *I.J.A.* court refused to grant a stay of litigation pending resolution of a related proceeding in Canada. In doing so, the court relied on three major factors: (1) in the American action, the plaintiff was seeking declaratory relief and damages for conspiracy, both of which were not claimed in the foreign proceeding; (2) the foreign litigation was in its incipiency, and (3) the American lawsuit involved defendants not named as parties in Canada. 524 F. Supp. at 198-99. These factors are clearly applicable to the instant proceeding.

Furthermore, a stay pending resolution of the English proceedings will not conserve this Court's resources or dispose of duplicative issues. The RICO claims in the Complaint are not part of the English proceedings and could not even be reached by a court in the U.K. Most importantly, any resolution of the lawsuits pending in England will bind neither Rogers nor Forrest. A stay will put Lexington in the deleterious and highly prejudicial position of having its legitimate RICO and fraud claims stagnate for the duration of the English proceedings. And no matter the outcome of those proceedings, Lexington will be forced to return to this forum to prove the same facts against the defendants that it now asserts. The passage of time will in all likelihood adversely affect the sources of proof. Memories fade, documents are lost or inadvertently destroyed, employees move to different companies or retire (or pass away). As a result, any stay of these proceedings will severely prejudice Lexington in its ability to satisfy its burden of proof in proving all of the allegations in the Complaint.

## CONCLUSION

The motions to dismiss or stay should be denied.

Dated: December 24, 2002

CAHILL GORDON & REINDEL

*Of Counsel*:

   Ira J. Dembrow
   Scott M. Mory

By: _____/s/ Edward P. Krugman_____
          Edward P. Krugman
80 Pine Street
New York, New York  10005
(212) 701-3000

-and-

*Of Counsel*:

   Jeffrey R. Lerman
   Glenn F. Rosenblum

MONTGOMERY, MCCRACKEN, WALKER
  & RHOADS, LLP
123 South Broad Street
Philadelphia, Pennsylvania  19109
(215) 772-1500

*Attorneys for Plaintiff*