# TABLE OF CONTENTS

**Page**

I.    Introduction...................................................................................................2

    A.    This Court's Lack of *In Personam* Jurisdiction Over Mr. Forrest .........................3

    B.    This Court's Lack of Subject Matter Jurisdiction Over Lexington's Claims..........4

    C.    The Appropriateness of Dismissal of this Action Under the Doctrine of *Forum Non Conveniens.* ...................................................................................6

    D.    The Appropriateness of Dismissal or Stay of this Action Under the Doctrine of International Abstention. .....................................................7

    E.    Lexington's Complaint Fails to Adhere to the Heightened Pleading Requirements of Fed. R. Civ. P. 9(b). ...................................................9

II.    Argument ....................................................................................................9

    A.    The Eastern District of Pennsylvania is Not the Appropriate Forum for This Litigation. .........................................................................9

        1.    This Court Should Dismiss Lexington's Complaint Against Forrest on the Grounds of *Forum Non Conveniens.* ...........................................9

            a.    The U.K. Presents an Adequate Alternate Forum for the Adjudication of the Issues Raised in This Action. ........................10

                i.    Defendants' Burden of Demonstrating the *Forum Non Conveniens* Factors is Less Stringent Because Lexington is a Corporate Entity Suing on Occurrences Involving Its Foreign Operations. .................10

                ii.    Contrary to Lexington's Assertions, the Lack of a RICO Cause of Action in the U.K. Does Not Receive Substantial Weight in *Forum Non Conveniens* Analysis.........................................................12

                iii.    Lexington Possesses an Adequate Remedy Under English Law. ..................................................................14

                iv.    Both Forrest and Rogers are Amendable to Process in the U.K..........................................................................15

            b.    A Balancing of Public and Private Interest Factors Favors Dismissal on *Forum Non Conveniens* Grounds.............................15

i.    The Public Interest Factors ................................................15

      (a)    England's Interest in Having an English Controversy Resolved in England Strongly Favors Dismissal......................................................16

      (b)    The Application of English Law to Lexington's Claims Weighs in Favor of Dismissal.........................................................18

ii.    The Private Interest Factors ..............................................18

      (a)    The Need for Live Testimony Regarding Defendants' Alleged Fraudulent Acts Supports Dismissal. ................................19

      (b)    Forrest's Inability to Implead Potential Co-Conspirators Weighs in Favor of Dismissal. .........20

      (c)    Greater Access to Sources of Proof in England Supports Dismissal. ...............................22

      (d)    Lexington Has Waived Any Argument That an English Forum Would Be Inconvenient. ..........24

B.    The Doctrine of International Abstention Also Supports Dismissal, or Alternatively, a Stay Pending Conclusion of Parallel Pending Proceedings in England. ............................................................................24

    1.    The Issues and Allegations in This Action and the English Proceedings Are Nearly Identical. ................................................26

    2.    Avoidance of Duplicative Litigation and the Promotion of Judicial Efficiency Weigh in Favor of Abstention. ..................................28

    3.    English Courts Can Provide Adequate Relief. .........................................29

    4.    The U.K.'s Interest in the Issues at the Heart of Lexington's Claims Merits Deference to a U.K. Forum. ....................................................................30

    5.    Issues of Fairness to and Convenience of Witnesses, Parties, and Counsel and Potential Prejudice to Any of the Parties Weigh in Favor of Dismissal or Stay. .......................................................................31

    6.    Lexington's Lethargy in Filing the Instant Action Militates in Favor of a Dismissal or Stay. ....................................................................32

C.    Lexington Has Failed to Establish Subject Matter Jurisdiction in This Court Because Its Claims Remain Contingent on the Outcome of the English Proceedings.................................................................................33

D.    Lexington's Claims Against Forrest Should Be Dismissed for Failure to Meet the Heightened Pleading Requirements of Fed. R. Civ. P. 9(b)..................33

III.    Conclusion.............................................................................................................33

# TABLE OF AUTHORITIES

## CASES

*Aero Sys. Eng'g, Inc. v. Opron, Inc.*, 21 F. Supp. 2d 990 (D. Minn. 1998) ..................................10

*Banks v. Cox,* [2002] EWCH 2166 (Ch. D Dec. 21, 2000) ..........................................................20

*Caspian Invs., Ltd. v. Vicom Holdings, Ltd.*, 770 F. Supp. 880 (S.D.N.Y. 1991) ........................32

*Contact Lumber Co. v. P.T. Moges Shipping Co.*, 918 F.2d 1446 (9th Cir. 1990) ................10, 11

*Corel Corp., Inc. Secs. Litig.*, 147 F.Supp. 2d 363 (E.D. Pa. 2001) .............................................19

*D&S Screen Fund II v. Ferrari*, 174 F. Supp. 2d 343 (E.D. Pa. 2001) ...........................................3

*DiRienzo v. Philip Servs. Corp.*, 232 F.3d 49 (2d Cir. 2000) ........................................................19

*Evergreen Marine Corp. v. Welgrow Int'l Inc.*, 954 F. Supp. 101 (S.D.N.Y. 1997) .....................25

*Folio 552*, 2001 WL 1423026 ¶ 8 (Q.B. 2001) .............................................................................26

*Goldhammer v. Dunkin Donuts*, 59 F. Supp. 2d 248 (D. Mass. 1999)............25, 28, 29, 30, 31, 32

*Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947) ...............................................................................9

*Howe v. Goldcorp Invest., Ltd.*, 946 F.2d 944 (1st Cir. 1991) ................................................19, 20

*Jennings v. The Boeing Co.*, 677 F. Supp. 803 (E.D. Pa. 1987) ...............................................20, 22

*Kempe v. Ocean Drilling & Exploration Co.*, 876 F.2d 1138 (5th Cir. 1989) .............................13

*Lacey v. Cessna Aircraft Co.*, 862 F.2d 38 (3d Cir. 1988) ...........................................................15

*Lacey v. Cessna Aircraft Co.*, 932 F.2d 170 (3d Cir. 1991) .........................................................19

*Law Debenture Trust Corp. (Channel Islands) Ltd. v. Lexington Ins. Co.*,
Nos. 2001, Folios 211 935, [2002] EW HC 2440 (Q.B. Nov. 19, 2002) ................................21, 26

*Law Debenture Trust Corp.  v. Lexington Ins. Co.*, Transcript ....................................................21

*Law Debenture Trust Corp. v. Lexington Ins. Co.*, Claim No. 2000
Folio 552, 2001 WL 142 3026 (Q.B. 2001) ..................................................................................26

*Lockman Found. v. Evangelical Alliance Mission*, 930 F.2d 764 (9th Cir. 1991) ........................13

*Nat'l Union Fire Ins. Co. of Pitt. v. Kozeny*, 115 F. Supp. 2d 1243 (D. Col. 2000) ...............25, 30

*Paraschos v. YBM Magnex Int'l, Inc.*, 130 F. Supp. 2d 642 (E.D. Pa. 2000) .............24, 25, 29, 30

*Paraschos v. YBM Magnex Int'l, Inc.*, No. 98-6444, 2000 WL 325945 (E.D. Pa. Mar. 29, 2000) ........................................................................................................................................30

*Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41 (2d Cir. 1996) ......................................................18

*Perry v. Markman Capital Mgmt., Inc.*, No. 02-744, 2002 U.S. Dist. LEXIS 19103 (E.D. Pa. Oct. 4, 2002) ...........................................................................................................................3

*Philadelphia Gear Corp. v. Philadelphia Gear de Mexico, S.A.*, 44 F.3d 187 (3d Cir. 1994) ................................................................................................................................................25

*Piper Aircraft Co. v. Reyno*, 454 U.S. 234 ....................................................................13, 15, 20

*R. Maganlal & Co. v. M.G. Chem. Co.*, 942 F.2d 164 (2d Cir. 1991)..........................................18

*Reid-Walen v. Hansen*, 933 F.2d 1390 (8th Cir. 1991) ................................................................10

*Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935 (11th Cir. 1997) ................................................................................................13, 16, 18, 22

*Scandinavia v. Nordbanken Group*, No. 91-6773, 1992 U.S. Dist. LEXIS 15330 (E.D. Pa. Oct. 8, 1992) ....................................................................................................13, 14, 15

*Schertenleib v. Traum*, 589 F.2d 1156 (2d Cir. 1978) ..................................................................19

*Somportex Ltd. v. Philadelphia Chewing Gum Corp.*, 453 F.2d 435 (3d Cir. 1971) ....................25

*Transunion Corp. v. PepsiCo, Inc.*, 811 F.2d 127 (2d Cir. 1987) ................................................13

*VanCauwenberghe v. Biard*, 486 U.S. 517 (1988) ......................................................................15

*Winex, Ltd. v. Paine*, No. 89-2083, 1990 U.S. Dist. LEXIS 10834 (E.D. Pa. Aug. 15, 1990) ........................................................................................................................................12, 13

## STATUTES

Fed. R. Civ. P. 9(b) ....................................................................................................1, 3, 9, 33, 34

Pa. R. Civ. P. 4(k) ............................................................................................................................4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LEXINGTON INSURANCE COMPANY,

                Plaintiff,

        v.

