# CAHILL GORDON & REINDEL

## EIGHTY PINE STREET

### NEW YORK, N.Y. 10005-1702

FLOYD ABRAMS
L. HOWARD ADAMS
ROBERT A. ALESSI
ROGER ANDRUS
HELENE R. BANKS
MICHAEL A. BECKER
LANDIS C. BEST
GARY A. BROOKS
SUSAN BUCKLEY
KEVIN J. BURKE
P. KEVIN CASTEL
JAMES J. CLARK
BENJAMIN J. COHEN
CHRISTOPHER T. COX
W. LESLIE DUFFY
RICHARD E. FARLEY
PATRICIA FARREN
JOAN MURTAGH FRANKEL
BART FRIEDMAN
CIRO A. GAMBONI
WILLIAM B. GANNETT
CHARLES A. GILMAN
STEPHEN A. GREENE
ROBERT M. HALLMAN
WILLIAM M. HARTNETT
CRAIG M. HOROWITZ
DAVID G. JANUSZEWSKI
THOMAS J. KAVALER
LAWRENCE A. KOBRIN
IMMANUEL KOHN

EDWARD P. KRUGMAN
GEOFFREY E. LIEBMANN
MICHAEL MACRIS
JONATHAN I. MARK
GERARD M. MEISTRELL
ROGER MELTZER
MICHAEL E. MICHETTI
JOHN P. MITCHELL
ATHY A. MOBILIA
DONALD J. MULVIHILL
KENNETH W. ORCE
LUIS R. PENALVER
ROY L. REGOZIN
DEAN RINGEL
JAMES ROBINSON
THORN ROSENTHAL
JONATHAN A. SCHAFFZIN
JOHN SCHUSTER
HOWARD G. SLOANE
LAURENCE T. SORKIN
LEONARD A. SPIVAK
GERALD S. TANENBAUM
JONATHAN D. THIER
JOHN A. TRIPODORO
ROBERT USADI
GEORGE WAILAND
GLENN J. WALDRIP, JR.
MICHAEL B. WEISS
GARY W. WOLF
DANIEL J. ZUBKOFF

WALTER C. CLIFF
DAVID R. HYDE
WILLIAM T. LIFLAND
DENIS McINERNEY
MATHIAS E. MONE
IRWIN SCHNEIDERMAN
JOHN R. VAUGHAN
RALPH O. WINGER
SENIOR COUNSEL

CORYDON B. DUNHAM
PHILIP A. HEIMOWITZ
COUNSEL

WASHINGTON, D.C. OFFICE
1990 K STREET, N.W.
WASHINGTON, D.C. 20006-1181

EUROPEAN OFFICE
AUGUSTINE HOUSE
6A AUSTIN FRIARS
LONDON EC2N 2HA

TELEPHONE 212-701-3000
FACSIMILE 212-269-5420

WRITER'S DIRECT NUMBER

(212) 701-3506

March 12, 2003

Re: *Lexington Insurance Co. v. Forrest and Rogers*
    Civil Action No. 02-CV-4435

Dear Judge Brody:

This letter responds to the post-argument letters of Messrs. Rohn and Dunham of February 28 and March 3 respectively. We submit that the letters are wrong and seek a result that is completely without justification.

## *Injury and Ripeness*

The complaint in this action alleges current, out-of-pocket costs incurred by plaintiff in connection with litigation in which it was forced to engage as a proximate result of defendants' fraud. As I advised the Court at the conference on February 25, those costs currently exceed $15 million. And it is, as we pointed out in our answering brief (at 33-34), black letter law that:

"One who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover reasonable compensation for loss of time, attorney fees and other expenditures thereby suffered or incurred in the earlier action." *Restatement (Second) of Torts* § 914(2).

Mr. Rohn argues, however, that the English litigation may make these expenses go away. So does Mr. Dunham. They are both wrong: they are wrong on the law, and they are wrong on the facts.

Contrary to Mr. Rohn's arguments, the law is clear that even a "distinct possibility" that other litigation may resolve particular issues or reduce or eliminate damages does not provide a basis to dismiss or stay a RICO action. *In re Foundation for New Era Philanthropy Litigation*, 1997 WL 585577 (E.D. Pa. Sept. 4, 1996).

