**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

LEXINGTON INSURANCE CO.,           :
        Plaintiffs,                  :       CIVIL ACTION
                                     :       No. 02-4435
                 v.                  :
                                     :
DAVID FORREST, and                 :
T. BEAUCLERC ROGERS, IV,           :
        Defendants.                  :

**EXPLANATION AND ORDER**

**Anita B. Brody, J.**                                    **May        , 2003**

On July 3, 2002, plaintiff Lexington Insurance Company ("Lexington") filed suit against defendants David Forrest ("Forrest") and T. Beauclerc Rogers, IV ("Rogers"). In its five-count complaint, plaintiff alleged that defendants, by and through various companies under their control, conspired to defraud Lexington of millions of dollars in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968 (Counts I-III), and that they also committed common law fraud (Count IV) and tortious interference with contract (Count V).

On September 12, 2002, Rogers filed a motion to dismiss plaintiff's complaint or, alternatively, stay the proceedings. His motion seeks dismissal of plaintiff's complaint on the following grounds: lack of subject matter jurisdiction, forum non conveniens, principles of international comity, and failure to state a claim for which relief can be granted. On November 4, 2002, Forrest filed an identical motion, save that he also alleges that the court lacks personal jurisdiction over him. For the reasons discussed below, I will deny defendants' motions.

1

## I.    FACTUAL BACKGROUND

Plaintiff states that this litigation arises from the following alleged circumstances: Defendants controlled a set of companies collectively referred to as "Flashpoint."  Compl. ¶¶ 2, 3, 14.  Defendant Rogers resides within the Eastern District of Pennsylvania, and several of the Flashpoint companies, including Flashpoint Ltd., are located at his home in Gladwyne, Pennsylvania.  Id. ¶¶ 8, 14.  Defendant Forrest is a subject of the United Kingdom, and Flashpoint UK Ltd. is organized and exists under the laws of that same nation.  Id. ¶¶ 7, 12. Plaintiff is a Delaware corporation with its principal place of business in Massachusetts. Id. ¶ 6. It writes property and casualty insurance business in the United States and the United Kingdom. Id.

Defendants were in the business of securing financing for motion pictures. Id. ¶ 16.  Typically, movies produced by independent film makers initially have few assets other than the anticipated success of their as-yet unfinished product.  To secure bank loans or alternative forms of financing, production companies are sometimes required to enter into agreements with insurance companies that insure the investments of a film's creditors.  By issuing what are known as "credit enhancements" for film production loans, insurers like Lexington agree to pay a film's creditors for any shortfall between the film's revenue stream and the face amount of its loan as of a specified "claim date."  Id. ¶¶ 17, 18.  Plaintiff maintains that defendants obtained insurance for film loans by promising to serve as "risk managers," meaning that Flashpoint would monitor a film's production and sales on behalf of the company insuring the film's loans. Id. ¶ 19.  These promises allegedly induced Lexington to enter into eight film finance

2

transactions with companies connected to defendants.[1]  Id. ¶¶ 23, 29, 31-34, 38.  According to

plaintiff, these eight transactions constituted an elaborate Ponzi scheme, wherein the defendants

used funds from later projects to pay off those debts incurred in earlier ones. Id. ¶ 3.

Plaintiff claims that defendants reneged on their promises to serve as risk

managers for those film projects insured by Lexington and connected to Flashpoint.  In

particular, plaintiff accuses defendants of (i) fraudulently inflating the estimated sales receipts of

the various films and projects that Lexington insured, (ii) misappropriating funds from one set of

insured films and applying those funds toward a different set, (iii) misappropriating funds from

insured films for personal investments like a California office building ("The Building"), a film

post-production site in Los Angeles ("New Standard Post"), and a chain of Russian cinemas, (iv)

deliberately concealing their ownership of the production companies that they had promised to

monitor, (v) removing a profitable film from a slate insured by Lexington in order to avoid using

the film's proceeds to repay the insured loans, and (vi) hiding their misdeeds in order to induce

Lexington to issue insurance policies for successive projects.  Id. ¶¶ 20-23, 26, 29, 31-35.

Some time after Lexington entered into the eight financing agreements with

defendants, and before defendants could enter into "Hollywood Funding No. 7," Flashpoint UK

went into judicial administration proceedings, the British equivalent of bankruptcy.  Id. ¶ 44.

Following the collapse of defendants' alleged Ponzi scheme, Flashpoint's creditors have come

calling. Id. ¶¶ 3-5.  As a result of its insurance contracts with Flashpoint, Lexington is now

embroiled in a series of British lawsuits with Flashpoint's creditors that threaten plaintiff's credit

---

[1]Lexington refers to these eight transactions as "The New Professionals," "It Had to Be You," and "Hollywood Funding No. 1" through "Hollywood Funding No. 6"

rating and risk costing it close to $200 million.  <u>Id.</u>  Lexington has already spent several million

dollars defending itself against these suits.  <u>Id.</u>  Neither the defendants nor Flashpoint are parties

to the lawsuits against Lexington.

   In support of its underlying legal claim, plaintiff alleges that: (i) the collection of

Flashpoint companies that committed the alleged frauds constitutes an enterprise, (ii) defendants'

frauds required the use of the mails and/or wire transmissions in interstate and foreign commerce

and that numerous such communications occurred in furtherance of their scheme, (iii) defendants

knowingly caused the transportation of fraudulently-obtained funds in interstate or foreign

commerce, (iv) defendants agreed and conspired to commit the acts of racketeering activity

alleged above, and (v) such conspiracy was at least partially implemented through phone and fax

communications between Rogers in Gladwyne and Forrest in the United Kingdom. <u>Id.</u> ¶¶ 39, 40.


## II.  DISCUSSION


   Defendants' motions raise a number of issues.  First, Forrest contends that this

court lacks personal jurisdiction over him.  Second, both defendants aver that plaintiff's

complaint should be dismissed for lack of subject matter jurisdiction based on their arguments

that (a) plaintiff lacks standing to make the complaint, and (b) that the complaint is not ripe.

Third, the defendants maintain that the complaint should be dismissed based on the doctrine of

*forum non conveniens*.  Fourth, they seek dismissal based on principles of international comity.

Fifth, they argue that plaintiff's complaint fails to state a claim upon which relief may be

granted.[2]  And, finally, if the court elects not to dismiss the complaint, defendants request that the

court grant a stay pending resolution of the British lawsuits involving Lexington and Flashpoint's

creditors.[3]  I will address each of defendants' arguments in turn.

