# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

---

LEXINGTON INSURANCE COMPANY,

                    Plaintiff,

- against -

DAVID FORREST and T. BEAUCLERC ROGERS IV,

                    Defendants.

Civil Action No. 02-CV-4435
(Hon. Anita B. Brody)

---

## LEXINGTON'S RICO CASE STATEMENT

Plaintiff, Lexington Insurance Company ("Lexington"), submits the following RICO Case Statement pursuant to this Court's RICO Case Standing Order.  Each request for information set forth in the Standing Order appears in ***bold italics***, followed by Lexington's response.

**1.     *State whether the alleged unlawful conduct is in violation of 18 U.S.C. §§ 1962(a), (b), (c), and/or (d).***

The alleged unlawful conduct set forth in Lexington's Amended and Supplemental Complaint (the "Complaint") is in violation of the following three sections of 18 U.S.C. § 1962: § 1962(c), the First Claim for Relief, § 1962(a), the Second Claim for Relief, and § 1962(d), the Third Claim for Relief.  (The same alleged unlawful conduct also is asserted in the Complaint to constitute common law fraud, the Fourth Claim for Relief, and tortious interference with contract, the Fifth Claim for Relief.)

**2.     *List each defendant and state the alleged misconduct and basis of liability of each defendant.***

The two defendants are David Forrest, a resident of the United Kingdom, and T. Beauclerc Rogers IV, who lives in Gladwyne.  The defendants were the principals of a cluster of related companies known generically as "Flashpoint," which were involved in the financing and production of motion pictures and television series.  As alleged in the Complaint and set forth in

response to paragraph 5 below, the Flashpoint companies constituted an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

The alleged misconduct, and the basis of liability, of each of the two defendants arises from their ownership, management, and operation of the Flashpoint Enterprise. During the period from 1996 through 1999, defendants, operating through Flashpoint, raised funds from various investors, purportedly to finance the production of motion pictures. In order to provide credit support for these transactions, without which the transactions would not have occurred, insurance policies were procured from and issued by Lexington and other insurance companies. Fraudulent misconduct on the part of the defendants, however, permeated this entire process; defendants' operation was corrupt from beginning to end. At the front end, defendants raised the funds by lying to Lexington and the other insurers about the prospects of the pictures being financed and about defendants' professed intention to use the funds for the purposes for which they were raised. Thereafter, defendants did in fact misappropriate substantial proceeds of the transactions for use in other ventures such as real estate, Russian movie theaters, and films other than the ones for which the proceeds were earmarked. The upshot is that Lexington and the other victims were duped into financing pictures and TV series that had no prospect of success, and substantial portions of the money they provided was fraudulently diverted from that purpose in any event.

Forrest and Rogers used the Flashpoint companies to commit numerous distinct frauds in connection with at least eight separate film/TV series[1] finance transactions ("The New Professionals," "Hollywood Funding No. 1" through "Hollywood Funding No. 6," and "It Had To Be You"), over a period of well over two years. Specifically:

---

[1] "The New Professionals" was a TV series, as was "The Secret Adventures of Jules Verne" (Hollywood Funding No. 4). The rest of the projects were feature-length films, or "slates" of such films. Some of these films were intended for theatrical release and some for TV use only. For convenience, Lexington may refer to the transactions simply as "film finance," treating the television aspect as included within that description notwithstanding the differences in some respects between the financing of motion pictures and the financing of a TV series.

- On five separate occasions defendants induced the issuance of film finance insurance policies by fraudulently inflating the "sales estimates" by which the insurers evaluated the likelihood that the loans would be repaid.  Three of these frauds were perpetrated by defendant Forrest; two of them by both defendants acting together.  In the case of "It Had To Be You," Lexington's current understanding is that the fraud was attempted but was not in fact carried out.

- On three occasions Forrest and Rogers, acting together, caused Flashpoint to misappropriate funds dedicated to the production of one set of films and apply the funds to another set.

- On three occasions Forrest and Rogers, acting together, simply stole money dedicated to production of specific films and used it to finance projects of their own.

- Forrest and Rogers concealed from the insurers for whose benefit they were supposedly "monitoring" the film productions that they were in fact the owners of one of the production companies they were "monitoring".

- On at least one occasion, defendants "pulled" a profitable film from a slate insured by Lexington, hoping to keep the revenues for themselves instead of using them to repay the loans plaintiff had insured.

- Defendants repeatedly concealed their prior defalcations in order to induce Lexington to issue insurance policies covering additional projects.

Lexington is filing with this RICO Case Statement the report of Andrew Maclay, a forensic accountant, which summarizes and describes the misappropriations set forth above.  The report has been redacted so as not to disclose materials that Lexington is prohibited from disclosing by English law.

**3.      List the alleged victims and state how each victim was allegedly injured.**

Lexington, the plaintiff in the instant action, was a victim of defendants' misconduct.  Lexington was injured in its business and property as a result of defendants' misconduct in that it was fraudulently induced to enter into three motion picture financing transactions known as Hollywood Funding Nos. 4, 5, and 6 (in each of which it issued an insurance policy), as a result of which:

(a)    Lexington was forced to expend substantial amounts in pursuing its creditors' remedies against Flashpoint UK, one of the companies directly or indirectly owned by defendants that together comprise Flashpoint;

(b)    Lexington was forced to expend several million dollars in defending itself against claims by the insured under the Hollywood Funding Nos. 4, 5, and 6 policies;

(c)    Lexington was forced to settle such claims for an additional expenditure (net of reinsurance recoveries) of several million dollars; and

(d)    defendants' misappropriation of funds was the proximate cause of an increase in the loss incurred by the insured and, therefore, a concomitant increase in the amount paid by Lexington in settlement of the claims under the Hollywood Funding Nos. 4, 5, and 6 policies.

