## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF PENNSYLVANIA

LEXINGTON INSURANCE COMPANY,

Plaintiff,

-against-

DAVID FORREST, T. BEAUCLERC ROGERS IV, STANLEY MUNSON, MARTIN FINK, all individually, and NEW BEGINNINGS ENTERPRISES LLC, a California Limited Liability Company, and TARLO LYONS, a partnership,

Defendants

Civil Action No. 02-CV-4435
(Hon. Anita B. Brody)

**SECOND AMENDED AND
SUPPLEMENTAL COMPLAINT**

Plaintiff alleges:

1.    This is an action under the Racketeer Influenced and Corrupt Organizations Act to recover on account of a multi-year, multi-party, multi-transaction Ponzi scheme that has cost plaintiff millions of dollars in direct, out-of-pocket loss.

2.    The Ponzi scheme was effected through a cluster of related companies known generically as "Flashpoint." The collection of Flashpoint companies constituted an "enterprise" within the meaning of 18 U.S.C. § 1961(4), as described in more detail below. On numerous occasions from 1996 to 1999 defendants Forrest and Rogers, operating through Flashpoint, raised funds from various investors, purportedly to finance the production of motion pictures. To provide credit support for these transactions, insurance policies were procured from and issued by plaintiff and other insurance companies.

3.    Defendants'[1] operation was corrupt from beginning to end.  At the front end, defendants Forrest and Rogers raised the funds by lying to plaintiff and the other insurers about the prospects of the pictures whose financing the insurers were backing.  After the funds were raised, defendants fraudulently diverted substantial proceeds of the transactions to real estate ventures, Russian movie theaters, and films other than the ones for which the proceeds were earmarked.

4.    As time went on, defendants Forrest and Rogers needed to raise more and more money to cover their tracks on old transactions and keep the scheme moving forward.  In the six "Hollywood Funding" transactions that closed in 1997 and 1998, defendants Forrest and Rogers raised a total of $240,200,000, as follows:

| Transaction | Closing Date | Amount Raised |
|---|---|---|
| Hollywood Funding No. 1 | August 13, 1997 | $16,400,000 |
| Hollywood Funding No. 2 | December 4, 1997 | $15,500,000 |
| Hollywood Funding No. 3 | December 17, 1997 | $25,600,000 |
| Hollywood Funding No. 4 | July 3, 1998 | $33,600,000 |
| Hollywood Funding No. 5 | July 28, 1998 | $48,400,000 |
| Hollywood Funding No. 6 | December 23, 1998 | $100,700,000 |

Plaintiff was the insurer for the last three transactions (Hollywood Funding 4, 5, and 6); another insurer (HIH Casualty & General Insurance Ltd.) was the insurer for the first three.

5.    As a result of defendants' frauds, plaintiff faced claims in England by the trustee for investors in the last three Hollywood Funding projects, who asserted that plaintiff was required to respond on the insurance policies it wrote.  Plaintiff expended in excess of $15 million defending itself against such claims and paid certain additional amounts (net of reinsurance recoveries) to settle them.  The exact amounts plaintiff paid are subject to confidentiality

---

[1]    Unless otherwise indicated, the use of the term "defendants" throughout the Second Amended and Supplemental Complaint refers to all six named defendants.

-3-

orders and agreements in the English proceedings and will be supplied to defendants upon entry of a suitable confidentiality order in this action.

## PARTIES AND JURISDICTION

6.     Plaintiff is Lexington Insurance Company, a Delaware corporation with its principal place of business at 200 State Street, Boston, Massachusetts. Lexington writes property and casualty insurance business on an excess and surplus lines basis throughout the United States. It also writes property and casualty insurance business in the United Kingdom.

7.     Defendant David Forrest is a subject of the United Kingdom and was at all times material hereto an owner (directly or indirectly) and an officer of various Flashpoint companies.

8.     Defendant T. Beauclerc Rogers IV is a citizen of the Commonwealth of Pennsylvania and a resident of this District. He was at all times material hereto an owner (directly or indirectly) and an officer of various Flashpoint companies.

9.     Defendant Stanley Munson is a subject of the United Kingdom and at all times material hereto was a solicitor and a partner in Tarlo Lyons, a United Kingdom firm of solicitors, an indirect owner and an officer of at least one Flashpoint company, and functioned as the United Kingdom lawyer for the various Flashpoint companies.

10.     Defendant Martin Fink is a citizen of the State of California and had day-to-day operational control of the Flashpoint Enterprise's California operations.

11.     Defendant New Beginnings Enterprises LLC is, on information and belief, a California limited liability company that was the vehicle for the Flashpoint Enterprise's California motion picture production operations. This defendant is sued only in the Eighth Claim for Relief.

12.    Defendant Tarlo Lyons is a firm of solicitors based in London in the United Kingdom and at all times material hereto was the firm in which defendant Stanley Munson was a partner and was represented by Flashpoint as being the United Kingdom lawyers for the various Flashpoint companies.

13.    As alleged below, substantial portions of defendants' conduct occurred in the United States and/or had effects in the United States, including without limitation in the financing of motion pictures in this country and the harm to plaintiff herein. A portion of the Flashpoint Enterprise was physically and permanently present in the United States, and misappropriated proceeds of the financing transactions were invested in this country.

14.    This Court has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331. The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 in that plaintiff and defendants Fink, Rogers, and New Beginnings are citizens of different states, each of defendants Forrest, Munson, and Tarlo is an alien, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs. The Court also has supplemental jurisdiction over the non-federal claims herein because such non-federal claims arise out of the same facts and circumstances as, and ought to be tried together with, the federal claims.

## THE FLASHPOINT ENTERPRISE

15.    The Flashpoint Enterprise consists of a group of affiliated companies that are associated in fact. The group had ongoing structure and hierarchy and was in existence from at least 1995 until three of the principal companies became the subject of insolvency proceedings in London in January 2001. A "Flashpoint 'Family' Chart" created by or on behalf of defendants Forrest and Rogers and showing at least a portion of the structure of the enterprise is annexed hereto as Exhibit A.

16.    The principal Flashpoint companies were Flashpoint UK Ltd. ("Flashpoint UK"), a company organized and existing under the laws of the United Kingdom, and Flashpoint Ltd. ("Flashpoint Jersey"), a company organized and existing under the laws of the Channel Island of Jersey. Flashpoint Jersey did not have substantial operations of its own but was basically a financing conduit. Flashpoint UK was engaged in the business of raising insurance-backed funds for the production of motion pictures and overseeing and monitoring the productions as the insurers' "risk manager."

