Exhibit A

310 315 4768

# CAHILL GORDON & REINDEL

### EIGHTY PINE STREET

### NEW YORK, N.Y. 10005-1702

FLOYD ABRAMS
L. HOWARD ADAMS
ROBERT A. ALESSI
ROGER ANDRUS
HELENE R. BANKS
MICHAEL A. BECKER
LANDIS C. BEST
SUSAN BUCKLEY
KEVIN J. BURKE
P. KEVIN CASTEL
JAMES J. CLARK
BENJAMIN J. COHEN
CHRISTOPHER T. COX
W. LESLIE DUFFY
RICHARD E. FARLEY
PATRICIA FARREN
JOAN MURTAGH FRANKEL
BART FRIEDMAN
CIRO A. GAMBONI
WILLIAM B. GANNETT
CHARLES A. GILMAN
STEPHEN A. GREENE
ROBERT M. HALLMAN
WILLIAM M. HARTNETT
CRAIG H. HOROWITZ
DAVID G. JANUSZEWSKI
THOMAS J. KAVALER
LAWRENCE A. KOBRIN
IMMANUEL KOHN
EDWARD P. KRUGMAN

GEOFFREY E. LIEBMANN
WILLIAM T. LIFLAND
MICHAEL MACRIS
JONATHAN I. MARK
GERARD M. MEISTRELL
ROGER MELTZER
MICHAEL G. MICHETTI
JOHN R. MITCHELL
ATHY A. MOBILIA
DONALD J. MULVIHILL
KENNETH W. ORCE
ROY L. REGOZIN
DEAN RINGEL
JAMES ROBINSON
THORN ROSENTHAL
JONATHAN A. SCHAFFZIN
JOHN SCHUSTER
HOWARD G. SLOANE
LAURENCE T. SORKIN
LEONARD A. SPIVAK
GERALD S. TANENBAUM
JONATHAN D. THIER
JOHN A. TRIPODORO
ROBERT USADI
GEORGE WAILAND
GLENN J. WALDRIP, JR.
MICHAEL B. WEISS
GARY W. WOLF
JOHN R. YOUNG
DANIEL W. ZUBKOFF

WALTER C. CLIFF
DAVID R. HYDE
DENIS McINERNEY
MATHIAS E. MONE
IRWIN SCHNEIDERMAN
JOHN R. VAUGHAN
RALPH O. WINGER
SENIOR COUNSEL

CORYDON B. DUNHAM
PHILIP A. HEIMOWITZ
COUNSEL

WASHINGTON, D.C. OFFICE
1990 K STREET, N.W.
WASHINGTON, D.C. 20006-1181

EUROPEAN OFFICE
AUGUSTINE HOUSE
6A AUSTIN FRIARS
LONDON EC2N 2HA

TELEPHONE 212-701-3000
FACSIMILE 212-269-5420

WRITER'S DIRECT NUMBER

(212) 701-3506

November 2, 2001

Re: *Martin Fink*

Dear Mr. Michelman:

      This letter sets forth the terms and conditions of an agreement between your client, Mr. Martin Fink (including Complete Film Company, of which you have informed me he is the principal owner, but not including any other entity), and The New Hampshire Insurance Company ("New Hampshire"), Lexington Insurance Company ("Lexington"), and other member or associated companies of American International Group, Inc. (collectively "AIG Companies"), for all of which we are counsel, pursuant to which Mr. Fink will make himself available for interviews with AIG Companies' counsel concerning any and all aspects of Mr. Fink's involvement with and knowledge of (a) the Flashpoint/Hollywood Funding transactions, (b) Flashpoint and/or its principals (including without limitation David Forrest and Beau Rogers) and/or any of their related entities, (c) any other aspect of insurance-backed film financing transactions.

