**EXHIBIT A**

10/07/00 18:03   ☎+44 20 7814-9421   Tarlo Lyons   Kay F Jaszek→Jennifer Barrett   09/16

106/012/01444

901 Youngsford Road
Gladwyne
Pennsylvania 19035
U.S.A.

1st December 1996

Filmwatch Limited
c/o Tarlo Lyons
Watchmaker Court
33 St John's Lane
LONDON EC1M 4DB

Graham Johnson
c/o Matrix Consultancy Ltd
Chancery House
53/64 Chancery Lane
LONDON WC2A 1QU

Dear Sirs,

RE: FLASHPOINT LIMITED ("the Company")

I am writing to confirm the terms that David Forrest and I have agreed with you relating to the division of income earned by the Company and the shareholdings in the Company. We have agreed as follows:-

1.   The gross fees, commissions, and other income of the Company earned after the date hereof will be applied as follows:-

   (a)   There shall first be deducted bona fide arms length disbursements payable or paid to third parties such as insurance brokers and the like. There shall not be deducted any expenses incurred by any of us.

   (b)   Filmwatch Limited shall be paid 5.75% and Graham Johnson shall be paid 3.75% of the resultant net receipts.

   (c)   The balance shall be used to reimburse David Forrest and myself (but not you) any expenses reasonably and necessarily incurred in respect of the business of the Company.

   (d)   The resultant net profit shall be divided equally between David Forrest and myself.

SXM\bowisgr.doc\279701

LEX-01 100439

106/012/01445

2.  None of us nor any third party shall be paid a salary or fee which is deducted before the division referred to in 1 above unless we all unanimously agree otherwise.

3.  In due course, the business of the Company will be moved from Delaware to Jersey and it is our intention that the Company will, for tax purposes, be resident in Jersey. We all agree to take out our respective shares of the income of the Company in a tax efficient manner in order to avoid paying tax. David Forrest and I shall be the directors of the Company but you shall have no right to appoint directors. The shareholdings in the Company shall be as follows and all shares shall have exactly the same rights except in one respect; your shares shall have no voting rights:-

    a)  Beau Rogers       -    43.75%
    b)  David Forrest      -    43.75%
    c)  Filmwatch Limited  -    7.5 %
    d)  Graham Johnson     -    5 %

    Formalities of the Company formation will be dealt with in due course.

4.  This agreement shall apply to all income received by the Company after the date hereof.

If the foregoing reflects your understanding of the agreement we have reached would you please countersign a copy of this letter where indicated below and I am also asking David to do the same.

Yours sincerely

**BEAU ROGERS**

Accepted and Agreed

................................
Filmwatch Limited

................................
David Forrest

................................
Graham Johnson

**LEX-01 100440**

**EXHIBIT B**



67 Pall Mall
London.
SW1Y 5PA

Tel: 0171 930 9315
Fax: 0171 930 9316

E-mail: swright@fastaccess.co.uk

## MEMORANDUM

## STRICTLY PRIVATE AND CONFIDENTIAL

TO: **Flashpoint Directors:** David Forrest, Beau Rogers, Andrew Wignall;
**Tarlo Lyons:** Stanley Munson;
**Prosperity Pictures:** Marty Fink, Richard Mann, Leslie Richards;
**Lloyd Thompson:** Mark Drummond-Brady

DATE: November 18, 1998

REF: -

FROM:    SUSAN WRIGHT

### The Funding, Accounting and Ownership of Real and Personal Property & Real Estate acquired by "7.23 Slate", "Prosperity I Slate", and "Prosperity II Slate"

Following our various discussions regarding the acquisitions please see the below details of how we will handle the issues of funding, accounting and ownership of assets acquired to date and assets to be acquired in the future. If you have any points to make then please address them to me in writing.

### "7.23" Slate

Some items of equipment have been purchased from funds advanced by Flashpoint to the "7.23" slate. This equipment is now in the care custody and control of Prosperity Pictures, but title to it belongs to Flashpoint. The equipment has been used on "7.23" films and is now being used on Prosperity Films. This equipment will also be available to be rented out in the future on both Flashpoint and non-Flashpoint funded films. It has not been, nor is it, Flashpoint's intention to make a free gift of this equipment to "7.23". This equipment must and will pay for itself out of rental income. Any income generated by this equipment must be credited back to the 7.23 Collection Account, which was created under the financing agreement between Flashpoint and "7.23", in order to fulfil the obligation of "7.23" to recoup the finance advanced by Flashpoint. We will establish a *modus operandi* for determining the charges that will be levied from these rental activities and how they will be accounted for.

It makes no sense to charge "7.23" for the use of the equipment, after all why would "7.23" draw down against Flashpoint's finance to buy the equipment simply to have to make further drawdowns in order to make rental payments into the Collection Account. This defeats the commercial object of the exercise, which was, in the first place, to save on rentals by buying the equipment. However, when the equipment is used by Prosperity Pictures (Slate I) or anybody else for that matter, then a rent must be charged for its use, and that rent must be credited to the "7.23" Collection Account.

CF-07952

LEX-01 015065

**"Prosperity Pictures (Slate I)"**

In the same way, further items of equipment have also been purchased from funds advanced by Flashpoint to "Prosperity Pictures (Slate I)" slate. This equipment is also in the care custody and control of Prosperity Pictures, but title to it, as before belongs to Flashpoint. This equipment is being used on "Prosperity Pictures (Slate I)" films. This equipment will also be available to be rented out in the future on both Flashpoint and non-Flashpoint funded films. As with the equipment purchased out of funds advanced by Flashpoint to "7.23", it has not been, nor is it, Flashpoint's intention to make a free gift of this equipment to "Prosperity Pictures (Slate I)". Income generated by this equipment will be credited back to the Collection Account created under the financing agreement between Flashpoint and "Prosperity Pictures (Slate I)". As with the "7.23" equipment, we need to establish how the income generated from these rental activities will be charged and accounted for. In particular, we must recognize the potential conflict of interest which arises from the fact that Prosperity Pictures is a wholly owned subsidiary of New Beginnings Enterprises, a company which is, in turn, a 70% subsidiary of Flashpoint.

