# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF PENNSYLVANIA

LEXINGTON INSURANCE COMPANY,

                Plaintiff,

    -against-

DAVID FORREST, T. BEAUCLERC ROGERS IV,
STANLEY MUNSON, MARTIN FINK, all
individually, and NEW BEGINNINGS ENTERPRISES
LLC, a California Limited Liability Company, and
TARLO LYONS, a partnership,

                Defendants.

Civil Action No. 02-CV-4435
(Hon. Anita B. Brody)

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO THE MOTIONS TO DISMISS OF DEFENDANTS STANLEY MUNSON AND TARLO LYONS

Edward P. Krugman
Kevin J. Burke
Ira J. Dembrow
CAHILL GORDON & REINDEL LLP
Eighty Pine Street
New York, New York  10005
(212) 701-3000

Jeffrey R. Lerman
Glenn F. Rosenblum
MONTGOMERY, WALKER & ROADES, LLP
123 South Broad Street
Philadelphia, Pennsylvania  19109
(215) 772-1500

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF FACTS ........................................................................................... 3

ARGUMENT

I.  THIS COURT HAS PERSON JURISDICTION OVER DEFENDANTS MUNSON AND TARLO .......................................................................................... 9

   A.  Munson and Tarlo Are Subject to Jurisdiction Pursuant to Rule 4(k)(1)(A) and the Pennsylvania Long-Arm Statute ................................. 9

      1.  Munson's Contacts With Pennsylvania Compel the Exercise of Jurisdiction Over Him and Tarlo ................................ 10

      2.  Jurisdiction Also Exists Because Munson Conspired With a Pennsylvania Resident and Actively Communicated With Him in Pennsylvania in Furtherance of the Conspiracy ................ 15

      3.  The Exercise of Jurisdiction Does Not Offend Traditional Notions of Fair Play and Substantial Justice ............................... 16

   B.  The Impact of Rule 4(k)(2) ...................................................................... 22

   C.  Munson and Tarlo Lyons Cannot Hide Behind the "Corporate Shield" ................................................................................................... 26

II. THE EASTERN DISTRICT OF PENNSYLVANIA IS THE APPROPRIATE FORUM FOR THIS ACTION .................................................... 28

   A.  A Defendant Must Satisfy a High Burden of Proof on a Forum Non Conveniens Motion ................................................................................. 29

   B.  Plaintiff's Choice of Forum Deserves "Considerable Deference" ............ 30

   C.  The Private Interest Factors Do Not Favor Dismissal ............................. 31

      1.  Location of Documents and Evidence ............................................ 32

      2.  Location of Witnesses/Situs of Conduct ....................................... 33

   D.  The Public Interest Factors Do Not Favor Dismissal ............................. 36

      1.  Interest of the Forum .................................................................... 36

      2.  Burden of Jury Duty on Local Citizens ........................................ 36

      3.  Conflict of Laws ........................................................................... 37

      4.  Relative Congestion of Court Dockets .......................................... 37

CONCLUSION ........................................................................................................... 39

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Agency Holding, Corp.* v. *Malley-Duff & Associates, Inc.*, 483 U.S. 143 (1987).................................................................................. 25n

*American Trade Partners, L.P.* v. *A-1 International Importing Enterprises, Ltd.*, 755 F. Supp. 1292 (E.D. Pa. 1990) ................................. 15, 26-27

*In re Arthur Treacher's Franchisee Litigation*, 92 F.R.D. 398 (E.D. Pa. 1981)................................................................................. 16

*Asahi Metal Industry Co.* v. *Superior Court*, 480 U.S. 102 (1987)...................... 17

*Burger King Corp.* v. *Rudzewicz*, 471 U.S. 462 (1985)........................................ 16, 17

*Calder* v. *Jones*, 465 U.S. 783 (1984)................................................................ 27

*Carteret Savings Bank, F.A.* v. *Shushan*, 954 F.2d 141 (3d Cir. 1992)................ 11, 16

*Clark* v. *Milam*, 847 F. Supp. 409 (S.D. W. Va. 1994) ...................................... 19

*In re Corel Corp. Securities Litigation*, 147 F. Supp. 2d 363 (E.D. Pa. 2001) ...................................................................... 29, 30, 31, 32, 35, 36-37, 38

*DiRienzo* v. *Philip Services Corp.*, 294 F.3d 21 (2d Cir. 2002) ........................... 32, 35

*Eagle Traffic Control, Inc.* v. *James Julian, Inc.*, 933 F. Supp. 125 (E.D. Pa. 1996)................................................................... 25

*Eggear* v. *Shibusawa Warehouse Co.*, 2001 WL 267881 (E.D. Pa. Mar. 19, 2001)........................................................... 22

*E.I. DuPont de Nemours & Co.* v. *Rhodia Fiber & Resin Intermediates, S.A.S.*, 197 F.R.D. 112 (D. Del. 2000), *aff'd in part, appeal dismissed in part*, 269 F.3d 187 (3d Cir. 2001) .............................. 31

*Ethanol Partners Accredited* v. *Wiener, Zuckerbrot, Weiss & Brecher*, 635 F. Supp. 15 (E.D. Pa. 1985) ...................................................... 15

*Flood* v. *Makowski*, 2004 WL 1908221 (M.D. Pa. Aug. 24, 2004)....................... 21

*Forbes* v. *Eagleson*, 1997 U.S. Dist. LEXIS 18052 (E.D. Pa. Nov. 7, 1997) ................................................................... 27

*Founds* v. *Shedaker*, 278 F. Supp. 2d 32 (E.D. Pa. 1968) .................................. 24-25

*General Electric Capital Corp.* v. *Alleco, Inc.*, 2001 WL 253850 (E.D. Pa. Mar. 13, 2001)........................................................... 27

**Page**

*Grand Entertainment Group, Ltd.* v. *Star Media Sales, Inc.*, 988 F.2d 476 (3d Cir. 1993)............................................................................ 9-12, 14-15, 16, 17, 18

*Gulf Oil Corp.* v. *Gilbert*, 330 U.S. 501 (1947)..................................... 32

*Handeen* v. *Lemaire*, 112 F.3d 1339 (8th Cir. 1997)............................. 19

*Hanson* v. *Denckla*, 357 U.S. 235 (1958) ............................................. 10

*Lacey* v. *Cessna Aircraft Co.*, 862 F.2d 38 (3d Cir. 1988), *rev'd after remand*, 932 F.2d 170 (3d Cir. 1991) ........................................ 29, 30, 31, 38

*Lehman* v. *Humphrey Cayman, Ltd.*, 713 F.2d 339 (8th Cir. 1983), *cert. denied*, 464 U.S. 1042 (1984).............................................. 37

*Lexington Insurance Co.* v. *Forrest*, 263 F. Supp. 2d 986 (E.D. Pa. 2003) ................................................................................... passim

*Lony* v. *E.I. DuPont de Nemours & Co.*, 886 F.2d 628 (3d Cir. 1989), *appeal after remand*, 935 F.2d 604 (3d Cir. 1991)...................... 29, 29n, 30, 38

*Massachusetts School of Law* v. *American Bar Ass'n*, 846 F. Supp. 374 (E.D. Pa. 1994).................................................................. 16

*Mellon Bank (East) PSFS, N.A.* v. *Farino*, 960 F.2d 1217 (3d Cir. 1992) .................................................................................... 9, 11

*Merchants National Bank* v. *Safrabank*, 1991 WL 173781 (D. Kan. Aug. 28, 1991) ...................................................................... 27

*Nordic Bank PLC* v. *Trend Group, Ltd.*, 619 F. Supp. 542 (S.D.N.Y. 1985) ................................................................................... 27

*Obee* v. *Teleshare, Inc.*, 725 F. Supp. 913 (E.D. Mich. 1989) ............ 27

*Peregrine Myanmar Ltd.* v. *Segal*, 89 F.3d 41 (2d Cir. 1996)............. 31, 36

*Piper Aircraft Co.* v. *Reyno*, 454 U.S. 235 (1981)............................... 30, 31, 33, 36

*Prime Leasing, Inc.* v. *CMC Lease, Inc.*, 1999 WL 1285847 (N.D. Ill. Dec. 29, 1999)........................................................................ 27

*Reid-Walen* v. *Hansen*, 933 F.2d 1390 (8th Cir. 1991) ....................... 31

*Remick* v. *Manfredi*, 238 F.3d 248 (3d Cir. 2001) ............................... 10

*Renner* v. *Lanard Toys Ltd.*, 33 F.3d 277 (3d Cir. 1994) .................... 3

*Republic of Panama* v. *BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935 (11th Cir. 1997)................................................................ 22

**Page**

*Reves* v. *Ernst & Young*, 507 U.S. 170 (1993) ...................................................... 19-21

*Romann* v. *Geissenberger Manufacturing Corp.*, 865 F. Supp. 255
(E.D. Pa. 1994)............................................................................................ 25

*Rosner* v. *Daniels*, 1999 WL 601011 (E.D. Pa. July 28, 1999) ........................... 11, 15

*Salinas* v. *United States*, 522 U.S. 52 (1997)......................................................... 21

*Smith* v. *Berg*, 247 F.3d 532 (3d Cir. 2001)............................................... 20-21, 21n

*Supra Medical Corp.* v. *McGonigle*, 955 F. Supp. 374 (E.D. Pa. 1997) .............. 31

*Telespectrum Worldwide, Inc.* v. *MBNA Canada Bank*, 1999 WL
239112 (E.D. Pa. Apr. 16, 1999) ....................................................... 10

*Temtex Products, Inc.* v. *Kramer*, 479 A.2d 500 (Pa. Super. Ct. 1984) ............... 15

*In re Union Carbide Corp. Gas Plant Disaster*, 634 F. Supp. 842
(S.D.N.Y. 1986).............................................................................. 33

*United Power Ass'n* v. *L.K. Comstock & Co.*, 1992 WL 402906
(D. Minn. Oct. 27, 1992)................................................................... 27

*United States* v. *Arrow Medical Equipment Co.*, 1990 WL 210601
(E.D. Pa. Dec. 18, 1990) ................................................................. 15

*United States* v. *Parise*, 159 F.3d 790 (3d Cir. 1998)............................................ 20

*United States* v. *Sun West Services, Inc.*, 2000 U.S. Dist. LEXIS 17193
(D.N.M. Apr. 11, 2000) .................................................................. 27

*Von Cos.* v. *Seabest Foods, Inc.*, 926 P.2d 1085 (Cal. 1996), *cert. de-
nied*, 522 U.S. 808 (1997)............................................................... 24

*Ward* v. *Hampton Psychiatric Hospital*, 1993 WL 419143 (E.D. Pa.
Oct. 19, 1993) ................................................................................ 25

*Wiwa* v. *Royal Dutch Petroleum Co.*, 226 F.3d 88 (2d Cir. 2000), *cert.
denied*, 532 U.S. 941 (2001) ........................................................... 31, 33

**Rules**

Fed. R. Civ. P.

4................................................................................................................... 22n
4(k)(1)(A)..................................................................................................... *passim*
4(k)(2) .......................................................................................................... 22-26
12(b).............................................................................................................. 2

Page

**Statutes**

Cal. Code Civ. Proc.

