**EXPLANATION AND ORDER**

**May 6, 2003**

Case 2:02-cv-04435-AB    Document 86-9    Filed 10/12/2004    Page 2 of 21

personal injury lawsuit necessarily depends on the specifics of the particular lawsuit. As Prudential itself puts its: "the court must review the four corners of the policy along side the four corners of the complaint to determine whether coverage exists." *See* Pl.'s Mem. L. in Supp. Mot. Summ. J. at 4.

Prudential cannot escape the inconvenient fact that there is no longer a complaint or any corner of any articulated claim to which we may refer. To be sure, there may someday be a new personal injury lawsuit, but it may well contain different allegations and claims. Simply put, we are not in business to try to anticipate the allegations and claims that the tort plaintiffs *may* assert in another lawsuit. Federal courts do not make declarations in advisory settings. *See, e.g., Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937). Indeed, even where they otherwise have jurisdiction, federal courts in declaratory judgment actions avoid using their power under 28 U.S.C. § 2201 when prudence so counsels, as it clearly does here. *Wilton v. Seven Falls Co.,* 515 U.S. 277, 288–89, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995).

For all these reasons, we decline to decide whether Prudential P & C is liable for indemnification and defense in a personal injury lawsuit that no longer exists. By accompanying Order, we will dismiss plaintiff's declaratory judgment action without prejudice.

### ORDER

AND NOW, this 30th day of April, 2003, upon consideration of plaintiff's motion for summary judgment, defendants' response thereto, plaintiff's reply thereto, and defendants' April 10, 2003 letter attaching as an "addendum" to defendants' response to the motion for summary judgment the Stipulation of Dismissal in the underlying lawsuit, and in accordance with the foregoing Memorandum, it is hereby ORDERED that:

1. The Complaint for Declaratory Judgment is DISMISSED WITHOUT PREJUDICE;

2. The motion for summary judgment (Doc. No. 5) is DENIED WITHOUT PREJUDICE; and

3. The Clerk shall CLOSE this case statistically.



## LEXINGTON INSURANCE CO., Plaintiffs,

v.

## David FORREST, and T. Beauclerc Rogers, IV, Defendants.

### No. CIV.A. 02–4435.

United States District Court,
E.D. Pennsylvania.

May 6, 2003.

Insurance company brought suit alleging that "risk managers" fraudulently induced it to enter into film finance transactions in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), and that they also committed common law fraud and tortious interference with contract. On defendants' motions to dismiss, the District Court, Anita B. Brody, J., held that: (1) exercise of personal jurisdiction over subject of the United Kingdom resident was reasonable; (2) private and public interest factors did not weigh in favor of transferring suit to United Kingdom on ground of forum non conveniens; and (3) suit would not be stayed

pending ⟨
insurance ⟨
creditors. ⟨

Moti⟨

**1. Consti⟨**
   **Feder⟨**
   Fede⟨
to deter⟨
exercise ⟨
dant: (1) ⟨
whether ⟨
personal ⟨
determin⟨
al jurisdi⟨
dant's ⟨
U.S.C.A⟨

**2. Const⟨**
   Defe⟨
process ⟨
solved t⟨
whether ⟨
tacts wit⟨
reasonab⟨
court the⟨
of person⟨
ditional ⟨
justice. ⟨

**3. Feder⟨**
   For ⟨
personal ⟨
dant mu⟨
by which⟨
itself of ⟨
ties with⟨
the ben⟨

**4. Feder⟨**
   Nur⟨
from def⟨
ain to d⟨
ern Dis⟨
present ⟨
contacts ⟨
tion, wh⟨
mercial ⟨
the for⟨

pending outcome of British suit against insurance company by film production creditors.

Motions denied.

## 1. Constitutional Law ⟺305(4.1)
## Federal Courts ⟺76

Federal courts employ a two-part test to determine whether a federal court may exercise personal jurisdiction over a defendant: (1) court must begin by ascertaining whether state law permits the exercise of personal jurisdiction; and (2) court must determine whether the exercise of personal jurisdiction would comport with a defendant's federal due process rights. U.S.C.A. Const.Amend. 14.

## 2. Constitutional Law ⟺305(5)

Defendant's objections regarding due process and personal jurisdiction are resolved through a two-part inquiry: (1) whether the defendant has minimum contacts with the forum such that he should reasonably anticipate being haled into court there, and (2) whether the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice. U.S.C.A. Const.Amend. 14.

## 3. Federal Courts ⟺76.5

For minimum contacts requisite for personal jurisdiction to exist, the defendant must engage in some affirmative act by which the defendant purposely avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws.

## 4. Federal Courts ⟺86

Numerous faxes and telephone calls from defendant who resided in Great Britain to defendant who resided in the Eastern District of Pennsylvania sufficed to present a prima facie case of minimum contacts for purpose of personal jurisdiction, where communications involved commercial matters that, by occurring within the forum, benefitted from the laws of

Pennsylvania, and the communications gave rise to suit.

## 5. Federal Courts ⟺76

In evaluating the reasonableness of exercise of personal jurisdiction, district court considers following factors: (1) the burden on the defendant; (2) the interests of the forum state; (3) the plaintiff's interest in obtaining relief; (4) the judicial system's interest in judicial efficiency; and (5) the shared interests of the several states in furthering fundamental substantive social policies.

## 6. Federal Courts ⟺86

Exercise of personal jurisdiction over subject of the United Kingdom resident was reasonable in suit alleging scheme to defraud insurance company in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), considering that defendant showed his ability to conduct business in the United States and actively carried on substantial activities here, that Commonwealth of Pennsylvania had a legally-protected interest in preventing wire fraud from either passing through or occurring within its borders, and that judicial economy weighed in favor of exercising jurisdiction. 18 U.S.C.A. § 1961 et seq.

## 7. Federal Civil Procedure ⟺103.2, 103.3

Constitutional standing requires that the pleadings show: (1) an injury-in-fact; (2) caused by the named defendants or at least fairly traceable to the challenged action of the defendants; which (3) a favorable decision by the court would likely redress. U.S.C.A. Const. Art. 3, § 1 et seq.

## 8. Racketeer Influenced and Corrupt Organizations ⟺59

Insurance company had standing to bring suit alleging that "risk managers" fraudulently induced it to enter into film finance transactions in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO); insurance company

Case 2:02-cv-04605-AB    Document 86-9    Filed 10/12/2004    Page 4 of 21

stated injury-in-fact based on allegation that it suffered out-of-pocket loss of millions of dollars in form of legal fees incurred in a series of British lawsuits with film production creditors, injury was traceable to defendants' challenged actions, and a favorable decision by district court would likely redress the loss. 18 U.S.C.A. § 1961 et seq.

**9. Federal Courts ⊜12.1**

To determine whether a claim is ripe, a court must weigh: (1) the hardship to the parties of withholding court consideration; and (2) the fitness of the issues for judicial review.

**10. Federal Courts ⊜13**

Claim asserted by insurance company in suit alleging that "risk managers" fraudulently induced it to enter into film finance transactions in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO) was ripe for review; if court were to withhold review, company would be uncompensated for losses it incurred in third party litigation as a result of defendants' actions, and whether defendants' past communications within the forum constituted wire fraud and whether such frauds harmed company by forcing it to defend itself against third parties were questions that were fit for judicial review.

**11. Federal Courts ⊜45**

A district court may exercise its discretion and dismiss a case on ground of forum non conveniens, when an alternative forum has jurisdiction to hear the case, and when trial in the chosen forum would establish oppressiveness and vexation to a defendant out of all proportion to plaintiff's convenience, or when the chosen forum is inappropriate because of considerations affecting the court's own administrative and legal problems.

**12. Federal Courts ⊜45**

There are two stages of analysis in evaluating a forum non conveniens claim:

first, the court decides whether an adequate alternative forum exists; second, the court must evaluate several private and public interest factors.

**13. Federal Courts ⊜45**

For purposes of doctrine of forum non conveniens, an "adequate alternative forum" exists if the defendants are amenable to process in the other jurisdiction and the alternative forum permits litigation of the disputed subject matter.

See publication Words and Phrases for other judicial constructions and definitions.

**14. Federal Courts ⊜45**

For purposes of forum non conveniens motion, United Kingdom was an adequate alternative forum for suit by insurance company alleging that "risk managers" fraudulently induced it to enter into film finance transactions in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), considering that both defendants were amenable to jurisdiction in the United Kingdom, and that legal remedy for fraud was available in the United Kingdom. 18 U.S.C.A. § 1961 et seq.

**15. Federal Courts ⊜45**

Private interest factors that a court should consider on a forum non conveniens motion include: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process for unwilling witnesses; (3) the cost of obtaining witnesses; (4) the enforceability of a judgment, if one is obtained; and (5) all other practical problems concerning litigation.

