## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LEXINGTON INSURANCE COMPANY,<br><br>                              Plaintiff,<br><br>- against -<br><br>DAVID FORREST, T. BEAUCLERC ROGERS IV, STANLEY MUNSON, MARTIN FINK, all individually, and NEW BEGINNINGS ENTERPRISES LLC, a California Limited Liability Company, and TARLO LYONS, a partnership,<br>                              Defendants. | Civil Action No. 02-CV-4435<br>(Hon. Anita B. Brody)<br><br><br>**AFFIDAVIT OF EDWARD P. KRUGMAN IN SUPPORT OF MOTION FOR ISSUANCE OF LETTER OF REQUEST** |

STATE OF NEW YORK    )
                                        :ss.:
COUNTY OF NEW YORK )

EDWARD P. KRUGMAN, having been duly sworn, deposes and says:

1.    I am a member of the firm of Cahill Gordon & Reindel LLP and am admitted in this action *pro hac vice* as counsel for plaintiff, Lexington Insurance Company ("Lexington"). I submit this affidavit in support of Lexington's motion for issuance of a Letter of Request to the High Court in England.

2.    The Letter of Request is sought pursuant to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters of March 18, 1970 (the "Convention"). The purpose of the Letter of Request is to obtain evidence, in the form of testimony and documents, for use at the trial of this action.

3.    The facts set forth herein, unless otherwise specified, are based on my information and belief as to the testimony I believe the specified witnesses would give in this matter. My factual basis for making these statements is my experience since August 2000 as world-

-2-

wide coordinating counsel for AIG Companies (including Lexington) on film finance litigation and, in particular, on four-plus years of claims and litigation with respect to Flashpoint risks. During this period I have been directly involved in, and have supervised, the investigation of the facts of this case, including review of thousands of pages of documentation, interviews of many of the individuals for whom the Letter of Request is sought, and oversight of the English *Hollywood Funding* litigation (which is the source of Lexington's damages herein).

*Background*

4.    As the Court is aware, Lexington claims against defendants in this action for RICO violations, common law fraud, tortious interference with contract, fraudulent inducement, constructive trust, and money had and received.  All of the claims relate to a cluster of companies known generically as "Flashpoint," and the defendants include the principals of Flashpoint (Messrs. Forrest and Rogers), Flashpoint's man in Los Angeles (Mr. Fink), Flashpoint's English lawyer and law firm (Mr. Munson and Tarlo Lyons), and one of the Flashpoint companies (New Beginnings Enterprises).  All of the defendants except New Beginnings are alleged to have been involved in a massive, multi-year Ponzi scheme involving procuring insurance policies by fraud and diverting the proceeds of insured transactions when received.

5.    The risk Lexington insured was that films would not earn sufficient amounts to pay off their financing costs.  As set forth in the Complaint in this action, the films Flashpoint financed did not have the financial worth that they were represented to have, and Flashpoint diverted to itself much of the production money it had raised.  The investors made claims under the policies Lexington had issued, but Lexington refused to pay, asserting that the policies were tainted by this fraud.

6.    The investors thereupon sued Lexington in the English High Court, in three actions captioned *Hollywood Realisations Trust Limited* v. *Lexington Insurance Company and*

-3-

*Others*, 2001 Folio Nos. 211/935 and *Law Debenture Trust Corporation (Channel Islands) Limited* v. *Lexington Insurance Company and JLT Risk Solutions Limited*, 2002 Folio No. 193 (the "*Hollywood Funding* actions"). Lexington expended millions of dollars in defending and settling the *Hollywood Funding* actions; the purpose of the action in this Court is to recover those costs from the architects of the Flashpoint scheme.

### *Fraudulent Sales Estimates*

7.     Investors loaned money to film production enterprises, and Lexington insured the loans, based in substantial part on "sales estimates" — estimates of the amount of money a film could be expected to earn. Lexington has alleged that when Flashpoint was faced with projects that could not be justified on an objective view of their merits, it took to inflating sales estimates in order to induce lenders — and, more particularly, insurers — to go forward with the financing transactions so that Flashpoint could earn its transaction fees and gain access to the proceeds that it intended to (and did) divert to its own purposes.

