# EXHIBIT A

Source: Legal > Legal (excluding U.S.) > United Kingdom > Case Law > **UK Cases, Combined Courts**  
Terms: **hollywood funding**  (Edit Search)

↙Select for FOCUS™ or Delivery

*[2001] Lloyd's Rep IR 224, [2001] 1 Lloyd's Rep 378*

HIH CASUALTY AND GENERAL INSURANCE LTD v NEW HAMPSHIRE INSURANCE CO AND OTHERS

QUEEN'S BENCH DIVISION (COMMERCIAL COURT)

[2001] Lloyd's Rep IR 224, [2001] 1 Lloyd's Rep 378

**HEARING-DATES:** 7, 8, 9 November, 4 December 2000

4 December 2000

**CATCHWORDS:**
Reinsurance -- Indemnity -- Warranty -- Allegations of breach -- Reinsurers denied liability -- Whether reinsurers correctly identified terms in underlying insurance contracts as warranties -- Effect of "Disclosure and/or Waiver of rights" clause in underlying insurance contract -- Whether clause incorporated into reinsurance contracts -- Effect of clause in reinsurance contracts.

**HEADNOTE:**
The claimants (HIH) had underwritten two film finance insurance policies concerning two separate groups of films: one with regard to a number of films to be co-produced by 7.23 Productions LLC and Flashpoint Ltd (the "7.23 slate"); the other with regard to a number of films to be co-produced by Rojack Films Inc and Flashpoint Ltd (the "Rojack slate"). The insured was Law Debenture Trust (LDT). The insurance was a pecuniary loss indemnity insurance and was to indemnify LDT if at the end of a defined period there was a shortfall between the amount of finance provided and the revenue collected.

The pecuniary loss indemnity policy in respect of the 7.23 Productions, dated Aug 22, 1997, contained various terms including the following:

Clause 8 Disclosure and/or Waiver Of Rights

8.1 To the fullest extent permissible by applicable law, the Insurer hereby agrees that it will not seek to or be entitled to avoid or rescind this Policy or reject any claim hereunder or be entitled to seek any remedy or redress on the grounds of invalidity or unenforceability of any of its arrangements with Flashpoint Ltd or any other person (or of any arrangements between Flashpoint Ltd or the Purchaser) or non-disclosure or misrepresentation by any person or any other similar grounds. The Insurer irrevocably agrees not to assert and waives any and all defences and rights of set-off and/or counterclaim (including without limitation any such rights acquired by assignment or otherwise) which it may have against the Assured or which may be available so as to deny payment of any amount due hereunder in accordance with the express terms hereof.

The slip policy in respect of the Rojack Films Inc was in broadly similar terms to that in respect of 7.23 Productions.

HIH reinsured its liability under both policies. Axa Reassurance SA (Axa) and New Hampshire Insurance Co Ltd were reinsurers in respect of both policies and Independent Insurance Co Ltd were reinsurers in respect of the 7.23 policy only.

HIH having paid LDT sums totalling over US$31m, sought to recover under the reinsurance agreements. The reinsurers refused to indemnify HIH on the grounds that HIH should not have paid LDT or alternatively that, whatever the position under the insurance contract they were not obliged to pay under the reinsurance contracts for various reasons including breaches of warranty and breaches of the duty of good faith.

The reinsurers contended that the underlying insurance contained a warranty to the effect that a slate of six or 10 films respectively would be made and that the reinsurance contained such a warranty and a further warranty that the insurers would obtain the consent of reinsurers to any amendment to the terms of the underlying insurance.

The claimants submitted that cl 8 of the policy wording disabled them from relying on any breach of warranty by the original assured and that as cl 8 was a term of the reinsurance it precluded the reinsurers from relying on any breach of warranty and further precluded the insurers from relying upon any misrepresentation or non-disclosure unless the same was fraudulent.

The following preliminary issues were ordered to be determined:

1 Are the terms (of both the insurance contracts and reinsurance contracts) alleged by the Reinsurers to have been warranties in fact such?

2 What is the effect of Clause 8 of the underlying insurance contract? In particular does it mean that the facts and matters alleged in the de fences (if true) would not have provided the Claimant Insurer/Reinsured with a defence (whether in whole or in part) to the underlying Insured's claim?

3 On the assumption that the Reinsurers' underwriters were aware that the underlying policy wording contained Clause 8, was Clause 8 a term of the reinsurance contract? Is the answer different if the underwriters were not so aware?

4 What is the effect of Clause 8 in the context of the reinsurance contracts? In particular does it mean that:

i The facts and matters alleged in the defences and counterclaims (if true) do not provide the Defendant Reinsurers with a (complete or partial) defence (including by way of set-off) to the Claimants Insurers/Reinsured's claim; and/or

ii the Defendant's Reinsurers do not (or did not) have the right to avoid the reinsurance contract on grounds of misrepresentation or non-disclosure (assuming they otherwise have or had such a right) irrespective of whether or not the relevant misrepresentation or non-disclosure was negligent or fraudulent as opposed to innocent.

