# EXHIBIT B

Source: Legal > Legal (excluding U.S.) > United Kingdom > Case Law > **UK Cases, Combined Courts**  i
Terms: **hollywood funding** (Edit Search)

✔Select for FOCUS™ or Delivery

*[2001] EWCA Civ 735, [2001] 2 Lloyd's Rep 161, [2001] Lloyd's Rep IR 596*

HIH CASUALTY AND GENERAL INSURANCE LTD v NEW HAMPSHIRE INSURANCE CO AND OTHERS

COURT OF APPEAL (CIVIL DIVISION)

*[2001] EWCA Civ 735, [2001] 2 Lloyd's Rep 161, [2001] Lloyd's Rep IR 596*

**HEARING-DATES: 13, 14, 15, 21 May 2001**

21 May 2001

**CATCHWORDS:**
Reinsurance -- Indemnity -- Warranty -- Allegations of breach -- Reinsurers denied liability -- Whether reinsurers correctly identified terms in underlying insurance contracts as warranties -- Effect of "Disclosure and/or Waiver of rights" clause in underlying insurance contract -- Whether clause incorporated into reinsurance contracts -- Effect of clause in reinsurance contracts.

**HEADNOTE:**
The claimants (HIH) had underwritten two film finance insurance policies concerning two separate groups of films: one with regard to a number of films to be co-produced by 7.23 Productions LLC and Flashpoint Ltd (the "7.23 slate"); the other with regard to a number of films to be co-produced by Rojak Films Inc and Flashpoint Ltd (the "Rojak slate"). The insured was Law Debenture Trust (LDT). The insurance was a pecuniary loss indemnity insurance and was to indemnify LDT if at the end of a defined period there was a shortfall between the amount of finance provided and the revenue collected.

The pecuniary loss indemnity policy in respect of the 7.23 Productions, dated Aug 22, 1997, contained various terms including the following:

Clause 8 Disclosure and/or Waiver Of Rights

8.1 To the fullest extent permissible by applicable law, the Insurer hereby agrees that it will not seek to or be entitled to avoid or rescind this Policy or reject any claim hereunder or be entitled to seek any remedy or redress on the grounds of invalidity or unenforceability of any of its arrangements with Flashpoint Ltd or any other person (or of any arrangements between Flashpoint Ltd or the Purchaser) or non-disclosure or misrepresentation by any person or any other similar grounds. The Insurer irrevocably agrees not to assert and waives any and all defences and rights of set-off and/or counterclaim (including without limitation any such rights acquired by assignment or otherwise) which it may have against the Assured or which may be available so as to deny payment of any amount due hereunder in accordance with the express terms hereof.

The slip policy in respect of the Rojak Films Inc was in broadly similar terms to that in respect of 7.23 Productions.

HIH reinsured its liability under both policies. Axa Reassurance SA (Axa) and New Hampshire Insurance Co Ltd were reinsurers in respect of both policies and Independent Insurance Co Ltd were reinsurers in respect of the 7.23 policy only.

HIH having paid LDT sums totalling over US$31 m sought to recover under the reinsurance agreements. The reinsurers refused to indemnify HIH on the grounds that HIH should not have paid LDT or alternatively that, whatever the position under the insurance contract they were not obliged to pay under the reinsurance contracts for various reasons including breaches of warranty and breaches of the duty of good faith.

The reinsurers contended that the underlying insurance contained a warranty to the effect that a slate of six or 10 films respectively would be made and that the reinsurance contained such a warranty and a further warranty that the insurers would obtain the consent of reinsurers to any amendment to the terms of the underlying insurance.

The claimants submitted that cl 8 of the policy wording disabled them from relying on any breach of warranty by the original assured and that as cl 8 was a term of the reinsurance it precluded the reinsurers from relying on any breach of warranty and further precluded the insurers from relying upon any mispresentation or non-disclosure unless the same was fraudulent.

The following preliminary issues were ordered to be determined:

1 Are the terms (of both the insurance contracts and reinsurance contracts) alleged by the Reinsurers to have been warranties in fact such?

2 What is the effect of Clause 8 of the underlying insurance contract? In particular does it mean that the facts and matters alleged in the defences (if true) would not have provided the Claimant Insurer/Reinsured with a defence (whether in whole or in part) to the underlying Insured's claim?

3 On the assumption that the Reinsurers' underwriters were aware that the underlying policy wording contained Clause 8, was Clause 8 a term of the reinsurance contract? Is the answer different if the underwriters were not so aware?

4 What is the effect of Clause 8 in the context of the reinsurance contracts? In particular does it mean that:

i The facts and matters alleged in the defences and counterclaims (if true) do not provide the Defendant Reinsurers with a (complete or partial) defence (including by way of set-off) to the Claimants Insurers/Reinsured's claim; and/or

ii the Defendant's Reinsurers do not (or did not) have the right to avoid the reinsurance contract on grounds of misrepresentation or non-disclosure (assuming they otherwise have or had such a right) irrespective of whether or not the relevant misrepresentation or non-disclosure was negligent or fraudulent as opposed to innocent.

-- Held, by QB (Com Ct) (DAVID STEEL, J), that (1) the underlying policy was contained in the slip policy subject to the terms and conditions contained in the policy wording dated Aug 22; it was a term of the policy that a full slate would be made and that term was a warranty; and the reinsurance contracts contained the same warranty;

(2) the only commercially realistic construction of the amendment clause involved excluding from its application immaterial amendments ie changes which did not affect the sense or substance of the underlying policy in a manner potentially prejudicial to the reinsurer; if this was right it would be right to categorize the amendment clause as a warranty;

(3) the concluding phrase of cl 8 "so as to deny payment of any amount due hereunder in accordance with the express terms hereof" made it plain that waiver was in respect of

defences akin to rights of set-off or counter-claim; it was the very antipathy of a waiver of coverage defences where by definition an amount was not due to be paid;

(4) the submission that breach of warranty fell within "any other similar grounds" in cl 8 would be rejected; it was not similar to "invalidity or unenforceability" of the arrangements with Flashpoint; nor was it similar to "non-disclosure or misrepresentations"; the effect of a breach of warranty was to discharge the insurer from liability; non-disclosure or misrepresentation gave rise, consistent with the terms of the clause to rights of avoidance, rescission and rejection;

(5) on its proper construction the reference in the reinsurance slips to "Cancellation Clause as Original Policy" referred to cl 8; and the clause was thereby incorporated in the reinsurance contracts;

(6) even if the condition in the slip referring to the cancellation clause was not thereby making a reference to cl 8 or even if it was, such was not sufficient in itself to incorporate that clause, but it was fair nonetheless to all the reinsurers to treat the clause as incorporated by the general words;

(7) the effect of cl 8 was not solely to agree to follow settlements made by HIH where otherwise HIH would have had a defence;

(8) it was necessary to discern a clear intention to exclude the consequences of a breach of duty of good faith; the parties did intend to exclude the consequences of inadvertent concealment or misrepresentation whether careless or not.

HIH appealed and the reinsurers cross-appealed the issues for decision being: (i) whether it was a term of the original slip policy that six films (or in the case of the Rojak slate 10 films) would be completed; (ii) whether the six film term was a term of the policy wording; (iii) whether the policy wording superseded the original slip policy; (iv) whether the six film term was a term of the reinsurance slip policy; (v) if a term of any of the insurances whether the six film term was a warranty; (vi) whether the term in the reinsurance slip policy that HIH agreed to consult and obtain reinsurers' agreement to all amendments was a warranty; (vii) whether cl 8 covered and excluded breach of warranty defences; (viii) whether cl 8 covered and excluded negligent misrepresentation and non-disclosure; (ix) whether cl 8 was specifically incorporated into the reinsurance contracts by reason of the term therein "Cancellation clause as Original Policy"; (x) if there was no specific incorporation of cl 8 whether it was incorporated into the reinsurance contracts by reason of general words of incorporation; (xi) for these purposes whether it made any difference whether cl 8 was an unusual term; whether it was an unusual term: whether incorporation of such a term was fair; (xii) for these purposes whether it made any difference whether a reinsurer was aware of cl 8; (xiii) if cl 8 was incorporated into any reinsurance contract, what was its effect there? (xiv) whether the six film term was a term of the original slip policy.

-- Held by CA (PETER GIBSON, MUMMERY and RIX, LJJ), that (1) the slip policy stated against the word "INTEREST" that "7.23 Productions will produce and make six made-for-TV films"; having regard to the need for the revenues of each firm to cross-collateralize with the revenues of each other film there could be no doubt that it was a term of the insurance that the stipulated number of films would be made; and the original slip policy contained a term that six films would be produced and made (see p 175, cols 1 and 2);

(2) the making of the films was inherent in talk of their failure to generate revenues; unless made they could not be revenue generating and it was their failure to generate revenue which was at the heart of the risk underwritten; "the failure of the Projects to generate a balance . . ." meant or necessarily implied that there would be six films to generate a balance whose failure to do so in sufficient quantities would produce an insured loss; an insured loss

could only occur if the "projects" had failed to generate sufficient funds in the relevant account (see p 176, col 1);

(3) it was not necessary to decide the issue whether the slip policy was superseded by the policy wording but it appeared it was not; the policy wording itself could be and ought to be construed against the background of the original slip policy; that produced the result both that there was no reason to think that the term "7.23 Productions will produce and make six made-for-TV films" ever ceased to be a term of the insurance, and that in any event the policy wording's construction was further strengthened by reference to the wording of the original slip policy (see p 181, cols 1 and 2);

(4) the six film term was a term of the reinsurance slip policy (see p 181, col 2);

(5) once the six film term was established as a term of the insurance or reinsurance contract, the grounds for holding it to be a warranty were very strong; it was a question of construction and the presence or absence of the word "warranty" or "warranted" was not conclusive; the six film term was a term which went to the root of the transaction; it was descriptive of or bore materially on the risk of loss; and damages would be an unsatisfactory or inadequate remedy; and once the six film term was seen as being a term of the insurance, whether set out as it was in the original slip policy or derived from the construction of the policy wording, it was immediately clear that it was the essence of the risk underwritten; if the slate of (six) films was made with the moneys invested the insurers would indemnify the investors against the loss (see p 182, cols 1 and 2);

(6) the term of the reinsurance policy that HIH agreed to consult and obtain the reinsurers' agreement to all amendments was a warranty (see p 182, col 2; p 183, cols 1 and 2);

(7) the learned Judge was right to reject the submission that cl 8 contained a defence to breaches of warranty (see p 184, col 1; p 185, col 2);

(8) cl 8 covered and thus excluded a defence based on negligent misrepresentation and non-disclosure; the language of the clause was very wide; its opening words were words of widely saving but they emphasized that the language of the clause was intended to be read as widely as it properly could be; and there was no reason why the words "any claim . . . any remedy or redress on the grounds of . . . non-disclosure or misrepresentation . . . or any similar ground" did not embrace a claim based on negligent non-disclosure or s 2 of the Misrepresentation Act, 1967 (see p 188, col 1);

