in the absence of a plea of rectification a slip could not be used to alter or contradict the construction of a policy which had superseded a slip. As it happens, there does not appear to be any support in Ionides v Pacific Fire & Marine for the thesis that policy supersedes slip, albeit that is perhaps entirely to be explained by the peculiarities of marine insurance at that time. A policy could hardly be said to supersede an unenforceable contract. Matters have now moved on. This illustrates, however, the problems involved in seeking a rule of law amid the shifts of historical development.

93. Even Mr Flaux came to put his submission in favour of the supersession of slip by policy as a matter of a rebuttable presumption of fact. Having begun by favouring a rule of law, he no longer did so by the end of his submissions. However, I am doubtful about his presumption of fact. I would prefer to say that it is a question of construction which depends in part, as all such questions do, on the surrounding circumstances. In the insurance market, however, it may well by now be possible to talk of a general presumption that a policy is intended to supersede a slip.

94. In the present case, however, it is not common ground that the policy wording superseded the original slip policy. On the contrary the issue is precisely whether the policy wording was intended to supersede the original slip policy. As part of that issue it is also debated whether the policy wording is a self-contained policy and whether it matters whether the slip policy is called a slip or a slip policy.

95. It is unnecessary to decide this issue of whether the slip policy was superseded by the policy wording, but I do not think it was. First the slip was called a "slip policy". That immediately calls into question the basic presumption that a slip is intended to be superseded by a policy. Secondly, it is hard to see how the policy wording, for all that it is presented as a self-contained "policy", was intended to supersede the slip policy. Thus there is nothing in the policy wording concerning a cap of US$3.9 m any one film, nor cross-collateralization, but above all there was nothing regarding the premium (other than it had been paid). It is I suppose possible that by Aug 22, 1997 the basic premium had been paid, although I do not think that it had; but there still remains the "Back End" or additional premium, and nothing at all has suggested that there was any intention on the part of HIH to forego that right. It would appear therefore that the policy wording is incomplete, and that it would be preferable to regard the policy wording as containing the "Conditions" to be incorporated into the slip policy. (That would be consistent with the manner in which the slip policy and the policy wording were bound up together in Lloyd Thompson's policy folders, and with the terms of Lloyd Thompson's cover notes: although I do not rely on such matters.) It would also be consistent with the terms of the reinsurance slip policy, a contract which may have been amended as the underlying insurance became amended, but which was never superseded by any further contract or policy. The reinsurance slip policy stated that the "INTEREST" was "As Original Policy", which was a reference to the original slip policy's "7.23 Productions will produce and make six made-for-TV Films", and contained express references to the US$3.9 m cap any one film and to the premium as being "Original Net Premium . . ."

96. It was also the Judge's view that there was no intention to supersede the original slip policy.

97. I am inclined therefore to conclude that the original slip policy was never superseded. It follows to my mind that the policy wording itself can be, and ought to be, construed against the background of the original slip policy. That produces the result both that there is no reason to think that the term "7.23 Productions will produce and make six made-for-TV Films" ever ceased to be a term of the insurance, and that in any event the policy wording's construction (question (ii) above) is further strengthened by reference to the wording of the original slip policy.

(iv) Is the six film term a term of the reinsurance slip policy?

98. In the circumstances this question can only be answered "Yes".

(v) Is the six film term a warranty?

99. Mr Justice David Steel held that the six film term was a warranty whether found in the original or the reinsurance contract. Mr Flaux challenged that conclusion. He submitted that for a term in an insurance contract to be a warranty, the intention that it should be so had to be very clear, since the implications of breach were so serious. Where the fulfilment of a term depended on a third person, here the makers and producers of the films, and the assured had no control over events, there should be all the more caution in finding a warranty. As for the original slip policy, one should not expect to find a warranty in the definition of the insured interest; and as for the policy wording, the oblique reference to the projects could not support a warranty. Nor should the assured's own brokers, Lloyd Thompson, be thought of as putting forward a warranty.

100. Under this issue I am considering the matter outside the terms of cl 8 of the policy wording. HIH relies on cl 8 as a waiver of every defence save for that of lack of cover. Mr Flaux also submits, however, that the presence of cl 8 makes it harder to find a warranty in the contract. However, I do not understand that submission. If cl 8, which I shall consider below, prevents reliance on a defence of breach of warranty, then so be it: but I do not see how it affects the nature of a term. On the contrary, even if cl 8 is given the wide effect on which HIH relies, that merely suggests that there are terms in the contract whose breach would amount, absent cl 8 itself, to a complete defence to a claim.

101. In my judgment, once the six film term is established as a term of the insurance or reinsurance contract, the grounds for holding it to be a warranty are very strong. It is a question of construction, and the presence or absence of the word "warranty" or "warranted" is not conclusive. One test is whether it is a term which goes to the root of the transaction; a second, whether it is descriptive of or bears materially on the risk of loss; a third, whether damages would be an unsatisfactory or inadequate remedy. As Lord Justice Bowen said in Barnard v Faber, [1893] 1 QB 340 at p 344: "A term as regards the risk must be a condition." Otherwise the insurer is merely left to a cross-claim in a matter which goes to the risk itself, which is unbusinesslike (ibid; see also Ellinger & Co v Mutual Life Insurance Co of New York, [1905] 1 KB 31 at p 38). In the present case, the six film term would seem to answer all three tests. It is a fundamental term, for even if only one film were omitted, the revenues are likely to be immediately reduced. That will not matter if the revenues already exceed the sum insured, for in that case there can be no loss in any event. Where, however, the revenues fall below she sum insured, the loss of a single film may be the critical difference between a loss or no loss, and will in any event be likely to increase the loss. For the same reason the term bears materially on the risk. A cross-claim would be an unsatisfactory and inadequate remedy because it would never be possible to know how much the lost film would have contributed to revenues. The very fact that the making of the six films lies under the "INTEREST" line emphasizes the importance of the term and its direct bearing on the risk. As for the draft originating with the assured's brokers, that is nearly always the case. There is a maximum of construction which is called the contra proferentum rule; but there is no maxim to the opposite effect.

102. My conclusion that the term is a warranty is consistent with the view expressed in MacGillivray on Insurance Law, 9th ed, 1997, at par 10-26 that --

. . . a description of the subject-matter of the insurance written into the policy and obviously material to the risk would be likely to be construed as a warranty.

103. Moreover, such pre-contractual material as the Court has been shown is consistent with the importance of the full slate of films and the way in which there was to be cross

collateralization of their revenues. Similarly the importance of "Lured Innocence" in particular was emphasized, and when that film dropped out of the 7.23 slate there was an assurance that it would be replaced by another film of comparable quality. However, for reasons which I have set out at the beginning of this judgment, I do not think it would be right to place any store on such matters, and I have not.

104. The position is the same, as it seems to me, whether the six film term is seen as arising out of the original slip policy itself, or out of the policy wording, or out of a combination of the two; and whether the term is viewed from the point of view of the original insurance or the reinsurance. The reinsurance slip policy expressly states "INTEREST: As Original Policy". Moreover, once the six film term is seen as being a term of the insurance, whether set out as it is in the original slip policy or derived from the construction of the policy wording, it is immediately clear that it is the essence of the risk underwritten: if the slate of (six) films is made with the moneys invested, the insurers will indemnify the investors against loss. That is what the insurance is all about.

(vi) Is the term in the reinsurance slip policy that HIH agreed to consult and obtain the reinsurers' agreement to all amendments a warranty?

105. The term in question is the first sentence of the third of the CONDITIONS set out in the reinsurance slip policy, viz --

The Reinsured hereon agrees to consult and obtain Reinsurers' agreement to all amendments and alterations to the terms, clauses and conditions of the Original Policy.

106. Mr Flaux's principal submission under this issue is that the last sentence of that paragraph sets out the consequences of a breach of that term, namely that because simultaneous payment of the reinsurance is said to be "In consideration of the above", therefore a breach of the consultation and joint agreement term means that the reinsurers are spared the obligation of simultaneous payment.

107. That, however, is a non-sequitur. The last sentence reads:

In consideration of the above, Reinsurers hereon agree that in the event of a claim and/or professional advisors fees and expenses being incurred under the Original Policy, this Reinsurance will pay at the same time.

108. There is no consequence prescribed in the last sentence for its breach. The fact that simultaneous payment is the consideration for HIH's promises in the preceding sentences does not mean that HIH's breach of those promises simply frees the reinsurers of their promise of simultaneous payment.

109. Mr Flaux also submits that the second and third sentences of the paragraph, dealing as they do with claims consultation and the appointment of lawyers and accounts, are not warranties, and that indicates that the first sentence is not a warranty either. The argument is valid as far as it goes, but it is not decisive. The fact is that the subject-matter of the first sentence differs in a critical way from the subject-matter of the second and third sentences, in that the first sentence is dealing with the content of the insurance contract itself, whereas the second and third sentences are dealing only with the processing of claims. Moreover, the subject-matter of the first sentence reflects the position at common law. Thus in Norwich Union Fire Insurance Society v Colonial Mutual Fire Insurance Co Ltd, (1922) 12 Ll L Rep 215; [1922] 2 KB 461 it was held that variation of the original policy without the consent of the reinsurer discharged the latter. Mr Justice McCardie referred at p 218; pp 468-469 to this Court's decision in Lower Rhine and Wurtemberg Insurance Association v Sedgwick, [1899] 1 QB 179, and to Lord Justice Rigby's dictum during argument (see the report at 4 Com Cas 14 at p 19) that:

It is one thing for the plaintiffs to trust to the policies which the defendant had made and another to trust to those that he might make in the future.

Mr Justice McCardie then continued (at p 218; p 469):

. . . It appears to me that there is no half-way house between a right to alter the head policy without consent and an absence of right to do so. Either it can be altered or not. If it can be altered, then what limit is to be placed on the right of alteration? The only sound rule seems to be that the head policy cannot be altered save with the consent of the re-insurer.

110. Mr Justice McCardie then went on (at p 218; pp 469-470) to apply the analogy of the rule in contracts of guarantee:

As pointed out by Leake [on Contracts, 7th ed] at p 600: "The Court will not entertain the question of the materiality of the variation in the contract guarantee; and unless it is self-evident that it is not material or prejudicial to the surety, he is left to be the sole judge whether he will consent to remain liable." This passage is supported by the well-known judgment of Cotton LJ in Holme v Brunskill (1877) 3 QBD 495, 504. It seems to me that a rule at least is rigorous should apply to matters of insurance. If a head policy could be altered without the consent of the re-insurer the latter would be thrown in to a position of danger, difficulty and doubt.

111. Mr Justice David Steel held, and the reinsurers accept, that the term in question only covers material amendments. If so, that may represent a position somewhat less stringent than the common law. It is no reason, however, for holding that the term is not a warranty, to the contrary. In my judgment, therefore, the first sentence of the third condition stated in the reinsurance slip policy is a warranty.

(vii) Does cl 8 cover and exclude breach of warranty defences?

112. It does not matter whether the six-film slate term or the amendment term is a warranty if cl 8 of the policy wording covers and excludes breach of warranty defences (and if the reinsurer is bound by cl 8).

113. It is convenient to set out cl 8 again:

Clause 8 Disclosure and/or Waiver of Rights

8.1 To the fullest extent permissible by applicable law, the Insurer hereby agrees that it will not seek to or be entitled to avoid or rescind this Policy or reject any claim hereunder or be entitled to seek any remedy or redress on the grounds of invalidity or unenforceability of any of its arrangements with Flashpoint Ltd or any other person (or of any of its arrangements between Flashpoint Ltd and the Purchaser) or non-disclosure or misrepresentation by any person or any other similar grounds. The Insurer irrevocably agrees not to assert and waives any and all defences and rights of set-off and/or counterclaim (including without limitation any such rights acquired by assignment or otherwise) which it may have against the Assured or which may be available so as to deny payment of any amount due hereunder in accordance with the express terms hereof.

