# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LEXINGTON INSURANCE COMPANY, | Civil Action No. 02-CV-4435 |
| Plaintiff, | (Hon. Anita B. Brody) |
| - against – | |
| DAVID FORREST, T. BEAUCLERC ROGERS IV, STANLEY MUNSON, MARTIN FINK, all individually, and NEW BEGINNINGS ENTERPRISES LLC, a California Limited Liability Company, and TARLO LYONS, a partnership, | |
| Defendants. | |

## ORDER

AND NOW, this _____ day of _____, 2005, in consideration of the

MOTION OF DEFENDANT STANLEY MUNSON FOR JUDGMENT ON THE PLEADINGS

PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(C), the accompanying

Memorandum of Law in support thereof, the accompanying Affidavit of Conrad Kattner, and

any response thereto, it is hereby

ORDERED that the Motion for Judgment on the Pleadings is GRANTED. It is further

ORDERED that judgment shall be entered, with prejudice, in favor of Defendant, Stanley

Munson, and against Plaintiff on all counts of Plaintiff's Second Amended and Supplemental

Complaint.

BY THE COURT:

_____
                                                          J.

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

LEXINGTON INSURANCE COMPANY,

          Plaintiff,

    - against –

DAVID FORREST, T. BEAUCLERC ROGERS IV,
STANLEY MUNSON, MARTIN FINK, all individually,
and NEW BEGINNINGS ENTERPRISES LLC, a
California Limited Liability Company, and
TARLO LYONS, a partnership,

          Defendants.

Civil Action No. 02-CV-4435
  (Hon. Anita B. Brody)

## MOTION OF DEFENDANT STANLEY MUNSON
## FOR JUDGMENT ON THE PLEADINGS
## PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(C)

     Defendant, Stanley Munson, through undersigned counsel, hereby moves this Court,

pursuant to Federal Rule of Civil Procedure 12(c), for judgment on the pleadings, for the reasons

set forth in the accompanying Memorandum of Law and Affidavit of Conrad O. Kattner filed

herewith.

          Respectfully submitted,


        BY:   /s/ Conrad O. Kattner
           CONRAD O. KATTNER, ESQ.
           Identification No: 035468
           MCSHEA & TECCE, P.C.
           1735 Market Street, 16th Floor
           Philadelphia, PA 19103
           (215) 599-0800
           *Counsel for Defendant,*
           *Stanley Munson*

Date:    January 27, 2005

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

---

| | |
|---|---|
| LEXINGTON INSURANCE COMPANY, | Civil Action No. 02-CV-4435 |
| Plaintiff, | (Hon. Anita B. Brody) |
| - against – | |
| DAVID FORREST, T. BEAUCLERC ROGERS IV, STANLEY MUNSON, MARTIN FINK, all individually, and NEW BEGINNINGS ENTERPRISES LLC, a California Limited Liability Company, and TARLO LYONS, a partnership, | |
| Defendants. | |

---

**MEMORANDUM OF LAW IN SUPPORT**
**OF MOTION OF DEFENDANT STANLEY MUNSON**
**FOR JUDGMENT ON THE PLEADINGS**
**PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(C)**

Defendant Stanley Munson respectfully submits this memorandum in support of its motion pursuant to Rule 12(c) of the Federal Rules of Civil Procedure for judgment on the pleadings against plaintiff Lexington Insurance Company. ("Lexington").

### A.    INTRODUCTION

Lexington's second amended and supplemental complaint (the "complaint"), the operative pleading in this action, is selectively drafted, and based only in a few respects on real facts:

> 1.    There was a series of related companies called Flashpoint during the relevant period which were involved in obtaining and supplying financing for the production of motion pictures.

> 2.    There were six "Hollywood Funding" transactions, as alleged in ¶ 4 of the complaint.

> 3.    Tarlo Lyons, an established firm of solicitors in London, and specifically Stanley Munson, a salaried partner there, were counsel for Flashpoint in the Hollywood Funding transactions.

The core accusation against Mr. Munson – that he was lax in acquiescing in the application of moneys in a Flashpoint Holding Account – was specifically made in Lexington's original complaint in this case, filed July 3, 2002, but, to their prejudice, Lexington named neither Mr. Munson nor Tarlo Lyons as parties until the present complaint filed in April, 2004.

Paragraph 4 identifies the six Hollywood funding transactions. It says: "Plaintiff [Lexington] was the insurer for the last three transactions (Hollywood Funding 4, 5 and 6); another insurer (HIH Casualty & General Insurance Ltd.) was insurer for the first three." The complaint necessarily seeks relief only on the Hollywood Funding 4, 5 and 6 transactions, although it freely pleads wrongdoing with respect to earlier Hollywood Funding transactions. (E.g., Complaint ¶¶ 27(b), 33(a) and (b)).

There is much more to the foundation of the story than Lexington lets on. Lexington is a wholly-owned subsidiary of American International Group ("AIG"), a very large, publicly-traded, highly profitable, prominent and recently notorious American insurance company.  In the period when Flashpoint was active (1997-1999), the same kind of shortfall insurance for motion picture financing that Lexington sold could also be obtained in London from New Hampshire Insurance Co. ("New Hampshire"), another AIG subsidiary just like Lexington.  New Hampshire was a participant in Hollywood Funding 1, 2 and 3 – though as a reinsurer, not a direct insurer.  Despite that participation and the allegations of fraud in these earlier transactions, neither New Hampshire nor AIG seeks any recovery for them; they are not suing Tarlo Lyons or the other defendants here or elsewhere.

HIH, the insurer referred to in the portion of ¶ 4 of the complaint quoted above, did pay the $31 million in insurance claims presented in the Hollywood Funding 1 and 2 transactions. However, when HIH claimed on its reinsurance from New Hampshire and two other reinsurers, these companies declined, claiming that HIH should have refused to pay those claims based on numerous grounds, including fraud: one such ground was a rigid application of the doctrine of warranty – long since overruled by statute in many jurisdictions (e.g., N.Y. Insurance Law § 3106(b)), but on which the High Court and the Court of Appeal in England sustained New Hampshire, enabling it to retain the substantial reinsurance premiums it had collected for coverage it was allowed to walk away from.[1/]  HIH went into insolvency.

AIG and New Hampshire make no claim to recover for Hollywood Funding 1, 2 and 3 because they benefited handsomely from what Lexington now claims here was a RICO violation of which it was a victim. Indeed, assuming the 10% premium identified in the UK Flashpoint opinions, the net premiums collected just by Lexington on the $186 million value (Complaint ¶ 4) of Hollywood Funding 4, 5 and 6 alone (which its complaint never refers to) approximate the amount of its purported damages.

## PRELIMINARY STATEMENT

The complaint alleges six counts against Stanley Munson:

Count 1.        Substantive RICO (18 U.S.C. § 1962(c))

Count 3.        RICO conspiracy (18 U.S.C. § 1962(d))

Count 4.        Common Law Fraud

---

[1/]     HIH Casualty & General Insurance Ltd. v. New Hampshire Insurance Co., [2001] 1 Lloyd's Rep 378, aff'd. [2001] EWCA Civ. 735. Copies of these decisions will be supplied. According to paragraph 5 of the first Court of Appeal decision, HIH's premiums were rated at 10% of the limit of the coverage. As a quota share reinsurer, New Hampshire should have received that amount less a small overrider paid to HIH.

Count 5.        Tortious Interference with Contract

Count 6.        Fraudulent Inducement

Count 7.        Tortious Interference with Contract

The damages claimed are expenses incurred by Lexington in defending and settling claims

brought under the insurance policies Lexington issued on the Hollywood Funding 4, 5 and 6

transactions.

The factual gravemen of the complaint is in two core allegations.

First, it is claimed that defendants Forrest and Rogers misrepresented and

fabricated the probable earnings of the films in all the Hollywood Funding transactions and two

miscellaneous freestanding Flashpoint films, "The New Professionals" and "It Had to Be You".

There is no allegation that Tarlo Lyons or Munson had any role in, or knowledge of, this alleged

wrongdoing, although the RICO "enterprise" and conspiracy allegations of the complaint seek to

make them financially responsible for it nevertheless.

Second, Lexington claims against Mr. Munson and the other defendants that in

violation of Collateral Agreements – entered into between Lexington and Flashpoint as part of

the documentation for each slate in the Hollywood Funding transactions – the proceeds of the

financings were applied from the Holding Account to films and other Flashpoint motion picture

activities outside the confines of the specific slate to which each such Collateral Agreement

applied.  Here again New Hampshire's unidentified role as reinsurer in the Hollywood Funding

1-3 transactions creates a paradox in its affiliate's claim as victim: the bulk of the moneys the

complaint identifies as having been subjected to such misuse were Hollywood Funding 1-3 funds

(where New Hampshire, although exposed, was able to profit by avoidance of its reinsurance

responsibilities) applied to Hollywood Funding 4-6 films, which mitigated Lexington's insurance exposure.  (Complaint ¶ 33(a)(i) and (b)(i)).

The predicate felonies in the RICO counts are mail fraud and wire fraud (18 U.S.C. §§ 1341, 1343).  These statutes are plainly relevant to the specific claim of misrepresentation of future film earnings Lexington levels at Rogers and Forest.  However, the applicability of these statutes is not clear at all to the part of the complaint in which Munson and Tarlo Lyons figure, in which the wrongdoing alleged is that Munson and Tarlo Lyons had "wrongfully authoriz[ed] and certif[ied] withdrawals of funds raised in the various Hollywood Funding transactions for purposes other than the projects to which they were dedicated…aware that such conduct was in breach of Flashpoint's contractual obligations…and each deliberately misled plaintiff as to such conduct."  (Complaint ¶ 35).  The complaint repeatedly characterizes defendants' alleged wrongdoing as "misappropriation" of the borrowed funds, obviously intending to imply an undesirable thing, but this alleged wrong is a species of misconduct unknown as such both to Title 18 of the United States Code and to the law of torts.

What Lexington's claim comes down to is that financing from the Hollywood Funding 4, 5 and 6 transactions was used outside the specific film slates to which the financing and Collateral Agreements applied, at most the breach of contract Lexington identifies (Complaint ¶ 35) if  (1) Mr. Munson was a party to the Collateral Agreements, which he was not; or (2) Mr. Munson had assumed responsibilities to Lexington some other way with regard to this

use of the funds, which he hadn't; and (3) the Collateral Agreements contained such restrictions on the use of funds, which they didn't.[2/]

Even with a contract to which Tarlo Lyons or Mr. Munson was a party, Lexington's fraud claims would founder on the basic rule that: "A tort obligation is a duty imposed by law to avoid causing injury to others.  It is 'apart from and independent of promises made and therefore apart from the manifested intention of the parties' to a contract (Prosser and Keeton, Torts § 92, at 655 [5th Ed.])."  New York University v. Continental Ins. Co., 87 N.Y.2d 308, 316 (1995).

Finally, in taking an overview of the facts, the Court needs to recognize that, of the three Hollywood Funding transactions – 4, 5 and 6 – on which Lexington participated, the complaint only pleads misuse of the proceeds of Hollywood Funding 6 effectively.  (¶ 33). Certain of the "misappropriations" are specifically attributed to Hollywood Funding 1-3 (¶ 33(a) and (b)), in which Lexington was not involved, and two "misappropriations" are specifically attributed to Hollywood Funding 6 (¶ 33(f) and (g)), in which Lexington participated.  However, the other "misappropriations" (¶ 33(c), (d) and (e)) are each simply attributed to "the various Hollywood Funding financings" – as easily Hollywood Funding 1-3 as a later transaction – and thus the pleading is inadequate in these instances to state a claim on which Lexington can recover.

Last, all of the claims alleged are time barred.  None of the transactions took place later than 1998, and the alleged "misappropriations" are not claimed to have taken place later

---

[2/]    Representative Collateral Agreements are annexed to the moving affidavit of John D. Gordan, III, submitted herewith, and are appropriately considered by the Court on the motion because of Lexington's extensive citation to, and quotation from, the Collateral Agreements in the complaint.  Lum v. Bank of America, 361 F.3d 217, 222 n.3 (3d Cir. 2004).  There are variations in later versions.

than 1999. Lexington admits as much, because the complaint makes an ineffectual effort to

claim fraudulent concealment and equitable tolling. (¶¶ 93-97).

### B.    THE COLLATERAL AGREEMENTS

Lexington's case against Mr. Munson depends entirely on its assertion that

moneys in the Hollywood Funding 1-6 transactions were "misappropriated" by Flashpoint with

Mr. Munson's acquiescence as a signatory on accounts established under Collateral Agreements.

Although it is an essential element of Lexington's allegations of mens rea that the defendants

were "simultaneously violating" the restrictions of the Hollywood Funding 1-3 "transactions"

when negotiating the Collateral Agreements for Hollywood Funding 4, 5 and 6, that claim is part

of the fiction of Lexington's complaint. Lord Justice Rix in the HIH appeal, cited in footnote 1

above, described the status of the Collateral Agreement for Hollywood Funding 1 as follows:

> 24. The collateral agreement (for the 7.23 slate) was not in fact
> executed as between HIH and Flashpoint until at least a year later.
> The document is headed "DATED with effect from the 3rd August
> 1998". That heading is by way of manuscript amendment of an
> original line which had read "DATED DECEMBER 1998". It is
> well possible therefore that the document was in fact executed
> even later than Aug 3, 1998. Despite the working inference that I
> am in general prepared to make regarding the availability of a
> contemporary draft of the collateral agreement as of July, 1997, the
> Court was not shown such a draft in the available bundles, and my
> personal attempt to find one has brought to light a draft attached to
> a Lloyd Thompson fax on July 17, 1997 (referred to there as the
> "Side Agreement") which is a very much less sophisticated
> document than the final executed version. That again indicates
> that it is impossible to proceed on the basis of any particular
> finding as to what was seen by any party at the time of binding any
> of the three insurance documents.

Lord Justice Rix's example – the 7.23 slate (Hollywood 1, according to ¶ 29(a) of the Complaint)

– shows that contrary to Lexington's complaint, the Collateral Account for Hollywood Funding 1

was not negotiated until sometime after Hollywood Funding 5 (Complaint ¶ 4).

7

Annexed to the moving affidavit of Conrad Kattner, are the two Collateral

Agreements applicable to Filmworks, one of the slates within Hollywood 5, chosen as a

paradigm from Lexington's production.

The funds pass from the investor pool to the Jersey Flashpoint company –

Flashpoint Ltd. ("Flashpoint Jersey"). The Flashpoint Jersey – Lexington Collateral Agreement

(at 3(1)) provides that the "Films budget portion of the Funds" – a term not among the defined

terms of the document – "shall be immediately deposited in the Flashpoint Jersey Holding

Account and in turn be paid by Flashpoint under the Flashpoint UK Purchase Agreement to

Flashpoint UK."

Paragraph 4(1) of the Flashpoint UK-Lexington Collateral Account provides that

the Films budget portion of the Funds, once received from Flashpoint Jersey as provided above,

will be immediately placed on deposit in a bank account (the "Holding Account") opened and

maintained by Flashpoint UK and on which a partner of Tarlo Lyons shall be a co-signatory for

all cheques or other payment authorisations from such account. The only further provision

respecting the "Holding Account" is paragraph 4(2):

> (2)     Flashpoint further undertakes to Lexington to procure that
> Tarlo Lyons will not release any funds from such Holding Account
> in relation to the principal photography of the Films unless and
> until the Principal Production Documents in relation to the Films
> have been substantially completed to the reasonable satisfaction of
> Lexington.

The "Films" are defined in the definition section as "includ[ing] 'Filmworks' series of films as a

whole, and any and all films, or excerpts and episodes therein".

Paragraph 4 of the Lexington-Flashpoint UK Collateral Agreement then provides

for the establishment of a Production Account, in which moneys are to be deposited when drawn

out of the Holding Account in conformity with Paragraph 4(2), quoted above.[3/]  Paragraphs 4(5)

and 4(6) provide for the establishment of, and priorities of distribution from, a Collection

Account for deposit of the Net Receivables, which are defined as the films' Revenues less

Producer expenses.[4/]

        Paragraph 4(7) imposes the following obligations:

---

[3/]    <u>Production Account</u>

    (3)    Upon drawdown of any monies from the Holding Account in accordance with sub-clause (2) above, such monies shall be paid into a production account opened for the benefit of Flashpoint by the Producer (the "Production Account").

    (4)    Flashpoint undertakes that withdrawals from the Production Account shall be made strictly in accordance with the Production and Finance Agreement, and the relevant budget and cashflow scheduled provided to Lexington.

[4/]    <u>Collection Account</u>

    (5)    Flashpoint undertakes to Lexington to:

        (a)    open and maintain the Flashpoint UK Collection Account being a specially designated trust account with Leopold Joseph of 29 Gresham Street, London EC2V 7EA in the name of Flashpoint UK for the purpose of receiving all Net Receivables and in turn transferring such Net Receivables into the Collection Account up to an aggregate amount of the Collection amount;

        (b)    procure that Tarlo Lyons will procure that there is opened and maintained a specially designated trust account with the Guernsey branch of Credit Suisse First Boston for the purposes of receiving from the Flashpoint UK Collection Account all Net Receivables (the "Collection Account") in the name of Flashpoint Jersey.

    (6)    The amount standing to the credit of the Collection Account shall be held on the following trusts:

        (a)    FIRST up to an amount in aggregate equal to the Collection Amount to Flashpoint Jersey to enable Flashpoint Jersey to pay such Collection Amount into the Escrow Account for the benefit of Hollywood Funding (No. 5) Limited in accordance with the terms of the Purchase Agreement;

        (b)    SECOND to Lexington to enable Lexington to recover monies due to Lexington under the terms of this agreement or the Flashpoint Jersey Collateral Agreement generally (including without limitation, amounts due to Lexington under Clauses 11 and 12);

        (c)    THIRD, upon execution of all liabilities and obligations under the Policy and this agreement to Flashpoint absolutely.

(7)    Flashpoint undertakes to Lexington to procure that Tarlo Lyons will confirm in writing to the reasonable satisfaction of Lexington that Tarlo Lyons acknowledges its obligations under Clause 4(5) and (6) [the Collection Account] and confirms its intentions to comply with same.

Finally, Paragraph 4(9) provides Lexington with the following monitoring mechanism:

Management of Accounts

(9)    Flashpoint agrees to provide to Lexington (on a monthly basis) copies of all bank statements in relation to the Holding Account, Flashpoint Jersey Holding Account, Production Account, Collection Account, Flashpoint UK Collection Account and Escrow Account, together with a breakdown and reconciliation of monies paid and received, the payee/payer (as the case may be), and brief details of the reason for the payment or receipt, and agrees to provide such other information in relation to the accounts as Lexington may reasonably require.

## ARGUMENT

## STANLY MUNSON IS ENTITLED
## TO JUDGMENT ON THE PLEADINGS

### I.    FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

The foregoing background information greatly facilitates the Court's task in identifying the utter failure of Lexington's complaint to state a claim upon which it can be granted the relief it seeks.

### Counts 6 and 7

Counts Six and Seven allege fraudulent inducement and tortious interference with contract. These claims are based on something Lexington bootstraps into calling "the Tarlo Lyons Representation," but which is nothing more than Paragraph 4(2) of the Collateral Agreement quoted at p. 8 above.  (See Complaint ¶¶ 73, 82).

Count Six treats this contractual language as a representation – which it is not. Even though there is a Representation and Warranty Section of the Lexington-Flashpoint UK Collateral Agreement, that section contains nothing about Tarlo Lyons or Stanley Munson.

Lexington also insinuates that Paragraph 4(2) is a representation by Tarlo Lyons, christening it as such. Obviously, if this contractual language were a representation at all, it would be one by the contracting party, Flashpoint.

The Flashpoint UK Collateral Agreement does contain Paragraph 4(7), dealing with the Collection Account, whereby Flashpoint was contractually required to obtain Tarlo Lyons' written undertaking to perform the contractually specified activities, but (1) there is no claim that Tarlo Lyons gave the undertaking; (2) violation of such an undertaking is a breach of contract, if it is anything, not a fraud; (3) the only undertaking by Tarlo Lyons concerned the Collection Account, and Lexington does not complain about the administration of Collection Account; and (4) the Holding Account is what Lexington is complaining about.  (Complaint ¶¶ 42, 47(e), 73, 82).

Paragraph 75 of the Complaint seeks to load Munson with guilt "because, inter alia, in July 1997 Munson, acting on behalf of Flashpoint, negotiated the Collateral Agreement with respect to the Hollywood Funding No. 1 Transaction", when it is obvious from the quoted portion of Lord Justice Rix's opinion that the parties viewed the Collateral Agreement as so insignificant that more than a year later it was still in draft and unsigned.

Nor does the language of the "Tarlo Lyons Representation" that Lexington relies on support Lexington's claim. Its only limitation on the use of the funds in the Holding Account is that they not be used for principal photography with regard to the films governed by the Collateral Agreement until the applicable contractual documents have been approved. There is

<u>no</u> limitation on the use of the moneys in the Holding Account for <u>pre-production</u> costs for the films which are the subject of the Collateral Agreement or for <u>any</u> <u>other</u> <u>purpose</u> separate from such films.

Lexington is trying to make a federal crime out of what would not have risen to a breach of contract had Mr. Munson or Tarlo Lyons been a party to the Collateral Agreements, which they were not.

Accordingly, no fraud or tort has been plead, and these counts must be dismissed.

**<u>Count 5</u>**

This is another tortious interference claim, based on "misappropriation" of Flashpoint moneys to expenditures on "The Building/New Standard Post, Ice Storm and Russian Cinemas." (Complaint ¶ 68).

Although the contracts interfered with are claimed to be the Collateral Agreements for Hollywood Fundings 4-6, (¶¶ 68-69), the detailed allegations with regard to the sources of the funds applied for those three purposes do not attribute the source to Hollywood Funding 4-6 but instead to "the Flashpoint account that contained the (improperly commingled) funds **raised in the various Hollywood Funding transactions**" (Complaint 33(c)(iii) and (e)(iii) (emphasis supplied). Since these allegations fail to earmark the "misappropriated" funds to Hollywood Funding 4-6, in which Lexington participated, rather than Hollywood Funding 1-3, in which Lexington did not, Lexington has pleaded no injury.

In any event, its claim here fails for the same reason as it did on Counts Six and Seven – what is pleaded does not make out a breach of the Collateral Agreement by Flashpoint.

Consequently, no injury has been adequately plead, and once again no fraud or tort has been plead, and thus Count Five must also be dismissed.

### Counts 1 and 3

These are RICO counts.  The first count is a substantive count under 18 U.S.C. § 1962(c).  The third count is a conspiracy count under 18 U.S.C. § 1962(d).  The third count subsumes the allegations not only of the first count but also of the second – pleaded against Forrest and Rogers only under 18 U.S.C. § 1962(a), alleging that a portion of the racketeering income they received was invested in The Building LLC and New Standard Post and that Lexington has been injured financially by being forced to pursue creditor's remedies. (Complaint ¶¶ 55-59).

 (a) The 1962(c) claim in Count One

This claim is predicated on the mail and wire fraud statutes (18 U.S.C. §§ 1341, 1343) and the interstate transportation of fraudulently obtained goods statute (18 U.S.C. § 2314). Lexington's 1962(c) claim is thus premised exclusively on fraud.

Under settled law in this Circuit, all fraud claims, including RICO claims, must be pleaded with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure. Lum v. Bank of America, supra, 361 F.3d at 223-24. Lexington must "allege who made a misrepresentation to whom and the general content of the misrepresentation." Id. at 224.  See also McLaughlin v. Anderson, 962 F.2d 187, 191 (2d Cir. 1992).

Lexington must also plead and prove reliance on the misrepresentation alleged. Ideal Diary Farmers v. John Labatt, Ltd., 90 F.3d 737, 746-47 (3d Cir. 1996).  See also Moore v. Paine Webber, Inc., 189 F.3d 165, 169-73 (2d Cir. 1999);  18 U.S.C. § 1964(c).

From the shape of Lexington's pleading it seems that the "Tarlo Lyons Representation" from Counts 6 and 7 is not a basis for the RICO claim. If it were, they would fail to support it for the reasons already discussed.

Otherwise, the Court will look in vain for the identification in the RICO pleadings of <u>any</u> misrepresentations made by Stanley Munson.

These counts are little changed from the original pleading filed by Lexington in July 2002, when only Mr. Forrest and Mr. Rogers were named, and this element may have been satisfied as to them by the laundry list of misrepresentations on film performance now transposed to ¶ 27 of the existing complaint. But neither Mr. Munson nor Tarlo Lyons are alleged to have had any part in, or knowledge of, that activity: the charge against them is that they acquiesced in Flashpoint's "misappropriation" of the proceeds from one Hollywood Funding deal for the purposes of another, or for other Flashpoint business purposes. But nowhere is there a single specific allegation that Mr. Munson misrepresented anything to anybody, much less to Lexington.

Similarly Lexington fails to plead reliance on any identifiable misrepresentation by Mr. Munson. This is hardly surprising, because as in <u>Ideal Diary Farms</u>, the "misappropriations" complained of would be immediately apparent from the monthly statements and reconciliation to which Lexington was contractually entitled (see paragraph 4(9) of the Collateral Agreement, quoted above at page 10). Lexington's pleading is silent about these reports, but the facts can only be: (1) the reports misrepresented the true situation – something that Lexington would undoubtedly plead if it could and it has not; or (2) the reports disclosed what was happening, in which case Lexington has no fraud claim; or (3) Lexington never asked for the reports it was entitled to, or never looked at the ones it got, because its staff was entirely

indifferent to the "misappropriations" – nothing more sinister than taking money from the wrong

pocket for valid business reasons – which its lawyers have puffed up after the fact to federal

criminal violations.  In any event, the closest that Lexington ever gets to pleading reliance – even

as to the alleged film performance misrepresentations that Munson or Tarlo Lyons were not

involved in – is the mere statement that "plaintiff justifiably relied on such misrepresentations"

(Complaint ¶ 44) and "Had plaintiff known the truth" (Complaint ¶ 46), neither of which

complies with Rule 9(b)'s requirement to specify who relied on what said by whom.[5/]

        A final RICO point is the requirement that the plaintiff plead the personal

participation of each defendant in two racketeering acts injuring the plaintiff.  See Eaby v.

Richmond, 561 F. Supp. 131, 134 (E.D. Pa. 1983); Ronly, Ltd. v. Feingold, 1990 WL 187019, at

*3 (E.D. Pa. 1990).  See also First Capital Asset Mgmt. v. Satinwood, 385 F.3d 159 (2d Cir.

2004).  Here, in coopering Munson and Tarlo Lyons to its existing RICO claim, Lexington

simply added subparagraph (e) to what is now paragraph 47:

> (e)     on information and belief, numerous faxes between
> defendant Fink in California and defendants Munson and Tarlo
> Lyons in the United Kingdom for the purpose of arranging for
> withdrawals from the Flashpoint holding account of the monies
> raised in the various Hollywood Funding transactions.

Such nonspecific allegations on information and belief hardly meet the pleading requirements for

the two predicate RICO felonies, particularly since, as noted several times before, Lexington was

not involved in and has no standing to complain about Hollywood Funding 1, 2 and 3.

---

[5/]    Lest the Court be skeptical that Lexington would be indifferent to the management of moneys in transactions in which it was ostensibly exposed for nearly $200 million, the proof at trial would show that, despite appearances, at the inception of each transaction, Lexington laid off all but a tiny percentage of the risks on other carriers by the use of reinsurance and was left with almost no economic interest.

(b)     the 1962(d) claim in Count Three

The present 1962(d) conspiracy claim is pleaded exactly as it was when the original complaint was filed against Forrest and Rogers alone in July 2002.  It pleads two objects – the 1962(c) substantive violation alleged in the first count and the 1962(a) substantive violation pleaded in the second.  When Tarlo Lyons, Munson, and the other defendants were added to the case in April 2004, they were named in the first count but not the second; there are no allegations against them that relate to the second count.  Hence, it is supposed that the dual objects pleaded in the conspiracy count relate to Forrest and Rogers alone, and only the first object to all other defendants except New Beginnings.

The general rule is that in a case such as this one, where the substantive 1962(c) violation pleaded is deficient, that deficiency requires dismissal of the 1962(d) conspiracy count as well.  In the rare instances where the 1962(c) count is well pleaded but the plaintiff can only show injury from conduct in furtherance of the conspiracy apart from the pattern of racketeering activity alleged, then in this Circuit a conspiracy claim under Section 1962(d) may still lie if the injury-causing conduct is a felony identified in Section 1961(1).  Rehkop v. Berwick Healthcare Corp., 955 F.3d 285, 289-91 (3d Cir. 1996).  See also Breslin v. Brainard, 2003 U.S. Dist. LEXIS 19609 (E.D. Pa. 2003).  However, here at least as to Mr. Munson, because of the deficiencies on the underlying fraud claims, and potentially as to all defendants because of the inadequate pleading of reliance identified above, the case is governed by the general rule and Count 3 must be dismissed.

(c)     **Count 4**

This claim is disposed of by the discussion of fraud and reliance under the discussion of Count 1.

## II.    <u>STATUTE OF LIMITATIONS</u>

All of Lexington's state law claims are governed by the Pennsylvania Uniform Statute of Limitations on Foreign Claims Act, which applies the <u>shorter</u> of the foreign limitations period or the applicable Pennsylvania statute of limitations.  42 Pa. Cons. Stat. Ann. J.A. § 5521.

The Pennsylvania statute of limitations for common law fraud (Count 4) and fraudulent inducement (Count 6) is two years.  42 Pa. Cons. Stat. Ann. § 5524(7).  The Pennsylvania statute of limitations for tortious interference with contract (Counts 5 and 7) is two years.  42 Pa. Cons. Stat. Ann. § 5524(3).  These claims obviously accrued earlier than April 2002, which was two years prior to the filing of the complaint against Mr. Munson and Tarlo Lyons.  Lexington admits knowledge of the fraud by the end of 2000.

Accordingly, all of Lexington's state law claims, Counts Five, Six, and Seven, accrued before April 2002, and thus must be dismissed under the applicable two year statute of limitations.

RICO claims (Counts 1 and 3) have a four-year statute of limitations.  <u>Agency Holding Corp. v. Malley-Duff Assocs.</u>, 483 U.S. 143, 152-156 (1987).  There is no question that even the <u>last</u> of the acts pleaded against any of the defendants was in 1999, more than four years before Mr. Munson and Tarlo Lyons were added to the complaint.  None of the possibilities for relation back under Rule 15(c) of the Federal Rules of Civil Proceedings apply – indeed, "Mr. Munson of Tarlo Lyons" was even identified by name in the original complaint (¶ 32(c)) filed July 2002 as someone defendants Forrest and Rogers knew "would certify any draw he was requested to certify, without regard to the propriety of the draw."

The current rule for the accrual of RICO claims in this Circuit is the "injury discovery rule" announced in <u>Forbes v. Eagleson</u>, 228 F.3d 471, 484 (3d Cir. 2000).  Under

Forbes "a RICO claim accrues when 'plaintiffs knew or should have known of their injury.'"
Mathews v. Kidder, Peabody & Co., 260 F.3d 239, 250-51 (3d Cir. 2001). As noted earlier,
Lexington had a contractual right under Section 4(9) of the Flashpoint UK – Lexington
Collateral Agreements to receive monthly reports which would have revealed all of the injurious
"misappropriations" now claimed to have harmed Lexington. In the paragraphs (¶¶ 93-96)
devoted to "fraudulent concealment and equitable tolling" in the complaint there is no allegation,
as there surely would be, that Flashpoint submitted falsified reports. Therefore, it can only be
the case that either (1) accurate reports were submitted or (2) the reports that Flashpoint was
contractually bound to submit were not provided, a circumstance in itself more than sufficient to
have led a sophisticated insurer to "recognize[] it as a storm warning" -- and Flashpoint as its
source -- requiring immediate investigation and the diligence while Lexington admits it did not
even initiate for two years. Id. at 252.

        As for equitable tolling, Lexington offers an explanation of its inability to
discover the alleged misrepresentations regarding film performance (Complaint at ¶ 96), but their
aspect of the claim does not involve Mr. Munson or Tarlo Lyons. The only justification for
Lexington's failure to discover the "misappropriations" of which it complains is its bald
assertion that: "Defendants' frauds and other misconduct were inherently self-concealing."
(Complaint ¶ 93). Not only is this naked assertion light years away from what it is Lexington's
burden to establish to claim the benefit of equitable tolling, Forbes, supra, 228 F.3d at 487, the
Collateral Agreements, which are crucial to Lexington's fraud claim, prove that the opposite is
true.

        Accordingly, under the injury discovery rule, Lexington's RICO claims accrued
before April 2000, for from the face of the complaint and the Collateral Agreements paragraph

4(9), Lexington knew or should have known of its injury and its source by then, and thus Counts

One and Three must be dismissed for this additional reason.

## CONCLUSION

        The motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal

Rules of Civil Procedure should be granted, and all claims against Defendant, Stanley Munson,

should be dismissed by entry of an Order in the form attached.

