DATED / JULY 1998                    *Ince & Co.*

(1) LEXINGTON INSURANCE COMPANY
(2) FLASHPOINT (UK) LIMITED

---

### COLLATERAL AGREEMENT
relating to the four films known as the Filmworks Project

---

Ince & Co
Corporate Insurance Group
Knollys House
11 Byward Street
London EC3R 5EN

Tel: 0171 623 2011
Fax: 0171 623 3225
Ref: DC/NA/224/629

#318543

LEX-01 180206

**THE AGREEMENT** is made the    *03*    day of July 1998    *hue 86.*

**BETWEEN:**

(1)  **LEXINGTON INSURANCE COMPANY** whose registered office is at 1 Alico Plaza, 6 Kings Street, Wilmington, Delaware 19801, USA ("Lexington"); and

(2)  **FLASHPOINT (UK) LIMITED** of Watchmaker Court, 33 St. John's Lane, London EC1M 4DB ("Flashpoint").

**RECITALS**

(A)  Words and expressions used in these Recitals shall bear the meaning set out in Clause 1 below.

(B)  Flashpoint is in the process of investment in the  Film projects known as the Filmworks Project.

(C)  Flashpoint Limited ("Flashpoint Jersey"), a company associated with Flashpoint UK by common ownership, will today enter into the Purchase Agreement with Hollywood Funding (No. 5) Limited whereby, in consideration of Hollywood Funding (No. 5) Limited providing funds in the sum of at least US$14,000,000 to Flashpoint Jersey in connection with the  Filmworks Project, Flashpoint Jersey has agreed to make a payment of the Collection Amount on the last day of the Policy Period.  Flashpoint will enter into the Flashpoint UK Purchase Agreement with Flashpoint Jersey whereby, in consideration of Flashpoint Jersey providing funds in the sum of US$14,000,000 to Flashpoint in connection with the  Filmworks Project, Flashpoint has agreed to invest the funds in the  Filmworks Project in accordance with the terms of this agreement and the Purchase Agreement.

(D)  Lexington has agreed to issue the Policy in favour of Law Debenture Trust Corporation (Channel Islands) Limited as collateral for certain risks arising in relation to the  Filmworks Project upon certain assurances made by Flashpoint, and has agreed to appoint Flashpoint as its agent for the purposes of managing the risks contained within the Policy upon the terms of this agreement.

#318543

LEX-01 180206A

**IT IS AGREED** as follows-

1.    **DEFINITIONS**

(1)    Except as expressly provided otherwise in this agreement, the following words and expressions shall bear the following meanings:-

| Word or Expression | Meaning |
|---|---|
| "Business Day" | a day (other than a Saturday or Sunday) on which the banks are generally open for business in both Guernsey and New York City; |
| "Charge" | the charge, in the form set out in Schedule 1, to be entered into by Flashpoint upon execution of this agreement; |
| "Claim" | any claim paid by Lexington under the Policy; |
| "Collection Account" | the trust account opened by Flashpoint Jersey (Account No. 15101) with the Guernsey branch of Credit Suisse First Boston |
| "Collection Amount" | the US Dollar amount being equal to the lesser of :- |
| | (i)    US $22,400,000 ; and |
| | (ii)   the balance (if any) standing to the credit of the Collection Account as at the close of business on the second business day immediately prior to the last day of the Policy Period; |
| "Escrow Account" | the trust account opened by Flashpoint Jersey (Account No.15105) for the benefit of Law Debenture Trust Corporation (Channel Islands) Limited with the Guernsey branch of Credit Suisse First Boston; |
| "Exploitation" | any exploitation of any of the Films Materials or any Films Rights, including, |

*"Completion Bond" ⊕*

⊕ The benefit of the completion guarantee(s) fasten out with the Motion Picture Bond Company Inc. and/or any insurance policy relating to such completion guarantee(s). *Ira Sh*

#318543

without limitation, any merchandising, marketing, sales, showings, licences, distributions or any form of television or other media performances of the Films;

"Flashpoint Jersey Collateral Agreement" — an agreement of today's date entered into between Flashpoint Jersey and Lexington in relation to the Films;

"Flashpoint UK Collection Account" — the trust account to be opened by Flashpoint (Account No. 41533002) with Leopold Joseph;

"Flashpoint Jersey Holding Account" — the account to be opened by Flashpoint Jersey (Account No. 15101) with Leopold Joseph;

"Flashpoint UK Purchase Agreement" — an agreement to be entered into between Flashpoint Jersey and Flashpoint in relation to the Films.

"Holding Account" — the account to be opened by Flashpoint (Account No: 41533001) with Leopold Joseph;

*"Insurance Policies" (†)*

"Net Receivables" — the Revenues less only those amounts properly payable to the Producer in accordance with Clause 7.2;

"Policy" — the pecuniary loss indemnity policy to be issued by Lexington in favour of Law Debenture Trust Corporation (Channel Islands) Limited;

"Policy Period" — the policy period stated in the Policy;

"Principal Production Documents" — the documents listed in Schedule 2 (and such other documents, as may be entered into in relation to the production of the Films);

"Producer" — the producer of the Films being Prosperity Pictures ~~LLC~~ *I Lc*

"Production and Finance Agreement" — the agreement to be entered into between Flashpoint and the Producer in relation to the financing and production of the Films;

*† including, but not limited to (a) those insurance policies taken out by Flashpoint or Flashpoint Jersey in relation to pay or all the Films and (b) those insurance policies which are being paid or all the Films and (b) those insurance policies*

*Ince & Co*

#318543

LEX-01 180208

| | |
|---|---|
| "Purchase Agreement" | an agreement of today's date entered into, between Flashpoint Jersey and Hollywood Funding (No. 5) Limited; |
| "Revenues" | all television and box-office receipts or takings, or other monies, profits, gains, receivables, and choses in action for each of them, arising from any Exploitation; |
| "Films" | includes "Filmworks" series of films as a whole, and any and all films, or excerpts and episodes therein; |
| "Film Materials" | in respect of the Films, including all literary, dramatic, artistic and musical material (including any commentary), in all or any media (incorporated or synchronised with or otherwise forming part of such Films or produced for the purposes thereof), and any and all sound recordings included in the soundtrack of the Films, and any or all excerpts from sound recordings or other films/television incorporated in the Films, and all negative and positive materials produced in connection with the Films; |
| "Film Rights" | any and all rights of copyright and design right, and all other intellectual or industrial property rights wherever situated, and howsoever and whenever arising in relation to the Films and Films Materials in whatever state they may be in from time to time, together with the sole and exclusive rights to distribute, exhibit, broadcast and otherwise howsoever turn any of them to account; |
| "Tarlo Lyons" | Tarlo Lyons, solicitors, of Watchmaker Court, 33 St John's Lane, London EC1M 4DB; |

(2)    In this agreement, unless the context otherwise requires:-

    (a)    words importing the singular shall include the plural (and vice versa);

#318543

- 4 -

LEX-01 180209

(b)     references to a person includes a company, corporation or unincorporated body of persons; and

(c)     clause headings are for ease of reference only, and shall not affect the interpretation of this agreement.

(d)     The Schedules shall be a part of this agreement.

2.     **APPOINTMENT**

Lexington appoints Flashpoint as its risk management agent in relation to the Policy, and the risks arising under the Policy, on the terms contained in this agreement.

3.     **COMMENCEMENT AND TERM**

(1)     This agreement shall become effective on the date of this agreement.

(2)     Subject to the provisions of Clause 17 entitling early termination of this agreement, the authority of Flashpoint to act on behalf of Lexington in relation to the Policy shall terminate on the later of:-

(a)     the extinction of all risks under the Policy; and

(b)     the fulfilment of all of its obligations to Lexington under this agreement, and by Flashpoint Jersey to Lexington under the Flashpoint Jersey Collateral Agreement.

