# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF PENNSYLVANIA

LEXINGTON INSURANCE COMPANY,

                                              Plaintiff,

          -against-

DAVID FORREST, T. BEAUCLERC ROGERS IV, STANLEY MUNSON, MARTIN FINK, ALL INDIVIDUALLY, AND NEW BEGINNINGS ENTERPRISES LLC, A CALIFORNIA LIMITED LIABILITY COMPANY, AND TARLO LYONS, A PARTNERSHIP,

                                              Defendants.

Civil Action No. 02-CV-4435
(Hon. Anita B. Brody)

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO MOTIONS OF DEFENDANTS MUNSON AND TARLO LYONS FOR JUDGMENT ON THE PLEADINGS

*Of Counsel*:

    Jeffrey R. Lerman
    Glenn F. Rosenblum

MONTGOMERY, MCCRACKEN, WALKER & RHOADS, LLP
123 South Broad Street
Philadelphia, Pennsylvania  19109
(215) 772-1500

                    -and-

CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, New York  10005
(212) 701-3000

*Of Counsel*:

    Edward P. Krugman
    Kevin J. Burke
    Ira J. Dembrow

*Attorneys for Plaintiff*

***TABLE OF CONTENTS***

**Page**

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ...............................................................................................1

BACKGROUND ...................................................................................................................3

ARGUMENT ......................................................................................................................6

     I.     Lexington Has Adequately Pleaded All Applicable Counts Against
          Defendants Munson and Tarlo Lyons.......................................................................7

          A.     The Complaint States Claims for Fraudulent Inducement and
                 Tortious Interference with Contract (Counts 6 and 7) ................................7

          B.     The Complaint States a Claim for Tortious Interference
                 With Contract (Count 5) ............................................................................13

          C.     The Complaint States Claims for a Substantive RICO Violation,
                 RICO Conspiracy and Common Law Fraud (Counts 1, 3 and 4) .............15

     II.     Lexington Has Adequately Pleaded That The Causes of Action are Timely ........20

CONCLUSION ...................................................................................................................23

## TABLE OF AUTHORITIES

**Page**

*Cases*

*American Trade Partners, L.P.* v. *A-1 International Importing Enterprises, LTD.*, 755 F. Supp. 1292 (E.D.Pa. 1990) .................................................................. 10

*Ballard* v. *National City Mortgage Co.*, No. Civ. A. 04-3715, 2005 WL 147075 (E.D.Pa. Jan. 21, 2005) ...................................................................... 21

*Banks* v. *Wolk*, 918 F.2d 418 (3d Cir. 1990) .................................................. 10n.6

*Beck* v. *Prupis*, 529 U.S. 494, 120 S. Ct. 1608, 146 L. Ed. 2d 561 (2000) .................. 20

*Cohen* v. *Wolgin*, Civ. A. No. 87-2007, 1995 WL 33095 (E.D.Pa. Jan. 24, 1995). ...... 10n.6

*Flood* v. *Makowski*, No. Civ. A. 3:CV-03-1803, 2004 WL 1908221 (M.D.Pa. Aug. 24, 2004) ................................................................................ 21-22

*Forbes* v. *Eagleson*, 228 F.3d 471, 486 (3d Cir. 2000) ................................................ 22

*Ideal Dairy Farms* v. *John Labatt, Ltd.*, 90 F.3d 737 (3d Cir. 1996). .......................... 17-18 n.11

*In re Linerboard Antitrust Litigation*, 223 F.R.D. 335 (E.D.Pa. 2004) ........................ 7

*Jairett* v. *First Montauk Securities Corp.*, 203 F.R.D. 181 (E.D.Pa. 2001) .................. 16

*Mill Run Associates* v. *Locke Property Co.*, 282 F. Supp. 2d 278 (E.D.Pa. 2003)........ 7n.5

*Oshiver* v. *Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380 (3d Cir. 1994).............. 22

*Republic Environmental Systems, (PA), Inc.* v. *Reichhold Chemicals, Inc.*, 154 F.R.D. 130 (E.D.Pa. 1994) ...................................................................... 16

*Resolution Trust Corp.* v. *KPMG Peat Marwick*, Civ. A. No. 92-1373, 1992 WL 252784 (E.D.Pa. Sept. 29, 1992) ............................................................ 21

*Salinas* v. *United States*, 522 U.S. 52, 65, 118 S.Ct. 469, 477-478 (1997) .................. 12n.9, 20

**Page**

*Shelly* v. *Johns-Manville Corp.*, 798 F.2d 93 (3d Cir. 1986)..........................................    6n.4

*Smith* v. *Berg*, 247 F.3d 532, 538 (3d Cir. 2001) ..........................................    12n.9, 20

*Sutton* v. *Royal Chevrolet-Oldsmobile-Pontiac Buick, Inc.*, No. Civ. A. 03-CV-
    1825, 2004 WL 90071 (E.D.Pa. Jan. 15, 2004)..........................................    6

*Town of Kearny* v. *Hudson Meadows Urban Renewal Corp.*, 829 F.2d 1263
    (3d Cir. 1987) ..........................................    10n.6

*WIH Management, Inc.* v. *Heine*, No. Civ. A 99-CV-3002, 1999 WL 778319
    (E.D.Pa. Sept. 30, 1999) ..........................................    13

**Statutes**

18 U.S.C. § 1341 ..........................................    18, 20

18 U.S.C. § 1343..........................................    18, 20

18 U.S.C. § 1961(1) ..........................................    20

18 U.S.C. § 1962(c) ..........................................    12n.9, 17, 20

18 U.S.C. § 1962(d)..........................................    12n.9,20

18 U.S.C. § 2314 ..........................................    18, 20

**Other**

Federal Rule of Civil Procedure 9(b)..........................................    16

Federal Rule of Civil Procedure 12(c)..........................................    1, 17, 23

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF PENNSYLVANIA

LEXINGTON INSURANCE COMPANY,

Plaintiff,

-against-

DAVID FORREST, T. BEAUCLERC ROGERS IV, STANLEY MUNSON, MARTIN FINK, ALL INDIVIDUALLY, AND NEW BEGINNINGS ENTERPRISES LLC, A CALIFORNIA LIMITED LIABILITY COMPANY, AND TARLO LYONS, A PARTNERSHIP,

Defendants.

