# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LEXINGTON INSURANCE COMPANY,<br><br>Plaintiff,<br><br>- against –<br><br>DAVID FORREST, T. BEAUCLERC ROGERS IV, STANLEY MUNSON, MARTIN FINK, all individually, and NEW BEGINNINGS ENTERPRISES LLC, a California Limited Liability Company, and TARLO LYONS, a partnership,<br><br>Defendants. | Civil Action No. 02-CV-4435<br>(Hon. Anita B. Brody) |

## REPLY MEMORANDUM OF LAW OF DEFENDANT TARLO LYONS IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE PLEADINGS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(C)

Defendant Tarlo Lyons respectfully submits its memorandum in reply to the brief of plaintiff Lexington Insurance Co. in opposition to Tarlo Lyons's motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

Little of Lexington's brief addresses Tarlo Lyons's demonstration of the fatal pleading deficiencies in Lexington's Second Amended and Supplemental Complaint. Invective and invocation of the apparently talismanic "Ponzi" word are substituted for legal argument. The Court will judge the Collateral Agreements by what they say, and not by Lexington's

self-serving recharacterizations.[1/] Since the law is decisively in Tarlo Lyons's favor on the few legal issues on which Lexington is willing to engage, we limit our response to obvious and dispositive points, reserving the rest for oral argument.

Lexington's repeated appeals to defer resolution of the legal issues raised by this motion until summary judgment rather than to make them now on the pleadings have no place here:

1.    This lawsuit has been pending for more than two and a half years. Although neither he nor Tarlo Lyons were then named a party, Lexington expressly leveled the same accusations of wrongdoing against Mr. Munson by name in the original Complaint (¶ 32(c)).

2.    The authorities Lexington relies on demonstrate that the reason issues are deferred until motions for summary judgment is to give the opposing party the opportunity to develop evidence on discovery. <u>Ballard v. National City Mortgage Co.</u>, No. Civ. A 04-3715, 2005 WL 147075, at *1 (E.D. Pa. January 21, 2005). Here, Lexington is represented by counsel who advised the Court by affidavit dated December 14, 2004 in support of Letters of Request, of:

> . . . my experience since August 2000 as world-wide coordinating counsel for AIG Companies (including Lexington) on film finance litigation and, in particular, on four-plus years of claims and litigation with respect to Flashpoint risks. During this period I have been directly involved in, and have supervised, the investigation of the facts of this case, including review of thousands of pages of documentation, interviews of many of the individuals for whom the Letter of Request is sought, and

---

[1/]    So enthusiastic is Lexington to recast the language of the Collateral Agreements that its brief (at 8) attributes to the Collateral Agreements, as a representation by Mr. Munson, language which is actually part of Lexington's accusations of Mr. Munson in its complaint.

In addition, Lexington repeats and amplifies its "certification" duty on Tarlo Lyons partners with respect to drawdowns from the holding accounts (Br. at 5), when there is no such provision in the Collateral Agreements. Indeed, Lexington's concession that the individual holding accounts were never even funded (Br. at 14, Complaint ¶ 32) makes its complaint founded on their governing provisions totally illusory.

oversight of the English *Hollywood Funding* litigation (which is the source of Lexington's damages herein).

3.     Despite this Court's intervention and Lexington's applications in England, Tarlo Lyons and its counsel remain deprived of access to huge amounts of relevant evidence Lexington possesses, two months before discovery is presently scheduled to end.

4.     The instant motion is one for judgment on the pleadings pursuant to Rule 12(c), not a Rule 12(b) motion which contemplates repleading.  A Rule 12(c) motion is a dispositive motion.

5.     Because Lexington's complaint makes specific reference to the provisions of the Collateral Agreements, the Court is authorized to consider documents not physically attached to the complaint and to evaluate the allegations of the complaint in light of the documents upon which those allegations depend.  Lum v. Bank of America, 361 F.3d 217, 222 n.3 (3d Cir. 2004). Indeed, Lexington has chosen to supply additional Collateral Agreements and other documents by affidavit in its opposition to this motion.  Hence the Court has a great deal more usable information available to it than on a typical Rule 12 motion.

