**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| LEXINGTON INSURANCE COMPANY, | Civil Action No. 02-CV-4435 |
| Plaintiff, | (Hon. Anita B. Brody) |
| - against – | |
| DAVID FORREST, T. BEAUCLERC ROGERS IV, STANLEY MUNSON, MARTIN FINK, all individually, and NEW BEGINNINGS ENTERPRISES LLC, a California Limited Liability Company, and TARLO LYONS, a partnership, | |
| Defendants. | |

**REPLY MEMORANDUM OF LAW OF**
**DEFENDANT STANLEY MUNSON IN SUPPORT OF**
**HIS MOTION FOR JUDGMENT ON THE PLEADINGS**
**PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(C)**

Defendant Stanley Munson respectfully submits this memorandum in reply to the

brief of plaintiff Lexington Insurance Co. in opposition to Tarlo Lyons's motion for judgment on

the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

Lexington's brief fails to address the fatal pleading deficiencies of Lexington's Second

Amended and Supplemental Complaint as pointed out by Munson's and Tarlo Lyons Motions to

Dismiss under Fed. R. Civ. P. 12(c), and only confirms that Complaint must be dismissed with

prejudice as to Munson as a matter of law, for at least the following reasons:

**A.**     <u>Statute of Limitations</u>

All of Lexington's claims, under both state law and civil RICO, must be dismissed as to Munson under the applicable statutes of limitations.

    1.     **State Law Claims**

Lexington's Counts 4 (common law fraud), 5 (tortious interference with contract), 6 (fraudulent inducement), and 7 (tortious interference with contract), all sound solely in state law.

Pennsylvania's Uniform Statute of Limitations on Foreign Claims Act applies the <u>shorter</u> of the foreign limitations period or the applicable Pennsylvania statute of limitations. 42 Pa. Cons. Stat. Ann. J.A. § 5521. The Pennsylvania statute of limitations for common law fraud (Count 4) and fraudulent inducement (Count 6) is two years. 42 Pa. Cons. Stat. Ann. § 5524(7). The Pennsylvania statute of limitations for tortious interference with contract (Counts 5 and 7) is two years. 42 Pa. Cons. Stat. Ann. § 5524(3).

Lexington first filed against Munson on April 29, 2004. Thus, all of Lexington's state law claims are barred if they accrued before April 29, 2002.

The latest underlying act alleged in Lexington's operative Complaint ended by December 9, 1999. (¶33(c)).

Lexington only alleges equitable tolling against "Forrest and Rogers," <u>not</u> against Munson. (¶¶93-95). It only alleges "Forrest and Rogers" alleged "efforts to cover up" continued until "February 2001." (¶33(f)(iv)). Lexington admits it exercised audit rights as of August 2000 (¶94), was granted access to books and records by November 2000 (¶95), and had obtained an injunction in English courts against Flashpoint entities by January 19, 2001 (¶¶15, 36).

Lexington's reply brief states no more than "the misconduct at issue … could not have been discovered by Plaintiff until after November 2000, at the very earliest." (p. 22). It implicitly

concedes completion of activity, injury, and discovery on or before that date. It offers nothing

establish accrual of any of the state law causes of action on or after April 29, 2002.

Also, to its prejudice, in its initial Complaint against Forrest and Rogers in this action,

filed on July 23, 2002, Lexington named, but did not join, Munson, with essentially the same

allegations it now asserts. It is thus appears of record that Lexington had discovered its potential

claims by that date. This creates a record where Lexington's only hope of saving the state law

claims would be to show it first discovered them in the narrow window of a few months between

April 29, 2002 and July 23, 2002. Fatal to those claims, Lexington has made no such allegations

or showing.

Hence, Lexington's Complaint and reply brief have effectively waived Lexington's state

law claims as to Munson. Lexington has failed to allege any basis to show these claims accrued

before the statute of limitations date of April 29, 2002. Hence, all of Lexington's state law claims

against Munson – Counts 4, 5, 6, and 7 – must be dismissed with prejudice.

2.        **Civil RICO Claims**

Lexington's Count 1 (substantive civil RICO under 1962(c)) and Count 3 (conspiracy

under 1962(d)) assert civil RICO claims against Munson.

