## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LEXINGTON INSURANCE COMPANY,<br><br>                                        Plaintiff,<br><br>           - against –<br><br>DAVID FORREST, T. BEAUCLERC ROGERS IV,<br>STANLEY MUNSON, MARTIN FINK, all individually,<br>and NEW BEGINNINGS ENTERPRISES LLC, a<br>California Limited Liability Company, and<br>TARLO LYONS, a partnership,<br><br>                                        Defendants. | Civil Action No. 02-CV-4435<br>(Hon. Anita B. Brody) |

## <u>O R D E R</u>

AND NOW, this _____ day of _____, 2005, upon motion of

Defendant Tarlo Lyons to compel production of documents, and any responses thereto, it

is hereby ORDERED that Defendant's Motion is GRANTED.

It is hereby ORDERED that American International Group, Inc. and New

Hampshire Insurance Co. shall produce documents as specified in Requests No. 3, 4, 6,

and 7 of Defendant Tarlo Lyons's document subpoenas issued from this Court pursuant

to Federal Rule of Civil Procedure 45 on December 29, 2004, within five (5) days of the

date of this Order.

BY THE COURT:

_____

                                                                                          J.

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

LEXINGTON INSURANCE COMPANY,

                                        Plaintiff,

        - against –

DAVID FORREST, T. BEAUCLERC ROGERS IV,
STANLEY MUNSON, MARTIN FINK, all individually,
and NEW BEGINNINGS ENTERPRISES LLC, a
California Limited Liability Company, and
TARLO LYONS, a partnership,

                                        Defendants.

Civil Action No. 02-CV-4435
(Hon. Anita B. Brody)

---

## MOTION OF DEFENDANT TARLO LYONS TO COMPEL PRODUCTION OF DOCUMENTS

Defendant Tarlo Lyons, by and through its undersigned counsel, hereby moves this Court to

enforce document subpoenas, issued from this Court pursuant to Fed. R. Civ. P. 45 on behalf of

Defendant Tarlo Lyons on December 29, 2004, to American International Group, Inc. and New

Hampshire Insurance Co., for the reasons set forth in the accompanying Memorandum of Law and

Affidavit of John D. Gordan, III, filed herewith.

Date: New York, NY
February 18, 2005

Respectfully submitted,

MORGAN LEWIS & BOCKIUS LLP

By: _____
John D. Gordan, III (pro hac vice)
Eugene F. Bannigan (pro hac vice)
John N. Thomas (pro hac vice)
101 Park Avenue
New York, NY 10178
212.309.6000

Thomas M. Kittredge (Pa. I.D. 04471)
Kenneth L. Racowski (Pa. I.D. 90514)
1701 Market Street
Philadelphia, PA 19103
215.963.5000

Attorneys for Defendant
Tarlo Lyons

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

LEXINGTON INSURANCE COMPANY,

Plaintiff,

- against –

DAVID FORREST, T. BEAUCLERC ROGERS IV,
STANLEY MUNSON, MARTIN FINK, all individually,
and NEW BEGINNINGS ENTERPRISES LLC, a
California Limited Liability Company, and
TARLO LYONS, a partnership,

Defendants.

Civil Action No. 02-CV-4435
(Hon. Anita B. Brody)

## CERTIFICATION OF COMPLIANCE WITH LOCAL RULE 26.1(f)

I, John D. Gordan, III, hereby certify that the parties and third parties, after reasonable effort, are unable to resolve the discovery dispute that is the subject of this Motion to Compel. Defendant Tarlo Lyons has engaged in good faith efforts to secure the information to which it is entitled under the Federal Rules of Civil Procedure.

Date: New York, NY
February 17, 2005

By: _____
John D. Gordan, III (pro hac vice)
MORGAN LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
212.309.6000

Attorney for Defendant
Tarlo Lyons

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LEXINGTON INSURANCE COMPANY,<br><br>                                      Plaintiff,<br><br>      - against –<br><br>DAVID FORREST, T. BEAUCLERC ROGERS IV,<br>STANLEY MUNSON, MARTIN FINK, all individually,<br>and NEW BEGINNINGS ENTERPRISES LLC, a<br>California Limited Liability Company, and<br>TARLO LYONS, a partnership,<br><br>                                  Defendants. | Civil Action No. 02-CV-4435<br>(Hon. Anita B. Brody) |

## MEMORANDUM OF LAW IN SUPPORT
## OF TARLO LYONS'S MOTION TO COMPEL

Defendant Tarlo Lyons respectfully submits its memorandum of law in support of its motion to enforce document subpoenas, issued from this Court pursuant to Fed.R.Civ.P. 45 on behalf of Tarlo Lyons on December 29, 2004, to American International Group, Inc. ("AIG") and New Hampshire Insurance Co. ("New Hampshire").

