# EXHIBIT 6

1            SUPREME COURT OF THE STATE OF NEW YORK                    COUN

2    AXA REASSURANCE, S.A.,           *

3         Plaintiff                   *                                    *

4    VS.                         * INDEX NO. 99-121290

5    CHASE MANHATTAN BANK,       * (Gammerman, J.)STIRLING COOKE BROWN

6    HOLDINGS, LTD., STIRLING    *COOKE BROWN REINSURANCE          *

7    BROKERS, LTD., SAWTANTAR     *SHARMA, GEORGE LITTO             *

8    PICTURES, INC.,             *    Defendants                   *

9

10

11    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

12              ORAL DEPOSITION OF THOMAS MURPHY

13    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

14

15

16

17         ORAL DEPOSITION OF THOMAS MURPHY, produced

18    as a witness at the instance of the Defendant, taken

19    in the above-styled and -numbered cause on the 28th

20    day of August, 2001, beginning at 8:32 a.m., before

21    Wendy Watson, a Certified Shorthand Reporter in and

22    for the State of Texas, at the Dallas Marriot,

23    located at 223 West Las Colinas Boulevard, Irving,

24    Texas, in accordance with the New York Rules of Civil

25    Procedure and the agreement hereinafter set forth.

8/28/2001 Murphy, Thomas

1    A P P E A R A N C E S

2

3    FOR CHASE MANHATTAN BANK:

4        MR. EUGENE F. BANNIGAN    Morgan, Lewis & Bockius, L.L.P.

5        101 Park Avenue    New York, New York    10178-0060

6        (212) 309-6815    (212) 309-6273 (Fax)

7

8    FOR NEW HAMPSHIRE INSURANCE COMPANY:

9        MR. STUART COTTON

10       Mound, Cotton, Wollan & Greengrass    One Battery Park Plaza

11       New York, New York    10004-1486    (212) 804-4200

12       (212) 344-8066 (Fax)

13

14   FOR HEATH LAMBERT GROUP, HEATH INSURANCE BROKINGLTD., HEATH NORTH AME

15   ROGER BASSETT:

16       MR. JONATHAN KLINE    59 Maiden Lane

17       New York, New York    10038    (212) 972-1000

18       (212) 972-1030 (Fax)

19

20

21   WITNESS' ADDRESS:    1303 Plantation Drive

22       Southlake, Texas

23

24

25

1                    I N D E X

2

3    Appearances . . . . . . . . . . . . . page 2

4    Exhibit Index . . . . . . . . . . . . page 4

5    Stipulations  . . . . . . . . . . . . page 5

6    Examination by Mr. Bannigan . . . . . . page 5

7    Examination by Mr. Kline . . . . . . . page 192

8    Signature and Corrections . . . . . . page 218

9    Reporter's Certificate  . . . . . . . page 219

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

8/28/2001 Murphy, Thomas

```
 1              E X H I B I T   L I S T

 2                                  Page    PageNo.    Description

 3     800   Document Entitled        157     158

 4           "Indemnification Agreement Among    New Hampshire Insurance Co

 5           acting through its Agent AIG     Europe U.K., Ltd., AXA Reassu

 6           U.K., PLC, and Destination Films"

 7     801   (Document not identified)        182      --

 8     802   (Document not identified)        182      --

 9

10

11     REPORTER'S NOTE:  All exhibits were retained by

12                                                              Mr.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S
 2              THE REPORTER:  Do y'all -- I don't
 3    know how you do it in New York.  Do you have any
 4    agreements before I swear him in?
 5              MR. BANNIGAN:  They've had a usual
 6    stipulation thing.  You want to read it and you want
 7    to sign it, and you don't have to do it before the
 8    same notary.
 9              MR. COTTON:  Right.
10              MR. BANNIGAN:  Nothing gets filed.
11              THOMAS MURPHY,
12    having been first duly sworn, testified as follows:
13              EXAMINATION
14    BY MR. BANNIGAN:
15      Q.   Would you please state your full name and
16    give us your business and home address.
17      A.   Thomas Michael John Murphy, 1303 Plantation
18    Drive, Southlake, Texas.
19      Q.   This morning, let me -- first of all, let
20    me introduce myself formally on the record.  My name
21    is Gene Bannigan.  I'm with the firm of Morgan, Lewis
22    & Bockius.  We represent Chase Manhattan Bank in the
23    matter of Chase Manhattan Bank versus the New
24    Hampshire Insurance Company, AXA Reassurance, pending
25    in the Supreme Court, State of New York, before
```

8/28/2001 Murphy, Thomas

```
1      Justice Gammerman.

2            This morning, I'm going to be asking you

3      some questions relating to an insurance product known

4      as GAP film financing, and it goes by various other

5      names too, but that's generally what it's being

6      called, GAP financing.

7            If you have any questions or you don't

8      understand my questions, please let me know and I'll

9      try to rephrase the question so that we have a record

10     that's usable.  Okay?

11     A.    Uh-huh.

12     Q.    Okay.  And --

13           MR. KLINE:  Is it okay if -- I meant

14     to mention this to you before.  Is it okay if I put a

15     short statement on the record?  Is that a problem?

16           MR. BANNIGAN:  I don't mind.

17           MR. KLINE:  I'm sorry to interrupt --

18     I can do it at the end, if it's better.

19           MR. BANNIGAN:  No, no.  Help yourself.

20           MR. KLINE:  I just want to say that my

21     name is Jonathan Kline.  I represent Heath Lambert

22     Group, Heath Insurance Broking, Heath North America,

23     and Special Risks and Roger Bassett.  And we're

24     participating in these depositions pursuant to

25     Justice Gammerman's June 11, 2001, order.
```

1          We take exception to certain parts of that

2     order, and we reserve the right to reconduct this

3     deposition in the J & M litigation, with respect to

4     the Texas Funeral History Being Made at Night and

5     Bruno cases.

6               THE REPORTER:  The night name?  I'm

7     sorry.

8               MR. KLINE:  History is Made at Night.

9               MR. BANNIGAN:  These are all movies

10    you've undoubtedly seen.

11    Q.   (BY MR. BANNIGAN)  Just to add to -- very

12    briefly to what Mr. Kline said, this is a deposition

13    in one case.  There are a number of cases, all

14    involving film finance.  It's not my intention to go

15    into the facts of those other cases, except to the

16    extent that there may be some overlap with the

17    particular films and issues that are involved in this

18    case.

19          Okay.  Could you tell us how you're

20    employed?

21    A.   I'm employed for TIG Insurance.  I'm their

22    director of reinsurance.

23    Q.   Okay.  And what is TIG Insurance?

24    A.   It's a commercial insurance company.

25    Q.   And where is that located?

8/28/2001 Murphy, Thomas

```
1         A.    Right across the pond, Irving, Texas.

2         Q.    All right.  And how long have you been

3    employed there?

4         A.    A year.

5         Q.    A year would go back to 2000 and roughly

6    what, what month?

7         A.    September.

8         Q.    September.  Okay.  And before that, how

9    were you employed?

10        A.    I was self-employed, a start-up outsource

11   accounting firm.

12        Q.    And where is that business located?

13        A.    Bridgewater, New Jersey.

14        Q.    And are you a CPA?

15        A.    No.

16        Q.    Would you explain to me what this company

17   was?

18        A.    It was a venture between myself and my CPA,

19   starting up a new business venture.

20        Q.    Okay.  And what was the -- aside from the

21   profit, what was the goal of the company?  What was

22   its function?

23        A.    Outsource accounting services for small

24   businesses.

25        Q.    Okay.  Does that business still exist?
```

1          A.    Uh-huh.

2          Q.    Are you still affiliated with it in any

3     way?

4          A.    Uh-huh.  I'm an investor.

5          Q.    So you're not involved in the operation of

6     that business?

7          A.    (Moves head side to side.)

8          Q.    Let me go back to -- is it TIG Insurance?

9          A.    Yes.

10         Q.    What does TIG stand for?

11         A.    I don't believe it stands for anything now.

12         Q.    Okay.

13         A.    The history of the company was it was

14    Transamerica Insurance Group's casualty operations,

15    and I believe they kept the initials.

16         Q.    And is it still part of that empire?

17         A.    No.  It's owned by a Canadian holding

18    company.

19         Q.    The name of which is?

20         A.    Fairfax.

21         Q.    And did you say you were the director of

22    reinsurance?

23         A.    Uh-huh.

24         Q.    Okay.  And is the -- withdrawn.

25               Are you involved in actually underwriting

1    insurance?

2         A.    No.  This is ceding reinsurance.  This is,

3    in effect, buying reinsurance for an insurance

4    company.

