1    at the time.

2        Q.    What did he tell you?

3        A.    That we had maybe a half a dozen risks and

4    that the amount of premium involved was very low and

5    the amount of limits exposed was very low.

6        Q.    Did you discuss whether there was any

7    reinsurance protection in place for those risks?

8        A.    Yes.

9        Q.    And what did you find out on that score?

10       A.    I was told and was given an exhibit, a

11   spreadsheet, that identified the half dozen risks and

12   the written premium and the net limits exposed.

13       Q.    Do you have any knowledge -- withdrawn.

14            Were you aware that there was in place,

15   during this period of time, a quota-share treaty

16   protecting the entertainment business that was being

17   written in Mr. Gumbrecht's operation?

18       A.    Yes.

19       Q.    And do you recall, as you sit here today,

20   who the quota-share reinsurer was?

21       A.    There were a number of reinsurers.

22       Q.    Was AXA Re one of the reinsurers?

23       A.    I believe they were.

24       Q.    Who had arranged that quota-share treaty,

25   to your knowledge?

1    A.   As in all treaties, it's a collaboration

2    between the profit center manager -- in this case,

3    Peter -- working with our reinsurance department.

4    Q.   Was Peter the profit center manager for

5    entertainment risks being written out of AIG Europe

6    U.K.?

7    A.   Yes.

8    Q.   Okay.   In the normal course, if Peter was

9    arranging a treaty of reinsurance to protect that

10   business, would you be informed of that?

11   A.   Yes.

12   Q.   And as part of the process of informing you

13   of that, would there be some description of what the

14   business was that was being written and being

15   reinsured?

16   A.   Yes.

17   Q.   And given the fact that this quota-share

18   reinsurance treaty was in place, what did you

19   understand the business to be that was being

20   reinsured at the time the reinsurance treaty was

21   placed?

22   A.   The production packages, the prize

23   indemnity, the event liability, and the prize

24   indemnity.

25   Q.   And did you come to that understanding

8/28/2001 Murphy, Thomas

1    because there was some writing which described those

2    businesses and the extent of the exposures that was

3    to be presented to a potential reinsurer?

4        A.   Yes.  There is -- a submission typically is

5    given to the reinsurers.

6        Q.   And did this submission -- withdrawn.

7             I take it this submission said nothing

8    about GAP film finance business?

9        A.   I don't believe it did.

10       Q.   Okay.  Do you know when it was that this

11   treaty was originally placed?

12       A.   I believe it would have been -- I don't

13   recall if it was January of '96 or one of the early

14   months of '96.  It may actually have started in '95.

15       Q.   Before you came on board?

16       A.   Uh-huh.

17       Q.   Okay.

18       A.   Yes.

19             THE WITNESS:  I'm working on it.

20       Q.   (BY MR. BANNIGAN)  If it was placed in

21   1995, at that time, Peter wasn't writing GAP film

22   finance business, correct?

23       A.   I've subsequently discovered that.

24       Q.   Excuse me?

25       A.   I've subsequently discovered that.

6/28/2001 **Murphy, Thomas**

1    Q.    Well, I'm just asking you based on what
2    you've already testified to, that as far as you were
3    aware, when he was in the U.S., he was not writing
4    it.  And you were on board and he was on board, both
5    working in the U.S. for a while before he went to
6    London, correct?

7    A.    For very short span of time, correct.

8    Q.    Okay.  But it wasn't until he went to
9    London, according to your understanding, that he
10   began to write film finance risks, correct?

11   A.    I believe so, yes.

12   Q.    Well, you've not seen any evidence to
13   suggest otherwise, have you?

14   A.    No.

15   Q.    So at the time the treaty was placed -- on
16   the assumption that it was placed in 1995 -- there
17   wasn't any disclosure to be made about film finance
18   insurance, correct?

19   A.    Correct.

20   Q.    Now, the treaty was renewed, however,
21   correct?

22   A.    Yes.

23   Q.    And they're usually renewed annually, these
24   types of treaties?

25   A.    It depends.  This one was.

1      Q.   In the renewal, is there usually a

2   submission as to the state of the business being

3   written at the time?

4      A.   Yes.

5      Q.   And were those presented to you before they

6   were shown to the reinsurer?

7      A.   Yes.

8      Q.   And it's your recollection that none of

9   those renewal presentations contained any reference

10   to GAP film financing?

11      A.   Correct.

12      Q.   Okay.  At any time before you left AIG --

13   AIU, did you ever go back to look at those --

14   withdrawn.

15         At any time before you left AIU, but after

16   you discovered that Peter had been writing this

17   business, did you ever go back and look at any of the

18   presentations that were made to the reinsurers to see

19   whether the subject matter of this business was

20   contained in those proposals?

21      A.   No, because I was reasonably sure it

22   wasn't.

23      Q.   Based on your recollection of having seen

24   them in the beginning?

25      A.   Yes.

1          Q.    Now, I think we established -- if we
2     didn't, let me do it now -- this was a quota-share
3     reinsurance treaty?
4          A.    Yes.
5          Q.    And do you remember what the percentages
6     were under the treaty; that is, what percentage of
7     any particular risk that was written was retained by
8     the company for whom AIU -- Mr. Gumbrecht was writing
9     for?
10         A.    If you want to rely upon a recollection --
11         Q.    Yeah, that's fine.
12         A.    -- I'm not sure it's accurate.  I think it
13    was 25 percent of the first 10 million.
14         Q.    Okay.
15              MR. BANNIGAN:  Since we don't want to
16    rely on your recollection, Stuart, I'm asking for the
17    treaty, as well as all of its renewals.
18              MR. COTTON:  Okay.  To help me as I
19    take it this under advisement with the others, could
20    you tell me --
21              MR. BANNIGAN:  Excuse me?
22              MR. COTTON:  Could you tell me its
23    relevance?
24              MR. BANNIGAN:  Yes, because when you
25    make a presentation to a reinsurer, just as you do

8/28/2001 Murphy, Thomas

1    when you make a presentation to a direct insurer,

2    there is a duty to inform the company of the nature

3    of the business you're asking to reinsure.  That

4    would necessarily include the company's understanding

5    of what they're doing about GAP business prior to the

6    writing of the Litto risk, which is the demarcation

7    point for discovery on this subject.

8        Q.    (BY MR. BANNIGAN)  Who put together the

9    presentation to the reinsurers for this quota-share

10   treaty?

11       A.    Peter.

12       Q.    And were you the only person at AIU that

13   reviewed it before it went to the organization within

14   the AIG empire that arranged reinsurance?

15       A.    Yes.

16       Q.    Do you remember who -- withdrawn.

17            Was there a specific individual in that

18   part of the AIG empire that dealt with this

19   particular quota-share reinsurance treaty?

20       A.    Yes.

21       Q.    Who is that?

22       A.    Wayne Bookalill.

23       Q.    Could you spell his last name?  B-o --

24       A.    B-o-o-k --

25       Q.    Okay.  That's easy.

1          A.    -- a-l-i-l-1, I believe.  By the way, for

2     the record, it was Julie Hespy (phonetic) that was

3     the environmental manager that worked for me for two

4     years.

5          Q.    Okay.

6          A.    So I can sleep tonight.

7          Q.    All right.  When you discovered --

8     withdrawn.

9               Subsequent to your discovery that

10    Mr. Gumbrecht was writing GAP financial insurance --

11    withdrawn -- GAP film financial insurance, did you

12    ever have a discussion with this gentleman in the

13    reinsurance arm of AIG about the fact that that

14    business was being written and, at least notionally,

15    should have been included in the treaty?

