1    I think we can go through a lot of these pretty

2    quickly, given how it was you found out about GAP

3    business.

4            It is correct, is it not, that you first

5    learned that AIG Europe U.K. was underwriting GAP

6    film finance business for New Hampshire sometime

7    early in 1998?

8        A.    That's correct.

9        Q.    And you learned that as a result of an

10   audit that you were conducting of the business that

11   was being written by Mr. Gumbrecht and his office?

12       A.    That's correct.

13       Q.    And you had no knowledge, prior to that,

14   that that type of business was being written,

15   correct?

16       A.    That's correct.

17       Q.    And you testified -- I'm summarizing this,

18   because I just want to go through this quickly now --

19   that when you learned about the business, it was

20   unfamiliar to you in terms of your underwriting

21   experience, and that was principally so -- no, that

22   was in part so because of the financial nature of the

23   insurance policy that was being written?

24       A.    That's correct.

25       Q.    And it was particularly unusual to you

**8/28/2001 Murphy, Thomas**

1    because it had a certain guarantee aspect to it?

2        A.    That's correct.

3        Q.    Okay.  And then you were otherwise

4    concerned about it because of the nature of the risk,

5    i.e., filmmaking and everything that goes with that?

6        A.    That's correct.

7        Q.    When you had your conversation with

8    Mr. Gumbrecht about the fact -- withdrawn.

9            You mentioned earlier this morning that

10   before Mr. Gumbrecht went off to London, he prepared

11   a business plan.

12       A.    (Moves head up and down.)

13       Q.    I take it, it's fair to say that that

14   business plan did not address the subject of GAP film

15   financing business in any way?

16       A.    That's correct.

17       Q.    Okay.  Now, when you confronted -- and I

18   don't mean that in an adversarial way.  But when you

19   first confronted Mr. Gumbrecht about the fact that

20   this business was being written and you asked him

21   about it, did you seek to determine whether he had

22   done any kind of analysis or empirical study prior to

23   beginning to write this business?

24       A.    His description was that he was familiar

25   with financing in this arena because of his prior

1    background in banking.

2        Q.    Familiar with film financing?

3        A.    Yes.

4        Q.    And --

5        A.    Which made him very comfortable with the

6    components of underwriting this product.

7        Q.    So the answer to my question is that you're

8    not aware of any study, empirical or otherwise, that

9    he did to validate his belief that this was a type of

10   product that the company should be writing?

11       A.    He did not do a study, but he did obtain

12   loss data and analyses of the financial performance

13   of Hollywood productions over time.

14       Q.    And the loss data that he obtained was in

15   connection with individual placements and in

16   connection with slate placements and information that

17   he gathered from risk managers?

18           MR. COTTON:   I'll object to the form.

19   You can answer.

20       Q.    (BY MR. BANNIGAN)   If you know.

21       A.    I'm not sure where he got the information

22   from.

23       Q.    But you're not aware of any study that he

24   commissioned or he undertook himself to go out and

25   collect data and make an analysis just --

**8/28/2001  Murphy, Thomas**

1          A.    That's correct.

2          Q.    Okay.  And I take it, it's fair to say that

3    you're not aware that anybody in the office that

4    worked for him did that?

5          A.    That's correct.

6          Q.    Okay.  I guess it's fair to say then that

7    there was no premium budget -- withdrawn.

8                Was there a premium budget established for

9    the entertainment division, if you will, or the

10   entertainment area of your profit center?

11         A.    Yes.

12         Q.    Okay.  And who established that budget?

13         A.    That's the end product of the budgeting

14   process, which involves -- I would write a first

15   draft of what I think we would expect, and then the

16   president of AIU and then the president of commercial

17   lines division would come back to me and give me

18   their thoughts.

19         Q.    Well, in connection with your preparing --

20   this was -- withdrawn.

21               Was this an annual exercise?

22         A.    Yes.

23         Q.    Okay.  In connection with your preparing

24   that kind of a budget, did you get input from the

25   people who reported to you --

1        A.    Yes.

2        Q.    -- that is, Mr. Gumbrecht, the

3    environmental people --

4        A.    Yes.

5        Q.    -- and the medical malpractice or the

6    medical area?

7        A.    Yes.

8        Q.    And was the input that you got from these

9    people broken down by specific types of risks within

10    the category that they were writing, or was it a

11    gross figure that they would give you?

12        A.    It was a gross figure, the breakout.  There

13    would be a breakout, but it wouldn't be on that

14    detailed a level.

15        Q.    Was there anything in -- withdrawn.

16            I take it these were written presentations?

17        A.    Yes.

18        Q.    Now, when I say "written," given the way

19    the company works, they're either electronic -- i.e.,

20    an attachment to an E-mail -- or they were a hard

21    copy piece of paper?

22        A.    Yes.

23        Q.    And do you recall, during the period that

24    Mr. Gumbrecht was in London, that he did provide you

25    with his estimates or his projections as to what

8/28/2001 **Murphy, Thomas**

1      premium income should be written --

2            A.    Yes.

3            Q.    -- in his area?

4            A.    Yes.

5            Q.    Okay.

6                        MR. BANNIGAN:   Call for the production

7      of those.

8            Q.    (BY MR. BANNIGAN)   And it's also correct,

9      is it not, that none of those presentations that you

10     received from Mr. Gumbrecht on that subject contained

11     breakouts which permitted you to determine that one

12     of the lines of business that was being written was

13     GAP film financing?

14           A.    That's correct.

15           Q.    Was there anybody in the day-to-day

16     operation of your profit center who functioned as an

17     information intermediary between you and

18     Mr. Gumbrecht?

19           A.    No.

20           Q.    So the communication was direct between you

21     and Gumbrecht?

