**8/28/2001  Murphy, Thomas**

1    then they're going to use that reinsurer.

2         Q.    Is there some kind of an annual or biannual

3    review conducted of these companies to continue to

4    upgrade or downgrade them, based on their financial

5    performance?

6         A.    You'd have to ask the reinsurance

7    department.

8         Q.    You are not involved in that -- you were

9    not involved in that?

10        A.    No.

11        Q.    Was there -- aside from a requirement that

12   reinsurers be approved, was there, to your knowledge,

13   any requirement that brokers showing business to your

14   office in London for New Hampshire also had to be

15   approved?

16        A.    Yes.

17        Q.    And were they approved in different

18   categories; that is, for direct business, for

19   reinsurance business?

20        A.    Well, direct business is an entirely

21   different field.  I think you're talking about

22   reinsurance.  And reinsurance brokers would have to

23   be approved.

24        Q.    Do you ever recall an instance where

25   Mr. Gumbrecht had written a piece of GAP film

```
 1    financing business concerning which he had arranged
 2    reinsurance, but it turned out that the broker was
 3    not approved to arrange that reinsurance?
 4         A.   Not that I can recall offhand.
 5         Q.   Okay.  With respect to the very risk we're
 6    talking about here today -- that is, the Litto
 7    working capital loan out of the Litto policy for a
 8    motion picture called "The Crew" -- did you ever come
 9    to learn that the insurance broker that presented
10    those businesses to Mr. Gumbrecht was not approved to
11    arrange reinsurance?
12         A.   No.
13         Q.   Okay.  And that sort of would be important
14    if any of the risks were fronted, right?
15         A.   Potentially.
16         Q.   Okay.  The arrangement for the reinsurance
17    with GenStar, I am told had a particular name to it
18    called Project Kraut (phonetic).  Were you aware of
19    that?
20         A.   I am now.
21         Q.   You were not aware of it at the time?
22         A.   No.
23         Q.   Do you have any reason or any understanding
24    as to why they called it Project Kraut?
25         A.   I --
```

**8/28/2001  Murphy, Thomas**

1           MR. COTTON:  You have to leave out

2    anything you learned from counsel.

3           Q.   (BY MR. BANNIGAN)  Yeah, anything you

4    learned from your counsel, you can't tell me.

5           A.   All I knew was that the spreadsheet that

6    had been created, you know, to outline the risks to

7    GenStar was called Kraut Excel-S.

8           Q.   Kraut Excel?

9           A.   That's the software.  Excel-S is a

10   Microsoft Excel spreadsheet.

11          MR. COTTON:  No advertisements.

12          THE WITNESS:  Sorry.

13          Q.   (BY MR. BANNIGAN)  What about the Kraut

14   part, where did that come from?

15          A.   I think Rupert told me, at one point, that

16   there was -- one of the individuals at Ice Media that

17   had his nickname as the Kraut.

18          Q.   Okay.  I know who you mean.  And was that

19   individual involved in helping to arrange the

20   reinsurance?

21          A.   I don't know.

22          Q.   Okay.  During your -- withdrawn.

23          Prior to your leaving AIG, was an effort

24   made, to your knowledge, to centralize in New York

25   claims handling for all GAP film financing risks?

1        A.    No.

2        Q.    Claims were handled, before you left, in

3    the normal way that claims had been handled before

4    that?

5        A.    Yeah.

6        Q.    Okay.  And just to make sure I understand

7    it, the normal way is that claims would be handled by

8    the claims individuals in the province that wrote the

9    risk, unless it got to a certain level, when it was

10   referred to New York through the large claims report.

11   And exactly what happened after that, I didn't ask

12   you, and I'm not sure you know.  Do you?

13       A.    No.  How the claim department organized,

14   you know, where they'd manage the claims out of,

15   you'd have to ask the claim department.  But in this

16   case, it was London.

17       Q.    In this case?

18       A.    It was London.

19       Q.    It was London.  Okay.  At least until you

20   left?

21       A.    Right.

22       Q.    Now, at some time after you did your audit,

23   up until the time you left, did you ever have

24   occasion to read any of the policies that had been

25   issued by the New Hampshire covering GAP film

1  financial risks?

2      A.    In the course of some of my business --

3  visits to London in 1999, I looked through files.  I

4  recall there were placing slips there.  I don't

5  recall reading through a formal policy.

6      Q.    Okay.  When you looked --

7      A.    I don't recall reading a policy, I guess is

8  the answer.

9      Q.    What I'm trying to do is get your

10 understanding as to whether -- well, withdrawn.

11     At least in London, when they're talking

12 about the terms of an insurance policy, they

13 frequently call it "the wording."

14     A.    Yes.

15     Q.    Are you familiar with that?

16     A.    Yes.

17     Q.    Did you have occasion to look at, in

18 quotes, wordings, with respect to any of the GAP film

19 finance policies?

20     A.    I believe I did.

21     Q.    Okay.  Sometimes the wordings that were

22 going to be in the policy are actually on the slip,

23 depending on who prepared the slip and how detailed

24 it is; sometimes it's not.

25     I guess my question to you, ultimately, is:

1    When you -- to the extent that you had a chance to

2    look at some of the wording, was there anything about

3    any of the wording that you found unusual?

4        A.    I don't recall.

5        Q.    Okay.  Did you ever come to learn that

6    under some versions of GAP film financing risks, that

7    the wordings basically foreclosed to the

8    underwriters, in the event of a claim, from raising

9    defenses based on nondisclosure?

10            MR. COTTON:  I'll object to the form.

11   You can answer.

12       A.    I think I may have read that.

13       Q.    (BY MR. BANNIGAN)  To the extent that you

14   can recall having heard that, do you recall what your

15   reaction was to that?

16       A.    My immediate reaction was trying to

17   understand what circumstances we could.  In other

18   words, did such a contract stand under contract law.

19   You know, how -- what's -- well, what's the conflict,

20   if there is one, between that and standard contract

21   law.

