# EXHIBIT 7

**Peacock, Keith**

| | |
|---|---|
| **From:** | Brace, Robert@ISGSITE1 |
| **Sent:** | 01 May 1998 20:40 |
| **To:** | Peacock, Keith; Mitchell, Steve |
| **Subject:** | Verne |

Keith I got your call,by the way your v-mail doesn't work, hence the email.
I am meeting with Bob Lewis, AIG's chief credit risk officer in NY on Mon to
discuss not only this project but others. On verne, I'm told by Tom Murphy,
Gumbrect's boss that they are committed subject to satisfactory
documentation. The remaining operative document is the side agreement
between Lex and Flashpoint,a draft of which they sent me on Thurs.
Additionally, the Lex commitment continues to be subject to approved r/l and
terms. I instructed our counsel to release a DRAFT opinion on the issues
regarding Lex's ability to write this type of cover. They were planning on
talking to their counterparts today, Friday. Will keep you posted.

1

59/AIG/KP1 -
00187

# EXHIBIT 8

HF4-5/LEX 596-
00564

**AI Entertainment, Inc.**
**200 State Street**
**Boston, MA 02109**
**(617) 330-8557**

Our facsimile number: (617) 951-0067          212-742-9611

x Tom Murphy 770-8363
Tim Green  0330-8833

TO: Bob Lewis

FROM: Robert R. Brace, President   x Peter Gumbrecht (Paris)

DATE: 4/27/98

TIME: _____ Steve Mitchell (formerly HIH)

NUMBER OF PAGES (including cover): 6

MESSAGE: see attached
"Contingent Extra Expense Product"
a/k/a  Sales Agents Film Gap
3 year timer

RECEIVED
APR 27 1998
AIG-CREDIT DEPT.

LEX-01 038204

**American International Entertainment, Inc.**

HF4-5/LEX/596 - 00565

ROBERT R. BRACE
President

04/24/98

To:  Robert Lewis
From: Rob Brace

Re:  Pecuniary Loss Indemnity Insurance a/k/a  Financial Guarantee

Attached is a copy of a memo I wrote to Kevin Kelley discussing a fronting arrangement we have been working on.  Kevin suggested that I give you a call with John Iannucci to discuss this type of facility.  I have had many discussions on this type of business in the past and I would submit that with the right structure, rate and recoupment position, insurers can protect themselves.

As an aside, you may have seen some of these risks over the past few years as AIU has been involved in some of them.  I'm also told that AIG-Re took some of attached Sony deal, which was put together with AON and CNA.  Perhaps you know where to look within AIG to confirm.

I look forward to discussing this with you on Monday.

Cc: JIannucci

AI Entertainment Insurance Agency of Massachusetts, Inc.
200 State Street - Fourth Floor - Boston, MA 02109
Phone: 617-330-8557 - Fax  617-951-0067

Page 3 of 7

# AI Entertainment

American International Entertainment ...

HF4-5/LEX/596 -
00566

04/23/98

To:   Kevin H. Kelley
From: Rob Brace

Re:   Jules Vera/Flashpoint-TV Series Project

Transaction Summary

| | |
|---|---|
| Assured: | Flashpoint/Credit Suisse |
| Sum Insured: | $33,600,000 |
| Insurer: | Lexington ($500k net retention) |
| Policy Period: | May 1998-April 2001 |
| Reinsurance: | All AIG approved, including a $3 million line from AIU-London |
| Premium: | 10% $3,336,000 (Lex 1.5% share: $50,400) |
| Ceding Comm. | 5% ($164,280) |
| Lex Admin Fee: | $100,000 (One time pd to Lex only and agreed to by all R/I). |
| Lex Compensation: | $314,680 (63% rate on our $500k line) |
| Legal Counsel: | Ince &Co (London), Morrison, Mahoney (Boston) Our fees to be paid by Flashpoint. |
| Broker: | Lloyd Thompson |

As a result of Steve Mitchell's involvement with some film financing deals at his former employer, HIH, he is in a position to lead a number of these transactions. He had been working on this particular transaction prior to joining us and has done two similar deals with Flashpoint and Lloyd Thompson, both of which are now off risk. While not all of these transaction make sense, with careful structuring and an eye on protecting our net, we can make a good return on some of this business. While I got involved late in the game on this transaction, I support the deal and see the biggest potential risk as one of reinsurance recoveries should there be a loss. This is mitigated by the quality of the reinsurers, all of which must be on the AIG approved list.

As you know this business is a form of guarantee, however there are a couple of significant mitigating factors. First, in some deals such as this one, the insurers will have a perfected security interest in the copyright of the project, an asset that will have value and can be used to mitigate any potential loss. Secondly, certain fees that in normal financings are paid upfront, i.e. producers or directors fees, are being deferred until the insurers are off risk. Lastly, significant backend upside is available to the producers/production company once the insurers are off risk. Hence to realize any windfall, they are incentivized to get us off risk. (The insurers also have a backend profit share of 7.5% but I would value it at zero).

LEX-01 038206

Structurally, the assured is Credit Suisse and we are providing them with a guarantee. They plan on selling zero coupon notes to investors, backed by our policy, and will likely offer the investors some upside if the project is a success. Importantly, a separate agreement is in place between the insurers and Flashpoint which gives us certain rights as well as ownership of the project if needed. This agreement is the operative insurance policy. Arguably, we don't need Credit Suisse in the transaction and in the future, we may want to consider AIGFP's involvement and give them an opportunity to make the fees that CS is making based on our credit rating.