DAVID FORREST

           and

T. BEAUCLERC ROGERS,

             Defendants.

:
:
:
:
:
:
:
:   CIVIL ACTION NO.
:   02-CV-4435
:
:
:
:
:
:

## REPLY BRIEF IN FURTHER SUPPORT OF
## FORREST'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT OR, ALTERNATIVELY, STAY THE INSTANT PROCEEDINGS PENDING CONCLUSION OF PARALLEL PROCEEDINGS IN ENGLAND

Defendant David Forrest ("Forrest"), by and through his attorneys, respectfully submits this Reply Brief demonstrate the legal inaccuracies and insufficiently pled claims of Plaintiff Lexington Insurance Company ("Lexington"), and to elucidate further the appropriateness of dismissal.

Reduced to its essentials, this action is but a thinly veiled attempt by Lexington to avoid its insurance obligations, to shop for a U.S. forum where it can bring a RICO claim with the attendant *in terroram* threat of treble damages, and to achieve an award of attorneys' fees where none is allowed under either U.S. or U.K. law. The Court should dismiss this action in its entirety.

# I.    Introduction

Lexington brought this action against Forrest and T. Beauclerc Rogers ("Rogers") (collectively "Defendants"), alleging RICO violations and common law fraud supposedly based on Defendants' alleged fraudulent inducement of Lexington to issue Pecuniary Loss Indemnity Policies ("PLIPs"), and to enter into collateral agreements in England with regard to film financing transactions known as Hollywood Funding Nos. 4, 5, and 6.  Lexington contends that, as a result of this alleged fraudulent inducement, it: (1) must pursue creditors' claims against Flashpoint, a group of companies operated by Defendants, in the Administration proceedings in England; (2) has been forced to pay legal fees to defend against an action brought by the Law Debenture Trust in a pending action in England for payments due under the PLIPs; and (3) may be ordered to make contractually obligated payments under the PLIPs.  Lexington further alleges that Defendants misappropriated funds that were supposed to be earmarked for specific film financing transactions and used them for other films and for purchasing real estate for a film venture.

In light of the impropriety of this Court's exercise of personal jurisdiction over Forrest, a citizen and resident of the U.K., the inappropriateness of trial in this forum of issues which relate to events that occurred in England, the unripe nature of Lexington's claims, Lexington's lack of standing, the pendency of an action in England that will be determinative of the claims Lexington asserts here, and the failure of Lexington to state a claim upon which relief can be granted in its Complaint, Forrest moved this Court to dismiss Lexington's Complaint or, alternatively, stay the instant proceedings pending the conclusion of the parallel litigation in England.  In his brief in Support of His Motion to Dismiss, Forrest joined most of the arguments of Defendant Rogers.  More specifically, Forrest moved to dismiss, or alternatively stay,

Lexington's Complaint on the grounds of lack of personal jurisdiction, lack of subject matter jurisdiction, forum *non conveniens*, international abstention, and failure to meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). For the convenience of this Court, Forrest briefly summarizes the parties' arguments on these issues.

### A.    This Court's Lack of *In Personam* Jurisdiction Over Mr. Forrest

This Court lacks *in personam* jurisdiction over Forrest, a citizen and resident of England, for a number of reasons. First, Forrest lacks sufficient minimum contacts with Pennsylvania. At all times relevant to this action, Forrest's only contact with Pennsylvania consisted of telephone and telefax communications with Rogers. Lexington has pled no facts sufficient to support its conclusory allegations that those communications played a role in the alleged misconduct. Second, Pennsylvania's interest in protecting its citizens is not applicable here, as Lexington has alleged no harm done to it in Pennsylvania. Third, the exercise of personal jurisdiction over Forrest would not comport with traditional notions of fair play and substantial justice because:

(a)    nearly all of the relevant documents are located in England;

(b)    Lexington has already submitted to the jurisdiction of the English courts;

(c)    obtaining compulsory process over the vast majority of defense witnesses, nearly all of whom reside in England, would be difficult and expensive and would unduly burden Forrest; and

(d)    the proceedings in England involve essentially the same issues and parties – namely alleged fraud by Flashpoint and those who ran it – as those before this Court.

Finally, the exercise of personal jurisdiction over Mr. Forrest would be inappropriate because the corporate shield doctrine protects Forrest, a former director of Flashpoint's U.K. entities, with regard to actions taken in his corporate capacity. <u>Perry v. Markman Capital Mgmt., Inc.</u>, No. 02-744, 2002 U.S. Dist. LEXIS 19103, at *17 (E.D. Pa. Oct. 4, 2002). The protection of the corporate shield is particularly applicable where, as here, the defendant lacks significant contacts with Pennsylvania. <u>See</u>, <u>e.g.</u>, <u>D&S Screen Fund II v. Ferrari</u>, 174 F. Supp. 2d 343, 347-

- 3 -

48 (E.D. Pa. 2001) (even where the defendant President and owner had "the most significant role in [the company's corporate structure and] the plaintiff alleged that the defendant had a direct role in the alleged tortious conduct, the court will not exercise personal jurisdiction where the only contacts defendant, a California resident, had with Pennsylvania consist of several telephone conversations and faxes").

Lexington responds that this Court has personal jurisdiction over Forrest under Pennsylvania's long-arm statute and that the "corporate shield" doctrine does not apply in RICO cases.  (See Pl's. Mem. of Law in Opp. to Defs.' Mots. to Dismiss or Stay at 7, 19-20).  In support of its arguments, Lexington would have the Court assume that Forrest, allegedly through telephone and telefax communications, conspired with Rogers, a Pennsylvania resident, to implement their alleged scheme.  (See Id. at 11, 14).  Lexington goes on to argue that Forrest's business trips to California and Montreal, and occasional personal contacts with Pittsburgh, are relevant to the exercise of personal jurisdiction over him.  (See Id. at 16).  After discussing at length Forrest's non-Pennsylvania U.S. contacts, Lexington then concedes that Forrest's national contacts are not relevant for purposes of this Court's exercise of personal jurisdiction over him under Pa. R. Civ. P. 4(k) because that section only applies where no U.S. state can obtain personal jurisdiction over Forrest, which Lexington admits is not likely the case.  (See Id. at 16-19).  Alternatively, Lexington seeks a transfer to a district court in California.  (See Id. at 19).

**B.    This Court's Lack of Subject Matter Jurisdiction Over Lexington's Claims**

In addition to this Court's lack of personal jurisdiction over Forrest, the Court does not have subject matter jurisdiction over this action because Plaintiff's claims do not present an actual case or controversy for adjudication.[1]  Lexington argues, in complete contravention of the

---

[1]    (See Forrest Mem. in Support of Mot. to Dismiss or Stay at 17-18; Rogers Mem. in Support of Mot. to Dismiss or Stay at 12-18).

"American Rule" that each party to the litigation in the U.S. bears its own costs subject to certain well-defined exceptions clearly not applicable here, that its damages consist of expenditures of legal fees pursuing creditors' claims pending in the Flashpoint Administration proceedings in England and defending against the Law Debenture Trust's action in England to recover under Lexington's PLIPs. Lexington then makes the curious argument that if the English court orders it to live up to its contractual obligations under the PLIPs and make payments to the Law Debenture Trust, these payments would somehow constitute "damages" for which Forrest would be liable. Finally, Lexington posits an inchoate theory of "damages" based on an unspecified increase in Lexington's liability for losses resulting from Defendants' alleged misappropriation of funds "if and to the extent" the PLIPs are enforceable.

If Lexington succeeds in the English proceedings, it may recover legal fees from the Law Debenture Trust and therefore will not have suffered any damages in the form of legal fees. If it fails in that litigation, it will recover nothing, nor will it be entitled to. The existence of Lexington's damages thus depends on the outcome of the English proceedings. The contingent nature of these alleged damages renders Lexington's claims unripe. Moreover, without a judgment in the English proceedings, Lexington cannot demonstrate that it has a cognizable, present, actual injury necessary to confer standing because its alleged damages are speculative, unclear, and indefinite.

Lexington responds that the simple expenditure of legal fees in the English proceedings constitutes an injury, and that it might not be able to recover all legal fees in the English actions because English courts only permit recovery for legal fees expended for winning arguments. (See Pls.' Mem. in Opp. to Defs.' Mots. to Dismiss or Stay at 34-36). Lexington also claims that Defendants' alleged conduct caused it to suffer injuries that are ripe for adjudication, not

withstanding the presently indeterminate amount of damages. (See Id. at 37). Apparently, Lexington would have this Court order Forrest, and Rogers, to indemnify it in advance of suffering any damages whatsoever. In making this demand, Lexington offers no explanation of how it intends to establish any causal connection between Defendants' alleged misconduct and its expenditure of legal fees in the English proceedings if the court in England determines that its claims, which are predicated on the same allegations as in this action, fail. The Court should decline Lexington's invitation to craft a new, and completely unsupportable, theory of damages.