As a matter of fact, Ms. George's Declaration points out at paragraphs 18 through 21 that Lexington "will certainly incur some loss" because of (1) the likelihood that a claimant would receive only "a proportion of his [her or its] costs" where, as here, there are numerous issues, and (2) the uncertainty, in any event, as to the solvency of the parties against whom any award of attorneys' fees might

-2-

ultimately be made. As Ms. George points out, Lexington has already seen how an order for costs (against Flashpoint), can be an illusory victory "given that Flashpoint essentially has no funds, has numerous creditors, and is in administration." The Declaration of Timothy John Langton, submitted with Mr. Dunham's letter, does not begin to undercut this point.

### *Present, Non-Contingent Injury from the Creditors' Proceeding*

Of the many reasons why this is so, the simplest perhaps is that certain of the pleaded damages in this case will never be recoverable in the pending London litigation, no matter how stunning a victory Lexington may obtain there. We refer to paragraphs 49(a), 59(a), and 63 of the Complaint in this matter, which seek recovery of the substantial amounts Lexington has expended pursuing its creditors' remedies against Flashpoint UK. As set forth in the Declaration of Adrian Mecz annexed hereto as Exhibit A," these costs will never be recoverable in the existing litigation, because "costs" in England (even on an indemnity basis) includes only costs actually incurred in the action for which they are awarded (Mecz Dec. ¶ 6). The creditors' litigation against Flashpoint UK is over, and it is not and never has been part of the current insurance coverage litigation (*id.* ¶¶ 4, 6). As Mr. Langton points out (Langton Dec. ¶ 4), Lexington does have a costs order against Flashpoint UK in that action, but Flashpoint UK is insolvent, and Lexington has no hope whatsoever of recovering even a fraction of what it expended there (George Dec. ¶¶ 4, 5; Mecz Dec. ¶¶ 4, 5). Mr. Langton's speculation that Lexington may in the future recover on its costs order (Langton Dec. ¶ 4) is both wrong and irrelevant. It is wrong because the collection efforts being engaged in by Numerica relate almost entirely to film proceeds, all of which are subject to security interests and none of which, therefore, will become general assets of the Flashpoint estate available to satisfy the costs order (Mecz Dec. ¶ 5). It is irrelevant because, as Judge Dalzell expressly held in *New Era Philanthropy*, the possibility that Lexington might in the future be made whole from an insolvent estate does not in any way take away from the existence of current compensable injury. Having bankrupted Flashpoint UK by their misappropriations of funds, Messrs. Forrest and Rogers would now have this Court require Lexington to beg for scraps from the bankrupt estate instead of seeking recovery from those who caused Lexington's loss. That is arrant nonsense.

### *Lexington Will Not Be Made Whole in the UK, Even if It Prevails There*

Mr. Langton appears not to challenge any of the specific grounds underlying Ms. George's conclusion that "[i]n practice, Lexington will not be able to recover all the costs that it incurs" (George Dec. ¶ 18). Rather, he adverts to the possibility that Lexington might recover costs on an "indemnity" basis that, he says, would be likely to make Lexington whole. Not so.

Awards of indemnity costs are extremely rare in England and would certainly not be awarded against the insureds in this case (Law Debenture Trust/Hollywood Recovery Trust), who nobody contends were complicit in the alleged fraud (Mecz Dec. ¶ 8). Accordingly, even if proving that Flashpoint committed fraud provides Lexington with a good defense against LDT/HRT — which, as Ms. George pointed out (George Dec. ¶ 10) and as is discussed further below, is by no means certain — that would not entitle Lexington to indemnity costs and would leave Lexington with unrecovered expenses even on Mr. Langton's view of life. The only situation in which it is even possible for Lexington to recover indemnity costs is if it shows that the broker (Jardine Lloyd Thompson) committed fraud,** and Lexington might well be limited to standard costs even in those circumstances (Mecz Dec. ¶ 9).

Once again, however, these fine points of English procedure are largely irrelevant, because ***Lexington will not be made whole even if it recovers indemnity costs against JLT.*** In addition to

* Ms. George is on a well-deserved holiday and thus was not available to respond to Mr. Langton.