     A.    *Personal Jurisdiction Over Defendant Forrest*

     A complaint may be dismissed when the court lacks personal jurisdiction over a

defendant.  Fed. R. Civ. P. 12(b)(2).  "[C]ourts reviewing a motion to dismiss a case for lack of

in personam jurisdiction must accept all of the plaintiff's allegations as true and construe disputed

facts in favor of the plaintiff."  Carteret Sav. Bank, F.A. v. Shushan, 954 F.2d 141, 142 n.1 (3d

Cir.), cert. denied, 506 U.S. 817 (1992) (citation omitted).

     Unlike with Rules 12(b)(1) and 12(b)(6), the plaintiff may not rely on the

pleadings alone to withstand a motion to dismiss for lack of personal jurisdiction.  Stranahan

Gear Co., Inc. v. NL Indus., 800 F.2d 53, 58 (3d Cir. 1986).  Rather, "plaintiff bears the burden

of establishing with reasonable particularity sufficient contacts between the defendant and the

forum state to support jurisdiction."  Gehling v. St. George's Sch. of Med., 773 F.2d 539, 542

(3d Cir. 1985).  This burden both distinguishes a Rule 12(b)(2) motion from other motions to

dismiss and engenders a particular procedural posture:  If the court neither conducts an

evidentiary hearing nor permits limited discovery to determine personal jurisdiction, the plaintiff

---

[2]Defendants' 12(b)(6) motions do not seek dismissal of plaintiff's entire complaint, but only counts I-IV, that is, the motions do not challenge the tortious interference claim, but only the RICO and fraud claims.

[3]In his separate motion to dismiss, Forrest adopted and incorporated Rogers's arguments regarding standing, ripeness, forum non conveniens, principles of international comity, subject matter jurisdiction and the need for a stay.  For this reason, I will attribute those arguments made in Rogers's brief to both defendants.

"need make only a prima facie showing of jurisdiction through its affidavits and supporting materials." Kishi Int'l v. Allstate Textile Mach., Inc., No. 96-6110, 1997 WL 186324, at *2 (E.D. Pa. April 11, 1997) (quoting Marine Midland Bank, N.A. v. Miller, 664 F.2d 899, 904 (2d Cir. 1981)). Plaintiff, however, "must eventually establish jurisdiction by a preponderance of the evidence, either at a pretrial evidentiary hearing or at trial." Id. (citation omitted).

The federal courts employ a two-part test to determine whether a federal court may exercise personal jurisdiction over a defendant. First, because "[u]nder Fed. R. Civ. P. 4(k), a district court's personal jurisdiction is usually coextensive with that of courts of general jurisdiction in the state where the district court sits," Electro Med. Equip. Ltd. v. Hamilton Med. AG, No. 99-579, 1999 WL 1073636, at *2 (E.D. Pa. Nov. 16, 1999), the court must begin by ascertaining whether state law permits the exercise of personal jurisdiction. Grand Entm't Group, Ltd. v. Star Media Sales, Inc., 988 F.2d 476, 481 (3d Cir. 1993). Second, the court must determine whether the exercise of personal jurisdiction would comport with a defendant's federal due process rights. IMO Indus., Inc. v. Kiekert AG, 155 F.3d 254, 259 (3d Cir. 1998). Pennsylvania's long-arm statute permits the exercise of personal jurisdiction to the full extent allowed by the Fourteenth Amendment and its guarantee of due process. 42 Pa. Cons. Stat. Ann. § 5322(b) (Purdon 1981);[4] see also Time Share Vacation Club v. Atlantic Resorts, Ltd., 735 F.2d 61, 63 (3d Cir. 1984). Consequently, within Pennsylvania the two stages of analysis used to determine whether a court has personal jurisdiction collapse into one.

―――――――――――――――

[4]The Pennsylvania statute provides in relevant part that "the jurisdiction of the tribunals of this Commonwealth shall extend to all persons...to the fullest extent allowed under the Constitution of the United States and may be based on the most minimum contact with this Commonwealth allowed under the Constitution of the United States." 42 Pa. Con. Stat. Ann. § 5322(b) (Purdon 1981).

A defendant's objections regarding due process and personal jurisdiction are resolved through a familiar two-part inquiry. The court must ask: (i) whether the defendant has minimum contacts with the forum "such that [he] should reasonably anticipate being haled into court there," World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980), and (ii) whether the exercise of personal jurisdiction comports with "traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945).[5]

For minimum contacts to exist, "[t]he defendant must engage in some affirmative act 'by which the defendant purposely avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" Grand, 988 F.2d at 482 (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)). The contacts alleged by plaintiff are Forrest's "numerous" faxes and telephone calls to Rogers in Gladwyne. Pl.'s Mem. of Law in Opp'n to Defs.' Mot. to Dismiss ("Pl.'s Mem.") at 12.[6]

---

[5]There are two categories of personal jurisdiction that satisfy the fairness standard articulated in International Shoe: general and specific jurisdiction. General jurisdiction exists when a defendant's contacts with the forum state are "continuous and systematic." Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 416 (1984). Specific jurisdiction "arises out of or relates to" the defendant's limited contacts with the forum. Id. at 414. To establish general jurisdiction over a defendant the plaintiff "must show significantly more" contact between the forum and the non-resident defendant than that required to establish specific jurisdiction. Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Assoc., 819 F.2d 434, 437 (3d Cir. 1987). General jurisdiction requires that the non-resident's contacts with the forum be "continuous and systematic." Fields v. Ramada Inn, Inc., 816 F. Supp. 1033, 1036 (E.D. Pa. 1993).

Plaintiff has not sought to prove that Forrest's contacts with this district were continuous and systematic. Thus, although it has not specified which of the two types of personal jurisdiction it believes applies to Forrest, I will presume that plaintiff is only arguing for specific jurisdiction.