Lexington's reinsurers in the HF4, 5, and 6 transactions were also victims of the frauds identified above, in the manner identified in categories (b), (c), and (d).  The extent of each reinsurer's loss, to the extent known by Lexington, is subject to the confidentiality provisions of the agreements settling the UK litigation in respect of Hollywood Funding Nos. 4, 5, and 6 and will be provided upon entry of a suitable confidentiality order (which Lexington has sought).  Lexington's reinsurers include The New Hampshire Insurance Company, a Pennsylvania corporation with its registered offices in Philadelphia.

Certain other participants in the HF4, 5, and 6 transactions were also victims of the fraud.  Each of them either expended funds in legal fees in or related to the UK litigation and/or lost investments (net of amounts paid in settlement) that would not have been made but for the frauds and/or paid money to compensate other victims of the fraud.  The identities of the victims and the nature and extent of their injuries are likewise covered by Lexington's confidentiality obligations under the UK settlement agreements.

HIH Casualty & General Insurance Ltd., which is now in liquidation in Australia, was the victim of the fraud in Award (HF3).

The insurers that issued the policy covering *The New Professionals* were the principal victims of defendants' fraud in connection with that transaction.  There may have been other victims, such as the investors in that project, who may not have been made fully whole by the settlement of the litigation arising from that policy.

**4.    *Describe in detail the pattern of racketeering activity or collection of unlawful debts alleged for each RICO claim.  A description of the pattern of racketeering shall include the following information:***

    **a.    *List the alleged predicate acts and the specific statutes that were allegedly violated;***

       **b.**       *If the RICO claim is based on the predicate offenses of wire fraud, mail fraud, or fraud in the sale of securities, the "circumstances of fraud or mistake shall be stated in particularity";*

       **c.**       *Describe how the predicate acts form a "pattern of racketeering activity"; and*

       **d.**       *State whether the alleged predicate acts relate to each other as part of a common plan.  If so, describe.*

Each of the three RICO claims asserted in the Complaint arises from a scheme to defraud devised and operated by the two defendants through their conduct of the affairs of Flashpoint.  Each defendant committed predicate acts of racketeering activity in connection with his conduct of the affairs of the Flashpoint Enterprise.  The scheme to defraud pertained to insurance-backed financing for motion pictures and TV series and included (i) fraudulent sales estimates for films, (ii) misappropriation of funds obtained through such financings, and (iii) the fraudulent inducement of certain Collateral Agreements between Flashpoint and Lexington.  These fraudulent activities were facilitated by defendants' use of mail and wire communications, which constitute the predicate offenses of mail fraud and wire fraud.  Misappropriated and fraudulently obtained funds also moved in interstate commerce.  A detailed discussion of defendants' scheme, the various fraudulent activities that gave effect to their scheme, and particularization of the mail and/or wire fraud follows:

### *Background:  Film Finance Transactions*

Beginning in around 1995, Flashpoint was engaged in the business of arranging for insurance-backed financing for motion pictures on a fee-for-service basis.  In a basic motion picture financing deal, money is loaned up front to produce the picture, with repayment of the loan to come from revenues generated after the picture is released.  The revenues may come from one or more of domestic or foreign theatrical revenues, video rights, television rights, cable rights, and so forth.

During most of the 1990s, film financing transactions other than those involving major studios were set up so that the lender's only recourse would be to a specified revenue stream from exploitation of the film or slate of films; it was rarely the case that the lender could look to

the general credit of a substantial pre-existing entity to repay the loan.  By the mid-1990s banks were becoming increasingly unwilling to take such film-specific credit risk without some form of credit enhancement in the transaction.

In numerous cases, the credit enhancement was provided by the insurance industry. A market developed whereby one or more insurance companies would issue a policy that, in one form or another, promised to pay the difference between the amount of the loan and the revenues generated by the film as of a certain "claim date."  The theory ostensibly was that (a) most films would in fact generate the necessary revenue by the claim date, and that (b) most of those that did not would generate such revenue eventually.  Thus, the principal risk the insurer was perceived to be taking was timing risk:  it was thought that very few policies would end up in a permanent loss position.

### *Flashpoint as Risk Manager*

As opposed to the banks that had traditionally loaned to the motion picture industry, insurance companies had little experience either in credit evaluation of motion picture loans or in monitoring and administering such loans once made.  Accordingly, they needed assistance at both ends of the transaction.  Flashpoint's original business was as a promoter and a "risk manager":  it would structure insurance-backed loan transactions and then, after they closed, monitor the production of the films and the revenue-generating sales of various rights in various geographic territories.  For these services Flashpoint would receive a fee that was generally a certain percentage of the face amount of the loan.

Flashpoint professed to believe, and it told insurance companies to which it offered its services, that loans could be made against a motion picture if conservatively projected revenues dedicated to repayment of the loan were at least 150% – 160% of the face amount of the loan.

There were, however, numerous bad motion picture projects seeking financing, and very few of them could legitimately project sales in excess of 160% of the loaded production

cost (which would be the face amount of the loan). This was particularly true where, as was of-ten the case in Flashpoint projects, very substantial fees and other overheads would be included in the amount of the loan but would not be expended in actual production of the motion picture. Because the amount that one can expect to realize from exploitation of a motion picture is (in general terms and all other things being equal) related to the amount that is spent in actual production of the film, fees and overheads of the type taken out by Flashpoint increase the financial exposure to the insurer (by increasing the face amount of the insured loan) without a concomitant increase in the expected revenue stream.