17.    Affiliated with the two principal Flashpoint companies were at least the following other Flashpoint companies, with the nature of each company's business set forth in parentheses:

(a)    New Beginnings Enterprises LLC (holding company for the film production operations)

(b)    New Beginnings Media LLC. (motion picture sales agent)

(c)    various other companies containing the name "New Beginnings"

(d)    The Building LLC (ownership of 6855 Santa Monica Boulevard, Los Angeles, California)

(e)    Prosperity Pictures, Inc. (film production)

(f)    New Standard Post LLC (film post-production)

(g)    Flashpoint Ltd. (on information and belief, not the same company as Flashpoint Jersey) and Flashpoint (U.S.) LLC

18.    Each of the Flashpoint companies was majority owned, directly or indirectly, by defendants Forrest and Rogers, who held their interests either in their own names or through two personal holding companies — Flashpoint Investments Ltd. (77.777% owned by defendant Forrest) and Bees & Honey LLC (100% owned by defendant Rogers). Both the Flashpoint Ltd. identified in paragraph 17(g) above and Flashpoint (U.S.) LLC were located in this District, at 901 Youngsford Road in Gladwyne, Pa. (which is also the residence of defendant

Rogers). The New Beginnings companies, Prosperity Pictures, The Building LLC, and New Standard Post were all physically located in or around Los Angeles, California.

## THE SCHEME

19.     As do most Ponzi schemes, the Flashpoint scheme started small but ultimately spiraled out of control until it collapsed under its own weight.

### *Background: Film Finance Transactions*

20.     Beginning in around 1995, Flashpoint was engaged in the business of arranging for insurance-backed financing for motion pictures on a fee-for-service basis. In a basic motion picture financing deal, money is loaned up front to produce the picture, with repayment of the loan to come from revenues generated after the picture is released. The revenues may come from one or more of domestic or foreign theatrical revenues, video rights, television rights, cable rights, and so forth.

21.     During most of the 1990s, film financing transactions other than those involving major studios were set up so that the lender's only recourse would be to a specified revenue stream from exploitation of the film or slate of films; it was rarely the case that the lender could look to the general credit of a substantial pre-existing entity to repay the loan. By the mid-1990s banks were becoming increasingly unwilling to take such film-specific credit risk without some form of credit enhancement in the transaction.

22.     In numerous cases, the credit enhancement was provided by the insurance industry. A market developed whereby one or more insurance companies would issue a policy that, in one form or another, promised to pay the difference between the amount of the loan and the revenues generated by the film as of a certain "claim date." The theory ostensibly was that (a) most films would in fact generate the necessary revenue by the claim date, and that (b) most of those that did not would generate such revenue eventually. Thus, the principal risk the insurer

was perceived to be taking was timing risk: it was thought that very few policies would end up in a permanent loss position.

### *Flashpoint as Risk Manager*

23.    As opposed to the banks that had traditionally loaned to the motion picture industry, insurance companies had little experience either in credit evaluation of motion picture loans or in monitoring and administering such loans once made.  Accordingly, they needed assistance at both ends of the transaction.  Flashpoint's original business was as a promoter and a "risk manager":  it would structure insurance-backed loan transactions and then, after they closed, monitor the production of the films and the revenue-generating sales of various rights in various geographic territories.  For these services Flashpoint would receive a fee that was generally a certain percentage of the face amount of the loan.

24.    Flashpoint professed to believe, and it told insurance companies to which it offered its services, that loans could be made against a motion picture if conservatively projected revenues dedicated to repayment of the loan were at least 150% – 160% of the face amount of the loan.

25.    There were, however, numerous bad motion picture projects seeking financing, and very few of them could legitimately project sales in excess of 160% of the loaded production cost (which would be the face amount of the loan).  This was particularly true where, as was often the case in Flashpoint projects, very substantial fees and other overheads would be included in the amount of the loan but would not be expended in actual production of the motion picture.  Because the amount that one can expect to realize from exploitation of a motion picture is (in general terms and all other things being equal) related to the amount that is spent in actual production of the film, fees and overheads of the type taken out by Flashpoint increase the financial exposure to the insurer (by increasing the face amount of the insured loan) without a concomitant increase in the expected revenue stream.

*Fraudulent Sales Estimates*

26.    Flashpoint, of course, could not earn fee income from financing transactions that did not in fact go forward. Faced with projects that could not be justified on an objective view of their merits, Flashpoint took to inflating sales estimates in its presentations in order to induce lenders — and, more particularly, insurers — to go forward with film financing transactions so that Flashpoint could earn its fees.

27.    Specifically:

(a)    *The New Professionals*

(i)    In the period November 1996 to May 1997, Flashpoint was endeavoring to secure insurance-backed financing for a television series known as "The New Professionals."

(ii)    The original sales estimates were $26,520,000, and these were already inflated by the use of the sales agent's "high" estimates as opposed to the customary "low" or "medium" estimates.

(iii)    Nevertheless, the insurance underwriters indicated that the margin between the sales estimates and the amount of the loan was too thin.

(iv)    Thereupon, on information and belief, defendant Forrest conspired with the insurance broker (Gordon Dawson of Lloyd Thompson) to produce new estimates that were substantially higher ($34,727,599) and presented the risk to the insurance market on the basis of those new estimates.

(v)    At the time they presented the new estimates, on or about March 3, 1997, Forrest and Dawson knew that the estimates had no basis in fact and that they were derived by applying to an already-inflated starting point a revenue cycle that, if it took place at all, could do so only in a substantially longer time frame than the period of the insurance policy the underwriters were being asked to issue.

(b)    *Award*

(i)    In December 1997, at the direction of defendants Forrest and Rogers, Lloyd Thompson presented a project known as "Award" (and which eventually became the transaction referred to above as "Hollywood Funding 3") to various insurers and reinsurers.

(ii)    In the presentation, sales estimates for the five-film slate were presented as "Accepting" (or minimum) of $25,878,500 and "Asking" of $43,048,000.

(iii)    As defendants Forrest and Rogers well knew, these new estimates were without justification in fact or reasonable analysis.

(iv)    In particular, the aggregate "Asking" estimate for four of the films was 56% higher than estimates received from Award Entertainment four months previously, notwithstanding that the only changes or proposed changes in any of the key elements (script, cast, or budget) as to these films were immaterial.

(v)     As to the fifth film, the "Accepting" and "Asking" estimates went, respectively, from $3,595,000 to $7,920,000 and from $4,364,620 to $12,810,000. Casting and budget had changed, but not in ways that would begin to justify such huge increases.

(c)     *The Secret Adventures of Jules Verne*

(i)     Beginning in July 1997, Rupert Lywood of Matrix Securities Ltd. and subsequently Neil Dunn, of Talisman Pictures, provided a series of sales estimates for use by Flashpoint, through defendant Forrest, in obtaining financing for a new television series to be known as "The Secret Adventures of Jules Verne."

(ii)    For the most part, each of the estimates projected a better result than the previous one. During the period July 1997 to December 1997, cumulative five-year projected sales increased from $38,317,600 to $49,135,635, then went to $47,825,000, and finally jumped to $55,560,280.

(iii)   The cumulative estimates ultimately presented to insurers (including plaintiff) were nearly four times greater than a reasonable estimate would have been: $49.4 million (as presented; the three-year version of the $55.6 million estimate referred to in the previous subparagraph) *vs.* $13.9 million (reasonable).