      You have indicated that Mr. Fink is willing to make himself available for an initial interview with AIG Companies' counsel in regard to Flashpoint/Hollywood Funding on a date and time and at a location convenient for you, Mr. Fink and AIG Companies' counsel. You have indicated further that at this initial interview, Mr. Fink is prepared to respond to questions about the following general subjects: Flashpoint accounting, how funds were distributed by Flashpoint, and New Beginnings Enterprises. With regard to these general subjects, Mr. Fink should be prepared at this initial interview to respond to questions, and to produce relevant documents in his possession, custody, or control (which phrase in this letter includes documents in the possession, custody, or control of any of Mr. Fink's related entities, including without limitation Assets and Rights Management), pertaining the following topics:

1.     All matters related to the delivery of "It Had to Be You."

2.     The sales estimates for the Regent and Prosperity slates in the Hollywood Funding 5 transaction, including without limitation any discussions with persons associated with Flashpoint, Lloyd Thompson, Merban Ltd., and Regent Entertainment.

3.     Accounting practices, books, and records at Flashpoint and its related entities (including without limitation New Beginnings Media and other New Beginnings entities, The Building LLC, Prosperity Pictures, New City, Icestorm, AKA Movies, and

CAHILL GORDON & REINDEL

-2-

New Standard Post), including without limitation the purposes of transfers of funds among them and how such transfers were recorded.

4.   The sale of The Building and the disposition of the funds derived therefrom.

5.   Allocations of films to Flashpoint slates, including timing of allocation.

As Mr. Fink's counsel, you may be present throughout the initial interview and all subsequent interviews, and he may consult with you in private whenever he or you so desire.

Unless AIG Companies' counsel determines (in good faith, but in its sole discretion) that Mr. Fink has not been truthful, candid, and (in the context of an initial interview) complete in this initial interview in responding to the questions posed to him by AIG Companies' counsel and in producing any relevant documents within his possession, custody, or control requested by AIG Companies' counsel (such production of documents to take place either at the initial interview or as promptly as practicable subsequent to said interview), AIG Companies agree that:

(i)   New Hampshire will dismiss Mr. Fink as a defendant in the lawsuit entitled *New Hampshire Insurance Company* v. *JLT Risk Solutions, Ltd., et al.*, No. CV-00 13207RSWL (RCx), currently pending in the United States District Court for the Central District of California.

(ii)   AIG Companies will not name Mr. Fink or Complete Film Company as a defendant (or seek to implead, cross claim, or otherwise claim against them) in any current or future lawsuit relating to insurance-backed film financing transactions.

(iii)   AIG Companies will use their best efforts to persuade their co-insurers and/or reinsurers on any applicable insurance policies or reinsurance contracts relating insurance-backed film financing transactions not to name Mr. Fink or Complete Film Company as a defendant (or seek to implead, cross claim, or otherwise claim against them) in any current or future lawsuit relating to insurance-backed film financing transactions.

(iv)   AIG Companies shall not release any information obtained from Mr. Fink in the interviews described in this letter to any co-insurer or reinsurer without the express written undertaking and agreement of such co-insurer or reinsurer to abide by paragraph (iii) above.

(v)   After the initial interviews and immediate follow-ups AIG Companies will use their best efforts to limit the extent of Mr. Fink's time commitment to that reasonably necessary for AIG to investigate and defend claims related to the subject matter of this letter and pursue related litigation, it being understood that the judgment of counsel for AIG Companies will be determinative on the issue of reasonableness, *provided, however*, that the parties shall engage in good faith discussions to relieve any asserted burdens on Mr. Fink that are in excess of those reasonably contemplated by this agreement, and *provided, further*, (a) that if after the initial interviews and immediate follow-ups AIG requests substantial and concentrated amounts of Mr. Fink's time, it shall in good faith respond to a request for reimbursement of the excess attorneys' fees Mr. Fink incurs thereby, and (b) that ~~if after the initial interview in New York on November 11 and 12 AIG~~ requests that Mr. Fink travel outside the greater Los Angeles area for further interviews, then AIG will reimburse Mr. Fink and his counsel for their reasonable hotel charges plus business class airfare plus attorneys' fees for travel time only, calculated at the

CAHILL GORDON & REINDEL

-3-

    regular hourly rate for one lawyer for actual in-the-air time plus two hours in each direction.