As with "7.23", "Prosperity Pictures (Slate I)" will not pay a rental for the use of this equipment on films in the Prosperity Pictures (Slate I) films. However, when the equipment is used by Prosperity Pictures (Slate II) or anybody else for that matter, then a rent must be charged for its use, and that rent must be credited to the "Prosperity Pictures (Slate I)" Collection Account. All charges will be calculated at fair market rates, and in order to manage the potential conflict of interest point, discounts to fair market rates, if any, will only be made available if the film in question is non-Flashpoint funded in order to promote full usage of the equipment. Obviously, priority use will be given to Flashpoint projects.

In order to manage these assets and to see to it they are fully utilized and that charges are levied at reasonable amounts, and supervise their collection, we have agreed, with our partners in New Beginnings Enterprises, to form a further wholly owned subsidiary of New Beginnings Enterprises for this purpose. This company will be called New Standard Post. This company will be funded by charging a modest percentage of the rental income charged to be agreed, which will be used for maintenance, insurance costs etc., the balance being credited to the relevant Collection Account.

In order to assist New Standard Post we need to:

a) Compile a full list of all equipment (a capital assets ledger) with copies of the original invoices; and
b) Determine the exact prices which will be charged as being "fair market" rates; and
c) There will already exist funds due from the use of the equipment to date, purchased out of both the "7.23" Slate as well as the "Prosperity Pictures (Slate 1), which must be credited to the appropriate Collection Accounts.

I will be dealing with this specific exercise during my impending visit to Los Angeles next week. As soon as this is completed I will forward a full list of all equipment per slate to you all for your records.

**"Prosperity Pictures (Slate II)"**

In order to maximize the potential income that can be generated by the equipment managed by New Standard Post, and also to establish Prosperity Pictures as a commercial service company in the Hollywood film community, Prosperity has asked Flashpoint to finance a business plan, that it has developed, in order to operate as a full service Post Production house. The plan calls for the acquisition of a building in Los Angeles and the purchase of additional equipment. This would be over and above the equipment currently in the care custody and control of Prosperity.

CF-07953

LEX-01 015066

Flashpoint has agreed to make a mortgage loan to "New Beginnings Enterprises &/or Prosperity Pictures &/or New Standard Post" of US$4,000,000 in order to facilitate the purchase of a 45,000 square foot former bank building, which has been selected by New Beginnings, and which is located on Santa Monica Boulevard. Flashpoint will retain a mortgage over the property, and the loan will be repaid, as agreed between Flashpoint and New Beginnings. The interest rate to be charged will be calculated to be 1% below the commercial mortgage rate charged by local banks to local businesses in the Los Angeles area.

Within Prosperity Pictures (Slate II) there is an overall budget allocation of US$20,000,000, which includes a contingent business reserve of US$2,500,000. If Prosperity is able to recoup sales of US$38,000,000 into the designated Collection Account, within 30 months of the first drawdown, then Flashpoint will permit Prosperity to drawdown the unused portion of this reserve, and Prosperity will be able to use this amount to reduce the mortgage. If there is a shortfall in the Collection Account, Flashpoint will transfer to the Collection Account any funds not drawn down, in order to increase the amount in the Collection Account. As and when further funds become available to the Collection Account then these amounts will be retained by Prosperity but only up to the value of the unused portion of the contingent business reserve at month 30, thereafter, funds will be credited to the Collection Account in the normal way.

Additionally, Flashpoint will also finance the acquisition of further equipment by New Standard Post, by way of further loans, at terms to be agreed between Flashpoint and Prosperity. As with the equipment acquisitions which have already been made, Prosperity Pictures (Slate II) will not pay any rent for occupying the new building, but wherever possible commercial tenants will be brought in who will pay commercial rents. These rents will be paid directly into the mortgage account in order to service interest payments and possibly reduce the capital debt within the mortgage account.

## Equitable Arrangements between Flashpoint and its Insurers

I have outlined in this memo the obligations of Prosperity to Flashpoint and the levying of charges and the payment of such charges into the appropriate Collection Account and the security arrangements in favour of Flashpoint. Flashpoint has not made it its goal to spell out to the personnel at Prosperity the detail of how it raises money for the purpose of investing in films. We are also aware that there is a general knowledge that the mechanism is insurance backed. We are also aware that there is a certain curiosity on the part of our partners in Los Angeles about how Flashpoint, in turn, accounts for these transactions to the insurance market.

First of all, we do so by way of disclosure. We have advised the underwriters that funds from these slates have been and/or will be set aside for the purpose of acquiring assets. This process of disclosure is evidenced by the fact that a copy of this memo is sent to Lloyd Thompson who is Flashpoint's insurance broker for these policies. One of my main concerns is that the applicable rental income is credited back to the appropriate Collection Account and I will be working on ensuring this is completed in a efficient, fair and accurate manner.

Secondly, whilst the equipment is owned by Flashpoint, we will hold such assets in trust for the underwriters. So that, in the event that the underwriters are called upon to pay a claim, in the future, they have the option to require the sale of the equipment in order to raise cash to reduce their loss. If there is no claim against the insurers, then the equipment will generate income which will be put back into the appropriate Collection Account and in the same way that Flashpoint has a share in the long term profits of these Slates, so do the underwriters.

Thirdly, the acquisition of the building is something that is being financed by a loan made by Flashpoint, out of its own resources, and not by drawing down on funds set aside for the Slates. Prosperity hopes to pay off that loan by earning some of that money from the Slate II, through cost efficient film making, without having to draw down on the business reserve, and will hope to pay off the balance out of future

CF-07954

Slates. The risk of a default by Prosperity is borne by Flashpoint and not by the underwriters. Hence the mortgage on the property

belongs to Flashpoint. However, we wish to pass on a benefit to the underwriters and we do this by allowing Prosperity to occupy the building without paying any rent to Flashpoint thereby reducing its overheads and the cost of production of the films.