§ 410.10..................................................................................... 24

Pa. Cons. Stat. Ann.

§ 5322(a) (West 2004) ................................................................. 9

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.
§ 1961 *et seq.* (2000), as amended

18 U.S.C. § 1965(b)(2000) ............................................................. 25n
18 U.S.C. § 1962(c) (2000)............................................................. 20n, 21, 25n
18 U.S.C. § 1962(d) (2000)............................................................. 20, 20n, 21, 21n
18 U.S.C. § 1965 (2000) ................................................................. 27
28 U.S.C. § 1631 (2000) ................................................................. 24-25, 25n

Other Authorities

Sonya Larsen, Annotation, *Validity, Construction, and Application of
the 'Fiduciary Shield' Doctrine — Modern Cases*, 79 A.L.R.5th
587 (2000)..................................................................................... 27n

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF PENNSYLVANIA

LEXINGTON INSURANCE COMPANY,

                                    Plaintiff,

        -against-

DAVID FORREST, T. BEAUCLERC ROGERS IV,
STANLEY MUNSON, MARTIN FINK, all
individually, and NEW BEGINNINGS ENTERPRISES
LLC, a California Limited Liability Company, and
TARLO LYONS, a partnership,

                                    Defendants.

Civil Action No. 02-CV-4435
(Hon. Anita B. Brody)

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO THE MOTIONS TO DISMISS OF DEFENDANTS STANLEY MUNSON AND TARLO LYONS

Plaintiff, Lexington Insurance Company ("Lexington"), respectfully submits this Memorandum in opposition to the separate motions of defendants Tarlo Lyons ("Tarlo") and Stanley Munson ("Munson") to dismiss this action as against each of them. For the reasons stated herein, both motions should be denied in their entirety.[1]

## PRELIMINARY STATEMENT

The Tarlo and Munson motions to dismiss are the fourth and fifth motions to dismiss filed by defendants in this action. Lexington initially filed this action in July 2002 against two defendants, David Forrest ("Forrest"), a subject of the United Kingdom, and T. Beauclerc Rogers IV ("Rogers"), who lives in this District (in Gladwyne). Both Forrest and Rogers filed similar

---

[1] As both motions essentially raise the same arguments, lack of personal jurisdiction and *forum non conveniens*, Lexington is submitting this single opposition to both motions. The opposition is supported by the Declaration of Edward P. Krugman ("Krugman Dec.").

motions to dismiss the Complaint on a variety of grounds, including *forum non conveniens*. Forrest also argued that this Court lacked personal jurisdiction over him. In a May 6, 2003 Explanation and Order, this Court denied Forrest's and Rogers' motions in their entirety. The decision is reported at 263 F. Supp. 2d 986 (E.D. Pa. 2003) and will be referred to herein as *Lexington I*. A copy is annexed to this Memorandum.

In June 2004, Lexington filed its Second Amended and Supplemental Complaint ("Complaint"), the current operative complaint, which added four defendants to the action: Martin Fink ("Fink"), a California resident, New Beginnings Enterprises, LLC, the California company he controls, Stanley Munson ("Munson"), an English solicitor, and Tarlo Lyons ("Tarlo"), the English law firm of which Mr. Munson was a partner during the relevant period of time. Mr. Fink filed a motion to dismiss based on an agreement he had with Lexington (and other companies affiliated with Lexington) that he claims prevents Lexington from pursuing this action against him. Fink's motion has been fully briefed and is pending before the Court.

Most recently, on September 15, 2004, Munson and Tarlo, after receiving an extension of time to respond to the Complaint by Lexington and a further extension from the Court, filed separate motions to dismiss pursuant to Fed. R. Civ. P. 12(b). As did Forrest, Munson and Tarlo argue that this Court lacks personal jurisdiction over them; as did Forrest and Rogers, Munson and Tarlo argue that the action against them should be dismissed on *forum non conveniens* grounds. This is Lexington's response to the Munson and Tarlo motions.

Lexington submits that the Munson and Tarlo motions are governed by *Lexington I*. Mindful of that ruling, Munson and Tarlo spend most of their efforts trying to differentiate Munson from Forrest and trying to show that Munson's role in the Flashpoint Enterprise was purely that of a legal advisor and minimal at best. These efforts are wrong as a matter of fact and unavailing in any event as a matter of law. We demonstrate below that Munson and Tarlo played a central role in furthering the objectives of the Flashpoint Enterprise by their substantial participation in the business and financial operations of Flashpoint. Indeed, their contacts with Penn-

sylvania and the United States in connection with Flashpoint's affairs were repeated and continuous. Accordingly, the motions to dismiss should be denied.

## STATEMENT OF FACTS

The available documentation demonstrates that Munson's activities and contacts with Pennsylvania and the United States justify the exercise by the Court of personal jurisdiction over him just as the Court concluded in *Lexington I* that defendant Forrest was subject to jurisdiction here.[2] In its Motion and Memorandum, Tarlo does not dispute, and implicitly concedes, that it is responsible for Munson's actions.[3]

Munson did not merely provide professional services to Flashpoint from time to time. In his Affidavit, which is submitted in support of both motions, he acknowledges, as he must, that his "shareholdings effectively gave [him] a 7.5% interest in the Flashpoint companies," *i.e.*, in all of the companies comprised by the Flashpoint Enterprise (Munson Aff't ¶ 5). He also acknowledges that he was a director of Flashpoint Investments Limited, which held shares in other companies (*id.* ¶¶ 5, 7), and the company secretary of Flashpoint (UK) Limited and Flashpoint Investments Limited (*id.* ¶ 7). According to a December 1, 1996 letter prepared by Rogers (Krugman Dec. Ex. A), Filmwatch Limited, Munson's company, which had a 7.5% interest in the shares in Flashpoint Limited, was entitled to receive, after the deduction of arms-

---

[2]    Although we hardly think it matters given the record set forth herein and the ruling in *Lexington I*, should the Court conclude that the evidentiary support presented by Lexington is insufficient, Lexington requests that the Court allow jurisdictional discovery of Munson and Tarlo prior to ruling on the instant motions. *See, e.g., Renner* v. *Lanard Toys Ltd.*, 33 F.3d 277, 283 (3d Cir. 1994) (sustaining "the right of plaintiffs to conduct discovery before the court dismisses for lack of personal jurisdiction"). This discovery would include production of the 70 boxes of Flashpoint-related documents that are possessed by Tarlo (Tarlo Mem. at 4) and the deposition of Messrs. Munson and Rogers.

[3]    Indeed, Tarlo makes only one distinction between its liability and that of Munson. Tarlo claims in its Memorandum (at p. 23) that "the firm was not aware of the alleged ownership by Stanley Munson, its former partner, of a part of Flashpoint and should there be any basis for finding him liable on that basis it would not apply to the law firm." Of course, liability is not the issue on this motion, only jurisdiction. In any event, Munson's ownership interest in Flashpoint is not the sole basis on which Munson is claimed to be liable for RICO and common law fraud, so any distinction between Tarlo and Munson is irrelevant for purposes of this motion.

length disbursements, 5.75% of all "gross fees, commissions, and other income of" Flashpoint Limited.

However, in his Affidavit, Munson seeks to substantially diminish his role in the Flashpoint Enterprise. He states that he "was not involved in the implementations of any of the Hollywood Funding projects" and that he "acted as counsel to Flashpoint when instructed to do so in London, particularly on contractual and intellectual property issues" (Munson Aff't ¶ 15). This is an egregious understatement of Munson's role in the overall Flashpoint Enterprise. Wholly apart from his financial interest in the Flashpoint companies, Munson was involved, on a regular, everyday basis, in a considerable amount of the business and financial activities of Flashpoint.

For example Munson, along with Forrest, Rogers, Fink, and only a few others, was an addressee of a "Strictly Private and Confidential" November 18, 1998 Memorandum from Susan Wright, a senior executive of Flashpoint, setting forth "details of how we will handle the issues of funding, accounting and ownership of assets acquired to date and assets to be acquired in the future" (Krugman Dec. Ex. B). This document specifically mentions the diversion of funds from film production accounts, one of the central allegations of Lexington's Complaint. *E.g.*, "[s]ome items of equipment have been purchased from funds advanced by Flashpoint to the '7.23' slate". And, "[i]n the same way, further items of equipment have also been purchased from funds advanced by Flashpoint to 'Prosperity Pictures (Slate I)' slate."

Munson was, as he acknowledges, involved in contractual matters (Munson Aff't ¶¶ 15-16). He drafted various contractual documents for Flashpoint's businesses and sent them to the United States, such as the Master Agreement and Production and Finance Agreement between Flashpoint and Regent Entertainment, and the Production and Finance Agreement between Flashpoint and 7.23 Productions (Krugman Dec. Ex. C). However, Munson also functioned in many other areas on behalf of Flashpoint. He was actively involved in handling and arranging the cash flow for the Flashpoint companies. In a November 26, 1997 letter, he wrote to Forrest

with respect to funds in the amount of $8 million that were being placed on deposit, earning 5.25% interest. He noted: "We can place a core part of the principal on deposit with a notice period of, say, one week or one month, earning a higher interest rate, but in order to do this we need to analyse how much is needed in Los Angeles and when. I do not have up to date copies of the cash flow schedules so would you let me have them. . . ." [11/26/97] (Krugman Dec. Ex. D)

Lexington alleges in the Complaint that Munson wrongfully authorized payments when he knew that the funds were being used for purposes other than the production of the films for which the monies were raised (Complaint ¶ 32). Tarlo acknowledges that Munson was a co-signatory on all disbursements from Flashpoint bank accounts, but claims Munson only signed "at the direction of Flashpoint" (*see* Tarlo Mem. at 9, 17). This mischaracterizes the purpose for Munson's signature. He was a "co-signatory"; a signature of a Flashpoint executive, normally David Forrest, was also required for all such disbursements. If Munson were just signing "at the direction of Flashpoint," there would have been no necessity for his signature since Flashpoint officer had already signed. The requirement of a second signature would have been meaningless. The Collateral Agreements between Lexington and Flashpoint, which Munson helped to draft, provided:

> "Flashpoint undertakes to Lexington that the . . . funds . . . will be immediately placed on deposit in a bank account (the 'Holding Account') opened and maintained by Flashpoint and in which a partner of Tarlo Lyons shall be a co-signatory on all cheques or other payment authorisations from such account." (Krugman Dec. Ex. E)

The obvious purpose of this clause in the Collateral Agreements was to ensure that Flashpoint did not misappropriate any funds. Accordingly, the clear intention was that Tarlo would act independently from Flashpoint when signing a payment authorization by satisfying itself that the requested transfer of funds was in compliance with the Agreements. Munson was plainly aware of this purpose, as he drafted and negotiated the Collateral Agreements.