**16. Federal Courts ⊜45**

Private interest factors did not weigh in favor of transferring fraud suit to United Kingdom on ground of forum non conveniens, where defendants failed to demonstrate why bringing suit in the United States was much more expensive or oppressive than litigating in England; more-

over, any ju[...] tion would [...] in the Unit[...] da, as defe[...] countries.

**17. Federa[...]**

Releva[...] forum non [...] administrat[...] court conge[...] ing localiz[...] home; (3) a[...] lems in con[...] of foreign [...] burdening [...] jury duty.

**18. Federa[...]**

Public [...] in favor of [...] ed Kingdom[...] veniens; al[...] law would [...] claims agai[...] in favor of [...] anced by th[...] the compla[...] Racketeer I[...] zations Act [...] federal law[...] claims were[...] that British[...] by district [...] presumptio[...] non conveni[...]

**19. Courts [...]**

Princip[...] low a distri[...] tion and dis[...] subject mat[...] the laws an[...]

**20. Courts [...]**

Dismiss[...] comity is ap[...] circumstanc[...] litigation, (2[...] forum, (3) t[...]

over, any judgment acquired in either nation would potentially require enforcement in the United States, England, and Canada, as defendants had assets in all three countries.

**17. Federal Courts ⟺45**

Relevant public interest factors in a forum non conveniens inquiry include: (1) administrative difficulties flowing from court congestion; (2) local interest in having localized controversies decided at home; (3) avoidance of unnecessary problems in conflict of laws, or the application of foreign law; and (4) the unfairness of burdening citizens in unrelated forum with jury duty.

**18. Federal Courts ⟺45**

Public interest factors did not weigh in favor of transferring fraud suit to United Kingdom on ground of forum non conveniens; although possibility that British law would govern plaintiff's common-law claims against defendants weighed heavily in favor of dismissal, it was counter-balanced by the fact that more than half of the complaint involved claims under the Racketeer Influenced and Corrupt Organizations Act (RICO) that were governed by federal law, and so long as the RICO claims were legally viable, the possibility that British law would need to be applied by district court could not outweigh the presumption against dismissal for forum non conveniens.

**19. Courts ⟺512**

Principles of international comity allow a district court to exercise its discretion and dismiss a case over which it has subject matter jurisdiction in deference to the laws and interests of another nation.

**20. Courts ⟺512**

Dismissal for reasons of international comity is appropriate only in extraordinary circumstances, including: (1) duplicative litigation, (2) inconvenience of the domestic forum, (3) the governing law, (4) the order in which jurisdiction was obtained, (5) the relative progress of each proceeding, and (6) the contrived nature of the domestic claim.

**21. Courts ⟺512**

Principles of international comity did not compel dismissal of insurance company's fraud suit in deference to courts of the United Kingdom where plaintiff was the object of a creditors' suit brought as a result of defendants' actions, considering that suit was not a duplicate of creditors' British suit, and that comparative drawbacks of bringing suit in either forum did not weigh heavily in defendants' favor; moreover, specter of a conflict of law problem was not "extraordinary" and did not require dismissal.

**22. Federal Courts ⟺65**

Federal courts have the power to stay an action based on the pendency of related proceedings in a foreign jurisdiction.

**23. Federal Courts ⟺65**

District court would not stay suit by insurance company alleging that "risk managers" fraudulently induced it to enter into film finance transactions in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), pending outcome of British suit against insurance company by film production creditors; while resolution of the British litigation would clarify whether insurance company had a claim for additional damages, it would not address company's alleged loss of millions of dollars in legal fees incurred in defending creditors' claims, and it would not determine whether defendants committed wire and mail fraud within the forum or whether those frauds unlawfully injured company. 18 U.S.C.A. § 1961 et seq.

———

Edward P. Krugman, New York City, Glenn F. Rosenblum, Philadelphia, PA, Ira

J. Dembrow, Scott M. Mory, New York City, Jeffrey R. Lerman, Philadelphia, PA, for plaintiffs.

Edward M. Dunham, Jr., James J. Rohn, Philadelphia, PA, Kevin Dooley Kent, Nicholas M. Centrella, Philadelphia, PA, for defendants.

### EXPLANATION AND ORDER

ANITA B. BRODY, District Judge.

On July 3, 2002, plaintiff Lexington Insurance Company ("Lexington") filed suit against defendants David Forrest ("Forrest") and T. Beauclerc Rogers, IV ("Rogers"). In its five-count complaint, plaintiff alleged that defendants, by and through various companies under their control, conspired to defraud Lexington of millions of dollars in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968 (Counts I–III), and that they also committed common law fraud (Count IV) and tortious interference with contract (Count V).

On September 12, 2002, Rogers filed a motion to dismiss plaintiff's complaint or, alternatively, stay the proceedings. His motion seeks dismissal of plaintiff's complaint on the following grounds: lack of subject matter jurisdiction, forum non conveniens, principles of international comity, and failure to state a claim for which relief can be granted. On November 4, 2002, Forrest filed an identical motion, save that he also alleges that the court lacks personal jurisdiction over him. For the reasons discussed below, I will deny defendants' motions.

### I. FACTUAL BACKGROUND

Plaintiff states that this litigation arises from the following alleged circumstances:

Defendants controlled a set of companies collectively referred to as "Flashpoint." Compl. ¶¶ 2, 3, 14. Defendant Rogers resides within the Eastern District of Pennsylvania, and several of the Flashpoint companies, including Flashpoint Ltd., are located at his home in Gladwyne, Pennsylvania. *Id.* ¶¶ 8, 14. Defendant Forrest is a subject of the United Kingdom, and Flashpoint UK Ltd. is organized and exists under the laws of that same nation. *Id.* ¶¶ 7, 12. Plaintiff is a Delaware corporation with its principal place of business in Massachusetts. *Id.* ¶ 6. It writes property and casualty insurance business in the United States and the United Kingdom. *Id.*

Defendants were in the business of securing financing for motion pictures. *Id.* ¶ 16. Typically, movies produced by independent film makers initially have few assets other than the anticipated success of their as-yet unfinished product. To secure bank loans or alternative forms of financing, production companies are sometimes required to enter into agreements with insurance companies that insure the investments of a film's creditors. By issuing what are known as "credit enhancements" for film production loans, insurers like Lexington agree to pay a film's creditors for any shortfall between the film's revenue stream and the face amount of its loan as of a specified "claim date." *Id.* ¶¶ 17, 18. Plaintiff maintains that defendants obtained insurance for film loans by promising to serve as "risk managers," meaning that Flashpoint would monitor a film's production and sales on behalf of the company insuring the film's loans. *Id.* ¶ 19. These promises allegedly induced Lexington to enter into eight film finance transactions with companies connected to defendants.[1] *Id.* ¶¶ 23, 29, 31–34, 38. According to plaintiff, these eight transactions constituted an elaborate Ponzi scheme, wherein the

defendants ...to pay o ones. *Id*

Plainti... on their ers for t ington a particula... (i) fraud sales rec jects tha priating films an... different from ins ments l... ("The B site in Post"), a... deliberate the proc... promised able film ton in o... ceeds to hiding th... Lexington successiv... 31–35.

Some the eight dants, a... into "H... point UK proceedi... bankrup... lapse of Flashpoi... *Id.* ¶¶ 3... contracts now emb... suits w... threaten... costing i...

You," through

---

[1]. Lexington refers to these eight transactions as "The New Professionals," "It Had to Be

defendants used funds from later projects to pay off those debts incurred in earlier ones. *Id.* ¶ 3.

Plaintiff claims that defendants reneged on their promises to serve as risk managers for those film projects insured by Lexington and connected to Flashpoint. In particular, plaintiff accuses defendants of (i) fraudulently inflating the estimated sales receipts of the various films and projects that Lexington insured, (ii) misappropriating funds from one set of insured films and applying those funds toward a different set, (iii) misappropriating funds from insured films for personal investments like a California office building ("The Building"), a film post-production site in Los Angeles ("New Standard Post"), and a chain of Russian cinemas, (iv) deliberately concealing their ownership of the production companies that they had promised to monitor, (v) removing a profitable film from a slate insured by Lexington in order to avoid using the film's proceeds to repay the insured loans, and (vi) hiding their misdeeds in order to induce Lexington to issue insurance policies for successive projects. *Id.* ¶¶ 20–23, 26, 29, 31–35.

Some time after Lexington entered into the eight financing agreements with defendants, and before defendants could enter into "Hollywood Funding No. 7," Flashpoint UK went into judicial administration proceedings, the British equivalent of bankruptcy. *Id.* ¶ 44. Following the collapse of defendants' alleged Ponzi scheme, Flashpoint's creditors have come calling. *Id.* ¶¶ 3–5. As a result of its insurance contracts with Flashpoint, Lexington is now embroiled in a series of British lawsuits with Flashpoint's creditors that threaten plaintiff's credit rating and risk costing it close to $200 million. *Id.* Lex-

ington has already spent several million dollars defending itself against these suits. *Id.* Neither the defendants nor Flashpoint are parties to the lawsuits against Lexington.