8.     I have seen substantial evidence that Flashpoint personnel (including Messrs. Forrest, Rogers, and Fink) fraudulently inflated or participated in the inflation of sales estimates for certain projects known as *The New Professionals*, *Award*, *The Secret Adventures of Jules Verne* ("*Jules Verne*"), and *Regent 1*, as detailed in the Second Amended Complaint at paragraph 27.

9.     In the instance of *Jules Verne*, defendants also appear to have deliberately misrepresented that the BBC was highly interested in purchasing the English broadcast rights for a substantial sum — after the date in which the BBC had already declined to do so.

10.     A substantial amount of evidence concerning the sales estimates issue must come from documents and witnesses located in England. Most of the evidence to be obtained by the Letter of Request relates to sales estimates.

-4-

*Misappropriation of Funds*

11.    Another component of the Flashpoint scheme was to divert funds from their intended purpose to improper ends.  Flashpoint routinely commingled the funds it received for its various projects in a single bank account, despite the fact that it was obligated to keep such funds segregated.  This was the precursor to various abuses.

12.    Flashpoint routinely used funds that were earmarked by the lenders for the productions of specific slates of films to produce films of different slates.  Flashpoint also fraudulently diverted funds to defendants' own use for ventures such as a film post-production facility in California, a chain of movie theaters in Russia, and a group of companies in Canada known as Ice Storm.

13.    On January 19, 2001, the English High Court entered judgment determining that at least $8.8 million of funds that Flashpoint had raised were not used for the purpose of funding the relevant films but had been dissipated.

14.    Lexington is already in possession of most of the evidence it needs on the misappropriation issue, but certain additional evidence is needed, as outlined below.

*The English Actions*

15.    Over the course of the *Hollywood Funding* actions, substantial discovery was conducted, and multiple witnesses submitted witness statements, many of which attached documents as exhibits.  These witness statements and documents remain in the possession of Lexington.

16.    The witness statements and documents have been requested by defendants in the instant proceeding via formal discovery and are currently the subject of a motion to compel filed by defendant Rogers.  Many (but certainly not all) of these documents are plainly dis-

-5-

coverable in this action,[1] and Lexington would have produced them long ago but for the fact that English law prohibits such disclosure.

17.    Specifically, England's Civil Procedure Rule 32.12 provides that "a witness statement may be used only for the purpose of the proceedings in which it is served." Likewise, according to Civil Procedure Rule 31.22: "[a] party to whom a document has been disclosed may use the document only for the purpose of the proceedings in which it is disclosed."[2] Accordingly, any disclosure of these materials to defendants would likely violate English law, as the documents and witness statements would then be used for purposes other than that of the proceeding in which they were originally disclosed. However, both of these rules allows for future use of the witness statements and documents when the party or witness that has provided the statement or documents in question grants written consent, or when the English court grants permission to do so.

18.    Lexington is thus sandwiched between its obligations under English law from the *Hollywood Funding* actions and its obligations under the Federal Rules of Civil Procedure in this case. As will be set forth in more detail in our response to the motion to compel, we acknowledge this Court's power simply to direct Lexington to turn over the documents. In the

---

[1]    Lexington's response to the motion to compel will address the relevance issue in detail.

[2]    CPR 32.12 reads as follows, in relevant part:

(1) Except as provided by this rule, a witness statement may be used only for the purpose of the proceedings in which it is served.

(2) Paragraph (1) does not apply if and to the extent that- (a) the witness gives consent in writing to some other use of it; (b) the court gives permission for some other use; or (c) the witness statement has been put in evidence at a hearing held in public.

CPR 31.22 reads as follows, in relevant part:

(1) A party to whom a document has been disclosed may use the document only for the purpose of the proceedings in which it is disclosed, except where- (a) the document has been read to or by the court, or referred to, at a hearing which has been held in public; (b) the court gives permission; or (c) the party who disclosed the document and the person to whom the document belongs agree.