-- Held, by QB (Com Ct) (DAVID STEEL J), that (1) the underlying policy was contained in the slip policy subject to the terms and conditions contained in the policy wording dated Aug 22; it was a term of the policy that a full slate would he made and that term was a warranty; and the reinsurance contracts contained the same warranty (see p 384, cols 1 and 2);

(2) the only commercially realistic construction of the amendment clause involved excluding from its application immaterial amendments ie changes which did not affect the sense or substance of the underlying policy in a manner potentially prejudicial to the reinsurer; if this was right it would he right to categorize the amendment clause as a warranty (see p 385, col 1);

(3) the concluding phrase of cl 8 "so as to deny payment of any amount due hereunder in

accordance with the express terms hereof" made it plain that waiver was in respect of defences akin to rights of setoff or counter-claim; it was the very antipathy of a waiver of coverage defences where by definition an amount was not due to he paid (see p 385, col 2);

(4) the submission that breach of warranty fell within "any other similar grounds" in cl 8 would be rejected: it was not similar to "invalidity or unenforceability" of the arrangements with Flashpoint; nor was it similar to "non-disclosure or misrepresentation"; the effect of a breach of warranty was to discharge the insurer from liability; non-disclosure or misrepresentation gave rise, consistent with the terms of the clause to rights of avoidance, rescission and rejection (see p 385, col 2);

(5) on its proper construction the reference in the reinsurance slips to "Cancellation Clause as Original Policy" referred to cl 8; and the clause was thereby incorporated in the reinsurance contracts (see p 386, col 1);

(6) even if the condition in the slip referring to the cancellation clause was not thereby making a reference to cl 8 or even if it was, such was not sufficient in itself to incorporate that clause, it was fair nonetheless to all the reinsurers to treat the clause as incorporated by the general words (see p 387, col 2; p 388, col 1);

(7) the effect of cl 8 was not solely to agree to follow settlements made by HIH where otherwise HIH would have had a defence (see p 388, col 1);

(8) it was necessary to discern a clear intention to exclude the consequences of a breach of duty of good faith; the parties did intend to exclude the consequences of inadvertent concealment or misrepresentation whether careless or not (see p 388, col 2).

**CASES-REF-TO:**

Aughton Ltd v MF Kent Service Ltd, [1991] 31 Con LR 60;
Australian Widows Fund Life v National Mutual Life, [1914] AC 615;
Barnard v Faber, [1893] 1 QB 340;
CAN International Insurance Co Ltd v Companhia de Seguros Tranquillidade SA, [1999] CLC 140;
Canada Steamship Lines Ltd v The King, (PC) [1952] 1 Lloyd's Rep 1; [1952] AC 192;
Charlesworth v Faber, (1900) 5 Com Cas 508;
Citadel Insurance Co v Atlantic Union Insurance Co SA, (CA) [1982] 2 Lloyd's Rep 543;
Container Transport International Inc v Oceanus Mutual Underwriting Association (Bermuda) Ltd, (CA) [1984] 1 Lloyd's Rep 476;
Excess Insurance Co Ltd v Mander, [1997] 2 Lloyd's Rep 119;
Forsikringsaktieselskapet Vesta v Butcher, (HL) [1989] 1 Lloyd's Rep 359; [1989] AC 852;
Groupama Navigation et Transports v Catatumbo CA Seguros, [2000] 2 Lloyd's Rep 350;
Home Insurance Co of New York v Victoria-Montreal Fire Insurance Co, (HL) [1907] AC 59;
HIH Casualty and General Insurance Ltd v Chase Manhattan Bank, [2000] 1 Lloyd's Rep 30;
Interfoto Picture Library Ltd v Stiletto Visual Programmes Ltd, (CA) [1989] QB 433;
Marten v The Nippon Sea and Land Insurance Co, (1898) 3 Com Cas 164;
Norwich Union Fire Insurance Society v Colonial Mutual Fire Insurance Co (1922) 12 Ll L Rep 215; [1922] 2 KB 461;
Pearson (S) & Son Ltd v Dublin Corporation, (HL) [1907] AC 351;
Pine Top Insurance Co v Unione Italiana Anglo-Saxon Reinsurance Co, [1987] 1 Lloyd's Rep 476;
Property Insurance Co v National Protector Insurance Co, (1913) LT 104;
Thomas (TW) & Co Ltd v Portsea Shipping Co Ltd, (HL) [1912] AC 1;
Toomey v Eagle Star Insurance Co Ltd (No 2), [1995] 2 Lloyd's Rep 88;
Tor Line AB v Alltrans Group of Canada Ltd, (HL) [1984] 1 Lloyd's Rep 123; [1984] 1 WLR 48;

Youell v Bland Welch & Co Ltd, (CA) [1992] 2 Lloyd's Rep 127.

**INTRODUCTION:**
These were preliminary issues ordered to be determined in the actions brought by the claimants HIH Casualty and General Insurance Ltd against the defendants New Hampshire Insurance Co, Independent Insurance Co and Axa Reassurance SA, claiming an indemnity under the reinsurance policies issued by the defendants in respect of claims paid by the claimants to their insured.

**COUNSEL:**
Mr Julian Flaux, QC and Mr S Picken for the claimant; Mr Christopher Hancock, QC and Ms Sara Masters for the defendant New Hampshire; Mr S Ruttle, QC for the defendant Independent; Mr Peter Gross, QC, Mr P Edey and Mr M Collett for the defendant Axa.

**PANEL:** DAVID STEEL J

**JUDGMENTBY-1:** DAVID STEEL J

**JUDGMENT-1:**
DAVID STEEL J: Introduction

1. Pursuant to an order dated Aug 22, 2000, the Court has heard argument on various preliminary issues that arise in relation to three related actions. In each of those three actions, the claimant was HIH Casualty and General Insurance Co Ltd ("HIH"). HIH had underwritten two film finance insurance policies. The insured was Law Debenture Trust ("LDT"). The disputes in the three actions relate to reinsurance of that cover.

2. The two underlying insurance policies concerned two separate groups of films: one with regard to a number of films to be co-produced by 7.23 Productions LLC and Flashpoint Ltd (the "7.23 slate"); the other with regard to a number of films to be co-produced by Rojack Films Inc and Flashpoint Ltd ("the Rojack slate"). Axa Reassurance SA ("Axa") and New Hampshire Insurance Co ("New Hampshire") are reinsurers in respect of HIH's liability under both policies: Independent Insurance Co Ltd are reinsurers in respect of HIH's liability under the 7.23 policy only.