(9) it would be wrong to find in the term "Cancellation Clause as Original Policy" a specific reference to cl 8; and the reference to a "cancellation clause" simply failed to have content; if that was wrong and the reference was to cl 8 then cl 8 would have been incorporated into the reinsurance contracts (see p 189, cols 1 and 2; p 190, col 1);

(10) on the assumption that the insurances were intended and reinsurance contracts were intended to be back to back and that the set up was akin to a fronting arrangement cl 8 could not be incorporated in manipulated form into the reinsurance contracts; it did not make sense, could not be successfully manipulated and even if it could be could have an effect contrary to the reason of the thing; the incorporation of cl 8 in unmanipulated form would make sense and would be apposite; cl 8 was germane to the reinsurance; in its unmanipulated form it was a form of "follow the settlement" clause and nothing could be more germane to a reinsurance than a form of follow the settlement clause; cl 8 was not a collateral clause; and cl 8 was not to be regarded as incorporated into the reinsurance contracts in its manipulated form but could properly be regarded as incorporated in its unmanipulated form (see p 193, cols 1 and 2; p 194, cols 1 and 2; p 195, cols 1 and 2);

(11) on the evidence the learned Judge was perfectly entitled to find that clauses such as cl 8

were sometimes agreed particularly when supported by a collateral agreement even though not standard or customary; the clause was not unconscionable or extortionate and the clause was unusual but something which the market would recognize; the terms of the reinsurance slip policy that the reinsurance was subject to all the terms as original together with the invitation to consult the information held on the brokers file collectively placed on the reinsurers the burden of showing that cl 8 was not incorporated or that the proposal was unfairly presented (see p 198, col 1; p 200, col 1);

(12) if a reinsurer was actually or constructively aware of cl 8 then plainly it could not be said that it had not had sufficient notice of it; if however cl 8 could only become part of the reinsurance contract if the reinsurer had actually agreed to it then it would be necessary to show that the clause had been actually agreed and not merely that sufficient notice of it had been given (see p 200, col 1);

(13) the effect of cl 8's incorporation into the reinsurance contracts was to bind the reinsurers to pay. despite any non-disclosure or misrepresentation covered by the clause in circumstances where the non-disclosure or misrepresentation in question was the same at each level of the placement (see p 201, col 1).

## CASES-REF-TO:

American Airlines Inc v Hope, (HL) [1974] 2 Lloyd's Rep 301;
Aughton Ltd v ME Kent Service Ltd, [1991] 31 ConLR 60;
Bank of Nova Scotia v Hellenic Mutual War Risks Association (Bermuda) Ltd (The Good Luck), (HL) [1991] 2 Lloyd's Rep 191; [1992] 1 AC 233;
Banque Keyser Ullmann SA v Skandia (UK) Insurance Co Ltd, (HL) [1990] 2 Lloyd's Rep 377; [1991] 2 AC 249;
Barnard v Faber, [1893] 1 QB 340;
CNA International Insurance Co Ltd v Companhia de Seguros Tranguillidade SA, [1999] CLC 140;
Caledonia (EE) Ltd v Orbit Valve Co, [1994] 2 Lloyd's Rep 239; [1994] 1 WLR 1515;
Canada Steamship Lines Ltd v The King (PC) [1952] 1 Lloyd's Rep 1; [1952] AC 192;
Charlesworth v Faber, (1900) 5 Com Cas 508;
Citadel Insurance Co v Atlantic Union Insurance Co SA, (CA) [1982] 2 Lloyd's Rep 543;
Ellinger & Co v Mutual Life Insurance Co of New York, [1905] 1 KB 31;
Excess Insurance Co Ltd v Mander, [1997] 2 Lloyd's Rep 119;
Forsikringsaktieselskapet Vesta v Butcher, (HL) [1989] 1 Lloyd's Rep 331; [1989] AC 852;
Gan Insurance Co Ltd v Tai Ping Insurance Co Ltd, [1999] Lloyd's Rep IR 472;
Groupama Navigation et Transports v Catatumbo CA Seguros, [2000] 2 Lloyd's Rep 350;
HIH Casualty and General Insurance Ltd v Chase Manhattan Bank, [2001] 1 Lloyd's Rep 30;
Hill v Mercantile and General Reinsurance Co Plc, (HL) [1996] LRLR 341; [1996] 1 WLR 1239;
Holme v Brunskill, (1877) 3 QBD 495;
Insurance Co of Africa v Scor (UK) Reinsurance Co Ltd, [1985] 1 Lloyd's Rep 312;
Interfoto Picture Library Ltd v Stiletto Visual Programmes Ltd, (CA) [1989] QB 433;
Ionides v Pacific Fire & Marine, (1872) LR 7 QB 517; (1871) LR 6 QB 674;
Lower Rhine and Wurtemberg Insurance Association v Sedgwick, (1899) 1 QB 179;
Marten v The Nippon Sea and Land Insurance Co, (1898) 3 Com Cas 164;
Mann and Holt v Lexington Insurance Co, (CA) [2001] 1 Lloyd's Rep 1;
Miramar Maritime Corporation v Holborn Oil Trading Ltd (The Miramar), (HL) [1984] 2 Lloyd's Rep 129; [1984] AC 676;
New Hampshire Insurance Co v MGN Ltd, [1997] 1 LRLR 24;
Norwich Union Fire Insurance Society v Colonial Mutual Fire Insurance Co Ltd, (1922) 12 Ll L Rep 215; [1922] 2 KB 461;
Pan Atlantic Insurance Co Ltd v Pine Top Insurance Co, (CA) [1993] 1 Lloyd's Rep 496;
Pearson (S) & Son Ltd v Dublin Corporation, (HL) [1907] AC 351;

Pine Top Insurance Co v Unione Italiana Anglo-Saxon Reinsurance Co, [1987] 1 Lloyd's Rep 476;
Punjab National Bank v de Boinville, (CA) [1992] 1 Lloyd's Rep 7; [1992] 1 WLR 1138; [1992] 1 Lloyd's Rep 7;
St Paul Fire & Marine Insurance Co (UK) Ltd v McConnell Dowell Constructors Ltd, (CA) [1995] 2 Lloyd's Rep 116; [1993] 2 Lloyd's Rep 503;
State Trading Corporation of India Ltd v M Golodetz Ltd, (CA) [1989] 2 Lloyd's Rep 277;
Svenska Handelsbanken v Sun Alliance and London Insurance plc, [1996] 1 Lloyd's Rep 519;
Thomas (TW) & Co Ltd v Portsea Shipping Co Ltd, (HL) [1912] AC 1;
Thompson v Adams, (1889) 23 QBD 361;
Toomey v Eagle Star Insurance Co (No 2), [1995] 2 Lloyd's Rep 88;
Tor Line AB v Alltrans Group of Canada Ltd, (HL) [1984] 1 Lloyd's Rep 123; [1984] 1 WLR 48;
Xenos v Wickham, (1867) LR 2 HL 296;
Youell v Bland Welch & Co Ltd, (CA) [1992] 2 Lloyd's Rep 127; [1990] 2 Lloyd's Rep 423.

**INTRODUCTION:**
This was an appeal and a cross-appeal by the claimant HIH Casualty and General Insurance Ltd and the defendants New Hampshire Insurance Co, Independent Insurance Co and Axa Reassurance SA from the judgment of Mr Justice David Steel ([2001] 1 Lloyd's Rep 378) on the issue as to whether the claimant was entitled to claim an indemnity under the reinsurance policies issued by the defendants in respect of claims paid by the claimants to their insured.

**COUNSEL:**
Mr Julian Flaux, QC and Mr Simon Picken for the claimants; Mr Christopher Hancock, QC and Ms Sara Masters for New Hampshire; Mr Stephen Ruttle, QC and Mr Tom Adam for Independent; Mr Peter Gross, QC, Mr Philip Edey and Mr Michael Collett for Axa.

**PANEL:** PETER GIBSON, MUMMERY, RIX LJJ

**JUDGMENTBY-1:** RIX LJ

**JUDGMENT-1:**
RIX LJ: Introduction

1. Film production is a risky business. Just how risky was something that the parties to this appeal, insurer and reinsurers of two slates of "made for TV" films, discovered to their cost. The insurer HIH Casualty & General Insurance Ltd ("HIH"), has paid over US$31 m to the investors in these films, and seeks recovery against three of the reinsurers concerned, Axa, Independent and New Hampshire, who say, however, that they are not liable.

2. The insurance concerned is of a somewhat novel kind. It is of a class called "pecuniary loss indemnity" insurance. In essence it provides collateral for film finance. The peril insured is the risk that revenues from the films concerned will fail to reach the sum insured within a certain period. The sum insured is premised on the costs of production. The insurance is designed to enable the investors whose finance supports the production of the films to recoup their investment. Either they are paid from the films' revenues, or from the insurance, or from a combination of the two. If the films are successful, the insurer is not called upon to make any payment. If the films earn nothing whatsoever, the insurer is liable to pay the whole sum insured. If the films earn something but not enough, the insurer makes up the difference, up to the sum insured. The account is struck at a fixed date. The insurer may, however, manage to recoup more or less of its loss either from later earnings of the films, or from other protection or collateral for which he stipulates and upon which he may have either a direct or a subrogated claim.

3. It appears that this kind of insurance has proliferated in recent years, and that there are potentially many cases which may, in some respect or other, be guided by this appeal. Apart from the judgment under appeal, which is that of Mr Justice David Steel ([2001] 1 Lloyd's Rep 387), there has been only one other decision in this field, and that is HIH Casualty and General Insurance Ltd v Chase Manhattan Bank, [2001] 1 Lloyd's Rep 30. There is, however, very little overlap between the two cases.

4. If this kind of insurance is novel, at any rate to the English Courts, it bears some resemblance to commercial mortgage indemnity insurance, under which a lender of an advance secured on a mortgage insures against the risk that, following a default by the borrower, the security will not repay the principal of the advance, interest and associated costs. The point of resemblance is that the insurer is not insuring against damage or liability but against the risk that the insured's investment will not be repaid. There are, however, important differences. In commercial mortgage indemnity insurance, the property concerned is usually built and let, and its investment value can, subject of course to market fluctuations, be assessed, as can the creditworthiness of the borrower. The insurer can therefore evaluate whether the loan is likely to be repaid, and it is only if the borrower defaults that the insurer can be called upon to pay at all. In what I shall film finance insurance, however, the insurer's gamble is much purer. The films are not yet made, their earning potential is peculiarly difficult to evaluate and might remain so even when they have been made, and the insurer must pay, whatever the credit-worthiness of the borrower, unless the films quickly earn revenues which at least match the sum insured.