114. Mr Flaux submits that cl 8 provides the insured with protection against every defence available to HIH, except the defence that the claim does not fall within the cover itself. Mr Justice David Steel had held below that if cl 8 extended to including within its waiver even a coverage defence, then that would remove from the agreement the basic ingredients of a contract of insurance, a conclusion which a Court would be loath to reach in the absence of the very clearest language: cf in a different context Tor Line AB v Alltrans Group of Canada

Ltd, [1984] 1 Lloyd's Rep 123; [1984] 1 WLR 48. Mr Flaux does not pursue HIH's appeal from that conclusion. He accepts that a claim outside the cover of the insurance is simply not within the insurance at all; and that a defence of lack of cover would not fit with the words at the end of the second sentence which presume that, but for the defence in question, an amount would be "due hereunder in accordance with the express terms hereof". With that exception, however, Mr Flaux submits that cl 8 is a complete exoneration of every defence, save for fraud in the making of the original insurance contract itself.

115. Mr Flaux relies on both sentences of the clause, but primarily on the first. There he points in particular to its concluding words -- "or any other similar grounds". In the second sentence he points in particular to the words -- "any and all defences".

116. He submits that the first sentence has the very widest scope. It begins with the words "To the fullest extent possible" and continues with language of broad import, viz "the Insurer hereby agrees that it will not . . . reject any claim hereunder . . . on the grounds of . . . non-disclosure or misrepresentation by any person or any other similar grounds". He submits that a defence of breach of warranty is closely akin to that of non-disclosure or misrepresentation in that in both cases the contract can be avoided. In that connection he relies on some remarks of mine in Svenska Handelsbanken v Sun Alliance and London Insurance plc, [1996] 1 Lloyd's Rep 519 at p 552.

117. As to the second sentence, he submits that a defence of breach of warranty is within the words "any and all defences . . . which it may have against the Assured or which may be available so as to deny payment of any amount due hereunder . . ." He submits that if Mr Justice David Steel were right to say that the word "defences" were limited to defences "akin to rights of set-off or counterclaim", then the word would be redundant, for the second sentence immediately goes on to refer expressly to rights of set-off or counterclaim. Thus the words "defences and rights of set-off and counterclaim" are not to be understood as part of a single phrase. There are, he says, no "defences" of counterclaim, thus the term "defences" is dealing with something apart from "rights of set-off or counterclaim".

118. In my judgment, however, Mr Justice David Steel was right to reject the submission that cl 8 contained a defence to breaches of warranty. Subject to its concluding words "or any other similar grounds", the first sentence's subject matter is (a) "the invalidity or unenforceability of any of [the Insurer's] arrangements with Flashpoint Ltd" etc, and (b) "non-disclosure or misrepresentation". Both those items of subject matter are extra contractual. The first is dealing with arrangements collateral to the insurance contract, the second is dealing with pre-contractual negotiations. Breaches of warranty, however, are breaches of the contract of insurance itself. I would not therefore regard them as constituting "similar grounds". Mr Flaux argues similarity by reference only to the remedy, invoking the comments in Svenska v Sun Alliance. There, however, I was concerned to underline the importance of a clause, which I found to be a warranty, by reference to its concern for proper disclosure, and I emphasized that both non-disclosure and breach of warranty could have the effect, albeit in their different ways, of "undoing the insurance . . . not something that merely sounds in damages". That was in the context of a submission that the clause in question was not a warranty but merely sounded in damages. In the present case, however, the critical phrase is concerned with similarity of grounds, not with dissimilar grounds which might give rise to similarities of remedy.

119. As for the opening phrase ("To the fullest extent permissible by applicable law"), those words cannot be relied on to extend the scope of the first sentence, even if they may be said to emphasize its width and to warn against any attempt at an artificial narrowing of its scope. Essentially, however, they are words of saving, not of extension.

120. As for the second sentence, if it had been intended to include a waiver of breach of warranty, that could have been easily stated. As it is, the whole pressure of Mr Flaux's

submission has to be carried ultimately by the single word "defences", which it is said stands separately from the rest of the sentence. In my judgment, however, it is much more natural to read that word as part of the overall phrase "defences and rights of set-off and/or counterclaim". It is natural to think of a set-off as a defence (even if it can also be thought of as a right), and a counterclaim as a right (even if it may also give rise to a defence). In my view the word "defences" is primarily connected with "set-off" and the word "rights" is primarily connected with "counterclaim". In any event, it is plain that a set-off may give a defence, and that is sufficient to explain the language of the sentence.

121. Moreover, that explanation would be consistent with the closing language of the sentence -- "so as to deny payment of any amount due hereunder in accordance with the express terms hereof". If there was prima facie a good claim ("amount due hereunder" etc), a defence of set-off or a right of counterclaim might result in a valid denial of payment of a sum otherwise due. Where, however, a breach of warranty occurs before a loss within the cover, it is difficult to say that that breach provides a defence against an amount "due hereunder in accordance with the express terms hereof". It would be more natural to say that by reason of the breach of warranty there was nothing due, and that that was so precisely because of the contract's "express terms".

122. That is because it is well established that a breach of warranty produces an automatic discharge of a contract of insurance from the moment of breach: Bank of Nova Scotia v Hellenic Mutual War Risks Association (Bermuda) Ltd (The Good Luck), [1991] 2 Lloyd's Rep 191; [1992] 1 AC 233. Lord Goff of Chieveley at p 202, col 1; pp 262-263 put the matter in this way:

Once this is appreciated, it becomes readily understandable that, if a promissory warranty is not complied with, the insurer is discharged from liability as from the date of the breach of warranty, for the simple reason that fulfilment of the warranty is a condition precedent to the liability of the insurer. This moreover reflects the fact that the rationale of warranties in insurance law is that the insurer only accepts the risk provided that the warranty is fulfilled. This is entirely understandable; and it follows that the immediate effect of a breach of a promissory warranty is to discharge the insurer from liability as from the date of the breach.

123. At p 202, col 2; p 263F-G Lord Goff cited with approval the following statement by Lord Justice Kerr from State Trading Corporation of India Ltd v M Golodetz Ltd, [1989] 2 Lloyd's Rep 277 at p 287, that --

Thus, the correct analysis of a breach of warranty in an insurance contract may be that, upon the true construction of the contract, the consequence of the breach is that the cover ceases to be applicable unless the insurer subsequently affirms the contract, rather than to treat the occurrence as a breach of the contract by the insured which the insurer subsequently accepts as a wrongful repudiation.

124. This analysis of the function of a warranty and of the consequences of its breach not only supports, to my mind, the construction which I would give to the second sentence of cl 8, but also undermines Mr Flaux's construction of the first sentence. The latter factor is for two reasons. First, it demonstrates that even the remedy for breach of warranty differs in important respects from the remedy for non-disclosure or misrepresentation. In the case of breach of warranty, there is an automatic discharge; in the case of non-disclosure or misrepresentation, nothing happens unless the insurer elects to avoid the contract, in which case the contract is not discharged for the future but rescinded ab initio. Secondly, it demonstrates that by being in breach of his warranty, an assured takes himself outside the cover which he has agreed with his insurer. As Lord Justice Kerr said -- "the cover ceases to be applicable". This is because a warranty is very akin to a statement of the cover provided by the insurance, indeed it is part of that cover's definition. That is why the insurance ceases to bind as from the time of breach. That is why the insurance ceases to bind even though any

subsequent loss had nothing to do with the breach of warranty. It is because the insurer had only agreed to cover the risk provided the warranty was performed. It follows that Mr Flaux's concession that cl 8 does not provide an answer to lack of cover in principle covers the case of a breach of warranty as well. At any rate, the case of lack of cover and the case of breach of warranty are much closer to one another than either is to non-disclosure and misrepresentation.

125. For these reasons I agree with the Judge that cl 8 does not exclude a defence based on breach of warranty.

(viii) Does cl 8 cover and exclude negligent misrepresentation and non-disclosure?

126. Mr Justice David Steel held that cl 8 covered and thus excluded a defence based on negligent misrepresentation and non-disclosure. The reinsurers cross-appeal on this issue. Although treated below in the context of the reinsurance contracts (see pars 52-56 of his judgment under the heading of "Effect of Clause 8 in the reinsurance contract"), this issue seems to me to stand free of that question of incorporation. If cl 8 covers and excludes a defence based on negligent misrepresentation and non-disclosure, it will do so in the original insurance. Of course, the role of cl 8 in the reinsurance contracts, if there incorporated at all, is another question, to which I shall come later.

127. The reason why the matter was discussed in the Court below in the context of reinsurances is that preliminary issue 4(ii) specifically raised the question as to whether the reinsurers could avoid their contracts of reinsurance on the grounds of fraudulent or negligent, as distinct from (non-negligent) innocent misrepresentation or non-disclosure. I think it is more helpful to concentrate first on the scope of cl 8 according to its own terms, and secondly to ask how such a clause would operate in the reinsurance contracts, if incorporated there at all.

128. Two preliminary matters need to be stated. The first relates to the question of fraudulent misrepresentation or non-disclosure, a matter included in the preliminary issue. Mr Justice David Steel stated "there are in fact no allegations of fraud against HIH or its agents" (at par 52). That is not, however, as I read the pleadings (see at par 49 above), but it may be that he had been told that nevertheless fraud was not being relied upon. He went on to say ". . . (for) the record" that it is not open to a party to exclude liability "for his own fraud" in inducing the contract, citing S Pearson & Son Ltd v Dublin Corporation, [1907] AC 351. That was presumably intended to leave open the question of whether one can exclude liability for the fraud of one's agent, a question which was debated in the authority just cited, with Lord Halsbury and Lord Atkinson appearing to state that one can not (at pp 357-358, 366-367) and Lord Loreburn, LC (at p 354) expressing himself more cautiously. However, nothing has been said before this Court on the question of fraud, perhaps again because it was common ground that no case of fraud is intended or persisted in. Therefore, nothing said by me in this paragraph should be regarded as other than a passing comment. I note that in HIH Casualty and General Insurance Ltd v Chase Manhattan Bank, [2001] 1 Lloyd's Rep 30 at par 44 the case of Pearson v Dublin Corporation is analysed by Mr Justice Aikens, and that he concludes at pars 45-46 that it is conceptually possible to have a clause in a contract of insurance that excludes or limits the consequences of fraudulent non-disclosure by the assured's agent.

129. The second matter relates to a cause of action in negligent misrepresentation, as distinct from the right to avoid for (negligent) misrepresentation. The reinsurers submitted on their appeal that the former cause of action in any event was not excluded by cl 8. Their pleadings invoke such a cause of action. Preliminary issue 4(ii) does not, however, specifically encompass it, since it speaks only of a right to avoid, and Mr Justice David Steel does not appear to have considered it. However, it would seem to me to be wrong to leave it out of account.

130. In considering only the remedy of avoidance, Mr Justice David Steel gave the following reasons (at par 56) for his conclusion that the parties did intend to exclude the consequences of inadvertent concealment or misrepresentation whether careless or not:

(i) The insurer expressly forgoes rights of avoidance, rejection of any claim or any remedy for non-disclosure or misrepresentation.