        Respectfully submitted,


BY:   /s/ Conrad O. Kattner      
        CONRAD O. KATTNER, ESQ.
        Identification No: 035468
        MCSHEA & TECCE, P.C.
        1735 Market Street, 16th Floor
        Philadelphia, PA 19103
        (215) 599-0800
        *Counsel for Defendant,*
        *Stanley Munson*

Date:    January 27, 2005        

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LEXINGTON INSURANCE COMPANY,<br><br>                           Plaintiff,<br><br>        - against –<br><br>DAVID FORREST, T. BEAUCLERC ROGERS IV,<br>STANLEY MUNSON, MARTIN FINK, all individually,<br>and NEW BEGINNINGS ENTERPRISES LLC, a<br>California Limited Liability Company, and<br>TARLO LYONS, a partnership,<br><br>                           Defendants. | Civil Action No. 02-CV-4435<br>    (Hon. Anita B. Brody) |

## EXHIBIT LIST FOR
## MOTION OF DEFENDANT STANLEY MUNSON
## FOR JUDGMENT ON THE PLEADINGS
## PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(C)

     A.    Copy of Opinion in *HIH Casualty and General Ins. Co. v. New Hampshire Ins. Co.,* 2001 Lloyd's Rep. IR 224 (Queen's Bench, Commercial Court, Dec. 4, 2000) (Steel, J.).

     B.    Copy of Opinion in *HIH Casualty and General Ins. Co. v. New Hampshire Ins. Co.,* 2001 Lloyd's Rep. IR 596 (Court of Appeal, Civil Division, May 21, 2001) (Rix, LJ.).

     C.    Affidavit of Conrad Kattner

     D.    Collateral Agreement re: Filmworks between Lexington and Flashpoint (Jersey)

     E.    Collateral Agreement re: Filmworks between Lexington and Flashpoint (UK)

Certificate of Service.

# Exhibit A

A.      Copy of Opinion in *HIH Casualty and General Ins. Co. v. New Hampshire Ins. Co.,* 2001 Lloyd's Rep. IR 224 (Queen's Bench, Commercial Court, Dec. 4, 2000) (Steel, J.).

2000 WL 33148819                                                    Page 2
2000 WL 33148819 (QBD (Comm Ct)), [2001] C.L.C. 481, [2001] 1 Lloyd's Rep. 378
**(Publication page references are not available for this document.)**

Hih Casualty and General Insurance Limited v. New Hampshire Insurance Company,

Independent Insurance Company Limited,
Axa Reassurance S.A.
No. 1999 Folio No: 1248
2000 Folio 40
2000 Folio 268

High Court of Justice Queen's Bench Division Commercial Court

QBD

Before: The Hon. Mr. Justice David Steel

Monday 4th December, 2000

**Representation**

MR. J. Flaux Q.C. and Mr. S. Picken(instructed by Holman, Fenwick & Willan) appeared on behalf of the Claimant.

Mr. C. Hancock Q.C. and Ms. S. Masters(instructed by Kennedys) appeared on behalf of the Defendants (New Hampshire).

Mr. S. Ruttle Q.C. (instructed by Davies Lavery) appeared on behalf of the Defendants (Independent).

Mr. P. Gross Q.C., Mr. P. Edeyand Mr. M. Collett (instructed by D J Freeman ) appeared on behalf of the Defendants (Axa).

**JUDGMENT**

**Introduction**

**1.** Pursuant to an order dated the 22nd August 2000, the court has heard argument on various preliminary issues that arise in relation to three related actions. In each of those three actions, the Claimant was HIH Casualty and General Insurance Company Limited ("HIH"). HIH had underwritten two film finance insurance policies. The insured was Law Debenture Trust ("LDT"). The disputes in the three actions relate to reinsurance of that cover.

**2.** The two underlying insurance policies concerned two separate groups of films: one with regard to a number of films to be co-produced by 7.23 Productions LLC and Flashpoint Limited (the "7.23 slate"); the other with regard to a number of films to be co-produced by Rojak Films Inc. and Flashpoint Limited ("the Rojak slate"). Axa Reassurance SA ("Axa") and New Hampshire Insurance Company Limited ("New Hampshire") are reinsurers in respect of HIH's liability under both policies: Independent Insurance Company Limited are reinsurers in respect of HIH's liability under the 7.23 policy only.

**3.** HIH, having paid LDT sums totalling over US$31 million, seek to recover in the three actions contributions towards some 80% of that sum under the reinsurance agreements. The reinsurers have refused to indemnify HIH on the grounds that HIH should not have met LDT's claims or, alternatively, that, whatever the position was under the insurance contract, they are not obliged to pay under the reinsurance contract for various reasons including breaches of warranty and breaches of the duty of good faith.

Copr. © West 2004 No Claim to Orig. Govt. Works

Westlaw.

2000 WL 33148819                                                                Page 2
2000 WL 33148819 (QBD (Comm Ct)), [2001] C.L.C. 481, [2001] 1 Lloyd's Rep. 378
**(Publication page references are not available for this document.)**

**4.** For the purposes of the preliminary issues, the parties have agreed that it be assumed that all the allegations of fact made by the reinsurers in the various defences and counter claims are true. The preliminary issues focus on two matters; firstly, the question whether any terms of the underlying insurance and/or the reinsurance contract have been correctly identified by the reinsurers as warranties; and, secondly, the impact of a clause within the underlying insurance wording which HIH say both precluded it from resisting payment of the underlying insurance claim and prevents the reinsurers from relying on anything that they have pleaded as grounds for not indemnifying HIH.

### The commercial structure

**5.** The commercial structure of the arrangements is broadly as follows. Flashpoint Ltd ("Flashpoint") entered into production and finance agreements with 7.23 Productions Inc. and Rojak Films Inc. Flashpoint in turn obtained finance from two companies, Hollywood Funding Limited and Hollywood Funding No. 2 Limited, which were corporate vehicles for various investing financial institutions such as Credit Suisse First Boston. This finance was obtained pursuant to "purchase agreements" under which, in consideration for providing the necessary payments to Flashpoint, HFL would receive revenue from the film productions subject to a cap. HFL funded its payment obligations to Flashpoint by means of Notes constituted by a trust deed made between LDT and HFL.

**6.** It follows that, through the trust deed in each case, LDT was the ultimate investment vehicle for the various investors. Part of the collateral security that those investors required was a "pecuniary loss indemnity" insurance. This would indemnify LDT if at the end of a defined period there was a shortfall between the amount of finance provided and the revenue collected. Flashpoint undertook to procure such insurance naming LDT as the insured. To that end, Flashpoint approached Lloyds' brokers Lloyd Thompson who specialised in placing this type of insurance. It appears that the brokers had a "core" market of insurers who were interested in underwriting such insurance, including HIH, AIG (New Hampshire), Axa and Kemper Re. The business was structured as a 100% insurance of LTD by HIH with other companies, including New Hampshire and Axa, participating by way of lines on an 80% quota share reinsurance of HIH.

**7.** The first of the risks to be written related to 7.23 Productions. The insurance slip was subscribed by the claimant's underwriter Mr Steve Mitchell on the 13th August 1997 for a 100% "subject to reinsurance of 80%". The slip provided (inter alia) as follows:

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

**8.** About a week later, Mr Mitchell agreed and signed the Pecuniary Loss Indemnity policy wording which had been through a number of drafts. The precise status of this document and, in particular, whether it was by way of an endorsement of, or substitution for, the Slip Policy was in issue. Its form was as follows:

*Pecuniary Loss Indemnity Policy*

Copr. © West 2004 No Claim to Orig. Govt. Works

Westlaw.

2000 WL 33148819                                                    Page 3
2000 WL 33148819 (QBD (Comm Ct)), [2001] C.L.C. 481, [2001] 1 Lloyd's Rep. 378
**(Publication page references are not available for this document.)**

Dated 22nd August 1997

HIH ... being the company issuing this policy (hereinafter ... referred to as the "Insurer") unconditionally ... and irrevocably agrees with the "Assured" ... that in consideration of the payment of the premium ... and subject to the insuring clause, definitions, exclusions and conditions of this policy that the Insurer will pay amounts due to the Assured on the respective due dates payment as set out in this policy.

*Preamble*

(A) Whereas Flashpoint Ltd ... has invested or is in the process of investing six revenue generating entertainment projects collectively known as 7.23 (the Projects) where all the revenue generated thereby ... is due to be paid into the collection account and

(B) Whereas pursuant to the purchase agreement ... dated on or about the date of this policy and made between Flashpoint Ltd and Hollywood Funding Ltd (the Purchaser) Ltd has agreed or will agree to pay to the escrow account ... the collection amount ... on the last day of the policy period ... and

(C) Whereas the Purchaser has decided to fund its payment obligations under the purchase agreement by the issue of US$ 16,400,000 Zero Coupon Notes due 1999 ...

(D) Whereas Flashpoint Ltd has procured the issue of this Policy in favour of the Assured

(E) Whereas neither the Purchaser nor the Assured is involved nor has any interest in the projects or in the collection amount

*Now Therefore*

*Clause 1 Insuring Clause*

1.1 Initial ClaimIf at the close of business on the last day of the Policy Period the amount of the balance standing to the credit of the Escrow Account is less than the Sum Insured (as defined in the Schedule) as a consequence of the occurrence of the Insured Peril then on the last day of the Waiting Period (as defined in clause 2.6 below) the Insurer will pay to, or to the order of, the Assured such US Dollar amount as is necessary to ensure that the Assured receives and retains in the Escrow Account a net sum equal to the Sum Insured ...

*Clause 2 Definitions*

2.1 Insured PerilInsured Peril means the failure to generate a balance in the Escrow Account as at the last day of the Policy Period equal to the Sum Insured, for any reason whatsoever.

This definition includes, but is not limited to, the failure of the Projects to generate a balance in the Collection account equal to, or in excess of, the Sum Insured or the failure of Flashpoint Ltd to make any payment under the Purchase agreement for any reason whatsoever ...

2.3 Escrow AccountThe Escrow Account means the account set up with the Guernsey branch of Credit Suisse First Boston (account no. 15091) in the name of the Assured.

*Clause 4 Assignments and Amendments*

4.1 Assignments by the AssuredThe Assured may, at any time, assign all or any of its rights and benefits under this Policy ...

4.3 Amendments to the PolicyThis Policy may not be amended, cancelled, revoked or

Copr. © West 2004 No Claim to Orig. Govt. Works

Case 2:02-cv-04435-AB    Document 128    Filed 01/27/2005    Page 27 of 115

Westlaw.

2000 WL 33148819                                                          Page 4
2000 WL 33148819 (QBD (Comm Ct)), [2001] C.L.C. 481, [2001] 1 Lloyd's Rep. 378
**(Publication page references are not available for this document.)**

rescinded without the prior written consent of the Assured.

*Clause 7 Governing Law and Jurisdiction*

7.1 English LawThis Policy shall be governed by, and construed in accordance with, the laws of England and Wales.

7.2 English CourtsThe Insurer and the Assured hereby irrevocably agree for the benefit of each other that the courts of England shall have jurisdiction to hear and determine any suit, action or proceedings ...

*Clause 8 Disclosure and/or Waiver of Rights*

8.1 To the fullest extent permissible by applicable law, the Insurer hereby agrees that it will not seek to or be entitled to avoid or rescind this Policy or reject any claim hereunder or be entitled to seek any remedy or redress on the grounds of invalidity or unenforceability of any of its arrangements with Flashpoint Ltd. or any other person (or of any arrangements between Flashpoint Ltd. or the Purchaser) or non-disclosure or misrepresentation by any person or any other similar grounds. The Insurer irrevocably agrees not to assert and waives any and all defences and rights of set-off and/or counterclaim (including without limitation any such rights acquired by assignment or otherwise) which it may have against the Assured or which may be available so as to deny payment of any amount due hereunder in accordance with the express terms hereof"

9. The reference in the Slip Policy to a "side agreement" is a reference to a collateral agreement between the Claimants and Flashpoint. This agreement made

provision for the collection and control of funds. Of particular note was that, pursuant to Clause 5 of the collateral agreement, Flashpoint represented and warranted that "*it has fully and accurately disclosed to HIH in respect of the Policy all information which is material to the consideration of the risks forming the policy, or to the terms, conditions and exclusions contained in the policy*". Furthermore Clause 10 headed Good Faith reads as follows:

"Flashpoint and HIH acknowledge that this agreement have been (*sic*) entered into for the purposes of managing the risks contained in the policy and it is the parties intention that the utmost good faith shall be the essence of the relationship between them, and in the interpretation and the effect of this agreement and in the negotiation and placement of the policy" ...

10. The second of the risks to be written was in respect of Rojak Films Inc just a few months after the 723 Productions insurance had been concluded. The claimants subscribed to the slip 100% on the 4th December 1997. The slip was in broadly similar terms to that in respect of 723 Productions. So far as there were any material differences they were as follows:

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE
The Pecuniary Loss Indemnity Policy wording issued in respect of this Slip was in materially identical terms.

11. The reinsurance slip in respect of 7.23 Productions provided (inter alia) as follows:

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT

Copr. © West 2004 No Claim to Orig. Govt. Works

Westlaw.

2000 WL 33148819                                                           Page 5
2000 WL 33148819 (QBD (Comm Ct)), [2001] C.L.C. 481, [2001] 1 Lloyd's Rep. 378
**(Publication page references are not available for this document.)**

DISPLAYABLE

**12.** The Reinsurers who subscribed that Reinsurance Slip were Axa, New Hampshire (AIG), CCR, Kravag, Deutscher Lloyd and Independent. It is perhaps to be noted that AIG's stamp was "*subject to reinsurance*" and Independent's stamp was expressed on the basis "*to max loss any one film for 100% is USD 3,900,000.*"

**l3.** The stamps of all the reinsurers were subject to "*all amendments being agreed* ". With the exception of differences reflecting those between the two underlying policies, the Reinsurance Slip in respect of Rojak was on the same terms. The Reinsurers were Axa, New Hampshire (AIG), CCR and GIO.

**14.** At the expiry of the Policy period in relation to the 7.23 slate, revenue collected was only US$1,621,500 leaving a shortfall from the sum insured of some US$ 14,778,500. Similarly at the expiry of the policy for a period relating to Rojak slate, the revenue collected was only US$829,526.43, giving another substantial shortfall from the sum insured. The claims of LDT were each paid by the Claimants.

**15.** There are extensive pleadings in all the actions but there are certain issues that are common, both as between the various Reinsurers and as between the two film projects that had been insured. The principal examples of these common issues are as follows

a The Reinsurers contend that the underlying insurance contained a warranty to the effect that a slate of six or ten films respectively would be made

b The Reinsurers contend that the Reinsurance contained such a warranty and

a further warranty that the insurers would obtain the consent of Reinsurers to any amendment to the terms of the underlying insurance

c The Claimants contend that Clause 8 of the Policy wording disabled them from relying upon any breach of warranty by the original Assured.

d The Claimants further contend that Clause 8 was a term of the reinsurance and precluded the Reinsurers from relying upon any breach of warranty and further precluded the Reinsurers from relying upon any misrepresentation or nondisclosure unless the same was fraudulent.

**16.** Against this background the following preliminary issues were ordered to be determined.

1 Are the terms (of both the insurance contracts and reinsurance contracts) alleged by the Reinsurers to have been warranties in fact such?

2 What is the effect of Clause 8 of the underlying insurance contract? In particularly does it mean that the facts and matters alleged in the defences (if true) would not have provided the Claimant Insurer/Reinsured with a defence (whether in whole or in part) to the underlying Insured's claim?

3 On the assumption that the Reinsurers' underwriters were aware that the underlying policy wording contained Clause 8, was Clause 8 a term of the reinsurance contract? Is the answer different if the underwriters were not so aware?

4 What is the effect of Clause 8 in the context of the reinsurance contracts? In particular does it mean that:

　　i The facts and matters alleged in the defences and counterclaims (if true) do not provide the Defendant Reinsurers with a

Copr. ©  West 2004 No Claim to Orig. Govt. Works

Westlaw.

2000 WL 33148819 (QBD (Comm Ct)), [2001] C.L.C. 481, [2001] 1 Lloyd's Rep. 378
**(Publication page references are not available for this document.)**

(complete or partial) defence (including by way of set-off) to the Claimants Insurers /Reinsured's claim; and/or

ii The Defendant's Reinsurers do not (or did not) have the right to avoid the reinsurance contract on grounds of misrepresentation or nondisclosure (assuming they otherwise have or had such a right) irrespective of whether or not the relevant misrepresentation or nondisclosure was negligent or fraudulent as opposed to innocent.

### Issue 1: Warranty

**17.** The question is drafted in broader terms but the central issue here is whether the insurance or reinsurance or both contained a warranty to the effect that a slate of 6 or 10 films respectively would be made. This in turn breaks down into two questions:

i. Was there a term to that effect in either or both the underlying and the reinsurance policies?

ii If so, did it have the status of a warranty?

**18.** The threshold issue is to determine what document or documents constitute the underlying insurance. It was HIH's case that the policy was contained solely in the Pecuniary Loss Indemnity Policy dated the 22 supernd August 1997. This, it was contended, had superseded the slip policy. Accordingly, it was further submitted, it was not permissible to have regard to the slip even as an aid to construction of the insurance contract: see Youell v. Bland Welch [1992] 2 Lloyd's Rep. 127.

**19.** In support of this proposition, HIH argued that the express condition that the Pecuniary Loss Indemnity wording was to

be agreed by Leading Underwriter exhibited an intention that the slip policy should be replaced by a formal policy. Consistent with that, the policy dated the 22 supernd August went beyond setting out the wording and constituted a self-contained contract of insurance.

**20.** I am not persuaded by that argument. It strikes me as notable that the slip is indeed headed "slip policy". The conditions expressly contemplate the preparation of wording to be agreed, without any inference that the wording should be in the form of a formal policy in substitution for the slip policy. Whilst the "policy" dated the 22 supernd August is, on one view, fashioned in the form of a complete policy, it notably contains no reference, for example, to the maximum of $3.9 million "any one film". Whilst it is possible that this reflects agreement with the leading underwriter to exclude that limitation, this is a conclusion that I would reach with the greatest of hesitation given the presence of such a limit in the reinsurance slip policy. (Indeed HIH was at pains to emphasise the need for the two policies to be back to back.)

**21.** It has to be said that the structure of the insurances only makes sense in the context of cover being furnished for a specific number of films. The sum insured reflected the combined cost of producing the entire slate, the premium being a percentage thereof. Consistent with this, the placing documentation spoke to a "slate" of films. In contrast, underwriters would probably not have been able to rely upon the terms of the side agreements in the event of a shortfall on the number of films since there was no express provision contained in them about completing the slate.

Copr. © West 2004 No Claim to Orig. Govt. Works

Westlaw.

2000 WL 33148819                                                                                           Page 7
2000 WL 33148819 (QBD (Comm Ct)), [2001] C.L.C. 481, [2001] 1 Lloyd's Rep. 378
**(Publication page references are not available for this document.)**

**22.** I prefer the view that the underlying policy is contained in the slip policy, subject to the terms and conditions contained in the policy wording dated the 22 supernd August. I am fortified in this view by the terms of the cover notes issued by the brokers and, indeed, the formulation of paragraph 1 of the various Particulars of Claim filed by HIH to the same effect. It follows that, in my judgment, it was a term of the policy that the full slate would be made.

**23.** If this conclusion were wrong, there would remain the issue whether such a term is contained within the August policy in any event. This is more finely balanced but I prefer the view that there is such a term. The preamble defines the "projects" as the full slate of films. Any commercially realistic construction of the specified insured peril involves the premise that the projects are to be completed in order to generate such income as may be forthcoming. Otherwise the policy becomes a cash performance bond which must answer even if none of the films are made despite the provision of funding.

**24.** Once the conclusion is reached that it was a term of the policies that the full slate of films would be made, it is readily to be concluded that the term was a warranty. The absence of the word "warranty" is of no significance. The test is whether the clause has a material bearing on the risk: see Barnard v. Faber [1893] 1 QB 340. It manifestly does in the sense that, the fewer the films that are made, that very same few must generate the same return. It is no answer to treat breach of the term as answerable in damages as it would be impossible to assess the shortfall attributable to a particular missing film.

**25.** Other alleged warranties in the underlying insurance were only advanced in the most tentative form and I say no more about them. However, once it is concluded that the underlying policies contained a warranty with regard to the completion of the full slate, it can readily be concluded that the reinsurance contracts contained the same warranty. I see this despite the reservations expressed by Lord Griffiths with regard to the incorporation of a warranty from the underlying policy in a different context; Vesta v. Butcher [1989] AC 852. In the first place, the interest in the reinsurance slip is expressed "as original policy". This in itself imports the need for the full slate.

**26.** Furthermore, as both HIH and New Hampshire have been at pains to emphasise, I accept the basic need for the two levels of insurance to be back-to-back. This was put, legitimately in my view, as a matter of general principle in the context of facultative insurance (see e.g. Vesta v. Butcher [1989] AC 852 and Groupama Navigation et Transports v. Catatumbo CA. Seguros [2000] 2 Lloyd's Rep 350). But stress was also properly put on the history of the placement which demonstrated that HIH was fairly to be regarded as "fronting" the insurance for a pool: the result was not dissimilar to a split of the risk at the primary level among all the underwriters, with HIH as the leader.

**27.** All three reinsurers also alleged that the term in the contracts of reinsurance that required the reinsured to obtain the reinsurers' agreement to all amendments to the original policy was a warranty. In this connection I derive no assistance, contrary

Copr. © West 2004 No Claim to Orig. Govt. Works

Westlaw.

2000 WL 33148819                                                                                          Page 8
2000 WL 33148819 (QBD (Comm Ct)), [2001] C.L.C. 481, [2001] 1 Lloyd's Rep. 378
**(Publication page references are not available for this document.)**

to the submissions on behalf of HIH, from the adjacent terms relating to the appointment of lawyers and accountants and payment of their fees. In particular I reject the submission that the prescribed remedy for breach of the amendment clause is non-simultaneous payment by reinsurers. In the event of a material amendment, such would be no remedy at all.

**28.** The starting point, as I see it, is to determine the true scope and meaning of the amendment clause. In particular, does it cover any amendment, or only a material amendment? For instance, clause 9.2 of the wording provides: *Notwithstanding Clause 5 no claim may be made under this Policy after the expiry of 180 days after the last day of the Discovery Period*. In the event that the reinsured was to agree with the original assured to a reduction of that period to, say, 100 days, an amendment that on any view would not be material to the risk, would the clause require agreement on the part of the reinsurers?

**29.** The only commercially realistic construction of the clause, in my view, involves excluding from its application immaterial amendments. By immaterial, I mean changes that do not affect the sense or substance of the underlying policy in a manner potentially prejudicial to the reinsurer. If this were right, it follows, in my judgment, that it would be right to categorise the amendment clause as a warranty. The outcome does no more than give contractual substance to the position at common law: see Norwich Union Fire Insurance Soc. v. Colonial Mutual Fire Ins. Co. [1922] 2 KB 461.

**Issue 2: Effect of Clause 8 in the**

**underlying insurance**

**30.** It is important to bear in mind the context in which this issue is raised. The reinsurers contend that HIH was not liable to the underlying assured on various grounds, some of which can be categorised as coverage issues (e.g. the loss was not fortuitous, the loss attributable to the failure to complete the full slate was not an insured risk, etc.) and some of which can be categorised as breach of warranty issues (e.g. the failure to complete the slate, agreement to reduce the size of the slate, etc.). It is the case of HIH that, by virtue of Clause 8 of the wording, these matters afforded it no defence to LDT's claim.

**31.** As I understood it, HIH placed particular reliance in the context of coverage issues to the second sentence of Clause 8 and, in effect, extracted from it the proposition that it reflected an irrevocable agreement on the part of HIH not to rely on any defence which it might have against the insured. This would unquestionably constitute a startling agreement since it would render the cover no less than an on-demand performance bond which must respond to any, or at least any honest, claim. I agree with the Defendants that such a conclusion involving the removal from the agreement of the basic ingredients of a contract of insurance is one which the court would only reach in the face of the clearest language: see Tor Line v. Alltrans [1984] 1 WLR 476.

**32.** In my judgment, the concluding phrase "*so as to deny payment of any amount due hereunder in accordance with the express terms hereof*" makes it plain that the waiver is in respect of defences akin to rights of set-

Copr. © West 2004 No Claim to Orig. Govt. Works

2000 WL 33148819                                                      Page 9
2000 WL 33148819 (QBD (Comm Ct)), [2001] C.L.C. 481, [2001] 1 Lloyd's Rep. 378
**(Publication page references are not available for this document.)**

off or counterclaim. It is the very antipathy of a waiver of coverage defences where, by definition, an amount is not due to be paid. This conclusion also puts paid to any reliance on the second sentence in regard to a breach of warranty.

  33.  In any event, as regards breach of warranty, HIH were minded to place more particular reliance on the first sentence. The submission was that a breach of warranty fell within "*any other similar grounds*". I do not agree. It is not similar (nor was it suggested to be) to "*invalidity or unenforceability*" of the arrangements with Flashpoint. Nor is it similar to "*non-disclosure or misrepresentation*". The effect of breach of warranty is to discharge the insurer from liability. Non-disclosure or misrepresentation gives rise, consistent with the terms of the clause, to rights of avoidance, rescission and rejection.

### Issue 3: Was clause 8 incorporated into the reinsurance contract?

  34.  Here the reinsurers part company. New Hampshire accept that Clause 8 forms part of the reinsurance contract by virtue of the condition that "*this reinsurance is subject to all terms, clause and conditions as original* ". Axa and Independent do not. Although the matter does not call for decision at this stage, there may be a factual justification for distinguishing between Axa and Independent in that the former appears to have scratched a copy of the wording in July but the latter did not. This disparity explains the alternative formulation of the issue.

  35.  It is convenient to start with the question whether the reference in the reinsurance slips to "*Cancellation Clause as Original Policy*" is a specific reference to Clause 8. It certainly is not entitled as such and its content, insofar as it touches on the availability of rights of cancellation, excludes or waives them. Indeed, it is perhaps better classified as a "non-cancellation" clause.

  36.  In this connection, some reliance was placed in the oral argument on the expert evidence. I had put before me two experts' reports. Neither of the authors was called to give oral evidence. The primary purpose of the reports was express opinions on the usualness of clause 8. I am doubtful of the admissibility of their views on the significance of the reference to a cancellation clause in the original policy. Suffice it to say that one expert suggested that the clause referred to was Clause 8 while the other suggested Clause 4.3.

  37.  I do not think this latter option is arguable. The choice, as I see it, is between there being no such clause and Clause 8. If possible, it is desirable to give some meaning to the specific identification of this clause. On balance, I prefer the conclusion that, on its proper construction, it refers to Clause 8. If this be right, I would further conclude that the clause would be thereby incorporated. This would be on the basis that the express reference to Clause 8 made by virtue of the condition is sufficient to render the reinsurers aware of the clause so as not to inhibit incorporation of the clause on this ground (and to put them at the least on enquiry for the purposes of disclosure).

  38.  However, I may be wrong about this, a possibility all the more likely given that such a contention is not, as I read it, any part of the pleaded case of HIH. Accordingly, I

Copr. ©  West 2004 No Claim to Orig. Govt. Works

Westlaw.

2000 WL 33148819                                                          Page 10
2000 WL 33148819 (QBD (Comm Ct)), [2001] C.L.C. 481, [2001] 1 Lloyd's Rep. 378
**(Publication page references are not available for this document.)**

go on to consider whether the clause has been included by reason of the general words of incorporation. The starting point is the presumption, already referred to, that the purpose and impact of such a provision is to make the arrangements back to back: see Citadel Ins. v. Atlantic Union [1982] 2 Lloyd's Rep. 543 per Kerr L.J. at p.546.

**39.** I have been referred to a number of cases that have considered the effect of such general words in the fields of insurance and carnage of goods. I would summarise their effect as follows. Incorporation of a specific term (or condition) is only achieved if:

   i. The term is germane to the reinsurance.

   ii. The term makes sense, subject to permissible "manipulation", in the context of the reinsurance.

   iii. The term is consistent with the express terms of the reinsurance.

   iv. The term is apposite for inclusion in the reinsurance.

**40.** Is Clause 8 germane to the reinsurance? In my judgment, it is. It may not be part of the central definition of the risk. But it is material to the nature and scope of the risk in the same way as an exceptions clause is germane to the shipment, carriage and discharge of goods under a bill of lading: see Thomas v. Portsea [1912] AC 1. The clause is not collateral, as for example with an arbitration clause or choice of law or jurisdiction clause: see Pine Top Ins. Co. v. Unione Italiana Anglo-Saxon Reinsurance Co. [1987] 1 Lloyd's Rep.476, Excess Ins. Co v. Mander [1997] 2 Lloyd's Rep. 119. The dividing line is most eloquently expressed, albeit in the context of a construction dispute, in the judgment of Sir John Megaw in Aughton Ltd. v. M.F.Kent Services Ltd. [1991] 31 Con. L.R. 60 at p.86ff.

**41.** Does Clause 8 make sense? Whilst the references to arrangements with Flashpoint are not directly apposite, only a minor adaptation is required to make the clause workable in the context of the reinsurance. In short, the reference to the "Insurer" needs to be replaced by "Re-insurer" and the reference to the "Assured" by "Re-assured". I regard such manipulation as appropriate and permissible: see e.g. CAN International Insurance Co. Ltd. v. Companhia de Seguros Tranquillidade SA [1999] CLC 140.

**42.** Is the term consistent? It certainly does not contradict any of the express terms of the reinsurance contact: cf. Home Ins Co. of New York v. Victoria-Montreal Fire Ins. Co. [1907] AC 59, Australian Widows v. National Mutual Life [1914] AC 615 .

**43.** Is the term in some other respect inapposite? It was argued by reinsurers that incorporation of the clause was inappropriate. The major theme to this submission was that, unlike the reinsured, the reinsurers could not rely upon the terms of the side agreements that contained warranties to the effect that there had been no non-disclosures or misrepresentations during the placement.

**44.** This point, in my view, begs the question, since reinsurers could exercise rights of subrogation under the side agreement in the event they were deprived of a defence under Clause 8 in circumstances giving rise to a claim under the side agreement. Where, as I have indicated, the set-up is akin to a fronting arrangement, I see nothing inapposite in treating Clause 8 as incorporated in the

Copr. © West 2004 No Claim to Orig. Govt. Works

Case 2:02-cv-04435-AB    Document 128    Filed 01/27/2005    Page 34 of 115

Westlaw.

2000 WL 33148819                                                          Page 11
2000 WL 33148819 (QBD (Comm Ct)), [2001] C.L.C. 481, [2001] 1 Lloyd's Rep. 378
**(Publication page references are not available for this document.)**

Reinsurance slip.

**45.** This leaves a further point taken by both Axa and Independent to the effect that Clause 8 could not be incorporated by the general words since it was unusual. The first point to be grappled with here is the issue of fact whether the clause is unusual (although there is an element of unreality here in that insurance cover of this class in the U.K. has no standard terminology or forms). As already mentioned, I have had the benefit of expert evidence on this topic. Mr. Day, retained by HIH, had considerable experience of financial "risk" insurance on the London market: Mr. Godfrey had considerable experience of financial "guarantee" insurance in the U.S.. Neither was called to called to give oral evidence.

**46.** It was clear that there were significant differences between the two markets. (Indeed, it would appear that the standard form financial guarantee policies issued on the American market not only do not have, but can have no place for, a clause 8 equivalent since they are in terms unconditional and irrevocable.) I have thus felt it right to impose much greater reliance on the views of Mr. Day. As I understood his evidence, clauses such as clause 8 are often requested by the assured in this class of business and are sometimes agreed, more often where there are collateral agreements.

**47.** Quite where this leaves the clause on the spectrum from usual to unusual is not easy to identify. At one extreme, I do not categorise it as inconscionable or extortionate: at the other, it is not standard or customary. For present purposes, I am disposed to proceed on the assumption that it is arguable (and as I understand it, the

issue is not for determination at this stage) that a fair presentation of the risk would involve its disclosure: mere notice of there being terms applicable to the underlying policy might not be sufficient to put reinsurers on inquiry: see Property Ins. Co. v. National Protector Ins. Co. [1913] LT 104, C.T.I. v. Oceanus [1984] 1 Lloyd's Rep. 476per Kerr L.J. at p. 498. (However, I recognise that, if there is notice adequate enough to allow incorporation (see below), it may be a rare case where the same notice is not adequate to discharge the obligation of good faith.)

**48.** More directly in point for present purposes was the reliance by Axa and New Hampshire on a passage in **MacGillivray on Insurance Law 9th Ed.** at para. 33-52 to the following effect: --

A difficulty has arisen where the original insurance contract contains an unusual term about which the reinsurer is unaware at the time when incorporation is agreed. It has been held that a reinsurer is not bound by the incorporation of terms unless they are well known and in common use. The reasoning is that the reinsurer may not be entitled to see, or will not in practice be aware of, the precise terms of the underlying insurance. It is submitted that the fact that a clause is highly unusual may be

relevant to the question whether the parties intended that clause to be incorporated into their contract.