4.     **CONTROL OF FUNDS**

Holding Account

(1)     Flashpoint undertakes to Lexington that the Film budget portion of the funds (being (US$14,000,000)) provided by Hollywood Funding (No. 5) Limited under the Purchase Agreement to Flashpoint Jersey and immediately deposited in the Flashpoint Jersey Holding Account and in turn provided by Flashpoint Jersey under the Flashpoint UK Purchase Agreement to Flashpoint will be immediately placed on deposit in a bank account (the "Holding Account") opened and maintained by Flashpoint    and in which a partner of Tarlo Lyons shall be a co-signatory on all cheques or other payment authorisations from such account.

#318543

LEX-01 180210

(2)    Flashpoint further undertakes to Lexington to procure that Tarlo Lyons will not release any funds from such Holding Account in relation to the principal photography of the Films unless and until the Principal Production Documents in relation to the Films have been substantially completed to the reasonable satisfaction of Lexington.

Production Account

(3)    Upon drawdown of any monies from the Holding Account in accordance with sub-clause (2) above, such monies shall be paid into a production account opened for the benefit of Flashpoint by the Producer (the "Production Account").

(4)    Flashpoint undertakes that withdrawals from the Production Account shall be made strictly in accordance with the Production and Finance Agreement, and the relevant budget and cashflow schedule provided to Lexington.

Collection Account

(5)    Flashpoint undertakes to Lexington to:-

(a)    open and maintain the Flashpoint UK Collection Account being a specially designated trust account with Leopold Joseph of 29 Gresham Street, London EC2V 7EA in the name of Flashpoint UK for the purpose of receiving all Net Receivables and in turn transferring such Net Receivables into the Collection Account up to an aggregate amount of the Collection Amount;

(b)    procure that Tarlo Lyons will procure that there is opened and maintained a specially designated trust account with the Guernsey branch of Credit Suisse First Boston for the purposes of receiving from the Flashpoint UK Collection Account all Net Receivables (the "Collection Account") in the name of Flashpoint Jersey.

(6)    The amount standing to the credit of the Collection Account shall be held on the following trusts:-

#318543

- 6 -

LEX-01 180211

*( other than the obligation in clause 12 hereof )*

(a)     FIRST up to an amount  in aggregate equal to the Collection Amount to Flashpoint Jersey to enable Flashpoint Jersey to pay  such Collection Amount into the Escrow Account for the benefit of Hollywood Funding (No. 5) Limited in accordance with the terms of the Purchase Agreement;

(b)     SECOND to Lexington to enable Lexington to recover monies due to Lexington under the terms of this agreement or the Flashpoint Jersey Collateral Agreement generally (including without limitation, amounts due to Lexington under Clauses 11 and 12);

(c)     THIRD, upon extinction of all  liabilities and obligations under the Policy and this agreement, to Flashpoint absolutely.

(7)    Flashpoint undertakes to Lexington to procure that Tarlo Lyons will confirm in writing to the reasonable satisfaction of Lexington that Tarlo Lyons acknowledges its obligations under Clause 4(5) and (6) and confirms its intention to comply with same.

(8)    Lexington acknowledges Flashpoint Jersey's obligations to pay the Collection Amount from the Collection Account to the Escrow Account in accordance with Clause 4.1 of the Purchase Agreement, and Lexington confirms that Flashpoint shall be entitled to make withdrawals for such purpose only.  Subject to this entitlement only, Flashpoint undertakes to ensure that no payments shall be made from the Collection Account without Lexington 's prior written consent.

Management of Accounts

(9)    Flashpoint agrees to provide to Lexington (on a monthly basis) copies of all bank statements in relation to the Holding Account, Flashpoint Jersey Holding Account, Production Account, Collection Account, Flashpoint UK Collection Account and Escrow Account, together with a breakdown and reconciliation of monies paid and received, the payee/payer (as the case may be), and brief details of the reason for the payment or receipt, and agrees to provide such other information in relation to the accounts as Lexington may reasonably require.

#318543

- 7 -

LEX-01 180212

5.    **INVESTMENT IN THE FILMS**

(1)    Flashpoint undertakes to Lexington to use the finance provided by Hollywood Funding (No. 5) Limited to Flashpoint Jersey under the Purchase Agreement and in turn by Flashpoint Jersey to Flashpoint UK under the Flashpoint UK Purchase Agreement only for funding the production of the Films by the Producer, and for no other purpose.

(2)    Flashpoint acknowledges that it has entered into the Production and Finance Agreement with the Producer in respect of the Films. In respect of such agreement, Flashpoint shall keep Lexington fully appraised of all matters arising, and shall take account therein of all reasonable requests and suggestions of Lexington in relation to such agreement. In respect of such agreement, Flashpoint will procure that:-

(a)    the ownership of the Film Rights and Film Materials, shall vest exclusively in the beneficial ownership of Flashpoint until Lexington has no further liability under the Policy;

(b)    the Producer will agree to produce the Films within the budget, cashflow schedule and production schedule, and Flashpoint undertakes:-

(i)    to provide such budget, cashflow schedule and production schedules to Lexington prior to agreement with the Producer, and to take account of any reasonable comments which Lexington may have in relation to each of them;

(ii)    not to deviate, or allow the Producer to deviate, from such budget, cashflow schedule and production schedule in any material respect, or in any respect which may increase the risk of a Claim;

(c)    to retain (in its discretion) approval rights in respect of all major elements of the production of the Films, including, without limitation, the terms of the

#318543

- 8 -

LEX-01 180213

Principal Production Documents, the engagement of any writer, director, cast member, individual producer or other creative personnel, and the terms of such engagements;

(d)    to require the Producer to effect and maintain a completion guarantee with The Motion Picture Bond Company Inc. (or such other company as approved by Flashpoint and Lexington) guaranteeing the Films will, inter alia, be delivered within budget and on schedule;

(e)    to require the Producer to insure in respect of the Films, upon terms and in amounts approved by Flashpoint and Lexington, against all risks usually insured against in relation to the production of television programmes, and in particular, television producer's indemnity insurance covering, without limitation:-

    (i)    leading artists and the director;

    (ii)    all risks on the Film Materials;

    (iii)    Producer's errors and omissions, with limits not less than US Dollar equivalent of $1,000,000 any one claim and $3,000,000 in the aggregate; and

    (iv)    such other insurance cover as is customary in the television industry in relation to the Films.

(3)    Flashpoint will appoint, subject to Lexington's approval, an individual with adequate relevant film experience as its agent to monitor the production and Exploitation of the Films. Flashpoint agrees to provide Lexington without delay full details of all reports, recommendations or other advices of such individual given from time to time, and to discuss them with Lexington and take account of Lexington's comments in relation to such reports, recommendations and advices.

#318543

- 9 -

LEX-01 180214

6.    **EXPLOITATION OF THE FILMS**

(1)    Flashpoint undertakes to Lexington that it will take all reasonable steps necessary to carry out the Exploitation of the Films to its best commercial  advantage and to maximise the Revenues and Net Receivables generated from the Films, the Film Rights and the Film Materials.

(2)    Flashpoint further undertakes that it will use its best endeavours to procure that all its duly appointed agents and distributors will act materially in accordance with their respective terms and conditions of appointment or engagement to ensure maximum Exploitation of the Films, and the Film Rights and Film Materials.  If any agent or distributor breaches such terms and conditions, Flashpoint agrees to take such steps requested by Lexington to recover such compensation as a reasonable, prudent litigant would take to maximise Net Receivables, to reduce any Claim under the Policy and reduce potential loss to Lexington.