Civil Action No. 02-CV-4435
(Hon. Anita B. Brody)

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO MOTIONS OF DEFENDANTS MUNSON AND TARLO LYONS FOR JUDGMENT ON THE PLEADINGS

Plaintiff Lexington Insurance Company ("Lexington") respectfully submits its opposition to the substantially similar motions of defendants Stanley Munson ("Munson") and Tarlo Lyons ("Tarlo") (collectively, the "Defendants") for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).

### PRELIMINARY STATEMENT

Having lost their motions to dismiss, defendants Tarlo (by its new counsel) and Munson now are scrambling to find some other device by which to bring their overblown rhetoric before this Court. Judgment on the pleadings was the wrong choice.

There is absolutely no basis on which the motions are proper under Rule 12(c). On its face, the Second Amended and Supplemental Complaint (the "Complaint") contains allegations that are clear, concise and as a matter of law more than sufficient to state each and every cause of action asserted against Munson and Tarlo. The Defendants' reference to the absence of "real facts" in the Complaint must be a joke. It is *undisputed* that Flashpoint and its principals diverted funds earmarked for the financing and production of specific slates of motion pictures. It is *undisputed* that defendants Munson and Tarlo authorized and certified Flashpoint's withdrawals of the diverted funds, and it is *unmistakably alleged* that they knew that the misappropriation of funds was in breach of Flashpoint's contractual obligations to Lexington. Moreover, it is clearly alleged that at the time Munson was negotiating the Collateral Agreements between Lexington and his (and Tarlo's) client, Flashpoint, defendant Munson had a specific intention not to comply with the Collateral Agreements and specific knowledge that the Agreements would have to be breached to restore the funds diverted from the earlier Hollywood Funding Nos. 1, 2 and 3 financings.

Munson and Tarlo want this Court to believe that this is a simple breach of contract case, but as is clear from the face of the Complaint, this action is anything but: it is a multi-party, multi-transaction Ponzi scheme spanning a number of years that was formulated and carried out with an intention to defraud Lexington and other insurers. Both Munson and Tarlo are charged in the Complaint as direct participants in that scheme. These lawyer defendants — one of whom had an undisclosed financial interest in Flashpoint — can no longer stick their heads in the sand and pretend they were not at the epicenter of a major conspiracy.

In the absence of favorable facts or favorable law, defendants Munson and Tarlo have resorted to pounding the table. There is absolutely no relevance to this motion for judgment on the pleadings, or to the litigation in general, of the relationship between Lexington and

non-parties New Hampshire Insurance Co. and American International Group. That two separate subsidiaries of one of the world's largest insurance groups were involved in a significant piece of insurance business here in the United States as well as in Europe is not surprising. That defendants Munson and Tarlo attempt to disparage a defrauded Lexington's motives for bringing suit not only is irrelevant, but is an obvious display of desperation.[1]

Plaintiff Lexington respectfully requests that this Court deny the motions of Munson and Tarlo. As set forth in Point I, *infra*, Lexington has adequately pleaded all causes of action against Munson and Tarlo, which is the only inquiry necessary on a motion for judgment on the pleadings. Moreover, as discussed in Point II, the statute of limitations argument before the Court is also without merit, since Lexington adequately has pleaded fraudulent concealment and equitable tolling.

## BACKGROUND

This Court is well-versed in the background of this litigation. As set forth in the Second Amended and Supplemental Complaint,[2] the allegations of which must be taken as true

---

[1]    Of the many irrelevancies in the Tarlo papers, perhaps the most egregious is the suggestion (Tarlo Br. 3) that Lexington has not suffered serious damage, because "the net premiums collected just by Lexington on the $186 million value of Hollywood Funding 4, 5 and 6 alone . . . approximate the amount of its purported damages." As Tarlo's counsel knows, because they have the documents and have commented upon them, Lexington's participation in these transactions was heavily reinsured. Most of the premium went to the reinsurers, and so did most of the risk. The overall settlement amount in the *Hollywood Funding* litigation in England is many tens of millions of dollars more than Lexington itself paid; Lexington in this action is seeking recovery only of its own costs and settlement payments, net of the amount recovered from or paid by others. If Tarlo Lyons wishes to tax Lexington with the gross premium, is it willing to face exposure to the gross loss?

[2]    Citation to the Second Amended and Supplemental Complaint is by paragraph number only.

-3-

for purposes of this motion, Munson and Tarlo were active participants in a wide-reaching conspiracy that has cost Lexington millions of dollars in direct, out-of-pocket loss (¶¶ 1, 5, 9). The Ponzi scheme was effected through a cluster of related companies known generically as "Flashpoint" (¶ 2). On numerous occasions from 1996 to 1999, defendants David Forrest and Beau Rogers, operating through Flashpoint, raised funds from various investors, purportedly to finance the production of motion pictures. At that time, financial institutions were unwilling to put up funds without some sort of credit backing, which was provided in the form of insurance policies procured from and issued by Lexington and other insurance companies (¶¶ 2, 21, 22).

There were six financing transactions in all, known as Hollywood Funding Nos. 1 through 6 (¶ 4). HIH Casualty & General Insurance Ltd. was the insurer for Hollywood Funding Nos. 1, 2, and 3 (*id.*). Lexington was the insurer for the last three transactions, Hollywood Funding Nos. 4, 5 and 6 (*id.*).

Defendants Munson and Tarlo are, respectively, the lawyer and law firm that on behalf of Flashpoint negotiated the agreements to obtain the insurance policies that allowed Flashpoint to raise the investor funds for the Hollywood Funding financings (¶ 37, 74).[3] Munson knew that Lexington would not issue the relevant insurance policies unless this documentation, known collectively as the Collateral Agreements, between Lexington and Flashpoint was put in place, and without the insurance the financing transaction would not go forward (¶ 43, 74, 75).