## ARGUMENT

### A.     STATUTE OF LIMITATIONS

In its opening brief defendant Tarlo Lyons pointed out that under the applicable Pennsylvania borrowing statutes all of the non-RICO counts pleaded against Tarlo Lyons are governed by two-year statutes of limitations and that Lexington's own complaint demonstrated its knowledge of the specific fraud complained of more then two years prior to the joinder of Tarlo Lyons as a defendant in the action at the end of April 2004.  Lexington's brief (at 22) seems to acknowledge the assertion in its complaint that it became aware of the necessary facts

in November, 2000 – January, 2001. It cannot easily say anything else, since it obtained an injunction against Flashpoint on the exact same theory it advances here in a High Court decision dated January 19, 2001, to which it makes specific reference in its complaint (at ¶ 36).[2/]

Lexington argues that it alleges equitable tolling and that equitable tolling issues cannot be decided on pleadings. This argument cannot apply to the state law claims with two-year limitations periods because Lexington's pleadings affirmatively show that any fraudulent concealment ended more than two years before Tarlo Lyons and Mr. Munson were impleaded. Action on these counts now is even more compelling given the reservations expressed by the Court in its December 19, 2004 Explanation and Order regarding the validity of personal jurisdiction over Tarlo Lyons on the state law claims.

With respect to the RICO claims, Lexington's papers concede Tarlo Lyons's showing of Lexington's contractual right to receive monthly reports reflecting and reconciling the deposit and application of the film production proceeds of the Hollywood Funding loans – a right also expressed in identical language in the Collateral Agreements applicable to the Regent transactions which Lexington's affidavit on this motion puts before the Court. Lexington's brief also admits that it never received this contractually-mandated monthly information from Flashpoint, despite the passage of more than two years between these transactions and Lexington's decision in late 2000 to take Flashpoint to court. Lexington does not deny that Flashpoint's failure to provide the monthly reports was a "storm warning" sufficient to trigger the running of the statute of limitations under Third Circuit precedent. Not only does Lexington's total lack of interest in the subject which its counsel now uses as a platform for its

---

[2/]    A copy of the decision, Lexington Ins. Co. v. Flashpoint Ltd. and Flashpoint UK Ltd., 2000 Folio 1410 (January 19, 2001) is annexed hereto.

RICO claims create fatal reliance problems, for the reasons stated above it is time now for Lexington to show any equitable basis it has for tolling the RICO statute of limitations after September 1998, when the first monthly report did not appear.  It has totally failed to do so.

**B.     RICO**

Lexington attaches as Exhibit B to its counsel's affidavit four sets of drawdown documents from the period April and May 1998, evidently signed by defendant Munson among others, directing the payment of moneys for Regent slate films at a time several months prior to the funding of Hollywood Funding 5, by which the Regent films were to be financed.  These documents are characterized as "improper drawdown certificates" (Lexington brief at 11 n.8) and are put forward to do service for the legally required allegations, missing from Lexington's complaint, of two predicate racketeering felonies injuring Lexington and committed by Munson/Tarlo Lyons.  That Lexington should think these documents help it shows how utterly flawed its RICO claims are.

1.     **Proximate Cause**

These certificates, Lexington contends, show the diversion of Hollywood Funding 1-3 moneys to as yet unfunded Hollywood Funding 5 films for Regent.  Since these moneys were applied for such a purpose, it follows, Lexington says, that when the Hollywood Funding 5 money came through, it would have to be restored to the Hollywood Funding 1-3 accounts to replace the money earlier taken from them "improperly" to fund the Regent Hollywood Funding 5 films.  However, Lexington says, since the Hollywood Funding 5 Collateral Agreements limited the use of those borrowings to Hollywood Funding 5 films, using any of that money to repay the Hollywood Funding 1-3 accounts was a violation of those Collateral Agreements.  And Lexington also says that since Mr. Munson knew that this money would have to be put back at

5

the time he was negotiating the Hollywood Funding 5 Collateral Agreements, his conduct was fraudulent. This pattern of conduct is said to apply to each of Hollywood Funding 4, 5 and 6. This is Lexington's theory of the fraud.