"Injury-discovery" governs accrual of civil RICO claims under a four-year statute of

limitations. Forbes v. Eagleson, 228 F.3d 471, 484 (3d Cir. 2000). Under this principle, "a RICO

claim accrues when 'plaintiffs knew or should have known of their injury.'" Mathews v. Kidder,

Peabody & Co., 260 F.3d 239, 250-51 (3d Cir. 2001). A plaintiff need only be able to discover

the "injury," and its "potential source." It essentially must be on "inquiry notice." *Id.* at 252. The

"should have known" element has both an objective – reasonableness – and subjective –

characteristics of the individual plaintiff – element. It also considers the circumstances – such as

sources of information available to the plaintiff. The "injury" to be the discovered is that alleged

by plaintiff. The statute of limitations also accrues when the plaintiff knew, or should have

known, of "storm warnings," either individual signals or cumulative signals that the investment

is threatened, or of a different character than contemplated by plaintiff. *Id.* at 252.

Since Lexington first filed against Munson on April 29, 2004, all of Lexington's civil

RICO claims are barred if Lexington discovered, or should have discovered, any of the "injuries"

it now alleges, or any "storm warnings" before April 29, 2000.

The "injuries" that Lexington now alleges – at least as to "misappropriation," the only

charges involving Munson (Complaint, ¶35) – occurred as early as July 1998 through December

1999. (Lex. Brief at 14).[1] Many or most could have been discovered by reviewing a single bank

statement. They are, in chronological order: "Commingling" funds in a single account, as of July

6, 1998 and after. (¶32); A "transfer" to the Building LLC on August 14, 1998. (¶33(c);

"Invest[ments]" in Russian movie theaters "during 1998 and/or 1999." (¶33(d)); Another

"transfer" to the Building LLC on April 7, 1999 (¶33(c)); "Transfers" to Ice Storm from August

12, 1999 to December 9, 1999 (¶33(e)). Allegedly, "all of these funds so used were transferred

from the Flashpoint account that contained the (improperly commingled) funds that were raised

in the various Hollywood Funding financings." (¶¶33(c), (d), (e)). (Lex. Brief at 14).

---

[1]    No concession is being made or implied that such alleged "commingling" or "transfers" are
adequate or even competent bases of any potential mail fraud, wire fraud, tort, or even contractual
breach, or that they actually proximately or remotely caused any recoverable injury or damage to
Lexington. Indeed, Munson contends the opposite. However, Lexington cannot have it both ways.
In the context of its claim, Lexington alleges these events of "commingling" and "transfer" to be
"injuries." (¶¶32, 33, etc.; Lex. Brief at 14). They must thus be treated as such for purposes of the
"injury-discovery" rule for the civil RICO statute of limitations, such that Lexington's civil RICO
claim based on them must be dismissed if Lexington did, or should have, discovered one or more
of these "injuries" before April 29, 2000.

"Storm warning" events acknowledged by Lexington include at least the allegation that "Flashpoint ran out of money" as of November 1999. (¶33(f)).

Lexington has carefully refrained from admitting, in so many words, that it actually discovered these alleged "injuries" or storm warnings before April 29, 2000.

Thus, the question before the court is whether Lexington has admitted to facts and circumstances from which the court can infer, as a matter of law, that Lexington's Complaint and Brief show either (1) it "knew" of facts which constitute sufficient "storm warnings" to put it on "inquiry notice," or (2) "should have known" in the exercise of reasonable prudence under the facts and circumstances before the court of its alleged "injuries" or "storm warnings," before April 29, 2000.

Lexington's character as a corporate insurer, capable of conducting international transactions, investigation, and litigation simultaneously spanning from California, through Pennsylvania, New York, and to the United Kingdom is before the court as a matter of record. (*E.g.* Affidavits of Krugman; Opinions of Justice Rix; Complaint ¶¶15, 36, passim).

Lexington's insured risk of over $180 million through Hollywood Funding 4, 5, and 6, bears upon what constitutes "reasonable" inquiry as a matter of law. (¶4).