### Preliminary Statement

Lexington added Tarlo Lyons to this RICO case on April 29, 2004, after having initially suing Forrest and Rogers in 2002. Lexington's claim is premised fraudulent activity that is alleged to have occurred in connection with the various Flashpoint transactions, the last of which closed in 1998, more than five years before Lexington sued Tarlo Lyons. Accordingly, the critical issue in terms of the four year statute of limitations which governs RICO claims is what

Lexington knew and when.[1/]  Another is reliance, since the clam is fraud.  The documents sought by the underlying subpoenas relate directly to those issues.

The two companies subpoenaed are closely related to plaintiff Lexington.  AIG is the parent corporation of Lexington; it is also the parent corporation of New Hampshire.  AIG from time to time intervened directly in the management of Lexington.  In addition, in the late 1990s in London, both Lexington and New Hampshire, sometimes in collaboration with one another, were engaged in selling insurance which protected lenders for motion picture productions against shortfalls in exploitation receipts pledged to repay their loans.  In fact, New Hampshire, Lexington and senior management of AIG all consulted together in connection with the decision that Lexington and New Hampshire would participate in Hollywood Funding 4, one of the transactions in this case.

On December 29, 2004, defendant Tarlo Lyons issued identical document subpoenas to AIG and New Hampshire for the production of eight categories of documents.  (Affidavit of John D. Gordan, III, sworn to February 17, 2005 ("Gordan Aff.") Exhibits 1 and 2).  Objections and separate "Responses" (a document not provided for by Rule 45) were served in answer to the subpoenas.  (Gordan Aff. Exs. 3-4).  On the return date, January 14, 2005, AIG made a small production of witness statements, but New Hampshire produced nothing.

A lengthy meet and confer was held by telephone on January 19, 2005, with counsel for AIG and New Hampshire, who are also counsel for Lexington in this action.  While agreement was reached for the production of additional documents, three categories of documents as requested in the subpoenas remain objected to:

---

1/    Tarlo Lyons has moved for judgment on the pleadings under Rule 12(c) on statute of limitations grounds.  While believing that motion is sufficient, because it is limited to the face of the pleadings and because of the approaching discovery deadline, this motion is required.

**Subpoena Request No. 3**

    3.      Any witness statement, affidavit, affirmation, deposition or trial or hearing testimony by any present or former employee of, or any attorney for, American International Group, Inc., Lexington Insurance Co. or New Hampshire Insurance Co., containing any information concerning any insurance-backed motion picture financing transaction or the termination of participation by any of those companies in that class of business.

**Objection to Request No. 3**

        AIG and New Hampshire object to Request No. 3 to the extent that it seeks any documents other than Witness Statements submitted in the English litigation pertaining to Hollywood Funding Nos. 4 and 5, on the grounds that to such extent the Request seeks documents that are neither relevant to the issues raised in the Second Amended and Supplemental Complaint annexed to each subpoena (the "Complaint") nor reasonably calculated to lead to the discovery of admissible evidence.

**Subpoena Request No. 6**

    6.      Any document concerning the decision to terminate the underwriting by Lexington Insurance Co. or New Hampshire Insurance Co. of coverage for insurance-backed motion picture financing transactions, including but not limited to the meeting between Messrs. Greenberg and Peacock referenced at LEX-01 006954.

**Objection to Request No. 6**

        AIG and New Hampshire object to Request No. 6 to the extent that it seeks documents other than those pertaining to Lexington Insurance Co. ("Lexington") on the grounds that to such extent the Request seeks documents that are neither relevant to the issues raised in the Complaint nor reasonably calculated to lead to the discovery of admissible evidence.

**Subpoena Request No. 7**

    7.      Any document concerning the reinsurance contract referred to as "Project Kraut," including but not limited to the reason(s) for its formation, its negotiation, and any cession under it of any risk referred to in paragraphs 4, 27 and 33 of the Complaint insured or reinsured by New Hampshire Insurance Co.

**Objection to Request No. 7**

AIG and New Hampshire object to this Request on the grounds that it seeks documents that are neither relevant to the issues raised in the Complaint nor reasonably calculated to lead to the discovery of admissible evidence as the reinsurance program referred to as "Project Kraut" pertained solely to the reinsurance of film finance risks insured by New Hampshire which is not a party to the Complaint, and New Hampshire's insurance of the film *It Had To Be You* is not relevant to the issues in the Complaint.

In addition, AIG and New Hampshire did not object to Request No. 4 in the subpoenas and stated in their "Responses":

**Subpoena Request No. 4**

4.      Any document prepared prior to August 4, 2000, alleging fraud, misrepresentation, non-disclosure or misappropriation in connection with any insurance-backed motion picture financing transaction in which Lexington Insurance Co. or New Hampshire Insurance Co. participated as an insurer or reinsurer.