5         Q.    So you act as an intermediary?

6         A.    No.  I act as the buyer.

7         Q.    For insurance companies that are within the

8    same group?

9         A.    Yes.

10        Q.    Why don't you give me the corporate

11    structure of TIG, from its -- the holding company to

12    its subsidiaries.

13        A.    Well, if you've been involved in major

14    insurance companies, the holding company -- the

15    structure gets quite complex.  And I couldn't list

16    for you all the different subsidiaries, but --

17        Q.    Why don't you make it as simple as

18    possible.

19        A.    Fairfax --

20        Q.    Give me a 30-second explanation.

21        A.    Fairfax Holdings, the Canadian company,

22    owns a variety of insurance companies in the United

23    States, one of which is TIG Holdings, which owns TIG

24    Insurance, the TIG Insurance Company in various

25    states.  TIG Holdings actually also owns Odyssey

1    Reinsurance, which is separately managed and has
2    nothing to do with my activities for the company.
3         Q.   Okay.  Let me just see if I understand.  I
4    don't want to spend a lot of time.  But TIG, the
5    company that you work for, does not write reinsurance
6    or insurance, but places reinsurance for insurance
7    companies?
8         A.   No.
9         Q.   Is that correct?
10        A.   No.  TIG is -- TIG is an insurance company.
11        Q.   Okay.
12        A.   And any major insurance company buys
13   reinsurance, in effect, sharing the risk of the
14   business that it writes on what's called a treaty
15   basis.
16        Q.   Okay.  Treaty reinsurance, right.
17        A.   And every major insurance company, there's
18   a reinsurance department which manages that function,
19   manages the outward reinsurance.
20        Q.   Now, are we talking about retrocessional
21   insurance now?
22        A.   Retrocessional insurance is the reinsurance
23   of reinsurance companies.
24        Q.   Right.
25        A.   Reinsurance is the reinsurance of insurance

1    companies.

2    Q.    Correct.  And you're involved in that

3    reinsurance of the insurance company?

4    A.    Yes.

5    Q.    Not involved in retrocessional placements?

6    A.    That's correct.

7    Q.    Okay.  Now, by training, is that an area of

8    expertise that you have been involved in for some

9    period of time?

10    A.    In my 25 years in the insurance business,

11    I've had two tours of duty in reinsurance functions

12    with the Hartford Insurance Group.

13    Q.    Hartford?

14    A.    (Moves head up and down.)

15    Q.    And when was that?  Or when were those two

16    occasions, if there were two?

17    A.    1985 through '86 and 1992 through '95.

18    Q.    Okay.  Let me go back to the accounting

19    business that you established.  Prior to establishing

20    that business with your CPA, how were you employed?

21    A.    With AIG.

22    Q.    Were you with a specific unit of AIG?

23    A.    AIU, American International Underwriters.

24    Q.    And when did you begin your employment

25    with -- for simplicity sake, since there's lots of

1    alphabet soup letters here, I'll call it AIG, unless

2    I want to refer to a specific other company, in which

3    case I will try to use the name of the other company.

4    Is that okay, or would you prefer it some other way?

5         A.   Well, it's okay, but I would suggest that

6    for your accuracy that AIU is more accurate.

7         Q.   Okay.  Is AIU a separate company?

8         A.   Yes.

9         Q.   And did you join AIU in 1995 or '96?

10        A.   I joined them in '96, yes.

11        Q.   And that was after your last tour at

12    Hartford?

13        A.   Right.

14        Q.   Was there anything between Hartford and AIU

15    in terms of employment?

16        A.   No.

17        Q.   And when you joined AIU, what was the

18    position that you came in as?

19        A.   Specialty casualty profit center manager.

20        Q.   I'm sorry.  The last part?

21        A.   Profit center manager.

22        Q.   Profit center manager.  And where was AIU

23    located?

24        A.   70 Pine Street, Manhattan, New York, New

25    York.

1          Q.    And what were your duties -- withdrawn.
2     Did you have a title?
3          A.    Senior vice president.
4          Q.    What were your duties as senior vice
5     president of special casualty profit center
6     management?
7          A.    The specialty casualty division was a new
8     one really created upon my arrival to develop three
9     lines of business outside the U.S. that AIG does
10    routinely in the U.S.
11         Q.    What were the three lines of business?
12         A.    Medical malpractice or medical professional
13    liability, environmental liability, and
14    entertainment.
15         Q.    Are those products currently written in the
16    U.S. -- withdrawn.
17              At the time that you were asked to organize
18    this -- these new products for underwriting, I take
19    it, outside the U.S., were those products written in
20    the U.S. by an AIG company?
21         A.    Uh-huh.
22         Q.    What AIG company was writing those products
23    at that time?
24         A.    I would imagine a number of them.  I
25    believe environmental was Commerce and Industry.  If

8/28/2001 Murphy, Thomas

```
1     you're at all familiar with AIG, you know they have a

2     long list of writing companies.

3          Q.    Yes.

4          A.    And I imagine that the other coverages were

5     written in a variety of different AIG companies.

6          Q.    Now, when you joined AIU, was there already

7     a business plan established to accomplish the goal

8     that you've just described, that is --

9          A.    No.

10         Q.    -- establishing underwriting for these

11    different lines of business?

12         A.    (Moves head side to side.)

13         Q.    Was one of your -- withdrawn.

14               What were your responsibilities at the time

15    you were hired?

16         A.    To develop medical professional business

17    outside the U.S. and environmental and entertainment.

18         Q.    Okay.  And how did you go about doing that?

19         A.    It wasn't easy.  First, wrote a business

20    plan for the medical professional area, made a number

21    of trips overseas, really fact-finding missions,

22    learning what the opportunities might be.

23               For the entertainment business, there was

24    already an individual employed by AIU with specific

25    expertise in entertainment business.
```

1    Q.  Who was that?

2    A.  Peter Gumbrecht.

3    Q.  And he already worked at AIU at the time?

4    A.  Uh-huh.

5         THE REPORTER:  What was that last name

6    again?  I'm sorry.

7         THE WITNESS:  Gumbrecht,

8    G-u-m-b-r-e-c-h-t.

9    Q.  (BY MR. BANNIGAN)  And Mr. Gumbrecht worked

10   at AIU in New York at that time?

11   A.  Yes.

12   Q.  Okay.  The other lines?  Well -- withdrawn.

13        That's all that was done as far as

14   entertainment?  Gumbrecht worked there, that was it?

15   Or was a business plan developed?

16   A.  This was on the ground floor.  Gumbrecht

17   wrote a business plan for entertainment.

18   Q.  Did he, like you, go on fact-finding trips,

19   to your knowledge?

20   A.  No, because entertainment business was a

21   great deal different than medical professional --

22   Q.  I hope so.

23   A.  -- from the standpoint of how prevalent the

24   exposures were internationally.  Let me see if I can

25   explain what I mean.

```
1              MR. COTTON:  Could I get you to read
2      the question again, please, before you answer it?
3              (Requested portion was read.)
4              MR. COTTON:  You can continue that
5      one.
6      A.   He did not go on fact-finding trips,
7      because the nature of the business is that it's --
8      virtually all entertainment business finds its way to
9      London, outside the U.S.
10     Q.   (BY MR. BANNIGAN)  And that has been
11     historically true?
12     A.   Yes.
13     Q.   Okay.  Now, let me just go back a bit.  I
14     think you said that before the establishment of AIU,
15     these lines of business -- I believe four that you
16     mentioned -- were already written by other AIG
17     companies?
18     A.   There were three.
19     Q.   Three?  Okay.  There was medical mal --
20     A.   Professional.
21     Q.   -- and professional liability,
22     entertainment, and environmental?
23     A.   (Moves head up and down.)
24     Q.   Those three were being written.  Now, you
25     just testified that the entertainment business tended
```

8/28/2001 Murphy, Thomas

1  to migrate to London?

2      A.    The entertainment business outside of the

3  U.S.

4      Q.    What does that mean by entertainment

5  outside the U.S.?  Let me give you a hypothetical.

6  Somebody wants to make a movie in Hollywood, and they

7  want to buy insurance.   Does that business normally

8  migrate to London?

9      A.    It can.

10      Q.    Under what circumstances?

11      A.    It's really the choice of the insurance

12  broker.

13      Q.    Okay.  What was the basis for your

14  testimony that that business tended to migrate to

15  outside the U.S.?

16      A.    When I talked about business migrating to

17  London, I was referring to business from outside the

18  U.S., for example, Malaysia, Hong Kong, and that was

19  a major focus.