16                    THE REPORTER:  At least -- what was

17    that?

18                    MR. BANNIGAN:  I'll rephrase it.

19         Q.    (BY MR. BANNIGAN)  Did you ever have a

20    discussion with Mr. -- how did you pronounce the

21    name?

22         A.    Bookalill?

23         Q.    -- yes, Mr. Bookalill about GAP film

24    finance insurance?

25         A.    No.

1          Q.    Did you ever have a discussion with anybody

2     in the reinsurance segment of AIG about that type of

3     insurance?

4          A.    No.

5          Q.    Now, did you -- withdrawn.

6                After you received the supplemental report

7     from Mr. Gumbrecht and advised him that the

8     prohibition against writing this insurance was

9     continuing, to your knowledge, were there subsequent

10    GAP risks written?

11         A.    To my knowledge, at what point in time?

12         Q.    Anytime after you gave your first direction

13    to Mr. Gumbrecht not to write any additional GAP film

14    finance insurance risks?

15         A.    Yes.

16         Q.    You found out that there were additional

17    risks written?

18         A.    Yes.

19         Q.    When did you discover that?

20         A.    At the point of Peter's departure.

21         Q.    Departure from London to Paris or departure

22    from Paris to another form of employment?

23         A.    From Paris to another form of employment.

24         Q.    And how did you come to discover that

25    additional GAP film finance risks were written after

1    your direction that that should not occur?

2        A.    I had repeatedly asked Peter for updates on

3    the amount of policies that we had on the books that

4    wrote this type of coverage.  I was not satisfied

5    with the responses and continued to press and finally

6    went over there.

7        Q.    I'm sorry.  Continued?

8        A.    To press, and finally went over there to,

9    among other things, to see for myself exactly how

10   many we had.

11           MR. COTTON:  Could you read the

12   question and answer back for me, please?

13           (Requested portion was read.)

14       Q.    (BY MR. BANNIGAN)  Okay.  You say you

15   weren't satisfied with the responses.  In what

16   respect were you dissatisfied?

17       A.    There seemed to be a continual delay in

18   getting me a simple exhibit.

19       Q.    In other words, you weren't getting a

20   response?

21       A.    Yes.

22       Q.    And when was it that you decided that you

23   would personally go over to determine the number of

24   risks that were written?

25       A.    October.

1          Q.   Of?

2          A.   '98.

3          Q.   Of 1998?   And did you go to London

4    initially?

5          A.   Yes.

6          Q.   Okay.   And you did an audit of sorts?

7    Withdrawn.

8               You did -- you engaged in some exercise to

9    determine the number of GAP financial risks that had

10   been written during the period of time that

11   Mr. Gumbrecht was with AIU, located in London?

12         A.   Yes.

13         Q.   And what did you discover?

14         A.   That we had a great many more than a half a

15   dozen films with a great deal more premium than

16   originally described and a great deal more limits at

17   risk.

18         Q.   Okay.   And what did you do then, when you

19   found that out?

20         A.   Well, shortly before I found that out,

21   Peter resigned.

22         Q.   Okay.   And what reason, if any, did he give

23   for his resignation?

24         A.   Stress.

25         Q.   Stress?

1      A.   (Moves head up and down.)

2      Q.   What happens when you live in Paris.  And

3   did he have another job opportunity to go to, as far

4   as you were aware of, when he left?

5      A.   No.

6      Q.   He did not have a job or you were not aware

7   of a job?

8      A.   I was not aware of a job.

9      Q.   Did you come to learn that he, in fact, had

10  a job prospect?

11     A.   Yes.

12     Q.   And what was that job prospect?

13     A.   With some company in Los Angeles.

14     Q.   Some company called Destination Films?

15     A.   Yes.

16     Q.   Okay.  Have you spoken to Peter since his

17  departure from the company?

18     A.   No.

19     Q.   Have you tried to speak to Peter since his

20  departure from the company?

21     A.   No.

22     Q.   When you found out that there were a

23  significantly larger number of risks with a

24  significantly larger exposure having been written

25  during Mr. Gumbrecht's tenure, what did you do?

1      A.   Reported it to Joe Smetna, Martin Sullivan,

2  and Tom Tizzio.

3      Q.   And Martin Sullivan, who is he?

4      A.   He was the president of AIU at that time.

5      Q.   And you said we reported, who's the "we"?

6      A.   Well, the raw material for the reports were

7  prepared by staff in London.

8      Q.   What kind of report was prepared?

9      A.   A spreadsheet which --

10     Q.   Showed all the risks?

11     A.   -- lists all the risks, limits, terms,

12  premiums, net risk.

13     Q.   Okay.

14         MR. BANNIGAN:  Stuart, I call for the

15  spreadsheet.  I feel I have no documents from you.

16         MR. COTTON:  As I said, I'll look at

17  all of these.  I make no judgment on the spot, since

18  I am not completely up-to-date on the state of play

19  or the state of requests right now.

20         MR. BANNIGAN:  All right.  I won't

21  debate it with you now.

22     Q.   (BY MR. BANNIGAN)  Aside from the

23  spreadsheet, was there any other document prepared to

24  inform Mr. Sullivan and Mr. --

25      A.   Smetna.

8/28/2001 Murphy, Thomas

1     Q.   -- Smetna and the other people?

2     A.   I believe I had a cover letter --

3     Q.   Okay.

4     A.   -- which, you know, outlined the nature of

5     the risk.

6     Q.   Okay.

7          MR. BANNIGAN:  Just let me have a

8     standing request, Stuart.  Every time the witness

9     mentions a document, I feel certain that I don't have

10    it.  So let it be on the record that I'm making a

11    request for it.

12         MR. COTTON:  I'd like it on the

13    record.

14         MR. BANNIGAN:  Okay.  All right.

15         MR. COTTON:  I recognize certain ones

16    are obvious, but I'm sure he's going to mention a lot

17    of documents.

18         MR. BANNIGAN:  So far he hasn't

19    mentioned one that's not obvious.

20         MR. COTTON:  No.  But the future lies

21    ahead.

22         MR. BANNIGAN:  All right.  Let's go

23    on.

24    Q.   (BY MR. BANNIGAN)  All right.  What

25    happened after you sent the spreadsheet and the

1    statistical -- and your cover letter to these

2    gentlemen with respect to the GAP financial

3    underwritings of Mr. Gumbrecht?

4        A.    It was decided to reinsure the book 100

5    percent.

6        Q.    That was your net line of retained

7    business -- withdrawn.

8              You wanted to get a reinsurance to cover

9    the business that was retained on the books of the

10   companies that Mr. Gumbrecht had been writing for?

11       A.    All the business.

12       Q.    Well, you already had some reinsurance,

13   right?

14       A.    Yes.  But we decided to notify our treaty

15   reinsurers that we had written this business and to

16   take it out of the treaty.

17       Q.    Okay.  So this business was backed out of

18   the quota-share treaty that we discussed earlier?

19       A.    Yes.

20       Q.    Okay.  And how were the quota-share

21   reinsurers notified that that's something that you

22   wanted to do?

23       A.    There was a letter.

24       Q.    Were you the author of the letter?

25       A.    Yes.

1      Q.   Okay.

2            MR. BANNIGAN:  We'd call for the

3  letter.

4      Q.  (BY MR. BANNIGAN)  Was there any

5  information that accompanied the letter, such as the

6  spreadsheet or any other documentation that you're

7  aware of?