22           A.    Yes.

23           Q.    No filter in the middle?

24           A.    Yes.

25           Q.    Now, when a risk was written in

1      Mr. Gumbrecht's area, whether it was a GAP risk or

2      any other kind of entertainment risk, was there any

3      kind of a report on that piece of business that was

4      communicated back to your office in New York?

5           A.   Not on a policy level, but in an

6      aggregation of monthly written premium, yes.

7           Q.   There was a monthly report?

8           A.   Yes.

9           Q.   And there was a written premium report?

10          A.   Among other things.

11          Q.   What other things did it contain?

12          A.   Hit ratios -- by that I mean amount of

13     successful new business quotes versus opportunities

14     seen -- the ratio of accounts renewed versus renewal

15     opportunities; any loss development, individual large

16     losses; and market intelligence, you know, what's

17     going on in the market.

18          Q.   But was there anything in these monthly

19     reports which identified the specific line of

20     business that was being written so that you could

21     say, Well, I don't understand why we wrote a million

22     dollars of premium for this particular line of

23     business?

24          A.   No.

25          Q.   No.   It was just gross numbers?

**8/28/2001  Murphy, Thomas**

1         A.    Yes.

2               MR. BANNIGAN:  In any event, we call

3    for the monthly reports.

4         Q.    (BY MR. BANNIGAN)  Aside from monthly

5    reports, were there any other type of periodic report

6    that you received from Mr. Gumbrecht's operation on

7    an annual basis within a year -- when I say "annual,"

8    semiannual, annual, or anything like that?

9         A.    No.

10        Q.    So the only -- withdrawn.

11              So the only regular periodic communication

12   that you had with Mr. Gumbrecht's operation in any

13   given year, as I understand your testimony today, is

14   the monthly premium reports and other information,

15   the information you needed in order to prepare your

16   budget?  That's it?

17        A.    The report you alluded to earlier was the

18   presentation of reinsurers.  That was an annual

19   event.

20        Q.    Oh, okay.  The reinsurance, correct.  The

21   presentation relating to the quota-share treaty?

22        A.    But as far as my communication with

23   Peter --

24        Q.    Right.

25        A.    -- that also included daily phone

1    conversations.

2         Q.    You spoke to him daily?

3         A.    Yes.

4         Q.    And in none of your conversations with him

5    prior to your audit did he ever mention to you the

6    fact that he was writing GAP film financial

7    insurance?

8         A.    That's correct.

9         Q.    In your conversations with Mr. Gumbrecht,

10   up to that point in time that you did your audit, was

11   he pleased with the -- did he express pleasure or

12   satisfaction with the performance of the London

13   operation?

14        A.    Yes.

15        Q.    And did he articulate to you, in any way,

16   why he was pleased?

17        A.    Well, because he was making his numbers.

18        Q.    What percentage, if you know, of the

19   business that Mr. Gumbrecht was writing, in terms of

20   premium income, was GAP film financing business?

21        A.    I don't know off the top of my head, but it

22   was a minor share.

23        Q.    Minor share?

24        A.    Yes.

25        Q.    And that's something you learned later on?

**8/28/2001 Murphy, Thomas**

1        A.    Up until the final year, where it became

2    more significant.

3        Q.    When you say "the final year," what do you

4    mean by "the final year"?

5        A.    1998 when --

6        Q.    You mean business that was written in 1998?

7        A.    Some of it may have been bound earlier, but

8    the written premium didn't show up until 1998.

9        Q.    Okay.  So the premium received in 1998 was,

10   on a percentage basis, much higher than that that had

11   been received in the prior years in proportion to the

12   others?

13       A.    I believe so.

14       Q.    And in 1998, was it a significant number?

15       A.    It was not a majority.  I don't -- it might

16   have been 25 percent, but I --

17       Q.    Was it a sufficiently high percentage that

18   it was noticeable?

19       A.    Yes.

20       Q.    And what percentage, if you can break down

21   the annual percentage of that business, was premium

22   that was written after you had directed Mr. Gumbrecht

23   not to write any more business?

24       A.    A premium that showed up on the books?

25       Q.    Yeah.

**8/28/2001 Murphy, Thomas**

```
1          A.    Probably the great majority of it.

2          Q.    And --

3                MR. COTTON:  I'm going to jump in for

4     clarification.  When he said "premium that showed up

5     on the books," I'm not sure how that relates to

6     premium written.

7                MR. BANNIGAN:  Okay.

8          Q.    (BY MR. BANNIGAN)  When you say premium

9     that showed up on the books, what do you mean by

10    that?

11         A.    Well, there's apparently a long lag time

12    between when these things were initially bound to

13    when premium actually changed hands.  So a lot of

14    this business that showed up in '98 was actually from

15    '97-bound business.

16         Q.    Was there a significant amount of the

17    premium that showed up on the books, on the books as

18    a result of business that was written after you had

19    directed Mr. Gumbrecht not to write any further

20    risks?

21         A.    Yes.

22         Q.    Was there any requirement -- withdrawn.

23               Was there any procedure in place, while

24    Mr. Gumbrecht was in London and in Paris, which

25    required Mr. Gumbrecht or the people who -- the other
```

**8/28/2001  Murphy, Thomas**

1    underwriters who were working with him to refer

2    business back to New York for approval?

3         A.   Yes.

4         Q.   What were the circumstances under which

5    business had to be referred back to New York for

6    approval?