22       Q.    Did -- when you came to understand that

23   there were wordings out there that raised this

24   question about the ability of the company to avoid on

25   the basis of nondisclosure, were you concerned that

**8/28/2001 Murphy, Thomas**

1    any underwriter would have written a policy

2    containing such language?

3         A.    I found it unusual.

4         Q.    Not standard?

5         A.    Yes.

6         Q.    Okay.  Now, was there any procedure in

7    place at AIG -- and I mean that in the broadest

8    sense, which would include New Hampshire and include

9    your operations -- where, when a policy was written

10   that wasn't standard for the type of business that

11   was being underwritten, the policy had to be reviewed

12   before the risk could be bound?

13        A.    That would vary by type of business.

14        Q.    Okay.  Let's go to the entertainment area.

15   In the entertainment area, was there any requirement

16   that if a policy was to be authorized -- by that, I

17   mean by the underwriter -- if it was nonstandard,

18   that it contained clauses which were unusual, it had

19   to be reviewed by some other area of the company

20   before it could -- the business could be bound?

21        A.    No.

22             MR. BANNIGAN:  Now, on -- I want to

23   put this on the record with you, Stuart.  We received

24   certain transcripts pursuant to confidentiality

25   understanding, and those are transcripts which were

**8/28/2001  Murphy, Thomas**

1    taken in another litigation involving Silicon Valley

2    Bank.  In connection with those transcripts, there

3    were also exhibits marked.

4         It's my understanding, based on Judge

5    Gammerman's position on this, as well as my

6    understanding with you, that we are entitled to use

7    those materials within the context of this case.

8         Now, if we have a different understanding

9    on that, you should speak up now; otherwise, I want

10   to mark a document.

11             MR. COTTON:  Well --

12             MR. BANNIGAN:  I'd be happy to show

13   you the document.

14             MR. COTTON:  Yeah, why don't you --

15   why don't we do that.

16             MR. BANNIGAN:  Let's go off the record

17   on that.

18                  (Break was taken at 12:36 p.m. for

19                  less than one minute.)

20             MR. BANNIGAN:  I have received a

21   number of documents from Mr. Cotton that were

22   produced in another case involving film finance.  I

23   have an understanding with him that we will treat

24   those documents as confidential, but for use within

25   this case and that we are reserving our right,

**8/28/2001  Murphy, Thomas**

1   subject to Judge Gammerman's further directions, to

2   seek to use them in all the other cases involving

3   Chase Manhattan Bank and film financing.  Okay?

4           MR. COTTON:  I agree no rights are

5   waived, including ours, to disagree with the position

6   you take.  And we'll --

7           MR. KLINE:  I'd just like to say that

8   we would like to reserve our rights to use these

9   documents in the other litigation, which I guess also

10  involves Chase Manhattan Bank.

11          (Exhibit Numbers 801 and 802 were marked.)

12          MR. COTTON:  801 is the --

13          MR. BANNIGAN:  801 is the single --

14  I'll identify them on the record.  But they're in the

15  order in which I'm going to use them.

16      Q.   (BY MR. BANNIGAN)  Mr. Murphy, I'm showing

17  you two documents marked, respectively, 801 and 802.

18  The first is a single-page document, and the second

19  is a two-page document.  And I'll just ask you

20  whether you have ever seen these documents before?

21      A.   I believe I've seen this one.  I'm not sure

22  about this one.

23      Q.   "This one" being?

24      A.   I'm not sure about 801.  I believe I've

25  seen 802.

**8/28/2001 Murphy, Thomas**

1        Q.    Okay.  And what were the circumstances

2    under which you saw 802, if you remember them, other

3    than what the documents say?

4        A.    What the document said.  This is a normal

5    loss notification.

6        Q.    You don't have any recollection of learning

7    any other information about this particular loss,

8    other than set forth on the document?

9        A.    What's the answer to that question?  Was

10    that a yes or no question?

11        Q.    Do you have any information concerning the

12    risk as to which this loss relates, other than what

13    is set forth in the document itself?

14        A.    Not that I recall.

15        Q.    Turn back to 801.  And I know you don't

16    have a recollection, as you sit here today because

17    you haven't see it, but just take a read of the

18    next-to-the-last paragraph there, which I'll read

19    into the record.

20        "You will note that Clause 4.7 there is

21    what amounts to an innocent nondisclosure clause so,"

22    comma, "even if there are coverage issues, it is

23    unlikely we will be able to exercise our usual

24    rights," period.

25        Having read that clause, is your

**8/28/2001 Murphy, Thomas**

1    recollection refreshed at all concerning the fact

2    that there were clauses in some GAP film financial

3    policies which restricted the underwriters' or the

4    insurers' rights to avoid?

5        A.    It doesn't add any more to my recollection.

6    I would note that it does say "innocent

7    nondisclosure."

8        Q.    I know.  But beyond what you've testified

9    to about your understanding of the policy wording,

10    this doesn't provide you --

11        A.    Doesn't jog anything, no.

12        Q.    -- provide you with any additional

13    information?

14        A.    No.

15        Q.    You can just leave those.  Now, when you

16    left AIG, to your knowledge, did somebody assume your

17    position?

18        A.    I have no knowledge.

19        Q.    You don't know.  Was there ever --

20    withdrawn.

21            In London, to your recollection, prior to

22    your leaving, was there a merger of the underwriting

23    operations of Lexington and AIG Europe U.K. writing

24    for New Hampshire?

25        A.    No.

```
 1          Q.   Was there any kind of a merger between
 2    those two organizations in London?
 3          A.   No.
 4          Q.   Did you ever meet an underwriter by the
 5    name of Mitchell?
 6          A.   First name?
 7          Q.   It's escaping me.
 8               MR. KLINE:  Stephen.
 9          Q.   (BY MR. BANNIGAN)  Stephen Mitchell?
10          A.   I've heard the name.  I may have -- I may
11    have met the individual once in my various trips to
12    London.
13          Q.   Was he working for --
14          A.   I think he was working for Lexington,
15    wasn't he?
16          Q.   Yeah, that's true at one point.  Do you
17    know that he came to work for AIG at some point?
18          A.   No.
19          Q.   In any event, you're not aware of any
20    merger of the underwriting operations of Lexington
21    and New Hampshire by AIG Europe?
22          A.   No.
23          Q.   Okay.  Now, you left AIG in December '99,
24    correct?
25          A.   Correct.
```

1          Q.   I believe -- is it correct that Mr. Green

2     also left in December of '99?