You should know that AIU has independently already committed to this deal. The transaction needs Lexington for two important reasons. First, they need a US front with a triple A rating. AIU offered New Hampshire paper but Credit Suisse balked. Secondly, many of the reinsurers are on this risk due to their involvement with Steve when he underwrote similar risks at HIH.

Going forward, I feel it is important that AIG, be it AIE, AIU/London or AIGFP should all be working in concert on these sorts of transactions. In the past, we have not gone a good job coordinating AIG's position and this will come back to haunt us. As is the case in many other specialized areas, we need to send a consistent message to the marketplace thereby preserving the structure and rate adequacy of these sorts of transactions.

Let's discuss at your earliest convenience.

HF4-5/LEX/596 -
00567

CC: KPeacock
      SMitchell
      JIanucci ✓

LEX-01 038207

HF4-5/LEX/596-
00568

## JULES VERNE AGREED PARTICIPATING MARKET

| | | |
|---|---|---|
| | | ✓ = approved |
| | | check others |
| AIG | 3,500,000 | ✓ |
| Axa | 5,800,000 | ✓ |
| CCR | 1,000,000 | |
| Kravag | 1,539,500 | |
| D. Lloyd | 1,000,000 | |
| Mondella | 1,600,000 | |
| Re Ae | 1,500,000 | ✓ |
| GIO | 2,500,000 | ✓ |
| Lib Mutual | 750,000 | ✓ |
| MMI | 1,250,000 | |
| New Cap Re | 2,500,000 | |
| Colonia | 1,000,000 | ✓ |
| Transatlantic | 2,000,000 | ✓ |
| CU | 1,600,000 | ✓ |
| HIH | 600,000 | ✓ |
| Kemper | 2,000,000 | ✓ |
| Zurich Re | 1,000,000 | ✓ |
| PICS | 8,720,000 | |
| | 36,467,500 | |

Page 1

Page 6 of 7

LEX-01 038208





## INDIE KELNER PLANS DO-IT-YOURSELF PREEM

## THINGS AREN'T WHAT THEY SEEM IN SPICE WORLD

— Martin Peers and Dan Cox

## SONY COVERING ASSETS WITH INSURANCE FUNDS







# A nose for news

BY JENNIFER NIX

HF4-5/LEX/596 - 00569

LEX-01 038209

# EXHIBIT 9

High Court Judgment Template                                    Page 1 of 10

Neutral Citation Number: [2004] EWHC 1687 (Comm)

Case No: 1999 Folio1248

2000 Folio 40

2000 Folio 268

2000 Folio 1120

**IN THE HIGH COURT OF JUSTICE**

**QUEENS BENCH DIVISION**

**COMMERCIAL COURT**

Royal Courts of Justice

Strand, London, WC2A 2LL

Date: 13/07/2004

**Before :**

**THE HONOURABLE MR JUSTICE LANGLEY**

- - - - - - - - - - - - - - - - - - - - -

**Between :**

**Hih Casualty And General Insurance Limited**                    **Claimant**

**- and -**

**Jlt Risk Solutions Limited**                    **Defendant**

**(Formerly Lloyd Thompson Limited)**

**Hollywood 1,2 And 3**

**('7.23'/'Rojak'/'Award')**

- - - - - - - - - - - - - - - - - - - - -

- - - - - - - - - - - - - - - - - - - - -

**Mr J. Flaux QC and Mr S. Picken** (instructed by **Messrs Holman Fenwick & Willan**) for the **Claimant**

**Mr J. Davies-Jones** (instructed by **Messrs Eversheds**) for the **Defendant**

Hearing dates: 21-22nd June 2004

- - - - - - - - - - - - - - - - - - - - -

**Approved Judgment**

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this Judgment and that copies of this version as handed down may be treated as authentic.

.............................

The Hon. Mr Justice Langley

**The Hon. Mr Justice Langley:**

The Application

1.  The Claimant (HIH) seeks permission to amend the claims in these consolidated proceedings to allege fraud by the Defendant (JLT).

    Background

2.  The proceedings concern the finance insurance arrangements (pecuniary loss indemnity policies) for three slates of films which have come to be referred to as Hollywood 1 ("7.23") Hollywood 2 ("Rojak") and Hollywood 3 ("Award").

3.  The proceedings were originally brought by insurers against their reinsurers (including "New Hampshire" and "Axa") for payment under the reinsurances following payments made by HIH to the underlying assured. The assured was Law Debenture Trust (LDT). LDT acted on behalf of those who provided the finance for the films. The payments were for shortfalls in the revenues achieved by the films from the sum assured.

4.  Both the insurance and reinsurance for Hollywood 1, 2 and 3 were placed by JLT as brokers.

5.  The sums involved, in rounded figures, are US$15.6m in Hollywood 1, US$ 14.7m in Hollywood 2, and US$ 25.1m in Hollywood 3.

6.  JLT had also placed the insurance of another project called "The New Professionals" ("TNP") and of the slates of films known as Hollywood 4 and 5. These insurances also gave rise to litigation. TNP was placed before Hollywood 1, 2 and 3 but in the same year (1997). Hollywood 4 and 5 were placed after Hollywood 1,2 and 3. Proceedings in Hollywood 1 and 2 began before the proceedings in TNP.

    TNP

7.  HIH was the lead underwriter on TNP. HIH sought to avoid the insurance alleging fraudulent misrepresentation and non-disclosure by JLT. The proceedings against reinsurers commenced in May 2000. JLT were joined as Part 20 Defendants in October 2000. The proceedings were due to be tried in April 2002 but were settled shortly before trial.

    Hollywood 1, 2 and 3.