### C. The Appropriateness of Dismissal of this Action Under the Doctrine of *Forum Non Conveniens*.

Most significantly, Forrest and Rogers moved to dismiss this action pursuant to the doctrine of *forum non conveniens* because nearly all of the operative events alleged took place in England between and among residents of that jurisdiction. As a result, nearly all of the relevant evidence is located in England, so that a balancing of the relevant public and private interests warrants dismissal:.

- nearly all of the key defense witnesses are located outside of this jurisdiction, primarily in England, and not subject to this Court's compulsory process;

- nearly all of the relevant documents are located in England;

- transporting willing witnesses and documents to this forum would represent an enormous expense to Defendants;

- the alleged wrongful conduct of Defendants allegedly occurred primarily in England, among English citizens and international corporations operating in England;

- England is the only place where the majority of the all of the alleged wrongs with regard to Hollywood Funding Transactions Nos. 4, 5, and 6 could be adjudicated;[2]

- finally, and most significantly, while this Court should have little interest in adjudicating this matter in this forum, English courts have a substantial interest in

---

[2]     Lexington, which conducts extensive business in England, can hardly claim the inconvenience of a U.K. forum.

adjudicating claims based primarily on events that took place in England, among English citizens. (See Forrest Mem. in Support of Mot. to Dismiss or Stay at 18-19; Rogers Mem. in Support of Mot. to Dismiss or Stay at 18-26).

Ignoring the fact that its claims are based primarily on garden-variety fraud, which is cognizable in England, Lexington responds that dismissal would be improper because relief under RICO is available only in the United States. (See Pl's. Mem. in Opp. to Defs.' Mots. to Dismiss or Stay at 40-41). In making this argument, Lexington inexplicably fails to inform the Court of the critical fact that it conducts extensive international business in England, and that indeed the transactions upon which these claims are based took place primarily in England between Defendants and Lexington's employees in its London offices. Cavalierly ignoring these salient facts of which it is well aware, Lexington asks the Court to give deference to its choice of forum simply because it is a U.S. citizen. (See Id. at 43).

Lexington goes on to argue that, because many sources of proof, such as documents and witnesses, are located in the United States and this Court has an interest in upholding U.S. law under RICO, local citizens therefore would not be burdened by jury duty. (See Id. at 43-50). Finally, Lexington argues that the application of English law to its claims is not dispositive.

In summary, Lexington fails to meet Forrest's and Roger's compelling arguments, supported by overwhelming legal authority, so that the Court should dismiss this action because of the impermissible and significant inconvenience of the Eastern District of Pennsylvania as a forum.

**D.    The Appropriateness of Dismissal or Stay of this Action Under the Doctrine of International Abstention.**

Even if this Court were to determine that dismissal on *forum non conveniens* grounds is not appropriate, it should still dismiss or stay this action pursuant to the doctrine of international abstention. Although the parties here are not completely identical to the parties in the English

proceedings, the issues are nearly identical. (See Forrest Mem. in Support of Mot. to Dismiss or Stay at 19; Rogers Mem. in Support of Mot. to Dismiss or Stay at 27, 28-30). The English court has before it Lexington's defenses to the Law Debenture Trust's claims for payment under the PLIPs in which Lexington alleges precisely the same claims it brings here.[3] (See Forrest Mem. in Support of Mot. to Dismiss or Stay at 19; Rogers Mem. in Support of Mot. to Dismiss or Stay at 29-30 n.17).

Moreover, permitting the English courts to resolve these issues, will promote judicial efficiency by avoiding piecemeal litigation; prevent undue prejudice to witnesses, counsel, and Defendants, who already must deal with these same issues in England; and provide Lexington with any relief to which it may be entitled, since England recognizes claims for fraud. (See Forrest Mem. in Support of Mot. to Dismiss or Stay at 19; Rogers Mem. in Support of Mot. to Dismiss or Stay at 30-34).

In response, Lexington would have the Court ignore the obvious fact that, not only can English courts provide adequate relief for the underlying garden-variety fraud Lexington alleges here, but they already possess extensive familiarity with the events and allegations upon which this action is based. Moreover, in the event that Lexington's defenses fail in the English proceedings, there will be no damages to claim in this action. Without a stay, therefore, this Court will waste months, if not several years, litigating needless issues, at a high cost to the Court, the parties, and counsel.

---

[3]    Specifically, those claims are that the number and nature of the films made breached the policies; that Jardine Lloyd Thompson or Flashpoint or both made fraudulent or negligent misrepresentations or non-disclosures with regard to projected revenues in the sales estimates and the quality and nature of the films to be made, all to induce Lexington to insure the risk; and that Flashpoint, through Forrest and Rogers, improperly applied the revenues received from the films.

**E.      Lexington's Complaint Fails to Adhere to the Heightened Pleading Requirements of Fed. R. Civ. P. 9(b).**

Finally, Lexington's Complaint simply fails to adhere to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure.  The Complaint violates the well-established rule that allegations of fraudulent conduct by "defendants" are too general to meet the strict pleading requirements of Rule 9(b).  Lexington's response fails to overcome these fatal deficiencies.

As Forrest's Memorandum and Rogers' Reply Memorandum make clear, the Complaint further fails to meet Rule 9(b)'s strict pleading requirements by alleging fraud based on "information and belief" without specifically identifying the basis for those beliefs, and by alleging that Defendants prepared and presented fraudulent sales estimates without stating the proper method that Defendants should have used to formulate those estimates, how the Defendants failed to adhere to that method, or that the Defendants recognized the impropriety of the method used.

## II.      Argument

**A.      The Eastern District of Pennsylvania is Not the Appropriate Forum for This Litigation.**

      **1.      This Court Should Dismiss Lexington's Complaint Against Forrest on the Grounds of *Forum Non Conveniens*.**

To obtain a dismissal on *forum non conveniens* grounds, the defendant must demonstrate (1) that an adequate alternate forum exists and (2) that a balancing of the public and private interest factors favors dismissal.  <u>Gulf Oil Corp. v. Gilbert</u>, 330 U.S. 501, 507 (1947).  (<u>See</u> Forrest Mem. in Support of Mot. to Dismiss or Stay at 18-19; Rogers Mem. in Support of Mot. to Dismiss or Stay at 18-26).  Forrest has demonstrated that the weight of authority supports both

factors here so that the Court should dismiss Lexington's Complaint, at least as to Forrest, on

*forum non conveniens* grounds.

> **a.      The U.K. Presents an Adequate Alternate Forum for the Adjudication of the Issues Raised in This Action.**
>
> **i.      Defendants' Burden of Demonstrating the *Forum Non Conveniens* Factors is Less Stringent Because Lexington is a Corporate Entity Suing on Occurrences Involving Its Foreign Operations.**

Courts are likely to permit a defendant seeking dismissal on *forum non conveniens*

grounds to overcome the presumption in favor of a plaintiff's choice of forum, where, as here,

the U.S. citizen plaintiff is a corporate entity engaging in extensive international business abroad.

Reid-Walen v. Hansen, 933 F.2d 1390, 1395 (8th Cir. 1991); Contact Lumber Co. v. P.T. Moges

Shipping Co., 918 F.2d 1446, 1450 (9th Cir. 1990); Aero Sys. Eng'g, Inc. v. Opron, Inc., 21 F.

Supp. 2d 990, 999 (D. Minn. 1998).  (See Forrest Mem. in Support of Mot. to Dismiss at 18-19;

Rogers Mem. in Support of Mot. to Dismiss or Stay at 18 n.12).

Lexington argues that these cases are inapposite.  In doing so, it surprisingly quotes an

admonition of the Contract Lumber court particularly applicable to Lexington's own

expectations in bringing this action: "[A] part[y] who choose[s] to engage in international

transactions should know that when their foreign operations lead to litigation they cannot expect

always to bring their foreign opponents into a United States forum when every reasonable

consideration leads to the conclusion that the site of the litigation should be elsewhere."  Contact

Lumber, 918 F.2d at 1450 (cited in Pl.'s Mem. in Opp. to Defs.' Mots. to Dismiss or Stay at 42

n.26).  Lexington, blatantly ignoring Forrest's U.K. citizenship and domicile, then essentially

argues that this statement does not apply here because Rogers is not a "foreign opponent," but

rather a resident of Pennsylvania.  (Id.)  Even more surprisingly, Lexington appears to argue,

- 10 -

completely contrary to the facts, that the action does not involve Lexington's extensive "foreign operations."  (Id.).