** This overlaps to some extent with, but is *not* the same thing as, proving the Flashpoint fraud at issue in this action.

the costs of pursuing creditors' remedies, discussed above, costs that were caused by the Flashpoint fraud but are not "costs of the action" in England, even on an indemnity basis, include certain of the fees of Lexington's special entertainment counsel, the Los Angeles firm of Loeb & Loeb, and the fees of my firm, which is worldwide coordinating counsel for AIG Companies in film finance litigation. As Mr. Mecz points out, a substantial portion of Loeb & Loeb's fees in analyzing and advising on the Flashpoint transactions was incurred before the Hollywood Funding litigation even began, and that portion will not be recoverable in England regardless of the outcome there (Mecz Dec. ¶ 10). Neither will those portions of my firm's fees that are directly related to the UK litigation (*id.* ¶ 11).⁎ Here too, therefore, there are real, live, out-of-pocket costs occasioned by defendants' fraud that cannot be recovered except as damages in this litigation.

### *The Terra Nova Decision Is Inapposite*

As I pointed out to the Court on February 25, the *Terra Nova* decision, which Mr. Rohn attached to his reply brief, is completely unlike this case, because the other litigation there involved the same parties as the pending RICO action, whereas this case does not. Accordingly, *Terra Nova* does not fit within the rule on which we rely, the rule of *Restatement* § 914(2) that fraud damages include the costs of "bringing or defending an action *against a third person*" (emphasis added). There was no "third person" in *Terra Nova*;⁎⁎ here, everybody in England is a "third person" vis-à-vis these defendants. Mr. Rohn's attempt to resuscitate the *Terra Nova* case goes nowhere.

### *The UK Litigation Will Not Necessarily Resolve Any Issues Relevant Here*

Mr. Rohn's contention that the U.K. coverage action will "necessarily" decide "the issue of fraud" ignores both the record before this Court and the greater breadth of the fraud claims presented in this Court. More specifically, Mr. Rohn contends:

"[I]f plaintiff loses in the coverage action and is forced to pay the asserted claims, the U.K. Court will necessarily have found against plaintiff on the issue of fraud."

This contention ignores the Declaration of Ms. George, at paragraphs 9 and 10, in which she explains the limited nature of the fraud allegations before the English Court, and the contention of the investors

---

⁎ As but one example, I spent a substantial amount of time this past weekend reviewing expert reports to be submitted in the UK litigation and discussing them with Mr. Mecz. That time is not recoverable as attorneys' fees in this action under 18 U.S.C. § 1964(c), because it does not relate to the prosecution of this action. It is not recoverable in England because I am not a member of the English Bar and I do not appear in the English action. My role vis-à-vis Ms. George and Mr. Mecz is as an advisor and an interface between them and the client (Lexington); as such, the fees for my support of their efforts are included within Lexington's "loss of time . . . and other expenditures" incurred by reason of defendants' fraud.

⁎⁎ In *Terra Nova*, plaintiffs "Jeff" and "Distefano" sued an insurer for coverage and bad faith for refusing to pay certain property damage claims. 663 F. Supp. 809, 810. In defending that initial lawsuit, the insurer answered and asserted defenses. *Id.* Then, over three years after the submission of the property claim, it filed a RICO claim against Jeff and Distefano contending that the property damage claim previously filed was fraudulent. *Id.* As the Court in *Terra Nova* recognized, the question of whether Distefano and Jeff's insurance claim was fraudulent was presented not only in the RICO case but in the earlier insurance litigation involving the identical parties. *Id.* at 810-11. In determining that a stay of the RICO action was appropriate, the Court "weighed the hardship that would be incurred by the parties," found "little, if any hardship" in having the insurer defend the earlier filed lawsuit of its insureds, and recognized an "additional benefit" of its stay was "neutralizing" the insurer's "attempt to use its RICO action as a means of cooercing a settlement" with its insureds. *Id.* at 812-13. In sum, in *Terra Nova*, the Court was faced with truly duplicative litigation between identical parties, saw a potential for coerciveness that tilted the "balance of hardships" in favor of the stay, and ruled on facts that could not be more different from those involved here.