[6]Lexington also asserts that Forrest's contacts constituted wire fraud and that he could therefore be indicted and tried in this district. In support of this argument, plaintiff points to a Third Circuit Court of Appeals case that upheld prosecution for wire fraud where the relevant

This Circuit takes a "highly realistic" approach to analyzing minimum contacts. Mellon Bank (East) PSFS, Nat'l Assoc. v. Farino, 960 F.2d 1217, 1224 (3d Cir. 1992). For this reason, minimum contacts need not include a defendant's physical presence in the forum. Quill Corp. v. North Dakota by and through Heitkamp, 504 U. S. 298, 307 (1992). Telephone calls and fax transmissions can create the requisite contacts. See Grand, 988 F.2d at 482, Carteret Sav. Bank; 954 F.2d at 147-48. The facts in Grand resemble those now in dispute. In Grand, a Spanish defendant accused of violating the RICO Act argued that the district court's exercise of in personam jurisdiction violated due process. The defendant, Ricardo Sanz Perez, was a Spanish national living in Spain who was connected to approximately twelve telexes sent to Bala Cynwyd, Pennsylvania regarding a contract negotiation.[7] On appeal, the Third Circuit found that Sanz Perez's telefaxes constituted minimum contacts with the Eastern District of Pennsylvania and that the district court's exercise of personal jurisdiction over the defendant accorded with notions of fair play and substantial justice. Grand, 988 F.2d at 476. Forrest's case bears a number of similarities to those of Sanz Perez. In both cases the defendants' communications involved commercial matters that, by occurring within this forum, benefitted from the laws of this state. See id. at 483. Like Sanz Perez, Forrest freely chose to communicate with this forum and the resulting communications gave rise to the lawsuit whose jurisdiction each man contested. See id.. Based on these factual similarities and the Third Circuit's approval of the district court's

---

wire transfer merely passed through the district wherein defendant was convicted. See United States v. Goldberg, 830 F.2d 459, 465 (3d Cir. 1987). The defendant in Goldberg, however, did not dispute the court's personal jurisdiction. Absent evidence to the contrary, the possibility of indictment does not amount to a minimum contact for the purposes of federal civil procedure.

[7]These telexes seem to be Sanz Perez's only contacts with this forum, since it appears from the opinion that he never visited or called Pennsylvania.

exercise of personal jurisdiction over Sanz Perez, I find that Forrest's phone calls and faxes with this forum suffice to present a prima facie case of minimum contacts.[8]

Having found that minimum contacts exist, it remains to be determined whether the exercise of personal jurisdiction squares with notions of "fair play and substantial justice." See Int'l Shoe, 326 U.S. at 316. There is a heavy burden on a defendant who seeks to demonstrate a lack of fairness or substantial justice. Grand, 988 F.2d at 483. Once the plaintiff has made out a prima facie case of minimum contacts, "the defendant 'must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" Carteret Sav. Bank, 954 F.2d at 150 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477 (1985)). For the reasons discussed below, I do not find that Forrest has made a sufficiently compelling case.

In evaluating the reasonableness of a district court's exercise of personal jurisdiction, the Third Circuit considers the following factors: (i) the burden on the defendant; (ii) the interests of the forum state; (iii) the plaintiff's interest in obtaining relief; (iv) the judicial

---

[8]Forrest argues that the "corporate shield" doctrine prevents his actions from constituting minimum contacts for jurisdictional purposes. See Forrest's Mot. to Dismiss at 15. Under this doctrine, "the actions of corporate employees and officers that are conducted within their corporate capacity do not constitute contacts with the forum that support jurisdiction over them." Perry v. Markman Capital Mgmt, Inc., No. 02-744, 2002 WL 31248038, *4 (E.D. Pa. 2002).

Even assuming, *arguendo*, that Forrest's contacts occurred while he was acting in his official capacity, this doctrine does not prevent a court from exercising personal jurisdiction over defendant. The corporate shield doctrine does not apply to RICO claims. Am. Trade Partners, L.P. v. A-1 Int'l Importing Enters., Ltd., 755 F. Supp. 1292, 1303 n. 17 (E.D. Pa. 1990). Nor does it apply to torts, for the "courts have refused to permit a corporate officer to invoke the shield when the officer was involved in tortious conduct...." Lautman v. Loewen Group, Inc., No. 99-75, 2000 WL 772818, *5 (E.D. Pa. 2000). As Forrest is accused of having violated RICO and of having caused two torts (fraudulent misrepresentation and tortious interference with a contract), he is amenable to personal jurisdiction regardless of what capacity he was acting in when he initiated contacts with this forum.

system's interest in judicial efficiency; and (v) "the shared interests of the several States in
furthering fundamental substantive social policies." Grand, 988 F.2d at 483 (quoting Asahi
Metal Indus. Co. v. Superior Court, 480 U.S. 102, 113 (1987)).  I will now consider these factors
in light of Forrest's motion.

        Defending a lawsuit in a foreign country is a burden.  See Asahi, 480 U.S. at 114.
It is not, however, an unjustifiable burden.  Id. (noting that when "minimum contacts have been
established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will
justify even the serious burdens placed on the alien defendant").  Once again, I take my cue from
Grand.  Like the Spanish defendant in that case, Forrest "has shown his ability to conduct
business in the United States and has actively carried on substantial activities here."  Grand, 988
F.2d at 483.  Plaintiff attached to its brief a Flashpoint brochure whose opening page is signed by
Rogers and Forrest.  Pl.'s Mem., Ex. TBR at 2.  This brochure reveals at least seven Flashpoint-
related entities located in the United States. Id. at 3.  Forrest's connection to Flashpoint's U.S.
subsidiaries and transactions is also documented by his prominent signature and picture on two
Flashpoint brochures.  Id. at 2, 20.  In one of these two brochures, Rogers and Forrest state that
"we are driven by a desire to reach audiences in every part of the world."  Id. at 20.  Rogers's
demonstrated interest in reaching a U.S. audience and in developing successful commercial
properties in this country shows that "[t]his is not a case where a party without a significant
presence or ability to act in the United States is drawn into litigation as a result of acts outside the
forum."  Grand, 988 F.2d at 483.  Although inconvenient, this litigation should not have been an
unforeseen consequence of Forrest's business dealings with the United States and it is not
unjustifiably burdensome.

Moreover, this litigation is of concern to the Commonwealth of Pennsylvania. The Goldberg case cited by plaintiff demonstrates that this forum has a legally-protected interest in preventing wire fraud from either passing through or occurring within its borders. Goldberg, 830 F.2d at 465. This interest justifies any burden that Forrest might encounter in defending suit in the Eastern District of Pennsylvania. See Asahi, 480 U.S. at 114 ("When minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant.").

The plaintiff has an interest in obtaining relief. When evaluating a 12(b)(2) motion to dismiss, the court must "accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff." Carteret Sav. Bank, 954 F.2d at 142 n.1. Plaintiff claims to have lost millions of dollars as a result of those fraudulent acts that occurred in this forum. This loss evinces an interest in securing relief and outweighs any burden Forrest might bear if this court exercises personal jurisdiction over him.

The concerns of judicial economy also weigh in favor of exercising jurisdiction. Dismissal of the suit against Forrest will not necessarily forestall suit in this forum. Regardless of where Lexington might sue Forrest or Rogers, Rogers remains connected to assets in this forum. Consequently, if plaintiff ever obtains a judgment against Rogers, it will have to come before this court if it is to enforce the judgment against Rogers's local assets. Dismissal of the present suit would therefore engender additional litigation in other forums without necessarily forestalling suit here. Such a proliferation of lawsuits would run counter to the interests of judicial economy.