### *Fraudulent Sales Estimates*

Flashpoint, of course, could not earn fee income from financing transactions that did not in fact go forward. Faced with projects that could not be justified on an objective view of their merits, Flashpoint took to inflating sales estimates in its presentations in order to induce lenders — and, more particularly, insurers — to go forward with film financing transactions so that Flashpoint could earn its fees.

Specifically:

(a)  *The New Professionals*

 (i)  In the period November 1996 to May 1997, Flashpoint was endeavor-ing to secure insurance-backed financing for a television series known as "The New Professionals."

 (ii)  The original sales estimates were $26,520,000, and these were already inflated by the use of the sales agent's "high" estimates as opposed to the customary "low" or "medium" estimates.

 (iii)  Nevertheless, the insurance underwriters indicated that the margin be-tween the sales estimates and the amount of the loan was too thin.

 (iv)  Thereupon, defendant Forrest conspired with the insurance broker (Gordon Dawson of Lloyd Thompson) to produce new estimates that were substantially higher ($34,727,599) and presented the risk to the insurance market on the basis of those new estimates.

 (v)  At the time they presented the new estimates, on or about March 3, 1997, Forrest and Dawson knew that the estimates had no basis in fact and that they were derived by applying to an already-inflated starting point a revenue cycle that, if it took place at all, could do so only in a substantially longer time frame than the period of the insurance policy the underwriters were being asked to issue.

(b)  *Award*

    (i)  In December 1997, at the direction of both defendants, Lloyd Thompson presented a project known as "Award" (and which eventually became the transaction referred to above as "Hollywood Funding 3") to various insurers and reinsurers.

    (ii)  In the presentation, sales estimates for the five-film slate were presented as "Accepting" (or minimum) of $25,878,500 and "Asking" of $43,048,000.

    (iii)  As defendants well knew, these new estimates were without justification in fact or reasonable analysis.

    (iv)  In particular, the aggregate "Asking" estimate for four of the films was 56% higher than estimates received from Award Entertainment four months previously, notwithstanding that the only changes or proposed changes in any of the key elements (script, cast, or budget) as to these films were immaterial.

    (v)  As to the fifth film, the "Accepting" and "Asking" estimates went, respectively, from $3,595,000 to $7,920,000 and from $4,364,620 to $12,810,000.  Casting and budget had changed, but not in ways that would begin to justify such huge increases.

(c)  *The Secret Adventures of Jules Verne*

    (i)  Beginning in July 1997, Rupert Lywood of Matrix Securities Ltd. and subsequently Neil Dunn, of Talisman Pictures, provided a series of sales estimates for use by Flashpoint, through defendant Forrest, in obtaining financing for a new television series to be known as "The Secret Adventures of Jules Verne."

    (ii)  For the most part, each of the estimates projected a better result than the previous one.  During the period July 1997 to December 1997, cumulative five-year projected sales increased from $38,317,600 to $49,135,635, then went to $47,825,000, and finally jumped to $55,560,280.

    (iii)  The cumulative estimates ultimately presented to insurers (including plaintiff) were nearly four times greater than a reasonable estimate would have been:  $49.4 million (as presented; the three-year version of the $55.6 million estimate referred to in the previous subparagraph) *vs*. $13.9 million (reasonable).

    (iv)  Dunn and Forrest knew that the successive estimates had no basis in fact, were not reasonable or professionally prepared, and were created for the sole purpose of inducing insurers to issue what turned out to be the Hollywood Funding 4 policy.

    (v)  In addition, as defendant Forrest knew and intended, the sales estimates that were presented to insurers (including plaintiff) were further misrepresented by presenting them as "net" (*i.e.*, with the sales agents' commission deducted), whereas they were in fact developed on a gross basis.

    (vi)  Further, as defendant Forrest was well aware, the series was presented to insurers (including plaintiff) as though the British Broadcasting Corporation was about to purchase the English rights to the series for

a substantial sum, whereas in truth and in fact the BBC had already rejected the series.

(d) *Regent I*

    (i) The sales estimates prepared by or at the direction of defendants for the Regent 1 slate (part of Hollywood 5) were made up out of whole cloth.

    (ii) It is not possible to trace all of individual components of these estimates back to source documents, which is itself an indication of fraud. Where it has been possible to trace back individual components, the component as presented exceeded a reasonable value for the component by a factor of between two and three.

(e) *It Had To Be You*

    (i) In December 1997, Flashpoint assisted in the placement of insurance providing credit support for a $10,000,000 loan by Silicon Valley Bank, in Santa Clara, California, to It Had To Be You Productions, the producer of a film entitled "It Had To Be You."

    (ii) On information and belief, in connection with such placement defendant Forrest, through Martin Fink (a participant in the Flashpoint Enterprise) and Neil Kaplan (the producer of the film), endeavored to persuade the sales agent, Ian Jessel, of Condor Communications LLC, to inflate his sales estimates to induce the insurer (The New Hampshire Insurance Company) to issue the policy. Jessel has asserted that he refused to alter his estimates in response to such pressure.

### Misappropriation of Funds

Beginning in 1996 and taking full shape in 1997, defendants determined that they did not wish to be limited to fee-for-service revenues from the financing and production of motion pictures. Rather, they wished to be entrepreneurs as well — to be producers.

To implement this program, defendants conceived a new financing structure. Instead of the funds for the motion picture being provided directly by a bank or a single investor, zero-coupon notes would be issued by a "special purpose vehicle," or "SPV," that would have no assets other than (a) the revenue stream generated by the movies when produced and (b) the proceeds of an insurance policy insuring against the risk that the revenue stream would not be sufficient to repay the notes when due. The notes would carry the credit rating of the issuer of the insurance policy — in the case of Lexington, AAA, the highest rating assigned by Standard & Poors. The funds so raised would not be paid over directly to the producers but would be fun-

neled through Flashpoint and would — unbeknownst to either the investors or the insurers — be treated as Flashpoint's own equity.