(iv)    On information and belief, Dunn and Forrest knew that the successive estimates had no basis in fact, were not reasonable or professionally prepared, and were created for the sole purpose of inducing insurers to issue what turned out to be the Hollywood Funding 4 policy.

(v)     In addition, as defendant Forrest knew and intended, the sales estimates that were presented to insurers (including plaintiff) were further misrepresented by presenting them as "net" (*i.e.*, with the sales agents' commission deducted), whereas they were in fact developed on a gross basis.

(vi)    Further, as defendant Forrest was on information and belief well aware, the series was presented to insurers (including plaintiff) as though the British Broadcasting Corporation was about to purchase the English rights to the series for a substantial sum, whereas in truth and in fact the BBC had already rejected the series.

(d)     *Regent 1*

(i)     On information and belief, the sales estimates prepared by or at the direction of defendants Forrest and Rogers for the Regent 1 slate (part of Hollywood 5) were made up out of whole cloth.

        (ii)    It is not possible to trace all of individual components of these estimates back to source documents, which is itself an indication of fraud.

        (iii)    Where it has been possible to trace back individual components, the component as presented exceeded a reasonable value for the component by a factor of between two and three.

    (e)    *It Had To Be You*

        (i)    In December 1997, Flashpoint assisted in the placement of insurance providing credit support for a $10,000,000 loan by Silicon Valley Bank, in Santa Clara, California, to It Had To Be You Productions, the producer of a film entitled "It Had To Be You."

        (ii)    On information and belief, in connection with such placement defendants Forrest and Fink, and Neil Kaplan (the producer of the film), endeavored to persuade the sales agent, Ian Jessel, of Condor Communications LLC, to inflate his sales estimates to induce the insurer (The New Hampshire Insurance Company) to issue the policy. Jessel has asserted that he refused to alter his estimates in response to such pressure.

    (f)    Fink's activities in connection with "It Had To Be You" were symptomatic of his basic *modus operandi* in obtaining sales estimates, which was to inform the sales agent (or other estimator) of the level the estimates would need to reach in order to support financing and to "encourage" the person making the estimates to revise the estimate upward where necessary.

### *Misappropriation of Funds*

28.    Beginning in 1996 and taking full shape in 1997, defendants Forrest and Rogers determined that they did not wish to be limited to fee-for-service revenues from the financing and production of motion pictures. Rather, they wished to be entrepreneurs as well — to be producers.

29.    To implement this program, defendants Forrest and Rogers conceived a new financing structure. Instead of the funds for the motion picture being provided directly by a bank or a single investor, zero-coupon notes would be issued by a "special purpose vehicle," or "SPV," that would have no assets other than (a) the revenue stream generated by the movies when produced and (b) the proceeds of an insurance policy insuring against the risk that the revenue stream would not be sufficient to repay the notes when due. The notes would carry the

credit rating of the issuer of the insurance policy — in the case of plaintiff, AAA, the highest rating assigned by Standard & Poors. The funds so raised would not be paid over directly to the producers but would be funneled through Flashpoint and would — unbeknownst to either the investors or the insurers — be treated as Flashpoint's own equity.

30.    In addition, also unbeknownst to the investors or the insurers, defendants Forrest and Rogers (through companies they owned) were majority owners of New Beginnings Enterprises, which in turn owned one of the production companies, Prosperity Pictures. During this period, which began in 1998 and included all of 1999, defendants Forrest and Rogers continued to cause Flashpoint to represent that it would monitor production costs, etc. on behalf of the insurers, without taking adequate steps to disclose the inherent conflict of interest in themselves being the owners of one of the production companies being "monitored." Flashpoint informed the broker of its ownership interest in New Beginnings, but the broker, for reasons that are not currently known, did not disclose this information to insurers.

31.    The failure to disclose the conflict of interest rendered the representations that Flashpoint would protect insurers' interests materially false and misleading, as defendants Forrest and Rogers well knew. In addition, because Flashpoint was proposing to assume a position of trust and confidence on behalf of insurers (including plaintiff) — i.e., as their designated risk manager under certain Collateral Agreements described further below — it owed insurers an affirmative duty to disclose such conflicts of interest. That duty was not complied with in circumstances suggesting that defendants Forrest and Rogers were involved in the decision not to carry through with disclosure to the insurers.

32.    Flashpoint and defendants Munson and Tarlo Lyons, acting as Flashpoint's agents, repeatedly ignored obligations to maintain funds it raised in segregated accounts and use them only for the purposes for which they had been raised. Rather, all funds were commingled in a single account, which Flashpoint treated as its general operating account. Fraudu-

lently and in breach of trust, defendants misappropriated funds from the projects to which they were dedicated and spent them for other purposes.

33.    Specifically:

(a)    *Regent*

     (i)    During the period March – July 1998, defendants, acting through Flashpoint UK and Flashpoint Jersey, caused a total of $9,809,134 in funds that had been raised for and were dedicated to 7.23 Productions, Rojak, and/or Award (Hollywood Funding Nos. 1, 2, and 3) to be used for the acquisition and/or production of films for Regent Enterprises (part of Hollywood Funding No. 5).

     (ii)    All of the funds so used were transferred from the Flashpoint account that contained the (improperly commingled) funds that were raised in the three previous Hollywood Funding financings. The funds raised in each such previous financing were to have been segregated and dedicated solely to the production of films identified in connection with such financings.

     (iii)    As defendants well knew, none of these uses of funds was permitted under the terms of the Hollywood Funding Nos. 1, 2, or 3 transactions (notwithstanding the formal Collateral Agreement in respect of such transactions had not yet been executed), and each of them constituted misappropriation, fraud, and breach of trust.

(b)    *Filmworks*

     (i)    Also during the period March – July 1998, defendants, acting through Flashpoint UK and Flashpoint Jersey, caused a total of $4,870,281 in funds that had been raised for and were dedicated to 7.23 Productions, Rojak, and/or Award (Hollywood Funding Nos. 1, 2, and 3) to be used for the acquisition and/or production of films for New Beginnings/Filmworks (part of Hollywood Funding No. 5).

     (ii)    All of the funds so used were transferred from the Flashpoint account that contained the (improperly commingled) funds that were raised in the three previous Hollywood Funding financings. The funds raised in each such previous financing were to have been segregated and dedicated solely to the production of films identified in connection with such financings.

     (iii)    As defendants well knew, none of these uses of funds was permitted under the terms of the Hollywood Funding Nos. 1, 2, or 3 transactions (notwithstanding the formal Collateral Agreement in respect of such transactions had not yet been executed), and each of them constituted misappropriation, fraud, and breach of trust.

     (iv)    Because defendants Forrest and Rogers were the owners of New Beginnings, defendants Forrest and Rogers were personally enriched by such misappropriation, fraud, and breach of trust.

   *(c)*   *The Building/New Standard Post*

      (i)   On or about August 14, 1998, defendants, acting through Flashpoint UK and Flashpoint Jersey, caused approximately $2.7 million to be transferred to The Building LLC to enable that entity to purchase a real estate parcel in Los Angeles known as 6855 Santa Monica Boulevard for use as offices and a post-production facility. An additional $1.5 million was transferred on or about April 7, 1999.