    Each of the undertakings and agreements on the part of AIG Companies set forth above is, shall be, and shall remain, contingent upon (a) Mr. Fink's agreeing to make himself available, at reasonable dates, times, and locations, for further interviews by AIG Companies' counsel, the number and duration of which shall be solely within the discretion of AIG Companies' counsel, in regard to matters relating to Flashpoint/Hollywood Funding and/or any other aspect of insurance-backed film financing transactions; (b) Mr. Fink's being truthful, candid, and complete in such interviews; and (c) Mr. Fink's continued cooperation in making available to AIG Companies' counsel any and all documents in his possession, custody, or control relating to any of the subject matters set forth in this letter. If AIG's counsel determines that Mr. Fink has not complied with his commitment in regard to interviews and document production, it shall notify Mr. Fink's counsel of the reasons therefor and provide Mr. Fink, through his counsel, with the opportunity to rebut such determination. AIG's counsel shall consider such rebuttal in good faith, but the ultimate determination as to whether AIG is of the view that Mr. Fink has not been truthful, candid, and complete, remains in the discretion of AIG's counsel. If AIG's counsel adheres to such determination, AIG shall be relieved of its agreements and undertakings set forth in paragraphs (i) through (iii), above, but paragraph (iv) shall remain in effect. In no event, however, shall any statement made by Mr. Fink during the initial or any subsequent interview be used directly against him or Complete Film Company by AIG Companies in any legal proceeding, except that AIG Companies' counsel shall be free to examine Mr. Fink concerning such statements to the extent he testifies inconsistently therewith.

    This agreement neither obligates Mr. Fink to testify in legal proceedings at the request of AIG Companies nor precludes AIG Companies from seeking to compel such testimony concerning any matter within the subject matter of this letter. Neither AIG Companies nor Mr. Fink will assert that interviews or production of documents pursuant to this agreement waives any privilege, protection, or evidentiary objection available to either of them.

    If the terms and conditions of the agreement set forth in this letter are acceptable to Mr. Fink and accurately reflect the basis on which the initial and subsequent interviews of Mr. Fink by AIG Companies' counsel will be conducted, please acknowledge your acceptance of this agreement and have Mr. Fink acknowledge his acceptance of this agreement by both you and Mr. Fink signing the Acceptance below. Your signature and that of Mr. Fink below indicate acceptance of each of the terms and conditions of the agreement set forth in this letter.

    This letter constitutes the entire understanding between AIG Companies and Martin Fink. You and Mr. Fink understand and confirm by your signatures below that Mr. Fink has not been made a promise of any kind, directly or indirectly, by AIG Companies or their counsel except as set forth in this letter.

    Sincerely,

Edward P. Krugman
Counsel for New Hampshire Insurance Company,
Lexington Insurance Company, and the member
and associated companies of American International Group, Inc.

NOV-08-01  12:12P                                                                    P.05

Case 2:02-cv-04435-AB    Document 77-4    Filed 08/10/2004    Page 5 of 21
Nov-02-01  08:00am  From-Cahill Gordon & Reindel US        212-269-5420-US      T-757  P.006  F-657

CAHILL GORDON & REINDEL

-4-

Sanford L. Michelman, Esq.
Michelman & Robinson, LLP
16255 Ventura Boulevard, Suite 320
Encino, California 91436

*Acceptance*

       I, Martin Fink, have read the above agreement in full; I have consulted with legal counsel of
my own choosing regarding its significance, and I agree to the terms and conditions of the agreement
between myself and AIG Companies set forth above.

                                  Martin Fink

Date:

       I, Sanford Michelman, have read the above in full; I have consulted with my client, Mr.
Martin Fink, and I have advised him to agree to the terms and conditions of the agreement between him-
self and AIG Companies set forth above.

                                  Sanford L. Michelman

Date:

# Exhibit B

**Krugman, Edward P.**

| | |
|---|---|
| **From:** | Krugman, Edward P. |
| **Sent:** | Tuesday, September 09, 2003 2:05 PM |
| **To:** | Sanford L. Michelman |
| **Subject:** | Our call |



Documents for Ed
Krugman.pdf (...