## Conclusion

In conclusion, in our judgement, there is no inequitable financial gain to Flashpoint/Prosperity at the expense of the underwriters. The obligation imposed by the underwriters upon Flashpoint is to invest in slates of films where the aggregate value of the projected minimum sales for each slate is between 150% and 160% of the proposed production spend. At all times we have conformed to that requirement. The money to buy the equipment is spent in order to (a) improve the quality of films produced, which is not simply a function of spending more and more money, and (b) generate additional future revenue streams and (c) provide the underwriters with access to an asset which has a residual value in the event of a loss. Disclosure has been made to the underwriters regarding the acquisition of equipment, the income from which, as well as title, inures to their benefit.

The terms of the mortgage advance between Flashpoint and Prosperity are not commercial to Flashpoint, because we are intentionally lending money at below the market rate. The beneficiary of such an arrangement is Prosperity, and in turn underwriters, because this reduces the amount of money Prosperity needs in order to generate Production funds, to pay back Flashpoint. The underwriters get the benefit of free rent for Prosperity. If the business reserve needs to depleted in order to get the films out and onto the screens with an aggregate minimum sales value of 150% to 160% of the total production spend, then this is what it will be spent upon. Any shortfall in funds in the Collection Account, at the end of 30 months, will be made good through paying back to the underwriters any underspend of the contingent business reserve. Finally, and as "a belt and braces" we have disclosed to the underwriters that funds from Slate II will be used towards the acquisition of Real Estate.

Somehow, it has managed to grow to four pages, apologies to everyone. However, you all know the motto.. "a fat file is a happy file."

Regards

Susan

CF-07955

**EXHIBIT C**

**Tarlo Lyons** :associates:

Martin Fink Esq
3000 West Olympic Boulevard
Santa Monica
California 90404
U.S.A.
BY POST AND BY FAX NO:001 310 315-4788

Direct Fax No: 0171-814 9423

February 3, 1996

SM/jep

Dear Marty

Re: Regent Entertainment

I am enclosing a re-draft of the Master Agreement and attached Production and Finance Agreement with the amendments underlined. I could not read all of Greg Bernstein's amendments but I have attempted to anticipate what his comments were or might have been and I have taken on board the comments in your memo to me of January 17th. On your memo I would comment as follows.

Master Agreement

1(a)    Noted.

1(b)    The approval right will be exercised by you and/or David and/or Beau in a similar fashion to the exercise of your approval rights over projects submitted to you by 7.23 Productions.

3(b)    Noted.

4.      Noted.

5(d)    Agreed.

5(e)    Agreed.

9.      I do not see any reason why Flashpoint should not have the right of first refusal as regards remakes and sequels (i.e. the clause reversed).

16.     Yes, but I require that governing law should be English law.

Exhibit A

2(c)(iv) Noted.

2(c)(v) Noted.

CF-00305

LEX-01 010669

Page 2

**Tarlo Lyons**
Solicitors

4(c)    I need to check the credits with David.

5(d)    Noted.

7(a)    Noted.

8(a)    Noted.

8.      This clause was obscured by the facsimile machine.  It should of course conform with the production schedule.

10(a)   Agreed.

10(d)(iv)   Greg Bernstein has said that Regent have an Executive Producer's fee equal to 10% of the budget.  This needs to be agreed by David and Beau.

11(a)   Noted.

13.     Agreed

15(a)   Noted.

15(b)   Noted.

16.     I was not aware that we had already agreed to delete this in relation to this transaction.  I have deleted the clause but will double check with David and Beau.

18.     Noted.

21.     Flashpoint remedies here may not be the same as the completion guarantor's remedies, but of course Flashpoint will comply with any remedies granted to the completion guarantor which Flashpoint agrees to.  At the moment, I do not see that there is a conflict but perhaps you can elucidate for me.

26.     Noted.

Kind regards.

Yours sincerely,

**STANLEY MUNSON**

cc    David Forrest

CF-00306

LEX-01 010670

**Tarlo Lyons** Solicitors                                                        **106/055/00348**

Leslie Richards
Attorney at Law
165 Arroyo Pinon Dr.
Sedona
ARIZONA 86336
<u>BY FAX:001 520 204 9479 AND BY COURIER</u>

Watchmaker Court
33 St John's Lane
London EC1M 4DB

Telephone: 0171-405 2000
                0171-814 5400

Fax: 0171-814 9421
DX: 53323 Clerkenwell

| Direct Fax No: 0171-814 9423 |

Our Ref     SM/jap/208556          Your Ref                    Date   July 3, 1997

Dear Leslie

<u>Re:  Flashpoint/7.23</u>

Thank you for your fax of 1st July.  I am enclosing a re-draft of the master agreement with the Production and Finance Agreement annexed as exhibit "A".  The structure of the documentation is as follows.  The form of the Production and Finance Agreement will be agreed now so that once the master agreement is executed, all that need be done in respect of each film is for the details of the film to be filled in on a new production and finance agreement relating to that project.  I obviously need the script, the budget, the cashflow schedule etc to be annexed to the back of the Production and Finance Agreement as exhibits and also other relevant details included.

I do not believe that there will be any delay in dealing with the documentation.  Flashpoint will have ten days to approve or reject a project which it will do in writing.  If it rejects a project it will state its reasons.

Thereafter, I need to review the rights agreements and any other relevant documentation which Flashpoint needs to see in order to make an informed decision about becoming legally obligated to finance the project.  Flashpoint will sign a Production and Finance Agreement within twenty-eight days after you submit that documentation.

In practice, Marty Fink will not require ten days to approve or reject a project because he is working closely with your clients.  If you send me the relevant documentation relating to a project that Flashpoint wishes to proceed with, then I do not anticipate any delay in having a Production and Finance Agreement signed.

As regards the exclusive nature of the arrangement, it is my instructions that your clients should submit all properties to Flashpoint during the thirteen month period so that Flashpoint have a "first-look" right over all properties.

I look forward to hearing from you with your comments on the document in order that we can proceed to have it executed as quickly as possible.

**Tarlo Lyons**
Solicitors

Page 2

106/055/00349

Kind regards.