Munson violated the obligation that he and Tarlo assumed pursuant to the Collateral Agreements, and assisted in the Flashpoint fraud, by becoming a rubber stamp for Flashpoint. Rubber stamp or not, however, Munson had a significant and essential position in conducting the affairs of the Flashpoint Enterprise. Without Munson's activities on behalf of Flashpoint and, in particular, his co-authorizing all Flashpoint disbursements, the Flashpoint Enterprise could not have continued to operate. Tarlo states that "[a]t no time did Stanley Munson or any other employee at Tarlo Lyons make a decision that a particular disbursement should be initiated" (Tarlo Mem. at 10) and Munson in his Affidavit states that he "did not initiate any drawn-down request for funds" (Munson Aff't ¶ 15). Regardless of whether this is true — and it is plainly an issue for discovery and litigation on the merits — Munson had to approve each and every request for funds that had been obtained through financings insured by Lexington. Munson was supposed to exercise his independent judgment as to whether the disbursement was proper — *i.e.* whether the funds raised for the production of a specific motion picture or pictures were, in fact, being used for such production. If, as he and Tarlo now say, he merely operated "at the direction of Flashpoint," he and Tarlo stand convicted out of their own mouths of facilitating a massive fraud.

But, of course, Munson did far more with respect to these disbursements than just sign his name to authorize the transfer of the funds. He was the focal point with respect to arranging and assuring that funds were transferred as required to perpetuate Flashpoint's business affairs. For example, in an April 13, 1998 fax to Munson, Martin Fink in California said that, at Forrest's suggestion, he would "recap the situation [for Munson] with regard to drawdowns, advances, etc." with respect to a number of different motion pictures and motion picture slates (Krugman Dec. Ex. F). On April 15, 1998, Fink faxed Forrest a letter with respect to the amounts of money that he "would like to see wired tomorrow." Forrest sent this letter to Munson with a handwritten note, "Please process payments." (Krugman Dec. Ex. G) In a May 11, 1998 fax, Fink asked Munson "where [do] we stand on the past-due drawdowns" for certain films (Krugman Dec. Ex. H) and, on April 22, 1998, Fink told Munson that Regent had

not yet received a drawdown in the amount of $734,182 (Krugman Dec. Ex. I). This is direct evidence of Munson's complicity in one of the central diversions of funds alleged in the Complaint — the payment of funds to Regent out of moneys raised for other projects, prior to the closing date of the Regent transaction (Complaint ¶ 33(a)). That Munson's complicity is demonstrated by a communication between Munson in England and Fink in the United States is plainly significant for jurisdictional purposes.

Munson was intimately involved in and aware of Flashpoint's purchase of a building and facility in California, which is alleged in the Complaint to have been financed with funds that should have been used for the production of motion pictures. In an October 3, 1998 fax to Munson from Fink, Fink notes that "[a]s to the build-out and the equipment, the general plan is to utilize funds from the Prosperity slates [of films]" (Krugman Dec. Ex. J).

Munson was fully aware of and apparently responsible for being aware of the intricate and byzantine structure of all the various affiliated Flashpoint companies. In a September 27, 1999 letter, on which he copied (among others) both Rogers and Forrest, he noted: "Just to remind everybody what the shareholdings are" and then proceeded to provide the ownership percentages for Flashpoint Limited and Flashpoint (UK) Limited in England and, "[as] regards the U.S. operations," New Beginnings Enterprises, LLC, Bees and Honey, LLC, formerly Flashpoint (USA) LLC (Krugman Dec. Ex. K). In this letter, Munson noted that "the four shareholders — Forrest, Rogers, Filmwatch Limited and Graham Johnson — "should beneficially share the 'Flashpoint' interest in any company in the ratios" of 43.75%, 43.75%, 7.5% and 5.0%. Filmwatch Limited, of course, was the company that was "owned and controlled" by Munson (Munson Aff't ¶ 5) and was the entity through which Munson owned 7.5% of all of Flashpoint's affiliated companies.

On one of Munson's acknowledged trips to California on Flashpoint business (Munson Aff't ¶ 16), Fink sent a letter to him at the California hotel where he was staying in order to arrange a meeting with respect to the Regent slate of films "to review what needs to be

done and who needs to do it" (Krugman Dec. Ex. L). Munson drafted a Memorandum Agreement with respect to Flashpoint's dealings with Prosperity Pictures and forwarded it to Fink, Forrest, and several Prosperity personnel, as well as to Rogers in Pennsylvania (Krugman Dec. Ex. M). While in California in November 1997, Munson planned to meet with Serge Rodnunsky of Rojak Films to "finalize matters" (Krugman Dec. Ex. N).

In fact, Munson even participated in an exchange of correspondence with Rogers involving the music component of a particular film. He wrote Rogers:

> "It is often the case that producers who go over budget deal with music considerations at the eleventh hour and possibly end up doing a bad deal. In order to minimise costs they contract with a composer and do not pay a proper arms-length fee such that the production company ends up owning the copyright in the music. The result of this is that there is no income generated from the exploitation of the music which benefits the producer/financer. This appears to be the case here." (Krugman Dec. Ex. O)

In a November 6, 1998 letter to Rogers, while Rogers was in London, Munson recounted a meeting he had with a representative of a company that handled music rights and royalties for motion pictures. Munson noted: "I personally have experience in the music industry and I do know how it works. Having said that, however, Flashpoint does require some assistance in focussing on music rights and the collection of royalties." (Krugman Dec. Ex. P)

In view of his financial and personal involvement with the Flashpoint companies, Munson cannot say that he only provided professional services. From a jurisdictional standpoint, his involvement with Pennsylvania and the United States was so extensive that the choice of characterization of lawyer *versus* businessman is irrelevant. Munson was actively involved in essential matters relating to the business and financial operations of Flashpoint and, as shown below, communicated extensively with Rogers in Pennsylvania and with Fink in California with respect to his activities on behalf of Flashpoint. Munson's position in Flashpoint and his communications to and with Rogers and Fink require this Court to exercise personal jurisdiction over Munson and, consequently, over Tarlo.

# ARGUMENT

## I.

## THIS COURT HAS PERSON JURISDICTION OVER DEFENDANTS MUNSON AND TARLO

### A.    *Munson and Tarlo Are Subject to Jurisdiction Pursuant to Rule 4(k)(1)(A) and the Pennsylvania Long-Arm Statute*

Under Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure, non-resident defendants such as Munson and Tarlo are subject to personal jurisdiction to the same extent that they "could be subjected to the jurisdiction of a court of general jurisdiction in the state in which the district court is located." Munson's actions are imputed to Tarlo to establish the law firm's minimum contacts for constitutional purposes. *See Mellon Bank (East) PSFS, N.A.* v. *Farino*, 960 F.2d 1217, 1226 n.5 (3d Cir. 1992). Accordingly, if Munson and Tarlo are subject to personal jurisdiction under Pennsylvania's long-arm statute, their motions to dismiss for want of personal jurisdiction must be denied.

Subsection (a) of the Pennsylvania long-arm statute, 42 Pa. Cons. Stat. Ann. § 5322(a) (West 2004), contains a laundry list of conduct that subjects non-residents to the personal jurisdiction of Pennsylvania courts, and subsection (b) provides:

> "In addition to the provisions of subsection (a) the jurisdiction of the tribunals of this Commonwealth shall extend to all persons who are not within the scope of section 5301(relating to persons) to the fullest extent allowed under the Constitution of the United States and may be based on the most minimum contact with this Commonwealth allowed under the Constitution of the United States." *Id.* § 5322(b).

Pennsylvania thus asserts jurisdiction over non-residents "to the fullest extent allowed" by due process, and jurisdiction "may be based on the most minimum contact with this Commonwealth allowed under the Constitution of the United States." *See, e.g., Grand Entertainment Group, Ltd.* v. *Star Media Sales, Inc.*, 988 F.2d 476, 481 (3d Cir. 1993). As stated by the Court in *Lexington I*, the test is: "(i) whether the defendant has minimum contacts with the forum such that [he] should reasonably anticipate being haled into court there, and (ii) whether

the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice." 263 F. Supp. 2d at 993 (citations and internal quotation marks omitted). *See also Remick* v. *Manfredi*, 238 F.3d 248, 255 (3d Cir. 2001) ("Due process requires that the defendant have 'minimum contacts' in the forum state, and that the exercise of jurisdiction comport with 'traditional notions of fair play and substantial justice.'") (citation omitted).

### 1. Munson's Contacts With Pennsylvania Compel the Exercise of Jurisdiction Over Him and Tarlo

In determining whether there are sufficient minimum contacts to justify the exercise of personal jurisdiction, a court should consider "(1) whether defendant 'purposefully avail[ed] itself of the privilege of conducting business' with Pennsylvania; and (2) if defendant's relationship with plaintiff and the forum state is such that the defendant 'should reasonably anticipate being haled into court.'" *Telespectrum Worldwide, Inc.* v. *MBNA Canada Bank*, 1999 WL 239112, at *1 (E.D. Pa. Apr. 16, 1999) (citations omitted). Or, as the Court of Appeals said in *Grand Entertainment*, the "defendant must engage in some affirmative act 'by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" 988 F.2d at 482 (quoting *Hanson* v. *Denckla*, 357 U.S. 235, 253 (1958)). And this Court emphasized in *Lexington I* that "[t]his Circuit takes a 'highly realistic' approach to analyzing minimum contacts." 263 F. Supp. 2d at 993.

In *Grand Entertainment*, the Third Circuit permitted personal jurisdiction over a Spanish defendant who had, "in his individual and corporate capacity, directed at least twelve communications to the forum . . . engaged in negotiations for an agreement which would have created rights and obligations among citizens of the forum and contemplated significant ties with the forum." 988 F.2d at 482-83. This was evidence that the defendant had "deliberately and personally directed significant activities toward the state." *Id.* at 483. The court pointed out that "[w]here the contacts evaluated are those that give rise to the litigation, even one contact with the forum may be enough to justify jurisdiction" and that the defendant's "personal, intentional

-10-

communications [into the forum were what] gave rise to the underlying suit." *Id. Grand Entertainment* also makes clear that the defendant's physical presence in the state is *not* required. *Id.* at 482 ("Due process does not require a defendant's physical presence in the forum before personal jurisdiction is exercised."). *Accord, e.g., Mellon Bank, supra,* 960 F.2d at 1225 ("When a defendant has received the benefits and protections of the forum's laws by engaging in business activities with a forum resident, the courts have 'consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.'") (citation omitted); *Rosner* v. *Daniels,* 1999 WL 601011, at *3 (E.D. Pa. July 28, 1999) (Brody, J.) ("Telephone calls and correspondences can constitute minimum contacts.").

The Third Circuit has expressly held — and this Court recognized in finding jurisdiction over co-defendant Forrest — that when evaluating a 12(b)(2) motion to dismiss, the court must "accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff." *Carteret Savings Bank, F.A.* v. *Shushan,* 954 F.2d 141, 142 n.1 (3d Cir. 1992); *Lexington I,* 263 F. Supp. 2d at 992 (citing *Carteret*). Indeed, not only has Munson "deliberately directed" significant activities in carrying out this deception toward Pennsylvania, but *the very communications that Munson directed to Pennsylvania are RICO predicate acts.* As alleged in the Complaint:

47.   In furtherance of the foregoing scheme, defendants on numerous occasions caused the transmission of documents and/or information through the United States Postal Service, through private or commercial interstate carriers, and/or through wire or radio communication in interstate or foreign commerce.

. . . .