In support of its underlying legal claim, plaintiff alleges that: (i) the collection of Flashpoint companies that committed the alleged frauds constitutes an enterprise, (ii) defendants' frauds required the use of the mails and/or wire transmissions in interstate and foreign commerce and that numerous such communications occurred in furtherance of their scheme, (iii) defendants knowingly caused the transportation of fraudulently-obtained funds in interstate or foreign commerce, (iv) defendants agreed and conspired to commit the acts of racketeering activity alleged above, and (v) such conspiracy was at least partially implemented through phone and fax communications between Rogers in Gladwyne and Forrest in the United Kingdom. *Id.* ¶¶ 39, 40.

## II. DISCUSSION

Defendants' motions raise a number of issues. First, Forrest contends that this court lacks personal jurisdiction over him. Second, both defendants aver that plaintiff's complaint should be dismissed for lack of subject matter jurisdiction based on their arguments that (a) plaintiff lacks standing to make the complaint, and (b) that the complaint is not ripe. Third, the defendants maintain that the complaint should be dismissed based on the doctrine of *forum non conveniens.* Fourth, they seek dismissal based on principles of international comity. Fifth, they argue that plaintiff's complaint fails to state a claim upon which relief may be granted.[2] And, finally, if the court elects not to dismiss the complaint, defendants request that the

You," and "Hollywood Funding No. 1" through "Hollywood Funding No. 6"

2. Defendants' 12(b)(6) motions do not seek dismissal of plaintiff's entire complaint, but only counts I–IV, that is, the motions do not

court grant a stay pending resolution of the British lawsuits involving Lexington and Flashpoint's creditors.[3] I will address each of defendants' arguments in turn.

### A. Personal Jurisdiction Over Defendant Forrest

A complaint may be dismissed when the court lacks personal jurisdiction over a defendant. Fed.R.Civ.P. 12(b)(2). "[C]ourts reviewing a motion to dismiss a case for lack of in personam jurisdiction must accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff." *Carteret Sav. Bank, F.A. v. Shushan,* 954 F.2d 141, 142 n. 1 (3d Cir.), *cert. denied,* 506 U.S. 817, 113 S.Ct. 61, 121 L.Ed.2d 29 (1992) (citation omitted).

Unlike with Rules 12(b)(1) and 12(b)(6), the plaintiff may not rely on the pleadings alone to withstand a motion to dismiss for lack of personal jurisdiction. *Stranahan Gear Co., Inc. v. NL Indus.,* 800 F.2d 53, 58 (3d Cir.1986). Rather, "plaintiff bears the burden of establishing with reasonable particularity sufficient contacts between the defendant and the forum state to support jurisdiction." *Gehling v. St. George's Sch. of Med.,* 773 F.2d 539, 542 (3d Cir. 1985). This burden both distinguishes a Rule 12(b)(2) motion from other motions to dismiss and engenders a particular procedural posture: If the court neither conducts an evidentiary hearing nor permits limited discovery to determine personal jurisdiction, the plaintiff "need make only

a prima facie showing of jurisdiction through its affidavits and supporting materials." *Kishi Int'l v. Allstates Textile Mach., Inc.,* No. 96–6110, 1997 WL 186324, at *2 (E.D.Pa. April 11, 1997) (quoting *Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 904 (2d Cir.1981)). Plaintiff, however, "must eventually establish jurisdiction by a preponderance of the evidence, either at a pretrial evidentiary hearing or at trial." *Id.* (citation omitted).

[1] The federal courts employ a two-part test to determine whether a federal court may exercise personal jurisdiction over a defendant. First, because "[u]nder Fed.R.Civ.P. 4(k), a district court's personal jurisdiction is usually coextensive with that of courts of general jurisdiction in the state where the district court sits," *Electro Med. Equip. Ltd. v. Hamilton Med. AG,* No. 99–579, 1999 WL 1073636, at *2 (E.D.Pa. Nov.16, 1999), the court must begin by ascertaining whether state law permits the exercise of personal jurisdiction. *Grand Entm't Group, Ltd. v. Star Media Sales, Inc.,* 988 F.2d 476, 481 (3d Cir.1993). Second, the court must determine whether the exercise of personal jurisdiction would comport with a defendant's federal due process rights. *IMO Indus., Inc. v. Kiekert AG,* 155 F.3d 254, 259 (3d Cir.1998). Pennsylvania's long-arm statute permits the exercise of personal jurisdiction to the full extent allowed by the Fourteenth Amendment and its guarantee of due process. 42 Pa. Cons.Stat. Ann. § 5322(b) (Purdon 1981);[4] *see also Time Share Va-*

cation Clu[b
F.2d 61, 6[
within Pen[
analysis use[
has persona[

[2] A d[
due proces[
resolved th[
ry. The c[
defendant [
forum "suc[
anticipate [
*World–Wid[
son,* 444 U[
L.Ed.2d 49[
exercise of [
with "tradi[
substantial [
*Washington[
154, 90 L.E[

[3] For [
"[t]he defer[
firmative ac[
posely avai[
ducting act[
thus invoki[
of its laws[

---

3. In his separate motion to dismiss, Forrest adopted and incorporated Rogers's arguments regarding standing, ripeness, forum non conveniens, principles of international comity, subject matter jurisdiction and the need for a stay. For this reason, I will attribute those arguments made in Rogers's brief to both defendants.

challenge the tortious interference claim, but only the RICO and fraud claims.

4. The Pennsylvania statute provides in relevant part that "the jurisdiction of the tribunals of this Commonwealth shall extend to all persons ... to the fullest extent allowed under the Constitution of the United States and may be based on the most minimum contact with this Commonwealth allowed under the Constitution of the United States." 42 Pa. Con. Stat. Ann. § 5322(b) (Purdon 1981).

5. There ar[
diction tha[
ulated in I[
cific jurisd[
when a de[
state are "[
*copteros N[
466 U.S. 4[
404 (1984)[
of or relat[
tacts with [
1868. To [
defendant [
cantly mor[
the non-re[
to establis[
*Nat'l Bank[
819 F.2d [
jurisdiction[
contacts w[
systematic.[
F.Supp. 10[

*cation Club v. Atlantic Resorts, Ltd.*, 735 F.2d 61, 63 (3d Cir.1984). Consequently, within Pennsylvania the two stages of analysis used to determine whether a court has personal jurisdiction collapse into one.

[2] A defendant's objections regarding due process and personal jurisdiction are resolved through a familiar two-part inquiry. The court must ask: (i) whether the defendant has minimum contacts with the forum "such that [he] should reasonably anticipate being haled into court there," *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), and (ii) whether the exercise of personal jurisdiction comports with "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945).[5]

[3] For minimum contacts to exist, "[t]he defendant must engage in some affirmative act 'by which the defendant purposely avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Grand*, 988 F.2d at 482

(quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)). The contacts alleged by plaintiff are Forrest's "numerous" faxes and telephone calls to Rogers in Gladwyne. Pl.'s Mem. of Law in Opp'n to Defs.' Mot. to Dismiss ("Pl.'s Mem.") at 12.[6]

[4] This Circuit takes a "highly realistic" approach to analyzing minimum contacts. *Mellon Bank (East) PSFS, Nat'l Assoc. v. Farino*, 960 F.2d 1217, 1224 (3d Cir.1992). For this reason, minimum contacts need not include a defendant's physical presence in the forum. *Quill Corp. v. North Dakota by and through Heitkamp*, 504 U.S. 298, 307, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992). Telephone calls and fax transmissions can create the requisite contacts. *See Grand*, 988 F.2d at 482, *Carteret Sav. Bank*, 954 F.2d at 147–48. The facts in *Grand* resemble those now in dispute. In *Grand*, a Spanish defendant accused of violating the RICO Act argued that the district court's exercise of in personam jurisdiction violated due process. The defendant, Ricardo Sanz Perez, was a Spanish national living in Spain who was

---

5. There are two categories of personal jurisdiction that satisfy the fairness standard articulated in *International Shoe*: general and specific jurisdiction. General jurisdiction exists when a defendant's contacts with the forum state are "continuous and systematic." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). Specific jurisdiction "arises out of or relates to" the defendant's limited contacts with the forum. *Id.* at 414, 104 S.Ct. 1868. To establish general jurisdiction over a defendant the plaintiff "must show significantly more" contact between the forum and the non-resident defendant than that required to establish specific jurisdiction. *Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Assoc.*, 819 F.2d 434, 437 (3d Cir.1987). General jurisdiction requires that the non-resident's contacts with the forum be "continuous and systematic." *Fields v. Ramada Inn, Inc.*, 816 F.Supp. 1033, 1036 (E.D.Pa.1993).