-6-

interests of comity, however, Lexington requests that this Court include in its Letter of Request a request to the appropriate judicial authorities of the United Kingdom to authorize Lexington to use (and, of course, to deliver to all of the other parties to this action) the witness statements and the exhibits thereto, as designated below.

***The Evidence Sought***

19.    The testimony and documents Lexington seeks through the Letter of Request are as follows:

| Witnesses | Last Known Address | Evidence Sought: |
|---|---|---|
| Gordon Dawson | 3 Rosehill Road London SW18 2NY | Testimony Prior Witness Statement and associated documents |
| Mark Drummond Brady | c/o JLT Risk Solutions Ltd. 6 Crutched Friars London EC3N 2PH | Testimony Prior Witness Statement and associated documents |
| Douglas Fenton | c/o Miller Insurance Services, Ltd. 5 Jewry Street London EC3N 2PJ | Testimony Prior Witness Statement and associated documents |
| JLT Risk Solutions Ltd. | 6 Crutched Friars London EC3N 2PH | Documents (including witness statements from the *Hollywood Funding* actions) |

20.    Mr. Dawson was an insurance broker and employee of Lloyd Thompson, JLT Risk Solutions and/or related entities (collectively, "JLT") from 1995 until 1997.    Mr. Drummond Brady was the head of JLT's Financial Risks Division throughout the relevant time period.    Mr. Fenton worked under Mr. Drummond Brady from 1994 to 2000.    JLT broked the Flashpoint risks to Lexington and others.    Mr. Dawson participated in the broking of television projects known as *The New Professionals* and *The Secret Adventures of Jules Verne* ("*Jules Verne*") to Lexington, as well as other Flashpoint projects including what is known as the Award

-7-

slate. Mr. Fenton participated in the broking of the Hollywood Funding Nos. 4, 5, and 6 transactions, particularly *Jules Verne*, *Regent 1*, and *Filmworks*. Mr. Drummond Brady was involved, at one level or another (and frequently directly), in the broking of all of the risks identified in the Complaint.

21.    Mr. Dawson is believed to have knowledge concerning the allegations of paragraphs 27(a), (b), (c) of the Complaint. Mr. Fenton is believed to have knowledge, and his testimony is requested, concerning the allegations of paragraphs 27(c), (d), 33(a), (b) of the Complaint. Mr. Drummond Brady is believed to have knowledge, and his testimony is requested concerning, all of the foregoing and, as well, concerning two instances (in or around March 1998 and October 1998) in which Messrs. Forrest and Rogers assert that they attempted (in the event unsuccessfully) to disclose to insurers certain of the information Lexington asserts was misrepresented and/or concealed in the placement of the Flashpoint risks. Lexington further requests that each of these witnesses testify about background and presentation of Flashpoint risks in the London market and preparation and dissemination of sales estimates in connection therewith.

22.    Each of these three witnesses gave witness statements in the *Hollywood Funding* actions, and Mr. Dawson gave a witness statement in a prior action concerning *The New Professionals*, captioned *HIH Casualty and General Insurance Limited and Others* v. *JLT Risk Solutions Limited and Others*, 2000 Folio No. 552. In addition, JLT disclosed certain documents in the several litigations referred to above. Not all of these documents are relevant to this action, but many of them are. On behalf of Lexington, I respectfully request that the Court request the appropriate judicial authorities of the United Kingdom to release Lexington from its obligations with respect to those witness statements and documents.