3. HIH, having paid LDT sums totalling over US$31m, seek to recover in the three actions contributions towards some 80 per cent of that sum under the reinsurance agreements. The reinsurers have refused to indemnify HIH on the grounds that HIH should not have met LDT's claims or, alternatively, that, whatever the position was under the insurance contract, they are not obliged to pay under the reinsurance contract for various reasons including breaches of warranty and breaches of the duty of good faith.

4. For the purposes of the preliminary issues, the parties have agreed that it be assumed that all the allegations of fact made by the reinsurers in the various defences and counterclaims are true. The preliminary issues focus on two matters; firstly, the question whether any terms of the underlying insurance and/or the reinsurance contract have been correctly identified by the reinsurers as warranties; and, secondly, the impact of a clause within the underlying insurance wording which HIH say both precluded it from resisting payment of the underlying insurance claim and prevents the reinsurers from relying on anything that they have pleaded as grounds for not indemnifying HIH.

The commercial structure

5. The commercial structure of the arrangements is broadly as follows. Flashpoint Ltd ("Flashpoint") entered into production and finance agreements with 7.23 Productions Inc and Rojack Films Inc Flashpoint in turn obtained finance from two companies, **Hollywood**

**Funding** Ltd and **Hollywood Funding** No 2 Ltd, which were corporate vehicles for various investing financial institutions such as Credit Suisse First Boston. This finance was obtained pursuant to "purchase agreements" under which, in consideration for providing the necessary payments to Flashpoint, HFL would receive revenue from the film productions subject to a cap. HFL funded its payment obligations to Flashpoint by means of notes constituted by a trust deed made between LDT and HFL.

6. It follows that, through the trust deed in each case, LDT was the ultimate investment vehicle for the various investors. Part of the collateral security that those investors required was a "pecuniary loss indemnity" insurance. This would indemnify LDT if at the end of a defined period there was a shortfall between the amount of finance provided and the revenue collected. Flashpoint undertook to procure such insurance naming LDT as the insured. To that end, Flashpoint approached Lloyd's brokers Lloyd Thompson who specialized in placing this type of insurance. It appears that the brokers had a "core" market of insurers who were interested in underwriting such insurance, including HIH, AIG (New Hampshire), Axa and Kemper Re. The business was structured as a 100 per cent insurance of LDT by HIH with other companies, including New Hampshire and Axa, participating by way of lines on an 80 per cent quota share reinsurance of HIH.

7. The first of the risks to be written related to 7.23 Productions. The insurance slip was subscribed by the claimant's underwriter Mr Steve Mitchell on Aug 13, 1997 for a 100 per cent "subject to reinsurance of 80%". The slip provided (inter alia) as follows:

TYPE: Slip Policy

INSURED: THE LAW DEBENTURE TRUST CORPORATION (CHANNEL ISLANDS) LIMITED

PERIOD: 22nd August 1997 to 22nd July 1999

INTEREST: 7.23 productions will produce and make six made-for-TV Films.

It is understood that, if at the expiry of the Policy Period the revenue collected is less than the Sum Insured as a result of Force Majeure, as defined then the Underwriters will pay to the Assured, at the expiry of the Waiting Period, the difference between the Sum Insured and the revenue collected, subject to the exclusions set forth below.

SUM INSURED: Maximum USD 3,900,000 any one Film and USD$16,400,000 in the aggregate . . .

CONDITIONS: As per Pecuniary Loss indemnity wording tba L/U only.

Waiting Period: 20 Day.

UK Law and Jurisdiction . . .

Cross Collaterolisation (sic) Clause to be agreed L/U only.

INFORMATION: (Not to appear on the Policy)

Revenue from all films will cross collaterolise across the 6 film slate.

See "Side Agreement agreed by L/U only.

All other information on file with Lloyd Thompson Limited . . .

8. About a week later, Mr Mitchell agreed and signed the pecuniary loss indemnity policy

wording which had been through a number of drafts. The precise status of this document and, in particular, whether it was by way of an endorsement of, or substitution for, the slip policy was in issue. Its form was as follows:

PECUNIARY LOSS INDEMNITY POLICY

Dated 22nd August 1997

HIH . . . being the company issuing this policy (hereinafter . . . referred to as the "Insurer") unconditionally . . . and irrevocably agrees with the "Assured" . . . that in consideration of the payment of the premium . . . and subject to the insuring clause, definitions, exclusions and conditions of this policy that the Insurer will pay amounts due to the Assured on the respective due dates payment as set out in this policy.

PREAMBLE

(A) Whereas Flashpoint Ltd . . . has invested or is in the process of investing six revenue generating entertainment projects collectively known as 7.23 (the Projects) where all the revenue gathered thereby . . . is due to be paid into the collection account and

(B) Whereas pursuant to the purchase agreement . . . dated on or about the date of this policy and made between Flashpoint Ltd and **Hollywood Funding** Ltd (the Purchaser) Ltd has agreed or will agree to pay to the escrow account . . . the collection amount . . . on the last day of the policy period . . . and

(C) Whereas the Purchaser has decided to fund its payment obligations under the purchase agreement by the issue of US$16,400,000 Zero Coupon Notes due 1999 . . .

(D) Whereas Flashpoint Ltd has procured the issue of this Policy in favour of the Assured

(E) Whereas neither the Purchaser nor the Assured is involved nor has any interest in the projects or in the collection amount

NOW THEREFORE

Clause 1 Insuring Clause

1.1 Initial Claim

If at the close of business on the last day of the Policy Period the amount of the balance standing to the credit of the Escrow Account is less than the Sum Insured (as defined in the Schedule) as a consequence of the occurrence of the Insured Peril then on the last day of the Waiting Period (as defined in clause 2.6 below) the Insurer will pay to, or to the order of, the Assured such US Dollar amount as is necessary to ensure that the Assured receives and retains in the Escrow Account a net sum equal to the Sum Insured . . .

Clause 2 Definitions

2.1 Insured Peril

Insured Peril means the failure to generate a balance in the Escrow Account as at the last day of the Policy Period equal to the Sum Insured, for any reason whatsoever.