5. In the circumstances, the premiums charged in the present case at any rate, are a significant percentage of the sum insured, namely 10 per cent. HIH was also promised, as part of its premium, 7.5 per cent of revenues above the sum insured. Somewhat paradoxically, if an insured loss would have been avoided, then HIH would have earned a larger premium. This interest in the films' profits was called a "Back End". Thus, HIH as insurer was in a very real sense a form of joint venturer in the project. On the downside, this sense of joint ventureship can be seen in the fact that the cost of the premium itself played a significant role in the make-up of the sum insured. One example will suffice: in the case of one of the slates of films whose production finance was insured, which I shall call "the 7.23 slate" by reference to its producer, 7.23 Productions LLC ("7.23 Productions"), the total sum insured was US$16.4 m, of which the films' budgets amounted to only US$10.9 m, and the balance was made up of "interest/fees" of US$3.86 m and the insurance premium of US$1.64 m.

6. Such insurance may be said to play a useful role in facilitating film finance and thus in the creativity and productivity of the film industry. But the danger for insurers is that they, albeit relative outsiders to the industry, are undertaking the fundamental risk of the costs of production. In such circumstances, what precautions do they take to ensure what may be called due diligence on the part of the insured financers? What constitutes a fair presentation of such risks? And what warranties or exceptions do they require for undertaking the risk?

7. I pose these questions, but can barely provide an answer, for this appeal arises on preliminary issues as to the construction of the insurance and reinsurance policies involved, without a trial in which the facts of the case have been investigated. For the purpose of the trial of the preliminary issues below before Mr Justice David Steel, it was simply assumed that the facts were as stated in the reinsurers' defences. There was no live evidence before the Judge, nor any witness statements. There were reports from two experts, but they were not called for cross-examination, and, to the extent that it was relevant to his decisions, the Judge had to evaluate their opinions without further assistance. The placing documents (but I am not sure they are complete) were before the Judge, as they are again on appeal before this Court, but they were barely referred to by the Judge, and have been invoked by Counsel on appeal only sporadically. There are no agreed facts. There is no agreed chronology. The assumed facts to be taken from the reinsurers' defences have been nowhere summarized. In

effect, the exercise of construction upon which the Judge was asked to embark exists in a sort of no man's land, in which now and again, some feature looms out of the mist. For instance, the Judge referred to, and in this Court we were taken to, a collateral agreement, made between HIH and a company called Flashpoint Ltd, which was designed to provide HIH with protection to support its insurance. Quite what its provisions amount to, however, could well be the subject of debate, but are not for decision here.

8. In the circumstances, apart from the insurance and reinsurance policies themselves, which exist as items for construction, there is, I think, nothing which can be regarded as a matter of fact, securely found. Any factual matter referred to has a sort of provisional quality, it is possible to say that a document of some sort exists and states such and such a thing, but it is impossible to affirm with any confidence that what is said in any single document is a secure foundation for some conclusion.

9. I make these comments at the outset because I feel some disquiet about conducting the exercise of construction which this Court, as the Judge below, has been asked to perform, without a clear understanding of the factual matrix of these novel arrangements. Insurance and reinsurance provisions are so often dealt with in such brief language, that their construction divorced from a firm understanding of their context can be a dangerous process. There is also, for instance, a question of fairness in the incorporation of a term which, as will be seen, has to be addressed, which I feel unhappy to decide, as it were, in the abstract.

10. I wish to say nothing to discourage the identification of preliminary issues for decision, which can perform a very useful function. In recent years, the previous climate of coolness or even hostility to the setting of preliminary issues has warmed considerably, and I believe that has been helpful to the litigants involved. I remain concerned, however, that in this case the Judge and his Court have been set an unusually academic examination paper, and in a sub-category of subject which cannot be said to be familiar territory. That said, the paper must be answered, wherever possible, as best as can be done, and the problems of context must be sought to be overcome where possible in a way which is fair and reflects the manner in which the parties have approached this litigation.

The issues on appeal

11. It is difficult to introduce the issues which were argued on the appeal (by HIH) and the cross-appeal (by the reinsurers) in any really meaningful way without setting out a good deal of further information. In brief, however, all the issues decided by Mr Justice David Steel at first instance are challenged on appeal. Those issues raise questions of construction which in most cases arise from the structure of the insurance and reinsurance itself. Thus, where an insurance contract is to be found in a "slip policy" which looks forward to "policy wording" and that wording emerges in the form of a "policy", does that policy supersede the slip entirely? Or are the two documents to be read together? Where read together or separately, does a term exist that a certain number of films are to be produced, and if so, is that term a warranty? Where the reinsurance contract is to be found in a slip which incorporates the underlying insurance, are the reinsurers bound by the original wording of the underlying insurance, as found in the slip policy, or by the amended wording of the underlying insurance, as found in the policy wording? For these purposes, is a term in the reinsurance contract, that the reinsured (ie the original insurer) will obtain the reinsurers' agreement to all amendments to the original insurance, a warranty? Are the reinsurers bound by the policy wording whether or not they were aware of it or agreed to it? Does it matter for these purposes whether a particular term in the policy wording can be described as an unusual term? Where does the question of the fairness of the incorporation of an unusual term meet with the question of a fair presentation in the insurance context? Where the underlying insurance contract contains a special term which prevents the original insurer from relying on a defence of non-disclosure or misrepresentation, how does that affect the reinsurers? Can such a term be incorporated in the reinsurance contract? If so, what is its effect there: to

prevent the reinsurers from complaining, for follow the settlement purposes, about the payment of a claim despite non-disclosure or misrepresentation in the placement of the original insurance? Or to operate separately as between reinsurers and reinsured at the level of the reinsurance contract? And how in any event is that special term to be construed? Does it prevent reliance on misrepresentation or non-disclosure even where there has been negligence? Does it even extend to excuse any complaint and waive any defence whatsoever?

The structure of the transaction

12. I have already introduced HIH as the insurer and Axa, New Hampshire and Independent as among the reinsurers of the finance investment in the two slates of films. The other reinsurers are not involved in this litigation. The assured in both cases is Law Debenture Trust Corporation (Channel Islands) Ltd ("LDT", or "the assured"), who as trustee under trust deeds in respect of the instruments which generated and evidenced the finance in question is the ultimate representative of the investors concerned.

13. The chain between LDT and the actual producers of the films is a complex one. Its details may not matter, but, briefly, the position appears to be as follows. As I have stated, one slate of films, the 7.23 slate, was to be produced by 7.23 Productions and the other slate of films ("the Rojak slate") was to be produced by Rojak Inc ("Rojak"). Each of those production companies obtained its finance from a Jersey company called Flashpoint Ltd. ("Flashpoint"), to which I have already referred above in connection with the collateral agreement between it and HIH. The finance was provided under co-production/finance agreements. Flashpoint appears to have performed a somewhat polymorphous role, about which I shall say something further below. As a provider of finance it was only in an intermediate position, for it obtained its finance in turn from two funding vehicles called **Hollywood Funding** Ltd (in the case of the 7.23 slate) and **Hollywood Funding** (No 2) Ltd (in the case of the Rojak slate): I shall call those companies HFL, for I have no need to distinguish between them. HFL in turn represented the various investors, who were presumably shareholders. The relationship between HLF and Flashpoint was governed in the case of each slate by a purchase agreement, under which in return for finance Flashpoint undertook to pay over the revenues of the films up to a cap.

14. Part of the collateral security required by the investors whose corporate vehicle was HFL was the pecuniary loss indemnity insurance in question. Under each of the purchase agreements payment by HFL to Flashpoint of the finance was subject to the condition precedent of the procurement by Flashpoint of a "policy" underwritten by HIH in favour of LDT as assured: the "policy" was scheduled to the purchase agreement in question.

15. I have remarked above that Flashpoint played a polymorphous role. Vis-a-vis the production companies, it was a financer and co-producer. Vis-a-vis HFL, it was obliged to procure the underlying insurance in favour of LDT as a condition of obtaining finance to pass on to the production companies. Vis-a-vis HIH, it was both the effective principal of the placing broker and as such the source of the information presented to HIH for the purpose of the underwriting process, and also a managing agent in relation to the working out of the insurance and the exploitation of the films. Its obligations to HIH were governed by the collateral agreements to which I have referred above, and to which I will revert below. Those agreements represented a form of collateral security, to the extent that Flashpoint could be relied on to meet its obligations, which HIH obtained in support of the risks undertaken by it in its underwriting of the insurances concerned.

16. The placing broker used by Flashpoint was Lloyd Thompson Ltd ("Lloyd Thompson"). They made the presentations both to HIH and to the reinsurers. The placing was essentially a single operation, but, in the case of the reinsurance, it may be said that Lloyd Thompson was acting on behalf of HIH. That is how the matter is pleaded by Axa and Independent, and thus

must be assumed to be so for present purposes.

The insurances and their placement

17. There are two sets of three documents whose construction is in issue in these appeals. For present purposes it will be sufficient to consider one set (that in connection with 7.23 slate) alone. The three documents are (a) an insurance slip, headed "Slip Policy"; (b) a reinsurance slip headed "Quota Share Reinsurance Slip Policy"; and (c) a policy document headed "Pecuniary Loss Indemnity Policy". There is a dispute about the status of the third document: does it entirely supersede the insurance slip, or is it to be read together with the insurance slip? Because the insurance slip is itself called a policy ("slip policy"), I will for convenience call the third document the "policy wording". I do so entirely without prejudice to the issue which I have just indicated: it may be that the policy wording is not only a policy in its own right, but the only policy where the underlying insurance is to be found. However I use the expression "policy wording" not only for convenience of exposition, but also because the slip policy contemplates the creation of such wording in its provision -- "CONDITIONS: As per Pecuniary Loss Indemnity wording tba [to be agreed] L/U [Leading Underwriter] only". The policy wording is in the same form as the "policy" scheduled to the purchase agreements.

18. Thus I will refer to the three insurance documents as the (original) slip policy, the reinsurance slip policy, and the policy wording respectively.

19. HIH underwrote 100 per cent of both original insurances. It did so subject to reinsurance for 80 per cent which was achieved. Thus it was not willing to insure unless it obtained reinsurance for 80 per cent of its risk. It is submitted by HIH that because the investors wanted a policy with one insurer, the insurance was structured as 100 per cent insurance by HIH who "fronted" for the other companies who participated by way of lines on the 80 per cent quota share reinsurance The "fronting" analogy is disputed by the reinsurers.