(ii) The obligations of good faith are indeed unitary and absolute: the establishment of a negligent misstatement adds nothing: the very concept of a negligent non-disclosure is not easy to grasp.

(iii) There is no indication in the rest of the policy wording that the parties were minded to distinguish between deliberate, careless and accidental activity.

(iv) The introductory words "to the fullest extent permissible by applicable law" on their natural meaning accord the widest possible scope to the exclusion. I reject the submission that it means no more than: "Avoidance for innocent misrepresentation or non-disclosure is not permitted, unless the law prohibits such an exclusion".

131. The reinsurers submitted that Mr Justice David Steel was there in error. They relied primarily on the well-known principles of construction set out in Canada Steamship Lines Ltd v The King, [1952] 1 Lloyd's Rep 1; [1952] AC 192, which they said the Judge was wrong not to apply nor to consider of particular help. He should rather have followed Mr Justice Colman in Toomey v Eagle Star Insurance Co Ltd (No 2), [1995] 2 Lloyd's Rep 88 and Mr Justice Aikens in HIH v Chase Manhattan Bank in applying the Canada Steamship principles to analogous clauses in insurance contracts. He should therefore have concluded that there was no sufficiently clearly expressed intention in cl 8 to exclude the consequences of negligence in misrepresentation or non-disclosure. As for the specific reasons given by the Judge: (i) The reliance on "any claim" and "any remedy" was misplaced; it was not as though the clause had said "any" non-disclosure or misrepresentation. (ii) While it was true that the obligations of good faith are unitary in the sense that a misrepresentation or non-disclosure will entitle an insurer to avoid his contract even in the absence of negligence, nevertheless that did not answer the question whether the parties intended to exclude any remedy for negligence, especially as negligence was the essence of a cause of action in damages for negligent misstatement. (iii) The absence of any indication elsewhere in the contract that the parties intended to distinguish between the negligent and the merely accidental was at best a neutral consideration. (iv) The opening words of cl 8 were nothing more than a saving provision in the event that any part of what followed was impermissible as a matter of law.

132. In Toomey v Eagle Star (No 2) the clause in question merely stated "This contract is neither cancellable nor voidable by either party". Mr Justice Colman considered the Canada Steamship line of authorities and concluded that, on a "finely balanced" point, the clause did not exclude the right to avoid for negligent non-disclosure or misrepresentation nor the right to recover damages under s 2(1) of the Misrepresentation Act, 1967. He appears to have considered it to be axiomatic that non-disclosure and misrepresentation in the insurance context can be negligent as distinct from innocent.

133. In HIH v Chase Manhattan Bank on the other hand Mr Justice Aikens adopted a more complex analysis. The clause there stated: ". . . the insured will not have any duty or obligation to make any representations, warranty or disclosure of any nature, express or implied . . . and shall have no liability of any nature to the insurers for any information provided by any other parties and any such information provided by or non-disclosure by other parties . . . shall not be a ground or grounds for avoidance . . ." He held that the rules of construction in Canada Steamship were not directly applicable, and in that respect he differed from Mr Justice Colman in Toomey v Eagle Star (No 2) (at pars 41-45 of his

judgment). He nevertheless concluded that even so the parties had not intended by the clause in question to exclude either the right to avoid for negligent non-disclosure or misrepresentation or the right to damages for negligent misrepresentation whether at common law or under s 2(1) of the Misrepresentation Act, 1967 (see pars 46, 72-73, 76, 78-80, 88 and 90).

134. The particular wording of the clause before Mr Justice Aiken was nothing like cl 8, and, with (as I understand it) an appeal pending in that case I would not want to say anything about his ultimate conclusion as a matter of construction of that clause. Of particular interest for present purposes, however, is his analysis of the Canada Steamship line of authority in the context of the right to avoid an insurance contract for non-disclosure or misrepresentation. At pars 41-43 of his judgment he said this:

The rules of construction set out by Lord Morton in the Canada Steamship case and subsequent cases concern clauses in contracts which purport either: (i) to exempt a party from the consequences (in damages) of the negligence of that party or its employees or agents; or (ii) to grant an indemnity to a party where loss has resulted from its negligence or that of its employees or agents. The basis for the three well known "rules" of construction is that parties to a contract will not be presumed to wish to exclude liability for negligence of one party. Therefore there has to be express words of exclusion for negligence (r 1); or the words of the clause have to be wide enough to cover liability for negligence, (r 2); if so, the clause will only be effective to cover negligence if it is demonstrated that there is no other "head of damage" (which is not fanciful or remote) which might be covered by the clause (r 3).

It seems to me that the second and third "rules" of construction are intended to deal with cases where the exemption or indemnity clause wording has been deliberately drawn in a wide and general way. It is for that reason that its effect will appear equivocal and so the Court naturally asks: what did the parties actually intend to cover by these general words? I think that the Canada Steamship case rules of construction were not intended to apply to a particular clause that is specifically directed at exempting liability for the breach of a particular type of absolute duty, where the breach can be established whether or not negligence (or fraud) is proved.

In contracts of insurance the duty of disclosure of material facts is unitary and absolute in the sense that there will be a breach even if the non-disclosure is only inadvertent. Generally neither negligence nor fraud need to be demonstrated to establish a breach. The same is true of the duty not to misrepresent material facts. Moreover, the consequence of the breach of the duty of utmost good faith is that the insurer has a right to avoid the contract of insurance, rather than damages. So, subject to the limitations concerning fraud discussed above, it seems to me that provided that a clause in a contract of insurance is clearly and specifically intended to cover the consequences of a breach of the duty of disclosure or the "duty" not to misrepresent material facts, then the rules of construction in the Canada Steamship case would not be directly applicable to such a clause.

135. That reasoning appealed to Mr Justice David Steel, and it appeals to me. I also agree with Mr Justice David Steel that the very concept of a negligent non-disclosure is unfamiliar territory. (Fraud is something apart.) Moreover, at the time when the principles relating to avoidance for non-disclosure or misrepresentation were developing in insurance law, and at the time of the Marine Insurance Act, 1906, there was in any event no question of a cause of action sounding in damages. Breach of the duty of good faith gave rise to no cause of action in damages, only to a right to avoid, as has recently been affirmed in Banque Keyser Ullmann SA v Skandia (UK) Insurance Co Ltd, [1990] 2 Lloyd's Rep 377; [1991] 2 AC 249. Damages at common law for negligent misstatement causing merely financial loss had not yet arisen. The Misrepresentation Act, 1967 had not yet been enacted. The only remedy lay in avoidance. Moreover, the duty of good faith, breach of which entitled avoidance but nothing

else, was an absolute duty. It would not occur to anyone to seek to prove negligence. It ought to follow that it would not have occurred to the parties to an insurance contract to seek to exclude the right to avoid for negligence.

136. In such a context, where a clause such as cl 8 seeks to exclude the right "to avoid or rescind this Policy . . . on the grounds of . . . non-disclosure or misrepresentation . . .", I do not see why those words should permit insurers to seek to prove negligence in non-disclosure or misrepresentation as the ground for a right to avoid for breach of the duty of good faith. Since the parties could not have had negligent breach of the duty of good faith in mind, it seems to me impossible to say that, in the absence of an express exclusion of negligence, the parties are to be thought of as not intending to embrace any negligent breach of the duty of good faith.

137. Do the new causes of action in negligent misstatement or under the Misrepresentation Act make any difference? I do not think that a cause of action at common law has been pleaded, only a counterclaim for damages under s 2(1) of the Misrepresentation Act. Such a claim, therefore, is not covered by the words from cl 8 quoted in the previous paragraph: but I do not see why it is not prima facie covered both by the additional words of exclusion in the first sentence -- "any remedy or redress on the grounds of . . . misrepresentation . . . or any other similar grounds" --; and by the language of the second sentence whereby "any and all . . . rights of . . . counterclaim" are excluded. Moreover, since negligence is not a condition precedent of a right to claim under s 2(1), I do not see why it needs to be expressly or impliedly excluded. All a claimant under s 2(1) has to prove is a misrepresentation which induced his contract. It is then up to the defendant to prove the absence of negligence as a defence. With respect to Mr Justice Aikens (see par 90 of his judgment), I do not think that a clause such as cl 8 would have to state expressly that "there was no liability on the insured even if there was no reasonable belief" in the representation complained of.

138. In any event, I agree with Mr Justice David Steel that the language of the clause is very wide. Its opening words are words of saving, but they emphasize that the language of the clause is intended to be read as widely as they properly can be. I do not see why "any claim . . . any remedy or redress on the grounds of . . . non-disclosure or misrepresentation . . . or any other similar grounds" does not embrace a claim based on negligent non-disclosure or s 2(1) of the Misrepresentation Act. Moreover, since misrepresentation (in the absence of fraud) can only give rise to a claim in damages if there is negligence and not otherwise, and since cl 8 is plainly intended to go beyond the exclusion of the right to avoid for misrepresentation and to extend to the exclusion of "any remedy or redress on the grounds of . . . misrepresentation", and since therefore there could be no remedy or redress for misrepresentation other than the right to avoid in the absence of negligence, I do not see why cl 8 would not in any event pass even the most stringent application of the Canada Steamship rules as an exclusion of the right to claim damages under s 2(1) of the Misrepresentation Act, or, for the same reason, of the right to claim damages at common law for negligent misstatement.

139. The reinsurers placed emphasis in their submissions as did Mr Justice Aikens himself (see at par 77 of his judgment), on what Lord Justice Steyn said in EE Caledonia Ltd v Orbit Valve Co, [1994] 2 Lloyd's Rep 239 at p 246, col 1; [1994] 1 WLR 1515 at p 1523H to the effect that --

. . . Why was an express reference to negligence not inserted? Similar questions have been posed on a number of occasions. Why do draftsmen not take note of a clear and consistent line of judicial decisions? For my part I have no doubt that the draftsman on the underground to whom such a question was addressed would say "one does not want to frighten off one or other of the parties." Omissions of express reference to negligence tend to be deliberate.

140. That, however, was said in the context of a classic application of the rules of Canada

Steamship, not in the context of a clause which was dealing with remedies inter alia of avoidance arising from non-disclosure or misrepresentation in the negotiation of an insurance contract. For reasons which I have sought to give above, I do not think that it would occur to the draftsman in such circumstances to think it necessary to provide expressly for negligence.

141. For these reasons, this aspect of the reinsurers' cross-appeal fails.

(ix) Is cl 8 specifically incorporated into the reinsurance contracts by reason of the term therein "Cancellation Clause as Original Policy"?

142. New Hampshire accepts that cl 8 forms part of the reinsurance contract by virtue of a general incorporation said to be effected by the condition that "this reinsurance is subject to all terms, clauses and conditions as original". In its case, therefore, the issue currently under consideration may add nothing. Axa and Independent, however, oppose any incorporation of cl 8 into their contracts.

143. HIH, which relies on the incorporation of cl 8 into the contracts of reinsurance, pleaded such incorporation by reference to the general words found in the condition just cited. In the event, however, HIH received an unexpected bonus in the form of the evidence of its expert, Mr Roger Day, who was the first to suggest that the words "Cancellation Clause as Original Policy" in the reinsurance slip policy were a specific reference to cl 8, albeit cl 8 was a type of clause which he knew more commonly as a "non-cancellation" clause. This suggestion was discussed between the experts at a joint meeting, and the joint memorandum which resulted contained this passage:

4. Messrs Day and Godfrey [Mr Robert Godfrey, Axa's and Independent's expert] next discussed Clause 8. Mr Day believes Clause 8 to be the non-cancellation provision of the policy to which the reinsurer agreed in signing the reinsurance slip. Mr Godfrey believes in having reviewed the policy, the cancellation (or non-cancellation) clause is more appropriately Clause 4.3 . . . wherein cancellation provisions are mentioned. In Mr Godfrey's opinion Clause 8 does not deal with cancellation but more appropriately deals with disclosures and waivers of rights. Mr Godfrey believes the matter of interpretation of the policy contract may be more of a matter of law for the Court to decide rather than the subject of expert opinion.