**49.** It is certainly right that it has been held that reinsurers are bound by usual or customary terms in the underlying policy even when they extend or expand the scope of the reinsurers' liability: put another way that commonplace terms can even override an inconsistency : see Marten v. The Nippon

2000 WL 33148819 (QBD (Comm Ct)), [2001] C.L.C. 481, [2001] 1 Lloyd's Rep. 378
**(Publication page references are not available for this document.)**

Sea and Land Ins. Co. (1898) 3 Com. Cas. 164, Charlesworth v. Faber (1900) 5 Com. Cas. 508. Whether general terms of incorporation can import an unusual or uncommon term is quite a different question. In my judgment, the issue is to be approached as a matter of general principle in the light of such decisions as Interfoto Picture Library Ltd. v. Stiletto Visual Programmes Ltd. [1989] QB 433. I particularly bear in mind the judgment of Bingham L.J. who concluded that failure to draw attention to an onerous clause might prevent reliance upon it. He summarised his approach as follows:--

The tendency of the English authorities has, I think, been to look at the nature of the transaction in question and the character of the parties to it; to consider what notice the party alleged to be bound was given of the particular conditions said to bind him; and to resolve whether in all the circumstances it is fair to hold him bound by the condition in question.

**50.** The following seem to me to be the most material considerations:

i. This is a contract of reinsurance, which is intended to be back to back with the underlying insurance.

ii. It is expressly subject to "*all*" terms and to 'follow that placement in all respects".

iii. The clause in question is in no sense unique in this class of insurance, particularly where there is a collateral agreement.

iv. The slip records that information is available on the brokers' file: this would have included drafts of the wording.

v. As a matter of commercial convenience, it is desirable that all reinsurers subscribing to the same slip should contract on the same terms.

vi. Insofar as aspects of good faith arise, individual reinsurers may be able to avoid the policy if the presentation to them, including considerations of notice of the clause, was unfair.

**51.** In these circumstances, I conclude that, even if the condition in the slip referring to the cancellation clause was not thereby making reference to Clause 8 or, even if it was, such was not sufficient in itself to incorporate that clause, it is fair nonetheless to all the Reinsurers to treat the clause as incorporated by the general words.

**Issue 4: Effect of Clause 8 in the reinsurance contract**

**52.** I reject the submission that the effect is solely to agree to follow settlements made by HIH where otherwise HIH would have had a defence. The focus therefore is on the extent to which the clause is apt to exclude reliance on remedies in relation to non-disclosure and misrepresentation by the reinsured. It is conceded by reinsurers that the clause prohibits avoidance on the grounds of innocent non-disclosure and innocent misrepresentation. At the other end of the spectrum, there are in fact no allegations of fraud against HIH or its agents. (For the record, I hold that it is not open to a party to exclude liability for his own fraud in inducing the contract: see S Pearson & Son Ltd. v. Dublin Corp. [1907] AC 351. I have also been asked to confirm that Clause 8 has no effect in the face of an allegation of illegality, for instance the newly pleaded case of wagering. I do so confirm, although illegality in relation to arrangements with Flashpoint might be a different matter.)

Copr. © West 2004 No Claim to Orig. Govt. Works

Westlaw.

2000 WL 33148819                                                                Page 13
2000 WL 33148819 (QBD (Comm Ct)), [2001] C.L.C. 481, [2001] 1 Lloyd's Rep. 378
**(Publication page references are not available for this document.)**

**53.** There have been two recent decisions in which similar issues arose. In Toomey v. Eagle Star Ins. Co. Ltd (No.2). [1995] 2 Lloyd's Rep. 88 , the relevant clause read: *This contract is neither cancellable nor voidable by either party*. Having directed himself on the principles of construction to be derived from Canada SS.Lines Ltd v. The King [1952] AC 192, Colman J. concluded that the clause did not exclude avoidance for negligent non-disclosure or misrepresentation primarily because there was no exclusion of a remedy in damages.

**54.** In HIH Casualty and General Ins. Ltd v. Chase Manhattan Bank [2000] All ER (D) 1120, there was an elaborate clause, the most pertinent section of which read: *the Insured will not have any duty or obligation to make any representation, warranty or disclosure of any nature, express or implied (such duty and obligation being expressly waived by the insurers) and shall have no liability of any nature to the insurers for information provided by any other parties and any such information provided by or non-disclosure by other parties ... shall not be a ground or grounds for avoidance of the insurers' obligations under the policy or the cancellation thereof.*

**55.** Aikens J. took the view that, since the pre-contractual duties of nondisclosure and misrepresentation that arise in the insurance context are unitary and absolute, there being no need to establish negligence and only the remedy being by way of avoidance, the Canada Steamship case was not directly applicable. Nonetheless he decided the exclusion covered neither

deliberate concealment nor negligence. Particular emphasis was placed in this context on clear wording in another clause that expressly excluded an indemnity for loss arising from "*any fraud, misrepresentation or concealment by the Insured.*"

**56.** Each such exclusion must be considered in the light of its own terms and its own context. I do not believe that the issue is much advanced by considering the application or otherwise of the Canada Steamshipcase. I accept that it is necessary to discern a clear intention to exclude the consequences of a breach of a duty of good faith. In the present case, no point arises as to the extent to which the remedies for deliberate concealment or misstatement is excluded. However, I have concluded that the parties did intend to exclude the consequences of inadvertent concealment or misrepresentation whether careless or not. My reasons are:

i. The insurer expressly forgoes rights of avoidance, rejection of any claim or any remedy for non-disclosure or misrepresentation.

ii. The obligations of good faith are indeed unitary and absolute: the establishment of a negligent misstatement adds nothing: the very concept of a negligent non-disclosure is not easy to grasp.

iii. There is no indication in the rest of the policy wording that the parties were minded to distinguish between deliberate, careless and accidental activity.

iv. The introductory words "to the fullest extent permissible by applicable law" on their natural meaning accord the widest possible scope to the exclusion. I reject the submission that it means no more than: "Avoidance for innocent misrepresentation or non-disclosure is not permitted, unless the

Copr. © West 2004 No Claim to Orig. Govt. Works

Westlaw.

2000 WL 33148819                                                    Page 14
2000 WL 33148819 (QBD (Comm Ct)), [2001] C.L.C. 481, [2001] 1 Lloyd's Rep. 378
**(Publication page references are not available for this document.)**

law prohibits such an exclusion".

 **Conclusion**

  I am extremely grateful to all counsel for
their detailed oral and written submissions. I
shall need their further assistance in
formulating the answers to the Preliminary
Issues in the light of this judgment.

                Crown Copyright.

END OF DOCUMENT

Copr. ©  West 2004 No Claim to Orig. Govt. Works

# Exhibit B

B.      Copy of Opinion in *HIH Casualty and General Ins. Co. v. New Hampshire Ins. Co.,* 2001 Lloyd's Rep. IR 596 (Court of Appeal, Civil Division, May 21, 2001) (Rix, LJ.).

Westlaw.

2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

**\*161** HIH Casualty and General Insurance Ltd. v. New Hampshire Insurance Co. and Others

Court of Appeal

CA
Feb. 13, 14, 15; May 21, 2001; May 21, 2001

Before Lord Justice Peter Gibson, Lord Justice Mummery and Lord Justice Rix

Reinsurance - Indemnity - Warranty - Allegations of breach - Reinsurers denied liability - Whether reinsurers correctly identified terms in underlying insurance contracts as warranties - Effect of "Disclosure and/or Waiver of rights" clause in underlying insurance contract - Whether clause incorporated into reinsurance contracts - Effect of clause in reinsurance contracts.

The claimants (HIH) had underwritten two film finance insurance policies concerning two separate groups of films: one with regard to a number of films to be co-produced by 7.23 Productions LLC and Flashpoint Ltd. (the "7.23 slate"); the other with regard to a number of films to be co-produced by Rojak Films Inc. and Flashpoint Ltd. (the "Rojak slate"). The insured was Law Debenture Trust (LDT). The insurance was a pecuniary loss indemnity insurance and was to indemnify LDT if at the end of a defined period there was a shortfall between the amount of finance provided and the revenue collected.

The pecuniary loss indemnity policy in respect of the 7.23 Productions, dated Aug. 22, 1997, contained various terms including the following:

Clause 8 Disclosure and/or Waiver Of Rights

8.1 To the fullest extent permissible by applicable law, the Insurer hereby agrees that it will not seek to or be entitled to avoid or rescind this Policy or reject any claim hereunder or be entitled to seek any remedy or redress on the grounds of invalidity or unenforceability of any of its arrangements with Flashpoint Ltd. or any other person (or of any arrangements between Flashpoint Ltd. or the Purchaser) or non-disclosure or misrepresentation by any person or any other similar grounds. The Insurer irrevocably agrees not to assert and waives any and all defences and rights of set-off and/or counterclaim (including without limitation any such rights acquired by assignment or otherwise) which it may have against the Assured or which may be available so as to deny payment of any amount due hereunder in accordance with the express terms hereof.

The slip policy in respect of the Rojak Films Inc. was in broadly similar terms to that in respect of 7.23 Productions.

HIH reinsured its liability under both policies. Axa Reassurance S.A. (Axa) and New Hampshire Insurance Co. Ltd. were reinsurers in respect of both policies and Independent Insurance Co. Ltd. were reinsurers in respect of the 7.23 policy only.

HIH having paid LDT sums totalling over

[2001] 2 Lloyd's Rep. 161                                                                 Page 2
2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

U.S.$31 m. sought to recover under the reinsurance agreements. The reinsurers refused to indemnify HIH on the grounds that HIH should not have paid LDT or alternatively that, whatever the position under the insurance contract they were not obliged to pay under the reinsurance contracts for various reasons including breaches of warranty and breaches of the duty of good faith.

The reinsurers contended that the underlying insurance contained a warranty to the effect that a slate of six or 10 films respectively would be made and that the reinsurance contained such a warranty and a further warranty that the insurers would obtain the consent of reinsurers to any amendment to the terms of the underlying insurance.

The claimants submitted that cl. 8 of the policy wording disabled them from relying on any breach of warranty by the original assured and that as cl. 8 was a term of the reinsurance it precluded the reinsurers from relying on any breach of warranty and further precluded the insurers from relying upon any mispresentation or non-disclosure unless the same was fraudulent.

The following preliminary issues were ordered to be determined:

  1 Are the terms (of both the insurance contracts and reinsurance contracts) alleged by the Reinsurers to have been warranties in fact such?

  2 What is the effect of Clause 8 of the underlying insurance contract? In particular does it mean that the facts and matters alleged in the defences (if true) would not have provided the Claimant

Insurer/Reinsured with a defence (whether in whole or in part) to the underlying Insured's claim?

  3 On the assumption that the Reinsurers' underwriters were aware that the underlying policy wording contained Clause 8, was Clause 8 a term of the reinsurance contract? Is the answer different if the underwriters were not so aware?

  4 What is the effect of Clause 8 in the context of the reinsurance contracts? In particular does it mean that:

  i The facts and matters alleged in the defences and counterclaims (if true) do not provide the Defendant Reinsurers with a (complete or partial) defence (including by way of set-off) to the Claimants Insurers/Reinsured's claim; and/or

  ii the Defendant's Reinsurers do not (or did not) have the right to avoid the reinsurance contract on grounds of misrepresentation or non-disclosure (assuming they otherwise have or had such a right) irrespective of whether or not the relevant misrepresentation or non-disclosure was negligent or fraudulent as opposed to innocent.

  Held, by Q.B. (Com. Ct.) (DAVID STEEL, J.), that

  (1) the underlying policy was contained in the slip policy subject to the terms and conditions contained in the policy wording dated Aug. 22; it was a term of the policy that a full slate would be made and that term was a warranty; and the reinsurance contracts contained the same warranty;

  **\*162** (2) the only commercially realistic construction of the amendment clause involved excluding from its application immaterial amendments i.e. changes which did not affect the sense or substance of the

Copr. © West 2004 No Claim to Orig. Govt. Works

Westlaw.

2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

underlying policy in a manner potentially prejudicial to the reinsurer; if this was right it would be right to categorize the amendment clause as a warranty;

(3) the concluding phrase of cl. 8 "so as to deny payment of any amount due hereunder in accordance with the express terms hereof" made it plain that waiver was in respect of defences akin to rights of set-off or counter-claim; it was the very antipathy of a waiver of coverage defences where by definition an amount was not due to be paid;

(4) the submission that breach of warranty fell within "any other similar grounds" in cl. 8 would be rejected; it was not similar to "invalidity or unenforceability" of the arrangements with Flashpoint; nor was it similar to "non-disclosure or misrepresentations"; the effect of a breach of warranty was to discharge the insurer from liability; non-disclosure or misrepresentation gave rise, consistent with the terms of the clause to rights of avoidance, rescission and rejection;

(5) on its proper construction the reference in the reinsurance slips to "Cancellation Clause as Original Policy" referred to cl. 8; and the clause was thereby incorporated in the reinsurance contracts;

(6) even if the condition in the slip referring to the cancellation clause was not thereby making a reference to cl. 8 or even if it was, such was not sufficient in itself to incorporate that clause, but it was fair nonetheless to all the reinsurers to treat the clause as incorporated by the general words;

(7) the effect of cl. 8 was not solely to agree to follow settlements made by HIH where otherwise HIH would have had a defence;

(8) it was necessary to discern a clear intention to exclude the consequences of a breach of duty of good faith; the parties did intend to exclude the consequences of inadvertent concealment or misrepresentation whether careless or not.

HIH appealed and the reinsurers cross-appealed the issues for decision being: (i) whether it was a term of the original slip policy that six films (or in the case of the Rojak slate 10 films) would be completed; (ii) whether the six film term was a term of the policy wording; (iii) whether the policy wording superseded the original slip policy; (iv) whether the six film term was a term of the reinsurance slip policy; (v) if a term of any of the insurances whether the six film term was a warranty; (vi) whether the term in the reinsurance slip policy that HIH agreed to consult and obtain reinsurers' agreement to all amendments was a warranty; (vii) whether cl. 8 covered and excluded breach of warranty defences; (viii) whether cl. 8 covered and excluded negligent misrepresentation and non-disclosure; (ix) whether cl. 8 was specifically incorporated into the reinsurance contracts by reason of the term therein "Cancellation clause as Original Policy"; (x) if there was no specific incorporation of cl. 8 whether it was incorporated into the reinsurance contracts by reason of general words of incorporation; (xi) for these purposes whether it made any difference whether cl. 8 was an unusual term; whether it was an unusual term; whether incorporation of such a term was fair; (xii) for these purposes whether it made any difference whether a reinsurer was aware of cl. 8; (xiii) if cl. 8 was incorporated into any reinsurance contract, what was its effect there? (xiv) whether the six film term was a term of the original slip policy.

Copr. © West 2004 No Claim to Orig. Govt. Works

Westlaw.

2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

Held, by C.A. (PETER GIBSON, MUMMERY and RIX, L.JJ.), that

(1) the slip policy stated against the word "INTEREST" that "7.23 Productions will produce and make six made-for-TV films"; having regard to the need for the revenues of each film to cross-collateralize with the revenues of each other film there could be no doubt that it was a term of the insurance that the stipulated number of films would be made; and the original slip policy contained a term that six films would be produced and made (see p. 175, cols. 1 and 2);

(2) the making of the films was inherent in talk of their failure to generate revenues; unless made they could not be revenue generating and it was their failure to generate revenue which was at the heart of the risk underwritten; "the failure of the Projects to generate a balance. . ." meant or necessarily implied that there would be six films to generate a balance whose failure to do so in sufficient quantities would produce an insured loss; an insured loss could only occur if the "projects" had failed to generate sufficient funds in the relevant account (see p. 176, col. 1);

(3) it was not necessary to decide the issue whether the slip policy was superseded by the policy wording but it appeared it was not; the policy wording itself could be and ought to be construed against the background of the original slip policy; that produced the result both that there was no reason to think that the term "7.23 Productions will produce and make six made-for-TV films" ever ceased to be a term of the insurance, and that in any event the policy wording's construction was further strengthened by reference to the wording of the original slip policy (see p. 181, cols. 1 and 2);

(4) the six film term was a term of the reinsurance policy (see p. 181, col. 2);

(5) once the six film term was established as a term of the insurance or reinsurance contract, the grounds for holding it to be a warranty were very strong; it was a question of construction and the presence or absence of the word "warranty" or "warranted" was not conclusive; the six film term was a term which went to the root of the transaction; it was descriptive of or bore materially on the risk of loss; and damages would be an unsatisfactory or inadequate remedy; and once the six film term was seen as being a term of the insurance, whether set out as it was in the original slip policy or derived from the construction of the policy wording, it was immediately clear that it was the essence of the risk underwritten; if the slate of (six) films was made with the moneys invested the insurers would indemnify the investors against the loss (see p. 182, cols. 1 and 2);

(6) the term of the reinsurance policy that HIH agreed to consult and obtain the reinsurers' agreement to all amendments was a warranty (see p. 182, col. 2; p. 183, cols. 1 and 2);

**\*163** (7) the learned Judge was right to reject the submission that cl. 8 contained a defence to breaches of warranty (see p. 184, col. 1; p. 185, col. 2);

(8) cl. 8 covered and thus excluded a defence based on negligent misrepresentation and non-disclosure; the language of the clause was very wide; its opening words were words of saving but they emphasized that the language of the clause was intended to be read as widely as it properly could be; and there was no reason why the words "any claim. . .any remedy or

Copr. © West 2004 No Claim to Orig. Govt. Works

Westlaw.

[2001] 2 Lloyd's Rep. 161                                                      Page 5
2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
(Cite as: [2001] 2 Lloyd's Rep. 161)

redress on the grounds of. . .non-disclosure or misrepresentation. . .or any similar ground" did not embrace a claim based on negligent non-disclosure or s. 2 of the Misrepresentation Act, 1967 (see p. 188, col. 1);

(9) it would be wrong to find in the term "Cancellation Clause as Original Policy" a specific reference to cl. 8; and the reference to a "cancellation clause" simply failed to have content; if that was wrong and the reference was to cl. 8 then cl. 8 would have been incorporated into the reinsurance contracts (see p. 189, cols. 1 and 2; p. 190, col. 1);

(10) on the assumption that the insurances were intended and reinsurance contracts were intended to be back to back and that the set up was akin to a fronting arrangement cl. 8 could not be incorporated in manipulated form into the reinsurance contracts; it did not make sense, could not be successfully manipulated and even if it could be could have an effect contrary to the reason of the thing; the incorporation of cl. 8 in unmanipulated form would make sense and would be apposite; cl. 8 was germane to the reinsurance; in its unmanipulated form it was a form of "follow the settlement" clause and nothing could be more germane to a reinsurance than a form of follow the settlement clause; cl. 8 was not a collateral clause; and cl. 8 was not to be regarded as incorporated into the reinsurance contracts in its manipulated form but could properly be regarded as incorporated in its unmanipulated form (see p. 193, cols. 1 and 2; p. 194, cols. 1 and 2; p. 195, cols. 1 and 2);

(11) on the evidence the learned Judge was perfectly entitled to find that clauses such as cl. 8 were sometimes agreed particularly when supported by a collateral agreement even though not standard or customary; the clause was not unconscionable or extortionate and the clause was unusual but something which the market would recognize; the terms of the reinsurance slip policy that the reinsurance was subject to all the terms as original together with the invitation to consult the information held on the brokers file collectively placed on the reinsurers the burden of showing that cl. 8 was not incorporated or that the proposal was unfairly presented (see p. 198, col. 1; p. 200, col. 1);

(12) if a reinsurer was actually or constructively aware of cl. 8 then plainly it could not be said that it had not had sufficient notice of it; if however cl. 8 could only become part of the reinsurance contract if the reinsurer had actually agreed to it then it would be necessary to show that the clause had been actually agreed and not merely that sufficient notice of it had been given (see p. 200, col. 1);

(13) the effect of cl. 8's incorporation into the reinsurance contracts was to bind the reinsurers to pay, despite any non-disclosure or misrepresentation cov- ered by the clause in circumstances where the non-disclosure or misrepresentation in question was the same at each level of the placement (see p. 201, col. 1).

The following cases were referred to in the judgment of Lord Justice Rix:

American Airlines Inc. v. Hope, (H.L.) [1974] 2 Lloyd's Rep. 301;

Aughton Ltd. v. M. F. Kent Service Ltd., [1991] 31 Con.L.R. 60;

Copr. © West 2004 No Claim to Orig. Govt. Works

Westlaw.

2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

Bank of Nova Scotia v. Hellenic Mutual War Risks Association (Bermuda) Ltd. (The Good Luck), (H.L.) [1991] 2 Lloyd's Rep. 191; [1992] 1 A.C. 233;

Banque Keyser Ullmann S.A. v. Skandia (UK) Insurance Co. Ltd., (H.L.) [1990] 2 Lloyd's Rep. 377; [1991] 2 A.C. 249;

Barnard v. Faber, [1893] 1 Q.B. 340;

CNA International Insurance Co. Ltd. v. Companhia de Seguros Tranquillidade S.A., [1999] C.L.C. 140;

Caledonia (E.E.) Ltd. v. Orbit Valve Co., [1994] 2 Lloyd's Rep. 239; [1994] 1 W.L.R. 1515;

Canada Steamship Lines Ltd. v. The King, (P.C.) [1952] 1 Lloyd's Rep. 1; [1952] A.C. 192;

Charlesworth v. Faber, (1900) 5 Com. Cas. 508;

Citadel Insurance Co. v. Atlantic Union Insurance Co. S.A., (C.A.) [1982] 2 Lloyd's Rep. 543;

Ellinger & Co. v. Mutual Life Insurance Co. of New York, [1905] 1 K.B. 31;

Excess Insurance Co. Ltd. v. Mander, [1997] 2 Lloyd's Rep. 119;

Forsikringsaktieselskapet Vesta v. Butcher, (H.L.) [1989] 1 Lloyd's Rep. 331; [1989] A.C. 852;

Gan Insurance Co. Ltd. v. Tai Ping

Insurance Co. Ltd., [1999] Lloyd's Rep. IR 472;

Groupama Navigation et Transports v. Catatumbo C.A. Seguros, [2000] 2 Lloyd's Rep. 350;

HIH Casualty and General Insurance Ltd. v. Chase Manhattan Bank, [2001] 1 Lloyd's Rep. 30;

Hill v. Mercantile and General Reinsurance Co. Plc. , (H.L.) [1996] L.R.L.R. 341; [1996] 1 W.L.R. 1239;

Holme v. Brunskill, (1877) 3 Q.B.D. 495;

Insurance Co. of Africa v. Scor (UK) Reinsurance Co. Ltd., [1985] 1 Lloyd's Rep. 312;

Interfoto Picture Library Ltd. v. Stiletto Visual Programmes Ltd., (C.A.) [1989] Q.B. 433;

Ionides v. Pacific Fire & Marine, (1872) L.R. 7 Q.B. 517; (1871) L.R. 6 Q.B. 674;

Lower Rhine and Wurtemberg Insurance Association v. Sedgwick, (1899) 1 Q.B. 179;

**\*164** Marten v. The Nippon Sea and Land Insurance Co. , (1898) 3 Com. Cas. 164;

Mann and Holt v. Lexington Insurance Co., (C.A.) [2001] 1 Lloyd's Rep. 1;

Miramar Maritime Corporation v. Holborn Oil Trading Ltd. (The Miramar), (H.L.) [1984] 2 Lloyd's Rep. 129; [1984] A.C. 676;

New Hampshire Insurance Co. v. MGN

Westlaw.

2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

Ltd., [1997] 1 L.R.L.R. 24;

Norwich Union Fire Insurance Society v. Colonial Mutual Fire Insurance Co. Ltd., (1922) 12 Ll.L.Rep. 215 ; [1922] 2 K.B. 461;

Pan Atlantic Insurance Co. Ltd. v. Pine Top Insurance Co., (C.A.) [1993] 1 Lloyd's Rep. 496;

Pearson (S.) & Son Ltd. v. Dublin Corporation , (H.L.) [1907] A.C. 351;

Pine Top Insurance Co. v. Unione Italiana Anglo-Saxon Reinsurance Co., [1987] 1 Lloyd's Rep. 476;

Punjab National Bank v. de Boinville, (C.A.) [1992] 1 Lloyd's Rep. 7; [1992] 1 W.L.R. 1138; [1992] 1 Lloyd's Rep. 7;

St. Paul Fire & Marine Insurance Co. (UK) Ltd. v. McConnell Dowell Constructors Ltd., (C.A.) [1995] 2 Lloyd's Rep. 116; [1993] 2 Lloyd's Rep. 503;

State Trading Corporation of India Ltd. v. M. Golodetz Ltd., (C.A.) [1989] 2 Lloyd's Rep. 277;

Svenska Handelsbanken v. Sun Alliance and London Insurance plc., [1996] 1 Lloyd's Rep. 519;

Thomas (T.W.) & Co. Ltd. v. Portsea Shipping Co. Ltd., (H.L.) [1912] A.C. 1;

Thompson v. Adams, (1889) 23 Q.B.D. 361;

Toomey v. Eagle Star Insurance Co. Ltd.

(No. 2) , [1995] 2 Lloyd's Rep. 88;

Tor Line A.B. v. Alltrans Group of Canada Ltd., (H.L.) [1984] 1 Lloyd's Rep. 123; [1984] 1 W.L.R. 48;

Xenos v. Wickham, (1867) L.R. 2 H.L. 296;

Youell v. Bland Welch & Co. Ltd., (C.A.) [1992] 2 Lloyd's Rep. 127; [1990] 2 Lloyd's Rep. 423.

This was an appeal and a cross-appeal by the claimant HIH Casualty and General Insurance Ltd. and the defendants New Hampshire Insurance Co., Independent Insurance Co. and Axa Reassurance S.A. from the judgment of Mr. Justice David Steel [2001] 1 Lloyd's Rep. 378) on the issue as to whether the claimant was entitled to claim an indemnity under the reinsurance policies issued by the defendants in respect of claims paid by the claimants to their insured.

**Representation**

Mr. Julian Flaux, Q.C. and Mr. Simon Picken (instructed by Messrs. Holman Fenwick & Willan) for the claimants; Mr. Christopher Hancock, Q.C. and Ms. Sara Masters (instructed by Messrs. Kennedys) for New Hampshire; Mr. Stephen Ruttle, Q.C. and Mr. Tom Adam (instructed by Messrs. Davies Lavery) for Independent; Mr. Peter Gross, Q.C. , Mr. Philip Edey and Mr. Michael Collett (instructed by Messrs. D. J. Freeman) for Axa.

The further facts are stated in the judgment of Lord Justice Rix.

Copr. © West 2004 No Claim to Orig. Govt. Works

2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

Judgment was reserved.

Monday May 21, 2001

**JUDGMENT**

Lord Justice RIX:

*Introduction*

1. Film production is a risky business. Just how risky was something that the parties to this appeal, insurer and reinsurers of two slates of "made for TV" films, discovered to their cost. The insurer HIH Casualty & General Insurance Ltd. ("HIH"), has paid over U.S.$31 m. to the investors in these films, and seeks recovery against three of the reinsurers concerned, Axa, Independent and New Hampshire, who say, however, that they are not liable.

2. The insurance concerned is of a somewhat novel kind. It is of a class called "pecuniary loss indemnity" insurance. In essence it provides collateral for film finance. The peril insured is the risk that revenues from the films concerned will fail to reach the sum insured within a certain period. The sum insured is premised on the costs of production. The insurance is designed to enable the investors whose finance supports the production of the films to recoup their investment. Either they are paid from the films' revenues, or from the insurance, or from a combination of the two. If the films are successful, the insurer is not called upon to make any payment. If the films earn nothing whatsoever, the insurer is liable to pay the whole sum insured. If the films earn something but not enough, the

insurer makes up the difference, up to the sum insured. The account is struck at a fixed date. The insurer may, however, manage to recoup more or less of its loss either from later earnings of the films, or from other protection or collateral for which he stipulates and upon which he may have either a direct or a subrogated claim.

3. It appears that this kind of insurance has proliferated in recent years, and that there are **\*165** potentially many cases which may, in some respect or other, be guided by this appeal. Apart from the judgment under appeal, which is that of Mr. Justice David Steel ([2001] 1 Lloyd's Rep. 387), there has been only one other decision in this field, and that is HIH Casualty and General Insurance Ltd. v. Chase Manhattan Bank, [2001] 1 Lloyd's Rep. 30. There is, however, very little overlap between the two cases.

4. If this kind of insurance is novel, at any rate to the English Courts, it bears some resemblance to commercial mortgage indemnity insurance, under which a lender of an advance secured on a mortgage insures against the risk that, following a default by the borrower, the security will not repay the principal of the advance, interest and associated costs. The point of resemblance is that the insurer is not insuring against damage or liability but against the risk that the insured's investment will not be repaid. There are, however, important differences. In commercial mortgage indemnity insurance, the property concerned is usually built and let, and its investment value can, subject of course to market fluctuations, be assessed, as can the credit-worthiness of the borrower. The insurer can therefore evaluate whether the loan is likely to be repaid, and it

Copr. © West 2004 No Claim to Orig. Govt. Works

[2001] 2 Lloyd's Rep. 161                                                      Page 9
2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

is only if the borrower defaults that the insurer can be called upon to pay at all. In what I shall film finance insurance, however, the insurer's gamble is much purer. The films are not yet made, their earning potential is peculiarly difficult to evaluate and might remain so even when they have been made, and the insurer must pay, whatever the credit-worthiness of the borrower, unless the films quickly earn revenues which at least match the sum insured.

5. In the circumstances, the premiums charged in the present case at any rate, are a significant percentage of the sum insured, namely 10 per cent. HIH was also promised, as part of its premium, 7.5 per cent. of revenues above the sum insured. Somewhat paradoxically, if an insured loss would have been avoided, then HIH would have earned a larger premium. This interest in the films' profits was called a "Back End". Thus, HIH as insurer was in a very real sense a form of joint venturer in the project. On the downside, this sense of joint ventureship can be seen in the fact that the cost of the premium itself played a significant role in the make-up of the sum insured. One example will suffice: in the case of one of the slates of films whose production finance was insured, which I shall call "the 7.23 slate" by reference to its producer, 7.23 Productions LLC ("7.23 Productions"), the total sum insured was U.S.$16.4 m., of which the films' budgets amounted to only U.S.$10.9 m., and the balance was made up of "interest/fees" of U.S.$3.86 m. and the insurance premium of U.S. $1.64 m.

6. Such insurance may be said to play a useful role in facilitating film finance and thus in the creativity and productivity of the film industry. But the danger for insurers is that they, albeit relative outsiders to the industry, are undertaking the fundamental risk of the costs of production. In such circumstances, what precautions do they take to ensure what may be called due diligence on the part of the insured financers? What constitutes a fair presentation of such risks? And what warranties or exceptions do they require for undertaking the risk?

7. I pose these questions, but can barely provide an answer, for this appeal arises on preliminary issues as to the construction of the insurance and reinsurance policies involved, without a trial in which the facts of the case have been investigated. For the purpose of the trial of the preliminary issues below before Mr. Justice David Steel, it was simply assumed that the facts were as stated in the reinsurers' defences. There was no live evidence before the Judge, nor any witness statements. There were reports from two experts, but they were not called for cross-examination, and, to the extent that it was relevant to his decisions, the Judge had to evaluate their opinions without further assistance. The placing documents (but I am not sure they are complete) were before the Judge, as they are again on appeal before this Court, but they were barely referred to by the Judge, and have been invoked by Counsel on appeal only sporadically. There are no agreed facts. There is no agreed chronology. The assumed facts to be taken from the reinsurers' defences have been nowhere summarized. In effect, the exercise of construction upon which the Judge was asked to embark exists in a sort of no man's land, in which now and again, some feature

2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

looms out of the mist. For instance, the Judge referred to, and in this Court we were taken to, a collateral agreement, made between HIH and a company called Flashpoint Ltd., which was designed to provide HIH with protection to support its insurance. Quite what its provisions amount to, however, could well be the subject of debate, but are not for decision here.

8. In the circumstances, apart from the insurance and reinsurance policies themselves, which exist as items for construction, there is, I think, nothing which can be regarded as a matter of fact, securely found. Any factual matter referred to has a sort of provisional quality. It is possible to say that a document of some sort exists and states such and such a thing, but it is impossible to affirm with any confidence that what is said in any single document is a secure foundation for some conclusion.

**\*166** 9. I make these comments at the outset because I feel some disquiet about conducting the exercise of construction which this Court, as the Judge below, has been asked to perform, without a clear understanding of the factual matrix of these novel arrangements. Insurance and reinsurance provisions are so often dealt with in such brief language, that their construction divorced from a firm understanding of their context can be a dangerous process. There is also, for instance, a question of fairness in the incorporation of a term which, as will be seen, has to be addressed, which I feel unhappy to decide, as it were, in the abstract.