7.    **COLLECTION OF REVENUES AND NET RECEIVABLES**

(1)    Subject to the terms of this agreement, Lexington acknowledges that Flashpoint shall be responsible for collecting and holding the Net Receivables in respect of the Exploitation as trustee upon the trusts set out in Clause 4(6) above, which appointment Flashpoint accepts.

(2)    Lexington acknowledges that in relation to the production, sales and distribution of the Films, certain costs, expenses and other deductions will be payable or netted from the Revenues to, inter alios, distribution and sales agents in accordance with the relevant distribution or sales agency agreement (as disclosed in writing to Lexington). Flashpoint agrees that Lexington shall be entitled to review all of the Principal Production Documents if Lexington request to do so including distribution and sales agency agreements. Flashpoint further agrees that it will procure that all payments withheld or netted from the Revenues by such distributors or sales agents shall be in accordance with the agreed distribution or sales agency agreement, and that no unauthorised or excessive withholding or netting off from the Revenues shall occur (except lawfully deducted withholding tax) without the prior written consent of Lexington.

#318543

LEX-01 180215

(3)     Flashpoint shall have and retain overall management and conduct of the collection of
Net Receivables, including, without limitation:-

(a)     the examination, adjustment, settlement and/or compromise of amounts due in
the ordinary course of business to distributors and sales agents and such other
intermediaries (who shall be approved by Lexington), as shall be appointed,
together with the investigation and contesting of any such amounts; and

(b)     the making of any arrangements and/or participation in any project which in
the reasonable opinion of Flashpoint will or may avoid a Claim, or alleviate or
reduce the risk of a Claim, or enhance subrogation recoveries.

(4)     In relation to the conduct and management of the collection of Revenues:-

(a)     Flashpoint shall keep Lexington advised of the progress and handling of the
collection of Revenues, and shall provide Lexington with sufficient details to
enable Lexington to evaluate its exposure and liability under the Policy from
time to time; and

(b)     if at any stage either litigation or other dispute shall arise in relation to the
Revenues, or part of the Revenues, or the amount of any withholding or
deduction from the Revenues, Flashpoint shall immediately inform Lexington,
and Flashpoint shall not embark upon any course of action to be followed in
relation thereto without the prior written consent of Lexington (such consent
not to be unreasonably withheld); and

(c)     Flashpoint shall not agree any compromise or settlement of any litigation or
dispute in relation to the Revenues or the amount of any withholding or
deduction from the Revenues without the prior written consent of Lexington
(such consent not to be unreasonably withheld).

(5)     Flashpoint will, free of charge, furnish Lexington promptly with such information,
correspondence, reports, data and other papers and documentation as Lexington may
reasonably request in relation to the collection of Revenues and Net Receivables, and
Flashpoint shall, if requested, supply status reports concerning the production of the
Films, and the Exploitation of the Films, Film Rights and Film Materials, and the

#318543

- 11 -

LEX-01 180216

projected amount of and timing of receipt of the Revenues and Net Receivables to be generated by such Exploitation.

(6)    Flashpoint shall issue irrevocable instructions and authorisations to all distributors and sales agents to pay all Revenues arising from the Exploitation of the Films and Film Rights (net only of fees properly due to the distributors or sales agents in accordance with their relevant agreements in relation to the distribution of the Films, but without other deduction withholding or set-off except for lawfully deducted withholding tax) into the Flashpoint UK Collection Account.

(7)    Flashpoint shall pay immediately on receipt all Revenues arising from the Exploitation of the Films into the Flashpoint UK Collection Account and then comply with its obligations to pay Flashpoint Jersey pursuant to the terms of the Flashpoint UK Purchase Agreement the sums due and payable  (net only of such amounts as shall be agreed in writing by Lexington from time to time, but without other deduction, withholding or set-off  except for lawfully deducted withholding tax).

8.    **REPRESENTATIONS AND WARRANTIES OF FLASHPOINT**

Flashpoint makes the representations and warranties set out in paragraphs (a) to (i) below, and acknowledges that Lexington has entered into this agreement and the Policy in reliance on those representations and warranties:

(a)    it is a company duly incorporated under the laws of England and Wales with power to enter into this agreement, the Charge, Flashpoint UK Purchase Agreement  and each of the Principal Production Documents and to exercise its rights and perform its obligations under each of them, and all corporate and other action required to authorise its execution of this agreement, the Charge, Flashpoint UK Purchase Agreement and each of the Principal Production Documents and its performance and its obligations under them has been or will be duly taken;

(b)    the obligations expressed to be assumed by it in this agreement, the Charge, the Flashpoint UK Purchase Agreement and each of the Principal Production Documents are or will be legal and valid obligations binding on it in accordance with their respective terms;

#318543

- 12 -

**LEX-01 180217**

(c)   its execution of this agreement, the Charge, the Flashpoint UK Purchase Agreement and each of the Principal Production Documents and its exercise of its rights and performance of its obligations under such agreement(s), do not and will not:-

   (i)   conflict with any agreement, mortgage, bond or other instrument or treaty to which it is a party or which is binding upon it or any of its assets;

   (ii)   conflict with its constitutive documents and rules and regulations; or

   (iii)   conflict with any applicable law, regulation or official or judicial order;

(d)   all acts, licences, consents, exemptions, registrations, conditions and things required to be done, fulfilled and performed in order:-

   (i)   to enable it lawfully to enter into, exercise its rights under and perform and comply with the obligations expressed to be assumed by it in this agreement, the Charge, the Flashpoint UK Purchase Agreement and each of the Principal Production Documents; and

   (ii)   to ensure that the obligations expressed to be assumed by it in this agreement, the Charge, the Flashpoint UK Purchase Agreement and each of the Principal Production Documents are or will be legal, valid and binding; and

   (iii)   to make this agreement, the Charge, and each of the Principal Production Documents admissible in evidence in Jersey and England,

have been or will be done, fulfilled and performed;

(e)   there are no charges, debentures, mortgages, pledges, liens, encumbrances or other agreements or arrangements creating a security interest over or in respect of the whole or any part of the assets, property or undertaking of Flashpoint;

(f)   in any proceedings taken in Jersey or England in relation to this agreement or the Charge, it will not be entitled to claim for itself or any of its assets immunity from suit, execution, attachment or other legal process;

#318543

- 13 -

LEX-01 180218

(g)  under the laws of Jersey and England in force at today's date, it is not necessary that this agreement or the Charge be filed (save for Companies House), recorded or enrolled with any court or other authority in such jurisdiction or that any stamp, registration or similar tax be paid on or in relation to this agreement or the Charge;

(h)  it has fully and accurately disclosed to Lexington in respect of the Policy all information which is material to the consideration of the risks forming the Policy, or to the terms, conditions and exclusions contained in the Policy; and

(i)  it has not taken any corporate action nor have any other steps been taken or legal proceedings been started or (to the best of its knowledge and belief) threatened against it for its winding-up, dissolution, administration or re-organisation or for the appointment of a receiver, administrator, administrative receiver, trustee or similar officer of it or of any or all of its assets or revenues.