---

[3]  Tarlo does not challenge the application of vicarious liability to its relationship with Munson, which for purposes of this motion, must be accepted as true. *See, e.g.*, Complaint ¶ 34 ("Defendant Tarlo Lyons is liable for the actions of defendant Munson with respect to Munson's authorizing and certifying such improper withdrawals and the resulting misappropriations of funds, as Munson undertook such actions in the ordinary course of Tarlo Lyons' business.").

The Collateral Agreements on Hollywood Funding Nos. 4-6 each provided that:

- funds raised in each of the Hollywood Funding financings were to be kept segregated in an account dedicated to the transaction for which it was raised;

- funds raised in a given financing could be used only for specified purposes in connection with the production of the films involved in that financing; and

- a Tarlo partner would authorize all transfers from the Flashpoint holding account and certify that no withdrawal notice on the Flashpoint accounts could be issued until satisfactory principal production documents on the films were in place (¶¶ 37, 39, 42).

Yet neither Munson nor Tarlo nor any of the other defendants in this action ever had any intention to adhere to the protections put in place for the benefit of Lexington (¶¶ 38, 40, 76). After the funds were raised, defendants, including Munson and Tarlo, helped fraudulently to divert substantial proceeds of the transactions to real estate ventures, Russian movie theaters, and films other than the ones for which the proceeds were earmarked, all in direct violation of the Collateral Agreements (¶¶ 3, 33).

Unbeknownst to Lexington, at the time Munson negotiated the Collateral Agreements, he and Tarlo knew that the Flashpoint principals were violating the parallel restrictions and requirements of the Hollywood Funding Nos. 1-3 transactions (¶ 38). Munson and Tarlo knew — because Munson was signing off on the withdrawals — that Flashpoint was using funds dedicated to one slate of films for an entirely different slate and commingling accounts that were by agreement supposed to be segregated (*id*.). Munson and Tarlo knew at the time Munson was negotiating the Collateral Agreement in connection with Hollywood Funding No. 6 that it would have to be breached on the basis of false representations and certifications to restore to the Hollywood Funding Nos. 1-3 accounts the funds that had been raised but diverted (¶ 41). Most specifically, Munson and Tarlo knowingly negotiated the Collateral Agreements with a specific intent not to adhere to the draw notice provisions. The icing on the cake was that (unbeknownst to

Lexington), Munson had an equity interest in Flashpoint (¶ 38(c)) and therefore had an equity interest in the fruits of the fraudulent scheme.

Munson and Tarlo are alleged to have been active participants in the conduct of these affairs, specifically with the diversions of funds from the films for which they were intended (¶¶ 32-35) and fraudulently inducing Lexington to enter into the Collateral Agreements (¶¶ 40-42). Accordingly, Munson and Tarlo are liable to Lexington for RICO offenses under 18 U.S.C. § 1962(c) and (d), as well as for common law fraud, tortious interference with contract and fraudulent inducement (¶¶ 50-54, 60-87).

## ARGUMENT

The reason why Munson and Tarlo spend ten pages — more than half of their brief — before reaching their argument is that they have nothing to say on the law. The standard by which the Court must adjudicate this motion is simple and clear: "Judgment on the pleadings is appropriate only when the movant establishes, on the face of the pleadings alone, that he is entitled to judgment as a matter of law and that no material issue of fact remains to be resolved in order to ensure that the rights of the nonmoving party are decided as fully and fairly on a rule 12(c) motion, as if there had been a trial." *Sutton* v. *Royal Chevrolet-Oldsmobile-Pontiac Buick, Inc.*, No. Civ. A. 03-CV-1825, 2004 WL 90071, at *2 (E.D.Pa. Jan. 15, 2004) (denying defendants' motion to dismiss and for judgment on the pleadings) (internal quotation marks and citations omitted).[4] Courts must accept all well pleaded facts in the complaint as true and view all

---

[4]     The standard for evaluating a motion for judgment on the pleadings under Rule 12(c) is the same as that for evaluating a motion to dismiss under Rule 12(b)(6). *Shelly* v. *Johns-Manville Corp.*, 798 F.2d 93, 97 n.4 (3d Cir. 1986) (reversing dismissal).

facts and inferences to be drawn from the pleadings in the light most favorable to the non-moving party. *In re Linerboard Antitrust Litigation*, 223 F.R.D. 335, 341 (E.D.Pa. 2004).

Lexington has more than met its burden with respect to Munson and Tarlo.

**I.**

**LEXINGTON HAS ADEQUATELY PLEADED
ALL APPLICABLE COUNTS AGAINST
DEFENDANTS MUNSON AND TARLO LYONS**

**A.    *The Complaint States Claims for
Fraudulent Inducement and
Tortious Interference with Contract
(Counts 6 and 7)***

In its Sixth Claim for Relief, Lexington alleges that Defendants fraudulently induced it to issue insurance policies with respect to the Hollywood Funding Nos. 4, 5 and 6 transactions. All of the requisite elements[5] of the claim have been alleged:

- Munson, a solicitor and partner in Tarlo who also had an equity interest in Flashpoint (¶¶ 9, 38), on behalf of that entity negotiated the Collateral Agreements and knew that the Agreements were intended to protect Lexington's interests (¶¶ 74, 75). Munson also knew that Lexington would not have issued the insurance policies without the Collateral Agreements (*id.*).

---

[5]    *Mill Run Associates* v. *Locke Property Co.*, 282 F. Supp. 2d 278, 291-92 (E.D.Pa. 2003) ("Defendant . . . alleges that [Plaintiff] engaged 'in false, deceitful and misleading courses of conduct that were designated and intended to deceive [Defendant], and to fraudulently induce [Defendant] to continue under the terms of the Agreement,' and that [Defendant] 'detrimentally relied in good faith on the conduct of [Plaintiff] and its agents. Because [Defendant] pleads the elements of a claim for fraudulent inducement, the claim is sufficient for purposes of this motion to dismiss.") (internal citation omitted).