Leaving aside its misinterpretation of the Collateral Agreements, Lexington strikes out on this argument on its own terms because the faxes which distributed the Hollywood Funding 1-3 money, generated in transactions <u>not</u> insured by Lexington and at a time before there were <u>any</u> Hollywood Funding transactions insured by Lexington, are too remote to be the legally required predicate acts of racketeering activity by Mr. Munson proximately causing injury to Lexington, even if the rest of Lexington's attenuated "for want of a nail the shoe was lost, for want of a shoe the horse was lost . . ." theorizing were correct; the RICO statute did not enact Mother Goose. The injured party, if injury there had been, would have been HIH Casualty General Insurance Ltd., the insurer of Hollywood Funding 1-3. HIH, and <u>not</u> Lexington, would be the plaintiff with standing to sue for the alleged diversions of the funds <u>HIH</u> insured, as represented in Lexington's affidavit on this motion. <u>Holmes v. SIPC</u>, 503 U.S. 258 (1992), is controlling and dispositive. See also <u>Callahan v. A.E.V., Inc.</u>, 182 F.3d 237 (3d Cir. 1999).

2.    **Fraud**

Lexington's brief identifies no misrepresentation by Munson and Tarlo Lyons to anyone. It argues, as discussed above, that Munson's earlier involvement in transferring money to later slates meant that the provisions of the Collateral Agreements on those later transactions would have to be violated to put back the funds, and so the negotiation of those later Collateral Agreements was a fraud. Lexington's theories are all grounded upon the provisions of the Collateral Agreements. As such, none of these contract-based theories state a claim in tort, including fraud in the inducement, as a matter of law. <u>Werwinski v. Ford Motor Co.</u>, 286 F.3d

6

661 (3d Cir. 2002); Etoll v. Elias/Savion Advertising, Inc., 2002 PA Super 347, 811 A.2d 10

(2002). Lexington's entire argument demonstrates that its fraud claims here are not simply

"intertwined" with the Collateral Agreements – no other foundation is alleged for them except

further inchoate Collateral Agreements. In these circumstances, no claim can be stated under

RICO with a mail or wire fraud predicate. United States v. Handakas, 286 F.3d 92 106-07 (2d

Cir. 2002); *overruled in part on other grounds*, United States v. Rybicki, 354 F.3d 124 (2d Cir.

2003) *(en banc)*; United States v. Chandler, 376 F.3d 1303, 1312-14, on rehearing, 388 F.3d 796

(11th Cir. 2004).[3/]

## CONCLUSION

Tarlo Lyons's motion for judgment on the pleadings should be granted.

Date: New York, NY
     February 16, 2005

                              Respectfully submitted,

                              MORGAN LEWIS & BOCKIUS LLP

                              By:

                              John D. Gordan, III (pro hac vice)
                              Eugene F. Bannigan  (pro hac vice)
                              John N. Thomas  (pro hac vice)
                              101 Park Avenue
                              New York, NY  10178
                              (212) 309-6000

                              Thomas M. Kittredge  (Pa. I.D.  04471)
                              Kenneth L. Racowski  (Pa. I.D.  90514)

---

[3/]     To the extent that Lexington tries to bootstrap its fraud claim into something more by claiming some kind of agency or "special" or fiduciary relationship with Tarlo Lyons, the Court can see from the structure of the transactions and provisions of the Collateral Agreements that there was none. (Complaint at ¶ 12). To the extent that Lexington relies on 18 U.S.C. § 2314 in recognition of the inadequacy of its fraud claims, the short answer is that theft is even less applicable than fraud on Lexington's pleaded case.