Lexington specifically refers to and quotes the Collateral Agreements in its Complaint. (*e.g.* ¶35). Thus, the text of such agreements is before the court on this Motion to Dismiss. *Lum v. Bank of America,* 361 F.3d 217, 222 n. 3 (3d Cir. 2004). Lexington has also chosen to supply additional Collateral Agreement documents with the Affidavit to its brief.

The Collateral Agreements, paragraph 4(9), provided to Lexington "monthly" access to (1) bank statements; (2) reconciliation reports; and (3) other details of Flashpoint's accounts which it alleges were "commingled," and to the identities of the payees to whom such funds

were "transferred," starting in July 1998 (¶4; Hollywood Funding 4 (Jules Verne) Collateral

Agreement), as follows:

> 5.  Management of Accounts
>
> (9)     Flashpoint agrees to provide to Lexington (on a monthly basis) [1] copies of all bank statements in relation to the [a] Holding Account, [b] Flashpoint Jersey Holding Account, [c] Production Account, [d] Collection Account, [e] Flashpoint UK Collection Account and [f] Escrow Account, together with [2] a breakdown and reconciliation of [a] monies paid and received, [b] the payee/payer (as the case may be), and [c] brief details of the reason for the payment or receipt, and [3] agrees to provide such other information in relation to the accounts as Lexington may reasonably require.

(internal bracketed [] numbering added).

Thus, at least as of August or September 1998, Lexington had a contractual right to

copies of the bank statements for both the Flashpoint UK and the Flashpoint Jersey "Holding

Accounts" into which it now alleges "all funds" were "commingled." (¶¶33(c), (d), (e)). (Lex.

Brief at 14). One look at any month's bank's statement – even without any reports from

Flashpoint – would reveal the alleged "commingling." The first bank statement as of September

1998 would almost certainly show the alleged "transfer" to the Building LLC on August 14,

1998. which Lexington now alleges to be an "injury" (¶33(c)).

Nor could there be any question about "potential sources" since Flashpoint's principals,

bank accounts, and solicitors, such as the Tarlo Lyons firm, and one of the individual solicitors

with whom Lexington's counsel had negotiated, Munson, were known to Lexington, and

identified largely on the face of the Collateral Agreements.

Lexington now alleges it never received any of the monthly bank statements, monthly

reconciliation reports, or other monthly information from Flashpoint. (Lex. Brief at 20-21). It

does not deny that the absence of such reports was a "storm warning" under Third Circuit

precedent.

Lexington contends that it failed to assign even one clerk, with minimal training, to request and check the bank statements and reports for "commingling" or "transfers," and instead relied on the purported fiduciary duty created by a reference to "utmost good faith" in the Collateral Agreements. (Lex. Brief at 10).

It is well-established that a mere reference to fiduciary duties, agency, or utmost good faith in a contract does not overcome the character of a transaction as shown by the contractual terms as a whole. *See, e.g., PXRE Reinsurance Co. v. Lumberman's Mutual Casualty Ins. Co.,* 330 F.Supp.2d 981 (N.D. Ill. 2004) (reference to "utmost good faith" did not somehow override the nature of the transaction and of the parties' relationship); *Waverly Productions v. RKO General*, 32 Cal.Rptr. 73 (Cal. Ct App. 1963) (limited fiduciary relationship between motion picture producer and distributor with respect to accounting for the rental money received was one "of a strictly contractual obligation," and no other fiduciary relationship between the parties existed). Moreover, Munson is not personally a party to the transaction, but was the solicitor for Flashpoint. The terms regarding good faith undoubtedly had some contractual significance, imposing obligations on both Lexington and Flashpoint. But, it is beyond reasonable inference or any fair reading of the documents for Lexington to suggest that the references to agency, risk management, or mutual good faith, somehow relieve Lexington of all duties of reasonableness and due diligence applicable to a civil RICO claim.

Thus, Lexington's case requires the court to find that it is reasonable for a corporate insurer with global reach, and over $180 million at risk, to never once check, over a period of 21 months, for bank statements, reconciliations, or reports to which it had a contractual right – and which would have shown instantly on the face of almost any one of them either the "commingling" or "transfers" it now alleges to be "injuries" – and for a period of at least 6

7

months would show other "storm warnings" ("out of money"); and then, over four years later to subject the court system and multiple parties to a civil RICO action based largely, exclusively in the case of Munson (Complaint, ¶¶ 35, 73), on those readily discoverable "transfers" and that "commingling," which the insurer plaintiff chose to ignore at the time of the events.