**Response to Request No. 4**

AIG and New Hampshire have no documents responsive to Request No. 4. In the meet-and-confer on January 14, AIG's counsel advised that he had understood the language to refer only to claims involving Hollywood Funding 4-6 and would serve amended objections to include Request No. 4.  That has never happened.

<u>**Summary of Argument**</u>

For the reasons set forth below, supported by the accompanying Affidavit of John D. Gordan, III ("Gordan Aff."), we respectfully submit that the motion should be granted. The information AIG and New Hampshire refuse to provide relates directly to this issue of what Lexington knew and when it knew it, as it would document (1) the circumstances surrounding Lexington's and New Hampshire's abrupt termination in late 1998 of their participation in this class of insurance, in which they had been leaders, Lexington under direct orders of the president of AIG; (2) the knowledge each had when, after being ordered to stop, Lexington went ahead

with the $100,000,000 Hollywood Funding 6 transaction, the only Hollywood Fund transaction Lexington's complaint begins to tie proximately to any loss it claims to have suffered; (3) the reasons behind the efforts by both Lexington and New Hampshire – only New Hampshire's successful – to off-load their entire existing motion picture financing portfolios; and (4) the evidence supporting their common course of conduct from 1999 on to resist virtually all claims under their policies with allegations of fraud in the placement. The Third Circuit test for accrual under RICO, enunciated in Forbes v. Eagleson, 228 F.3d 471, 484 (2000), and Mathews v. Kidder, Peabody & Co., 260 F.3d 239, 250-51 (2001), obviously turns on what AIG, Lexington and New Hampshire knew and when they knew it. So does the reliance Lexington must show to establish its fraud claims. The discovery is clearly appropriate, based on the showing below.

## Background

These are the relevant facts.

### A.    The Hollywood Funding Transactions

This is an action brought by Lexington allegedly to recover litigation costs and moneys paid in settlement of claims arising under policies of insurance issued by Lexington in the three film financing transactions referred to as Hollywood Funding 4, 5 and 6. The policies insured the repayment in full on the maturity date of zero-coupon notes for funds borrowed from investors to finance these slates of motion pictures through an intermediary known as "Flashpoint", actually comprised of two affiliated companies, Flashpoint Ltd., incorporated in Jersey, and Flashpoint (UK) Limited, incorporated in Great Britain. The policies were a source of repayment secondary to the pledged proceeds of the exploitation of the motion pictures financed by the borrowing.

According to paragraph 4 of the Second Amended and Supplemental Complaint (the "complaint"), the financings closed as follows:

| Hollywood Funding 4 | July 3, 1998 | $33,600,000 |
| Hollywood Funding 5 | July 28, 1998 | $48,400,000 |
| Hollywood Funding 6 | December 23, 1998 | $100,700,000 |

The same paragraph of the complaint identifies three earlier Flashpoint transactions in which the

insurer issuing the policy was HIH Casualty & General Insurance Ltd., rather than Lexington:

| Hollywood Funding 1 | August 13, 1997 | $16,400,000 |
| Hollywood Funding 2 | December 4, 1997 | $15,500,000 |
| Hollywood Funding 3 | December 17, 1997 | $25,600,000 |

The complaint includes allegations concerning the use of funds borrowed on the earlier slates for

the benefit of films on those insured by Lexington, which Lexington attacks as a

"misappropriation". (E.g., Complaint ¶¶ 33(a) and (b)).

Neither HIH nor Lexington kept 100% of the exposures they insured. It appears

that HIH retained 20% of the exposure for its own account and "fronted" the remaining 80%,

mostly with a French company, AXA Reassurances, S.A. ("AXA"), and with New Hampshire.

Like Lexington itself, New Hampshire is a subsidiary of AIG, a prominent and successful

international insurance company headquartered in New York.

The documents produced by Lexington thus far show that Hollywood Funding 4

was initially going to be "fronted" – insured 100% – by New Hampshire. Although New

Hampshire was later replaced by Lexington as the direct insurer, New Hampshire continued to

lead the reinsurance on Hollywood Funding 4 and 5, although again AXA was the most

prominent of the reinsurers. New Hampshire did not participate on Hollywood Funding 6 at all,

and its place was taken by General Star Indemnity International Indemnity Ltd. ("GenStar").

The Lexington documents and the deposition of Thomas Murphy (Gordan Aff.