20      Q.    Not U.S. risks that you were focusing on

21  underwriting outside the U.S.; it was risks from

22  every other place in the world?

23      A.    Yes.

24      Q.    Okay.  And to the extent that U.S. risks

25  happened to migrate there, that was simply sort of on

8/28/2001 Murphy, Thomas

```
1     an ad hoc basis?

2          A.    Yes.

3          Q.    Now, were entertainment risks being written

4     in the U.S. for U.S. risks at the time you joined

5     AIU?

6          A.    Yes.

7          Q.    Okay.  And do you recall which insurance

8     company within the AIG group was writing that

9     business?

10         A.    There were at least two.

11         Q.    Okay.  What were they?

12         A.    One was Lexington, and the other, I'm not

13    sure of.  It might have been American Home.

14         Q.    And to your knowledge, was Mr. Gumbrecht

15    involved in any of that underwriting at the time you

16    came to AIU?

17         A.    Peter wrote for AIU.

18         Q.    Okay.  AIU is not an insurance company

19    though, correct?

20         A.    If your question is:  What were the writing

21    companies, AIG --

22         Q.    No, I asked -- my question is whether AIU

23    is an insurance company?

24         A.    AIU, I believe, is a managing underwriter

25    for the fleet of AIG companies.
```

```
 1          Q.   Okay.   It writes for other companies --

 2          A.   (Moves head up and down.)

 3          Q.   -- that are actually the insurance

 4     companies?

 5          A.   The licensed insurance companies in the

 6     various jurisdictions.

 7          Q.   So Mr. Gumbrecht was writing for -- using

 8     entertainment as a product -- perhaps, for the

 9     Lexington and perhaps for the other company that you

10     mentioned, which was American Home, did you say?

11               Let me rephrase the question and go back.

12     AIU does the underwriting or did the underwriting, at

13     that time, for other licensed insurance companies --

14          A.   Yes.

15          Q.   -- within the AIG group; is that correct?

16          A.   That's correct.

17          Q.   Some, but not all of those companies, wrote

18     entertainment risks, correct?

19          A.   Yes.

20          Q.   Mr. Gumbrecht was an employee of AIU who

21     specialized in entertainment risks, correct?

22          A.   Yes.

23          Q.   At the time you joined AIU, was

24     Mr. Gumbrecht already there?

25          A.   Yes.
```

8/28/2001 Murphy-Thomas

1          Q.    At the time you joined AIU, for what

2     companies, if you know, was he actually underwriting

3     insurance -- entertainment insurance risks?

4          A.    To answer that question, I'll have to

5     describe for you a little bit how AIU works.

6          Q.    Okay.

7          A.    You're right, AIU is an underwriting -- I

8     think a managing -- technically, a managing

9     underwriting company who writes on the paper, if you

10    will, of the insurance company licensed in the

11    individual jurisdictions.

12         Q.    Right.

13         A.    New Hampshire, for example, was a -- was

14    one of the AIG companies licensed to write business

15    in the U.K.  I'm not -- I would not recall,

16    specifically, what were the companies that were

17    licensed in individual countries, because that's not

18    what we focused on.  It was simply we were writing

19    the business, and all the licensing and the

20    appropriate company to use was handled else where.

21         Q.    All right.

22         A.    Does that answer your question?

23         Q.    No, I don't think so.

24              MR. COTTON:  He wants to know which

25    companies, if you know?

1/25/2005  2:24 PM

21

8/28/2001 Murphy, Thomas

1    Q.    (BY MR. BANNIGAN)  I want to know:  If you

2    know, what companies was Mr. Gumbrecht actually

3    underwriting entertainment risks for at the time that

4    you joined AIU?

5        A.    I can tell you in most cases, it was New

6    Hampshire.  It certainly was not Lexington.  I don't

7    believe we used American Home in any jurisdictions

8    that we wrote entertainment business, but I'm not

9    sure of that.

10       Q.    Okay.  Now, to go back very briefly, it was

11   your understanding at the time that New Hampshire was

12   licensed to write insurance products in the United

13   Kingdom, right?

14       A.    Correct.

15       Q.    Do you know whether Lexington was licensed

16   to write business in the U.K.?

17       A.    I believe they are.

18       Q.    Okay.  They didn't write through a managing

19   general agency in the U.K., to your knowledge?

20       A.    No.

21       Q.    And you didn't believe that American Home

22   was writing through the U.K.; is that correct -- let

23   me rephrase that.

24           Was American Home writing entertainment

25   risks at the time you joined AIU?

1/25/2005  2:24 PM

1      A.    Not to my knowledge.

2      Q.    Okay.

3      A.    I'm sorry.  Outside the U.S.

4      Q.    It was writing it in the U.S.?

5      A.    I believe they were.

6      Q.    Now, was New Hampshire writing

7    entertainment risks in the U.S.?

8      A.    I don't believe so.

9      Q.    Was Lexington writing entertainment risks

10    in the U.S.?

11      A.    Yes.

12            MR. COTTON:  Gene, can I jump in for a

13    minute?

14            MR. BANNIGAN:  Sure.

15            MR. COTTON:  I don't think we have a

16    definitional problem.  But when you say was New

17    Hampshire writing entertainment risks in the U.S., I

18    assume you mean by his definition, meaning out of a

19    U.S. --

20            MR. BANNIGAN:  Meaning the source of

21    the business, which is the way he defined it before.

22    If it was a risk from Singapore, that was being

23    written in England.  If it was a risk from Hollywood,

24    with exceptions, it was being written in the U.S.

25    That's the way I understood it.

1          MR. COTTON:  I just wanted to make

2     sure that exception was in there because of the

3     unique circumstance of this case.  We have a risk in

4     the U.S. placed in London.

5          MR. BANNIGAN:  Well, I'm going to get

6     to this case.  I just want to find out what the lay

7     of the land was when Mr. Murphy came to AIU.  That's

8     all.  I won't spend a lot more time on it, but --

9          Q.   (BY MR. BANNIGAN)  To your knowledge, was

10     Mr. Gumbrecht writing entertainment risks that were

11     sited in the U.S. at the time that you joined AIU?

12          A.   No.

13          Q.   Okay.  Do you know where -- withdrawn.

14          Were you hired -- when you were hired, was

15     AIU in operation?

16          A.   Yes.

17          Q.   Had it been -- for how long a period of

18     time had it been in operation?

19          A.   AIG started in China, so I guess you could

20     say in 1919.

21          Q.   So AIU was always part of AIG for this

22     whole period of time?

23          A.   AIU is really the original company, if you

24     look at it that way.  American International started

25     in China in 1919.

1    Q.    All right.  Just let me understand then the

2    scope of AIU.  When you joined, you were the senior

3    vice president of the casualty -- special casualty

4    profit center management?

5    A.    (Moves head up and down.)

6    Q.    Was that a -- that was a new group within

7    AIU that was designed to write these three products

8    that were being generated outside the U.S.?

9    A.    Correct.

10    Q.    Okay.  And was Mr. Gumbrecht, at the time

11    you joined AIU, a member of that -- let's call it a

12    division?

13    A.    Yes.

14    Q.    Okay.  So was he -- he was already writing

15    entertainment risks that were being generated outside

16    the U.S.?

17    A.    He was writing entertainment business as

18    part of the casualty division prior to my arrival.

19    Upon my arrival, a specialty casualty division was

20    formed and entertainment business was moved into that

21    new division.

22    Q.    And he moved into that division at that

23    point?

24    A.    Such as it was.

25    Q.    How many employees were there in the

1/25/2005  2:24 PM

8/28/2001 - Murphy, Thomas

1    division at the time that you joined?

2        A.    One.

3        Q.    You and Gumbrecht?

4        A.    (Moves head up and down.)

5        Q.    That's two.  When you joined -- okay --

6    Gumbrecht was there?

7            MR. COTTON:  You got him.

8        A.    You got me.  Gumbrecht was the first.

9        Q.    (BY MR. BANNIGAN)  Just so that the record

10   is clear, we've been talking about entertainment

11   risks.  What definition, if any, do you have --

12       A.    Excuse me.  Let me correct that statement.

13   There were actually two.  There was an underwriter

14   for environmental as well.

15       Q.    Okay.  I don't think we need his name or

16   her name.

17           Just so that the record is clear, when we

18   talk about entertainment risks, how do you define

19   that as the head of the special casualty project

20   center manager?