8      A.  I don't recall what the -- whether we

9  included the spreadsheet or not.  We discussed the

10  nature of the business and the fact that this is not

11  what we intended to put in the treaty and that we

12  intended to take it out.

13            MR. BANNIGAN:  To the extent that

14  there were any attachments to the letter, Stuart,

15  I'll call for them.

16      Q.  (BY MR. BANNIGAN)  Did you receive any

17  communications back from any of the quota-share

18  reinsurers concerning this decision to back out this

19  business?

20      A.  I believe some of them were concerned about

21  losing the premium.

22      Q.  Well, you say they were concerned.  Did

23  they put that in writing?

24      A.  No.  This came through, you know,

25  word-of-mouth back to the brokers.

8/28/2001 Murphy, Thomas

1    Q.    Can you identify any of the reinsurers that

2    were concerned about losing the premium?

3    A.    I think AXA might be one of them.

4    Q.    AXA?

5              MR. COTTON:  Nobody understands the

6    French.

7    Q.    (BY MR. BANNIGAN)  Were you aware that AXA

8    was writing GAP film finance business itself at this

9    period of time, other than --

10    A.    Yes.

11    Q.    -- other than as your quota-share

12    reinsurer?

13    A.    Yes.

14    Q.    Aside from AXA that was concerned about

15    losing the premium on the quota-share reinsurance

16    treaty, did anybody else express concern about that,

17    any other reinsurer that you remember?

18    A.    I don't recall if there were more than one.

19    There may have been, because there are many

20    reinsurers on a treaty reinsurance contract.

21    Q.    Were there many on that quota-share

22    reinsurance treaty?

23    A.    Yes.

24    Q.    Okay.  Do you remember any others that were

25    on it, besides AXA?

1/25/2005  2:24 PM

1    A.    If I answered, it would be --

2    Q.    Don't guess.

3    A.    -- not reliable, so I don't want to answer

4    that.

5    Q.    I have no doubt we'll see the paper.

6    A.    Right.

7    Q.    Now, when you said you were going to back

8    business out of the treaty, is it correct that the

9    only business you wanted to back out was that

10   business which fell within the broad definition, as

11   we're using it, of GAP film financial business?

12   A.    Yes.

13   Q.    In other words, you weren't going to back

14   out of any other business that was ceded to the

15   quota-share reinsurers?

16   A.    No.

17   Q.    Ultimately, did all of the reinsurers agree

18   to allow you to do that?

19   A.    Yes.

20   Q.    Did they charge anything for allowing you

21   to do that?

22   A.    No.

23   Q.    Was there some proration of the premium?

24   A.    We took back from them the premium that we

25   had ceded to them under the treaty.

1       Q.    And you somehow allocated -- well, I
2    guess -- nevermind -- withdrawn.
3              You took back 100 percent of it?
4       A.    Yes.
5       Q.    Now, that would be 100 percent only on the
6    current year, right?
7       A.    No.
8       Q.    All the way back to inception?
9       A.    Yes.
10      Q.    All right.  And what did you do with this
11   business now that was completely exposed?
12      A.    We reinsured it.
13      Q.    And who did you reinsure it with?
14      A.    GenStar.
15      Q.    GenStar Indemnity?
16      A.    Uh-huh.
17      Q.    And who took the lead at -- within AIG --
18   I'm using that in the broadest possible way -- in
19   arranging the GenStar reinsurance?
20      A.    Tim Green worked with an underwriter in
21   London.
22      Q.    Tim Green.  And Mr. Green was in London, or
23   did he --
24      A.    Yes.
25      Q.    And who did he work with, did you say?

1      A.   An underwriter for GenStar in London.

2      Q.   Do you remember his name?

3      A.   I believe it was Cox.

4      Q.   Cox?

5      A.   (Moves head up and down.)

6      Q.   And what involvement did you have in that
7 exercise?

8      A.   I had -- I placed a call to the president
9 of GenStar.

10     Q.   What was his name?

11     A.   Kevin Brooks.

12     Q.   Brooks?

13     A.   Uh-huh.

14     Q.   Is Mr. Brooks someone you knew --

15     A.   Yes.

16     Q.   -- from other relationships?

17     A.   Yeah.

18     Q.   And what was the purpose of your call to
19 Mr. Brooks?

20     A.   To explain to him the reasons why we were
21 placing this -- making this unusual reinsurance
22 request.

23     Q.   Were you the person who initially
24 approached GenStar?

25     A.   No.

8/28/2001 Murphy, Thomas

1     Q.    Somebody else approached them, and then you

2  were brought in to talk to Mr. Brooks?

3     A.    Yes.

4     Q.    Who had made the initial approach?

5     A.    Tim Green.

6     Q.    In London?

7     A.    Yes.

8     Q.    Did you feel it was necessary to speak to

9  Mr. Brooks in order to effectuate this reinsurance?

10     A.    Yes.

11     Q.    Why?

12     A.    Because it's highly unusual to place a

13  reinsurance of 100 percent of a risk.

14     Q.    Why did you feel it was necessary to place

15  a reinsurance of 100 percent of the risk?

16     A.    Because those were my instructions.

17     Q.    Your instructions from whom?

18     A.    Joe Smetna.

19     Q.    Anybody else?

20     A.    I presume there was a conversation with

21  Martin Sullivan, but that's speculation.

22     Q.    You didn't have any conversation with him?

23     A.    No.

24     Q.    Was Mr. Greenberg involved at all, to your

25  knowledge?

8/28/2001 Murphy, Thomas

1       A.    I have no direct knowledge.

2       Q.    When I say "Greenberg," I mean Evan

3    Greenberg.

4       A.    I have no direct knowledge.  It wouldn't

5    suprise me if he were advised of it.

6       Q.    You had no conversations with Mr. Evan

7    Greenberg about the reinsurance with GenStar?

8       A.    No.

9       Q.    Now, who prepared, if anybody, the

10   presentation package to GenStar so that you could

11   transfer 100 percent of your exposure to them?

12      A.    Tim Green and Rupert Dickson.

13      Q.    Now, Mr. Dickson was an underwriter in

14   London?

15      A.    Yes.

16      Q.    And Mr. Dickson had been a broker before

17   that?

18      A.    Yes.

19      Q.    And, in fact, he had been a broker at C.E.

20   Heath?

21      A.    Yes.

22      Q.    And Mr. Dickson was a man who was familiar

23   with GAP film financial insurance, correct?

24      A.    Yes.

25      Q.    Because he'd actually placed some of it

1    with Mr. Gumbrecht, correct?

2        A.    Yes.

3        Q.    Now, before the presentation was made --

4    withdrawn.

5              Before the written presentation or

6    statistical presentation was made to GenStar, did you

7    review it?  I don't mean detail.  Just did you look

8    at it?

9        A.    Yes.

10       Q.    And just generally, to the extent that you

11   can recall it, what information did it contain?

12       A.    It was a standard London placing slip,

13   along with the spreadsheet which identified every

14   risk.

15       Q.    Was that all that was presented, was the

16   spreadsheet -- I mean, for statistical information?

17       A.    Yes.  Well, the spreadsheet also contained,

18   at that point, any loss information.  There was, at

19   that point, one loss.

20       Q.    Do you remember what risk --

21       A.    No.

22       Q.    -- had produced the loss?

23             MR. BANNIGAN:  Stuart, we call for the

24   presentation, including any attachments.