7         A.   There was a written authority letter which

8    described the premium size and limits involved.

9         Q.   By that, was that on a per risk basis?

10        A.   No.  It was very broad categories.

11        Q.   Broad categories of business?

12        A.   Yes.

13        Q.   Okay.  Were there ever occasions where

14   referrals were made back, that you recall, by

15   Mr. Gumbrecht?

16        A.   Yes.

17        Q.   And did any of those referrals relate to

18   film finance risks?

19        A.   No.

20        Q.   I take it there was no limit with respect

21   to film finance risk?

22        A.   Well, there was no specific mention of

23   the -- of this GAP financing in the authority letter.

24        Q.   So, therefore, there was no --

25        A.   There was no specific exclusion of it.

**8/28/2001  Murphy, Thomas**

1          Q.    Right.  And there was, therefore, no limit

2     either which would have authorized it?

3          A.    Right.

4          Q.    So it was just a -- did you -- aside from

5     the fact that this business wasn't specifically

6     authorized, the extent that there were limits in

7     place for the entertainment business that he was

8     writing, did Mr. Gumbrecht ever exceed those limits?

9          A.    No.

10         Q.    Did Mr. Gumbrecht have a specific

11    underwriting limit that was specific to him in the

12    sense that he could write "X" amount of exposure on

13    any particular risk?

14         A.    Yes.  And I have to refer to the

15    underwriting authority level to tell you what that

16    might be.

17         Q.    Was there a written document which spelled

18    out the underwriting authority of Mr. Gumbrecht as

19    well as the people who worked for him?

20         A.    Yes.

21         Q.    And where was that document prepared?

22         A.    That was a letter of authority from myself

23    to Peter.

24         Q.    Aside from the classes of business that he

25    wrote, did he ever exceed the authority in that

**8/28/2001  Murphy, Thomas**

1    letter?

2          A.    Not that I recall.

3          Q.    Okay.

4                MR. BANNIGAN:   We call for a copy of

5    the letter.

6          Q.    (BY MR. BANNIGAN)   Did you ever seek to

7    determine whether, with respect to GAP film financing

8    business, anybody had ever prepared guidelines as to

9    how it should be written?

10         A.    No.

11         Q.    Were you --

12                THE WITNESS:   Can I take this

13    opportunity to take a break?

14                MR. BANNIGAN:   Sure.

15    (Break was taken from 11:38 a.m. to 11:44 a.m.)

16         Q.    (BY MR. BANNIGAN)   My question, in case it

17    was not clear, related to written guidelines.   The

18    answer is still no, correct?

19         A.    Correct.

20         Q.    Did you ever inquire of either

21    Mr. Gumbrecht, Mr. Green -- I guess those are the

22    only ones; you didn't talk to Filapek -- as to

23    whether there were parol guidelines for the writing

24    of GAP film finance business?

25         A.    No.

1          Q.    Did you ever seek to determine, from

2    Mr. Gumbrecht or Mr. Green, whether there were any

3    criteria for writing GAP film financing?

4          A.    That was contained in his description of

5    the product and why it should be written.

6          Q.    And he described what the criteria were in

7    that writing?

8          A.    Yes.

9          Q.    Do you remember what they are?

10         A.    Part of it was how much the banks were

11   loaning on a particular production, the number of

12   films in the slate.

13         Q.    But whatever it was, you weren't persuaded,

14   correct?

15         A.    Correct.

16         Q.    And neither was Mr. Lewis, correct?

17         A.    Correct.

18         Q.    And when I say "persuaded," you weren't

19   persuaded that this was the business that should be

20   being written by the New Hampshire?

21         A.    Correct.

22               MR. COTTON:  Mr. Bannigan, did you

23   intend to cut off his answer when you jumped in?

24               MR. BANNIGAN:  No.  Did I cut him off?

25               MR. COTTON:  Could we go back to the

1    previous question about criteria?

2                    MR. BANNIGAN:  I didn't think I cut

3    him off, but go ahead.

4                    MR. COTTON:  I don't know.  I could go

5    be wrong.  I can't hear.

6                    MR. BANNIGAN:  Excuse me?

7                    (Requested portion was read.)

8                    MR. COTTON:  I don't know whether that

9    was the end of the answer.

10        A.    There were other criteria, but I'm not sure

11    I could recall them right now.

12        Q.    (BY MR. BANNIGAN)  Whatever they were, to

13    go back to your prior -- your previous answer, you

14    weren't persuaded that they established a proper

15    basis for this being -- this business being written

16    by New Hampshire, correct?

17        A.    Right.

18        Q.    Now, let me just go back very briefly.  You

19    conducted an audit in early '98?

20        A.    Yes.

21        Q.    What was the specific reason -- I may have

22    asked you this before.  If I did, I apologize for

23    going over it again.  What was the specific reason

24    that you decided you needed to do an audit?

25        A.    Well, most of my time had been taken up in

**8/28/2001 Murphy, Thomas**

1    medical professional and environmental.  I was not

2    devoting much time to entertainment.  It had been 18

3    months, and I hadn't seen, you know, item one of what

4    Peter was doing in London, and I thought it was time.

5    Just routine.

6        Q.    There was no sort of procedure in place

7    annually to review every underwriter's book of

8    business?

9        A.    It was not that formal, particularly in a

10    brand new profit center.

11        Q.    In other words, you got to give it time to

12    grow, so to speak?

13        A.    Well, you're typically behind the curve in

14    staffing.

15        Q.    And what was your staff, say, by the time

16    you did the audit?  What did it consist of?