3          A.   Yes, I believe so.

4          Q.   Was the fact that you both left at or about

5     the same time just totally coincidental, as far as

6     you know?

7          A.   It was largely coincidental.

8          Q.   To the extent that it wasn't coincidental,

9     what was it about it that was not?

10         A.   I had decided to pursue, you know, this

11    other interest I had.  I think Tim was anxious to

12    return to the U.K.

13         Q.   Let me come back and be more completely

14    direct.  Was your departure from AIG and Mr. Green's

15    departure from AIG -- and, again, I use that "AIG" as

16    the big company -- in any way whatsoever related to

17    the fact that AIU's people in London had written GAP

18    film finance business?

19         A.   No.

20         Q.   Now, did you have occasion, before you came

21    in here this morning, to do any preparation at all

22    for this deposition?

23         A.   I had a conversation.

24         Q.   Okay.  Who did you speak to?  Not what you

25    spoke about.  Who did you speak to?

**8/28/2001  Murphy, Thomas**

1          A.    This gentleman to my right.

2          Q.    Okay.  Mr. Cotton.  And when did you speak

3    to him?

4          A.    Yesterday.

5          Q.    Was that the first time you spoke to him?

6          A.    Ever?

7          Q.    Well, why don't we start there, sure.

8          A.    No.  I had -- I had a conversation with

9    Stuart and a couple of other people at AIG last year.

10         Q.    What were the circumstances under which

11   that took place?

12         A.    They just wanted to ask me about what I

13   knew about this GAP financing issue.

14         Q.    Okay.  At the time that you had that

15   conversation, were you being represented by

16   Mr. Cotton?

17         A.    No.

18         Q.    Okay.  So you didn't have any lawyer at

19   that time?

20         A.    No.

21         Q.    Well, tell us what you said to them and

22   what they said to you?

23         A.    Pretty much described, you know, exactly

24   what we're talking about here, you know, the chain of

25   events that took place as I understood them in our

1    writing this business.

2         Q.    And who besides Mr. Cotton conducted that

3    interview?

4         A.    One other gentleman's name, I believe, was

5    Eric Krobick.  I'm not sure if I recall -- I do not

6    recall the third person's name.

7         Q.    Is he with the company, or is he with

8    Mr. Cotton's firm?

9         A.    I don't recall.

10        Q.    You don't know where he's from?

11        A.    True.

12        Q.    Did you make any notes during the course of

13    that interview?

14        A.    No.

15        Q.    Do you know whether they made any notes

16    during the course of that interview?

17        A.    I do not know.  They may have, but I

18    couldn't --

19        Q.    How long did the interview take place?

20        A.    -- testify on it.

21        Q.    If I cut you off, I'm sorry.  How long did

22    that interview take place?

23        A.    An hour or two.

24        Q.    And was it on the phone or face-to-face?

25        A.    Face-to-face.

**8/28/2001  Murphy, Thomas**

1       Q.   Here in Texas or in New York?

2       A.   In New York.

3       Q.   Okay.  You came up for that?

4       A.   I was still in New Jersey at the time.

5       Q.   Oh, okay.  You came into New York for that?

6       A.   Right.

7       Q.   Okay.  And aside from your conversation

8 with Mr. Cotton yesterday, the meeting that you just

9 testified about last year, and perhaps a telephone

10 call from him to set up this deposition, were there

11 any other occasions when you spoke to him?

12      A.   No.

13      Q.   And how long was your conversation with

14 Mr. Cotton yesterday?

15      A.   Maybe three hours, two hours, something

16 like that.

17      Q.   And the substance of which was to review

18 the same things you'd talked about -- no detail -- a

19 year ago?

20      A.   Yes.

21      Q.   Did you look at any documents --

22      A.   No.

23      Q.   -- in preparation for today's session?

24      A.   (Moves head side to side.)

25      Q.   Do you have any documents that you took

8/28/2001 Murphy, Thomas

```
 1    with you when you left AIG that relate in any way

 2    whatsoever to film financing?

 3         A.   No.

 4         Q.   Have you ever given a deposition before?

 5         A.   No.

 6         Q.   Have you been asked to give any depositions

 7    besides this particular one?

 8         A.   No.

 9         Q.   It's coming.  I'm kidding.

10              MR. COTTON:  This is it.

11              MR. BANNIGAN:  Well, for me.

12         Q.   (BY MR. BANNIGAN)  Do you have any kind of

13    a consulting arrangement with your former employer,

14    AIG?

15         A.   No.

16         Q.   Do you have any understanding with them

17    whatsoever, written or otherwise, that you will

18    cooperate with them in connection with any litigation

19    arising out of the GAP film financing business

20    underwritten in London?

21         A.   No.

22         Q.   Do you have any arrangement with them that

23    to the extent that you are called upon to be of some

24    assistance, such as in this deposition, that you will

25    be compensated for your time?
```

**8/28/2001 Murphy, Thomas**

```
 1        A.    No.

 2        Q.    And you're not being compensated to be here

 3   today, correct?

 4        A.    No.  Wish I were.

 5        Q.    And you weren't compensated for the time

 6   you spent, other than the pleasure of his company,

 7   yesterday with Mr. Cotton; is that true?

 8        A.    That's correct.

 9        Q.    Okay.

10              MR. COTTON:  There was coffee.

11              THE WITNESS:  That's true.  I'm not

12   sure if that comes under compensation.

13              MR. BANNIGAN:  You'll have to decide

14   that.

15        Q.    (BY MR. BANNIGAN)  When was the last time

16   you spoke to Mr. Green?

17        A.    Probably 18 months ago, shortly after --

18        Q.    All right.  And I think you testified that

19   you've never spoken to Mr. Gumbrecht since he left?

20        A.    Right.

21        Q.    And at least in so far as it relates to GAP

22   film financing business, you never spoke to

23   Mr. Filapek?

24        A.    Correct.

25        Q.    Since you left the big AIG, has anybody
```

**8/28/2001  Murphy, Thomas**

1    consulted you at all about any of the claims that

2    have been made by the insureds in respect of GAP film

3    financing risks that were written in London through

4    AIG Europe U.K., other than the meeting you had in

5    New York?

6        A.    I got a call from a Chase attorney.  I

7    don't recall if it was you or not.