8.  The relevant history of the present proceedings is as follows. HIH paid the claims between August 1999 and June 2000. The proceedings against reinsurers were begun in October 1999 and January 2000 (Hollywood 1), March 2000 (Hollywood 2) and October 2000 (Hollywood 3). Preliminary issues were tried in Hollywood 1 and 2. Both David Steel J ( in December 2000) and, on appeal, the Court of Appeal (in May 2001) decided that the contracts of insurance and reinsurance contained warranties as to the number of films to be completed which had been broken: [2001] EWCA Civ 735. JLT became a party in Hollywood 1, 2 and 3 in November 2001.

9.  Axa sought summary judgment on the basis that HIH had no realistic prospect of succeeding in its allegation that the breaches of warranty had been waived. That application came before Mr Jules Sher QC on 21 December 2001. HIH lost. The Court of Appeal dismissed HIH's appeal from that decision in July 2002. The warranty issues in Hollywood 3 were the same and it was only excluded from these issues because the proceedings were commenced later.

10. The two defeats for HIH in the Court of Appeal meant that HIH's claims against reinsurers in each of Hollywood 1, 2 and 3 were bound to fail. Terms of discontinuance were therefore negotiated and agreed towards the end of 2002. The proceedings were then amended to reflect the decisions of the Court of Appeal (to which JLT was not party) and the fact that JLT was thereafter the sole Defendant. Those amendments were served on 28 March 2003.

Flashpoint

11. To introduce one other relevant participant in the commercial transactions, it is convenient to quote from the judgment of Rix LJ in the first Court of Appeal decision, at pages 166-167. The production companies concerned in Hollywood 1 and 2 can shortly be described as 7.23 and Rojak.

"The chain between LDT and the actual producers of the films is a complex one …. Each of these production companies obtained its finance from a Jersey company called Flashpoint Ltd ("Flashpoint") …. Flashpoint seems to have performed a somewhat polymorphous role …. As a provider of finance it was only in an intermediate position, for it obtained its finance in turn from two funding vehicles … (which) represented the various investors …. The relationship between (the funding vehicles) and Flashpoint was governed in the case of each slate by a purchase agreement, under which in return for finance Flashpoint undertook to pay over the revenues of the films up to a cap.

Part of the collateral security required by the investors … was the pecuniary loss indemnity insurance in question. Under each of the purchase agreements payment … to Flashpoint of the finance was subject to the condition precedent of the procurement by Flashpoint of a "policy" underwritten by HIH in favour of LDT as assured ….

I have remarked above that Flashpoint played a polymorphous role. Vis a vis the production companies, it was a financier and co-producer. Vis a vis (the funding vehicles) it was both the effective principal of the placing broker and as such the source of the information presented to HIH for the purpose of the underwriting process and also a managing agent in relation to the working out of the insurance and the exploitation of the films. Its obligations to HIH were governed by … collateral agreements ….

The placing broker used by Flashpoint was (JLT) … (JLT) made the presentations both to HIH and to the reinsurers. The placing was essentially a simple operation, but, in the case of the reinsurance, it may be said that (JLT) was acting on behalf of HIH …."

Hollywood 4 and 5

12. Hollywood 4 and 5 (concerning the insurance and not the reinsurance) proceeded towards trial. The lead insurer was "Lexington". Leading Counsel for Lexington was Mr David Railton QC. HIH were not a party. The trial began, before Colman J, on 7 May 2003. Mr Railton opened the case and referred to allegations of fraud against JLT in relation not only to Hollywood 4 and 5 but Hollywood 1, 2 and 3 and TNP as well. In early June HIH obtained transcripts of the opening. Hollywood 4 and 5 settled on 20 June 2003 part way through the opening. A week earlier HIH had applied in the proceedings for copies of the pleadings and written openings insofar as they related to any allegation of fraud against JLT and Flashpoint in relation to Hollywood 1, 2 and 3. This application was opposed by JLT and was heard by Colman J on 17 July 2003. Judgment was handed down on 9 October 2003. Colman J ordered that HIH have access to the pleadings to the full extent necessary to enable HIH to follow the allegations of fraud made against JLT and Flashpoint in respect of Hollywood 1, 2 and 3 and to the written openings to the full extent necessary to enable HIH to follow the allegations of fraud made against JLT in respect of Hollywood 3 and against Flashpoint in respect of Hollywood 1, 2 and 3. The reason for the wording of the order was that JLT objected to the deployment in opening of allegations of fraud against JLT in respect of Hollywood 1 and 2 on the basis they were not pleaded. Redacted copies of the pleadings and openings in accordance with the order were provided to HIH by JLT on 16 October 2003.

The Fraud Allegations

13. HIH notified JLT of the intention to plead fraud on 20 November 2003. Draft pleadings alleging fraud were provided on 8 March. On 22 March JLT by its solicitors wrote opposing the amendments and setting out the reasons for doing so. Because of the nature of some of these objections it will be necessary to refer to the draft amendments in some detail albeit so far as possible by summary and paragraph numbers of the drafts. The drafts appear in volume 3 of the Case Management Bundle. References to Hollywood 1 will be to the draft in Claim No 1999 Folio 1248.

Case Management in Hollywood 1, 2 and 3.

14. There have been a number of case management conferences. For the purposes of the present application it need only be noted that apart from disclosure on the presently pleaded issues no timetable existed for exchange of witness statements, expert reports or a trial before the present hearing at the end of which orders were made for a trial of an estimated length of 8-10 weeks to commence not before 1 June 2005.