Contact Lumber directly *supports* this Court's dismissal of this action under the doctrine of *forum non conveniens*.  Lexington is understandably reluctant to bring to the Court's attention the fact that it was its foreign operations, not its domestic operations, that were primarily involved in underwriting the policies Lexington now claims Forrest and Rogers fraudulently induced them to issue.  All negotiations for the PLIPs and collateral agreements were carried out in London.  (See Affidavit of Susan Wright ("Wright Affidavit") at ¶ 7, attached hereto as Exhibit "A"[4]; Affidavit of David Forrest ("Forrest Affidavit") at ¶¶ 4-11, attached hereto as Exhibit "B"[5]).  Jardine Lloyd Thompson negotiated the policies for Hollywood Funding Nos. 1, 2, and 3, with the London offices of HIH, and the policies for Hollywood Funding Nos. 4, 5, and 6 with Lexington's London office.  (See Forrest Affidavit, Exh. "B", at ¶ 7).  All meetings surrounding the negotiation of the Hollywood Funding transactions took place in London in either Lexington's office or Jardine Lloyd Thompson's office.  (See Wright Affidavit, Exh. "A", at ¶ 7; Forrest Affidavit, Exh. "B", at ¶ 7).  The only underwriters known to have dealt with Forrest regarding the film financing transactions are Keith Peacock and Steve Mitchell, both of whom are U.K. citizens.  (See Forrest Affidavit, Exh. "B", at ¶ 8).

Additionally, Lexington retained Ince & Co., a firm of solicitors in London, to handle the negotiations with Tarlo Lyons, Flashpoint's U.K. counsel, on the collateral agreements to the

---

[4]     Forrest attaches the signed affidavit of Susan Wright.  Ms. Wright is in the process of having her affidavit signed before a notary in the United Kingdom, and Forrest will substitute the notarized affidavit as soon as it is received in the United States.

[5]     Forrest attaches his signed affidavit.  Forrest is in the process of having his affidavit signed before a notary in the United Kingdom, and he will substitute the notarized affidavit as soon as it is received in the United States.

PLIPs.  (See Wright Affidavit, Exh. "A", at ¶¶ 4 & 7; Forrest Affidavit, Exh. "B", at ¶¶ 9-11).

The fee bills of Ince & Co. likely demonstrate a high level of involvement in London in the

drafting and negotiation of the agreements between Lexington and Flashpoint.  (See Wright

Affidavit, Exh. "A", at ¶¶ 4 & 5).  Indeed, the front cover of the collateral agreements indicates

that the London office of Ince & Co was responsible for drafting them.  (See Collateral

Agreements between Lexington Ins. Co. & Flashpoint (Jersey) Ltd, and Lexington Ins. Co. &

Flashpoint (UK) Ltd., Relating to the Regent Project, attached hereto as Exhibits "C" and "D,"

respectively).

 The cumulative effect of these facts is to make it crystal clear that this action belongs in a

U.K., not a U.S., court.

 In an attempt to minimize the effect of a compelling set of facts against them, Lexington

argues that, even if Defendants do have a lighter burden where, as here, the plaintiff is an

international corporation whose international activities have given rise to litigation, this weaker

burden is "of little consequence . . . where all the other factors either lean in favor of Lexington's

choice or are neutral."  (Pl's. Mem. in Opp. to Defs.' Mots. to Dismiss or Stay at 42 n.26).  This

argument should count little in the Court's consideration of all the other *forum non conveniens*

factors which weigh heavily in favor of dismissal.

   **ii.**  **Contrary to Lexington's Assertions, the Lack of a
       RICO Cause of Action in the U.K. Does Not Receive
       Substantial Weight in *Forum Non Conveniens* Analysis.**

 While Lexington argues vigorously that an English court does not present an adequate

forum because relief under RICO is available only in the United States, this Court, and many

other federal courts, have expressly rejected that contention.  "[T]he assertion of federal

securities and RICO claims does not preclude application of FNC [(*forum non conveniens*)]."

Winex, Ltd. v. Paine, No. 89-2083, 1990 U.S. Dist. LEXIS 10834 at *13 (E.D. Pa. Aug. 15,

1990) (Shapiro, J.) (citing Kempe v. Ocean Drilling & Exploration Co., 876 F.2d 1138, 1146

(5th Cir. 1989)).  In dismissing on *forum non conveniens* grounds in Winex, Judge Shapiro

reasoned:

> Ordinarily, the alternative forum requirement will be satisfied if the defendant is amenable to process in a foreign forum, except in the rare circumstance where the alternate forum affords no remedy or an unsatisfactory remedy for plaintiff's claims.  A change in forum may not deprive plaintiffs of their day in court, but there is *no requirement that plaintiffs have the opportunity to recover substantially identical relief in the alternate forum.  The possibility that a change of forum will result in the application of less favorable substantive law does not receive conclusive or substantial weight in a* [forum non conveniens] *inquiry.*

Winex, 1990 U.S. Dist. LEXIS 10834 at *13 (emphasis added) (citing Piper Aircraft Co. v.

Reyno, 454 U.S. 234, 255 n22 (1981)).  See also Republic of Panama v. BCCI Holdings

(Luxembourg) S.A., 119 F.3d 935, 952 (11th Cir. 1997) (plaintiff's inability to assert a RICO

claim in the forum *does not* preclude dismissal on *forum non conveniens* grounds) (citing

Lockman Found. v. Evangelical Alliance Mission, 930 F.2d 764, 769 (9th Cir. 1991) (same);

Kempe, 876 F.2d at 1143-44 (same); Transunion Corp. v. PepsiCo, Inc., 811 F.2d 127, 129 (2d

Cir. 1987) (per curium) (same)).

　　　In a case particularly applicable here, in Scandinavia v. Nordbanken Group, Judge

Fullam dismissed the plaintiffs' arguments that England did not present an adequate forum for

litigation of its fraud claims on the basis that relief under RICO is not available in England.  No.

91-6773, 1992 U.S. Dist. LEXIS 15330 at *3-4 (E.D. Pa. Oct. 8, 1992) (Fullam, S.J.).  The

plaintiffs alleged RICO violations, but the "principal thrust of the amended complaint" alleged

that the plaintiffs were "induced to join the consortium and to invest in the stock of [a company]

by means of various misrepresentations and omissions of material information . . ."  Id. at *4.

The court determined that other factors overcame the presumption in favor of the U.S. plaintiffs'

choice of forum, id. at *6, and dismissed the plaintiffs' arguments that England did not afford

them an adequate forum, id. at *8-9.  The court reasoned that "every wrong alleged by plaintiffs

would be actionable if asserted in an English court.  *The only significant difference is the*

*availability of treble damages here and not there*.  I am not persuaded that this circumstance[] is

sufficient to warrant denial of the motion to dismiss."  Id. (emphasis added).

In short, the unavailability of RICO relief in England does not preclude English courts

from providing Lexington with an adequate forum to adjudicate its claims.  Accordingly, this

Court should so find.

### iii.    Lexington Possesses an Adequate Remedy Under English Law.

As in Scandinavia, the main thrust of Lexington's complaint sounds in fraud, which is

actionable under English law.  Id. at *8-9.  See also MacDonald v. Hill Pub. Ltd., (Ch. D. Feb.

11, 2002) (action for fraudulent misrepresentation and fraudulent inducement under English

law); Great Future Int'l Ltd v. Sealand Housing Corp., (Ch. D. Nov. 1, 2001) (same); Banks v.

Cox, [2002] EWCH 2166 (Ch. D Dec. 21, 2000) (action for fraudulent or negligent

misrepresentation under English law).  Initially, Lexington instituted litigation against Flashpoint

in the U.K. in December 2000.  At any point since then, Lexington could have instituted

proceedings against Forrest or Rogers for fraud, or could have joined them to the Law Debenture

Trust action.  One suspects that Lexington might have failed to do so because it is easier to allege

fraud without the alleged perpetrators being in court to rebut the allegations against them.

Moreover, English common law permits a party such as Lexington, who claims that it has

been defrauded or the victim of a fraudulent misrepresentation, to bring an action for

indemnification against the alleged perpetrators.  See, e.g., Banks v. Cox, [2002] EWHC 2166;

Degtiarev v. Mohan, (H.H. Feb. 18, 2000).  As in Scandinavia, it is of no consequence that,

- 14 -

unlike RICO, English common law does not provide for treble damages, since English law does provide a cause of action that addresses Lexington's allegations.  Scandinavia, 1992 U.S. Dist. LEXIS 15330 at *9.

> **iv.    Both Forrest and Rogers are Amendable to Process in the U.K..**

Forrest, as a citizen of the U.K., is clearly amenable to process there.  Moreover, Rogers has already agreed to submit to the personal jurisdiction of the courts in the U.K. for the purposes of this action.  (See Rogers Mem. in Support of Mot. to Dismiss or Stay at 19).  With these potential jurisdictional hurdles out of the way, there simply is no impediment to the U.K. as an adequate forum.

> **b.    A Balancing of Public and Private Interest Factors Favors Dismissal on *Forum Non Conveniens* Grounds.**

> **i.    The Public Interest Factors**

To determine the propriety of dismissal on *forum non conveniens* grounds, courts consider several public interest factors, including, among other things:  administrative difficulties relating to court congestion; local interest in having local controversies decided at home; avoidance of unnecessary conflict of laws problems; and the unfairness of burdening citizens of an unrelated forum with jury duty.  Piper, 454 U.S. at 241.  Each of these factors, evaluated in light of the locus of the alleged wrongful conduct, see Lacey v. Cessna Aircraft Co., 862 F.2d 38, 48 (3d Cir. 1988) (quoting VanCauwenberghe v. Biard, 486 U.S. 517, 528 (1988)), demonstrates the appropriateness of dismissing Lexington's claims on *forum non conveniens* grounds.  (See Forrest Mem. in Support of Mot. to Dismiss at 18-19; Rogers Mem. in Support of Mot. to Dismiss at 25-26).