-4-

that they are "insulate[d] . . . from any defense based on fraudulent conduct by Flashpoint." Further, the fraud alleged before this Court goes beyond "fraudulent inducement," which as Ms. George explains is only one of seven identified defenses before the English Court. Most significantly, only in this action does Lexington seek recovery for the diversions of funds raised for Hollywood 4, 5, and 6; in the UK litigation that is going to trial in May (Hollywood 4 and 5), the focus is on diversion of funds from Hollywood 1, 2, and 3, and even there only on the basis that failure to disclose the diversions misrepresented that Flashpoint was an upstanding citizen when in truth it was not. Even in the Hollywood 6 litigation — which as I pointed out at the conference will not be concluded until 2006 at the earliest — the Hollywood 6 diversions of funds are not directly at issue, although the Hollywood 4 and 5 diversions may be.

Moreover, Mr. Rohn lacks logical or other support for his contention that "any finding in plaintiff's favor by the U.K. Courts on a ground other than fraud would abrogate any possibility of plaintiff establishing a causal link between its incursion of legal fees and the alleged fraud." As Ms. George explains, the defenses of Lexington other than fraud in the inception include issues as to "insurable interest," the doctrine of "fortuity," and the failure of others to provide reinsurance. Mr. Rohn clearly is wrong that Lexington's prevailing on any one of those defenses undermines this case. Lexington contends in this case that but for the fraudulent sale estimates, and the provision to it of "collateral agreements" providing false assurance that the funds raised for projects Lexington insured would be used for those projects,* Lexington would not have become involved in the transactions at all. The fees and other expenses Lexington has already incurred are a direct and proximate result of defendants' fraud here, even if it turns out that Lexington wins in England on other issues. Lexington's claims here remain substantial and viable if Lexington prevails in England on non-fraud grounds, or loses on fraud because the investors establish that they are "isolated" from such claims, or if fraud issues here are not addressed for any other reason in the U.K.

Mr. Rohn further argues that "plaintiff fails to cite any case in which the Court held that a claim for damages in the form of legal fees — which related to a still pending litigation in which a judgment had yet to be entered — was ripe." To the extent that Mr. Rohn suggests that damages of legal fees can only be recovered by parties that have successfully obtained a judgment in earlier litigation, he is wrong once more. Numerous cases have allowed litigation seeking legal fees to proceed: where the underlying litigation was settled and not taken to a judgment, *e.g.*, *Seaboard Surety Co.* v. *Permacrete Construction Corp.*, 221 F.2d 366, 371-72 (3d Cir. 1955);** where there was no underlying litigation at all, *e.g.*, *Beiser* v. *Evered*, 20 Conn. Supp. 365, 366, 135 A.2d 741, 742-43 (C.P. 1957); *Barrett Roofing & Supply Co.* v. *Ross*, 131 F. Supp. 348 (D. Mass. 1955); and even where the underlying litigation resulted in a judgment adverse to the party seeking legal fees, *e.q.*, *McCosker* v. *Federal Insurance Co.*, 115 Kan. 626, 224 P. 53 (1924); *Bergquist* v. *Kreidler*, 158 Minn. 127, 196 N.W. 964 (1924).

## *Forum Non Conveniens*

To the extent that Mr. Dunham addresses the issue of *forum non conveniens*, Lexington relies principally on the presentation set forth in its responding brief at pages 30 to 32, 43 to 44, and 45 to 48 demonstrating a great amount of activity in the United States relating to the underwriting of the insurance at issue, the operation and diversions from the projects at issue, and the alleged fraud at issue.

---

*   As set forth in the Complaint, Lexington alleges that at the time the collateral agreements were entered into, defendants and their companies were already engaged in an undisclosed pattern of looting and conflict of interests in connection with these and other projects which rendered the protections therein relied upon by Lexington illusory.

**  In *Seaboard Surety*, the Third Circuit relied on section 914 of the *Restatement of Torts*, the predecessor of section 914(2) of the *Restatement (Second) of Torts*, quoted above.

We do, however, object to Mr. Dunham's assertion that we "improperly characterized" the fax from Mr. Drummond Brady to Mr. Forrest that is annexed hereto as Exhibit B and was included within Exhibit A to the Mory Declaration in opposition to the motions to dismiss.