Finally, there is no evidence that the social policies of the several States would

11

suffer any harm by dint of this court's exercising jurisdiction in this matter.  For these reasons and those expressed above, I find that Forrest has not shown that defending himself in this forum would be so unreasonable as to deprive him of his right to fair play and substantial justice.  See Grand, 988 F.2d at 484.  Personal jurisdiction over defendant Forrest is therefore proper and his Rule 12(b)(2) motion is denied.

   B.    *Rule 12(b)(1): Subject Matter Jurisdiction*

       Rule 12(b)(1) allows the court to dismiss a suit for want of subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  There are two types of Rule 12(b)(1) motions.  The first type, a facial attack, challenges only the court's subject matter jurisdiction.  The second type, a factual attack, allows the court to question the plaintiff's facts after the defendant files an answer.  See Mortensen v. First Fed. Sav. and Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977).  As defendants have not filed an answer, their motion is necessarily a facial attack.

       It is unclear what standard of review governs facial attacks made via Rule 12(b)(1).  The Third Circuit has "cautioned against treating a Rule 12(b)(1) motion as a Rule 12(b)(6) motion and reaching the merits of the claims" because "the standard for surviving a Rule 12(b)(1) motion is lower than that for a 12(b)(6) motion."  Gould Elecs. Inc. v. United States, 220 F.3d 169, 178 (3d Cir. 2000) (citation omitted).  Nonetheless, the Third Circuit has also held that, when considering a facial attack under Rule 12(b)(1), "the trial court must accept the complaint's allegations as true."  Turicentro, S.A. v. Am. Airlines Inc., 303 F.3d 293, 300 n. 4 (3d Cir. 2002) (citing NE Hub Parrtners, L.P. v. CNG Transmission Corp., 239 F.3d 333, 341 n. 7 (3d Cir. 2001).  Rule 12(b)(6) requires that a court considering a motion to dismiss draw all reasonable inferences in favor of the plaintiff.  Ford v. Schering-Plough Corp., 145 F.3d 601, 604

12

(3d Cir. 1998). Because Rule 12(b)(1) has a more forgiving standard of review than that for Rule 12(b)(6), it logically follows that a court should also draw all reasonable inferences in the plaintiff's favor when considering a Rule 12(b)(1) defense.

Having determined that the court has personal jurisdiction over Forrest, the non-resident defendant, the question now becomes whether the court also has subject matter jurisdiction. Defendants raise two justiciability considerations in support of their argument that this court lacks subject matter jurisdiction: standing and ripeness. As some commentators have noted, discussions of standing and ripeness often blend together. See 13A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3531.12 (2d ed. 1984); Erwin Chemerinsky, Federal Jurisdiction § 2.4.1 (3d ed. 1999). For this reason it is practical to frame standing as an inquiry into whether a plaintiff has adequately stated an injury and to frame ripeness as an inquiry into whether a plaintiff's adequately-stated injury has occurred. See Wright & Miller, supra, §§ 3531, 3532. For the reasons discussed below, I find that plaintiff has demonstrated that it has standing to make its complaint and that the complaint is ripe.

1. Standing

The doctrine of standing "consists of both a 'case or controversy' requirement stemming from Article III, Section 2 of the Constitution, and a subconstitutional 'prudential' element." Pitt News v. Fisher, 215 F.3d 354, 359 (3d Cir. 2000). Defendants have not referred to the prudential element and this decision shall focus only on constitutional concerns.[9]

---

[9]The Supreme Court has identified three prudential standing requirements. They are: (i) a general prohibition on allowing a plaintiff to raise the concerns of a third party, (ii) a prohibition on taxpayer suits wherein the grievance is common to all taxpayers, and (iii) a requirement that the plaintiff raise a claim within the zone of interests protected by the statute in question. See generally Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992). None of these requirements are

Constitutional standing requires that the pleadings show: (i) an injury-in-fact; (ii) caused by the named defendants or at least "fairly traceable to the challenged action of the defendant[s]"; which (iii) a favorable decision by the court would likely redress.  <u>Pryor v. Nat'l Collegiate Athletic Ass'n</u>, 288 F.3d 548, 561 (3d Cir. 2002) (quoting <u>Bennett v. Spear</u>, 520 U.S. 154, 167 (1997)); <u>Doe v. Nat'l Bd. of Med. Exam'rs</u>, 199 F.3d 146, 152-53 (3d Cir. 1998).

Defendants argue that Lexington has failed to state an injury-in-fact.  In particular, defendants argue that a RICO plaintiff does not have standing to recover legal fees.  Rogers's Mot. to Dismiss at 16.  In the section of Rogers's brief that discusses standing, which Forrest adopts and incorporates, defendants appear to conflate the requirements of 12(b)(6) and 12(b)(1). The confusion perhaps arises from a short quote in the Supreme Court decision, <u>Sedima S.P.R.L. v. Imrex. Co., Inc.</u>, 473 U.S. 479 (1985), upon which defendants' argument relies.  <u>See</u> Rogers's Mot. to Dismiss at 16.  <u>Sedima</u> addressed what types of injuries could be brought under RICO. In <u>Sedima</u>, Justice White rejected a decision by the Second Circuit Court of Appeals, which had held that a successful RICO plaintiff needed to plead a "racketeering" or mob-related injury.  473 U.S. at 495.  The question of what type of injury the plaintiff needed to plead arose in the context of a Rule 12(b)(6) motion granted by the district court.  <u>See</u> <u>Sedima S.P.R.L. v. Imrex Co., Inc.</u>, 574 F.Supp. 963, 965 (E.D. N.Y. 1983).  In deciding the case on review, Justice White commented that Sedima "only has standing if, and can only recover to the extent that, [it] has been injured in [its] business or property by the conduct constituting the violation [of § 1962]." <u>Sedima</u>, 473 U.S. at 496.  Rogers, with Forrest's approval, appears to argue that this quote precludes a court from finding standing for a plaintiff who alleges losses incurred through legal

---

at issue in the case now before me.

fees. Rogers's Mot. to Dismiss at 16. There is, however, no discussion of the standing doctrine in <u>Sedima</u>. This void, together with the procedural posture of <u>Sedima</u>, which came before the Court after a dismissal on a Rule 12(b)(6) motion, leads me to conclude that constitutional standing requirements for deciding a 12(b)(1) motion are not governed by <u>Sedima</u>. The Third Circuit's observation that "determination[s] of the likelihood of success on the merits of the case is a separate inquiry from the threshold issue of Article III standing," supports this conclusion. <u>Pitt News</u>, 215 F.3d at 360.[10] Consequently, I reject defendants' interpretation of <u>Sedima</u>.