In addition, also unbeknownst to the investors or the insurers, defendants (through companies they owned) were majority owners of New Beginnings Enterprises, which in turn owned one of the production companies, Prosperity Pictures. During this period, which began in 1998 and included all of 1999, defendants continued to cause Flashpoint to represent that it would monitor production costs, etc. on behalf of the insurers, without taking adequate steps to disclose the inherent conflict of interest in themselves being the owners of one of the production companies being "monitored." Flashpoint informed the broker of its ownership interest in New Beginnings, but the broker, for reasons that are not currently known, did not disclose this information to insurers.

The failure to disclose the conflict of interest rendered the representations that Flashpoint would protect insurers' interests materially false and misleading, as defendants well knew. In addition, because Flashpoint was proposing to assume a position of trust and confidence on behalf of insurers (including Lexington) — *i.e.*, as their designated risk manager under certain Collateral Agreements described further below — it owed insurers an affirmative duty to disclose such conflicts of interest. That duty was not complied with in circumstances suggesting that defendants were involved in the decision not to carry through with disclosure to the insurers.

Flashpoint repeatedly ignored obligations to maintain funds it raised in segregated accounts and use them only for the purposes for which they had been raised. Rather, all funds were commingled in a single account, which Flashpoint treated as its general operating account. Fraudulently and in breach of trust, defendants misappropriated funds from the projects to which they were dedicated and spent them for other purposes.

Specifically:

(a)  *Regent*

    (i)  During the period March – July 1998, defendants, acting through Flashpoint UK and Flashpoint Jersey, caused a total of $9,809,134 in

funds that had been raised for and were dedicated to 7.23 Productions, Rojak, and/or Award (Hollywood Funding Nos. 1, 2, and 3) to be used for the acquisition and/or production of films for Regent Enterprises (part of Hollywood Funding No. 5).

(ii)    All of the funds so used were transferred from the Flashpoint account that contained the (improperly commingled) funds that were raised in the three previous Hollywood Funding financings. The funds raised in each such previous financing were to have been segregated and dedicated solely to the production of films identified in connection with such financings.

(iii)    As defendants well knew, none of these uses of funds was permitted under the terms of the Hollywood Funding Nos. 1, 2, or 3 transactions (notwithstanding the formal Collateral Agreement in respect of such transactions had not yet been executed), and each of them constituted misappropriation, fraud, and breach of trust.

(b)    *Filmworks*

(i)    Also during the period March – July 1998, defendants, acting through Flashpoint UK and Flashpoint Jersey, caused a total of $4,870,281 in funds that had been raised for and were dedicated to 7.23 Productions, Rojak, and/or Award (Hollywood Funding Nos. 1, 2, and 3) to be used for the acquisition and/or production of films for New Beginnings/Filmworks (part of Hollywood Funding No. 5).

(ii)    All of the funds so used were transferred from the Flashpoint account that contained the (improperly commingled) funds that were raised in the three previous Hollywood Funding financings. The funds raised in each such previous financing were to have been segregated and dedicated solely to the production of films identified in connection with such financings.

(iii)    As defendants well knew, none of these uses of funds was permitted under the terms of the Hollywood Funding Nos. 1, 2, or 3 transactions (notwithstanding the formal Collateral Agreement in respect of such transactions had not yet been executed), and each of them constituted misappropriation, fraud, and breach of trust.

(iv)    Because defendants were the owners of New Beginnings, defendants were personally enriched by such misappropriation, fraud, and breach of trust.

(c)    *The Building/New Standard Post*

(i)    On or about August 14, 1998, defendants, acting through Flashpoint UK and Flashpoint Jersey, caused approximately $2.7 million to be transferred to The Building LLC to enable that entity to purchase a real estate parcel in Los Angeles known as 6855 Santa Monica Boulevard for use as offices and a post-production facility. An additional $1.5 million was transferred on or about April 7, 1999.

(ii)    In or about August 1998, defendants, acting through Flashpoint UK and Flashpoint Jersey, caused approximately $900,000 to be transferred to New Standard Post, LLC to enable that entity, as tenant of The Building, to furnish facilities for the post-production of motion pictures.

(iii)    All of the funds so used were transferred from the Flashpoint account that contained the (improperly commingled) funds that were raised in the various Hollywood Funding financings and that were supposed to be dedicated to the uses set forth in the documents related to such financings.

(iv)    As defendants well knew, none of these uses of funds was permitted under the Hollywood Funding No. 5 Collateral Agreement, and each of them constituted misappropriation, fraud, and breach of trust.

(v)    Because defendants were indirect owners of The Building LLC and New Standard Post, defendants were personally enriched by such misappropriation, fraud, and breach of trust.

(d)    *Russian Cinemas*. During 1998 and/or 1999, defendants misappropriated approximately $760,000 from the (improperly commingled) funds in the Flashpoint operating account to invest in a chain of movie theaters in and around Moscow.

(e)    *Ice Storm*

(i)    During the period August 12, 1999 to December 9, 1999, in connection with the production of "The Secret Adventures of Jules Verne," defendants, acting through Flashpoint UK and Flashpoint Jersey, transferred a total of US$824,900 to a company known as Ice Storm for items not within the production budget of the film being financed.