      (ii)   In or about August 1998, defendants, acting through Flashpoint UK and Flashpoint Jersey, caused approximately $900,000 to be transferred to New Standard Post, LLC to enable that entity, as tenant of The Building, to furnish facilities for the post-production of motion pictures.

      (iii)   All of the funds so used were transferred from the Flashpoint account that contained the (improperly commingled) funds that were raised in the various Hollywood Funding financings and that were supposed to be dedicated to the uses set forth in the documents related to such financings.

      (iv)   As defendants well knew, none of these uses of funds was permitted under the Hollywood Funding No. 5 Collateral Agreement, and each of them constituted misappropriation, fraud, and breach of trust.

      (v)   Because defendants Forrest and Rogers were indirect owners of The Building LLC and New Standard Post, defendants Forrest and Rogers were personally enriched by such misappropriation, fraud, and breach of trust.

   *(d)*   *Russian Cinemas.* During 1998 and/or 1999, defendants misappropriated approximately $760,000 from the (improperly commingled) funds in the Flashpoint operating account to invest in a chain of movie theaters in and around Moscow.

   *(e)*   *Ice Storm*

      (i)   During the period August 12, 1999 to December 9, 1999, in connection with the production of "The Secret Adventures of Jules Verne," defendants, acting through Flashpoint UK and Flashpoint Jersey, transferred a total of US$824,900 to a company known as Ice Storm (on information and belief, one of the "Icestorm" companies listed on Exhibit A) for items not within the production budget of the film being financed.

      (ii)   Earlier, in April and May 1999, Flashpoint posted separate amounts of US$1,500,000 and C$3,426,652 as security for Ice Storm equipment leases. Those amounts were subsequently drawn against by the lessor.

      (iii)   All of the funds so used were transferred from the Flashpoint account that contained the (improperly commingled) funds that were raised in the various Hollywood Funding financings and that were

supposed to be dedicated to the uses set forth in the documents re-
lated to such financings.

(iv)    As defendants well knew, none of these uses of funds was permit-
ted under the Jules Verne Collateral Agreement, and each of them
constituted misappropriation, fraud, and breach of trust.

(v)    Because defendants Forrest and Rogers were owners of Ice Storm,
defendants Forrest and Rogers were personally enriched by such
misappropriation, fraud, and breach of trust.

(f)    *Hollywood Funding No. 6 Misappropriations*

(i)    The Hollywood Funding No. 6 transaction closed in December
1998, having raised money for six separate films or slates of films.
Flashpoint was obligated to expend funds raised in the Hollywood
Funding No. 6 transaction solely for the projects for which the
funds were raised.

(ii)    In fact, Flashpoint, at the direction of defendants, did nothing of
the sort. Throughout 1999, Flashpoint repeatedly expended Hol-
lywood Funding No. 6 funds for projects that were entirely outside
the scope of the transaction, including in numerous instances on
films that were not produced by *any* of the producers that were the
subject of the Hollywood Funding No. 6 transaction.

(iii)    Defendants Forrest and Rogers also caused Flashpoint to withhold
at least one potentially successful film from the Hollywood Fund-
ing No. 6 slate to which it belonged, hoping to appropriate to
themselves the profits of that film without those profits having to
be dedicated to repayment of the transactions plaintiff had insured.

(iv)    In November 1999 Flashpoint ran out of money, and the scheme
came crashing down, although plaintiff was unable to verify that
this was what happened until it audited Flashpoint the following
year. Between November 1999 and February 2001 defendants
Forrest and Rogers attempted to cover up their wrongdoing by
dressing up Flashpoint's books so that the misappropriations and
misapplications of funds would not look so stark.

(g)    *Beautiful*

(i)    It is the position of defendants Fink and New Beginnings Enter-
prises that the film "Beautiful," which Flashpoint co-produced,
was never intended to be part of the Prosperity II (or any other
Lexington-financed) slate and that revenues from the film therefore
need not be remitted to Lexington.

(ii)    With Fink's specific knowledge and at his specific direction, how-
ever, Flashpoint's funding for "Beautiful" was obtained from the
proceeds of the Hollywood Funding No. 6 financing.

34.    Each misappropriation of funds set forth in paragraph 33 above was ef-

fected and allowed to occur by the actions of defendants Munson and Tarlo Lyons in wrongfully

authorizing and certifying withdrawals of funds raised in the various Hollywood Funding transactions for purposes other than the projects to which they were dedicated. Upon information and belief, defendants Munson and Tarlo Lyons each was aware that such conduct was in breach of Flashpoint's contractual obligations and responsibilities to plaintiff under certain Collateral Agreements described further below and each deliberately misled plaintiff as to such conduct. Defendant Tarlo Lyons is liable for the actions of defendant Munson with respect to Munson's authorizing and certifying such improper withdrawals and the resulting misappropriations of funds, as Munson undertook such actions in the ordinary course of Tarlo Lyons' business.

35.    The misappropriations alleged in subparagraphs (a), (b), (c), (f), and (g) of paragraph 33 above are alleged against defendants Fink, Forrest, and Rogers (in addition to defendants Munson and Tarlo Lyons, as alleged in the preceding paragraph). They were effected by defendant Fink with the connivance and at the direction of defendants Forrest and Rogers. The misappropriations alleged in subparagraphs (d) and (e) of paragraph 33 above are not alleged against defendant Fink.

36.    On January 19, 2001, the Commercial Court of the High Court of Judicature of England and Wales entered judgment determining that at least $8.8 million of funds that Flashpoint had raised in connection with the Hollywood Funding Nos. 4, 5 and 6 transactions was not used for the purpose of funding the relevant films but had been dissipated.

### Fraudulent Inducement of the Collateral Agreements

37.    During the period March-July 1998, defendants were engaged in, *inter alia*, negotiating the terms of "Collateral Agreements" between Flashpoint (Flashpoint Jersey and Flashpoint UK) and plaintiff in connection with Hollywood Funding No. 4 ("Jules Verne") and Hollywood Funding No. 5 ("Regent I" and "Prosperity I"). The terms of such Collateral Agreements included the following provisions:

(a) that funds raised in the each of the Hollywood Funding financings were to be kept segregated in an account dedicated to the transaction for which it was raised (the account was identified by number in the Collateral Agreement and was different in each Agreement);

(b) that funds raised in a given financing could be used only for specified purposes in connection with the production of the motion pictures involved in that financing; and

(c) that defendant Tarlo Lyons would certify that no draw notice could be issued until satisfactory Principal Production Documents were in place.

38.    At the time defendants were negotiating and executing these Collateral Agreements, they had the fixed intent, which they concealed from plaintiff, not to comply with these requirements. Such fixed intent is demonstrated, *inter alia*, by defendants' contemporaneous non-compliance with similar requirements in other agreements and by their prompt breach of the Hollywood Funding Nos. 4 and 5 Collateral Agreements when executed. Specifically:

(a) At the time defendants were negotiating the Collateral Agreements, they were simultaneously violating the parallel requirements of earlier Hollywood Funding transactions by misappropriating for the benefit of Regent Entertainment funds that were raised for 7.23 Productions, Rojak, and Award.