Here are the docs I'll be talking about on candor and completeness.  Calling you in a couple of minutes

**COMPLETE FILM COMPANY LLC**
3000 Olympic Boulevard
Santa Monica, California 90404
Telephone (310) 315-4767
Fax (310) 315-4768

<u>VIA FACSIMILE</u>

To:       Richard Mann

From:     Martin Fink

Date:     June 19, 1998

Subject:  Prosperity, Prosperity II

═══════════════════════════════════════════════════════════

Had a nice early morning phone call from the King to complement my
middle-of-the-night "business management" thoughts.  Please call
when you get in to discuss that and perhaps also set up a time this
morning to meet on a number of issues, including:

Design of third slate
"Laundry list" of services/prices for single pix
Building
"Audit"
Individual picture budgets

CF-08251

062/121/184

Richard,

I had some late night thoughts about our conversation with Jeff.

First, the reality is that we may have to throw in the towel and ask for a reduction to four films in the second slate. Second, it's very possible that those four films will turn out to be ROMANTIC MORITZ, EXHUMING MR RICE, DIRT and KASHMIR. Or maybe THE COLLECTORS will make it into the four. Either way, that's a second slate without any titles that were developed in house. Going backwards, you could also make the argument that the first slate choices that were built in house aren't award-winners, even LA CUCARACHA, where we lost the argument with the best first-slate director about wordiness. Looking forward, based on what we've learned, especially with slightly higher budgets, we could take the view that we have a high level of confidence that we can "acquire" packages, turnkeys, etc., without the current emphasis on development/script processing, etc.

A cut-back development department that has to work a little harder to process scripts, i.e., develop a team of outside freelance readers and account for the costs of every script covered, would be a positive all around. It will also improve Ellen's chances of showing us she can convert the job into creative affairs, which is really her only chance of sticking longterm at the salary level she wants.

On balance, this analysis perhaps justifies a position that the second-slate raises which Betsy, Ellen, Leslie, Lenny, etc., awarded themselves were premature, to say the least. You took a cut, the program lost a full-salaried producer, but the troops patted themselves on the back. Perhaps the way to bring this back into line is to share the pain by erasing all the post-first slate raises and, between the starting point and, say, October, averaging the higher salaries back to the first slate level. For example, we would compute Betsy's salary at what it would have been for the second-slate period if she didn't get a raise, subtract what she's gotten so far in the period and pay out the remained on weekly instalments to the end of the period. To soften the blow, we could figure out a bonus pool related to second slate which could be shared out if it existed at the end of the period (something that would be very likely if we cut back to four films, perhaps less likely if we squeezed to five). With the exception of development, where I think the problems are very deep and expensive, this approach could be both cost-effective and fair. I believe Betsy and Leslie will see the reality and personally accept this solution. I think the same holds for Ellen, but if she doesn't, we should accept her resignation, keep Travis as a Heather-style bridge to whatever comes next and move on as we have in casting. We're at a point where we've probably done what we can to repair the damage in the first slate films and we have the second slate (or could have it) lined up without further development department involvement.

Totally changing subjects, we should probably go to a drawdown process on the building, i.e., send David c/o Susan (cc Stanley) a first drawdown certificate for 50K for a slate or stand-alone called 5419 W Sunset. That opens the door for a second drawdown

CF-08252

certificate when we need it and is consistent with how he plans to finance the building. The total spend of the slate should be Plan A, 7M-plus, whatever that number was, net of the 1.5M we're putting in from the second slate.

I'm going to start early in Santa Monica and try and get over to Hollywood between 10 and 11.