Yours sincerely,

**STANLEY MUNSON**

enc

cc     David Forrest Esq
       Beau Rogers Esq
       Marty Fink Esq

LEX-01 123083

**Tarlo Lyons** Solicitors

Martin Fink Esq
3000 West Olympic Boulevard
Santa Monica
California 90404
U.S.A.
BY POST AND BY FAX NO:001 310 315 4769

Our Ref: SM/jsp/208556     Your Ref:

Watchmaker Court
33 St. John's Lane
London EC1M 4DB
Telephone: 0171-405 2000
              0171-814 5400

Fax: 0171-814 9421
DX: 53323 Clerkenwell

Direct Fax No: 0171-814 9423

Date: July 17, 1997

Dear Marty

Re: Flashpoint/7.23 Productions

I am enclosing a re-draft of the Master Agreement and Production and Finance Agreement for each film (being sent by post) but I would like to check one or two points with you as follows. They are in no particular order of importance or order in the agreement.

1.  Leslie Richards has said that when the Producer submits a project to Flashpoint (i.e. to you) there will be a period of ten days during which Flashpoint assesses whether or not it wants to proceed with that project. If the project is approved a Production and Finance Agreement will be executed for that film; if it is rejected then there is no obligation on the part of Flashpoint. The relevant clause 1(b) of the Master Agreement states that if Flashpoint fails to respond the Property (project) will be deemed to be rejected. Leslie Richards then wanted Flashpoint to state its reasons for rejection, which may be completely whimsical. David Forrest has said that this is illogical because if Flashpoint does not respond then it will not respond by giving its reasons for rejection. I do not necessarily agree and I am trying to accommodate her point. If Flashpoint rejects a project can we agree that it will state its reasons in writing at some point after the ten day period has expired? The reasons may be completly unreasonable but that is not the issue here.

2.  As regards the working of the production bank account, it is proposed that the money to cover the cost of production will be held in my firm's client account and then released in tranches according to the agreed cash flow schedule for each film. This will be done by wire transfer to the relevant bank in Los Angeles. The account in Los Angeles will be under the control of one signatory for the Producer and one signatory for Flashpoint. In other words, each cheque will require two signatures one from their side and one from our side. Do you see any problem with this?

3.  I originally said that when the film was completed, the books had to be looked at by a Chartered Accountant and the cost of production certified by that Chartered Accountant, which is what happens in England. Leslie says that this is expensive and the procedure there is that the completion bond company must approve the production accountant who prepares the statement of the total cost of production of the film. Is this acceptable?

CF-04684

**Page 2**

**Tarlo Lyons**
Solicitors

4.  As regards legal fees, David has agreed with you that the budgets for the films will accommodate my firm's legal fees. The agreed maximum amounts are £25,000 for the first film and £10,000 for each of the other five films, i.e. a total of £75,000. Leslie Richards has said that it is not agreed that my fees are paid out of the budget. I believe that there is provision for accommodating Flashpoint's overheads, or an executive producer's fee, and I am asking whether my firm's legal fees are paid out of this item in the budget. What is the position?

5.  As regards the delivery items, Leslie Richards has sent a fax to me dated 17th July which was also copied to you. I have heard nothing from Rosenfeld Meyer and Susman with regard to the Sales Agency Agreement and I should like to know as soon as possible what delivery items we need from the Producer.

6.  I understand that a fixed fee is being paid to the sales agent. Where is this allowed for? Is it included in the budget or is it a distribution expense which is recouped by Flashpoint later? What is the deal with the sales agent?

7.  As regards the costs of advertising materials, is there any provision for such cost in the budget or is this recouped as a distribution expense to the extent that Flashpoint pays for it?

Leslie Richards has indicated that residuals/royalties are payable to the cast, writers and director in accordance with collective bargaining agreements with SAG, Writers Guild, and Directors Guild. Can I please have, as a matter of urgency, copies of the relevant agreements with those guilds and an indication of what residuals/royalties are payable to the various personnel. David is concerned that to the extent that payments are made out of receipts, this affects Flashpoint's recoupment position of 150% of receipts in first position. Generally speaking, it is usual in England to treat these payments as distribution expenses but David would like to know how much is involved.

I look forward to hearing from you.

Yours sincerely,

STANLEY MUNSON

enc

cc    David Forrest Esq
      Beau Rogers Esq

LEX-01 013360

**EXHIBIT D**

SENT BY:Xerox Telecopier 7020 :30-11-5: : FAX

106/066/02145

# Tarlo Lyons Solicitors

David Forrest Esq
Fletland Mill
Nr Baston
Lincs
PE6 9NS

Watchmaker Court
33 St John's Lane
London EC1M 4DB

Telephone: 0171-405 2000
0171-814 5400

Fax: 0171-814 9421
DX: 53323 Clerkenwell

Our Ref: SHM/asd/LJ       Your Ref:        Date: November 26, 1997

Dear David

## Leopold Joseph

I spoke to Paul Thornhill yesterday about the $8,000,000 which he has now received. He is placing the money on overnight deposit which, at current interest rates, earns 5.25%. We can place a core part of the principal on deposit with a notice period of, say, one week or one month, earning a higher interest rate, but in order to do this we need to analyse how much is needed in Los Angeles and when. I do not have up to date copies of the cash flow schedules so would you let me have them or, alternatively, deal directly with Paul Thornhill on this point.

Kind regards.

Yours sincerely

## STANLEY MUNSON

cc:   Beau Rogers

**EXHIBIT E**

DATED 6 JULY 1998

(1) LEXINGTON INSURANCE COMPANY
(2) FLASHPOINT (UK) LIMITED

---

## COLLATERAL AGREEMENT
relating to the television series "The Secret Adventures
of Jules Verne" known as the Jules Verne Project
and produced by The Jules Verne Partnership

---

Ince & Co
Corporate Insurance Group
Knollys House
11 Byward Street
London  EC3R 5EN

Tel:  0171 623 2011
Fax:  0171 623 3225
Ref:  DC/NA/224/629

#310366

LEX-01 180131

**THE AGREEMENT** is made the _6_ day of July 1998

**BETWEEN:**

(1)  **LEXINGTON INSURANCE COMPANY** whose registered office is at 1 Alico Plaza, 6 Kings Street, Wilmington, Delaware 19801, USA ("Lexington"); and

(2)  **FLASHPOINT (UK) LIMITED** of Watchmaker Court, 33 St. John's Lane, London EC1M 4DB ("Flashpoint").