51.   Each defendant committed predicate acts of racketeering activity in connection with his conduct of the affairs of the Flashpoint Enterprise, in that:

(a)   having devised the scheme to defraud alleged above, defendants caused the use of the jurisdictional means alleged in paragraph 47 above, thereby in each instance violating 18 U.S.C. § 1341 and/or 18 U.S.C. § 1343, and

(b)   having devised a scheme to obtain money and/or property (the proceeds of the Hollywood Funding Nos. 4, 5, and 6 financings) by means of false and fraudulent pretenses as alleged above, defendants caused the use of the jurisdictional means alleged in para-

graph 47, thereby in each instance violating 18 U.S.C. § 1341 and/or 18 U.S.C. § 1343, and

(c) having misappropriated funds placed in their trust pursuant to the several Hollywood Funding transactions, as alleged above, defendants caused the transport of such funds in interstate and foreign commerce, as alleged in paragraphs 48 and 49 above, thereby in each instance violating 18 USC 2314.

Thus personal jurisdiction over Munson is clearly proper under *Grand Entertainment* and *Lexington I*.

This Court recognized *Grand*'s relevance to the case at hand in finding personal jurisdiction over co-defendant Forrest. In *Lexington I*, the Court noted the similarity between Forrest's contacts with this forum and the contacts of the defendant in *Grand*, observing that "[i]n both cases the defendants' communications involved commercial matters that, by occurring within this forum, benefitted from the laws of this state" and that both defendants "freely chose to communicate with this forum and the resulting communications gave rise to the lawsuit whose jurisdiction each man contested." 263 F. Supp. 2d at 994. Consequently, "[b]ased on these factual similarities and the Third Circuit's approval of the district court's exercise of jurisdiction over [the defendant in *Grand*]," this Court found "that Forrest's phone calls and faxes with this forum present a *prima facie* case of minimum contacts." *Id*.

Based on the documents summarized below that demonstrate Munson's contacts with Pennsylvania and with the United States, it is clear that Munson's correspondence with this forum also "presents a *prima facie* case of minimum contacts."

Munson claims that he communicated "occasionally with Beau Rogers of Gladwyne Pennsylvania in connection with Flashpoint" and that these communications were by "fax, mail or telephone calls from my office in London" (Munson Aff't ¶ 12). Munson then attempts to minimize these communications — apparently in an effort to preclude their consideration as "minimum contacts" — by claiming that "[t]he preponderance of my communication with Beau Rogers whilst he was in Pennsylvania would be to arrange convenient times for his visits to London and meetings so that we could discuss any business whilst he was in England. Such other

limited communications as there may have been were invariably of a logistical nature." (*Id.*) This, most charitably, is an egregious understatement of the communications that Munson directed to Rogers in Pennsylvania. It is contradicted by a single one-page document, a May 27, 1997 fax from Rogers to Munson in which Rogers says he learned that Marty Fink (in California) had received a letter from Munson with respect to a Flashpoint slate of films. Rogers then writes: **"Would you please, as a matter of course in the future, copy me on all correspondence that deals with Flashpoint, where you copy David [Forrest], so that I can be as up to date as possible on all of our deals"** (Krugman Dec. Ex. Q). And, from the quantity of documents that Lexington has seen to date, some of which are summarized below, it appears that Munson complied with Rogers' directive. Why did Rogers want Munson to send him copies of all of Munson's Flashpoint correspondence? Because, as noted above, Munson was handling a variety of important business and financial matters for the Flashpoint companies, matters as to which Rogers wanted to keep abreast. Without knowing what Munson was doing (such as correspondence with Marty Fink in California), Rogers would be at a serious loss in knowing what Flashpoint was doing and would be unable to protect and direct his substantial interest in the Flashpoint companies.

Given that Forrest and Rogers, the two major shareholders of Flashpoint, were located on two different continents, it was essentially for the operation of Flashpoint for Rogers to be fully aware of everything involving Flashpoint that was occurring in England. And, as Munson was actively involved in many aspects of Flashpoint's business and financial activities, it is understandable that Rogers wanted Munson to copy him on all of Munson's Flashpoint-related correspondence. Munson's correspondence with Rogers in Pennsylvania, thus, was essential to the operation and functioning of Flashpoint. It was not solely for Rogers to learn what actions had been taken in the past, as argued by Tarlo (Tarlo Mem. at 9). If Rogers, upon learning of a particular action, disagreed with it, he presumably would say so and his views would be adhered to in similar actions taken by Munson in the future.

-13-

The correspondence that Munson originated in London and directed to Rogers in Pennsylvania took place over a five-year period and comprised a host of topics, all related to the operation and functioning of the Flashpoint companies. For example, on July 2, 1998, Munson sent Rogers a draft Letter of Undertaking with his comments that Rogers was to sign with respect to Lexington's insurance policy on the Jules Verne (Hollywood Funding No. 4) project. The documents that Munson sent to Rogers in Pennsylvania include (Krugman Dec. Ex. R):

- a February 13, 2001 fax enclosing Flashpoint (UK) Limited Board Minutes;

- a November 6, 1997 fax with respect to Completion Guarantees;

- a July 1, 1998 fax regarding Letters of Undertaking for Forrest and Rogers on the Jules Verne project;

- a February 17, 1998 fax regarding the "divergence between the amounts held by Leopold Joseph" for Rogers and for Forrest;

- a September 9, 1997 fax with respect to Flashpoint Limited and a transfer of funds in the amount of $328,000;

- a November 5, 1997 fax with respect to certain monies received from Lloyd Thompson with respect to the film "Hyper-Allergenic";

- a November 26, 1997 fax enclosing copies of several letters "relating to various Flashpoint matters";

- a June 5, 1997 letter enclosing a share certificate in Flashpoint Limited; and

- a July 12, 1996 letter regarding the incorporation of Flashpoint Limited as a Jersey Corporation.

Munson was directly involved with a great deal of the activity surrounding the financing of Flashpoint's film projects, and he communicated regularly with Rogers in Pennsylvania to keep Rogers apprised of what was going on. Munson plainly undertook affirmative acts in which he purposely availed himself of the privilege of conducting activity in Pennsylvania. Lexington's claims against Munson and Tarlo arise directly out of the operation of the enterprise and, hence, Munson's contacts with Pennsylvania. Notwithstanding the defendants' attempt to distinguish *Grand*, this Court and courts in this circuit take a "highly realistic" view when mak-

-14-

ing personal jurisdiction determinations. *Lexington I, supra.; Rosner, supra*, 1999 WL 601011, at *3. Any "realistic" view of Munson's communications with Rogers in Pennsylvania — communications over a period of years, that are both independent RICO predicate acts (¶ 51) and were undertaken as part of the operation of a racketeering enterprise (¶ 51) — requires subjecting Munson to personal jurisdiction in this District. Based on his extensive business dealings with Rogers in Pennsylvania and with Fink and others in California, Munson most assuredly should have anticipated the possibility, if not the strong likelihood, of "being haled into court in the United States." The letters and faxes between Munson and Rogers are similar to the communications between Forrest and Rogers that the Court found sufficient to confer personal jurisdiction over Forrest. The same result should be reached in the case of Munson and Tarlo Lyons.

2.    *Jurisdiction Also Exists Because Munson Conspired With a
      Pennsylvania Resident and Actively Communicated With
      Him in Pennsylvania in Furtherance of the Conspiracy*

It is settled that, under appropriate circumstances, the contacts of a co-conspirator may be attributed to other members of the conspiracy for the purpose of establishing jurisdiction. In upholding conspiracy-based personal jurisdiction in *United States* v. *Arrow Medical Equipment Co.*, 1990 WL 210601 (E.D. Pa. Dec. 18, 1990), Judge Giles stated:

> "[Plaintiff] alleges that . . . defendants were all involved in a coordinated effort to defraud the government of its recovery of Medicare overpayments. Plaintiff also alleges that substantial acts in furtherance of that conspiracy took place in Pennsylvania, namely, the billing of Medicare for equipment sold but not medically necessary." *Id.* at *8.

*Accord Ethanol Partners Accredited* v. *Wiener, Zuckerbrot, Weiss & Brecher*, 635 F. Supp. 15, 18 (E.D. Pa. 1985) (upholding jurisdiction on co-conspirator theory); *Temtex Products, Inc.* v. *Kramer*, 479 A.2d 500, 506-07 (Pa. Super. Ct. 1984) (jurisdiction based on a conspiracy appropriate where "the cause of action arises out of the conspiracy to defraud, a material part of which was performed in [Pennsylvania]"); *see also American Trade Partners, L.P.* v. *A-1 International Importing Enterprises, Ltd.*, 755 F. Supp. 1292, 1304 (E.D. Pa. 1990) (RICO venue appropriate on co-conspirator basis).

-15-

Mere membership in a conspiracy does not automatically make a member subject to the jurisdiction of every other member's forum. *Massachusetts School of Law* v. *American Bar Ass'n*, 846 F. Supp. 374, 379 (E.D. Pa. 1994) (citing *In re Arthur Treacher's Franchisee Litigation*, 92 F.R.D. 398, 411 (E.D. Pa. 1981)). Rather, plaintiff must allege "the performance of substantial acts within the forum in furtherance of the conspiracy . . . 'of which the out-of-state [defendant] was or should have been aware.'" *Arthur Treacher's*, 92 F.R.D. at 411 (citation omitted); *see also Massachusetts School of Law*, 846 F. Supp. at 379-80. Clearly that standard had been met here. Rogers was not merely a resident of Pennsylvania; two elements of the Flashpoint Enterprise were physically located here (¶¶ 17(g), 18). It is a fair inference from the facts alleged in the Complaint that a substantial part of Rogers's participation in the "conduct of the affairs of the Flashpoint Enterprise" (¶ 51) — *i.e.*, the object of the conspiracy alleged in the Complaint — took place in and through his Pennsylvania operations. And, of course, Munson's admitted communications with Rogers in Pennsylvania means that Munson was aware of such activities.

> 3.   *The Exercise of Jurisdiction Does Not Offend Traditional Notions of Fair Play and Substantial Justice*

Once the minimum contacts requirement has been satisfied, the question turns to whether "the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Burger King Corp.* v. *Rudzewicz*, 471 U.S. 462, 476 (1985) (citations omitted). If the plaintiff has made out a *prima facie* case of minimum contacts, "the defendant '*must present a compelling case* that the presence of some other considerations would render jurisdiction unreasonable.'" *Grand Entertainment, supra*, 988 F.2d at 483 (quoting *Carteret Savings Bank*, 954 F.2d at 150, quoting *Burger King*, 471 U.S. at 477; emphasis added; internal quotation marks omitted). In determining whether a defendant has met this heavy burden, the court must weigh the claimed inconvenience to the defendant against a variety of factors, including "the interests of the forum State, . . . the plaintiff's interest in obtaining relief[,] . . . 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies[,] and the shared interest

-16-

of the several States in the furthering of fundamental social policies.'" *Grand Entertainment*, 988 F.2d at 483 (quoting *Asahi Metal Industry Co.* v. *Superior Court*, 480 U.S. 102, 113 (1987)).