6. Plaintiff has not sought to prove that Forrest's contacts with this district were continuous and systematic. Thus, although it has not specified which of the two types of personal jurisdiction it believes applies to Forrest, I will presume that plaintiff is only arguing for specific jurisdiction.

Lexington also asserts that Forrest's contacts constituted wire fraud and that he could therefore be indicted and tried in this district. In support of this argument, plaintiff points to a Third Circuit Court of Appeals case that upheld prosecution for wire fraud where the relevant wire transfer merely passed through the district wherein defendant was convicted. *See United States v. Goldberg*, 830 F.2d 459, 465 (3d Cir.1987). The defendant in *Goldberg*, however, did not dispute the court's personal jurisdiction. Absent evidence to the contrary, the possibility of indictment does not amount to a minimum contact for the purposes of federal civil procedure.

connected to approximately twelve telexes sent to Bala Cynwyd, Pennsylvania regarding a contract negotiation.[7] On appeal, the Third Circuit found that Sanz Perez's telefaxes constituted minimum contacts with the Eastern District of Pennsylvania and that the district court's exercise of personal jurisdiction over the defendant accorded with notions of fair play and substantial justice. *Grand,* 988 F.2d at 476. Forrest's case bears a number of similarities to those of Sanz Perez. In both cases the defendants' communications involved commercial matters that, by occurring within this forum, benefitted from the laws of this state. *See id.* at 483. Like Sanz Perez, Forrest freely chose to communicate with this forum and the resulting communications gave rise to the lawsuit whose jurisdiction each man contested. *See id.* Based on these factual similarities and the Third Circuit's approval of the district court's exercise of personal jurisdiction over Sanz Perez, I find that Forrest's phone calls and faxes with this forum suffice to present a prima facie case of minimum contacts.[8]

Having found that minimum contacts exist, it remains to be determined whether the exercise of personal jurisdiction squares with notions of "fair play and sub-

stantial justice." *See Int'l Shoe,* 326 U.S. at 316, 66 S.Ct. 154. There is a heavy burden on a defendant who seeks to demonstrate a lack of fairness or substantial justice. *Grand,* 988 F.2d at 483. Once the plaintiff has made out a prima facie case of minimum contacts, "the defendant 'must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Carteret Sav. Bank,* 954 F.2d at 150 (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 477, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). For the reasons discussed below, I do not find that Forrest has made a sufficiently compelling case.

[5] In evaluating the reasonableness of a district court's exercise of personal jurisdiction, the Third Circuit considers the following factors: (i) the burden on the defendant; (ii) the interests of the forum state; (iii) the plaintiff's interest in obtaining relief; (iv) the judicial system's interest in judicial efficiency; and (v) "the shared interests of the several States in furthering fundamental substantive social policies." *Grand,* 988 F.2d at 483 (quoting *Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 113, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987)). I will now consider these factors in light of Forrest's motion.

---

7. These telexes seem to be Sanz Perez's only contacts with this forum, since it appears from the opinion that he never visited or called Pennsylvania.

8. Forrest argues that the "corporate shield" doctrine prevents his actions from constituting minimum contacts for jurisdictional purposes. *See* Forrest's Mot. to Dismiss at 15. Under this doctrine, "the actions of corporate employees and officers that are conducted within their corporate capacity do not constitute contacts with the forum that support jurisdiction over them." *Perry v. Markman Capital Mgmt., Inc.,* No. 02–744, 2002 WL 31248038, *4 (E.D.Pa.2002).

Even assuming, *arguendo,* that Forrest's contacts occurred while he was acting in his

official capacity, this doctrine does not prevent a court from exercising personal jurisdiction over defendant. The corporate shield doctrine does not apply to RICO claims. *Am. Trade Partners, L.P. v. A–I Int'l Importing Enters., Ltd.,* 755 F.Supp. 1292, 1303 n. 17 (E.D.Pa.1990). Nor does it apply to torts, for the "courts have refused to permit a corporate officer to invoke the shield when the officer was involved in tortious conduct...." *Lautman v. Loewen Group, Inc.,* No. 99–75, 2000 WL 772818, *5 (E.D.Pa.2000). As Forrest is accused of having violated RICO and of having caused two torts (fraudulent misrepresentation and tortious interference with a contract), he is amenable to personal jurisdiction regardless of what capacity he was acting in when he initiated contacts with this forum.

[6] Det
country is
at 114, 107
an unjusti
when "min
lished, oft
and the fo
tion will ju
placed on
again, I ta
the Spanis
rest "has s
ness in the
carried or
*Grand,* 988
to its brie
opening pa
Forrest. F
brochure re
related en
States. *Id*
Flashpoint'
tions is als
signature a
brochures.
two brochu
that "we a
audiences i
at 20. Rog
reaching a
successful
country sho
where a pa
ence or abi
is drawn in
outside the
483. Altho
should not
quence of F
the United
ably burden

Moreover
the Commo
*Goldberg* c
strates that
tected inter
from either
within its b

**[6]** Defending a lawsuit in a foreign country is a burden. *See Asahi*, 480 U.S. at 114, 107 S.Ct. 1026. It is not, however, an unjustifiable burden. *Id.* (noting that when "minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant"). Once again, I take my cue from *Grand*. Like the Spanish defendant in that case, Forrest "has shown his ability to conduct business in the United States and has actively carried on substantial activities here." *Grand*, 988 F.2d at 483. Plaintiff attached to its brief a Flashpoint brochure whose opening page is signed by Rogers and Forrest. Pl.'s Mem., Ex. TBR at 2. This brochure reveals at least seven Flashpoint-related entities located in the United States. *Id.* at 3. Forrest's connection to Flashpoint's U.S. subsidiaries and transactions is also documented by his prominent signature and picture on two Flashpoint brochures. *Id.* at 2, 20. In one of these two brochures, Rogers and Forrest state that "we are driven by a desire to reach audiences in every part of the world." *Id.* at 20. Rogers's demonstrated interest in reaching a U.S. audience and in developing successful commercial properties in this country shows that "[t]his is not a case where a party without a significant presence or ability to act in the United States is drawn into litigation as a result of acts outside the forum." *Grand*, 988 F.2d at 483. Although inconvenient, this litigation should not have been an unforeseen consequence of Forrest's business dealings with the United States and it is not unjustifiably burdensome.

Moreover, this litigation is of concern to the Commonwealth of Pennsylvania. The *Goldberg* case cited by plaintiff demonstrates that this forum has a legally-protected interest in preventing wire fraud from either passing through or occurring within its borders. *Goldberg*, 830 F.2d at

465. This interest justifies any burden that Forrest might encounter in defending suit in the Eastern District of Pennsylvania. *See Asahi*, 480 U.S. at 114, 107 S.Ct. 1026 ("When minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant.").

The plaintiff has an interest in obtaining relief. When evaluating a 12(b)(2) motion to dismiss, the court must "accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff." *Carteret Sav. Bank*, 954 F.2d at 142 n. 1. Plaintiff claims to have lost millions of dollars as a result of those fraudulent acts that occurred in this forum. This loss evinces an interest in securing relief and outweighs any burden Forrest might bear if this court exercises personal jurisdiction over him.

The concerns of judicial economy also weigh in favor of exercising jurisdiction. Dismissal of the suit against Forrest will not necessarily forestall suit in this forum. Regardless of where Lexington might sue Forrest or Rogers, Rogers remains connected to assets in this forum. Consequently, if plaintiff ever obtains a judgment against Rogers, it will have to come before this court if it is to enforce the judgment against Rogers's local assets. Dismissal of the present suit would therefore engender additional litigation in other forums without necessarily forestalling suit here. Such a proliferation of lawsuits would run counter to the interests of judicial economy.

Finally, there is no evidence that the social policies of the several States would suffer any harm by dint of this court's exercising jurisdiction in this matter. For these reasons and those expressed above, I find that Forrest has not shown that defending himself in this forum would be so

unreasonable as to deprive him of his right to fair play and substantial justice. *See Grand,* 988 F.2d at 484. Personal jurisdiction over defendant Forrest is therefore proper and his Rule 12(b)(2) motion is denied.

### B. Rule 12(b)(1): Subject Matter Jurisdiction

Rule 12(b)(1) allows the court to dismiss a suit for want of subject matter jurisdiction. Fed.R.Civ.P. 12(b)(1). There are two types of Rule 12(b)(1) motions. The first type, a facial attack, challenges only the court's subject matter jurisdiction. The second type, a factual attack, allows the court to question the plaintiff's facts after the defendant files an answer. *See Mortensen v. First Fed. Sav. and Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977). As defendants have not filed an answer, their motion is necessarily a facial attack.