-8-

| Witness | Last Known Address | Evidence Sought: |
|---|---|---|
| Susan Wright | 18 Wilson Close<br>Willesborough Ashford<br>Kent TW24 0HX | Testimony |

23.    Ms. Wright was a Flashpoint executive holding the title of Vice President of Finance and Risk Management and worked closely with defendants Forrest, Rogers, Munson and Fink throughout the duration of the alleged scheme. As the Vice President of Finance, Ms. Wright has knowledge of Flashpoint's activities with regard to the alleged diversions of funds. (Complaint ¶¶ 26-36) Lexington requests that Ms. Wright give testimony relating to her knowledge of sales estimates prepared for Flashpoint projects, her dealings with the defendants with regard to sales estimates, the participation of the respective defendants in Flashpoint operations, and the alleged misappropriation of funds obtained to support Flashpoint projects, including the diversion of funds from the slates to which they were intended, the diversion of funds to a company or companies known as The Building LLC and/or New Standard Post, the diversion of funds to a chain of Russian movie theaters, and/or the diversion of funds to a company or companies known as "Ice Storm."

| Witnesses | Last Known Address | Evidence Sought: |
|---|---|---|
| Neil Dunn | 380 Upper Richmond Road<br>London SW14 7JU | Testimony<br>Prior Witness Statement and<br>associated documents |
| Richard Jackson | c/o Talisman Films<br>5 Addison Place<br>London W11 4RJ | Testimony<br>Prior Witness Statement and<br>associated documents |
| Carolyn Oulton | c/o Talisman Films<br>5 Addison Place<br>London W11 4RJ | Testimony |

-9-

| Witnesses | Last Known Address | Evidence Sought: |
|---|---|---|
| Allan Guest | c/o Mitsui Sumitomo Insurance (London Management) Ltd. 71 Fenchurch Street London EC3M 4BS | Testimony |
| Mitsui Sumitomo Insurance (London Management) Ltd. | 71 Fenchurch Street London EC3M 4BS | Documents |
| Talisman Films (U.K.) Ltd. | 5 Addison Place London W11 4RJ | Documents |

24.    Mr. Dunn was an employee of Talisman Films (U.K.) Ltd ("Talisman") and a producer of *Jules Verne* in 1997. Mr. Dunn formulated the sales estimates for *Jules Verne* that were transmitted to Lexington, and also has knowledge pertaining to the proposed sale of *Jules Verne* broadcasting rights to the British Broadcasting Corporation ("BBC"), another element in the frauds alleged in the Complaint (¶¶ 27(c)(i)-(vi)). Mr. Jackson was an employee of Talisman and a producer of *Jules Verne*. Mr. Jackson has knowledge of the sales estimates for *Jules Verne* that were transmitted to Lexington and the proposed sale of *Jules Verne* broadcasting rights to the BBC. Messrs. Dunn and Jackson also played significant roles in the "Ice Storm" companies, to which defendants misappropriated funds, and have knowledge thereof, and they have knowledge of the proposed "Hollywood Funding No. 7" transaction (Complaint ¶ 52(c)), which Talisman was promoting jointly with Flashpoint.

25.    Mr. Guest was and is the Chief Executive Officer of the London underwriting operation of Mitsui Marine International (now Mitsui Sumitomo), to which the Hollywood Funding No. 7 transaction was presented.

26.    Ms. Oulton was also an employee of Talisman and is believed to have knowledge concerning the discussions with the BBC.

-10-

27.    The witnesses' testimony is sought concerning these matters, and Talisman's and Mitsui Sumitomo's related documents are also sought.

28.    As with the JLT witnesses, Mr. Dunn and Mr. Jackson gave witness statements in the *Hollywood Funding* litigation, and Talisman disclosed documents therein. These documents are in the possession of Lexington. As above, release of Lexington from its confidentiality obligations under English law is sought.

| Witness | Last Known Address | Evidence Sought: |
|---------|--------------------|------------------|
| David Lamping | Ferry House<br>South Stoke<br>Oxon RG8 0JL | Testimony<br>Prior Witness Statement and associated documents |