This definition includes, but is not limited to, the failure of the Projects to generate a balance in the Collection account equal to, or in excess of, the Sum Insured or the failure of Flashpoint Ltd to make any payment under the Purchase agreement for any reason

whatsoever . . .

2.3 Escrow Account

The Escrow Account means the account set up with the Guernsey branch of Credit Suisse First Boston (account no 15091) in the name of the Assured.

Clause 4 Assignments and Amendments

4.1 Assignments by the Assured

The Assured may, at any time, assign all or any of its rights and benefits under this Policy.

4.3 Amendments to the Policy

This Policy may not be amended, cancelled, revoked or rescinded without the prior written consent of the Assured.

Clause 7 Governing Law and Jurisdiction

7.1 English Law

This Policy shall be governed by, and construed in accordance with, the laws of England and Wales.

7.2 English Courts

The Insurer and the Assured hereby irrevocably agree for the benefit of each other that the courts of England shall have jurisdiction to hear and determine any suit, action or proceedings . . .

Clause 8 Disclosure and/or Waiver Of Rights

8.1 To the fullest extent permissible by applicable law, the Insurer hereby agrees that it will not seek to or be entitled to avoid or rescind this Policy or reject any claim hereunder or be entitled to seek any remedy or redress on the grounds of invalidity or unenforceability of any of its arrangements with Flashpoint Ltd or any other person (or of any arrangements between Flashpoint Ltd or the Purchaser) or non-disclosure or misrepresentation by any person or any other similar grounds. The Insurer irrevocably agrees not to assert and waives any and all defences and rights of set-off and/or counterclaim (including without limitation any such rights acquired by assignment or otherwise) which it may have against the Assured or which may be available so as to deny payment of any amount due hereunder in accordance with the express terms hereof.

9. The reference in the slip policy to a "side agreement" is a reference to a collateral agreement between the claimants and Flashpoint. This agreement made provision for the collection and control of funds. Of particular note was that, pursuant to cl 5 of the collateral agreement, Flashpoint represented and warranted that --

. . . it has fully and accurately disclosed to HIH in respect of the Policy all information which is material to the consideration of the risks forming the policy, or to the terms, conditions and exclusions contained in the policy.

Furthermore cl 10 headed "Good Faith" reads as follows:

Flashpoint and HIH acknowledge that this agreement have been (sic) entered into for the

purposes of managing the risks contained in the policy and it is the parties intention that the utmost good faith shall be the essence of the relationship between them, and in the interpretation and the effect of this agreement and in the negotiation placement of the policy.

10. The second of the risks to be written was in respect of Rojack Films Inc just a few months after the 7.23 Productions insurance had been concluded. The claimants subscribed to the slip 100 per cent on Dec 4, 1997. The slip was in broadly similar terms to that in respect of 7.23 Productions. So far as there were any material differences they were as follows:

PERIOD: 23 months with effect from 8th December 1997.

INTEREST: Rojack Films Inc will produce and make 10 made-for-TV films . . .

SUM INSURED: Maximum US$2,000,000 any one film and US$15,500,000 in the aggregate.

The pecuniary loss indemnity policy wording issued in respect of this slip was in materially identical terms.

11. The reinsurance slip in respect of 7.23 Productions provided (inter alia) as follows:

TYPE: As Original Policy.

FORM: Quota Share Reinsurance Slip Policy . . .

INTEREST: As Original Policy

ORIGINAL SUM INSURED: Maximum USD3,900,000 any one film and USD16,400,000 in the aggregate.

SUM REINSURED: USD13,120,000 in the aggregate quota share part of USD16,400,000 in the aggregate . . .

CONDITIONS: This Reinsurance is subject to all terms, clauses and conditions as original and to follow that placement in all respects.

This Reinsurance to bear its proportion of any and all costs and expenses incurred under the Original Insurance.

The Reinsured hereon agrees to consult and obtain Reinsurers' agreement to all amendments and alterations to the terms, clauses and conditions of the Original Policy. The Reinsured also agrees to obtain Reinsurers (agreement) to the appointment of any advisor and/or lawyer in the event of a claim being made under the OrIginal Policy and/or a dispute under the original Policy. The Reinsured further agrees to obtain Reinsurers' agreement to the appointment of accountants and/or auditors as deemed necessary under the Original Policy. In consideration of the above, Reinsurers hereon agree that in the event of claim and/or professional advisors fees and expenses being incurred under the Original Policy, this Reinsurance will pay at the same time.

Cancellation Clause as Original Policy . . .

INFORMATION: see copy of original Slip and information as held on file with Lloyd Thompson Limited.

12. The reinsurers who subscribed that reinsurance slip were Axa, New Hampshire (AIG), CCR, Kravag, Deutscher Lloyd and Independent. It is perhaps to be noted that AIG's stamp was "subject to reinsurance" and Independent's stamp was expressed on the basis "to max

loss any one film for 100% is USD3,900,000."

13. The stamps of all the reinsurers were subject to "all amendments being agreed". With the exception of differences reflecting those between the two underlying policies, the reinsurance slip in respect of Rojack was on the same terms. The reinsurers were Axa, New Hampshire (AIG), CCR and GIO.

14. At the expiry of the policy period in relation to the 7.23 slate, revenue collected was only US$1,621,500 leaving a shortfall from the sum insured of some US$14,778,500. Similarly at the expiry of the policy for a period relating to Rojack slate, the revenue collected was only US$829,526.43, giving another substantial shortfall from the sum insured. The claims of LDT were paid by the claimants.