20. A word about chronology apposite. The first of the three insurance documents in existence as a binding contract (or potentially binding contract) was not the original slip policy, but the reinsurance slip policy. Thus New Hampshire (by its agents AIG Europe (UK) Ltd ("AIG")) put down its stamp subscribing to 35 per cent of the reinsurance (itself "subject to r/i") on July 22, 1997. Next to subscribe was Axa, on July 25, for 30 per cent of the 80 per cent. Independent subscribed on July 29, for 12.5 per cent. All three dates preceded the original slip policy, which was not stamped by HIH until Aug 13. It is not unknown for reinsurance to precede insurance, especially where the former is vital to the latter.

21. The policy wording is dated Aug 22, 1997, which is the same date as the purchase agreement. The date is entered in typescript just beneath the heading of the document. HIH's signature is not itself dated, but lies beneath the typed words "This Policy has been issued in London on the date stated at the beginning." An earlier draft of the policy wording had previously been endorsed on behalf of New Hampshire and Axa on July 30, with the words "Agreed subject to L/W [Line Written]. Side agreement [to be] agreed". I assume, but it is only an assumption, that the "side agreement" was the collateral agreement which was due to be entered into between HIH and Flashpoint. Thus the original slip policy refers under "INFORMATION (Not to appear on the Policy)" inter alia to "See 'Side Agreement' agreed by L/U only". It is to be inferred therefore that a contemporary draft of the collateral agreement was in existence or about to be brought into existence, and was due to be shown to New Hampshire and Axa.

22. There is no similar version of the draft policy wording which was endorsed by Independent. Therefore Independent pleads that it was never shown, did not endorse, and was unaware of the terms of the policy wording. For present purposes, that must be assumed to be true.

23. I would in general be prepared to infer that contemporary drafts of the original slip policy, as well as of the collateral agreement, were available to be seen by the reinsurers. However, I cannot be sure that such contemporary drafts were in the same terms as the ultimate form of those documents; nor, in the light of the important plea by Independent that it was not shown the draft policy wording, can I be sure that such drafts were seen by all the reinsurers. It is impossible to make findings of fact about such matters.

24. The collateral agreement (for the 7.23 slate) was not in fact executed as between HIH and Flashpoint until at least a year later. The document is headed "DATED with effect from the 3rd August 1998". That heading is by way of manuscript amendment of an original line which had read "DATED DECEMBER 1998". It is well possible therefore that the document was in fact executed even later than Aug 3, 1998. Despite the working inference that I am in general prepared to make regarding the availability of a contemporary draft of the collateral agreement as of July, 1997, the Court was not shown such a draft in the available bundles, and my personal attempt to find one has brought to light a draft attached to a Lloyd Thompson fax on July 17, 1997 (referred to there as the "Side Agreement") which is a very much less sophisticated document than the final executed version. That again indicates that it is impossible to proceed on the basis of any particular finding as to what was seen by any party at the time of binding any of the three insurance documents.

25. So far as the placing of reinsurance and insurance is concerned, I will merely allude to a small number of documents to which the Court was itself referred at the hearing of the appeal. I record what the documents say, but I make no findings of fact. On June 18, 1997 Mr Gordon Dawson of Lloyd Thompson faxed Mr Jean Michel Guillot of Axa with "details of a new project for which we have been asked to place a Pecuniary Loss policy". The fax is headed "'7.23' Productions -- A 6 Film Slate". The fax states:

Due to the structure and source of the financing for the slate, HIH are to front for 100% of the risk, retaining 20% for themselves, and we are placing a 80% quota share reinsurance . . .

The fax goes on to mention a number of "positive underwriting points". Among them are the points that one of the six films, "Lured Innocence", had well known stars and had already collected some US$0.75 m in pre-sales; that the six films would cross-collateralize; and that there was a sub-limit to the policy of US$3.9 m any one film. Drafts of the "original slip" and of the "reinsurance slip" were attached. Those drafts were not in the final form of the slip policies. The reinsurers rely inter alia on the expression "A 6 film slate". HIH relies on the reference to itself as fronting for 100 per cent of the risk.

26. On June 26 Independent, which subsequently took a 12.5 per cent line on the reinsurance, scratched a 10 per cent line on the underlying insurance on a slip in the form of the draft attached to the Lloyd Thompson fax to which I have just referred. However, in the event, Independent operated as a reinsurer, not an original insurer.

27. On July 22, the date on which New Hampshire stamped the reinsurance slip policy, Lloyd Thompson faxed AIG, New Hampshire's agents, with answers to certain questions which had been posed. One related to "Lured Innocence" which, in the meantime, had dropped out of the six film slate, apparently because of timing difficulties: its film finance insurance was now being placed separately. The slate details were therefore still showing six films, but in the slot where "Lured Innocence" had been, there now appeared the words "To be agreed". Lloyd Thompson's fax explained:

The slate will still be 6 films although "Lured Innocence" will be placed separately. We will find an alternative production of similar size and with similar sales estimates so that the original slate is identical.

The fax went on to state that by "force majeure", an expression found in the original slip policy, was meant a failure of the projects to generate enough revenues at the expiry of the policy to equal the sum insured for any reason whatsoever, and added:

. . . This coverage is obviously subject always to the terms, conditions and limitations of the wording agreed by HIH as lead and fronting underwriter.

28. On Aug 22, 1997, the date of the policy wording, a signed copy of it was provided by HIH to Lloyd Thompson under cover of a letter addressed by HIH to Credit Suisse. Lloyd Thompson sent HIH's letter and the policy wording on to LDT's lawyers, referring to it as "the Policy". The policy wording referred to receipt of the premium (that was the only reference to the premium in it), but I do not think payment had in fact been made by that date.

29. Lloyd Thompson's cover note in respect of the original slip policy was sent out on Sept 30, 1997, and its cover note in respect of the reinsurance slip policy was sent on Oct 14, 1997. Both cover notes were in the final form of the respective slip policies. The reinsurers rely on the fact that, even after the policy wording had been issued, the cover note referred to the terms of the original slip policy, not to the terms of the policy wording.

30. In the case of the Rojak slate, the chronology is more conventional. There the original slip policy was stamped by HIH on Dec 4, 1997, prior to New Hampshire's stamping of the reinsurance slip policy on Dec 5 and Axa's stamping of the same on Dec 9. In this case, Independent was not a reinsurer. The policy wording for the Rojak slate was dated Dec 8, 1997, both in the typescript and in the signature. The collateral agreement was again dated with effect from Aug 3, 1998. The cover notes, both dated Dec 19, 1997, again reproduced the final terms of the slip policies.

31. When in due course the insurance contracts came to be reproduced in Lloyd Thompson's books and bound up in the form of policy folders, they took the following form, at any rate as exempted in the case of the Rojak slate. The original insurance was given a policy no LP 9702013, which was the number on the slip policy stamped by HIH. That slip policy was bound in with the policy wording. The reinsurance contract was given the policy number LP 9702014 and the folder contained the slip policies stamped by the various reinsurers.

The insurance documents

The 7.23 slate original slip policy

32. A transcription of this shows as follows:

TYPE: SLIP POLICY

INSURED: THE LAW DEBENTURE TRUST CORPORATION (CHANNEL ISLANDS) LIMITED

PERIOD: 22nd AUGUST 1997 to 22nd JULY 1999

INTEREST: 7.23 Productions will produce and make six made-for-TV Films.

It is understood that, if at expiry of the Policy Period the revenue collected is less than the Sum Insured as a result of Force Majeure, as defined, then the Underwriters will pay to the Assured, at the expiry of the Waiting Period, the difference between the Sum Insured and the revenue collected, subject to the exclusions set forth below.

SUM Maximum USD 3,900,000 any one Film and USD INSURED: 16,400,000 in the aggregate.

SITUATION: WORLDWIDE

CONDITIONS: As per Pecuniary Loss Indemnity wording tba L/U/only. Waiting Period: 20 Day. UK Law and Jurisdiction . . . Cross Collaterolisation [sic] Clause to be agreed L/U only.

INFORMATION: Revenue from all films will cross collateralise (Not to appear [sic] the 6 film slate. See "Side Agreement" on the Policy) agreed by L/U only. All other information on file with Lloyd Thompson Limited.

PREMIUM: USD 1,640,000 inclusive of IPT plus 7.5% of "Back End" payable semi annually from date of first exploitation . . .

The "TYPE" and "INSURED" lines were, as I understand the matter, amended on Aug 13, 1997 when HIH's underwriter, Mr Steven Mitchell, put down HIH's stamp on this slip policy. The "PERIOD" line's first amendment was also made at that time. Subsequently, when the total scheme was lined up to commence on Aug 22, the period was changed again, and Mr Mitchell initialled that amendment.

33. When Mr Mitchell subscribed HIH's stamp, he added the following words in manuscript: "wording to be agreed all r/i-s" and "subject to reinsurance of 80%". HIH's stamp contained the words: "All terms and amendments to be agreed".

34. The following matters may be observed at this point. The reinsurers rely (HIH did not) on the term found under the "INTEREST" line that 7.23 Productions "will produce and make six made-for-TV Films". The reinsurers submit that that was a term, and a warranty, of both the insurance contract and, by incorporation, of the reinsurance contracts. The reinsurers also rely, for the purpose of the issue as to whether this slip contract was superseded by the policy wording, on the designation of the insurance type as a "Slip Policy" and on the reference to the policy wording as "wording". HIH, on the other hand, points out that under "INFORMATION" the matters there indicated are "Not to appear on the Policy", which appears to be a reference to the policy wording, an advanced draft of which was already in existence at this time, and which refers to itself as a "Policy".

The 7.23 slate policy wording

35. This was also signed by Mr Mitchell, and provided inter alia as follows:

PECUNIARY LOSS INDEMNITY POLICY

Dated 22nd August 1997

HIH . . . being the company issuing this Policy (hereinafter . . . referred to as the "Insurer") unconditionally . . . and irrevocably agrees with the "Assured" . . . that in consideration of the payment of the premium . . . and subject to the Insuring Clause, Definitions, Exclusions and Conditions of this Policy that the Insurer will pay amounts due to the Assured on the respective due dates for payment as set out in this Policy.

PREAMBLE

(A) WHEREAS Flashpoint Ltd . . . has invested or is in the process of investing in six revenue generating entertainment projects collectively known as "7.23" (the "Projects") where all the revenue generated thereby . . . is due to be paid into the Collection Account . . . and

(B) WHEREAS pursuant to the Purchase Agreement . . . dated on or about the date of this Policy and made between Flashpoint Ltd and **Hollywood Funding** Limited (the "Purchaser"),

Flashpoint Ltd has agreed (or will agree) to pay to the Escrow Account . . . the Collection Amount . . . on that last day of the Policy Period . . . and

(C) WHEREAS the Purchaser has decided to fund its payment obligations under the Purchase Agreement by the issue of US$16,400,000 Zero Coupon Notes due 1999 . . . and

(D) WHEREAS Flashpoint Ltd, has procured the issue of this Policy in favour of the Assured . . . and

(E) WHEREAS neither the Purchaser nor the Assured is involved nor has any interest in the Projects or in the Collection Account.