144. It may be recalled that cl 4.3 of the policy wording is headed "Amendments to the Policy" and states that "This policy may not be amended, cancelled, revoked or rescinded without the prior written consent of the Assured". The experts were not called to give oral evidence, and their evidence stood therefore as I have set it out above.

145. Mr Justice David Steel dealt with this issue at pars 35-38 of his judgment. He held that cl 4.3 was not a viable option for the "Cancellation Clause", and that the choice therefore lay between cl 8 or nothing. He thought it right to give some meaning to the specific reference to a cancellation clause, if possible, that on balance the reference was to cl 8, and that it was therefore incorporated. Since cl 8 was specifically referred to, it did not matter whether the reinsurers actually knew about it or signed the policy wording itself.

146. Axa and Independent submit that the Judge was in error. On behalf of Independent, Mr Stephen Ruttle, QC relies substantively on the absence of HIH's pleaded reliance on this contention of specific incorporation, submitting that, if the point had been pleaded expressly, the role of the experts would have been different. On behalf of Axa, Mr Peter Gross, QC refers to the absence of HIH's pleading only forensically. On the merits of the point, Axa and Independent submit that cl 8 was not identified by the words "Cancellation Clause", since cl 8 was neither entitled as a cancellation clause, nor dealt with cancellation (as distinct from avoidance, a different concept with different consequences), nor was regarded by Mr Day as

a cancellation clause rather than a non-cancellation clause. If, therefore, the reference was to anything, it must be to cl 4.3. Even if the reference was to cl 8, however, there was no incorporation since the reference was "oblique and equivocal" and the clause would not work (without an impermissible degree of manipulation) in the reinsurance context. That last submission covers the same ground as question (x) below and will be dealt with there.

147. For the rest, I am persuaded in any event that it would be wrong to find in the term "Cancellation Clause as Original Policy" a specific reference to cl 8. I discount both the expert evidence and the absence of any pleading. It might be different if there was unchallenged evidence that in the insurance market in question cl 8 was known as a "Cancellation Clause", or even if there was disputed evidence to that effect but it was not possible for the Court to prefer one expert's evidence over the others on objective grounds. As things stand, however, even Mr Day's point was made equivocally: he knows cl 8 as a "non-cancellation" clause. In any event, if the experts' evidence were important, the absence of any pleading might well be significant. As it is, I would prefer to view the point as a pure matter of construction. On that basis, the fact that the term in question refers to the clause as "Cancellation Clause" strongly suggests that it should be possible to find a clause whose title is or contains the word "Cancellation". Clause 8, however, is entitled "Disclosure and/or waiver of rights". Even in its text, it nowhere contains the word "cancellation" or "cancel" (not even in any negative form). I agree with the submission that avoidance or rescission is not the same as cancellation, since the latter operates under the terms of the contract itself and only for the future, whereas the former operates by reason of common law and relates back. The absence of any reference at all to cancellation in cl 8 can be contrasted, moreover, to its presence (in the form "cancelled") in cl 4.3. I do not think that the mere presence of that word justifies regarding cl 4.3 at the "Cancellation Clause", for it is entitled "Amendments to the Policy" and refers only incidentally to cancellation; but the contrast between the texts of cl 8 and of cl 4.3 highlights the difficulty of calling the former a cancellation clause when it is only the latter which refers anywhere to cancellation. Moreover, I am not concerned too much with the failure of finding a clause to identify with the specific reference to a "Cancellation Clause". Of course, if it could appropriately be done, well and good. However, the original slip policy provides the example of a specific reference to a "Cross Collateralisation Clause" which does not appear in the policy wording. Moreover, a draft of the policy wording was already available at the time of the reinsurance slip policy, and that draft referred to cl 4.3 and to cl 8 under their final titles. If it had been intended to refer to cl 8 (or cl 4.3), I do not see why some more appropriate identification could not have been chosen.

148. I would prefer to say, therefore, that the reference to a "Cancellation Clause" simply fails to have content. If, however, I were wrong about that, and the reference was to cl 8, then I would agree that it was incorporated, even if Axa did not have specific knowledge of it, subject to the following considerations which are dealt with later in this judgment. One is whether the clause can work (with or without manipulation) in the reinsurance context. Of course, where a clause is specifically incorporated, there is pressure to see that it does work, if at all possible and if necessary by appropriate manipulation. Secondly, there is the general question of how cl 8 operates in the reinsurance context. Thirdly, however, there might have been a question which has only partly been considered by the Judge below, and that is whether cl 8 is so unusual a clause (that has been considered) and the reference to it as a "Cancellation Clause" so unsatisfactory a reference (that has not), that it would be unfair to give effect to the specific reference. As it is, that question, in that form, does not arise.

149. On this point, therefore, I would disagree with the Judge's admittedly tentative conclusion.

(x) If there is no specific incorporation of cl 8, is it incorporated into the reinsurance contracts by reason of general words of incorporation?

150. As already stated, New Hampshire accepts that the answer to this question is "Yes", but

Axa and Independent submit that it is "No". Mr Justice David Steel held that, if he was wrong about cl 8's specific incorporation by virtue of its identification with the "Cancellation Clause" referred to in the reinsurance slip policy, then it was in any event incorporated by reason of the general words found there --

. . . This reinsurance is subject to all terms, clauses and conditions as original and to follow that placement in all respects.

151. For the purposes of this present issue, I shall for the present leave out of account additional factors considered below under questions (xi) (does it make any difference that cl 8 is an unusual term, and would its incorporation be fair?) and (xii) (does it make any difference whether a reinsurer was aware of cl 8?), although I shall have to give some consideration at this point to the final question (xiii) which asks what the effect of cl 8 is, if incorporated into the reinsurance contract.

152. Axa and Independent have a primary and an alternative case regarding the issue of cl 8's incorporation into their contracts. Their primary case is that it is not incorporated at all. Their alternative case, however, is that, if incorporated, its effect is merely to emphasize that the reinsurers could not complain if HIH paid a claim (by reason of cl 8 being a term of the original insurance and thus depriving HIH of possible defences) in circumstances where, in the absence of cl 8, no claim would be payable at all.

153. Mr Justice David Steel rejected that alternative case, at par 52 of his judgment, in a single sentence, and without giving reasons: "I reject the submission that the effect is solely to agree to follow settlements made by HIH where otherwise HIH would have had a defence."

154. Although it is clear that the Judge rejected that alternative case, it is not entirely clear what effect the Judge thought that he was giving to cl 8 by accepting, as he did, HIH's case that it was incorporated into the reinsurance contracts. On the one hand he accepted that, as so incorporated, it would require a degree of manipulation. Thus in par 41 of his judgment he said:

Does cl 8 makes sense? While the references to arrangements, with Flashpoint are not directly apposite, only a minor adaptation is required to make the clause workable in the context of the reinsurance. In short, the reference to the "Insurer" needs to be replaced by the "Re-insurer" and the reference to the "Assured" by "Re-assured". I regard such manipulation as appropriate and permissible . . .

155. On this basis, it would seem that the Judge considered that cl 8, when incorporated into the reinsurance contracts, operated there as a clause independent of the original insurance and regulating relations not between the original assured, LDT, and the original insurer, HIH, but independently between the reinsured, HIH, and the reinsurers.

156. On the other hand, in pars 43-44 of his judgment the Judge addressed the reinsurers' submission that incorporation was inappropriate because, unlike HIH, the reinsurers could not rely on the collateral agreements and their warranties concerning, inter alia, proper disclosure and the exercise of the utmost good faith. He rejected that submission on the ground that the reinsurers could rely on the collateral agreements by way of subrogation and added -- "Where, as I have indicated, the set-up is akin to a fronting arrangement, I see nothing inapposite in treating cl 8 as incorporated in the reinsurance slip." The problem with that reasoning, as it seems to me, is that it assumes that the exclusion created by cl 8 in the original insurance and by the manipulated cl 8 incorporated into the reinsurance contracts will operate in a back to back manner, so that the reinsurers would be entitled to exercise rights of subrogation under the collateral agreements. If, however, the non-disclosure or misrepresentation (or any other complaint) which would have operated as a defence under the reinsurance contracts but for the incorporated cl 8 is not equally relevant to the original

insurance, but on the contrary independent of an excluded defence under cl 8 of the original insurance, then the situation is not back to back and the reinsurers would not be entitled to be subrogated to HIH's rights against Flashpoint under the collateral agreements.

157. Thus either Mr Justice David Steel was in error in his reasoning in pars 43-44, or, sub silentio, he was giving to an incorporated cl 8 an effect different from that which it might seem he was accepting in par 41 where he was prepared to manipulate the words of the clause so as to enable it to operate independently between HIH and the reinsurers.

158. The importance of this distinction to Axa and Independent is that if cl 8 were fully incorporated into their reinsurance contracts so as to operate independently at the reinsurance level, then the reinsurers could not complain about non-disclosure or misrepresentation (or any other ground of defence which might be excluded by cl 8 on its true construction) as between HIH and themselves. If, however, the effect of cl 8's incorporation into the reinsurance contracts were merely to bind the reinsurers to a payment made by HIH where only HIH's defence under the original contract were in issue, the reinsurers would say that they still remained free at the reinsurance level to refuse payment to HIH where there was, for instance, a separate ground of avoidance in the circumstances of the placement of the reinsurance.

159. Thus in its skeleton argument, Axa put the matter in the following way:

75. What clause 8 does not do is prevent reinsurers avoiding the reinsurance itself on the grounds of a breach of duty of good faith by HIH (or its agents) in the course of the placement of the reinsurance contract.

76. In effect, if clause 8 is incorporated into the reinsurance contract, reinsurers are thereby agreeing that they are content for HIH to waive any rights or defences it might otherwise have. That is a personal decision for HIH but one that requires reinsurers' approval if it is to bind reinsurers. What reinsurers are not, however, agreeing to do is give up their own rights and defences. That would be a personal decision for reinsurers and not one it should be concluded they have made by the incorporation of someone else's waiver.

77. Only by so construing clause 8 is the need for any manipulation of clause 8 avoided, while giving clause 8 effect and purpose in the reinsurance contract. The learned judge should have construed clause 8 accordingly.

160. Independent, in its skeleton argument, put the matter in this way:

12.(i) The presumed intention of both parties in seeking to incorporate clause 8 into the reinsurance must have been to bind the reinsurers to follow HIH's settlements to its insured; or at least to avoid any argument about HIH's entitlement to recover such settlements.

(ii) Their presumed intention cannot have been to leave unresolved the question of the liability of reinsurers for such payments . . . and to amount to a waiver by reinsurers of breaches of duty of utmost good faith by HIH. First this would leave a significant and uncertain gap in coverage. Secondly, the release by HIH of its insured from the consequences of the latter's breaches of duty of utmost good faith is met, commercially, by a side agreement [the collateral agreement] between HIH and Flashpoint; to which the reinsurers would be subrogated where a breach by Flashpoint leads to a claim. There is no corresponding agreement to compensate reinsurers for their release of HIH from the consequence of that party's breaches of duties of utmost good faith . . . Assume the disclosure by the insured to HIH, at the request of Flashpoint, of fundamentally important information. HIH omits to pass on this information. Alternatively, assume the omission of HIH, on placing of the reinsurance, of material information about HIH's underwriter or about HIH's own investigation into the risk or that HIH had only written the risk as a favour to the

broker. In none of these instances would the reinsurers have any subrogated recovery from Flashpoint because none of these omissions would amount to a breach by Flashpoint of any duty owed by it to HIH.