10. I wish to say nothing to discourage the

identification of preliminary issues for decision, which can perform a very useful function. In recent years, the previous climate of coolness or even hostility to the setting of preliminary issues has warmed considerably, and I believe that has been helpful to the litigants involved. I remain concerned, however, that in this case the Judge and his Court have been set an unusually academic examination paper, and in a sub-category of subject which cannot be said to be familiar territory. That said, the paper must be answered, wherever possible, as best as can be done, and the problems of context must be sought to be overcome where possible in a way which is fair and reflects the manner in which the parties have approached this litigation.

*The issues on appeal*

11. It is difficult to introduce the issues which were argued on the appeal (by HIH) and the cross-appeal (by the reinsurers) in any really meaningful way without setting out a good deal of further information. In brief, however, all the issues decided by Mr. Justice David Steel at first instance are challenged on appeal. Those issues raise questions of construction which in most cases arise from the structure of the insurance and reinsurance itself. Thus, where an insurance contract is to be found in a "slip policy" which looks forward to "policy wording" and that wording emerges in the form of a "policy", does that policy supersede the slip entirely? Or are the two documents to be read together? Where read together or separately, does a term exist that a certain number of films are to be produced, and if so, is that term a warranty? Where the reinsurance contract is to be

Westlaw.

[2001] 2 Lloyd's Rep. 161                                                                          Page 11
2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

found in a slip which incorporates the underlying insurance, are the reinsurers bound by the original wording of the underlying insurance, as found in the slip policy, or by the amended wording of the underlying insurance, as found in the policy wording? For these purposes, is a term in the reinsurance contract, that the reinsured (i.e. the original insurer) will obtain the reinsurers' agreement to all amendments to the original insurance, a warranty? Are the reinsurers bound by the policy wording whether or not they were aware of it or agreed to it? Does it matter for these purposes whether a particular term in the policy wording can be described as an unusual term? Where does the question of the fairness of the incorporation of an unusual term meet with the question of a fair presentation in the insurance context? Where the underlying insurance contract contains a special term which prevents the original insurer from relying on a defence of non-disclosure or misrepresentation, how does that affect the reinsurers? Can such a term be incorporated in the reinsurance contract? If so, what is its effect there: to prevent the reinsurers from complaining, for follow the settlement purposes, about the payment of a claim despite non-disclosure or misrepresentation in the placement of the original insurance? Or to operate separately as between reinsurers and reinsured at the level of the reinsurance contract? And how in any event is that special term to be construed? Does it prevent reliance on misrepresentation or non-disclosure even where there has been negligence? Does it even extend to excuse any complaint and waive any defence whatsoever?

*The structure of the transaction*

12. I have already introduced HIH as the insurer and Axa, New Hampshire and Independent as among the reinsurers of the finance investment in the two slates of films. The other reinsurers are not involved in this litigation. The assured in both cases is Law Debenture Trust Corporation (Channel Islands) Ltd. ("LDT", or "the assured"), who as trustee under trust deeds in respect of the instruments which generated and evidenced the finance in question is the ultimate representative of the investors concerned.

13. The chain between LDT and the actual producers of the films is a complex one. Its details may not matter, but, briefly, the position appears to be as follows. As I have stated, one slate of films, the 7.23 slate, was to be produced by 7.23 Productions and the other slate of films ("the Rojak slate") was to be produced by Rojak Inc. ("Rojak"). Each of those production companies obtained its finance from a Jersey company called Flashpoint Ltd. ("Flashpoint"), to which I have already referred above in connection with the collateral agreement between it and HIH. The finance was provided under co-production/finance agreements. Flashpoint appears to have performed a somewhat polymorphous role, about which I shall say something further below. As a provider of finance it was only in an intermediate position, for it obtained its finance in turn from two funding vehicles called Hollywood Funding Ltd. (in the case of the 7.23 slate) and Hollywood Funding (No. 2) Ltd. (in the **\*167** case of the Rojak slate): I shall call those companies HFL, for I have no need to distinguish between them. HFL in turn represented the various investors, who were presumably

Copr. © West 2004 No Claim to Orig. Govt. Works

Westlaw.

2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

shareholders. The relationship between HLF and Flashpoint was governed in the case of each slate by a purchase agreement, under which in return for finance Flashpoint undertook to pay over the revenues of the films up to a cap.

14. Part of the collateral security required by the investors whose corporate vehicle was HFL was the pecuniary loss indemnity insurance in question. Under each of the purchase agreements payment by HFL to Flashpoint of the finance was subject to the condition precedent of the procurement by Flashpoint of a "policy" underwritten by HIH in favour of LDT as assured: the "policy" was scheduled to the purchase agreement in question.

15. I have remarked above that Flashpoint played a polymorphous role. Vis-à-vis the production companies, it was a financer and co-producer. Vis-à-vis HFL, it was obliged to procure the underlying insurance in favour of LDT as a condition of obtaining finance to pass on to the production companies. Vis-à-vis HIH, it was both the effective principal of the placing broker and as such the source of the information presented to HIH for the purpose of the underwriting process, and also a managing agent in relation to the working out of the insurance and the exploitation of the films. Its obligations to HIH were governed by the collateral agreements to which I have referred above, and to which I will revert below. Those agreements represented a form of collateral security, to the extent that Flashpoint could be relied on to meet its obligations, which HIH obtained in support of the risks undertaken by it in its underwriting of the insurances concerned.

16. The placing broker used by Flashpoint was Lloyd Thompson Ltd. ("Lloyd Thompson"). They made the presentations both to HIH and to the reinsurers. The placing was essentially a single operation, but, in the case of the reinsurance, it may be said that Lloyd Thompson was acting on behalf of HIH. That is how the matter is pleaded by Axa and Independent, and thus must be assumed to be so for present purposes.

*The insurances and their placement*

17. There are two sets of three documents whose construction is in issue in these appeals. For present purposes it will be sufficient to consider one set (that in connection with 7.23 slate) alone. The three documents are (a) an insurance slip, headed "Slip Policy"; (b) a reinsurance slip headed "Quota Share Reinsurance Slip Policy"; and (c) a policy document headed "Pecuniary Loss Indemnity Pol- icy". There is a dispute about the status of the third document: does it entirely supersede the insurance slip, or is it to be read together with the insurance slip? Because the insurance slip is itself called a policy ("slip policy"), I will for convenience call the third document the "policy wording". I do so entirely without prejudice to the issue which I have just indicated: it may be that the policy wording is not only a policy in its own right, but the *only* policy where the underlying insurance is to be found. However I use the expression "policy wording" not only for convenience of exposition, but also because the slip policy contemplates the creation of such wording in its provision - "CONDITIONS: As per Pecuniary Loss Indemnity wording tba [to

Westlaw.

2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

be agreed] L/U [Leading Underwriter] only". The policy wording is in the same form as the "policy" scheduled to the purchase agreements.

18. Thus I will refer to the three insurance documents as the (original) slip policy, the reinsurance slip policy, and the policy wording respectively.

19. HIH underwrote 100 per cent. of both original insurances. It did so subject to reinsurance for 80 per cent. which was achieved. Thus it was not willing to insure unless it obtained reinsurance for 80 per cent. of its risk. It is submitted by HIH that because the investors wanted a policy with one insurer, the insurance was structured as 100 per cent. insurance by HIH who "fronted" for the other companies who participated by way of lines on the 80 per cent. quota share reinsurance. The "fronting" analogy is disputed by the reinsurers.

20. A word about chronology is apposite. The first of the three insurance documents in existence as a binding contract (or potentially binding contract) was not the original slip policy, but the reinsurance slip policy. Thus New Hampshire (by its agents AIG Europe (UK) Ltd. ("AIG")) put down its stamp subscribing to 35 per cent. of the reinsurance (itself "subject to r/i") on July 22, 1997. Next to subscribe was Axa, on July 25, for 30 per cent. of the 80 per cent. Independent subscribed on July 29, for 12.5 per cent. All three dates preceded the original slip policy, which was not stamped by HIH until Aug. 13. It is not unknown for reinsurance to precede insurance, especially where the former is vital to the latter.

21. The policy wording is dated Aug. 22, 1997, which is the same date as the purchase agreement. The date is entered in typescript just beneath the heading of the document. HIH's signature is not itself dated, but lies beneath the typed words "This Policy has been issued in London on the date stated at the beginning." An earlier draft of the policy wording had previously been endorsed on behalf of **\*168** New Hampshire and Axa on July 30, with the words "Agreed subject to L/W [Line Written]. Side agreement [to be] agreed". I assume, but it is only an assumption, that the "side agreement" was the collateral agreement which was due to be entered into between HIH and Flashpoint. Thus the original slip policy refers under "INFORMATION (Not to appear on the Policy)" inter alia to "See 'Side Agreement' agreed by L/U only". It is to be inferred therefore that a contemporary draft of the collateral agreement was in existence or about to be brought into existence, and was due to be shown to New Hampshire and Axa.

22. There is no similar version of the draft policy wording which was endorsed by Independent. Therefore Independent pleads that it was never shown, did not endorse, and was unaware of the terms of the policy wording. For present purposes, that must be assumed to be true.

23. I would in general be prepared to infer that contemporary drafts of the original slip policy, as well as of the collateral agreement, were available to be seen by the reinsurers. However, I cannot be sure that such contemporary drafts were in the same terms as the ultimate form of those documents; nor, in the light of the important

Westlaw.

plea by Independent that it was not shown the draft policy wording, can I be sure that such drafts were seen by all the reinsurers. It is impossible to make findings of fact about such matters.

24. The collateral agreement (for the 7.23 slate) was not in fact executed as between HIH and Flashpoint until at least a year later. The document is headed "DATED with effect from the 3rd August 1998". That heading is by way of manuscript amendment of an original line which had read "DATED DECEMBER 1998". It is well possible therefore that the document was in fact executed even later than Aug. 3, 1998. Despite the working inference that I am in general prepared to make regarding the availability of a contemporary draft of the collateral agreement as of July, 1997, the Court was not shown such a draft in the available bundles, and my personal attempt to find one has brought to light a draft attached to a Lloyd Thompson fax on July 17, 1997 (referred to there as the "Side Agreement") which is a very much less sophisticated document than the final executed version. That again indicates that it is impossible to proceed on the basis of any particular finding as to what was seen by any party at the time of binding any of the three insurance documents.

25. So far as the placing of reinsurance and insurance is concerned, I will merely allude to a small number of documents to which the Court was itself referred at the hearing of the appeal. I record what the documents say, but I make no findings of fact. On June 18, 1997 Mr. Gordon Dawson of Lloyd Thompson faxed Mr. Jean Michel Guillot of Axa with "details of a new project for which we have been asked to place a Pecuniary Loss policy". The fax is headed " '7.23' Productions - A 6 Film Slate". The fax states:

Due to the structure and source of the financing for the slate, HIH are to front for 100% of the risk, retaining 20% for themselves, and we are placing a 80% quota share reinsurance . . .

The fax goes on to mention a number of "positive underwriting points". Among them are the points that one of the six films, "Lured Innocence", had well known stars and had already collected some U.S.$0.75 m. in pre-sales; that the six films would cross-collateralize; and that there was a sub-limit to the policy of U.S.$3.9 m. any one film. Drafts of the "original slip" and of the "reinsurance slip" were attached. Those drafts were not in the final form of the slip policies. The reinsurers rely inter alia on the expression "A 6 film slate". HIH relies on the reference to itself as fronting for 100 per cent. of the risk.

26. On June 26 Independent, which subsequently took a 12.5 per cent. line on the reinsurance, scratched a 10 per cent. line on the underlying insurance on a slip in the form of the draft attached to the Lloyd Thompson fax to which I have just referred. However, in the event, Independent operated as a reinsurer, not an original insurer.

27. On July 22, the date on which New Hampshire stamped the reinsurance slip policy, Lloyd Thompson faxed AIG, New Hampshire's agents, with answers to certain questions which had been posed. One related to "Lured Innocence" which, in the meantime, had dropped out of the six film slate, apparently because of timing

Copr. © West 2004 No Claim to Orig. Govt. Works

Westlaw.

2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

difficulties: its film finance insurance was now being placed separately. The slate details were therefore still showing six films, but in the slot where "Lured Innocence" had been, there now appeared the words "To be agreed". Lloyd Thompson's fax explained:

The slate will still be 6 films although "Lured Innocence" will be placed separately. We will find an alternative production of similar size and with similar sales estimates so that the original slate is identical.

The fax went on to state that by "force majeure", an expression found in the original slip policy, was meant a failure of the projects to generate enough revenues at the expiry of the policy to equal the sum insured for any reason whatsoever, and added:

. . .This coverage is obviously subject always to the terms, conditions and limitations of the wording agreed by HIH as lead and fronting underwriter.

**\*169** 28. On Aug. 22, 1997, the date of the policy wording, a signed copy of it was provided by HIH to Lloyd Thompson under cover of a letter addressed by HIH to Credit Suisse. Lloyd Thompson sent HIH's letter and the policy wording on to LDT's lawyers, referring to it as "the Policy". The policy wording referred to receipt of the premium (that was the only reference to the premium in it), but I do not think payment had in fact been made by that date.

29. Lloyd Thompson's cover note in respect of the original slip policy was sent out on Sept. 30, 1997, and its cover note in respect of the reinsurance slip policy was sent on Oct. 14, 1997. Both cover notes were in the final form of the respective slip policies. The reinsurers rely on the fact that, even after the policy wording had been issued, the cover note referred to the terms of the original slip policy, not to the terms of the policy wording.

30. In the case of the Rojak slate, the chronology is more conventional. There the original slip policy was stamped by HIH on Dec. 4, 1997, prior to New Hampshire's stamping of the reinsurance slip policy on Dec. 5 and Axa's stamping of the same on Dec. 9. In this case, Independent was not a reinsurer. The policy wording for the Rojak slate was dated Dec. 8, 1997, both in the typescript and in the signature. The collateral agreement was again dated with effect from Aug. 3, 1998. The cover notes, both dated Dec. 19, 1997, again reproduced the final terms of the slip policies.

31. When in due course the insurance contracts came to be reproduced in Lloyd Thompson's books and bound up in the form of policy folders, they took the following form, at any rate as exemplified in the case of the Rojak slate. The original insurance was given a policy no. LP 9702013, which was the number on the slip policy stamped by HIH. That slip policy was bound in with the policy wording. The reinsurance contract was given the policy number LP 9702014 and the folder contained the slip policies stamped by the various reinsurers.

*The insurance documents*

*The 7.23 slate original slip policy*

32. A transcription of this shows as follows:

TYPE: Pecuniary Loss Indemnity SLIP

Copr. © West 2004 No Claim to Orig. Govt. Works

Westlaw.

2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

POLICY

INSURED: HOLLYWOOD FUNDING LIMITED, Jersey THE LAW DEBENTURE TRUST CORPORATION (CHANNEL ISLANDS) LIMITED

PERIOD: 23 months with effect from 30th July 1997, DATE OF SIGNING OF PURCHASE AGREEMENT (YET TO BE CONFIRMED AND AGREED) 22nd AUGUST 1997 to 22nd JULY 1999

INTEREST: 7.23 Productions will produce and make six made-for-TV Films.

It is understood that, if at expiry of the Policy Period the revenue collected is less than the Sum Insured as a result of Force Majeure, as defined, then the Underwriters will pay to the Assured, at the expiry of the Waiting Period, the difference between the Sum Insured and the revenue collected, subject to the exclusions set forth below.

SUM Maximum USD 3,900,000 any one Film and USD INSURED: 16,400,000 in the aggregate.

SITUATION: WORLDWIDE

CONDITIONS: As per Pecuniary Loss Indemnity wording tba L/U/only. Waiting Period: 20 Day. UK Law and Jurisdiction. . .Cross Collaterolisation [sic] Clause to be agreed L/U only.

INFORMATION: Revenue from all films will cross collateralise (Not to appear [sic] the 6 film slate. See "Side Agreement" on the Policy) agreed by L/U only. All other information on file with Lloyd Thompson Limited.

PREMIUM: USD 1,640,000 inclusive of IPT plus 7.5% of "Back End" payable semi annually from date of first exploitation . . . The "TYPE" and "INSURED" lines were, as I understand the matter, amended on Aug. 13, 1997 when HIH's underwriter, Mr. Steven Mitchell, put down HIH's stamp on

this slip policy. The "PERIOD" line's first amendment was also made at that time. Subsequently, when the total scheme was lined up to commence on Aug. 22, the period was changed again, and Mr. Mitchell initialled that amendment.

33. When Mr. Mitchell subscribed HIH's stamp, he added the following words in manuscript: "wording to be agreed all r/i-s" and "subject to reinsurance of 80%". HIH's stamp contained the words: "All terms and amendments to be agreed".

34. The following matters may be observed at this point. The reinsurers rely (HIH did not) on the term found under the "INTEREST" line that 7.23 Productions "will produce and make six made-for-TV Films". The reinsurers submit that that was a term, and a warranty, of both the insurance contract and, by incorporation, of the reinsurance contracts. The reinsurers also rely, for the purpose of the issue as to whether this slip contract was superseded by the policy wording, on the designation of the insurance type as a "Slip Policy" and on the reference to the policy wording as "wording". HIH, **\*170** on the other hand, points out that under "INFORMATION" the matters there indicated are "Not to appear on the Policy", which appears to be a reference to the policy wording, an advanced draft of which was already in existence at this time, and which refers to itself as a "Policy".

*The 7.23 slate policy wording*

35. This was also signed by Mr. Mitchell, and provided inter alia as follows:

PECUNIARY     LOSS     INDEMNITY

Copr. © West 2004 No Claim to Orig. Govt. Works

2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

POLICY

Dated 22nd August 1997

HIH. . .being the company issuing this Policy (hereinafter. . .referred to as the "Insurer") unconditionally. . .and irrevocably agrees with the "Assured". . .that in consideration of the payment of the premium. . .and subject to the Insuring Clause, Definitions, Exclusions and Conditions of this Policy that the Insurer will pay amounts due to the Assured on the respective due dates for payment as set out in this Policy.

PREAMBLE

(A) WHEREAS Flashpoint Ltd. . .has invested or is in the process of investing in six revenue generating entertainment projects collectively known as "7.23" (the "Projects") where all the revenue generated thereby. . .is due to be paid into the Collection Account. . .and

(B) WHEREAS pursuant to the Purchase Agreement. . .dated on or about the date of this Policy and made between Flashpoint Ltd. and Hollywood Funding Limited (the "Purchaser"), Flashpoint Ltd has agreed (or will agree) to pay to the Escrow Account. . .the Collection Amount. . .on that last day of the Policy Period. . .and

(C) WHEREAS the Purchaser has decided to fund its payment obligations under the Purchase Agreement by the issue of US$16,400,000 Zero Coupon Notes due 1999. . .and

(D) WHEREAS Flashpoint Ltd, has procured the issue of this Policy in favour of the Assured. . .and

(E) WHEREAS neither the Purchaser nor the Assured is involved nor has any interest in the Projects or in the Collection Account.

NOW THEREFORE

Clause 1 Insuring Clause
1.1 Initial Claim

If at the close of business on the last day of the Policy Period the amount of the balance standing to the credit of the Escrow Account is less than the Sum Insured (as defined in the Schedules) as a consequence of the occurrence of the Insured Peril then on the last day of the Waiting Period (as defined in clause 2.6 below) the Insurer will pay to, or to the order of, the Assured such US Dollar amount as is necessary to ensure that the Assured receives and retains in the Escrow Account a net sum equal to the Sum Insured . . .

Clause 2 Definitions
2.1 Insured Peril

Insured Peril means the failure to generate a balance in the Escrow Account as at the last day of the Policy Period equal to the Sum Insured, for any reason whatsoever.

This definition includes, but is not limited to, the failure of the Projects to generate a balance in the Collection Account equal to, or in excess of, the Sum Insured or the failure of Flashpoint Ltd. to make any payment under the Purchase Agreement for any reason whatsoever . . .

2.3 Escrow Account

The Escrow Account means the account set up with the Guernsey Branch of Credit Suisse First Boston (account no. 159091), in the name of the Assured . . .

Clause 4 Assignments and Amendments
4.1 Assignments by the Assured

The Assured may, at any time, assign all or any of its rights and benefits under this Policy . . .

4.3 Amendments to the Policy

This Policy may not be amended, cancelled, revoked or rescinded without the prior written consent of the Assured . . .

Copr. © West 2004 No Claim to Orig. Govt. Works

Westlaw.

2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

Clause 7 Governing Law and Jurisdiction

7.1 English Law

This Policy shall be governed by, and construed in accordance with, the laws of England and Wales.

7.2 English Courts

The Insurer and the Assured hereby irrevocably agree for the benefit of each other that the courts of England shall have jurisdiction to hear and determine any suit, action or proceedings . . .

Clause 8 Disclosure and/or Waiver of Rights

8.1 To the fullest extent permissible by applicable law, the Insurer hereby agrees that it will not seek to or be entitled to avoid or rescind this Policy or reject any claim hereunder or be entitled to seek any remedy or redress on the grounds of invalidity or unenforceability of any of its arrangements with Flashpoint Ltd. or any other person (or of any arrangements between Flashpoint Ltd. and the Purchaser) or non-disclosure or misrepresentation by any person or any other similar grounds. The Insurer irrevocably agrees not to assert and waives any and all **\*171** defences and rights of set-off and/or counterclaim (including without limitation any such rights acquired by assignment or otherwise) which it may have against the Assured or which may be available so as to deny payment of any amount due hereunder in accordance with the express terms hereof.

36. In connection with the policy wording, I would underline the following matters at this stage. First, the reinsurers point out that this document, although it refers to itself as a "Policy", has some surprising omissions if it was intended to be a complete and self-contained statement of the insurance contract. Thus it omits any reference at all to the premium. It also omits the slip policy's reference to a cap per film or to any cross collateralization clause. Secondly, the insured peril is defined in cl. 2 in very wide terms as including the failure "of the Projects" to generate a balance in the collection account equal to the sum insured "for any reason whatsoever". Thirdly, the "Projects" are defined in the second preamble as "six revenue generating entertainment projects collectively known as '7.23' ", viz., as the reinsurers submit, the six film slate. The reinsurers submit that the policy wording, even by itself, continues to contain a term, which they say is a warranty, that six films will be made. Fourthly, cl. 8 is an important bone of contention. HIH relies on its as providing a complete defence to the original assured, LDT, on any ground (save for coverage itself) whatsoever, and also submits that, both as a matter of general incorporation and also because of a specific reference to it in the reinsurance slip policy, it is incorporated into the reinsurance contracts. In effect, therefore, HIH says that cl. 8 left it with no defence against LDT, and that it similarly leaves the reinsurers with no defence against its claim against them. The reinsurers say that the clause is of comparatively narrow width, that it does not cover breach of warranty or negligent misrepresentation or non-disclosure, and that in any event it is not incorporated into their reinsurance contracts.

*The 7.23 slate reinsurance slip policy*

37. This provided as follows:

TYPE: As Original Policy

FORM: Quota Share Reinsurance Slip Policy.

Westlaw.

2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

REASSURED: All companies underwritten for by HIH Casualty and General Insurance Ltd and/or Quota Share and/or Surplus Reinsurers if any . . .

PERIOD: 23 months with effect from 30th July 1997.

INTEREST: As Original Policy.

ORIGINAL SUM

INSURED: Maximum USD 3,900,000 any one film and USD 16,400,000 in the aggregate.

SUM REINSURED: USD 13,120,000 in the aggregate quota share part of USD 16,400,000 in the aggregate . . .

CONDITIONS: This Reinsurance is subject to all terms, clauses and conditions as original and to follow that placement in all respects.

This Reinsurance to bear its proportion of any and all costs and expenses incurred under the Original Insurance.

The Reinsured hereon agrees to consult and obtain Reinsurers' agreement to all amendments and alterations to the terms, clauses and conditions of the Original Policy. The Reinsured also agrees to obtain Reinsurers' [agreement] to the appointment of any advisor and/or lawyer in the event of a claim being made under the Original Policy and/or a dispute under the Original Policy. The Reinsured further agrees to obtain Reinsurers' agreement to the appointment of accountants and/or auditors as deemed necessary under the Original Policy. In consideration of the above, Reinsurers hereon agree that in the event of claim and/or professional advisors fees and expenses being incurred under the Original Policy, this Reinsurance will pay at the same time.

Cancellation Clause as Original Policy . . .

PREMIUM: Original Net Premium to the Reassured being after all deductions provided for under the Original Policy . . .

INFORMATION: See copy of Original Slip and information as held on file with Lloyd Thompson Limited.

38. The reinsurers' stamp in each case, by one form of words or another, provided that all terms and amendments were to be agreed. It may be noted that the original assured and the period were still in forms which were to be overtaken by subsequent amendment. The first sentence of the third paragraph under the "CONDITIONS" line is in issue: is the requirement of reinsurers' agreement for all amendments a warranty? The fourth paragraph is also in contention: what is the "Cancellation Clause" thus incorporated from the original policy? HIH submits that that provision is an express and specific incorporation of the controversial cl. 8 of the policy wording ("Disclosure and/or Waiver of Rights"). The reinsurers submit, on the other hand, that it is either a specific incorporation of cl. 4.3 of the policy wording ("Amendments to the Policy") or fails for lack of content. A further matter of note is that the "Premium" line does not say anything about the "Back End", but this was not a matter of any comment on the appeal.

**\*172** *The Rojak slate original slip policy*

39. This was broadly similar to the 7.23 slate original slip policy, save that in this case the period ran for 23 months from Dec. 8, 1997, the "INTEREST" line said that "Rojak Films Inc will produce and make 10 made-for-TV Films" and the "SUM INSURED" line read "Maximum US$2,000,000 any one film and US$15,500,000 in the aggregate".

Copr. © West 2004 No Claim to Orig. Govt. Works

Westlaw.

2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

*The Rojak slate policy wording*

40. This was in materially identical form to the 7.23 slate policy wording, save that the sum insured was $15.5 m. and the "Projects" here referred to the 10 Rojak "revenue generating entertainment projects".

*The Rojak slate reinsurance slip policy*

41. This was, mutatis mutandis, in identical terms to the final form of the 7.23 slate reinsurance slip policy.

*The collateral agreements*

42. The ultimate form of the collateral agreement made between HIH and Flashpoint in connection with the 7.23 slate is an extensive and sophisticated document running to some 25 pages plus schedules. Although the title said it was made with effect from Aug. 3, 1998, cl. 3(1) provided that its terms took effect from Aug. 22, 1997 - the beginning of the period under the insurance contracts. Under cl. 2, HIH appointed Flashpoint as its "managing agent in relation to the Policy, and the risks arising under the Policy". The word "Policies" is defined as referring to what I have called the policy wording "and 'Policy' shall be construed accordingly". Clause 5 contained undertakings by Flashpoint that the finance provided by HFL had been and would be used for no other purpose than the production of the "Films" ("Films" was defined as "those film projects listed in Schedule 2") and that the producer, i.e. 7.23 Productions, had produced each film within budget. Clause 6 contained Flashpoint's undertaking that it would take all necessary

steps to exploit the films to their best commercial advantage. Clause 7 governed Flashpoint's responsibilities for the collection and holding of the film's revenues. Clause 8 ("Representations and Warranties by Flashpoint") contained inter alia the following:

(h) it has fully and accurately disclosed to HIH in respect of the Policy all information which is relevant or material to the consideration of the risks forming the Policy, or to the terms, conditions and exclusions contained in the Policy; . . .

(j) each Film within slate of Films known as project 7.23 has been duly and properly completed within budget . . .

(k) the Film budget proportion of the funds placed on deposit. . .has been used in their entirety on the production of the Films, and has not been used for any other purpose.

43. Clause 13 was a "Good Faith" clause:

Flashpoint and HIH acknowledge that this Agreement and the Charge have been entered into for the purpose of managing the respective risks contained in the Policy and it is the parties' intention that utmost good faith shall be the essence of the relationship between them, and in the interpretation of this Agreement and in the negotiation and placement of the Policy.

44. Schedule 3 to the collateral agreement lists a number of "Principal Production Documents" which were to be disclosed to HIH before production of a film. They include a completion guarantee from the Motion Picture Bond Co., and a producer's errors and omissions insurance (if applicable).

45. There is another collateral agreement in

[2001] 2 Lloyd's Rep. 161                                                    Page 21
2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

relation to the 7.23 slate, dated in the same way (save on this occasion said to become effective only on its date, see cl. 2(1)), but this agreement is between HIH and Flashpoint (UK) Ltd. ("Flashpoint UK"). It is not clear to me what the respective functions of the two Flashpoint companies or the two agreements are, but it would seem that Flashpoint UK, which was only incorporated in March, 1998, may have been interposed for taxation reasons. At the trial of the preliminary issues, Mr. Justice David Steel appears to have quoted from the Flashpoint UK collateral agreement in the belief that it was the Flashpoint collateral agreement (see at par. 9). To a large extent it contains similar covenants, e.g. cl. 5(h) is the equivalent of cl. 8(h) cited above, and cl. 10 is the equivalent of cl. 13 cited above. It appears that the responsibility of paying the "Back End" element of the premium, here described as the "Additional Premium", was the responsibility of Flashpoint UK (see cl. 9(1)), although in its collateral agreement Flashpoint also undertook to procure Flashpoint UK's performance of that obligation (cl. 12).

46. The reinsurers point to the collateral agreement as providing HIH, through another avenue, with the protection which HIH waived under cl. 8 of the policy wording in terms of a fair presentation of the original risk. They submit, however, that that protection was available *only* to HIH, and not to themselves, in the event for instance of any non-disclosure or misrepresentation in relation to the separate contract of reinsurance. HIH submits, on the other hand, that Flashpoint's warranty of good **\*173** faith disclosure is available to the reinsurers by way of subrogation, and that

the range of protection granted by the collateral agreement supports its contentions generally as to the absence of any warranty in the insurance as to the making of the full number of the films and as to the width of cl. 8's exclusion of any defences to a claim under the insurance.

*The three actions and the pleadings*

47. There are three actions. In the first, 1999 Folio 1248, HIH sues Independent and New Hampshire in respect of the 7.23 slate reinsurance. In the second, 2000 Folio 40, HIH sues Axa, again in respect of the 7.23 slate reinsurance. In the third, 2000 Folio 268, HIH sues Axa and New Hampshire in respect of the Rojak slate reinsurance.

48. As a forensic point, but not as a pleading point, the reinsurers emphasize that in all three actions HIH claims by reference to the reinsurance of its liability under the "slip/policy" made as of the dates of HIH's subscription to the original slip policy, and not by reference to the policy wording.

49. In its amended defence in respect of the 7.23 slate reinsurance, Axa pleads inter alia that the losses paid by HIH were not fortuitous and were inevitable; that Lloyd Thompson were agents to insure acting on behalf of HIH; that they made misrepresentations by reference to the fax dated June 18, 1997 to which I have referred above at par. 25 (some of which misrepresentations are said to have been made in bad faith, either by reference to HIH's or Lloyd Thompson's or Flashpoint's beliefs); that HIH and Lloyd Thompson failed to disclose other matters, such as Flashpoint's right to cancel any film at any

2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

time; that the 7.23 slate had been reduced from six films to five and that HIH therefore had a complete defence under the original insurance on the ground of breach of warranty; that in any event HIH was in breach of the six film warranty in the reinsurance contract; and, by way of counterclaim, that HIH is liable to Axa under s. 2(1) of the Misrepresentation Act, 1967 for the misrepresentations pleaded by reference to Lloyd Thompson's fax.

50. Independent, in its amended defence, pleads inter alia non-disclosure in relation to the dropping of "Lured Innocence" from the 7.23 slate and the presence of cl. 8 in the policy wording ("an unusual clause of draconian effect"); misrepresentation as to the presence of "Lured Innocence" in the slate; breach of warranty in relation to the reduction of the slate from six films to five and also in relation to an alteration in the terms of the original insurance to the same effect without obtaining Independent's consent; and, by way of counterclaim, inter alia that HIH is liable to it under s. 2(1) of the Misrepresentation Act for misrepresentation in relation to "Lured Innocence".

51. New Hampshire, in its defence, complained inter alia that "Lured Innocence" was not replaced by a film of comparable quality, and that only five films had been made instead of six; that HIH therefore either had a defence to the claim against it, or had, by agreeing to the amendment without obtaining New Hampshire's consent, broken the warranty against such amendment; but did not rely on any non-disclosure or misrepresentation; and by its amended rejoinder admitted the

incorporation in its contract of reinsurance of cl. 8 of the policy wording, but denied the effect which HIH sought to give to it.

52. There are analogous pleadings in the third action relating to the Rojak slate. I have not sought to give an exhaustive review of even those pleadings which are relevant to the preliminary issues; but this brief outline of the reinsurers' defences is enough to indicate both that they are not unanimous as to their situation or stance and that there are nevertheless certain themes in common. The preliminary issues which were ordered were an attempt to cover as much of this ground as possible.