9.  **COVENANTS OF FLASHPOINT**

Flashpoint covenants and undertakes with Lexington that until Flashpoint shall have discharged its obligations and duties under this agreement it will:-

(a)  furnish to Lexington:-

(i)  within 90 days of the end of Flashpoint's financial year, copies of its yearly audited consolidated financial statements prepared in accordance with general accepted accounting principles and bases consistently applied (save to the extent of changes in those generally accepted accounting principles and bases) together with explanations of any significant variances between the budgets and forecasts referred to in sub-paragraph (ii) below and the position and the results shown in such financial statements;

(ii)  copies of annual budgets and forecasts for Flashpoint as soon as the same shall become available and in any event no later than 30 days prior to the commencement of each financial year of Flashpoint;

#318543

- 14 -

LEX-01 180219

(iii)    such other financial or other information concerning Flashpoint as Lexington may from time to time reasonably require;

(b)    not without the prior written consent of Lexington, create or extend or permit to arise or subsist any security interest of any kind (including any debenture, charge, mortgage, pledge or encumbrance) over the whole or any part of its undertaking, property, assets or revenues in respect of the Filmworks Project. Flashpoint warrants to Lexington that no such prior security interest(s) subsist;

(c)    not:-

(i)    without the prior written consent of Lexington, sell, transfer, assign, lease, lend or otherwise dispose of or part with possession or the ownership of the whole or any part of its present or future business or undertaking or its property or assets (whether in a single transaction or in a Films of transactions whether related or not) other than in the ordinary course of its business;

(ii)    make or permit (without the prior written consent of Lexington) any substantial change in the scope or nature of its business;

(d)    do nothing which could prejudice Flashpoint's or Lexington's interest under either the Insurance Policies or the Completion Bond;

(e)    record and maintain complete written records of any and all dealings with their agents including but not limited to the producer, cast, distributors and sales agents;

(f)    fully comply with and hereby agrees to be bound by the terms of the Flashpoint UK Purchase Agreement;

(g)    enter into the Production and Finance Agreement with the Producer

(h)    permit Lexington a right of approval over the terms upon which Flashpoint will contract with its sub-agents (including but not limited to sales agents and distributors), such right of approval to be exercised if requested by Lexington and thereafter to be exercised reasonably by Lexington, and further Flashpoint

#318543

- 15 -

LEX-01 180220

will at Lexington's request provide Lexington with a copy of documents containing the proposed terms of contract. If Lexington exercises such right of approval it shall not thereafter complain about such contracts made by Flashpoint with its sub-agents;

(i)   obtain a legal opinion from Tarlo Lyons wherein Tarlo Lyons opine that the documentation, agreements and insurance policies exhibited to this agreement at Schedule 2 and Schedule A to the Charge are enforceable and valid;

(j)   obtain, maintain and perform such insurance policies which Lexington deem appropriate in relation to the Filmworks Project (such power to be exercised reasonably by Lexington) including but not limited to the insurance policies listed in Schedule A to the Charge; and

(i)   punctually pay the premiums in full on the due dates;

(ii)   provide notice to Lexington immediately upon any claims being made thereunder;

(iii)   provide notice to Lexington immediately of any correspondence and/or communication from insurers avoiding, seeking to avoid, or repudiating or disputing the validity and enforceability of the above insurance policies;

(iv)   provide full disclosure to insurers of all information material to the risks insured;

(v)   disclose this agreement and the Charge to the errors and omissions insurance policy insurer and to the bond provider, The Motion Picture Board Company Inc., prior to obtaining those specific insurance policies;                                   *as a named insured*

(vi)   will ensure that the interest of Lexington is noted/on the Insurance Policies and/the Completion Bond and that notice of the assignment in *hu SG* clause 2.1 of the Charge is given to the relevant underwriters

*a beneficiary under*

#318543

- 16 -

LEX-01 180222

(vii)   generally do all things necessary to ensure that the above insurance policies are at all times to this agreement valid and enforceable.

(k)   not without the prior written consent of Lexington, amend its memorandum and articles of association or other constitutional documentation in any way which might adversely affect the ability of Flashpoint to perform its obligations under this agreement, the Charge, the Flashpoint Jersey Purchase Agreement or any of the Principal Production Documents;

(l)   not (without the prior written consent of Lexington) deal with its Revenues otherwise than in the ordinary course of getting in and realising the same in accordance with the terms of this agreement, which expression shall not include or extend to the selling or assigning or in any other way factoring or discounting of any of such Revenues or otherwise; and

(m)   not enter into or maintain any guarantee or indemnity or assume any contingent liability in respect of the obligations of any other company or person.

(n)   not to permit, procure or cause any interim dealing with the Collection Account monies that stand from time to time to the credit of the Collection Account or interest (if any) accrued thereon without the prior written consent of Lexington.

## 10.   UNDERTAKINGS OF FLASHPOINT

Flashpoint, for itself and each of its officers and employees, undertakes that it will not:-

(a)   pledge, or purport to pledge Lexington's credit in any way;

(b)   misrepresent expressly or by implication, the meaning, application or effect of the Policy;

(c)   undertake or perform any wrongful or unlawful act or omission when carrying out or purporting to carry out its duties and obligations under this Agreement;

#318543

- 17 -

**LEX-01 180223**

(d)    waive or exercise, or purport to waive or exercise, any rights Lexington may have in respect of the Policy or in relation to a Claim, or any rights of subrogation or recovery arising from such Policy, this agreement, the Charge and/or the Principal Production Documents.

## 11.  RECOUPMENT

(1)    If there is a Claim, Lexington shall receive from Flashpoint out of Net Receivables received from time to time after the end of the Policy Period an amount in aggregate equal to such Claim. Payment of such amount shall be made by Flashpoint to Lexington immediately upon receipt of the Net Receivables on a reducing balance basis.

(2)    Notwithstanding sub-clause (1), if there is a breach by Flashpoint of any of its obligations or duties under this agreement, and such breach gives rise to a Claim under the Policy, then Flashpoint shall indemnify and hold harmless Lexington from all losses, liabilities, costs, claims and expenses (including reasonable legal costs and expenses) Lexington may suffer directly as a result of such breach.

(3)    Further if there is a breach by any of Flashpoint's distributors, sales-agents or any other agent of any of the obligations or duties under this agreement as a result of any fraud, recklessness, wilful default, negligence or misconduct, and whether as a consequence or not there is a Claim under the Policy, then Flashpoint shall take any such steps to recover compensation as a reasonable, prudent litigant would take to maximise Net Receivables, reduce any Claim under the Policy, and reduce losses, liabilities, costs, claims and expenses (including reasonable legal costs and expenses) Lexington may suffer whether directly or indirectly as a result of such breach.

(4)    The rights and remedies provided in this agreement are cumulative and not exclusive of any rights or remedies otherwise provided by law unless expressly stated.

## 12.  ADDITIONAL PREMIUM

(1)    Flashpoint acknowledges that in connection with the issue of the Policy, it will pay an additional premium ("the Additional Premium") to the Insurer in the sum of 7.5% of

#318543

- 18 -

LEX-01 180224

the aggregate Net Receivables of the Films in excess of US$22,400,000 irrespective of whether there is a Claim or not.

(2)    At the end of each calendar quarter following the expiration of the Policy Period, Flashpoint shall calculate the value of the Net Receivables, whereupon Flashpoint shall submit a certificate to Lexington showing the Net Receivables received during the period ending on the appropriate quarter day together with a calculation of the Additional Premium and such supporting evidence as may be necessary in relation to such calculation. Lexington shall within 14 days of the production of such certificate either:-

(a)    confirm its agreement with such certificate, in which case, Flashpoint shall immediately pay the Additional Premium to Lexington from the Collection Account in the agreed amounts; or

(b)    object to such calculation, giving reason for its objections.  The parties shall thereupon meet to determine the amount of Additional Premium payable, and if they cannot agree, then the dispute shall be referred at the request of either party to an independent chartered accountant decided between the parties (or if the parties cannot agree who should be appointed by the President of the Institute of Chartered Accountants for England and Wales).  Such accountant shall act as expert and not arbitrator, and except in the case of manifest error, his decision shall be final and binding.  The accountant's costs shall be borne equally between the parties.