- Those Agreements contained a provision that Flashpoint would undertake to procure that Tarlo would not release any funds from the Holding Account in relation to the principal photography of the Films unless and until Lexington was reasonably satisfied that the Principal Production Documents in relation to the Films was substantially completed (¶¶ 37, 39, 73).

- Munson and Tarlo never intended (either at the time of negotiation or any point thereafter) to comply with or honor the Collateral Agreement representation restricting the use of Holding Account funds, making their representation false and fraudulent when made (¶ 76). It is alleged that they knew funds had been taken from the Hollywood Funding Nos. 1-3 transactions (¶77).

- The representations, upon information and belief, were made with reckless disregard for Lexington's interests with intent to deceive and defraud and to induce Lexington to issue the policies (¶ 78).

- Lexington relied on the representations as being true and accurate, would not have issued the policies had it known the truth, and has been injured (¶¶ 79-81).

Munson and Tarlo's resort to semantics to extricate themselves from the fraudulent scheme at issue is unavailing. Munson, a Tarlo partner, personally negotiated the Collateral Agreements on behalf of Flashpoint and in connection therewith agreed to a representation of his *own conduct* that, as specifically alleged in the Complaint, "defendant Munson would certify or arrange to have Tarlo Lyons certify any draw [on Flashpoint's accounts] he was requested to certify, without regard to the propriety of the draw" (¶ 38(c)). Stated differently, Munson personally was involved in making the representation involving his and his law firm's conduct, which

-8-

representation Munson knew was central to the deal with Lexington.  Munson also knew that those representations were false because he had already assisted Flashpoint in misappropriating the funds raised in connection with Hollywood Funding Nos. 1-3, which would have to be replenished with the funds from the later financings.  Defendants' argument, that somehow Munson and Tarlo are not responsible for a term they negotiated involving their own conduct and adopted themselves by agreeing to serve in the required capacity under the Collateral Agreements, would truly elevate form over substance.

Moreover, Munson and Tarlo misread the Collateral Agreement provision at issue and contend, rather astoundingly, that "[t]here is *no* limitation on the use of the moneys in the Holding Account for *pre-production* costs for the films which are the subject of the Collateral Agreement or for *any other purpose* separate from such films" (Moving Briefs pp. 11-12; emphases in originals).  Stated differently, Munson and Tarlo are quite confident that the funds raised in connection with the Hollywood Funding financings could be used as Flashpoint's own personal piggy bank.

Munson and Tarlo are just wrong.  As set forth in the Complaint, and in the Collateral Agreements attached to the Affidavits of John D. Gordan, III and Conrad O. Kattner submitted with their motions, Flashpoint had clear obligations to (1) maintain the funds from the Hollywood Funding financings in segregated accounts (the account number was identified in each Collateral Agreement and was different in each Agreement) and (2) use the funds only for the purposes for which they had been raised: the production of films identified in connection with the specific financing (¶¶ 32, 33, 37, 39).

The allegation of fraud in the inducement of the Collateral Agreements against Munson is that, in conspiracy with Forrest and Rogers, he negotiated Collateral Agreements that he knew, at the time he negotiated them, would never be honored, and he negotiated direct par-

-9-

ticipation by his law firm in certifications that he knew would be false when made. Munson was telling Lexington that it could rely on Tarlo for protection at a time when he knew that it could not. Inducing someone to enter into a contract that is known will be breached is fraud. *See American Trade Partners, L.P.* v. *A-1 International Importing Enterprises, LTD.*, 755 F. Supp. 1292, 1301 (E.D.Pa. 1990) ("The essence of fraud is in the misrepresentation that occurs when a defendant makes a bargain with no intention of living up to it."). The allegations regarding the misappropriations from the Hollywood Funding Nos. 1, 2, and 3 transactions are both part of the pattern for RICO purposes[6] and constitute evidence on the issue of a fixed intention not to comply with the Hollywood Funding Nos. 4, 5, and 6 Collateral Agreements.

On the face of the Collateral Agreements, Tarlo's effort to portray the Ponzi scheme as "nothing more sinister than taking money from the wrong pocket for valid business reasons" (Tarlo Br. 14), or the whole issue as merely one of breach of contract, is ludicrous. The Flashpoint Collateral Agreements were not ordinary contracts; they were fiduciary in nature. They were "entered into for the purposes of managing the risks contained in the Policy," and it was "the parties' intention that utmost good faith shall be the essence of the relationship between them" (Gordan Aff't Ex. B at LEX-01 180225). Segregation of funds and control over their use was not a casual contractual term; it was the essence of the documents. As alleged in the Com-

---

[6]    Defendants point out that Lexington was not a party to the first three Hollywood Funding transactions, but they do not say — because they cannot say — that those transactions are not relevant for RICO pattern purposes. It is well settled that the plaintiff need not have been the victim of *every* predicate act that forms part of the pattern; it is sufficient that the plaintiff has been the victim of one. *Town of Kearny v. Hudson Meadows Urban Renewal Corp.*, 829 F.2d 1263, 1268 (3d Cir. 1987); *see also Banks v. Wolk*, 918 F.2d 418, 424 (3d Cir. 1990); *Cohen v. Wolgin*, Civ. A. No. 87-2007, 1995 WL 33095, at *11 (E.D.Pa. Jan. 24, 1995). Transactions not involving the plaintiff are relevant and admissible on the existence of the requisite "*pattern* of racketeering activity."

plaint, each transaction had a separate and distinct Holding Account (¶¶ 37(a), 39).[7]  Flashpoint expressly undertook to use the money raised in each transaction "only for funding the production of the Films by the Producer, and for no other purpose" (Gordan Aff't Ex. A at LEX-01 180257; *id*. Ex. B at LEX-01 180213).  The "Producer" is a defined term in each transaction; and refers to the entity making the films financed *in that transaction* (*compare* Gordan Aff't Ex. A at LEX-01 180254 ("Producer" is "Prosperity Pictures Inc.") *with* Krugman Dec. Ex. A at LEX-01 180329 ("Producer" is Regent Entertainment Partnership, L.P.)).  The Complaint alleges that similar obligations existed in the Hollywood Funding Nos. 1, 2, and 3 transactions notwithstanding that collateral agreements had not been executed with respect to those transactions at the time the Collateral Agreements for Hollywood Funding Nos. 4 and 5 were being negotiated (¶¶ 33(a), 33(b)).