1701 Market Street
Philadelphia, PA 19103
215.963.5000

Attorneys for Defendant
Tarlo Lyons

IN THE HIGH COURT OF JUSTICE                    2000 Folio 1410

QUEEN'S BENCH DIVISION

COMMERCIAL COURT

Royal Courts of Justice

Friday, 19th January 2001

Before:

MR. JUSTICE DAVID STEEL

B E T W E E N :

LEXINGTON INSURANCE COMPANY          Claimant

- and -

(1)   FLASHPOINT LIMITED
(2)   FLASHPOINT UK LIMITED           Defendants

---

Transcribed by **BEVERLEY F. NUNNERY & CO.**
Official Shorthand Writers and Tape Transcribers
Quality House, Quality Court, Chancery Lane, London WC2A 1HP
**Tel:** 020 7831 5627   **Fax:** 020 7831 7737

---

MR. D. RAILTON Q.C. and MR. M. SMITH (instructed by Messrs. Denton
    Wilde Sapte) appeared on behalf of the Claimant.

MR. A. CHRISTIE (instructed by Messrs. Davies Arnold Cooper)
    appeared on behalf of the Defendants.

---

J U D G M E N T
(As approved by the Judge)

1   MR. JUSTICE DAVID STEEL:  This is an application for judgment

2       under CPR Part 24 by the claimants in the form of an order for

3       specific performance of some obligations on the part of the

4       defendants, Flashpoint Ltd. and Flashpoint UK Ltd.

5           The background is slightly complicated and for the

6       purposes of this application I will try to keep the

7       description short.

8           The claimant is an insurance company which was

9       involved in the financing of some nine slates of films.  The

10      financing appears to have been put together by the defendant

11      companies in cooperation with Credit Suisse First Boston, and

12      funds were raised by the issue of notes by a range of special

13      purpose companies, all called Hollywood Funding variously

14      No. 4, 5, 6, and so on, and they were held by the assured,

15      namely Law Debenture Trust.  The proceeds were to be passed

16      first to the first defendant, Flashpoint Jersey, and then to

17      the second defendant, Flashpoint UK.  Funds were then to be

18      passed on by Flashpoint UK to specified production companies

19      to produce the relevant slates of films.  In due course it was

20      anticipated that the receipts for the films would be collected

21      and passed back down the same chain, from Flashpoint UK to

22      Flashpoint Jersey and then to the relevant special purpose

23      company, so as to pay off the notes.

24          The interest of the claimant was that they provided

25      financial guarantee insurance against the risk of the receipts

26      from the showing of the relevant films proving insufficient to

1    repay the notes, and it is in respect of that policy that the
2    claimant is exposed to the assured, Law Debenture Trust.

3         There is a whole wealth of documentation in relation
4    to each of the separate slates of films.  It is sufficient to
5    say that in respect of each slate, as I understand it,
6    Lexington, the claimant, entered into collateral agreements
7    with the two Flashpoint companies which made provision as to
8    how the funds received from the special purpose companies
9    should be dealt with and, vice versa, how the receipts from
10   the exploitation of the films was going to be dealt with.

11        Part of the machinery was that the Flashpoint
12   companies would open specified holding accounts for each
13   individual slate, and likewise Flashpoint Jersey would do the
14   same, so that each individual slate (the financing for it and
15   the receipts from it) would be kept separate.

16        In order to secure Flashpoint's undertakings in that
17   regard, there were, under the collateral agreement, first
18   floating charges afforded to Lexington over the sums of money
19   standing to the credit of Flashpoint UK, with an option on the
20   part of Lexington to convert those floating charges into fixed
21   charges at any time.

22        What originally prompted an application for a freezing
23   order by Lexington, which was made to me without notice to the
24   defendants, was knowledge that had come to the claimant that
25   some of the funds that had been received from the special
26   purpose company vehicles had not been used for the purpose of

1   funding the production of relevant films.  There was at that

2   time a suspicion, at least, that the individual holding

3   accounts had not been opened (that, in due course, proved to

4   be unfounded);  but there was also a strong suspicion that the

5   monies had been, in fact, intermingled in a quite separate

6   account (a suspicion which has now proved to be well founded).

7   In effect all the monies in respect of all the slates appear

8   to have gone into one account and have been treated by the

9   Flashpoint companies as a pot from which to distribute funding

10  for the production of at least some of the films on some of

11  the slates.