In short, Lexington's Complaint, its Brief, and the Collateral Agreement – the record properly before the court on this Motion to Dismiss – show a set of circumstances in which Lexington had sufficient storm warnings, sophistication, and rights of access to be upon at least "inquiry notice" of its alleged "injury" – that the funds underlying its risk were not being deposited and withdrawn as Lexington now alleges they should have been – well before the statute of limitations trigger date of April 29, 2000, so that its civil RICO claim against Munson is barred in its entirety by the statute of limitations, and thus must be dismissed with prejudice.

3.       **No Equitable Tolling**

Lexington alleges it "could not with the exercise of reasonable due diligence" have discovered "defendants' criminal conduct" until some time after November 2000 "because the frauds and other misconduct were inherently self-concealing." (¶93). It contends that "Forrest and Rogers" engaged in "a cover up" lasting until February 2001. (¶33(f)). It alleges a series of events involving assertion of its audit rights in August 2000, until an injunction issued by the English courts on January 19, 2001. (¶¶93-95).

None of these allegations establish equitable tolling; and they especially fail as to Munson.

In *Merritt v. Blaine,* the Court of Appeals for the Third Circuit reiterated the two general requirements for equitable tolling: **(**1) that the petitioner has in some *extraordinary way* been *prevented* from asserting his or her rights; and (2) that the petitioner has shown that he or she

exercised *reasonable diligence* in investigating and bringing [the] claims. *See Merritt v. Blaine*, 326 F.3d 157, 168 (3d Cir.), cert. denied, 540 U.S. 921 (2003). Moreover, "[t]he law is clear that courts must be sparing in their use of equitable tolling." *Seitzinger v. Reading Hosp. & Med. Ctr.*, 165 F.3d 236, 239 (3d Cir. 1999).

Here, the gravamen of the claim against Munson is not at all "self-concealing." (¶93). – The alleged "commingling" or "transfers" in derogation of the Collateral Agreements (¶35) would have been apparent on any of the bank statements, or reports, or both to which Lexington had a contractual right under the Collateral Agreements.

Second, Lexington has not alleged <u>any</u> concealing conduct by Munson individually, and certainly no "extraordinary" prevention as required by the law of equitable tolling.

Third, Lexington has not alleged nor shown "reasonable diligence" on its part in the time from July 1998 through April 29, 2000.

Finally, as noted in the preceding section, the absence of monthly and other reports themselves, under the circumstances of record, constituted a "storm warning" in itself sufficient to create "inquiry notice" to Lexington before the statute of limitations date of April 29, 2000.

Consequently, no equitable tolling applies. All of Lexington's civil RICO claims as to Munson are barred by the statute of limitations, and must be dismissed with prejudice.

## B.    <u>No Reliance</u>

Where a plaintiff has access to reports that on their face can reveal the very facts that the plaintiff has claimed the defendant misrepresented, such a plaintiff cannot properly claim it has "relied" on the defendants statements, nor can it claim any such alleged reliance was "reasonable" or "justifiable," and thus its civil RICO claim must fail for lack of the essential

element of reliance. *Ideal Diary Farmers v. John Labatt, Ltd.,* 90 F.3d 737, 746-47 (3d Cir.

1996).  *See also, Moore v. Paine Webber, Inc.,* 189 F.3d 165, 169-73 (2d Cir. 1999).

Here, the terms of the Collateral Agreements obtained by Lexington starting in July 1998

– with its detailed reporting requirements, rights to monthly copies of bank statements for all

accounts, monthly reconciliation reports, annual budgets and forecasts, audited annual reports,

and any other such information Lexington might request – shows that Lexington did not, in fact,

"rely" upon the alleged statements of Munson while "negotiating" the later Collateral

Agreements (¶38-40), nor upon Munson's signatures on the drawdown certificates for the one

account (the Flashpoint UK Holding Account) to which the "Tarlo Lyons representations"

applied (*see,* Collateral Agreements), with regard to determining whether the funds were

"commingled" or to whom the funds were "transferred." (*See* Collateral Agreements, §§ 5(9),

7(i), etc.).