Ex. 6) show Hollywood Funding financing insurance coverages were placed with and bound by

underwriters at Lexington's and New Hampshire's London offices, but their headquarters are in

Boston and New York City, respectively. Similarly, underwriting for those companies was

supervised, again from their headquarters cities, by separate underwriting agencies, also

subsidiaries of AIG, AI Entertainment for Lexington and AIU – American International

Underwriters – for New Hampshire in London, where AIU traded under the name "AIG Europe

UK Ltd." It is clear, however, that the two underwriting companies collaborated and that

Lexington and New Hampshire shared capacity and particular risks: one of the documents

produced by Lexington reflects confirmation by Robert Brace, the head of AI Entertainment,

with his opposite number at AIU (Tom Murphy) that Murphy's subordinate at New Hampshire

had bound its participation in the reinsurance of Lexington on Hollywood Funding 4 (Gordan

Aff. Ex. 7). In addition, Lexington documents show and Mr. Murphy testified in his deposition

in another case that the chief credit officer of AIG had been consulted about Lexington's and

New Hampshire's participation in the Hollywood Funding 4 risk. (Gordan Aff. Ex. 8 and Ex. 6

at Tr. 152-53). Similarly, a senior AIG officer was involved in the negotiations with GenStar,

which became New Hampshire's reinsurer on almost all of its motion picture financing

insurance. (Gordan Aff. Ex. 25).

**B.**    **The Lexington and New Hampshire Motion Picture Financing Portfolios**

During the 1996-99 period when insurance-backed motion picture financing was

in vogue, the six Flashpoint Hollywood Funding transactions, totaling nearly $250 million in

sums insured, were among the largest portfolios brought to market. In late 1998, there was also a

single $100 million transaction for start-up funding and distribution companies called

Destination, separate from Flashpoint and its principals, based on the issuance of notes issued to

investors and insured by AXA and New Hampshire.[2] Apart from investor financings through

---

[2]    Litigation spawned by the Destination transaction included litigation by New Hampshire, which
for once had actually paid a policy claim, to recover from its recalcitrant reinsurers. New
Hampshire Ins. Co. v. Sphere Drake Ins. Ltd., et al., 2002 US Dist. LEXIS 13105 (S.D.N.Y.),
aff'd., 51 Fed. Appx. 342 (2d Cir. 2002)

notes, there were also insured motion picture financings by banks, of which Chase Manhattan Bank and Imperial Bank had the largest portfolios.

The Chase-financed slates were denominated Phoenix and Paramount I through V; there were also six related single-picture financings called "J&M," a single-picture financing called "Looking for an Echo," and a $7.5 million working capital loan and five-picture slate for George Litto Productions. Lexington and New Hampshire were significantly involved in the Chase portfolio. Lexington participated on the direct coverage for the Phoenix slate, where the insurance was led by Steve Mitchell at HIH. Both Lexington and New Hampshire participated in the direct coverage for Paramounts slates 1, 2 and 3, and New Hampshire was on Paramount 4, "Looking for an Echo," the J&M films, and the working capital piece of the Litto transaction. Many of the insured financings had approximately 36-month terms; the J&M financings, however, had 18-month maturities. Thus, the Chase loans for Phoenix, the Paramount I slate, one of the J&M films and "Looking for an Echo" were due to mature at the end of 1999 or early 2000, about the same time as the maturities on Hollywood Funding 1 and 2.

Various London-market brokers placed the insurance – e.g., CE Heath, Stirling Cooke Brown and Jardine Lloyd Thompson ("JLT"). Heath brokered Phoenix, the Paramount slates, and J&M; Stirling Cooke Brown brokered Litto and Looking For An Echo; JLT brokered Destination and Flashpoint.

## C.   **Lexington and New Hampshire's Three Part Effort To Avoid Liability**

As demonstrated below, after writing all of this insurance (and collecting all the premium), New Hampshire and Lexington, with coordination and direction from AIG, engaged in a three-part process of walking away from all liability, the last step being to disclaim coverage

on the basis of alleged fraud on nearly <u>every</u> claim regardless of who lent the money, who brokered the transaction, or who acted as their risk manager.

1. **Step I – AIG Pullout**

In the latter part of 1998, both Lexington and New Hampshire abruptly stopped issuing insurance and reinsurance for insurance-backed motion picture financing transactions.

A reason why Lexington should have is stated in the records Lexington has produced – Evan Greenberg, then president of AIG, and son of its chairman, Maurice Greenberg, stopped at Lexington's London office on October 30, 1998, and ordered Lexington to stop. Despite those instructions from so high a personnage, the local Lexington staff seized on their "commitment" to the $100 million Hollywood No. 6 deal to close it two months later. (Gordan Aff. Ex. 17).