21           MR. COTTON:  How did you define it?

22           MR. BANNIGAN:  Excuse me?

23           MR. COTTON:  How did you define it?

24       Q.    (BY MR. BANNIGAN)  Do you have a definition

25   for it?

```
1              A.    Our major focus were for event liability,
2      cancellation coverage, and prize indemnity.
3              Q.    I'm sorry.  The last one?
4              A.    Prize indemnity.
5              Q.    Prize?  Okay.
6              A.    But there were a long list of -- how would
7      you describe it -- niche products that were available
8      in the London market.  And to the extent that Lloyd's
9      treated it as entertainment business, so did AIU.
10     Like many areas of insurance, it's very difficult to
11     define.
12             Q.    No, I understand.  I just wanted to get the
13     major products within the group.  You said there's
14     event liability, cancellation.  That's also known as
15     contingency insurance?
16             A.    Uh-huh.
17             Q.    And prize and indemnity insurance, and that
18     defines itself, I think.
19             A.    Also package policies for movie productions
20     and theatrical productions.
21             Q.    And what would those be, just general
22     liability, workman's compensation?
23             A.    A package policy is a combination of
24     property coverages and general liability and
25     sometimes auto.
```

1/25/2005  2:24 PM

1      Q.   All right.  Within the definition of

2   entertainment insurance, at the time you joined AIU,

3   was one of the products that you were familiar with

4   what has become known as GAP film financing

5   insurance?

6      A.   No.

7      Q.   Okay.  Was that a product that you had even

8   heard about before you joined AIU?

9      A.   No.

10     Q.   I'll come back to that.  Did you -- did

11  AIU -- rephrase that.

12          Once AIU, the special casualty project

13  management center got up and operating, did it have

14  any responsibilities for writing reinsurance on

15  behalf of any of the companies for whom it had the

16  pen?

17     A.   It was not uncommon for -- on a facultative

18  basis --

19     Q.   Okay.

20     A.   -- for us to share risks.  So, yes,

21  reinsurance -- assuming reinsurance facultatively was

22  something that was done.

23     Q.   But that would be on a risk-specific basis?

24     A.   Correct.

25     Q.   With respect to treaty insurance, did the

**8/28/2001  Murphy, Thomas**

1   division that you were responsible for have any

2   responsibility for any kind of treaty reinsurance

3   protection for any of the business that it was

4   writing?

5       A.    Buying treaty protection?

6       Q.    Yeah.

7       A.    We were involved.  AIG had, as does TIG, a

8   reinsurance department, which function is to manage

9   the process of buying that.  But at AIG, the profit

10  center managers were involved in the process,

11  explaining to the reinsurance markets what the

12  business was and helping in the placement.

13      Q.    Is that organization that you're alluding

14  to something called SAIL?

15      A.    No.

16      Q.    Okay.  What's SAIL?

17      A.    SAIL, to my understanding, is, in effect, a

18  reinsurance broker in Europe.  I believe -- well,

19  what I believe doesn't matter.

20      Q.    Are you aware that SAIL is an organization

21  within the AIG group?

22      A.    I was going to say I believe it's owned by

23  AIG.

24      Q.    Did you have any business conduct --

25  withdrawn.

1              Did you have any business contact with SAIL

2      during the period of time that you were head of the

3      division that was set up for you to run?

4          A.   Not directly, no.

5          Q.   What does that mean, "not directly"?

6          A.   I did not.

7          Q.   Did other people who worked for you, at

8      your request --

9          A.   Yes.

10         Q.   -- or pursuant to their normal business

11     duties have contact?

12         A.   Yes.

13         Q.   Okay.  And what were the nature of those

14     contacts?

15         A.   Processing reinsurance.

16         Q.   When you say "reinsurance" now, are we

17     talking about treaty, or are we talking about

18     facultative?

19         A.   Facultative.

20         Q.   So let me understand the structure.  If an

21     underwriter in AIU -- withdrawn.

22              You did have underwriters in AIU, correct?

23         A.   (Moves head up and down.)

24         Q.   Mr. Gumbrecht was one of them?

25         A.   Uh-huh.

**8/28/2001  Murphy, Thomas**

1          Q.    And there were others?  I think you said --

2    you even mentioned that there was an entertainment --

3    environmental underwriter?

4          A.    Correct.

5          Q.    If one of those individuals wished to buy

6    facultative reinsurance with respect to a specific

7    risk that they were underwriting, they would use the

8    facilities of SAIL in order to arrange that?

9          A.    Yes.

10         Q.    And how would they go about that, as you

11   understand the structure?

12         A.    Anytime you're placing facultative

13   reinsurance, you have two major options.  You either

14   do it through direct markets, which means that you

15   deal directly with reinsurers, or you do it through

16   an intermediary.  SAIL was an intermediary.

17         Q.    SAIL acted basically to go out and buy

18   reinsurance protection for the direct writing

19   companies of the AIG group?

20         A.    Yes.

21         Q.    Okay.  Now, reverting back to treaty

22   reinsurance.  To the extent that -- let me give you a

23   hypothetical -- you wished to buy a treaty protectant

24   for all of the entertainment business that was being

25   written by the AIU underwriters, to what organization

6/28/2001 Murphy, Thomas

1    within the AIG group would you go to arrange that

2    treaty?

3         A.   The reinsurance department.

4         Q.   And that's what it was called, the

5    reinsurance department?

6         A.   Not very clever.

7         Q.   Okay.  And who -- at the time that you were

8    with AIU, who was the individual who headed that

9    department?

10        A.   Chris Milton.

11        Q.   Milton?

12        A.   (Moves head up and down.)

13        Q.   And was Mr. Milton still there when you

14   left AIU?

15        A.   I believe so.

16        Q.   And was he there when you came?

17        A.   Yes.

18        Q.   And during that period of time prior --

19   withdrawn.

20             During that entire period of time, he was

21   the senior executive in charge of reinsurance?

22        A.   Yes.

23        Q.   We'll come back to him later.  Let me come

24   back to -- I'm going to try now to focus simply on

25   the entertainment products that were in the division

1    that you were running.

2         About 15 minutes ago, you said, in response

3    to a question of mine, that Mr. Gumbrecht did not

4    take trips like you did to fact-find, but that he did

5    write a business plan?

6         A.   (Moves head up and down.)

7              THE WITNESS:  Should I always say yes

8    instead of shaking my head?

9              THE REPORTER:  Absolutely, yes.

10             THE WITNESS:  I'm sorry.

11        Q.   (BY MR. BANNIGAN)  Aside from writing the

12   business plan, which I'll come back to, what else did

13   Mr. Gumbrecht do, to your knowledge, in order to put

14   AIU in a position to begin to underwrite

15   entertainment risks generated outside of the U.S.?

16        A.   Could you repeat the question?

17             MR. BANNIGAN:  Read it back.

18             (Requested portion was read.)

19        A.   Well, a decision had been made, really

20   simultaneously with my arrival, to locate Peter in

21   London as a logical place for him to develop

22   entertainment business outside the U.S.  So his move

23   to London was really the primary device for him to

24   develop that business.

25        Q.   (BY MR. BANNIGAN)  Okay.  Now, do you know

**8/28/2001  Murphy, Thomas**

```
1    who it was within the AIG group of companies that

2    made the initial decision that a special casualty

3    profit center should be established to write

4    entertainment risks outside of the U.S.?

5         A.   I can -- not having been at the meeting, I

6    can only speculate.

7              MR. COTTON:  Well, I don't think we

8    allow speculation.

9         Q.   (BY MR. BANNIGAN)  You weren't at the

10   meeting, right?  What meeting?

11        A.   I presume, somewhere along the line, they

12   had to have a meeting to say let's have a specialty

13   casualty profit center.

14        Q.   Well, sounds like that, but I don't know.

15   I don't know how the company worked.

16             MR. COTTON:  You're not alone.

17        Q.   (BY MR. BANNIGAN)  How did you come to

18   learn, for the first occasion, that this profit

19   center was being set up?

20        A.   Tom Tizzio.

21        Q.   And who was that gentleman?

22        A.   President of AIG.

23        Q.   He contacted you?

24        A.   I was being interviewed by a number of

25   senior executives at AIG.
```

1     Q.     In other words, you were looking for a

2     position?

3     A.     They approached me.

4     Q.     You were looking to change positions?

5     A.     They had approached me.

6     Q.     And in the course of those interviews, you

7     learned that this special profit center was being set

8     up?

9     A.     (Moves head up and down.)

10    Q.     And the man's name is Tizzio, with a "T"?

11    A.     Yes.

12    Q.     And is he still there?

13    A.     Uh-huh.

14    Q.     And what did he say to you, and what did

15    you say to him about this profit center?

16    A.     They noted in my background that I was an

17    experienced medical professional underwriter.  They

18    were starting up this new division.  One of the key

19    coverages would be medical professional.  They asked

20    me if I would be willing to start it up for them.