25       Q.    (BY MR. BANNIGAN)  In your -- how many

1    conversations did you have with Mr. Brooks?

2         A.   One.

3         Q.   Could you tell us what you said to him and

4    what he said to you?

5         A.   I told him that, you know, we were

6    approaching his London office to place this

7    reinsurance and the reasons for it.  We'd gotten into

8    this business; it's not the kind of business we

9    typically write; we're not comfortable with it, and

10   wanted to get rid of it.

11        Q.   What did he say?

12        A.   He understood.

13        Q.   Excuse me?

14        A.   He understood.

15        Q.   He said, I understand?  That's all he said?

16        A.   I don't remember any more specifics of the

17   conversation.

18        Q.   Okay.  Were you involved in the negotiation

19   of the premium for this transfer of 100 percent of

20   the GAP business that had been written?

21        A.   The premium was the premium that we had

22   originally collected for.

23        Q.   It was exactly the same premium?

24        A.   (Moves head up and down.)

25        Q.   There was no increase?

8/28/2001  Murphy, Thomas

```
 1              A.    Correct.

 2              Q.    Now, did you -- was there ever an actual

 3      reinsurance policy that was issued?

 4              A.    Yes.

 5              Q.    Okay.  And do you remember any of the terms

 6      of that policy?

 7              A.    It was the standard form.  I don't remember

 8      the specific terms.

 9              Q.    Were there any, to your knowledge, side

10      agreements, to your knowledge, agreements that were

11      outside of this policy itself between GenStar and --

12      withdraw.  Let me rephrase that.

13              Who was the ceding company for this

14      reinsurance policy?

15              A.    I would expect it would be New Hampshire.

16              Q.    New Hampshire.  Okay.  And were there any

17      side agreements between New Hampshire and GenStar

18      relating to this reinsurance?

19              A.    There was an agreement to engage a risk

20      manager to assist in managing the book and managing

21      any subsequent losses.

22              Q.    And was that risk manager a company called

23      Ice Media?

24              A.    Yes.

25              Q.    And was there a -- withdrawn.
```

1           And was that company engaged to act, in

2     some capacity, as risk manager?

3           A.   Yes.

4           Q.   What understanding did you have, if any, as

5     to what the risk manager was to do in connection with

6     this reinsurance placement?

7           A.   As losses came in --

8           Q.   Uh-huh.

9           A.   -- to analyze those and to see if they

10    passed the credibility test, given the experience of

11    the risk manager.

12          Q.   Okay.  What did you know, if anything,

13    about Ice Media at the time that they were engaged to

14    act as a risk manager in connection with the

15    reinsurance treaty?

16          A.   That they were a company that specialized

17    in, you know, this arena and were very familiar with

18    the players for this business and would have the

19    ability to evaluate, you know, figures that would be

20    given to us as far as revenues generated off of a

21    given production and whether the pieces fit.

22          Q.   Did you make any investigation of the

23    background of Ice Media?

24          A.   Peter did.

25          Q.   Peter?

**8/28/2001  Murphy, Thomas**

1         A.    Gumbrecht.

2         Q.    I thought Mr. Gumbrecht was gone at the

3    time you placed this treaty?

4         A.    Yes.  Our association with Ice Media

5    preceded his departure.

6         Q.    Okay.  So Mr. Gumbrecht had done some

7    investigation of Ice Media while he was writing this

8    business; is that correct?

9         A.    Yes.

10        Q.    Okay.  And how do you know that he actually

11   did some investigation about the expertise, if you

12   will, of Ice Media?

13        A.    His conversations.

14        Q.    Was there anything in his initial report to

15   you dealing with risk managers such as Ice Media?

16        A.    Yes.

17        Q.    Okay.  All right.  Other than that

18   qualification, if you will, of Ice Media to be the

19   risk manager for the reinsurance treaty, was any

20   other investigation done that you're aware of about

21   Ice Media?

22        A.    No.

23        Q.    Do you know whether GenStar did any

24   investigation of Ice Media to determine their

25   qualification for this position?

**8/28/2001  Murphy, Thomas**

```
1          A.    I don't know.

2          Q.    Okay.  Did you ever -- have you ever spoken

3    to anybody from Ice Media?

4          A.    Yes.

5          Q.    Who have you spoken to?

6          A.    Graham Bradstreet.

7          Q.    And what were the circumstances under which

8    you spoke to Mr. Bradstreet?

9          A.    During the course of Peter's effort to

10   educate both myself and Bob Lewis, he encouraged us

11   to come to London and meet with Ice Media.

12         Q.    And you did so?

13         A.    Yes.

14         Q.    And how many times did you have occasion to

15   meet Mr. Bradstreet?

16         A.    Once.

17         Q.    Just that one time?

18         A.    (Moves head up and down.)

19         Q.    And you and Mr. Lewis met him in London --

20   well, you met him in London?

21         A.    Yes.

22         Q.    Was Mr. Lewis with you?

23         A.    No.

24         Q.    Was anybody with you?

25         A.    Peter.
```

**8/28/2001  Murphy, Thomas**

```
 1          Q.   Where did you meet Mr. Bradstreet?

 2          A.   At their offices.

 3          Q.   At Ice Media's offices?

 4          A.   Yes.

 5          Q.   And how long a meeting did you have with

 6     him?

 7          A.   Two hours.

 8          Q.   Did you make any notes during that meeting?

 9          A.   Probably.

10          Q.   It's your custom to make notes when you

11     have meetings of some significance?

12          A.   Yes.

13          Q.   What do you generally do with -- this is

14     general now, not necessarily that.  What do you

15     generally do with your notes of meetings on matters

16     of some significance?

17          A.   Throw them in a correspondence file.

18          Q.   Okay.  And to the extent that you took

19     notes during your meeting with Mr. Bradstreet, do you

20     have any reason to believe that you departed from

21     your normal practice of throwing them in the

22     correspondence file?

23          A.   No.

24          Q.   So if you took notes, would they be in that

25     file, as far as you know?
```

1          A.    They should be.

2          Q.    Okay.

3                MR. BANNIGAN:  We call for the

4    correspondence file, including any notes that

5    Mr. Murphy took during his meeting with

6    Mr. Bradstreet.

7          Q.    (BY MR. BANNIGAN)  When you met with Mr. --

8    how do you pronounce it?

9          A.    Smetna.

10         Q.    -- Smetna, did you take notes during that

11   meeting?

12         A.    No.

13         Q.    When you met with Mr. Lewis the first time,

14   did you take any notes?

15         A.    No.

16         Q.    When you had your first conversation with

17   Peter about your audit, did you take any notes?

18         A.    No.

19         Q.    Is the only occasion that you recall taking

20   notes in respect to GAP film finance business your

21   meeting with Mr. Bradstreet?

22         A.    I would expect there were other occasions.

23         Q.    And those notes would be in the

24   correspondence file?

25         A.    (Moves head up and down.)

1          MR. BANNIGAN:  We'd call for them.

2          Q.   (BY MR. BANNIGAN)  Someday maybe we'll see

3     those notes, but we may not.  So why don't you tell

4     me what you said to Mr. Bradstreet and what

5     Mr. Bradstreet said to you, to the extent that you

6     can recall it?

7          A.   He basically explained, you know, the

8     income streams available for the product of Hollywood

9     these days, whether it's television or movies or

10    whatever, and the different distribution income

11    streams, whether it's movies or tapes, rentals or

12    syndication, and movie distribution, both in the U.S.