17        A.    I believe, at that time, I had at least

18    one, possibly two underwriters in environmental, an

19    underwriter in medical professional.  We may have had

20    more in environmental.  If I add some of the existing

21    underwriters in Puerto Rico, we had more in medical

22    professional as well, so the unit was growing.

23        Q.    Okay.  So the underwriters that were in

24    the -- writing the other lines of business of the

25    three that you directing were not all located in New

**8/28/2001  Murphy, Thomas**

1    York either?

2        A.    No.

3        Q.    Okay.   They were located at other

4    facilities within the AIG group?

5        A.    We had one book of business in medical

6    professional, for example, in Puerto Rico which was

7    preexisting.   So there were underwriters on-site in

8    Puerto Rico.

9        Q.    What about environmental?

10       A.    We had no one outside of New York.

11       Q.    Nothing outside of New York?

12       A.    Correct, at that point.

13       Q.    Okay.   And the only underwriting operation

14   for the entertainment end of the business was with

15   Mr. Gumbrecht in London?

16       A.    At that point, Stuart may have been on with

17   us in New York.

18       Q.    Okay.   Mr. Kohn?

19       A.    And Mark was there in London.   And I don't

20   recall when -- I guess that's really the extent of

21   the staff then.

22       Q.    When Mr. Gumbrecht went to Paris, was he

23   the only underwriter there writing entertainment

24   business?

25       A.    Yes and no.

1        Q.    Okay.   Who else was underwriting that

2    business?

3        A.    There was an individual who was just

4    elevated to underwriter who worked for the company

5    manager in France -- the company manager in France.

6    The company manager in France had an affection for

7    entertainment business, considered himself something

8    of an authority and had written some business --

9        Q.    This was the manager or this individual?

10       A.    The individual, really, at the instruction

11   of the manager.

12       Q.    And who was the manager?

13       A.    Phil Schwartz.

14       Q.    Was he an American?

15       A.    Yes.

16       Q.    Is he still with the company?

17       A.    I believe so.

18       Q.    In Paris?

19       A.    I don't think so.

20       Q.    And he had an affection for underwriting

21   entertainment business?

22       A.    He had a background in it, yes.

23       Q.    He did.  And what kind of entertainment

24   business did he underwrite in Paris?

25       A.    Prize indemnity.

**8/28/2001  Murphy, Thomas**

1      Q.    Did he write any GAP film financial

2    business that you know?

3      A.    No.

4      Q.    So the only person in Paris, once

5    Mr. Gumbrecht moved there, who might have been

6    writing GAP film financial business, whether

7    authorized or not, was Mr. Gumbrecht?

8      A.    Yes.

9      Q.    You mentioned the monthly reports; you've

10   mentioned the budget input from Mr. Gumbrecht; you

11   may have mentioned another.  But were there any other

12   reports that you received from Mr. Gumbrecht about

13   what he was doing, in a written form?

14     A.    As we discussed, the reinsurance

15   presentation.

16     Q.    That's it?

17     A.    Uh-huh, yes.

18     Q.    And the only other report you got from him

19   were oral or your daily or almost daily phone

20   conversations?

21     A.    Yes.

22     Q.    Okay.  In connection with the GenStar

23   reinsurance, did Mr. Dickson perform any tasks in

24   connection with that placement that you know of?

25     A.    He would compile information and,

1    potentially, answer any specific questions on

2    specific risks that the underwriter would have.

3        Q.   Do you know whether he conducted an audit

4    of the entire film finance book of business?

5        A.   I believe he did.

6        Q.   You believe he did?

7        A.   Yes.

8        Q.   And was -- do you believe that that was in

9    writing -- I mean, the end result was in writing?

10       A.   I believe the end result found its way into

11   the submission to GenStar.

12       Q.   Okay.  Was that in addition to the

13   spreadsheet?

14       A.   I don't know that it took the form of a

15   formal report, but the information that Rupert

16   gleaned from looking through our files was relayed to

17   GenStar.

18       Q.   Was it relayed to them in the spreadsheet,

19   or was it relayed to them in some other way?

20       A.    In the spreadsheet, in the placing slip,

21   and in the various conversations that took place

22   surrounding the placement.

23            MR. BANNIGAN:  We call for the

24   production of that, Stuart, whatever it is that

25   Mr. Dickson did in connection with the GenStar

1    placement.

2              MR. COTTON:  I think you've already

3    asked for the spreadsheet and the placing

4    information.

5              MR. BANNIGAN:  I did.  But there may

6    be other stuff that Mr. Dickson did which found its

7    way, in whole or in part, into the placement with

8    GenStar; and if there is, I'd like it.

9              MR. COTTON:  Okay.  What I heard might

10   be included, sounds like a lot of stuff.

11             MR. BANNIGAN:  I don't disagree with

12   you.

13             MR. COTTON:  All right.

14             MR. BANNIGAN:  But there may be

15   additional stuff, too, but we don't know, because I

16   don't have it.  That's why I'm asking for it.

17        Q.   (BY MR. BANNIGAN)  Do you know whether,

18   when Mr. Gumbrecht was writing GAP film financial

19   risks, he made any effort to coordinate his

20   activities with those underwriters at the Lexington

21   that were writing similar risks?

22        A.   I believe he did.

23        Q.   And how did you come to learn that?

24        A.   Conversations after Peter left with Sal

25   Nosiferro.

**8/28/2001  Murphy, Thomas**

1      Q.    I'm sorry.  With Mr. Nosiferro?

2      A.    Nosiferro.

3      Q.    More than the fact that he tried to --

4    withdrawn.