8        Q.    It was me.  You didn't call me back either.

9        A.    I apologize.

10       Q.    It wasn't easy finding you.

11       A.    My wife wondered about that.

12            MR. BANNIGAN:  Off the record.

13       (Break was taken from 12:52 p.m. to 1:01 p.m.)

14            MR. BANNIGAN:  I have no further

15    questions.  And thank you for your time, Mr. Murphy.

16            THE WITNESS:  Thank you.

17                        EXAMINATION

18    BY MR. KLINE:

19       Q.    Mr. Murphy, my name is Jonathan Kline.  I

20    represent the various Heath entities, as I mentioned

21    earlier.  I'm going to ask you a few questions.  I

22    don't anticipate that I'm going to be finished by

23    1:45 though.  I'll endeavor to speed my questions

24    along.  But in the event that I'm not, I'm going to

25    reserve the right to continue this deposition at a

1/25/2005  2:24 PM

**8/28/2001  Murphy, Thomas**

```
1     later date.

2          A.   Okay.

3          Q.   As long as you understand that?

4          A.   I understand.

5               MR. KLINE:  I know Mr. Cotton may have

6     something to say about that, but we'll take that up

7     another day.

8               MR. COTTON:  Well, your rights are

9     reserved.

10              MR. KLINE:  Yes.  Thank you.

11         Q.   (BY MR. KLINE)  You testified earlier that

12    you were aware of an individual named Stephen

13    Mitchell?

14         A.   I've heard the name, yes.

15         Q.   Okay.  And I think you -- when -- you

16    agreed that he probably worked for Lexington

17    Insurance in London; is that correct?

18         A.   I believe he did.

19         Q.   Do you have any recollection or knowledge

20    about any cross -- strike that.

21              Do you have any recollection or knowledge

22    about any involvement he had with Peter Gumbrecht in

23    their underwriting of various film risks?

24         A.   I believe, as I stated, I've come to learn

25    that there was sharing of risks.  And I imagine, in
```

1    that process, there was conversation that took place.

2        Q.    Did you -- were you aware of this at the

3    time the risks were placed?

4        A.    No, because I wasn't aware the risks were

5    being placed.

6        Q.    What is your understanding of the

7    Destination Films placement, the original placement?

8    Do you have a current awareness of the original

9    placement?

10       A.    Very little.  Destination Films, to me,

11   doesn't represent much more than a line on a

12   spreadsheet with 100 million in limits.

13       Q.    Is this a -- is this part of the risks that

14   were ceded to GenStar?

15       A.    Yes.

16       Q.    Are you aware that the bonds that were

17   guaranteed by the insurance in the Destination --

18   well, strike that.

19            Were you aware that the nature of that risk

20   was insurance guaranteeing the performance of certain

21   bonds?

22       A.    No.

23       Q.    Were you aware that the bonds -- strike

24   that.

25            Are you aware of any letters exchanged

1    between AIG and Standard & Poor's regarding the

2    rating of any bonds in Destination?

3        A.    No.

4        Q.    Do you feel you had a full understanding of

5    the nature of AIG's exposure when you sought the

6    treaty with General Star?

7        A.    Yes.

8        Q.    Okay.  Can you recap for me the nature of

9    your understanding of the risks that AIG faced, at

10    that time, in dollar terms?

11        A.    I don't recall the aggregate amounts,

12    although, I believe I did summarize that in that

13    cover letter to Tom Tizzio and Martin Sullivan.

14            MR. KLINE:  Is that cover letter

15    something you've requested the production of?

16            MR. BANNIGAN:  If I haven't, I do.

17            MR. KLINE:  I thought you did.  We'd

18    like to request production of that cover letter, to

19    the extent it wasn't asked for before.  I can't

20    recall personally.

21            MR. COTTON:  Okay.

22        Q.    (BY MR. KLINE)  Now, this cover letter that

23    you wrote to Tom Tizzio and the other individual --

24    what was his name?

25        A.    Martin Sullivan.

1    Q.   Martin Sullivan.  And forgive me if you've

2    answered this question already today.  But what was

3    the purpose of that cover letter, other than to

4    suggest that that reinsurance be purchased?

5    A.   It was to alert most senior management at

6    AIG that we had written this business, that we had

7    this exposure on our books.

8    Q.   Did you receive a response to that letter?

9    A.   No.  It wasn't requiring a response.

10   Q.   So there was no written response?

11   A.   Correct.

12   Q.   Was there a -- were there verbal

13   communications after you wrote that letter?

14   A.   I had a conversation with Tom Tizzio

15   explaining to him in person what I knew of the

16   business.

17   Q.   Okay.  And what did you tell him at that

18   time, if you recall?

19   A.   A lot of what we've rehashed here, how this

20   came about, what I understood, you know, the nature

21   of the business to be.

22   Q.   Okay.  And did you reiterate, at that time,

23   the need for the facultative reinsurance from General

24   Star?

25   A.   I did not advocate that step.

**8/28/2001  Murphy, Thomas**

1          Q.    Okay.  Who made the decision to purchase

2     this facultative reinsurance?

3          A.    I was instructed to do it by Joe Smetna.

4          Q.    By Joe Smetna.  Is it your understanding

5     that Mr. Smetna made the decision to purchase -- that

6     AIG should purchase this reinsurance?

7          A.    I don't know whether he made it himself or

8     whether he did it in consultation with others.

9          Q.    In the ordinary course of business, would

10    it generally be his responsibility to make that

11    decision?