The Existing claims

15. The existing claims make allegations of negligence and breach of contract in the placing of the reinsurances of HIH. HIH allege that JLT, as brokers for HIH in placing the reinsurance, failed to ensure that reinsurers' agreement to any reductions in the number of films was obtained or recorded, thereby depriving HIH of the ability to contend that

reinsurers could not rely upon breaches of warranty as to the number of films, or to ensure that HIH were informed of the want of agreement and advised what to do to so that the reinsurance remained back to back with the insurance, alternatively to make HIH aware of the position before they paid claims under the insurance.

THE PROPOSED FRAUD CASE

16. The proposed fraud case is expressed in terms of both fraudulent misrepresentation and fraudulent non-disclosure. The allegations escalate in the sense that specific allegations of fraud in respect of the Hollywood 1 placing are, so Mr Davies-Jones for JLT submits, completely lacking whereas in Hollywood 3 they are very much to the fore. In each case reliance is also sought to be placed on what is alleged to have been fraud in the placing of TNP and, so far as applicable, in the later Hollywood 2 and 3 placings, as evidence in support of the fraud. The allegations of fraud in respect of TNP are set out in Part A of a Schedule to each draft amendment.

HOLLYWOOD 1 (7.23)

Due Diligence

17. In Hollywood 1 (and 2 and 3) it is alleged that by faxes dated 15 and 16 May 1997 ("the May 1997 faxes") JLT made representations to HIH about the due diligence to be carried out by Flashpoint and generally in respect of film projects which would be presented to HIH for cover. Those representations are alleged to have been repeated in respect of each project at the time it was presented as representations of fact made at that time.

18. The representations are alleged to have been false in fact in (for example) paragraph 21 (i) and (ii) of the proposed claim in Hollywood 1. It is sub-paragraphs (iii) and (iv) of paragraph 21 which give rise to some of JLT's specific objections to the amendments.

19. Sub-paragraph 21 (iii) seeks to make what came to be referred to as the similar fact point as follows:

"The Claimants will contend that the subsequent conduct of Flashpoint and (JLT) in relation to the later Rojak and Award transactions, taken together with their earlier conduct in relation to the New Professionals transaction, amounted to (a) a complete failure to conduct a due diligence exercise ... and/or (b) a pattern of fraudulent behaviour supporting an inference of fraud in this instance ...."

20. Sub-paragraph 21(iv) makes specific reference to "sales estimates" for the films put forward by Flashpoint and JLT alleging, to use my own terms, that they were designed to give a picture which would satisfy HIH but was not true. Mr Flaux QC, for HIH, said this sub-paragraph was intended to make a specific allegation about the actual sales estimates in Hollywood 1 as well as relying on the similar fact point. Mr Davies-Jones said he and JLT had not read it that way. For reasons which will become apparent I need say no more than I sympathise with Mr Davies-Jones and JLT. The contrast with the terms of the sales estimates allegations made in Hollywood 2 and 3 is stark.

Non-Disclosure

21. In sub-paragraph 22 (i) and (ii) of the proposed claim the "due diligence" case is also expressed as "fraudulent non-disclosure". Further, in sub-paragraph 22(iii) it is sought to allege that:

"... these non-disclosures are actionable in deceit because:

(a) combined with the positive representations (made in the May faxes and by presenting the projects) the non-disclosures themselves amounted to misrepresentations ; and/or

(b) by virtue of the positive representations ... (JLT) were under a duty to speak; and/or

(c) by virtue of the duty of disclosure imposed on (JLT) as agents to insure, by Section 19 of the Marine Insurance Act 1906, (JLT) were under a duty to speak; and/or

(d) by virtue of (the HIH) retainer of (JLT) in respect of the obtaining of reinsurance, (JLT) were under a duty to speak ... such duty included a duty to inform (HIH) that non-disclosures had been made to the Reinsurers ..."

The Reliability and Trustworthiness of Flashpoint and JLT.

22. The proposed claim on this basis is set out in paragraphs 23 to 28. It is expressed in terms of non-disclosure of the

alleged fact that JLT "knew that they themselves and Flashpoint were unreliable and untrustworthy".

23.  The similar fact point is again relied upon as is the allegation that the non-disclosures are "actionable in deceit" for the same four reasons as appear in paragraph 22(iii).

HOLLYWOOD 2 (ROJAK).

The Presentation of Rojak.

24.  The proposed claim alleges fraudulent misrepresentations and non-disclosure specific to the placing with Axa of the reinsurance of Hollywood 2 concerning the identity of the sales agents for the films and the independence of those who prepared the sales estimates: paragraphs 16 to 22. Paragraph 24 alleges that JLT fraudulently failed to disclose to HIH these misrepresentations and non-disclosures to Axa before HIH wrote the insurance.

Due Diligence

25.  The same case is sought to be made as in Hollywood 1.

Reliability and Trustworthiness of Flashpoint and JLT

26.  The same case is sought to be made as in Hollywood 1.

HOLLYWOOD 3 (AWARD)

The Presentation of Award.

27.  Paragraphs 15 to 39 of the proposed claim allege fraudulent misrepresentations and non-disclosures specific to the placing of Hollywood 3 in three respects: the plausibility of the sales estimates, the identity and independence of the author of the estimates, and the use of "medium" not "low" projections to compare with the sum insured. The "similar fact point" appears in paragraph 39 relying on the alleged conduct in respect of sales estimates in TNP and Rojak to support an inference of fraud in the case of Hollywood 3.

Due Diligence

28.  The same case is sought to be made as in Hollywood 1.

Reliability and Trustworthiness of JLT and Flashpoint.

29.  The same case is sought to be made as in Hollywood 1.

The Escrow Account

30.  Paragraphs 58 to 63 of Part A of the Schedule to each proposed claim sets out a case of non-disclosure in relation to TNP relating to the operation of an escrow account established to hold any difference between the revenue from TNP and the sum insured.