(a)    **England's Interest in Having an English Controversy Resolved in England Strongly Favors Dismissal.**

Most significantly, the English courts have a substantial interest in resolving this dispute in England because the majority of the alleged wrongs occurred in England.  In BCCI, the court of appeals affirmed the lower court's dismissal for *forum non conveniens*, reasoning that the majority of the allegedly fraudulent acts occurred abroad:

> [The plaintiff] alleges that the defendants participated in an international [] scheme to defraud [the plaintiff] of funds rightfully belonging to it.  The vast majority of the fraudulent acts committed in furtherance of the scheme were committed abroad.  As a result, documents and witnesses necessary to prove or disprove the validity of [the plaintiff's] allegations are scattered throughout the world . . . It was therefore not unreasonable to conclude that England or Luxembourg, *where more of the allegedly fraudulent acts occurred, would be a more convenient* location to resolve this dispute.

BCCI, 119 F.3d at 952 (emphasis added).

Similarly, dismissal on *forum non conveniens* grounds is appropriate in this action.  Although in its Complaint, Lexington highlighted the fact that the majority of the alleged occurrences at the heart of its claims of fraud all allegedly took place in the U.K., it now, when faced with a serious *forum non conveniens* motion, back-peddles to downplay the significant U.K. connections.  (See Pl's. Mem. in Opp. to Defs.' Mot. to Dismiss or Stay at 45-48)

Lexington alleges that Forrest conspired with individuals located in England to produce fraudulent sales estimates to induce Lexington to issue the PLIPs.  (See Complaint at ¶ 23).  For example, Lexington alleges that "Forrest conspired with the insurance broker (Gordon Dawson of Lloyd Thompson) to produce new estimates [for *The New Professionals*] that were substantially higher. . . ."  (Complaint at ¶ 23(a)(iv)).  Gordon Dawson is a citizen of the U.K.

who both resides and works there for Jardine Lloyd Thompson, a U.K. company.  (See Forrest Affidavit, Exh. "B", at ¶ 13).

Additionally, central to Lexington's claim that it was fraudulently induced to execute the collateral agreements is the allegation that Flashpoint's U.K. law firm, Tarlo Lyons, through solicitor Stanley Munson, would certify in the U.K. any draw upon Defendants' request, regardless of whether Principal Production Documents were in place.  (See Compl. at ¶¶ 31-32).  This allegation further demonstrates that the U.K. is the epicenter of the alleged wrongful conduct at the heart of this case.

Next, Lexington alleges that the "defendants continued to cause Flashpoint to represent that it would monitor production costs, etc. on behalf of the insurers, without disclosing the inherent conflict of interest" in owning one of the monitored companies.  (Complaint at ¶ 26).  Since all negotiations for the PLIPs and Collateral Agreements were carried out in the U.K. at the parties' London offices, through U.K. solicitors and U.K. underwriters, any alleged fraudulent inducements, misrepresentations, or failure to disclose must have occurred in the U.K..  (See Wright Affidavit, Exh. "A", at ¶¶ 4, 5, & 7; Forrest Affidavit, Exh. "B", at ¶¶ 4-11).

Finally, Lexington alleges that Flashpoint failed to maintain funds in segregated dedicated accounts as allegedly required under the collateral agreements, and that "defendants misappropriated funds from the projects to which they were dedicated and spent them for other purposes." (Complaint at ¶ 28).  Allegedly, Defendants misappropriated funds that were to be held in separate bank accounts *in England*, placed those funds in the Flashpoint account *in England*, and later diverted those funds for uses all around the world, including real estate investments in California and an investment in Russian Cinemas.  (Complaint at ¶ 29).  The question of whether Lexington can prevail on its claims of misappropriation of funds in the U.K.

- 17 -

will require among other things, testimony from Susan Wright, Flashpoint's Chief Operating Officer, and from Flashpoint's professional and legal advisors in England, all of whom are citizens of the U.K.. (<u>See</u> Forrest Affidavit, Exh. "B", at ¶ 12).

As in <u>BCCI</u>, Lexington alleges fraudulent acts throughout the world,[6] the majority and most significant of which allegedly occurred in the U.K.. Even if the documents and witnesses are scattered throughout the world, the appropriate venue for this action lies in the U.K., the venue with the greatest connection to the alleged fraud. <u>BCCI</u>, 119 F.3d at 952.

**(b)    The Application of English Law to Lexington's Claims Weighs in Favor of Dismissal.**

Although "the need to apply foreign law is not alone sufficient to dismiss under the doctrine of *forum non conveniens*," it is a factor in the analysis that weighs in favor of dismissal. <u>Peregrine Myanmar Ltd. v. Segal</u>, 89 F.3d 41, 47 (2d Cir. 1996) (citing <u>R. Maganlal & Co. v. M.G. Chem. Co.</u>, 942 F.2d 164, 169 (2d Cir. 1991)). Both the PLIPs and the Collateral Agreements for the Hollywood Funding transactions, the fraudulent inducement of which Lexington alleges, are governed by English law. (<u>See</u>, <u>e.g.</u>, Pecuniary Loss Indemnity Policy for Regent Project at § 7.1, attached hereto as Exhibit "E"; Exh. "C" at § 20(1); Exh. "D" at § 22(1)).

**ii.    The Private Interest Factors**

In addition to the public interest factors, the private interest factors also favor dismissal on *forum non conveniens* grounds. (<u>See</u> Forrest Mem. in Support of Mot. to Dismiss or Stay at

---

[6]    Lexington further alleges that, with respect to The Secret Adventures of Jules Verne, "Rupert Lywood of Matrix Securities Ltd. and subsequently Neil Dunn, of Talisman Pictures, provided a series of sales estimates for use by Flashpoint, through defendant Forrest . . . [and] Dunn and Forrest knew that the successive estimates had no basis in fact, were not reasonable or professionally prepared, and were created for the sole purposes of inducing insurers to" fund Hollywood Funding 4. (Complaint at ¶ 23(c)). Neil Dunn is a Canadian citizen. (<u>See</u> Forrest Affidavit Exh. "B" at ¶ 13).

18-19; Rogers Mem. in Support of Mot. to Dismiss or Stay at 21-25). The private interest factors include: the relative ease of access to sources of proof; the availability of compulsory process for unwilling witnesses; the cost of obtaining attendance of willing witnesses; and all other factors affecting the ease, speed, and convenience of the trial. Lacey v. Cessna Aircraft Co., 932 F.2d 170, 180 (3d Cir. 1991); Corel Corp., Inc. Secs. Litig., 147 F.Supp. 2d 363, 366 (E.D. Pa. 2001) (Brody, J.)

> **(a)    The Need for Live Testimony Regarding Defendants' Alleged Fraudulent Acts Supports Dismissal.**

Although videotaped depositions may suffice for some witnesses, the courts have recognized that, where "fraud and subjective intent are elements of the claim," live witness testimony is "essential to a fair trial" and testimony by letter rogatory only will not suffice, particularly where the defendant seeks the testimony of an alleged co-conspirator. Howe v. Goldcorp Invest., Ltd., 946 F.2d 944, 952 (1st Cir. 1991) (citing Schertenleib v. Traum, 589 F.2d 1156, 1165 (2d Cir. 1978) ("Since the crux of this litigation is the truth or falsity of . . . charges that plaintiff is a swindler, to be able to take the alleged co-conspirators' testimony by letter rogatory only would be a very serious hardship")).

In Corel, this Court relied on DiRienzo v. Philip Servs. Corp., 232 F.3d 49, 66-67 (2d Cir. 2000), wherein the court disagreed with Howe and supported the use of videotaped depositions obtained through letters rogatory to avoid dismissal. Corel, 147 F. Supp. 2d at 366. Nevertheless, unlike here, there is no indication from the opinions in Corel and DiRienzo that any of the witnesses whose testimony was sought were potential co-defendants. In contrast, here, several alleged co-conspirators, including Gordon Dawson of Jardine Lloyd Thompson in London, Stanley Munson, formerly of Tarlo Lyons in London, Rupert Lywood of Matrix Securities, and Neil Dunn of Talisman Pictures, with whom Lexington accuses Defendants of

conspiring, see Complaint at ¶¶ 23, 31-32, are believed not to be subject to compulsory process in this district. (See Forrest Affidavit, Exh. "B", at ¶ 13). Accordingly, as noted in Howe, live demeanor evidence of those potential co-conspirators is key to a defense in this action, but cannot be adequately obtained in this jurisdiction. 946 F.2d at 952.