Our point in proffering the fax was to show that the collateral agreements (which are expressly alleged in this action to have been fraudulently induced) were reviewed and signed off on by Lexington's home office in Boston, and not by Lexington's UK underwriter. That is, the inducement of those agreements took place in Boston. Mr. Dunham attempts to pooh-pooh the fax by describing it as a "mere consultation with Rob Brace of the Boston office of Lexington," but the document plainly evidences more than a "mere consultation" and illustrates the significance of the involvement of, and the approvals of, Lexington's Boston office and Mr. Brace. In the fax, Mr. Drummond Brady advises Mr. Forrest that "Brace feels that he is entitled to review all relevant documentation, including Wording and Collateral Agreement prior to confirming his agreement (and in this regard, he is correct)." Mr. Drummond Brady goes on to advise Mr. Forrest that in obtaining an agreement from Lexington "we will be calling Mr. Brace once Boston opens today. Meanwhile, as an emergency measure, I can travel to Boston next week to see these people in person." I do not blame Mr. Dunham for disliking the document, but it says what it says, and what it says is that the action on the collateral agreements so far as Lexington was concerned was in Boston, not London.

Indeed, not only was Lexington's U.S. operation substantially involved in the underwriting; so was Flashpoint's. We attach as Exhibit C cover notes and debit notes issued by the broker to Flashpoint *in Gladwyne* to document and bill the placements of the Hollywood 4, 5, and 6 transactions.

Finally, there is Mr. Forrest's rather curious affidavit that purports to say something — it is not clear exactly what — about a dinner in London in which he may or may not have said something about some of Flashpoint's misconduct. The affidavit, read closely, has no evidentiary value whatsoever. Mr. Forrest, for example, talks of Mr. Lebedev's recollection of the dinner, not his own. Indeed, the affidavit is significant far more for what it does *not* say than what it does. Mr. Forrest does not deny commingling funds prior to inception of Hollywood 4 and Hollywood 5. Nor does he say that Lexington was told that Flashpoint's Russian investments were being made with *funds raised for the production of films* as opposed to with Flashpoint's own equity. If this is Mr. Forrest's denial of the substantive allegations of the Complaint, he is in deep, deep trouble.

Of course, the affidavit is submitted in an effort to show the presence of witnesses outside the United States, but it does not accomplish that task very well, either. Marty Fink has already been identified by Ms. George as resident in California; Cecilia Polato is not English but Belgian and was, the last we heard, living in the United States.

Regardless, Mr. Dunham is wrong in arguing that the applicability of *forum non conveniens* depends on determinations as to where the "majority" of relevant events occurred. To the contrary, application of the doctrine requires a showing that "trial of the action in Pennsylvania establishes 'oppressiveness and vexation' [to defendants] 'out of all proportion' to plaintiff['s] convenience.'" *In Re Corel Corp. Inc. Securities Litigation*, 147 F. Supp. 2d 363, 365 (E.D. Pa. 2001) (Brody, J.) (quoting *Piper Aircraft Co.* v. *Reyno*, 454 U.S. 235, 241 (1981)). That is plainly not the case here.

Lexington is incurring millions of dollars of legal fees in proceedings in the U.K. with third parties as a result of the fraud of defendants. The fraud alleged in this case occurred substantially as a result of activities involving fraudulent sales estimates made in the United States, diversions from projects operating in the United States, diversions to entities and properties in the United States, the operations of Lexington in its Boston office and elsewhere in the United States, and the operations of Flashpoint in Pennsylvania, California, and other places in the United States. The fraud alleged in this case is not limited to fraud in the inducement, and is particularly appropriate for resolution under the RICO statute given the temporal and geographic breadth of the scheme alleged. We respectfully submit that the motions to dismiss should be denied.

CAHILL GORDON & REINDEL

-6-

Respectfully submitted,

Edward P. Krugman

Hon. Anita B. Brody
United States District Court for the
  Eastern District of Pennsylvania
United States Courthouse
601 Market Street, Room 7613
Philadelphia, Pennsylvania 19106-1744

**BY TELECOPY AND FEDERAL EXPRESS**

cc:    All Counsel