Lexington's out-of-pocket loss of millions of dollars in legal fees states an injury. When determining standing, the court must accept as true all material allegations set forth in the complaint, and must construe those facts in favor of the complaining party. <u>Storina v. Borough of Point Pleasant Beach</u>, 322 F.3d 293 (3d Cir. 2003) (citing <u>Warth v. Seldin</u>, 422 U.S. 490, 498 (1975)). The plaintiff has less money today than it did before defendants' alleged frauds occurred. This loss is concrete and actual. It is an injury-in-fact. <u>See</u> <u>Pitt News</u>, 215 F.3d at 360 (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992)). Although defendants argue that plaintiff's injury is speculative because Lexington could conceivably win attorney's fees in the British lawsuits, pending parallel proceedings "should not preclude this RICO action, when all that defendants can say is that there is a 'distinct possibility' that plaintiffs will recover completely" in those proceedings. <u>In re Foundation For New Era Philanthropy Litigation</u>, No. 96-3554, 1996 WL 585577, *2 (E.D. Pa. Sept. 4, 1996). The possibility that Lexington will recoup its loss, which plaintiff contests, does not preclude my finding an injury-in-fact.

---

[10]Consistent with the Third Circuit's observation, I will reserve my determination of whether plaintiff's injury is sufficient to state a claim for the discussion of defendants' Rule 12(b)(6) motion below.

Moreover, those fees spent by Lexington pursuing creditors remedies in England will not be recompensed.

Turning to the second and third prongs of the standing test, I find that, as required by the second prong, plaintiff's injury is traceable to defendants' challenged actions and is an injury that this court can redress. Consequently, plaintiff has standing to sue for recovery. According to plaintiff's complaint, defendants' frauds caused it to spend millions of dollars in legal fees: but for defendants' purported misrepresentations and subterfuge, Lexington would not have incurred this loss. Based on the alleged but-for causation presented within the complaint, the injury is "fairly traceable" to defendants' alleged misdeeds. See Pitt News, 215 F.3d at 361. Finally, a favorable judgment for Lexington would compel defendants to make plaintiff whole by compensating it for its losses. This court can thus effectuate legal redress for plaintiff. See id. Plaintiff has therefore satisfied the three prongs of the constitutional requirements for demonstrating standing.

### 2. Ripeness

"Intertwined" with Article III's requirement that a plaintiff demonstrate standing is the ripeness doctrine, "which seeks to 'prevent the courts, through the avoidance of premature adjudication, from entangling themselves in abstract disagreements.'" Artway v. Attorney Gen. of N.J., 81 F.3d 1235, 1246-47 (3d Cir.1996) (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 148 (1967), overruled on other grounds, Califano v. Sanders, 430 U.S. 99, 105(1977)). To determine whether a claim is ripe, a court must weigh: "(1) the hardship to the parties of withholding court consideration; and (2) the fitness of the issues for judicial review." Planned Parenthood of Cent. N.J. v. Farmer, 220 F.3d 127, 147-48 ( 3d Cir. 2000) (quoting Artway, 81

F.3d at 1247).  Judicial determination of an injury's ripeness are to be performed in "a pragmatic

fashion."  Barmo v. Reno, 899 F. Supp. 1375, 1379 (E.D. Pa. 1995).

   The difficult issue here is not whether Lexington's injury is ripe, but, rather,

which injury is ripe.  The legal fees incurred by plaintiff are not "abstract," for there is no

question that this alleged injury has occurred.  See Artway, 81 F.3d at 1247.  If the court were to

withhold review, plaintiff would be forced to go uncompensated for those losses it incurred as a

result of defendants' alleged actions.  This decision would constitute a hardship.  Furthermore,

whether defendants' past communications within this forum constituted wire fraud and whether

these frauds harmed Lexington by forcing it to defend itself against third parties are questions

that are fit for judicial review.  Because Lexington has standing to make its complaint and

because it has stated an injury that is ripe for review, I will not consider defendants' argument

that plaintiff's risk of losing more money in the pending English litigation means that

Lexington's complaint fails to satisfy the ripeness requirement of Article III.  Defendants'

concerns regarding plaintiff's alleged losses in legal fees are best addressed in the context of its

Rule 12(b)(6) motion, as they pertain to whether plaintiff has stated a claim for which relief can

be granted.[11]  For the purposes of conferring standing, however, these losses are ripe.

---

[11]Rogers's argument relies in part on a Rhode Island district court opinion, Terra Nova
Ins. Co., Ltd. v. DiStefano, 663 F. Supp. 809 (D. R.I. 1987).  See Rogers's Mot. to Dismiss at 15.
The plaintiffs in Terra Nova were litigating against the defendants in both state and federal court.
The state and federal cases rested on the same set of facts and involved identical parties.  Because
the state court proceedings could have preclusive effect on the federal proceedings, the district
court dismissed the federal case as unripe.  Unlike Terra Nova, this case involves different parties
and related - but different - sets of facts.  Although defendants' alleged frauds are at issue in the
British litigation, plaintiff has argued that they are neither dispositive nor exclusive.
Furthermore, the British court's decision regarding those lawsuits against Lexington, which
Rogers submitted, recognizes that even those issues arising in the British lawsuits are not
uniform.  In deciding against consolidating the trials for Hollywood Funding No. 5 and The New

C.    *The Doctrine of Forum Non Conveniens*

   The law regarding the doctrine of forum non conveniens is well-established.  The "polestar" in dealing with a forum non conveniens motion is <u>Piper Aircraft Co. v. Reyno</u>, 454 U.S. 235 (1981).  <u>Lacey v. Cessna Aircraft Co.</u>, 862 F.2d 38, 39 (3d Cir. 1988) ("<u>Lacey I</u>"), <u>rev'd after remand</u>, 932 F.2d 170 (1992) ("<u>Lacey II</u>").  <u>Piper</u> requires defendants who file motions to dismiss on forum non conveniens grounds to supply the court with enough information such that it might balance the parties' interests.  <u>Piper</u>, 454 U.S. at 258.  Based on both sides' submissions, the district court must "develop adequate facts to support its decision" and "articulate specific reasons for its conclusions."  <u>Lacey I</u>, 862 F.2d at 39.