(ii)    Earlier, in April and May 1999, Flashpoint posted separate amounts of US$1,500,000 and C$3,426,652 as security for Ice Storm equipment leases. Those amounts were subsequently drawn against by the lessor.

(iii)    All of the funds so used were transferred from the Flashpoint account that contained the (improperly commingled) funds that were raised in the various Hollywood Funding financings and that were supposed to be dedicated to the uses set forth in the documents related to such financings.

(iv)    As defendants well knew, none of these uses of funds was permitted under the Jules Verne Collateral Agreement, and each of them constituted misappropriation, fraud, and breach of trust.

(v)    Because defendants were owners of Ice Storm, defendants were personally enriched by such misappropriation, fraud, and breach of trust.

(f)    *Hollywood Funding No. 6 Misappropriations*

(i)    The Hollywood Funding No. 6 transaction closed in December 1998, having raised money for six separate films or slates of films. Flashpoint was obligated to expend funds raised in the Hollywood Funding No. 6 transaction solely for the projects for which the funds were raised.

(ii)    In fact, Flashpoint, at the direction of defendants, did nothing of the sort. Throughout 1999, Flashpoint repeatedly expended Hollywood Funding No. 6 funds for projects that were entirely outside the scope of the transaction, including in numerous instances on films that were

not produced by *any* of the producers that were the subject of the Hollywood Funding No. 6 transaction.

(iii)   Defendants also caused Flashpoint to withhold at least one potentially successful film from the Hollywood Funding No. 6 slate to which it belonged, hoping to appropriate to themselves the profits of that film without those profits having to be dedicated to repayment of the transactions plaintiff had insured.

In November 1999 Flashpoint ran out of money, and the scheme came crashing down, although plaintiff was unable to verify that this was what happened until it audited Flashpoint the following year.  Between November 1999 and February 2001 defendants attempted to cover up their wrongdoing by dressing up Flashpoint's books so that the misappropriations and misapplications of funds would not look so stark.  Through Susan Wright, they caused Flashpoint to delay and obfuscate in response to Lexington's repeated efforts to audit, and they caused Ms. Wright to lie about the existence of unexpended funds.  In fact, all of the funds were gone.  On January 19, 2001, the English High Court entered judgment determining that at least $8.8 million of funds that Flashpoint had raised in connection with the Hollywood Funding Nos. 4, 5 and 6 transactions was not used for the purpose of funding the relevant films but had been dissipated.

***Fraudulent Inducement of the Collateral Agreements***

During the period March-July 1998, defendants were engaged in, *inter alia*, negotiating the terms of "Collateral Agreements" between Flashpoint (Flashpoint Jersey and Flashpoint UK) and plaintiff in connection with Hollywood Funding No. 4 ("Jules Verne") and Hollywood Funding No. 5 ("Regent I" and "Prosperity I").  The terms of such Collateral Agreements included the following provisions:

(a)   that funds raised in the each of the Hollywood Funding financings were to be kept segregated in an account dedicated to the transaction for which it was raised (the account was identified by number in the Collateral Agreement and was different in each Agreement);

(b)   that funds raised in a given financing could be used only for specified purposes in connection with the production of the motion pictures involved in that financing; and

(c)   that Tarlo Lyons, a firm of London solicitors, would certify that no draw notice could be issued until satisfactory Principal Production Documents were in place.

At the time defendants were negotiating and executing these Collateral Agreements, they had the fixed intent, which they concealed from plaintiff, not to comply with these requirements. Such fixed intent is demonstrated, *inter alia*, by defendants' contemporaneous non-compliance with similar requirements in other agreements and by their prompt breach of the Hollywood Funding Nos. 4 and 5 Collateral Agreements when executed. Specifically:

(a) At the time defendants were negotiating the Collateral Agreements, they were simultaneously violating the parallel requirements of earlier Hollywood Funding transactions by misappropriating for the benefit of Regent Entertainment funds that were raised for 7.23 Productions, Rojak, and Award.

(b) At the time defendants were negotiating the Collateral Agreements, they were simultaneously violating the foregoing requirements by not maintaining, and never intending to establish, separate segregated accounts for each of the separate Hollywood Funding transactions.

(c) At the time defendants were negotiating the Collateral Agreements, they knew that Stanley Munson, Esq. of Tarlo Lyons, would certify any draw he was requested to certify, without regard to the propriety of the draw. Mr. Munson in fact had an equity interest in the Flashpoint enterprise, a fact that was never disclosed to plaintiff and that would, if known to plaintiff, have caused plaintiff not to enter into the Collateral Agreements on the terms there set forth.

(d) The breaches of these requirements with respect to the Building and New Standard Post came very shortly after the Collateral Agreements were executed.

In December 1998, defendants executed a Collateral Agreement with plaintiff in connection with the Hollywood Funding No. 6 transaction that was then closing. The Hollywood Funding No. 6 Collateral Agreement contained requirements identical to those set forth above with respect to Hollywood Funding Nos. 4 and 5.

At the time they were negotiating and executing the Hollywood Funding No. 6 Collateral Agreement, defendants had the fixed intent, which they concealed from plaintiff, not to comply with these requirements. Such fixed intent is demonstrated by defendants' repeated pattern of non-compliance with similar requirements under earlier agreements, as set forth above, and by the fact that, also as set forth above, defendants caused Flashpoint to fail to comply with such requirements promptly after execution of the Hollywood Funding No. 6 Collateral Agreement and, thereafter, throughout 1999.

The Collateral Agreement for a given Hollywood Funding transaction was a material element of the entire transaction.  Absent a Collateral Agreement that was satisfactory to the insurer, the transaction would not take place at all.  Accordingly, defendants' fraudulent inducement of the Collateral Agreements constitutes fraudulent inducement of the transaction as a whole.