(b) At the time defendants were negotiating the Collateral Agreements, they were simultaneously violating the foregoing requirements by not maintaining, and never intending to establish, separate segregated accounts for each of the separate Hollywood Funding transactions.

(c) At the time defendants were negotiating the Collateral Agreements, they knew that defendant Munson would certify or arrange to have Tarlo Lyons certify any draw he was requested to certify, without regard to the propriety of the draw. Defendant Munson in fact had an equity interest in the Flashpoint enterprise, a fact that was never disclosed to plaintiff and that would, if known to plaintiff, have caused plaintiff not to enter into the Collateral Agreements on the terms there set forth.

(d) The breaches of these requirements with respect to the Building and New Standard Post came very shortly after the Collateral Agreements were executed.

(e) An inevitable consequence of defendants Munson and Tarlo Lyons authorizing withdrawals of funds raised in the various Hollywood Funding transactions to be made for purposes other than the projects for which they were dedicated was a breach of such Collateral Agreements.

39.    In December 1998, defendants negotiated and executed a Collateral Agreement with plaintiff in connection with the Hollywood Funding No. 6 transaction that was then closing. The Hollywood Funding No. 6 Collateral Agreement contained requirements identical to those set forth in paragraph 37 above with respect to Hollywood Funding Nos. 4 and 5.

40.    At the time they were negotiating and executing the Hollywood Funding No. 6 Collateral Agreement, defendants had the fixed intent, which they concealed from plaintiff, not to comply with these requirements. Such fixed intent is demonstrated by defendants' repeated pattern of non-compliance with similar requirements under earlier agreements, as alleged above, and by the fact that, also as alleged above, defendants caused Flashpoint to fail to comply with such requirements promptly after execution of the Hollywood Funding No. 6 Collateral Agreement and, thereafter, throughout 1999.

41.    In negotiating the terms of the Collateral Agreements in connection with the Hollywood Funding Nos. 4, 5 and 6 transactions, defendants Munson and Tarlo Lyons knew that the terms of each of these Agreements would have to be breached in order to restore to the earlier Hollywood Funding Nos. 1, 2 and 3 accounts the funds that had been raised in those transactions, as defendants Munson and Tarlo Lyons had been personally involved in diverting funds raised in those transactions for purposes other than the projects to which they were dedicated.

42.    In certifying the draws that they were requested to certify by defendants Forrest and Rogers and/or by other Flashpoint personnel pursuant to the requirement contained in each Collateral Agreement that all transfers from the Flashpoint holding account be authorized by a Tarlo Lyons partner, defendants Munson and Tarlo Lyons each was acting for the protection of plaintiff, which would be adversely affected if monies obtained through the separate Hollywood Funding financings were misspent. Therefore, there was a special relationship between

plaintiff and each of Munson and Tarlo Lyons, requiring Munson and Tarlo Lyons to act at all times in the best interests of plaintiff.

43.     The Collateral Agreement for a given Hollywood Funding transaction was a material element of the entire transaction. Absent a Collateral Agreement that was satisfactory to the insurer, the transaction would not take place at all. Accordingly, defendants' fraudulent inducement of the Collateral Agreements constitutes fraudulent inducement of the transaction as a whole.

### *Scienter, Materiality, and Reliance*

44.     Each of the misrepresentations set forth above (with the potential exception of the matters alleged in paragraphs 30 and 31) was known by the defendants who are alleged to have made each such misrepresentation to be false at the time it was made, was material and was known to be so by such defendants, and was made with the specific intent to defraud plaintiff. As defendants intended, plaintiff justifiably relied on such misrepresentations to its detriment.

45.     Each of the omissions set forth above was known by the defendants who are alleged to have caused each such omission to concern matters that they were under a duty to disclose to plaintiff, concerned matters that were known by such defendants to be material, and of which plaintiff, as defendants well knew, was unaware. Defendants made conscious decisions not to disclose such matters with the specific intent to defraud plaintiff.

46.     Had plaintiff known the truth at the time it bound the Hollywood Funding No. 4 coverage on July 3, 1998, the Hollywood Funding No. 5 coverage on July 28, 1998, or the Hollywood Funding No. 6 coverage on December 23, 1998, it:

      (a)     would not have bound the coverage being bound at such time, and

      (b)     with respect to previously bound coverage, would have taken such steps against Flashpoint as were available to it, both contractually and as a mat-

ter of law, to shut down the fraudulent enterprise and recover unexpended funds.

## USE OF JURISDICTIONAL MEANS

47.    In furtherance of the foregoing scheme, defendants on numerous occasions caused the transmission of documents and/or information through the United States Postal Service, through private or commercial interstate carriers, and/or through wire or radio communication in interstate or foreign commerce.  Such transmissions include but are not limited to the following:

(a)    transmission of sales estimates, during the period 1997-1999, from Flashpoint's California operations to Flashpoint UK in England, and telephone calls and faxes back to California to obtain the necessary "revisions" to such sales estimates;

(b)    numerous faxes and telephone calls between and among various entities in the United Kingdom (principally Lexington's London office and Messrs. Ince & Co., a firm of solicitors), and Lexington's Boston office and its Boston and Delaware counsel (Morrison, Mahoney & Miller and The Bayard Firm) concerning the placement and the documentation of Hollywood Funding Nos. 4 and 5, in the period March – August 1998;

(c)    numerous similar faxes and telephone calls concerning the placement and the documentation of Hollywood Funding No. 6, in the period October 1998 – February 1999; and

(d)    on information and belief, numerous faxes and telephone calls between defendant Forrest in the United Kingdom and defendant Rogers in this District for the purpose of coordinating and implementing the scheme.

(e)    on information and belief, numerous faxes between defendant Fink in California and defendants Munson and Tarlo Lyons in the United Kingdom for the purpose of arranging for withdrawals from the Flashpoint holding account of the monies raised in the various Hollywood Funding transactions.

In each instance, defendants either participated directly in the listed communications or knew or anticipated that such communications would take place.  Defendants' scheme to defraud depended upon communications such as those alleged herein.

48.    Defendants knowingly caused the transportation in interstate and/or foreign commerce of funds having been taken by fraud in at least the following instances:

-20-

    (a)    the March 1998 transmission to and/or for the benefit of Regent Enter-
tainment (located in and around Los Angeles, California) of funds that had
been raised for, and were for the exclusive use and benefit of, 7.23 Pro-
ductions;

    (b)    the August 1998 and April 1999 transmissions to The Building LLC, for
use in purchasing real property located at 6855 Santa Monica Boulevard,
in Los Angeles, of funds that had been raised for, and were for the exclu-
sive use and benefit of, Regent Entertainment and New Beginnings/Film-
works;

    (c)    the August 1998 transmission to New Standard Post, for use in purchasing
post-production equipment, of funds that had been raised for, and were for
the exclusive use and benefit of, Regent Entertainment and New Begin-
nings/Filmworks; and

    (d)    the payments, throughout 1999, to those United States-based production
entities that were not entitled to receive funding from the Hollywood
Funding No. 6 transaction but did in fact do so.