Nighty-night,

Marty

CF-08253

Jun-19-98 06:18P Complete Film Company,LLC 310 315 4768                    P.01

**COMPLETE FILM COMPANY LLC**
3000 Olympic Boulevard
Santa Monica, California 90404
Telephone (310) 315-4767
Fax (310) 315-4768

**VIA FACSIMILE**

**To:**      Betsy Chasse

**From:**    Martin Fink

**Date:**    June 19, 1998

**Subject:** Flashpoint costs

====================================================

Dear Betsy:

With regard to your note on the memo concerning Dave Long:

I think we should set up an accounts receivable or suspense account for Flashpoint to cover expenses like Dave and related expenses. Same goes for the party invitations, the new Avid, the building expenses and all costs related to Laszek (hereby my previous suggestion that his costs be classified Exec Producer). Unless and until these expenses, which are not legitimately covered by picture-related budgets and/or drawdowns, are reimbursed by Flashpoint from other sources, they constitute an offset against the overfunding. The Cannes expenses arguably could be treated the same way, including Richard's time in London, and you might get creative and find other "unclassified" costs to treat this way.

Please discuss with Richard and Jeff.

Cheers,

062/121/187

Exhibit C

**Krugman, Edward P.**

| | |
|---|---|
| **From:** | Krugman, Edward P. |
| **Sent:** | Wednesday, October 08, 2003 12:40 PM |
| **To:** | 'Sanford Michelman' |
| **Subject:** | Marty Fink |

We had talked a while back about "candor" issues, and I had sent you some material, which you said you would consider and discuss with Marty.  Where are we?

# Exhibit D

CAHILL GORDON & REINDEL LLP

EIGHTY PINE STREET

NEW YORK, N.Y. 10005-1702

FLOYD ABRAMS
L. HOWARD ADAMS
ROBERT A. ALESSI
ROGER ANDRUS
HELENE R. BANKS
MICHAEL A. BECKER
LANDIS C. BEST
GARY A. BROOKS
SUSAN BUCKLEY
KEVIN J. BURKE
P. KEVIN CASTEL
JAMES J. CLARK
BENJAMIN J. COHEN
CHRISTOPHER T. COX
W. LESLIE DUFFY
RICHARD E. FARLEY
PATRICIA FARREN
JOAN MURTAGH FRANKEL
BART FRIEDMAN
CIRO A. GAMBONI
WILLIAM B. GANNETT

CHARLES A. GILMAN
STEPHEN A. GREENE
ROBERT M. HALLMAN
WILLIAM M. HARTNETT
CRAIG M. HOROWITZ
DAVID G. JANUSZEWSKI
THOMAS J. KAVALER
LAWRENCE A. KOBRIN
IMMANUEL KOHN
EDWARD P. KRUGMAN
GEOFFREY E. LIEBMANN
MICHAEL MACRIS
JONATHAN I. MARK
GERARD M. MEISTRELL
ROGER MELTZER
MICHAEL E. MICHETTI
ATHY A. MOBILIA
DONALD J. MULVIHILL
NOAH B. NEWITZ
KENNETH W. ORCE
JOHN PAPACHRISTOS

TELEPHONE: (212) 701-3000
FACSIMILE: (212) 269-5420

———

1990 K STREET, N.W.
WASHINGTON, D.C. 20006-1181
(202) 862-8900
FAX: (202) 862-8958

———

AUGUSTINE HOUSE
6A AUSTIN FRIARS
LONDON, ENGLAND EC2N 2HA
(011) 44.20.7920.9800
FAX: (011) 44.20.7920.9825

———

WRITER'S DIRECT NUMBER

(212) 701-3506

LUIS R. PENALVER
ROY L. REGOZIN
DEAN RINGEL
JAMES ROBINSON
THORN ROSENTHAL
JONATHAN A. SCHAFFZIN
JOHN SCHUSTER
HOWARD G. SLOANE
LAURENCE T. SORKIN
LEONARD A. SPIVAK
SUSANNA M. SUH
GERALD S. TANENBAUM
JONATHAN D. THIER
JOHN A. TRIPODORO
ROBERT USADI
GEORGE WAILAND
GLENN J. WALDRIP, JR.
MICHAEL B. WEISS
GARY W. WOLF
DANIEL J. ZUBKOFF

SENIOR COUNSEL

WALTER C. CLIFF
DAVID R. HYDE
WILLIAM T. LIFLAND
DENIS McINERNEY
MATHIAS E. MONE
IRWIN SCHNEIDERMAN
JOHN R. VAUGHAN
RALPH O. WINGER

COUNSEL

CORYDON B. DUNHAM
PHILIP A. HEIMOWITZ
JASON W. KAPLAN

January 26, 2004

Re:    *Martin Fink*

Dear Mr. Michelman:

I write pursuant to that certain letter agreement dated November 2, 2001 between AIG Companies and Martin Fink. I have concluded that Mr. Fink has violated his obligation of truthfulness, candor, and completeness under the letter agreement and that AIG Companies' obligation to refrain from initiating actions against Mr. Fink is therefore at an end.