**RECITALS**

(A)  Words and expressions used in these Recitals shall bear the meaning set out in Clause 1 below.

(B)  Flashpoint is in the process of investment in the twenty two (22) episode television series "The Secret Adventures of Jules Verne" (known as the Jules Verne Project).

(C)  Flashpoint Limited ("Flashpoint Jersey"), a company associated with Flashpoint UK by common ownership, will enter into the Purchase Agreement with Hollywood Funding (No. 4) Limited whereby, in consideration of Hollywood Funding (No. 4) Limited providing funds in the sum of US$21,400,000 to Flashpoint Jersey in connection with the Jules Verne Project, Flashpoint Jersey has agreed to make a payment of the Collection Amount on the last day of the Policy Period. Flashpoint will enter into the Flashpoint UK Purchase Agreement with Flashpoint Jersey whereby, in consideration of Flashpoint Jersey providing funds in the sum of US$21,400,000 to Flashpoint in connection with the Jules Verne Project, Flashpoint has agreed to invest the funds in the Jules Verne Project in accordance with the terms of this agreement and the Purchase Agreement.

(D)  Lexington has agreed to issue the Policy in favour of Law Debenture Trust Corporation (Channel Islands) Limited as collateral for certain risks arising in relation to the Jules Verne Project upon certain assurances made by Flashpoint, and has agreed to appoint Flashpoint as its agent for the purposes of managing the risks contained within the Policy upon the terms of this agreement.

8310366

**IT IS AGREED** as follows-

1.    **DEFINITIONS**

(1)    Except as expressly provided otherwise in this agreement, the following words and expressions shall bear the following meanings:-

| Word or Expression | Meaning |
| --- | --- |
| "Business Day" | a day (other than a Saturday or Sunday) on which the banks are generally open for business in both Guernsey and New York City; |
| "Charge" | the charge, in the form set out in Schedule 1, to be entered into by Flashpoint upon execution of this agreement; |
| "Claim" | any claim paid by Lexington under the Policy; |
| "Collection Account" | the trust account opened by Flashpoint Jersey (Account No. 15100) with the Guernsey branch of Credit Suisse First Boston |
| "Collection Amount" | the US Dollar amount being equal to the lesser of :- |
| | (i)    US $33,600,000; and |
| | (ii)    the balance (if any) standing to the credit of the Collection Account as at the close of business on the second business day immediately prior to the last day of the Policy Period; |
| "Escrow Account" | the trust account opened by Flashpoint Jersey (Account No. 15104) for the benefit of Law Debenture Trust Corporation (Channel Islands) Limited with the Guernsey branch of Credit Suisse First Boston; |
| "Exploitation" | any exploitation of any of the Series Materials or any Series Rights, including, |

#310366

- 2 -

LEX-01 180133

without limitation, any merchandising, marketing, sales, showings, licences, distributions or any form of television or other media performances of the Series;

"Flashpoint Jersey Collateral Agreement"

an agreement of today's date entered into between Flashpoint Jersey and Lexington in relation to the Series;

"Flashpoint UK Collection Account"

the trust account to be opened by Flashpoint (Account No. 41530023) with Leopold Joseph;

"Flashpoint Jersey Holding Account"

the account to be opened by Flashpoint Jersey (Account No. [          ]) with Leopold Joseph;

"Flashpoint UK Purchase Agreement"

an agreement to be entered into between Flashpoint Jersey and Flashpoint in relation to the Series.

"Net Receivables"

the Revenues less only those amounts properly payable to the Producer in accordance with Clause 7.2;

"Policy"

the pecuniary loss indemnity policy to be issued by Lexington in favour of Law Debenture Trust Corporation (Channel Islands) Limited;

"Policy Period"

the policy period stated in the Policy;

"Principal Production Documents"

the documents listed in Schedule 2 (and such other documents, as may be entered into in relation to the production of the Series);

"Producer"

the producer of the Series being The Jules Verne Partnership, 5 Addison Place, London W11 4RJ

"Production and Finance Agreement"

the letter agreement dated 27th March 1998 entered into between Flashpoint and the Producer in relation to the financing and production of the Series to be replaced by an agreement to be entered into between Flashpoint and the Producer in relation to the finance and production of the Series;

LEX-01 180134

| | |
|---|---|
| "Purchase Agreement" | an agreement of today's date entered into, between Flashpoint Jersey and Hollywood Funding (No. 4) Limited; |
| "Revenues" | all television and box-office receipts or takings, or other monies, profits, gains, receivables, and choses in action for each of them, arising from any Exploitation; |
| "Series" | includes "The Secret Adventures of Jules Verne" series as a whole, and any and all excerpts and episodes therein; |
| "Series Materials" | in respect of the Series, including all literary, dramatic, artistic and musical material (including any commentary), in all or any media (incorporated or synchronised with or otherwise forming part of such Series or produced for the purposes thereof), and any and all sound recordings included in the soundtrack of the Series, and any or all excerpts from sound recordings or other films/television incorporated in the Series, and all negative and positive materials produced in connection with the Series; |
| "Series Rights" | any and all rights of copyright and design right, and all other intellectual or industrial property rights wherever situated, and howsoever and whenever arising in relation to the Series and Series Materials in whatever state they may be in from time to time, together with the sole and exclusive rights to distribute, exhibit, broadcast and otherwise howsoever turn any of them to account; |
| "Tarlo Lyons" | Tarlo Lyons, solicitors, of Watchmaker Court, 33 St John's Lane, London EC1M 4DB; |

(2)    In this agreement, unless the context otherwise requires:-

    (a)    words importing the singular shall include the plural (and vice versa);

#310366

- 4 -

LEX-01 180135

(b)     references to a person includes a company, corporation or unincorporated body of persons; and

(c)     clause headings are for ease of reference only, and shall not affect the interpretation of this agreement.

(d)     The Schedules shall be a part of this agreement.

## 2.     APPOINTMENT

Lexington appoints Flashpoint as its risk management agent in relation to the Policy, and the risks arising under the Policy, on the terms contained in this agreement.

## 3.     COMMENCEMENT AND TERM

(1)     This agreement shall become effective on the date of this agreement.