This is not an even-handed balancing test: a heavy thumb is placed on the side of exercising jurisdiction. As the Supreme Court has said, "[w]hen minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant." *Asahi*, 480 U.S. at 114. Indeed, in finding jurisdiction over co-defendant Forrest in *Lexington I*, this Court cited the above quotation from *Asahi* and noted: "Defending a lawsuit in a foreign country is a burden. It is not, however, an unjustifiable burden." *Lexington I*, *supra*, 263 F. Supp. 2d at 995 (citation omitted).

Consequently, if the defense of this lawsuit in Pennsylvania was found not to be an unjustifiable burden for Forrest — also a resident of the United Kingdom — it cannot be considered an unjustifiable burden for Munson or Tarlo Lyons. Munson knew the Hollywood Funding film financing transactions were insured by Lexington, a U.S. insurance carrier. He also knew — not only as Flashpoint's attorney but also as a shareholder in the Flashpoint companies — that (as this Court previously found), Flashpoint has substantial connections to the United States. *Id.* Given Munson's authorization of drawdowns to transmit funds obtained by Flashpoint's film financing transactions to numerous entities in the United States (primarily in California) and Munson's ongoing interactions with Rogers in California and Fink in California, as this Court said with respect to Forrest, "[a]lthough inconvenient, this litigation should not have been an unforeseen consequence of . . . business dealings with the United States and is not unjustifiably burdensome." *Id.*

Furthermore, in *Grand Entertainment* the court concluded that the burden of defending a lawsuit in Pennsylvania was not so severe as to deprive Spanish defendants of due process when an officer of the defendant corporation had "shown his ability to conduct business in the United States and had actively carried on substantial activities" in the United States. *Grand Entertainment*, 988 F.2d at 483. Munson has shown his ability and willingness to travel to the

United States and conduct business with clients and others here.  (Munson Aff't ¶ 16)  He admits traveling to California twice on Flashpoint's behalf.  Although the trips might not, according to Munson's Affidavit, have been substantial in number, they played a significant role in developing the Flashpoint Enterprise.  If they did not, there would have been no reason for Munson to travel from London to California in lieu of faxes or telephone calls to California.  The California trips are relevant in rebutting any claim by Munson of undue hardship or lack of forseeability.  *Grand Entertainment*, 988 F.2d at 483.  Munson thus has not begun to make a "compelling case" that the exercise of jurisdiction here would violate due process.

In *Lexington I*, the Court set forth a number of reasons for its conclusion that "fair play and substantial justice" allowed it to proceed against Forrest:

- "Forrest has shown his ability to conduct business in the United States and has actively carried on substantial activity here."  263 F. Supp. 2d at 995 (internal quotation marks omitted).

- "Although inconvenient, this litigation should not have been an unforeseen consequence of Forrest's business dealings with the United States and it is not unjustifiably burdensome."  (*Id.*)

- "[T]his litigation is of concern to the Commonwealth of Pennsylvania . . . .  This interest justifies any burden that Forrest might encounter in defending suit in the Eastern District of Pennsylvania."  (*Id.*)

- "This loss [by Lexington] evinces an interest in securing relief and outweighs any burden Forrest might bear if this court exercises personal jurisdiction over him."  (*Id.*)

- "I find that Forrest has not shown that defending himself in this forum would be so unreasonable as to deprive him of his right to fair play and substantial justice."  (*Id.* at 995-96)

These same conclusions are as applicable to Munson as they were to Forrest, and the same result should be reached by the Court as to Munson's (and Tarlo's) motions to dismiss on the grounds of a lack of personal jurisdiction.

Munson and Tarlo spend much time arguing that Munson merely provided professional services and did not participate in the "operation or management" of any scheme, as required by the Supreme Court's decision in *Reves* v. *Ernst & Young*, 507 U.S. 170 (1993). (Tarlo Mem. at 17-23)  Since they have not moved to dismiss the RICO claim under Rule 12(b)(6) for failure to state a claim, it is difficult to tell why they are raising this point.  They can argue this point to the jury, or even on summary judgment if they are so advised, but it has nothing to do with whether there are sufficient contacts to support jurisdiction over them.

In any event, the point is not merely irrelevant; it is also wrong.  Although an attorney will not be subject to liability for performing routine legal services, behavior prohibited by the RICO statutes

> "will violate RICO regardless of the person to whom it may be attributed, and we will not shrink from finding an attorney liable when he crosses the line between traditional rendition of legal services and active participation in directing the enterprise.  The polestar is the activity in question, not the defendant's status." *Handeen* v. *Lemaire,* 112 F.3d 1339, 1349 (8th Cir. 1997); *see also Clark* v. *Milam*, 847 F. Supp. 409, 417 (S.D. W. Va. 1994) (declining to dismiss allegation that accountants "knowingly concealed the activity of other defendants who exercised day-to-day control over the enterprise").

At the very least, the knowing connivance and active assistance rendered by Munson and Tarlo to the fraudulent drawdowns — knowingly and intentionally abdicating the Tarlo Lyons signature requirement, an express contractual safeguard that they themselves had participated in creating — crossed any line between professional advice and criminal conduct.  Munson and Tarlo Lyons clearly participated in the operation and management of the enterprise, which as Tarlo Lyons notes is the test for determining a professional's RICO liability (*See* Tarlo Mem. at 16-18).

Moreover, the Supreme Court has made clear that the "operation or management" test does not limit RICO liability to "upper management" because "[a]n enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management." *Reves*, 507 U.S. at 184.  "In so holding, the Court made

clear that RICO liability may extend to those who do not hold a managerial position within an enterprise, but who do nonetheless knowingly further the illegal aims of the enterprise by carrying out the directives of those in control." *United States* v. *Parise*, 159 F.3d 790, 796 (3d Cir. 1998)

In the instant case, Munson did not act in a perfunctory advisory capacity, as he and Tarlo would have the Court believe, but was a direct and necessary participant. He knowingly performed tasks that induced Lexington to continue its business relationship with companies in which Munson admittedly had a 7.5% ownership interest (¶¶ 37-41). Munson continued his activity in successive and separate transactions needed to cover the tracks of the Flashpoint Enterprise as the fraud progressed — the classic Ponzi format — despite his knowledge that funds raised were being diverted for other than their dedicated purposes (¶¶ 32-34). Indeed, as stated above, Munson's acts were RICO predicate acts (¶¶ 47, 51).

Furthermore, the defendants' citation of *Reves*, and myriad other cases, for the proposition that a defendant must participate in the "operation or management" of an enterprise to be found liable under the RICO statute ignores the fact that the allegations in the Complaint include a violation of § 1962(d) of that statute.[4] While we strongly believe that Munson was part of the "operation or management" of the Flashpoint Enterprise, section 1962(d) of RICO also makes it unlawful simply "to conspire to violate [§ 1962(a), (b) or (c)]."

And the test for liability under 1962(d) is not the *Reves* "operation or management" test. In *Smith* v. *Berg*, 247 F.3d 532 (3d Cir. 2001), the Third Circuit adopted the Supreme Court's

---

[4]      18 U.S.C. 1962(c) states:

"It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

18 U.S.C. 1962(d) states:

"It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

analysis in *Salinas* v. *United States*, 522 U.S. 52, 65-66 (1997), which held that § 1962(c) liability is not a prerequisite to § 1962(d) liability. Consequently, the *Smith* court held that conspiracy liability under § 1962(d) does not require satisfaction of the *Reves* "operation or management" test, but is governed by the "general principles of criminal conspiracy law." 247 F.3d at 538. Those principles require only that the defendant "share[s] a common purpose" with his co-conspirators and "knowingly agrees to facilitate a scheme, which includes the operation or management of a RICO enterprise." *Id.* at 537-38; *see also Flood* v. *Makowski*, 2004 WL 1908221, at *26-27 (M.D. Pa. Aug. 24, 2004) ("The Supreme Court has been very clear that RICO conspiracy under § 1962(d) should be analyzed consistent with common law concepts of conspiracy. 'One can be a conspirator by agreeing to facilitate only some of the acts leading to the substantive offense. . . .'") (quoting *Salinas*, 522 U.S. at 65). Clearly, while Lexington believes, and believes it has demonstrated, that Munson was a participant in the "operation or management" of the Flashpoint scheme, at the very least it has shown that he agreed to and knowingly facilitated it.[5]

Tarlo also claims that it must "defend an almost identical lawsuit" in London and "must pay counsel in two actions" (Tarlo Mem. at 15) and that this violates traditional notions of fair play and substantial justice. Munson also claims that "Lexington is conducting parallel litigation in the United Kingdom, asserting essentially the same allegations against Munson and Tarlo Lyons" (Munson Mem. at 4; *see also id.* at 15.) However, Lexington's London action against Tarlo and Munson has now been stayed pending the resolution of the instant action pursuant to an agreement by Tarlo and Lexington and approved by the English court. (A copy of the English court's approval of the parties' stay is annexed as Exhibit S to the Krugman Declara-

---

[5]    The defendants in *Smith* argued that that such a "knowingly facilitated" definition of conspiracy would impose liability on those who "merely provide services." The Third Circuit responded: "This phrase masks the fact that liability will only arise from services which were purposefully and knowingly directed at facilitating a criminal pattern of racketeering activity. If the appellants repeated characterization of themselves as *innocent* service providers is not belied by the evidence, they will incur no liability under section 1962(d)." *Smith*, 247 F.3d at 537 n.11 (emphasis in original). Based on the documents to and from Munson noted above, Munson cannot be considered only an "innocent service provider[]."

tion.) While Tarlo claims that the cost to defend the action in this Court "would be substantially more than would be true for defense of the case in London" (Tarlo Mem. at 15), Tarlo nevertheless agreed to stay the London action.

## B.    The Impact of Rule 4(k)(2)

For the reasons set forth above, we believe it is clear that the Court has jurisdiction over Munson and Tarlo under Rule 4(k)(1)(A) and the Pennsylvania long-arm statute. Should the Court disagree with this conclusion, however, it must then consider the impact of Rule 4(k)(2) which provides:

> "If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state."

The second and third requirements of Rule 4(k)(2) are plainly met here:  Munson and Tarlo do not challenge the effectiveness of the service of the summons,[6] and Lexington's RICO claims unquestionably arise under federal law.  We address the fourth requirement (lack of jurisdiction in "the courts of general jurisdiction of any state") below.  First, however, we demonstrate what, we submit, is absolutely clear — that Munson and Tarlo "possess sufficient contacts with the nation as a whole to subject [them] to United States' law." *Eggear* v. *Shibusawa Warehouse Co.*, 2001 WL 267881, at *4 (E.D. Pa. Mar. 19, 2001) (citation omitted).  Under this "national contacts" test, "a defendant's contacts with the forum state play no magical role in the Fifth Amendment analysis"; instead, courts must "examine a defendant's aggregate contacts with the nation as a whole rather than his contacts with the forum state." *Republic of Panama* v. *BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 946-47 (11th Cir. 1997) (citation omitted).

---

[6]    Lexington personally served its summons and complaint on Munson and Tarlo in England, and the appropriate United Kingdom agency certified this service, which is a method of service permitted under Fed. R. Civ. P. 4 and the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters.