It is unclear what standard of review governs facial attacks made via Rule 12(b)(1). The Third Circuit has "cautioned against treating a Rule 12(b)(1) motion as a Rule 12(b)(6) motion and reaching the merits of the claims" because "the standard for surviving a Rule 12(b)(1) motion is lower than that for a 12(b)(6) motion." *Gould Elecs. Inc. v. United States,* 220 F.3d 169, 178 (3d Cir.2000) (citation omitted). Nonetheless, the Third Circuit has also held that, when considering a facial attack under Rule 12(b)(1), "the trial court must accept the complaint's allegations as true." *Turicentro, S.A. v. Am. Airlines Inc.,* 303 F.3d 293, 300 n. 4 (3d Cir.2002) (citing *NE Hub Partners, L.P. v. CNG Transmission Corp.,* 239 F.3d 333, 341 n. 7 (3d Cir.2001)). Rule 12(b)(6) requires that a court considering a motion to dismiss draw all reasonable inferences in favor of the plaintiff. *Ford v. Schering–Plough Corp.,* 145 F.3d 601, 604 (3d Cir.1998). Because Rule 12(b)(1) has a more forgiving standard of review than that for Rule 12(b)(6), it logically follows that a court should also draw all reasonable inferences in the plaintiff's favor when considering a Rule 12(b)(1) defense.

Having determined that the court has personal jurisdiction over Forrest, the non-resident defendant, the question now becomes whether the court also has subject matter jurisdiction. Defendants raise two justiciability considerations in support of their argument that this court lacks subject matter jurisdiction: standing and ripeness. As some commentators have noted, discussions of standing and ripeness often blend together. *See* 13A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3531.12 (2d ed. 1984); Erwin Chemerinsky, *Federal Jurisdiction* § 2.4.1 (3d ed. 1999). For this reason it is practical to frame standing as an inquiry into whether a plaintiff has adequately stated an injury and to frame ripeness as an inquiry into whether a plaintiff's adequately-stated injury has occurred. *See* Wright & Miller, *supra,* §§ 3531, 3532. For the reasons discussed below, I find that plaintiff has demonstrated that it has standing to make its complaint and that the complaint is ripe.

#### 1. Standing

The doctrine of standing "consists of both a 'case or controversy' requirement stemming from Article III, Section 2 of the Constitution, and a subconstitutional 'prudential' element." *Pitt News v. Fisher,* 215 F.3d 354, 359 (3d Cir.2000). Defendants have not referred to the prudential element and this decision shall focus only on constitutional concerns.[9]

[7] Const
that the plea
fact; (ii) caus
or at least "
lenged action
(iii) a favorab
likely redress
*Athletic Ass'*
2002) (quotin
154, 167, 117
(1997)); *Doe*
199 F.3d 146,

[8] Defen
has failed to
particular, de
plaintiff does
legal fees. R
In the section
cusses standin
incorporates,
the requireme
The confusion
quote in the S
*ma S.P.R.L.*
479, 105 S.Ct.
upon which
*See* Rogers's
*ma* addresse
be brought u
tice White re
ond Circuit C
held that a su
ed to plead a
ed injury. 47
The question
plaintiff neede
text of a Rul
the district c
*Imrex Co.,*
(E.D.N.Y.198
review, Justi

within the zo
statute in qu
*Defenders of*
2130, 119 L.E
requirements
before me.

---

9. The Supreme Court has identified three prudential standing requirements. They are: (i) a general prohibition on allowing a plaintiff to raise the concerns of a third party, (ii) a prohibition on taxpayer suits wherein the grievance is common to all taxpayers, and (iii) a requirement that the plaintiff raise a claim

**[7]** Constitutional standing requires that the pleadings show: (i) an injury-in-fact; (ii) caused by the named defendants or at least "fairly traceable to the challenged action of the defendant[s]"; which (iii) a favorable decision by the court would likely redress. *Pryor v. Nat'l Collegiate Athletic Ass'n,* 288 F.3d 548, 561 (3d Cir. 2002) (quoting *Bennett v. Spear,* 520 U.S. 154, 167, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997)); *Doe v. Nat'l Bd. of Med. Exam'rs,* 199 F.3d 146, 152–53 (3d Cir.1999).

**[8]** Defendants argue that Lexington has failed to state an injury-in-fact. In particular, defendants argue that a RICO plaintiff does not have standing to recover legal fees. Rogers's Mot. to Dismiss at 16. In the section of Rogers's brief that discusses standing, which Forrest adopts and incorporates, defendants appear to conflate the requirements of 12(b)(6) and 12(b)(1). The confusion perhaps arises from a short quote in the Supreme Court decision, *Sedima S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), upon which defendants' argument relies. *See* Rogers's Mot. to Dismiss at 16. *Sedima* addressed what types of injuries could be brought under RICO. In *Sedima,* Justice White rejected a decision by the Second Circuit Court of Appeals, which had held that a successful RICO plaintiff needed to plead a "racketeering" or mob-related injury. 473 U.S. at 495, 105 S.Ct. 3275. The question of what type of injury the plaintiff needed to plead arose in the context of a Rule 12(b)(6) motion granted by the district court. *See Sedima S.P.R.L. v. Imrex Co., Inc.,* 574 F.Supp. 963, 965 (E.D.N.Y.1983). In deciding the case on review, Justice White commented that

*Sedima* "only has standing if, and can only recover to the extent that, [it] has been injured in [its] business or property by the conduct constituting the violation [of § 1962]." *Sedima,* 473 U.S. at 496, 105 S.Ct. 3275. Rogers, with Forrest's approval, appears to argue that this quote precludes a court from finding standing for a plaintiff who alleges losses incurred through legal fees. Rogers's Mot. to Dismiss at 16. There is, however, no discussion of the standing doctrine in *Sedima.* This void, together with the procedural posture of *Sedima,* which came before the Court after a dismissal on a Rule 12(b)(6) motion, leads me to conclude that constitutional standing requirements for deciding a 12(b)(1) motion are not governed by *Sedima.* The Third Circuit's observation that "determination[s] of the likelihood of success on the merits of the case is a separate inquiry from the threshold issue of Article III standing," supports this conclusion. *Pitt News,* 215 F.3d at 360.[10] Consequently, I reject defendants' interpretation of *Sedima.*

Lexington's out-of-pocket loss of millions of dollars in legal fees states an injury. When determining standing, the court must accept as true all material allegations set forth in the complaint, and must construe those facts in favor of the complaining party. *Storino v. Borough of Point Pleasant Beach,* 322 F.3d 293 (3d Cir.2003) (citing *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). The plaintiff has less money today than it did before defendants' alleged frauds occurred. This loss is concrete and actual. It is an injury-in-fact. *See Pitt News,* 215 F.3d at 360 (citing *Lujan v. Defenders of Wildlife,*

within the zone of interests protected by the statute in question. *See generally Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). None of these requirements are at issue in the case now before me.

**10.** Consistent with the Third Circuit's observation, I will reserve my determination of whether plaintiff's injury is sufficient to state a claim for the discussion of defendants' Rule 12(b)(6) motion below.

504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). Although defendants argue that plaintiff's injury is speculative because Lexington could conceivably win attorney's fees in the British lawsuits, pending parallel proceedings "should not preclude this RICO action, when all that defendants can say is that there is a 'distinct possibility' that plaintiffs will recover completely" in those proceedings. *In re Foundation For New Era Philanthropy Litigation*, No. 96–3554, 1996 WL 585577, *2 (E.D.Pa. Sept.4, 1996). The possibility that Lexington will recoup its loss, which plaintiff contests, does not preclude my finding an injury-in-fact. Moreover, those fees spent by Lexington pursuing creditors remedies in England will not be recompensed.

Turning to the second and third prongs of the standing test, I find that, as required by the second prong, plaintiff's injury is traceable to defendants' challenged actions and is an injury that this court can redress. Consequently, plaintiff has standing to sue for recovery. According to plaintiff's complaint, defendants' frauds caused it to spend millions of dollars in legal fees: but for defendants' purported misrepresentations and subterfuge, Lexington would not have incurred this loss. Based on the alleged but-for causation presented within the complaint, the injury is "fairly traceable" to defendants' alleged misdeeds. *See Pitt News*, 215 F.3d at 361. Finally, a favorable judgment for Lexington would compel defendants to make plaintiff whole by compensating it for its losses. This court can thus effectuate legal redress for plaintiff. *See id.* Plaintiff has therefore satisfied the three prongs of the constitutional requirements for demonstrating standing.

#### 2. Ripeness

[9, 10] "Intertwined" with Article III's requirement that a plaintiff demonstrate standing is the ripeness doctrine, "which

seeks to 'prevent the courts, through the avoidance of premature adjudication, from entangling themselves in abstract disagreements.' " *Artway v. Attorney Gen. of N.J.*, 81 F.3d 1235, 1246–47 (3d Cir. 1996) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *overruled on other grounds, Califano v. Sanders*, 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192(1977)). To determine whether a claim is ripe, a court must weigh: "(1) the hardship to the parties of withholding court consideration; and (2) the fitness of the issues for judicial review." *Planned Parenthood of Cent. N.J. v. Farmer*, 220 F.3d 127, 147–48 ( 3d Cir.2000) (quoting *Artway*, 81 F.3d at 1247). Judicial determination of an injury's ripeness are to be performed in "a pragmatic fashion." *Barmo v. Reno*, 899 F.Supp. 1375, 1379 (E.D.Pa.1995).