29.    Mr. Lamping was the sales agent for *The New Professionals* and formulated the original sales estimates for this project. Lexington alleges that these sales estimates were later altered by defendants in 1997 to be substantially higher (Complaint ¶ 27 (a)). Lexington requests that Mr. Lamping give testimony relating to his knowledge of the formulation of sales estimates for *The New Professionals* and his dealings with Messrs. Forrest and Rogers with regard to sales estimates. Mr. Lamping gave witness statements in both the *Hollywood Funding* and *New Professionals* actions, which are in the possession of Lexington, and release of Lexington from its obligations with respect to those statements and the associated documents is sought.

| Witnesses | Last Known Address | Evidence Sought: |
|-----------|--------------------|------------------|
| Steve Mitchell | 17 Redbourne Lane<br>Bury Ramsey<br>Cambridgeshire B26 2PB | Testimony<br>documents associated with Prior Witness Statement |
| Keith Peacock | Roseholm<br>Debden Green<br>Saffron Waldon<br>Essex CB11 3LX | Testimony<br>documents associated with Prior Witness Statement |

-11-

| Witnesses | Last Known Address | Evidence Sought: |
|---|---|---|
| Marcus Ringrose | 6 Cotton Row<br>Plantation Wharf<br>London SW11 3UG | Testimony<br>documents associated with Prior<br>Witness Statement |

30.    Messrs. Mitchell and Peacock are among Lexington's principal fact witnesses.    In 1998 Mr. Mitchell was an underwriter for Lexington, reporting to Keith Peacock, who was then the general manager of Lexington's London office.  Mr. Mitchell was also (as an employee of HIH (U.K.) Limited) the underwriter for the Hollywood Funding 1, 2, and 3 transactions.  Mr. Mitchell has extensive knowledge of Lexington's involvement with Flashpoint regarding the projects known as *Prosperity 1*, *Regent 1*, *Filmworks*, and *Jules Verne*.  Mr. Peacock signed off on the Hollywood Funding 4 and 5 transactions and underwrote the Hollywood Funding 6 transaction for Lexington.  Mr. Ringrose is a former underwriter with Liberty Mutual Insurance Co. (U.K.) Ltd. and participated in insuring various Flashpoint projects.  Mr. Ringrose has knowledge of the sales estimates for *Jules Verne* and *The New Professionals,* for which he wrote insurance coverage (Complaint ¶ 27).

31.    Lexington requests that Mr. Mitchell and Mr. Peacock give testimony relating to all aspects of their dealings with Flashpoint and with JLT on the Hollywood Funding transactions, and that Mr. Ringrose testify concerning *The New Professionals* and *Jules Verne*. They have agreed that their witness statements may be made available to all parties in this action, but to the extent those statements refer to documents other than those disclosed by Lexington or otherwise not subject to CPR 31.22, I respectfully request the Court to request the appropriate judicial authorities of the United Kingdom to release Lexington from its obligations with respect thereto.

-12-

| Witnesses | Last Known Address | Evidence Sought: |
|---|---|---|
| Peter Salmon<br>Tessa Ross | c/o British Broadcasting<br>   Corporation<br>Broadcasting House<br>Portland Place<br>London W1A 1AA | Testimony |
| British Broadcasting Corp. | Broadcasting House<br>Portland Place<br>London W1A 1AA | Documents |

32.    Ms. Ross and Mr. Salmon are believed to have been employees of the BBC in 1998 and to have knowledge of the proposed sale of *Jules Verne* broadcasting rights to the BBC and the BBC's eventual decision to not purchase such broadcast rights (Complaint, ¶¶ 27(c)(i)–(vi)).  It is believed that Mr. Salmon was the individual at the BBC who declined to purchase the broadcast rights.  Ms. Ross is the individual at the BBC that communicated their decision to not purchase the broadcast rights.

33.    Lexington requests that Ms. Ross and Mr. Salmon give testimony as to their knowledge of the proposed sale of *Jules Verne* broadcasting rights to the BBC and that the BBC produce its documents related to the proposed sale.

Edward P. Krugman

Sworn to before me this
14th day of December, 2004

Notary Public
MARGUERITE SALAMONE
Notary Public, State of New York
No. 01SA4814416
Qualified in New York County
Commission Expires Oct. 5, 2006