15. There are extensive pleadings in all the actions but there are certain issues that are common, both as between the various reinsurers and as between the two film projects that had been insured. The principal examples of these common issues are as follows:

(a) the reinsurers contend that the underlying insurance contained a warranty to the effect that a slate of six or 10 films respectively would be made;

(b) the reinsurers contend that the reinsurance contained such a warranty and a further warranty that the insurers would obtain the consent of reinsurers to any amendment to the terms of the underlying insurance;

(c) the claimants contend that cl 8 of the policy wording disabled them from relying upon any breach of warranty by the original assured;

(d) the claimants further contend that cl 8 was a term of the reinsurance and precluded the reinsurers from relying upon any breach of warranty and further precluded the reinsurers from relying upon any misrepresentation or non-disclosure unless the same was fraudulent.

16. Against this background the following preliminary issues were ordered to be determined.

1 Are the terms (of both the insurance contracts and reinsurance contracts) alleged by the Reinsurers to have been warranties in fact such?

2 What is the effect of Clause 8 of the underlying insurance contract? In particularly does it mean that the facts and matters alleged in the defences (if true) would not have provided the Claimant Insurer/Reinsured with a defence (whether in whole or in part) to the underlying Insured's claim?

3 On the assumption that the Reinsurers' underwriters were aware that the underlying policy wording contained Clause 8, was Clause 8 a term of the reinsurance contract? Is the answer different if the underwriters were not so aware?

4 What is the effect of Clause 8 in the context of the reinsurance contracts? In particular does it mean that:

(i) The facts and matters alleged in the defences and counterclaims (if true) do not provide the Defendant Reinsurers with a (complete or partial) defence (including by way of set-off) to the Claimants Insurers/Reinsured's claim; and/or

(ii) the Defendant's Reinsurers do not (or did not) have the right to avoid the reinsurance contract on grounds of misrepresentation or non-disclosure (assuming they otherwise have or had such a right) irrespective of whether or not the relevant misrepresentation or non-disclosure was negligent or fraudulent as opposed to innocent.

Issue 1: Warranty

17 The question is drafted in broader terms but the central issue here is whether the insurance or reinsurance or both contained a warranty to the effect that a slate of 6 or 10 films respectively would be made. This in turn breaks down into two questions: (i.) Was there a term to that effect in either or both the underlying and the reinsurance policies? (ii.) If so, did it have the status of a warranty?

18. The threshold issue is to determine what document or documents constitute the underlying insurance. It was HIH's case that the policy was contained solely in the pecuniary loss indemnity policy dated Aug 22, 1997. This, it was contended, had superseded the slip policy. Accordingly, it was further submitted, it was not permissible to have regard to the slip even as an aid to construction of the insurance contract: see Youell v Bland Welch & Co Ltd, [1992] 2 Lloyd's Rep 127.

19. In support of this proposition, HIH argued that the express condition that the pecuniary loss indemnity wording was to be agreed by leading underwriter exhibited an intention that the slip policy should be replaced by a formal policy. Consistent with that, the policy dated Aug 22 went beyond setting out the wording and constituted a self-contained contract of insurance.

20. I am not persuaded by that argument. It strikes me as notable that the slip is indeed headed "slip policy". The conditions expressly contemplate the preparation of wording to be agreed, without any inference that the wording should be in the form of a formal policy in substitution for the slip policy. While the "policy" dated Aug 22 is, on one view, fashioned in the form of a complete policy, it notably contains no reference, for example, to the maximum of US$3.9 m "any one film". While it is possible that this reflects agreement with the leading underwriter to exclude that limitation, this is a conclusion that I would reach with the greatest of hesitation given the presence of such a limit in the reinsurance slip policy. (Indeed HIH was at pains to emphasize the need for the two policies to be back to back.)

21. It has to be said that the structure of the insurances only makes sense in the context of cover being furnished for a specific number of films. The sum insured reflected the combined cost of producing the entire slate, the premium being a percentage thereof. Consistent with this, the placing documentation spoke to a "slate" of films. In contrast, underwriters would probably not have been able to rely upon the terms of the side agreements in the event of a shortfall on the number of films since there was no express provision contained in them about completing the slate.

22. I prefer the view that the underlying policy is contained in the slip policy, subject to the terms and conditions contained in the policy wording dated Aug 22. I am fortified in this view by the terms of the cover notes issued by the brokers and, indeed, the formulation of par 1 of the various particulars of claim filed by HIH to the same effect. It follows that, in my judgment, it was a term of the policy that the full slate would be made.

23. If this conclusion were wrong, there would remain the issue whether such a term is contained within the August policy in any event. This is more finely balanced but I prefer the view that there is such a term. The preamble defines the "projects" as the full slate of films. Any commercially realistic construction of the specified insured peril involves the premise that the projects are to be completed in order to generate such income as may be forthcoming. Otherwise the policy becomes a cash performance bond which must answer even if none of the films are made despite the provision of funding.

24. Once the conclusion is reached that it was a term of the policies that the full slate of films would be made, it is readily to be concluded that the term was a warranty. The absence of

the word "warranty" is of no significance. The test is whether the clause has a material bearing on the risk: see Barnard v Faber, [1893] 1 QB 340. It manifestly does in the sense that, the fewer the films that are made, that very same few must generate the same return. It is no answer to treat breach of the term as answerable in damages as it would be impossible to assess the shortfall attributable to a particular missing film.

25. Other alleged warranties in the underlying insurance were only advanced in the most tentative form and I say no more about them. However, once it is concluded that the underlying policies contained a warranty with regard to the completion of the full slate, it can readily be concluded that the reinsurance contracts contained the same warranty. I see this despite the reservations expressed by Lord Griffiths with regard to the incorporation of a warranty from the underlying policy in a different context; Forsikringsaktieselskapet Vesta v Butcher, [1989] 1 Lloyd's Rep 359; [1989] AC 852. In the first place, the interest in the reinsurance slip is expressed "as original policy". This in itself imports the need for the full slate.