NOW THEREFORE

Clause 1 Insuring Clause

1.1 Initial Claim

If at the close of business on the last day of the Policy Period the amount of the balance standing to the credit of the Escrow Account is less than the Sum Insured (as defined in the Schedules) as a consequence of the occurrence of the Insured Peril then on the last day of the Waiting Period (as defined in clause 2.6 below) the Insurer will pay to, or to the order of, the Assured such US Dollar amount as is necessary to ensure that the Assured receives and retains in the Escrow Account a net sum equal to the Sum Insured . . .

Clause 2 Definitions

2.1 Insured Peril

Insured Peril means the failure to generate a balance in the Escrow Account as at the last day of the Policy Period equal to the Sum Insured, for any reason whatsoever.

This definition includes, but is not limited to, the failure of the Projects to generate a balance in the Collection Account equal to, or in excess of, the Sum Insured or the failure of Flashpoint Ltd to make any payment under the Purchase Agreement for any reason whatsoever . . .

2.3 Escrow Account

The Escrow Account means the account set up with the Guernsey Branch of Credit Suisse First Boston (account no 159091), in the name of the Assured . . .

Clause 4 Assignments and Amendments

4.1 Assignments by the Assured

The Assured may, at any time, assign all or any of its rights and benefits under this Policy . . .

4.3 Amendments to the Policy

This Policy may not be amended, cancelled, revoked or rescinded without the prior written consent of the Assured . . .

Clause 7 Governing Law and Jurisdiction

7.1 English Law

This Policy shall be governed by, and construed in accordance with, the laws of England and Wales.

7.2 English Courts

The Insurer and the Assured hereby irrevocably agree for the benefit of each other that the courts of England shall have jurisdiction to hear and determine any suit, action or proceedings . . .

Clause 8 Disclosure and/or Waiver of Rights

8.1 To the fullest extent permissible by applicable law, the Insurer hereby agrees that it will not seek to or be entitled to avoid or rescind this Policy or reject any claim hereunder or be entitled to seek any remedy or redress on the grounds of invalidity or unenforceability of any of its arrangements with Flashpoint Ltd or any other person (or of any arrangements between Flashpoint Ltd and the Purchaser) or non-disclosure or misrepresentation by any person or any other similar grounds. The Insurer irrevocably agrees not to assert and waives any and all defences and rights of set-off and/or counterclaim (including without limitation any such rights acquired by assignment or otherwise) which it may have against the Assured or which may be available so as to deny payment of any amount due hereunder in accordance with the express terms hereof.

36. In connection with the policy wording, I would underline the following matters at this stage. First, the reinsurers point out that this document, although it refers to itself as a "Policy", has some surprising omissions if it was intended to be a complete and self-contained statement of the insurance contract. Thus it omits any reference at all to the premium. It also omits the slip policy's reference to a cap per film or to any cross collateralization clause. Secondly, the insured peril is defined in cl 2 in very wide terms as including the failure "of the Projects" to generate a balance in the collection account equal to the sum insured "for any reason whatsoever". Thirdly, the "Projects" are defined in the second preamble as "six revenue generating entertainment projects collectively known as '7.23'", viz, as the reinsurers submit, the six film slate. The reinsurers submit that the policy wording, even by itself, continues to contain a term, which they say is a warranty, that six films will be made. Fourthly, cl 8 is an important bone of contention. HIH relies on its as providing a complete defence to the original assured, LDT, on any ground (save for coverage itself) whatsoever, and also submits that, both as a matter of general incorporation and also because of a specific reference to it in the reinsurance slip policy, it is incorporated into the reinsurance contracts. In effect, therefore, HIH says that cl 8 left it with no defence against LDT, and that it similarly leaves the reinsurers with no defence against its claim against them. The reinsurers say that the clause is of comparatively narrow width, that it does not cover breach of warranty or negligent misrepresentation or non-disclosure, and that in any event it is not incorporated into their reinsurance contracts.

The 7.23 slate reinsurance slip policy

37. This provided as follows:

TYPE: As Original Policy

FORM: Quota Share Reinsurance Slip Policy.

REASSURED: All companies underwritten for by HIH Casualty and General Insurance Ltd and/or Quota Share and/or Surplus Reinsurers if any . . .

PERIOD: 23 months with effect from 30th July 1997.

INTEREST: As Original Policy.

ORIGINAL SUM INSURED: Maximum USD 3,900,000 any one film and USD 16,400,000 in the aggregate.

SUM REINSURED: USD 13,120,000 in the aggregate quota share part of USD 16,400,000 in the aggregate . . .

CONDITIONS: This Reinsurance is subject to all terms, clauses and conditions as original and to follow that placement in all respects.

This Reinsurance to bear its proportion of any and all costs and expenses incurred under the Original Insurance.

The Reinsured hereon agrees to consult and obtain Reinsurers' agreement to all amendments and alterations to the terms, clauses and conditions of the Original Policy. The Reinsured also agrees to obtain Reinsurers' [agreement] to the appointment of any advisor and/or lawyer in the event of a claim being made under the Original Policy and/or a dispute under the Original Policy. The Reinsured further agrees to obtain Reinsurers' agreement to the appointment of accountants and/or auditors as deemed necessary under the Original Policy. In consideration of the above, Reinsurers hereon agree that in the event of claim and/or professional advisors fees and expenses being incurred under the Original Policy, this Reinsurance will pay at the same time.

Cancellation Clause as Original Policy . . .

PREMIUM: Original Net Premium to the Reassured being after all deductions provided for under the Original Policy . . .

INFORMATION: See copy of Original Slip and information as held on file with Lloyd Thompson Limited.

38. The reinsurers' stamp in each case, by one form of words or another, provided that all terms and amendments were to be agreed. It may be noted that the original assured and the period were still in forms which were to be overtaken by subsequent amendment. The first sentence of the third paragraph under the "CONDITIONS" line is in issue: is the requirement of reinsurers' agreement for all amendments a warranty? The fourth paragraph is also in contention: what is the "Cancellation Clause" thus incorporated from the original policy? HIH submits that that provision is an express and specific incorporation of the controversial cl 8 of the policy wording ("Disclosure and/or Waiver of Rights"). The reinsurers submit, on the other hand, that it is either a specific incorporation of cl 4.3 of the policy wording ("Amendments to the Policy") or fails for lack of content. A further matter of note is that the "Premium" line does not say anything about the "Back End", but this was not a matter of any comment on the appeal.

The Rojak slate original slip policy

39. This was broadly similar to the 7.23 slate original slip policy, save that in this case the period ran for 23 months from Dec 8, 1997, the "INTEREST" line said that "Rojak Films Inc will produce and make 10 made-for-TV Films" and the "SUM INSURED" line read "Maximum US$2,000,000 any one film and US$15,500,000 in the aggregate".

The Rojak slate policy wording

40. This was in materially identical form to the 7.23 slate policy wording, save that the sum insured was $15.5 m and the "Projects" here referred to the 10 Rojak "revenue generating entertainment projects".

The Rojak slate reinsurance slip policy

41. This was, mutatis mutandis, in identical terms to the final form of the 7.23 slate reinsurance slip policy.

The collateral agreements

42. The ultimate form of the collateral agreement made between HIH and Flashpoint in connection with the 7.23 slate is an extensive and sophisticated document running to some 25 pages plus schedules. Although the title said it was made with effect from Aug 3, 1998, cl 3(1) provided that its terms took effect from Aug 22, 1997 -- the beginning of the period under the insurance contracts. Under cl 2, HIH appointed Flashpoint as its "managing agent in relation to the Policy, and the risks arising under the Policy". The word "Policies" is defined as referring to what I have called the policy wording "and 'Policy' shall be construed accordingly". Clause 5 contained undertakings by Flashpoint that the finance provided by HFL had been and would be used for no other purpose than the production of the "Films" ("Films" was defined as "those film projects listed in Schedule 2") and that the producer, ie 7.23 Productions, had produced each film within budget. Clause 6 contained Flashpoint's undertaking that it would take all necessary steps to exploit the films to their best commercial advantage. Clause 7 governed Flashpoint's responsibilities for the collection and holding of the film's revenues. Clause 8 ("Representations and Warranties by Flashpoint") contained inter alia the following:

(h) it has fully and accurately disclosed to HIH in respect of the Policy all information which is relevant or material to the consideration of the risks forming the Policy, or to the terms, conditions and exclusions contained in the Policy; . . .

(j) each Film within slate of Films known as project 7.23 has been duly and properly completed within budget . . .

(k) the Film budget proportion of the funds placed on deposit . . . has been used in their entirety on the production of the Films, and has not been used for any other purpose.

43. Clause 13 was a "Good Faith" clause:

Flashpoint and HIH acknowledge that this Agreement and the Charge have been entered into for the purpose of managing the respective risks contained in the Policy and it is the parties' intention that utmost good faith shall be the essence of the relationship between them, and in the interpretation of this Agreement and in the negotiation and placement of the Policy.

44. Schedule 3 to the collateral agreement lists a number of "Principal Production Documents" which were to be disclosed to HIH before production of a film. They include a completion guarantee from the Motion Picture Bond Co, and a producer's errors and omissions insurance (if applicable).

45. There is another collateral agreement in relation to the 7.23 slate, dated in the same way (save on this occasion said to become effective only on its date, see cl 2(1)), but this agreement is between HIH and Flashpoint (UK) Ltd ("Flashpoint UK"). It is not clear to me what the respective functions of the two Flashpoint companies or the two agreements are, but it would seem that Flashpoint UK, which was only incorporated in March, 1998, may have been interposed for taxation reasons. At the trial of the preliminary issues, Mr Justice David Steel appears to have quoted from the Flashpoint UK collateral agreement in the belief that it

was the Flashpoint collateral agreement (see at par 9). To a large extent it contains similar covenants, eg cl 5(h) is the equivalent of cl 8(h) cited above, and cl 10 is the equivalent of cl 13 cited above. It appears that the responsibility of paying the "Back End" element of the premium, here described as the "Additional Premium", was the responsibility of Flashpoint UK (see cl 9(1)), although in its collateral agreement Flashpoint also undertook to procure Flashpoint UK's performance of that obligation (cl 12).

46. The reinsurers point to the collateral agreement as providing HIH, through another avenue, with the protection which HIH waived under cl 8 of the policy wording in terms of a fair presentation of the original risk. They submit, however, that that protection was available only to HIH, and not to themselves, in the event for instance of any non-disclosure or misrepresentation in relation to the separate contract of reinsurance. HIH submits, on the other hand, that Flashpoint's warranty of good faith disclosure is available to the reinsurers by way of subrogation, and that the range of protection granted by the collateral agreement supports its contentions generally as to the absence of any warranty in the insurance as to the making of the full number of the films and as to the width of cl 8's exclusion of any defences to a claim under the insurance.