(iii) The expert evidence . . . was consistent with the parties' having wished clause 8 to have had the . . . effect [of the alternative submission]; but inconsistent with them having wished the clause to have the . . . effect [contended for by HIH] . . .

14. Independent accepts that it will be easier to show that clause 8 is incorporated into the reinsurance if its effect, once incorporated, is as a follow settlements provision . . . Thus no manipulation of the clause would be required. However, general words of incorporation would not be sufficient to bring in the clause, even on such a basis.

161. It will be clear from these citations, and it became even clearer in oral argument, that the real battle-ground between HIH on the one hand and Axa and Independent on the other on this issue regarding incorporation of cl 8 related to the effect of incorporation, rather than the fact of incorporation itself. If incorporation merely had the effect of the reinsurers' alternative submission, then they were quite prepared to live with it. Moreover they accepted that on this basis the clause did not require manipulation, and that the expert evidence (directed primarily to the question of whether cl 8 was a usual clause, but trespassing onto a discussion of its purpose and effect) was consistent with their alternative submission. Nevertheless, their primary submission was not abandoned, and it is to this that I now turn. In doing so, however, it is necessary not to lose sight of the question of the effect which incorporation in one form or another might have on the relations between the parties.

162. Axa and Independent put forward their submissions that cl 8 is not to be incorporated into the reinsurance contracts by reference to a number of well known criteria, also considered by Mr Justice David Steel below. Thus, is the clause in question germane to the reinsurance, or merely collateral? Does it make sense without undue manipulation? Is it consistent with the express terms of the reinsurance? Is it apposite for inclusion in the reinsurance?

163. On these criteria, which he approached in that order, Mr Justice David Steel held as follows (at pars 39-44). Clause 8 is germane, for, although it is not part of the central definition of the risk, it is material to the nature and scope of the risk in the same way as an exceptions clause is germane to the shipment, carriage and discharge of goods under a bill of lading. It is not collateral in the sense that an arbitration or choice of law or jurisdiction clause is collateral. It does make sense, albeit with some manipulation, and is apposite to the back to back fronting arrangement which is how he saw the transaction as a whole (see above). It is not inconsistent with any of the express terms of the reinsurance contract.

164. It is convenient to start with the questions whether cl 8 makes sense, with or without manipulation, and whether it is apposite, when read into the reinsurance contracts. These are linked questions, as I have already indicated above in my analysis of the Judge's conclusions and reasoning in respect of them.

165. I start with the assumption, and I stress the word assumption, that the insurance and reinsurance contracts were intended to be back to back and that, as the Judge said, the set-up was akin to a fronting arrangement. Those matters are in dispute, and the extent of the inferences that may be derived from them are likewise in dispute. Indeed the reinsurers criticize the Judge for starting from the premise of a presumption that the insurances were intended to be back to back.

166. I wish to be cautious, which is why I use the word assumption, I wish to be cautious because of the combination of circumstances that there has been no agreement or agreed assumptions as to the facts of the placement of these insurances, no investigation of them,

and yet there is a dispute about such matters. What is a Court to do in such a situation? Since the preliminary issues are there to be answered, I think the Court must try to do so, if it can do so without potential injustice or the likelihood of error. In such circumstances I do not think it is unfair or likely to turn out to be in error to assume that the insurances were intended to be back to back or that the set-up was akin to a fronting arrangement. I have in mind both the facts stated earlier on in this judgment, and the general principle that in the context of facultative reinsurance, as here, there is a presumption, aided by general words of incorporation such as those found in this case, that the parties intended at least the scope of the cover to be back to back, so that a risk falling within one will fall within the other. If a subsequent investigation of the facts shows that a different conclusion is required, then I acknowledge that nothing said here should pre-empt findings of fact yet to be made, or any necessary inferences of construction to be made on the basis of those facts. In the meantime, I must proceed as best I can.

167. As for the general presumption of back to back reinsurance, I would refer to what Lord Justice Kerr said in Citadel Insurance Co v Atlantic Union Insurance Co SA, [1982] 2 Lloyd's Rep 543 at p 546:

The conditions of the cover were described "as original" with certain qualifications. This is usual and means no more than the terms of the reinsurance cover are to be the same as those of the original, ie, reinsured policies.

168. In Forsikringsaktieselskapet Vesta v Butcher, [1989] 1 Lloyd's Rep 331 at p 336, col 1; [1989] AC 852 at p 895B-C Lord Griffiths spoke in perhaps even broader terms of reinsurance being back to back with insurance. He said:

. . . In the ordinary course of business reinsurance is referred to as "back-to-back" with the insurance, which means that the reinsurer agrees that if the insurer is liable under the policy the reinsurer will accept liability to pay whatever percentage of the claim he has agreed to reinsure. A reinsurer could, of course, make a special contract with an insurer and agree only to reinsure some of the risks covered by the policy of insurance, leaving the insurer to bear the full cost of the other risks. Such a contract would I believe be wholly exceptional . . .

See also Groupama Navigation et Transports v Catatumbo CA Seguros, [2000] 2 Lloyd's Rep 350 at pp 352-353 and Mann and Holt v Lexington Insurance Co, [2001] 1 Lloyd's Rep 1 at pp 6-7.

169. In the present case there is not only the general incorporation clause already cited, but also the following further indicia of an intention of a back to back policy: the fact that "TYPE" and "INTEREST" are stated to be "As Original Policy"; the fact that the premium is the same ("Original Net Premium . . . " etc); the fact that the amendment clause is intended to bind reinsurers, subject to consultation and their agreement being obtained, to "all amendments and alterations to the terms, clauses and conditions of the Original Policy"; and the fact that reinsurers promise to pay any claim and recovering advisers' fees and expenses "incurred under the Original Policy . . . at the same time". I agree that such terms do not in themselves answer any particular question as to the scope of incorporation (see eg Gan Insurance Co Ltd v Tai Ping Insurance Co Ltd, [1999] Lloyd's Rep IR 472) but they certainly support the general presumption that the insurance and reinsurance are intended to be back to back.

170. I turn then to cl 8 in particular, and ask whether it would make sense and be apposite or appropriate in the reinsurance. The first rule of incorporation, of course, is to test the allegedly incorporated term in the context of the incorporating document by writing it out verbatim in the latter. In that context the question immediately arises as to whether cl 8 should be manipulated or not, for if it is not, then it refers to the situation between HIH and the original assured rather than the situation between HIH and the reinsurers. There is

nothing unusual about such manipulation, provided it can be done simply and deftly as a matter of language, where everything points to the incorporation of the term in question. Thus in bill of lading and charter-party cases, where the terms of a charter-party are often incorporated in a bill of lading, a charter-party term which refers to the "charterer" may in the context of the bill of lading have to be understood as referring to the "bill of lading holder". In the reinsurance context, such manipulation has been approved in CNA International Reinsurance Co Ltd v Tranquilidade SA, [1999] CLC 140, a case relied on by the Judge below, where Mr Justice Clarke, in order to maintain what he regarded as "essentially a fronting arrangement" in good faith back to back order, held that references to "the assured" were references to the "reassured" and so on (at pp 151-152). On the other hand, Miramar Maritime Corporation v Holborn Oil Trading Ltd (The Miramar), [1984] 2 Lloyd's Rep 129; [1984] AC 676 is a warning that the need to manipulate in uncertainly apposite circumstances is a pointer against incorporation.

171. In my judgment there are two grounds which indicate that cl 8 should not be manipulated in the present case, one linguistic and the other a matter of the reason of the thing. The linguistic grounds is that if "the Insurer" in cl 8 is understood, in the reinsurance contract, to be referring to "the Reinsurer", then the clause does not make sense: for the clause goes on to speak of "its arrangements with Flashpoint Ltd", where "its" must, in the manipulated version, refer to the reinsurer, but cannot properly do so, since it is only HIH which has arrangements with Flashpoint. Mr Justice David Steel referred in passing to this difficulty when he said (at par 41) that "the references to arrangements with Flashpoint are not directly apposite"; but he did not solve the difficulty, and I do not think that it can be solved. The other ground is that, although the rationale of the manipulation is to preserve the contracts back to back, this purpose is not achieved, but thwarted, by the manipulation: for it does not follow that because HIH has waived its right to avoid for breach of the duty of good faith by its assured, LDT, that the reinsurers should also waive what might be an entirely different and independent breach of the duty of good faith on the part of HIH. That would be the very antithesis of a back to back contract. Thus it could be that there is no breach as between LDT and HIH, but HIH is personally guilty of some independent non-disclosure or misrepresentation as between it and a reinsurer. In such a case, if cl 8 was incorporated in the reinsurance contract in manipulated form, the reinsurer would neither have a defence against HIH nor a claim by way of subrogation against Flashpoint.

172. In my judgment, therefore, cl 8 cannot be incorporated in manipulated form into the reinsurance contracts. It does not make sense, cannot be successfully manipulated, and, even if it could be, could have an effect contrary to the reason of the thing. On the same basis, it can be said that the clause in such a form would not be consistent with the express terms of the reinsurance, neither with their spirit nor with their letter, since such a clause might make it impossible for the reinsurance to "follow the placement in all respects". In the circumstances, it does not matter whether the clause in such a form is germane or collateral, but in my opinion, for reasons which I will express below, it is germane and is not collateral.

173. The question next arises whether the incorporation of cl 8 in unmanipulated form would make sense and would be apposite. I do not think that Axa and Independent would submit that it would not. If I am wrong about that, however, let me say that I think it would make sense and would be apposite. There can be nothing senseless or inapposite about the reinsurers' alternative submission. That would, however, still leave open the question whether the reinsurers' alternative submission as to the effect of the incorporation of an unmanipulated cl 8 is the only solution to be considered. I shall return to that question under question (xiii) below. In the meantime I would merely observe that there is an oddity and uncommerciality in a situation where the reinsurers have agreed to pay even though there has been non-disclosure or misrepresentation in the placement of the original insurance with HIH (or some other such fault within the waiver of cl 8) if the reinsurers could at the same time reject any liability to pay on their part on the ground of the identical non-disclosure or misrepresentation in the placement of the reinsurance with themselves.

174. Is cl 8, whether in manipulated or unmanipulated form, germane to the reinsurance? The reinsurers had two main arguments for saying that it was not. The first was that a clause in this context is only germane if it relates directly to the scope of the cover. Otherwise it is merely collateral, and authorities demonstrate that merely collateral clauses are not incorporated. Secondly, a clause excluding the consequences of avoidance can only be effective if it survives avoidance: but to survive avoidance, such a clause has to be collateral to the main contract, like an arbitration clause, an archetypal example of a clause which is not incorporated by general language, only by express reference.