*The preliminary issues*

53. The preliminary issues stated are as follows:

1. Are the terms (of both the insurance contract(s) and reinsurance contract(s)) alleged by the Reinsurers to have been warranties in fact such?

2. What is the effect of Clause 8 of the underlying insurance contracts? In particular does it mean that the facts and matters alleged in the defences (if true) would not have provided the Claimant Insured/Reinsured with a defence (whether in whole or in part) to the underlying Insured's claim?

3. On the assumption that the Reinsurers' underwriter(s) were aware that the underlying policy wording contained Clause 8, was Clause 8 a term of the reinsurance contract? Is the answer different if the underwriter(s) were not so aware?

4. What is the effect of Clause 8 in the context of the reinsurance contract(s)? In particular does it mean that:

Westlaw.

2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

(i) the facts and matters alleged in the defences and counterclaims (if true) do not provide the Defendant Reinsurers with a (complete or partial) defence (including by way of set-off) to the Claimant Insurer's/Reinsured's claim; and/or

**\*174** (ii) the Defendant Reinsurers do not (or did not) have the right to avoid the reinsurance contracts on the grounds of misrepresentation or non-disclosure (assuming they otherwise have or had such a right) irrespective of whether or not the relevant misrepresentation or non-disclosure was negligent or fraudulent as opposed to innocent.

*The Judge's answers*

54. Mr. Justice David Steel answered these questions as follows:

1. Of the terms alleged to be warranties:

(1) There was a warranty in both the insurance and the reinsurance contract(s) as to the number of films to be made.

(2) There was a warranty in the reinsurance contract(s) that no material amendments or alterations to the terms, clauses and conditions of the insurance contract would be made without the agreement of reinsurers.

(3) None of the other terms were warranties in either the insurance or the reinsurance contract(s).

2. As to the general question, see pars 30-33 of the judgment. As to the more particular question, the answer is no, save in respect of any defences by way of or akin to rights of set-off or counterclaim.

3. The answer to the first question is "yes". The answer to the second "no".

4. As to the general question, see pars 52-56 of the judgment. As to the more

particular questions, the answers are:

(i) No, save in respect of any defences by way of or akin to rights of set-off or counterclaim.

(ii) Yes, save in so far as any non-disclosure or misrepresentation was fraudulent.

55. The answer to issue 1 speaks for itself. On this issue the Judge found in favour of the reinsurers. HIH appeals against this determination, so far as issues 1(1) and 1(2) are concerned. Nothing further arises as to issue 1(3).

56. The answer to issue 2 is opaque without reference to the judgment. In pars. 30-33 of his judgment, Mr. Justice David Steel held that cl. 8 did *not* exclude a defence on the part of HIH as against LDT in respect of coverage issues (e.g. that the losses were not fortuitous), nor any defence based on breach of warranty (viz. that the full slate of films would be made); but that it did exclude a defence based on non-disclosure or misrepresentation, and defences by way of or akin to rights of set-off or counterclaim. HIH appeals against this limitation on the scope of cl. 8, save that it no longer submits that the clause excludes any defence in respect of coverage issues. In all other respects, however, it submits on appeal that cl. 8 is intended to exclude all defences which HIH might otherwise raise to a claim from LDT under the original insurance. The scope of cl. 8 is also visited, in the context of the position between insurer and reinsurers, under issue 4.

57. As to issue 3, the Judge held that cl. 8 was incorporated ("Yes") into the reinsurance contract if the reinsurer in

Westlaw.

2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

question was aware of cl. 8, and that it made no difference ("No") if it was not so aware. The reinsurers cross-appeal on this issue, submitting that there was neither a specific nor any general incorporation of cl. 8.

58. Issue 4 raises two questions as to the effect of cl. 8 as between HIH and reinsurers on the hypothesis that it did fall to be incorporated into any reinsurance contract. Again, the answer given cannot be understood without reference to the judgment itself. In pars. 52-56 of his judgment, Mr. Justice David Steel held (a) that the effect of cl. 8, if incorporated into a reinsurance contract, was not merely an agreement on the part of the reinsurer to follow settlements made by HIH where otherwise HIH would have had a defence, but operated to exclude defences by the reinsurer as against HIH under the reinsurance contract, on the same terms as it operated to exclude defences by HIH as against LDT under the underlying insurance. Thus (b), it was apt to exclude any defence based on misrepresentation or non-disclosure, except one involving fraud, whether or not the misrepresentation or non-disclosure was negligent; and (c) any defence by way of or akin to rights of set-off or counterclaim; but (d) not otherwise. The reinsurers cross-appeal aspects (a) and (b) of this answer, for they submit (a) that, if incorporated in their contracts, cl. 8 goes no further than agreement on their part to follow the settlement of HIH despite what might have been, in the absence of cl. 8, an ability to complain that such settlement amounted to an unjustified ex gratia payment; and (b) that cl. 8 in any event could not exclude negligent misrepresentation or non-disclosure.

59. I would prefer to restate the questions which arise on appeal and cross-appeal in the following way:

(i) Was it a term of the original slip policy that six films (or in the case of the Rojak slate, 10 films) would be completed?

(ii) Was the six film term a term of the policy wording?

(iii) Did the policy wording supersede the original slip policy?

(iv) Was the six film term a term of the reinsurance slip policy?

**\*175** (v) If a term of any of the insurances, was the six film term a warranty?

(vi) Was the term in the reinsurance slip policy that HIH agreed to consult and obtain reinsurers' agreement to all amendments a warranty?

(vii) Did cl. 8 cover and exclude breach of warranty defences?

(viii) Did cl. 8 cover and exclude negligent misrepresentation and non-disclosure?

(ix) Was cl. 8 specifically incorporated into the reinsurance contracts by reason of the term therein "Cancellation Clause as Original Policy"?

(x) If there was no specific incorporation of cl. 8, was it incorporated into the reinsurance contracts by reason of general words of incorporation?

Copr. © West 2004 No Claim to Orig. Govt. Works

Westlaw.

2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

(xi) For these purposes, did it make any difference whether cl. 8 was an unusual term? Was it an unusual term? Was incorporation of such a term "fair"?

(xii) For these purposes, did it make any difference whether a reinsurance was aware of cl. 8?

(xiii) If cl. 8 was incorporated into any reinsurance contract, what was its effect there?

*(i) Is the six film term a term of the original slip policy?*

60. I do not think this was seriously disputed by HIH. The slip policy stated, against the word "INTEREST:", that "7.23 Productions will produce and make six made-for-TV films". There was some suggestion that this was merely a statement of the subject-matter of the insurance, not a term that the six films would be made. In that connection, Mr. Julian Flaux, Q.C., on behalf of HIH, submitted that it would be odd to find a contractual undertaking by LDT, the assured, as to something that would be done by a third party. Since it was not in LDT's power to make the films, the reference should not be construed as an obligation.

61. However, there is nothing unusual about one party in what is in effect a chain of contracts undertaking that something will be done which under the overall scheme falls to be done by another party in the chain. In my judgment, having regard to the need for the revenues of each film to cross-collateralize with the revenues of each other film, there can be no doubt that it is a term

of the insurance that the stipulated number of films would be made. Clearly, there is a risk that, if fewer films are made, the possibility, that the total revenues engendered from those that are made may fall below the sum insured, increases. In an extreme case, only one or even no film might be produced.

62. Thus the original slip policy contained a term that six films would be produced and made.

*(ii) Is the six film term a term of the policy wording?*

63. For the purposes of this question, I will assume that the policy wording has to be construed as an entirely self-contained contract, which has superseded the original slip policy: see Youell v. Bland Welch & Co. Ltd., [1990] 2 Lloyd's Rep. 423; [1992] 2 Lloyd's Rep. 127.

64. Under cl. 2.1 the insured peril is defined, inter alia, as "the failure of the Projects to generate a balance. . .equal to, or in excess of, the Sum Insured. . ." Under cl. 2.2 "the revenue generated by the Projects" is to be received into a stipulated account known as the collection account. The "Projects" is itself a term defined in preamble (A) as "six revenue generating projects" in which Flashpoint has invested or is in the process of investing and whose revenues are due to be paid into the collection account.

65. Mr. Flaux submitted that, whatever the position might be under the original slip policy, there is no term in the policy wording requiring six films to be made. He

Westlaw.

2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

submitted that the closest that the policy wording comes to any such term is preamble (A), where the language "WHEREAS, Flashpoint. . . has invested or is in the process of investing in six revenue generating entertainment projects. . ." is to be found: but that such language does not amount to an undertaking that Flashpoint will make six films. Again, he points out that Flashpoint is a third party, and that the assured, LDT, is expressly said (under preamble (E)) to have no interest in the projects. Preamble (A), he submits, is merely a recitation of the background to the policy. In any event, investment in the projects is not the same as making the films.

66. Like Mr. Justice David Steel below, I am unable to adopt this submission. He described the point as "finely balanced", but pointed out that any commercially realistic construction of the specified insured peril (cl. 2) involves the premise that the projects are to be completed in order to generate such income as may be forthcoming. Otherwise, he added -

. . .the policy becomes a cash performance bond which must answer even if none of the films are made despite the provision of funding (at par. 24).

Mr. Flaux was expressly reluctant to submit that, to test the matter by an extreme possibility, the policy would operate without any breach even where no films at all were made. After some time for reconsideration, however, he did not shrink from that submission.

**\*176** 67. For myself, I am not sure that the analogy with a cash performance bond is helpful, or even, on the abjured premise, accurate. I do not see why, in principle, a policy might not be written - if underwriters are willing to take the risk with or without such additional protection as might be provided by some side agreement - which simply insures the risk that revenues from the investment will be less than a stipulated sum. As the policy wording states, the failure of the projects to generate a sum equal to the sum insured "for any reason whatsoever" is the essence of the peril insured. If the assured was the investor, it might be said that such a contract could not be made where no investment was ever made, for then the loss would be self-induced. And similarly, if the assured was the film-maker, it might be said that such a contract could not be effective, in the absence of some misfortune, where no film was ever made, for again the loss would be self-induced. I do not see, however, why an underwriter might not take the risk that, for instance, the investment moneys are stolen or misused, or that the films cannot be completed through some misfortune such as ill-health. The question, however, remains whether this has been done under this policy wording.

68. In my judgment, the making of the films is inherent in talk of their failure to generate revenues. "Six revenue generating entertainment projects" are six films, by another name. Unless made, they could not be revenue generating. It is their failure to generate revenue, which is at the heart of the risk underwritten: "the failure of the Projects to generate a balance. . ." means or necessarily implies that there will be six films to generate a balance, whose failure to do so in sufficient quantities will produce an insured loss. The policy could have been written simply in terms of the absence of

2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

funds or sufficient funds in the relevant account. Instead, however, an insured loss can only occur if the "projects" have failed to generate sufficient funds in the relevant account.

*(iii) Did the policy wording supersede the original slip policy?*

69. This is a most interesting question, but the decision on the previous question makes it unnecessary to determine it. Nevertheless, it has been fully argued.

70. The importance of the question for present purposes is that if the policy wording did not supersede the original slip policy, then the two documents would have to be read together, and in such a case there would be no reason to regard the term of the original slip policy considered under question (i) above as having been exercised by anything said in the policy wording. On the con-trary, the original slip policy might even have to be regarded as the primary document, and the policy wording as wording which was to be incorporated in it and which, where inconsistent, had to make way for the text of the incorporating document. Even if, on the contrary, the original slip policy was the document which had to give way in the face of anything inconsistent in the policy wording, there would be no reason why the general principle, that one tries to read both documents together, if possible, should not be given effect.

71. Mr. Flaux nevertheless submitted that authority determined that the later policy wording superseded the earlier slip policy. For these purposes the policy wording was

to be regarded as *the* policy of which the contract contained in the slip was merely anticipatory.

72. The authorities relied on by Mr. Flaux are as follows.

73. Youell v. Bland Welch & Co. Ltd., [1990] 2 Lloyd's Rep. 423 concerned a contract of reinsurance at Lloyd's. The slip was superseded by a formal policy. It was common ground that that was so, but the defendant reinsurers submitted that the slip could be looked at as an aid to the construction of the policy. At first instance, Mr. Justice Phillips (as he then was) disagreed. He held that the parol evidence rule made the slip inadmissible. He said (at pp. 428-429):

I do not consider Mr. Mance's submission to be sound in law. The drafting of the slip formed no part of the relevant matrix in this case. That matrix was the background to the commercial adventure that formed the subject matter of the contract, not the mechanism by which the parties set about negotiating and reaching agreement. The reason that Mr. Mance wished me to look at the slip was not so that I could inform myself of relevant background, but because he hoped that, by considering somewhat different words used by the parties in an earlier version of the contract, I would deduce the agreement reached as being that for which he contended and construe the policy so as to reproduce that agreement. This approach to construction is one which has its attractions and which in some cases might result in the Court construing an unclear written agreement so as to give effect to the intentions of the parties where it might not otherwise do so. But if prior

Westlaw.

2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

written agreements or drafts were admitted in evidence as an aid to construction the result would be that the Courts would often be called upon to consider a profusion of documents in cases where there was an issue as to the true construction of the final version of the contract. The English Court has firmly set its face against **\*177** such a practice. It has done so by adopting the so-called parol evidence rule . . .

Mr. Sumption submitted with, I thought, good reason that the strict application of the parol evidence rule has a particular justification in a case such as the present. An insurance slip customarily sets out a shorthand version of the contract of insurance, in terms which may be neither clear [nor] complete. Where, as here, the slip provides for the formal wording to be agreed by the leading underwriter, the other subscribers to the risk anticipate and agree that the leading underwriter will, on their behalf, agree the final wording which will spell out their rights and obligations. If differences between the wording of the slip and that of the formal contract which is embodied in the policy give rise to the possibility that the natural meaning of the slip differs from that policy, the natural assumption is and should be that the wording of the policy has been designed the better to reflect the agreement between the parties. To refer to the slip as an aid to the construction of the policy runs counter to one of the objects of replacing the slip with the policy.

Mr. Justice Phillips went on in any event to adopt the construction of the policy for which Mr. Mance had been contending.

74. In the Court of Appeal, [1992] 2 Lloyd's Rep. 127, Lord Justice Staughton

adopted a more cautious approach to the problem. He said (at p. 133):

It can be argued that an insurance slip is different from negotiations for the formation of a contract. It contains a concluded agreement between the parties, albeit one which they may expect, and even agree, to replace by different wording in a formal contract. The nature of the problem which then arises is clearly illustrated by the present case.

75. Lord Justice Staughton then demonstrated by reference to both slip and policy the point of construction in dispute, and continued (at p. 134):

Even if one could confidently discern what the words meant in the slip - which I do not think one can - there would remain the possibility, and perhaps even a probability, that the parties wished to alter that meaning when they prepared and agreed the policy. It is not argued that the leading underwriter had no authority to do so on behalf of others.

I would accordingly hold that the slip, whether admissible or not, is of no assistance in this case.

He went on to construe the policy, and agreed with the reinsurers' construction.

76. Lord Justice Beldam dealt with the point of construction first, and only then sought to deal with the point of principle, making it plain, however, that he was doing so by way of comment only (at p. 140). Unlike Lord Justice Staughton but like Mr. Justice Phillips, he stated his preference for a rule of law, founded in the parol evidence rule. He pointed out that prior to the Marine Insurance Act, 1906, a slip was regarded as an unenforceable contract: it was only the

Case 2:02-cv-04435-AB    Document 128    Filed 01/27/2005    Page 67 of 115

Westlaw.

[2001] 2 Lloyd's Rep. 161                                                                      Page 29
2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

formal policy which could be enforced. Thus, the slip could be looked to only if there was an issue of rectification, misrepresentation or non-disclosure. He said (at p. 141):

Although the slip initialled by the underwriters records the original agreement between the parties, if it contains words showing an intention that the terms will subsequently be incorporated into a policy form, when the policy has been issued it is the policy and not the slip which constitutes the contract or agreement between the parties. Reinsurers who invited the learned Judge to have regard to the wording of the slip as an aid to the interpretation of the contract did not seek rectification. The slip is clearly admissible in evidence for some purposes. Section 89 of the Marine Insurance Act, 1906 provides that reference may be made "as heretofor" to the slip or covering note in any legal proceeding.

Prior to 1996 the extent of the slip's admissibility after a policy had been signed was considered in Ionides v. The Pacific Fire & Marine Insurance Co., (1871) L.R. 6 Q.B. 674. Lord Blackburn at page 685 indicated that, although the slip was clearly a contract of marine insurance, it was not a policy and not enforceable at law but it could be given in evidence wherever it was, though not valid, material . . .

This view was affirmed in the Exchequer Chamber (1873) L.R. 7 Q.B. 517. Kelly C.B. stated that the slip was admissible, for example to show that the policy had been procured by misrepresentation or by non-disclosure, and he added:

It is quite enough therefore to say that here it was not given in evidence to prove a binding contract between the parties or to contradict or explain, or in any way affect the construction of the policy in question; but it was given in evidence only to shew what their intention was in preparing the policy.

The implication seems clearly to be that it would not have been admissible to affect the construction of the policy.

If prior to the passing of the Marine Insurance Act, 1906, the slip was not admissible to explain or in any way affect the construction of the policy. . .in my judgment it was not admissible **\*178** for the purpose of affecting the construction of the policy in question in this case.

Lord Justice Fox merely agreed that the appeal should be dismissed for the reasons given by Lord Justice Staughton and Lord Justice Beldam (at p. 141). So nothing said by this Court in that case about the problem of a slip followed by a policy is binding authority.

77. This question was also considered by Mr. Justice Hobhouse (as he then was) in Punjab National Bank v. de Boinville, [1992] 1 Lloyd's Rep. 7. That case was decided after the judgment of Mr. Justice Phillips, but before the hearing in the Court of Appeal, in Youell v. Bland Welch. Mr. Justice Hobhouse could be read as stating that there is a rule of law that "once a policy has been issued that is the document that contains the terms of the contract" (at p. 12). He cited Mr. Justice Phillips with approval. Nevertheless, it has to be borne in mind that in his case, as in Youell v. Bland Welch , the parties were agreed that the policy had replaced the slip. He said (at p. 13):

But in the present case there is no claim for rectification and no allegation of mistake. Accordingly, in my judgment, it is not proper to look at the slip or another

Copr. © West 2004 No Claim to Orig. Govt. Works

Case 2:02-cv-04435-AB    Document 128    Filed 01/27/2005    Page 68 of 115

Westlaw.

[2001] 2 Lloyd's Rep. 161                                                    Page 30
2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

anterior document. If they disclose a different contractual intention to that which is contained in the policy itself, they are irrelevant unless there is also a claim for rectification. The parties' contentions must stand or fall by the terms of the policy document itself - subject always to taking into account documents which are referred to in or incorporated into the policy, and the general principle of construing any document taking into account the surrounding circumstances.

After citing from Mr. Justice Phillips' judgment he said:

Mr. Justice Phillips here stresses the business considerations which underlay the replacement of the slip with a policy and the need to treat the policy as the definitive document. I would only add that once it is accepted the policy is a contractual statement of the contract between the parties and its terms, then as a matter of principle nothing short of rectification can permit the Court to treat any other document or communication as evidence of the agreement (or intention) of the parties in contradiction or variation of their agreement (or intention) as defined in the policy documents on its true construction.

The point was no longer a live one in the Court of Appeal, [1992] 1 Lloyd's Rep. 7; [1992] 1 W.L.R. 1138.

78. In St. Paul Fire & Marine Insurance Co. (UK) Ltd. v. McConnell Dowell Constructors Ltd., [1993] 2 Lloyd's Rep. 503 at pp. 516-517 Mr. Justice Potter applies the parol evidence rule again in refusing to look outside the policy for the terms of the risk insured. He said:

However, in this case, a formal policy had been issued before the loss and/or claims of the defendants arose pursuant to the contract of insurance. It is therefore to the terms of the policy that one must look in order to ascertain the terms of the risk insured. . .Nor, as is frequently the case in such policies, was there any reference to the slip, the submission, or other preliminary documents by way of further definition or incorporation. . .[I]n the absence of any route open to Mr. Pickering to avoid the effects of the parol evidence rule (such as resort to an ambiguity in the policy or assertion of a claim for rectification) this aspect of his argument must fail . . .

Again, the point was no longer alive in the Court of Appeal, [1995] 2 Lloyd's Rep. 116.

79. Finally, in New Hampshire Insurance Co. v. MGN Ltd., [1997] 1 L.R.L.R. 24 at pp. 53-54 Lord Justice Staughton (giving the judgment of the Court) said this:

Secondly, it was submitted that, once a policy has been issued, its terms are conclusive evidence of the contract between the parties unless and until it is altered by the process of rectification. That can happen by agreement of the parties or by order of a Court but not otherwise. And there has been no application for rectification in this case.

This doctrine is said to be supported by Youell v. Bland Welch & Co. Ltd. (No. 1), [1990] 2 Lloyd's Rep. 423 and Punjab National Bank v. de Boinville, [1992] 1 Lloyd's Rep. 7. But in our opinion those cases are concerned with the situation where a policy has been agreed to by the parties. In those circumstances the policy will, at any rate in the ordinary way, be conclusive evidence of the contract unless and until it has been rectified; the slip cannot be used to add to, explain or contradict the meaning of the policy. That is not this case. Here the

Copr. © West 2004 No Claim to Orig. Govt. Works

Westlaw.

2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

issue is whether the policy ever was agreed to. The insurers cannot pre-empt the answer to that question by the unilateral act of issuing it. That was the reasoning of Mr. Justice Potter, and we agree with it.

80. That was again an obiter passage in as much as it referred to the earlier cases; and it was again cautious to avoid restating an out and out rule of law.

81. In my judgment, there is nothing in these citations which binds this Court to rule that where a prior contract has been followed by a further contract, or where in an insurance context a slip contract has been followed by a policy, there is a **\*179** rule of law which makes it inadmissible to consider the terms of the prior contract, or that the parol evidence rule has the same effect. That is because all passages in prior cases in this Court are only obiter dicta. Moreover, in Youell v. Bland Welch and Punjab National Bank v. de Boinville it was common ground that the policies in question were intended to supersede the slips. Where it is common ground that one contract has been intended to supersede an earlier contract, it must follow that the parties' contract must be found exclusively in the later contract. Thus the earlier contract cannot be used to add to, or modify, the later contract.

82. But does it follow that the earlier contract cannot even be looked at for the purposes of construing the later contract?

83. In principle, it would seem to me that it is always admissible to look at prior *contracts* as part of the matrix or surrounding circumstances of a later contract. I do not see how the parol evidence

rule can exclude prior contracts, as distinct from mere negotiations. The difficulty of course is that, where the later contract is intended to *supersede* the prior contract, it may in the generality of cases simply be useless to try to construe the later contract by reference to the earlier one. Ex hypothesi, the later contract replaces the earlier one and it is likely to be impossible to say that the parties have not wished to alter the terms of their earlier bargain. The earlier contract is unlikely therefore to be of much, if any, assistance. Where the later contract is identical, its construction can stand on its own feet, and in any event its construction should be undertaken primarily by reference to its own overall terms. Where the later contract differs from the earlier contract, prima facie the difference is a deliberate decision to depart from the earlier wording, which again provides no assistance. Therefore a cautious and sceptical approach to finding any assistance in the earlier contract seems to me to be a sound principle. What I doubt, however, is that such a principle can be elevated into a conclusive rule of law.

84. Where, however, it is not even common ground that the later contract is intended to supersede the earlier contract, I do not see how it can ever be permissible to exclude reference to the earlier contract. I do not see how the relationship of the two contracts can be decided without considering both of them. In essence there are, it seems to me, three possibilities. Either the later contract is intended to supersede the earlier, in which case the above principles apply. Or, the later contract is intended to live together with the earlier contract, to the extent that that is possible, but where that is not possible it

Westlaw.

may well be proper to regard the later contract as superseding the earlier. Or the later contract is intended to be incorporated into the earlier contract, in which case it is prima facie the second contract which may have to give way to the first in the event of inconsistency. I doubt that it is in any event possible to be dogmatic about these matters.

85. Is the insurance context different? Is the case of a slip followed by a policy a special case? First, it may be said that where a slip is followed by a policy there will usually be an intention to supersede the slip by the policy. That was the situation which was common ground in Youell v. Bland Welchetc. Secondly, the considerations mentioned by Mr. Justice Phillips, such as the fact that slips customarily set out the contract in shorthand in a way that is neither clear nor complete, will in general promote and underline the inutility of seeking to find in the slip an aid to the construction of the policy. Beyond that, however, I am doubtful that it is at all helpful to go.

86. In particular it is I think dangerous to seek help from the older cases. As late as 1867 it was the view of Judges who were summoned to give their opinions to the House of Lords in Xenos v. Wickham, (1867) L.R. 2 H.L. 296 that a slip was a mere proposal for insurance: see Mr. Justice Smith at p. 305, Mr. Justice Willes at pp. 314-315 and 317. Lord Chelmsford, L.C. at p. 321 said:

It is one thing to cancel a slip, which is merely the inception of a contract, and to change the terms of the proposal for an insurance; and an entirely different thing to release the underwriters from their liability upon a policy.

87. In Ionides v. Pacific Fire & Marine, (1871) L.R. 6 Q.B. 674; (1872) L.R. 7 Q.B. 517, which Lord Justice Beldam relied on in his judgment in Youell v. Bland Welch, Mr. Justice Blackburn at pp. 684-685 explained that a slip was a contract ("the complete and final contract between the parties"), but one unenforceable at law and binding only in honour. He went on to explain the changing historical and statutory background to the roles of slip and policy in the context of marine insurance. At one time, a slip could not be given in evidence for any purpose whatsoever. But that had been changed only a few years before, by the Customs and Inland Revenue Act, 1867. That provided that no contract of marine insurance could be valid unless expressed in a policy, and that no policy could be given in evidence unless duly stamped. A slip therefore remained unenforceable: since, however, a slip was not a policy, "it may be given in evidence wherever it is, though not valid, material". The rule which in marine insurance required a "policy" in due course became embodied in s. 22 of the Marine Insurance Act, 1906. It was only under the Finance Act, 1959 that such a policy became valid even though not stamped. For a *180 history of the matter see Arnould's Law of Marine Insurance, 1981, 16th ed., at pars. 14-20.

88. In Ionides v. Pacific Fire & Marine a problem arose because the policy named the vessel in which the insured cargo was to be carried as *Socrates*, whereas the vessel in which the cargo had actually been shipped, and lost, was *Socrate*. The question was whether the slip could be used to assist in finding the parties' true intention. Because of

Westlaw.

[2001] 2 Lloyd's Rep. 161                                        Page 33
2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

the statutory restrictions, and the controversy surrounding use of the slip for any purpose, both Courts whose judgments were reported were anxious to show that the use for which the slip was admitted into evidence was limited. In the Court of Queen's Bench, Mr. Justice Blackburn looked on the matter as a mere case of misnomer. It seems to have gone beyond that, however, for the jury's finding was that "neither party cared what the name of the ship was, as they meant to insure the goods by the ship on which they were really shipped" (at p. 686). In the Exchequer Chamber, Kelly, C.B. defined the issue in these terms (at pp. 525-526):

In this case it is unnecessary to do more than to consider whether [the slip] is admissible in evidence for the purpose of shewing what the two parties intended at the time they entered into this transaction; in other words, whether they intended it to be a policy pursuant to a previous contract, although that contract was not binding, or whether the policy was a new, separate, and substantive contract, to be construed without reference to the previous acts of the parties. It was the former solution which was adopted. It might well be said, therefore, that the case is not an authority for a rule of law which would prevent a slip being admitted to assist in the interpretation of the policy.

89. In Thompson v. Adams, (1889) 23 Q.B.D. 361 the effect of a slip outside the marine insurance context was still in issue. There the underwriters under a fire insurance at Lloyd's submitted that the slip was no contract, merely an honorary undertaking to make a contract (subsequently, in the policy): see at p. 364. Evidence as to the custom of the market was

called, but Mr. Justice Mathew was not deterred from his view "by the light of common sense" that the slip was "a binding contract to insure", whatever might be the position in the case of marine insurance (at p. 365). Even so, the theory of Mr. Justice Mathew seems to have been that the slip was merely a contract to issue a policy and that upon issue the contract of insurance would be in the policy.

90. In 1974, in the context of aviation insurance Lord Diplock put the matter in the following way, in American Airlines Inc. v. Hope, [1974] 2 Lloyd's Rep. 301 at pp. 304-305:

The slip contemplates its eventual replacement by a policy of insurance in the standard form in use at Lloyd's for aviation risks, but subject to such deletions and additions as are indicated in the slip. Such additions are generally clauses which themselves follow a standard form and are sufficiently identified in the slip by a reference to a description or a number but some may be specially tailored to the particular requirements of the assured. In the latter case if the slip is for an original insurance the actual clause is set out in the slip itself, although it may be in only abbreviated form . . .

Almost invariably the slip provides that the wording of the policy is to be agreed by leading underwriter. Where this is the case the leading underwriter may occasionally consent to some clause going into the policy which was not provided for by the slip, if in his judgment it would not affect the premium. So there is the possibility of minor variations being made in the contract of insurance when the terms of the policy are agreed.

Copr. © West 2004 No Claim to Orig. Govt. Works

Westlaw.

[2001] 2 Lloyd's Rep. 161                                                          Page 34
2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

91. The point was well made in argument that in many cases a loss may occur before a policy is even issued. That was precisely the point which drove Mr. Justice Mathew as a matter of common sense to conclude that there must be a binding contract in the slip. If thereafter a policy is issued which is intended to supersede the slip, the principle that the contract is to be found in the policy rather than the slip remains; but the example demonstrates the difficulty of a dogmatic assertion that in no case can the construction of the policy be educated by a consideration of the slip, when ex hypothesi the slip was the only contract in existence at the time of loss.

92. In the light of the uncertain status of the slip until relatively speaking modern times, I would for myself with genuine respect consider it dangerous to build, as Lord Justice Beldam did in his obiter dicta in Youell v. Bland Welch, on the single case of Ionides v. Pacific Fire & Marine , or on the negative inference or "implication", which he sought to derive from the positive use of the slip there "to shew what their intention was in preparing the policy", that a slip could never be used to assist in the construction of a policy. I would, however, agree that in the absence of a plea of rectification a slip could not be used to alter or contradict the construction of a policy which had superseded a slip. As it happens, there does not appear to be any support in Ionides v. Pacific Fire & Marine for the thesis that policy supersedes slip, albeit that is perhaps entirely to be explained by the peculiarities of marine insurance at that time. A policy could hardly be said to supersede an unenforceable contract.

Matters have now moved on. This illustrates, *181 however, the problems involved in seeking a rule of law amid the shifts of historical development.

93. Even Mr. Flaux came to put his submission in favour of the supersession of slip by policy as a matter of a rebuttable presumption of fact. Having begun by favouring a rule of law, he no longer did so by the end of his submissions. However, I am doubtful about his presumption of fact. I would prefer to say that it is a question of construction which depends in part, as all such questions do, on the surrounding circumstances. In the insurance market, however, it may well by now be possible to talk of a general presumption that a policy is intended to supersede a slip.

94. In the present case, however, it is not common ground that the policy wording superseded the original slip policy. On the contrary the issue is precisely whether the policy wording was intended to supersede the original slip policy. As part of that issue it is also debated whether the policy wording is a self-contained policy and whether it matters whether the slip policy is called a slip or a slip policy.

95. It is unnecessary to decide this issue of whether the slip policy was superseded by the policy wording, but I do not think it was. First, the slip was called a "slip policy". That immediately calls into question the basic presumption that a slip is intended to be superseded by a policy. Secondly, it is hard to see how the policy wording, for all that it is presented as a self-contained "policy", was intended to supersede the slip policy. Thus there is nothing in the policy wording

Copr. © West 2004 No Claim to Orig. Govt. Works

Westlaw.

[2001] 2 Lloyd's Rep. 161                                                    Page 35
2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

concerning a cap of U.S.$3.9 m. any one film, nor cross-collateralization, but above all there was nothing regarding the premium (other than it had been paid). It is I suppose possible that by Aug. 22, 1997 the basic premium had been paid, although I do not think that it had; but there still remains the "Back End" or additional premium, and nothing at all has suggested that there was any intention on the part of HIH to forego that right. It would appear therefore that the policy wording is incomplete, and that it would be preferable to regard the policy wording as containing the "Conditions" to be incorporated into the slip policy. (That would be consistent with the manner in which the slip policy and the policy wording were bound up together in Lloyd Thompson's policy folders, and with the terms of Lloyd Thompson's cover notes: although I do not rely on such matters.) It would also be consistent with the terms of the reinsurance slip policy, a contract which may have been amended as the underlying insurance became amended, but which was never superseded by any further contract or policy. The reinsurance slip policy stated that the "INTEREST" was "As Original Policy", which was a reference to the original slip policy's "7.23 Produc tions will produce and make six made-for-TV Films", and contained express references to the U.S.$3.9 m. cap any one film and to the premium as being "Original Net Premium. . ."