13.    **GOOD FAITH**

Flashpoint and Lexington acknowledge that this agreement and the Charge have been entered into for the purposes of managing the risks contained in the Policy and it is the parties' intention that utmost good faith shall be the essence of the relationship between them, and in the interpretation and effect of this agreement and in the negotiation and placement of the Policy.

#318543

- 19 -

LEX-01 180225

14.   **AUDITS**

(1)    Lexington may at its expense undertake an audit of Flashpoint in connection with this agreement at any time on reasonable prior notice, and its representatives may attend at any office of Flashpoint for this purpose.

(2)    Flashpoint will co-operate fully with an audit and supply such reasonable information, data and records as may be requested by Lexington or its representatives.

(3)    Flashpoint shall provide Lexington, and any regulatory body governing Lexington (including HM Treasury) with reasonable access to the records and data of Flashpoint including, inter alia, facilitating entry to computer systems.

15.   **NOTIFICATION**

Flashpoint shall notify Lexington immediately by telephone or facsimile, and in writing on the occurrence of any of the following coming within its knowledge:-

(a)    change of business address or senior management of Flashpoint;

(b)    any circumstances occurring which will, or are likely to result in:-

    (i)    any dispute or litigation in relation to the production, distribution or Exploitation of the Films, Film Rights or Film Materials (as appropriate), or the Revenues or Net Receivables or which may otherwise give rise to a claim; or

    (ii)   any claim under any guarantee, bond or insurance taken out in relation to the production or distribution of the Films;

(c)    Flashpoint, Flashpoint Jersey, Hollywood Funding (No. 5) Limited or the Producer becomes insolvent, ceases or threatens to cease to trade, has an administrator, administrative receiver or receiver (or any analogous person) appointed, goes into liquidation, or provisional liquidation or is otherwise unable to pay its debts within the meaning of Section 223 of the Insolvency Act 1986 (or analogous legislation in relation to each of them);

#318543

- 20 -

LEX-01 180226

(d)   a meeting of creditors is convened or any composition or arrangement for the benefit of creditors is proposed or entered into by Flashpoint, Flashpoint Jersey, Hollywood Funding (No. 5) Limited or the Producer, or a petition is presented or a meeting is convened for the purpose of considering a resolution, or analogous proceedings are taken, for its winding up save in the course of a reconstruction, amalgamation or reorganisation;

(e)   if any judgment is entered against Flashpoint, Flashpoint Jersey, the Producer or Hollywood Funding (No. 5) Limited and not satisfied or discharged within 14 days;

(f)   if a distress or execution shall be levied or enforced upon or sued out against the whole or any part of the property of Flashpoint and shall not be paid within 48 hours.

16.   **EVENTS OF DEFAULT**

The following shall constitute Events of Default for the purposes of this agreement:-

(a)   Flashpoint shall commit a material breach of any of its obligations under this agreement or the Flashpoint Jersey Purchase Agreement and shall fail to remedy the same within twenty-eight (28) days after notice in writing is sent by Lexington specifying the breach and requiring the same to be remedied; or

(b)   Flashpoint shall suspend or cease to carry on business, or suspend payment of its debts or fail to pay, upon execution being levied therefor, any judgment debt in full; or

(c)   Flashpoint shall suffer the appointment of a receiver, administrator, liquidator, provisional liquidator or administrative receiver (or any comparative appointee anywhere in the world); or

(d)   an order shall be made, or an effective resolution passed for the winding-up of Flashpoint; or

#318543

- 21 -

**LEX-01 180227**

(e)    any of the senior management of Flashpoint shall become subject to material disciplinary proceedings instituted by any disciplinary, professional or regulatory organisation or body; or

(f)    Flashpoint shall be in breach of its obligations to collect any Revenues or to pay the Net Receivables into the Flashpoint UK Collection Account, and Flashpoint shall fail to remedy such breach after Lexington shall, (without prejudice to any rights under the Charge or elsewhere in this agreement), serve notice in writing upon Flashpoint specifying the breach and requiring the same to be remedied; or

(g)    Flashpoint Jersey shall be in breach of any of its obligations under the Flashpoint UK Purchase Agreement or the Flashpoint Jersey Collateral Agreement and shall fail to remedy the same within 28 days after notice in writing is sent by Lexington specifying the breach and requiring the same to be remedied.

## 17.    **EFFECT OF DEFAULT**

(1)    If an Event of Default shall occur, and subject to the rights of any guarantor of completion of the Films and without prejudice to all or any other rights and remedies of Lexington under this agreement or the Charge, Lexington may either itself or through its duly appointed agent:-

(a)    be entitled to take over the collection of the Revenues and Net Receivables and the functions and obligations of Flashpoint provided for in this agreement as agent for Flashpoint and to pay the Revenues and Net Receivables into the Collection Account; and/or

(b)    be entitled to take over the collection of the Revenues and Net Receivables and the functions and obligations of Flashpoint provided for in Clause 7 of this agreement; and/or

(c)    be entitled to take over Flashpoint's rights in respect of the collection, adjustment, settlement and payment of the Revenues and Net Receivables; and/or

#318543

- 22 -

LEX-01 180228

(d)    be entitled make payments of the Revenues and Net Receivables into and out of the Production Account, Collection Account, Flashpoint UK Collection Account and Escrow Account in accordance with the terms of this Agreement; and/or

(e)    elect by written notice to Flashpoint to conduct the run-off of the Filmworks Project, and require Flashpoint not to draw on or allow withdrawals from the Holding Account, the Production Account, Flashpoint Jersey Holding Account, Flashpoint UK Collection Account and the Collection Account, and Lexington shall be entitled to write to the bankers of such accounts notifying them accordingly; and/or

(f)    approve or prescribe in the name of Flashpoint for action to be taken by Flashpoint to minimise any loss or delay caused by such event; and/or

(g)    terminate this agreement; and/or

(h)    take over Flashpoint's rights and obligations to manage production and completion of the Films, Film Rights and Film Materials and/or the Exploitation and/or collection and/or adjustment, settlement and payment of the Revenues and Net Receivables; and/or

(i)    subject always to the terms of the production and Finance Agreement appoint another person to take over production of the Films and (for such purpose) to exercise Flashpoint's rights to take possession of the Films, the Film Rights and the Film Materials.

(2)    If this agreement is terminated and/or the production of the Films and/or Exploitation is taken over as aforesaid, written notice will be given to Flashpoint whereupon Flashpoint will, or will use  all reasonable endeavours to procure that the Producer will:-

(a)    subject to the terms of the Production and Finance Agreement forthwith deliver up to Lexington (or its appointed agent) all Films Materials, and all other documents and correspondence whatsoever and wheresoever kept relating to the Films;

#318543

- 23 -

**LEX-01 180229**

(b)    execute and do such documents acts and things as Lexington may from time to time reasonably require to facilitate, evidence or perfect the full and unrestricted ownership and control by Lexington (or its appointed agent) of Flashpoint's interest in the Films, the Film Materials and the Film Rights and the production, disposal or Exploitation thereof;

(c)    do such acts and things, and execute such deeds and documents, as Lexington may reasonably require for the purposes of completing production of the Films and agreeing, adjusting, settling, litigating and collecting the Revenues and Net Receivables, either in the name of Flashpoint or its own name PROVIDED that any Revenues or Net Receivables collected in such manner shall be paid into the Collection Account without deduction or withholding;

(3)    Termination of this agreement shall be without prejudice to any rights that may have accrued or arisen prior to termination.

(4)    Lexington shall first apply any monies it may receive pursuant to this Clause 17 in or towards repayment of Claims and payment of all other amounts owing to it under this agreement.    Should there remain any sum of money after Lexington has been reimbursed in full for these amounts, this sum shall be remitted to Flashpoint or to such other person entitled.