The Complaint alleges that, in violation of these obligations, funds raised for Hollywood Funding Nos. 1, 2, and 3 were diverted for the benefit of Regent, Prosperity/Filmworks, and Jules Verne (¶¶ 33, 38).  It alleges that Munson knew and was complicit in this diversion (¶ 34).[8]  It alleges that he negotiated the Collateral Agreements for Hollywood Funding Nos. 4 and 5 with the fixed intent that they not be performed (¶¶ 38, 76).  It alleges that the Collateral Agreements were a material inducement to Lexington to enter into the Hollywood Funding Nos.

---

[7]    The Holding Account for the Regent 1 transaction, for example, was Account No. 41539001 at Leopold Joseph (Declaration of Edward P. Krugman ("Krugman Dec.") Ex. A at LEX-01 180329), whereas the Holding Account for the Filmworks transaction was Account No. 15101 (Gordan Aff't Ex. A at LEX-01 180253).

[8]    Examples of improper drawdown certificates signed by Munson are annexed as Exhibit B to the Krugman Declaration.  The drawdown certificates originated in California and were transmitted by mail, wire (fax), or courier to London; the money came back across the Atlantic to Hollywood. All this easily establishes the jurisdictional means requirement for mail and wire fraud and interstate transportation of stolen property (¶¶ 47-48).

4 and 5 transactions (¶¶ 43, 74). It alleges that the Hollywood Funding Nos. 4 and 5 Collateral Agreements were in fact violated (as Munson knew and intended that they be) and that Munson knew this when negotiating the Hollywood Funding No. 6 Collateral Agreements (¶¶ 38, 40-41, 76). It alleges that Munson negotiated the Hollywood Funding No. 6 Collateral Agreements with the fixed intent that they also not be performed (¶¶ 40, 41, 76). It alleges that the Collateral Agreements were a material inducement to Lexington in determining whether to enter into the Hollywood Funding No. 6 transaction (¶ 43). It alleges that Munson did all this in his capacity as a member of the firm of Tarlo Lyons and in the course of Tarlo Lyons's business (¶ 34). For Tarlo Lyons to say that the Complaint has not alleged fraud, or the personal involvement of Mr. Munson in multiple predicate acts,[9] is beyond the pale.

Moreover, Tarlo was obligated not to release funds "in relation to the principal photography of the Films unless and until the Principal Production Documents in relation to the Films have been substantially completed to the reasonable satisfaction of Lexington" (¶ 82). Stated differently, once Lexington believed that the appropriate production documents for the specific slate of films was substantially completed, Tarlo could then certify withdrawals from the Holding Account that were related to the principal photography of the films that were the subject matter of each Collateral Agreement. Accordingly, Lexington has adequately stated a claim for fraudulent inducement and Defendants' motion with respect to Count 6 must be denied.

---

[9] Such involvement is an element of the claim against Munson and Tarlo Lyons under 18 U.S.C. § 1962(c). It is *not* an element of a conspiracy claim under section 1962(d). *See Salinas* v. *United States*, 522 U.S. 52, 65, 118 S.Ct. 469, 477-478 (1997); *Smith* v. *Berg*, 247 F.3d 532, 538 (3d Cir. 2001) ("one who opts into or participates in a conspiracy is liable for the acts of his co-conspirators which violate section 1962(c) even if the defendant did not personally agree to do, or to conspire with respect to, *any* particular element . . . .a defendant may be held liable for conspiracy to violate section 1962(c) if he knowingly agrees to facilitate a scheme which includes the operation or management of a RICO enterprise.").

The same is true on Count 7.  It is essential to note that although they lump together their arguments on Count 6 (for fraudulent inducement) and Count 7 (for tortious interference with contract), Munson and Tarlo do not in fact say one word about the tortious interference claim in Count 7.[10]  Indeed, Munson and Tarlo's entire argument with respect to Count 7 seems to revolve around a semantic dissection of the word "misrepresentation" (Moving Briefs at 10-11).  Because Lexington clearly has alleged all necessary elements for such a claim, *see, e.g.*, *WIH Management, Inc.* v. *Heine*, No. Civ. A 99-CV-3002, 1999 WL 778319, at *2-3 (E.D.Pa. Sept. 30, 1999) ("In stating a clam for tortious interference with contracts . . . a party must allege: (1) intention and improper interference with the performance of a contract; (2) between another and a third person; (3) by inducing or causing a third person not to perform or enter into the contract; (4) resulting in loss to the other from the third person's failure to enter or perform."), which does not require the existence of a "misrepresentation," Defendants' motion with respect to Count 7 must be denied.

**B.      *The Complaint States a Claim for Tortious Interference With Contract (Count 5)***

Lexington's claim for tortious interference against Munson and Tarlo is straightforward: the various Collateral Agreements between Lexington and Flashpoint provided that the funds raised by the Hollywood Funding financings were to be used only for the purposes for which they had been raised (¶¶ 32, 33, 34, 37, 39, 68); Flashpoint breached the Collateral Agreements by making improper transfers of the funds to, among others, The Building, Russian movie theaters and Ice Storm (¶ 33, 69); the conduct of Defendants Munson and Tarlo, among

---

[10]     To the extent that Defendants seek to apply their arguments on Count 6 to Count 7, Count 7 is well-pleaded for the same reasons as those set forth above.

others, induced the breach, which was tortious and without justification (¶ 70); and Lexington has been injured (¶ 71). It couldn't be any clearer.

Munson and Tarlo's argument, that Lexington failed to plead "injury", makes no sense and easily can be disposed. On the face of the Complaint, it is alleged that:

- Lexington was the insurer for Hollywood Funding Nos. 4, 5 and 6, which closed on July 3, 1998; July 28, 1998; and December 23, 1998, respectively (¶ 4).