12       What was understood by the claimant at the time when

13  they made their original application (which I should say was

14  successful) for an appropriate freezing order, was derived

15  from the defendants' American attorneys namely that a sum of

16  some $8.4 million out of the funds which were received by

17  Flashpoint Jersey for four of the slates (Regent 2, New City

18  1, Edgewood and Prosperity 2) had not only not been used for

19  the funding of the production of the relevant films, but in

20  fact was still sitting in an account, or accounts, in which

21  Flashpoint Jersey and/or Flashpoint UK had an interest, and it

22  is in respect of the non-dissipation of those monies that my

23  order was originally made.

24       The matter now comes back to me inter partes in

25  circumstances in which Lexington are seeking a continuation of

26  the original freezing order, but also, as I have indicated,

1   have taken out an application for a judgment under Part 24 so

2   as to require Flashpoint Jersey and Flashpoint UK to perform

3   their obligations under the collateral agreements.  The

4   financial position has changed somewhat, primarily in the

5   light of the statement which has been produced by the Chief

6   Operating Officer of the defendant companies, Miss Susan

7   Wright, who has now disclosed that a sum of something more

8   approaching $8.8 million was indeed received by Flashpoint

9   Jersey and/or Flashpoint UK in respect of those individual

10  slates and indeed was not used for the purpose of funding the

11  production of the relevant films, but that those monies have

12  in fact been dissipated.  What Miss Wright has to say about

13  that emerges in para.12 of her statement, when she says:

14          "Up to about June 1999, Flashpoint UK had in excess
15          of US$8,836,248 in its Leopold Joseph account
16          number 41528005 in addition to its other assets and
17          funds.  Flashpoint UK had by that time negotiated, and
18          imminently expected to enter into, a new financing
19          deal with Malaysia National Insurance Company which
20          should have produced an income of approximately
21          US$9,000,000 to the Flashpoint companies.  In those
22          circumstances, Flashpoint UK believed that it had
23          command of sufficient funds to enable it to purchase
24          certain assets in its own right without risk to the
25          unutilised balance of the monies advanced in
26          connection with the Hollywood Funding No. 6 deal.
27          With the benefit of hindsight we see what we should
28          have realised at the time, that the US$8,836,248 in
29          cash would not be maintained indefinitely if in the
30          fullness of time we did not achieve a fresh deal.
31          Some of the monies advanced to Flashpoint UK in

1          connection with the Slates were applied to fund the
2          general running of the Flashpoint companies' business
3          and the purchase of assets referred to.  As it turned
4          out, the expected deal with Malaysia National
5          Insurance Co. represented an attempted fraud upon the
6          Flashpoint companies and those representing the
7          insurance company are now the subject of an
8          investigation by Errors & Omissions Underwriters who
9          have paid a claim on behalf of a Flashpoint associated
10         company.  The result was that no new income stream was
11         produced and Flashpoint UK did not have sufficient
12         liquid assets to complete the production of the
13         Slates."

14         Put in more homely language, what Miss Wright is
15    conceding is that having, it seemed to her, available to
16    Flashpoint UK a substantial sum of money in their account,
17    over which at that stage there was a floating charge and over
18    which there was an undertaking it be used for the purpose of
19    the relevant slate of films, this was a convenient pot in
20    respect of which Flashpoint UK could make investments in
21    assets and also run its own business.  It is right to say that
22    no information whatsoever is forthcoming from Miss Wright as
23    to what the assets were that were purchased, or any indication
24    as to how much monies (and for what purpose) from the funds
25    were used, as is described, for "general running of Flashpoint
26    company business".

27         The claimant says that these circumstances justify the
28    court making an order under Part 24 for specific performance
29    of an obligation to restore to the relevant holding accounts

1    the monies that have been thus misappropriated.  It is not in

2    issue that the defendants were under the express contractual

3    obligations and undertakings that I have referred to about

4    keeping the monies in specified accounts and only using them

5    for the specified purposes.  It is not in issue (indeed, it

6    could not be) that the defendants are in flagrant breach of

7    those obligations, and apart from the somewhat unhappy

8    reliance upon impecuniosity, no excuse is forthcoming for

9    failure to comply with their obligations.