Lexington contends in its brief that it "relied" exclusively on the alleged fiduciary nature

of the relationship, created by the "utmost good faith" reference as to Flashpoint in the Collateral

Agreements. (Lex. Brief at 10).

The overall structure of the Collateral Agreements shows that there was in fact no

fiduciary relationship between Flashpoint and Lexington. Moreover, it is clear that the Tarlo

Lyons firm, of which Munson was a contract partner, was counsel for Flashpoint.

Munson asserts that there were no misrepresentations or contractual breaches on his part.

Yet, even if statements were made and acts done as alleged by Lexington, Lexington's has

shown no "justifiable" basis for its alleged "reliance" with respect to the matters of which it

complains – "commingling" of bank accounts (¶32-33) and "transfers" to certain payees from

those accounts (¶32-33). Even giving Lexington the benefit of all reasonable inferences, as we

10

must, reliance cannot be reasonable, where, as here, like the plaintiff in *Ideal Dairy*, Lexington

had a contemporaneous right to written reports from independent third parties – the banks – that

would show unequivocally the factual situation, or not, about which Lexington now claims it

"relied."

In short, the terms Lexington insisted upon in the Collateral Agreements of record show

that Lexington did <u>not</u> in fact "rely" upon Munson. Moreover, if Lexington insisted upon

obtaining those contractual terms, then ignored them completely, as it now claims in its brief,

any reliance Lexington placed cannot be considered "reasonable" nor "justifiable" as a matter of

law.

Thus, for either or both reasons, the essential element of "reliance" is lacking as a matter

of law on the face of the Complaint and the record properly before the court on this Motion to

Dismiss, and thus Lexington's civil RICO claims as to Munson must now be dismissed with

prejudice.

C.    <u>No Proximate Cause</u>

Lexington, with its brief and affidavit, has submitted drawdown certificates from April

and May 1998, presumably during the time of Hollywood Funding 1-3 insured by HIH Casualty

(¶4), directing payments for the Regent slate of films, which was part of the Hollywood Funding

5 of August 1998 insured by Lexington.

These add nothing to Lexington's case.

Lexington seems to argue that such "advance" payments from Hollywood Funding 1-3 in

April and May 1998 to Regent, would need to be "refunded" to Hollywood Funding 1-3 projects

sometime after August 1998 out of moneys from Hollywood Funding 5; and thus that Lexington

was somehow "injured" by those advance payments; and that somehow Munson

11

"misrepresented" matters by not revealing such advances during negotiations of Hollywood

Funding 4-5.

If there is any "injury" to Lexington from such a convoluted chain of supposed

obligations and purported duties or plans to refund, it is certainly not sufficiently "proximate" to

be considered by the law. If the payments injured anyone, and anyone had standing to sue, it

would be HIH, not Lexington. Such expenditures did not and do not "proximately" cause any

injury to Lexington, and thus cannot be considered with regard to its civil RICO claims. *See*,

*Holmes v SIPC,* 503 U.S. 258 (1992); *Callahan v. A.E.V., Inc.*, 182 F.3d 237 (3d Cir. 1999).

**D.    No Stolen Funds**

Lexington asserts transportation of stolen moneys, *18 U.S.C. §2314*, as a potential alleged

predicate act. (Lex. Brief at 20).

Yet, the face of the record, particularly the Collateral Agreements, shows that the moneys

in the downward flow of funds – from the Flashpoint Jersey Holding Account, to the (various)

Flashpoint UK Holding Accounts, to the (various) Production Accounts – was all of funds

owned by Flashpoint.

This situation is unlike the "trust" imposed by the Collateral Agreements upon the

upward flow of funds – from the Collection Accounts, to the Escrow Accounts. But, Lexington's

Complaint is not about these accounts.

All of Lexington's allegations regarding Munson involve the downward flow of funds

and the Holding Accounts – including the allegations of "commingling," "transfers,"

"misappropriation" (¶¶33, 77), or Munson's alleged statements during negotiations about

compliance or breach of prior agreements. (¶¶38-40).