With New Hampshire the facts are less cut and dried. According to prior deposition testimony by Thomas Murphy, the head of AIU in New York at the time, he learned that film financing was being written in London by New Hampshire, inquired into it, and was told that only a few small risks had been written. He directed that no further risks of this type be written without further study and his authorization and assumed his instructions were being followed. The study was made but found unpersuasive by both Murphy and AIG's chief credit officer, Bob Lewis. In the fall of 1998, in doing a review of the risks being written in London, Murphy learned that a huge volume of such risks had been written in violation of his instructions; contemporaneously, the person in charge of this business in London chose to retire to a position at a motion picture industry company New Hampshire had insured, <u>i.e.</u>, Destination. (Gordan Aff. Ex. 6 at Tr. 51-53, 55-58, 67-69, 78-82).

2.    **Step II – Off-loading the film finance book**

Confronted with a substantial aggregation of unwanted film finance business on its books, in late 1998 and early 1999, New Hampshire entered into a 100% reinsurance of its entire film-finance insurance book with GenStar, apparently including some of its Hollywood Funding reinsurance. This transaction, known as "Project Kraut", later generated litigation between New Hampshire and GenStar (Gordan Aff. Ex. 6 at Tr. 101-106, 175-76; Ex. 25).

Lexington took the opposite tack, as noted, closing the largest Hollywood Funding transaction two months later despite Evan Greenberg's orders. (Gordan Aff. Ex. 17). Shortly, thereafter, however, according to Murphy's testimony, Sal Nociforo, then in charge of Lexington's underwriting at A.I. Entertainment, expressed regret that the Project Kraut cession to GenStar had not included Lexington's exposure (Gordan Aff. Ex. 6 at Tr. 124-26). In addition, the documents produced by Lexington in this litigation include a memorandum dated July 19, 1999 to Kevin Kelly, the CEO of Lexington, from Thomas R. Tizzio, "Senior Vice Chairman" of AIG and believed to be the number two person at AIG:

> RE:    *AI Entertainment/Lexington London Film Finance Accounts*
>
> I have discussed with Sal Nociforo reinsuring the in force business. I understand the difficulty – and suggest that you get involved as well to see what can be done.
>
> I find it hard to understand how this business was written against company guidelines. Were any audits ever conducted of the office? If so, why wasn't it picked up that we were writing the business?

(Gordan Aff. Ex. 18).

3.    **Step III – Pay no claims – allege fraud in the inducement**

From the time of Mr. Tizzio's fax forward, claims began to arise in the film financings described at pp. 7-9 above. With the exception of Destination, Lexington and New Hampshire disclaimed coverage each time.

Flashpoint

On November 3, 1999, HIH, AXA, GenStar, Lexington and New Hampshire representatives met in London on all the Flashpoint slates. At the time New Hampshire expected there would be losses on the early Hollywood Funding transactions. New Hampshire called for a full investigation, questioning the "veracity of the original value" of the Flashpoint films, and GenStar suggested that the original sales estimates were "fraudulent" and questioned the manner in which Flashpoint planned to spend its money. The meeting apparently decided to retain Cameron McKenna, a London law firm, which three weeks later would file the Phoenix declaratory judgment action for insurers including Lexington and AXA. (Gordan Aff. Exs. 20-21). Shortly thereafter, Flashpoint reported to the brokers that New Hampshire was refusing to pay HIH's reinsurance claim on Hollywood Funding 1-2 (Gordan Aff. Ex. 22). By February 21, 2000, Cameron McKenna had formally put Flashpoint on notice with respect to Hollywood Funding 2 that "it has become apparent that significant non-disclosure and misrepresentations were made to insurers, notably in and relating to the Rojak presentation document…" and advising that insurers reserved their remedy against Flashpoint under the Collateral Agreements. On June 12, 2000, Cameron McKenna wrote to Flashpoint in identical terms about Hollywood Funding 3. (Gordan Aff. Exs. 23 and 24).

A decision by Mr. Justice Langley of the High Court in the Hollywood 1, 2 and 3 litigation in 2004[3] summarized the outbreak of Flashpoint related litigation in London in 1999 and early 2000:

---

3/    HIH Casualty and General Ins. Ltd. v. JLT Risk Solutions, [2004] EWHC 1687 (Comm.) (Gordan Aff. Ex. 9).

Background

2.    The proceedings concern the finance insurance arrangements (pecuniary loss indemnity policies) for three slates of firms which have come to be referred to as Hollywood 1 ("7.23") Hollywood 2 ("Rojak") and Hollywood 3 ("Award").

3.    The proceedings were originally brought by insurers against their reinsurers (including "New Hampshire" and "AXA") for payment under the reinsurances following payments made by HIH to the underlying assured. The assured was Law Debenture Trust (LDT). LDT acted on behalf of those who provided the finance for the firms. The payments were for shortfalls in the revenues achieved by the films from the sum assured.

4.    Both the insurance and reinsurance for Hollywood 1, 2 and 3 were placed by JLT as brokers.

5.    The sums involved, in rounded figures, are US $15.6m in Hollywood 1, US $14.7m in Hollywood 2, and US $25.1m in Hollywood 3.