21    Q.     Okay.  We know the answer.  Was there any

22    writing provided to you which sort of outlined the

23    concept of this new profit center?

24    A.     No.

25    Q.     Okay.  So when you walked in, you just had

1      an understanding that you were supposed to establish

2      this profit center that was supposed to begin to

3      write three lines of business that were being

4      generated outside the U.S.; is that correct?

5          A.   Uh-huh.

6          Q.   Okay.  And who besides Mr. Tizzio did you

7      discuss your employment with?

8          A.   Evan Greenberg.

9          Q.   And what was Mr. Evan Greenberg's position

10     at that time?

11         A.   He was president of AIU.

12         Q.   What did you and Mr. Greenberg talk about?

13     Well, let me rephrase that.  Let me rephrase that.

14     That's too general.

15             With respect to the establishment of this

16     profit center, what did Mr. Greenberg say to you, and

17     what did you say to him?

18         A.   I don't remember the conversation in exact

19     detail, but it was a general conversation about my

20     background and his description of what -- I believe

21     when I met with Evan, it was before I met with Tom

22     Tizzio.  And the subject of the specialty casualty

23     division had not been broached at that point.

24         Q.   It had not been brought up in your

25     discussion with Mr. Greenberg?

1          A.    Correct, in the first conversation.

2          Q.    Okay.  Was it brought up in subsequent

3    conversations?

4          A.    Yes.

5          Q.    Okay.  Do you remember any of the specifics

6    of any of the conversations that you had with

7    Mr. Greenberg about establishing this special

8    division?

9          A.    Yes.  It's a very simple concept.  AIG is

10   world-known for writing these coverages inside the

11   U.S.  AIG, through the AIU network, has an unrivaled

12   international network for which to write business.

13   It made sense to see if the worldwide market was

14   interested in these sort of insurance products.

15         Q.    These products were not available anywhere

16   in the world except through AIG in the U.S. at the

17   time?

18         A.    They were available, but the market

19   certainly had -- far, far from saturated.

20         Q.    Now, to your knowledge, had anybody within

21   the AIG group of companies done any study or analysis

22   which was the bases for the decision to form this

23   special unit to underwrite the three lines of

24   business that you've identified outside the U.S.?

25         A.    If your question is, was there an empirical

8/28/2001  Murphy, Thomas

1    analysis, no.

2        Q.    Well, any kind of analysis, I would be

3    satisfied with.

4        A.    Well, I think it's -- the reasons for

5    establishing it were based on long business

6    experience, in that to grow new lines of business,

7    you need to focus on them.

8        Q.    Was there any writing that you're aware of

9    which described this plan to form the special profit

10   center to write these three lines of business outside

11   the U.S.?

12       A.    I was not privy to any correspondence.

13       Q.    Well, not just correspondence.  Memorandum,

14   report, study, anything like that that you saw?

15       A.    No.

16       Q.    Now, you said that you prepared a business

17   plan with respect to at least one line of the three

18   products, correct?

19       A.    Uh-huh.

20       Q.    And Mr. Gumbrecht prepared a business plan

21   with respect to the entertainment?

22       A.    (Moves head up and down.)

23       Q.    Did you get involved in any way in working

24   with Mr. Gumbrecht in his preparation of his plan?

25       A.    No.  He did it prior to my arrival.

1          Q.    Okay.  I take it, at some point in time,

2     you had occasion to read it?

3          A.    Yes.

4          Q.    And what, if anything, do you recall about

5     its contents, since we've not been graced with a copy

6     of it?

7          A.    It was fairly brief, high level.

8          Q.    Okay.  Well, I need a little more

9     substance.

10         A.    Just discussion of, you know, the

11    production sources in the U.K.

12         Q.    Is that all it talked about was the

13    production sources?

14         A.    Largely.

15         Q.    What about loss experience?  Was that

16    addressed at all in the report?

17         A.    The availability of loss data

18    internationally is sparse, to say the least.

19         Q.    So the answer is, no, it did not discuss --

20         A.    It couldn't.

21         Q.    -- albeit brief, the loss exposure and

22    history?

23         A.    It couldn't.

24         Q.    It couldn't.  It couldn't address the

25    experience because, as you said, the information

8/29/2001 Murphy, Thomas

1    wasn't available.

2         Did the report discuss the exposures that

3    the company would have, where it was, within the

4    various lines of business that were going to be

5    underwritten, that the company was the most exposed?

6         A.   Not a lot of time was spent on that because

7    the company was very familiar with the insurance

8    products.

9         Q.   It was familiar with it.  So the company

10   had its own statistical base of information relating

11   to what we've broadly described as entertainment

12   risks?

13        A.   Uh-huh.

14        Q.   And when you say "the company," I take it

15   you mean whichever underwriting company was writing

16   that business within the AIG group; is that correct?

17        A.   Uh-huh.

18        Q.   Did you make any effort to collect that

19   information so that you could try to do some analysis

20   as to where the company would be most exposed

21   overseas?

22        A.   No.

23        Q.   Do you know whether Mr. Gumbrecht did?

24        A.   No.

25        Q.   Do you know whether anybody did?

1/25/2005  2:24 PM

1    A.   I don't believe they did.

2    Q.   Okay.  Now, after the -- after you came on

3  board and you began to organize your profit center,

4  who were your direct reports?

5    A.   Peter.  I suppose I should ask at what

6  point in time?  Because, with a growing division, it

7  changed month by month.

8    Q.   Okay.  Well, just take me through.  All

9  right.  Well, just take me through the growth of

10  direct reports up until the time you left, which I

11  think was in December of 1999?  If I'm wrong on that,

12  we can clarify it later.

13    A.   All right.  I'll see what I can do.

14  Certainly, Peter was there, and George Pigault was an

15  environmental underwriter.

16    Q.   Is it P-i-g?

17    A.   P-i-g-a-u-l-t.  George left within two

18  months.  The timing is approximate.  It might have

19  been three months.

20    Q.   That's okay.  I'm not too concerned about

21  these other people.  Just give me their names, if you

22  can, then we'll move back to the entertainment area,

23  which is where we're more interested.

24    A.   Then focused on hiring a more senior

25  manager for environmental; hired someone from the

1    domestic operation.   I'm afraid I'm drawing a blank

2    on her name right now.

3        Q.    Okay.

4        A.    Because she was with us for about two

5    months, then went back to domestic operation.   Then

6    hired someone from Swiss Re, Julie -- this is

7    terrible.   I worked with her for two years, and I

8    blanked her last name.

9             MR. COTTON:  You're still in

10   environmental?

11            THE WITNESS:  Yes.

12            MR. COTTON:  He's not excited about

13   environmental.

14       Q.    (BY MR. BANNIGAN)  I'm not going to test

15   your recollection on names.   I don't want these

16   people to know you don't know who they are.

17       A.    Thank you.

18       Q.    Let's focus on the entertainment.   Peter

19   Gumbrecht was a direct report, I gather, practically

20   the day you walked in the door?

21       A.    (Moves head up and down.)

22       Q.    Did Mr. Gumbrecht, at some point in time,

23   leave the company?

24       A.    Yes.

25       Q.    And did somebody take his place as a direct

1    report to you?

2        A.   Yes.

3        Q.   Who was that?

4        A.   Tim Green.

5        Q.   Tim Green.  And what about -- did Mr. Green

6    leave at some point in time?

7        A.   I believe so.

8        Q.   And when he left, did somebody take his

9    place as a direct report to you?

10       A.   No.  I left.

11       Q.   You had already left?

12       A.   Yeah.

13       Q.   Okay.  So the two reports in the

14   entertainment line of business in AIU to you were

15   Peter Gumbrecht, initially, and then, subsequently,

16   Tim Green?

17       A.   Correct.

18       Q.   Okay.  Did AIU, during the period that you

19   were there -- and putting aside Peter Gumbrecht's

20   move to London for a moment -- have any underwriters

21   located in New York who were underwriting

22   entertainment risks that were being generated outside

23   of the U.S.?

24       A.   It's possible.

25       Q.   Who would that have been?

1    A.   If they wrote risks outside of the U.S., it

2   would have been Lexington.

3    Q.   Okay.  And did AIU special casualty

4   division have any responsibility for underwriting

5   risks that would be insured on Lexington paper?

6    A.   No.

7    Q.   So within AIU special casualty division,

8   there were no underwriters other than Peter

9   Gumbrecht, for the brief period of time that he was

10  in the U.S., underwriting that kind of business?