13    and outside the U.S.

14         Q.   During the course of your meeting with

15    Mr. Bradstreet, did he provide you with any

16    documentation of any kind to corroborate or

17    substantiate, validate the things he was telling you?

18         A.   There was a presentation that described

19    some of the terms and who the parties were in the

20    financial arrangement.

21         Q.   And consistent with your practice with your

22    notes, would that presentation have also found its

23    way into the file that you maintained on this matter?

24         A.   Yes.

25         MR. BANNIGAN:  Call for the production

1    of that presentation.  Let me just take a couple of

2    minutes.

3        (Break was taken from 10:38 a.m. to 10:44 a.m.)

4        Q.   (BY MR. BANNIGAN)  Now, the reinsurance

5    with GenStar, approximately when was that placed, at

6    the end of '98?

7        A.    Early '99.  It was like January '99, I

8    think.

9        Q.    And when was it that you left AIG?

10       A.    The end of '99.

11       Q.    December-ish?

12       A.    Yeah.

13       Q.    Between early 1999, when the business was

14   placed with GenStar, and the time you left in the

15   last part of 1999, did you have any occasion to

16   devote any time to the GAP film finance insurance

17   that had been ceded to GenStar?

18       A.    Yes.

19       Q.    And what activities did you find yourself

20   engaged in in that respect?

21       A.    It was reported to me that we were late in

22   paying some of the premiums and that communication

23   with our claims department was not what it should be

24   between ourselves and GenStar, so I got involved to

25   be sure that those issues were cleared up.

**8/28/2001  Murphy, Thomas**

```
 1        Q.   Okay.  The late payment of premium,

 2   wasn't -- was the premium paid all at once on this,

 3   or was it to be paid all at once?

 4        A.   The bulk of it was paid.  But as not all

 5   the business had given us premium yet, it was only

 6   when we got the premium that we would give it to the

 7   reinsurers, so there was still premium in the

 8   pipeline.

 9        Q.   Under this particular reinsurance treaty,

10   was there any adjustment to the premium depending on

11   loss experience going forward?

12        A.   No.

13        Q.   Was the -- was this reinsurance a onetime

14   premium payment insurance?

15        A.   Other than what I just explained, yes.

16        Q.   It was?  Okay.  Now, you said that there

17   were some communication problems with the claims

18   department?

19        A.   Yes.

20        Q.   What was the nature of the problem?

21        A.   Some of our claims people were adjusting

22   claims as they normally do, you know, as they

23   normally would for any insurance policy, whereas, in

24   this case, they needed to be communicating with the

25   reinsurer on a much closer basis than normal.
```

**8/28/2001  Murphy, Thomas**

1      Q.    Was there a cooperation clause of some sort

2   in the reinsurance treaty which required a greater

3   cooperation between the ceding company and the

4   reinsurer than would normally be the case?

5      A.    I believe there may have been claim

6   reporting stipulations in the contract.

7      Q.    During the period of time -- well, did you

8   resolve those problems?

9      A.    Yes.

10     Q.    And were there any other problems that came

11  up during the period prior to your leaving with

12  respect to this reinsurance treaty?

13     A.    Just general reconciliation of, you know,

14  do we have all the accounts listed and --

15     Q.    At any period of time prior to your leaving

16  AIG, did you ever learn that GenStar felt that there

17  had not been full and complete disclosure relating to

18  the underlying risks that they were reinsuring?

19     A.    No.  Let me say I guess that would be a

20  matter of degree.

21     Q.    I don't know.  I don't know what was said.

22     A.    No, the same questions that were asked, you

23  could arguably say, you know, are we complying, and I

24  made sure that we were.

25     Q.    Well, what were the questions that were

1    being asked that gave rise to whether there was full

2    and fair disclosure --

3              MR. COTTON:  Could I have --

4        Q.   (BY MR. BANNIGAN)  -- whether there was

5    full and fair disclosure?

6              MR. COTTON:  I'd like to go back and

7    hear the last series -- let's make it two questions

8    and answers.

9              MR. BANNIGAN:  Sure.

10              (Requested portion was read.)

11              MR. COTTON:  I'm going to move to

12    strike whatever was nonresponsive.

13              MR. BANNIGAN:  I thought it all was

14    responsive.

15              MR. COTTON:  Beyond the "no," I

16    thought none of it was.

17        Q.   (BY MR. BANNIGAN)  When you said --

18    withdrawn.

19              What concerns arose between -- of a nature

20    which related to whether the ceding company was

21    complying, as you used the term "complying" in your

22    answer?

23        A.   Well, on premium payment.

24        Q.   Okay.

25        A.   At one point, GenStar had a number that

1    they thought was the premium, and it didn't agree

2    with the number that we thought was the premium.  And

3    so, depending on how you want to cast that situation,

4    if GenStar's numbers were right, then we would not be

5    in compliance.  If, in fact, they were wrong, then we

6    were.

7         Q.   Okay.  Aside from issues relating to

8    premium, was there any concern expressed to you that

9    GenStar felt that they had not been given all of the

10   details material and relevant to the risks that were

11   being ceded to them?

12        A.   Yes, because there was an issue of the

13   files.  We had told them we'd give them all of our

14   files.

15        Q.   Told them you would give them all your

16   files?

17        A.   Right.  And we had -- because it was, you

18   know, a lot of file material, we had sent it to an

19   outside contractor to copy it and, subsequently,

20   found out that they did a poor job of it as far as

21   mixing up the file contents and damaging some of the

22   files to begin with.  So there was -- and they took a

23   long time.  So there was some concern about getting

24   the files delivered that they had expected sooner.

25        Q.   Was the -- were these problems rectified?

1/25/2005  2:24 PM

**8/28/2001  Murphy, Thomas**

1     A.   Yes.

2     Q.   And was it your responsibility to get these

3  problems rectified?

4     A.   Yes.

5     Q.   Who was the outside contractor that made a

6  botch of the reproduction?

7     A.   I don't recall.  It was done locally in

8  London.

9     Q.   It was done in England?

10     A.   Yeah.

11     Q.   I take it -- let me start again.

12          Were these files that were to be delivered

13  to GenStar to be delivered after it was already

14  agreed by GenStar to write the business?

15     A.   Yes.

16     Q.   So they had -- withdrawn.

17          Is it the case that they agreed to

18  underwrite this business, as far as you know, based

19  solely on the spreadsheet that you mentioned earlier

20  and any other documents that accompanied that

21  spreadsheet and your conversation with Mr. Brooks and

22  Mr. Green's conversations with whoever it was he

23  spoke to?

24     A.   I believe there was a number of

25  conversations that took place in London.

**8/28/2001  Murphy, Thomas**

1          Q.    Between Mr. Green and Mr. Cox?

2          A.    Yes.

3          Q.    Are you privy to the substance of those

4     conversations?

5          A.    Discussing the risks in detail.  I'm not

6     privy to the conversations, no.

7          Q.    Were there any memorandum or documents

8     prepared by Mr. Green concerning his discussions with

9     Mr. Cox that you've ever seen?

10         A.    No.

11         Q.    Do you know whether, prior to the time that

12    you left AIG, there had been a demand by GenStar for

13    arbitration --

14         A.    No.

15         Q.    -- concerning the business that was ceded

16    to them?

17         A.    No.

18         Q.    Have you ever heard that they asked for

19    arbitration of disputes involving this business?

20         A.    No, this is the first I've heard.

21         Q.    I'm not saying it happened.  I'm just

22    asking whether you ever heard it.