5            More than the fact that he did communicate

6    with the Lexington, what else did you learn?

7      A.    That they shared risks.

8      Q.    And what do you mean by "shared risks"?

9      A.    That they would both apply their capacity

10   to a given risk.

11     Q.    And that would take some coordination then

12   between the two underwriters, correct?

13     A.    Yes.

14          MR. COTTON:  Object to the form.

15     Q.    (BY MR. BANNIGAN)  And do you know who the

16   underwriters at the Lexington were who agreed with

17   Mr. Gumbrecht to share risks --

18     A.    No.

19     Q.    -- by name?

20     A.    No.

21     Q.    Do you have in mind any specific risks that

22   they agreed to share, other than that they agreed to

23   share risks?

24     A.    The risk that prompted the discussion with

25   Bob Lewis was something called Jules Verne.

8/28/2001  Murphy, Thomas

1     Q.    I'm sorry?

2     A.    Jules Verne.

3     Q.    Jules Verne?

4     A.    Yeah.  And it was a risk that I believe

5     Lexington was going to issue the policy and was

6     looking for some reinsurance support from AIU.

7     Q.    Which would have been written into New

8     Hampshire?

9     A.    Or possibly the other way around.  I'm not

10    sure.

11    Q.    New Hampshire didn't do reinsurance, did

12    it?

13    A.    They could on a facultative basis.

14    Q.    Okay.  And was that risk written, to your

15    knowledge --

16    A.    No.

17    Q.    -- by both New Hampshire and Lexington?

18    A.    No.

19    Q.    It was not.  Do you know why it wasn't?

20    A.    No.

21    Q.    Are there any other risks that you came to

22    understand that Mr. Gumbrecht and the Lexington

23    underwriters agreed to share?

24    A.    No.  I believe -- I don't have specific

25    knowledge of what Lexington's participation was on

1    the accounts that we identified our exposure to be

2    on.   I believe that they do have some exposure on

3    those risks as well.

4         Q.    During the course of your -- withdrawn.

5              Subsequent to your audit, up until the time

6    that you left the company, what, if anything, did you

7    find out about the relationship between the New

8    Hampshire's writing of GAP film finance risks and AXA

9    Reassurance's participation in the same risks?

10        A.    Nothing more than AXA was a market that was

11   really interested in this type of business and

12   participated on a lot.

13        Q.    And how did you find out that they were

14   really interested in it?

15        A.    From Peter.

16        Q.    Did Peter, when he told you that, mention

17   any names of underwriters at AXA that were

18   particularly interested in this business?

19        A.    If he did, I don't recall them.

20        Q.    Did you come to learn, at some point in

21   time, that some of the risks that Peter was

22   writing -- that is, some of the GAP film financial

23   risks -- were being ceded under the quota-share

24   treaty to AXA?

25        A.    Can you read that back, please?

```
 1          Q.   I'll rephrase it.

 2          A.   It may be a perfectly easy question to

 3     answer.  I'm just not sure I caught the first part.

 4          Q.   Did you come to learn, at some point --

 5          A.   At some point, anything we wrote would be

 6     subject to a treaty.

 7          Q.   So if Peter was writing GAP film finance

 8     risks, that would automatically be ceded under the

 9     quota-share treaty?

10          A.   That's correct.

11          Q.   Okay.  So that means AXA -- were you also

12     aware that AXA was writing GAP film finance risks,

13     wholly apart from what it was receiving via the

14     quota-share treaty?

15          A.   Yes.

16          Q.   Did you ever have any concern that AXA was

17     building up an accumulation that was perhaps

18     unhealthy of GAP film finance risks?

19          A.   No.

20          Q.   Did you ever come to learn the extent to

21     which AXA wrote GAP film finance risks?

22          A.   I think I read a newspaper account that --

23     I don't think it quoted numbers, but left the

24     impression it was quite a lot.

25          Q.   Was this after you had left AIG?
```

**8/28/2001  Murphy, Thomas**

1        A.   Yes.

2        Q.   Okay.  Had you still been with AIG at the

3    time, would that have been something that would have

4    concerned you?

5        A.   It would concern me if I thought it was of

6    enough magnitude to threaten the viability of AXA as

7    a reinsurer.

8        Q.   But you never had to make that judgment,

9    correct?

10       A.   Correct.

11            MR. BANNIGAN:  Let me -- just as a

12   slight change of pace -- mark an exhibit.  Do you

13   have a clue as to what number --

14            MR. COTTON:  Not a clue.

15            MR. BANNIGAN:  -- we're up to?  Are we

16   over 600?

17            MR. KLINE:  I know that John Gordon

18   was marking exhibits in the 700 range at the Joelle

19   de LaCroix deposition last week.

20            MR. BANNIGAN:  Okay.  Why don't we

21   mark this as Chase 800.  That way, we should be okay.

22            MR. KLINE:  He started, I think, with

23   700.

24            MR. BANNIGAN:  This is off the record.

25            (Exhibit Number 800 was marked.)

1              (An off-the-record discussion was held

2              at 12:02 p.m. for less than one minute.)

3         Q.    (BY MR. BANNIGAN)  Mr. Murphy, I'm going to

4    show you a multipage document that's been marked as

5    Chase Exhibit 800.  The document is captioned

6    "Indemnity Agreement Among New Hampshire Insurance

7    Company, Acting Through Its Agent, AIG Europe,"

8    paren, "U.K.," close paren, "Limited, AXA Reassurance

9    U.K., PLC, and Destination Films" -- "Destination

10   Films Funding Corporation."  Have you ever seen this

11   document before?