12         A.    It could well be.

13         Q.    You don't know for a fact, one way or

14    another?

15         A.    Well, he had -- I worked for him, so he

16    could tell me what to do.  That was the way it

17    worked.

18         Q.    Sure.  I understand.  Now, do you

19    understand, at this point, there have been some

20    losses that have accumulated on the various GAP

21    financing film risks?

22         A.    I'm under that impression.

23         Q.    Okay.  Had any of these losses accumulated

24    at the time you left AIU?

25         A.    Yes, losses had shown up at that point.

1        Q.    And had claims been made at that point?

2        A.    Yes.

3        Q.    And were any of these claims paid?

4        A.    Yes.

5        Q.    They were.  Do you recall which claims were

6    paid?

7        A.    No.  At the time we reinsured it with

8    GenStar, I recall that there was a loss up at that

9    point, which we had disclosed as part of the

10   placement.

11       Q.    Right.  And if I recall correctly, was that

12   Jules -- no, that wasn't Jules Verne.  Was there a

13   name for that risk?

14       A.    I don't recall what the individual

15   production was.

16       Q.    Okay.  Were you involved -- strike that.

17             At some point, to your recollection, did

18   there come a time when other claims were made?

19       A.    Yes.

20       Q.    Was this during your employ with AIU still?

21       A.    Yes.

22       Q.    And were those subsequent claims paid?

23       A.    I don't know which were paid and which were

24   not.

25       Q.    Okay.

1        A.    Well --

2        Q.    Please continue if you're not done.

3        A.    Well, at that point in time, I think we

4    were talking about putting up reserves.   And

5    payments, you know, would follow some time

6    afterwards.

7              MR. COTTON:   I'd like the question and

8    the answer, please.

9              (Requested portion was read.)

10       Q.    (BY MR. KLINE)   Can you recall at what

11   point in time that was?

12       A.    At the time losses -- I was aware of

13   losses?

14       Q.    No.   You mentioned putting up reserves.

15   You said, at this point in time, you put up reserves.

16       A.    That would be at various times, as losses

17   come in.

18       Q.    So if I understand you correctly, there

19   were multiple claims?

20       A.    Yes.

21       Q.    Okay.   Were you involved in any decision to

22   pay or not pay claims?

23       A.    No.

24       Q.    Who was involved in that then, any decision

25   of that nature?

1        A.    That's typically a claims function.

2        Q.    Okay.  And who would that be, in relation

3   to these risks?  Or who would it have been when you

4   left the employ of AIU?

5        A.    The head of the claims department and Joe

6   Burns, who was the senior claims person in New

7   York --

8        Q.    Okay.

9        A.    -- for AIU, for casualty claims.

10       Q.    Okay.  Now, you've mentioned posting

11   reserves.  Would that be your responsibility, or

12   would that, again, be a claims function?

13       A.    Claims function.

14       Q.    Now, we've talked about the cession with

15   General Star a little bit.  Are you aware of any

16   present dispute, at this time, between New Hampshire

17   and General Star concerning that cession?

18       A.    No.

19       Q.    Were claims ceded to that policy while you

20   were at AIU?

21       A.    Yes.

22       Q.    Would that be the one claim that we've

23   previously discussed?

24       A.    Yes.

25       Q.    No subsequent claims were ceded to that --

1    to that reinsurance policy that you're aware of?

2                    MR. COTTON:   Subsequent to what?

3                    MR. KLINE:   Subsequent to the one that

4    he just described.

5          A.    Every time we would set up a claim, we

6    would be ceding it to that facility.

7          Q.    (BY MR. KLINE)  Are you aware of the level

8    of the reserves for any of the losses described by

9    you?

10                   MR. KLINE:   Do you want me to clarify

11   the question, Mr. Cotton?

12                   MR. COTTON:   No, that's fine.

13         A.    I don't remember specific amounts.   I think

14   in some cases, it would -- some of the -- one or two

15   of the policies would be reserved, in effect, at the

16   policy limit, whatever that limit would be.

17         Q.    (BY MR. KLINE)  Okay.  Was Christian

18   Milton, from AIG New York, involved in the decision

19   to purchase the reinsurance through General Star?

20         A.    No.

21         Q.    Did you ever see any of the presentation

22   materials presented to underwriters concerning the

23   Phoenix transaction?

24         A.    I don't have any specific recollection of

25   it.

8/28/2001  Murphy, Thomas

1        Q.    Do you --

2               MR. COTTON:  Mr. Kline, I recognize

3       that with Judge Gammerman's rulings that anything can

4       be asked of any witness and there better not be any

5       objections, but questions of relevance are perhaps a

6       little out of place.  But I nonetheless am curious

7       about what you think the relevance of Phoenix is to

8       Litto or J & M or anything else we're here to talk

9       about.

10              MR. KLINE:  Allegations have been

11      made, in all the actions involving my client,

12      concerning activities undertaken on the Phoenix deal.

13      I'm concerned that -- I'm concerned -- if you don't

14      think this is the time and place for this

15      questioning, I can understand that.  But I'm

16      concerned that, in light of the order, we have to ask

17      our questions, or we risk not having the opportunity.

18              I'm -- you know, if you -- I can deal with

19      other areas of questioning.  I'm certainly not going

20      to finish in the next 25 minutes.

21              MR. COTTON:  Given Judge Gammerman's

22      order, I'm not asking you to stay away from anything.

23      I just --

24              MR. KLINE:  There are allegations

25      concerning Phoenix made by -- made by insurers,

**8/28/2001 Murphy, Thomas**

1    including your client, as I recall, through its

2    incorporation of certain of AXA's pleadings.

3                    MR. COTTON:  I'm not so sure of that,

4    but we're not going to debate that.  You've only got

5    20 minutes left, so forge ahead.

6                    MR. KLINE:  Okay.  I'm only going to

7    ask limited questions on these issues.

8                    MR. COTTON:  Well, the sky's the

9    limit.