THE PRINCIPLES TO BE APPLIED

Amendments

31.  Mr Flaux referred to the well-known general principle that a party should be permitted to amend unless the other party would, by the amendments, suffer prejudice which could not properly and fairly be compensated for by a suitable order for costs. He submitted the principle applied to proposed amendments to plead fraud as to any other proposed amendments and so the key question for the court on the present application was the degree to which, if at all, JLT would be prejudiced by the amendments if they were to be permitted. I should record that, although it was adverted to at one time by JLT, there is no suggestion that any of the proposed amendments seek to advance claims that are or may be statute-barred.

32.  In addition, of course, the court must be satisfied that the amendments are in proper form and that they give rise to "a sufficient case to go to trial" to quote Moore-Bick J in Glencore International A.G. v Alpina Insurance Co Ltd

[2002] EWHC 1463. As Moore-Bick J said "That is the threshold test and ... I do not think it is a very high one". In Laws v Society of Lloyds [2003] EWCA Civ 1887 Waller LJ (in paragraph 11) described "the test" to be whether the case sought to be put forward "has a reasonable prospect of succeeding" adding that "it is not right to conduct a mini-trial".

33.   In a case alleging fraud the "proper form" of a proposed pleading requires especial focus on the need for the allegations to be sufficiently particularised before permission to amend is granted to ensure that the defendant to the claim may know with precision the case it has to meet.

34.   These principles are not in dispute but Mr Davies-Jones submitted that there was a further special requirement to be satisfied before an amendment to plead fraud should be permitted which he sought to derive from the decision of the Court of Appeal in Atkinson v Fitzwalter [1987] 1 WLR 201. The submission, as set out in Mr Davies-Jones skeleton argument, is that a late amendment to allege fraud should be refused if:

"(1) The facts giving rise to the plea were known to the applicant at the time of the original pleading;

(2) The failure to plead fraud earlier could amount to overreaching (which JLT understands to mean putting the other side at a disadvantage which they would not otherwise have been in); or

(3) The failure to plead fraud earlier was in connection with some tactical manoeuvre."

35.   The first of these propositions explains the concentration in some of the submissions on what was or was not known to HIH of what it now seeks to rely upon by amendment at the time it launched this claim. Plainly such knowledge or lack of it may in any event be a factor in delay and prejudice and the general balancing exercise. The second proposition seems to me to be no more than one aspect of prejudice. The third, I think, is a reference to some form of abuse of process and again to the prejudice which that might occasion. Mr Davies-Jones expressly acknowledged that JLT were not suggesting that HIH had been guilty of any tactical manoeuvring in that sense.

36.   In Atkinson v Fitzwalter the Court of Appeal considered an earlier dictum of Lord Esher MR in Bentley v Black (1983) 9 TLR 580 that it was "the universal practice except in the most exceptional circumstances, not to allow an amendment for the purposes of adding a plea of fraud where fraud had not been pleaded in the first instance". The Court of Appeal rejected the dictum. May LJ at 210 B-D did so in terms which I think are entirely consistent with the general principles I have stated. So too Parker LJ at 214 E-F. Stocker LJ, at 219 E-F said of "the general proposition that fraud, if not pleaded initially, cannot be raised by subsequent amendment":

"No doubt it is a proposition which would apply in cases where the facts giving rise to the plea of fraud were all known at the time of the original pleading and certainly where the failure to plead such facts could amount to "overreaching" or where the delay in pleading fraud was in connection with some tactical manoeuvre ...."

37.   It is this passage in Stocker LJ's judgment on which Mr Davies-Jones places reliance in support of his submission. In my judgment it does not begin to bear the weight he seeks to put on it. HIH's researches show that Atkinson v Fitzwalter was last referred to in the 1999 (pre-CPR) Edition of The Supreme Court Practice. It was cited at 20/8/23 in support of the proposition that amendments to plead fraud were subject to the same principles as other amendments. Further in Stimp International v Barclays Bank (unreported) 11 August 1996 Lloyd LJ said in terms, after referring to Atkinson v Fitzwalter, "there is no special rule relating to applications to amend to plead fraud". Stocker LJ was the other member of the court and he expressed agreement with Lloyd LJ.

38.   I therefore reject Mr Davies-Jones' submission.

Similar Facts

39.   The Court of Appeal reviewed the law on similar fact evidence in a civil context in O'Brien v CC South Wales Police [2003]EWCA 1085. There is a two-stage test:

  i.   is the evidence logically probative of an issue in the case; and

  ii.  if it is, whether the evidence should nonetheless be excluded as a matter of discretion.

40.   Similar fact evidence is unlikely to be logically probative of fraud where there is no evidence of fraud in the actual transaction impugned: Sail v Farex [1995] LRLR 116. At page 152 Hoffmann LJ said:

"The admissibility of similar fact evidence depends upon it having a strong probative value. This in turn depends not

only on degree of similarity but also on the kind of issue to which the evidence is relevant and the other evidence in the case. The other evidence is frequently of vital importance. It does not follow that merely because something happened on one occasion, it must also have happened on another occasion. On the other hand, if there is other evidence to suggest that it did happen, evidence of earlier occurrences may provide powerful confirmation."

41.  In the context of discretion prejudice is the prime consideration, including the extent to which admitting the similar fact evidence may complicate or prolong the trial and increase costs.