**(b)** **Forrest's Inability to Implead Potential Co-Conspirators Weighs in Favor of Dismissal.**

Beyond the need for the live testimony of alleged co-conspirators, the inability of Forrest and Rogers to implead potential co-conspirators is also a factor weighing in favor of dismissal on *forum non conveniens* grounds, even if Defendants could maintain a separate action for contribution or indemnification against those co-conspirators in England. Jennings v. The Boeing Co., 677 F. Supp. 803, 804-05 (E.D. Pa. 1987) (VanArtsdalen, S.J.). In Jennings, the court found that the defendant's inability to implead potential third party defendants in an action in the U.S. was a factor favoring dismissal for *forum non conveniens*,

> consistent with the statement of the Supreme Court in Reyno that 'the problems posed by the inability to implead potential third party defendants clearly supported' *forum non conveniens* dismissal. The Court so held even though it assumed the Reyno defendant could have initiated a separate action for indemnity or contribution against other parties in a foreign court[, which] does not diminish the significance of the fact that such an indemnity or contribution action could not be maintained *in this country*.

Id. (citing Reyno, 454 U.S. at 259)(emphasis added).

In the English proceedings, Lexington makes allegations of fraudulent inducement by Forrest as Flashpoint and asserts claims against Jardine Lloyd Thompson and its employees. Similarly, in this action, as discussed above, Lexington also alleges that Forrest conspired with Gordon Dawson of Lloyd Thompson, Rupert Lywood of Matrix Securities, Neil Dunn of Talisman Pictures, and Stanley Munson of Tarlo Lyons, to knowingly produce and utilize fraudulent sales estimates to induce Lexington to issue the PLIPs. (Complaint at ¶¶ 23, 31-32).

None of these alleged co-conspirators is a United States citizen or resident, and three of the four alleged co-conspirators, Messrs. Dawson, Munson, and Lywood, are citizens of the U.K. and presumably not amenable to process in the U.S.[7] (See Forrest Affidavit, Exh. "B", at ¶ 13).

Unlike a United States District Court, a court in the U.K. would have personal jurisdiction over all of the alleged co-conspirators, with the possible exception of Neil Dunn, a Canadian citizen. Although Lexington could have, in the interest of judicial economy, joined Forrest and Rogers in the pending U.K. proceedings, it chose not to. As Justice Langley stated in the English action, "[England] seems to be obviously the logical venue for [Mr. Forrest] to be impleaded if that was the intention." (Law Debenture Trust Corp. v. Lexington Ins. Co., Transcript of Nov. 1, 2002 Hearing at 10:5-16, attached hereto as Exhibit "F").[8] Instead, in the English proceedings, Lexington asserted claims against Lloyd Thompson, in which Lexington, without joining Forrest, alleged that employees of Lloyd Thompson conspired with Forrest. In this action, related to the same transactions and same alleged wrongs, Lexington again alleges

---

[7]     Lexington also alleges that Mr. Forrest "conspired with the sales agent, Ian Jessel, of Condor Communications LLC, to produce grossly inflated sales estimates to induce" the issuance of the policy for *It Had To Be You* and that Mr. Forrest and Mr. Jessel knew that the estimates were grossly inflated. (Complaint at ¶ 23(e)). Lexington indicates that Mr. Jessel is located in California, but Defendants do not yet possess sufficient information to determine whether Mr. Jessel would be subject to process in Pennsylvania or in England.

[8]     At this hearing, Justice Langley roundly chastised Lexington for not disclosing to the court or to Forrest Lexington's intention to bring proceedings against Forrest in the Eastern District of Pennsylvania at the time that Forrest entered into an undertaking with Lexington in the U.K. action to provide documents stored on the hard drive of his personal computer. As the court stated, "[t]he failure to disclose even the possibility of such proceedings either to Mr. Forest [*sic*] or to his advisers and the court is, in my judgment, open to very serious criticism . . . I would add that, as it seems Lexington must have appreciated, the prospect of Mr. Forest [*sic*] being joined in the English proceedings is now, and was in June, remote, even though it seems to be obviously the logical venue for him to be impleaded if that was the intention. *No doubt it was Mr. Forest's [sic] belief, as it was the understanding of this court, that claims were not going to be made against Mr. Forest [sic] personally.*" (Exh. "G" at 9:27-28; 10:1; 10:12-19) (emphasis added).

wrongdoing without giving the alleged wrongdoers – this time Forrest and Rogers – the benefit of alleged co-conspirators' testimony.  Accordingly, Forrest and Rogers respectfully submit that this Court should dismiss this action under the doctrine of *forum non conveniens* to permit Defendants an opportunity to properly implead their alleged co-conspirators in the appropriate U.K. proceeding.  Jennings,  677 F. Supp. at 804-05.

### (c)    Greater Access to Sources of Proof in England Supports Dismissal.

Despite Lexington's attempt to minimize the events in the U.K. at the heart of this litigation by claiming that copies of "numerous documents" relating to the film financing transactions are located in Massachusetts at Lexington's corporate offices, nearly all of the negotiations for the PLIPs, collateral agreements, and funding transactions took place in the U.K. among U.K. solicitors and U.K. citizens.  (See Wright Affidavit, Exh. "A", at ¶ 4, 5, & 7; Forrest Affidavit, Exh. "B", at ¶¶ 4-11).  Even if numerous documents do exist in the U.S. and Canada, as discussed in detail above, where documents are located all around the world, litigation is most appropriate in the venue with the closest connection to the events at the center of the controversy.  In this case, the U.K. courts represent such a venue.  See, BCCI, 119 F.3d at 952 (affirming dismissal on *forum non conveniens* grounds where documents were located all around the world, but England and Luxembourg, not the U.S., had the greatest connection with the key events and issues in the litigation).

Moreover, Lexington's arguments that it can supply Forrest and Rogers with the documents it received from the Flashpoint Administrator miss the mark.  Lexington asserts that it has obtained all of the Flashpoint documents from the Flashpoint Administrator and that there exists no confidentiality restriction preventing Lexington from producing those documents to Forrest and Rogers.  (See Pl's. Mem. in Opp. to Defs.' Mots. to Dismiss or Stay at 44).  Besides

the sheer cost of transporting those documents to the U.S., Lexington's argument ignores the

undue prejudice to Defendants by forcing them to rely on Lexington, an interested party, to

produce *all* of the documents produced by the Flashpoint Administrators.  If Lexington had

brought its claims in England, both parties would have the benefit of obtaining the documents

from an independent third party.

Moreover, Lexington's argument that confidential documents from English proceedings

"can be made available with the consent of the relevant parties or by an order of the English

court" (Pl's. Mem. in Opp. to Defs.' Mots. to Dismiss or Stay at 44-45) lacks credibility.  While

this statement technically may be true, it provides no guarantee that either party could actually

obtain the necessary documents for a U.S. action through either a court order or through

voluntary means.

Given the recent disdain of the court in the U.K. for Lexington's actions with respect to

Forrest in this action and the Law Debenture Trust action,[9] it is not at all clear that a court in the

U.K would lift any confidentiality orders at Lexington's request, or even Defendants' request.

Additionally, there exists no evidence that any of the relevant parties would agree to voluntarily

disclose otherwise confidential documents to Forrest, Rogers, or even Lexington, for an action

pending in another country and over which they can exert no control.

Finally, because the policies are governed by English law, the parties will most likely call

upon English lawyers to give testimony.  (See, e.g., Exh. "E" at § 7.1 (English law governs);

Exh. "D" at § 22(1) (same); Exh. "C" at § 20(1) (same)).  Permitting the action to continue in the

United States, therefore, will dramatically increase the cost to the litigants and unduly prejudice

Defendants.

---

[9]      See note 8, *supra*.

**(d)    Lexington Has Waived Any Argument That an English Forum Would Be Inconvenient.**

Finally, Lexington has unequivocally waived any argument that litigation in the English forum would be inconvenient or present an improper venue.  For example, in the Collateral Agreement for the Regent transaction, the parties provided that English courts have jurisdiction, albeit non-exclusive jurisdiction, over "any disputes which may arise out of or in connection with [the Collateral Agreement] and accordingly any legal action or proceedings arising out of or in connection with this [Collateral Agreement]."  (See Exh. "D" at ¶ 22(2)).  Moreover, "[the parties] *waive[] any objection to Proceedings in such courts whether on the ground of venue or on the ground that the Proceedings have been brought in an inconvenient forum*."  Id. (emphasis supplied) (See also Exh. "E" at ¶ 7.2 (the parties "waive[] any objection which it might have now or hereafter to [English] courts being nominated as the forum to hear and determine any Proceedings and to settle any Disputes and agree[] not to claim that such court is not a convenient or appropriate forum")).  In the face of these clear and consistent waivers, Lexington's argument that an English court would not present a proper forum for this action is completely without basis or merit.