   Consistent with this posture of review, a district court may exercise its discretion and dismiss a case "when an alternative forum has jurisdiction to hear the case, and when trial in the chosen forum would 'establish...oppressiveness and vexation to a defendant...out of all proportion to plaintiff's convenience,' or when the 'chosen forum' [is] inappropriate because of considerations affecting the court's own administrative and legal problems.'" <u>Piper</u>, 454 U.S. at 241 (quoting <u>Koster v. Am. Lumbermens Mut. Cas. Co.</u>, 330 U.S. 518, 524 (1947)).  There are two stages of analysis in evaluating a forum non conveniens claim.  First, the court decides whether an adequate alternative forum exists; second, the court must evaluate several private and public interest factors.  The parties have raised a number of arguments and I will address them in the contest of this analytic frame. I will do so mindful of two considerations: (i) that Plaintiff's

---

Professionals, the British court held that "the extent of overlap of those issues [in the two cases] is in fact minimal...."  Rogers's Mot. to Dismiss, Ex. B at 4.  The diversity of issues being litigated in England stands in contrast to the uniformity of <u>Terra Nova</u>. This diversity, coupled with questions of whether any British decision would necessarily have preclusive effect in this jurisdiction, lead me to reject defendants' argument that <u>Terra Nova</u> governs this case.

choice of forum "should rarely be disturbed," Lacey I, 862 F.2d at 43; and (ii) that defendants

bear the burden of persuasion "as to all elements of the forum non conveniens analysis" and they

must show that the "private and public interest factors weigh heavily on the side of dismissal."

Id. at 43-44 (citation omitted).

       1.   *Availability of an Adequate Alternative Forum*

       The parties disagree on whether an adequate alternative forum exists.  An

adequate alternative forum exists if the defendants are amenable to process in the other

jurisdiction and the alternative forum permits litigation of the disputed subject matter.  See Piper,

454 U.S. at 255, n.22.  Both defendants agree that they would be amenable to jurisdiction in the

United Kingdom.  At issues is the fact that RICO - and its award of treble damages - is a legal

remedy particular to the United States. In Piper, the Supreme Court held that "the possibility of a

change in substantive law should ordinarily not be given conclusive or even substantial weight"

when determining dismissal on the grounds of forum non conveniens.  Lony v. E.I. Du Pont de

Nemours & Co., 886 F.2d 628, 632 n.2 (3d Cir. 1989) ("Lony I"), appeal after remand, 935 F.2d

604 (1991) ("Lony II") (citing Piper, 454 U.S. at 257).  Although neither Piper nor Lony I

involved RICO, my colleague the Honorable Norma L.  Shapiro has held that assertion of RICO

claims "does not preclude application of forum non conveniens."  Winex, Ltd. v. Paine, No. 89-

2083, 1990 WL 121483, at *5 (E.D. Pa. Aug. 15, 1990).  As defendants point out, differences

between British and American law do not preclude plaintiff from bringing suit in England.  In

both nations legal remedies for fraud are available.  Id.  In light of Piper, Lony I, and Winex, I

find that Britain is an adequate alternative forum.  I will therefore not address defendants'

additional arguments about the possibility of combining this nascent lawsuit with the longer-

19

standing litigations taking place in England.

2.    *Private Interest Factors*

As stated above, the court must also consider several private and public interest factors.  In Gulf Oil Corp. v. Gilbert, 330 U.S. 501 (1947), the Supreme Court listed private interest factors that a court should consider.  They included: (i) the relative ease of access to sources of proof; (ii) the availability of compulsory process for unwilling witnesses; (iii) the cost of obtaining witnesses; (iv) the enforceability of a judgment, if one is obtained; and (v) all other practical problems concerning litigation.  Id. at 508.

Defendants make a series of arguments about why the private interest factors weigh in their favor.  They contend that many witnesses are British citizens who are unwilling to travel to the United States to testify, that evidence is located in England, that the disputed events transpired in England, that this lawsuit could be brought in conjunction with future British lawsuits involving creditors' claims against plaintiff, and that plaintiff "has no compelling reason with respect to its own convenience to support its choice of forum."  Rogers's Mot. to Dismiss at 24.

Plaintiff disputes defendants' contention that the balance of private interests weighs in defendants' favor.  Although agreeing with defendants that discovery materials are located in England, Lexington points out that materials are also located in the United States and Canada.  In particular, the funds allegedly misappropriated by defendants were allegedly siphoned off for Flashpoint projects in California and Canada, where discovery will need to be conducted.  In addition, documents are to be found in Massachusetts at Lexington's office and in Gladwyne, Pennsylvania.

20

Regarding the availability of witnesses, defendants have identified four British citizens who would be unwilling to travel to the United States. They argue that these four individuals are critical to the defense, but likely to be unwilling witnesses. Defendants think that because the English courts could better compel the testimony of these witnesses the case should be dismissed on the basis of forum non conveniens. Rogers's Mot. to Dismiss at 22. In response to defendants' arguments, plaintiff points to the numerous U.S.-based individuals involved in Hollywood Funding Nos. 3, 4, and 5 and "It Had To Be You." This court has previously noted that "the need to resort to videotaped depositions, obtained through letters rogatory, should not mandate dismissal." In re Corel Corp. Inc. Sec. Litig., 147 F. Supp.2d 363, 366 (E.D. Pa. 2001). Similarly, the potential need to videotape the four British defendants does not mandate dismissal in this case either.

At least on the face of the pleadings, it appears that the allegedly fraudulent transactions spanned three countries and involved many individuals. The complexity of this lawsuit's underlying facts means that it will be costly and complicated wherever it is brought. The court must thus address the relative costs of bringing suit in the various countries involved. Defendants have failed to demonstrate why bringing suit in the United States is so much more expensive or oppressive than litigating in England. Furthermore, any judgment acquired in either nation will potentially require enforcement in the United States, England, and Canada, as the defendants have assets in all three countries. Finally, there are no additional practical considerations that compel disregarding plaintiff's choice of forum. The evidence, when evaluated with the deference owed to a plaintiff's choice of forum, leads me to find that defendants have not demonstrated that the private interest factors weigh heavily in favor of

21

dismissal.

> 3.    *Public Interest Factors*

In <u>Piper</u>, the Supreme Court stated that the relevant public interest factors in a forum non conveniens inquiry include: (i) administrative difficulties flowing from court congestion; (ii) "local interest in having localized controversies decided at home;" (iii) avoidance of unnecessary problems in conflict of laws, or the application of foreign law; and (iv) the "unfairness of burdening citizens in unrelated forum with jury duty." 454 U.S. at 241 n. 6 (citation omitted).