### Mail and Wire Communications

Having devised the scheme to defraud described above, defendants on numerous occasions caused the transmission of documents or information through the United States Postal Service, through private or commercial interstate carriers, and/or through wire or radio communications in interstate and/or foreign commerce.  Such transmissions include but are not limited to the following:

(a)  transmission of sales estimates, during the period 1997-1999, from Flashpoint's California operations to Flashpoint UK in England, and telephone calls and faxes back to California with respect to obtaining "revisions" to sales estimates;

(b)  numerous faxes and telephone calls between defendant Forrest, on trips to the United States, and the broker and others in England for the purpose of arranging the insurance-backed financings that were central to the scheme;

(c)  numerous faxes and telephone calls between and among various entities in the United Kingdom (principally Lexington's London office and Messrs. Ince & Co., a firm of solicitors), and Lexington's Boston office and its Boston and Delaware counsel (Morrison, Mahoney & Miller and The Bayard Firm) concerning the placement and the documentation of Hollywood Funding Nos. 4 and 5, in the period March - August 1998;

(d)  the cover notes for the HF 4 and 5 insurance policies were sent by mail or fax from the broker in England to defendant Rogers in Gladwyne;

(e)  numerous similar faxes and telephone calls concerning the placement and the documentation of Hollywood Funding No. 6, in the period October 1998 - February 1999;

(f)  numerous faxes and telephone calls between defendant Forrest in the United Kingdom and defendant Rogers in Gladwyne for the purpose of coordinating and implementing the scheme.

### Predicate Acts and the Pattern of Racketeering Activity

The predicate acts committed by defendants consist of mail fraud, wire fraud, and interstate/foreign transportation of stolen property, as follows:

(a)   Having devised the schemes to defraud described above, defendants caused at least the use of the mails and interstate/foreign wires set forth above in connection with and furtherance of such schemes, thereby violating 18 U.S.C. § 1341 and/or 18 U.S.C. § 1343.

(b)   Having devised a scheme to obtain money and/or property (the proceeds of the Hollywood Funding Nos. 4, 5 and 6 financings) by means of false and fraudulent practices, defendants caused at least the use of the mails and interstate/foreign wires set forth above in connection with and furtherance of such schemes, thereby violating 18 U.S.C. § 1341 and/or 18 U.S.C. § 1343..

(c)   Having misappropriated funds placed in their trust pursuant to the several Hollywood Funding transactions, defendants caused the transport of such funds in interstate and foreign commerce, and thereby violated 18 U.S.C. § 2314.

The foregoing predicate acts constitute a "pattern of racketeering activity" because they satisfy both branches of the "continuity plus relatedness" test, as follows:

*Relatedness*.  The predicate acts alleged in the Complaint relate to each other and to the Flashpoint Enterprise in that they all deal with raising money for film and/or TV productions, they have similar methods, they involve similar transactions, and they have similar victims.

*Continuity*.  The predicate acts were continuous and are not isolated events.  They have both "open-ended" and "closed-ended" continuity.  They have "closed-ended continuity" because they took place over a substantial period of time, beginning in 1997 and continuing for all of 1998 and 1999.  They have "open-ended continuity" because:

(a)   the repeated use of fraud and misappropriation, in multiple transactions, itself demonstrates not only a threat of continuity, but, in fact, that defendants' entire enterprise was corrupt and that fraud was its usual way of doing business; and

(b)   at the time defendants' scheme came apart, in January 2001, defendants requested that Lexington forbear creditors' remedies against one of the Flashpoint companies because defendants were then engaged in an attempt to structure a "Hollywood 7" transaction, with an insurer other than Lexington:

   (i)    defendants caused Flashpoint to tell Lexington that Flashpoint would use the proceeds of the Hollywood Funding No. 7 transaction to repay the amounts that had been misappropriated from Hollywood Funding Nos. 1 to 6, thereby demonstrating that Ponzi-like activity was defendants' normal mode of doing business;

   (ii)   Lexington declined to have anything to do with such a scheme and, instead, pursued its creditors' remedies and forced Flashpoint UK into judicial administration proceedings (akin to bankruptcy) in London, and

   (iii)  it was only the entry of Flashpoint UK into administration that caused defendants to desist from their scheme.

5.    **Describe in detail the alleged enterprise for each RICO claim.  A description of the enterprise shall include the following information:**

   a.    **State the names of the individuals, partnerships, corporations, associations, or other legal entities that allegedly constitute the enterprise;**

   b.    **Describe the structure, purpose, function and course of conduct of the enterprise;**

   c.    **State whether any defendants are employees, officers or directors of the alleged enterprise;**

   d.    **State whether any defendants are associated with the alleged enterprise; and**

   e.    **State whether you are alleging that the defendants are individuals or entities separate from the alleged enterprise, or that the defendants are the enterprise itself; or members of the enterprise.**

   The enterprise for each of the three RICO claims asserted in the Complaint is what is referred to in the Complaint as the "Flashpoint Enterprise."  The Building LLC and New Standard Post, each of which is a legal entity, are also enterprises with respect to the claim under 18 U.S.C. § 1962(a).

   The Flashpoint Enterprise consists of a group of affiliated companies that are associated in fact and are known generically as Flashpoint.  This group had ongoing structure and hierarchy and was in existence from at least 1995 until three of the principal companies in the group became the subject of insolvency proceedings in London in January 2001.  A "Flashpoint 'Family' Chart," created by or on behalf of the defendants and showing at least a portion of the structure of the Enterprise, is annexed hereto as Exhibit A (and is annexed to the Complaint as Exhibit A).  The course of conduct of the Flashpoint Enterprise is described in response to question 4 above.