    49.    In addition, because (at the very least) the Award Transaction (Hollywood

Funding No. 3) and each of the Hollywood Funding transactions in which plaintiff was insurer

(Hollywood Funding Nos. 4, 5, and 6) was fraudulently induced, each payment to a producer in

the United States with respect to any of these transactions constituted the transmission in foreign

commerce of funds taken by fraud. Such payments and transmissions occurred on a routine basis

beginning in late 1997 and continuing throughout 1998 and 1999.

## FIRST CLAIM FOR RELIEF
### (Violation of 18 U.S.C. § 1962(c))
### (Against All Defendants Except New Beginnings)

    50.    Each defendant is a "person" within the meaning of 18 U.S.C. § 1961(3).

    51.    Each defendant committed predicate acts of racketeering activity in con-

nection with his conduct of the affairs of the Flashpoint Enterprise, in that:

    (a)    having devised the scheme to defraud alleged above, defendants caused
the use of the jurisdictional means alleged in paragraph 47 above, thereby
in each instance violating 18 U.S.C. § 1341 and/or 18 U.S.C. § 1343, and

    (b)    having devised a scheme to obtain money and/or property (the proceeds of
the Hollywood Funding Nos. 4, 5, and 6 financings) by means of false and
fraudulent pretenses as alleged above, defendants caused the use of the ju-

-21-

risdictional means alleged in paragraph 47, thereby in each instance violating 18 U.S.C. § 1341 and/or 18 U.S.C. § 1343, and

(c)     having misappropriated funds placed in their trust pursuant to the several Hollywood Funding transactions, as alleged above, defendants caused the transport of such funds in interstate and foreign commerce, as alleged in paragraphs 48 and 49 above, thereby in each instance violating 18 U.S.C. § 2314.

52.     These acts of racketeering activity were related to one another and to the Flashpoint Enterprise, and they displayed both "open-ended" and "closed-ended" continuity, in that:

(a)     the acts took place over a period beginning in 1997 and continuing for all of 1998 and 1999;

(b)     the repeated use of fraud and misappropriation, in multiple transactions, itself demonstrates not only a threat of continuity but, in fact, that defendants' entire enterprise was corrupt and that fraud was its usual way of doing business; and

(c)     at the time the scheme came apart, in January 2001, defendants Forrest and Rogers requested that plaintiff forbear seeking creditors' remedies against Flashpoint UK because defendants Forrest and Rogers were then engaged in an attempt to structure a "Hollywood 7" transaction, with an insurer other than plaintiff:

   (i)     defendants Forrest and Rogers caused Flashpoint to tell plaintiff that Flashpoint would use the proceeds of the Hollywood Funding No. 7 transaction to repay the amounts that had been misappropriated from Hollywood Funding Nos. 1 to 6, thereby demonstrating that Ponzi-like activity was defendants Forrest and Rogers' normal mode of doing business;

   (ii)    plaintiff declined to have anything to do with such a scheme and, instead, pursued its creditors' remedies and forced Flashpoint UK into judicial administration proceedings (akin to bankruptcy) in London; and

   (iii)   it was only the entry of Flashpoint UK into administration that caused defendants Forrest and Rogers to desist from their scheme.

53.     Accordingly, each defendant has conducted the affairs of the Flashpoint Enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

54.    Plaintiff has been injured in its business and property by reason of such violation in that it was fraudulently induced to enter into the Hollywood Funding Nos. 4, 5, and 6 transactions, as a result of which:

(a)    plaintiff was forced to expend substantial amounts in pursuing its creditors' remedies against Flashpoint UK;

(b)    plaintiff was forced to expend several million dollars in defending itself against claims brought by the insured under the Hollywood Funding Nos. 4, 5, and 6 policies;

(c)    plaintiff was forced to settle such claims for an additional expenditure (net of reinsurance recoveries) of several million dollars;

(d)    defendants' misappropriation of funds was the proximate cause of an increase in the loss incurred by the insured and, therefore, a concomitant increase in the amount paid by plaintiff in settlement of the claims under the Hollywood Funding Nos. 4, 5, and 6 policies.

### SECOND CLAIM FOR RELIEF
(Violation of 18 U.S.C. § 1962(a))
(Against Defendants Forrest and Rogers)

55.    As alleged above, defendants Forrest and Rogers received income through a pattern of racketeering activity.

56.    A portion of such income was invested in, and used to establish and operate, The Building LLC and New Standard Post, each of which, as a legal entity, is an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

57.    The activities of The Building LLC and New Standard Post affected interstate commerce. The investment and use alleged above therefore constituted a violation of 18 U.S.C. § 1962(a).

58.    Plaintiff has been injured in its business and property by such investment and use in that plaintiff has been forced to expend substantial amounts in pursuing its creditors' remedies against Flashpoint UK.

-23-

59.     As a result of the claims brought by the insured under the Hollywood Funding Nos. 4, 5, and 6 policies, plaintiff has been further injured in its business and property by such investment and use in that the investment and use of funds for other than the purpose for which they were raised was the proximate cause of an increase in the amount of the insured's loss and, therefore, a concomitant increase in the amount that plaintiff was forced to pay to settle the insured's claims.

### THIRD CLAIM FOR RELIEF
(Violation of 18 U.S.C. § 1962(d))
(Against All Defendants Except New Beginnings)

60.     Defendants agreed and conspired with one another to commit the acts of racketeering activity alleged above and, more broadly, to operate Flashpoint in the Ponzi-like fashion alleged herein, in violation of 18 U.S.C. § 1962(d).

61.     On information and belief, such conspiracy was implemented, in part, through communications between defendant Forrest in the United Kingdom and defendant Rogers in this District.

62.     It was an object of such conspiracy that Flashpoint be conducted through a pattern of racketeering activity, as alleged in the First Claim for Relief.

63.     It was an object of such conspiracy that the proceeds of the pattern of racketeering activity be used and invested as alleged in the Second Claim for Relief.

64.     Defendants' conspiracy has injured plaintiff in its business and property in the manner alleged in the First and Second Claims for Relief.

### FOURTH CLAIM FOR RELIEF
(Common Law Fraud)
(Against All Defendants Except New Beginnings)

65.     As alleged above, defendants knowingly and intentionally induced plaintiff to enter into the Hollywood Funding Nos. 4, 5 and 6 transactions by means of misrepresenta-

tions of material facts and omissions to disclose material facts that defendants were under a duty to disclose.

66. Also as alleged above, plaintiff justifiably relied upon such misrepresentations and omissions in entering into the Hollywood Funding Nos. 4, 5 and 6 transactions and in not exercising contractual rights on existing transactions to shut down defendants' fraudulent activities, recover funds, and thereby minimize any loss for which plaintiff might ultimately be responsible.