In our initial interviews with Mr. Fink and thereafter, he has consistently maintained that he believed that the payments for non HF 1, 2, 3 projects prior to the close of the Hollywood 4 and 5 transactions were made from Flashpoint's own funds. On September 9, 2003, I forwarded to you documents (copies attached) that indicated to us that those statements by Mr. Fink were false and that he had actual acknowledge — and, indeed was complicit in — the use of Hollywood Funding 1, 2, 3 funds to fund Flashpoint proprietary projects prior to the closing of Hollywood Funding 4 or 5. These documents also call into question Mr. Fink's assertion that he believed that payments to Regent in March 1998 were made from Flashpoint proprietary funds.

On October 8, 2003, I sent you an email (copy attached) inquiring as to Mr. Fink's position of those issues, and I followed up with you again by telephone in November. I have heard nothing from you on this subject since that time.

Please be advised that AIG Companies are currently considering various options, including adding Mr. Fink as a defendant in Lexington Insurance Company's RICO action currently pending against Messrs. Forrest and Rogers in the Eastern District of Pennsylvania. Please advise whether, if Lexington chooses to pursue that course, you will accept service of process on behalf of Mr. Fink.

Sincerely,

Edward P. Krugman

CAHILL GORDON & REINDEL LLP

-2-

Sanford L. Michelman, Esq.
Michelman & Robinson, LLP
15760 Ventura Boulevard, Suite 500
Encino, California 91436

**BY TELECOPIER**

bcc:    Adrian Mecz, Esq.
        Eric Kobrick, Esq.

Exhibit E

**Dembrow, Ira J.**

| | |
|---|---|
| **From:** | Krugman, Edward P. |
| **Sent:** | Thursday, April 22, 2004 12:40 PM |
| **To:** | Mecz Adrian; esk; ijd; Villarreal, Miguel |
| **Subject:** | FW: Fink & NBE |

FYI

-----Original Message-----
From: Sanford Michelman [mailto:smichelman@mrllp.com]
Sent: Thursday, April 22, 2004 12:40 PM
To: ekrugman@cahill.com
Subject: RE: Fink & NBE


Thanks for the prompt response. I will start the letter. I will also address Beautiful as
your client's allegations are not correct regarding the funds. As to breach, obviously I
disagree. We will address it as appropriate. Hopefully your client will ultimately decide
to cool down for a bit and interview Marty, instead of wasting more money.  But, that is
not my call, of course.

My best,


SM

818.783.5530

This email was sent from Sanford's Blackberry.


-----Original Message-----
From: "Krugman, Edward P." <ekrugman@cahill.com>
Date: Thu, 22 Apr 2004 12:24:32
To:"'Sanford Michelman'" <smichelman@mrllp.com>
Subject: RE: Fink & NBE

Sanford, I first raised "candor and completeness", in terms, as an issue back in
September.  That phrase has one and only one meaning under the letter agreement, and that
is as the condition to AIG's ongoing covenant not to sue.  I have raised it again at
various times in the seven plus months since then, including at least twice during the
Fall.  I raised it expressly and formally in my letter of January 26 -- which itself is
now nearly three months.  I am sorry you did not think it was important; I certainly did.

We can extend this chain of e-mails forever, but to no purpose, I think.  I will consider
whatever you have to say when I receive such letter, if any, that you choose to write.  I
will not delay proceedings in Pennsylvania while I await the letter, but I will drop Marty
from the fraud and RICO claims (not from the Beautiful claim) if you persuade me he has
not in fact violated his obligations, as it appears to me he has.