(2)     Subject to the provisions of Clause 17 entitling early termination of this agreement, the authority of Flashpoint to act on behalf of Lexington in relation to the Policy shall terminate on the later of:-

(a)     the extinction of all risks under the Policy; and

(b)     the fulfilment of all of its obligations to Lexington under this agreement, and by Flashpoint Jersey to Lexington under the Flashpoint Jersey Collateral Agreement.

## 4.     CONTROL OF FUNDS

### Holding Account

(1)     Flashpoint undertakes to Lexington that the Series budget portion of the funds (being (US$21,400,000)) provided by Hollywood Funding (No. 4) Limited under the Purchase Agreement to Flashpoint Jersey and immediately deposited in the Flashpoint Jersey Holding Account and in turn provided by Flashpoint Jersey under the Flashpoint UK Purchase Agreement to Flashpoint will be immediately placed on deposit in a bank account (the "Holding Account") opened and maintained by Flashpoint and in which a partner of Tarlo Lyons shall be a co-signatory on all cheques or other payment authorisations from such account.

- 5 -

s310366

LEX-01 180136

**SIGNED** by *KEITH JOHN PEACOCK*
duly authorised for and on behalf
of **LEXINGTON INSURANCE COMPANY**
in the presence of:-

)
)
)
)

S. Mitchell

( S. MITCHELL )

**SIGNED** by
duly authorised for and on behalf
of **FLASHPOINT (UK) LIMITED**
in the presence of:-

)
)
)
)

STANLEY MUNSON
33 St. John's Lane
LONDON EC1M 4DB

#310366

- 43 -

**EXHIBIT F**

Apr-13-98 06:20P Complete Film Company,LLC 310 315 4768

COMPLETE FILM COMPANY LLC
3000 Olympic Boulevard
Santa Monica, California 90404
Telephone (310) 315-4767
Fax (310) 315-4768

VIA FACSIMILE

To:      Stanley Munson Esq.

From:    Martin Fink

Date:    April 13, 1998

Subject: Flashpoint

Dear Stanley:

David suggested that I recap the situation with regard to drawdowns, advances, etc.

Starting with Regent:

You have received four fully executed drawdown requests on SILENT STORMS totalling US$ 2,776,615. Thus far, Regent has received "advances" totalling US$ 1,902,117. Therefore, they are US$ 874,498 in arrears as of the fourth drawdown, which had an effective funding date of March 23rd. A wire transfer of US$ 874,498 tomorrow will bring them current as of the fourth drawdown. (I am holding but have not signed and sent drawdowns five and six, which add up to US$ 266,017.)

On their second project, MONSTERS, you should have their first drawdown certificate in the amount of US$ 734,182 with an affective date of March 23rd. They have thus far not received anything on account of MONSTERS. (I expect a second drawdown request on this project by tomorrow.)

As far as 7.23 is concerned, I believe they are current on all drawdowns. But their cash flow is somewhat inconvenienced by the outstanding amount of US$ 59,365.61, which they advanced against AFM party costs out of funds drawn down for SHARK IN A BOTTLE and NOWHERE LAND (aka KILLING TIME).

Prosperity Pictures, Inc. (formerly known as Second Slate Inc.) will also need an "advance" this week. I had previously requested US$ 25,000 to cover the costs of "buying" from 7.23 all of the rights, options, organizational expenditures, etc., related to the second slate of films. (This could be wired to a corporate account that has been set up for Second Slate/Prosperity, details of which have already been sent to you and will be confirmed overnight by fax from Betsy.)

SX(18)DET/G - 00457

Apr-13-98 06:20P Complete Film Company,LLC 310 315 4768                    P.02

Subsequently, Casper Van Dien was signed for the male lead in ROMANTIC MORITZ and we have offers out to several actors for DIRT. So we may need to fund some escrow accounts before the end of the week. This can be done as an "advance" which will be accounted for against drawdowns on the individual pictures or as a first drawdown for ROMANTIC MORITZ, for which a separate account has been set up. The paperwork on this project has been sent to you, but in case you have not yet received it, and since the master agreement and individual picture production and finance agreement have not been finalized, perhaps an "advance" to the corporate account (Leslie and I are the only signatories) might be preferable. I'm tracking this on a daily basis, but something in the order of about US$ 500,000 Wednesday or Thursday might be required.

MORGAN'S CREEK also does not have a finalized production and finance agreement, but they have made offers to cast in the aggregate amount of approximately US$ 750,000. These should be signed this week and therefore they will need to fund escrows for the actors, possibly by the end of the week or early next week. (I believe Greg Bernstein has written to you about his comments to your draft agreement and is awaiting a response.)

I think that's the lot. SILENT STORMS, MONSTERS and ROMANTIC MORITZ are the neediest supplicants. We'll know about MORGAN'S FERRY in the next day or two. I'd be very grateful if you could let me know Tuesday what Flashpoint can and cannot do, so I strike the right pose here.

Best regards,

Marty

cc: David Forrest
    Beau Rogers

5M(18)/DET/G -
00458

LEX-01 006608

**EXHIBIT G**

Apr-15-98 11:32P Complete Film Company.LLC 310 315 4768                 P.01

*723*

**COMPLETE FILM COMPANY LLC**
3000 Olympic Boulevard
Santa Monica, California 90404
Telephone (310) 315-4767
Fax (310) 315-4768

106/056/00756

VIA FACSIMILE

To:        David Forrest    *Stanley Munson*

From:      Martin Fink

Date:      April 15, 1998        *0171 814 9423*

Subject:   Flashpoint

====================================================================

Dear David:

Per our telephone conversation earlier today, here is what I would
like to see wired tomorrow, Thursday:

REGENT: US$ 874,498 on account of SILENT STORMS, which will bring
them up to date as of the fourth drawdown request, copies of which
have already been submitted to you and Stanley. (I will try to
delay further drawdowns.)

        US$ 734,182 on account of MONSTERS, being the first
drawdown on that project. (I will hold further drawdown requests
as long as I can.)