In the first place, of course, there are all of Munson's faxes and mailings with Rogers in Pennsylvania, set forth above. With respect to national contacts, Munson also admits that he traveled to California on behalf of Flashpoint to meet with other lawyers regarding contract issues (Munson Aff't ¶ 16). As alleged in the Complaint, Munson knowingly caused misappropriated funds to be delivered to Regent Entertainment, The Building LLC, New Beginnings/Filmworks, and New Standard Post, all based in Los Angeles (¶¶ 32-34). Indeed, through The Building, New Beginnings, and New Standard Post, the Flashpoint Enterprise had a permanent physical location in California (¶ 18). Flashpoint companies, in which Munson had an ownership interest, co-produced in excess of ten films with the Los Angeles-based Regent Entertainment production company, produced four movies with the Los Angeles-based Award Entertainment production company, and were involved with financing for Edgewood Studios, a Vermont-based production company (Krugman Dec. Ex. T at 6, 13). Tarlo refers to the brochure distributed by Flashpoint in the United States (*id.*) which figured prominently in the Court's opinion on Forrest's and Rogers' motions to dismiss (263 F. Supp. 2d at 995) and says "it is believed that these brochures do not refer to Tarlo Lyons" (Tarlo Mem. at 24). In fact, they do. Tarlo Lyons' name and address appears on a page listing the various lawyers and accountants representing Flashpoint. (Krugman Dec. Ex. T at p. 17)

And, there was extensive communication initiated by Munson with Martin Fink, a resident of California, who was responsible for Flashpoint's operations in California. This correspondence included:

- a February 3, 1998 letter enclosing a redraft of the Master Agreement and Production and Finance Agreement with Regent Entertainment;

- a July 17, 1997 letter enclosing a redraft of the Master Agreement and Production and Finance Agreement for each film in Flashpoint's 7.23 slate of films;

- a September 18, 1998 fax enclosing a draft Memorandum of Agreement with respect to Prosperity Pictures;[7]

- a February 13, 1998 letter describing meetings he and Forrest had with an individual named Robbert Aarts regarding "exploitation arrangements relating to the 7.23 slate and in particular the recoupment priority as between Flashpoint, Filmwave and 7.23 Productions"; and

- a February 7, 2000 fax with respect to a Subordination Agreement for the film "Beautiful."

(Copies of the above Munson to Fink correspondence is Exhibit U to the Krugman Declaration.) Munson also corresponded regularly with Fink with respect to payments that he was required to authorize for the numerous Flashpoint film projects that were proceeding in California. For example, in a May 13, 1998 fax, Munson advised Fink that:

> "David and I have signed bank authorities for draw downs on 'Silent Storms', 5 through 9, totalling $298,365 and 'Monsters' draw downs, 2 through 4, totalling $667,818. The payments will be sent by the bank first thing tomorrow morning" (Krugman Dec. Ex. V).

There can be, we submit, no doubt that Munson has sufficient "national contacts" to subject him (and, thus, Tarlo) to jurisdiction under Rule 4(k)(2).

As the litany of United States contacts makes clear, however, Munson and Tarlo are almost certainly subject to jurisdiction in California, since that state, like Pennsylvania, asserts personal jurisdiction over non-residents to the fullest extent permitted by the Constitution. Cal. Code Civ. Proc. § 410.10; *Von Cos.* v. *Seabest Foods, Inc.*, 926 P.2d 1085, 1091 (Cal. 1996), *cert. denied*, 522 U.S. 808 (1997). If this is true, then jurisdiction over Munson and Tarlo does *not* exist under Rule 4(k)(2), since it will *not* be the case that there is no jurisdiction over Munson and Tarlo in "the courts of general jurisdiction of any state." In these circumstances, however, the appropriate course is not to dismiss but to transfer this action to the Central District of California pursuant to 28 U.S.C. § 1631.[8] *See Founds* v. *Shedaker*, 278 F. Supp. 32, 33 (E.D.

---

[7]    A copy of this fax also was faxed to Rogers in Pennsylvania.

[8]    Section 1631 provides:

*Footnote continued on next page.*

Pa. 1968) ("It is clear that this Court does have the power . . . to transfer . . . despite the lack of personal jurisdiction over the defendant" and that transfer was appropriate since dismissal would preclude plaintiffs from bringing their claim due to the statute of limitations (collecting authority); *Romann* v. *Geissenberger Manufacturing Corp.*, 865 F. Supp. 255, 263-64 (E.D. Pa. 1994) (Joyner, J.) (transferring under U.S.C. §§ 1404(a), 1631 to cure want of personal jurisdiction), *partially abrogated on other grounds in Eagle Traffic Control, Inc.* v. *James Julian, Inc.*, 933 F. Supp. 1251 (E.D. Pa. 1996).[9] As this Court held in *Ward* v. *Hampton Psychiatric Hospital*, 1993 WL 419143 (E.D. Pa. Oct. 19, 1993), transfer instead of dismissal is particularly appropriate where, as here, a statute of limitations may have run since the filing of the original action.[10]

We reiterate that, in view of the Court's ruling in *Lexington I* that Forrest is subject to personal jurisdiction in Pennsylvania, and the discussion above as to personal jurisdiction in

---

*Footnote continued from previous page.*

"Whenever a civil action is filed in a court as defined in section 610 of this title or any appeal, including a petition for review of administrative action, is noticed for or filed with such a court and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court in which the action or appeal could have been brought at the time it was filed or noticed, and the action or appeal shall proceed as if it had been filed or noticed for the court to which it is transferred on the date upon which it was actually filed in or noticed for the court from which it is transferred.

[9]   If there is jurisdiction over Munson and Tarlo in California then the Central District of California is plainly a district where this action "could have been brought," since Forrest and Rogers are also subject to jurisdiction there because of their extensive contacts with Flashpoint's California operations, and Rogers as a United States resident, is subject to RICO's nationwide service of process provisions, 18 U.S.C. § 1965(b), (d). The other two defendants, Fink and New Beginnings Enterprises, are California residents. Indeed, Fink has brought an action in California state court, which Lexington removed to federal court, seeking, in part, a declaratory judgment with respect to the film, Beautiful, that is the mirror opposite of Lexington's Eighth Claim for Relief in this action (Complaint ¶¶ 88-92). In this California action, Lexington has brought a counterclaim against Fink and New Beginnings, asserting against them the same causes of action that are asserted against them in this action. Lexington has moved to transfer Fink's California action to this Court to be consolidated with or heard in conjunction with this action. Oral argument on the transfer motion is scheduled for October 18, 2004.

[10]  The RICO statute of limitations if four years, *Agency Holding, Corp.* v. *Malley-Duff & Associates, Inc.*, 483 U.S. 143, 156 (1987), and the Jules Verne transaction (Hollywood Funding 4) closed in July 1998, more than four years ago. Although plaintiff has pleaded equitable tolling on the basis of defendants' fraudulent concealment (¶¶ 65-68), and it may be argued that Lexington's claims did not accrue in any event until it incurred the out-of-pocket losses that are the basis for its damages claims in this action, it is obviously undesirable for there to be any risk at all that the statute will be held to have run on a newly commenced action.

Pennsylvania over Munson and Tarlo, we do not believe that the Court will need to reach this point. It is plain that personal jurisdiction over Munson and Tarlo exists in Pennsylvania and the entire action can and should continue before this Court, which already has invested substantial time and effort on this case. If the Court disagrees, however, we respectfully submit that, because of the substantial nexus that California has to all the defendants and to the claims asserted against them by Lexington, the Court should transfer this action to California *in lieu* of dismissing Munson and Tarlo.

### C.     *Munson and Tarlo Lyons Cannot Hide Behind the "Corporate Shield"*

Munson's invocation of the "corporate shield" or "fiduciary shield" doctrine as a defense to personal jurisdiction is without merit. This doctrine, Munson argues, prevents any contacts undertaken in his corporate capacity from serving as a basis for personal jurisdiction over him as an individual (Munson Mem. at 17-20). Munson does not cite any RICO cases in support of this proposition, however, and for good reason. Despite Munson's attempt to imply otherwise, it is well-settled — and this Court affirmed in *Lexington I* — that the fiduciary shield doctrine simply does not apply in RICO cases.[11] In *Lexington I*, the Court succinctly held that "[t]he corporate shield doctrine does not apply to RICO claims" and said: "As Forrest is accused of having violated RICO and of having caused two torts (fraudulent misrepresentations and tortious interference with a contract), he is amenable to personal jurisdiction regardless of what capacity he was acting in when he initiated contacts with this forum." 263 F. Supp. 2d at 994 n.8. This same conclusion is applicable to Munson. *Accord American Trade Partners*, 755 F. Supp. at 1303 n.17 (noting that the fiduciary shield doctrine is solely a creature of state law and should

---

[11]     In his Memorandum (at p. 18), Munson cites several cases for the proposition that "[e]ven when the plaintiff asserts an 'exception' for alleged tortious acts or acts under a statutory scheme — such as civil RICO — that may expose the corporate actor to personal liability (if he violated such tort or statute), the court must still analyze (1) the officer's alleged role in the corporate structure; (2) the quality and nature of the officer's alleged contacts; and (3) the extent of the officer's role in the alleged conduct." Again, however, none of the cases cited in support of this proposition are RICO cases and the fiduciary shield doctrine in the RICO context is not quite so complicated: As stated, it simply does not apply.

not apply to determination under § 1965); *Prime Leasing, Inc.* v. *CMC Lease, Inc.*, 1999 WL 1285847, at *5-6 (N.D. Ill. Dec. 29, 1999); *United Power Ass'n* v. *L.K. Comstock & Co.*, 1992 WL 402906, at *5 (D. Minn. Oct. 27, 1992); *Merchants National Bank* v. *Safrabank*, 1991 WL 173781, at *2 (D. Kan. Aug. 28, 1991); *Obee* v. *Teleshare, Inc.*, 725 F. Supp. 913, 915 (E.D. Mich. 1989); *Nordic Bank PLC* v. *Trend Group, Ltd.*, 619 F. Supp. 542, 569 n.30 (S.D.N.Y. 1985).

Even outside the context of federal statutes, courts in this district have generally rejected the fiduciary shield doctrine. To be sure, some courts in the non-RICO context have weighed various factors to determine whether a defendant's corporate contacts are relevant to the jurisdictional inquiry, as Munson suggests must be done here (Munson Mem. at 18). However, in line with the growing disfavor into which the fiduciary shield doctrine has fallen,[12] courts in this district have more recently stated that "[i]t appears that this [fiduciary shield] doctrine was soundly rejected by the Supreme Court of the United States in *Calder* when it observed that defendants' 'status as employees does not somehow insulate them from jurisdiction.'" *General Electric Capital Corp.* v. *Alleco, Inc.*, 2001 WL 253850 (E.D. Pa. Mar. 13, 2001) (quoting *Calder* v. *Jones*, 465 U.S. 783, 790 (1984)); *see also Forbes* v. *Eagleson*, 1997 U.S. Dist. LEXIS 18052, at *20 (E.D. Pa. Nov. 7, 1997) ("If the [corporate shield] doctrine were ever viable in Pennsylvania, however, it almost certainly is no longer in light of *Calder* v. *Jones*.") (footnote omitted); *United States* v. *Sun West Services, Inc.*, 2000 U.S. Dist. LEXIS 17193, at *23 (D.N.M. Apr. 11, 2000) ("More importantly, the Supreme Court opinion in *Calder* v. *Jones* seems to reject outright the constitutional underpinnings of the corporate shield rule.") (internal citation omitted).