The difficult issue here is not whether Lexington's injury is ripe, but, rather, which injury is ripe. The legal fees incurred by plaintiff are not "abstract," for there is no question that this alleged injury has occurred. *See Artway*, 81 F.3d at 1247. If the court were to withhold review, plaintiff would be forced to go uncompensated for those losses it incurred as a result of defendants' alleged actions. This decision would constitute a hardship. Furthermore, whether defendants' past communications within this forum constituted wire fraud and whether these frauds harmed Lexington by forcing it to defend itself against third parties are questions that are fit for judicial review. Because Lexington has standing to make its complaint and because it has stated an injury that is ripe for review, I will not consider defendants' argument that plaintiff's risk of losing more money in the pending English litigation means that Lexington's complaint fails to satisfy the ripeness requirement of Article III. Defendants' concerns regarding plaintiff's alleged losses in legal fees are best addressed in the con-

text of its pertain to claim for v For the pu however, th

#### C. The I niens

The law r non conven "polestar" i conveniens *Reyno*, 454 L.Ed.2d 419 craft Co., 8 ("*Lacey I*"), 170 (1991) defendants v forum non the court w that it might *Piper*, 454 Based on bo trict court m support its d ic reasons fo 862 F.2d at 3

[11, 12] review, a di discretion ar alternative fo the case, an

11.  Rogers's
     Rhode Islar
     *Nova Ins. C*
     809 (D.R.I.1
     miss at 15.
     litigating aga
     and federal
     cases rested
     involved ide
     court procee
     on the feder
     dismissed the
     *Terra Nova,* t
     and related-
     though defen
     in the Britis
     that they are

text of its Rule 12(b)(6) motion, as they pertain to whether plaintiff has stated a claim for which relief can be granted.[11] For the purposes of conferring standing, however, these losses are ripe.

### C.  The Doctrine of Forum Non Conveniens

The law regarding the doctrine of forum non conveniens is well-established. The "polestar" in dealing with a forum non conveniens motion is *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981). *Lacey v. Cessna Aircraft Co.*, 862 F.2d 38, 39 (3d Cir.1988) ("*Lacey I*"), *rev'd after remand*, 932 F.2d 170 (1991) ("*Lacey II*"). *Piper* requires defendants who file motions to dismiss on forum non conveniens grounds to supply the court with enough information such that it might balance the parties' interests. *Piper*, 454 U.S. at 258, 102 S.Ct. 252. Based on both sides' submissions, the district court must "develop adequate facts to support its decision" and "articulate specific reasons for its conclusions." *Lacey I*, 862 F.2d at 39.

[11, 12]  Consistent with this posture of review, a district court may exercise its discretion and dismiss a case "when an alternative forum has jurisdiction to hear the case, and when trial in the chosen

---

[11]. Rogers's argument relies in part on a Rhode Island district court opinion, *Terra Nova Ins. Co., Ltd. v. DiStefano*, 663 F.Supp. 809 (D.R.I.1987). *See* Rogers's Mot. to Dismiss at 15. The plaintiffs in *Terra Nova* were litigating against the defendants in both state and federal court. The state and federal cases rested on the same set of facts and involved identical parties. Because the state court proceedings could have preclusive effect on the federal proceedings, the district court dismissed the federal case as unripe. Unlike *Terra Nova*, this case involves different parties and related—but different—sets of facts. Although defendants' alleged frauds are at issue in the British litigation, plaintiff has argued that they are neither dispositive nor exclusive.

forum would 'establish ... oppressiveness and vexation to a defendant ... out of all proportion to plaintiff's convenience,' or when the 'chosen forum' [is] inappropriate because of considerations affecting the court's own administrative and legal problems.' " *Piper*, 454 U.S. at 241, 102 S.Ct. 252 (quoting *Koster v. Am. Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 524, 67 S.Ct. 828, 91 L.Ed. 1067 (1947)). There are two stages of analysis in evaluating a forum non conveniens claim. First, the court decides whether an adequate alternative forum exists; second, the court must evaluate several private and public interest factors. The parties have raised a number of arguments and I will address them in the contest of this analytic frame. I will do so mindful of two considerations: (i) that Plaintiff's choice of forum "should rarely be disturbed," *Lacey I*, 862 F.2d at 43; and (ii) that defendants bear the burden of persuasion "as to all elements of the forum non conveniens analysis" and they must show that the "private and public interest factors weigh heavily on the side of dismissal." *Id.* at 43–44 (citation omitted).

### 1.  Availability of an Adequate Alternative Forum

[13, 14]  The parties disagree on whether an adequate alternative forum exists. Furthermore, the British court's decision regarding those lawsuits against Lexington, which Rogers submitted, recognizes that even those issues arising in the British lawsuits are not uniform. In deciding against consolidating the trials for Hollywood Funding No. 5 and The New Professionals, the British court held that "the extent of overlap of those issues [in the two cases] is in fact minimal...." Rogers's Mot. to Dismiss, Ex. B at 4. The diversity of issues being litigated in England stands in contrast to the uniformity of *Terra Nova*. This diversity, coupled with questions of whether any British decision would necessarily have preclusive effect in this jurisdiction, lead me to reject defendants' argument that *Terra Nova* governs this case.

An adequate alternative forum exists if the defendants are amenable to process in the other jurisdiction and the alternative forum permits litigation of the disputed subject matter. *See Piper,* 454 U.S. at 255, n. 22, 102 S.Ct. 252. Both defendants agree that they would be amenable to jurisdiction in the United Kingdom. At issues is the fact that RICO—and its award of treble damages—is a legal remedy particular to the United States. In *Piper,* the Supreme Court held that "the possibility of a change in substantive law should ordinarily not be given conclusive or even substantial weight" when determining dismissal on the grounds of forum non conveniens. *Lony v. E.I. Du Pont de Nemours & Co.,* 886 F.2d 628, 632 n. 2 (3d Cir.1989) ("*Lony I*"), *appeal after remand,* 935 F.2d 604 (1991) ("*Lony II*") (citing *Piper,* 454 U.S. at 257, 102 S.Ct. 252). Although neither *Piper* nor *Lony I* involved RICO, my colleague the Honorable Norma L. Shapiro has held that assertion of RICO claims "does not preclude application of forum non conveniens." *Winex, Ltd. v. Paine,* No. 89–2083, 1990 WL 121483, at \*5 (E.D.Pa. Aug.15, 1990). As defendants point out, differences between British and American law do not preclude plaintiff from bringing suit in England. In both nations legal remedies for fraud are available. *Id.* In light of *Piper, Lony I,* and *Winex,* I find that Britain is an adequate alternative forum. I will therefore not address defendants' additional arguments about the possibility of combining this nascent lawsuit with the longer-standing litigations taking place in England.

#### 2. *Private Interest Factors*

**[15]** As stated above, the court must also consider several private and public interest factors. In *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), the Supreme Court listed private interest factors that a court should consider. They included: (i) the relative

ease of access to sources of proof; (ii) the availability of compulsory process for unwilling witnesses; (iii) the cost of obtaining witnesses; (iv) the enforceability of a judgment, if one is obtained; and (v) all other practical problems concerning litigation. *Id.* at 508, 67 S.Ct. 839.

**[16]** Defendants make a series of arguments about why the private interest factors weigh in their favor. They contend that many witnesses are British citizens who are unwilling to travel to the United States to testify, that evidence is located in England, that the disputed events transpired in England, that this lawsuit could be brought in conjunction with future British lawsuits involving creditors' claims against plaintiff, and that plaintiff "has no compelling reason with respect to its own convenience to support its choice of forum." Rogers's Mot. to Dismiss at 24.

Plaintiff disputes defendants' contention that the balance of private interests weighs in defendants' favor. Although agreeing with defendants that discovery materials are located in England, Lexington points out that materials are also located in the United States and Canada. In particular, the funds allegedly misappropriated by defendants were allegedly siphoned off for Flashpoint projects in California and Canada, where discovery will need to be conducted. In addition, documents are to be found in Massachusetts at Lexington's office and in Gladwyne, Pennsylvania.

Regarding the availability of witnesses, defendants have identified four British citizens who would be unwilling to travel to the United States. They argue that these four individuals are critical to the defense, but likely to be unwilling witnesses. Defendants think that because the English courts could better compel the testimony of these witnesses the case should be dismissed on the basis of forum non conve-

niens. Roger response to d tiff points to dividuals invo Nos. 3, 4, and This court ha need to resor obtained thro not mandate *Inc. Sec. Lit* (E.D.Pa.2001). need to video dants does no case either.