26. Furthermore, as both HIH and New Hampshire have been at pains to emphasize, I accept the basic need for the two levels of insurance to be back-to-back. This was put, legitimately in my view, as a matter of general principle in the context of facultative insurance (see eg Forsikringsaktieselskapet Vesta v Butcher, [1989] 1 Lloyd's Rep 359; [1989] AC 852 and Groupama Navigation et Transports v Catatumbo CA Seguros, [2000] 2 Lloyd's Rep 350). But stress was also properly put on the history of the placement which demonstrated that HIH was fairly to be regarded as "fronting" the insurance for a pool: the result was not dissimilar to a split of the risk at the primary level among all the underwriters, with HIH as the leader.

27. All three reinsurers also alleged that the term in the contracts of reinsurance that required the reinsured to obtain the reinsurers' agreement to all amendments to the original policy was a warranty. In this connection I derive no assistance, contrary to the submissions on behalf of HIH, from the adjacent terms relating to the appointment of lawyers and accountants and payment of their fees. In particular I reject the submission that the prescribed remedy for breach of the amendment clause is non-simultaneous payment by reinsurers. In the event of a material amendment, such would be no remedy at all.

28. The starting point, as I see it, is to determine the true scope and meaning of the amendment clause. In particular, does it cover any amendment or only a material amendment? For instance, cl 9.2 of the wording provides:

Notwithstanding Clause 5 no claim may be made under this Policy after the expiry of 180 days after the last day of the Discovery Period.

In the event that the reinsured was to agree with the original assured to a reduction of that period to, say, 100 days, an amendment that on any view would not be material to the risk, would the clause require agreement on the part of the reinsurers?

29. The only commercially realistic construction of the clause, in my view, involves excluding from its application immaterial amendments. By immaterial, I mean changes that do not affect the sense or substance of the underlying policy in a manner potentially prejudicial to the reinsurer. If this were right, it follows, in my judgment, that it would be right to categorize the amendment clause as a warranty. The outcome does no more than give contractual substance to the position at common law: see Norwich Union Fire Insurance Society Colonial Mutual Fire Insurance Co, (1922) 12 Ll L Rep 215; [1922] 2 KB 461.

Issue 2: Effect of cl 8 in the underlying insurance

30. It is important to bear in mind the context in which this issue is raised. The reinsurers contend that HIH was not liable to the underlying assured on various grounds, some of which

can be categorized as coverage issues (eg the loss was not fortuitous, the loss attributable to the failure to complete the full slate was not an insured risk, etc) and some of which can be categorized as breach of warranty issues (eg the failure to complete the slate, agreement to reduce the size of the slate, etc). It is the case of HIH that, by virtue of cl 8 of the wording, these matters afforded it no defence of LDT's claim.

31. As I understood it, HIH placed particular reliance in the context of coverage issues to the second sentence of cl 8 and, in effect, extracted from it the proposition that it reflected an irrevocable agreement on the part of HIH not to rely on any defence which it might have against the insured. This would unquestionably constitute a startling agreement since it would render the cover no less than an on-demand performance bond which must respond to any, or at least any honest, claim. I agree with the defendants that such a conclusion involving the removal from the agreement of the basic ingredients of a contract of insurance is one which the Court would only reach in the face of the clearest language: see Tor Line AB v Alltrans Group of Canada Ltd, [1984] 1 Lloyd's Rep 123; [1984] 1 WLR 48.

32. In my judgment, the concluding phrase "so as to deny payment of any amount due hereunder in accordance with the express terms hereof" makes it plain that the waiver is in respect of defences akin to rights of set-off or counterclaim. It is the very antipathy of a waiver of coverage defences where, by definition, an amount is not due to be paid. This conclusion also puts paid to any reliance on the second sentence in regard to a breach of warranty.

33. In any event, as regards breach of warranty, HIH were minded to place more particular reliance on the first sentence. The submission was that a breach of warranty fell within "any other similar grounds". I do not agree. It is not similar (nor was it suggested to be) to "invalidity or unenforceability" of the arrangements with Flashpoint. Nor is it similar to "non-disclosure or misrepresentation". The effect of breach of warranty is to discharge the insurer from liability. Non-disclosure or misrepresentation gives rise, consistent with the terms of the clause, to rights of avoidance, rescission and rejection.

Issue 3: Was cl 8 incorporated into the reinsurance contract?

34. Here the reinsurers part company. New Hampshire accept that cl 8 forms part of the reinsurance contract by virtue of the condition that "this reinsurance is subject to all terms, clause and conditions as original". Axa and Independent do not. Although the matter does not call for decision at this stage, there may be a factual justification for distinguishing between Axa and Independent in that the former appears to have scratched a copy of the wording in July but the latter did not. This disparity explains the alternative formulation of the issue.

35. It is convenient to start with the question whether the reference in the reinsurance slips to "Cancellation Clause as Original Policy" is a specific reference to cl 8. It certainly is not entitled as such and its content, insofar as it touches on the availability of rights of cancellation, excludes or waives them. Indeed, it is perhaps better classified as a "non-cancellation" clause.

36. In this connection, some reliance was placed in the oral argument on the expert evidence. I had put before me two experts' reports. Neither of the authors was called to give oral evidence. The primary purpose of the reports was express opinions on the usualness of cl 8. I am doubtful of the admissibility of their views on the significance of the reference to a cancellation clause in the original policy. Suffice it to say that one expert suggested that the clause referred to was cl 8 while the other suggested cl 4.3.

37. I do not think this latter option is arguable. The choice, as I see it, is between there being no such clause and cl 8. If possible, it is desirable to give some meaning to the specific

identification of this clause. On balance, I prefer the conclusion that, on its proper construction, it refers to cl 8. If this be right, I would further conclude that the clause would be thereby incorporated. This would be on the basis that the express reference to cl 8 made by virtue of the condition is sufficient to render the reinsurers aware of the clause so as not to inhibit incorporation of the clause on this ground (and to put them at the least on enquiry for the purposes of disclosure).