The three actions and the pleadings

47. There are three actions. In the first, 1999 Folio 1248, HIH sues Independent and New Hampshire in respect of the 7.23 slate reinsurance. In the second, 2000 Folio 40, HIH sues Axa, again in respect of the 7.23 slate reinsurance. In the third, 2000 Folio 268, HIH sues Axa and New Hampshire in respect of the Rojak slate reinsurance.

48. As a forensic point, but not as a pleading point, the reinsurers emphasize that in all three actions HIH claims by reference to the reinsurance of its liability under the "slip/policy" made as of the dates of HIH's subscription to the original slip policy, and not by reference to the policy wording.

49. In its amended defence in respect of the 7.23 slate reinsurance, Axa pleads inter alia that the losses paid by HIH were not fortuitous and were inevitable; that Lloyd Thompson were agents to insure acting on behalf of HIH; that they made misrepresentations by reference to the fax dated June 18, 1997 to which I have referred above at par 25 (some of which misrepresentations are said to have been made in bad faith, either by reference to HIH's or Lloyd Thompson's or Flashpoint's beliefs); that HIH and Lloyd Thompson failed to disclose other matters, such as Flashpoint's right to cancel any film at any time; that the 7.23 slate had been reduced from six films to five and that HIH therefore had a complete defence under the original insurance on the ground of breach of warranty; in any event HIH was in breach of the six film warranty in the reinsurance contract; and, by way of counterclaim, that HIH is liable to Axa under s 2(1) of the Misrepresentation Act, 1967 for the misrepresentations pleaded by reference to Lloyd Thompson's fax.

50. Independent, in its amended defence, pleads inter alia non-disclosure in relation to the dropping of "Lured Innocence" from the 7.23 slate and the presence of cl 8 in the policy wording ("an unusual clause of draconian effect"); misrepresentation as to the presence of "Lured Innocence" in the slate; breach of warranty in relation to the reduction of the slate from six films to five and also in relation to an alteration in the terms of the original insurance to the same effect without obtaining Independent's consent; and, by way of counterclaim, inter alia that HIH is liable to it under s 2(1) of the Misrepresentation Act for misrepresentation in relation to "Lured Innocence".

51. New Hampshire, in its defence, complained inter alia that "Lured Innocence" was not replaced by a film of comparable quality, and that only five films had been made instead of six; that HIH therefore either had a defence to the claim against it, or had, by agreeing to the amendment without obtaining New Hampshire's consent, broken the warranty against

such amendment; but did not rely on any non-disclosure or misrepresentation; and by its amended rejoinder admitted the incorporation in its contract of reinsurance of cl 8 of the policy wording, but denied the effect which HIH sought to give to it.

52. There are analogous pleadings in the third action relating to the Rojak slate. I have not sought to give an exhaustive review of even those pleadings which are relevant to the preliminary issues; but this brief outline of the reinsurers' defences is enough to indicate both that they are not unanimous as to their situation or stance and that there are nevertheless certain themes in common. The preliminary issues which were ordered were an attempt to cover as much of this ground as possible.

The preliminary issues

53. The preliminary issues stated are as follows:

1. Are the terms (of both the insurance contract(s) and reinsurance contract(s)) alleged by the Reinsurers to have been warranties in fact such?

2. What is the effect of Clause 8 of the underlying insurance contracts? In particular does it mean that the facts and matters alleged in the defences (if true) would not have provided the Claimant Insured/Reinsured with a defence (whether in whole or in part) to the underlying Insured's claim?

3. On the assumption that the Reinsurers' underwriter(s) were aware that the underlying policy wording contained Clause 8, was Clause 8 a term of the reinsurance contract? Is the answer different if the underwriter(s) were not so aware?

4. What is the effect of Clause 8 in the context of the reinsurance contract(s)? In particular does it mean that:

(i) the facts and matters alleged in the defences and counterclaims (if true) do not provide the Defendant Reinsurers with a (complete or partial) defence (including by way of set-off) to the Claimant Insurer's/Reinsured's claim; and/or

(ii) the Defendant Reinsurers do not (or did not) have the right to avoid the reinsurance contracts on the grounds of misrepresentation or non-disclosure (assuming they otherwise have or had such a right) irrespective of whether or not the relevant misrepresentation or non-disclosure was negligent or fraudulent as opposed to innocent.

The Judge's answers

54. Mr Justice David Steel answered these questions as follows:

1. Of the terms alleged to be warranties:

(1) There was a warranty in both the insurance and the reinsurance contract(s) as to the number of films to be made.

(2) There was a warranty in the reinsurance contract(s) that no material amendments or alterations to the terms, clauses and conditions of the insurance contract would be made without the agreement of reinsurers.

(3) None of the other terms were warranties in either the insurance or the reinsurance contract(s).

2. As to the general question, see pars 30-33 of the judgment. As to the more particular

question, the answer is no, save in respect of any defences by way of or akin to rights of set-off or counterclaim.

3. The answer to the first question is "yes". The answer to the second "no".

4. As to the general question, see pars 52-56 of the judgment. As to the more particular questions, the answers are:

(i) No, save in respect of any defences by way of or akin to rights of set-off or counterclaim.

(ii) Yes, save in so far as any non-disclosure or misrepresentation was fraudulent.

55. The answer to issue 1 speaks for itself. On this issue the Judge found in favour of the reinsurers. HIH appeals against this determination, so far as issues 1(1) and 1(2) are concerned. Nothing further arises as to issue 1(3).

56. The answer to issue 2 is opaque without reference to the judgment. In pars 30-33 of his judgment, Mr Justice David Steel held that cl 8 did not exclude a defence on the part of HIH as against LDT in respect of coverage issues (eg that the losses were not fortuitous), nor any defence based on breach of warranty (viz that the full slate of films would be made); but that it did exclude a defence based on non-disclosure or misrepresentation, and defences by way of or akin to rights of set-off or counterclaim. HIH appeals against this limitation on the scope of cl 8, save that it no longer submits that the clause excludes any defence in respect of coverage issues. In all other respects, however, it submits on appeal that cl 8 is intended to exclude all defences which HIH might otherwise raise to a claim from LDT under the original insurance. The scope of cl 8 is also visited, in the context of the position between insurer and reinsurers, under issue 4.

57. As to issue 3, the Judge held that cl 8 was incorporated ("Yes") into the reinsurance contract if the reinsurer in question was aware of cl 8, and that it made no difference ("No") if it was not so aware. The reinsurers cross-appeal on this issue, submitting that there was neither a specific nor any general incorporation of cl 8.

58. Issue 4 raises two questions as to the effect of cl 8 as between HIH and reinsurers on the hypothesis that it did fall to be incorporated into any reinsurance contract. Again, the answer given cannot be understood without reference to the judgment itself. In pars 52-56 of his judgment, Mr Justice David Steel held (a) that the effect of cl 8, if incorporated into a reinsurance contract, was not merely an agreement on the part of the reinsurer to follow settlements made by HIH where otherwise HIH would have had a defence, but operated to exclude defences by the reinsurer as against HIH under the reinsurance contract, on the same terms as it operated to exclude defences by HIH as against LDT under the underlying insurance. Thus (b), it was apt to exclude any defence based on misrepresentation or non-disclosure, except one involving fraud, whether or not the misrepresentation or non-disclosure was negligent; and (c) any defence by way of or akin to rights of set-off or counterclaim; but (d) not otherwise. The reinsurers cross-appeal aspects (a) and (b) of this answer, for they submit (a) that, if incorporated in their contracts, cl 8 goes no further than agreement on their part to follow the settlement of HIH despite what might have been, in the absence of cl 8, an ability to complain that such settlement amounted to an unjustified ex gratia payment; and (b) that cl 8 in any event could not exclude negligent misrepresentation or non-disclosure.

59. I would prefer to restate the questions which arise on appeal and cross-appeal in the following way:

(i) Was it a term of the original slip policy that six films (or in the case of the Rojak slate, 10 films) would be completed?

(ii) Was the six film term a term of the policy wording?

(iii) Did the policy wording supersede the original slip policy?

(iv) Was the six film term a term of the reinsurance slip policy?

(v) If a term of any of the insurances, was the six film term a warranty?

(vi) Was the term in the reinsurance slip policy that HIH agreed to consult and obtain reinsurers' agreement to all amendments a warranty?

(vii) Did cl 8 cover and exclude breach of warranty defences?

(viii) Did cl 8 cover and exclude negligent misrepresentation and non-disclosure?

(ix) Was cl 8 specifically incorporated into the reinsurance contracts by reason of the term therein "Cancellation Clause as Original Policy"?

(x) If there was no specific incorporation of cl 8, was it incorporated into the reinsurance contracts by reason of general words of incorporation?

(xi) For these purposes, did it make any difference whether cl 8 was an unusual term? Was it an unusual term? Was incorporation of such a term "fair"?

(xii) For these purposes, did it make any difference whether a reinsurance was aware of cl 8?

(xiii) If cl 8 was incorporated into any reinsurance contract, what was its effect there?

(i) Is the six film term a term of the original slip policy?

60. I do not think this was seriously disputed by HIH. The slip policy stated, against the word "INTEREST:", that "7.23 Productions will produce and make six made-for-TV films". There was some suggestion that this was merely a statement of the subject-matter of the insurance, not a term that the six films would be made. In that connection, Mr Julian Flaux, QC, on behalf of HIH, submitted that it would be odd to find a contractual undertaking by LDT, the assured, as to something that would be done by a third party. Since it was not in LDT's power to make the films, the reference should not be construed as an obligation.

61. However, there is nothing unusual about one party in what is in effect a chain of contracts undertaking that something will be done which under the overall scheme falls to be done by another party in the chain. In my judgment, having regard to the need for the revenues of each film to cross-collateralize with the revenues of each other film, there can be no doubt that it is a term of the insurance that the stipulated number of films would be made. Clearly, there is a risk that, if fewer films are made, the possibility, that the total revenues engendered from those that are made may fall below the sum insured, increases. In an extreme case, only one or even no film might be produced.

62. Thus the original slip policy contained a term that six films would be produced and made.

(ii) Is the six film term a term of the policy wording?

63. For the purposes of this question, I will assume that the policy wording has to be construed as an entirely self-contained contract, which has superseded the original slip policy: see Youell v Bland Welch & Co Ltd, [1990] 2 Lloyd's Rep 423; [1992] 2 Lloyd's Rep 127.