175. Like the Judge below, I am not persuaded by these submissions, nor by the authorities which are relied on in support of them. A leading authority on the incorporation of terms (in the marine context) is Thomas & Co Ltd v Portsea Steamship Co Ltd, [1912] AC 1. The rule is that a general incorporation clause only brings with it terms which are "germane to . . . the proper subject matters" of the incorporating contract (per Lord Atkinson at p 6). Where bills of lading incorporate charter-party terms, those proper subject-matters are clauses "germane to the receipt, carriage, or delivery of the cargo or the payment of freight" (ibid). Such terms commonly include exception clauses relating to those subject-matters. I do not see why a clause like cl 8 is not germane to a reinsurance contract, nor to the scope of the risk accepted by the reinsurer. The reason why an insurer is entitled to avoid his contract for (material) non-disclosure or misrepresentation is that he calculates the risk that he is prepared to run and the premium that he stipulates for running that risk on the basis of the information he is given. Clauses affirming that common law position, or altering it, seem to me alike to be germane to the risk covered, even though they do not seek to define that risk, as coverage clauses or warranty clauses seek to do. In CNA International v Tranquilidade Mr Justice Clarke held that a clause which affirmed the common law position was incorporated from a reinsurance into an insurance (at pp 144-145).

176. In principle, therefore, cl 8 is germane to the reinsurance. This is a fortiori the case for cl 8 in its unmanipulated form, for as such it affirms the reinsurer's liability to pay where the original insurer must pay, even in circumstances where in the absence of cl 8 the original insurer might have had a defence. In its unmanipulated form it is, as the reinsurers themselves recognize, a form of "follow the settlement" clause. Nothing could be more germane to a reinsurance than a form of follow the settlement clause.

177. On what basis therefore do the reinsurers say that cl 8 is not germane? They refer to the following authorities. In Pine Top Insurance Co Ltd v Unione Italiana Anglo Saxon Reinsurance Co Ltd, [1987] 1 Lloyd's Rep 476 at pp 480-481 Mr Justice Gatehouse declined to incorporate an arbitration clause into either a reinsurance or a retrocession. He gave two main reasons, the first that only terms which "define the risk" are incorporated, the second that he would in any event follow the bill of lading cases to hold that an arbitration clause is not incorporated without express provision. But he included "Exceptions . . . and the General Exceptions" (at p 480) in his view of terms which define the risk.

178. Aughton Ltd v MF Kent Services Ltd, [1991] 31 ConLR 60 concerned construction contracts: did a sub-sub-contract incorporate the main contract's arbitration clause? Again, the Court said no, albeit the two-Judge Court of Appeal differed in the route by which each of them got there. Lord Justice Ralph Gibson thought that arbitration clauses could be incorporated by general words, but held that on the facts there was no agreement in writing within the Arbitration Act, 1950. Nevertheless, he distinguished (at p 77) between terms which "define the rights and obligations of the parties with reference to the subject-matter" and those which control or affect the "rights of the parties to enforce those rights and obligations by proceedings at law". There is nothing in that distinction which to my mind would allocate cl 8 to either category. Sir John Megaw, however, directed himself by reference to Thomas v Portsea and emphasized the special factors which relate to arbitration clauses, such as their effect in precluding parties from bringing a dispute before a Court of

law, and their nature as a self-contained contract collateral or ancillary to the substantive contract, a "category of their own" (at pp 87-88). Again, there is nothing at all in that which seems to me to be relevant to cl 8. On the contrary, Sir John Megaw described germane terms relating to the subject matter of a contract as including "clauses of substantial commercial importance -- for example, exception clauses . . ." (at p 86).

179. Thirdly, the Court was referred to Excess Insurance Co Ltd v Mander, [1997] 2 Lloyd's Rep 119, where again the Court refused to incorporate an arbitration clause (into a retrocession contract). In the course of his review of the authorities, Mr Justice Colman pointed out (at p 125) that --

. . . the Courts impute to the parties to the bill of lading contract a mutual intention by their use of general words of incorporation to write into their contract only the corresponding subject-matter of the incorporated contract because they are taken to treat merely ancillary or collateral provisions, such as an arbitration clause as by their very nature essentially personal to the parties to the incorporated contract.

180. Mr Gross emphasized the expression "personal to the parties" as being relevant to the situation encompassed in a clause dealing with the placement of an insurance or reinsurance contract, viz cl 8. However, that expression has to be read subject to the reason of the topic being discussed. An arbitration clause is patently an ancillary or collateral provision which is personal to the parties: arbitration is private and confidential and cannot be conjoined with another arbitration without the consent of all the parties.

181. In sum, I see no reason to ally cl 8 with clauses like arbitration clauses or other clauses concerned with dispute resolution, such as jurisdiction clauses, or notice clauses, to mention the subjects of other decisions to which the reinsurers' skeletons make reference.

182. The second strand of argument under this heading was the submission that cl 8 was collateral, indeed had to be collateral, because otherwise it could not itself survive avoidance. In this respect cl 8 was said again to be analogous to an arbitration clause, which has to survive even the discharge or frustration of its host contract if it is to direct the parties' obligation to arbitrate. I did not understand the logic of this submission. Clause 8 does not have to survive avoidance, because it prevents avoidance, by waiving the right to exercise an entitlement to avoid. Despite Mr Gross' citation, in support of his submission, of what Mr Justice Colman said in Toomey v Eagle Star (No 2) at p 91, where he also referred to a passage from Lord Justice Steyn's judgment in Pan Atlantic Insurance Co Ltd v Pine Top Insurance Co, [1993] 1 Lloyd's Rep 496 at p 502, I do not understand those passages as stating that a clause excluding a right of avoidance is a collateral contract or has to be one in order to be effective, merely that if a clause is to have that effect, then it has to be done clearly, even expressly. Indeed, Lord Justice Steyn may be read as saying that an anti-avoidance clause is to be contrasted with an arbitration or exclusive jurisdiction clause, which are "procedural in character and discrete from the remainder of the contract".

183. In my view cl 8 shares with an arbitration clause none of those characteristics which have marked the latter out for special (I do not say unique) treatment. It is not collateral either in the sense that it is concerned with the resolution of disputes, and in that context the making of claims, as distinct from substantive rights, or in the sense that it is intended to survive the death of its host contract. It is not procedural. It is not personal in the sense in which that term is used in the arbitration context.

184. I would therefore reject the submission that cl 8 could not be incorporated into the reinsurance contracts because it is not germane, but collateral.

185. Finally, under this issue, the criterion of consistency with the other terms of the reinsurance contracts was raised. Clause 8 was said to be inconsistent with the common law

duties of good faith which would otherwise exist in relation to the reinsurance contracts. Thus it is said that the clause is inconsistent not with any of the express terms of the reinsurance contracts, but with the standard common law position. It seems to me that this point has cogency in relation to cl 8 in its manipulated form. I agree that an exclusion of a standard and important common law obligation should not easily be regarded as incorporated by merely general words. The fact that the exclusion will only operate as an independent term of the reinsurance contract if its language is manipulated as the Judge was minded to allow, to my mind emphasizes the difficulty of the incorporation.

186. However, there is not the same difficulty if the incorporation is in the unmanipulated form.

187. In sum, therefore, I would conclude that, in the light of the criteria discussed under this question, cl 8 is not to be regarded as incorporated into the reinsurance contracts in its manipulated form, but can, subject to the further questions to be considered below, properly be regarded as incorporated in its unmanipulated form.

(xi) For these purposes, does it make any difference whether cl 8 is an unusual term? Is it an unusual term? Is incorporation of such a term "fair"?

188. Axa and Independent submitted that cl 8 was an unusual term and that this was a further reason why it should not be regarded as incorporated by words of general incorporation. They further submitted that, because it was an unusual term, it would not be fair to regard the reinsurers as bound by cl 8.

189. On these submissions it was Independent, rather than Axa, that made the running, since Independent had a positive case that, because, unlike the other two reinsurers, it had not endorsed a copy of the policy wording, it was unaware of cl 8. Therefore, it was said, it could not be bound by an unusual clause, or should not be bound by an unusual clause because that would be unfair. In the background, moreover, but not part of these preliminary issues, lies an additional argument that the presentation was itself unfair because of the inclusion of an unusual clause. That might be a ground for avoidance of the whole reinsurance, rather than merely for the exclusion of a clause from being incorporated.

190. Although it was Independent that made the running on these issues, Axa joined in them, even though it had endorsed a draft of the policy wording which included cl 8. It joined in on the basis that, even so, it could not necessarily be assumed to have been aware of the clause; and the issue of awareness was not for determination at the trial of preliminary issues. It also, I think, submitted, but in a rather muted way, that, if cl 8 was an unusual term, then it would not be effectively incorporated in any of the contracts of reinsurance by merely general words of incorporation: that that was a matter of construction which was not affected by the special knowledge of any particular reinsurer. I would have thought that, if the clause were an unusual one, the last point may be formally open, but that, in the light of the Axa's endorsement of the policy wording, it might prove to be an ambitious submission since, quite apart from awareness, a party is usually bound by its signature. However, I see that in an insurance context there remains the point that a presentation involving an unusual term may be unfair.

191. Mr Justice David Steel dealt with this issue as follows. On the question of fact, he reviewed the evidence of the two experts in the light of their respective experience and said that he thought it right to place much greater reliance on the views of Mr Day (HIH's expert) because he alone had experience of the relevant class of insurance in the London market, whereas ML Godfrey's experience lay in the US. He found that insurance of this type in the US market was for relevant purposes written in significantly different terms in that it was unconditional and irrevocable and therefore had no need for a clause like cl 8. He found that Mr Day's evidence was that clauses such as cl 8 were often requested and "sometimes

agreed" and added (at par 47):

Quite where this leaves the clause on the spectrum from usual to unusual is not easy to identify. At one extreme, I do not categorize it as unconscionable or extortionate: at the other, it is not standard or customary.

192. In the light of that finding the Judge went on to consider the legal test to apply. He rejected a submission that for general words of incorporation to be effective a clause had to be well known and in common use and held that as a matter of general principle the question was whether the term was sufficiently unusual or uncommon so that it would be unfair in all the circumstances to hold the party to it: see Interfoto Picture Library Ltd v Stiletto Visual Programmes Ltd, [1989] QB 433. He then resolved that question by holding that it was fair to all the reinsurers to treat the clause as incorporated by the general words. He gave six reasons for his conclusion (at par 50). They were as follows:

(i) This is a contract of reinsurance, which is intended to be back to back with the underlying insurance.

(ii) It is expressly subject to "all" terms and to "follow that placement in all respects".

(iii) The clause in question is no sense unique in this class of insurance, particularly where there is a collateral agreement.

(iv) The slip records that information is available on the brokers' file: this would have included drafts of the wording.

(v) As a matter of commercial convenience, it is desirable that all reinsurers subscribing to the same slip should contract on the same terms.

(vi) Insofar as aspects of good faith arise, individual reinsurers may be able to avoid the policy if the presentation to them, including considerations of notice of the clause, was unfair.

193. He nevertheless recognized that the last question, which lay outside the preliminary issues, was rendered difficult for the reinsurers by his reasoning, in that if there is notice adequate enough to allow incorporation, on the test he applied, "it may be a rare case where the same notice is not adequate to discharge the obligation of good faith" (at par 47).

194. Thus the Judge found that cl 8 was not standard or customary, but in no sense unique, and that in all the circumstances it was fair to regard it as incorporated.

195. In this Court there was no submission that Mr Justice David Steel adopted the wrong test. Mr Ruttle himself relied on Interfoto v Stiletto. Nevertheless it was submitted that on the expert evidence he should have found that cl 8 was highly unusual if not unheard of, and that on the test applied he should have concluded that it was unfair to treat the clause as incorporated or binding. As for the Judge's six specific points, (i) was disputed, and both (i) and (ii) were said to beg the question; (iii) was said to be either a wrong categorization of the evidence, or in any event neutral; (iv) was said to be neutral or to beg the question in the sense that it remained the broker's job to draw the reinsurers' attention to clauses of this nature; (v) was said to be neutral by Mr Gross and was criticized by Mr Ruttle as overlooking Independent's submission that the facts of the placement indicated that the brokers were repeatedly instructed by HIH to ensure that the reinsurers saw and approved the policy wording; and (vi) was said to be circular, or even wrong, in that if the clause was incorporated, it precluded avoidance.