96. It was also the Judge's view that there was no intention to supersede the original slip policy.

97. I am inclined therefore to conclude that the original slip policy was never

superseded. It follows to my mind that the policy wording itself can be, and ought to be, construed against the background of the original slip policy. That produces the result both that there is no reason to think that the term "7.23 Productions will produce and make six made-for-TV Films" ever ceased to be a term of the insurance, and that in any event the policy wording's construction (question (ii) above) is further strengthened by reference to the wording of the original slip policy.

*(iv) Is the six film term a term of the reinsurance slip policy?*

98. In the circumstances this question can only be answered "Yes".

*(v) Is the six film term a warranty?*

99. Mr. Justice David Steel held that the six film term was a warranty whether found in the original or the reinsurance contract. Mr. Flaux challenged that conclusion. He submitted that for a term in an insurance contract to be a warranty, the intention that it should be so had to be very clear, since the implications of breach were so serious. Where the fulfilment of a term depended on a third person, here the makers and producers of the films, and the assured had no control over events, there should be all the more caution in finding a warranty. As for the original slip policy, one should not expect to find a warranty in the definition of the insured interest; and as for the policy wording, the oblique reference to the projects could not support a warranty. Nor should the assured's own brokers, Lloyd Thompson, be thought of as putting forward a warranty.

Westlaw.

[2001] 2 Lloyd's Rep. 161                                                        Page 36
2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

100. Under this issue I am considering the matter outside the terms of cl. 8 of the policy wording. HIH relies on cl. 8 as a waiver of every defence save for that of lack of cover. Mr. Flaux also submits, however, that the presence of cl. 8 makes it harder to find a warranty in the contract. However, I do not understand that submission. If cl. 8, which I shall consider below, prevents reliance on a defence of breach of warranty, then so be it: but I do not see how it affects the nature of a term. On the contrary, even if cl. 8 is given the wide effect on which HIH relies, that merely suggests that there are terms in the contract whose breach would **\*182** amount, absent cl. 8 itself, to a complete defence to a claim.

101. In my judgment, once the six film term is established as a term of the insurance or reinsurance contract, the grounds for holding it to be a warranty are very strong. It is a question of construction, and the presence or absence of the word "warranty" or "warranted" is not conclusive. One test is whether it is a term which goes to the root of the transaction; a second, whether it is descriptive of or bears materially on the risk of loss; a third, whether damages would be an unsatisfactory or inadequate remedy. As Lord Justice Bowen said in Barnard v. Faber, [1893] 1 Q.B. 340 at p. 344: "A term as regards the risk must be a condition." Otherwise the insurer is merely left to a cross-claim in a matter which goes to the risk itself, which is unbusinesslike (ibid.; see also Ellinger & Co. v. Mutual Life Insurance Co. of New York, [1905] 1 K.B. 31 at p. 38). In the present case. the six film term would seem to answer all three tests. It is a fundamental term, for even if only one film

were omitted, the revenues are likely to be immediately reduced. That will not matter if the revenues already exceed the sum insured, for in that case there can be no loss in any event. Where, however, the revenues fall below the sum insured, the loss of a single film may be the critical difference between a loss or no loss, and will in any event be likely to increase the loss. For the same reason the term bears materially on the risk. A cross-claim would be an unsatisfactory and inadequate remedy because it would never be possible to know how much the lost film would have contributed to revenues. The very fact that the making of the six films lies under the "INTEREST" line emphasizes the importance of the term and its direct bearing on the risk. As for the draft originating with the assured's brokers, that is nearly always the case. There is a maximum of construction which is called the contra proferentum rule; but there is no maxim to the opposite effect.

102. My conclusion that the term is a warranty is consistent with the view expressed in MacGillivray on Insurance Law, 9th ed., 1997, at par. 10-26 that -

  . . .a description of the subject-matter of the insurance written into the policy and obviously material to the risk would be likely to be construed as a warranty.

103. Moreover, such pre-contractual material as the Court has been shown is consistent with the importance of the full slate of films and the way in which there was to be cross collateralization of their revenues. Similarly the importance of "Lured Innocence" in particular was emphasized, and when that film dropped out

Copr. © West 2004 No Claim to Orig. Govt. Works

Westlaw.

2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

of the 7.23 slate there was an assurance that it would be replaced by another film of comparable quality. However, for reasons which I have set out at the beginning of this judgment, I do not think it would be right to place any store on such matters, and I have not.

104. The position is the same, as it seems to me, whether the six film term is seen as arising out of the original slip policy itself, or out of the policy wording, or out of a combination of the two; and whether the term is viewed from the point of view of the original insurance or the reinsurance. The reinsurance slip policy expressly states "INTEREST: As Original Policy". Moreover, once the six film term is seen as being a term of the insurance, whether set out as it is in the original slip policy or derived from the construction of the policy wording, it is immediately clear that it is the essence of the risk underwritten: if the slate of (six) films is made with the moneys invested, the insurers will indemnify the investors against loss. That is what the insurance is all about.

*(vi) Is the term in the reinsurance slip policy that HIH agreed to consult and obtain the reinsurers' agreement to all amendments a warranty?*

105. The term in question is the first sentence of the third of the CONDITIONS set out in the reinsurance slip policy, viz. -
The Reinsured hereon agrees to consult and obtain Reinsurers' agreement to all amendments and alterations to the terms, clauses and conditions of the Original Policy.

106. Mr. Flaux's principal submission under this issue is that the last sentence of that paragraph sets out the consequences of a breach of that term, namely that because simultaneous payment of the reinsurance is said to be "In consideration of the above", therefore a breach of the consultation and joint agreement term means that the reinsurers are spared the obligation of simultaneous payment.

107. That, however, is a non-sequitur. The last sentence reads:
In consideration of the above, Reinsurers hereon agree that in the event of a claim and/or professional advisors fees and expenses being incurred under the Original Policy, this Reinsurance will pay at the same time.

108. There is no consequence prescribed in the last sentence for its breach. The fact that simultaneous payment is the consideration for HIH's promises in the preceding sentences does not mean that HIH's breach of those promises simply frees the reinsurers of their promise of simultaneous payment.

109. Mr. Flaux also submits that the second and third sentences of the paragraph, dealing as they do with claims consultation and the appointment of **\*183** lawyers and accounts, are not warranties, and that indicates that the first sentence is not a warranty either. The argument is valid as far as it goes, but it is not decisive. The fact is that the subject-matter of the first sentence differs in a critical way from the subject-matter of the second and third sentences, in that the first sentence is dealing with the content of the insurance contract itself, whereas the second and third sentences are dealing only with the

Copr. © West 2004 No Claim to Orig. Govt. Works

Westlaw.

[2001] 2 Lloyd's Rep. 161                                                                     Page 38
2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

processing of claims. Moreover, the subject-matter of the first sentence reflects the position at common law. Thus in Norwich Union FireInsurance Society v. Colonial Mutual Fire Insurance Co. Ltd., (1922) 12 Ll.L.Rep. 215; [1922] 2 K.B. 461 it was held that variation of the original policy without the consent of the reinsurer discharged the latter. Mr. Justice McCardie referred at p. 218; pp. 468-469 to this Court's decision in Lower Rhine and Wurtemberg Insurance Association v. Sedgwick, [1899] 1 Q.B. 179, and to Lord Justice Rigby's dictum during argument (see the report at 4 Com. Cas. 14 at p. 19) that:

It is one thing for the plaintiffs to trust to the policies which the defendant had made and another to trust to those that he might make in the future.

Mr. Justice McCardie then continued (at p. 218; p. 469):

. . .It appears to me that there is no half-way house between a right to alter the head policy without consent and an absence of right to do so. Either it can be altered or not. If it can be altered, then what limit is to be placed on the right of alteration? The only sound rule seems to be that the head policy cannot be altered save with the consent of the re-insurer.

110. Mr. Justice McCardie then went on (at p. 218; pp. 469-470) to apply the analogy of the rule in contracts of guarantee:

As pointed out by Leake [on Contracts, 7th ed.] at p. 600: "The Court will not entertain the question of the materiality of the variation in the contract guarantee; and unless it is self-evident that it is not material or prejudicial to the surety, he is left to be the sole judge whether he will consent to remain liable." This passage is supported by

the well-known judgment of Cotton LJ in Holme v. Brunskill(1877) 3 QBD 495, 504. It seems to me that a rule at least is rigorous should apply to matters of insurance. If a head policy could be altered without the consent of the re-insurer the latter would be thrown in to a position of danger, difficulty and doubt.

111. Mr. Justice David Steel held, and the reinsurers accept, that the term in question only covers material amendments. If so, that may represent a position somewhat less stringent than the common law. It is no reason, however, for holding that the term is not a warranty, to the contrary. In my judgment, therefore, the first sentence of the third condition stated in the reinsurance slip policy is a warranty.

*(vii) Does cl. 8 cover and exclude breach of warranty defences?*

112. It does not matter whether the six-film slate term or the amendment term is a warranty if cl. 8 of the policy wording covers and excludes breach of warranty defences (and if the reinsurer is bound by cl. 8).

113. It is convenient to set out cl. 8 again:

Clause 8 Disclosure and/or Waiver of Rights

8.1 To the fullest extent permissible by applicable law, the Insurer hereby agrees that it will not seek to or be entitled to avoid or rescind this Policy or reject any claim hereunder or be entitled to seek any remedy or redress on the grounds of invalidity or unenforceability of any of its arrangements with Flashpoint Ltd or any other person (or

Copr. © West 2004 No Claim to Orig. Govt. Works

Westlaw.

2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

of any of its arrangements between Flashpoint Ltd and the Purchaser) or non-disclosure or misrepresentation by any person or any other similar grounds. The Insurer irrevocably agrees not to assert and waives any and all defences and rights of set-off and/or counterclaim (including without limitation any such rights acquired by assignment or otherwise) which it may have against the Assured or which may be available so as to deny payment of any amount due hereunder in accordance with the express terms hereof.

114. Mr. Flaux submits that cl. 8 provides the insured with protection against every defence available to HIH, except the defence that the claim does not fall within the cover itself. Mr. Justice David Steel had held below that if cl. 8 extended to including within its waiver even a coverage defence, then that would remove from the agreement the basic ingredients of a contract of insurance, a conclusion which a Court would be loath to reach in the absence of the very clearest language: cf. in a different context Tor Line A.B. v. Alltrans Group of Canada Ltd., [1984] 1 Lloyd's Rep. 123; [1984] 1 W.L.R. 48. Mr. Flaux does not pursue HIH's appeal from that conclusion. He accepts that a claim outside the cover of the insurance is simply not within the insurance at all; and that a defence of lack of cover would not fit with the words at the end of the second sentence which presume that, but for the defence in question, an amount would be "due hereunder in accordance with the express terms hereof". With that exception, however, Mr. Flaux submits that cl. 8 is a complete exoneration of every **\*184** defence, save for fraud in the making of the original insurance contract itself.

115. Mr. Flaux relies on both sentences of the clause, but primarily on the first. There he points in particular to its concluding words - "or any other similar grounds". In the second sentence he points in particular to the words - "any and all defences".

116. He submits that the first sentence has the very widest scope. It begins with the words "To the fullest extent possible" and continues with language of broad import, viz. "the Insurer hereby agrees that it will not. . .reject any claim hereunder. . .on the grounds of. . .non-disclosure or misrepresentation by any person or any other similar grounds". He submits that a defence of breach of warranty is closely akin to that of non-disclosure or misrepresentation in that in both cases the contract can be avoided. In that connection he relies on some remarks of mine in Svenska Handelsbanken v. Sun Alliance and London Insurance plc, [1996] 1 Lloyd's Rep. 519 at p. 552.

117. As to the second sentence, he submits that a defence of breach of warranty is within the words "any and all defences. . .which it may have against the Assured or which may be available so as to deny payment of any amount due hereunder. . ." He submits that if Mr. Justice David Steel were right to say that the word "defences" were limited to defences "akin to rights of set-off or counterclaim", then the word would be redundant, for the second sentence immediately goes on to refer expressly to rights of set-off or counterclaim. Thus the words "defences and rights of set-off and counterclaim" are not to be understood as part of a single phrase. There are, he says,

Copr. © West 2004 No Claim to Orig. Govt. Works

Westlaw.

2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

no "defences" of counterclaim, thus the term "defences" is dealing with something apart from "rights of set-off or counterclaim".

118. In my judgment, however, Mr. Justice David Steel was right to reject the submission that cl. 8 contained a defence to breaches of warranty. Subject to its concluding words "or any other similar grounds", the first sentence's subject matter is (a) "the invalidity or unenforceability of any of [the Insurer's] arrangements with Flashpoint Ltd" etc., and (b) "non-disclosure or misrepresentation". Both those items of subject matter are extra contractual. The first is dealing with arrangements collateral to the insurance contract, the second is dealing with pre-contractual negotiations. Breaches of warranty, however, are breaches of the contract of insurance itself. I would not therefore regard them as constituting "similar grounds". Mr. Flaux argues similarity by reference only to the remedy, invoking the comments in Svenska v. Sun Alliance. There, however, I was concerned to underline the importance of a clause, which I found to be a warranty, by reference to its concern for proper disclosure, and I emphasized that both non-disclosure and breach of warranty could have the effect, albeit in their different ways, of "undoing the insurance. . .not something that merely sounds in damages". That was in the context of a submission that the clause in question was not a warranty but merely sounded in damages. In the present case, however, the critical phrase is concerned with similarity of grounds, not with dissimilar grounds which might give rise to similarities of remedy.

119. As for the opening phrase ("To the

fullest extent permissible by applicable law"), those words cannot be relied on to *extend* the scope of the first sentence, even if they may be said to emphasize its width and to warn against any attempt at an artificial narrowing of its scope. Essentially, however, they are words of *saving*, not of extension.

120. As for the second sentence, if it had been intended to include a waiver of breach of warranty, that could have been easily stated. As it is, the whole pressure of Mr. Flaux's submission has to be carried ultimately by the single word "defences", which it is said stands separately from the rest of the sentence. In my judgment, however, it is much more natural to read that word as part of the overall phrase "defences and rights of set-off and/or counterclaim". It is natural to think of a set-off as a defence (even if it can also be thought of as a right), and a counterclaim as a right (even if it may also give rise to a defence). In my view the word "defences" is primarily connected with "set-off" and the word "rights" is primarily connected with "counterclaim". In any event, it is plain that a set-off may give a defence, and that is sufficient to explain the language of the sentence.

121. Moreover, that explanation would be consistent with the closing language of the sentence - "so as to deny payment of any amount due hereunder in accordance with the express terms hereof". If there was prima facie a good claim ("amount due hereunder" etc.), a defence of set-off or a right of counterclaim might result in a valid denial of payment of a sum otherwise due. Where, however, a breach of warranty occurs before a loss within the cover, it is difficult to say that that breach provides a defence against

Copr. © West 2004 No Claim to Orig. Govt. Works

Westlaw.

2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

an amount "due hereunder in accordance with the express terms hereof". It would be more natural to say that by reason of the breach of warranty there was nothing due, and that that was so precisely because of the contract's "express terms".

122. That is because it is well established that a breach of warranty produces an automatic discharge of a contract of insurance from the moment of breach: Bank of Nova Scotia v. Hellenic Mutual War Risks Association (Bermuda) Ltd. (The Good Luck), [1991] 2 Lloyd's Rep. 191; [1992] 1 A.C. 233. *185 Lord Goff of Chieveley at p. 202, col. 1; pp. 262-263 put the matter in this way:

Once this is appreciated, it becomes readily understandable that, if a promissory warranty is not complied with, the insurer is discharged from liability as from the date of the breach of warranty, for the simple reason that fulfilment of the warranty is a condition precedent to the liability of the insurer. This moreover reflects the fact that the rationale of warranties in insurance law is that the insurer only accepts the risk provided that the warranty is fulfilled. This is entirely understandable; and it follows that the immediate effect of a breach of a promissory warranty is to discharge the insurer from liability as from the date of the breach.

123. At p. 202, col. 2; p. 263F-G Lord Goff cited with approval the following statement by Lord Justice Kerr from State Trading Corporation of India Ltd. v. M Golodetz Ltd., [1989] 2 Lloyd's Rep. 277 at p. 287, that -

Thus, the correct analysis of a breach of warranty in an insurance contract may be that, upon the true construction of the contract, the consequence of the breach is that the cover ceases to be applicable unless the insurer subsequently affirms the contract, rather than to treat the occurrence as a breach of the contract by the insured which the insurer subsequently accepts as a wrongful repudiation.

124. This analysis of the function of a warranty and of the consequences of its breach not only supports, to my mind, the construction which I would give to the second sentence of cl. 8, but also undermines Mr. Flaux's construction of the first sentence. The latter factor is for two reasons. First, it demonstrates that even the remedy for breach of warranty differs in important respects from the remedy for non-disclosure or misrepresentation. In the case of breach of warranty, there is an automatic discharge; in the case of non-disclosure or misrepresentation, nothing happens unless the insurer elects to avoid the contract, in which case the contract is not discharged for the future but rescinded ab initio. Secondly, it demonstrates that by being in breach of his warranty, an assured takes himself outside the cover which he has agreed with his insurer. As Lord Justice Kerr said - "the cover ceases to be applicable". This is because a warranty is very akin to a statement of the cover provided by the insurance, indeed it is part of that cover's definition. That is why the insurance ceases to bind as from the time of breach. That is why the insurance ceases to bind even though any subsequent loss had nothing to do with the breach of warranty. It is because the insurer had only agreed to cover the risk provided the warranty was performed. It follows that Mr. Flaux's concession that cl. 8 does not provide an answer to lack of cover

[2001] 2 Lloyd's Rep. 161                                                        Page 42
2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

in principle covers the case of a breach of warranty as well. At any rate, the case of lack of cover and the case of breach of warranty are much closer to one another than either is to non-disclosure and misrepresentation.

125. For these reasons I agree with the Judge that cl. 8 does not exclude a defence based on breach of warranty.

*(viii) Does cl. 8 cover and exclude negligent misrepresentation and non-disclosure?*

126. Mr. Justice David Steel held that cl. 8 covered and thus excluded a defence based on negligent misrepresentation and non-disclosure. The reinsurers cross-appeal on this issue. Although treated below in the context of the reinsurance contracts (see pars. 52-56 of his judgment under the heading of "Effect of Clause 8 in the reinsurance contract"), this issue seems to me to stand free of that question of incorporation. If cl. 8 covers and excludes a defence based on negligent misrepresentation and non-disclosure, it will do so in the original insurance. Of course, the role of cl. 8 in the reinsurance contracts, if there incorporated at all, is another question, to which I shall come later.

127. The reason why the matter was discussed in the Court below in the context of reinsurances is that preliminary issue 4(ii) specifically raised the question as to whether the reinsurers could avoid their contracts of reinsurance on the grounds of fraudulent or negligent, as distinct from (non-negligent) innocent misrepresentation or non-disclosure. I think it is more helpful to concentrate first on the scope of cl. 8

according to its own terms, and secondly to ask how such a clause would operate in the reinsurance contracts, if incorporated there at all.

128. Two preliminary matters need to be stated. The first relates to the question of fraudulent misrepresentation or non-disclosure, a matter included in the preliminary issue. Mr. Justice David Steel stated "there are in fact no allegations of fraud against HIH or its agents" (at par. 52). That is not, however, as I read the pleadings (see at par. 49 above), but it may be that he had been told that nevertheless fraud was not being relied upon. He went on to say ". . .[f]or the record" that it is not open to a party to exclude liability "for his own fraud" in inducing the contract, citing S. Pearson & Son Ltd. v. Dublin Corporation, [1907] A.C. 351. That was presumably intended to leave open the question of whether one can exclude liability for the fraud of one's agent, a question which was debated **186** in the authority just cited, with Lord Halsbury and Lord Atkinson appearing to state that one can not (at pp. 357-358, 366-367) and Lord Loreburn, L.C. (at p. 354) expressing himself more cautiously. However, nothing has been said before this Court on the question of fraud, perhaps again because it was common ground that no case of fraud is intended or persisted in. Therefore, nothing said by me in this paragraph should be regarded as other than a passing comment. I note that in HIH Casualty and General Insurance Ltd. v. Chase Manhattan Bank, [2001] 1 Lloyd's Rep. 30 at par. 44 the case of Pearson v. Dublin Corporation is analysed by Mr. Justice Aikens, and that he concludes at pars. 45-46 that it is conceptually possible to have a clause in a

Copr. © West 2004 No Claim to Orig. Govt. Works

Westlaw.

[2001] 2 Lloyd's Rep. 161                                                                    Page 43
2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

contract of insurance that excludes or limits the consequences of fraudulent non-disclosure by the assured's agent.

129. The second matter relates to a cause of action in negligent misrepresentation, as distinct from the right to avoid for (negligent) misrepresentation. The reinsurers submitted on their appeal that the former cause of action in any event was not excluded by cl. 8. Their pleadings invoke such a cause of action. Preliminary issue 4(ii) does not, however, specifically encompass it, since it speaks only of a right to avoid, and Mr. Justice David Steel does not appear to have considered it. However, it would seem to me to be wrong to leave it out of account.

130. In considering only the remedy of avoidance, Mr. Justice David Steel gave the following reasons (at par. 56) for his conclusion that the parties did intend to exclude the consequences of inadvertent concealment or misrepresentation whether careless or not:

(i) The insurer expressly forgoes rights of avoidance, rejection of any claim or any remedy for non-disclosure or misrepresentation.

(ii) The obligations of good faith are indeed unitary and absolute: the establishment of a negligent misstatement adds nothing: the very concept of a negligent non-disclosure is not easy to grasp.

(iii) There is no indication in the rest of the policy wording that the parties were minded to distinguish between deliberate, careless and accidental activity.

(iv) The introductory words "to the fullest extent permissible by applicable law" on

their natural meaning accord the widest possible scope to the exclusion. I reject the submission that it means no more than: "Avoidance for innocent misrepresentation or non-disclosure is not permitted, unless the law prohibits such an exclusion".

131. The reinsurers submitted that Mr. Justice David Steel was there in error. They relied primarily on the well-known principles of construction set out in Canada Steamship Lines Ltd. v. The King, [1952] 1 Lloyd's Rep. 1; [1952] A.C. 192, which they said the Judge was wrong not to apply nor to consider of particular help. He should rather have followed Mr. Justice Colman in Toomey v. Eagle Star Insurance Co. Ltd. (No. 2), [1995] 2 Lloyd's Rep. 88 and Mr. Justice Aikens in HIH v. Chase Manhattan Bank in applying the *Canada Steamship* principles to analogous clauses in insurance contracts. He should therefore have concluded that there was no sufficiently clearly expressed intention in cl. 8 to exclude the consequences of negligence in misrepresentation or non-disclosure. As for the specific reasons given by the Judge: (i) The reliance on "any claim" and "any remedy" was misplaced; it was not as though the clause had said "any" non-disclosure or misrepresentation. (ii) While it was true that the obligations of good faith are unitary in the sense that a misrepresentation or non-disclosure will entitle an insurer to avoid his contract even in the absence of negligence, nevertheless that did not answer the question whether the parties intended to exclude any remedy for negligence, especially as negligence was the essence of a cause of action in damages for negligent misstatement. (iii) The absence of any indication elsewhere in the contract that

Copr. © West 2004 No Claim to Orig. Govt. Works

Westlaw.

2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

the parties intended to distinguish between the negligent and the merely accidental was at best a neutral consideration. (iv) The opening words of cl. 8 were nothing more than a saving provision in the event that any part of what followed was impermissible as a matter of law.

132. In Toomey v. Eagle Star (No. 2) the clause in question merely stated "This contract is neither cancellable nor voidable by either party". Mr. Justice Colman considered the Canada Steamship line of authorities and concluded that, on a "finely balanced" point, the clause did not exclude the right to avoid for negligent non-disclosure or misrepresentation nor the right to recover damages under s. 2(1) of the Misrepresentation Act, 1967. He appears to have considered it to be axiomatic that non-disclosure and misrepresentation in the insurance context can be negligent as distinct from innocent.

133. In HIH v. Chase Manhattan Bank on the other hand Mr. Justice Aikens adopted a more complex analysis. The clause there stated: ". . .the insured will not have any duty or obligation to make any representations, warranty or disclosure of any nature, express or implied. . .and shall have no liability of any nature to the insurers for any information provided by any other parties and any such information provided by or non-disclosure by other parties. . . shall not be a ground or grounds **187** for avoidance. . ." He held that the rules of construction in Canada Steamship were not directly applicable, and in that respect he differed from Mr. Justice Colman in Toomey v. Eagle Star (No. 2) (at pars. 41-45 of his judgment). He nevertheless concluded

that even so the parties had not intended by the clause in question to exclude either the right to avoid for negligent non-disclosure or misrepresentation or the right to damages for negligent misrepresentation whether at common law or under s. 2(1) of the Misrepresentation Act, 1967 (see pars. 46, 72-73, 76, 78-80, 88 and 90).

134. The particular wording of the clause before Mr. Justice Aiken was nothing like cl. 8 and, with (as I understand it) an appeal pending in that case I would not want to say anything about his ultimate conclusion as a matter of construction of that clause. Of particular interest for present purposes, however, is his analysis of the *Canada Steamship* line of authority in the context of the right to avoid an insurance contract for non-disclosure or misrepresentation. At pars. 41-43 of his judgment he said this:

The rules of construction set out by Lord Morton in the Canada Steamship case and subsequent cases concern clauses in contracts which purport either: (i) to exempt a party from the consequences (in damages) of the negligence of that party or its employees or agents; or (ii) to grant an indemnity to a party where loss has resulted from its negligence or that of its employees or agents. The basis for the three well known "rules" of construction is that parties to a contract will not be presumed to wish to exclude liability for negligence of one party. Therefore there has to be express words of exclusion for negligence (r. 1); or the words of the clause have to be wide enough to cover liability for negligence, (r. 2); if so, the clause will only be effective to cover negligence if it is demonstrated that there is no other "head of damage" (which is not fanciful or remote) which might by covered

Westlaw.

2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

by the clause (r. 3).

It seems to me that the second and third "rules" of construction are intended to deal with cases where the exemption or indemnity clause wording has been deliberately drawn in a wide and general way. It is for that reason that its effect will appear equivocal and so the Court naturally asks: what did the parties actually intend to cover by these general words? I think that the Canada Steamship case rules of construction were not intended to apply to a particular clause that is specifically directed at exempting liability for the breach of a particular type of absolute duty, where the breach can be established whether or not negligence (or fraud) is proved.

In contracts *of* insurance the duty of disclosure of material facts is unitary and absolute in the sense that there will be a breach even if the non-disclosure is only inadvertent. Generally neither negligence nor fraud need to be demonstrated to establish a breach. The same is true of the duty not to misrepresent material facts. Moreover, the consequence of the breach of the duty of utmost good faith is that the insurer has a right to avoid the contract of insurance, rather than damages. So, subject to the limitations concerning fraud discussed above, it seems to me that provided that a clause in a contract of insurance is clearly and specifically intended to cover the consequences of a breach of the duty of disclosure or the "duty" not to misrepresent material facts, then the rules of construction in the Canada Steamship case would not be directly applicable to such a clause.

135. That reasoning appealed to Mr. Justice David Steel, and it appeals to me. I also agree with Mr. Justice David Steel that the

very concept of a negligent non-disclosure is unfamiliar territory. (Fraud is something apart.) Moreover, at the time when the principles relating to avoidance for nondisclosure or misrepresentation were developing in insurance law, and at the time of the Marine Insurance Act, 1906, there was in any event no question of a cause of action sounding in damages. Breach of the duty of good faith gave rise to no cause of action in damages, only to a right to avoid, as has recently been affirmed in Banque Keyser Ullmann S.A. v. Skandia (UK) Insurance Co. Ltd., [1990] 2 Lloyd's Rep. 377; [1991] 2 A.C. 249. Damages at common law for negligent misstatement causing merely financial loss had not yet arisen. The Misrepresentation Act, 1967 had not yet been enacted. The only remedy lay in avoidance. Moreover, the duty of good faith, breach of which entitled avoidance but nothing else, was an absolute duty. It would not occur to anyone to seek to prove negligence. It ought to follow that it would not have occurred to the parties to an insurance contract to seek to exclude the right to avoid for negligence.

136. In such a context, where a clause such as cl. 8 seeks to exclude the right "to avoid or rescind this Policy. . .on the grounds of. . .non-disclosure or misrepresentation. . .", I do not see why those words should permit insurers to seek to prove negligence in non-disclosure or misrepresentation as the ground for a right to avoid for breach of the duty of good faith. Since the parties could not have had negligent breach of the duty of good faith in mind, it seems to me impossible to say that, in the absence of an express exclusion of negligence, the parties are to be thought of as not intending to

Copr. © West 2004 No Claim to Orig. Govt. Works

Westlaw.

2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

embrace any negligent breach of the duty of good faith.

**\*188** 137. Do the new causes of action in negligent misstatement or under the Misrepresentation Act make any difference? I do not think that a cause of action at common law has been pleaded, only a counterclaim for damages under s. 2(1) of the Misrepresentation Act. Such a claim, therefore, is not covered by the words from cl. 8 quoted in the previous paragraph: but I do not see why it is not prima facie covered both by the additional words of exclusion in the first sentence - "any remedy or redress on the grounds of. . . misrepresentation. . .or any other similar grounds" - ; and by the language of the second sentence whereby "any and all. . .rights of. . .counterclaim" are excluded. Moreover, since negligence is not a condition precedent of a right to claim under s. 2(1), I do not see why it needs to be expressly or impliedly excluded. All a claimant under s. 2(1) has to prove is a misrepresentation which induced his contract. It is then up to the defendant to prove the absence of negligence as a defence. With respect to Mr. Justice Aikens (see par. 90 of his judgment), I do not think that a clause such as cl. 8 would have to state expressly that "there was no liability on the insured even if there was no reasonable belief" in the representation complained of.

138. In any event, I agree with Mr. Justice David Steel that the language of the clause is very wide. Its opening words are words of saving, but they emphasize that the language of the clause is intended to be read as widely as they properly can be. I do not see why "any claim. . .any remedy or redress on the grounds of. . .non-disclosure or

misrepresentation. . .or any other similar grounds" does not embrace a claim based on negligent non-disclosure or s. 2(1) of the Misrepresentation Act. Moreover, since misrepresentation (in the absence of fraud) can only give rise to a claim in damages if there is negligence and not otherwise, and since cl. 8 is plainly intended to go beyond the exclusion of the right to avoid for misrepresentation and to extend to the exclusion of "any remedy or redress on the grounds of. . .misrepresentation", and since therefore there could be no remedy or redress for misrepresentation other than the right to avoid in the absence of negligence, I do not see why cl. 8 would not in any event pass even the most stringent application of the *Canada Steamship* rules as an exclusion of the right to claim damages under s. 2(1) of the Misrepresentation Act, or, for the same reason, of the right to claim damages at common law for negligent misstatement.

139. The reinsurers placed emphasis in their submissions as did Mr. Justice Aikens himself (see at par. 77 of his judgment), on what Lord Justice Steyn said in E. E. Caledonia Ltd. v. Orbit Valve Co., [1994] 2 Lloyd's Rep. 239 at p. 246, col. 1; [1994] 1 W.L.R. 1515 at p. 1523H to the effect that -

. . .Why was an express reference to negligence not inserted? Similar questions have been posed on a number of occasions. Why do draftsmen not take note of a clear and consistent line of judicial decisions? For my part I have no doubt that the draftsman on the underground to whom such a question was addressed would say "one does not want to frighten off one or other of the parties." Omissions of express reference to negligence tend to be deliberate.

[2001] 2 Lloyd's Rep. 161                                                          Page 47
2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

140. That, however, was said in the context of a classic application of the rules of *Canada Steamship*, not in the context of a clause which was dealing with remedies inter alia of avoidance arising from non-disclosure or misrepresentation in the negotiation of an insurance contract. For reasons which I have sought to give above, I do not think that it would occur to the draftsman in such circumstances to think it necessary to provide expressly for negligence.

141. For these reasons, this aspect of the reinsurers' cross-appeal fails.

*(ix) Is cl. 8 specifically incorporated into the reinsurance contracts by reason of the term therein "Cancellation Clause as Original Policy"?*

142. New Hampshire accepts that cl. 8 forms part of the reinsurance contract by virtue of a general incorporation said to be effected by the condition that "this reinsurance is subject to all terms, clauses and conditions as original". In its case, therefore, the issue currently under consideration may add nothing. Axa and Independent, however, oppose any incorporation of cl. 8 into their contracts.