(5)    Flashpoint irrevocably appoints Lexington or its duly appointed representative (including any receiver) as its attorney and in its name, and on its behalf, to sign, seal and deliver and otherwise perfect any deed assurance agreement or instrument required to give effect to the terms of this agreement and any of the documents referred to in it.

18.    **NOTICES**

The address of each party at the head of this agreement shall be its address for the service of notice until it notifies the other of a new address.    A notice shall be presumed to have been served by one party five (5) days (Saturdays, Sundays and public holidays excluded) after it has been handed in at a Post Office properly addressed to the other party prepaid for transmission by first class post, or the actual date of delivery if served personally, or the date of transmission if sent by telex or

#318543

- 24 -

LEX-01 180230

facsimile (provided a correct answer-back code is received at a sender's telex or facsimile machine and in the case of a facsimile, the "hard copy" of the notice is sent by first class post the day the facsimile is transmitted).

## 19.    NO PARTNERSHIP

Nothing in this agreement shall be deemed to constitute a partnership between the parties and neither of the parties shall do of suffer to be done anything whereby it may be represented as a partner of the other of them.

## 20.    ASSIGNMENT

(1)    Flashpoint may not assign its rights and/or obligations under this agreement except with the prior written consent of Lexington;

(2)    Lexington may assign all or any of the benefit of its rights under this agreement to re-insurers connected with the Filmworks Project without the consent of Flashpoint.

## 21.    WAIVER

The waiver by Lexington of any right or breach, default or omission by Flashpoint of any of the terms of this agreement or the Charge shall not take effect unless in writing and shall not constitute a continuing waiver of the right waived or apply to, or operate as a waiver of, any other breach, default or omission and any forbearance in enforcing any right shall not constitute a waiver.

## 22.    GOVERNING LAW

(1)    This agreement shall be governed by and construed in accordance with English law.

(2)    The courts of England are to have jurisdiction to settle any disputes which may arise out of or in connection with this agreement and accordingly any legal action or proceedings arising out of or in connection with this agreement ("**Proceedings**") may be brought in such courts. Each of Lexington and Flashpoint irrevocably submits to the jurisdiction of such courts and waives any objection to Proceedings in such courts whether on the ground of venue or on the ground that the Proceedings have been brought in an inconvenient forum. These submissions are made for the benefit of

#318543

- 25 -

LEX-01 180231

each party and shall not limit the right of either of them to take Proceedings in any other court of competent jurisdiction nor shall the taking of proceedings in one or more jurisdictions preclude the taking of Proceedings in any other jurisdiction (whether concurrently or not).

(3)    The submission to the jurisdiction of the courts referred to in Clause 22 shall not (and shall not be construed so as to) limit the right of either party to take Proceedings against the other party in any other court of competent jurisdiction nor shall the taking of Proceedings in any one or more jurisdictions preclude the taking of Proceedings in any other jurisdiction (whether concurrently or not) if and to the extent permitted by applicable law.

(4)    Lexington and Flashpoint each consent generally in respect of any Proceedings to the giving of any relief or the issue of any process in connection with such Proceedings including the making, enforcement or execution against any property whatsoever (irrespective of its use or intended use) of any other or judgment which may be made or given in such Proceedings.

23.    **INVALIDITY**

If at any time any one or more of the provisions in this agreement is or becomes invalid, illegal or unenforceable in any respect under any law or regulation, the validity, legality and enforceability of the remaining provisions of this agreement shall not as a result be in any way affected or impaired.

24.    **SEVERABILITY**

If any clause or condition or part thereof is found to be invalid, ineffective or unenforceable, the invalidity, ineffectiveness or unenforceability shall not affect or prejudice the remainder of such clause or other clause.

This agreement has been duly entered into the day and year first above written..

4318543

LEX-01 180232

## SCHEDULE 1

### The Charge

**THIS DEED OF CHARGE** is made the                    day of   July 1998

### BETWEEN

(1)   **LEXINGTON INSURANCE COMPANY** of 1 Alico Plaza, 6 Kings Street, Wilmington, Delaware 19801, USA ("Lexington") and

(2)   **FLASHPOINT (UK) LIMITED** of Watchmaker Court, 33 St. John's Lane, London EC1M 4DB ("Flashpoint")

### RECITALS:

(A)   As more fully described in a Collateral Agreement of today's date ("the Collateral Agreement"), Flashpoint has invested in the Filmworks Project to finance a Films consisting of four (4) films and Flashpoint Limited (a company associated with Flashpoint by common ownership) will enter into an agreement with Hollywood Funding (No. 5) Limited ("the Purchase Agreement") pursuant to which Hollywood Funding (No. 5) Limited is to purchase future receivables from the Films.

(B)   Pursuant to the Collateral Agreement, Flashpoint has agreed to pay or procure the payment of the Net Receivables from the Films into a Collection Account with Leopold Joseph.

(C)   Lexington will issue a Pecuniary Loss Indemnity Policy ("the Policy") in favour of Law Debenture Trust Corporation (Channel Islands) Limited, a nominee of Hollywood Funding (No. 5) Limited, which will allow the Assured to make a claim if the monies purchased by Hollywood Funding (No. 5) Limited under the Purchase Agreement amount to less than US$22,400,000.

(D)   Flashpoint has agreed to execute this charge in favour of Lexington as security for the amounts which Flashpoint may become obliged to pay Lexington in the future under the Collateral Agreement.

#318543

- 27 -

**LEX-01 180233**

**IT IS AGREED** as follows:

1.    **Definitions and interpretation**

1.1    Capitalised words and expressions defined in the Collateral Agreement shall have the same meaning in the Recitals and throughout this agreement.  Other capitalised words and expressions shall have the following meanings:-

**"Applications"**    any and all applications for the registration of the Film Rights which have been made as at the date of this charge or are made at any time during the subsistence of this security by or on behalf of Flashpoint in any registry or office in any part of the world;

**"Charged Property"**    the property, rights and assets of Flashpoint charged, assigned or licensed by or pursuant to this charge;

**"Completion Bond"**    the benefit of the completion guarantee taken out with The Motion Picture Board Company Inc. and/or any insurance policy relating to such completion guarantee;

**"Event of Default"**    any breach of warranty or non-performance by Flashpoint of any of the undertakings, covenants, warranties or obligations contained in the Collateral Agreement or this charge;

**"Exploitation Agreement"**    an arrangement or agreement between Flashpoint and any other person in respect of the licensing, distribution, use or other Exploitation;

**"Insurance Policy"**    the insurance policies in those amounts and with those insurers specified in schedule A to this Charge and any insurance policy relating to the

#318543

- 28 -

LEX-01 180234

Film Rights and/or the Film Materials effected by or on behalf of Flashpoint or by any Intellectual Property User pursuant to this charge or any Exploitation Agreement;

**"Intellectual Property User"**    any person or company who has entered or who enters after the date of this charge into any agreement or arrangement with Flashpoint in respect of the distribution, licence or use of the Film, Film Rights and Film Materials;

1.2    In this charge unless the context otherwise requires:-

1.2.1    reference to any statute or statutory provision includes any statute or statutory provision or regulation which amends, extends, consolidates or replaces the same;

1.2.2    words denoting the singular only shall include the plural, and vice versa, and words denoting a gender include every gender;

1.2.3    references to a company shall be construed so as to include any company, corporation or other body corporate, wherever and however incorporated or established;

1.2.4    references to a person shall be construed so as to include any individual, firm, company, corporation or other body corporate, association or partnership (whether or not having a separate legal personality);

1.2.5    references to any schedule are to schedules of this agreement; and

1.2.6    headings to clauses and schedules are for convenience only and shall not affect the interpretation of this agreement;

1.2.7    terms defined in the Collateral Agreement shall have the same meanings herein.