- "[A]ll funds were commingled in a single account, which Flashpoint treated as its general operating account" (¶ 32).

- Sums were transferred to The Building on or about August 14, 1998 and again on or about April 7, 1999 (¶ 33(c)), and "none of these uses of funds was permitted under the Hollywood Funding No. 5 Collateral Agreement" (*id*.).

- Sums were used to invest in a chain of Russian movie theaters "[d]uring 1998 and/or 1999" (¶ 33(d)) and sums were transferred to a company known as Ice Storm during the period August 12, 1999 to December 9, 1999, which was not permitted under the "Jules Verne Collateral Agreement" (¶ 33(e)).

- "All of the funds so used were transferred from the Flashpoint account that contained the (improperly commingled) funds that were raised in the various Hollywood Funding financings. . . (¶¶ 33(c), 33(e); *see also* ¶ 33(d))."

It is therefore alleged that all of the funds, including those from the Lexington-insured Hollywood Funding Nos. 4-6, were improperly commingled and thereafter misappropriated. Lexington has pleaded injury.

-14-

C.    ***The Complaint States Claims for a
      Substantive RICO Violation, RICO
      Conspiracy and Common Law
      Fraud (Counts 1, 3 and 4)***

At the heart of the Complaint are a substantive RICO violation, RICO conspiracy and fraud claims as to all defendants (except New Beginnings), which includes Munson and Tarlo who were integral participants in the Ponzi scheme effected through the Flashpoint enterprise. Contrary to their arguments, the allegations of the 97-paragraph Complaint are more than sufficient to put Munson and Tarlo on notice of their criminal misconduct:

- Munson and Tarlo were the Flashpoint architects of the Collateral Agreements, the documentation Lexington required before it would bind coverage for Hollywood Funding Nos. 4, 5, and 6 (¶¶ 37, 43, 74, 75).

- Munson negotiated the Collateral Agreements on behalf of Flashpoint during the period March through July 1998 and made agreements as to his (and Tarlo's) own conduct. Specifically, Munson negotiated the term that Tarlo would not release any funds from the Flashpoint Holding Account in relation to the principal photography of each specific slate of films unless and until Lexington was reasonably satisfied that those films' principal production documentation was substantially completed (¶ 37, 73, 74).

- It is alleged that at the time Munson was negotiating the Collateral Agreements, he and Tarlo had the fixed intent (which was concealed from Lexington) not to comply with the Collateral Agreements and to certify any draw regardless of the propriety of the draw (¶¶ 38, 40, 76). Munson and Tarlo therefore fraudulently induced Lexington to enter into the Collateral Agreements and the transaction as a whole (¶¶ 43, 73-81).

-15-

- Munson and Tarlo also knew that pursuant to the Collateral Agreements the funds raised in each of the Hollywood Funding financings were to be kept in a segregated account dedicated to each transaction (a distinct account number was specified in each different Collateral Agreement) and that the funds raised in each financing could only be used for specific purposes in connection with the films for that financing (¶ 37).

- It is specifically alleged that Munson and Tarlo repeatedly ignored the afore-mentioned obligations and misappropriated funds (which had all been im-properly commingled in a single, general operating account) throughout 1998 and 1999 (¶¶ 32, 33). The misappropriations are spelled out in Paragraph 33 of the Complaint, which contains so much detail it spans three, single-spaced pages of the pleading.

That is all that is required. Defendants' blustering about Federal Rule of Civil Procedure 9(b) is inappropriate and, once again, wrong on the law. The purpose of Rule 9(b) is to provide a defendant with sufficient notice of the misconduct at issue so as to enable that party to answer the Complaint. *See Jairett* v. *First Montauk Securities Corp*., 203 F.R.D. 181, 186 (E.D. Pa. 2001). Given that both Munson and Tarlo both answered the complaint, they cannot now argue that the pleading of fraud in the complaint was insufficient. *See e.g., Republic Environmental Systems, (PA), Inc*. v. *Reichhold Chemicals, Inc*., 154 F.R.D. 130, 132 (E.D. Pa. 1994) ("If the defendant can prepare an adequate answer to the complaint, the requirements of Rule 9(b) have been met."). Both Munson and Tarlo already have filed Rule 12(b) motions (which were denied) and answered the Complaint, without raising any defense as to Lexington's failure to plead fraud with particularity. In these circumstances, Munson and Tarlo's resort to a Rule 9(b) objection is too late.

-16-

Lexington also adequately pleads reliance.  In fact, Lexington's reliance on Munson and Tarlo is alleged at least seven distinct times throughout the Complaint (*see, e.g.*, ¶¶ 23, 31, 42, 44, 46, 66, 79).  Because Munson and Tarlo were supposed to be acting for the protection of Lexington in certifying the draws that Flashpoint requested they certify pursuant to the terms of the Collateral Agreements, a special relationship between Lexington and each of Munson and Tarlo existed requiring Munson and Tarlo to act at all times in Lexington's best interest (¶ 42).  Moreover, Munson and Tarlo were acting as the agents of Flashpoint, which had assumed a position of trust and confidence on behalf of Lexington (¶¶ 23, 31).  In the end, Lexington's statements that it justifiably relied on Munson and Tarlo's misrepresentations (¶¶ 44, 79), that it would not have bound the coverage for Hollywood Funding Nos. 4, 5, and 6 had it known of the Ponzi scheme at issue (¶¶ 46, 66), and would have taken all steps available to it to shut down the fraudulent enterprise and recover unexpended funds with respect to previously bound coverage (*id.*) are more than sufficient to allege reliance.