10       Various points were taken by the defendants by way of

11   challenge to the proposition that specific performance was an

12   appropriate remedy.  The first was a technical point about the

13   scope of Part 24;  that has been abandoned, and rightly

14   abandoned, and I will say no more about it.  The three

15   remaining contentions were, firstly, that damages were an

16   adequate remedy;  secondly, that the claimants had no interest

17   in these funds;  and thirdly, that the imposition of an order

18   for specific performance would impose undue hardship upon the

19   defendants.

20       So far as the first point is concerned, I was referred

21   helpfully to **Spry** and to **Jones** with regard to the general

22   principle in respect of the grant of an order for specific

23   performance.  I am content simply to say that two tests have

24   been adjurated and which may add up to precisely the same

25   thing;  firstly, that in each case the proper enquiry is

26   whether the plaintiff would, in all material respects, be in

1    the same position if he were relegated to such remedies in

2    damages as he would be if he obtained performance in specie of

3    the contractual obligations in question;  or alternatively

4    whether, in comparing the remedies, the court should determine

5    which is the more effective in serving the ends of justice.

6         The position here so far as the claim in damages is

7    concerned is firstly that, of course, damages (at least at

8    this stage) would not be easy to accurately assess.  I put

9    that consideration aside, because that would be a situation

10   which would be commonplace.  But there are two features which

11   seem to me to make it perfectly plain that damages would not

12   be an adequate remedy.  First, the contractual position,

13   namely that the claimants contracted for the security of their

14   charge over the funds that were to be held in the holding

15   account.  Damages will not be an adequate remedy after the

16   dispersal of such sums over which they had a floating charge

17   and now have a fixed charge.  Secondly, I have the gravest

18   doubts about the financial stability of the defendant

19   companies.  No audited accounts have been produced.  The

20   management balance sheets which have been produced (and which

21   are set out in divider 2, bundle 5) raise far more questions,

22   it seems to me, than they begin to answer.  It is said that

23   the defendants have valiantly tried to supply answers to the

24   questions that inevitably arise in relation to the assets

25   described.  Let me take some examples.  So far as Flashpoint

26   Jersey is concerned, it is said that they have only two

1    material assets:  one, a loan that has been made to Flashpoint

2    UK of some £2 million (the terms of that loan and the use to

3    which those monies have been put remains wholly obscure);  and

4    secondly, a total sum of something like 6 million, which has

5    been transferred (on what terms or whether by loan or not is

6    not remotely clear) to an associate company, Flashpoint

7    Investments Ltd.  No explanation is forthcoming as to the

8    detail of the terms of these transfers, the basis upon which

9    they would be returned (if at all), from where these funds

10   derived, and so on.  Furthermore, the figures with regard to

11   the items associated with Flashpoint Investments Ltd. have

12   varied very substantially between the time of the original

13   assessment of the asset position of Flashpoint Jersey and the

14   more recent schedule.

15        So far as Flashpoint UK is concerned, the primary

16   assets are said to be first some $2.5 million securing the

17   letter of credit at the National Bank of Canada;  then the sum

18   of some $7 million said to be due in respect of an investment

19   in one of the slates, Jules Verne (the precise status of that

20   $4 million investment and the alleged return due on it of

21   3 million by way of profit share, again remains wholly

22   obscure);  third an investment of $1 million in two Russian

23   cinemas - all of this is opaque,  it is all devoid of detail

24   and, given Miss Wright's continuous observations throughout

25   her statement of the difficulties from the financial point of

26   view of either responding to requests for an audit and

1  furnishing information to the claimants when asked for, I have

2  the gravest doubts as to whether Flashpoint UK and/or

3  Flashpoint Jersey are worth powder or shot.

4       The next point taken is, as I say, that the claimants

5  have no interest in these monies.  This submission is

6  furthered by the proposition that Lexington have reserved

7  their position with regard to their liability under the

8  insurance cover on the grounds that there may have been a

9  breach of warranty in the failure to complete the slates (in

10  respect of which I have made a decision which would be

11  favourable to the claimant if it is right, in an associated

12  piece of litigation).  It is, in my judgment, a concern which

13  is not to the point.  The interest of the claimants in this

14  money is the interest in the security under their floating

15  and/or fixed charge.  They may have an alternative (and in

16  this respect, inconsistent) claim arising under the

17  arrangements they have with the assured, but at this stage it

18  seems to me that the claimants are perfectly entitled to

19  enforce their obligations under the collateral agreement with

20  the defendants regardless of the relationship and position

21  that there may pertain under the insurance policy with LDT.