Thus, none of the moneys in question can be considered "stolen" from the face of the

record, and thus any claims based upon 18 U.S.C. §2314 as a predicate act must be dismissed.

**E.    No Fraud**

Contract-based theories do not state tort claims, and thus do not provide a basis for fraud

claims. *Werwinski v. Ford Motor Co.*, 286 F.3d 661 (3d Cir. 2002); *Etoll v. Elias/Savion*

*Advertising, Inc.*, 2002 PA Super 347, 811 A.2d 10 (2002).

The source of all restrictions alleged by Lexington – whether upon which bank accounts

Flashpoint moneys could be deposited, or as to which payees or purposes they could be

transferred, as to who should sign drawdowns for which accounts – is purely contractual. It is

fatal to Lexington's claims both that Munson is not himself a party to a contracts, and that the

source of alleged restrictions is purely contractual.

The sources of alleged restrictions before July 1998 are the inchoate Collateral

Agreements as to the Hollywood Funding 1-3 transactions insured by HIH, which specific

agreements Lexington admits did not then exist, but asserts had "parallel requirements" in

"earlier" unspecified "agreements." (¶¶38-40). Whatever these alleged terms were, they are at

most contractual.

From July 6, 1998 to December 1998, the Hollywood Funding 4 (Jules Verne) Collateral

Agreement came into effect. Other Collateral Agreements were allegedly entered on or before

December 16, 1998.

Lexington alleges that Munson knew his client Flashpoint was breaching certain terms of

earlier agreements when negotiating later agreements. (¶¶38-40, 77).

The cited cases establish that all contractual representations and warranties do not fall

within the scope of criminal fraud statutes. There is a difference between inducing statements on

such subjects as capacity – stating that a client is a corporation, or has means to perform, when such is not at all the case – and statements as here about the inner economic workings of contractual performance – which accounts will hold funds, which projects are being pursued. It is no crime to place funds in one bank account versus another, or to fund one film project versus another.

Lexington's entire argument demonstrates that its fraud claims here are not simply "intertwined" with the Collateral Agreements – no foundation is alleged for them except inchoate or existing Collateral Agreements. In these circumstances, no claim can be stated under RICO with a mail or wire fraud predicate. *United States v. Handakas*, 286 F.3d 92 106-07 (2d Cir. 2002); *United States v. Chandler*, 376 F.3d 1303, 1312-14, *on rehearing*, 388 F.3d 796 (11th Cir. 2004).

These principles require dismissal of Lexington's alleged predicate acts, even if the Collateral Agreements said what Lexington contends, which, as pointed out in Munson's Motion to Dismiss, they do not. Rather, Lexington's allegations, at minimum, require recasting the Collateral Agreements to apply to persons not parties, to apply the so-called "Tarlo Lyons representation' applicable only the Flashpoint (UK) Holding Accounts to other accounts to which it did not apply, and other modifications of terms. (*See* Lex. Brief at 8) (attributing to Collateral Agreements terms that only exist as part of Lexington's current allegations). Consequently, Lexington has failed to allege legally adequate predicate acts, and its Complaint as to Munson must be dismissed with prejudice for this reason as well.

**F.     Conclusion**

For all of the above reasons, and the reasons stated in Munson's Motion to Dismiss under Fed. R. Civ. P. 12 (c), all claims as to Munson must be dismissed with prejudice.

14

Lexington's brief in response to that motion has done nothing to cure the fatal deficiencies of Lexington's Second Amended and Supplemental Complaint filed April 29, 2004. All of Lexington's state law claims – Counts 4, 5, 6, and 7 – accrued before April 29, 2002, and thus are barred by the two-year statute of limitations. Lexington's civil RICO claims – Counts 1 and 3 – are such that Lexington must be deemed to have discovered its alleged injury, or sufficient storm warnings, prior to April 29, 2000, and thus they are barred by the four-year statute of limitations. No actual or justifiable reliance by Lexington can exist given the terms of the Collateral Agreements. No proximate cause exists between early-dated drawdown certificates Lexington has submitted and any injury to Lexington. No predicate acts have been established or adequately alleged. There is no stolen property. Contractual restrictions alone as alleged by Lexington do not support mail fraud or wire fraud claims. The other reasons for dismissal stated in Munson's original motion remain valid.