6.    JLT had also placed the insurance of another project called "The New Professionals" ("TNP") and of the slates of films known as Hollywood 4 and 5. These insurances also give rise to litigation. TNP was placed before Hollywood 1, 2 and 3 but in the same year (1997). Hollywood 4 and 5 were placed after Hollywood 1, 2 and 3. Proceedings in Hollywood 1 and 2 began before the proceedings in TNP.

TNP

7.    HIH was the lead underwriter on TNP. HIH sought to avoid the insurance alleging fraudulent misrepresentation and non-disclosure by JLT. The proceedings against reinsurers commenced in May 2000. JLT were joined as Part 20 Defendants in October 2000. The proceedings were due to be tried in April 2002 but were settled shortly before trial.

Hollywood 1, 2 and 3.

8.    The relevant history of the present proceedings is as follows. HIH paid the claims between August 1999 and June 2000. The proceedings against reinsurers were begun in October 1999 and January 2000 (Hollywood 1), March 2000 (Hollywood 2) and October 2000 (Hollywood 3). Preliminary issues were tried in Hollywood 1 and 2. Both David Steel J (in December 2000) and, on appeal, the Court of Appeal (in May 2001) decided that the contracts of insurance and reinsurance contained warranties as to the number of films to be completed which had been

> broken: [2001] EWCA Civ. 735.  JLT became a party in Hollywood 1, 2
> and 3 in November 2001.

As noted earlier, the Hollywood Funding 1 and 2 actions included fraud allegations.[4/]  So

too, as Justice Langley's opinion states, did the litigation involving "The New

Professionals" ("TNP").  The TNP fraud allegations appear to be reiterated by Lexington

in its complaint in this case, at ¶ 27(a).[5/]

In December 2000, also, Lexington sued Flashpoint in the High Court in London

for the unexpended portion of the Hollywood 4-6 fundings and in essence obtained an injunction

against its use of any moneys at all.[6/]  Also in December 2000, New Hampshire sued Flashpoint,

defendant Fink herein, and several other entities, in the United States District Court for the

Central District of California, for alleged fraud and other claims arising from the single-picture

financing, "It Had to be You."  (Gordan Aff. Ex. 26).

### Phoenix

On November 25, 1999, the insurers on the Phoenix transactions, including

Lexington, on the eve of the first claim date, brought a declaratory judgment action against

---

4/    See paragraph 49 of the opinion of Lord Justice Rix in the Court of Appeal in HIH Casualty and
      General Ins. Ltd. v. New Hampshire Ins. Co. [2001] EWCA 735 (2001).  This opinion is annexed
      as Exhibit B to the Tarlo Lyons Memorandum of Law in Support of its Motion on the Pleadings,
      filed January 27, 2005.

5/    Lexington appears to have felt able to produce the TNP Particulars of Claim despite the implied
      undertaking it relies on to withhold the other English pleadings.  (Gordan Aff. Ex. 19).  It is
      notable that New Hampshire is one of the participants in the direct insurance and a plaintiff in the
      action, and that counsel for insurers is once again, Cameron McKenna.

6/    The opinion is annexed to Tarlo Lyons's Reply Brief filed February 16, 2005.

Chase and Heath, the broker, in the High Court in London.[7/]  The insurers' claim was fraud in the

inducement by Heath, not Chase, in concealing concerns about the viability of the Phoenix risk

expressed by its original risk manager and insurers who had cancelled their participation.  The

London law firm representing insurers in the action was Cameron McKenna.  (Gordan Aff. Ex.

11).

"Looking for an Echo"

On March 7, 2000, Chase filed a complaint against New Hampshire in the

Supreme Court for New York County for its insurance claim for the shortfall on the repayment

of its loan for "Looking for an Echo."  On April 4, 2000, New Hampshire served its answer,

alleging fraud as an affirmative defense:

> 28.    Upon information and belief, the Relevant Policy was induced,
> procured and obtained through the use of false and/or misleading representations
> and/or material omissions inasmuch as the agreements and other documents
> submitted by plaintiff prior to the issuance of such policy provided inadequate
> information and inaccurate representations concerning the foreseeable risks
> attendant to the contemplated business venture and the financing thereof.

(Gordan Aff. Ex. 13).