11   A.   Correct.

12   Q.   Okay.  And then when he moved to London,

13  there were no underwriters located in the U.S. in

14  your division, underwriting entertainment business;

15  is that right?

16   A.   That's correct.

17   Q.   Okay.  And did that continue to be correct

18  for the entire period of time that you were in charge

19  of this profit center?

20   A.   No.  We hired an underwriter in New York.

21   Q.   And who was that?

22   A.   Stuart Kohn.

23   Q.   Stuart Kohn?

24   A.   (Moves head up and down.)

25   Q.   Is it Cohen or Kohn?

1        A.    Kohn, K-o-h-n.

2        Q.    And what was Mr. Kohn's -- withdrawn.  When

3   was Mr. Kohn hired?

4        A.    Probably about -- must have been 1997.

5        Q.    Why was he hired?

6        A.    To really act as liaison for entertainment

7   risks that had international exposures, but were

8   produced domestically.

9        Q.    Could you give me an example of such a

10  risk?

11       A.    Sure.  Take a movie production that is

12  filming in Malaysia, you know, it's maybe a Hollywood

13  film, but they're out on location.  They're going to

14  require insurance locally.  And many jurisdictions --

15  many countries have insurance regulations similar to

16  the United States in that you can't simply write a

17  policy in the United States and expect it to be valid

18  in Malaysia.  So AIU had the ability to write that

19  local policy.

20       Q.    Because it had the pen for a Malaysian

21  company?

22       A.    A subsidiary of AIG, I guess technically, I

23  think it was AIUOA.  I'm not sure how the

24  corporate --

25       Q.    So the company -- the issuing company, the

1    policy issuing company was an affiliate of AIG's, but

2    the actual underwriting of the risk would be handled

3    through New York?

4        A.    AIU.

5        Q.    And was Mr. Kohn writing the entire gamut

6    of entertainment insurance -- withdrawn.

7              Was he writing the same type of

8    entertainment insurance that Mr. Gumbrecht was

9    writing out of London?

10       A.    Yes.

11       Q.    So he was writing GAP film financing

12   coverage; is that correct?

13             MR. COTTON:   Can I have the previous

14   question and answer before this question?

15             (Requested portion was read.)

16       A.    No.

17       Q.    (BY MR. BANNIGAN)   Okay.   Why was he not

18   writing that type of insurance?

19       A.    Well, first of all, Stuart wrote business

20   according to authority level.

21       Q.    Okay.

22       A.    And what you term as GAP business is not

23   something anyone had authority for.

24       Q.    Okay.   So nobody in AIU wrote GAP

25   insurance; is that your testimony?

1          MR. COTTON:  I'll object to the form.

2     You can answer.

3          A.   I said, had the authority to write it.

4          Q.   (BY MR. BANNIGAN)  Okay.  Well, let me ask

5     the question again.  To your knowledge, was anybody

6     in AIU writing GAP film financial insurance during

7     the period of time that you were with AIU?

8          A.   Peter did.

9          Q.   Okay.  Was Peter authorized to write that

10    type of business?

11         A.   No.

12         Q.   When did you first discover that Peter was

13    writing -- I'll just use the abbreviation -- GAP

14    insurance?

15         A.   I did an audit of Peter's book in early

16    1998.

17         Q.   When you say you did an audit, did you

18    personally do the audit?

19         A.   Yes.

20         Q.   Okay.

21         A.   And out of the hundred or so policies I

22    looked at -- I guess thousands were written -- I came

23    across one that I didn't understand.

24         Q.   Okay.  Do you remember the name of that

25    one?

1      A.   I don't -- I don't remember a name, but I
2  remember what it was called, sales agent's
3  acquisition expense or something like that.
4      Q.   That was one of the names, "Sales Agent's
5  Acquisition."  Okay.  And when you came across this
6  policy -- when you say you didn't understand it, what
7  do you mean you didn't understand it, I mean, given
8  your long history of underwriting?
9      A.   Well, in my long history of underwriting, I
10  had yet to stumble across something called "Sales
11  Agent's Acquisition Expense."
12      Q.   Was it simply -- was it simply the name
13  that you didn't understand?  Or when you read the
14  coverage, you didn't understand what it was?
15      A.   There was no coverage form in the file.
16      Q.   There was no coverage form?
17      A.   It was simply a binder.
18      Q.   Was a policy ever issued with respect to
19  this particular --
20      A.   I believe it was.
21      Q.   Did you read the policy?
22      A.   The policy had not been issued at the time
23  that I was doing the audit.
24      Q.   Did you subsequently see the policy?
25      A.   Not for that risk, no.

1      Q.    Were there other risks that were of a

2    similar type, perhaps going under a different

3    nomenclature, that fell within the category of GAP

4    financing?

5      A.    Yes.

6      Q.    Have you ever heard of contingency extra

7    expense insurance?

8      A.    I believe that was a name used for the same

9    type of business.

10     Q.    Okay.  And wrapping all of these --

11    withdrawn.

12          Taking all of the nomenclature -- and just

13    for the purposes of this deposition, unless I say

14    otherwise, let's just call it GAP insurance.  Okay?

15     A.    Okay.

16     Q.    Now, did there come a point in time when

17    you saw a policy which purported to be a GAP

18    insurance policy?

19     A.    When I did the audit and saw the binder, I

20    asked Peter to explain to me what this coverage was.

21    He did.  And then we got into a general discussion as

22    to whether or not this was a product that AIU should

23    be writing.

24     Q.    And you said to him what, and he said to

25    you what?

1        A.    I said to him, This looks like something we

2    are going to have to get approval to write; write up

3    a position paper as to why we should write this

4    business.

5        Q.    And he said to you?

6        A.    And he did.

7        Q.    He wrote up a paper?

8        A.    (Moves head up and down.)

9        Q.    Okay.  And what did the paper say?

10        A.    It attempted to make a business case for

11    why we should write this business.

12        Q.    And what did you -- what was the business

13    case that he sought to make, if you remember it?

14        A.    That -- it had a variety of arguments in

15    it.  One was that this was business that would allow

16    us to write companion business, which was very much

17    part of our business plan.

18        Q.    When you say "companion business," what

19    falls within that definition?

20        A.    The package policies that would be thrown

21    off by the movie productions financed.  Another

22    argument was that we would have to -- we wouldn't

23    need to take much net risk.

24        Q.    Let me just stop you there on the net risk.

25    When you say little net risk, would that mean because

1    there was a significant amount of reinsurance

2    purchased for the risk?

3        A.    There was a significant amount of

4    reinsurance available.

5        Q.    Available.  Which could be purchased?

6        A.    Yes.

7        Q.    Okay.  What other arguments did he make?

8        A.    That statistical information that had been

9    provided indicated that this was a reasonable risk to

10   undertake.

11       Q.    Okay.  Any others that you can think of?

12       A.    (Moves head side to side.)

13       Q.    Okay.  And what did you do with -- this was

14   a written report, I take it?

15       A.    Uh-huh.

16            MR. KLINE:  Can I take a quick break?

17            MR. BANNIGAN:  Sure.

18   (Break was taken from 9:32 a.m. to 9:39 a.m.)

19       Q.    (BY MR. BANNIGAN)  Let me go back to your

20   testimony earlier.  You said that, in 1998, you

21   conducted an audit of Peter's book?

22       A.    (Moves head up and down.)

23       Q.    Do you remember when in 1998 you did that?

24       A.    It was early in the year.  It was probably

25   February, something like that.

1    Q.    Okay.  And when you concluded doing the

2    audit, was there some writing that you generated?

3    A.    Yes.

4    Q.    And it was at that point that you went and

5    saw Peter?

6    A.    (Moves head up and down.)

7    Q.    To discuss what your findings were?

8    A.    Uh-huh.

9    Q.    Okay.

10    MR. BANNIGAN:  All right.  Just so I

11    don't forget.  There have been three documents now

12    mentioned, none of which I've seen, although they've

13    all been asked for:  Peter Gumbrecht's business plan,

14    the audit that's just been testified to, and my

15    recollection is there was one other document.  It

16    will come to me.  And so I'm making a request for all

17    three of those documents.

18    MR. COTTON:  We'll take it under

19    advisement and be in touch.

20    MR. BANNIGAN:  That's fine.  Having

21    regard for the outstanding request, that's sort of

22    being complied with at a snail's pace.

23    Q.    (BY MR. BANNIGAN)  Aside from coming upon

24    this GAP business in your audit, were there any other

25    risks that were being written which, in your view,

1     were not authorized?

2          A.    No.

3          Q.    Okay.

4                MR. COTTON:  Could I belatedly -- when

5     you say "not authorized," can you define what you

6     mean by "not authorized"?