23         A.    I just heard it a moment ago.

24              MR. COTTON:  Don't believe him.

25         Q.    (BY MR. BANNIGAN)  Now, Mr. Green, at some

**8/28/2001  Murphy, Thomas**

1    point, came to the United States to work in New York.

2    Am I right?

3        A.    Yes.

4        Q.    When was that?

5        A.    Around midyear '99, I believe.

6        Q.    Midyear of '99.  And that was --

7    Mr. Gumbrecht, now, is gone?

8        A.    Yes.

9        Q.    Now, were you aware that when Mr. Green was

10   located in London, that he had, in fact, underwritten

11   a significant number of GAP film financial risks?

12       A.    No.

13       Q.    You were not aware of that?  You were not

14   aware of that?

15       A.    Right.

16       Q.    Are you aware of that now?

17       A.    Tim's description of events were he signed

18   documents at Peter's direction.

19       Q.    The Nuremberg defense.  Okay.  Let's

20   explore that a little bit.  When did you first learn

21   from Mr. Green that he had -- let me rephrase that.

22           Are you -- you are familiar, I take it,

23   with the practice in London that, when an underwriter

24   accepts a piece of business, one of the ways he does

25   that is to put a scratch on the -- either on the

**8/28/2001  Murphy, Thomas**

```
 1    placing memo or on the line slip or some offering

 2    document?

 3         A.   A scratch?

 4         Q.   Initials.

 5         A.   Oh.

 6         Q.   That's what they call it.  I didn't make it

 7    up.

 8         A.   Oh, I hadn't heard the term before.  The

 9    signed slip is a typical custom.

10         Q.   Right.  Okay.  And they put a stamp down

11    sometimes?

12         A.   Yes.

13         Q.   Okay.  Now, were you aware that Mr. Green

14    had signed or scratched and stamped a number of

15    acceptances of GAP finance film finance businesses?

16              MR. COTTON:  Can we have a time frame

17    of when he was aware?

18              MR. BANNIGAN:  I'm just asking whether

19    he was aware, and then we'll find out when.

20              MR. COTTON:  Ever?

21              MR. BANNIGAN:  Ever, at this point.

22         A.   Yes.

23         Q.   (BY MR. BANNIGAN)  And when did you become

24    aware of that?

25         A.   After the fact.  That would be in 1999.
```

**8/28/2001  Murphy, Thomas**

1        Q.    You were not aware of that, as a result of

2    your audit that preceded -- that was in 1998,

3    correct?

4        A.    Correct.

5        Q.    And you were not aware of that, based on

6    anything that Peter told you in his original response

7    to your audit inquiry, correct?

8        A.    That's correct.

9        Q.    And you were not aware of that as result of

10   any of the subsequent responses that Peter made; is

11   that correct?

12       A.    Correct.

13       Q.    And when you came over to London because

14   your -- because of your dissatisfaction with the

15   follow-up by Mr. Gumbrecht, did you discover that

16   Mr. Green had signed a number of risks?

17       A.    No.

18       Q.    When you came to London to determine the

19   extent to which GAP film finance risks had been

20   written, what documents did you look at to make that

21   determination?

22       A.    Looked at the files.  And this was in '99.

23   I looked through the files in detail.

24       Q.    This was in '99?

25       A.    (Moves head up and down.)

1       Q.   When did Mr. Gumbrecht leave?

2       A.   '98.

3       Q.   Okay.  I thought you had gone over just

4  about the time he left?

5       A.   Yes.  And I wasn't looking at files then.

6  I insisted upon the report.

7       Q.   You were just looking at the spreadsheet?

8       A.   Yes.

9       Q.   That's all you saw?

10      A.   Uh-huh.

11      Q.   You didn't go behind the spreadsheet?

12      A.   Right.

13      Q.   So in 1999, you came back -- was that in

14  connection with the GenStar --

15      A.   Yes.

16      Q.   -- cession?

17      A.   Yes.

18      Q.   And that's when you looked at the files.

19  And when you looked at the files, did you note that

20  there were various documents signed by Mr. Green?

21      A.   Yes.

22      Q.   And that was the first time you discovered

23  that?

24      A.   Yes.

25      Q.   And you had a conversation or more than one

1    conversation with Mr. Green about that?

2        A.   Yes.

3        Q.   Okay.  And the first conversation, what did

4    he -- just tell me the substance of what he said to

5    you and what you said to him when you found his

6    signature on some of these risks.

7        A.   I asked him about it, and he described the

8    fact that he understood that Peter had the authority

9    to do it and he did it per Peter's instruction.

10       Q.   Now, did you understand from that that each

11   specific risk Peter had approved -- withdrawn.

12            Was it your understanding that with respect

13   to each risk on which you found Mr. Green's

14   signature, that Peter Gumbrecht had approved that

15   risk prior to Green's --

16       A.   Yes.

17       Q.   -- signing it?

18       A.   Yes.

19       Q.   Okay.  So it wasn't a general authority

20   that Peter had conferred on these people to sign, it

21   was a per risk specific authority?

22       A.   Yes.

23       Q.   Did you, while you were -- withdrawn.

24            Did you come to meet a gentleman by the

25   name of Filapek (phonetic)?

**8/28/2001  Murphy, Thomas**

```
 1          A.   Yes.

 2          Q.   I think it's Mark Filapek?

 3          A.   Yes.

 4          Q.   And Mr. Filapek was also an underwriter in

 5     AIG Europe U.K. that was writing GAP film finance

 6     risks, right?

 7          A.   He worked for Peter.

 8          Q.   Okay.  When you went through the files, did

 9     you find risks that, in their acceptance, reflected

10     Mr. Filapek's signature?

11          A.   I don't recall.

12          Q.   Did you ever talk to Mr. Filapek about the

13     fact that that office was writing film finance risks?

14          A.   No.

15          Q.   So you had no conversations with Filapek

16     about this type of business?

17          A.   Correct.

18          Q.   Why is that, that you didn't talk to him?

19          A.   The time -- at the point I got involved in

20     it, it was all after the fact.  And Mark was a very

21     new, young underwriter, who didn't do anything other

22     than the specific instruction of Peter and,

23     subsequently, Tim.

24          Q.   He was new in 1999?

25          A.   He was new in -- when did he join us?  In
```

1    1997, maybe.  He was new to the insurance business,

2    and so he was a young underwriter being developed

3    then.

4         Q.    Were you aware that he had worked at

5    another section of the London office, writing risks

6    other than film finance risks?

7         A.    Yes, but he was a very young man.

8         Q.    Okay.

9         A.    He was -- I'm not sure of his college

10   background or where he came out of -- I think he

11   might have come right out of college.

12        Q.    Came right out of college?

13        A.    Well --

14        Q.    Okay.  But you never talked to Mr. Filapek

15   about the film finance business at any time that you

16   can recall?

17        A.    No.

18        Q.    Let me go back to Mr. Green.  When you and

19   Mr. Green had your discussions about the fact that

20   his signature appeared on film finance risks, his

21   explanation to you was that each of those risks had

22   been approved by Mr. Peter Gumbrecht and he had

23   simply signed those at the direction of

24   Mr. Gumbrecht?

25        A.    Yes.

**8/28/2001  Murphy, Thomas**

1        Q.    When Mr. Green was moved -- withdrawn.

2              Did you ever find out that that was not

3    true?