12              MR. COTTON:  I think you said

13   indemnity.  It might have been indemnification.

14        Q.    (BY MR. BANNIGAN)  I'm sorry.

15   "Indemnification Agreement."

16        A.    No.

17        Q.    Were you aware, prior to the time that you

18   left AIG, that New Hampshire had written coverage

19   involving film financing for Destination Film

20   Corporation?

21        A.    Yes.

22        Q.    What was your understanding -- withdrawn.

23              When did you come to understand that that

24   business had been written?

25        A.    When I obtained that spreadsheet on my

**8/28/2001  Murphy, Thomas**

1      visit to London where I demanded to get the full

2      accounting for what we had written.

3             Q.    And that was in late 19 --

4             A.    That was October.  That was the day Peter

5      resigned.

6             Q.    That was October of '98?

7             A.    Yes.

8             Q.    Okay.  And did you make some effort to

9      determine when this business was bound?

10            A.    No.  I was more concerned with the fact

11     that it was bound, rather than when it was bound at

12     that point.

13            Q.    Did you come to understand that it was

14     bound during the period where you had issued

15     instructions that no further film finance risk should

16     be underwritten?

17            A.    Yes.

18            Q.    Did that concern you?

19            A.    Yes.

20            Q.    Did the size of the Destination Film

21     Funding Corporation exposure concern you?

22            A.    Yes.

23            Q.    $100,000,000?

24            A.    (Moves head up and down.)

25            Q.    When the GenStar reinsurance arrangement

**8/28/2001 Murphy, Thomas**

1    was worked out, was the Destination Film Funding

2    Corporation one of the risks that was reinsured?

3         A.    Yes.

4         Q.    At the time that you left AIG, had any

5    claim been made in connection with the Destination

6    Film Funding Corporation?

7         A.    No.

8         Q.    Okay.  When you found out that this risk

9    had been written, did New Hampshire or AIG, the

10   parent corporation, make any effort to disown this

11   business?

12        A.    No.

13        Q.    Why not?

14        A.    When our underwriter -- any of our

15   underwriters puts his signature on a piece of

16   business, we're committed.

17        Q.    So he had the apparent authority, anyway,

18   to write this when he did?

19        A.    Yes.

20             MR. COTTON:  I'll object to the form.

21   That's a legal term.

22             MR. BANNIGAN)  I'll take the answer.

23   That's fine.

24        Q.    (BY MR. BANNIGAN)  To your knowledge, was

25   there in place at AIG a procedure whereby when a

1   claim -- when a policy written by New Hampshire or

2   Lexington reached a certain level, that a broad

3   notification had to be given to senior executives at

4   AIG, at your organization where you were working?

5       A.   Yes.

6       Q.   What was that procedure?

7       A.   A large-loss report would automatically be

8   generated.

9       Q.   And what was -- what was the definition, if

10  there was one, of a large-loss report?

11      A.   I believe it was $100,000, but it may have

12  been higher.

13      Q.   Let me focus on -- let's go back briefly.

14           If a loss arose under a piece of business

15  that was written out of AIG Europe U.K. for New

16  Hampshire, would that loss be handled by claims

17  people in London?

18      A.   Yes.

19      Q.   And would those people generally have the

20  authority to resolve that claim, or was there a limit

21  on their authority?

22      A.   You'd have to talk to the claim department

23  about how they structured their claim authorities.

24      Q.   Okay.  But when you have a large-loss

25  report, which you mentioned, did that shift

```
1     resolution authority back to the claims department in

2     New York or people in New York from the provinces

3     such as London?

4          A.   I don't know.

5          Q.   You don't know.  Do you recall ever

6     receiving a large claims report in connection with a

7     GAP film financing risk?

8          A.   Yes.

9          Q.   Did you receive the first of those large

10    claim reports after you had conducted your original

11    audit?

12         A.   Yes.

13         Q.   Okay.  So it was sometime after early 1998?

14         A.   It was after late '98.

15         Q.   Okay.  I just wanted to make sure it wasn't

16    before the audit.  That's all.  I know when it was.

17         A.   Okay.  Well, why did you ask?

18         Q.   Let me go back to the Destination Film

19    funding risk.

20         A.   Okay.

21         Q.   Was it your understanding, when you

22    discovered that this risk had been written, that

23    Peter Gumbrecht had written this risk?

24         A.   Yes.

25         Q.   Did you have any understanding as to
```

**8/28/2001 Murphy, Thomas**

1    whether Mr. Green had had any involvement in the

2    writing of that risk?

3         A.   Could you repeat the question?

4         Q.   I'll rephrase it.  Did you ever discuss the

5    Destination Film Funding Corporation risk with

6    Mr. Green?

7         A.   No.

8         Q.   In your review of the files relating to

9    that risk, did you come to learn that Mr. Green had

10   had some role in the writing of that risk, either

11   ministerial or judgmental as an underwriter?

12        A.   Yes.

13        Q.   And what was your understanding?

14        A.   That he was instructed to sign it at

15   Peter's -- Peter's instruction.

16        Q.   Now, when did -- withdrawn.

17             Mr. Gumbrecht, when did he go to Paris?

18   Late, early '98?

19        A.   It was late spring, I think.

20        Q.   But it was after your original audit?

21        A.   Yes.

22        Q.   And then he left in beginning of October,

23   roughly, of '98?

24        A.   Right.

25        Q.   Now, did you come to the understanding that

1    Mr. Gumbrecht had written the Destination risk while

2    he was in Paris?