10                   MR. KLINE:  You didn't answer the --

11                   THE WITNESS:  Yes, I did.

12                   MR. KLINE:  You did answer the

13   question?  Can I have the -- can I have the last

14   question and answer read back?

15                   (Requested portion was read.)

16        Q.    (BY MR. KLINE)  When you went to review the

17   various files maintained in the London office by

18   Mr. Gumbrecht, I believe you mentioned earlier --

19                   THE REPORTER:  I'm sorry.

20                   MR. KLINE:  I'm sorry.  Am I speaking

21   too fast?

22                   THE REPORTER:  Just too soft.

23                   MR. KLINE:  Too soft.  Okay.

24                   THE REPORTER:  By mister who?

25                   MR. KLINE:  I'll start fresh.

```
 1          Q.    (BY MR. KLINE)  When you went to London in

 2     early 1998 to review Mr. Gumbrecht's files, did

 3     you -- did those files contain any of the

 4     presentation materials presented to underwriters, to

 5     your knowledge?

 6          A.    No.

 7          Q.    Did, at any point in time, you become aware

 8     that there were placement materials concerning

 9     various GAP financing deals?

10          A.    I have no specific recollection of what

11     placement -- what the placement materials looked

12     like.

13          Q.    Okay.  Are you aware of -- are you aware,

14     generally, of the process of underwriting in the

15     London market?

16          A.    Generally.

17          Q.    Do you understand -- do you agree with me

18     that, ordinarily, brokers come to see underwriters?

19          A.    Yes.

20          Q.    And ordinarily, they bring some materials

21     with them?

22          A.    Yes.

23          Q.    Okay.  Do you have any understanding of

24     what happens to those materials after the meeting

25     between a broker and an underwriter?
```

**8/28/2001 Murphy, Thomas**

1    A.    In some -- this is not my field of

2    expertise.  But in some cases, I would imagine it

3    would be left with the underwriter; in some cases,

4    taken with them for the next conversation with the

5    next underwriter.

6    Q.    Do you have any recollection of seeing any

7    placement materials concerning any of the Paramount

8    films?

9    A.    The placement materials, as you describe

10   them, that I recall seeing were along the lines of a

11   placing slip.  It doesn't seem like the London method

12   of presenting risk is as formal as it is in the U.S.

13   Q.    Do you recall seeing any materials

14   concerning the placement of any of the GAP financing

15   risks, other than a placement slip?

16   A.    I believe we would have, in some cases in

17   our files, risk management reports from the risk

18   manager.

19   Q.    Okay.  And do you recall who the risk

20   manager was whose reports you saw?

21   A.    There were several.  Ice Media is one I

22   recall.

23   Q.    And you don't recall any others, as we sit

24   here today?

25   A.    I don't recall the names.  I know there

1    were a couple of others that were used.

2        Q.    Okay.  Do you recall seeing any placement

3    materials concerning any of the J & M films?

4        A.    No.

5        Q.    Would you know what the J & M films are as

6    you sit here today?

7        A.    No.

8        Q.    Are you aware of whether New Hampshire

9    subscribed to the Paramount risks?

10        A.    Paramount was a name that was on the

11    spreadsheet, so I'm not sure if that's the same risk

12    you're talking about.

13        Q.    Okay.  Do you know whether Lexington

14    subscribed to the Paramount?

15        A.    I don't know.

16        Q.    Are you familiar with an individual from

17    Lexington named Rob Brace?

18        A.    I've heard the name.  I think he ran the

19    entertainment business before Sal Nosiferro.

20        Q.    Okay.  When did Sal Nosiferro start running

21    the entertainment business?

22        A.    I don't know as a fact.  I first became

23    aware of him probably in early 1998.

24        Q.    Okay.  So is it your understanding that

25    Mr. Brace was out of the organization at that point?

**8/28/2001  Murphy, Thomas**

1          A.    I believe so.

2          Q.    Did you ever have any personal contact with

3     him?

4          A.    No.

5          Q.    Was there any one person who was

6     responsible for overseeing the entertainment business

7     of New Hampshire and Lexington?

8          A.    No.

9          Q.    The closest person would be this guy,

10    Mr. Lewis, if I recall correctly?

11         A.    Lewis was not -- he was not an underwriting

12    chain of command.  Lewis was someone who had

13    financial expertise.  So that's why he was involved.

14         Q.    Right.  But he had some involvement on both

15    the Lexington and the New Hampshire end; is that

16    correct?

17         A.    Yes, as a --

18         Q.    In a financial capacity?

19         A.    Right.

20         Q.    I just want to go back a bit to your

21    personal experience as an underwriter.  You testified

22    that you had mostly experience in the medical

23    malpractice field in underwriting medical

24    malpractice -- strike that.

25              I believe you testified that your under --

1    you had some underwriting experience writing medical

2    malpractice policies; is that correct?

3         A.   That's correct.

4         Q.   Do you have any other underwriting

5    experience in other areas?

6         A.   Yes.

7         Q.   Forgive me if you've asked -- if you've

8    answered this already.

9         A.   I have experience in large casualty account

10   underwriting, umbrella underwriting, surplus lines

11   underwriting, little bit of exposure to pollution

12   underwriting coverages.  And prior to AIG, very

13   little exposure to the entertainment business.

14        Q.   What types of large casualty risks had you

15   been involved in underwriting?

16        A.   Oh, Fortune 500 accounts which involved

17   their workers' compensation and liability, commercial

18   auto, and other coverages surrounding their operating

19   their business.

20        Q.   At the time that the cession to General

21   Star was prepared, who was the person most

22   knowledgeable in the London office about the risks

23   being ceded?

24        A.   That would be Tim and Rupert.

25        Q.   And do you recall exactly what time -- at

**8/28/2001  Murphy, Thomas**

1    what time that was prepared?

2         A.   It was very end of '98 and beginning of

3    '99.  I think -- I want to say the slip was signed in

4    mid-January.

5         Q.   And that was after Peter Gumbrecht

6    departed?

7         A.   Yes.

8         Q.   With respect to Ice Media's involvement as

9    a risk manager on that reinsurance placement, I think

10   you mentioned that they analyzed the losses; is that

11   correct?