Disclosure of Fraud

42.  Mr Davies-Jones, in making specific objections to the non-disclosure case in proposed sub-paragraph 22(iii) of the Hollywood 1 pleading (paragraph 21 above) referred to PCW Syndicates v PCW Reinsurers [1996] 1 Lloyds Rep 241 in particular per Staughton LJ at page 257:

"I do not find in the authorities any decision that an agent to insure is required by Section 19 (of the Marine Insurance Act 1906) to disclose information which he has received otherwise than in the character of an agent for the assured; and certainly none where the information was as to the agent's own fraud on his principal. I would hold that he is not, whether it be by a branch of the Hampshire Land principle or because he is not an agent for that purpose."

43.  The "Hampshire Land" principle is a reference to the general rule that if an agent is acting in fraud of his principal knowledge of matters relevant to the fraud is not to be imputed to the principal. Mr Davies-Jones also referred to Sybron Corporation v Rochem Ltd [1984] Ch 112 as authority that an agent owes no duty to the principal to disclose his own fraud. That was in the context of a specific objection to paragraph 24 of the proposed claim in Hollywood 2 (see paragraph 24 of this judgment) seeking to allege a failing by JLT to disclose to HIH alleged fraudulent misrepresentation and non-disclosure made by JLT to Axa in placing the reinsurance.

44.  The thrust of Mr Davies-Jones submissions on the basis of these authorities was that the proposed non-disclosure case in (for example) paragraph 22(iii) of Hollywood 1 was unsustainable in law in seeking to rely on alleged fraud in TNP as the assured in Hollywood 1 was LDT and the assureds in TNP were other parties and that the proposed non-disclosure case in paragraph 24 of the pleading in Hollywood 2 was also unsustainable because the alleged knowledge was only acquired as HIH's agent to insure and in any event there was no obligation on JLT to disclose its own fraud to HIH as its principal.

OBJECTIONS TO THE AMENDMENTS IN PRINCIPLE

45.  Relying in large part on his submissions based on Atkinson v Fitzwalter which I have rejected, Mr Davies-Jones submitted, first, that the delay in bringing forward these amendments and what he termed HIH picking up, putting down and then picking up again the TNP allegations, was such that the courts should refuse permission for all the amendments for that reason. I reject that. But he also submits that there will be uncompensateable prejudice to JLT should any of the amendments be permitted and I must therefore address both delay and prejudice.

Delay

46.  I think the material considerations and submissions and my views upon them can be summarised as follows:

    i.   Undoubtedly many months have passed since these proceedings were commenced. But a glance at the chronology of the proceedings (paragraphs 8 and 9) reveals that it was only at the end of 2002 that the claims against reinsurers had to be discontinued. Although Mr Davies-Jones was critical of the statement by Mr Flaux that until then the focus of HIH had been on the warranty issue and the hearings in the Court of Appeal, he accepted of course, when told, that so far as counsel was concerned that was so. For my part I am not at all surprised or critical. Plainly, as in fact occurred, the preliminary issues and Part 24 application had the potential to change the whole structure of the proceedings.

    ii.  At the time of the present hearing no dates had been set for exchange of witness statements or experts reports let alone trial. Trial is, at earliest, some 11 months away. It cannot be (and has not been) suggested that JLT could not be ready for a trial of the fraud allegations.

    iii. HIH made allegations of fraud against JLT in respect of TNP some 4 years ago. Those allegations are similar to the ones now sought to be made in these proceedings albeit, to quote Mr Flaux, they have been "refined" in the light of the allegations now known to HIH to have been made by Lexington in Hollywood 4 and 5. The refinements only came to HIH's attention on 16 October 2003 (paragraph 12).

iv.   In Hollywood 3 itself New Hampshire alleged in its amended Defence served in July 2001 (in addition to the breach of warranty defence) that it was entitled to avoid the reinsurance with HIH because JLT had fraudulently misrepresented to it that it and Flashpoint were reliable and trustworthy whereas their alleged manipulation of sales estimates in respect of TNP demonstrated that to be false. On 23 November 2001 HIH amended its claim against JLT to rely on those allegations (contingently on New Hampshire establishing them) as allegations of breach of contract or duty by JLT to HIH. Mr Flaux stated expressly that it was not intended by this that HIH itself was alleging fraud in the respects alleged by New Hampshire. When HIH discontinued its claim against New Hampshire and amended the claim against JLT in consequence in March 2003 (paragraph 10) the contingent allegation was deleted, as it had to be, expressed as it was. It was this sequence of events that underlay Mr Davies-Jones' submission that the allegations had been picked up, put down, and were now being sought to be picked up again. I reject the description. There is a real difference between what was then alleged and the direct allegation of fraud now sought to be made.

v.   I can accept that HIH may have been in a position, had they sought to do so, to advance some and possibly most of the allegations now sought to be made some time ago. Axa in Hollywood 2 (in May 2000) and Axa and New Hampshire (in June/July 2001) in Hollywood 3 made allegations similar to those new sought to be made by HIH. Further HIH has learnt nothing from the pleadings and openings it has seen from Hollywood 4 and 5 to add to its sum of knowledge on Hollywood 1 and 2. But, in the context of the timetable (or lack of it) for these proceedings, I do not think any significant criticism is to be made of HIH for first seeing what it might glean from Hollywood 4 and 5 which, of course, were proceeding and might not have settled as or when they did.