**B.    The Doctrine of International Abstention Also Supports Dismissal, or Alternatively, a Stay Pending Conclusion of Parallel Pending Proceedings in England.**

Pursuant to the doctrine of international abstention, this Court has the discretion to decline the exercise of jurisdiction over this action in deference to the laws and interests of the U.K..  Paraschos v. YBM Magnex Int'l, Inc., 130 F. Supp. 2d 642, 645 (E.D. Pa. 2000) (Newcomer, S.J.) ("Paraschos II") (citations omitted), reh'g denied, 2001 U.S. Dist. LEXIS 22790 (E.D. Pa. Feb. 8, 2001).  The doctrine of international abstention recognizes the propriety of dismissing or staying an action in the interests of international comity, judicial economy, and

complete resolution of parallel concerns.  See, Nat'l Union Fire Ins. Co. of Pitt. v. Kozeny, 115 F. Supp. 2d 1243, 1247 (D. Col. 2000); Evergreen Marine Corp. v. Welgrow Int'l Inc., 954 F. Supp. 101, 103-04 (S.D.N.Y. 1997) (staying action in favor of Belgian litigation).  Indeed, "comity should be withheld only when its acceptance would be contrary or prejudicial to the interest of" the United States.  Paraschos II, 130 F. Supp. 2d at 645 (quoting Philadelphia Gear Corp. v. Philadelphia Gear de Mexico, S.A., 44 F.3d 187, 191 (3d Cir. 1994) (quoting Somportex Ltd. v. Philadelphia Chewing Gum Corp., 453 F.2d 435, 440 (3d Cir. 1971)).  Lexington's response fails to trump the factors favoring international abstention.

Among the factors a court considers in determining whether it should dismiss or stay an action under the doctrine of international abstention are:

> (1) similarity of parties and issues involved in the foreign litigation; (2) the promotion of judicial efficiency; (3) adequacy of relief available in the alternative forum; (4) issues of fairness to and convenience of the parties, counsel, and witnesses; (5) the possibility of prejudice to any of the parties; and (6) the temporal sequence of the filing of the actions.

Goldhammer v. Dunkin' Donuts, 59 F. Supp. 2d 248, 252-53 (D. Mass. 1999) (citations omitted).  (See also Rogers' Mem. in Support of Mot. to Dismiss or Stay at 27-28 (setting forth international abstention factors) (citing Nat'l Union, 115 F. Supp. 2d at 1247)).  A balancing of these factors weighs heavily in favor of this Court exercising its power to dismiss or stay in deference to principles of international comity.  Indeed, "notions of international comity are at an apex when parties," such as Lexington, "inject themselves into the economy of another nation for profit, particularly one as close as Great Britain, and then try to extricate themselves from its jurisdiction."  Goldhammer, 59 F. Supp. 2d at 255-56.

1.     **The Issues and Allegations in This Action and the English Proceedings Are Nearly Identical.**

The issues and allegations in this action are nearly identical to the issues and allegations raised by Lexington in the Law Debenture Trust's action against it in the U.K.. The Court should give little credence to Lexington's overstatement of the lack of an <u>exact</u> identity of parties between the U.S. and U.K. proceedings in its analysis.

In the Law Debenture Trust action, Lexington has raised the defense of fraudulent inducement, alleging that Forrest and employees of the Law Debenture Trust made fraudulent misrepresentations to Lexington, thereby inducing it to underwrite insurance policies for the Hollywood Funding Transactions that it would not otherwise have underwritten. Specifically, Lexington alleges that: the number and nature of the films made breached the policies; that Jardine Lloyd Thompson or Flashpoint, or both, made fraudulent or negligent misrepresentations or non-disclosures with regard to projected revenues in the sales estimates and the quality and nature of the films to be made to induce Lexington to insure the risk; and that Flashpoint improperly applied the revenues received from the films.[10]

Lexington makes nearly identical allegations in this action. For example, in the Complaint, Lexington alleges that

> Forrest conspired with the insurance broker (Gordon Dawson of Lloyd Thompson) to produce new estimates that were substantially higher . . . and presented the risk to the insurance market on the basis of those new estimates . . . [and that] Forrest and Dawson knew that the estimates had no basis in fact and that they were

---

[10]     (<u>See</u> Forrest Mem. in Support of Mot. to Dismiss or Stay at 19; Rogers Mem. in Support of Mot. to Dismiss or Stay at 29-30 n17 (citing <u>Law Debenture Trust Corp. v. Lexington Ins. Co.</u>, Claim No. 2000 Folio 552, 2001 WL 1423026 ¶ 8 (Q.B. 2001)). (<u>See also</u> <u>Law Debenture Trust Corp. (Channel Islands) Ltd. v. Lexington Ins. Co.</u>, Nos. 2001 Folios 211, 935, [2002] EWHC 2446 ¶¶ 3, 6 (Q.B. Nov. 19, 2002)) (discussing Lexington's allegations against Jardine Lloyd Thompson and Forrest relating to the presentation of sales estimates for Hollywood Funding Nos. 4 & 5) (attached hereto as Exhibit "G")).

derived by applying to an already-inflated starting point [an improperly extended revenue cycle . . .

(Complaint at ¶ 23(a)).  (See also Complaint at ¶ 23(b) (alleging that Lloyd Thompson, at Defendants' direction, presented inflated sales estimates to the insurers for *Award*); ¶ 23(c) (alleging that Forrest and Neil Dunn presented inflated sales estimates for *The Secret Adventures of Jules Verne*)).

The relevant inquiry is whether the English court will adjudicate the same factual issues, not the exact same causes of action, as presented in this action. Goldhammer, 59 F. Supp. 2d at 253-54 (staying action where factual and legal issues in the two cases overlapped, even though one action sounded in tort and the other in contract).  Thus, Lexington's argument that the English court will determine only whether Lexington has a defense to the insurance contract lacks merit where Lexington asserts that the same alleged underlying fraudulent acts of Defendants case are the same acts that provide Lexington's defense.  (See Pl's. Mem in Opp. to Defs.' Mots. to Dismiss or Stay at 54).

Faced with the overwhelming similarity of the issues before this Court and the English court, Lexington argues that this Court should not abstain from adjudicating this case because Forrest and Rogers are not before the English court in the Law Debenture Trust action.  (See Pl's. Mem. in Opp. to Defs.' Mots. to Dismiss or Stay at 53).  Lexington again would have the Court ignore a salient fact: Flashpoint is currently in Administration and Lexington is pursuing pending creditors' remedies against it.  In Goldhammer, the court held that the inclusion of a separately named party in the U.S. action, who was not a party to the pending U.K. action, did not preclude a stay based on international comity because the separately named party held a two-thirds interest in one of the parties to the U.K. action.  59 F. Supp. 2d at 253.  That rationale is

equally applicable here for, as Lexington makes abundantly clear, Forrest and Rogers are majority owners of Flashpoint.

Moreover, although Forrest and Rogers are not named parties to the Law Debenture Trust action in the U.K., Ms. Sabben-Clare, who represented Lexington in the U.K. proceedings in its attempt to force Forrest to turn over documents stored on his personal computer after Lexington commenced this action, admitted that "the fact is that the substance of the allegations being made in this [U.K.] litigation have all included allegations of fraud against Flashpoint *as Mr. Forrest*." (Exh. "F" at 75 lines 1-3) (emphasis added). Faced with this admission, this Court should not now permit Lexington to argue that the lack of an exact identity of parties justifies denial of Forrest's motion to dismiss or stay on grounds of international abstention. Rather, in light of the substantial similarity of issues between the U.S. and U.K. proceedings, and the practical similarity in identity of parties, international abstention remains an appropriate exercise of this Court's discretion.

## 2. Avoidance of Duplicative Litigation and the Promotion of Judicial Efficiency Weigh in Favor of Abstention.

Although the avoidance of duplicative litigation is not dispositive in a court's determination of whether to stay or dismiss on the grounds of international abstention, it represents a key factor in the court's analysis that, at a minimum, militates in favor of staying the action. Goldhammer, 59 F. Supp. 2d at 254 (citations omitted). Dismissal of an action in a U.S. district court on the grounds of international comity is appropriate where the action would be duplicative of related issues pending before a foreign court. Paraschos II, 130 F. Supp. 2d at 647 (dismissing federal action under the Exchange Act to avoid duplicating many related proceedings pending before Canadian courts). Where, as demonstrated above, the two actions involve "identical facts and highly similar legal issues," international abstention allows the court to avoid

the inherent "risk of inconsistent judgments" and avoid the waste of judicial resources.

Goldhammer, 59 F. Supp. 2d at 254.

The judge who hears the case in the U.K. will have mastered a complex factual situation and will be ideally suited to adjudicate any allegations of fraud against Mr. Forrest or Mr. Rogers.  Indeed, as Mr. Justice Langley, who has already become acutely aware of the complexities of the English proceedings by the Law Debenture Trust against Lexington, stated, "[England] seems to be obviously the logical venue for [Forrest] to be impleaded if that was the intention." (Exh. "F" at 10: 15-16).