Defendants argue that these public interest factors weigh in favor of dismissal. In support of their argument, they make the following statements. First, that there is no need to congest this forum's docket with an action whose factual predicate overlaps with that of the pending British litigation. Second, that the United States has negligible interest in the outcome of this litigation. Third, that the parties' common law disputes might be governed by British law. Fourth, that jurors from this district should not be burdened with the duty of hearing this matter.[12] <u>See</u> Rogers's Mot. to Dismiss at 25.

Defendants' arguments regarding the public interest factors are unpersuasive. While court congestion is a reality of the modern judicial system, this case does not represent the straw that might otherwise break the proverbial camel's back. The court is equipped to hear this

---

[12]Without explaining how this argument factors into the <u>Gulf Oil</u> analysis, defendants also maintain that a failure to dismiss "could impinge on the sovereign interests of the English legal system in overseeing discovery conducted within English borders." Rogers's Mot. to Dismiss at 26. This argument does not appear to represent one of the public interest factors at issue in a forum non conveniens motion, but rather a concern that should be addressed in the section on principles of international comity. For that reason I will address this argument below.

case and doing so will not prejudice the interests of those parties who do not have the option of

choosing from the variety of fora available to plaintiff. The overlap between this case and the

ongoing British litigation does not diminish this court's capacity, nor does it erode the deference

that a court owes to a plaintiff's choice of forum.

With regard to local interest, this forum has more than a negligible interest in the

outcome of this case. RICO's availability within this forum testifies to its commitment to

providing legal redress for victims of racketeering conspiracies. If the defendants did indeed use

the U.S. mails and phone lines to perpetuate an elaborate fraud in Pennsylvania, Massachusetts,

and California, whereby a Delaware corporation lost millions of dollars, then it stands to reason

that the United States would have an interest in regulating such conduct and in indemnifying its

citizens for their losses. Cf. Lacey I, 862 F.2d at 47 (recognizing, in federal diversity action,

"Pennsylvania's interest in regulating the manufacture of products within its borders").

Both parties agree that there is a possibility that British law will govern

Lexington's common-law claims against defendant. This possibility weighs heavily in favor of

dismissal. It is counter-balanced, however, by the fact that more than half of the complaint

involves RICO claims that are governed by federal law. So long as these RICO claims are

legally viable, the possibility that British law will need to be applied by this court cannot

outweigh the presumption against dismissal for forum non conveniens.

Finally, the risk that residents will be called to serve on a jury for this case does

not weigh heavily in favor of dismissal. If defendants, by and through their actions in Gladwyne,

conspired to effectuate the alleged Ponzi scheme, then a local jury has an interest in sanctioning

such behavior insofar as it offends the laws of this forum. Cf. Corel, 147 F. Supp. 2d at 367 n.2.

Because I find that neither the private nor the public interest factors discussed above weigh heavily in favor of dismissal, defendants motion to dismiss based on the doctrine of forum non conveniens is denied.

D.    *Principles of International Comity*

Similar to the doctrine of forum non conveniens, principles of international comity allow a district court to exercise its discretion and dismiss a case over which it has subject matter jurisdiction in deference to the laws and interests of another nation. See Societe Nationale Industrielle Aerospatiale v. United States Dist. Ct. for the So. Dist. of Iowa, 482 U.S. 522, 543 n. 27 (1987);  Paraschos v. YBM Magnex Int'l, Inc., No. 98-6444, 2000 WL 325945, at *5 (E.D. Pa. 2000).  In Hilton v. Guyot, 159 U.S. 113, 164 (1895), the Supreme Court defined international comity as: "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard to both the international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." These principles permit a court to engage in "a spirit of international cooperation."  Paraschos, 2000 WL 325945 at *5 (citation omitted).  They do not, however, extend judicial deference to those cases whose dismissal would be contrary to domestic public policy.  Id.  Nor do they compel dismissal when the suits in question are neither duplicative nor parallel.  Id.

Even the existence of a "parallel" case, however, need not compel dismissal.[13]

---

[13]Two actions are "parallel" when the parties "share some legal identity of interest such that they are 'substantially the same.'" Id. (quoting Caminiti & Iaarola, Ltd. v. Behnke Warehousing, Inc., 962 F.2d 698, 700 (7th Cir. 1992).  They are "substantially the same" when there is a "substantial likelihood that the [foreign] litigation will dispose of all claims presented in the federal case."  Id. (quoting Lumes Constr., Inc. v. Brant Constr. Co., 780 F.2d 691, 695

"[A] district court should exercise jurisdiction over an action even where identical subject matter is concurrently before a foreign court." Id. at *6 (citing Ingersoll Mill. Mach. Co. v. Granger, 833 F.2d 680, 685 (7th Cir. 1987)).  Dismissal for reasons of international comity is appropriate only in "extraordinary circumstances."  Id.  Such circumstances include: (i) duplicative litigation, (ii) inconvenience of the domestic forum, (iii) the governing law, (iv) the order in which jurisdiction was obtained, (iv) the relative progress of each proceeding, and (v) the "contrived nature" of the domestic claim."  Id. (citations omitted).

Addressing the circumstances that inform a court's decision to dismiss based on principles of international comity, I make the following conclusions: First, this lawsuit is not a duplicate of the creditors' British suit against Lexington.  The defendants are not parties to both suits and it is possible, according to plaintiff, that the English court will never reach Lexington's fraud defense to the creditors' claims.  In addition, the British court is not determining whether defendants' alleged fraud injured plaintiff.  Rather, the question before the British court appears to be whether defendants' fraud obviates plaintiff's obligation to indemnify Flashpoint's creditors.  Second, I have already addressed the relative inconvenience of bringing suit here and abroad and found that the comparative drawbacks of bringing suit in either forum do not weigh heavily in defendants' favor.  Third, my earlier conclusions regarding the issue of which forum's law governs plaintiff's claims apply here as well:  The specter of a conflict of law problem is not "extraordinary" and does not does require dismissal.  Fourth, defendants are correct that the present suit could have been brought when Flashpoint's creditors filed suit against Lexington. Although the British litigation preceded this suit, plaintiffs "should be permitted to bring their

_____

(7th Cir. 1985)).

claims in the forum of their choice." <u>Id.</u> Finally, the availability of treble damages under RICO, together with the fact that plaintiff is a U.S. company, allay any doubts that plaintiff is merely casting about for a pretext on which to bring suit outside of Britain.