   The principal top-level Flashpoint companies were Flashpoint UK Ltd. ("Flashpoint UK"), a company organized and existing under the laws of the United Kingdom, and Flashpoint Ltd. ("Flashpoint Jersey"), a company organized and existing under the laws of the Channel Island of Jersey.  Flashpoint Jersey did not have substantial operations of its own but was basically a financing conduit.  Flashpoint UK was engaged in the business of raising insurance-backed

funds for the production of motion pictures and overseeing and monitoring the productions as the insurers' "risk manager."

Affiliated with the two principal Flashpoint companies were at least the following other Flashpoint companies, with the nature of each company's business set forth in parentheses:

(a)   New Beginnings Enterprises LLC (holding company for the film production operations)

(b)   New Beginnings Media LLC. (motion picture sales agent)

(c)   various other companies containing the name "New Beginnings"

(d)   The Building LLC (ownership of 6855 Santa Monica Boulevard, Los Angeles, California)

(e)   Prosperity Pictures, Inc. (film production)

(f)   New Standard Post LLC (film post-production)

(g)   Flashpoint Ltd. (on information and belief, not the same company as Flashpoint Jersey) and Flashpoint (U.S.) LLC

The companies listed in paragraphs (a) through (f) were located in and around Los Angeles, California.  The companies listed in paragraph (g) were located in Gladwyne.  Each of the Flashpoint companies was majority owned, directly or indirectly, by defendants, who held their interests either in their own names or through two personal holding companies — Flashpoint Investments Ltd. (77.777% owned by defendant Forrest) and Bees & Honey LLC (100% owned by defendant Rogers).

**6.    *Describe the alleged relationship between the activities of the enterprise and the pattern of racketeering activity.  Discuss how the racketeering activity differs from the usual and daily activities of the enterprise, if at all.***

The pattern of racketeering activity was conducted in and through the ongoing activities of the Flashpoint Enterprise in packaging films and slates of films for financing and monitoring (or purporting to monitor) the production of financed films.  The frauds were made possible by the ostensibly legitimate and normal nature of these operations, and they were effected through abuses of those operations.  Thus, defendants raised money for the production of films, but they did so by lying about the films' prospects.  They monitored films on behalf of the investors and insurers, but they did not tell the investors or insurers that it was in many cases Flash-

point's own films that were being "monitored."  They managed and disbursed funds raised for filmmaking, except that they diverted to their own purposes substantial portions of the funds entrusted to them.  As alleged in the Complaint and set forth above, the entire Flashpoint Enterprise was corrupt, and fraud was its normal way of doing business.

**7.    *Describe the effect of the activities of the enterprise on interstate or foreign commerce.***

The activities of the Flashpoint Enterprise, conducted by or on behalf of defendants, affected interstate or foreign commerce in that defendants, in furtherance of their scheme to defraud on numerous occasions caused the transmission of documents and/or information through the United States Postal Service, through private or commercial interstate carriers, and/or through wire or radio communication in interstate or foreign commerce.  Such transmissions include but are not limited to the uses of the mails and wires set forth above in connection with the predicate acts.

In addition, the Flashpoint Enterprise itself was engaged in interstate and foreign commerce in the production and promotion of films and TV series, as set forth in part in the brochure annexed hereto as Exhibit B.

Further, Flashpoint caused funds to flow from investors in England to motion picture production companies in the United States (albeit defendants siphoned off some of the funds so flowing).

**8.    *If the complaint alleges a violation of 18 U.S.C. § 1962(a), provide the following information:***
   **a.    *State who received the income derived from the pattern of racketeering activity or through the collection of an unlawful debt; and***
   **b.    *Describe the use or investment of such income.***

The Complaint alleges a violation of 18 U.S.C. § 1962(a) in that, having received income through a pattern of racketeering activity (specifically, the misappropriation of the Hollywood Funding No. 5 transaction proceeds in August 1998), defendants invested a portion of

that income in The Building LLC (owner of the building housing Flashpoint's California opera-

tions) and New Standard Post (motion picture post-production facilities), each of which, as a le-

gal entity, is an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

**9.      If the complaint alleges a violation of 18 U.S.C. § 1962(b), describe the acquisi-
tion or maintenance of any interest in or control of the alleged enterprise.**

    The Complaint does not allege a violation of 18 U.S.C. § 1961(b).

**10.    If the complaint alleges a violation of 18 U.S.C. § 1962(c), provide the following
information:**

**a.      State who is employed by or associated with the enterprise; and**

**b.      State whether the same entity is both the liable "person" and the "enter-
prise" under § 1962(c).**

    In its First Claim for Relief, Lexington alleges a violation of 18 U.S.C. § 1962(c).

(a)    Each of the defendants, among many others, was associated with the Flashpoint
Enterprise, as described in paragraph 5, above, and was the majority owner, di-
rectly or indirectly, of each of the companies comprising the Flashpoint Enter-
prise.

(b)    In this action, the same entity is not both the liable "person" and the "enterprise"
under § 1962(c). Each of the two defendants is a "person" within the meaning
of U.S.C. § 1961(3) and each defendant committed predicate acts of racketeer-
ing activity in connection with his conduct of the affairs of the Flashpoint Enter-
prise. And, as noted above, each of the affiliated companies that constitute the
Flashpoint Enterprise was majority owned, directly or indirectly, by defendants.

**11.    If the complaint alleges a violation of 18 U.S.C. § 1962(d), describe the alleged
conspiracy.**

    In its Third Claim for Relief, Lexington alleges a violation of 18 U.S.C. § 1962(d).

The conspiracy was, in general terms, an agreement to raise funds, by fraud to the extent neces-

sary, and to use the funds raised as defendants' own equity in the development and operation of

the Flashpoint Enterprise. As alleged in the Complaint, the objects of the conspiracy included

perpetration of the predicate acts and violations of sections 1962(a) and (c) discussed herein.

12.    *Describe the alleged injury to business or property.*

Lexington was injured in its business and property by reason of defendants' activities in that it was fraudulently induced to enter into the Hollywood Funding Nos. 4, 5, and 6 transactions, as a result of which:

(a)    Lexington was forced to expend substantial amounts in pursuing its creditors' remedies against Flashpoint UK;

(b)    Lexington was forced to expend several million dollars in defending itself against claims brought by the insured under the Hollywood Funding Nos. 4, 5, and 6 policies;

(c)    Lexington was forced to settle such claims for an additional expenditure (net of reinsurance recoveries) of several million dollars; and

(d)    defendants' misappropriation of funds was the proximate cause of an increase in the loss incurred by the insured and, therefore, a concomitant increase in the amount paid by Lexington in settlement of the claims under the Hollywood Funding Nos. 4, 5, and 6 policies.

13.    *Describe the direct causal relationship between the alleged injury and the violation of the RICO statute.*

Defendants' misrepresentations were known by defendants to be false at the time they were made, were material and were known to be so by defendants, and were made with the specific intent of fraudulently inducing Lexington to enter into the Hollywood Funding Nos. 4, 5, and 6 transactions.  As defendants intended, Lexington justifiably relied on such misrepresentations to its detriment in participating in the transactions.

Similarly, defendants' omissions were known by defendants to concern matters that they were under a duty to disclose to Lexington, concerned matters that were known by defendants to be material, and of which Lexington, as defendants well knew, was unaware.  Defendants made conscious decisions not to disclose such matters with the specific intent of fraudulently inducing Lexington to enter into the Hollywood Funding Nos. 4, 5, and 6 transactions.  As defendants' intended, Lexington justifiably relied on such omissions to its detriment.

Had Lexington known the truth at the time it bound the Hollywood Funding No. 4 coverage on July 3, 1998, the Hollywood Funding No. 5 coverage on July 28, 1998, or the Hollywood Funding No. 6 coverage on December 23, 1998, it:

(a)   would not have bound the coverage being bound at such time; and

(b)   with respect to previously bound coverage, would have taken such steps against Flashpoint as were available to it, both contractually and as a matter of law, to shut down the fraudulent enterprise and recover unexpended funds.

As a direct and proximate cause of the fraudulent misrepresentations and omissions on the part of the defendants with respect to the Hollywood Funding Nos. 4, 5, and 6 transactions, Lexington suffered the injury to its business and property described in the response to paragraph 12, above.

As a direct and proximate result of defendants' misappropriations of funds, Lexington suffered the injury to its business and property described in paragraph 12(d) above.

**14.    *Provide any additional information that you feel would be helpful to the court in trying the RICO claim.***

Although this action concerns defendants' fraudulent activities occurring in numerous transactions over a period of years and involving many other entities and individuals (resulting, unavoidably, in the lengthy discovery plan presented to the Court), the overall Ponzi and get-rich scheme created and perpetrated by defendants was, in reality, easily understandable and quite straightforward, at least in its objectives.   Initially, defendants raised funds by lying to plaintiff and the other insurers about the prospects, in terms of sales revenue, of the picture whose financing the insurers were backing.   Then, after the funds were raised, defendants fraudulently diverted substantial proceeds of the transactions to other ventures, such as real estate ventures in Los Angeles, Russian movie theaters, and films other than the ones for which the proceeds were earmarked.

As time went by, defendants needed to raise more and more money to cover their tracks on old transactions and to keep the scheme moving forward.   In the six "Hollywood Funding" transactions that closed in 1997 and 1998, defendants raised a total of $240,200,000, as follows:

| Transaction | Closing Date | Amount Raised |
|---|---|---|
| Hollywood Funding No. 1 | August 13, 1997 | $16,400,000 |

| | | |
|---|---|---|
| Hollywood Funding No. 2 | December 4, 1997 | $15,500,000 |
| Hollywood Funding No. 3 | December 17, 1997 | $25,600,000 |
| Hollywood Funding No. 4 | July 3, 1998 | $33,600,000 |
| Hollywood Funding No. 5 | July 28, 1998 | $48,400,000 |
| Hollywood Funding No. 6 | December 23, 1998 | $100,700,000 |

Lexington was the insurer for the last three transactions (Hollywood Fundings 4, 5, and 6); another insurer (HIH Casualty & General Insurance Ltd.) was the insurer for the first three. As can be seen from the chart above, after Hollywood Funding No. 2, each succeeding transaction raised an ever increasing amount, concluding with the over $100 million raised by the Hollywood Funding No. 6 transaction.

Lexington strongly believes that the enormity of defendants' fraud (described in detail in the response to paragraph 4, above, at pages 4-16 will be clearly demonstrated to the Court (although the documentation may be voluminous) following the conclusion of the discovery phase of this action.

Dated: September 2, 2003

MONTGOMERY, MCCRACKEN, WALKER & RHOADS LLP


By:    /s/ Jeffrey R. Lerman
          Jeffrey R. Lerman
123 South Broad Street
Philadelphia, Pennsylvania  19109
(215) 772-1500


CAHILL GORDON & REINDEL LLP


By:    /s/ Edward P. Krugman
          Edward P. Krugman
80 Pine Street
New York, New York  10005
(212) 701-3000

*Attorneys for Plaintiff*