67. As a direct and proximate result of such reliance:

(a) plaintiff has been forced to expend substantial amounts in pursuing its creditors' remedies against Flashpoint UK;

(b) plaintiff was forced to expend several million dollars in defending itself against claims brought by the insured under the Hollywood Funding Nos. 4, 5, and 6 policies;

(c) plaintiff was forced to settle such claims for an additional expenditure (net of reinsurance recoveries) of several million dollars;

(d) defendants' misappropriation of funds was the proximate cause of an increase in the loss incurred by the insured and, therefore, a concomitant increase in the amount paid by plaintiff in settlement of the claims under the Hollywood Funding Nos. 4, 5, and 6 policies.

**FIFTH CLAIM FOR RELIEF**
(Tortious Interference With Contract)
(Against All Defendants Except New Beginnings)

68. At the times that defendants caused Flashpoint to misappropriate funds as alleged above with respect to The Building/New Standard Post, Ice Storm, and Russian Cinemas, Flashpoint was contractually obligated to plaintiff under the several Collateral Agreements to expend the funds raised in connection with the Hollywood Funding Nos. 4, 5, and 6 transactions only for the purposes, and under the procedures, identified in the Collateral Agreement for each transaction.

69.     As defendants knew and intended, the misappropriation and use of funds as alleged herein caused Flashpoint to breach its Collateral Agreements with plaintiff.

70.     Defendants' inducement of such breach was tortious and without justification.

71.     Plaintiff has been injured by such breach in that plaintiff has been forced to expend substantial amounts in pursuing its creditors' remedies against Flashpoint UK.

72.     As a result of the claims brought under the Hollywood Funding Nos. 4, 5 and 6 policies and plaintiff's resulting defense and settlement of such claims, plaintiff has been further injured by such breach in that the investment and use of funds for other than the purpose for which they were raised was the proximate cause of an increase in the amount of the insured's loss under the policies and a concomitant increase in the amount for which plaintiff was forced to settle the insured's claims.

**SIXTH CLAIM FOR RELIEF**
(Fraudulent Inducement)
(Against Defendants Munson and Tarlo Lyons)

73.     In the Collateral Agreements that were executed by Flashpoint and plaintiff with respect to each of the Hollywood Funding Nos. 4, 5, and 6 transactions, Flashpoint agreed, in paragraph 4(2) of each separate Collateral Agreement, that it would undertake "to procure that Tarlo Lyons will not release any funds from the Holding Account in relation to the principal photography of the Films unless and until the Principal Production Documents in relation to the Films have been substantially completed to the reasonable satisfaction of Lexington" (the "Tarlo Lyons Representations"),

74.     Acting on behalf of Flashpoint, defendant Munson negotiated each of the Collateral Agreements with respect to the Hollywood Funding Nos. 4, 5, and 6 transactions with Ince & Co., solicitors representing plaintiff. As a consequence, defendants Munson and Tarlo

Lyons knew the contents of the Tarlo Lyons Representations, that the Collateral Agreements, in their entirety, were intended to protect the interests of plaintiff in the Hollywood Funding Nos. 4-6 transactions, and that without the existence of the Collateral Agreements plaintiff would not have agreed to issue the insurance policies in the Hollywood Fundings Nos. 4-6 transactions.

75.    Defendant Munson was aware that the Tarlo Lyons Representations were fundamental requirements of plaintiff's participation in the Hollywood Funding transactions because, *inter alia*, in July 1997 Munson, acting on behalf of Flashpoint, negotiated the Collateral Agreement with respect to the Hollywood Funding No. 1 transaction for which HIH Casualty and General Insurance Company provided insurance.  As Munson knew, Lexington's underwriter at the time of the Hollywood Funding Nos. 4, 5, and 6 transactions was Steven Mitchell, who had been the HIH underwriter at the time of the Hollywood Fundings Nos. 1-3 transactions.

76.    Upon information and belief, the Tarlo Lyons Representations were false and fraudulent when made and were known by defendants Munson and Tarlo Lyons to be so, in that Munson and Tarlo Lyons had no intention at the time of the negotiation and execution of the Collateral Agreements of honoring or complying with such representations and assurances and knew at such time that such representations and assurances were wholly false and inaccurate.

77.    Upon information and belief, at the time he negotiated the terms of the Collateral Agreements with respect to the Hollywood Funding Nos. 4-6 transactions, defendant Munson knew that over US $14 million had been taken from funds raised for the Hollywood Funding Nos. 1-3 transactions and were used for the purposes of pre-funding productions that formed part of the Hollywood Funding Nos. 4 and 5 projects.

78.    Upon information and belief, the Tarlo Lyons Representations were made with reckless disregard for the interests of plaintiff and were made by defendants Munson and Tarlo Lyons to deceive and defraud the plaintiff and to induce plaintiff to issue insurance policies with respect to the Hollywood Funding Nos. 4, 5, and 6 transactions.

79.    Plaintiff justifiably relied on the Tarlo Lyons Representations as being true and accurate and was thereby induced by defendants Munson and Tarlo Lyons to issue insurance policies with respect to the Hollywood Funding Nos. 4, 5, and 6 transactions.

80.    Had plaintiff known the truth concerning the Tarlo Lyons Representations, plaintiff would not have issued insurance policies with respect to the Hollywood Funding Nos. 4, 5, and 6 transactions.

81.    Plaintiff has been injured in its business and property by reason of such violation in that it was fraudulently induced to enter into the Hollywood Funding Nos. 4, 5, and 6 transactions, as a result of which:

   (a)    plaintiff was forced to expend substantial amounts in pursuing its creditors' remedies against Flashpoint UK;

   (b)    plaintiff was forced to expend several million dollars in defending itself against claims brought by the insured under the Hollywood Funding Nos. 4, 5, and 6 policies;

   (c)    plaintiff was forced to settle such claims for an additional expenditure (net of reinsurance recoveries) of several million dollars;

   (d)    defendants' misappropriation of funds was the proximate cause of an increase in the loss incurred by the insured and, therefore, a concomitant increase in the amount paid by plaintiff in settlement of the claims under the Hollywood Funding Nos. 4, 5, and 6 policies.

### SEVENTH CLAIM FOR RELIEF
(Tortious Interference with Contract)
(Against Defendants Munson and Tarlo Lyons)

82.    In the Collateral Agreements that were executed by Flashpoint and plaintiff with respect to each of the Hollywood Funding Nos. 4, 5, and 6 transactions, Flashpoint agreed, in paragraph 4(2) of each separate Collateral Agreement, that it would undertake "to procure that Tarlo Lyons will not release any funds from the Holding Account in relation to the principal photography of the Films unless and until the Principal Production Documents in relation to the Films have been substantially completed to the reasonable satisfaction of Lexington."

-28-

83.    At the times that defendants Munson and Tarlo Lyons caused and allowed Flashpoint to fail to comply with the foregoing Collateral Agreement provision, Flashpoint was contractually obligated to plaintiff under the several Collateral Agreements to adhere to the requirement of the foregoing Collateral Agreement provision.

84.    As defendants Munson and Tarlo Lyons knew, the failure to adhere to and comply with the foregoing Collateral Agreement provision caused Flashpoint to breach its Collateral Agreements with plaintiff.

85.    Defendant Munson and Tarlo Lyons' inducement of such breach was tortious and without justification.

86.    Plaintiff has been injured in such breach in that plaintiff has been forced to expend substantial amounts in pursuing its creditors' remedies against Flashpoint UK.

87.    As a result of the claims brought under the Hollywood Funding Nos. 4, 5, and 6 policies and plaintiff's resulting defense and settlement of such claims, plaintiff has been further injured by such breach in that Flashpoint's failure to comply with the foregoing Collateral Agreement provision, *i.e.*, by using the funds raised in the Hollywood Funding transactions for purposes other than those for which they were raised, was the proximate cause of an increase in the amount of the insured's loss under the policies and a concomitant increase in the amount for which plaintiff was forced to settle the insured's claims.

**EIGHTH CLAIM FOR RELIEF**
(Constructive Trust, Money Had and Received, and Declaratory Judgment)
(Against Defendants Fink and New Beginnings)

88.    As alleged in paragraph 33 (g) above, insofar as the film "Beautiful" was made with money derived through Flashpoint, it was made with funds raised by the Hollywood Funding No. 6 financing.

89.    Plaintiff, directly and through Numerica, Flashpoint's UK receiver, is the beneficial owner of all rights to film revenues due the Hollywood Funding No. 6 slate from or through the Flashpoint operations.

90.    Defendants Fink and/or New Beginnings Enterprises LLC (which is currently controlled by defendant Fink) have asserted that they are the owners of the rights to such revenues and have possession of approximately $1 million in such revenue that is the rightful property of plaintiff.

91.    Defendants Fink and/or New Beginnings Enterprises LLC hold such revenues in constructive trust for plaintiff. Plaintiff is entitled to an order requiring defendants Fink and/or New Beginnings Enterprises LLC to deliver up and remit to plaintiff all such revenues received, plus interest.

92.    There is an actual controversy between plaintiff and defendants Fink and New Beginnings Enterprises LLC as to ownership of future revenues from the film "Beautiful." Plaintiff is entitled to a declaratory judgment that it is the owner of such revenues and mandatory injunctive relief directing defendants Fink and New Beginnings Enterprises LLC to pay over and remit such revenues as received.

### FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING

93.    Defendants' frauds and other misconduct were inherently self-concealing. Plaintiff did not discover, and could not with the exercise of reasonable diligence have discovered, the existence of any of defendants' criminal conduct until some time after November 2000.

94.    In August 2000, plaintiff exercised its right under the various Hollywood Funding Collateral Agreements to audit Flashpoint. At defendants Forrest and Rogers' direction, Flashpoint stonewalled, and no audit took place at that time.

95.     Plaintiff continued to press its audit rights, but it was not until November 2000 that its auditors were granted access to any of Flashpoint's books and records. Analysis of those books and records eventually revealed the misappropriations alleged above.

96.     With respect to the fraudulent sales estimates, plaintiff did not discover (and could not in the exercise of reasonable diligence have discovered) their existence until it gained access to (a) the Flashpoint files obtained on audit, (b) Flashpoint and New Beginnings documents made available by a cooperating witness, (c) other documents made available voluntarily by various transaction participants, and (d) documents obtained through disclosure in proceedings in the United Kingdom arising out of the New Professionals and Hollywood Funding insurance policies. Plaintiff did not have access to any of these sources of information prior to January 2001.

97.     Under the rules of the High Court in England, plaintiff is bound by an implied undertaking not to use materials obtained through disclosure in High Court proceedings except in connection with the proceedings in which disclosure is made. Each of the allegations in this Complaint is supported by documents or information obtained independently of such proceedings.

WHEREFORE, plaintiff demands judgment against defendants, and each of them, as follows:

A.     On each of the First and Third Claims for Relief, against all defendants except New Beginnings Enterprises LLC, threefold the amount of damages sustained by plaintiff as a result of defendants' criminal conduct, in an amount to be proven at trial, including at least the recovery of the amounts expended by plaintiff in pursing its creditors' remedies against Flashpoint and in defending and settling the claims on the fraudulently induced Hollywood Funding Nos. 4, 5 and 6 insurance policies, plus plaintiffs' attorneys' fees in prosecuting this action.

B.    On the Second Claim for Relief, against defendants Forrest and Rogers, threefold the amount of damages sustained by plaintiff as a result of defendants' criminal conduct, in an amount to be proven at trial, including at least the recovery of the amounts expended by plaintiff in pursing its creditors' remedies against Flashpoint and in defending and settling the claims on the fraudulently induced Hollywood Funding Nos. 4, 5 and 6 insurance policies, plus plaintiffs' attorneys' fees in prosecuting this action.

C.    On the Fourth Claim for Relief, against all defendants except New Beginnings Enterprises LLC, the damages sustained by plaintiff, in an amount to be proven at trial, including at least the recovery of the amounts expended by plaintiff in pursing its creditors' remedies against Flashpoint and in defending and settling the claims on the fraudulently induced Hollywood Funding Nos. 4, 5 and 6 insurance policies.

D.    On the Fifth Claim for Relief, against all defendants except New Beginnings Enterprises LLC, the damages sustained by plaintiff, in an amount to be proven at trial, including at least the recovery of the amounts expended by plaintiff in pursing its creditors' remedies against Flashpoint and in defending and settling the claims on the fraudulently induced Hollywood Funding Nos. 4, 5 and 6 insurance policies.

E.    On the Sixth and Seventh Claims for Relief, against defendants Munson and Tarlo Lyons, the damages sustained by plaintiff, in an amount to be proven at trial, including at least the recovery of the amounts expended by plaintiff in pursing its creditors' remedies against Flashpoint and in defending and settling the claims on the fraudulently induced Hollywood Funding Nos. 4, 5 and 6 insurance policies.

F.    On the Eighth Claim for Relief, against defendants Fink and New Beginnings Enterprises LLC,

> (a)    the establishment of a constructive trust over, and a direction to pay over to plaintiff with interest, all funds received on account of the film "Beautiful" or, in the alternative,

-32-

(b)    damages in the amount of funds that these defendants received on account of the film "Beautiful", and, in any event,

(c)    a declaratory judgment that these defendants must remit to plaintiff all future revenues on account of the film "Beautiful" and a mandatory injunction to effect such remittance.

G.    Prejudgment interest on all damages awarded herein.

H.    Such other and further relief as to the Court seems just and proper.

Dated:   Philadelphia, Pennsylvania
April 19, 2004

MONTGOMERY, MCCRACKEN, WALKER & RHOADS LLP

By: _____
Jeffrey R. Lerman
123 South Broad Street
Philadelphia, Pennsylvania 19109
(215) 772-1500

CAHILL GORDON & REINDEL LLP

By: _____
Edward P. Krugman
80 Pine Street
New York, New York 10005
(212) 701-3000

*Attorneys for Plaintiff*

# Exhibit A

106/064/00978

## FLASHPOINT "FAMILY" CHART