For the record, there is no "breach" for us to "cure".

-----Original Message-----
From: Sanford Michelman [mailto:smichelman@mrllp.com]
Sent: Thursday, April 22, 2004 12:03 PM
To: ekrugman@cahill.com
Subject: RE: Fink & NBE


Ed,

I want to take this from a different approach.

1

You first mentioned it to me as an issue. It seemed minor, in my opinion. You and I did not press the issue until recently. Clearly it was not this burning issue. Perhaps you thought it was, it just wasn't presented to me that way. Now I have addressed the issue with my client. You don't want to talk about it with me. That's fine. So, per the Agreement, I am recommending another follow up interview. You are rejecting the interview (which of course is the best avenue for information; considering if there is litigation you will depose Marty). Rather, you want a brief in short time. There is no obligation to do so. Your client, however, does have obligations under the Agreement it is not following; probably as a pretext to get around the Agreement. So be it. It will take me until late next week if it is agreed to write something. Clearly that is too much time for your client. Thus, we would need an Agreement.

That puts the ball in your court to cure its breach. Let me know your thoughts, realistic suggstions, etc.

Finally, we have had a friendly and professionally working relationship. I am not sure why you are taking an aggressive and nasty approach in your e mails, such as "I suggest you start writing". if that is not your intention, then nevermind. If it is, that's simply too bad.

I await your response.

My best,


SM

818.783.5530

This email was sent from Sanford's Blackberry.



-----Original Message-----
From: "Krugman, Edward P." <ekrugman@cahill.com>
Date: Thu, 22 Apr 2004 10:59:00
To:"'Sanford Michelman'" <SMichelman@mrllp.com>
Subject: RE: Fink & NBE

Sanford, the time for meetings has long since come and gone. You say a written statement will take time -- you've had seven months. The issue is not complex. I suggest you start writing.

-----Original Message-----
From: Sanford Michelman [mailto:SMichelman@mrllp.com]
Sent: Wednesday, April 21, 2004 11:08 AM
To: Krugman, Edward P.
Subject: RE: Fink & NBE


Thanks for the prompty response. I did not say that our client refuses. In fact, the complete opposite. I called you to discuss your position. You, instead, want a written statement, which will take time. I will make this very easy - you can interview Marty again; either in LA or NY. You have always had this option. That is the concept behind the letter agreement. I am suggesting that you conduct an interview. Let me know. SM

-----Original Message-----
From: Krugman, Edward P. [mailto:ekrugman@cahill.com]
Sent: Wednesday, April 21, 2004 7:59 AM
To: Sanford Michelman
Subject: RE: Fink & NBE


Sanford, I will keep you advised. I believe, however, that it is you who is missing the point. I've told you the conclusion I've reached, and the basis for it, and I've asked you to show me why I'm wrong (if I am) so I can consider your views, as I'm obligated to

under the letter agreement. Your telling me that I have documents in my possession that impeach my views, without saying more, does nothing for me. If I've missed something -- I don't think I have, but you apparently do -- then I'm not likely to find it unless you tell me where to look. Since you have resolutely refused to do that, I can only conclude that there is nothing to find.

-----Original Message-----
From: Sanford Michelman [mailto:SMichelman@mrllp.com]
Sent: Wednesday, April 21, 2004 10:49 AM
To: Krugman, Edward P.
Subject: RE: Fink & NBE


Ed,

I will let you know by the end of the week as to my client's next steps. However, I think you may have missed the point of my prior correspondence. You say that the time to talk has passed. What I am saying is that there is nothing to talk about - other than the clarification. You have the documents impeaching your own contentions. Your team has the information that demonstrates that our client did fulfill his obligations under the agreement, and there was nothing improper about the Beautiful matter. In any event, I will let you know. Please give me a head's up as to when the lawsuit be filed.

My best,

Sanford

-----Original Message-----
From: Krugman, Edward P. [mailto:ekrugman@cahill.com]
Sent: Tuesday, April 20, 2004 6:22 PM
To: Sanford Michelman
Subject: RE: Fink & NBE


No, I didn't leave a voicemail -- I called your office, told the person who answered who I was and that I was returning your call, and they said they'd get you the message.

The amended complaint naming Marty and NBE has not yet been filed, but the complaint and the sipulation for leave to file are circulating. At this stage, and with the number of phone calls we've had over the last seven plus months, I'm not sure that just talking would do much good. Why don't you send me a written explanation of how the documents I sent you last September (and my follow up letters, etc.) do not raise the candor and completeness issue identified in my letter of February 4 (I believe that's the date, but you now have two copies of the letter). If you send me such a letter, it will be treated as off the record (except, of course, in connection with litigation over whether I have fulfilled my responsibilities under the letter agreeement). If I am persuaded, or if I believe there is something to talk about, I will not serve Marty or NBE, and I will, if appropriate, re-amend to drop him from the fraud and RICO claims ("Beautiful" is another matter, as I have told you (and you have disagreed with)).

If you want to call, the best time to reach me Wednesday is before 2:30 NY time; after that I will be tied up for the rest of the day. I reiterate, though, that the time for talking is long past. Show me why I'm wrong, in writing, and do it quickly, please.

-----Original Message-----
From: Sanford Michelman [mailto:SMichelman@mrllp.com]
Sent: Tuesday, April 20, 2004 1:47 PM
To: Krugman, Edward P.
Subject: RE: Fink & NBE


Ed,

I do not want to debate it with you. If you say you called, then I will assume you did. However, there was no VM on my phone (we keep back ups), nor did my assistant receive a call. In any event, I have reviewed everything you submitted and, as I previously stated, your assumptions are just not right. If you file, so be it. But your client will be

3

sued.  I do want to talk with you about it so as to avoid further litigation.  I will be
available tomorrow.  What time?  Also, I want an assurance that litigation has not been
filed.  If it has, there is no reason to talk.  OK?

My best,

Sanford

-----Original Message-----
From: Krugman, Edward P. [mailto:ekrugman@cahill.com]
Sent: Tuesday, April 20, 2004 7:03 AM
To: Sanford Michelman
Subject: RE: Fink & NBE


Sanford, your facts are wrong. I returned your call last week, left word (twice), and
never heard back from you.  The complaint against Marty and NBE is circulating in
Pennsylvania for consent to amend, which I expect to get shortly; I can still pull the
plug, I suppose, but I've been asking you this question since September, and I STILL
haven't heard anything substantive from you.

-----Original Message-----
From: Sanford Michelman [mailto:SMichelman@mrllp.com]
Sent: Monday, April 19, 2004 5:49 PM
To: ekrugman@cahill.com
Subject: Fink & NBE


This e-mail will confirm that I have left two voicemail messages with your office last
week regarding the information you provided to me with respect to Marty Fink.  I have yet
to receive a return telephone call.  Please call me as soon as you can as your information
and the inferences drawn from the documents are simply wrong.  It appears that between all
the counsel and other parties, you are not receiving all the information.  As such, if
your client files suit against our client predicated on the information you provided, we
will file suit as any such suit filed by your client is without merit.  This will be
demonstrated by the documents in your own possession to which your team has failed to
review.  I am available at anytime.

My best,

Sanford


The information contained in this e-mail message may be privileged and confidential
information and is intended only for the use of the individual and/or entity identified in
the alias address of this message. If the reader of this message is not the intended
recipient, or an employee or agent responsible to deliver it to the intended recipient,
you are hereby requested not to distribute or copy this communication. If you have
received this communication in error, please notify us immediately by telephone or return
e-mail and delete the original message from your system.


Thank you.


The information contained in this e-mail message may be privileged and confidential
information and is intended only for the use of the individual and/or entity identified in
the alias address of this message. If the reader of this message is not the intended
recipient, or an employee or agent responsible to deliver it to the intended recipient,
you are hereby requested not to distribute or copy this communication. If you have
received this communication in error, please notify us immediately by telephone or return
e-mail and delete the original message from your system.