7:23:    You and Stanley already have drawdown requests for four of
the first slate films and hopefully these are not impacted by the
present complications and therefore can be wired tomorrow, to wit:

        US$    54,801      KILLING TIME
               70,911      SHARK IN A BOTTLE
              107,467      LA CUCARACHA
               62,673      ONE HELL OF A GUY

        Further, MPBC has just approved additional drawdowns for
two of the first slate films--$341,239 for KILLING TIME and
$216,429 for SHARK IN A BOTTLE. Again, if these drawdowns are
outside the bounds of the current problems, I'd like them as soon
as possible--tomorrow would be good--but Monday would also work.

        MPBC has also approved the first drawdown on ROMANTIC
MORITZ in the amount of $1,538,088. I understand that this may
present problems for a number of reasons, but the company is
already in its second week of preproduction and we have to put down
a $400,000 escrow on Casper Van Dien by Friday. If meeting the
drawdown is not convenient, I'd hope for an advance of at least
$500,000, wired either to the ROMANTIC MORITZ account indicated on
the drawdown or to the Prosperity account per the transfer

LEX-01 124289

106/056/00757

instructions faxed to Stanley by Jeff McCaig April 13th.

Last but not least, the SHARK IN A BOTTLE production account needs to be reimbursed $59,365.61 in expenditures related to the AFM party.

MORGAN'S FERRY: Nothing required at this moment.

I'm hoping that the drawdowns with regard to 7.23 first slate present no problems and that all of those funds are available to be transfered, along with Flashpoint's reimbursement of the AFM party costs. If necessary, I can temporarily carry ROMANTIC MORITZ out of those funds, although the actor's escrow is a big bite. In terms of tapping the Bank of Flashpoint to bring Regent current, the $874,498 for SILENT STORMS and $734,182 for MONSTERS are the immediate priorities, as I am already holding/stalling further drawdown requests on both projects.

Rather than clog up your computer, I am attaching copies of all the drawdown requests referenced in this memo to Stanley's copy. But both of you should have received each of these documents already. Please wake me up if further explanation is required and please fax me or leave me a voicemail as to what's actually been wired so that I know where things stand at the start of my Thursday (I will be back in the office just before 8 a.m.).

Best,

*Marty*

cc: Stanley Munson

*Please process payments*

*David F*

**EXHIBIT H**

*Regent*

**COMPLETE FILM COMPANY LLC**
3000 Olympic Boulevard
Santa Monica, California 90404
Telephone (310) 315-4767
Fax (310) 315-4768

<u>VIA FACSIMILE</u>

To:       Stanley Munson Esq.

From:     Martin Fink

Date:     May 11, 1998

Subject:  Regent

Dear Stanley:

I'm meeting with Steve Jarchow and another of his Regent investors
at 8 am tomorrow and I'd like to be able to tell them where we
stand on the past-due drawdowns for SILENT STORMS and MONSTERS. As
you know, I'm also holding the first drawdown on the third project,
SWEET LIES.

Best regards,

cc: David Forrest

5X(18)/DET/G -
00449

**EXHIBIT I**

**COMPLETE FILM COMPANY LLC**
3000 Olympic Boulevard
Santa Monica, California 90404
Telephone (310) 315-4767
Fax (310) 315-4768

<u>VIA FACSIMILE</u>

To:       Stanley Munson Esq

From:     Martin Fink

Date:     April 22, 1998

Subject:  Regent drawdowns

Dear Stanley:

Apparently, the US$ 734,182 drawdown for MONSTERS did not go
through as smoothly as the other April 16th transfers.  As of this
afternoon, nothing had turned up at their bank here.  Could you
please double-check on the Leopold Joseph end and let me know.

Thanks,

cc: David Forrest

CF-52178

LEX-01 027882

**EXHIBIT J**

**COMPLETE FILM COMPANY LLC**
3000 Olympic Boulevard
Santa Monica, California 90404
Telephone (310) 315-4767
Fax (310) 315-4768

**VIA FACSIMILE**

**To:**      Stanley Munson

**From:**    Martin Fink

**Date:**    October 3, 1998

**Subject:** Flashpoint--Building & Equipment

Thanks for yours of the 2nd. Of course, we understand and agree. But...

The overall building and facilities plan is, in very round numbers, about a US$8 million plan, roughly half for the building and half for the build-out, equipment and some overhead related to running the businesses. The initial transfer of US$2.8 million to the account in the name of The Building LLC was based on the earlier choice and price; the building actually being purchased will cost approximately US$3.9 million. In order to have a single source of funds for the purchase and a single owner, it's been suggested that Flashpoint UK top up the US$2.8 million to US$3.9 million before the November 16th closing date and I believe David is OK with this. This simplifies the mortgage issues as to the building itself and also leaves the door open for the asset to be held separately, connected to NBE or whatever is ultimately decided.

As to the build-out and the equipment, the general plan is to utilize funds from the Prosperity slates. The numbers you suggest are not the only numbers that I've seen, but they do add up, as do other versions, to US$4 million, which is the appropriate amount. As these funds will be drawn down on a picture by picture, budget by budget basis, it is likely that some sort of loan arrangement will be necessary.

This leaves the revenue stream from the building and New Standard Post to be applied directly to repayment of the overall US$8 million investment, rather than recycled back into operations and additional equipment purchases, at least until the "breakpoint" is achieved. Has any thought been given to some equivalent of a collection account to catch this revenue stream? For instance, we will have some smallish income almost immediately from the rental to Rojak of one of the new Avids, from KILLER BUD's use of an Avid and a camera package, etc.

CF-05244

LEX-01 013777

**EXHIBIT K**

106/017/00559

# Tarlo Lyons Solicitors

Watchmaker Court
33 St. John's Lane
London EC1M 4DB

| Tel: | +44 (0)171-405 2000 |
| --- | --- |
| Fax | +44 (0)171-814 9421 |
| DX | 53323 Clerkenwell |
| E-mail | info@tarlo-lyons.com |
| Web: | www.tarlo-lyons.com |

Mr Richard Stratton
Travers Smith Braithwaite
10 Snow Hill
LONDON EC1A 2AL

Our ref: **SHM/mak/319859**
(SHM87394.DOC)

Date: **27 September 1999**

Dear Rick

## U.S. OPERATIONS

Susan has indicated to me that KPMG are unable to prepare group accounts for the Flashpoint interests because at the moment the operations in the U.S. and the operations in the U.K. are not in the same group. As you know, they are linked by common ownership. I believe that what Susan and KPMG are saying is that the time has come when the U.S. and U.K. operations should be in the same group, if only so that group accounts can be prepared as our mutual clients require.

I am copying this letter to, amongst other people, Mr Fullerlove of Wiggins and Co., who advises Beau Rogers on his tax affairs. Just to remind everybody what the shareholdings are, both Flashpoint Limited (a company incorporated in Jersey) and Flashpoint (UK) Limited (a company incorporated in England) are :

| | |
| --- | --- |
| David Forrest | 43.75% |
| Beau Rogers | 43.75% |
| Filmwatch Limited | 7.5% |
| Graham Johnson | 5.0% |
| | ———— |
| | 100.00% |
| | ———— |

David Forrest and Beau Rogers are directors of both these companies but the other two shareholders are not.

As regards the U.S. operations, the holding company, New Beginnings Enterprises, LLC (a limited liability company incorporated in California) is owned by the following shareholders :

| | | |
| --- | --- | --- |
| Flashpoint Investments Limited | 39.375% | |
| Bees and Honey, LLC | 30.625% | (Beau Rogers) |
| Complete Films Company, LLC | 15.000% | (Marty Fink) |
| New Mann, LLC | 15.000% | (Richard Mann) |
| | ———— | |
| | 100.000% | |
| | ———— | |

Bees and Honey, LLC is a company incorporated in Nevada, is owned by Beau Rogers and was formerly called **Flashpoint (USA) LLC** (and before that it was called **Beauclerc Rogers IV LLC**). Flashpoint Investments Limited is a company incorporated in England and its shareholders are as follows :

Maurice Martin · Geoffrey Isaac · D. Michael Rose · Ezra Schwarz · David Diamond · Nigel McEwis · Lawrence Phillips · Nick Arnold
Kevin Burrow · Peter Watson · John Maxwood · Michael Brindman · Stanley Munson · Richard Guttridge · Tim Sournere · Simon Woods
Douglas Smith · Sarah Gforks · Robson Carmichael · Graham Ford · David Stokes · Michael Shiner · Jonathan Gardiner · Susan Carter Randall



INVESTOR IN PEOPLE

**Tarlo Lyons** Solicitors

| | | |
|---|---|---|
| David Forrest | 77.77% | 106/017/00560 |
| Filmwatch Limited | 13.33% | |
| Graham Johnson | 8.88% | |
| | 99.98% | |

The Managers of New Beginnings Enterprises, LLC are Marty Fink and Alice Neuhauser. Complete Films Company, LLC is a California limited liability company and New Mann, LLC, a Nevada limited liability company

The structure of the U.S. operations was set up in accordance with advice given by Kirk Borchardt of Lord, Bissell & Brook and in this respect I am enclosing a copy letter he wrote to me on the 19th October 1998.

Our commercial instructions are that the four shareholders - Forrest, Rogers, Filmwatch and Johnson - should beneficially share the "Flashpoint" interest in any company in the ratios set out at the top of page 1 of this letter.

The simplest way for the two operations to be brought within one group, and to preserve the correct arithmetic beneficial interests, would be for the four shareholders - Beau Rogers, David Forrest, Graham Johnson and Filmwatch Limited - to transfer their shares to a new holding company called, say, **"Flashpoint Holdings Limited"**. Proposed Structure 1 (see diagram) retains the existing investment companies Bees & Honey LLC and Flashpoint Investments Limited. Proposed Structure 2 (see diagram) gets rid of those companies. In either case the correct ratios are preserved as follows :

| | |
|---|---|
| David Forrest | 43.75% |
| Beau Rogers | 43.75% |
| Filmwatch Limited | 7.50% |
| Graham Johnson | 5.00% |
| | 100.00% |

Could everybody to whom this letter is copied please consider whether Structure 1 and/or Structure 2 works for them and if so, which is better. If so, where should the company **Flashpoint Holdings Limited** be incorporated. If there are problems with the proposal could we please discuss them generally. It may be that the parties in London could meet and join the other parties in a telephone conference.

I look forward to hearing from you.

With kind regards,

Yours sincerely

**STANLEY MUNSON**

c.c.    Mr David Forrest
        FLASHPOINT (UK) LIMITED

c.c.    Mr Beau Rogers
        FLASHPOINT (UK) LIMITED

LEX-01 104696

**Tarlo Lyons** Solicitors

c.c/    **Ms Jennifer Barrett & Ms Susan Wright**
       FLASHPOINT (UK) LIMITED                                        *106/017/00561*

c.c.    Mr M.R. Fullerlove
       WIGGIN AND CO

c.c.    Mr Bob Watts
       K P M G

c.c.    Mr Kirk Borchardt
       LORD BISSELL & BROOK

LEX-01 104697

**EXHIBIT L**



# COMPLETE FILM COMPANY LLC

3000 WEST OLYMPIC BOULEVARD
SANTA MONICA, CALIFORNIA 90404
TELEPHONE (310) 315-4767
FAX (310) 315-4768
EMAIL: COMFILM@IX.NETCOM.COM

February 27, 1998

Stanley Munson, Esq.
BEVERLY HILLS PLAZA HOTEL
10300 Wilshire Boulevard
Los Angeles, CA 90024

Dear Stanley:

Re:  Regent

I don't believe the attached was sent early enough to reach you
before you left London.  This package includes some of the fill-
the-blank information including bank account details, hard budget
numbers and fees.

Steve Jarchow has also attached some comments on the agreements
and a memo from Regent's post-production supervisor concerning
delivery items.

Steve and Greg would like to arrange a brief meeting with you and
me Monday to review what needs to be done and who needs to do it.
They've suggested late morning, perhaps just before (but not
necessarily including) lunch.  Please let me know if that will
work for you (I can get you to that meeting and then wherever you
need to go next).

Best regards,

MARTIN FINK

MF/dl
Encl.

cc:    David Forrest (w/encl)
       Beau Rogers (w/encl)

59(18)/DET/G -
00492

LEX-01 006642