---

[12] *See, e.g.*, Sonya Larsen, Annotation, *Validity, Construction, and Application of 'Fiduciary Shield' Doctrine — Modern Cases*, 79 A.L.R. 5th 587 (2000) ("Recently, the doctrine has come under increasing criticism from courts and commentators who argue that long-arm statutes and constitutional fairness concerns adequately protect corporate employees and assert that the doctrine unfairly prejudices plaintiffs who have valid claims against corporate defendants who have conducted affairs in the forum.").

Thus, it is quite clear that the purported fiduciary shield doctrine should have no effect on this Court's jurisdiction over Munson and Tarlo.

## II.

## THE EASTERN DISTRICT OF PENNSYLVANIA IS THE APPROPRIATE FORUM FOR THIS ACTION

Both Munson and Tarlo, presumably mindful of this Court's denial of Forrest's and Rogers' *forum non conveniens* motions in *Lexington I*, argue only briefly that the Complaint should be dismissed as to each of them on *forum non conveniens* grounds.[13]    Tarlo's and Munson's arguments on *forum non conveniens* are essentially those that Forrest and Rogers made in their *forum* motions, which the Court denied.  As the Court said in *Lexington I*:

> "Defendants have failed to demonstrate why bringing suit in the United States is so much more expensive or oppressive than litigating in England. . . .  Finally, there are no additional practical considerations that compel disregarding plaintiff's choice of forum.  The evidence, when evaluated with the deference owed to plaintiff's choice of forum, leads me to find that defendants have not demonstrated that the private interest factors weigh heavily in favor of dismissal." *Lexington I*, 263 F. Supp. 2d at 1001.

The Court then reached a similar conclusion as to the relevant public interest factors, noting that "[d]efendants' [Forrest and Rogers] arguments regarding the public interest factors are unpersuasive." (*Id.*)  The Court held:

> "If the defendants [Forrest and Rogers] did indeed use the U.S. mails and phone lines to perpetuate an elaborate fraud in Pennsylvania, Massachusetts and California, whereby a Delaware corporation lost millions of dollars, then it stands to reason that the United States would have an interest in regulating such conduct and in indemnifying its citizens for their losses." (*Id.* at 1002)

This observation applies equally to Tarlo and Munson who are alleged in the Complaint to have been part of the "elaborate fraud" described in the Complaint.  In *Lexington I*, the Court concluded:

---

[13]    Tarlo devotes just over two pages of a 26-page Memorandum to this issue; Munson incorporates Tarlo's arguments and adds just over one page of its 25-page Memorandum to this subject.

"Because I find that neither the private nor the public interest factors discussed above weigh heavily in favor of dismissal, defendants' motion to dismiss based on the doctrine of forum non conveniens is denied." *Lexington I*, 263 F. Supp. 2d at 1002.

Tarlo and Munson have not presented any arguments not presented by Forrest and Rogers in their *forum non conveniens* motion. Thus, the Court's ruling in *Lexington I* as to *forum non conveniens* should be its ruling on the *forum* motions of Tarlo and Munson.

The Court's prior ruling in this action as to *forum non conveniens* plainly governs the same motions made by Munson and Tarlo. With this action already proceeding in this forum as to Forrest and Rogers, moreover, it is difficult to see why or how there is *anything* to be said for sending the case against Munson and Tarlo back to England. Nevertheless, in an excess of caution and for the convenience and reference of the Court, Lexington now runs through the basic *forum non conveniens* analysis demonstrating that the instant motions should be denied even when considered without reference to prior and current proceedings in this case.

### A.    A Defendant Must Satisfy a High Burden of Proof on a Forum Non Conveniens Motion

Dismissal of a plaintiff's complaint on the ground of *forum non conveniens* is "the exception rather than the rule." *Lony v. E.I. DuPont de Nemours & Co.*, 935 F.2d 604, 609 (3d Cir. 1991) (citation and internal quotation marks omitted) ("*Lony II*");[14] *In re Corel Corp. Inc. Securities Litigation*, 147 F. Supp. 2d 363, 365 (E.D. Pa. 2001) (Brody, J.). The defendant bears the burden of persuasion on all elements of the *forum non conveniens* analysis. *Lony II*, 935 F.2d at 609. The defendant first must demonstrate that an adequate alternative forum exists. *Lacey v. Cessna Aircraft Co.*, 862 F.2d 38, 43-44 (3d Cir. 1988) ("*Lacey I*"), *rev'd after remand*, 932 F.2d 170 (3d Cir. 1991) ("*Lacey II*"). If an adequate alternative forum exists, and in *Lexington I*, the Court concluded that Britain was an appropriate alternative forum for the issues raised in the

---

[14]    *Lony v. E.I. DuPont de Nemours & Co.*, 886 F.2d 628 (3d Cir. 1989) ("*Lony I*"), *appeal after remand*, 935 F.2d 604 (3d Cir. 1991) ("*Lony II*").

Complaint, 263 F. Supp. 2d at 1000, then the defendant must show that several private and public interest factors weigh heavily in its favor, taking into account the considerable deference due to a plaintiff's choice of forum. *Id.* In *Lexington I*, the Court said that its analysis would be "mindful of two considerations:  (i) that plaintiff's choice of forum 'should rarely be disturbed;' and (ii) that defendants bear the burden of persuasion 'as to all elements of the *forum non conveniens* analysis' and they must show that the 'private and public interest factors weigh heavily on the side of dismissal.'" 263 F. Supp. 2d at 999 (citation omitted).  And, most importantly, if the evidence on the various factors considered by the court "are in equipoise, or even if they lean only slightly toward dismissal, the motion to dismiss must be denied," *Lacey II*, 932 F.2d at 180, and the plaintiff's choice of forum not disturbed.

Because defendants bear the burden of proof, Munson and Tarlo are required to show that "trial of the action in Pennsylvania [would result] in 'oppressiveness and vexation' . . . 'out of all proportion' to plaintiff['s] convenience." *Corel*, 147 F. Supp. 2d at 365 (quoting *Piper Aircraft Co.* v. *Reyno*, 454 U.S. 235, 241 (1981)).  Munson and Tarlo have not made and cannot make this showing, as demonstrated below.  Lexington's action against Munson and Tarlo should remain and proceed in this Court.

## B.    *Plaintiff's Choice of Forum Deserves "Considerable Deference"*

There is a strong presumption in favor of a plaintiff's choice of forum.  As noted in *Lexington I*, the Court said that "Plaintiff's choice of forum should rarely be disturbed." 263 F. Supp. 2d at 999 (citation and internal quotation marks omitted).  A court's analysis is not to be approached as a scholarly exercise in which a so-called "best" forum is sought focusing on location of witnesses, documents, convenience to the parties, etc.  In *forum non conveniens* jurisprudence, a plaintiff's choice of forum is granted "considerable deference" and "'should rarely be disturbed.'" *Lony II*, 935 F.2d at 608-09 (citation omitted); *Corel*, 147 F. Supp. 2d at 365.  This is especially true when the plaintiff selecting the federal forum is an American citizen, because a court can reasonably assume the choice is convenient. *See Piper Aircraft*, 454 U.S. at 255 n.23;

*Wiwa* v. *Royal Dutch Petroleum Co.*, 226 F.3d 88, 102 (2d Cir. 2000) ("[C]ourts should offer greater deference to the selection of a U.S. forum by U.S. resident plaintiffs. . . ."), *cert. denied*, 532 U.S. 941 (2001); *Lacey II*, 932 F.2d at 178 (citing *Piper Aircraft* for the proposition that there is a "strong presumption" in favor of plaintiff's choice). Where, as here, a defendant seeks dismissal in favor of a foreign, non-United States jurisdiction, the "home" forum for the plaintiff is not the judicial district in which he resides, but includes any federal district in the United States. *See Reid-Walen* v. *Hansen*, 933 F.2d 1390, 1394 (8th Cir. 1991).

Because Lexington is a United States corporation, with its principal place of business in Boston (Complaint ¶ 6), its choice of forum is entitled to "considerable deference." Courts routinely grant this deference to a corporate plaintiff's choice of forum, and the standard should be no different in this case. *See, e.g.*, *Peregrine Myanmar Ltd.* v. *Segal*, 89 F.3d 41 (2d Cir. 1996) (presumption in favor of corporate plaintiff's choice); *E.I. DuPont de Nemours & Co.* v. *Rhodia Fiber & Resin Intermediates, S.A.S.*, 197 F.R.D. 112, 125 (D. Del. 2000) (same), *aff'd in part, appeal dismissed in part*, 269 F.3d 187 (3d Cir. 2001); *Supra Medical Corp.* v. *McGonigle*, 955 F. Supp. 374, 384 (E.D. Pa. 1997) (corporate plaintiff's choice due "great deference").

To overcome Lexington's choice of forum, Munson and Tarlo must show that "trial of the action in Pennsylvania [will result] in 'oppressiveness and vexation' to [them] 'out of all proportion' to plaintiff['s] convenience." *Corel*, 147 F. Supp. 2d at 365 (citation omitted). In his argument on *forum non conveniens*, Munson claims that the burden of litigating this action in this forum would be "exceptional" (Munson Mem. at 23). As shown below, the evidence strongly supports the opposite conclusion — that this Court is the appropriate jurisdiction in which to resolve Lexington's Complaint against the defendants.

## C.    *The Private Interest Factors Do Not Favor Dismissal*

The Supreme Court has listed the following private interest factors to be considered when evaluating a motion to dismiss for *forum non conveniens*:

"[T]he relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Gulf Oil Corp.* v. *Gilbert*, 330 U.S. 501, 508 (1947).

*1.    Location of Documents and Evidence*

Defendants' racketeering enterprise, which involved fraud, misrepresentation and misappropriation of funds, had an international scope. The sources of proof in this case will involve documents, e-mails, phone conversations and other forms of communication taking place in multiple jurisdictions at multiple times. Lexington's corporate offices are located in Massachusetts and numerous documents relating to the transactions are located there. Rogers resides in this district. Relevant witnesses are located across the United States and England. As a result, documents and other relevant evidence exist in multiple jurisdictions, and the choice of any one jurisdiction will necessarily require transportation of documents.

The transportation of various documents to this jurisdiction from England and other United States districts does not constitute "oppressiveness and vexation" to Munson or Tarlo which, as noted above, must be established before an action will be dismissed on *forum non conveniens* grounds. As this Court has stated: "[w]hile the initial repository of most relevant documents may be in [a foreign country], this fact is of lesser significance in the modern electronic age. Documents can easily be photocopied or otherwise transferred to this jurisdiction." *Corel*, 147 F. Supp. 2d at 366 (involving witnesses and evidence located primarily in Canada); *see also DiRienzo* v. *Philip Services Corp.*, 294 F.3d 21, 30 (2d Cir. 2002) ("defendants have failed to explain how transporting the documents or copies of them would be 'oppressive' or 'vexatious'").

Even if this were not the case in the abstract, the same documents and testimony will be needed in the case against Munson and Tarlo as in the case against Forrest and Rogers, and thus will already be brought to this forum. This point applies both to the location of documents and to the location of witnesses/situs of conduct, to which we now turn.

2.    *Location of Witnesses/Situs of Conduct*

We treat these two items together because they both relate to the same underlying is-

sue — access to sources of proof.  This Court's asserted remoteness from the situs of the dis-

puted events is overstated and must in any event be considered a neutral factor, considering that

the conspiracy and fraud took place over a period of years and spanned multiple jurisdictions,

including England and the United States.  In addition, there are no premises that require viewing,

with the possible exception of the Los Angeles real estate purchased by defendants using misap-

propriated funds.

Furthermore, this is not a case involving a single tortious physical act such as a plane

crash or an environmental disaster, in which physical evidence and relevant witnesses are likely

to be located in one circumscribed area.  *See Piper Aircraft*, 454 U.S. at 238-39 (plane crash in

Scotland); *In re Union Carbide Corp. Gas Plant Disaster*, 634 F. Supp. 842 (S.D.N.Y. 1986)

(gas leak in India).  Nor does this case "involve substantial physical evidence that is difficult or

expensive to transport."  *Wiwa*, 226 F.3d at 107 (distinguishing sources of proof for claim under

Alien Tort Claims Act from sources of proof involved in *Piper Aircraft* and *Union Carbide*).

And, critical to the *forum non conveniens* analysis, a substantial amount of the con-

duct at issue took place within the United States.  Munson and Tarlo fail to mention that the fol-

lowing acts alleged in the Complaint all occurred in the United States:

- Defendants financed motion pictures and invested misappropriated proceeds of various financing transactions in the U.S (¶ 13).

- Defendants involved various United States entities in the conspiracy, all of which were under their control (¶¶ 17-18).  New Beginnings Enterprises, whose ownership defendants concealed from plaintiff, was a California entity (¶¶ 17-18, 30-31).

- Defendants transferred funds taken by fraud to various United States entities on a routine basis (¶¶ 33-34).

- Defendants misappropriated funds, diverting them to various California entities to purchase real estate in Los Angeles and to furnish unauthorized post-production facilities (¶ 33).

- Defendants perpetuated their conspiracy and committed fraud through numerous faxes and telephone calls between the United States, including Rogers's home in Pennsylvania, and the United Kingdom (¶ 47).

The above allegations set forth in the Complaint, are confirmed and expanded upon by a Flashpoint brochure distributed in the United States (Krugman Dec. Ex. T). The Flashpoint brochure emphasizes Flashpoint's United States connections. A chart entitled "the Flashpoint family" (*id.* at 3) indicates that:

- Premier Home Entertainment/New Spirit Entertainment is a "US based video distribution company for Flashpoint and external projects."

- New Beginnings Enterprises Inc. is "[t]he parent company of the Los Angeles operation providing administrative and management services."

- On the chart under New Beginnings Enterprises is New Standard Post, "[a] self-contained production facility located in the heart of Hollywood, capable of providing services for up to six films simultaneously."

- Also on the chart under New Beginnings Enterprises is "The Building," which is identified as "[o]wners of The Building in Hollywood in which NBE and all of its subsidiaries are located."

Additional pages in the Flashpoint brochure state that:

- Prosperity Pictures (involved in the HF5 proceeding) is "the in-house production company of New Beginnings Enterprises." (*Id.* at 6)

- Regent Entertainment (also involved in the HF5 proceeding), Rojak Films (HF2) and Award Entertainment (HF3) each is a "Los Angeles based production company." (*Id.* at 6)

- There are three sales agents within the "Flashpoint family," two in the United States, Artist View "[o]n the "West Coast of USA" and AKA Movies "on the East Coast [of the United States]." (*Id.* at 11)

- Edgewood Productions (part of HF6) is "a Vermont based production company." (*Id.* at 13)

Finally, the brochure identifies lawyers and accountants for Flashpoint (such as Tarlo Lyons), who are located in London, Los Angeles, and Beverly Hills. (*Id.* at 17)

Consequently, a number of witnesses and a large amount of the relevant documents are located in the United States. Most importantly, the Martin Fink documents, the Regent and Media Ventures documents, and documents from other sales agents for the motion pictures in question, such as Showcase and Filmwave, are all located in the United States.

Many of the individuals who have relevant knowledge pertaining to the insurance aspects of this film and who are likely to be deposed are United States-based and, in particular, California-based. Finally, there are a number of Lexington employees or former employees with knowledge of the relevant insurance issues.

Munson and Tarlo have failed to show and, in fact, are unable to show "oppressiveness and vexation" with regard to the testimony of witnesses. Lexington could make any of its relevant employees who reside in England available for this litigation as needed, and it is assumed that Tarlo would do the same. Munson and Tarlo point to the location of potential witnesses in the United Kingdom as reason for dismissal. Even if witnesses should be unwilling or unable to travel to the United States, that would not be grounds for a *forum non conveniens* dismissal. As this Court recognized in *Lexington I*, "'the need to resort to videotaped depositions, obtained through letters rogatory, should not mandate dismissal.'" 263 F. Supp. 2d at 1001, quoting *Corel*, 147 F. Supp. 2d at 366; *see also DiRienzo*, 294 F.3d at 30.

The evidence in this action will be mainly composed of testimony and documents. Defendants engaged in an international conspiracy involving conversations and representations, e-mails, and document distributions taking place in multiple jurisdictions. Some of the parties necessarily will be inconvenienced regardless of where the trial is held. The Court recognized this in *Lexington I* by noting that "[t]he complexity of this lawsuit's underlying facts proves that it will be costly and complicated wherever it is brought." 263 F. Supp. 2d at 1001. Munson and Tarlo have failed to show that the private interests in this case weigh heavily, if at all, in favor of a *forum non conveniens* dismissal.

-35-

**D.    *The Public Interest Factors Do Not Favor Dismissal***

A defendant seeking dismissal of a complaint on *forum non conveniens* grounds also must show that the public interest factors favor dismissal. Those factors include:

> "the administrative difficulties flowing from court congestion; the 'local interest in having localized controversies decided at home'; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty." *Piper Aircraft Co.* v. *Reyno*, 454 U.S. 235, 241 n.6 (1981).

### 1.    Interest of the Forum

This Court's decision in *Lexington I* is dispositive of this factor. In *Lexington I*, the Court held that "this forum has more than a negligible interest in the outcome of this case. RICO's availability within this forum testifies to its commitment to providing legal redress for victims of racketeering conspiracies. If the defendants did indeed use the U.S. mails and phone lines to perpetuate an elaborate fraud in Pennsylvania, Massachusetts, and California, whereby a Delaware corporation lost millions of dollars, then it stands to reason that the United States would have an interest in regulating such conduct and in indemnifying its citizens for their losses." 263 F. Supp. 2d at 1002. This conclusion, obviously, is just as applicable to Munson and Tarlo as it was to Forrest and Rogers.

Beyond that, this Court has already invested substantial resources in this action, and the action will proceed against the existing parties in any event. It is plainly in the interest of the forum that its efforts not be duplicated elsewhere.

### 2.    Burden of Jury Duty on Local Citizens

If a defendant's actions are related to the forum, then the concern about burdening citizens with jury duty is not implicated. *See Peregrine Myanmar*, 89 F.3d at 47. In addition, where an American company has suffered harm from a conspiracy involving an American defendant, local juries have an interest in hearing the dispute. *Cf. Corel*, 147 F. Supp. 2d at 367 n.2 (noting that local juries have an interest when American investors have suffered harm from pur-

chases made in the United States). The Court summarily disposed of this factor in *Lexington I*: "the risk that residents will be called to serve on a jury for this case does not weigh heavily in favor of dismissal. If defendants, by and through their actions in Gladwyne, conspired to effectuate the alleged Ponzi scheme, then a local jury has an interest in sanctioning such behavior insofar as it offends the laws of this forum." 263 F. Supp. 2d at 1002.

### 3.    Conflict of Laws

Because this is a RICO case, this Court will not be unduly burdened with unnecessary problems of conflict of laws or the application of foreign laws. The RICO claims are governed by federal law, and the pendent tort claims are routine common law claims that should not require extensive legal analysis. Even if English law should be deemed to apply to portions of the common law claims, "the fact that a federal court may be required to apply foreign law is not dispositive on the *forum non conveniens* issue." *Lehman* v. *Humphrey Cayman, Ltd.*, 713 F.2d 339, 345 (8th Cir. 1983), *cert. denied*, 464 U.S. 1042 (1984). "Federal courts are quite capable of applying foreign law when required to do so, and a district court's application of foreign law is a factual matter reviewable on appeal." *Id.* Here too, the Court in *Lexington I* rejected defendants' arguments. "So long as these RICO claims are legally viable, the possibility that British law will need to be applied by this court [with respect to Lexington's common-law claims] cannot outweigh the presumption against dismissal for *forum non conveniens*." 263 F. Supp. 2d at 1002.

### 4.    Relative Congestion of Court Dockets

In *Lexington I*, the Court commented: "While court congestion is a reality of the modern judicial system, this case does not represent the straw that might otherwise break the proverbial camel's back. The court is equipped to hear this case . . . ." *Id.* at 1001. And this Court previously stated in a similar case: "Whether or not the docket of the Eastern District of Pennsylvania is more congested than that of the Canadian courts, this case can be adjudicated

here without undue administrative difficulties." *Corel*, 147 F. Supp. 2d at 367. Indeed, defendants' failure to adduce proof on this subject requires weighing this factor *against* dismissal.

*    *    *

As noted above, this circuit subscribes to the standard that "[i]f, when added together, the relevant private and public interest factors are in equipoise, or even if they lean only slightly toward dismissal, the motion to dismiss must be denied." *Lacey II*, 932 F.2d at 180; *see also Lony II*, 935 F.2d at 613; *Corel*, 147 F. Supp. 2d at 365. Considering the deference that must be accorded to Lexington's choice of forum, the absence of any "oppressiveness and vexation" as a result of that choice, and the demonstrated strong tilt toward the United States of the public and private interest factors, the motions of Munson and Tarlo to dismiss on the grounds of *forum non conveniens* should be denied for the same reasons that this Court previously denied the identical *forum non conveniens* motions made by defendants Forrest and Rogers.

## CONCLUSION

For the reasons set forth above, the motions of Stanley Munson and Tarlo Lyons to dismiss Lexington's Second Amended and Supplemental Complaint as to each of them should be denied in their entirety.

Dated: October 12, 2004

CAHILL GORDON & REINDEL LLP

By: _____
Edward P. Krugman
80 Pine Street
New York, New York  10005
(212) 701-3000

*Of Counsel*:

    Kevin J. Burke
    Ira J. Dembrow

-and-

MONTGOMERY, MCCRACKEN, WALKER
    & RHOADS, LLP
123 South Broad Street
Philadelphia, Pennsylvania  19109
(215) 772-1500

*Of Counsel*:

    Jeffrey R. Lerman
    Glenn F. Rosenblum

*Attorneys for Plaintiff*