At least on appears that transactions s involved many ty of this laws that it will be ever it is bro address the re in the various dants have fa bringing suit much more ex litigating in E judgment acqu potentially re United States, the defendant: countries. Fin practical consi garding plainti evidence, wher ence owed to a leads me to fin demonstrated t tors weigh he

**12.** Without exp tors into the *G* maintain that pinge on the so legal system in ed within Engl Dismiss at 26.

niens. Rogers's Mot. to Dismiss at 22. In response to defendants' arguments, plaintiff points to the numerous U.S.-based individuals involved in Hollywood Funding Nos. 3, 4, and 5 and "It Had To Be You." This court has previously noted that "the need to resort to videotaped depositions, obtained through letters rogatory, should not mandate dismissal." *In re Corel Corp. Inc. Sec. Litig.*, 147 F.Supp.2d 363, 366 (E.D.Pa.2001). Similarly, the potential need to videotape the four British defendants does not mandate dismissal in this case either.

At least on the face of the pleadings, it appears that the allegedly fraudulent transactions spanned three countries and involved many individuals. The complexity of this lawsuit's underlying facts means that it will be costly and complicated wherever it is brought. The court must thus address the relative costs of bringing suit in the various countries involved. Defendants have failed to demonstrate why bringing suit in the United States is so much more expensive or oppressive than litigating in England. Furthermore, any judgment acquired in either nation will potentially require enforcement in the United States, England, and Canada, as the defendants have assets in all three countries. Finally, there are no additional practical considerations that compel disregarding plaintiff's choice of forum. The evidence, when evaluated with the deference owed to a plaintiff's choice of forum, leads me to find that defendants have not demonstrated that the private interest factors weigh heavily in favor of dismissal.

### 3. Public Interest Factors

[17] In *Piper*, the Supreme Court stated that the relevant public interest factors in a forum non conveniens inquiry include: (i) administrative difficulties flowing from court congestion; (ii) "local interest in having localized controversies decided at home;" (iii) avoidance of unnecessary problems in conflict of laws, or the application of foreign law; and (iv) the "unfairness of burdening citizens in unrelated forum with jury duty." 454 U.S. at 241 n. 6, 102 S.Ct. 252 (citation omitted).

[18] Defendants argue that these public interest factors weigh in favor of dismissal. In support of their argument, they make the following statements. First, that there is no need to congest this forum's docket with an action whose factual predicate overlaps with that of the pending British litigation. Second, that the United States has negligible interest in the outcome of this litigation. Third, that the parties' common law disputes might be governed by British law. Fourth, that jurors from this district should not be burdened with the duty of hearing this matter.[12] *See* Rogers's Mot. to Dismiss at 25.

Defendants' arguments regarding the public interest factors are unpersuasive. While court congestion is a reality of the modern judicial system, this case does not represent the straw that might otherwise break the proverbial camel's back. The court is equipped to hear this case and doing so will not prejudice the interests of those parties who do not have the option of choosing from the variety of fora available

---

12. Without explaining how this argument factors into the *Gulf Oil* analysis, defendants also maintain that a failure to dismiss "could impinge on the sovereign interests of the English legal system in overseeing discovery conducted within English borders." Rogers's Mot. to Dismiss at 26. This argument does not ap-

pear to represent one of the public interest factors at issue in a forum non conveniens motion, but rather a concern that should be addressed in the section on principles of international comity. For that reason I will address this argument below.

to plaintiff. The overlap between this case and the ongoing British litigation does not diminish this court's capacity, nor does it erode the deference that a court owes to a plaintiff's choice of forum.

With regard to local interest, this forum has more than a negligible interest in the outcome of this case. RICO's availability within this forum testifies to its commitment to providing legal redress for victims of racketeering conspiracies. If the defendants did indeed use the U.S. mails and phone lines to perpetuate an elaborate fraud in Pennsylvania, Massachusetts, and California, whereby a Delaware corporation lost millions of dollars, then it stands to reason that the United States would have an interest in regulating such conduct and in indemnifying its citizens for their losses. *Cf. Lacey I*, 862 F.2d at 47 (recognizing, in federal diversity action, "Pennsylvania's interest in regulating the manufacture of products within its borders").

Both parties agree that there is a possibility that British law will govern Lexington's common-law claims against defendant. This possibility weighs heavily in favor of dismissal. It is counter-balanced, however, by the fact that more than half of the complaint involves RICO claims that are governed by federal law. So long as these RICO claims are legally viable, the possibility that British law will need to be applied by this court cannot outweigh the presumption against dismissal for forum non conveniens.

Finally, the risk that residents will be called to serve on a jury for this case does not weigh heavily in favor of dismissal. If defendants, by and through their actions in Gladwyne, conspired to effectuate the alleged Ponzi scheme, then a local jury has

an interest in sanctioning such behavior insofar as it offends the laws of this forum. *Cf. Corel*, 147 F.Supp.2d at 367 n. 2.

Because I find that neither the private nor the public interest factors discussed above weigh heavily in favor of dismissal, defendants motion to dismiss based on the doctrine of forum non conveniens is denied.

### D. *Principles of International Comity*

[19] Similar to the doctrine of forum non conveniens, principles of international comity allow a district court to exercise its discretion and dismiss a case over which it has subject matter jurisdiction in deference to the laws and interests of another nation. *See Societe Nationale Industrielle Aerospatiale v. United States Dist. Ct. for the So. Dist. of Iowa*, 482 U.S. 522, 543 n. 27, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987); *Paraschos v. YBM Magnex Int'l, Inc.*, No. 98–6444, 2000 WL 325945, at *5 (E.D.Pa. 2000). In *Hilton v. Guyot*, 159 U.S. 113, 164, 16 S.Ct. 139, 40 L.Ed. 95 (1895), the Supreme Court defined international comity as: "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard to both the international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." These principles permit a court to engage in "a spirit of international cooperation." *Paraschos*, 2000 WL 325945 at *5 (citation omitted). They do not, however, extend judicial deference to those cases whose dismissal would be contrary to domestic public policy. *Id.* Nor do they compel dismissal when the suits in question are neither duplicative nor parallel. *Id.*

[20] Even the existence of a "parallel" case, however, need not compel dismissal.[13]

"[A] district c
tion over an
subject matt
foreign court.
*Mill. Mach.* (
685 (7th Cir.1
of internation
in "extraord
Such circums
litigation, (ii)
forum, (iii) th
der in which ,
the relative p
and (vi) the "
mestic claim."

[21] Addre
that inform a
based on princ
I make the f
this lawsuit is
tors' British s
defendants ar
and it is poss
that the Eng
Lexington's fr
claims. In ac
not determini
leged fraud in
question befor
to be whether
plaintiff's obli
point's credito
addressed the
bringing suit
that the comp
ing suit in e
heavily in def
earlier conclus
which forum'
claims apply h
a conflict of la
nary" and doe:
Fourth, defen
present suit
when Flashpo
against Lexing

(quoting *Lum*

---

13. Two actions are "parallel" when the parties "share some legal identity of interest such that they are 'substantially the same.'" *Id.* (quoting *Caminiti & Iatarola, Ltd. v. Behnke Warehousing, Inc.*, 962 F.2d 698, 700 (7th

Cir.1992)). They are "substantially the same" when there is a "substantial likelihood that the [foreign] litigation will dispose of all claims presented in the federal case." *Id.*

"[A] district court should exercise jurisdiction over an action even where identical subject matter is concurrently before a foreign court." *Id.* at \*6 (citing *Ingersoll Mill. Mach. Co. v. Granger*, 833 F.2d 680, 685 (7th Cir.1987)). Dismissal for reasons of international comity is appropriate only in "extraordinary circumstances." *Id.* Such circumstances include: (i) duplicative litigation, (ii) inconvenience of the domestic forum, (iii) the governing law, (iv) the order in which jurisdiction was obtained, (v) the relative progress of each proceeding, and (vi) the "'contrived nature' of the domestic claim." *Id.* (citations omitted).

[21] Addressing the circumstances that inform a court's decision to dismiss based on principles of international comity, I make the following conclusions: First, this lawsuit is not a duplicate of the creditors' British suit against Lexington. The defendants are not parties to both suits and it is possible, according to plaintiff, that the English court will never reach Lexington's fraud defense to the creditors' claims. In addition, the British court is not determining whether defendants' alleged fraud injured plaintiff. Rather, the question before the British court appears to be whether defendants' fraud obviates plaintiff's obligation to indemnify Flashpoint's creditors. Second, I have already addressed the relative inconvenience of bringing suit here and abroad and found that the comparative drawbacks of bringing suit in either forum do not weigh heavily in defendants' favor. Third, my earlier conclusions regarding the issue of which forum's law governs plaintiff's claims apply here as well: The specter of a conflict of law problem is not "extraordinary" and does not does require dismissal. Fourth, defendants are correct that the present suit could have been brought when Flashpoint's creditors filed suit against Lexington. Although the British

(quoting *Lumen Constr., Inc. v. Brant Constr.*

litigation preceded this suit, plaintiffs "should be permitted to bring their claims in the forum of their choice." *Id.* Finally, the availability of treble damages under RICO, together with the fact that plaintiff is a U.S. company, allay any doubts that plaintiff is merely casting about for a pretext on which to bring suit outside of Britain.

Earlier, defendants also raised the argument that a failure to dismiss would be disrespectful to the British courts. *Supra*, at n. 12. I suspect that the British courts are less thin-skinned than defendants maintain. This lawsuit has no bearing on the creditors' rights at issue in the British litigation. Nor does it purport to evaluate the fitness of any British court's decision. Should English law govern plaintiff's common-law claims, adjudication will be done with the utmost deference to England's jurists and its case law. Contrary to defendants' warning, I believe the sovereignty of that forum will not be impinged upon by American adjudication of this lawsuit. For these reasons and those expressed above, defendants' motions to dismiss based on principles of international comity are denied.

### E. Rule 12(b)(6): Failure to State a Claim for Which Relief Can Be Granted

Rule 12(b)(6) permits dismissal of a case when the plaintiff has failed to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). When considering a Rule 12(b)(6) motion, the Court must accept as true all of the allegations set forth in the complaint and must draw all reasonable inferences in favor of the plaintiff. *See Ford v. Schering–Plough Corp.*, 145 F.3d 601, 604 (3d Cir.1998). Dismissal of plaintiff's claim is appropriate only if plaintiff "can prove no set of facts in support of

*Co.*, 780 F.2d 691, 695 (7th Cir.1985)).

his claim which would entitle him to relief." *Id.* (quotations omitted). The court need not, however, accept conclusory allegations or legal conclusions. *Morse v. Lower Merion School District,* 132 F.3d 902, 906 (3d Cir.1997).

Defendants make two arguments for why plaintiff's claim should be dismissed under Rule 12(b)(6). First, they argue that Counts I, II, and IV, which allege fraud, fail to meet Rule 9(b)'s heightened pleading standard for fraud claims. Second, Rogers argues that plaintiff's legal fees are not an injury for which relief can be granted under RICO and that Counts I–III, which invoke this federal statute, should therefore be dismissed. I will address both these arguments.

### 1. Rule 9(b)

Rule 9(b) provides a heightened pleading requirement for fraud claims. This rule provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). The purposes of this rule are to provide notice of the precise misconduct with which defendants are charged and to "safeguard defendants against spurious charges of immoral and fraudulent behavior." *Seville Indus. Mach. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir. 1984). Although heightened, the pleading standards for fraud are not insurmountable. "As long as the allegations of fraud reflect precision and some measure of substantiation, the complaint is adequate." *In re Meridian Sec. Litig.,* 772 F.Supp. 223, 226 (E.D.Pa.1991) (citing *Seville,* 742 F.2d at 791). The Third Circuit has cautioned against over-zealous enforcement of this rule. *See Seville,* 742 F.2d at 791; *In re Craftmatic Sec. Litig.,* 890 F.2d 628, 645 (3d Cir.1989).

Lexington's 24-page complaint adequately particularizes the alleged fraudu-

lent conduct. Having read the complaint, there can be no reasonable doubt in defendants' minds as to what acts, taken in regard to which transactions, are the basis of plaintiff's complaints for fraud. The detail with which plaintiff describes the predicate acts is in such depth that it would be a burden for this court to repeat them all. Defendants' 12(b)(1) motion with regard to Rule 9(b) is denied.

### 2. Failure to State an Injury for Which Relief Can Be Granted

Defendants argue that plaintiff cannot state a claim for which relief can be granted because its injury, in the form of legal fees, is too remote from the alleged predicate acts necessary for a successful RICO claim. Defendants do not, however, present this court with any controlling case law that either precludes an alleged RICO victim from recovering legal fees related to a predicate act or establishes when an injury is too remote. Although plaintiff has found the decision of *Seaboard Surety Co. v. Permacrete Construction Corp.,* 221 F.2d 366, 371 (3d Cir.1955), which permits a victim of fraud to recover legal fees incurred defending itself against a third-party lawsuit when the alleged fraud caused that lawsuit, it has not presented the court with any controlling case that involves a RICO claim for legal fees. The controlling law in this circuit is thus unclear as to what type of injury a plaintiff must allege in order to state a RICO claim for which relief can be granted. Considering the case-at-hand in the light most favorable to plaintiff, I will deny defendants' 12(b)(6) motion.

### F. Request for a Stay

[22, 23] Both defendants have requested a stay in this matter if the court declines to grant their motions to dismiss. In addition to the power to dismiss, feder-

al courts have [...] based on the p[...] ings in a foreig[...] *Fire Ins. Co. o[...]* F.Supp.2d 124[...] *dis v. Am. Wa[...]* U.S. 248, 254,[...] (1936)). This [...] by the courts' [...] jurisdiction tha[...] Congress." *Q[...]* Co., 517 U.S. 7[...] L.Ed.2d 1 (199[...] not addressed [...] terminations of [...] the event of r[...] an alternative f[...] the Colorado c[...] helpful survey [...] address this is[...] court found tha[...] determining wh[...] were virtually i[...] dismissal based[...] tional comity. [...] F.Supp.2d at 12[...] the Colorado di[...] I reach a differe[...] lution of the B[...] whether plaintif[...] damages, it will[...] leged loss of n[...] fees. Nor will [...] fendants commi[...] within this foru[...] unlawfully injur[...] parallel litigatio[...] of those credito[...] For this reason[...] what looks to b[...] tracted litigatio[...] motions are ther[...]

### III. CONCLUS[...]

For the reas[...] fendants' Motio[...] tively, Stay the[...] denied.

DA ROSA SILVA v. I.N.S.
Cite as 263 F.Supp.2d 1005 (E.D.Pa. 2003)

al courts have the power to stay an action based on the pendency of related proceedings in a foreign jurisdiction. *Nat'l Union Fire Ins. Co. of Pittsburgh v. Kozeny*, 115 F.Supp.2d 1243, (D.Col.2000) (citing *Landis v. Am. Water Works & Elec. Co.*, 299 U.S. 248, 254, 57 S.Ct. 163, 81 L.Ed. 153 (1936)). This power, however, is checked by the courts' "strict duty to exercise the jurisdiction that is conferred upon them by Congress." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996). The Third Circuit has not addressed what standard governs determinations of whether to award a stay in the event of related litigation pending in an alternative forum. In *National Union*, the Colorado district court performed a helpful survey of those federal cases that address this issue. After its review, the court found that the relevant factors for determining whether a stay was warranted were virtually identical to those concerning dismissal based on principles of international comity. *See Nat'l Union*, 115 F.Supp.2d at 1247. Although I agree with the Colorado district court's legal analysis, I reach a different conclusion. While resolution of the British litigation will clarify whether plaintiff has a claim for additional damages, it will not address plaintiff's alleged loss of millions of dollars in legal fees. Nor will it determine whether defendants committed wire and mail fraud within this forum or whether those frauds unlawfully injured plaintiff. Rather, the parallel litigation will determine the rights of those creditors now suing Lexington. For this reason I see no reason to delay what looks to be an expensive and protracted litigation. Defendants 12(b)(6) motions are therefore denied.

## III. CONCLUSION

For the reasons articulated above, defendants' Motions to Dismiss, or, Alternatively, Stay the Instant Proceedings are denied.

## ORDER

AND NOW, this 6th day of May, 2003, the defendants' Motions to Dismiss, or, Alternatively, Stay the Instant Proceedings (Docket ## 6, 11) are DENIED.



Manuel DA ROSA SILVA, Petitioner

v.

IMMIGRATION & NATURALIZATION SERVICE, Kenneth Elwood, & John Ashcroft Respondents

No. 02–CV–8903.

United States District Court,
E.D. Pennsylvania.

May 8, 2003.

Alien filed petition for writ of habeas corpus, challenging removal order against him based on his conviction of aggravated felony and crimes of moral turpitude, and his detention without bond pending removal proceedings. The District Court, Anita B. Brody, J., held that: (1) alien's burglary conviction was an "aggravated felony" rendering him removable; (2) alien was removable for having been convicted of two crimes involving moral turpitude, namely, burglary and shoplifting; (3) alien was ineligible for family hardship waiver and cancellation of removal; but (4) alien remained eligible for discretionary waiver of deportation under repealed Immigration and Nationality Act section; (5) alien's due process rights were not violated by his lack of legal representation in removal proceedings; and (6) alien's due process rights were not violated by his continued deten-