38. However, I may be wrong about this, a possibility all the more likely given that such a contention is not, as I read it, any part of the pleaded case of HIH. Accordingly, I go on to consider whether the clause has been included by reason of the general words of incorporation. The starting point is the presumption, already referred to, that the purpose and impact of such a provision is to make the arrangements back to back: see Citadel Insurance Co v Atlantic Union Insurance Co SA, [1982] 2 Lloyd's Rep 543 per Lord Justice Kerr at p 546.

39. I have been referred to a number of cases that have considered the effect of such general words in the fields of insurance and carriage of goods. I would summarize their effect as follows. Incorporation of a specific term (or condition) is only achieved if: (i.) The term is germane to the reinsurance. (ii.) The term makes sense, subject to permissible "manipulation", in the context of the reinsurance. (iii.) The term is consistent with the express terms of the reinsurance. (iv.) The term is apposite for inclusion in the reinsurance.

40. Is cl 8 germane to the reinsurance? In my judgment, it is. It may not be part of the central definition of the risk. But it is material to the nature and scope of the risk in the same way as an exceptions clause is germane to the shipment, carriage and discharge of goods under a bill of lading: see TW Thomas & Co Ltd v Portsea Shipping Co Ltd, [1912] AC 1. The clause is not collateral, as for example with an arbitration clause or choice of law or jurisdiction clause: see Pine Top Insurance Co v Unione Italiana Anglo-Saxon Reinsurance Co [1987] 1 Lloyd's Rep 476, Excess Insurance Co v Mander, [1997] 2 Lloyd's Rep 119. The dividing line is most eloquently expressed, albeit in the context of a construction dispute, in the judgment of Sir John Megaw in Aughton Ltd v MF Kent Services Ltd, [1991] 31 Con LR 60 at p 86ff.

41. Does cl 8 make sense? While the references to arrangements with Flashpoint are not directly apposite, only a minor adaptation is required to make the clause workable in the context of the reinsurance. In short, the reference to the "Insurer" needs to be replaced by "Re-insurer" and the reference to the "Assured" by Re-assured". I regard such manipulation as appropriate and permissible: see eg CAN International Co Ltd v Companhia de Seguros Tranquillidade SA, [1999] CLC 140.

42. Is the term consistent? It certainly does not contradict any of the express terms of the reinsurance contact: cf Home Insurance Co of New York v Victoria-Montreal Fire Insurance Co [1907] AC 59, Australian Widows Fund Life v National Mutual Life, [1914] AC 615.

43. Is the term in some other respect inapposite? It was argued by reinsurers that incorporation of the clause was inappropriate. The major theme to this submission was that, unlike the reinsured, the reinsurers could not rely upon the terms of the side agreements that contained warranties to the effect that there had been no non-disclosures or misrepresentations during the placement.

44. This point, in my view, begs the question, since reinsurers could exercise rights of subrogation under the side agreement in the event they were deprived of a defence under cl 8 in circumstances giving rise to a claim under the side agreement. Where, as I have indicated, the set-up is akin to a fronting arrangement, I see nothing inapposite in treating cl 8 as incorporated in the reinsurance slip.

45. This leaves a further point taken by both Axa and Independent to the effect that cl 8 could not be incorporated by the general words since it was unusual. The first point to be grappled with here is the issue of fact whether the clause is unusual (although there is an element of unreality here in that insurance cover of this class in the UK has no standard terminology or forms). As already mentioned, I have had the benefit of expert evidence on this topic. Mr Day, retained by HIH, had considerable experience of financial "risk" insurance on the London market: Mr Godfrey had considerable experience of financial "guarantee" insurance in the US. Neither was called to give oral evidence.

46. It was clear that there were significant differences between the two markets. (Indeed, it would appear that the standard form financial guarantee policies issued on the American market not only do not have, but can have no place for, a cl 8 equivalent since they are in terms unconditional and irrevocable). I have thus felt it right to impose much greater reliance on the views of Mr Day. As I understood his evidence, clauses such as cl 8 are often requested by the assured in this class of business and are sometimes agreed, more often where there are collateral agreements.

47. Quite where this leaves the clause on the spectrum from usual to unusual is not easy to identify. At one extreme, I do not categorize it as unconscionable or extortionate: at the other, it is not standard or customary. For present purposes, I am disposed to proceed on the assumption that it is arguable (and as I understand it, the issue is not for determination at this stage) that a fair presentation of the risk would involve its disclosure: mere notice of there being terms applicable to the underlying policy might not be sufficient to put reinsurers on inquiry: see Property Insurance Co v National Protector Insurance Co, [1913] LT 104, Container Transport International Inc v Oceanus Mutual Underwriting Federation (Bermuda) Ltd, [1984] 1 Lloyd's Rep 476 per Lord Justice Kerr at 498. (However, I recognize that, if there is notice adequate enough to allow incorporation (see below), it may be a rare case where the same notice is not adequate to discharge the obligation of good faith.)

48. More directly in point for present purposes was the reliance by Axa and New Hampshire on a passage in MacGillivray on Insurance Law 9th ed at par 33-52 to the following effect:

A difficulty has arisen where the original insurance contract contains an unusual term about which the reinsurer is unaware at the time when incorporation is agreed. It has been held that a reinsurer is not bound by the incorporation of terms unless they are well known and in common use. The reasoning is that the reinsurer may not be entitled to see, or will not in practice be aware of, the precise terms of the underlying insurance. It is submitted that the fact that a clause is highly unusual may be relevant to the question whether the parties intended that clause to be incorporated into their contract.

49. It is certainly right that it has been held that reinsurers are bound by usual or customary terms in the underlying policy even when they extend or expand the scope of the reinsurers' liability: put another way that commonplace terms can even override an inconsistency: see Marten v The Nippon Sea and Land Insurance Co, (1898) 3 Com Cas 164, Charlesworth v Faber, (1900) 5 Com Cas 508. Whether general terms of incorporation can import an unusual or uncommon term is quite a different question. In my judgment, the issue is to be approached as a matter of general principle in the light of such decisions as Interfoto Picture Library Ltd v Stiletto Visual Programmes Ltd, [1989] QB 433. I particularly bear in mind the judgment of Lord Justice Bingham who concluded that failure to draw attention to an onerous clause might prevent reliance upon it. He summarized his approach as follows:

. . . The tendency of the English authorities has, I think, been to look at the nature of the transaction in question and the character of the parties to it; to consider what notice the party alleged to be bound was given of the particular conditions said to bind him; and to resolve whether in all the circumstances it is fair to hold him bound by the condition in question.

50. The following seem to me to be the most material considerations: (i.) This is a contract of reinsurance, which is intended to be back-to-back with the underlying insurance. (ii.) It is expressly subject to "all" terms and to "follow that placement in all respects". (iii.) The clause in question is in no sense unique in this class of insurance, particularly where there is a collateral agreement. (iv.) The slip records that information is available on the brokers' file: this would have included drafts of the wording. (v.) As a matter of commercial convenience, it is desirable that all reinsurers subscribing to the same slip should contract on the same terms. (vi.) Insofar as aspects of good faith arise, individual reinsurers may be able to avoid the policy if the presentation to them, including considerations of notice of the clause, was unfair.

51. In these circumstances, I conclude that, even if the condition in the slip referring to the cancellation clause was not thereby making reference to cl 8 or, even if it was, such was not sufficient in itself to incorporate that clause, it is fair nonetheless to all the reinsurers to treat the clause as incorporated by the general words.

Issue 4: Effect of cl 8 in the reinsurance contract

52. I reject the submission that the effect is solely to agree to follow settlements made by HIH where otherwise HIH would have had a defence. The focus therefore is on the extent to which the clause is apt to exclude reliance on remedies in relation to non-disclosure and misrepresentation by the reinsured. It is conceded by reinsurers that the clause prohibits avoidance on the grounds of innocent non-disclosure and innocent misrepresentation. At the other end of the spectrum, there are in fact no allegations of fraud against HIH or its agents (For the record, I hold that it is not open to a party to exclude liability for his own fraud in inducing the contract: see S Pearson & Son Ltd v Dublin Corporation, [1907] AC 351. I have also been asked to confirm that cl 8 has no effect in the face of an allegation of illegality, for instance the newly pleaded case of wagering. I do so confirm, although illegality in relation to arrangements with Flashpoint might be a different matter.)

53. There have been two recent decisions in which similar issues arose. In Toomey v Eagle Star Insurance Co Ltd (No 2), [1995] 2 Lloyd's Rep 88, the relevant clause read: This contract is neither cancellable nor voidable by either party. Having directed himself on the principles of construction to be derived from Canada Steamship Lines Ltd v The King, [1952] 1 Lloyd's Rep 1; [1952] AC 192, Mr Justice Colman concluded that the clause did not exclude avoidance for negligent non-disclosure or misrepresentation primarily because there was no exclusion of a remedy in damages.

54. In HIH Casualty and General Insurance Ltd Chase Manhattan Bank, [2001] 1 Lloyd's Rep 30, there was an elaborate clause, the most pertinent section of which read:

. . . the Insured will not have any duty or obligation to make any representation, warranty or disclosure of any nature, express or implied (such duty and obligation being expressly waived by the insurers) and shall have no liability of any nature to the insurers for information provided by any other parties and any such information provided by or non-disclosure by other parties shall not be a ground or grounds for avoidance of the insurers' obligations under the policy or the cancellation thereof.

55. Mr Justice Aikens took the view that, since the pre-contractual duties of non-disclosure and misrepresentation that arise in the insurance context are unitary and absolute, there being no need to establish negligence and only the remedy being by way of avoidance, the Canada Steamship case was not directly applicable. Nonetheless he decided the exclusion covered neither deliberate concealment nor negligence. Particular emphasis was placed in this context on clear wording in another clause that expressly excluded an indemnity for loss arising from "any fraud, misrepresentation or concealment by the Insured."

56. Each such exclusion must be considered in the light of its own terms and its own context. I do not believe that the issue is much advanced by considering the application or otherwise of the Canada Steamship case. I accept that it is necessary to discern a clear intention to exclude the consequences of a breach of a duty of good faith. In the present case, no point arises as to the extent to which the remedies for deliberate concealment or misstatement is excluded. However, I have concluded that the parties did intend to exclude the consequences of inadvertent concealment or misrepresentation whether careless or not. My reasons are: (i.) The insurer expressly forgoes rights of avoidance, rejection of any claim or any remedy for non-disclosure or misrepresentation. (ii.) The obligations of good faith are indeed unitary and absolute: the establishment of a negligent misstatement adds nothing: the very concept of a negligent non-disclosure is not easy to grasp. (iii.) There is no indication in the rest of the policy wording that the parties were minded to distinguish between deliberate, careless and accidental activity. (iv.) The introductory words "to the fullest extent permissible by applicable law" on their natural meaning accord the widest possible scope to the exclusion. I reject the submission that it means no more than: "Avoidance for innocent misrepresentation or non-disclosure is not permitted, unless the law prohibits such an exclusion".

Conclusion

I am extremely grateful to all Counsel for their detailed oral and written submissions. I shall need their further assistance in formulating the answers to the preliminary issues in the light of this judgment.

**SOLICITORS:**
Holman Fenwick & Willan; Kennedys; Davies Lavery; DJ Freeman.tWordStar 4.0B Messages 14 Feb 87Copyright (C) 1983,1987 MicroPro International Corp.All

Source: Legal > Legal (excluding U.S.) > United Kingdom > Case Law > **UK Cases, Combined Courts** i
Terms: **hollywood funding** (Edit Search)
View: Full
Date/Time: Friday, January 21, 2005 - 8:14 AM EST

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.