64. Under cl 2.1 the insured peril is defined, inter alia, as "the failure of the Projects to generate a balance . . . equal to, or in excess of, the Sum Insured . . ." Under cl 2.2 "the revenue generated by the Projects" is to be received into a stipulated account known as the collection account. The "Projects" is itself a term defined in preamble (A) as "six revenue generating projects" in which Flashpoint has invested or is in the process of investing and whose revenues are due to be paid into the collection account.

65. Mr Flaux submitted that, whatever the position might be under the original slip policy, there is no term in the policy wording requiring six films to be made. He submitted that the closest that the policy wording comes to any such term is preamble (A), where the language "WHEREAS, Flashpoint . . . has invested or is in the process of investing in six revenue generating entertainment projects . . ." is to be found: but that such language does not amount to an undertaking that Flashpoint will make six films. Again, he points out that Flashpoint is a third party, and that the assured, LDT, is expressly said (under preamble (E)) to have no interest in the projects. Preamble (A), he submits, is merely a recitation of the background to the policy. In any event, investment in the projects is not the same as making the films.

66. Like Mr Justice David Steel below, I am unable to adopt this submission. He described the point as "finely balanced", but pointed out that any commercially realistic construction of the specified insured peril (cl 2) involves the premise that the projects are to be completed in order to generate such income as may be forthcoming. Otherwise, he added --

. . . the policy becomes a cash performance bond which must answer even if none of the films are made despite the provision of funding (at par 24).

Mr Flaux was expressly reluctant to submit that, to test the matter by an extreme possibility, the policy would operate without any breach even where no films at all were made. After some time for reconsideration, however, he did not shrink from that submission.

67. For myself, I am not sure that the analogy with a cash performance bond is helpful, or even, on the abjured premise, accurate. I do not see why, in principle, a policy might not be written -- if underwriters are willing to take the risk with or without such additional protection as might be provided by some side agreement -- which simply insures the risk that revenues from the investment will be less than a stipulated sum. As the policy wording states, the failure of the projects to generate a sum equal to the sum insured "for any reason whatsoever" is the essence of the peril insured. If the assured was the investor, it might be said that such a contract could not be made where no investment was ever made, for then the loss would be self-induced. And similarly, if the assured was the film-maker, it might be said that a contract could not be effective, in the absence of some misfortune, where no film was ever made, for again the loss would be self-induced. I do not see, however, why an underwriter might not take the risk that, for instance, the investment moneys are stolen or misused, or that the films cannot be completed through some misfortune such as ill-health. The question, however, remains whether this has been done under this policy wording.

68. In my judgment, the making of the films is inherent in talk of their failure to generate revenues. "Six revenue generating entertainment projects" are six films, by another name. Unless made, they could not be revenue generating. It is their failure to generate revenue, which is at the heart of the risk underwritten: "the failure of the Projects to generate a balance . . ." means or necessarily implies that there will be six films to generate a balance, whose failure to do so in sufficient quantities will produce an insured loss. The policy could have been written simply in terms of the absence of funds or sufficient funds in the relevant account. Instead, however, an insured loss can only occur if the "projects" have failed to generate sufficient funds in the relevant account.

(iii) Did the policy wording supersede the original slip policy?

69. This is a most interesting question, but the decision on the previous question makes it unnecessary to determine it. Nevertheless, it has been fully argued.

70. The importance of the question for present purposes is that if the policy wording did not supersede the original slip policy, then the two documents would have to be read together, and in such a case there would be no reason to regard the term of the original slip policy considered under question (i) above as having been exercised by anything said in the policy wording. On the contrary, the original slip policy might even have to be regarded as the primary document, and the policy wording as wording which was to be incorporated in it and which, where inconsistent, had to make way for the text of the incorporating document. Even if, on the contrary, the original slip policy was the document which had to give way in the face of anything inconsistent in the policy wording, there would be no reason why the general principle, that one tries to read both documents together, if possible, should not be given effect.

71. Mr Flaux nevertheless submitted that authority determined that the later policy wording superseded the earlier slip policy. For these purposes the policy wording was to be regarded as the policy of which the contract contained in the slip was merely anticipatory.

72. The authorities relied on by Mr Flaux are as follows.

73. Youell v Bland Welch & Co Ltd, [1990] 2 Lloyd's Rep 423 concerned a contract of reinsurance at Lloyd's. The slip was superseded by a formal policy. It was common ground that that was so, but the defendant reinsurers submitted that the slip could be looked at as an aid to the construction of the policy. At first instance, Mr Justice Phillips (as he then was) disagreed. He held that the parol evidence rule made the slip inadmissible. He said (at pp 428-429):

I do not consider Mr Mance's submission to be sound in law. The drafting of the slip formed no part of the relevant matrix in this case. That matrix was the background to the commercial adventure that formed the subject matter of the contract, not the mechanism by which the parties set about negotiating and reaching agreement. The reason that Mr Mance wished me to look at the slip was not so that I could inform myself of relevant background, but because he hoped that, by considering somewhat different words used by the parties in an earlier version of the contract, I would deduce the agreement reached as being that for which he contended and construe the policy so as to reproduce that agreement. This approach to construction is one which has its attractions and which in some cases might result in the Court construing an unclear written agreement so as to give effect to the intentions of the parties where it might not otherwise do so. But if prior written agreements or drafts were admitted in evidence as an aid to construction the result would be that the Courts would often be called upon to consider a profusion of documents in cases where there was an issue as to the true construction of the final version of the contract. The English Court has firmly set its face against such a practice. It has done so by adopting the so-called parol evidence rule . . .

Mr Sumption submitted with, I thought, good reason that the strict application of the parol evidence rule has a particular justification in a case such as the present. An insurance slip customarily sets out a shorthand version of the contract of insurance, in terms which may be neither clear [nor] complete. Where, as here, the slip provides for the formal wording to be agreed by the leading underwriter, the other subscribers to the risk anticipate and agree that the leading underwriter will, on their behalf, agree the final wording which will spell out their rights and obligations. If differences between the wording of the slip and that of the formal contract which is embodied in the policy give rise to the possibility that the natural meaning of the slip differs from that policy, the natural assumption is and should be that the wording

of the policy has been designed the better to reflect the agreement between the parties. To refer to the slip as an aid to the construction of the policy runs counter to one of the objects of replacing the slip with the policy.

Mr Justice Phillips went on in any event to adopt the construction of the policy for which Mr Mance had been contending.

74. In the Court of Appeal, [1992] 2 Lloyd's Rep 127, Lord Justice Staughton adopted a more cautious approach to the problem. He said (at p 133):

It can be argued that an insurance slip is different from negotiations for the formation of a contract. It contains a concluded agreement between the parties, albeit one which they may expect, and even agree, to replace by different wording in a formal contract. The nature of the problem which then arises is clearly illustrated by the present case.

75. Lord Justice Staughton then demonstrated by reference to both slip and policy the point of construction in dispute, and continued (at p 134):

Even if one could confidently discern what the words meant in the slip -- which I do not think one can -- there would remain the possibility, and perhaps even a probability, that the parties wished to alter that meaning when they prepared and agreed the policy. It is not argued that the leading underwriter had no authority to do so on behalf of others.

I would accordingly hold that the slip, whether admissible or not, is of no assistance in this case.

He went on to construe the policy, and agreed with the reinsurers' construction.

76. Lord Justice Be1dam dealt with the point of construction first, and only then sought to deal with the point of principle, making it plain, however, that he was doing so by way of comment only (at 140). Unlike Lord Justice Staughton hut like Mr Justice Phillips, he stated his preference for a rule of law, founded in the parol evidence rule. He pointed out that prior to the Marine Insurance Act, 1906, a slip was regarded as an unenforceable contract: it was only the formal policy which could be enforced. Thus, the slip could be looked to only if there was an issue of rectification, misrepresentation or non-disclosure. He said (at p 141):

Although the slip initialled by the underwriters records the original agreement between the parties, if it contains words showing an intention that the terms will subsequently be incorporated into a policy form, when the policy has been issued it is the policy and not the slip which constitutes the contract or agreement between the parties. Reinsurers who invited the learned Judge to have regard to the wording of the slip as an aid to the interpretation of the contract did not seek rectification. The slip is clearly admissible in evidence for some purposes. Section 89 of the Marine Insurance Act, 1906 provides that reference may be made "as heretofor" to the slip or covering note in any legal proceeding.

Prior to 1996 the extent of the slip's admissibility after a policy had been signed was considered in Ionides v The Pacific Fire & Marine Insurance Co, (1871) LR 6 QB 674. Lord Blackburn at page 685 indicated that, although the slip was clearly a contract of marine insurance, it was not a policy and not enforceable at law but it could be given in evidence wherever it was, though not valid, material . . .

This view was affirmed in the Exchequer Chamber (1873) LR 7 QB 517. Kelly CB stated that the slip was admissible, for example to show that the policy had been procured by misrepresentation or by non-disclosure, and he added:

It is quite enough therefore to say that here it was not given in evidence to prove a binding

contract between the parties or to contradict or explain, or in any way affect the construction of the policy in question; but it was given in evidence only to shew what their intention was in preparing the policy.

The implication seems clearly to be that it would not have been admissible to affect the construction of the policy.

If prior to the passing of the Marine Insurance Act, 1906, the slip was not admissible to explain or in any way affect the construction of the policy . . . in my judgment it was not admissible for the purpose of affecting the construction of the policy in question in this case.

Lord Justice Fox merely agreed that the appeal should be dismissed for the reasons given by Lord Justice Staughton and Lord Justice Beldam (at p 141). So nothing said by this Court in that case about the problem of a slip followed by a policy is binding authority.

77. This question was also considered by Mr Justice Hobhouse (as he then was) in Punjab National Bank v de Boinville, [1992] 1 Lloyd's Rep 7. That case was decided after the judgment of Mr Justice Phillips, but before the hearing in the Court of Appeal, in Youell v Bland Welch. Mr Justice Hobhouse could be read as stating that there is a rule of law that "once a policy has been issued that is the document that contains the terms of the contract" (at p 12). He cited Mr Justice Phillips with approval. Nevertheless, it has to be borne in mind that in his case, as in Youell v Bland Welch, the parties were agreed that the policy had replaced the slip. He said (at p 13):

But in the present case there is no claim for rectification and no allegation of mistake. Accordingly, in my judgment, it is not proper to look at the slip or another anterior document. If they disclose a different contractual intention to that which is contained in the policy itself, they are irrelevant unless there is also a claim for rectification. The parties' contentions must stand or fall by the terms of the policy document itself -- subject always to taking into account documents which are referred to in or incorporated into the policy, and the general principle of construing any document taking into account the surrounding circumstances.

After citing from Mr Justice Phillips' judgment he said:

Mr Justice Phillips here stresses the business considerations which underlay the replacement of the slip with a policy and the need to treat the policy as the definitive document. I would only add that once it is accepted the policy is a contractual statement of the contract between the parties and its terms, then as a matter of principle nothing short of rectification can permit the Court to treat any other document or communication as evidence of the agreement (or intention) of the parties in contradiction or variation of their agreement (or intention) as defined in the policy documents on its true construction.

The point was no longer a live one in the Court of Appeal, [1992] 1 Lloyd's Rep 7; [1992] 1 WLR 1138.

78. In St Paul Fire & Marine Insurance Co (UK) Ltd v McConnell Dowell Constructors Ltd, [1993] 2 Lloyd's Rep 503 at pp 516-517 Mr Justice Potter applies the parol evidence rule again in refusing to look outside the policy for the terms of the risk insured. He said:

However, in this case, a formal policy had been issued before the loss and/or claims of the defendants arose pursuant to the contract of insurance. It is therefore to the terms of the policy that one must look in order to ascertain the terms of the risk insured . . . Nor, as is frequently the case in such policies, was there any reference to the slip, the submission, or other preliminary documents by way of further definition or incorporation . . . (In) the absence of any route open to Mr Pickering to avoid the effects of the parol evidence rule

(such as resort to an ambiguity in the policy or assertion of a claim for rectification) this aspect of his argument must fail . . .

Again, the point was no longer alive in the Court of Appeal, [1995] 2 Lloyd's Rep 116.

79. Finally, in New Hampshire Insurance Co v MGN Ltd, [1997] 1 LRLR 24 at pp 53-54 Lord Justice Staughton (giving the judgment of the Court) said this:

Secondly, it was submitted that, once a policy has been issued, its terms are conclusive evidence of the contract between the parties unless and until it is altered by the process of rectification. That can happen by agreement of the parties or by order of a Court but not otherwise. And there has been no application for rectification in this case.

This doctrine is said to be supported by Youell v Bland Welch & Co Ltd (No 1), [1990] 2 Lloyd's Rep 423 and Punjab National Bank v de Boinville, [1992] 1 Lloyd's Rep 7. But in our opinion those cases are concerned with the situation where a policy has been agreed to by the parties. In those circumstances the policy will, at any rate in the ordinary way, be conclusive evidence of the contract unless and until it has been rectified; the slip cannot be used to add to, explain or contradict the meaning of the policy. That is not this case. Here the issue is whether the policy ever was agreed to. The insurers cannot pre-empt the answer to that question by the unilateral act of issuing it. That was the reasoning of Mr Justice Potter, and we agree with it.

80. That was again an obiter passage in as much as it referred to the earlier cases; and it was again cautious to avoid restating an out and out rule of law.

81. In my judgment, there is nothing in these citations which binds this Court to rule that where a prior contract has been followed by a further contract, or where in an insurance context a slip contract has been followed by a policy, there is a rule of law which makes it inadmissible to consider the terms of the prior contract, or that the parol evidence rule has the same effect. That is because all passages in prior cases in this Court are only obiter dicta. Moreover, in Youell v Bland Welch and Punjab National Bank v de Boinville it was common ground that the policies in question were intended to supersede the slips. Where it is common ground that one contract has been intended to supersede an earlier contract, it must follow that the parties' contract must be found exclusively in the later contract. Thus the earlier contract cannot be used to add to, or modify, the later contract.

82. But does it follow that the earlier contract cannot even be looked at for the purposes of construing the later contract?

83. In principle, it would seem to me that it is always admissible to look at prior contracts as part of the matrix or surrounding circumstances of a later contract. I do not see how the parol evidence rule can exclude prior contracts, as distinct from mere negotiations. The difficulty of course is that, where the later contract is intended to supersede the prior contract, it may in the generality of cases simply be useless to try to construe the later contract by reference to the earlier one. Ex hypothesi, the later contract replaces the earlier one and it is likely to be impossible to say that the parties have not wished to alter the terms of their earlier bargain. The earlier contract is unlikely therefore to be of much, if any, assistance. Where the later contract is identical, its construction can stand on its own feet, and in any event its construction should be undertaken primarily by reference to its own overall terms. Where the later contract differs from the earlier contract, prima facie the difference is a deliberate decision to depart from the earlier wording, which again provides no assistance. Therefore a cautious and sceptical approach to finding any assistance in the earlier contract seems to me to be a sound principle. What I doubt, however, is that such a principle can be elevated into a conclusive rule of law.

84. Where, however, it is not even common ground that the later contract is intended to supersede the earlier contract, I do not see how it can ever be permissible to exclude reference to the earlier contract. I do not see how the relationship of the two contracts can be decided without considering both of them. In essence there are, it seems to me, three possibilities. Either the later contract is intended to supersede the earlier, in which case the above principles apply. Or, the later contract is intended to live together with the earlier contract, to the extent that that is possible, but where that is not possible it may well be proper to regard the later contract as superseding the earlier. Or the later contract is intended to be incorporated into the earlier contract, in which case it is prima facie the second contract which may have to give way to the first in the event of inconsistency. I doubt that it is in any event possible to be dogmatic about these matters.

85. Is the insurance context different? Is the case of a slip followed by a policy a special case? First, it may be said that where a slip is followed by a policy there will usually be an intention to supersede the slip by the policy. That was the situation which was common ground in Youell v Bland Welch etc. Secondly, the considerations mentioned by Mr Justice Phillips, such as the fact that slips customarily set out the contract in shorthand in a way that is neither clear nor complete, will in general promote and underline the inutility of seeking to find in the slip an aid to the construction of the policy. Beyond that, however, I am doubtful that it is at all helpful to go.

86. In particular it is I think dangerous to seek help from the older cases. As late as 1867 it was the view of Judges who were summoned to give their opinions to the House of Lords in Xenos v Wickham, (1867) LR 2 HL 296 that a slip was a mere proposal for insurance: see Mr Justice Smith at 305, Mr Justice Willes at pp 314-315 and 317. Lord Chelmsford, LC at p 321 said:

It is one thing to cancel a slip, which is merely the inception of a contract, and to change the terms of the proposal for an insurance; and an entirely different thing to release the underwriters from their liability upon a policy.

87. In Ionides v Pacific Fire & Marine, (1871) LR 6 QB 674; (1872) LR 7 QB 517, which Lord Justice Beldam relied on in his judgment in Youell v Bland Welch, Mr Justice Blackburn at pp 684-685 explained that a slip was a contract ("the complete and final contract between the parties"), but one unenforceable at law and binding only in honour. He went on to explain the changing historical and statutory background to the roles of slip and policy in the context of marine insurance. At one time, a slip could not be given in evidence for any purpose whatsoever. But that had been changed only a few years before, by the Customs and Inland Revenue Act, 1867. That provided that no contract of marine insurance could be valid unless expressed in a policy, and that no policy could be given in evidence unless duly stamped. A slip therefore remained unenforceable: since, however, a slip was not a policy, "it may be given in evidence wherever it is, though not valid, material". The rule which in marine insurance required a "policy" in due course became embodied in s 22 of the Marine Insurance Act, 1906. It was only under the Finance Act, 1959 that such a policy became valid even though not stamped. For a history of the matter see Arnould's Law of Marine Insurance, 1981, 16th ed, at pars 14-20.

88. In Ionides v Pacific Fire & Marine a problem arose because the policy named the vessel in which the insured cargo was to be carried as Socrates, whereas the vessel in which the cargo had actually been shipped, and lost, was Socrate. The question was whether the slip could be used to assist in finding the parties' true intention. Because of the statutory restrictions, and the controversy surrounding use of the slip for any purpose, both Courts whose judgments were reported were anxious to show that the use for which the slip was admitted into evidence was limited. In the Court of Queen's Bench, Mr Justice Blackburn looked on the matter as a mere case of misnomer. It seems to have gone beyond that, however, for the jury's finding was that "neither party cared what the name of the ship was, as they meant to

insure the goods by the ship on which they were really shipped" (at p 686). In the Exchequer Chamber, Kelly, CB defined the issue in these terms (at pp 525-526):

In this case it is unnecessary to do more than to consider whether [the slip] is admissible in evidence for the purpose of shewing what the two parties intended at the time they entered into this transaction; in other words, whether they intended it to be a policy pursuant to a previous contract, although that contract was not binding, or whether the policy was a new, separate, and substantive contract, to be construed without reference to the previous acts of the parties.

It was the former solution which was adopted. It might well be said, therefore, that the case is not an authority for a rule of law which would prevent a slip being admitted to assist in the interpretation of the policy.

89. In Thompson v Adams, (1889) 23 QBD 361 the effect of a slip outside the marine insurance context was still in issue. There the underwriters under a fire insurance at Lloyd's submitted that the slip was no contract, merely an honorary undertaking to make a contract (subsequently, in the policy): see at p 364. Evidence as to the custom of the market was called, but Mr Justice Mathew was not deterred from his view "by the light of common sense" that the slip was "a binding contract to insure", whatever might be the position in the case of marine insurance (at p 365). Even so, the theory of Mr Justice Mathew seems to have been that the slip was merely a contract to issue a policy and that upon issue the contract of insurance would be in the policy.

90. In 1974, in the context of aviation insurance Lord Diplock put the matter in the following way, in American Airlines Inc v Hope, [1974] 2 Lloyd's Rep 301 at pp 304-305:

The slip contemplates its eventual replacement by a policy of insurance in the standard form in use at Lloyd's for aviation risks, but subject to such deletions and additions as are indicated in the slip. Such additions are generally clauses which themselves follow a standard form and are sufficiently identified in the slip by a reference to a description or a number but some may be specially tailored to the particular requirements of the assured. In the latter case if the slip is for an original insurance the actual clause is set out in the slip itself, although it may be in only abbreviated form . . .

Almost invariably the slip provides that the wording of the policy is to be agreed by leading underwriter. Where this is the case the leading underwriter may occasionally consent to some clause going into the policy which was not provided for by the slip, if in his judgment it would not affect the premium. So there is the possibility of minor variations being made in the contract of insurance when the terms of the policy are agreed.

91. The point was well made in argument that in many cases a loss may occur before a policy is even issued. That was precisely the point which drove Mr Justice Mathew as a matter of common sense to conclude that there must be a binding contract in the slip. If thereafter a policy is issued which is intended to supersede the slip, the principle that the contract is to be found in the policy rather than the slip remains; but the example demonstrates the difficulty of a dogmatic assertion that in no case can the construction of the policy be educated by a consideration of the slip, when ex hypothesi the slip was the only contract in existence at the time of loss.

92. In the light of the uncertain status of the slip until relatively speaking modern times, I would for myself with genuine respect consider it dangerous to build, as Lord Justice Beldam did in his obiter dicta in Youell v Bland Welch, on the single case of Ionides v Pacific Fire & Marine, or on the negative inference or "implication" which he sought to derive from the positive use of the slip there "to shew what their intention was in preparing the policy", that a slip could never be used to assist in the construction of a policy. I would, however, agree that