196. On the part of HIH, Mr Flaux submitted that the Judge's findings were correct and supported his legal conclusions. He stressed that the incorporation clause put the reinsurers

on notice as to the existence of the underlying terms of the original insurance, and that the draft policy wording was available on the brokers' file to which the reinsurance slip policy specifically referred reinsurers under the "INFORMATION" line (the Judge's point (iv)). He also submitted that if the reinsurers were aware of cl 8, then unusual or not, it was binding; and that endorsement of the policy wording by Axa (on the 7.23 slate) showed that it was aware. Thus actual or constructive notice of cl 8 made the issue as to its usualness irrelevant.

197. I make the preliminary comment that this is, structurally speaking, a difficult issue, for a number of reasons. First, the experts' evidence was not tested by cross-examination and thus its value and effect are harder to ascertain. Secondly, it may be important to consider, but not easy to discern, what meaning the experts were ascribing to cl 8 in the context of the reinsurance. Thirdly, the Interfoto test, of fairness in all the circumstances, is a problematic one to apply at this trial, both because of the uncertain status of the facts and also because it closely overlaps with the question of fair presentation which lies outside the scope of these preliminary issues.

198. Having said that, I address the experts' evidence, starting with their experience. Mr Day had considerable experience in the London financial risk market and specifically in film finance business.

199. Mr Godfrey's experience, on the other hand, lay in the US financial guarantee insurance (and reinsurance) market. He defined that market (I am putting the matter broadly) as one in which debt instruments of investment grade are guaranteed or insured. The essence of such insurance is that it is "non-cancellable", by which the Judge understood him to mean unconditional as well as irrevocable. He emphasized that performance of "the most rigorous due diligence" is essential to this type of insurance, for the very reason that it is unconditional. Policies are often supported by collateral agreements. He annexed policies, which were (a) brief, (b) in standard form, and (c) contained a short term to the effect that "This policy is non-cancellable [for any reason]". However, as he remarked, there is no term waiving any defence of non-disclosure or misrepresentation. Reinsurance of a "portion" of the insurance is customary, the 1999 average being 38 per cent. The reinsurer generally agrees to follow the form of the primary cover "including its non-cancellation provision", but it is "highly unusual" for a reinsurer to waive any defences as against the insurer and he had never before seen a clause such as cl 8 (this comment may have been confined to the reinsurance context). On the contrary, the reinsurer relied on the insurer's due diligence and disclosure of all material and relevant information. Mr Godfrey stated that the HIH insurances were not, in his opinion, standard financial guarantee insurance, for HIH did no due diligence and the insurance was not of investment grade debt but was designed to lift the project to investment grade and was therefore inherently riskier. He therefore regarded the insurance as "atypical".

200. Mr Day pointed out in turn that there was an essential difference between the London market in which he was experienced and the US financial guarantee market of which Mr Godfrey spoke. The latter was concerned with investment grade security transactions, the relevant insurers were risk averse, the premium rates were low, but the sums insured very high. The London market, however, was more diverse, and included non-investment grade transactions, such as the instant insurances, where there was real risk and a higher rate of premium. Moreover, the London market was more comfortable with its traditional mixture of conditions and exclusions. I would comment that the bespoke nature of the London market contract and the standard form nature of the policies annexed by Mr Godfrey illustrate and highlight the differences in the two markets.

201. In the circumstances I fully accept Mr Justice David Steel's conclusion (at par 46 of his judgment) that there were significant differences between the experience of the two experts and the markets in which they operated, and that Mr Day's experience justified greater

reliance on his evidence.

202. Mr Godfrey's evidence as to the unusualness of cl 8 reflected his experience in general. Thus he had never seen such a clause before at any rate in a reinsurance, and he went on to say that it is "unusual" and atypical in an underlying policy, and "highly unusual" in a reinsurance contract as applying to the position between reinsurer and reinsured. He added "The reinsurer has the right to expect full and complete due diligence and disclosure from the insurer . . . I am unaware of any reinsurance contract in my experience where the reinsurer agreed to waive its defences".

203. Mr Day's evidence on the other hand was to the effect that "this type of clause is by no means unknown". He has seen them in financial risk insurances and more specifically in film finance risks "where similar clauses exist". This type of clause is often requested by the assured and is "by no means a clause which does not exist in this type of insurance". It is "certainly not unknown to have a clause of this type in financial risk insurance, including film finance business". "Not unknown" was a phrase used twice more in Mr Day's supplementary report.

204. In my judgment Mr Godfrey's evidence was not of much assistance, because the market in which he operated was materially different, because his evidence reflected that different experience, and because at any rate at the reinsurance level he was concerned with a clause whose effect was to operate independently as between reinsurer and reinsured. I have already sought to give my reasons as to why cl 8, even if incorporated, does not operate in that sense. Therefore the essential evidence to be considered is that of Mr Day. His somewhat tortured language discloses that he is unable to say that cl 8 is "usual" or even "not unusual": rather it is "not unknown" or "by no means unknown".

205. It seems to me that Mr Justice David Steel was a perfectly entitled to find that such clauses are "sometimes agreed" particularly when supported by a collateral agreement, even though "not standard or customary". I would express the evidence in the same way. I also agree with him that I would not categorize such a term as unconscionable or extortionate. Albeit in a different market, such clauses are known to the Courts in the field of professional liability indemnity insurance. If not unconscionable there, I do not see why they should be unconscionable here. The Judge also said that he was unsure where this evidence leaves the clause on the spectrum from usual to unusual. I would be prepared to say that the clause was unusual, but something which the market would recognize.

206. What then? Is a clause of such a kind disqualified from incorporation by general words? The reinsurers relied on MacGillivray on Insurance Law, 9th ed, 1997, at par 33-52, headed "Unusual terms":

It has been held that a reinsurer is not bound by the incorporation of terms unless they are well known and in common use. The reasoning is that the reinsurer may not be entitled to see, or will not in practice be aware of, the precise terms of the underlying insurance. It is submitted that the fact that a clause is highly unusual may be relevant to the question of whether the parties intended that clause to be incorporated into their contract. A different way of approaching the problem is that, while the actual incorporation of the term does not necessarily depend upon how usual it is, this factor is relevant to the question of whether the term ought to have been disclosed to the reinsurer.

207. The reinsurers relied on the two cases cited by MacGillivray in support of the first sentence of that passage. The Judge considered that the cases were only authority for the proposition that reinsurers are bound by usual terms, even to the extent of overriding an inconsistency, and that whether general words of incorporation can import an unusual or uncommon term "is quite a different question". In Marten v The Nippon Sea and Land Insurance Co, (1898) 3 Com Cas 164 Mr Justice Bigham had to consider the term "subject to

the same clauses and conditions as original policy" and the well known warehouse to warehouse clause. All he said was that "it is such a common clause that the defendants ought to have known that it was in the original policy" (at p 167). He found the clause to be "customary" and "to be read into the policy". I do not, however, consider that that is the test. Mr Justice Bigham did not even cite the words of incorporation. In Charlesworth v Faber, (1900) 5 Com Cas 508 the facts were similar and the clause in question was found to be "in common use", and to be a clause of whose probable existence in the original policy the reinsurer knew or ought to have known (p 412). The effect of the incorporation, however, was to extend the 12 month term of the reinsurance to beyond 12 months because the term was a "continuation clause" which provided for the insured to be held covered if the ship was at sea at the expiration of the policy. Whether that should be regarded as an inconsistency or as a qualification or extension of the policy period does not for present purposes matter. Subject to that comment, I agree with what Mr Justice David Steel said about those cases. They do not assist the question at issue.

208. I turn therefore to Interfoto v Stiletto. There the defendant was held not to be bound by a term in a set of printed conditions which had been provided to him in the form of a delivery note, but which he had neither signed nor read. The question was not so much concerned with an incorporation clause as with whether the term in question had been sufficiently brought to the defendant's notice so as to be incorporated into the contract. The term was described as "very onerous" (at p 438F), and "unreasonable and extortionate" (at p 445H). The Court of Appeal was even concerned that it might have been an unenforceable penalty (at pp 436C, 445H-446A), but that point was not argued. Lord Justice Bingham, in a passage cited and applied by the Judge, put the test as follows (at p 445B-C):

The tendency of the English authorities has, I think, been to look at the nature of the transaction in question and the character of the parties to it; to consider what notice the party alleged to be bound was given of the particular condition said to bind him; and to resolve whether in all the circumstances it is fair to hold him bound by the condition in question. This may yield a result not very different from the civil law principle of good faith, at any rate so far as the formation of the contract is concerned.

209. For all that neither party in terms rejected what I might call the Interfoto test, I am nevertheless doubtful of the application of this principle as a means of solving the present problem, especially at this stage of the proceedings. In the first place, Interfoto v Stiletto was not concerned with the effectiveness of an incorporation clause in a signed contract, which is essentially a question of construction, but rather with a question of notice: the question of whether sufficient notice has been given to a person by means of a document which has not been signed so as to render that person contractually bound by the term or terms set out in that document. Secondly, that question of notice is closely akin to a question of awareness: the party affected by sufficient notice even if not actually aware of the term in question, is regarded as having constructive knowledge of it, ie as being constructively aware of it. Thirdly, the question of awareness is for present purposes out of bounds: see issue 3 of the preliminary issues. The Court is merely asked to say what the consequences are, depending on whether the reinsurers were aware or were not aware that cl 8 was part of the underlying insurance contract. In the circumstances it seems to me no more appropriate to go into the question of constructive notice than actual notice. Fourthly and a fortiori, it seems to me inappropriate for the purposes of these preliminary issues to test the matter by asking whether there was sufficient notice to hold that it would be fair to hold the reinsurers to the term in question. This is because it is clear from Lord Justice Bingham's analysis that this question is very closely akin to a question of good faith. In the insurance context, where even the common law has adopted the civil law requirement of good faith, the question of fairness posed by Lord Justice Bingham cannot be divorced from the insurance doctrine of uberrima fides and the question of what constitutes a fair presentation. Mr Justice David Steel recognized the difficulty of divorcing the question which he posed and the separate question, not within the preliminary issues, of whether there had been a fair presentation of

the risk. I do not see how the one question can or should be answered without bearing in mind and attempting to answer the other question at the same time. That could be a recipe for a new unfairness all of its own. Fifthly, this is particularly the case when it is borne in mind that the test posed by Lord Justice Bingham and the Judge is a test which has to be answered "in all the circumstances". However, the limitation of this trial of preliminary issues make it impossible to take into account all the circumstances.

210. Sixthly, there is a further reason why, if the Interfoto analysis is appropriate at all, it is necessary to take it together with the question of fair presentation. The remedy for the case of notice which is insufficient because of unfairness is that the term in question never becomes part of the contract. However, the remedy for a case of unfair presentation of an insurance proposal is avoidance of the contract. The latter remedy goes much further than the former. It is only right that these issues be looked at together. Otherwise there is the danger that a term which is judged to be fair, outside the broader question of whether there has been a fair presentation, undermines that broader question. Equally, however, if there be any unfairness at all, there is the danger that the Court is unable to consider whether in all the circumstances the right approach is to regard the offending term as never having been incorporated, thus saving the contract, or to regard it as incorporated, thereby potentially destroying the contract.

211. Seventhly, I am not persuaded that the Interfoto test applies to a term that is merely unusual, at any rate in the context of a binding incorporation clause. I acknowledge that some of the dicta in previous cases referred to in Interfoto v Stiletto mention the case of a term that is "usual": but Interfoto v Stiletto itself was concerned with a term which was not merely unusual, but very onerous, unreasonable and extortionate. No one has suggested that those descriptions apply to cl 8, however much it might increase the risk undertaken by an insurer. The experts were not asked to opine on such a question: their reports make it clear that they were asked whether cl 8 was an unusual clause. Lord Justice Dillon spoke of a term which is "particularly onerous or unusual" (at p 439A); and both he and Lord Justice Bingham went out of their way to stress the particular objections to the offending clause in that case.

212. Eighthly, I am uneasy on a separate question about which there has not been much, if any, discussion in this Court, and that is whether the incorporation of cl 8 should be regarded as a matter dependent on the original terms of the underlying insurance or on those terms as amended (HIH would say as superseded) by the policy wording. If it is regarded as the former, then the question seems to depend on the question whether cl 8 is incorporated by general words of incorporation. If, however, it is regarded as the latter, then its incorporation would seem to depend rather on the question whether the reinsurers have severally been consulted and have agreed on the amendment to the terms of the original policy.

213. I therefore conclude that the Interfoto test, if applicable at all, a matter which I would prefer to leave open, should not be considered separately from the question of a fair presentation, which lies outside the scope of these issues.

214. In the circumstances I do not think that it is possible or appropriate to say more than this. The term of the reinsurance slip policy that the reinsurance is subject to all the terms as original, etc, together with the invitation to consult the information held on the brokers' file, collectively place on the reinsurers the burden of showing that cl 8 was not incorporated, or that the proposal was unfairly presented. If a reinsurer was actually or (subject to any appropriate test of fair notice) constructively aware of cl 8, then plainly it could not be said that it had not had sufficient notice of it. If, however, cl 8 could only become part of the reinsurance contract if the reinsurer had actually agreed it, then it would be necessary to show that the clause had been actually agreed and not merely that sufficient notice of it had been given. Of course, these two questions may overlap. But all such questions of actual or constructive notice or awareness, or of actual agreement, are not for these preliminary issues. When they are debated, it will be on the basis that cl 8 is neither unconscionable nor

extortionate on the one hand, nor standard or customary on the other hand, nor usual, but rather, albeit by no means unknown but something that the market would recognize.

(xii) For these purposes, does it make any difference whether a reinsurer was aware of cl 8?

215. I have already answered this question as best I can in the course of dealing with question (xi) above.

(xiii) If cl 8 is incorporated into any reinsurance contract, what is its effect there?

216. I have already held, under question above, that cl 8 is not to be incorporated into the reinsurance contracts in manipulated form, as a clause operating between reinsurer and reinsured independently of the original insurance, but can properly be regarded as incorporated in its unmanipulated form.

217. What is its effect in this form? The reinsurers submitted that it merely operates as a type of follow the settlements clause, binding the reinsurers to accept HIH's liability to pay even in circumstances where HIH might otherwise have had a straightforward defence based on non-disclosure or misrepresentation. Thus at least one effect of the clause would be to exclude any argument on the part of the reinsurers that payment by HIH in the face of non-disclosure or misrepresentation would have been in breach of its obligation to act in a businesslike manner: see Insurance Co of Africa v Scor (UK) Reinsurance Co Ltd, [1985] 1 Lloyd's Rep 312 at p 330, a passage cited by Lord Mustill in Hill v Mercantile and General Reinsurance Co Plc, [1996] LRLR 341 at p 347; [1996] 1 WLR 1239 at p 1247. The reinsurers went far to accept that in this form and as so regarded there was nothing very wrong with the clause's incorporation.

218. The question then arose: but what if the only complaints of non-disclosure or misrepresentation at the reinsurance level, as between reinsurer and reinsured, were identical to the position relating to possible complaints of non-disclosure or misrepresentation at the underlying level, as between the original assured and HIH? What, in other words, if the presentation of insurance and reinsurance was identical? When pressed with that question, it seemed to me that Mr Gross and Mr Ruttle were able to give no satisfactory explanation as to why, in those circumstances, the promise to recognize HIH's liability and thus to follow its settlement did not in turn entail that that promise remained effective even where the identical problem occurred at the reinsurance level. Otherwise, as it seems to me, the effect of the clause in its unmanipulated form would be meaningless. Where an original risk has been placed with original insurers on the basis of a certain presentation, it is highly likely that it will be placed with reinsurers on the same basis. I intend to make no finding of fact whatsoever, but it appears that in the instant case the presentations were at any rate intended to be the same, and were conducted essentially by the same brokers on the instructions of, no doubt among others, Flashpoint. Indeed, the reinsurance was signed up before the original insurance.

219. Of course, I accept that it is perfectly feasible for the presentation at the reinsurance level to suffer from vices from which the presentation at the original level remains free. Upon examination, all the scenarios suggested by Mr Gross and Mr Ruttle to illustrate the unfairness of cl 8 operating entirely independently at the reinsurance level turn out to be examples of non-disclosure or misrepresentation which are personal to the reinsured's presentation: see, for instance, my citation from Independent's skeleton argument at par 160 above. In my judgment, such examples do not gainsay the conclusion that if the incorporation of an unmanipulated cl 8 is to bind the reinsurers to pay even where HIH might otherwise have had a defence, then the reinsurers remain bound even where a defence based on what amounts factually to the same presentation might otherwise have been invoked by the reinsurers themselves. It is in just such a situation that the reinsurers would be entitled to be subrogated to HIH's rights under the collateral contracts. Indeed, although

Mr Justice David Steel approved incorporation of cl 8 in its manipulated form, it appears from his reasoning at pars 43-44 of his judgment that he must have been thinking that cl 8 would operate in a back to back manner at the two levels. It will do so, if the effect of the incorporation of cl 8 in unmanipulated form is as I have suggested it to be, it will not do so if the effect of cl 8's incorporation is that for the self-same non-disclosure or misrepresentation at the two levels, HIH is bound to pay but the reinsurers are entitled to avoid.

220. It seems to me that the effect that I would give to cl 8's incorporation in the reinsurance contracts is also indicated and supported by the wording of the incorporation clause in the reinsurance slip policies, which emphasizes that the reinsurance is to "follow that placement in all respects".

221. For these reasons I conclude that the effect of cl 8's incorporation into the reinsurance contracts is to bind the reinsurers to pay, despite any non-disclosure or misrepresentation covered by the clause, in circumstances where the non-disclosure or misrepresentation in question is the same at each level of the placement. Otherwise a defence intended to be waived back to back at both levels could be relied upon at the reinsurance level in circumstances where the primary remedy was intended to lie under the collateral contract.

Conclusion

222. In conclusion, I would seek to summarize my answers to the preliminary issues stated as follows.

223. Q1. Are the terms (of both the insurance contracts and the reinsurance contracts) alleged by the reinsurers to have been warranties in fact such?

A1. Yes. The six film (or 10 film) slate terms were terms of both insurance and reinsurance, and were warranties. The term in the reinsurance that all amendments etc had to be agreed by reinsurers was also a warranty.

224. Q2. What is the effect of cl 8 of the underlying insurance contract? In particular does it mean that the facts and matters alleged in the defences (if true) would not have provided the claimant insured/reinsured with a defence (whether in a whole or part) to the underlying insured's claim?

A2. The effect of cl 8 in the underlying insurance contract is to deprive the insured of a defence on the ground of non-disclosure or misrepresentation, whether wholly innocent or negligent, and whether otherwise giving rise only to rights of avoidance or also sounding in damages. It also deprived the insured of defences and rights of set-off and/or counterclaim. However, it did not cover fraud. Nor did it cover breaches of warranty or defences based on lack of cover.

225. Q3. On the assumption that the reinsurers underwriters were aware that the underlying policy wording contained cl 8, was cl 8 a term of the reinsurance contract? Is the answer different if the underwriters were not so aware?

A3. Subject only to arguments that (a) it would be unfair to incorporate cl 8 into the Axa and Independent reinsurance contracts because of insufficient notice being given of an unusual term, and (b) that cl 8 was not agreed at the reinsurance level in accordance with the requirements of the amendments term referred to at A1 above, cl 8 was incorporated into those contracts (in its unmanipulated form) whether those parties were aware of it or not. If, however, either party was in fact aware of cl 8, then argument (a) is not available to it. Argument (a) cannot be divorced from the separate argument, not within these preliminary issues, that the presence of cl 8 in the policy wording was not properly disclosed and rendered the relevant presentation unfair. For these purposes it is found that cl 8 was an

unusual term, but for the full finding see pars 205 and 214 above. New Hampshire has conceded that cl 8 was incorporated into its reinsurance contract. In the light of the discussion in this judgment under questions (x) and (xiii) above, the Court may require further assistance from New Hampshire and/or HIH as to the precise nature of the incorporation conceded.

226. Q4. What is the effect of cl 8 in the context of the reinsurance contracts? In particular does it mean that:

(i) the facts and matters alleged in the defences and counterclaims (if true) do not provide the defendant reinsurers with a (complete or partial) defence (including by way of set-off) to the claimant insurer's/reinsured's claim; and/or

(ii) the defendant reinsurers do not (or did not) have the right to avoid the reinsurance contract on the grounds of misrepresentation or non-disclosure (assuming that they otherwise have or had such a right) irrespective of whether or not the relevant misrepresentation or non-disclosure was negligent or fraudulent as opposed to innocent?

A4. The general effect of cl 8 in the reinsurance contracts of Axa and Independent is that stated under question (xiii) above, so far as matters of non-disclosure or misrepresentation are concerned. The scope of cl 8 is as stated in A2 above. There has been no attempt in advance of judgment to take the Court through the matters alleged in the defences and counterclaims to determine which if any of them would, even if true, nevertheless fail to provide those reinsurers with a defence. This is understandable given the possible permutations of the Court's answers as to the incorporation, scope and effect of cl 8. As to New Hampshire, I would repeat what I have said at the end of A3 above.

227. To a large extent therefore the answers provided by the Judge below have survived attack from both sides. Only on questions (ix), (x) (in part), and (xiii) have I differed from him. On questions (xi) and (xii) I have preferred to leave over the issues of fairness and sufficient notice and also the issue of the relevance of awareness to trial. It follows that, subject to those exceptions, both HIH's appeal (in whole) and the reinsurers' cross-appeal (in large part) have failed. The only, limited, successes have been on the cross-appeal, where Axa and Independent have displaced both specific incorporation of cl 8 and the incorporation of a manipulated cl 8; but they have failed to knock out its incorporation altogether.

**JUDGMENTBY-2:** MUMMERY LJ

**JUDGMENT-2:**
MUMMERY LJ: 228. I agree.

**JUDGMENTBY-3:** PETER GIBSON LJ

**JUDGMENT-3:**
PETER GIBSON LJ: 229. I also agree.

**SOLICITORS:**
Holman Fenwick & Willan; Kennedys; Davies Lavery; DJ Freeman.

Source:  Legal > Legal (excluding U.S.) > United Kingdom > Case Law > **UK Cases, Combined Courts**  i
Terms:  **hollywood funding**  (Edit Search)
View:  Full
Date/Time:  Friday, January 21, 2005 - 8:15 AM EST

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.