143. HIH, which relies on the incorporation of cl. 8 into the contracts of reinsurance, pleaded such incorporation by reference to the general words found in the condition just cited. In the event, however, HIH received an unexpected bonus in the form of the evidence of its expert, Mr. Roger Day, who was the first to suggest that the words "Cancellation Clause as Original Policy" in the reinsurance slip policy were a specific

reference to cl. 8, albeit cl. 8 was a type of clause which he knew more commonly as a "non-cancellation" clause. This suggestion was discussed between the experts at a joint meeting, and the joint memorandum which resulted contained this passage:

4. Messrs Day and Godfrey [Mr. Robert Godfrey, Axa's and Independent's expert] next discussed Clause 8. Mr. Day believes Clause 8 to be the non-cancellation provision of the policy to **\*189** which the reinsurer agreed in signing the reinsurance slip. Mr. Godfrey believes in having reviewed the policy, the cancellation (or non-cancellation) clause is more appropriately Clause 4.3. . .wherein cancellation provisions are mentioned. In Mr. Godfrey's opinion Clause 8 does not deal with cancellation but more appropriately deals with disclosures and waivers of rights. Mr. Godfrey believes the matter of interpretation of the policy contract may be more of a matter of law for the Court to decide rather than the subject of expert opinion.

144. It may be recalled that cl. 4.3 of the policy wording is headed "Amendments to the Policy" and states that "This policy may not be amended, cancelled, revoked or rescinded without the prior written consent of the Assured". The experts were not called to give oral evidence, and their evidence stood therefore as I have set it out above.

145. Mr. Justice David Steel dealt with this issue at pars. 35-38 of his judgment. He held that cl. 4.3 was not a viable option for the "Cancellation Clause", and that the choice therefore lay between cl. 8 or nothing. He thought it right to give some meaning to the specific reference to a cancellation clause, if

Copr. © West 2004 No Claim to Orig. Govt. Works

Westlaw.

2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

possible, that on balance the reference was to cl. 8, and that it was therefore incorporated. Since cl. 8 was specifically referred to, it did not matter whether the reinsurers actually knew about it or signed the policy wording itself.

146. Axa and Independent submit that the Judge was in error. On behalf of Independent, Mr. Stephen Ruttle, Q.C. relies substantively on the absence of HIH's pleaded reliance on this contention of specific incorporation, submitting that, if the point had been pleaded expressly, the role of the experts would have been different. On behalf of Axa, Mr. Peter Gross, Q.C. refers to the absence of HIH's pleading only forensically. On the merits of the point, Axa and Independent submit that cl. 8 was not identified by the words "Cancellation Clause ", since cl. 8 was neither entitled as a cancellation clause, nor dealt with cancellation (as distinct from avoidance, a different concept with different consequences), nor was regarded by Mr. Day as a cancellation clause rather than a non-cancellation clause. If, therefore, the reference was to anything, it must be to cl. 4.3. Even if the reference was to cl. 8, however, there was no incorporation since the reference was "oblique and equivocal" and the clause would not work (without an impermissible degree of manipulation) in the reinsurance context. That last submission covers the same ground as question (x) below and will be dealt with there.

147. For the rest, I am persuaded in any event that it would be wrong to find in the term "Cancellation Clause as Original Policy" a specific reference to cl. 8. I discount both the expert evidence and the absence of any pleading. It might be different if there was unchallenged evidence that in the insurance market in question cl. 8 was known as a "Cancellation Clause", or even if there was disputed evidence to that effect but it was not possible for the Court to prefer one expert's evidence over the others on objective grounds. As things stand, however, even Mr. Day's point was made equivocally: he knows cl. 8 as a "non-cancellation" clause. In any event, if the experts' evidence were important, the absence of any pleading might well be significant. As it is, I would prefer to view the point as a pure matter of construction. On that basis, the fact that the term in question refers to the clause as "Cancellation Clause" strongly suggests that it should be possible to find a clause whose title is or contains the word "Cancellation". Clause 8, however, is entitled "Disclosure and/or waiver of rights". Even in its text, it nowhere contains the word "cancellation" or "cancel" (not even in any negative form). I agree with the submission that avoidance or rescission is not the same as cancellation, since the latter operates under the terms of the contract itself and only for the future, whereas the former operates by reason of common law and relates back. The absence of any reference at all to cancellation in cl. 8 can be contrasted, moreover, to its presence (in the form "cancelled") in cl. 4.3. I do not think that the mere presence of that word justifies regarding cl. 4.3 at the "Cancellation Clause", for it is entitled "Amendments to the Policy" and refers only incidentally to cancellation; but the contrast between the texts of cl. 8 and of cl. 4.3 highlights the difficulty of calling the former a cancellation clause when it is only the latter which refers anywhere to cancellation.

Copr. © West 2004 No Claim to Orig. Govt. Works

Westlaw.

2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

Moreover, I am not concerned too much with the failure of finding a clause to identify with the specific reference to a "Cancellation Clause". Of course, if it could appropriately be done, well and good. However, the original slip policy provides the example of a specific reference to a "Cross Collateralisation Clause" which does not appear in the policy wording. Moreover, a draft of the policy wording was already available at the time of the reinsurance slip policy, and that draft referred to cl. 4.3 and to cl. 8 under their final titles. If it had been intended to refer to cl. 8 (or cl. 4.3), I do not see why some more appropriate identification could not have been chosen.

148. I would prefer to say, therefore, that the reference to a "Cancellation Clause" simply fails to have content. If, however, I were wrong about that, and the reference was to cl. 8, then I would agree that it was incorporated, even if Axa did not have specific knowledge of it, subject to the following **\*190** considerations which are dealt with later in this judgment. One is whether the clause can work (with or without manipulation) in the reinsurance context. Of course, where a clause is specifically incorporated, there is pressure to see that it does work, if at all possible and if necessary by appropriate manipulation. Secondly, there is the general question of how cl. 8 operates in the reinsurance context. Thirdly, however, there might have been a question which has only partly been considered by the Judge below, and that is whether cl. 8 is so unusual a clause (that has been considered) and the reference to it as a "Cancellation Clause" so unsatisfactory a reference (that has not), that it would be unfair to give effect to the specific reference.

As it is, that question, in that form, does not arise.

149. On this point, therefore, I would disagree with the Judge's admittedly tentative conclusion.

*(x) If there is no specific incorporation of cl. 8, is it incorporated into the reinsurance contracts by reason of general words of incorporation?*

150. As already stated, New Hampshire accepts that the answer to this question is "Yes", but Axa and Independent submit that it is "No". Mr. Justice David Steel held that, if he was wrong about cl. 8's specific incorporation by virtue of its identification with the "Cancellation Clause" referred to in the reinsurance slip policy, then it was in any event incorporated by reason of the general words found there -

. . .This reinsurance is subject to all terms, clauses and conditions as original and to follow that placement in all respects.

151. For the purposes of this present issue, I shall for the present leave out of account additional factors considered below under questions (xi) (does it make any difference that cl. 8 is an unusual term, and would its incorporation be fair?) and (xii) (does it make any difference whether a reinsurer was aware of cl. 8?), although I shall have to give some consideration at this point to the final question (xiii) which asks what the effect of cl. 8 is, if incorporated into the reinsurance contract.

152. Axa and Independent have a primary and an alternative case regarding the issue of cl. 8's incorporation into their contracts.

Copr. © West 2004 No Claim to Orig. Govt. Works

Westlaw.

2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

Their primary case is that it is not incorporated at all. Their alternative case, however, is that, if incorporated, its effect is merely to emphasize that the reinsurers could not complain if HIH paid a claim (by reason of cl. 8 being a term of the original insurance and thus depriving HIH of possible defences) in circumstances where, in the absence of cl. 8, no claim would be payable at all.

153. Mr. Justice David Steel rejected that alternative case, at par. 52 of his judgment, in a single sentence, and without giving reasons: "I reject the submission that the effect is solely to agree to follow settlements made by HIH where otherwise HIH would have had a defence."

154. Although it is clear that the Judge rejected that alternative case, it is not entirely clear what effect the Judge thought that he was giving to cl. 8 by accepting, as he did, HIH's case that it was incorporated into the reinsurance contracts. On the one hand he accepted that, as so incorporated, it would require a degree of manipulation. Thus in par. 41 of his judgment he said:
   Does cl. 8 makes sense? While the references to arrangements, with Flashpoint are not directly apposite, only a minor adaptation is required to make the clause workable in the context of the reinsurance. In short, the reference to the "Insurer" needs to be replaced by the "Re-insurer" and the reference to the "Assured" by "Re-assured". I regard such manipulation as appropriate and permissible . . .

155. On this basis, it would seem that the Judge considered that cl. 8, when incorporated into the reinsurance contracts,

operated there as a clause independent of the original insurance and regulating relations not between the original assured, LDT, and the original insurer, HIH, but independently between the reinsured, HIH, and the reinsurers.

156. On the other hand, in pars. 43-44 of his judgment the Judge addressed the reinsurers' submission that incorporation was inappropriate because, unlike HIH, the reinsurers could not rely on the collateral agreements and their warranties concerning, inter alia, proper disclosure and the exercise of the utmost good faith. He rejected that submission on the ground that the reinsurers could rely on the collateral agreements by way of subrogation and added - "Where, as I have indicated, the set-up is akin to a fronting arrangement, I see nothing inapposite in treating cl. 8 as incorporated in the reinsurance slip." The problem with that reasoning, as it seems to me, is that it assumes that the exclusion created by cl. 8 in the original insurance and by the manipulated cl. 8 incorporated into the reinsurance contracts will operate in a back to back manner, so that the reinsurers would be entitled to exercise rights of subrogation under the collateral agreements. If, however, the non-disclosure or misrepresentation (or any other complaint) which would have operated as a defence under the reinsurance contracts but for the incorporated cl. 8 is not equally relevant to the original insurance, but on the contrary independent of an excluded defence under cl. 8 of the original insurance, then the situation is not back to back and the reinsurers would not be entitled to be subrogated to **\*191** HIH's rights against Flashpoint under the collateral agreements.

Copr. © West 2004 No Claim to Orig. Govt. Works

Westlaw.

[2001] 2 Lloyd's Rep. 161                                                                                   Page 51
2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

157. Thus either Mr. Justice David Steel was in error in his reasoning in pars. 43-44, or, sub silentio, he was giving to an incorporated cl. 8 an effect different from that which it might seem he was accepting in par. 41 where he was prepared to manipulate the words of the clause so as to enable it to operate independently between HIH and the reinsurers.

158. The importance of this distinction to Axa and Independent is that if cl. 8 were fully incorporated into their reinsurance contracts so as to operate independently at the reinsurance level, then the reinsurers could not complain about non-disclosure or misrepresentation (or any other ground of defence which might be excluded by cl. 8 on its true construction) as between HIH and themselves. If, however, the effect of cl. 8's incorporation into the reinsurance contracts were merely to bind the reinsurers to a payment made by HIH where only HIH's defence under the original contract were in issue, the reinsurers would say that they still remained free at the reinsurance level to refuse payment to HIH where there was, for instance, a separate ground of avoidance in the circumstances of the placement of the reinsurance.

159. Thus in its skeleton argument, Axa put the matter in the following way:

75. What clause 8 does not do is prevent reinsurers avoiding the reinsurance itself on the grounds of a breach of duty of good faith by HIH (or its agents) in the course of the placement of the reinsurance contract.

76. In effect, if clause 8 is incorporated into the reinsurance contract, reinsurers are thereby agreeing that they are content for

HIH to waive any rights or defences it might otherwise have. That is a personal decision for HIH but one that requires reinsurers' approval if it is to bind reinsurers. What reinsurers are not, however, agreeing to do is give up their own rights and defences. That would be a personal decision for reinsurers and not one it should be concluded they have made by the incorporation of someone else's waiver.

77. Only by so construing clause 8 is the need for any manipulation of clause 8 avoided, while giving clause 8 effect and purpose in the reinsurance contract. The learned judge should have construed clause 8 accordingly.

160. Independent, in its skeleton argument, put the matter in this way:

12.(i) The presumed intention of *both* parties in seeking to incorporate clause 8 into the reinsurance must have been to bind the reinsurers to follow HIH's settlements to its insured; or at least to avoid any argument about HIH's entitlement to recover such settlements.

(ii) Their presumed intention cannot have been to leave unresolved the question of the liability of reinsurers for such payments. . .and to amount to a waiver by reinsurers of breaches of duty of utmost good faith by HIH. First this would leave a significant and uncertain gap in coverage. Secondly, the release by HIH of its insured from the consequences of the latter's breaches of duty of utmost good faith is met, commercially, by a side agreement [the collateral agreement] between HIH and Flashpoint; to which the reinsurers would be subrogated where a breach by Flashpoint leads to a claim. There is no corresponding agreement to compensate reinsurers for their release of

Case 2:02-cv-04435-AB     Document 128     Filed 01/27/2005     Page 90 of 115

Westlaw.

[2001] 2 Lloyd's Rep. 161                                                    Page 52
2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

HIH from the consequence of that party's breaches of duties of utmost good faith. . .Assume the disclosure by the insured to HIH, at the request of Flashpoint, of fundamentally important information. HIH omits to pass on this information. Alternatively, assume the omission of HIH, on placing of the reinsurance, of material information about HIH's underwriter or about HIH's own investigation into the risk or that HIH had only written the risk as a favour to the broker. In none of these instances would the reinsurers have any subrogated recovery from Flashpoint because none of these omissions would amount to a breach by Flashpoint of any duty owed by it to HIH.

  (iii) The expert evidence. . .was consistent with the parties' having wished clause 8 to have had the. . .effect [of the alternative submission]; but inconsistent with them having wished the clause to have the. . .effect [contended for by HIH] . . .

  14. Independent accepts that it will be easier to show that clause 8 is incorporated into the reinsurance if its effect, once incorporated, is as a follow settlements provision. . .Thus no manipulation of the clause would be required. However, general words of incorporation would not be sufficient to bring in the clause, even on such a basis.

  161. It will be clear from these citations, and it became even clearer in oral argument, that the real battle-ground between HIH on the one hand and Axa and Independent on the other on this issue regarding incorporation of cl. 8 related to the *effect* of incorporation, rather than the *fact* of incorporation itself. If incorporation merely had the effect of the reinsurers' alternative

submission, then they were quite prepared to live with it. Moreover they accepted that on this basis the clause did not require manipulation, and that the expert evidence (directed ***192** primarily to the question of whether cl. 8 was a usual clause, but trespassing onto a discussion of its purpose and effect) was consistent with their alternative submission. Nevertheless, their primary submission was not abandoned, and it is to this that I now turn. In doing so, however, it is necessary not to lose sight of the question of the effect which incorporation in one form or another might have on the relations between the parties.

  162. Axa and Independent put forward their submissions that cl. 8 is not to be incorporated into the reinsurance contracts by reference to a number of well known criteria, also considered by Mr. Justice David Steel below. Thus, is the clause in question germane to the reinsurance, or merely collateral? Does it make sense without undue manipulation? Is it consistent with the express terms of the reinsurance? Is it apposite for inclusion in the reinsurance?

  163. On these criteria, which he approached in that order, Mr. Justice David Steel held as follows (at pars. 39-44). Clause 8 is germane, for, although it is not part of the central definition of the risk, it is material to the nature and scope of the risk in the same way as an exceptions clause is germane to the shipment, carriage and discharge of goods under a bill of lading. It is not collateral in the sense that an arbitration or choice of law or jurisdiction clause is collateral. It does make sense, albeit with some manipulation, and is apposite to the back to back fronting

Westlaw.

2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

arrangement which is how he saw the transaction as a whole (see above). It is not inconsistent with any of the express terms of the reinsurance contract.

164. It is convenient to start with the questions whether cl. 8 makes sense, with or without manipulation, and whether it is apposite, when read into the reinsurance contracts. These are linked questions, as I have already indicated above in my analysis of the Judge's conclusions and reasoning in respect of them.

165. I start with the assumption, and I stress the word assumption, that the insurance and reinsurance contracts were intended to be back to back and that, as the Judge said, the set-up was akin to a fronting arrangement. Those matters are in dispute, and the extent of the inferences that may be derived from them are likewise in dispute. Indeed the reinsurers criticize the Judge for starting from the premise of a presumption that the insurances were intended to be back to back.

166. I wish to be cautious, which is why I use the word assumption. I wish to be cautious because of the combination of circumstances that there has been no agreement or agreed assumptions as to the facts of the placement of these insurances, no investigation of them, and yet there is a dispute about such matters. What is a Court to do in such a situation? Since the preliminary issues are there to be answered, I think the Court must try to do so, if it can do so without potential injustice or the likelihood of error. In such circumstances I do not think it is unfair or likely to turn out to be in error to assume that the insurances

were intended to be back to back or that the set-up was akin to a fronting arrangement. I have in mind both the facts stated earlier on in this judgment, and the general principle that in the context of facultative reinsurance, as here, there is a presumption, aided by general words of incorporation such as those found in this case, that the parties intended at least the scope of the cover to be back to back, so that a risk falling within one will fall within the other. If a subsequent investigation of the facts shows that a different conclusion is required, then I acknowledge that nothing said here should pre-empt findings of fact yet to be made, or any necessary inferences of construction to be made on the basis of those facts. In the meantime, I must proceed as best I can.

167. As for the general presumption of back to back reinsurance, I would refer to what Lord Justice Kerr said in Citadel Insurance Co. v. Atlantic Union Insurance Co. S.A., [1982] 2 Lloyd's Rep. 543 at p. 546:

The conditions of the cover were described "as original" with certain qualifications. This is usual and means no more than that the terms of the reinsurance cover are to be the same as those of the original, i.e., reinsured policies.

168. In Forsikringsaktieselskapet Vesta v. Butcher, [1989] 1 Lloyd's Rep. 331 at p. 336, col. 1; [1989] A.C. 852 at p. 895B-C Lord Griffiths spoke in perhaps even broader terms of reinsurance being back to back with insurance. He said:

. . .In the ordinary course of business reinsurance is referred to as "back-to-back" with the insurance, which means that the reinsurer agrees that if the insurer is liable

Copr. © West 2004 No Claim to Orig. Govt. Works

Westlaw.

under the policy the reinsurer will accept liability to pay whatever percentage of the claim he has agreed to reinsure. A reinsurer could, of course, make a special contract with an insurer and agree only to reinsure some of the risks covered by the policy of insurance, leaving the insurer to bear the full cost of the other risks. Such a contract would I believe be wholly exceptional . . .

See also Groupama Navigation et Transports v. Catatumbo C.A. Seguros, [2000] 2 Lloyd's Rep. 350 at pp. 352-353 and Mann and Holt v. Lexington Insurance Co., [2001] 1 Lloyd's Rep. 1 at pp. 6-7.

169. In the present case there is not only the general incorporation clause already cited, but also **193** the following further indicia of an intention of a back to back policy: the fact that "TYPE" and "INTEREST" are stated to be "As Original Policy"; the fact that the premium is the same ("Original Net Premium. . ." etc.); the fact that the amendment clause is intended to bind reinsurers, subject to consultation and their agreement being obtained, to "all amendments and alterations to the terms, clauses and conditions of the Original Policy"; and the fact that reinsurers promise to pay any claim and professional advisers' fees and expenses "incurred under the Original Policy. . .at the same time". I agree that such terms do not in themselves answer any particular question as to the scope of incorporation (see e.g. Gan Insurance Co. Ltd. v. Tai Ping Insurance Co. Ltd., [1999] Lloyd's Rep. IR 472) but they certainly support the general presumption that the insurance and reinsurance are intended to be back to back.

170. I turn then to cl. 8 in particular, and

ask whether it would make sense and be apposite or appropriate in the reinsurance. The first rule of incorporation, of course, is to test the allegedly incorporated term in the context of the incorporating document by writing it out verbatim in the latter. In that context the question immediately arises as to whether cl. 8 should be manipulated or not, for if it is not, then it refers to the situation between HIH and the original assured rather than the situation between HIH and the reinsurers. There is nothing unusual about such manipulation, provided it can be done simply and deftly as a matter of language, where everything points to the incorporation of the term in question. Thus in bill of lading and charter-party cases, where the terms of a charter-party are often incorporated in a bill of lading, a charter-party term which refers to the "charterer" may in the context of the bill of lading have to be understood as referring to the "bill of lading holder". In the reinsurance context, such manipulation has been approved in CNA International Reinsurance Co. Ltd. v. Tranquilidade S.A., [1999] C.L.C. 140, a case relied on by the Judge below, where Mr. Justice Clarke, in order to maintain what he regarded as "essentially a fronting arrangement" in good back to back order, held that references to "the assured" were references to the "reassured" and so on (at pp. 151-152). On the other hand, Miramar Maritime Corporation v. Holborn Oil Trading Ltd. (The Miramar), [1984] 2 Lloyd's Rep. 129; [1984] A.C. 676 is a warning that the need to manipulate in uncertainly apposite circumstances is a pointer against incorporation.

171. In my judgment there are two grounds which indicate that cl. 8 should not be

2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

manipulated in the present case, one linguistic and the other a matter of the reason of the thing. The linguistic grounds is that if "the Insurer" in cl. 8 is under- stood, in the reinsurance contract, to be referring to "the Reinsurer", then the clause does not make sense: for the clause goes on to speak of "its arrangements with Flashpoint Ltd", where "its" must, in the manipulated version, refer to the reinsurer, but cannot properly do so, since it is only HIH which has arrangements with Flashpoint. Mr. Justice David Steel referred in passing to this difficulty when he said (at par. 41) that "the references to arrangements with Flashpoint are not directly apposite"; but he did not solve the difficulty, and I do not think that it can be solved. The other ground is that, although the rationale of the manipulation is to preserve the contracts back to back, this purpose is not achieved, but thwarted, by the manipulation: for it does not follow that because HIH has waived its right to avoid for breach of the duty of good faith by its assured, LDT, that the reinsurers should also waive what might be an entirely *different and independent* breach of the duty of good faith on the part of HIH. That would be the very antithesis of a back to back contract. Thus it could be that there is no breach as between LDT and HIH, but HIH is personally guilty of some independent nondisclosure or misrepresentation as between it and a reinsurer. In such a case, if cl. 8 was incorporated in the reinsurance contract in manipulated form, the reinsurer would neither have a defence against HIH nor a claim by way of subrogation against Flashpoint.

172. In my judgment, therefore, cl. 8

cannot be incorporated in manipulated form into the reinsurance contracts. It does not make sense, cannot be successfully manipulated, and, even if it could be, could have an effect contrary to the reason of the thing. On the same basis, it can be said that the clause in such a form would not be consistent with the express terms of the reinsurance, neither with their spirit nor with their letter, since such a clause might make it impossible for the reinsurance to "follow the placement in all respects". In the circumstances, it does not matter whether the clause in such a form is germane or collateral, but in my opinion, for reasons which I will express below, it is germane and is not collateral.

173. The question next arises whether the incorporation of cl. 8 in *unmanipulated* form would make sense and be apposite. I do not think that Axa and Independent would submit that it would not. If I am wrong about that, however, let me say that I think it would make sense and would be apposite. There can be nothing senseless or inapposite about the reinsurers' alternative submission. That would, however, still leave open the question whether the reinsurers' alternative submission as to the effect of the incorporation of an unmanipulated cl. 8 is the only solution to be considered. I shall return to that **\*194** question under question (xiii) below. In the meantime I would merely observe that there is an oddity and uncommerciality in a situation where the reinsurers have agreed to pay even though there has been non-disclosure or misrepresentation in the placement of the original insurance with HIH (or some other such fault within the waiver of cl. 8) if the reinsurers could at the same time reject any

Copr. © West 2004 No Claim to Orig. Govt. Works

Westlaw.

2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

liability to pay on their part on the ground of the *identical* non-disclosure or misrepresentation in the placement of the reinsurance with themselves.

174. Is cl. 8, whether in manipulated or unmanipulated form, germane to the reinsurance? The reinsurers had two main arguments for saying that it was not. The first was that a clause in this context is only germane if it relates directly to the scope of the cover. Otherwise it is merely collateral, and authorities demonstrate that merely collateral clauses are not incorporated. Secondly, a clause excluding the consequences of avoidance can only be effective if it survives avoidance: but to survive avoidance, such a clause has to be collateral to the main contract, like an arbitration clause, an archetypal example of a clause which is not incorporated by general language, only by express reference.

175. Like the Judge below, I am not persuaded by these submissions, nor by the authorities which are relied on in support of them. A leading authority on the incorporation of terms (in the marine context) is Thomas & Co. Ltd. v. Portsea Steamship Co. Ltd., [1912] A.C. 1. The rule is that a general incorporation clause only brings with it terms which are "germane to. . .the proper subject-matters" of the incorporating contract (per Lord Atkinson at p. 6). Where bills of lading incorporate charter-party terms, those proper subject-matters are clauses "germane to the receipt, carriage, or delivery of the cargo or the payment of freight" (ibid.). Such terms commonly include exception clauses relating to those subject-matters. I do not see why a clause like cl. 8 is not germane to a

reinsurance contract, nor to the scope of the risk accepted by the reinsurer. The reason why an insurer is entitled to avoid his contract for (material) non-disclosure or misrepresentation is that he calculates the risk that he is prepared to run and the premium that he stipulates for running that risk on the basis of the information he is given. Clauses affirming that common law position, or altering it, seem to me alike to be germane to the risk covered, even though they do not seek to define that risk, as coverage clauses or warranty clauses seek to do. In CNA International v. Tranquilidade Mr. Justice Clarke held that a clause which affirmed the common law position was incorporated from a reinsurance into an insurance (at pp. 144-145).

176. In principle, therefore, cl. 8 is germane to the reinsurance. This is a fortiori the case for cl. 8 in its unmanipulated form, for as such it affirms the reinsurer's liability to pay where the original insurer must pay, even in circumstances where in the absence of cl. 8 the original insurer might have had a defence. In its unmanipulated form it is, as the reinsurers themselves recognize, a form of "follow the settlement" clause. Nothing could be more germane to a reinsurance than a form of follow the settlement clause.

177. On what basis therefore do the reinsurers say that cl. 8 is not germane? They refer to the following authorities. In Pine Top Insurance Co. Ltd. v. Unione Italiana Anglo Saxon Reinsurance Co. Ltd., [1987] 1 Lloyd's Rep. 476 at pp. 480-481 Mr. Justice Gatehouse declined to incorporate an arbitration clause into either a reinsurance or a retrocession. He gave two

Copr. © West 2004 No Claim to Orig. Govt. Works

2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

main reasons, the first that only terms which "define the risk" are incorporated, the second that he would in any event follow the bill of lading cases to hold that an arbitration clause is not incorporated without express provision. But he included "Exceptions. . .and the General Exceptions" (at p. 480) in his view of terms which define the risk.

178. Aughton Ltd. v. MF Kent Services Ltd., [1991] 31 Con. L.R. 60 concerned construction contracts: did a sub-sub-contract incorporate the main contract's arbitration clause? Again, the Court said no, albeit the two-Judge Court of Appeal differed in the route by which each of them got there. Lord Justice Ralph Gibson thought that arbitration clauses could be incorporated by general words, but held that on the facts there was no agreement in writing within the Arbitration Act, 1950. Nevertheless, he distinguished (at p. 77) between terms which "define the rights and obligations of the parties with reference to the subject-matter" and those which control or affect the "rights of the parties to enforce those rights and obligations by proceedings at law". There is nothing in that distinction which to my mind would allocate cl. 8 to the latter category. Sir John Megaw, however, directed himself by reference to Thomas v. Portsea and emphasized the special factors which relate to arbitration clauses, such as their effect in precluding parties from bringing a dispute before a Court of law, and their nature as a self-contained contract collateral or ancillary to the substantive contract, a "category of their own" (at pp. 87-88). Again, there is nothing at all in that which seems to me to be relevant to cl. 8. On the contrary, Sir John Megaw described germane terms relating to the subject matter

of a contract as including "clauses of substantial commercial importance - for example, exception clauses. . ." (at p. 86).

179. Thirdly, the Court was referred to Excess Insurance Co. Ltd. v. Mander, [1997] 2 Lloyd'sRep. 119 **195** , where again the Court refused to incorporate an arbitration clause (into a retrocession contract). In the course of his review of the authorities, Mr. Justice Colman pointed out (at p. 125) that -

. . .the Courts impute to the parties to the bill of lading contract a mutual intention by their use of general words of incorporation to write into their contract only the corresponding subject-matter of the incorporated contract because they are taken to treat merely ancillary or collateral provisions, such as an arbitration clause as by their very nature essentially personal to the parties to the incorporated contract.

180. Mr. Gross emphasized the expression "personal to the parties" as being relevant to the situation encompassed in a clause dealing with the placement of an insurance or reinsurance contract, viz. cl. 8. However, that expression has to be read subject to the reason of the topic being discussed. An arbitration clause is patently an ancillary or collateral provision which is personal to the parties: arbitration is private and confidential and cannot be conjoined with another arbitration without the consent of all the parties.

181. In sum, I see no reason to ally cl. 8 with clauses like arbitration clauses or other clauses concerned with dispute resolution, such as jurisdiction clauses, or notice clauses, to mention the subjects of other decisions to which the reinsurers' skeletons

[2001] 2 Lloyd's Rep. 161                                                                 Page 58
2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

make reference.

182. The second strand of argument under this heading was the submission that cl. 8 was collateral, indeed had to be collateral, because otherwise it could not itself survive avoidance. In this respect cl. 8 was said again to be analogous to an arbitration clause, which has to survive even the discharge or frustration of its host contract if it is to direct the parties' obligation to arbitrate. I did not understand the logic of this submission. Clause 8 does not have to survive avoidance, because it prevents avoidance, by waiving the right to exercise an entitlement to avoid. Despite Mr. Gross' citation, in support of his submission, of what Mr. Justice Colman said in Toomey v. Eagle Star (No. 2) at p. 91, where he also referred to a passage from Lord Justice Steyn's judgment in Pan Atlantic Insurance Co. Ltd. v. Pine Top Insurance Co., [1993] 1 Lloyd's Rep. 496 at p. 502, I do not understand those passages as stating that a clause excluding a right of avoidance is a collateral contract or has to be one in order to be effective, merely that if a clause is to have that effect, then it has to be done clearly, even expressly. Indeed, Lord Justice Steyn may be read as saying that an anti-avoidance clause is to be contrasted with an arbitration or exclusive jurisdiction clause, which are "procedural in char- acter and discrete from the remainder of the contract".

183. In my view cl. 8 shares with an arbitration clause none of those characteristics which have marked the latter out for special (I do not say unique) treatment. It is not collateral either in the sense that it is concerned with the resolution of disputes, and in that context the making

of claims, as distinct from substantive rights, or in the sense that it is intended to survive the death of its host contract. It is not procedural. It is not personal in the sense in which that term is used in the arbitration context.

184. I would therefore reject the submission that cl. 8 could not be incorporated into the reinsurance contracts because it is not germane, but collateral.

185. Finally, under this issue, the criterion of consistency with the other terms of the reinsurance contracts was raised. Clause 8 was said to be inconsistent with the common law duties of good faith which would otherwise exist in relation to the reinsurance contracts. Thus it is said that the clause is inconsistent not with any of the express terms of the reinsurance contracts, but with the standard common law position. It seems to me that this point has cogency in relation to cl. 8 in its manipulated form. I agree that an exclusion of a standard and important common law obligation should not easily be regarded as incorporated by merely general words. The fact that the exclusion will only operate as an independent term of the reinsurance contract if its language is manipulated as the Judge was minded to allow, to my mind emphasizes the difficulty of the incorporation.

186. However, there is not the same difficulty if the incorporation is in the unmanipulated form.

187. In sum, therefore, I would conclude that, in the light of the criteria discussed under this question, cl. 8 is not to be regarded as incorporated into the

Westlaw.

2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

reinsurance contracts in its manipulated form, but can, subject to the further questions to be considered below, properly be regarded as incorporated in its unmanipulated form.

*(xi) For these purposes, does it make any difference whether cl. 8 is an unusual term? Is it an unusual term? Is incorporation of such a term "fair"?*

188. Axa and Independent submitted that cl. 8 was an unusual term and that this was a further reason why it should not be regarded as incorporated by words of general incorporation. They further submitted that, because it was an unusual term, it would not be fair to regard the reinsurers as bound by cl. 8.

189. On these submissions it was Independent, rather than Axa, that made the running, since **\*196** Independent had a positive case that, because, unlike the other two reinsurers, it had not endorsed a copy of the policy wording, it was unaware of cl. 8. Therefore, it was said, it could not be bound by an unusual clause, or should not be bound by an unusual clause because that would be unfair. In the background, moreover, but not part of these preliminary issues, lies an additional argument that the presentation was itself unfair because of the inclusion of an unusual clause. That might be a ground for avoidance of the whole reinsurance, rather than merely for the exclusion of a clause from being incorporated.

190. Although it was Independent that made the running on these issues, Axa joined in them, even though it had endorsed

a draft of the policy wording which included cl. 8. It joined in on the basis that, even so, it could not necessarily be assumed to have been aware of the clause; and the issue of awareness was not for determination at the trial of preliminary issues. It also, I think, submitted, but in a rather muted way, that, if cl. 8 was an unusual term, then it would not be effectively incorporated in *any* of the contracts of reinsurance by merely general words of incorporation: that that was a matter of construction which was not affected by the special knowledge of any particular reinsurer. I would have thought that, if the clause were an unusual one, the last point may be formally open, but that, in the light of the Axa's endorsement of the policy wording, it might prove to be an ambitious submission since, quite apart from awareness, a party is usually bound by its signature. However, I see that in an insurance context there remains the point that a presentation involving an unusual term may be unfair.

191. Mr. Justice David Steel dealt with this issue as follows. On the question of fact, he reviewed the evidence of the two experts in the light of their respective experience and said that he thought it right to place much greater reliance on the views of Mr. Day (HIH's expert) because he alone had experience of the relevant class of insurance in the London market, whereas Mr. Godfrey's experience lay in the U.S. He found that insurance of this type in the U.S. market was for relevant purposes written in significantly different terms in that it was unconditional and irrevocable and therefore had no need for a clause like cl. 8. He found that Mr. Day's evidence was that clauses such as cl. 8 were often requested and

2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

"sometimes agreed" and added (at par. 47):

Quite where this leaves the clause on the spectrum from usual to unusual is not easy to identify. At one extreme, I do not categorize it as unconscionable or extortionate: at the other, it is not standard or customary.

192. In the light of that finding the Judge went on to consider the legal test to apply. He rejected a submission that for general words of incorporation to be effective a clause had to be well known and in common use and held that as a matter of general principle the question was whether the term was sufficiently unusual or uncommon so that it would be unfair in all the circumstances to hold the party to it: see Interfoto Picture Library Ltd. v. Stiletto Visual Programmes Ltd., [1989] Q.B. 433. He then resolved that question by holding that it was fair to all the reinsurers to treat the clause as incorporated by the general words. He gave six reasons for his conclusion (at par. 50). They were as follows:

(i) This is a contract of reinsurance, which is intended to be back to back with the underlying insurance.

(ii) It is expressly subject to "*all*" terms and to "*follow that placement in all respects*".

(iii) The clause in question is no sense unique in this class of insurance, particularly where there is a collateral agreement.

(iv) The slip records that information is available on the brokers' file: this would have included drafts of the wording.

(v) As a matter of commercial convenience, it is desirable that all reinsurers subscribing to the same slip should contract on the same terms.

(vi) Insofar as aspects of good faith arise, individual reinsurers may be able to avoid the policy if the presentation to them, including considerations of notice of the clause, was unfair.

193. He nevertheless recognized that the last question, which lay outside the preliminary issues, was rendered difficult for the reinsurers by his reasoning, in that if there is notice adequate enough to allow incorporation, on the test he applied, "it may be a rare case where the same notice is not adequate to discharge the obligation of good faith" (at par. 47).

194. Thus the Judge found that cl. 8 was not standard or customary, but in no sense unique, and that in all the circumstances it was fair to regard it as incorporated.

195. In this Court there was no submission that Mr. Justice David Steel adopted the wrong test. Mr. Ruttle himself relied on Interfoto v. Stiletto. Nevertheless it was submitted that on the expert evidence he should have found that cl. 8 was highly unusual if not unheard of, and that on the test applied he should have concluded that it was unfair to treat the clause as incorporated or binding. As for the Judge's six specific points, (i) was disputed, and both (i) and (ii) were said to beg the question; (iii) was said to be either a wrong categorization of the evidence, or in any event neutral; (iv) was said **\*197** to be neutral or to beg the question in the sense that it remained the broker's job to draw the reinsurers' attention to clauses of this nature; (v) was said to be neutral by Mr. Gross and was criticized by Mr. Ruttle as overlooking Independent's submission that the facts of the placement

Copr. © West 2004 No Claim to Orig. Govt. Works

Westlaw.

2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

indicated that the brokers were repeatedly instructed by HIH to ensure that the reinsurers saw and approved the policy wording; and (vi) was said to be circular, or even wrong, in that if the clause was incorporated, it precluded avoidance.

196. On the part of HIH, Mr. Flaux submitted that the Judge's findings were correct and supported his legal conclusions. He stressed that the incorporation clause put the reinsurers on notice as to the existence of the underlying terms of the original insurance, and that the draft policy wording was available on the brokers' file to which the reinsurance slip policy specifically referred reinsurers under the "INFORMATION" line (the Judge's point (iv)). He also submitted that if the reinsurers were aware of cl. 8, then unusual or not, it was binding; and that endorsement of the policy wording by Axa (on the 7.23 slate) showed that it was aware. Thus actual or constructive notice of cl. 8 made the issue as to its usualness irrelevant.

197. I make the preliminary comment that this is, structurally speaking, a difficult issue, for a number of reasons. First, the experts' evidence was not tested by cross-examination and thus its value and effect are harder to ascertain. Secondly, it may be important to consider, but not easy to discern, what meaning the experts were ascribing to cl. 8 in the context of the reinsurance. Thirdly, the *Interfoto* test, of fairness in all the circumstances, is a problematic one to apply at this trial, both because of the uncertain status of the facts and also because it closely overlaps with the question of fair presentation which lies outside the scope of these preliminary issues.

198. Having said that, I address the experts' evidence, starting with their experience. Mr. Day had considerable experience in the London financial risk market and specifically in film finance business.

199. Mr. Godfrey's experience, on the other hand, lay in the U.S. financial guarantee insurance (and reinsurance) market. He defined that market (I am putting the matter broadly) as one in which debt instruments of investment grade are guaranteed or insured. The essence of such insurance is that it is "non-cancellable", by which the Judge understood him to mean unconditional as well as irrevocable. He emphasized that performance of "the most rigorous due diligence" is essential to this type of insurance, for the very reason that it is unconditional. Policies are often supported by collateral agreements. He annexed policies, which were (a) brief, (b) in standard form, and (c) contained a short term to the effect that "This policy is non-cancellable [for any reason]". However, as he remarked, there is no term waiving any defence of non-disclosure or misrepresentation. Reinsurance of a "portion" of the insurance is customary, the 1999 average being 38 per cent. The reinsurer generally agrees to follow the form of the primary cover "including its non-cancellation provision", but it is "highly unusual" for a reinsurer to waive any defences as against the insurer and he had never before seen a clause such as cl. 8 (this comment may have been confined to the reinsurance context). On the contrary, the reinsurer relied on the insurer's due diligence and disclosure of all material and

2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

relevant information. Mr. Godfrey stated that the HIH insurances were not, in his opinion, standard financial guarantee insurance, for HIH did no due diligence and the insurance was not of investment grade debt but was designed to lift the project to investment grade and was therefore inherently riskier. He therefore regarded the insurance as "atypical".

200. Mr. Day pointed out in turn that there was an essential difference between the London market in which he was experienced and the U.S. financial guarantee market of which Mr. Godfrey spoke. The latter was concerned with investment grade security transactions, the relevant insurers were risk averse, the premium rates were low, but the sums insured very high. The London market, however, was more diverse, and included non-investment grade transactions, such as the instant insurances, where there was real risk and a higher rate of premium. Moreover, the London market was more comfortable with its traditional mixture of conditions and exclusions. I would comment that the bespoke nature of the London market contract and the standard form nature of the policies annexed by Mr. Godfrey illustrate and highlight the differences in the two markets.

201. In the circumstances I fully accept Mr. Justice David Steel's conclusion (at par. 46 of his judgment) that there were significant differences between the experience of the two experts and the markets in which they operated, and that Mr. Day's experience justified greater reliance on his evidence.

202. Mr. Godfrey's evidence as to the unusualness of cl. 8 reflected his experience in general. Thus he had never seen such a clause before at any rate in a reinsurance, and he went on to say that it is "unusual" and atypical in an underlying policy, and "highly unusual" in a reinsurance contract as applying to the position between reinsurer and reinsured. He added "The reinsurer has the right to **\*198** expect full and complete due diligence and disclosure from the insurer. . .I am unaware of any reinsurance contract in my experience where the reinsurer agreed to waive its defences".

203. Mr. Day's evidence on the other hand was to the effect that "this type of clause is by no means unknown". He has seen them in financial risk insurances and more specifically in film finance risks "where similar clauses exist". This type of clause is often requested by the assured and is "by no means a clause which does not exist in this type of insurance". It is "certainly not unknown to have a clause of this type in financial risk insurance, including film finance business". "Not unknown" was a phrase used twice more in Mr. Day's supplementary report.

204. In my judgment Mr. Godfrey's evidence was not of much assistance, because the market in which he operated was materially different, because his evidence reflected that different experience, and because at any rate at the reinsurance level he was concerned with a clause whose effect was to operate independently as between reinsurer and reinsured. I have already sought to give my reasons as to why cl. 8, even if incorporated, does not operate in that sense. Therefore the essential evidence to be considered is that of Mr. Day. His somewhat tortured language discloses

Westlaw.

2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

that he is unable to say that cl. 8 is "usual" or even "not unusual": rather it is "not unknown" or "by no means unknown".

205. It seems to me that Mr. Justice David Steel was a perfectly entitled to find that such clauses are "sometimes agreed" particularly when supported by a collateral agreement, even though "not standard or customary". I would express the evidence in the same way. I also agree with him that I would not categorize such a term as unconscionable or extortionate. Albeit in a different market, such clauses are known to the Courts in the field of professional liability indemnity insurance. If not unconscionable there, I do not see why they should be unconscionable here. The Judge also said that he was unsure where this evidence leaves the clause on the spectrum from usual to unusual. I would be prepared to say that the clause was unusual, but something which the market would recognize.

206. What then? Is a clause of such a kind disqualified from incorporation by general words? The reinsurers relied on MacGillivray on Insurance Law, 9th ed., 1997, at par. 33-52, headed "Unusual terms":

It has been held that a reinsurer is not bound by the incorporation of terms unless they are well known and in common use. The reasoning is that the reinsurer may not be entitled to see, or will not in practice be aware of, the precise terms of the underlying insurance. It is submitted that the fact that a clause is highly unusual may be relevant to the question of whether the parties intended that clause to be incorporated into their contract. A different way of approaching the

problem is that, while the actual incorporation of the term does not necessarily depend upon how usual it is, this factor is relevant to the question of whether the term ought to have been disclosed to the reinsurer.

207. The reinsurers relied on the two cases cited by MacGillivray in support of the first sentence of that passage. The Judge considered that the cases were only authority for the proposition that reinsurers are bound by usual terms, even to the extent of overriding an inconsistency, and that whether general words of incorporation can import an unusual or uncommon term "is quite a different question". In Marten v. The Nippon Sea and Land Insurance Co., (1898) 3 Com. Cas. 164 Mr. Justice Bigham had to consider the term "subject to the same clauses and conditions as original policy" and the well known warehouse to warehouse clause. All he said was that "it is such a common clause that the defendants ought to have known that it was in the original policy" (at p. 167). He found the clause to be "customary" and "to be read into the policy". I do not, however, consider that that is the test. Mr. Justice Bigham did not even cite the words of incorporation. In Charlesworth v. Faber, (1900) 5 Com. Cas. 508 the facts were similar and the clause in question was found to be "in common use", and to be a clause of whose probable existence in the original policy the reinsurer knew or ought to have known (p. 412). The effect of the incorporation, however, was to extend the 12 month term of the reinsurance to beyond 12 months because the term was a "continuation clause" which provided for the insured to be held covered if the ship was at sea at the expiration of the policy. Whether

Copr. © West 2004 No Claim to Orig. Govt. Works

Westlaw.

2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

that should be regarded as an inconsistency or as a qualification or extension of the policy period does not for present purposes matter. Subject to that comment, I agree with what Mr. Justice David Steel said about those cases. They do not assist the question at issue.

208. I turn therefore to Interfoto v. Stiletto. There the defendant was held not to be bound by a term in a set of printed conditions which had been provided to him in the form of a delivery note, but which he had neither signed nor read. The question was not so much concerned with an incorporation clause as with whether the term in question had been sufficiently brought to the defendant's notice so as to be incorporated into the contract. The term was described as "very onerous" (at p. 438F), and "unreasonable and extortionate" (at p. 445H). The Court of Appeal was even concerned that it might have been an unenforceable penalty (at pp. 436C, 445H-446A), but that point was not argued. Lord **\*199** Justice Bingham, in a passage cited and applied by the Judge, put the test as follows (at p. 445B-C):

The tendency of the English authorities has, I think, been to look at the nature of the transaction in question and the character of the parties to it; to consider what notice the party alleged to be bound was given of the particular condition said to bind him; and to resolve whether in all the circumstances it is fair to hold him bound by the condition in question. This may yield a result not very different from the civil law principle of good faith, at any rate so far as the formation of the contract is concerned.

209. For all that neither party in terms

rejected what I might call the Interfoto test, I am nevertheless doubtful of the application of this principle as a means of solving the present problem, especially at this stage of the proceedings. In the first place, Interfoto v. Stiletto was not concerned with the effectiveness of an incorporation clause in a signed contract, which is essentially a question of construction, but rather with a question of notice: the question of whether sufficient notice has been given to a person by means of a document which has *not* been signed so as to render that person contractually bound by the term or terms set out in that document. Secondly, that question of notice is closely akin to a question of awareness: the party affected by sufficient notice even if not *actually* aware of the term in question, is regarded as having constructive knowledge of it, i.e. as being *constructively* aware of it. Thirdly, the question of awareness is for present purposes out of bounds: see issue 3 of the preliminary issues. The Court is merely asked to say what the consequences are, depending on whether the reinsurers were aware or were not aware that cl. 8 was part of the underlying insurance contract. In the circumstances it seems to me no more appropriate to go into the question of constructive notice than actual notice. Fourthly and a fortiori, it seems to me inappropriate for the purposes of these preliminary issues to test the matter by asking whether there was sufficient notice to hold that it would be *fair* to hold the reinsurers to the term in question. This is because it is clear from Lord Justice Bingham's analysis that this question is very closely akin to a question of good faith. In the insurance context, where even the common law has adopted the civil law

[2001] 2 Lloyd's Rep. 161                                                    Page 65
2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

requirement of good faith, the question of fairness posed by Lord Justice Bingham cannot be divorced from the insurance doctrine of uberrima fides and the question of what constitutes a fair presentation. Mr. Justice David Steel recognized the difficulty of divorcing the question which he posed and the separate question, not within the preliminary issues, of whether there had been a fair presentation of the risk. I do not see how the one question can or should be answered without bearing in mind and attempting to answer the other question at the same time. That could be a recipe for a new unfairness all of its own. Fifthly, this is particularly the case when it is borne in mind that the test posed by Lord Justice Bingham and the Judge is a test which has to be answered "in all the circumstances". However, the limitation of this trial of preliminary issues make it impossible to take into account all the circumstances.

210. Sixthly, there is a further reason why, if the *Interfoto* analysis is appropriate at all, it is necessary to take it together with the question of fair presentation. The remedy for the case of notice which is insufficient because of unfairness is that the term in question never becomes part of the contract. However, the remedy for a case of unfair presentation of an insurance proposal is avoidance of the contract. The latter remedy goes much further than the former. It is only right that these issues be looked at together. Otherwise there is the danger that a notice which is judged to be fair, outside the broader question of whether there has been a fair presentation, undermines that broader question. Equally, however, if there be any unfairness at all, there is the danger that the Court is unable to consider whether in all the circumstances the right approach is to regard the offending term as never having been incorporated, thus saving the contract, or to regard it as incorporated, thereby potentially destroying the contract.

211. Seventhly, I am not persuaded that the Interfoto test applies to a term that is merely unusual, at any rate in the context of a binding incorporation clause. I acknowledge that some of the dicta in previous cases referred to in Interfoto v. Stiletto mention the case of a term that is "usual": but Interfoto v. Stiletto itself was concerned with a term which was not merely unusual, but very onerous, unreasonable and extortionate. No one has suggested that those descriptions apply to cl. 8, however much it might increase the risk undertaken by an insurer. The experts were not asked to opine on such a question: their reports make it clear that they were asked whether cl. 8 was an unusual clause. Lord Justice Dillon spoke of a term which is "particularly onerous or unusual" (at p. 439A); and both he and Lord Justice Bingham went out of their way to stress the particular objections to the offending clause in that case.

212. Eighthly, I am uneasy on a separate question about which there has not been much, if any, discussion in this Court, and that is whether the incorporation of cl. 8 should be regarded as a matter dependent on the original terms of the underlying insurance or on those terms as amended (HIH would say as superseded) by the policy wording. If it is regarded as the former, then the question seems **\*200** to depend on the question whether cl. 8 is incorporated by general words of incorporation. If, however, it is regarded as

Copr. © West 2004 No Claim to Orig. Govt. Works

[2001] 2 Lloyd's Rep. 161                                                    Page 66
2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

the latter, then its incorporation would seem to depend rather on the question whether the reinsurers have severally been consulted and have agreed on the amendment to the terms of the original policy.

213. I therefore conclude that the *Interfoto* test, if applicable at all, a matter which I would prefer to leave open, should not be considered separately from the question of a fair presentation, which lies outside the scope of these issues.

214. In the circumstances I do not think that it is possible or appropriate to say more than this. The term of the reinsurance slip policy that the reinsurance is subject to all the terms as original, etc., together with the invitation to consult the information held on the brokers' file, collectively place on the reinsurers the burden of showing that cl. 8 was not incorporated, or that the proposal was unfairly presented. If a reinsurer was actually or (subject to any appropriate test of fair notice) constructively aware of cl. 8, then plainly it could not be said that it had not had sufficient notice of it. If, however, cl. 8 could only become part of the reinsurance contract if the reinsurer had actually agreed it, then it would be necessary to show that the clause had been actually agreed and not merely that sufficient notice of it had been given. Of course, these two questions may overlap. But all such questions of actual or constructive notice or awareness, or of actual agreement, are not for these preliminary issues. When they are debated, it will be on the basis that cl. 8 is neither unconscionable nor extortionate on the one hand, nor standard or customary on the other hand, nor usual, but rather, albeit by no means unknown but something that

the market would recognize.

*(xii) For these purposes, does it make any difference whether a reinsurer was aware of cl. 8?*

215. I have already answered this question as best I can in the course of dealing with question (xi) above.

*(xiii) If cl. 8 is incorporated into any reinsurance contract, what is its effect there?*

216. I have already held, under question (x) above, that cl. 8 is not to be incorporated into the reinsurance contracts in manipulated form, as a clause operating between reinsurer and reinsured independently of the original insurance, but can properly be regarded as incorporated in its unmanipulated form.

217. What is its effect in this form? The reinsurers submitted that it merely operates as a type of follow the settlements clause, binding the reinsurers to accept HIH's liability to pay even in circumstances where HIH might otherwise have had a straightforward defence based on non-disclosure or misrepresentation. Thus at least one effect of the clause would be to exclude any argument on the part of the reinsurers that payment by HIH in the face of non-disclosure or misrepresentation would have been in breach of its obligation to act in a businesslike manner: see Insurance Co. of Africa v. Scor (UK) Reinsurance Co. Ltd., [1985] 1 Lloyd's Rep. 312 at p. 330, a passage cited by Lord Mustill in Hill v. Mercantile and General Reinsurance Co. Plc. , [1996] L.R.L.R. 341

Case 2:02-cv-04435-AB    Document 128    Filed 01/27/2005    Page 105 of 115

Westlaw.

[2001] 2 Lloyd's Rep. 161                                                                 Page 67
2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

at p. 347; [1996] 1 W.L.R. 1239 at p. 1247. The reinsurers went far to accept that in this form and as so regarded there was nothing very wrong with the clause's incorporation.

218. The question then arose: but what if the only complaints of non-disclosure or misrepresentation at the reinsurance level, as between reinsurer and reinsured, were identical to the position relating to possible complaints of non-disclosure or misrepresentation at the underlying level, as between the original assured and HIH? What, in other words, if the presentation of insurance and reinsurance was identical? When pressed with that question, it seemed to me that Mr. Gross and Mr. Ruttle were able to give no satisfactory explanation as to why, in those circumstances, the promise to recognize HIH's liability and thus to follow its settlement did not in turn entail that that promise remained effective even where the identical problem occurred at the reinsurance level. Otherwise, as it seems to me, the effect of the clause in its unmanipulated form would be meaningless. Where an original risk has been placed with original insurers on the basis of a certain presentation, it is highly likely that it will be placed with reinsurers on the same basis. I intend to make no finding of fact whatsoever, but it appears that in the instant case the presentations were at any rate intended to be the same, and were conducted essentially by the same brokers on the instructions of, no doubt among others, Flashpoint. Indeed, the reinsurance was signed up before the original insurance.

219. Of course, I accept that it is perfectly feasible for the presentation at the reinsurance level to suffer from vices from which the presentation at the original level remains free. Upon examination, all the scenarios suggested by Mr. Gross and Mr. Ruttle to illustrate the unfairness of cl. 8 operating entirely independently at the reinsurance level turn out to be examples of non-disclosure or misrepresentation which are personal to the reinsured's presentation: see, for instance, my citation from Independent's skeleton argument at par. 160 above. In my judgment, such examples do not gainsay the **\*201** conclusion that if the incorporation of an unmanipulated cl. 8 is to bind the reinsurers to pay even where HIH might otherwise have had a defence, then the reinsurers remain bound even where a defence based on what amounts factually to the same presentation might otherwise have been invoked by the reinsurers themselves. It is in just such a situation that the reinsurers would be entitled to be subrogated to HIH's rights under the collateral contracts. Indeed, although Mr. Justice David Steel approved incorporation of cl. 8 in its manipulated form, it appears from his reasoning at pars. 43-44 of his judgment that he must have been thinking that cl. 8 would operate in a back to back manner at the two levels. It will do so, if the effect of the incorporation of cl. 8 in unmanipulated form is as I have suggested it to be. It will not do so if the effect of cl. 8's incorporation is that for the self-same non-disclosure or misrepresentation at the two levels, HIH is bound to pay but the reinsurers are entitled to avoid.

220. It seems to me that the effect that I would give to cl. 8's incorporation in the reinsurance contracts is also indicated and supported by the wording of the incorporation clause in the reinsurance slip

Westlaw.

policies, which emphasizes that the reinsurance is to "follow that placement in all respects".

221. For these reasons I conclude that the effect of cl. 8's incorporation into the reinsurance contracts is to bind the reinsurers to pay, despite any non-disclosure or misrepresentation covered by the clause, in circumstances where the non-disclosure or misrepresentation in question is the same at each level of the placement. Otherwise a defence intended to be waived back to back at both levels could be relied upon at the reinsurance level in circumstances where the primary remedy was intended to lie under the collateral contract.

*Conclusion*

222. In conclusion, I would seek to summarize my answers to the preliminary issues stated as follows.

223. Q1. *Are the terms (of both the insurance contracts and the reinsurance contracts) alleged by the reinsurers to have been warranties in fact such?*

A1. Yes. The six film (or 10 film) slate terms were terms of both insurance and reinsurance, and were warranties. The term in the reinsurance that all amendments etc. had to be agreed by reinsurers was also a warranty.

224. Q2. *What is the effect of cl. 8 of the underlying insurance contract? In particular does it mean that the facts and matters alleged in the defences (if true) would not have provided the claimant insured/reinsured with a defence (whether in*

*a whole or part) to the underlying insured's claim?*

A2. The effect of cl. 8 in the underlying insurance contract is to deprive the insured of a defence on the ground of non-disclosure or misrepresentation, whether wholly innocent or negligent, and whether otherwise giving rise only to rights of avoidance or also sounding in damages. It also deprived the insured of defences and rights of set-off and/or counterclaim. However, it did not cover fraud. Nor did it cover breaches of warranty or defences based on lack of cover.

225. Q3. *On the assumption that the reinsurers' underwriters were aware that the underlying policy wording contained cl. 8, was cl. 8 a term of the reinsurance contract? Is the answer different if the underwriters were not so aware?*

A3. Subject only to arguments that (a) it would be unfair to incorporate cl. 8 into the Axa and Independent reinsurance contracts because of insufficient notice being given of an unusual term, and (b) that cl. 8 was not agreed at the reinsurance level in accordance with the requirements of the amendments term referred to at A1 above, cl. 8 was incorporated into those contracts (in its unmanipulated form) whether those parties were aware of it or not. If, however, either party was in fact aware of cl. 8, then argument (a) is not available to it. Argument (a) cannot be divorced from the separate argument, not within these preliminary issues, that the presence of cl. 8 in the policy wording was not properly disclosed and rendered the relevant presentation unfair. For these purposes it is found that cl. 8 was

Copr. © West 2004 No Claim to Orig. Govt. Works

Westlaw.

[2001] 2 Lloyd's Rep. 161                                                                 Page 69
2001 WL 513044 (CA (Civ Div)), [2001] C.L.C. 1480, [2001] Lloyd's Rep. I.R. 596, [2001] 2
Lloyd's Rep. 161, [2001] 2 All E.R. (Comm) 39, [2001] EWCA Civ 735
**(Cite as: [2001] 2 Lloyd's Rep. 161)**

an unusual term, but for the full finding see pars. 205 and 214 above. New Hampshire has conceded that cl. 8 was incorporated into its reinsurance contract. In the light of the discussion in this judgment under questions (x) and (xiii) above, the Court may require further assistance from New Hampshire and/or HIH as to the precise nature of the incorporation conceded.

226. Q4. *What is the effect of cl. 8 in the context of the reinsurance contracts? In particular does it mean that:*

*(i) the facts and matters alleged in the defences and counterclaims (if true) do not provide the defendant reinsurers with a (complete or partial) defence (including by way of set-off) to the claimant insurer's/reinsured's claim; and/or*

*(ii) the defendant reinsurers do not (or did not) have the right to avoid the reinsurance contract on the grounds of misrepresentation or non-disclosure (assuming that they otherwise *202 have or had such a right) irrespective of whether or not the relevant misrepresentation or non-disclosure was negligent or fraudulent as opposed to innocent?*

A4. The general effect of cl. 8 in the reinsurance contracts of Axa and Independent is that stated under question (xiii) above, so far as matters of non-disclosure or misrepresentation are concerned. The scope of cl. 8 is as stated in A2 above. There has been no attempt in advance of judgment to take the Court through the matters alleged in the defences and counterclaims to determine which if any of them would, even if true, nevertheless fail

to provide those reinsurers with a defence. This is understandable given the possible permutations of the Court's answers as to the incorporation, scope and effect of cl. 8. As to New Hampshire, I would repeat what I have said at the end of A3 above.

227. To a large extent therefore the answers provided by the Judge below have survived attack from both sides. Only on questions (ix), (x) (in part), and (xiii) have I differed from him. On questions (xi) and (xii) I have preferred to leave over the issues of fairness and sufficient notice and also the issue of the relevance of awareness to trial. It follows that, subject to those exceptions, both HIH's appeal (in whole) and the reinsurers' cross-appeal (in large part) have failed. The only, limited, successes have been on the cross-appeal, where Axa and Independent have displaced both specific incorporation of cl. 8 and the incorporation of a manipulated cl. 8; but they have failed to knock out its incorporation altogether.

Lord Justice MUMMERY:

228. I agree.

Lord Justice PETER GIBSON:

229. I also agree.

(c) Lloyds of London Press Limited

END OF DOCUMENT

# Exhibit C

C.    Affidavit of Conrad Kattner

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LEXINGTON INSURANCE COMPANY | | CIVIL ACTION |
| Plaintiff | | |
| v. | | NO.  02-4435 |
| DAVID FORREST, | | |
| T BEAUCLERC ROGERS IV, | | |
| STANLEY MUNSON, | | |
| MARTY FINK, | | |
| NEW BEGINNINGS ENTERPRISES LLC, | | |
| and TARLO LYONS | | |
| Defendants | | |

## AFFIDAVIT OF CONRAD KATTNER
### IN SUPPORT OF
### MOTION OF DEFENDANT STANLEY MUNSON
### FOR JUDGMENT ON THE PLEADINGS
### PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(C)

COMMONWEALTH OF PENNSYLVANIA      )
COUNTY OF PHILADELPHIA             )        ss:

CONRAD O. KATTNER, being duly sworn, deposes and says:

1.      I am admitted to practice before this Court and a member of the firm of McShea & Tecce, P.C., Bell Atlantic Tower, 28th Floor, 1717 Arch Street, Philadelphia, PA 19103. I make this affidavit in support of the Motion of Defendant Stanley Munson for Judgment on the Pleadings Pursuant to Federal Rule of Civil Procedure 12(c).

2.      Annexed hereto as Exhibits D and E to that Motion are what I believe to be copies of the Flashpoint Ltd. (Jersey) and the Flashpoint (UK) Collateral Agreements with regard to a four film transaction called "Filmworks," identified in these documents as part of Hollywood Funding No. 5.

3.      The version of the documents annexed hereto was served by plaintiff Lexington

Insurance Co. with its First Requests for Admissions, of which Nos. 14 and 15 sought

admissions of their authenticity from Stanley Munson. The requested admissions were made.


_____

Conrad O. Kattner

Sworn before me this

_____ day of January, 2005

# Exhibit D

D.    Collateral Agreement re: Filmworks between Lexington and Flashpoint (Jersey)



# Exhibit E

E.      Collateral Agreement re: Filmworks between Lexington and Flashpoint (UK)



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LEXINGTON INSURANCE COMPANY
                                        Plaintiff

                    v.

DAVID FORREST,
T BEAUCLERC ROGERS IV,
STANLEY MUNSON,
MARTY FINK,
NEW BEGINNINGS ENTERPRISES LLC,
and TARLO LYONS

                                        Defendants

CIVIL ACTION

NO.  02-4435

## CERTIFICATE OF SERVICE

Conrad Kattner, Esquire, attorney for Defendant, Stanley Munson, hereby certify that I

have caused copies of the foregoing:

(1) Motion of Defendant Stanley Munson for Judgment on the Pleadings Pursuant to
Federal Rule of Civil Procedure 12(c);

(2) Memorandum of Law in Support of the Motion of Defendant Defendant Stanley
Musnon for Judgment on the Pleadings Pursuant to Federal Rule of Civil Procedure
12(c);

(3) Affidavit of Conrad Kattner in Support of Motion of Defendant Stanley Munson for
Judgment on the Pleadings Pursuant to Federal Rule of Civil Procedure 12(c); and

(4) (Proposed) Order

to be served electronically, and by any additional means shown, upon the following parties or

their counsel of record on the date below:

| | |
|---|---|
| **Via Hand Delivery Jan. 28, 2005**<br>Glenn F. Rosenblum, Esquire<br>Jeffrey R. Lennan, Esquire<br>Montgomery, McCracken, Walker &<br>Rhoads<br>123 South Broad Street<br>Philadelphia, PA 19 109<br><br>**Via Overnight Delivery Sent Jan. 28,<br>2005**<br>Edward P. Krugman, Esquire<br>Emily A. Poler, Esquire<br>Ira J. Dembrow, Esquire<br>Scott M. Mory, Esquire<br>Cahill Gordon & Reindel<br>80 Pine Street<br>New York, NY 10005<br>*Counsel for Plaintiff* | Alexander Kerr, Esquire<br>Stephen P. McFate<br>McCarter & English, LLP<br>Mellon Bank Center<br>1735 Market Street, Suite 700<br>Philadelphia, PA 19 103<br>and<br>Beverly Y. Lu, Esquire<br>Charles A. Adamek<br>Lord Bissell & Brook, LLP<br>300 South Grand Avenue, Suite 800<br>Los Angeles, CA 9007 1<br>*Counsel for New Beginnings Enterprises* |
| Edward M. Dunham, Jr., Esquire<br>Shannon Hampton Sutherland, Esquire<br>Duane Morris LLP<br>One Liberty Place<br>Philadelphia, PA 19 103<br>*Counsel for David Forrest* | John D. Gordan, IIII<br>Eugene F. Bannigan<br>John N. Thomas<br>10 1 Park Avenue<br>New York, NY 10 178<br><br>Thomas M. Kittredge<br>Kenneth L. Racowski<br>170 1 Market Street<br>Philadelphia, PA 19 103<br><br>*Counsel for Tarlo Lyons* |
| Nicholas M. Centrella, Esquire<br>James J. Rohn, Esquire<br>Kevin Dooley Kent, Esquire<br>Conrad OYBrien Gellman & Rohn, PC<br>1 5 1 5 Market Street, 1 6th Floor<br>Philadelphia, PA 19 102<br>*Counsel for T.   Beauclerc Rogers, IV* | |

Neil G. Epstein, Esquire
Eckert Seamans Cherin & Mellott, LLC
15 15 Market Street
Ninth Floor
Philadelphia, PA 19 102
and
Jeffrey D. Farrow, Esquire
Mona Z. Hanna, Esquire
Sanford Louis Michelman, Esquire
Michelman & Robinson LLP
4 Hutton Centre, Suite 300
Santa h a , CA 92707
*Counsel for Martin Fink*

Respectfully submitted,


BY:___ /s/ Conrad O. Kattner_____
CONRAD O. KATTNER, ESQ.
Identification No: 035468
MCSHEA & TECCE, P.C.
1735 Market Street, 16th Floor
Philadelphia, PA 19103
(215) 599-0800
*Attorney for Defendant,*
*Stanley Munson*

Date: ____January 27, 2005_____