#318543

- 29 -

LEX-01 180235

1.3    The expressions Lexington and Flashpoint shall include their respective successors and assigns.

1.4    All Recitals and Schedules to this charge shall have the same full force and effect as if expressly set out in the body of this charge and references to this charge shall include its Recitals and its Schedules.

1.5    Any reference to copyright, design right or any other intellectual property right of any description shall be construed as a reference to all rights of such description subsisting under the laws of the United Kingdom and any and all analogous rights subsisting under the laws of each and every jurisdiction throughout the world.

2.    **Charge**

As a continuing security for all or any of its obligations, liabilities, duties, undertaking, warranties or covenants under the Collateral Agreement:-

Assignment

2.1    Flashpoint assigns absolutely to Lexington its entire interest in and to all proceeds of any and all Insurance Policies now or in the future taken out in relation to the Filmworks Project, together with the entire benefit of any rights devolving upon Flashpoint under or pursuant to any such Insurance Policies which shall accrue to Lexington;

2.2    Flashpoint undertakes to obtain all additional insurance policies that Lexington deem necessary or appropriate in relation to the Filmworks Project, such power to be exercised reasonably by Lexington;

Fixed Charge

2.3    Flashpoint charges in favour of Lexington by way of first fixed charge:

2.3.1    such part of the Films, Film Materials and Film Rights now in existence and which hereafter comes into existence and which is vested in Flashpoint; and

2.3.2    all right, title, benefit of and/or interest in the Completion Bond;

#318543

- 30 -

LEX-01 180236

Equitable Charge

2.4    Flashpoint charges such part of the Films, Film Rights, Film Materials not yet in existence but created or acquired by Flashpoint and vested in Flashpoint after the date of this charge in favour of Lexington by way of first equitable charge.

2.5    Flashpoint covenants with Lexington upon demand to execute, at Flashpoint's own cost, a first fixed mortgage in terms specified by Lexington of all or any part of the charged property which is for the time being subject to the first equitable charge created by clause 2.4 above.

Floating Charge

2.6    Flashpoint charges in favour of Lexington by way of first floating charge all its right, title and interest in and to all monies from time to time standing to the credit of the Holding Account and Production Account, together with all interest (if any) from time to time accrued thereon (in each case together with the debts they represent).

2.7    Upon the occurrence of an Event of Default , the floating charge shall automatically and without notice operate as a first fixed charge.

2.8    Lexington may at any time by notice in writing to Flashpoint, convert the floating charge created by clause 2.6 into a first fixed charge over all the property, assets and rights for the time being subject to such floating charge or over so much of the same as is specified in the notice, but shall allow Flashpoint to operate the Production Account so that Flashpoint is not in breach of any agreement with any third party, provided that such operation is  in accordance with the Budget exhibited to this Charge at Schedule B.

3.    **Covenants of Flashpoint**

Flashpoint covenants with Lexington and undertakes that throughout the subsistence of this Charge it will:-

3.1    punctually pay all premiums due under the Insurance Policies and will ensure that the interest of Lexington is noted on the Insurance Policies and the

#318543

- 31 -

LEX-01 180237

Completion Bond and that notice of the assignment in clause 2.1 hereof is given to the relevant underwriters;

3.2   not create or permit to subsist any mortgage or charge upon any of the Charged Property, nor permit any lien to arise on or affect any part of the same either in priority to or *pari passu* with this charge, and so that Flashpoint shall not have any power without the consent of Lexington to part with or dispose of any part of the Film Materials and Film Rights;

3.3   immediately upon the request of Lexington, it will deliver to, or to the order of, Lexington all Film Materials and copies of all other documents required, necessary or advisable to exploit, use or maintain Films, the Film Rights or the Film Materials or to manufacture or exploit the Film Rights or the Films. Delivery shall be effected by delivery of an appropriate laboratory access letter or letters in accordance with usual practice.

3.4   at the request of Lexington, execute any and all documents and do any and all acts (including, without limitation, the commencement of any legal proceedings), which acts shall be in the name of Flashpoint and/or Lexington as Lexington may reasonably require, which are required to enable Lexington to protect, perfect and enforce any of the rights granted, assigned or charged to it pursuant to this charge.

4.    **Redemption**

4.1   This charge shall remain in full force and effect as a continuing security for the benefit of Lexington until the execution by Lexington of an absolute and unconditional release of the obligations of Flashpoint or of a certificate confirming that it has no further liability under the Policy, that it has been reimbursed for all Claims and that no further amounts are owing by Flashpoint to Lexington under the Collateral Agreement.

4.2   Subject to the execution of the release or certificate referred to in clause 4.1, Lexington shall at the request and cost of Flashpoint discharge this security and reassign back to Flashpoint all rights assigned to Lexington pursuant to this charge.

#318543

- 32 -

LEX-01 180238

4.3    Lexington irrevocably appoints Flashpoint to be the attorney of Lexington in Lexington's name and on Lexington's behalf and as Lexington's act and deed to sign or execute all deeds, instruments and documents and do all such acts and things which may be required by Flashpoint to have this security discharged and the rights reassigned to Flashpoint if Lexington fail, without good cause, to comply with the provisions of Clause 4.2.

5.    **Continuing liability**

For the avoidance of doubt, it is agreed that

5.1    Flashpoint shall remain liable to perform all the obligations assumed by it in relation to the rights and property hereby charged and Lexington shall not be under any obligation of any kind whatsoever in relation thereto or be under any liability whatsoever in the event of any failure by Flashpoint to perform its obligations in respect of such rights and property; and

5.2    Lexington shall not be obliged to make any enquiry as to the nature or sufficiency of any payment received into the Production Account, Escrow Account, Holding Account, Flashpoint Jersey Holding Account or to make any claim or take any other action to collect any moneys or to enforce any rights and benefits hereby charged to it.

6.    **Enforceability**

6.1    This charge shall become:-

6.1.1    effective upon execution of the Collateral Agreement and this Charge;

6.1.2    enforceable upon giving of notice by Lexington to Flashpoint following the occurrence of any Event of Default under this agreement by Flashpoint and/or the occurrence of Event of Default under the Flashpoint Jersey Collateral Agreement by Flashpoint Jersey .

6.2    Once this charge has become enforceable, Lexington shall be entitled to sell the Charged Property or any part or parts of it or otherwise exploit or dispose of it or turn it to account for such price and in such manner as Lexington in its absolute discretion may think fit.

#318543

- 33 -

LEX-01 180239

6.3    Lexington shall, on receipt of any proceeds resulting from any of the acts of enforcement referred to in clause 6.2, apply the same in or towards repayment of the Claims and payment of all other amounts owing to Lexington under the Collateral Agreement. Lexington shall be entitled to the repayment of all costs and charges in connection with the foregoing, including all costs, fees and charges it may incur in connection with the enforcement of this charge.

6.4    If, following enforcement of this charge, there shall remain any sum of money after Lexington has been reimbursed in full for all amounts owing to it under the Collateral Agreement, such sum of money shall be remitted to Flashpoint or such other person entitled.

6.5    The Law of Property Act 1925 section 103 and the restrictions in section 93 of that Act shall not apply to the security created by this charge.

6.6    At any time after this charge has become enforceable, Lexington may under the hand of any official or manager or under seal appoint or remove a receiver or receivers of the Charged Property and may fix and pay the fees of a receiver, but any receiver shall be deemed to be the agent of Flashpoint and Flashpoint shall be solely responsible for the receiver's acts, defaults and remuneration. All or any of the powers conferred on a receiver by clause 6.7 may be exercised by Lexington without first appointing a receiver or notwithstanding any appointment.

6.7    Any receiver appointed by Lexington shall (in addition to all powers conferred on him by law) have the following powers, which in the case of joint receivers may be exercised jointly or severally:-

    6.7.1    to take possession of and generally manage the Charged Property;

    6.7.2    to sell, charge or otherwise deal with and dispose of the Charged Property without restriction;

    6.7.3    to carry into effect and complete any transaction by executing deeds or documents in the name of or on behalf of Flashpoint;

    6.7.4    to take continue or defend any proceedings and enter into any arrangement or compromise;

#318543

- 34 -

LEX-01 180240

LEX-01 180241

6.7.5   to employ advisers, consultants, managers, agents, and others and purchase materials, equipment or supplies;

6.7.6   to borrow any money and secure the payment of any money for the purpose of the exercise of any of his powers;

6.7.7   to comply with and perform all or any of the acts, matters, omissions or things covenanted to be done or omitted by Flashpoint under this charge;

6.7.8   to make payments:-

6.7.8.1   of the Net Receivables into and out of the  Collection Account and the Flashpoint UK Collection Account;

6.7.8.2   of the monies from time to time standing to the credit of the Holding Account, Flashpoint Jersey Holding Account and the Production Account in accordance with the terms of the Production and Finance Agreement and this agreement;

6.7.9   to initiate legal proceedings against the producer, cast, distributors, sales agents and any other person whatsoever connected directly or indirectly with the Filmworks Project;

6.7.10   to do any other acts which the receiver may consider to be incidental or conducive to any of his powers or to the realisation of the Charged Property or the income from the Charged Property.

6.7.11   without prejudice to the generality of the above take over Flashpoint's rights to manage production and completion of the Films, Film Rights and Film Materials and/or the Exploitation and/or collection and/or adjustment, settlement and payment of the Revenues and Net Receivables.

6.8   Once this Charge has become enforceable, upon Lexington providing written notice to Flashpoint, Flashpoint will, or will procure that the Producer will:-

(a)   exercise any relevant rights under the Production and Finance Agreement to endeavour to forthwith deliver up to  a receiver all Film Materials, and

#318543

- 35 -

LEX-01 180242

all other documents and correspondence whatsoever and wheresoever kept relating to the Films;

(b)     execute and do such documents, acts and things as the receiver may from time to time reasonably require to facilitate, evidence or perfect the full control by the receiver of Flashpoint's interest in the Films, the Film Materials and the Film Rights and the production, disposal or Exploitation thereof;

(c)     do such acts and things, and execute such deeds and documents, as the receiver may reasonably require for the purposes of completing production of the Films and agreeing, adjusting, settling, litigating and collecting the Revenues and Net Receivables.

6.9     Flashpoint by way of security irrevocably appoints Lexington and any receiver severally to be the attorney of Flashpoint (with unlimited power of substitution and delegation) in Flashpoint's name and on Flashpoint's behalf and as Flashpoint's act and deed to sign or execute all deeds, instruments and documents and do all such acts and things which may be required by Lexington or any receiver pursuant to this deed or the exercise of any of their powers. Flashpoint ratifies and confirms and agrees to ratify and confirm anything such attorney shall lawfully and properly do or purport to do by virtue of this clause 8.8 and all money expended by any such attorney shall be deemed to be expenses incurred by Lexington under this deed.

7.     **Protection of Third Parties**

No purchaser from Lexington or any receiver shall be concerned to enquire whether any of the powers which they have exercised or purported to exercise has arisen or become exercisable or whether any amounts remain owing to Lexington or as to the propriety or validity of the exercise or purported exercise of any such power, and the title of a purchaser and the position of such a person shall not be prejudiced by reference to any first matters. The receipt of Lexington or any receiver shall be an absolute and conclusive discharge to a purchaser and shall relieve such a person of any obligation to oversee the application of any monies paid to or by the direction of Lexington or any receiver.

#318543

- 36 -

LEX-01 180243

8.    **Protection of Lexington**

Neither Lexington nor any receiver shall be liable in respect of any loss, damage, liabilities, cost, claims and expenses (including reasonable legal costs and expenses) which arise directly or indirectly out of the exercise or the attempted or purported exercise of or the failure to exercise any of their respective powers, and entry into possession of the Films, Film Materials or the Film Rights shall not render Lexington or any receiver liable to account as mortgagee in possession.

9.    **Expenses**

Flashpoint shall indemnify Lexington from and against all actions, proceedings, claims, demands, costs, awards and damages howsoever arising as a result of any breach or non-performance by Flashpoint of any of its undertakings or obligations under this Charge.

10.   **Indemnity**

Flashpoint unconditionally covenants with Lexington upon demand to indemnify Lexington and/or the receiver (on a full complete and unqualified basis) against all claims, proceedings, expenditure, and liabilities which Lexington or the receiver may incur in connection with:-

(a)    this Charge and/or agreement or in consequence of anything done or purported to be done thereunder by Lexington or the receiver or of anything omitted to be done thereunder by Flashpoint; and

(b)    any payment or discharge in respect of monies standing to the credit of the Collection Account and the Flashpoint UK Collection Account together with any interest thereon (whether made by Flashpoint or a third person) being impeached or declared void for any reason whatsoever.

11.   **Notices, Waiver and Governing Law**

The provisions of clauses 18 ("Notices"), 21 ("Waiver") and 22 ("Governing Law") of the Collateral Agreement shall apply to this charge.

#318543

JLT 6        066        LEX-01 180244

IN WITNESS whereof this charge has been executed as a deed the day and year first above written.

#318543

- 38 -

JLT 6          067

LEX-01 180245

## SCHEDULE A

### Insurance Policies

1.   Producer's Film Production Indemnity Insurance Policy

2.   Flashpoint's Errors and Omissions Policy

3.   Any additional insurance policies which Lexington may reasonably require in accordance with the terms of this agreement

#318543

- 39 -

LEX-01 180246

# SCHEDULE B

## Budget

#318543

- 40 -

LEX-01 180247

Executed and delivered as a deed by   )
   )
for and on behalf of   )
**FLASHPOINT (UK) LIMITED**   )
in the presence of   )


Executed and delivered as a deed by   )
   )
for and on behalf of   )
**LEXINGTON INSURANCE COMPANY**   )
in the presence of   )

#318543

- 41 -

LEX-01 180248

## SCHEDULE 2

### Principal Production Documents

### (Documents to be disclosed to Lexington)

1.    Before Production of the Films

    (a)    Agreement between Flashpoint and Flashpoint Jersey

    (b)    Film Finance and Production Agreement between Prosperity Pictures LLC and Flashpoint;

    (c)    Producer's Agreement;

    (d)    Director's Agreement;

    (e)    Budgets and Cashflow Schedules;

    (f)    Example of typical Artiste's Agreement;

    (g)    Laboratory Access Letter;

    (h)    Location/Studio Agreement if applicable;

    (i)    Completion Guarantee from The Motion Picture Bond Company Inc.;

    (j)    Producer's Errors and Omissions Insurance;

    (k)    Flashpoint's Errors and Omissions Insurance;

    (l)    Any additional Insurance Policies which Lexington may reasonably require in accordance with the terms of this agreement

    (m)    Opinion Letter from Tarlo Lyons

2.    After Production of the Films

    (a)    All Distribution Agreements (if requested by Lexington);

    (b)    All Sales Agency Agreements.

#318543

- 42 -

**SIGNED** by _Keith J. Peacock_ )
duly authorised for and on behalf )
of **LEXINGTON INSURANCE COMPANY** )
in the presence of:- )

S. MITHAL

S. Mitchell


**SIGNED** by )
duly authorised for and on behalf )
of **FLASHPOINT (UK) LIMITED** )
in the presence of:- )

33 St. John's Lane
London EC1M 4DB
Solicitor


#318543

- 43 -