Munson and Tarlo's arguments in connection with Lexington's substantive section 1962(c) claim are unavailing.  First, Defendants' reference to "monthly reports" is just yet another example of the Defendants trying to expand this motion to something more than a motion for judgment on the pleadings.  The extent to which Lexington received proper monthly status reports from Flashpoint — an issue discussed, *infra*, and one that is to be resolved in discovery — is entirely irrelevant for Rule 12(c) purposes.[11]

---

[11]    Indeed, the authority Defendants cite in support of their argument concerning the "monthly reports" is a case applying the summary judgment standard, and not one constrained to the face of the pleadings.  *See Ideal Dairy Farms* v. *John Labatt, Ltd.*, 90 F.3d 737, 743 (3d Cir. 1996).

Second, Lexington has more than adequately alleged the Defendants' participation in and knowledge of the requisite predicate acts under RICO. The Complaint is replete with allegations regarding Munson and Tarlo's actual knowledge and personal participation in inducing Lexington into the Collateral Agreements, the diversions of funds, and all of the acts that constitute violations of 18 U.S.C. §§ 1341, 1343 and 2314. The Complaint also details how the defendants used interstate and foreign commerce to further their scheme (¶¶ 48-50). Contrary to Defendants' contention, allegations on information and belief are entirely appropriate and Paragraph 47(e) of the Complaint describing Munson and Tarlo's use of wire or radio communications in interstate or foreign commerce is sufficient to put Defendants on notice of the fraud. As but one example, the paragraph sets forth the *who* (Munson, Tarlo and Fink), *what* ("caused the transmission of documents and/or information through  . . . wire or radio communications in interstate or foreign commerce"), *where* (California and the United Kingdom), *why* ("for the purpose of arranging for withdrawals from the Flashpoint holding account of the monies raised in the various Hollywood Funding transactions") and *how* ("numerous faxes"). The *when* is also set forth in the Complaint at Paragraph 33, which details the periods of the various withdrawals of funds from the Holding Account.

Third, Munson and Tarlo's attempt to bar the applicability of Hollywood Funding Nos. 1, 2, and 3 to this litigation is futile. For one, Lexington does not, as Defendants suggest, need "standing" to allege that Flashpoint used funds raised in connection with the earlier Hollywood Funding financings to acquire and/or produce films that were part of Hollywood Funding No. 5 (¶ 33). Nor does Lexington need to be "involved in" Hollywood Funding Nos. 1-3 to allege that the terms of these transactions were breached by Flashpoint's conduct (*id*.) and reflect Flashpoint's fixed intent not to comply with the Collateral Agreements (¶ 38).

-18-

Moreover, Defendants make much of the fact that the Hollywood Funding Nos. 1-3 Collateral Agreements were not executed at the time of those financings, a fact plainly alleged in the Complaint (¶ 33).  The timing of their execution is of no moment.[12]  As is clear from the Complaint, the parties at least as early as July 1997 had negotiated the terms of the Hollywood Funding No. 1 Collateral Agreement and had understood that the segregated accounts and Tarlo Lyons' involvement as watchdog over the Holding Account funds were fundamental requirements of the Agreements (¶ 75).  That there was continuity between Hollywood Funding Nos. 1, 2, and 3, on the one hand, and Hollywood Funding Nos. 4, 5, and 6, on the other hand, is evidenced by the fact that the lead underwriter, Steve Mitchell, was the same for all six transactions —first on behalf of HIH Casualty and General Insurance Company and then on behalf of Lexington (¶ 75).

Finally, Defendants are confused about the facts and the law with respect to Lexington's RICO conspiracy claim, Count 3.  First, Munson and Tarlo are incorrect to assume that the dual objects of the conspiracy pleaded in Count 3 "relate to Forrest and Rogers alone" (Tarlo Br. 16).  There are myriad allegations throughout the Complaint (relating, for example, to

---

[12]     The opinions of the High Court and the Court of Appeal in England in the action between HIH Casualty and General Insurance Company, on the one hand, New Hampshire Insurance Company, Independent Insurance Company Limited and Axa Reassurance S.A., on the other hand, are irrelevant to the action before the Court.  The litigation, involving a reinsurance issue related to certain of the earlier Hollywood Funding financings, involves different parties and different issues.  It is not surprising that Defendants Munson and Tarlo selectively quote from the Court of Appeal decision (omitting reference to a description of the collateral agreement's provision requiring the financing to be "used for no other purpose than the production of 'Films'" as defined in the contract) but it is wholly disingenuous for them imply that findings were made that are relevant to this proceeding.  As is clearly set forth in the Court of Appeal decision by Lord Justice Rix when referring to the collateral agreement: "Quite what its provisions amount to . . . could well be the subject of debate, *but are not for decision here*."  *See* Gordan Aff't, Ex. B [2001] 2 Lloyd's Rep. 161, 165 (emphasis added).

Munson and Tarlo's participation in the scheme, their specific intent to defraud Lexington, Munson's equity interest in the Flashpoint enterprise, their certification of withdrawals without regard to the propriety of the draws, to name a few) to support the allegation that Munson and Tarlo's objects of the conspiracy were that Flashpoint be conducted through a pattern of racketeering activity and that the proceeds be used and invested in the scheme itself and diverted for purposes other than the production of films for which the monies were raised  (¶¶ 62, 63).  Second, Defendants are wrong that the dismissal of a "substantive" § 1962(c) claim mandates the dismissal of a § 1962(d) conspiracy claim.  It is well-settled that a party need not have violated section 1962(c) himself to be liable under section 1962(d).  *See Beck* v. *Prupis*, 529 U.S. 494, 507, 120 S. Ct. 1608, 1617 (2000); *Salinas* v. *United* States, 522 U.S. 52, 65, 118 S. Ct. 469, 478 (1997); *Smith* v. *Berg*, 247 F.3d 532, 537-38 (3d Cir. 2001).  Indeed, a plaintiff may still bring a conspiracy claim if the injury was caused by an act of racketeering as defined in § 1961(1).  *See Beck*, 529 U.S. at 505-07, 120 S. Ct. at 1616-17 (2000); *Smith*, 247 F.3d at 537-539.  Here, Lexington's injuries are alleged to be caused by mail and wire fraud (18 U.S.C. §§ 1341 and 1343) and the transportation of stolen monies (18 U.S.C. § 2314), all of which fall within the § 1961(1) definition of "racketeering" (¶¶ 50-64), and to which Defendants have no issue.  Defendants' arguments are without merit.

## II.

### LEXINGTON HAS ADEQUATELY PLEADED
### THAT THE CAUSES OF ACTION ARE TIMELY

In addressing Lexington's allegations regarding fraudulent concealment and equitable tolling, Munson and Tarlo once again blow smoke in an attempt to divert this Court from the motion before it.  It is absolutely irrelevant to a motion for judgment on the pleadings when film financing reinsurance litigation involving parties other than Lexington was commenced in Europe.  Lexington's receipt of Flashpoint reports —the content of which is disputed — also is

not relevant on these motions. This Court has one applicable legal standard before it: are the causes of action adequately pleaded on the face of the Complaint. The answer is a resounding yes.

      "Whether equitable tolling doctrine applies cannot be decided on the pleadings." *Ballard* v. *National City Mortgage Co.*, No. Civ. A. 04-3715, 2005 WL 147075, at *1 (E.D.Pa. Jan. 21, 2005) (motion to dismiss amended complaint based upon applicable statutes of limitations denied where plaintiff "argued for the benefit of equitable tolling"); *see also Resolution Trust Corp.* v. *KPMG Peat Marwick*, Civ. A. No. 92-1373, 1992 WL 252784, at *3 (E.D.Pa. Sept. 29, 1992) ("plaintiff has alleged several equitable tolling doctrines that potentially could apply and save this cause of action from the limitation period. The ultimate resolution, therefore, turns on issues of fact that are not presently before the court in this motion to dismiss. . . . such a factual determination would be inappropriate at this juncture."); *Flood* v. *Makowski*, No. Civ. A. 3:CV-03-1803, 2004 WL 1908221, at *6 (M.D.Pa. Aug. 24, 2004) ("When evaluating fraudulent concealment, it requires a fact-specific analysis which is best reserved for summary judgment, rather than a motion to dismiss."). To withstand a motion on the pleadings or a motion to dismiss based on statute of limitations grounds, a plaintiff is merely required to "plead the applicability of the [equitable tolling] doctrine." *Oshiver* v. *Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1392 (3d Cir. 1994) (finding allegations "taken as true and giving [plaintiff] the benefit of all reasonable inferences, are sufficient to activate the doctrine of equitable tolling.").

      Equitable tolling is appropriate in situations where, among others, the defendant has actively misled the plaintiff. *See Flood* v. *Makowski*, 2004 WL 1908221, at *6-7 ("Reading the Complaint in the light most favorable to Plaintiffs, they allege the three elements necessary to prove fraudulent concealment: Defendants actively mislead Plaintiffs; the misleading prevented Plaintiffs from discovering the injury; and Plaintiffs did not fail to engage in reasonable dili-

gence. . . . Whether Plaintiffs will be successful in proving fraudulent concealment . . . is a fact-specific analysis which is inappropriate for a motion to dismiss, but it is clear to the Court that Plaintiffs sufficiently pled fraudulent concealment . . . to survive a motion to dismiss.") (internal citation omitted) (citing *Forbes* v. *Eagleson*, 228 F.3d 471, 486 (3d Cir. 2000) (applying summary judgment standard), *cert. denied*, 533 U.S. 929, 121 S.Ct. 2551 (2001)).  The Complaint clearly alleges that the misconduct at issue was fraudulently concealed and could not have been discovered by Plaintiffs until after November 2000, at the very earliest (¶ 93).  As set forth in the Complaint:

- In August 2000, Lexington exercised its right under the Collateral Agreements to audit the insolvent Flashpoint but was denied access by various defendants until November 2000 (¶¶ 94-95).  Lexington thereafter learned of the diversion of funds that had taken place in connection with the proceeds of the various Hollywood Funding transactions (¶ 95).

- Lexington also was denied access to documents regarding the fraudulent sales estimates (¶ 96).  Again, as alleged in the Complaint, because various defendants denied Lexington access to the Flashpoint files, Lexington was prevented from discovering the depth of the defendants' fraud (id.).  Lexington also obtained relevant documents, after January 2001, from a cooperating witness and various transaction participants, and was able to obtain documents from legal proceedings in the United Kingdom (*id.*).

Defendants' reference to Lexington's receipt of Flashpoint reports pursuant to the Collateral Agreements is nothing but an effort to shift this Court's attention away from the Complaint's clear fraudulent concealment allegations.  Lexington's files do in fact reflect receipt of Flashpoint risk management reports, which have been produced to Tarlo's counsel, but those re-

ports do not contain the information required by the applicable section of the Collateral Agreements. Whether Lexington exercised sufficient diligence in following up is, of course, not the kind of issue that can be resolved on a motion for judgment on the pleadings.

At the end of the day, Lexington could not have learned of Munson and Tarlo's role in the Ponzi scheme until it was granted access to the documents and learned of the diversions of funds. On the judgment on the pleadings motions before the Court, that type of allegation is all that is required by law. Defendants' statutes of limitation argument is without merit.

## CONCLUSION

For the reasons set forth above, Plaintiff Lexington respectfully requests that the Court deny the motions of Defendants Munson and Tarlo Lyons for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).

Date:  New York, New York
       February 8, 2005

                                        Respectfully Submitted,

                                        CAHILL GORDON & REINDEL LLP

                                        By:      s/ Edward P. Krugman
                                                 Edward P. Krugman (pro hac vice)
                                                 Kevin J. Burke (pro hac vice)
                                                 Ira J. Dembrow (pro hac vice)
                                                 80 Pine Street
                                                 New York, New York  10005
                                                 (212) 701-3000

                                                 MONTGOMERY, MCCRACKEN, WALKER
                                                 & RHOADS LLP
                                                 Jeffrey R. Lerman
                                                 123 South Broad Street
                                                 Philadelphia, Pennsylvania 19109
                                                 (215) 772-1500

                                                 Attorneys for Plaintiff
                                                 Lexington Insurance Company