22       Lastly, it is said that this order for specific

23  performance would impose undue hardship.  One has to say that,

24  if it does cause hardship, on the face of it that hardship is

25  self-induced because those monies have been dissipated and

26  they have been expended on assets which are simply not

1    identified.  For all I know those assets are readily

2    realisable.  Since the defendants are entirely coy about the

3    terms of any loans that they have made to associated

4    Flashpoint companies or other companies outside the Group, it

5    is impossible for me to be persuaded (and the burden must be

6    upon the defendants) that any undue hardship bears upon them

7    in the event that they are under an obligation to restore the

8    funds that they have misappropriated to the relevant accounts.

9        Accordingly, I accede to this application for summary

10   judgment.  Albeit this is a discretionary remedy it seems to

11   me to be a paradigm example of where the granting of specific

12   performance serves the ends of justice much more significantly

13   than any award of damages and it would be appropriate to

14   exercise my discretion in the claimant's favour.  I remind

15   myself that the application is based upon the premise that the

16   order only bites in its present form within a period of three

17   weeks, and in the event that the defendants are in a position

18   to produce a full and frank explanation of what the position

19   is with regard to both the assets that they have

20   misappropriated and any other assets which they are entitled

21   to, so as to represent to the court that it is appropriate to

22   grant them further time to comply with the order, an

23   application can in due course be made; but subject to that,

24   the order will bite within 21 days.

25                              _____

## CERTIFICATE OF SERVICE

I, Kenneth L. Racowski, do hereby certify that on this date, I caused copies of the Reply Memorandum of Law of Defendant Tarlo Lyons in Support of its Motion for Judgment on the Pleadings Pursuant to Federal Rule of Civil Procedure 12(c) to be served upon counsel as follows:

### VIA HAND DELIVERY

Jeffrey R. Lerman, Esq.
Glenn F. Rosenblum, Esq.
Montgomery McCracken
    Walker & Rhoads, LLP
123 South Broad Street
Philadelphia, PA 19109

### VIA FEDERAL EXPRESS (overnight delivery)

Edward P. Krugman, Esq.
Kevin J. Burke, Esq.
Ira J. Dembrow, Esq.
Cahill Gordon & Reindel
80 Pine Street
New York, NY 10005

Edward M. Dunhan, Jr., Esq.
Shannon Hampton Sutherland, Esq.
Duane Morris LLP
One Liberty Place
Philadelphia, PA  19103

James J. Rohn, Esq.
Nicholas M. Centrella, Esq.
Kevin Dooley Kent, Esq.
Conrad O'Brien Gellman & Rohn PC
1515 Market Street, 16th Floor
Philadelphia, PA 19102

Alexander Kerr, Esq.
Stephen P. McFate, Esq.
McCarter and English, LLP
1735 Market Street, Suite 700
Philadelphia, PA 19103

Charles A. Adamek, Esq.
Beverly Y. Lu, Esq.
Lord Bissell & Brook LLP
300 South Grand Avenue, Suite 800
Los Angeles, CA  90071

Neil G. Epstein, Esq.
Eckert Seamans Charin & Mellott, LLC
1515 Market Street, 9th Floor
Philadelphia, PA  19102

Sanford I. Michelman, Esq.
Mora Z. Hanna, Esq.
Jeffrey D. Farrow, Esq.
Michelman & Robinson LLP
4 Hutton Centre, Suite 300
Santa Ana, CA  92707

Conrad O. Kattner, Esq.
McShea Tecce  P.C.
Mellon Bank Center
1735 Market Street, 16th Floor
Philadelphia, PA 19103


Kenneth L. Racowski

Dated:  February 16, 2005