Accordingly, the motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure should be granted, and all claims against Defendant, Stanley Munson, should be dismissed with prejudice.

Respectfully submitted,


BY:    /s/ Conrad O. Kattner
        CONRAD O. KATTNER, ESQ.
        Identification No: 035468
        MCSHEA & TECCE, P.C.
        1735 Market Street, 16th Floor
        Philadelphia, PA 19103
        (215) 599-0800
        *Counsel for Defendant,*
        *Stanley Munson*

Date:  _February 16, 2005_____

15

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LEXINGTON INSURANCE COMPANY<br><div align="right">Plaintiff</div><br><div align="center">v.</div><br><br>DAVID FORREST,<br>T BEAUCLERC ROGERS IV,<br>STANLEY MUNSON,<br>MARTY FINK,<br>NEW BEGINNINGS ENTERPRISES LLC,<br>and TARLO LYONS<br><br><div align="right">Defendants</div> | CIVIL ACTION<br><br>NO.  02-4435 |

**CERTIFICATE OF SERVICE**

Conrad Kattner, Esquire, attorney for Defendant, Stanley Munson, hereby certify

that I have caused copies of the foregoing:

**REPLY MEMORANDUM OF LAW OF**
**DEFENDANT STANLEY MUNSON IN SUPPORT OF**
**HIS MOTION FOR JUDGMENT ON THE PLEADINGS**
**PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(C)**

to be served electronically, and by any additional means shown, upon the following

parties or their counsel of record on the date below:

1

Glenn F. Rosenblum, Esquire
Jeffrey R. Lerman, Esquire
Montgomery, McCraken, Walker &
Rhoads
123 South Broad Street
Philadelphia, PA 19 109
and
Edward P. Krugman, Esquire
Emily A. Poler, Esquire
Ira J. Dembrow, Esquire
Scott M. Mory, Esquire
Cahill Gordon & Reindel
80 Pine Street
New York, NY 10005
*Counsel for Plaintiff*

Alexander Kerr, Esquire
Stephen P. McFate
McCarter & English, LLP
Mellon Bank Center
1735 Market Street, Suite 700
Philadelphia, PA 19 103
and
Beverly Y. Lu, Esquire
Charles A. Adamek
Lord Bissell & Brook, LLP
300 South Grand Avenue, Suite 800
Los Angeles, CA 9007 1
*Counsel for New Beginnings Enterprises*

Edward M. Dunham, Jr., Esquire
Shannon Hampton Sutherland, Esquire
Duane Morris LLP
One Liberty Place
Philadelphia, PA 19 103
*Counsel for David Forrest*

John D. Gordan, IIII
Eugene F. Bannigan
John N. Thomas
10 1 Park Avenue
New York, NY 10 178

Thomas M. Kittredge
Kenneth L. Racowski
170 1 Market Street
Philadelphia, PA 19 103

*Counsel for Tarlo Lyons*

Nicholas M. Centrella, Esquire
James J. Rohn, Esquire
Kevin Dooley Kent, Esquire
Conrad OYBrien Gellman & Rohn, PC
1 5 1 5 Market Street, 1 6th Floor
Philadelphia, PA 19 102
*Counsel for T.  Beauclerc Rogers, IV*

2

Neil G. Epstein, Esquire
Eckert Seamans Cherin & Mellott, LLC
15 15 Market Street
Ninth Floor
Philadelphia, PA 19 102
and
Jeffrey D. Farrow, Esquire
Mona Z. Hanna, Esquire
Sanford Louis Michelman, Esquire
Michelman & Robinson LLP
4 Hutton Centre, Suite 300
Santa h a , CA 92707
*Counsel for Martin Fink*

                                    Respectfully submitted,




                                    BY:_____/s/ Conrad O. Kattner_
                                          CONRAD O. KATTNER, ESQ.
                                          Identification No: 035468
                                          MCSHEA & TECCE, P.C.
                                          1735 Market Street, 16th Floor
                                          Philadelphia, PA 19103
                                          (215) 599-0800
                                          *Attorney for Defendant,*
                                          *Stanley Munson*

     Date: ___February 16, 2005_____


                                    3