"Texas Funeral" – J&M Film

On March 10, 2000, Chase filed a complaint against New Hampshire and other

insurers in the Supreme Court for New York County on its insurance claim for the shortfall on

the repayment of its loan for "Texas Funeral," one of the J&M films.  On April 26, 2000, New

Hampshire answered and counterclaimed for rescission, again alleging fraud:

---

7/    Even earlier, on October 19, 1999, AXA began a declaratory judgment action against the Chase
Manhattan Bank in the Supreme Court for New York County to void its portions of the coverages
on the two Litto transactions – the working capital loan, where New Hampshire fronted for AXA,
and the five-picture facility, on which Lexington participated on an excess layer.  New Hampshire
later intervened in the Litto action as a plaintiff.  The claim dates on both transactions were more
than a year off.  AXA also claimed that Richards Butler, a prominent London solicitors firm that
represented insurers in the Litto transactions, had been disloyal and conflicted and that Chase
knowingly exploited Richards Butler's disloyalty.  (Gordan Aff. Ex. 12).

35.    Upon information and belief, Chase misrepresented and/or concealed facts and information material to the risk insured under the Policy peculiarly within its knowledge including, but not limited to, its superior knowledge regarding the manner in which the risk would be packaged, structured and presented to the Defendants, which did not accurately reflect the facts pertinent to the risk, e.g. the potential value of the production being insured, the *bona fides* of the representations being made concerning the risk, the *bona fides* of the various parties who were participating either directly or indirectly in the risk being insured, the risk insured and its value, and the relationships (both past and present) among and between Chase, the risk manager, the broker, the sales agent, and others who played a role in the placement of the risk.

(Gordan Aff. Ex. 14).

## ARGUMENT

The standard for obtaining discovery by way of subpoena is not particularly onerous; indeed "the scope of discovery through a subpoena is the same as . . . the other discovery rules." Fed.R. Civ. P. 45(d) Advisory Committee's Note 1970 Amendment. The information sought, therefore, need only be relevant to a claim or defense in the case. See Fed.R. Civ. P. 26(b)(1).

What Tarlo Lyons seeks here easily satisfies that standard.

Because the last of the transactions allegedly giving rise to Lexington's claims in this case closed in December 1998 and Lexington did not sue Tarlo Lyons until April 29, 2004, Lexington's claims against Tarlo Lyons are, on their face, time barred – i.e., RICO claims have a four year statute of limitations and common law claims two.  Lexington's answer to this problem is the bald statement that "Defendants' fraud and other misconduct were inherently self-concealing." (Complaint ¶ 93.)  As a result, the critical issue for purposes of statute of limitations purposes is  what Lexington knew and when.  This issue is also central to Lexington's claims of reliance.

A.    **"Storm Warnings" Before April 29, 2000**

  The Third Circuit has adopted the "injury discovery" rule for purposes of determining the accrual date for the RICO statute of limitations.  Under this rule, a RICO claim accrues when the plaintiff "knew or should have known of [its] injury."  See Forbes v. Eagleson, 228 F.3d 471, 484 (3d Cir. 2000).  The inquiry notice aspect of this rule – i.e., the "or should have known" language – involves a two step analysis:  (1) the existence of "storm warnings," and (2) whether plaintiff exercised reasonable due diligence and yet was unable to discover its injuries.  See Matthews v. Kidder, Peabody & Co., Inc., 260 F.3d 239, 252 (3d Cir. 2001).

  Here, the facts make it clear that Lexington – and its sister corporation New Hampshire and parent AIG – saw what they themselves viewed as storm warnings – and indeed they acted upon them – more than four years before Lexington sued Tarlo Lyons:

- The decision of Lexington's sister company in the fall of 1998 to high-tail it out of the business film finance – a business its managers claim they never wanted it to be in to begin with;

- The belated recognition at Lexington and by Mr. Tizzio by mid-1999 that Lexington needed to get rid of its film finance portfolio if it could;

- Lexington's (and New Hampshire's) attendance at a November 1999 meeting of insurers at which allegations of fraud in the Hollywood Funding transactions and Flashpoint's use of the funding were openly discussed;

- The decision at the November 1999 meeting to hire Cameron McKenna, the London law firm which in less than three weeks would file a declaratory judgment action alleging fraud for the same insurers with regard to the five-film Chase-financed Phoenix motion picture risks;

- Cameron McKenna's February 21, 2000 letter to Flashpoint claiming fraud on the Hollywood Funding 1 transaction;

- The assertions of fraud in the Hollywood Funding 1 and 2 pleadings described by Mr. Justice Langley and Lord Justice Rix;

- The AXA allegations against Chase in the Litto action, filed October 19, 1999, including those added against Richards Butler, the solicitors; and

- From November 1999, the claims of fraud by Lexington and/or New Hampshire whenever a claim matured on a motion picture risk regardless of who lent the money, brokered the transaction, or acted as the risk manager.

Obviously, the further discovery Tarlo Lyons has sought and AIG and New Hampshire refused is relevant to the issues presented in this case – all seek information relevant to the statute of limitations and equitable tolling about either (1) allegations of fraud or sworn statements in litigation concerning film financing transactions involving AIG, Lexington or New Hampshire; or (2) the decision by both the New Hampshire and Lexington to abandon film financing coverage and to seek to shed their existing portfolios. Obviously, from perhaps 1998 but certainly 1999 on, AIG and its two subsidiaries were aware of information which led them to assert and litigate massive fraud claims in this class of business, including the Flashpoint transactions. That information and those circumstances are what we seek access to.

**B.    <u>Reliance</u>**

The discovery sought also bears directly on Lexington's claims of reliance, another issue central to this litigation.

- In the fall of 1998 Lexington was directed by the No. 2 executive in its parent company, AIG, discontinue underwriting film financing risks;

- In the fall of 1998, New Hampshire, Lexington's sister company – which had been writing the same type of risks in London in collaboration with Lexington, which it reinsured as Hollywood Funding 4 and 5 – stopped writing those risks and offloaded its entire film financing book of business in an unusual reinsurance transaction; and

- Lexington nevertheless went ahead and fronted – insured nearly 100% – the $100 million Hollywood Funding 6 transaction, for which it seeks recovery from Tarlo Lyons for its settlement costs.

These facts call into question Lexington's claims of reliance. The documents sought by Tarlo Lyons bear on the reasons Lexington and New Hampshire were directed to stop writing their business, why it is New Hampshire ceded all of its exposure to GenStar,

whereas Lexington nonetheless insured the $100 million Hollywood Fund 6 transaction

two months after being ordered by senior management to stop. Tarlo Lyons is entitled to

find out why it is these related AIG entities did what they did when they did it. New

Hampshire and AIG should be ordered to turn over the requested documents.

**Conclusion**

For the reasons set forth above, defendant Tarlo Lyons' motion to compel should

be granted.

Dated: February 18, 2005

Respectfully submitted,

MORGAN LEWIS & BOCKIUS LLP

By: _____
John D. Gordan, III  (pro hac vice)
Eugene F. Bannigan  (pro hac vice)
John N. Thomas  (pro hac vice)
101 Park Avenue
New York, NY  10178
(212) 309-6000

Thomas M. Kittredge  (Pa. I.D.  04471)
Kenneth L. Racowski  (Pa. I.D.  90514)
1701 Market Street
Philadelphia, PA 19103
215.963.5000

Attorneys for Defendant
Tarlo Lyons

## CERTIFICATE OF SERVICE

I certify that copies of a Proposed Order, Certification, Motion, Brief in Support and Affidavit of John D. Gordan, III, sworn to February 17, 2005, were served this 18th day of February , 2005, by hand upon:

> Edward P. Krugman
> Kevin J. Burke
> Ira J. Dembrow
> CAHILL GORDON & REINDEL LLP
> Eighty Pine Street
> New York, NY  10005

and by Federal Express, overnight delivery, upon:

> Jeffrey R. Lerman
> Glenn F. Rosenblum
> MONTGOMERY, MCCRACKEN,
> WALKER & RHOADS, LLP
> 123 South Broad Street
> Philadelphia, Pennsylvania  19109
>
> *Attorneys for Plaintiff*
>
>
> Edward M. Dunham, Jr., Esq.
> Shannon Hampton Sutherland, Esq.
> Duane Morris LLP
> One Liberty Place
> Philadelphia, PA  19103-7396
>
> *Attorneys for David Forrest*
>
> James J. Rohn, Esq.
> Nicholas M. Centrella, Esq.
> Kevin Dooley Kent, Esq.
> Conrad O'Brien Gellman & Rohn, P.C.
> 1515 Market Street, 16th Floor
> Philadelphia, PA  19102
>
> *Attorneys for T. Beauclerc Rogers, IV*
>
> Alexander Kerr, Esq.
> Stephen P. McFate
> McCarter & English, LLP

Mellon Bank Center
1735 Market Street, Suite
700 Philadelphia, PA  19103

and

Charles A. Adamek. Esq.
Beverly Y. Lu. Esq.
Lord, Bissell & Brook LLP
300 S. Grand Avenue, Suite 800
Los Angeles, CA  90071

*Attorneys for New Beginnings Enterprises*

Neil G. Epstein, Esq.
Eckert Seamans Cherin & Mellott LLC
1515 Market Street - Ninth Floor
Philadelphia, PA  19102

and

Sanford I. Michelman, Esq.
Mora Z. Hanna, Esq.
Jeffrey D. Farrow, Esq.
Michelman & Robinson, LLP
4 Hutton Centre Drive, Suite 300
Santa Ana, CA  92107

*Attorneys for Martin Fink*

Conrad O. Kattner
McShea Tecce P.C.
Mellon Bank Center, 16th Floor
1735 Market Street
Philadelphia, PA  19103

*Attorneys for Stanley Munson*

Dated: New York, New York
       February 18, 2005

John D. Gordan, III