7                MR. BANNIGAN:  Sure.

8          Q.    (BY MR. BANNIGAN)  Earlier, before we took

9     the break, you testified that Peter was not

10    authorized to write GAP business.

11         A.    (Moves head up and down.)

12         Q.    What did you mean by not authorized to

13    write GAP business?

14         A.    Well, he wasn't specifically precluded from

15    writing it, because we weren't aware that it existed.

16    And we would have expected that something of that

17    nature, you know, would have been discussed at some

18    length.  As I asked Peter to do belatedly, give me a

19    business case as to why we should write it, and I'll

20    run it up the flagpole and see if senior management

21    agrees that this is a product that we can undertake.

22         Q.    Okay.  Now, let me just go back now to

23    Mr. Cotton's inquiry.  Were there other lines of

24    business that Peter was writing which were not

25    specifically authorized that you discovered for the

1/25/2005  2:24 PM

8/26/2001  Murphy, Thomas

1    first time when you did this audit?

2    A.    Not at that audit.

3    Q.    At some point in time, were there other

4    lines of business that you discovered that Peter was

5    writing which were not specifically authorized?

6    A.    Yes.

7    Q.    When was that?

8    A.    Later in the year.

9    Q.    Later in '98?

10    A.    Yeah.

11         MR. BANNIGAN:  Before I explore that,

12    I do remember what the third document was.  That was

13    Peter Gumbrecht's explanation as to why the company

14    should be writing GAP business.  And I'm making a

15    specific request for that also.

16         MR. COTTON:  Okay.

17         MR. BANNIGAN:  And I'd truly like that

18    document before next week, since we'll be meeting

19    Mr. Gumbrecht at that time.

20         MR. COTTON:  Okay.

21    Q.    (BY MR. BANNIGAN)  Now, jumping forward

22    later into 1998, what was the -- what was the other

23    or other lines of business that you discovered that

24    Peter had been writing which were not specifically

25    authorized?

1       A.    There was an insurance for bonuses for

2   sports teams.

3       Q.    Okay.  Anything else besides that?

4       A.    No.

5       Q.    Okay.  After you did your audit, after you

6   had your conversation with Mr. Gumbrecht, and after

7   he prepared his explanation as to why the company

8   should be writing this business, what's the next

9   thing you did in connection with that business?

10      A.    Well, at the time I did the audit and at

11  the time I had the discussion with Peter, I said, We

12  don't write any more of these.

13      Q.    You stopped writing them?

14      A.    Yes.

15      Q.    You gave him directions to stop writing the

16  business?

17      A.    Correct.

18      Q.    And that would have been still early in

19  '98?

20      A.    Yes.

21      Q.    Okay.  And you gave him directions to stop

22  writing it.  What happened next with respect to GAP

23  business, if anything?

24      A.    We went through a period of time where he

25  was preparing that position paper and discussing it

1    with other people in the AIG organization.

2         Q.    Okay.   So in this interim period, while he

3    was preparing his response to your audit, he was

4    under directions that the -- withdrawn.

5              Let me just get this clear.   What was the

6    particular organization name that he was working out

7    of in London?

8         A.    AIG Europe.

9         Q.    AIG Europe U.K.?

10        A.    I believe that's the brand mark they went

11   by, AIG Europe U.K.

12        Q.    So after the audit, AIG U.K. was under

13   directions not to write any more GAP film financing

14   insurance until there was, A, a response by Peter

15   and, then, further directions from the company?

16        A.    Uh-huh.   I'm sorry.   Yes.

17        Q.    Okay.   How long a period of time elapsed

18   from your direction to Peter not to continue to write

19   the business until he prepared his report?

20        A.    I would say two months, three months.

21        Q.    Two months?

22        A.    Uh-huh.

23        Q.    Okay.   And that would have been -- I'm just

24   trying to get the times down.   I know the documents

25   will tell us the times.   But we're still in early

1   '98, the first half of '98, you think?

2     A. Closer to midyear at that point.

3     Q. Midyear would be his report?

4     A. (Moves head up and down.)

5     Q. Okay.  When he got his report -- withdrawn.

6     When you got his report, what's the next

7 thing that happened?

8     A. I shared it with the responsible parties in

9 the organization.

10    Q. Do they have names?

11    A. Joe Smetna.

12    Q. Joe?

13    A. Yes.  S-m-e-t-n-a.

14    Q. And who was he?

15    A. The president of commercial lines division.

16    Q. Okay.  Who else did you share it with?

17    A. Bob Lewis, Bob Lewis.

18    Q. Lewis?  And who was Mr. Lewis?

19    A. The chief credit officer of AIG.

20    Q. Okay.  Anyone else?

21    A. At that point, that was, I believe, it.

22    Q. Okay.  When you say you shared it with

23 them, you gave them copies?

24    A. Yes.

25    Q. And at some point, did you discuss the

1/25/2005  2:24 PM

1    contents of the report with them?

2        A.    Yes.

3        Q.    Okay.  And was this on a one-on-one with

4    each of them, or was it in a meeting?

5        A.    One on one with each of them.

6        Q.    Okay.  With respect to -- I'll never get

7    this pronunciation right.

8        A.    Smetna.

9        Q.    Smetna.

10       A.    Just as it's spelled.

11       Q.    Okay.  What did you and Mr. Smetna discuss

12   about the report?

13       A.    Well, this was an area that was beyond our

14   expertise and was very much a financial arrangement,

15   not a traditional insurance arrangement.  And we were

16   deferring to someone we saw as our financial -- a

17   financial resource, which was Bob Lewis.

18       Q.    Okay.  So did you and Mr. Smetna then go

19   speak to Mr. Lewis?

20       A.    I went -- I spoke to him over the phone

21   after having sent him the report.

22       Q.    Okay.  Let me just step back.  When you and

23   Mr. Smetna came to a conclusion that this product was

24   beyond your specific expertise, was this simply an

25   oral conversation?

1       A.   Yes.

2       Q.   Was there any writing between you and

3  Mr. Smetna where this was spelled out?

4       A.   No, I don't believe so.

5       Q.   Okay.  All right.  You went then to

6  Mr. Lewis?

7       A.   (Moves head up and down.)

8       Q.   Okay.  And you and Mr. Lewis talked about

9  this product, correct?

10      A.   Yes.

11      Q.   And Mr. Gumbrecht's report?

12      A.   Yes.

13      Q.   And your audit?

14      A.   Yes.

15      Q.   And would you tell us what you said to

16 Mr. Lewis and what Mr. Lewis said to you about those

17 documents?

18      A.   We discussed the arguments that Peter made,

19 and basically not persuaded at that point that it was

20 a viable product, and Peter was asked to provide some

21 additional information.

22      Q.   And what was it about Peter's original

23 report that failed to persuade you?

24      A.   Me personally?

25      Q.   We'll start there, and then we'll go to

1     Mr. Lewis.   That's okay.

2          A.    Well, the whole thing, on its face, you

3     know, raises a lot of concerns.   I mean, you're

4     talking about -- when you strip away a lot of the

5     insurance language, you're talking about eventually

6     backing Hollywood films, which didn't strike me as

7     being --

8          Q.    You said "the language."   Now, you're

9     talking about the language of the policies?

10         A.    Well, for example, terming the whole thing

11    contingent extra expense.   That's what I was

12    referring to.

13         Q.    Okay.  Those are labels.  By the time you

14    had an opportunity to digest Mr. Gumbrecht's initial

15    report and speak to Mr. Lewis, had you had an

16    opportunity to look at any policies that fall within

17    the broad definition of GAP film finance insurance?

18         A.    Well, before looking at policies, you

19    determine whether the general idea makes sense.   And

20    we were at that stage.

21         Q.    Okay.

22         A.    Policy language is the last thing in the

23    chain, you know, when you're putting out an insurance

24    product.

25         Q.    All right.   Well, what was it that was

1    causing you some concern, the concept of the

2    insurance?

3         A.    Yes.

4         Q.    All right.  What was it about the concept

5    of this type insurance that caused you a concern?

6         A.    I'm more comfortable with insurance

7    products that has, as a loss trigger, a fortuitous

8    event that is outside the control of the insured.

9         Q.    Okay.  And how did GAP film finance

10   insurance, as you understood it at that time, depart

11   from those aspects of more traditional insurance that

12   you were comfortable with?

13        A.    It involved guaranteeing loans, which were,

14   in turn, based upon the income stream from Hollywood

15   productions, a notoriously chancy venture.  And

16   Hollywood accountants are also famous for their

17   creativity.

18        Q.    Now, was this something you were aware of

19   about Hollywood accountants before --

20        A.    Just a general perception, having read the

21   newspapers and --

22        Q.    Okay.  And the, quote, chanciness of films,

23   was something you were aware of --

24        A.    From the same source.  When you read any

25   newspaper and you see how many movie studios are in

8/28/2001  Murphy, Thomas

1    difficulty over the unexpected failure of a surefire

2    hit.

3        Q.   So, to you, these two aspects of risk were

4    common knowledge?

5        A.   Yes.

6        Q.   Okay.  Now, you said that these were

7    guaranteeing loans.  Now, guaranty insurance is not

8    unusual, is it?

9        A.   My background doesn't include it.

10       Q.   The type of casualty business that you had

11   principally been associated with did not write

12   financial guaranty insurance?

13       A.   Correct.

14       Q.   But you are aware that financial guaranty

15   insurance is an insurance product that's sold by

16   certain types of insurance companies?

17       A.   That's about the extent of my knowledge.

18       Q.   Okay.  But when you understood the concept

19   here and had concerns about it, was that one of the

20   concerns that you had, that this was a form of

21   financial guaranty --

22       A.   Yes.

23       Q.   -- that you had no familiarity with?

24       A.   Yes.

25       Q.   Okay.  Now, you said that after you had an

1/25/2005  2:24 PM

1    opportunity to meet with Mr. Lewis and review

2    Mr. Gumbrecht's first report, in order to address

3    other concerns that you had, you asked Mr. Gumbrecht

4    to supplement that report; is that right?

5        A.    Yes.

6        Q.    Okay.  Do you remember any specific

7    concerns that you and Mr. Lewis had that you wanted

8    Mr. Gumbrecht to address, as opposed to the concept

9    itself?

10        A.    I believe one was more statistical data,

11    which Peter was going back to obtain.

12        Q.    In other words, you wanted him to collect

13    and provide you with some statistical data?

14        A.    Yes.

15        Q.    And would that be data relating to loss

16    history?

17        A.    In the sense of this product, yes.

18        Q.    Anything else, any other type of data,

19    besides data relating to the loss experience of this

20    product?

21        A.    No.

22        Q.    Okay.  Did you -- let me go back to

23    Mr. Lewis again.  When you and Mr. Lewis were

24    discussing Mr. Gumbrecht's initial report, did either

25    you or he generate any reports or documents or

1/25/2005  2:24 PM

8/28/2001 Murphy, Thomas

1    memoranda which incorporated, in any way, the subject

2    matter of your discussion?

3        A.    There were E-mails.

4        Q.    Between you and Mr. Lewis?

5        A.    And Mr. Gumbrecht.

6        Q.    And Mr. Gumbrecht.

7                MR. BANNIGAN:    Stuart, we request the

8    E-mails.

9        Q.    (BY MR. BANNIGAN)    Were there any other

10    individuals in this E-mail triangle, besides you,

11    Lewis, and Gumbrecht?

12        A.    Typically, you know, other parties would be

13    carbon copied.

14        Q.    Who were the typical carbon copies on these

15    E-mails?

16        A.    Probably Joe Smetna.

17        Q.    Okay.

18        A.    Probably Nick Walsh.

19        Q.    Who was Mr. Walsh?

20        A.    He ran the U.K. in Europe for AIG -- for

21    AIU, technically, even though they use AIG in the

22    trademark, so you can see why it gets very confusing.

23        Q.    Where was Mr. Walsh located?

24        A.    London.

25        Q.    He was in London?

1/25/2005 2:24 PM

1    A.    (Moves head up and down.)

2    Q.    Did you have occasion to ask Mr. Walsh

3    whether he was aware that Mr. Gumbrecht was writing

4    this kind of business?

5    A.    He would become aware through me.

6    Q.    Okay.  Is that because of the reporting

7    lines?

8    A.    His function was as a general manager, not

9    as an underwriting manager.

10    Q.    Okay.  So Mr. Gumbrecht, in respect of

11    underwriting managers, reported to you?

12    A.    Yes.

13    Q.    With respect to office management, things

14    of that nature, he would deal with Mr. Walsh?

15    A.    Yes.

16    Q.    Okay.  Now, at the time that you conducted

17    your audit, was Mr. Gumbrecht still in London?

18    A.    Yes.

19    Q.    Okay.  Now, at some point in time, he moved

20    to Paris; is that correct?

21    A.    Yes.

22    Q.    Now, after you -- excuse me -- after you

23    and Mr. Lewis asked Mr. Gumbrecht to supplement his

24    report, what's the next thing that happened with

25    respect to the GAP business?  Let me rephrase it.

1/25/2005  2:24 PM

8/28/2001 - Murphy, Thomas

1       While he was in the process -- withdrawn.

2       While he was under directions to supplement

3   his report, was the directive not to write any

4   additional GAP business still in place?

5       A.   Yes.

6       Q.   Okay.  And did Mr. Gumbrecht, at your

7   request, provide you with supplemental information?

8       A.   Yes, eventually.

9       Q.   And did he do that in writing?

10      A.   Yes.

11           MR. BANNIGAN:  We call for it, Stuart.

12      Q.   (BY MR. BANNIGAN)  And what was the form of

13   the writing?

14           MR. COTTON:  Can I just hear those two

15   questions?  I want to make sure I have the question.

16           MR. BANNIGAN:  It's a supplemental

17   report prepared by Mr. Gumbrecht.

18           MR. COTTON:  Got you.

19           MR. BANNIGAN:  And just -- we'll see

20   if we can clarify it.

21      Q.   (BY MR. BANNIGAN)  Was it one report or a

22   series of reports?

23      A.   I believe it was one that was talking about

24   statistics, you know, supporting the --

25      Q.   Do you recall when it was in 1998 -- if it

1   was still in 1998 -- that he provided this document

2   to you?

3        A.   It was, I believe, definitely in the summer

4   at that point.

5        Q.   Summer of '98?

6        A.   Yeah, it was after -- after the turn of the

7   year, after the half year.

8        Q.   You say "turn of the year," you mean fiscal

9   year?

10       A.   No.  I mean after July.  It was August,

11  September.

12       Q.   Okay.  All right.  Now, was this report a

13  paper report or an electronic report?

14       A.   We typically communicate electronically.

15       Q.   So this would have been an attachment to an

16  E-mail?

17       A.   Yes.

18       Q.   And when this report -- withdrawn.

19            Was this E-mail copied to the same people

20  that the other E-mails on this subject had been

21  copied to, that is, you and Mr. Walsh, Mr. Lewis?

22       A.   I would expect.

23       Q.   Okay.  At any point when you were

24  conducting this -- withdrawn.

25            During the period of time that Peter was in

1    the process of preparing both reports, did you

2    communicate your concerns -- this is a yes or no

3    question -- with any attorneys inside the AIG

4    organization?

5        A.   No.

6        Q.   Okay.  All right.  After Peter generated

7    his supplemental report -- we'll call it a

8    statistical report -- what's the next thing that

9    happened at your end with respect to this GAP

10   business?

11       A.   Nothing.

12       Q.   Nothing happened.  What did you do with the

13   report when you got it?

14       A.   Gave it to Mr. Lewis.

15       Q.   Okay.  Did you and he discuss it?

16       A.   He was still unpersuaded.

17       Q.   He was still unpersuaded.  Okay.  And what

18   did you do -- withdrawn.

19            Were you still unpersuaded?

20       A.   Yes.

21       Q.   Principally relying on Mr. Lewis's

22   expertise?

23       A.   Yes.

24       Q.   Principally relying on Mr. Lewis's

25   expertise?

8/28/2001  Murphy, Thomas

1    A.    Yes.

2    Q.    Now, at that point, what, if anything, did

3  you do?  Did you report to anybody else in the

4  organization?

5    A.    There was nothing to do because, to my

6  knowledge, we weren't writing it.

7    Q.    Okay.  Did you communicate back to Peter

8  after you received his supplemental report that your

9  direction not to write further risks of this nature

10  would continue?

11    A.    Yes.

12    Q.    Unless you changed your mind?

13    A.    (Moves head up and down.)

14    Q.    Okay.  Did you -- withdrawn.

15        When Peter gave you his -- withdraw that.

16        When you did your audit, I think you said

17  that you found one document which indicated to you

18  that this type of business was being written?

19    A.    (Moves head up and down.)

20    Q.    When you brought your concern to Peter, did

21  you learn that more than one risk had been written?

22    A.    Yes.

23    Q.    And did you learn the extent of the

24  underwritings when you brought your concern to Peter?

25    A.    I learned what Peter was willing to tell me