4        A.    No.

5        Q.    I -- let me make sure that we're clear on

6    that, that Mr. Green had written the business because

7    he understood that the office in which he worked was

8    authorized to write that business on behalf of New

9    Hampshire Insurance Company?

10       A.    No.

11             MR. COTTON:  I got to --

12             MR. BANNIGAN:  Sure.

13             MR. COTTON:  I still have a problem

14   with the "authorized."  Are you using it in the same

15   sense as before?  I just don't think that it's clear

16   what is meant.

17             MR. BANNIGAN:  Okay.

18             MR. COTTON:  I'll just leave that on

19   the record, and you can respond or not to it.

20       Q.    (BY MR. BANNIGAN)  As I understand, there

21   was a period of time when you gave Mr. Gumbrecht

22   directions that no further film finance risks should

23   be underwritten, correct?

24       A.    No new.

25       Q.    No new?

1          A.    Yes.

2          Q.    Okay.

3          A.    And it was always the understanding, and

4    Peter affirmed it, that anything that had already

5    been bound --

6          Q.    Sure.

7          A.    -- would be honored.

8          Q.    And if endorsements were necessary, he was

9    authorized to do that also?

10          A.    (Moves head up and down.)

11          Q.    Are you aware that during the period of

12    time, as you've defined the time, in early 1998, when

13    you gave that direction to Mr. Gumbrecht, that

14    Mr. Green underwrote risks of the type that were

15    prohibited by your direction?

16          A.    Yes.  Peter took a very broad view of what

17    it meant that something was already bound,

18    apparently.

19          Q.    What was that view?

20          A.    The way some of these deals were structured

21    were in slates, and there would be Slate 1 for the

22    same cast of characters, Slate 2, Slate 3.  Peter,

23    apparently, construed that if he approved Slate 1 and

24    had bound it, then he was within his purview to also

25    do Slate 2 and Slate 3.

1        Q.    Okay.  So should I understand from that

2    that to the extent that Mr. Green's signature

3    appeared on the GAP film finance risks subsequent to

4    the period of time that you gave your directions to

5    Mr. Gumbrecht that no further new risks should be

6    written, that the risks on which Mr. Green's

7    signature appears are all slate films?

8        A.    I don't know.

9        Q.    Okay.  In any event, at some point,

10   Mr. Green came to the U.S., correct?

11       A.    Yes.

12       Q.    And why did he come to the U.S.?

13       A.    Well, my experience with Peter demonstrated

14   that I needed to have my profit center manager closer

15   to me.

16       Q.    Okay.  So you directed him to move to the

17   U.S.?

18       A.    Yeah.

19       Q.    And let me go back just before Mr. Green

20   came to the U.S.  What was Mr. Green's responsibility

21   in the London office just prior to his being directed

22   to come to the U.S.?

23       A.    He was the new profit center manager for

24   entertainment.  He replaced Peter.

25       Q.    So he took Peter's position?

1      A.    Yes.

2      Q.    Okay.  So moving him to the U.S. wasn't a

3   promotion in the normal sense, it was simply that you

4   wanted him closer to your desk so that you would be

5   more familiar with what was being written?

6      A.    Yes.  And it was also more in the norm of

7   how the company was organized.  It was unusual for

8   Peter to be out in the field.  Profit center managers

9   are typically in New York for AIU.

10      Q.    But Peter's operation was specifically set

11   up so that he would be out in the field, right?

12      A.    It was a unique situation.

13      Q.    Were there other situations like that in

14   the company that you're familiar with?

15      A.    There may have been.  I'm not specifically

16   familiar with them.

17      Q.    And what did Mr. Green do once he moved to

18   New York?

19      A.    The same thing he did in London.  He just

20   did it from New York.

21      Q.    Except that he didn't write any film

22   finance business?

23      A.    Correct.

24      Q.    But they did write entertainment packages

25   of the type that you described before?

1      A.   Yeah.

2      Q.   At some point, Mr. Gumbrecht moved from

3  London to Paris?

4      A.   Yes.

5      Q.   What was the reason for that?

6      A.   It was the follow-on of what he had done in

7  London.  He had developed a book of business in

8  London.  We were looking for him to develop a book of

9  business in Europe.

10     Q.   The same kind of business?

11     A.   Yes.

12     Q.   Okay.  And at the time he -- at the time he

13  moved, were you aware that he had been writing film

14  finance risks?

15     A.   Not beyond the half dozen very small

16  exposure initial report.

17     Q.   So the direction that he shouldn't write

18  any more of that business applied both when he was in

19  London and when he went to Paris?

20     A.   Yes.

21     Q.   Do you know whether he, in fact, underwrote

22  any GAP financial business while he was in Paris?

23     A.   There was one account which Peter had

24  conversations with a broker repeatedly over the space

25  of almost a year which wound up putting us in a

8/28/2001 Murphy, Thomas

```
1    position where the broker felt that they, you know,

2    had been led to believe that we would provide a

3    market.

4        Q.   Do you remember what the identity of that

5    risk was?

6        A.   I remember the broker.

7        Q.   Okay.  Who was the broker?

8        A.   Grassavoye.

9             THE REPORTER:  I'm sorry?

10            THE WITNESS:  French.  Yeah, I'm

11   sorry.  G-r-a-s-s-a-v-o-y-e.

12       Q.   (BY MR. BANNIGAN)  Was that a French

13   broker?

14       A.   Yes.

15       Q.   Do you remember the specific risk that was

16   written?

17       A.   No, I don't remember the name of it.  It

18   had something to do with an animated feature, I

19   think, cartoon, something like that.

20       Q.   And did Peter write that?

21       A.   I think we eventually issued the paper, but

22   we -- if not 100 percent, we insured it close to it.

23       Q.   Now, when he -- at the time that you found

24   out that Peter had been writing GAP insurance and

25   gave him directions not to write any further
```

**8/28/2001 Murphy, Thomas**

1    business, period, were you aware that the Lexington

2    was writing GAP film finance insurance?

3        A.   Yes.

4        Q.   And had you been aware of that before you

5    learned that Peter was writing that business?

6        A.   No.

7        Q.   How did you come to learn that the

8    Lexington was writing that business?

9        A.   That was one of Peter's arguments for why

10   AIU should do it.

11       Q.   I see.  Okay.  When you found out from

12   Peter that the Lexington was writing that business,

13   did you reach out to anybody at the Lexington to

14   discuss GAP film finance business with them?

15       A.   That had come to Mr. Lewis.  And that is,

16   in fact, what prompted me to go to Mr. Lewis with the

17   GAP financing business that Peter was proposing.

18       Q.   When you say that had come to Mr. Lewis and

19   then that prompted you to go to Lewis, I'm a little

20   confused as to the order in which that happened.

21       A.   I had gotten a call from Bob Lewis, saying

22   that someone in Lexington had approached him about

23   business that Lexington was writing and, in fact, you

24   know, said that AIU was writing the same business.

25   At which point, I said, yes.  And apparently,

1    Lexington was looking to Bob for, you know, an

2    analysis and an opinion as to whether we should be

3    involved in this.  And I -- we were both looking for

4    the same thing, so we decided we'd all go to one

5    court.

6         Q.   Did you learn -- so everything you knew

7    about Lexington, other than what Mr. Gumbrecht told

8    you concerning GAP financial business, you learned

9    from Mr. Lewis?

10        A.   Yes.

11        Q.   Did you come to learn that the Lexington

12   had been writing this business for some years?

13        A.   Yes.

14        Q.   Did you have some understanding as to why

15   all of a sudden, in 1998, they were coming to

16   Mr. Lewis to find out whether they should be writing

17   this business?

18        A.   No.

19        Q.   Did you ask?

20        A.   No.

21        Q.   Did it strike you as peculiar that they'd

22   been writing the business for more than two years

23   before they decided they would talk to somebody in

24   New York about whether they should be doing so?

25        A.   I can't say I always understood things that

1    occurred in Lexington.

2              MR. COTTON:   Could I hear the question

3    again, please?

4                   (Requested portion was read.)

5         Q.   (BY MR. BANNIGAN)   Is that a shorthand for

6    yes?

7         A.   Yes.

8         Q.   Okay.  All right.  Well, in any event, when

9    you weren't satisfied with Peter's original report

10   and, as a result of your discussion with Mr. Lewis,

11   you were still concerned about it, do you know

12   whether, on a parallel track, anybody directed

13   Lexington to stop writing that business?

14        A.   I don't know.

15        Q.   Was Mr. Lewis in a position within the

16   company to give such a direction to the Lexington?

17        A.   No.

18        Q.   Mr. Lewis, you described earlier, is also

19   uncomfortable about this business.  Do you know

20   whether Mr. Lewis made a report up the chain within

21   the AIG organization to anybody about his discomfort

22   at the fact that the Lexington was writing this

23   business?

24        A.   I don't know.

25        Q.   Would you have expected him to do so, given

1    his position and his discomfort?

2        A.    Quite possibly.

3        Q.    And who would he have brought -- withdrawn.

4            In the normal course of events, who would

5    he have made such a report to?

6        A.    I don't know, because I don't know who he

7    directly reported to.

8        Q.    He was the chief credit officer of what

9    entity?

10        A.    I don't know.

11        Q.    How did you find him when you went to look

12    for him?

13        A.    He called me.  He called me.

14            MR. COTTON:  Found him on the phone.

15        Q.    (BY MR. BANNIGAN)  All right.  Was he at 70

16    Pine Street?

17        A.    Yes.  He was described as AIG's chief

18    credit officer.  What that -- you know, who he

19    reports to doesn't necessarily follow from that.

20        Q.    Right.  Okay.  In any event, you don't know

21    whether he ever did anything about his discomfort

22    vis-a-vis Lexington and its writing film finance

23    business?

24        A.    That's correct.

25        Q.    When the New Hampshire reinsurance treaty

1    with GenStar was effected, do you know whether --

2        A.   It wasn't a treaty.  It was really a

3    facultative placement.

4        Q.   Okay.  I'm sorry.  You're right.  You're

5    absolutely right.

6             When the reinsurance placement with GenStar

7    was arranged to cover the GAP film finance business

8    previously written by New Hampshire, do you know

9    whether the Lexington sought to transfer its exposure

10   on GAP film finance business in a way similar to the

11   GenStar arrangement?

12       A.   I don't know if they did.

13       Q.   Do you know whether they tried to?

14       A.   No.

15       Q.   You don't know anything one way or the

16   other about it?

17       A.   I'm pretty sure they didn't.

18       Q.   They didn't?

19       A.   I don't know if they tried to.

20       Q.   Why are you pretty sure they didn't?

21       A.   Because they had asked me, at one point,

22   why we didn't include Lexington in our arrangement

23   with GenStar.

24       Q.   And you said?

25       A.   I don't work for Lexington.

**8/28/2001  Murphy, Thomas**

1      Q.   Is that simply the reason?

2      A.   Yeah, I was managing my own book.

3      Q.   Not your responsibility?

4      A.   That's right.

5      Q.   Did the person who asked you that express

6  some interest or desire that you should have included

7  their exposures in that treaty -- in that

8  reinsurance?

9      A.   Yes.

10     Q.   And who was the person who discussed this

11  subject with you?

12     A.   Sal Nosiferro (phonetic).

13     Q.   And what was Mr. Nosiferro's position at

14  that time?

15     A.   He ran entertainment on the domestic side.

16     Q.   For AIU, AIG, the Lexington?

17     A.   AIG and the various companies.  When I say

18  the domestic side, that, to me, means AIG.  We're

19  international.

20     Q.   Okay.

21     A.   Or we were international.

22     Q.   Okay.  And how did it come about that

23  Mr. Nosiferro and you had this conversation about the

24  GenStar treaty -- the GenStar reinsurance?

25     A.   At that point in time, we were talking

1     amongst ourselves on all aspects of the entertainment

2     business.

3          Q.   And what was it he said to you about the

4     fact that you hadn't included the Lexington's

5     exposure on this business?

6          A.   Just that he wished we had.

7          Q.   Did he say why?

8          A.   No.

9          Q.   Did you ask him why?

10         A.   No.

11         Q.   Did you make some assumptions as to why he

12    was asking you?

13         A.   Yes.

14         Q.   And what were the assumptions that you

15    made?

16         A.   That he wasn't any more comfortable with

17    the business than we were, and the losses at that

18    point may have been emerging.

19         Q.   Do you have any knowledge as to whether or

20    not Mr. Nosiferro was aware, prior to your

21    conversation, that that business, as an ongoing

22    matter, was being written by the Lexington?

23         A.   I'm sorry?

24         Q.   I'll rephrase that.  Mr. Nosiferro, in a

25    conversation with you, in words or substance,

**8/28/2001  Murphy, Thomas**

1    expressed some concern that he would like to have

2    seen the Lexington's exposure on GAP financial

3    business reinsured either with GenStar or in a

4    similar arrangement, correct?

5        A.   Correct.

6        Q.   All right.  Did you ever come to learn when

7    it was that Mr. Nosiferro first learned that

8    Lexington was writing GAP film finance business?

9        A.   I think it was about the time that Bob

10    Lewis was brought into it, that Bob Lewis was brought

11    into the question of should we write this.

12        Q.   To your knowledge, was -- I won't spend a

13    lot of time on this -- this raises the Lexington.

14    But was it your understand -- withdrawn.

15        Did you come to the understanding that, to

16    the extent that the Lexington was writing film

17    finance business, it was also writing it out of

18    London?

19        A.   Yes.

20        Q.   Okay.  And what was the underwriting

21    structure in the Lexington for writing this kind of

22    business?  And by that I mean, to draw a parallel

23    with New Hampshire, the New Hampshire situation had

24    AIG Europe U.K. as sort of their underwriting

25    manager, if you will.  Was there a similar

**8/28/2001 Murphy, Thomas**

1    arrangement for Lexington?

2         A.    Well, Lexington is a surplus lines company,

3    and they operate differently than admitted companies.

4    If you mean from an underwriting perspective,

5    Lexington in London reported to Lexington in New York

6    or Boston, actually.

7         Q.    The home office, wherever that is?

8         A.    Right.

9         Q.    So it wasn't an agency underwriting

10   arrangement, such as existed with -- between New

11   Hampshire and AIG U.K.?

12        A.    No, they were company employees.

13        Q.    Okay.  And did Mr. Nosiferro have any

14   position, title, in Lexington?

15        A.    You'd have to ask him.

16        Q.    You don't know.  Okay.  Well, he was

17   responsible -- withdrawn.

18             Under the umbrella of whatever his

19   responsibility was, he had domestic entertainment

20   business?

21        A.    Yes.

22        Q.    Did he also have under his umbrella

23   international entertainment business?

24        A.    To the extent that Lexington wrote it, yes.

25        Q.    Okay.  We'll pick it up with Mr. Nosiferro.