3        A.    Yes.

4        Q.    Now, did you -- maybe we've already

5    established this early on today.  When Mr. Gumbrecht

6    left, I take it you learned that he went to work for

7    Destination Films?

8        A.    Eventually.

9        Q.    How long a period of time elapsed, to your

10   knowledge, between the time he left AIG and started

11   working at Destination?

12       A.    I don't know when he started work there.  I

13   heard about it months later.

14       Q.    Did you, when you heard about it, draw any

15   connection at all between the fact that he had

16   underwritten the Destination risk and the fact that

17   he was now working for Destination Films?

18       A.    Did I draw any conclusions?

19       Q.    Did you make any assumptions whatsoever?

20       A.    I thought it was quite a coincidence.

21       Q.    Was it a type of coincidence that caused

22   you concern?

23       A.    I found it disturbing.

24       Q.    Because you thought there was some conflict

25   of interest perhaps?

**8/28/2001 Murphy, Thomas**

1      A.    Not because I thought there was, but it

2  raises the possibility.

3      Q.    Okay.   I'm not saying that you had evidence

4  that there was, in fact, a conflict.   But there was

5  at least the appearance of a conflict, perhaps?

6      A.    Potential.

7      Q.    And did you ever do anything to determine

8  whether there was more to that than simple -- simply

9  a potential that a conflict existed?

10      A.    No.

11      Q.    You made no investigation to determine

12  whether there was a connection between his

13  underwriting this risk and his employment with

14  Destination?

15      A.    No.

16      Q.    If I asked this, I apologize.   Between the

17  time that you discovered that Mr. Gumbrecht was

18  writing GAP film finance risks and the time you left

19  AIG in '99, did you ever have a conversation about

20  that type of business with anybody at AXA?

21      A.    No.

22      Q.    Has any representative of AXA ever sought

23  to speak to you since you left AIG about GAP film

24  financial business that was written by Mr. Gumbrecht

25  out of London?

1          A.    No.

2          Q.    While you were with AIU and it was

3    underwriting for New Hampshire, was there any policy

4    in effect relating to fronting, if you know what I

5    mean by the term "fronting"?  If you don't, then I'll

6    come back to it.

7          A.    We did not typically front risks.

8          Q.    Under what circumstances would AIU, using

9    the pen for New Hampshire, front a risk?

10         A.    It would be a very unusual occurrence.  I

11   think this is an example right here of where we wound

12   up 100 percent reinsuring, you know, this GAP

13   financing business.  That turns out to be fronted.

14         Q.    When you say "right here," you're talking

15   about the specific policies that are at issue in this

16   litigation?

17         A.    Yes.

18         Q.    Which we haven't yet discussed, though?

19         A.    Yes, I'm talking about the GAP financing

20   category.

21         Q.    Okay.  But that's just one form of GAP

22   financing category, right?  Well, let me rephrase it.

23              I mean, you don't understand that all of

24   the GAP risks that were written by Mr. Gumbrecht into

25   New Hampshire were fronted, do you?

1        A.    To the extent that we have reinsured AIU's

2    net and treaty position, you could describe this

3    business as now being fronted.

4        Q.    Now?

5        A.    Yes.

6        Q.    Let's go back to the time the business was

7    written.  Okay.  When the business was written, there

8    were occasions when there was a retained exposure,

9    correct?

10        A.    Yes.

11        Q.    Okay.  Now, in those instances, although

12    it's possible, in some of those instances, they were

13    not all fronted, correct?

14        A.    As you describe it, none of them were

15    fronted.

16        Q.    Okay.  Is it your understanding -- well,

17    what is your understanding -- and you've got far more

18    experience in this area than I have -- of fronting?

19        A.    Fronting, to me, means the writing company

20    retains no risk.

21        Q.    Okay.  So in any instance where the writing

22    company retains some portion of the risk, there's no

23    fronting involved?

24        A.    Correct.

25        Q.    Okay.  Based on your review of the GAP

1    risks that were written by Mr. Gumbrecht, would you

2    agree that some fall, at the time they were written,

3    into the category of risks that were fronted and some

4    in which there were retained exposures by New

5    Hampshire?

6        A.   No, there were none fronted.  There was

7    retained exposure on all of them.

8        Q.   Okay.  There were none fronted, is that

9    what you said?

10       A.   That I recall.

11       Q.   Okay.  Are you aware of the risks that are

12   involved in this particular litigation involving two

13   policies involving George Litto?

14       A.   No.

15       Q.   Are you aware that there was a risk -- one

16   of the risks in this case -- in the amount of $7.5

17   million was fronted 100 percent by New Hampshire?

18       A.   Was it on the spreadsheet?

19       Q.   I have no idea.  You'd have to ask

20   Mr. Cotton.  I've never seen it.

21       A.   The name does not ring any bells with me.

22   And what we had identified as being the exposure

23   here, we had put on that spreadsheet.

24       Q.   Okay.  So you're -- all right.  Well, if it

25   was 100 percent fronted, then it would be 100 percent

1    reinsured, correct?

2        A.    Yes.

3        Q.    Okay.  Now, in that instance, would it not

4    have been on the spreadsheet?

5        A.    I would hope that it would have been.

6        Q.    Okay.  Whether it was 100 percent reinsured

7    or not, you wanted to know what was written?

8        A.    I wanted to know what paper we had out

9    there on these risks.

10       Q.    Sure.

11              MR. COTTON:  There have been a few

12   spreadsheets mentioned.  I think we all know which

13   one you're talking about, but could you clarify?

14              MR. BANNIGAN:  Since I've never seen

15   the spreadsheet, you're asking your witness to

16   clarify it, I guess.

17              MR. COTTON:  Well, I'll ask the

18   witness.

19              MR. BANNIGAN:  Well, I can't.  I don't

20   know.

21              MR. COTTON:  Yes, I know, but you're

22   talking about a spreadsheet, and you know quite well

23   which one you're talking about.

24              MR. BANNIGAN:  I'm talking about the

25   same spreadsheet that I think the witness is speaking

1    about, which was the spreadsheet --

2                        MR. COTTON:  I think that's all very

3    true.

4                        MR. BANNIGAN:  -- that was prepared

5    when he went to London to try to find out what

6    business had actually been written.

7                        MR. COTTON:  Thank you, Mr. Bannigan.

8        Q.   (BY MR. BANNIGAN)  Is that right,

9    Mr. Murphy?

10       A.   Yes.

11       Q.   Okay.  Now, do you recall, when you looked

12   at that spreadsheet, that there was a risk reflected

13   which showed that the New Hampshire had fronted 100

14   percent for a 7.5 million policy where the insured

15   was the Chase Manhattan Bank in respect of a working

16   capital loan for George Litto's film production

17   company?

18       A.   I don't recall seeing that name.  Chase's

19   name, I certainly saw, but not the George Litto

20   production company.

21       Q.   Are you aware of any risks that were

22   reflected on that spreadsheet that were 100 percent

23   reinsured by AXA?

24       A.   I don't believe there were, but I'm not

25   certain.

**8/28/2001 Murphy, Thomas**

```
1          Q.   Okay.  But if you had seen a risk that was
2     100 percent reinsured by anybody, wouldn't your
3     assumption be that that was fronted?
4          A.   Oh, yes.
5          Q.   Okay.  This spreadsheet that you looked at,
6     did it show premiums?
7          A.   Yes.
8          Q.   Did it show overrides?
9          A.   It may have.
10         Q.   If it showed an override, that would be
11    some indication that there probably was a fronting
12    involved, correct?
13         A.   Well, it showed gross and net limits, so
14    that would show whether it was 100 percent fronted or
15    not.
16              THE REPORTER:  It would show?
17              THE WITNESS:  Gross and net limits.
18              THE REPORTER:  And so that would show
19    whether?
20              THE WITNESS:  Whether there were --it
21    was fronted or not.
22         Q.   (BY MR. BANNIGAN)  Okay.  And your
23    recollection is, when you looked at that, sitting
24    here today, you don't recall whether any of the risks
25    were fronted --
```

1          A.    That's correct.

2          Q.    -- 100 percent, correct?

3          A.    That's correct.

4          Q.    And as you sit here today, you don't

5    recall -- withdrawn.

6                Did the risks have names by them as to who

7    the insured was --

8          A.    Yes.

9          Q.    -- and what the business was that was being

10   insured?

11         A.    There was a named insured column.

12         Q.    So it was just the name of the insured?

13         A.    Yes.

14         Q.    So you didn't know what exactly was

15   being -- what the underlying film was, if there was

16   one, that was being -- that was the subject of the

17   reinsurance?

18         A.    No.

19         Q.    Okay.  So you were not aware, when you

20   looked at the spreadsheet --

21         A.    Let me correct that.  I think there may

22   have been a column, if it was an individual film,

23   that also included the name of the film.  But to the

24   extent they were slates, it would just be five films,

25   you know.

**8/28/2001 Murphy, Thomas**

1          Q.    All right.  Or maybe the name of the

2     production company, like Paramount --

3          A.    Right.

4          Q.    -- or Phoenix or something like that?

5          A.    Right.

6          Q.    Do you recall -- and this is a memory

7     exercise, and we'll find it when we get the document.

8     But do you recall the name George Litto or Litto when

9     you looked at the spreadsheet?

10          A.    No, I don't recall that name.

11          Q.    Okay.  All right.  Let me come back to

12     fronting again.  You said that it was something that

13     you -- that New Hampshire, being underwritten by your

14     operation, generally did not do?

15          A.    That's correct.

16          Q.    When there were exceptions to that, was

17     there a procedure in place where that was supposed to

18     be cleared by New York?

19          A.    No.  One of the rare occasions that might

20     happen would be where a reinsurer, you know, who has

21     a good working relationship with us, needs, you know,

22     a company who's licensed to write insurance and given

23     jurisdiction to issue a policy which they, in turn,

24     would 100 percent reinsure.  It's not a common

25     practice, but it's not unheard of.

**8/28/2001  Murphy, Thomas**

1    Q.    Isn't it the case that in order for New

2    Hampshire to front -- whatever the underlying risk

3    is -- the actual underwriting company -- that is,

4    the -- we'll call them the reinsurer has to be

5    approved by AIG?

6        A.    Yes.

7        Q.    Okay.  And when reinsurance companies are

8    approved, is there some list published to the

9    underwriters, for example, in your operation of what

10   reinsurance companies those are?

11       A.    That's controlled through the reinsurance

12   department.  And, yes, a list would typically be

13   issued for facultative reinsurers, approved

14   facultative reinsurers.

15       Q.    So the underwriter would know that -- when

16   an underwriter was buying a piece of business and

17   wanted to get reinsurance and asked the broker to

18   arrange that, if the broker came in with a company

19   that was unacceptable, the underwriter could

20   determine that, based on some list or document that

21   he or she would have available?

22       A.    And common practice, to the extent that

23   we'd used the reinsurer --

24       Q.    In the past?

25       A.    -- in the past and they're comfortable,