12        A.   Yes.

13        Q.   Who employed Ice Media to do that?

14        A.   I believe the contract was actually with

15   GenStar after we made the reinsurance.

16        Q.   Okay.  So they were -- am I -- am I correct

17   that you're saying that they were brought in after

18   the agreement was reached between New Hampshire and

19   GenStar?

20        A.   No.  They were part of the agreement.

21        Q.   They were part of the agreement.  Okay.

22   And did GenStar pay their fee, whatever it was?

23        A.   I believe so.

24        Q.   Do you recall what their fee was?

25        A.   No.

**8/28/2001 Murphy, Thomas**

1      Q.   Did Mr. Gumbrecht maintain a file

2   concerning his evaluation of Ice Media?

3      A.   I don't know.

4      Q.   You mentioned earlier that it's your

5   understanding that Mr. Gumbrecht evaluated Ice Media

6   as a risk manager; is that correct?

7      A.   Yes.

8      Q.   But you're not aware as to whether there --

9   he maintained anything in writing?

10      A.   That's correct.

11      Q.   And when you reviewed the documents or

12   caused you to review the documents that were in the

13   London office, did anything turn up in terms of

14   writing?

15      A.   No.

16      Q.   Were you aware as to what General Star's

17   position was as a direct insurer of the various risks

18   they were reinsuring from New Hampshire?

19      A.   I understood that GenStar had -- was

20   experienced in writing this business on their own

21   account, as well as being interested in reinsuring

22   AIG's book.

23      Q.   Are you aware of any specific -- any

24   specific overlap for General Star between the

25   reinsurance and the direct insurance?

**8/28/2001  Murphy, Thomas**

1      A.    No.

2      Q.    Now, you testified that -- I believe that

3   Tim Green told you that the various risks that he

4   bound New Hampshire to, he did at Peter Gumbrecht's

5   direction; is that correct?

6      A.    That's correct.

7      Q.    Now, Mr. Gumbrecht left the employ of

8   New -- of AIG in 1998?

9      A.    Correct.

10      Q.    Can you tell me -- do you have a

11   recollection of exactly when that was?

12      A.    It was October.  I don't know the specific

13   date.

14      Q.    Okay.  And when did Mr. Green start working

15   in the same office as Mr. Gumbrecht?

16      A.    Well, Tim came on early '98.  It was

17   shortly after I did that audit, as I recall.  And

18   Tim's presence in London allowed Peter to go to

19   Paris.

20      Q.    Okay.  So their employment overlapped for a

21   certain amount of time; is that correct?

22      A.    Well, Tim reported to Peter.  Peter was

23   physically located in Paris and would make periodic

24   trips to London.

25      Q.    Okay.  And was Mark Filapek also employed

**8/28/2001  Murphy, Thomas**

```
1      at the same time?

2           A.   Yes.

3           Q.   And did Filapek report to Green or to

4      Gumbrecht?

5           A.   To Green at that point.

6           Q.   Do you have any knowledge concerning the

7      completeness or accuracy of materials presented to

8      New Hampshire's underwriters in the placement of any

9      of the film risks?

10          A.   No.

11          Q.   In the ordinary course of business, would

12     you be aware of those -- strike that.

13               At the time you were employed by AIU, in

14     the ordinary course of business, would you have been

15     aware of the adequacy of those materials?

16          A.   Not on individual accounts, no.

17          Q.   So the individual underwriter wouldn't have

18     a responsibility to bring any presentation materials

19     to your attention?

20          A.   Not necessarily.

21          Q.   Would they have the option to do so if they

22     chose?

23          A.   Yes.

24          Q.   You mentioned previously that there were

25     some general internal discussions at AIG regarding
```

1    entertainment business.  Do you recall that

2    testimony?

3         A.   In what context?

4         Q.   It was in the context where you were

5    describing conversations with Sal Nosiferro, and he

6    asked you why Lexington wasn't included in the

7    cession to General Star?

8         A.   Yes.

9         Q.   Were there -- but I think in your answer to

10   that, you mentioned there were general internal

11   discussions regarding entertainment business?

12        A.   Yes.

13        Q.   Can you elaborate on that for me a little

14   bit of the nature of those discussions?

15        A.   Well, we were writing similar types of

16   business in different geographic areas.  One of AIG's

17   challenges was always to get the different

18   underwriting groups to speak to one another, and we

19   were attempting, you know, to do that, to talk more.

20        Q.   So these internal discussions were to

21   facilitate communication between the various

22   underwriting arms of AIG?

23        A.   Correct.

24        Q.   Did these -- did these take the form of

25   internal meetings?

**8/28/2001  Murphy, Thomas**

1        A.    Informal conversations, really.

2        Q.    Were those telephone conversations?

3        A.    Largely.

4        Q.    Okay.  So there wasn't --

5        A.    Right.

6        Q.    Well, tell me, if there was, was there a

7    general meeting that was called for everybody to come

8    in -- come in to attend and talk about this stuff?

9        A.    No.

10        Q.    How was it that the various arms doing

11    similar business were put in touch with each other at

12    AIG?

13        A.    Very often, they weren't.  It was up to the

14    initiative of the individual profit center managers,

15    really.

16        Q.    Okay.  And what I'm getting at is:  There

17    must have been some reason that you were aware of the

18    other underwriting profit centers writing similar

19    business.  How were you made aware of that?

20        A.    Well, it's in my interest, in growing the

21    international piece, to have a good working

22    relationship with a domestic operation, because an

23    important source of production might be business that

24    arises out of that -- of those domestic producers but

25    has risks outside the U.S.  So if we're coordinating

**8/28/2001  Murphy, Thomas**

```
 1    our activities, I get to see that business instead of

 2    it going out to competing insurers in the

 3    marketplace.

 4         Q.    Was there -- was there some publication or

 5    listing within AIG that identified these people so

 6    you could contact them?

 7         A.    No.  AIG is not famous for organization

 8    charts.

 9         Q.    So you found these people through your own

10    initiative; is that correct?

11         A.    Yes.

12         Q.    And one of these people, at the time, was

13    Sal Nosiferro?

14         A.    Yes.

15         Q.    And would he have been responsible for

16    overseeing the underwriting that Steve Mitchell was

17    doing for Lexington?

18         A.    I believe so.

19         Q.    Was there -- in the course of your

20    discussions along this line, your internal

21    discussions, other than Sal Nosiferro, was there

22    anybody else involved in those discussions regarding

23    entertainment business?

24         A.    Sal had an underwriter in New York who

25    participated in conversations about our entertainment
```

```
1    business.

2         Q.    Who was that underwriter?

3         A.    I don't recall his name.

4         Q.    This was an underwriter for Lexington?

5         A.    Yes.

6         Q.    In what time period was this?

7         A.    Mid-'98 and thereafter.

8               MR. COTTON:  Can we break for a

9    second?

10                    (Break was taken at 1:38 p.m. for

11                     less than one minute.)

12              MR. COTTON:  Why don't we wrap this

13   up?

14              MR. KLINE:  I've got a whole lot

15   questions actually.

16              MR. BANNIGAN:  He's acknowledging

17   that.

18              MR. KLINE:  And that's fine.  That's

19   fine.  I'm acknowledging that --

20              MR. COTTON:  You seem to be able to

21   stretch it out.  I'm not sure that any of these have

22   anything to do with the case or any of the others.

23              MR. KLINE:  Well --

24              MR. COTTON:  But I'm sure that you

25   could make it to, you know, 14 minutes to 2:00, at
```

**8/28/2001  Murphy, Thomas**

1    which point Mr. Murphy has to go.

2                    MR. BANNIGAN:  They all seem

3    exquisitely relevant to me.

4                    MR. COTTON:  We'll call it a day, and

5    we'll fight with you at a future time whether you get

6    another shot.

7                    MR. BANNIGAN:  Just want to avoid the

8    thunderstorms.

9                    MR. COTTON:  Right.

10                   MR. BANNIGAN:  The deposition is

11   adjourned without date.

12                   MR. KLINE:  Right.

13                   MR. COTTON:  And I would just note on

14   the record that I dispute that.  But we'll fight it

15   out another day.

16                   (Proceedings adjourned at 1:39 p.m.)

17

18

19

20

21

22

23

24

25

1                    CHANGES AND SIGNATURE

2    PAGE/LINE        CHANGE              REASON FOR CHANGE

3    _____

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15        I, THOMAS MURPHY, have read the foregoingdeposition and hereby af:

16   true and correct except as noted herein.

17

18                        _____

19                        THOMAS MURPHY                      INDEX NO.

20   STATE OF TEXAS )

21        Subscribed and sworn to before me by the saidwitness, THOMAS MURPH

22   _____, 2001.

23                        _____

24                        NOTARY PUBLIC IN AND FOR

25   My Commission Expires:

1    STATE OF TEXAS )

2         I, Wendy Watson, a Certified Shorthand Reporter

3    in and for the State of Texas, do hereby certify

4    that, pursuant to the agreement hereinbefore set

5    forth, there came before me on the 28th day of

6    August, A.D., 2001, at 8:32 a.m., at the Dallas

7    Marriott, located at 223 West Las Colinas Boulevard,

8    in the City of Irving, State of Texas, the following

9    named person, to wit:  THOMAS MURPHY, who was by me

10   duly cautioned and sworn to testify the truth, the

11   whole truth and nothing but the truth, of his

12   knowledge touching and concerning the matters in

13   controversy in this cause; and that he was thereupon

14   carefully examined upon his oath, and his examination

15   was reduced to writing under my supervision; that the

16   deposition is a true record of the testimony given by

17   the witness, same to be sworn to and subscribed by

18   said witness before any Notary Public, pursuant to

19   the agreement of the parties; and that the amount of

20   time used by each party at the deposition is as

21   follows:

22         Mr. Bannigan - 4 hours, 0 minutes,

23         Mr. Kline - 0 hours, 37 minutes,

24         Mr. Cotton - 0 hours, 0 minutes;

25         I further certify that I am neither attorney or

**8/28/2001  Murphy, Thomas**

1     counsel for, nor related to or employed by, any of

2     the parties to the action in which this deposition is

3     taken, and further that I am not a relative or

4     employee of any attorney or counsel employed by the

5     parties hereto, or financially interested in the

6     action.

7          I further certify that, before completion of the

8     deposition, the Deponent _____, and/or the

9     Plaintiff/Defendant _____, did   X   did not _____

10    request to review the transcript.

11         In witness whereof, I have hereunto set my hand

12    and affixed my seal this _____ day of _____,

13    A.D., 2001.

14

15                        _____        WE

16                        Esquire Deposition Services

17                        Dallas, Texas   75202                    Cert. N

18                        Cert. Expires:  12-31-01                  (21

19

20    Taxable Cost: $_____

21

22

23

24

25

1          COURT REPORTER DISCLOSURE STATEMENT

2      X    Please be advised that pursuant to Rule IV.B4 ofthe standards and

3      Certified Shorthand Reporters as promulgated by theSupreme Court of Te

4      have no existing or past financial, business,professional, family or s

5      of the parties or their attorneys which to some mightreasonably create

6      ___ Please be advised that Esquire Deposition

7      Services has entered into a volume-related discountfee structure with

8      if such discount is in effect, all parties in thiscase will receive th

9      product and/or service.

10     ___ Please be advised that there is an existing orpast financial, busi

11     social relationship with counsel involved in thiscase, separate and ap

12     business with Esquire Deposition Services (orrelated companies) in the

13

14

15     Court Reporter:  WENDY WATSON, CSRCSR Number:  6211

16     Date: August 31, 2001

17

18     WENDY WATSON, CSR

19

20               CERTIFICATE OF SERVICE

21     This is to certify that a true and correct copy ofthe foregoing disclo

22     to all counsel present at the deposition, and a copyof same will be at

23

24

25     WENDY WATSON, CSR