Prejudice

47.   I think the material considerations and submissions and my views upon them can be summarised as follows.

i.   Allegations of deceit are serious. They place great strains on the individuals concerned. In this case Mr Davies-Jones submitted those strains were compounded by the "raising of false hopes and legitimate expectations". That was a further reference to delay in putting the allegations forward and the picking up and putting down point. But there is no evidence from any individual concerned that they thought or believed fraud was no longer being or would not be alleged against them. Indeed it would be surprising if there had been such evidence. The allegations were live in Hollywood 4 and 5 until June 2003 and HIH sought the pleadings and openings in those proceedings before they settled. The target of that application was obvious.

ii.   There are risks of unfairness in witnesses having to face any, but in particular such, allegations so long after the events occurred. But the issues are extensively documented and the relevant witnesses will have been questioned and proofed on behalf of JLT both for the TNP proceedings and Hollywood 4 and 5 in which witness statements had been exchanged before the proceedings settled. It is also those three projects which give rise to the most serious and best documented allegations.

iii.   It has been inevitable for some time, because of the applications which led to the decision of the Court of Appeal, that Hollywood 4 and 5 would come to trial (if they did) before Hollywood 1, 2 and 3. Indeed any trial date for these proceedings, in fairness to JLT, would have had to be set for a date sufficient to allow for the trial and in all probability judgment in those cases. The date for trial now set has to be viewed in that context and may well not have been much different if established earlier.

iv.   There can be no doubt that inclusion of the TNP allegations in these proceedings will add to the length of the trial. TNP itself had an estimated trial length of 5 weeks but there were, essentially, 3 parties involved. Mr Davies-Jones suggested inclusion would increase a 4 week estimate to the 8 weeks the court has allowed. That is a real factor to be put in the balance. On the other hand the events of TNP took place only shortly before those directly concerned with Hollywood 1, 2 and 3 and involved the same major personalities. It should also be recorded that listing in this court was such at the time of the hearing that the start-date for an 8 week trial would be no different from a 4 week trial.

Conclusion

48.   In my judgment the questions of principle whether or not permission to make amendments to plead fraud should be granted comes down emphatically in favour of giving that permission, subject of course to the usual sanction in costs. HIH has not in my judgment acted unreasonably in bringing forward the amendments now and they will if allowed cause no significant prejudice to JLT which cannot be compensated in costs.

SPECIFIC OBJECTIONS

HOLLYWOOD 1

Due Diligence

The May 1997 faxes.

49. The first submission made by Mr Davies-Jones was that the allegations were based on "an obvious misreading" of the two faxes. He submitted they were referring only to what may be called "legal" due diligence to be entered into in connection with the films and not to any due diligence on sales estimates or the like. I do not agree in the sense that I think there is a sufficient case to go to trial that the faxes carried the wider connotations on which HIH relies and the references to legal due diligence were illustrative not exclusive. The second submission was that the faxes contained only a representation as to the future not to the past. In general I agree, but the case is pleaded by HIH on the basis the representation was repeated when the various film projects were later presented for approval. Again that seems to me to raise a sufficient case for a trial.

Particulars of Falsity

50. Mr Davies-Jones had some compelling criticisms to make under this heading. In summary terms they included reliance on similar fact evidence without any relevant allegation relating to Hollywood 1 itself (see paragraphs 20 and 40); want of particulars of knowledge; and as to the non-disclosure case relating to TNP, infringement of the principle in PCW Syndicates v PCW Reinsurers (paragraphs 42-44). Mr Flaux submitted that at least in part it was HIH's case that Flashpoint was the or at least also a principal of JLT in the placing of the risk. But he acknowledged that case was not pleaded and that generally the case of HIH was still not adequately set out and required to be "re-visited". It follows that the application to amend in this regard must be refused and it will be for HIH to come forward with other amendments, if so advised, for consideration on their merits if and when they do so.

Reliability and Trustworthiness

51. Mr Davies-Jones made similar submissions. Mr Flaux's response was much the same: the drafting would be re-visited. The consequence is therefore the same as regards the presently proposed amendments.

TNP Allegations

52. Mr Davies-Jones submitted that in any event permission should not be given for the TNP allegations to be relied upon as similar fact evidence because their inclusion would unnecessarily prolong and complicate the trial. As this submission applies also to Hollywood 3, in which there are specific allegations as to the sales estimates for which reliance is placed on TNP but which are not otherwise open to specific objections, I propose to address this submission in that context. However, Mr Davies-Jones referred in particular to the Escrow Account references in Part A of the Schedules to each claim (paragraph 30) to make the point that the allegations there made appear not to be relied upon in or relevant to the body of any of the draft pleadings. References to Part A are all apparently in the context of allegations about sales estimates not escrow accounts. To quote Mr Davies-Jones "it appears ... that the escrow account allegations have been included without any proper consideration as to what they are doing there and they should not be allowed". I agree. So did Mr Flaux, at least to the extent of acknowledging that they should not be allowed in their present form.

HOLLYWOOD 2

Due Diligence; Reliability and Trustworthiness; Escrow Account.

53. The same considerations apply as for Hollywood 1 and the consequences are the same.

The Presentation of Rojak.

54. Although Mr Flaux maintained the proposed amendments (paragraph 24) were sustainable despite PCW and Sybron (paragraphs 42 and 43) he wished to consider advancing the claim on a further basis in addition. I think it better to await any further amendment albeit I do not mean by that that I think the present proposed formulation is an acceptable one.

HOLLYWOOD 3

Due Diligence; Reliability and Trustworthiness; Escrow Account.

55. The same considerations apply as for Hollywood 1 and the consequences are the same.

The Presentation of Award

56. The only submission made by Mr Davies-Jones was that the proposed allegations replicated allegations made by Lexington in Hollywood 4 and 5 in respect of sales estimates which Lexington had subsequently abandoned. But there is no explanation for why Lexington did so and in any event I do not think HIH can be precluded from making the allegations simply for that reason.

Similar Fact and TNP

57. Mr Davies-Jones accepted that the evidence was logically probative of an issue in the case and admissibility was therefore a matter for my discretion. It is, I think, important to appreciate that the issues on which the evidence is logically probative are the falsity of the sales estimates and JLT's knowledge of that falsity. The matters pleaded in relation to TNP, if established, could, as Mr Flaux submitted, be compelling evidence on those issues especially so as the material events all occurred in the same year and involved the same people.

58. I accept that the TNP allegations will lengthen any trial (perhaps by as much as 4 weeks) and increase the costs. But even then a trial is only estimated to last some 8 to 10 weeks and the timetable for a trial was set on the basis the TNP allegations would be included in it.

59. I think the balance decisively favours admission of the evidence.

HAND-DOWN

60. When this judgment is handed-down I shall look to the parties to prepare a draft order to reflect its terms and will consider any ancillary matters which cannot be agreed.

# EXHIBIT 10

Sheet1

106/062/02815

| Client Name | Film | Inception | SI ($) | Net Premium | Brokerage | Risk Management |
|---|---|---|---|---|---|---|
| **Phoenix (1)** | | | | | | |
| | Mirror Has Two Faces | 1-Jun-96 | 24,356,702 | 1,309,082 | 327,271 | 318,504 |
| | People vs Larry Flynt | 1-Jun-96 | 23,660,377 | 1,260,662 | 315,165 | 305,535 |
| | Swept from the Sea | 2-Sep-96 | 9,506,650 | 485,810 | 121,452 | 113,428 |
| | U-Turn | 13-Dec-96 | 14,048,457 | 714,155 | 178,539 | 191,292 |
| | Apt Pupil | 10-Feb-97 | 10,141,350 | 526,937 | 131,734 | 141,144 |
| **Paramount (1)** | | | | | | |
| | Phantom | 23-Sep-96 | 8,848,908 | 609,482 | 152,370 | 190,463 |
| | Beautician and The Beast | 23-Sep-96 | 7,653,220 | 527,126 | 131,782 | 164,727 |
| | In N Out | 23-Sep-96 | 6,371,657 | 438,857 | 109,714 | 137,143 |
| | Truman Show | 27-Mar-97 | 26,466,430 | 1,804,320 | 451,080 | 563,850 |
| **Paramount (2)** | | | | | | |
| | The Saint | 3-Apr-97 | 13,972,477 | 954,988 | 238,747 | 298,434 |
| | Event Horizon | 11-Aug-97 | 20,019,689 | 1,368,302 | 342,075 | 427,594 |
| | Face Off | 16-Aug-97 | 18,485,150 | 1,263,420 | 315,855 | 394,819 |
| | Magic Hour | 16-May-97 | 15,041,210 | 1,028,034 | 257,008 | 321,261 |
| **Paramount (3)** | | | | | | |
| | Kiss the Girls | 3-Oct-97 | 5,837,178 | 398,598 | 99,739 | 124,674 |
| | A Night at the Roxbury | 17-Dec-97 | 7,214,125 | 493,070 | 123,267 | 154,084 |
| | Odd Couple II | 17-Dec-97 | 14,492,607 | 990,538 | 247,634 | 309,543 |
| | Snake Eyes | 17-Dec-97 | 15,435,349 | 1,054,972 | 263,743 | 329,679 |
| **J&M** | | | | | | |
| | Letters From A Killer | 21-Mar-97 | 18,226,217 | 944,724 | 236,161 | 171,817 |
| | All the Little Animals | 24-Jul-97 | 3,707,541 | 266,942 | 40,783 | 44,489 |
| **CineVisions** | | | | | | |
| | Shattered Image | 30-Jun-97 | 1,974,278 | 142,076 | 35,519 | 39,466 |
| **Mayfair Entertainment** | | | | | | |
| | Hurrah | 31-Jul-97 | 989,062 | 71,213 | 17,803 | 46,486 |
| **Douris** | | | | | | |
| | Douris / Rohauer Library | 30-Jun-97 | 5,066,764 | 490,000 | 122,500 | 87,000 |
| **Amy Productions** | | | | | | |
| | Such a Long Journey | 23-Dec-97 | 402,086 | 28,678 | 7,527 | 8,042 |
| **MGM / UA** | | | | | | |
| | Red Corner | 27-Mar-97 | 17,089,639 | 1,936,826 | 484,205 | 569,655 |
| **MGM / Orion** | | | | | | |
| | Wellcome to Woop Woop | 8-Jan-98 | 2,050,306 | 185,758 | 46,439 | 43,569 |
| | Live Flesh | 8-Jan-98 | 295,920 | 26,810 | 6,703 | 6,288 |
| | Deceiver | 8-Jan-98 | 452,124 | 40,962 | 10,241 | 9,608 |
| | Music From Another Room | 8-Jan-98 | 1,493,130 | 135,278 | 33,819 | 31,729 |
| | Hurrican Streets | 8-Jan-98 | 338,194 | 30,641 | 7,660 | 7,187 |
| | One Man's Hero | 8-Jan-98 | 2,397,364 | 214,483 | 53,621 | 50,307 |
| | I Love You, Don't Touch Me | 8-Jan-98 | 347,072 | 31,445 | 7,861 | 7,375 |
| | Best Men | 8-Jan-98 | 1,662,892 | 150,584 | 37,646 | 35,332 |
| | Hanging Garden | 8-Jan-98 | 211,371 | 19,150 | 4,788 | 4,492 |
| **TOTAL** | | | 298,257,296 | 19,943,923 | 4,960,470 | 5,649,016 |

10,609,487



EXHIBIT
BARRETT
2
2 June 1998

Page 1