### 3.      English Courts Can Provide Adequate Relief.

The ability of the foreign court to provide adequate relief for a plaintiff's claims weighs in favor of dismissal on the grounds of international abstention.  Paraschos II, 130 F. Supp. 2d at 647 (where Canadian law provides a cause of action for securities fraud, and Canada has an interest in the case, Canadian law would afford plaintiffs with adequate relief, albeit different from the specific relief a U.S. court affords).  As demonstrated above, Forrest has clearly established the adequacy of relief that a court in the U.K. can provide.  Although the U.K. does not have a cause of action exactly equivalent to RICO, English common law provides Lexington with rights of indemnification against Forrest and Rogers if they are shown to have made fraudulent misrepresentations.  See supra at (II)(A)(1)(b)-(d).  See also Nat'l Union, 115 F. Supp. 2d at 1247 ("deference to British proceedings is consistent with notions of international comity" in keeping with the common legal heritage of the U.S. and England) (quoting Goldhammer, 59 F. Supp. 2d at 254-55).

####    4.    The U.K.'s Interest in the Issues at the Heart of Lexington's Claims Merits Deference to a U.K. Forum.

The interest of the U.K. in the issues at the center of Lexington's claims merits deference to the courts in the U.K.. In <u>Paraschos v. YBM Magnex Int'l, Inc.</u>, No. 98-6444, 2000 WL 325945 (E.D. Pa. Mar. 29, 2000) ("Paraschos I"), the court originally denied the defendants' motion to dismiss on the grounds of international comity in deference to the plaintiffs' choice to bring their claims under the Exchange Act and have their claims adjudicated under U.S. law. <u>Paraschos II</u>, 130 F. Supp. 2d at 645. Several months later, however, the court dismissed all claims on the grounds of international comity, based on new facts before the court that strengthened Canada's interest in the proceeding. <u>Id.</u> at 644. The court determined that these new facts demonstrated further that the action was "dominated by multi-national, and in particular, Canadian issues, interests and concerns." <u>Id.</u>

Similarly, Forrest, a named defendant, and a majority of Forrest's alleged co-conspirators such as Gordon Dawson and Stanley Munson, are citizens of the U.K. (<u>See</u> Complaint at ¶¶ 23, 31-32; Forrest Affidavit, Exh. "B", at ¶ 13). Moreover, Lexington alleges that Defendants misappropriated funds, which were allegedly to be held in segregated accounts in the U.K.. (<u>See</u> Complaint at ¶¶ 28-29). Next, all of the negotiations for the collateral agreements and PLIPs Lexington alleges Defendants fraudulently induced, took place in England, among English solicitors and underwriters. (<u>See</u> Wright Affidavit, Exh. "A", at ¶¶ 4, 5, & 7; Forrest Affidavit, Exh. "B", at ¶¶ 4-11). Moreover, those documents provide for the application of English law to this dispute. (<u>See</u> Exh. "E" at § 7.1; Exh. "D" at § 22(1); Exh. "C" at § 20(1)). Additionally, Flashpoint, of which Forrest and Rogers are majority shareholders, is currently in Administration in England. (<u>See</u> Wright Affidavit, Exh. "A", at ¶ 2). Most importantly, as Lexington repeatedly

ignores, the same factual issues are already before the English courts.  In light of the domination
of English concerns, dismissal or stay in deference to the English court is appropriate.

>        **5.        Issues of Fairness to and Convenience of Witnesses, Parties, and
>                Counsel and Potential Prejudice to Any of the Parties Weigh in Favor
>                of Dismissal or Stay.**

"It is not unfair to require an American party to defend and prosecute a case in England
where the party has been engaged in 'purposeful activity' there."  Goldhammer, 59 F. Supp. 2d
at 254 (citation omitted).  Lexington most assuredly has engaged in substantial "purposeful
activity" in England.  The parties agreed that English law applied to the collateral agreements
and PLIPs, the fraudulent inducement of which lies at the heart of Lexington's claims.  (See
Exhs. "C," "D," & "E").  The majority of the disputed facts are based on alleged conduct that
occurred in England.  With the close connection of the U.K. to the transactions, facts, and issues
in dispute, there can be no doubt as to Lexington's participation in "purposeful activity" in the
U.K..

Even if this Court were to accept Lexington's assertions that numerous witnesses are
located in the U.S., given the close connection of the U.K. with the conduct at issue in this case,
at the very least, convenience represents a neutral factor that favors neither party.  See
Goldhammer, 59 F. Supp. 2d at 17 (convenience factor is a draw where, on one hand, one
plaintiff was an English company, the parties transacted business in England and agreed that
English law applied to their agreement, many disputed facts were based on conduct that occurred
in England and the American plaintiff chose to sell his product and actively manage a business in
England, but defendant/counterclaim plaintiff had its principal place of business in the U.S. and
the manager of its U.K. operations and other witnesses were U.S. residents).

**6.    Lexington's Lethargy in Filing the Instant Action Militates in Favor of a Dismissal or Stay.**

Finally, Lexington's "litigation lethargy," both in the U.K. and in this Court, clinches the appropriateness of dismissal or stay of the instant action on grounds of international abstention. See Goldhammer, 59 F. Supp. 2d at 255 ("litigation lethargy is an important consideration" in international abstention analysis). Litigation against Flashpoint began in the U.K. in December 2000, over a year and a half before Lexington commenced this action. Subsequently, the Law Debenture Trust instituted an action against Lexington, in which Lexington asserted the defense of fraudulent inducement. At any time, Lexington could have instituted separate proceedings against Forrest and Rogers in the U.K. or joined them in proceedings already instituted, but inexplicably failed to do so. After having delayed so long in commencing this action, Lexington's claims that a stay would adversely affect sources of proof lack credibility. (See Pl's. Mem. in Opp. to Defs.' Mots. to Dismiss or Stay at 56).

The prudence of a stay or dismissal is further evidenced by the imminence of adjudication of the same facts and issues in the Law Debenture Trust action. Where the complaint and answer have been filed, extensive discovery has been completed, and trial in the foreign action is imminent, a stay or dismissal of the U.S. action is appropriate. See, e.g., Caspian Invs., Ltd. v. Vicom Holdings, Ltd., 770 F. Supp. 880, 885 (S.D.N.Y. 1991) (dismissing federal action pending Irish litigation) (cited in Goldhammer, 59 F. Supp. 2d at 255). The Law Debenture Trust action is scheduled to commence in April, only two months from now. In light of Lexington's delays, and the close resolution of the same factual issues in the Law Debenture Trust Action, dismissal or stay of this action pending the conclusion of the English proceedings would be a prudent exercise of judicial discretion.

**C.    Lexington Has Failed to Establish Subject Matter Jurisdiction in This Court Because Its Claims Remain Contingent on the Outcome of the English Proceedings.**

Even if this Court were to determine that this forum represented the appropriate forum for adjudication of this action, Lexington's failure to establish subject matter jurisdiction in this Court militates in favor of dismissal. The unripe and speculative nature of Lexington's claims prevents it from presenting an actual case or controversy for adjudication. For the reasons set forth in Forrest's and Rogers' briefs in support of their respective motions,[11] this Court should dismiss this action for lack of subject matter jurisdiction.

**D.    Lexington's Claims Against Forrest Should Be Dismissed for Failure to Meet the Heightened Pleading Requirements of Fed. R. Civ. P. 9(b).**

Finally, this Court should dismiss Lexington's claims for failure to satisfy the heightened pleading requirements of Federal Rules of Civil Procedure 9(b). Lexington impermissibly pleads fraud "on information and belief" and fails to sufficiently allege that Defendants prepared or presented fraudulent sales estimates. For the reasons set forth in Forrest's and Rogers' briefs in support of their respective motions,[12] the Court should dismiss this action for failure to comply with the requirements of Rule 9(b).

### III.    Conclusion

For all of the foregoing reasons, Forrest requests that this Court dismiss Lexington's complaint pursuant to the doctrine of *forum non conveniens*. Alternatively, Forrest requests the Court dismiss or stay this action pursuant to the doctrine of international abstention. Should this Court find that adjudication is proper in this forum, Forrest requests the Court dismiss for lack of

---

[11]    Forrest incorporates sections (I)(A) and (I)(E) of Rogers' Reply Memorandum of Law in Support of his Motion to Dismiss or Stay.

[12]    Forrest incorporates sections (I)(D)(2) and (I)(D)(3) of Rogers' Reply Memorandum of Law in Support of his Motion to Dismiss or Stay.

personal jurisdiction over Forrest, lack of subject matter jurisdiction, or for lack of ripeness and

standing, or any or all of the foregoing.  Finally, if the Court permits Lexington's action to

continue, Forrest requests that this Court dismiss Lexington's RICO and common law fraud

claims for failure to plead fraud with sufficient particularity pursuant to Federal Rule of Civil

Procedure 9(b).

Respectfully submitted,

DUANE MORRIS LLP

_____
Edward M. Dunham, Jr.
Shannon Hampton Sutherland
One Liberty Place
Philadelphia, PA 19103-7396
215.979.1148 – EMD phone
215.979-1104 – SHS phone
215.979.1020 - fax
Attorneys for Defendant
David Forrest

Dated: February 12, 2003