Earlier, defendants also raised the argument that a failure to dismiss would be disrespectful to the British courts. <u>Supra</u>, at n. 12. I suspect that the British courts are less thin-skinned than defendants maintain. This lawsuit has no bearing on the creditors' rights at issue in the British litigation. Nor does it purport to evaluate the fitness of any British court's decision. Should English law govern plaintiff's common-law claims, adjudication will be done with the utmost deference to England's jurists and its case law. Contrary to defendants' warning, I believe the sovereignty of that forum will not be impinged upon by American adjudication of this lawsuit. For these reasons and those expressed above, defendants' motions to dismiss based on principles of international comity are denied.

### E. Rule 12(b)(6): Failure to State a Claim for Which Relief Can Be Granted

Rule 12(b)(6) permits dismissal of a case when the plaintiff has failed to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). When considering a Rule 12(b)(6) motion, the Court must accept as true all of the allegations set forth in the complaint and must draw all reasonable inferences in favor of the plaintiff. <u>See</u> <u>Ford v. Schering-Plough Corp.</u>, 145 F.3d 601, 604 (3d Cir. 1998). Dismissal of plaintiff's claim is appropriate only if plaintiff "can prove no set of facts in support of his claim which would entitle him to relief." <u>Id.</u> (quotations omitted). The court need not, however, accept conclusory allegations or legal conclusions. <u>Morse v. Lower Merion School District</u>, 132 F.3d 902, 906 (3d Cir. 1997).

Defendants make two arguments for why plaintiff's claim should be dismissed

under Rule 12(b)(6).  First, they argue that Counts I, II, and IV, which allege fraud, fail to meet

Rule 9(b)'s heightened pleading standard for fraud claims.  Second, Rogers argues that plaintiff's

legal fees are not an injury for which relief can be granted under RICO and that Counts I-III,

which invoke this federal statute, should therefore be dismissed.  I will address both these

arguments.

        *1.    Rule 9(b)*

        Rule 9(b) provides a heightened pleading requirement for fraud claims.  This rule

provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or

mistake shall be stated with particularity." Fed. R. Civ. P. 9(b).  The purposes of this rule are to

provide notice of the precise misconduct with which defendants are charged and to "safeguard

defendants against spurious charges of immoral and fraudulent behavior."  <u>Seville Indus. Mach.</u>

<u>v. Southmost Mach.Corp.</u>, 742 F.2d 786, 791 (3d Cir. 1984).  Although heightened, the pleading

standards for fraud are not insurmountable.  "As long as the allegations of fraud reflect precision

and some measure of substantiation, the complaint is adequate."  <u>In re Meridian Sec. Litig.</u>, 772

F. Supp. 223, 226 (E.D. Pa. 1991) (citing <u>Seville</u>, 742 F.2d at 791).  The Third Circuit has

cautioned against over-zealous enforcement of this rule.  <u>See</u> <u>Seville</u>, 742 F.2d at 791; <u>In re</u>

<u>Craftmatic Sec. Litig.</u>, 890 F.2d 628, 645 (3d Cir. 1989).

        Lexington's 24-page complaint adequately particularizes the alleged fraudulent

conduct.  Having read the complaint, there can be no reasonable doubt in defendants' minds as to

what acts, taken in regard to which transactions, are the basis of plaintiff's complaints for fraud.

The detail with which plaintiff describes the predicate acts is in such depth that it would be a

burden for this court to repeat them all.  Defendants' 12(b)(1) motion with regard to Rule 9(b) is

denied.

       2.   *Failure to State an Injury for Which Relief Can Be Granted*

       Defendants argue that plaintiff cannot state a claim for which relief can be granted because its injury, in the form of legal fees, is too remote from the alleged predicate acts necessary for a successful RICO claim.  Defendants do not, however, present this court with any controlling case law that either precludes an alleged RICO victim from recovering legal fees related to a predicate act or establishes when an injury is too remote.  Although plaintiff has found the decision of <u>Seaboard Surety Co. v. Parmacrete Construction Corp.</u>, 221 F.2d 366, 371 (3d Cir. 1955), which permits a victim of fraud to recover legal fees incurred defending itself against a third-party lawsuit when the alleged fraud caused that lawsuit, it has not presented the court with any controlling case that involves a RICO claim for legal fees.  The controlling law in this circuit is thus unclear as to what type of injury a plaintiff must allege in order to state a RICO claim for which relief can be granted.  Considering the case-at-hand in the light most favorable to plaintiff, I will deny defendants' 12(b)(6) motion.

    F.   *Request for a Stay*

       Both defendants have requested a stay in this matter if the court declines to grant their motions to dismiss.  In addition to the power to dismiss, federal courts have the power to stay an action based on the pendency of related proceedings in a foreign jurisdiction.  <u>Nat'l Union Fire Ins. Co. of Pittsburgh v. Kozeny</u>, 115 F. Supp. 2d 1243, (D. Col. 2000) (citing <u>Landis v. Am. Water Works & Elec. Co.</u>, 299 U.S. 248, 254 (1936)).  This power, however, is checked by the courts' "strict duty to exercise the jurisdiction that is conferred upon them by Congress."  <u>Quackenbush v. Allstate Ins. Co.</u>, 517 U.S. 706, 716 (1996).  The Third Circuit has not

addressed what standard governs determinations of whether to award a stay in the event of

related litigation pending in an alternative forum.  In <u>National Union</u>, the Colorado district court

performed a helpful survey of those federal cases that address this issue.  After its review, the

court found that the relevant factors for determining whether a stay was warranted were virtually

identical to those concerning dismissal based on principles of international comity.  <u>See</u> <u>Nat'l</u>

<u>Union</u>, 115 F. Supp. 2d at 1247.  Although I agree with the Colorado district court's legal

analysis, I reach a different conclusion.  While resolution of the British litigation will clarify

whether plaintiff has a claim for additional damages, it will not address plaintiff's alleged loss of

millions of dollars in legal fees.  Nor will it determine whether defendants committed wire and

mail fraud within this forum or whether those frauds unlawfully injured plaintiff.  Rather, the

parallel litigation will determine the rights of those creditors now suing Lexington.  For this

reason I see no reason to delay what looks to be an expensive and protracted litigation.

Defendants 12(b)(6) motions are therefore denied.


**III.         CONCLUSION**

For the reasons articulated above, defendants' Motions to Dismiss, or,

Alternatively, Stay the Instant Proceedings are denied.

### **O R D E R**

**AND NOW,** this          day of May, 2003, the defendants' Motions to Dismiss, or,

Alternatively, Stay the Instant Proceedings (Docket ## 6, 11) are **DENIED**.

_____

Anita B. Brody, J.

Copies FAXED on ___ to:          Copies MAILED on ___ to: