# EXHIBIT 11

Source:  Legal > Legal (excluding U.S.) > United Kingdom > Case Law > **UK Cases, Combined Courts**  ᵢ
Terms:  **hih and chase and phoenix**  (Edit Search)

✒Select for FOCUS™ or Delivery

*(Transcript)*

**HIH** Casualty and General Insurance Ltd and others v **Chase** Manhattan Bank and others

QUEEN'S BENCH DIVISION (COMMERCIAL COURT)

*(Transcript)*

**HEARING-DATES:** 31 JULY 2000

31 JULY 2000

**COUNSEL:**
J Cooke QC and J Drake for the Claimants; C Edelman QC and D Edwards for the First
Defendants; C Butcher for the Second and Third Defendants

**PANEL:** AIKENS J

**JUDGMENTBY-1:** AIKENS J

**JUDGMENT-1:**
AIKENS J: [1] I have to determine three Preliminary Issues that were ordered to be heard by
Longmore J on 4 April 2000. The issues arise in three consolidated actions (Claim Nos 1999
Folios 1413 ("the First Action"); 1443 ("the Second Action") and Claim No 2000 Folio 00015
("the Third Action")). The First Action was brought by **HIH** Casualty and General Insurance
Ltd and other insurers ("**HIH**"). (However I was informed that insurers covering about 50%
of the insurance had paid the claims made on the policies and declarations) of financial
contingency insurance written for the benefit of the first defendants, **Chase** Manhattan Bank
("**Chase**"). **Chase** acted as agent for all the other lenders who, with **Chase**, participated in a
loan syndicate to provide finance for the production of five films. The second and third
defendants in the First Action ("Heaths") are the brokers who were concerned in the
negotiations in 1996 leading to the insurance. The insurers issued a line slip facility which, as
everyone agrees, was a contract for insurance, rather than a contract of insurance as would
be the case with individual policies. Under this line slip three declarations were made by off-
slips in respect of three of the five films: "Amy Foster"; "U-Turn" and "Apt Pupil". In the First
Action **HIH** claims to be entitled to avoid or rescind the line slip facility and/or the
declarations made under that facility because of non-disclosure and misrepresentations made
by Heaths in the course of the negotiations. **HIH** have alleged that these non-disclosures and
misrepresentations were fraudulent or negligent. **HIH** also claims, in the alternative,
damages from both **Chase** and Heaths for the alleged non-disclosures and
misrepresentations.

[2] The Second and Third Actions were brought by **Chase** against **HIH.** They concern
separate policies of financial contingency insurance that were issued in respect of two of the
five films: "The Mirror Has Two Faces" and "The People vs Larry Flynt". In those Actions
**Chase** claims an indemnity under the two policies. The total sum claimed in those actions is
about US$ 16.5 million.

[3] The Preliminary Issues to be tried in the consolidated action are as follows:

"On the true construction of the contracts of or for insurance pleaded in the Particulars of

Claim No 1999 Folio 1413 and on the assumption that the facts and matters pleaded in those Particulars of Claim are true, are the Claimants (**HIH**) entitled:

(a) to avoid and/or rescind the contracts of or for insurance against the First Defendants (**Chase**); and/or

(b) to damages from the First Defendants (**Chase**) for misrepresentation or non-disclosure; and/or

(c) to damages from Heaths for non-disclosure."

[4] The trial of these Preliminary Issues took place on 26 - 28 June 2000. I heard oral submissions from Counsel for **Chase, HIH** and Heaths, in addition to the substantial and very helpful Written Submissions that had been made. In the course of the written and oral submissions I was referred to some 50 authorities. I reserved judgment.

(A) The Background Facts

[5] The following facts are summarised principally from the Amended Particulars of Claim of **HIH:**

(1) **Phoenix** Pictures Inc ("PPI") was a film production company operating in the USA. In late 1994 and early 1995 PPI had discussions with Mr Graham Bradstreet in the hope that Mr Bradstreet would assist in obtaining insurance backed finance for PPI's proposed film productions. PPI intended to finance its productions by bank loan facilities. These loans would be repaid from revenues created by the exploitation of the films produced. It was intended that the repayment of the loans made by the lending banks would be insured by a form of insurance known as "time variable contingency" or "TVC" insurance.

(2) That type of insurance had been developed by a company called Screen Partners Ltd ("SPL"), which Heaths knew and had worked with since 1992. The use of TVC insurance to cover the risk of lending banks being unable to recover loans made to finance films had been developed by SPL and Heaths in 1992. Such insurance had been placed in the London insurance market since 1992 and in the international market since 1995.

(3) On about 7 July 1995 Mr Bradstreet, through his wholly owned company Premier Media Ltd ("PML") reached an agreement with PPI by which PML proposed to assist in financing up to 38 of PPI's films (over 5 years) by:

"procuring the issuance of a time variable contingency policy brokered through CE Heath (Insurance Broking) Limited."

(This is from Recital B of the agreement quoted in para 17 of the Amended Particulars of Claim: B1/p 18) (**HIH** say, although this may be the subject of argument, that this agreement made PML contractually responsible for obtaining the contingency insurance in respect of the films, for which PML would be paid a fee. Heaths were paid the "PML fee" which would include the premium payable to the financial contingency insurers). The agreement contemplated that the insurance would be broked through Heaths.

(4) **HIH** allege that PML were the agents of the insureds for the purpose of obtaining the insurance. But **HIH** also alleges that PML, Mr Bradstreet and SPL were at various times acting as the risk managers for the Insurers and so were their agents, although at the time of the placements SPL had been removed from that position.

(5) Therefore, **HIH** alleges, there was a clear conflict of interests in the position of PML and Mr Bradstreet, as to which the Insurers did not give their informed consent and which was

not disclosed to them.

(6) Pursuant to the PPI/PML agreement Heaths were retained as brokers. They wrote to PPI confirming that they would procure the TVC insurance on the terms indicated in the PPI/PML agreement. **HIH** have alleged that Heaths broked the contracts of or for insurance on the basis that they were the same as the TVC insurance that Heaths had broked in 1992 and subsequent years.

(7) The slip that was subsequently made the subject of Policy No 614/NKA/118A for the film "The Mirror Has Two Faces" was signed by **HIH** in June 1996 and other Claimants in June to September 1996.

(8) The line slip facility was signed by **HIH** in June 1996 and by other Claimants in the period June to September 1996. That was subsequently made the subject of Policy No 614/OL077A. Thereafter three declarations for the three films mentioned above were made in September and December 1996 and February 1997.

(9) In October 1996 **HIH** signed the slip in respect of the film "The People vs Larry Flynt." That slip was subsequently made the subject of Policy No 614/NKA/119A.

(10) Although the policy wording for each of the three policies is not identical, it was broadly in the same terms in respect of the following clauses:

(a) The Insured: This was identified as being **Chase**, for itself and as agent for the lenders from time to time under the relevant Loan Agreement (**Chase** were also named as the Insured in the two policies of insurance and, by an Endorsement to the PPI Line Slip Facility, in respect of policies resulting from declarations thereunder);

(b) The Insuring Clause: This stated that the Policy was to indemnify the Insured for their "Ascertained Net Loss" in respect of the Film Production that was the subject of the policy or the declaration(s), up to a certain limit:

"in consequence of their incurring Time Variable and/or Contingent Expenses as defined within this policy."

(c) "Ascertained Net Loss": This was stated to mean the "Time Variable" and/or "Contingent Expenses" that were "outstanding and unpaid on the Claim Determination Date" after various deductions. This meant, broadly, that if the insured banks had not recovered their loans from revenues engendered by the films the subject of the policies by a certain date ("the Claim Determination Date"), then they could claim those amounts under the policies up to the "Sum Insured" (I was informed that the Claim Determination Date had passed for the films "The Mirror Has Two Faces" and "The People vs Larry Flynt"; hence the claim on those two policies in the Second and Third Actions for US$ 16.7 million. The Claim Determination Dates for the other three films, declared under the Line Slip Facility are: 5 January, 23 April and 11 June 2001).

[6] The details of the financing arrangements between **Chase** and those involved in the proposed films are not dealt with in the Amended Particulars of Claim. However in order to understand the whole commercial background it is necessary to refer to the contracts, which were put in the bundles for the hearing and referred to by **Chase** without serious objection from **HIH**.

(1) TriStar Pictures Inc ("Tristar") owned the distribution rights to the film "The Mirror Has Two Faces". It entered into a Revenue Participation Agreement ("RPA") with Elmwood Films Inc ("Elmwood") dated 31 October 1996. Under the RPA Elmwood purchased the right to receive revenues from the film "The Mirror Has Two Faces" (referred to as the "First Film" in

the RPA) from Tristar. The purchase price was to be paid for by permitting Tristar to draw down on a Letter of Credit facility that Elmwood had made with **Chase** under the terms of what is referred to as the "First Picture Reimbursement and Loan Agreement". A copy of the terms of that agreement is exhibited to the RPA.

(2) In the same RPA the parties also agreed to a similar arrangement in relation to the film "The People vs Larry Flynt", referred to in the RPA as "the Second Film". The RPA contemplated that Elmwood would procure from **Chase** a further letter of credit facility in favour of Tristar, which would be the subject of a further Reimbursement and Loan Agreement between Elmwood and **Chase.**

(3) **Chase,** as agent for all the lending banks, entered into a Reimbursement and Term Loan Agreement ("RTLA") with Elmwood Films Inc as obligor on 31 October 1996 (B2/pp 57 - 130). This agreement related to the film "The Mirror Has Two Faces". The Introductory Statement to that agreement explains that the purpose of the facility afforded to Elmwood under its terms is to finance the purchase by Elmwood of a participation in the revenues generated by that film under the terms of the RPA (B2/pp 131 - 147). The RTLA states that, under the RPA, Elmwood agreed to pay the distributor of the film, Tristar Pictures Inc ("Tristar") US$ 16,915,450 for Elmwood's share in the film revenues. Under the RTLA, **Chase** and the other lenders agreed to provide the letter of credit and to loan to Elmwood the value of the letter of credit so that Tristar could draw down on it as the price for Elmwood's purchase of its interest in the RPA. **Chase** and the other lenders also agreed to provide further funds to Elmwood of just over $ 6 million for purposes connected with the principal loan.

(4) The RTLA provides as follows:

(a) in the "Introductory Statement" that, concurrently with the conclusion of the RTLA, Elmwood (as the "Obligor" under the RTLA):

"is purchasing Contingency Expense Insurance ('the Insurance') that will insure that the Participants [ie the lending banks] will repay the amount necessary to repay the Reimbursement Obligation. The named insured on the Insurance is the Issuing Bank as agent for the Participants."

(b) In the Definition section, Section 1, that the insurance was to be substantially in the form set out in Exhibit F to the RTLA with "such changes as shall be approved by the Issuing Bank."

(c) In Section 2, the RTLA provided for repayment by Elmwood of the letter of credit drawings by Tristar. Section 2.2(c) provided that Elmwood's obligation to reimburse the lenders for the amounts of the drawings under the letter of credit:

"shall be absolute, unconditional and irrevocable and shall be paid strictly in accordance with the terms of this Agreement under any and all circumstances . . ."

Section 2.7 provides that anything received by Elmwood from Tristar under the RPA and any proceeds of the contingency insurance will be applied to repay the loan;

(d) Under Section 4.1 it was a condition precedent to the lenders providing the letter of credit that:

(i) the Issuing Bank would have received the insurance; and

(ii) the lenders would have completed its due diligence investigations. But at the hearing before me it was emphasised for **Chase** that those investigations did not include any

enquiries as to the revenue projections of the films. Nor was the due diligence (of any sort) a precondition of the insurance;

(iii) that Elmwood would have deposited with **Chase** the premium for the insurance. This was US$ 1,189,082 for the first layer, which was for a sum insured of US$ 17,356,702. There were further premiums for a higher layer.

(e) Under Section 6 (Events of Default), in para (i), one of the Events of Default identified is the insurance ceasing to be in full force and effect or being declared null and void or becoming unenforceable, terminated or "disaffirmed" by the underwriters thereunder.

(5) In respect of the other three films (ie "Amy Foster"; "U-Turn" and "Apt Pupil"), **Chase** entered into a revolving credit facility with PPI. PPI entered into an "Output Distribution Agreement" (which was of similar effect to the RPA for the other two films) with two companies: Sony and Canal +.

(B) The relevant terms of the two facultative policies (that is those for the two films: "The Mirror Has Two Faces"; and "The People vs Larry Flynt") and other contracts

[7] It is agreed that I can take the policy wording for the film "The Mirror Has Two Faces" as being representative of all the wording of all the policies. The important clauses, in addition to those set out in para 5(10) above are:

(1) The Definition Clause: There are definitions of:

(a) the Claim Determination Date. This is stated to be 36 months after the calendar month in which Delivery of the film occurs. The "Delivery" of the film is defined as the "initial theatrical release of the Film Production in the United States".

(b) the Reimbursement Agreement. This is a reference to the RTLA.

(c) the Revenue Participation Agreement. This is a reference to the RPA.

(d) the Sum Insured.

(e) the Declaration. This refers to a Declaration that is made by the Insured and accepted by the Lead Insurers, (they are defined as being the XL Reinsurance Company Limited of Bermuda and **HIH)** in the form set out in Schedule 1 to the policy.

(f) the Questionnaire. This refers to the Questionnaire in the form in Schedule 2 to the policy.

(2) The Conditions Precedent Clause: This is the key clause for the purposes of the Preliminary Issues. It provides as follows:

"It is a condition precedent to this Policy that:

Truth of Statement

Elmwood Films Inc has truthfully completed Section I of the Questionnaire to the best of its knowledge. Any reference in the Questionnaire to the Revenue Participation Agreement is qualified by reference to the copy thereof attached to the Questionnaire or the Declaration. In completing the Questionnaire, Elmwood may rely on certificates of third parties to the extent such reliance is disclosed on the Questionnaire.

Provided that Elmwood Films Inc completes the sections of the Questionnaire required to be completed by it and delivers the same to the Lead Insurers (it being acknowledged that any

misstatement in any part of the Questionnaire (other than Section 1 thereof) shall not be the responsibility of the Insured or constituted a ground for avoidance of the insurers' obligations under the Policy or the cancellation thereof). In addition, the failure of Elmwood Films Inc, to update Section I of the Questionnaire for a Film Production shall not be the responsibility of the Insured or constitute a ground for avoidance of the insurers' obligation under the Policy or the cancellation thereof. Subject to the obligations of the Insured under 'General Conditions - Due Diligence Clause' after acceptance by the Lead Insurers of the Declaration with regard to the Film Production, the Insured will not have any duty or obligation to make any representation, warranty or disclosure of any nature, express or implied (such duty and obligation being expressly waived by the insurers) and shall have no liability of any nature to the insurers for any information provided by any other parties and any such information provided by or nondisclosure by other parties including, but not limited to, Heath North America & Special Risks Ltd (other than section 1 of the Questionnaire) shall not be a ground or grounds for avoidance of the insurers' obligations under the Policy or the cancellation thereof."

(3) The General Exclusions Clause:

"This policy will not indemnify the incurring of Time Variable and/or Contingent Expenses directly or indirectly arising out of, contributed by or resulting from:

1. Any fraud, misrepresentation or concealment by the Insured, any employee of the Insured or the Distributor or any agent of Distributor . . ."

(4) The Miscellaneous Clause: Part of this provides:

"The rule that a contract is to be construed against the party drafting the contract is hereby waived, and shall have no applicability in construing this policy or the terms of this Policy.

. . .

Insurers understand and agree that Premier Media Limited, Graham Bradstreet, TriStar Pictures, Inc and **Phoenix** Pictures Inc are not agents or representatives of the Insured.

It is understood and agreed that insurers are not bound whatsoever by the terms of any agreements with third parties entered into by Premier Media Limited or Graham Bradstreet . . .

. . .

The Insured is a large financial institution and for purposes of this condition precedent (the parties agreed that the wording "this condition precedent" was inapt but there was no explanation of how it came to be in this clause) and other provisions of this Policy, matters known to the Insured shall only refer to matters known to or delivered to those officers of the Insured servicing the Reimbursement Agreement . . ."

(5) The Revenue Analysis Clause:

"Insurers acknowledge that they have been informed by the Insured that it has neither requested nor received nor intends to request any revenue projections from the Distributor for the Film Production or any other film production into which insurers may have crossing rights. In addition, Insurers acknowledge that they have received no such projections from the Insured, the Distributor or any of their respective agents except as set forth in the Questionnaire. Except as set forth in the Questionnaire any revenue analysis or financial projections for the Film Production at the time the Film Production is submitted for Declaration upon which insurers are relying were prepared for them by their agents or

independent contractors and not by the Insured, the Distributor or their respective agents."

(6) Declaration No 1 under this policy, dated 31 October 1996 indicates that the film is "The Mirror Has Two Faces" and stipulates that the Sum Insured "at this time" is US$ 17,356,702 for the first layer.

(7) The Questionnaire is attached to the policy. This provides:

(a) In Section I - General:

"Undersigned represents and warrants to the Insurers ('Insurers') under the time variable contingency insurance policy with respect to the film described below (the 'Policy') that the information set forth in Section 1 of this Questionnaire is at the date hereof true and correct in material respects . . ."

The Questionnaire then sets out certain information, such as the name of the "Applicant" although this is Elmwood, not **Chase,** and the name of the Production Company, the name of the director and principal cast (identified as Barbra Streisand and Barbra Streisand and Jeff Bridges respectively), the date for delivery (20 December 1996) and the name of the distributor (TriStar). Section 1 is signed by a representative of Elmwood and is dated 21 December 1995.

(b) In Section II - "TVC Insurance": The introductory clause states that:

"Information set forth in Section II of this Questionnaire is provided without representation or warranty of any kind."

The clause continues that the Insurers acknowledge that the estimates set out in Section II are "purely informational"; and that the Insurers acknowledged that they had relied upon their own analysis of revenue estimates and that the Insurers would not be excused from paying any claim under the policy if for any reason the actual revenues are less than the estimates set forth in Section II.

The relevant terms of the Line Slip Facility

[8] None of the relevant terms are different to those in the Facultative policies. There is a minor difference in the Truth of Statement Clause in that there are no brackets around the phrase:

"it being acknowledged that any misstatement . . . under the Policy or the cancellation thereof."

No one suggested that this produced any difference in the result.

The Declarations under the Line Slip Facility

[9] The declarations of the three films were made on 5 November 1996 (for "Amy Foster"); 13 December 1996 (for what became "U-Turn", although it was declared as "Untitled Oliver Stone Project" aka "Stray Dogs"); and 10 February 1997 (for "Apt Pupil"). None of the terms of the declarations were relied upon by any of the parties for any particular argument at the hearing, so I shall not set them out in this judgment.

(C) The allegations made by **HIH** against **Chase**

Misrepresentations

[10] **HIH** alleges that before the conclusion of each of the contracts of or for insurance, Heaths made misrepresentations to the insurers. It is alleged that these misrepresentations were made fraudulently; recklessly or negligently in breach of a duty of care owed by **Chase** and Heaths to **HIH** (Amended Particulars of Claim para 48. The duty of care is pleaded in relation to both contracts of and for insurance). The details of the misrepresentations are set out in Sch 2 to the Amended Particulars of Claim. That schedule runs to 58 pages. The principal complaints appear to be:

(1) that Heaths represented that the policies that were being broked for the PPI films were the same as the TVC policies that had been concluded in 1992 and subsequent years, whereas the later policy terms were materially different. The key differences pleaded were that under the later policy terms (i) it was agreed that revenues would not be available to repay the insured lender banks unless and until all advances and all distribution expenses (which were defined broadly and imprecisely) had been recouped; and (ii) that insurers had little or no control over the production in the event of a claim on the insurance (para 3.1 of Sch 2 to the Amended Particulars of Claim).

(2) Heaths represented that the previous TVC facility had been claims free, whereas that was not true (para 3.2 of Sch 2 to the Amended Particulars of Claim).

(3) Heaths represented that Lloyd's underwriters and the lead company insurer had withdrawn their lines from the slips for "The Mirror Had Two Faces" and the Lineslip because the risk was akin to a financial guarantee which they either could not or did not wish to underwrite and also for "political reasons" between the lead company insurer and its head office; whereas the true reason was that Lloyd's withdrew because of non disclosures or misrepresentations by Heaths and the company lead had withdrawn because its head office had expressed fundamental technical concerns about the risks (para 3.8 and 3.9 of Schedule 2 of the Amended Particulars of Claim).

Non-Disclosures

[11] **HIH** also alleges that, prior to the contracts of or for insurance Heaths failed to disclose material facts and did so fraudulently (in the sense that the non-disclosure was done deliberately with the intent of hiding the facts from **HIH**); or recklessly (not caring whether or proper disclosure was made). Alternatively it is said that the non-disclosure was made negligently in breach of a duty of care owed by **Chase** or Heaths to **HIH** (Amended Particulars of Claim para 50. The pleading appears to allege that there is a duty of care in the contracts of insurance). The particulars of non-disclosure are set out in Sch 3 to the Amended Particulars of Claim; that schedule runs to five pages only. The principal non-disclosures alleged are:

(1) that there had been claims on the TVC facility in the 1992-3 year:

(2) that the Lloyd's market withdrew as a result of non-disclosures and misrepresentations;

(3) that the lead company insurer had withdrawn from the **Phoenix** facility because of fundamental technical concerns as to the **Phoenix** risk;

(4) that SPL was critical of the viability of the **Phoenix** programme and had communicated those concerns to both **Chase** and Heaths.

[12] **HIH** has also pleaded that insofar as the PPI Line Slip Facility is a contract for insurance and not one of insurance, so that it is not a contract of the utmost good faith, then Heaths are liable for those misstatements upon the basis of the principles set out in Pryke v Gibbs Hartley Cooper [1991] 1 Lloyd's Rep 602 (at pp 615-6 per Waller J. The plea is at para 49 of the Amended Particulars of Claim).

[13] Whilst recognising that the truth of these allegations had to be assumed for the purposes of the Preliminary Issues, both **Chase** and Heaths emphasised that they deny them. They say that they have substantial defences on the merits of those allegations.

(D) The relief claimed by **HIH** in the First Action

[14] **HIH** has claimed several alternative forms of relief in its Amended Particulars of Claim. They are:

(1) that it is entitled to avoid or rescind the contracts of and for insurance for misrepresentation or non-disclosure and did so by letter dated 25 November 1999 (Amended Particulars of Claim: paras 51 and 52). The legal ground for this relief is not elaborated in the pleading. So far as the contracts of insurance are concerned, it must be based principally on the right to avoid that arises upon proof of a breach of the duty of utmost good faith (in theory I suppose it could also be based on the right to rescission if deceit were proved or under the Misrepresentation Act 1967). So far as the contracts for insurance are concerned the allegation must be that: (a) there is a similar right based upon an analogous duty which has been broken; and/or (b) a right to rescind for deceit or fraudulent or negligent misrepresentation. These points will have to be explored;

(2) that it is entitled to recover damages from **Chase** and/or Heaths for fraudulent misrepresentations made by Heaths, for which **Chase** and/or Heaths are liable (Amended Particulars of Claim: paras 53 and 54);

(3) that it is entitled to recover damages from **Chase** and/or Heaths for negligent misrepresentations made by Heaths in breach of a duty of care owed by both to **HIH** at common law (Particulars of Claim: para 55);

(4) alternatively the misstatements were made by Heaths without any belief or reasonable grounds for believing that they were true, so that **Chase** and Heaths are liable in damages under s 2(1) of the Misrepresentation Act 1967 (Particulars of Claim: para 56);

(5) lastly **HIH** claims damages against both **Chase** and Heaths for non-disclosure (Particulars of Claim: paras 58 and 59). These paragraphs in the Particulars of Claim were added by amendment. Their inclusion led to the application by Heaths to add the third Preliminary Issue to the other two that were already being considered.

(E) Preliminary Issue One

[15] The question is:

"On the true construction of the contracts of or for insurance pleaded in the Particulars of Claim and on the assumption that the facts and matters pleaded in those Particulars of Claim are true, are the Insurers entitled to avoid and/or rescind the contracts of or for insurance."

This question therefore covers both the contracts of insurance (ie both the facultative cover and the off slips) and the contract for insurance (ie the **Phoenix** Line Slip Facility). As I have said above, the assumption must be that there has been a breach of the duty of utmost good faith by **Chase** and/or Heaths by virtue of misrepresentations or non-disclosure by Heaths and that this would normally give the insurers a right to avoid the contracts of insurance. In relation to the contracts for insurance, the argument is that there is a duty akin to the duty of utmost good faith or a duty to disclose unusual features of the transaction; if there is a breach then (it is said) this normally gives the "insurer" party the right to avoid the contract for insurance. Both parties accept that the resolution of this issue depends particularly upon the scope of the "Truth of Statement" clause in the policy wording that applies to all the five

films.

The Submissions of the Parties on Preliminary Issue One: **Chase**

[16] The main submissions of Mr Edelman QC, on behalf of **Chase,** were as follows:

(1) The insurance arrangements had their origin in the agreement between PPI and PML, to which **Chase** itself was not a party (this assertion is not accepted by the Insurers, who say that **Chase** and its the lawyers played a large part in the transaction as a whole, including the drafting of the policy wording and what should be presented to the insurers). The purpose of the insurance was to ensure that **Chase** and the other lenders were repaid the loan that was provided by them under the terms of the RTLA. As this insurance was their only security, then they would be anxious that it should be indefeasible, if possible. Hence the wording of the Truth of Statement Clause which was intended to cut down the scope of the duty of utmost good faith of **Chase** and/or to protect **Chase's** rights under the policies in the event of a failure of duty by Heaths.

(2) The effect of the Truth of Statement Clause is that **Chase** takes responsibility for the truth of the answers in Section 1 of the Questionnaire that is annexed to the policy wording, but for nothing else. **Chase's** duty of disclosure is limited to the facts dealt with in Section 1.

(3) As a matter of law the parties to a contract of insurance are entitled to limit the scope of the duty of utmost good faith which is owed by both the insurer and the insured to the opposite party (**Chase** rely on Jones v The Provincial Insurance Co (1857) 3 CB (NS) 65 at 85 per Cresswell J and the wording of s 18(3)(c) of the Marine Insurance Act 1906 ("the MIA") which they say reflects the common law applicable to non-marine insurance. They also rely upon the statements of Rix J (as he then was) in: Svenska Handelsbanken v Sun Alliance and London Insurance plc [1996] 1 Lloyd's Rep 519 at 551; and Langley J in: Sumitomo Bank Ltd v Banque Bruxelles Lambert SA [1997] 1 Lloyd's Rep 487 at 495 and 499 - 500). That is what the parties have done in this case, limiting the duties on **Chase** and also limiting the consequences of any breach of duty by either **Chase** or their brokers, Heaths. **Chase** accepts that it has the burden of establishing that the policy terms exclude or restrict the duty of utmost good faith that would otherwise lie on the assured.

(4) The effect of the wording of the Truth of Statement clause in limiting the duty of disclosure of **Chase** is to limit that duty on the part of Heaths also. This must be so because the duty of disclosure of an "agent to insure" (under MIA s 19 or the common law equivalent) is dependent upon the duty of the principal assured (**Chase** relies upon the opening words of MIA s 19: "Subject to the provisions of the preceding section (ie 18) as to circumstances which need not be disclosed." That, **Chase** says, is a reference to s 18(3)(c), which provides that an assured has no duty to disclose matters of which the insurer has waived disclosure.) Therefore if the principal's duty is limited, then that of the agent must be also. At the most the agent's duty is confined solely to matters that are within his own knowledge (that is the part of the duty referred to in MIA s 19(a), which relates to facts known to the agent but not to the assured. Mr Edelman characterised this as the agent's "private knowledge" duty of disclosure). The duty does not extend to matters which the assured itself is bound to disclose, under MIA s 19(b).

(5) It is irrelevant that Heaths have been accused of fraudulent non-disclosure. The duty of disclosure as a part of the obligation of the utmost good faith in insurance contracts is an absolute one; it is broken whether the reason for the non-disclosure was innocent forgetfulness; carelessness or a deliberate concealment of facts. So if the duty is circumscribed by contract, then the reason or motive for the non-disclosure is irrelevant because there is no pre-existing duty to be broken in the first place.

(6) The effect of the Truth of Statement clause is to limit the authority of Heaths, as agent or

broker, to make statements on behalf of **Chase** as principal. This limitation is logical, given the fact that **Chase** had no knowledge about the films to be produced and that Heaths procured the insurance as a result of the agreement between PML and Elmwood. So **Chase** would be anxious to ensure that Heaths (and others) had only limited rights to make statements for which **Chase** could be held responsible (**Chase** relied on the decision of Brightman J in: Overbrooke Estates Ltd v Glencombe Properties Ltd [1974] 3 All ER 511, [1974] 1 WLR 1335).

(7) Where the authority of the agent is restricted, then any actions of the agent (whether fraudulent, negligent or innocent) cannot be imputed to the principal. Therefore if Heaths have been guilty of fraudulent misrepresentations to the insurers, then **Chase** is not responsible for them. The insurers' remedy is to sue Heaths in deceit.

(8) On the analysis of a "restricted authority of the agent", then the Court need not be concerned with the argument that the Truth of Statement clause is akin to an exclusion clause, so must be construed in accordance with the strict rules laid down in Canada Steamship Lines Ltd v Regem [1952] AC 192, [1952] 1 All ER 305 and all the many cases that have followed that decision. This is because a clause that restricts an agent's authority is not an exclusion clause or one restricting liability and so is unaffected by those rules of construction.

(9) The Truth of Statement clause applies to exclude the insurers'right to avoid the policy in the event of misrepresentation by Heaths, even if it is found that **Chase** is potentially liable for anything said by Heaths. Such a clause can be effective (**Chase** relies on statements by Steyn LJ in: Pan Atlantic Insurance Co Ltd v Pine Top Insurance Co Ltd [1993] 1 Lloyd's Rep 496 at 502; and Colman J in Toomey v Eagle Star (No 2) [1995] 2 Lloyd's Rep 88 at 91 - 92) and there is no rule of law that prevents a principal from relying on a clause that excludes liability for the fraud of an agent.

(10) The principles developed in the cases following the Canada Steamship case do not result in giving the insurers the right to avoid, because ultimately they are based upon the intention of the parties as shown by the contract wording as a whole and the commercial background. When the Truth of Statement clause is considered against this background and the wording is given its ordinary meaning in its contractual setting, then it is clear that **Chase** is to have no liability for the misrepresentations or non-disclosures of Heaths. The apportionment of the risk of such misrepresentations and non-disclosures is clearly expressed, so those cases do not apply (**Chase** particularly relied upon the analysis of Leggatt LJ in: Breaveglen Ltd v Sleeman Ltd (unrep) 9 May 1997 at pp 7 to 9 of the transcript).

(11) So far as the Line Slip is concerned, that is not a contract of insurance, but a contract for insurance, so it is not a contract of the utmost good faith. Therefore the duties on Heaths under the common law equivalent of MIA s 19 do not apply. However it must be accepted that, subject to the arguments above, the duties will arise at the time that Declarations are made under the Line Slip.

(12) Any right that the Insurers might have to rescind the contract for insurance for misrepresentations by Heaths, whether fraudulent or negligent, are excluded by the Truth of Statement clause.

The principal submissions of The Insurers

[17] The principal submissions of Mr Cooke QC for **HIH** on Preliminary Issue One were:

(1) That the Truth Statement clause is an exclusion clause. This is because it attempts to exclude the consequences of a failure by **Chase,** the assured, to fulfil its fundamental duties of utmost good faith generally and in particular its duties to disclose all material facts and not

to misrepresent material facts at the time a contract of or for insurance is concluded. Therefore the clause has to be construed strictly. The degree of strictness of construction depends on the extent to which the clause attempts to exclude the consequences of failure to fulfil the duties referred to in the clause, bearing in mind the obligations that are implicitly accepted by parties to this type of contract.

(2) Generally, exclusion clauses will not be construed so as to relieve one party to a contract of all its duties and liabilities under the contract, so as to make the contract no more than an expression of intent (the insurers relied on Tor Line AB v Alltrans Group of Canada Ltd The TFL Prosperity [1984] 1 All ER 103, [1984] 1 WLR 48 (HL)). In this respect there can be no distinction between an exclusion of duty, liability or remedy.

(3) The Courts will construe even more strictly a clause in a contract that attempts to exclude a party from the liability or consequences of a breach of duty that has induced the contract itself: for example: duties not to make misrepresentations or to disclose all material facts.

(4) On its face the Truth of Statement clause cuts down drastically the duty of the assured to exercise utmost good faith at the time of concluding a contract of insurance. That duty, ordinarily, involves giving proper disclosure of all material facts and making no material misrepresentation.

(5) However, in contrast to other provisions in the policy wording (**HIH** relied particularly on General Exclusion 1, which excludes a right to indemnity where the loss directly arises from the fraud, misrepresentation or concealment by **Chase,** TriStar of any agent of TriStar), there is no specific exclusion of liability for the consequences of fraud or deliberate acts of misrepresentation or non-disclosure in the Truth of Statement clause. Nor is there any specific exclusion of liability for the consequences of negligent misrepresentations or non-disclosures. Therefore, on well known principles of construction, **Chase** cannot rely on the Truth of Statement clause to escape the consequences of fraudulent, deliberate or negligent misrepresentations or non-disclosures (**HIH** relies on the Canada Steamship case (supra) and subsequent authorities, ending with EE Caledonia Ltd v Orbit Valve Co Europe [1995] 1 All ER 174, [1994] 1 WLR 1515 (CA)).

(6) Even if the Truth of Statement clause cuts down the duty of the assured to give information, if the assured or its agent chooses to make a representation then the absence of a duty to do so would not affect the fact that such a representation had been made and the consequences that would flow from it being false (whether as a result of fraud, negligence or innocent failure by the assured or agent).

(7) **Chase** cannot use the Truth of Statement clause to escape the consequences of a fraudulent misrepresentation that has induced the contract of insurance. This is a rule of law so far as fraudulent statements of a principal is concerned (**HIH** relies on: London General Omnibus Compay Ltd v Holloway [1912] 2 QB 72 at 81; S Pearson & Sons Ltd v Dublin Corporation [1907] AC 351 at 353 - 4 and the comment of Steyn LJ in the Pan Atlanatic case (supra) at 502 where he said that although it was conceptually possible to draft a clause to exclude the right to rescind for non-disclosure, this would be "except for fraud"). In relation to fraudulent statements by agents that induce a contract to be concluded between the agent's principal and a third party, it is either a rule of law or a matter of construction of the contractual exceptions clause.

(8) Moreover even a clause in a contract of insurance that purports to exclude the right to rescind where the contract was induced by inadvertent non-disclosures will only be effective if the right to avoid/rescind is clearly excluded. In considering whether, as a matter of construction, the right has been clearly excluded, the Court should follow the rules of construction developed in relation to exclusion clauses since the Canada Steamship case (**HIH** relied on the statement of Steyn LJ in Pan Atlantic (supra), in which there was a clause

relieving both parties from "liability" for "any inadvertent . . . omissions". **HIH** also relied on the principles stated by Colman J in Toomey v Eagle Star (No 2) [1995] 2 Lloyd's Rep 88, particularly at 92).

(9) The rule that an exceptions clause in a contract should not usually be construed to exempt a party from liability where there has been a deliberate breach of contract should apply equally to deliberate breaches of extra contractual duties such as the duty of utmost good faith as in the present case. This would mean that, as a matter of construction the Truth of Statement clause could not exempt **Chase** from the consequences of a deliberate concealment or misrepresentation by Heath (**HIH** relies on the well known statement of Lord Denning in Sze Hai Tong Bank Ltd v Rambler Cycle Co Ltd [1959] AC 576, [1959] 3 All ER 182, at 586 - 7 of the former report).

(10) It is possible to phrase a clause to exclude liability for the negligent, deliberate or fraudulent acts of servants or agents (see eg Photo Productions v Securicor Ltd [1980] AC 827, [1980] 1 All ER 556 at 851 of the former report per Lord Diplock), (but not for liability by fraud inducing the contract in which the exclusion appears), the Truth Statement clause in the policy wording does not attempt to do so. It would only work if the clause was apt and clear (**HIH** relies on the statement of Lord Loreburn LC in S Pearson & Son Ltd v Dublin Corporation (supra) at 354). It is not in this case. Therefore the clause fails to exclude such liability.

(11) Accordingly even though the Truth of Statement clause:

"appears apt, on its terms, to exclude any duty of disclosure, to exclude avoidance for non-disclosure or misrepresentation by any agent of the insured and to exclude liability in damages for non-disclosure or misrepresentation made by any other party including Heaths," (**HIH's** Outline Submissions para 42)

the effect of the authorities is that the Truth of Statement clause is ineffective to prevent the consequences of either negligent or fraudulent misstatements or non-disclosures by **Chase.**

(12) So far as Heaths are concerned, the Truth of Statement clause neither limits their authority nor purports to exclude the duty of disclosure of Heaths as "agent to insure" (that is under the common law equivalent of MIA s 19). The duty of disclosure by Heaths, as agents to insure, is personal so that a clause that excluded that duty would have to do so expressly. The Truth of Statement does not exclude Heaths' duty at all.

(13) In relation to the **Phoenix** Facility Line Slip, which is a contract for insurance, the submissions are:

(a) that upon placement of the Line Slip the duty of utmost good faith or a similar duty attaches (**HIH** relies on Glasgow Assurance Corporation v Symondson & Co (1911) 16 Com Cas 109; Pryke v Gibbs Hartley Cooper [1991] 1 Lloyd's Rep 602 at 615 - 6 per Waller J); and, in any event

(b) as the Line Slip is a contract that is akin to one of insurance, there must be disclosure of any unusual features of the transaction, because a failure to disclose them amounts to a representation that there are no unusual features, which could be a misrepresentation (**HIH** again relies on the Pryke case (supra) and GMA v Unistorebrand and Kansa [1995] 1 LRLR 333 at 348 - 9 per Rix J).

Therefore duties arose at the original placement of the **Phoenix** Line Slip facility in January/March 1996 and also at the time of the cancellation and re-writing of the **Phoenix** Facility in June/September 1996.

Discussion: contracts of insurance

[18] I will deal first with the individual contracts of insurance. The principal pleaded basis on which **HIH** claims to be entitled to avoid those contracts is as a result of the breach of the duties of utmost good faith before the contracts of insurance were concluded (this plea is at paras 48 - 52 of the Amended Particulars of Claim: B1/Tab 3/pp 31 - 33. However, as I read the pleading there is also a separate claim to rescind for fraudulent or negligent misrepresentation). The particular breaches of this duty alleged are that fraudulent or negligent misrepresentations were made by Heaths; or that there were fraudulent or negligent non-disclosures by Heaths. The first question must be: what principles have the courts adopted concerning the effectiveness of clauses in contracts of insurance that purport to exclude or confine the duty of utmost good faith or purport to exclude the right of the innocent party to avoid the contract for breach of the duty by the other party?

The juridical nature of the duty of utmost good faith

[19] The duty of utmost good faith is imposed on the assured and the insurer by virtue of the general law and is independent of the contract of insurance itself (Banque Keyser Ullman SA v Skandia (UK) Insurance Co Ltd [1990] QB 665, [1989] 2 All ER 952 at 779 - 781 of the former report, rejecting a submission that the duty of utmost good faith prior to the conclusion of a contract of insurance was based on an implied term in the contract. The House of Lords affirmed the CA on that issue generally: [1991] AC 249 at 280D per Lord Templeman; 281F per Lord Jauncey, with whom Lords Ackner and Brandon concurred). The duty has a number of aspects of which the two most well known are the "pre-contract" duties on an assured or insurer. Those are the duties not to misrepresent material facts to the other party so as to induce it to enter the contract and the duty to disclose all material facts. But there is a distinction in the applicability of the two duties. If a person makes a misrepresentation of fact and it induces another to enter a contract, then the general law (including the Misrepresentation Act 1967) gives the innocent party certain remedies, including rescission of the contract. The "duty" not to make misrepresentations applies whether the parties are concluding a contract of utmost good faith or any other type of contract. But the active duty of disclosure of material facts (in contrast to the situation where there has been a partial disclosure of facts which amounts to an implied representation of a state of affairs which is false and so would be regarded as a misrepresentation) is peculiar to contracts of the utmost good faith, of which insurance contracts are the most well known example.

[20] In the case of an insurance contract, the normal position is that if either duty is broken and the innocent party proves that it was induced to enter the contract of insurance as a result of the misrepresentation or non-disclosure, then the only remedy that the innocent party has is to avoid the contract of insurance (The Banque Keyser Ullmann case (supra)). As English law stands at present, there is no right to damages against the other principal party for a breach of the duty of utmost good faith (this means, as Mr Cooke QC for **HIH** accepted, that I must answer "No" to the second Preliminary Issue, so far as deals with a right to damages against **Chase** for a breach of the duty of utmost good faith. But that does leave open the question of whether there is any right to damages against an agent to insure who has broken the duty of utmost good faith: that question arises under Preliminary Issue Three).

[21] An assured who makes a misrepresentation of a material fact or who fails to disclose a material fact before a contract of insurance is concluded is in breach of its duty of utmost good faith whatever the reason for the misrepresentation or non-disclosure. In the absence of some special factor the legal result is not dependent upon whether the misrepresentation was made deliberately or recklessly; negligently or inadvertently. Equally it does not matter whether the non-disclosure was deliberate, reckless, negligent or inadvertent. The duty is "absolute" (see: the Banque Keyser Ullmann case at p 771A - B). In all cases there will be a

breach of the duty of utmost good faith. In all cases provided that the other party can prove that the misrepresentation or non-disclosure induced the contract, then it has the right to avoid the contract (Pan Atlantic Insurance Co Ltd v Pine Top Insurance Co Ltd [1995] 1 AC 501, [1994] 3 All ER 581 (HL)). But if the innocent party does not elect to "avoid" the contract of insurance then it remains valid and enforceable even though there had been a breach of the duty (Mackender v Feldia AG [1967] 2 QB 590, [1966] 3 All ER 847).

General approach of the courts to clauses purporting to exclude or confine the duties of utmost good faith or the right to avoid if the duties are breached: (1) Excluding the right to avoid for non-disclosure

[22] The difficulty with the effectiveness of clauses in an insurance contract that either purport to exclude or reduce the duty of utmost good faith or the consequences of its breach is that the clauses only exist and can only be enforced if the contract itself continues to exist. The whole point about the duty of utmost good faith is that it arises outside the contract, but if there is a breach it gives the right to avoid the contract and when that right is exercised the whole contract ceases to exist, including the clause that purports to restrict the duty or the consequences of its breach. This problem was emphasised by Steyn LJ in the Court of Appeal in Pan Atlantic Insurance Co Ltd v Pine Top Insurance Co Ltd (see [1993] 1 Lloyd's Rep 496 at 502. Neither Nicholls V-C nor Farquharson LJ commented on this point).

[23] However Steyn LJ was prepared to accept that conceptually it is possible to draft a clause in an insurance contract which excluded the other party's right to avoid for non-disclosure,

"except in the case of fraud, even though the clause excluding rescission forms part of a contract which upon rescission would be rendered retrospectively null and void."

In Toomey v Eagle Star Insurance Co Ltd (No 2) [1995] 2 Lloyd's Rep 88 at 91 - 92 Colman J, following the statements of Steyn LJ in the Pan Atlantic case, accepted the principle that a clause in a contract of insurance could exclude the right to rescind the contract for non-disclosure and also misrepresentation (Colman J's phraseology does not restrict his statement of principle to cases of negligent or innocent misrepresentation or non-disclosure, although in one of the cases he cites, Boyd & Forrest v The Glasgow & South Western Railway Co [1915] SC (HL) 20 Lord Shaw of Dunfirmline said that the effect of fraud could not be excluded by a contract term: see pp 35 - 6). But he held that the drafting in that case did not exclude the right to avoid for negligent non-disclosure. I will consider that issue and the question of fraud presently. But, subject to those points, I accept that it is possible in principle to limit or exclude by contractual wording the right to avoid for a breach of the duty of utmost good faith.

(2) Clauses limiting or excluding the duty of disclosure

[24] The cases I have mentioned were dealing with the consequences of the breach of an existing duty. Can the duty itself be limited? There are many cases where the courts have said that the insurer has "waived" the duty of disclosure of the assured, usually by limiting the scope of questions that it asks in a proposal form (see eg: Joel v Law Union & Crown Insurance Co [1908] 2 KB 863 at 878 per Vaughan Williams LJ). It can also waive the duty by the nature of the insurance itself (see eg: Cantiere Meccanico Brindisino v Janson [1912] 3 KB 452 at 472 - 3 per Buckley LJ, who refers to s 18(3)(c) of the MIA). If the scope of disclosure can be limited by these means then I think it can be accepted that it is conceptually possible to draft a clause in a contract of insurance whereby the parties agree that the duty of disclosure of the assured (or his agent) is excluded, or waived, altogether. If that is so, then if it turns out that there was a deliberate non-disclosure by an assured or his agent, that cannot matter. If there is no duty, then adding the epithet "fraudulent" to the description of the deliberate non-disclosure of a material fact does not advance the

argument. If there is no duty in the first place then the assured is entitled to keep quiet.

[25] There are cases that support the proposition that an assured's duty of disclosure can be limited by virtue of the terms of the insurance contract that has been concluded. Thus in Property Insurance Company Ltd v National Protector Insurance Company Ltd (1913) 18 Com Cas 119 Scrutton J held that a clause in a reinsurance contract which stated that it was to be:

"subject without notice to the same clauses and conditions as the original policy,"

meant that the duty of disclosure did not extend to the contents of the clauses of the original insurance. Both Rix J and Langley J (in the Svenska case (supra) at 551 and the Sumitomo Bank case (supra) at 495 respectively) have recently accepted that it is possible to have clauses in contracts of insurance that restrict or exclude the duty of disclosure, although neither was dealing with allegations of fraudulent non-disclosure.

[26] Mr Cooke responds by arguing that a clause that entirely excluded the obligation of disclosure would be so inconsistent with the nature of the contract of insurance as to strike at its root and render the contract absurd (relying on Tor Line AB v Alltrans Group of Canada Ltd [1984] 1 WLR 48 at 59 per Lord Roskill). I do not accept that argument. The nature of the contract remains one of insurance, ie a "contract upon speculation" (the words of Lord Mansfield in Carter v Boehm (1766) 3 Burr 1905 at 1909: 97 ER at 1162). But the insurer would be accepting that the speculative nature of the contract was increased by agreeing that the duty of disclosure was limited or excluded altogether. The essence of the contract remains that the insurer agrees to hold the assured harmless against the insured perils in return for a premium paid by the assured. Moreover the duty of disclosure is not a contractual duty, but one imposed by the general law. So a term of the contract limiting or excluding the duty does not remove a fundamental contractual duty at all.

(3) Clauses excluding the consequences of misrepresentation

[27] Although the point was not made by any of the parties at the hearing, I note that s 3 of the Misrepresentation Act 1967 is framed widely. So it applies to any term of a contract that:

". . . would exclude or restrict

(a) any liability to which a party to a contract may be subject by reason of any misrepresentation made by him before the contract was made; or

(b) any remedy available to another party to the contract by reason of such a misrepresentation . . ."

The provision goes on to state that such clauses will only be effective if they satisfy the test of reasonableness under s 11 of the Unfair Contract Terms Act 1977. But the wording of s 3 appears to contemplate that all clauses dealing with any types of pre-contractual misrepresentation are subject to the requirement of reasonableness. Therefore the underlying assumption of s 3 is that clauses that exclude or restrict liability or remedies for misrepresentation could otherwise be valid. No distinction is made between different types of misrepresentation. Therefore it even contemplates (apparently) that a clause excluding a remedy for a fraudulent misrepresentation could be valid at common law.

[28] I make this point only to underline the fact that the law generally appears to accept the concept that parties to a contract can exclude or reduce the liability or remedies for a pre-contract misrepresentation. This is so, even though, before the Misrepresentation Act, one of the remedies of a party that had been induced to enter a contract as a result of a misrepresentation (that did not become a term of the contract) was rescission of the contract

(see: Chitty on Contracts (28th Edn) vol 1 para 6 - 103, p 387). The effect of rescission of a non-insurance contract would, of course, be the same as an insurance contract, as stated by Steyn LJ in Pan Atlantic.

(4) Clauses excluding the "duty" not to make misrepresentations

[29] I have some difficulty in accepting the idea that a duty not to misrepresent facts can be excluded or limited by contract, although the concept is considered by Professor MA Clarke in The Law of Insurance Contracts (3rd Edn para 23 - 18G). However he suggests that this would be part of a contractual waiver of the general duty of "good faith" and he confines the possibility to innocent misrepresentations. This is a concept that has not been developed in the cases in England. If necessary I would hold that a contractual clause could do away with the "duty" not to make misrepresentations, but the distinction between excluding the duty and excluding the consequences of breach may be academic in this case.

[30] Accordingly, I accept that it is conceptually possible in principle for parties to agree in a contract of insurance that:

(1) the duties of disclosure of one or both of the parties will be limited or excluded altogether;

(2) the liability for or remedies for non-disclosure or misrepresentation will be limited or excluded.

[31] The next two questions that arise must therefore be:

(i) does the law impose any limitations on these possibilities, particularly in relation to fraudulent misrepresentations or deliberate non-disclosures; and

(ii) how does a court approach the issue of construction of clauses that either limit the duty or exclude consequences of a breach of duty?

Is there any restriction to excluding liability or remedies in relation to fraudulent misrepresentation?

[32] In this case it is alleged that fraudulent misrepresentations and non-disclosures were made by the assured's agent, Heaths. Therefore the issue of whether a party to a contract can exclude liability (or remedies) for its own, personal, fraud, does not arise. I think that Mr Edelman was prepared to accept that, (notwithstanding s 3 of the Misrepresentation Act), as a matter of public policy a party to a contract cannot exclude liability for its own, personal, fraudulent misrepresentation which has induced the contract in question. But the debate centred on whether there was a rule of law that liability (or remedies) for the fraudulent misrepresentation of an agent could not be excluded.

[33] Before looking at the leading case of S Pearson & Son Ltd v Dublin Corporation and others [1907] AC 351, I consider the point as a matter of principle. Commercial concerns may contemplate concluding a contract of insurance and the potential insurer may be told that all the information (if any) which he will obtain from the assured's side (in order to decide whether to conclude the contract) will come from the potential assured's agent. If the potential insurer is conscious of the fact that there is a possibility of deliberate misrepresentation by the agent, yet he is prepared to take that risk, then why should he not agree to clauses that exclude the duty of the principal assured to give disclosure of material facts and limit his remedies if there are deliberate concealments or misrepresentations by the agent? I do not see why, logically, such a clause should not be given effect, subject to any statutory limitations as to when it will be effective, such as in s 3 of the Misrepresentation Act 1967. But this is subject to two points. First there may be a rule of public policy that the

courts have expressed, holding that a party cannot rely on a clause exempting liability for its agent's fraudulent misstatement; or that the courts would disregard such a clause. Secondly, there is the question of whether a court will be satisfied that the clause actually covers the possibility of fraud by the agent. But that latter point is to revert to the second of the two principal issues that I have mentioned in para 31 above.

The Approach of the cases to clauses which purport to exclude liability for the fraudulent misrepresentation of an agent

[34] What is the approach of the cases to this issue? I have been referred to the following cases in particular:

(1) S Pearson & Son Ltd v Dublin Corporation: In that case the agent of Dublin Corporation, an engineer, supplied S Pearson & Sons Ltd with drawings which contained information about the existence and position of a certain wall. There was evidence that the engineer knew that the plans were false. S Pearson entered into a contract to do sewage works; performed the contract but found that the plans were inaccurate, necessitating further work. Pearsons sued the Dublin Corporation in deceit, claiming the cost of the additional work. The corporation relied on clause 43 of the contract which provided that the corporation did not hold itself responsible for the accuracy of the information as to the sections or foundations of existing walls; and that no charges for extra work or otherwise would be allowed in consequence of incorrect information or inaccuracies in the drawings or specifications. The House of Lords held that the Corporation could not rely on the clause in the event of proof of fraud by the engineer and the question of fact (fraud or not) had to go to the jury.

Lord Loreburn LC (at pp 353 - 4) stated that no one could escape from his own fraudulent statements:

"by inserting a clause in a contract that the other party shall not rely upon them."

However he accepted that an innocent principal could:

"guard himself by apt and express clauses from liability for the fraud of his own agents."

He considered that clause 43 was not effective to do that. So Lord Loreburn accepted that there could be clauses that exempted an innocent principal from liability for the fraud of his agent. However he then said that it would not matter whether the agent or the principal made the fraudulent statement. The Earl of Halsbury took this point up as the basis for the opposite view, ie that if the agent has committed fraud then liability for that cannot be excluded by contract (at pp 357 and 359). So Lord Halsbury appears to conclude that, whether the fraud is that of the agent or the principal, it cannot be excluded by contract. Lord Ashbourne appears to consider the matter as one of construction (at p 360). Lord James of Hereford left open the issue of whether:

"an express term that fraud shall not vitiate a contract would be bad in law,"

although he inclined to the view that it would be so (at p 362). Lord Atkinson stated that he was inclined to think that clause 43 would be "illegal in point of law" (at p 365. However, in one of the cases he relies upon, Tunis v Jacson [1892] 3 Ch 441 Chitty J had decided that parties to a building contract could expressly agree that a valuation certificate could not be set aside for the fraud of a third party, an architect). He then considered the clause as a matter of construction.

The overall effect of the case is, with respect, difficult to state. I think that the majority took the view that the issue of whether a clause in a contract can exclude liability or remedies for the fraud of an agent that has induced the contract containing the clause is a matter of

construction. There is no public policy bar to such a clause, although there may well be a public policy bar to enforcing a clause that purports to exclude liability for the fraud of the principal party itself.

(2) Boyd & Forrest v The Glasgow & South Western Railway [1915] SC (HL) 20: In this case the pursuers claimed damages for the cost of extra work in building a railway, on the basis that they had been induced to enter the contract as a result of misrepresentations as to the state of the ground (from "bores" that had been obtained from third parties) over the course of the proposed line. The defenders contested the claim on the basis, amongst other defences, that the contract contained an exemption clause. That provided that the company did not guarantee the accuracy of the bores, and that it would not be liable in respect of any inaccuracy in the journal that contained the information given to the pursuers. The House of Lords held that there had been no misrepresentation. Lord Shaw of Dunfirmline was the only member of the House of Lords to deal with the question of the effect of the exemption clause, assuming that there had been a misrepresentation. He concluded that the exemption clause was effective to exclude liability for an innocent, as opposed to a fraudulent, misrepresentation. He said that a clause could not exclude liability for fraud of a contracting party. He continued (at p 36):

"It could not do so, in my opinion, even though the contract were expressed in such a particular. The law excludes from the range of agreement what is openly contrary to legal principle and to honest dealing."

Lord Shaw referred to the Pearson case, but he did not deal specifically with the position of an agent's fraud. It is clear that he regarded a clause that purports to exclude liability for the fraud of a party as being ineffective as a matter of law, rather than construction.

(3) The only other cases that I was specifically referred to on this point were the remarks of Steyn LJ in the Pan Atlantic case ((supra) at p 502) and those of Colman J in the Toomey case ((supra) at pp 91 - 92). Both of those were non-disclosure cases and the remarks on fraud were very brief.

(4) As a matter of general contract law (as opposed to the law relating to a contract of insurance), Chitty on Contracts (28th Edn at vol 1 para 6 - 129, p 399) states that, at common law, it was not possible to contract out of liability for fraud inducing the making of a contract,

"at least where the fraud was [the contract maker's] own. It is, however, possible that he could do so where the fraud was that of his employees."

But the case cited for that last proposition, John Carter (Fine Worsteds) Ltd v Hanson Haulage (Leeds) Ltd [1965] 2 QB 495, [1965] 1 All ER 113 does not appear to support it at all.

[35] I have concluded that, in principle and on the balance of the case law, it is legally possible to have a clause in a contract of or for insurance that excludes liability for fraudulent misrepresentations of an agent. Whether the wording is effective or not is another question.

(5) Is there any restriction to clauses excluding liability or remedies in relation to fraudulent non-disclosure?

[36] Next I should consider whether it is possible to have a clause in a contract of insurance which excludes or modifies liability or the remedies for the consequences of fraudulent non-disclosure of the assured's agent. As I have already indicated, I think that there must be a distinction between the situation where (i) the parties agree to limit the duty of disclosure by contract; and (ii) there is no agreed limitation of the duty, but an attempt to exclude or limit

the consequences of the breach of the duty of disclosure.

[37] In the former case if there is no duty then there is, strictly, no need for a clause to exclude or limit the consequences. Moreover if there is no duty, then there cannot be a "fraudulent" non-disclosure, as I have already explained. In any case I cannot see any public policy reason to strike down a clause excluding or limiting the consequences of "non-disclosure", (particularly of an agent), where there was no pre-existing duty.

[38] Is the position any different where the duty itself has not been excluded or limited, and there is a clause that purports to exclude or limit the consequences, eg by saying that there is no right to avoid the contract of insurance? In general such clauses are possible, as Steyn LJ has stated in Pan Atlantic. Would they be automatically ineffective in the case of a deliberate or "fraudulent" non-disclosure (if a non-disclosure is deliberate then I cannot see that the word "fraudulent" adds anything in this context either), assuming that the duty is extant? Steyn LJ clearly thought that it would not be possible to have a clause that purported to exclude the consequences (such as avoidance) in cases of fraud by the assured itself. But I think, in his very short comment in Pan Atlantic, that he was not attempting to lay down any fixed rule in relation to clauses that purport to exclude the consequences of "fraudulent" non-disclosure by an agent.

[39] Mr Cooke conceded that there are cases, such as Photo Productions Ltd v Securicor Transport Ltd [1980] AC 827, [1980] 1 All ER 556 at 851 of the former report per Lord Diplock and Swiss Bank Corporation v Brink's Mat Ltd [1986] 2 Lloyd's Rep 79 at 92 - 3 per Bingham J, which establish that a clause in a contract can, if suitably worded, exclude the liability of a party for the misdeeds or fraud of its employee or agent, assuming that the contracting party itself has not been in breach of its own contractual duties. Those cases are not directly applicable to the current situation because they deal with breach of contractual duties as opposed to a duty that is imposed by the general law. But I think they demonstrate the approach that a court should have to this issue. They regarded the issue as one of construction of the clause in question. Accordingly I have concluded that it is conceptually possible to have a clause in a contract of insurance (as I explain below, there is no duty of utmost good faith, as such, in relation to contracts for insurance, so this point does not directly arise there) that excludes or limits the consequences of the deliberate (or "fraudulent") non-disclosure of material facts by the agent of the assured. Whether the clause is effective to do so is another question. That is what I must consider next.

(6) Principles of construction of clauses in contract of insurance that purport to exclude or limit the duty of utmost good faith of the assured or the consequences of a breach of duty

[40] The starting point must be that parties to a contract of insurance expect that in the normal course of things both sides will have duties of utmost good faith and if they are broken then the innocent party will have the right to avoid the contract. If parties to a contract of insurance wish to alter those reasonable expectations by agreeing particular contract terms, then the terms must demonstrate, objectively, that this is the wish of both parties. That, I think, is why the cases (such as Pan Atlantic; Toomey; Svenska) state that a clause purporting to exclude or limit the duty of utmost good faith or the consequences of breach of the duty have to evince a clear intention to alter what would otherwise be the parties' expectations as to their duties and rights.

(7) The applicability of the rules of construction in Canada Steamship Lines Ltd v Regem [1952] AC 192, [1952] 1 All ER 305 at 208 of the former report per Lord Morton of Henryton and subsequent cases

[41] The rules of construction set out by Lord Morton in the Canada Steamship case and subsequent cases concern clauses in contracts which purport either:

(i) to exempt a party from the consequences (in damages) of the negligence of that party or its employees or agents; or

(ii) to grant an indemnity to a party where loss has resulted from its negligence or that of its employees or agents.

The basis for the three well known "rules" of construction is that parties to a contract will not be presumed to wish to exclude liability for negligence of one party. Therefore there have to be express words of exclusion for negligence (rule one); or the words of the clause have to be wide enough to cover liability for negligence, (rule two); if so, the clause will only be effective to cover negligence if it is demonstrated that there is no other "head of damage" (the phrase was originally used by Lord Greene MR in Alderslade v Hendon Laundry Ltd [1945] KB 189, [1945] 1 All ER 244 at 192 of the former report) (which is not fanciful or remote) which might be covered by the clause (rule three).

[42] It seems to me that the second and third "rules" of construction are intended to deal with cases where the exemption or indemnity clause wording has been deliberately drawn in a wide and general way. It is for that reason that its effect will appear equivocal and so the court naturally asks: what did the parties actually intend to cover by these general words? I think that the Canada Steamship case rules of construction were not intended to apply to a particular clause that is specifically directed at exempting liability for the breach of a particular type of absolute duty, where the breach can be established whether or not negligence (or fraud) is proved.

[43] In contracts of insurance the duty of disclosure of material facts is unitary and absolute in the sense that there will be a breach even if the non-disclosure is only inadvertent. Generally neither negligence nor fraud need to be demonstrated to establish a breach. The same is true of the duty not to misrepresent material facts. Moreover, the consequence of the breach of the duty of utmost good faith is that the Insurer has a right to avoid the contract of insurance, rather than damages. So, subject to the limitations concerning fraud discussed above, it seems to me that provided that a clause in a contract of insurance is clearly and specifically intended to cover the consequences of a breach of the duty of disclosure or the "duty" not to misrepresent material facts, then the rules of construction in the Canada Steamship case would not be directly applicable to such a clause.

[44] This conclusion means that, with respect, I differ from the precise terms of the analysis of Colman J in Toomey [1995] 2 Lloyd's Rep 88 at 92 - 3. In that case, which was an application for summary judgment, Colman J applied directly the rules of construction in Canada Steamship. He concluded, applying those "rules", that a clause in a reinsurance contract that provided: "this contract is neither cancellable nor voidable by either party" was only effective if the alleged non-disclosure or misrepresentation was innocent as opposed to negligent (see [1995] 2 Lloyd's Rep 88 at 93). It is not clear whether the point that I have emphasised, ie that the duty of disclosure is absolute and unitary, was taken in that case.

[45] However, even if the clause in question is specifically directed at the consequences of non-disclosure or misrepresentation, that is not the end of the matter. The Court's task is still to discern what the parties intended by the wording that they have agreed in the context of the particular type of contract under consideration. But although "rules" of construction are a guide to the intention of the parties, they are not the masters of the parties' intention. That is clear from cases such as: James Archdale & Co Ltd v Comservices Ltd [1954] 1 All ER 210, [1954] 1 WLR 459 (CA), particularly at 463 of the latter report per Romer LJ; Arthur White (Contractors) Ltd v Tarmac Civil Engineering Ltd [1967] 3 All ER 586, [1967] 1 WLR 1508 (HL), particularly at 1526B - G of the latter report per Lord Upjohn; 1529 C - G per Lord Pearson; Breaveglen Ltd v Sleeman Ltd CA: 9 May 1997 (unrep). See the judgment of Leggatt LJ at 9 - 10. Those cases were all dealing with indemnity clauses, but the comments on the Court's task when construing clauses are general and must apply to the present case.

[46] Thus it seems to me that even if the Canada Steamship "rules" of construction do not apply directly to a clause which specifically purports to exclude or limit a duty of utmost good faith or specifically purports to exclude or limit remedies for its breach, the Court still has to ask, objectively, what factual circumstances did the parties intend to cover by the wording that they have used? Thus, as an example, I think that a Court has to ask: does the contract wording cover a situation where there is a duty of disclosure, but the assured has failed to fulfil it as a result of its agent's negligence or deliberate concealment of facts? That is not considering "motive" as Mr Edelman suggested; it is considering whether the parties contemplated the clause would cover a particular circumstance in which the breach of duty had arisen.

The question of limiting the authority of the agent

[47] Mr Edelman relied on the proposition that a principal is entitled, in contract wording, to limit the authority of his agent to make any pre-contract representation to a third party on behalf of his principal (he relied upon the decision of Brightman J in Overbrooke Estates Ltd v Glencombe Properties Ltd [1974] 3 All ER 511, [1974] 1 WLR 1335). Mr Cooke accepted the principle, but submitted that there must be clear wording in the contract that limited the authority of the agent to make representations. I agree with that submission. Whether the contract does limit the agent's authority must, obviously, be a matter of construction of the particular contract terms.

Contracts for insurance

[48] It is agreed that when individual declarations were made under the **Phoenix** Facility Line Slip, then any duties of utmost good faith and disclosure must arise at that point at least. There was some argument as to whether there were duties of utmost good faith and disclosure or duties of a similar nature at the time that the **Phoenix** Line Slip Facility was concluded (it was agreed that the nature of a line slip is that it is a contract of authority whereby insurers delegate to another insurer the power to underwrite on their behalf: Baker v Touche Ross [1992] 2 Lloyd's Rep 207 per Lord Mustill at 210. The other insurers are not bound until the individual "off slips" are agreed by the insurer that has authority to do so: Denby v English & Scottish Maritime Insurance Co Ltd [1998] LRLR 343 at 356 - 8 per Hobhouse LJ). Mr Cooke submitted that a line slip, like an open cover (in Glasgow Assurance Corporation Ltd v William Symondson & Co (1911) 16 Com Cas 109 at 121 Scrutton J held that an open cover for reinsurance was a contract "uberimae fidei" so involved the obligation of disclosure), is to be regarded as a contract of utmost good faith that attracts the duties to disclose and not to misrepresent material facts. He distinguished it from a "binding authority" which has been held not to be a contract of utmost good faith (Pryke v Gibbs Hartley Cooper Ltd [1991] 1 Lloyd's Rep 602 at 616 per Waller J).

[49] I do not accept that the **Phoenix** Line Slip Facility, as a contract for insurance, is a contract of the utmost good faith. The contracts "upon speculation" are made when the individual declarations are made under the line slip and the underwriters become bound. It is clear in this case that individual declarations had to be agreed by leading underwriters and could be rejected when presented. Therefore in principle I think that the **Phoenix** Facility, which is a contract only to grant authority to contract insurance, does not have the necessary qualities to make it a contract of the utmost good faith. In this respect I think that the Facility is in the same category as Waller J held the binding authority to be in the Pryke case.

[50] I believe that this approach is also consistent with that of Rix J (as he then was) in L'Alsacienne Premiere Societe Alsacienne et Lorraine D'Assurances Contre L'Incendie Les Accidents et Les Risques Divers v Unistorebrand International Insurance AS and Kansa Reinsurance Co Ltd [1995] LRLR 335 at 348 - 9. In that case Rix J pointed out that in Bell v Lever Brothers Ltd [1932] AC 161 at 227 per Lord Atkin; 231 - 2 per Lord Thankerton, two

members of the House of Lords had said that the types of contract that can be categorised as giving rise in law to an obligation of utmost good faith are closed. In the Unistorebrand case Rix J rejected a submission that the contract of indemnity in that case was one that attracted a duty of utmost good faith.

[51] Rix J also held in that case that the law was not engaging in an:

"incremental approach under which the duty of disclosure attached by law to the negotiation of a contract uberrimae fidei might be applied to contracts closely analogous to contracts of insurance." (see p 349)

With respect, I agree with him. I therefore hold that, in relation to the **Phoenix** Facility Line Slip itself, as opposed to the off-slips declared under it, there are no duties of utmost good faith on **Chase** or its agents. If there are no duties of utmost good faith, then the right to avoid for breach of those duties also cannot exist. Therefore the issue of whether any clause that purports to limit or exclude the duty of utmost good faith or the consequences of its breach cannot arise in relation to the **Phoenix** Facility Line Slip.

[52] However, that does not dispose of the **Phoenix** Facility Line Slip for the purposes of Preliminary Issue One. Mr Cooke submitted that the nature of the Facility was such that there was a duty that was close to the duty of disclosure that arises in connection with a contract of utmost good faith. He submitted that when the Line Slip was negotiated by Heaths, then unless they stated the contrary, they were impliedly representing that there were no unusual features of the transactions that would be covered by the contracts of insurance to be created by the declarations made under the Line Slip. If, in fact, there were unusual features of the transactions, then there would be a duty to disclose them. Otherwise the implied representation would be false. Mr Cooke founds this submission upon statements made by Blackburn J in Lee v Jones (1864) 17 CB (NS) 482 at 503 - 4 which were adopted by Waller J in the Pryke case (see p 616) and Rix J in the Unistorebrand case (see: [1995] LRLR at p 349). In the last case Rix J emphasised that the failure to disclose unusual features of the transaction in question was not a breach of the duty of disclosure properly so called but "rather misrepresentation in the form of partial non-disclosure" (see p 349). Both he and Waller J in the Pryke case held that this duty not to misrepresent by making only a partial disclosure was placed both upon the agent negotiating the transaction as well as the principal (ibid).

[53] Paragraph 49 of the Amended Particulars of Claim pleads what I will call the "Pryke" type duty of disclosure and a breach of it through Heaths' failure to disclose "unusual features of the transaction to be covered by insurance" (B1/p 32). I understand that Mr Cooke relies on this duty and a failure to comply with it as a ground (or the ground) for alleging that **HIH** is entitled to avoid or rescind the **Phoenix** Line Slip Facility. If that is so, then, upon my analysis, the true basis for claiming this right is not a breach of the duty of utmost good faith as such, but proof of a misrepresentation at common law.

[54] If this is the correct analysis then it follows from the discussion set out above that:

(1) it is conceptually possible for there to be a clause in a contract that excludes or limits liability for or remedies for a pre-contract misrepresentation by an agent;

(2) this possibility extends even to a fraudulent pre-contract misrepresentation by an agent;

(3) whether the clause is effective or not must depend on the proper construction of the clause in question;

(4) the "rules" of construction in the Canada Steamship case and those following it do not directly apply to clauses specifically purporting to exclude or limit liability or the remedies for

a pre-contract misrepresentation (I was not referred to any case that applied the "rules" of construction in the Canada Steamship case to a clause purporting to exclude or limit liability or the remedies for pre-contract misrepresentation and Mr Cooke said he had found none. I have been unable to find any reference to one in Chitty on Contracts). But a Court will still have to decide whether the parties intended that the clauses in question do have that effect in relation to the particular facts of the case.

The application of these principles to Preliminary Issue One. The Construction of the Truth of Statement Clause: general comments

[55] This is not a standard form of clause. It was specifically drafted for the Facultative insurances and the **Phoenix** Facility Line Slip. But it is, I am afraid, ungrammatical, poor in its syntax and obscure. Mr Edelman QC acknowledged in argument that parts of the wording were not a model of clarity. The result is, in my view, that it is very difficult to discern precisely what the parties' intentions were from the wording of the clause. This makes the Court's task of deciding the effect of the clause more difficult.

[56] In his written and oral argument Mr Edelman broke the Truth of Statement Clause down into eight phrases. I shall do the same as this makes the clause easier to handle. However I recognise, of course, that when I am considering its effect I must examine the clause as a whole and look at it in its contractual and commercial context.

[57] Phrase One: "It is a condition precedent to this Policy that: Elmwood Films Inc . . . to the extent such reliance is disclosed on the Questionnaire."

In form the "Condition Precedent" applies to the whole of the Truth of Statement Clause. But in practice the condition precedent applies to the opening paragraph. It is a condition precedent that Elmwood has truthfully completed Section 1 of the Questionnaire. But this phrase does not directly affect the position of **Chase.**

[58] Phrase Three: ". . . it being acknowledged that any misstatement in any part of the Questionnaire (other than Section 1 hereof) shall not be the responsibility of the Insured or constitute a ground for avoidance of the insurers' obligations under the Policy or the cancellation thereof."

Mr Edelman for **Chase** submits that this phrase should be dealt with next, although that takes it out of order. The phrase deals with the effect of mis-statements in other parts of the Questionnaire as opposed to mis-statements generally. It purports to negate the responsibility of **Chase,** as the Insured, for any mis-statements in all the other parts of the Questionnaire other than Section One. It also purports to exclude the right of the Insurers to avoid the policy if there have been any mis-statements in the Questionnaire by **Chase.** It seems to me that this phrase is not directly relevant because the allegations in the Particulars of Claim all concern mis-representations or non-disclosures by Heaths (not **Chase)** and have nothing to do with the Questionnaire.

[59] Phrase Four: "In addition, the failure of Elmwood Films Inc to update Section 1 of the Questionnaire for a Film Production shall not be the responsibility of the Insured or constitute a ground for avoidance of the Insurers' obligations under the policy or the cancellation thereof."

No allegations have been made by the Insurers with regard to the "updating" of Section 1 of the Questionnaire. So this part of the Statement of Truth is not directly relevant. But phrases three and four do demonstrate that the parties were considering the issue of responsibility for mis-statements and the possible consequences if mis-statements were made.

[60] Phrase Two: "Provided that Elmwood Films Inc completes the sections of the

Questionnaire required to be completed by it and delivers the same to the Lead Insurers . . ."

It is **Chase's** submission that this phrase should be linked to the second half of the whole clause, beginning with the sentence that starts:

"Subject to the obligations of the Insured under 'General Conditions - due Diligence Clause' . . ."

**Chase** says that the effect of Phrase Two is that the limitations and exceptions in **Chase's** favour will only operate:

"provided that Elmwood Films Inc completes the sections of the Questionnaire required to be completed by it and delivers the same to the Lead Insurers."

This is an ingenious suggestion but it is not what the wording says. Normally the phrase "provided that" stipulates a condition that has to be fulfilled and if it is then there are certain consequences which will follow. But, however one tries to consider the sentence, which starts with Phrase Two, it is impossible to give it that effect. Therefore I think that Mr Cooke is correct in saying that this proviso in Phrase Two has no consequences and so is ineffective.

[61] Phrase Five: "Subject to the obligation of the Insured under 'General Conditions - Due Diligence Clause' after acceptance by the Lead Insurers of the Declaration with regard to the Film Production, the Insured . . ."

Mr Edelman accepts that this phrase maintains the obligations of the Insured that are set out in the Due Diligence Clause. Those obligations are similar to "sue and labour" obligations seen in marine policies. They do not relate to pre-contract duties of utmost good faith. But the relevance of this wording in Phrase Five is that it leads into the most important part of the wording of the Truth of Statement Clause.

[62] Phrase Six: ". . . the Insured will not have any duty or obligation to make any representation, warranty or disclosure of any nature, express or implied (such duty and obligation being expressly waived by the insurers) . . ."

This phrase purports to exclude the "duty" of **Chase,** as the Insured, to make any representation, warranty or disclosure of any nature. This raises three separate issues.

[63] First the clause attempts to negate a "duty" to make representations or warranties. This can have no effect. There is no duty on an Insured to make any representation to an insurer. Of course if the Insured chooses to make a representation that is another matter, as Mr Cooke pointed out. Then a statement that there is no "duty" could not negate the fact that a representation had been voluntarily made by the Insured; nor could it negate the consequences if that statement amounted to a misrepresentation. The same must be true in relation to a "warranty".

[64] Secondly the phrase purports to negate the duty of disclosure. I have already held that the duty of disclosure, strictly so called, only arises in relation to contracts of insurance. I have also held that it is conceptually possible for there to be such a clause in a contract of insurance. This phrase makes it clear, in my view, that the parties intend that there should be no duty on the Insured to make disclosure. However the wording of this phrase is limited expressly to the Insured itself. "Insured" is specifically defined in the policy wording to mean **Chase** or other banks participating in the RTLA.

[65] Thirdly there is the question of whether this phrase affects the position of an "agent to insure" (the phrase used in MIA s 19(a) to describe the class of person who, in addition to the Assured, also owe a duty of disclosure. It was accepted by Mr Edelman that a similar

class of agent exists in relation to non-marine insurance). There is no mention of agents in the clause. Therefore this wording does not expressly negate any duty of disclosure placed on an agent in connection with a contract of insurance. Mr Edelman accepted that, in relation to non-marine insurance, an "agent to insure" would normally have the same duties of disclosure as are set out in s 19 of the Marine Insurance Act for agents in relation to marine insurance. Therefore, normally there would be: (i) a duty to disclose matters that are within the agent's own "private knowledge" (the equivalent of s 19(a) of the MIA), and (ii) a duty to disclose matters which the insured is bound to disclose (unless those matters come to the insured's knowledge too late to communicate to the agent) (the equivalent of s 19(b) of the MIA). Mr Edelman argued that both these duties of disclosure of an agent are negated by this wording of the phrase. He said that because any duty of disclosure of the agent is dependent on that of the principal, then if the duty of the principal is negated by agreement, then the duty of the agent must go automatically as well. As a fall-back argument he submitted that the duty was confined to disclosure of the agent's "private knowledge".

[66] I do not accept either argument. It is clear from s 19 of the MIA itself and the recent cases on its scope that there is an independent duty of disclosure on the agent itself. This point is emphasised by Dillon and Hoffmann LJJ in SAIL v Farex ([1995] LRLR 116 per Dillon LJ at 142; per Hoffmann LJ at 150). Their view was followed by Staughton LJ in PCW Syndicates v PCW Reinsurers ([1996] 1 All ER 774, [1996] 1 Lloyd's Rep 241 at 255. Staughton LJ also stated that the "duty" of the agent cannot give rise to right (in the insurer) to enforce remedies if there is a breach by the agent. But that remark (which is relevant to Preliminary Issue Three) does not detract from the point that Staughton LJ confirmed the view that the duty of disclosure by the agent is independent of the principal assured's duty). Rose LJ agreed with Staughton LJ's judgment (see p 257 of the report). Once it is accepted that there is an independent duty to disclose that is placed on the agent, then I think that it can only be negated by clear words. Disclosure by the agent may be at least as important as that by the principal. It may be that the parties contemplate that all relevant material will come from the agent to insure, rather than the insured itself. Thus in this case the insured banks had very little (if any) relevant knowledge of the underlying transactions. It would be understandable if the parties contemplated that disclosure of all material facts (if there were to be any at all) would come from the agent, Heaths, rather than the principals, ie **Chase** or other banks.

[67] It is correct, of course, that both Hoffmann and Saville LJJ held in SAIL v Farex that because the principal had no duty to disclose a particular fact (because the fact of which it had knowledge was not material to be disclosed), therefore there could be no additional duty of disclosure on the agent in relation to that fact (see: pp 149 and 157 of the report). Mr Edelman relied on those passages as support for his submission that if the parties have agreed to negate all duties of disclosure of the principal, then it must follow that the agent also has no duties to disclose. I cannot accept this argument for the same reasons as I have given above. The duty of disclosure of the agent is not dependent on that of the principal; it is independent and distinct. The parties to the contract cannot be assumed to have agreed that, in negating entirely the one duty of the principal, they also negated the independent duty of the agent.

[68] Mr Cooke argued that, even if I accepted that this phrase was apt to negate the duty of disclosure of the agent, nevertheless it could not assist if there had been a "fraudulent" non-disclosure by Heaths. I would not have accepted that argument, for the reasons that I have already given above: if there is no duty to disclose at all, then there is no question of "concealment", let alone a deliberate or "fraudulent" concealment of material facts.

[69] Phrase Seven: ". . . the insured . . . shall have no liability of any nature to the insurers for any information provided by any other parties . . . including, but not limited to, Heath North America & Special Risks Ltd (other than Section 1 of the Questionnaire) . . ."

Mr Edelman submits that this phrase has the effect of expressly dissociating **Chase** from any information provided by Heaths. Therefore, he submits, the phrase declares that Heaths have no authority to make any sort of representation on behalf of **Chase**. Accordingly, following the Overbrooke Estates case ([1974] 1 WLR 1335) the Insurers are not entitled to attribute anything said by Heaths to **Chase** as the assured.

[70] I cannot accept this submission. The wording does not expressly limit the authority of Heaths (compare the wording in the Overbrooke Estates case which stated: "the vendors do not make or give and neither the auctioneers nor any person in the employment of the auctioneers has any authority to make or give any representation or warranty in relation to these properties": see p 1339 of the report). It is clear, looking at the insurance wording as a whole and the surrounding circumstances, that Heaths were acting as the agents of **Chase**. Indeed that is implicit in the wording of this phrase itself, with its reference to Heaths as one of a number of "parties . . ." Accordingly everyone concerned would be entitled to assume that Heaths would have authority to act on behalf of and make statements for **Chase**. If the parties had intended that such authority was to be removed, particularly in the context of giving information for the purposes of an insurance contract, then I am sure that the parties would have said so expressly.

[71] This conclusion on the construction of the phrase is reinforced by the wording of the Miscellaneous Clause (Bundle 2/Tab 1/p 25) of the policy wording. That specifically provides that the Insurers "understand and agree" that Premier Media Ltd, Graham Bradstreet, TriStar Pictures Inc and **Phoenix** Pictures Inc "are not agents or representatives of the Insured". That clause expressly declares that those entities have no authority to bind **Chase,** the Insured. Heaths are absent from that list. This absence, in a carefully drawn contract, must have been intentional. I am sure, from the wording of the phrase in the Truth of Statement clause that I am considering, that the parties did not intend that Heaths should be added by implication.

[72] Mr Edelman's next argument on this part of the Truth of Statement clause is that the words:

". . . no liability of any nature to the insurers for any information provided by other parties including . . . [Heaths],"

are plainly wide enough to embrace and exclude **Chase's** liability for any misrepresentations made by Heaths, however they might be categorised. There are two points here. First there is the question of whether the words "no liability . . . for any information" is wide enough to exclude liability for misrepresentations. Secondly there is the question of whether that phrase, particularly the word "liability", is apt to exclude the right of the Insurers to avoid the contract of insurance for a misrepresentation by Heaths.

[73] On the first question my view is that the word "information" is not sufficiently clear to indicate an intention by the parties to exclude a liability for misrepresentation at all. But even if it were clear enough to exclude a liability for inadvertent misrepresentation, I am sure that it is not clear enough to exclude a liability for a misrepresentation that was made negligently or fraudulently. Mr Edelman accepts, indeed relies upon, the statement of Steyn LJ in EE Caledonia Ltd v Orbit Valve Co plc [1994] 1 WLR 1515 at 1522C that:

". . . the ordinary meaning of the words in their contractual setting is the dominant factor."

The contractual setting here is that of an insurance contract. The parties therefore know that the Insurer is taking on a risk. They also know (particularly if they have legal advice) that, in the absence of special contractual wording, if the assured or his "agent to insure" makes a misrepresentation of a material fact that induces the contract of insurance, then the Insurer has a right to avoid the contract. In my view, given that setting, the "ordinary meaning" that

the parties would give to the word "information" would not embrace a negligent or fraudulent misrepresentation by Heaths. Therefore I hold that it does not do so.

[74] The second question is whether the word "liability" is apt to exclude the right of the Insurer to avoid. I think that it does not do so. The phrase refers to the liability of the Insured to the Insurers. If the parties had intended to exclude the right to avoid by this particular wording then they would have referred to the remedies of the Insurer rather than the liability of the Insured to the Insurer.

[75] Phrase Eight: ". . . and any such information provided by or non-disclosure by other parties including but not limited to Heath North America & Special Risks Ltd (other than Section 1 of the Questionnaire) shall not be a ground or grounds for avoidance of the insurers' obligations under the Policy or cancellation thereof."

So far I have concluded that, on the construction of the Truth of Statement clause, in particular Phrases Six and Seven (see paras 65 - 71 above) Heaths' duty of disclosure, as agents to insure, remained extant. Mr Edelman submits that this last phrase in the Truth of Statement clause has two effects. First it excludes the right of the Insurers to avoid for non-disclosure, whether the non-disclosure resulted from inadvertence, negligence or deliberate concealment. Secondly, he says, it also excludes the right of the Insurers to avoid for any type of misrepresentation by Heaths.

Does the wording exclude the right to avoid for all types of non-disclosure by Heaths?

[76] The obligation of disclosure only applies to the contract of insurance. So this issue only arises in relation to the facultative placements and the declarations under the **Phoenix** Facility Line Slip. The key words are:

". . . non-disclosure by . . . [Heaths] . . . shall not be a ground or grounds for the avoidance of the insurers' obligations under the policy . . ."

If there is no duty of disclosure by Heaths then could not be a breach of duty and there could not be a right to avoid for a breach. Therefore I approach this issue on the basis that Heaths' duty of disclosure to the Insurers remained. Then the question is: does this wording (objectively viewed) reflect an intention by the parties that if the non-disclosure is either the result of deliberate concealment or negligence by Heaths, the Insurers should not be entitled to exercise their right to avoid the contract of insurance? I have concluded that the answer must be: no it does not do so.

[77] Mr Edelman submitted that this wording was part of a carefully constructed contractual scheme in which the limitations of **Chase's** obligations and the apportionment of risk between the Insurer and assured are clearly expressed. If the parties' intentions were clearly identified in the wording then I would have expected them to state, in terms, that whatever the reason for the non-disclosure by Heaths, then the Insurers did not have a right to avoid the contract of insurance. But there is no such wording. This is in contrast to the wording in the "General Exclusion Clause". That excludes the right to an indemnity under the insurance for loss:

"directly or indirectly arising out of, contributed by or resulting from any fraud, misrepresentation or concealment by the Insured . . ."

So when the parties wished to deal expressly with the question of fraud they did so. I suspect that the reason for its omission, or any reference to negligence, in the Truth of Statement clause is exactly the same as that suggested by Steyn LJ in the EE Caledonia case, ie "one does not want to frighten off one or other of the parties" ([1994] **1** WLR 1515 at 1523H). But the precise reason does not matter. Without that clear wording I cannot conclude that the

parties intended to exclude the right of the Insurers to avoid the contract in circumstances where the breach of the independent duty of disclosure by Heaths was the result of either their negligence or deliberate concealment of material facts.

Does the wording exclude the right to avoid for all types of misrepresentation by Heaths?

[78] In my view it does not do so. This is for two reasons. First, as I have already stated, in my view, the word "information" is not apt to cover misrepresentations. Secondly I would apply the same approach to the issue of misrepresentation as I have done to non-disclosure. So the question is: does the wording, viewed objectively in its contractual setting, clearly reflect an intention of the parties to exclude the right to avoid when the reason for a misrepresentation by Heaths is either their negligence or a deliberate decision to mislead? In my view it does not do so. If that had been the parties' intention it would have been more clearly expressed.

[79] Preliminary Issue One poses the question of whether the Insured has the right to "avoid and/or rescind" the contracts of or for insurance. I assume that the use of the two words "avoid" and "rescind" was intended to reflect the point that the nature of the right might depend on whether it is as a result of a breach of the duty of utmost good faith (non-disclosure or misrepresentation) or the result of a common law misrepresentation. Common law misrepresentations will be particularly important in relation to the contracts for insurance, where, as I have held, there is no duty of utmost good faith as such.

[80] In my view the wording of the Truth of Statement clause does not exclude the right of the Insurer to rescind for a misrepresentation at common law, just as much as it does not exclude the right to avoid for a misrepresentation of a material fact in breach of the obligation of good faith. The reason for this conclusion is exactly the same as before. I should add that I have not been asked to consider the effect of s 3 of the Misrepresentation Act 1967 on the wording of the Truth of Statement clause and I have not done so.

Answer to Preliminary Issue One

[81] The short answer to Preliminary Issue One, which asks:

"On the true construction of the contracts of or for insurance . . . and on the assumption that the facts and matters pleaded in the Particulars of Claim are true, are the Claimants entitled to avoid and/or rescind the contracts of or for insurance against [**Chase**],"

is "Yes". In summary the reasons for this answer are:

(1) that although a clause in a contract of insurance can exclude or limit the duty of disclosure of an assured or its agent, the Truth of Statement clause does not exclude or limit the duty of disclosure of Heaths;

(2) that a clause in a contract of insurance can exclude the right of an insurer to avoid for breach of the duty of disclosure by the assured or its agent, even if the non-disclosure amounts to deliberate concealment. However the wording of the contract must clearly reflect an intention of the parties to exclude the right of avoidance in those circumstances. The wording in the Truth of Statement clause does not clearly reflect an intention to exclude the right of avoidance when the reason for the non-disclosure by Heaths is either their negligence or deliberate concealment of material facts. However the Truth of Statement clause would protect **Chase** against avoidance in the case of an innocent non-disclosure, but the Insurers have only alleged negligent or deliberate non-disclosures in their pleading;

(3) that a clause in a contract of insurance can exclude the right of an Insurer to avoid for breach of the duty of utmost good faith by virtue of a misrepresentation by the agent of the

assured, even if the misrepresentation is fraudulent. However the wording of the contract must clearly reflect an intention of the parties to exclude the right of avoidance in those circumstances. The wording in the Truth of Statement clause does not clearly reflect an intention to exclude the right of avoidance when the reason for the misrepresentation of the agent (Heaths) is either their negligence or an intention to misrepresent material facts. However the Truth of Statement clause would protect **Chase** against avoidance in the case of an "innocent" misrepresentation, but the Insurers have only alleged negligent or fraudulent misrepresentations in their pleading;

(4) that although a clause in a contract of (or for) insurance can limit the authority of an agent to make statements or representations on behalf of its principal, the wording of the Truth of Statement clause does not have that effect in this case;

(5) that there is no duty of utmost good faith in the case of contracts for insurance. Therefore the Insurers cannot have a right to avoid the contract for insurance (the **Phoenix** Line Slip Facility) for alleged breaches of that duty by Heaths. However the Insurers would normally have a right to rescind a contract for insurance if induced by a misrepresentation by the agent of the assured. The wording of the Truth of Statement clause does not reflect an intention of the parties to exclude the Insurers' right to rescind when the reason for the misrepresentation is either the negligence of the agent (Heaths) or an intentional or reckless misrepresentation of material facts.

(F) Preliminary Issue Two

[82] The question is:

"On the true construction of the contracts of or for insurance . . . and on the assumption that the facts and matters pleaded in [the] Particulars of Claim are true, are the Claimants entitled to damages from the First Defendants [ie **Chase**] for misrepresentation or non-disclosure."

This question covers two sub-issues:

(1) The first issue is whether the Insurers have a right to claim damages against **Chase,** as the assured, for breach of the duty of utmost good faith in relation to the contracts of insurance. (I have held there is no duty of utmost good faith in relation to the contract for insurance). The duty of utmost good faith obviously covers both non-disclosures and misrepresentations. This sub-issue involves two aspects. The first is whether the Insurers would have any right to claim damages at all. The second is, if they would have, have their rights been excluded by the Truth of Statement clause.

(2) The second sub-issue covers three questions. They are: whether the Insurers have a right to claim damages against **Chase** (a) for deceit; or (b) for a negligent misrepresentation made in breach of a common law duty of care or (c) under s 2(1) of the Misrepresentation Act 1967. Those questions could, in theory, arise in relation to both the contracts of insurance and the contracts for insurance. They also raise the two distinct aspects I have identified in relation to sub-issue one above.

Sub-Issue One: Do the Insurers have any right to claim against **Chase** for breach of the duty of utmost good faith?

[83] Mr Cooke QC accepted that, in relation this sub-issue, I must answer "No". In Banque Keyser Ullmann SA v Skandia (UK) Insurance Co ([1990] QB 665 at 779 - 781. Approved by the House of Lords: [1991] 2 AC 249 at 280 per Lord Templeman; 281 per Lord Jauncey, with both of whom Lords Ackner and Brandon agreed) the Court of Appeal held that neither party to a contract of insurance had a right to claim damages for breach of the duty of

utmost good faith by the other party. The only remedy available was avoidance of the contract of insurance. Mr Cooke did not attempt to argue that the answer to this question could be any different if I had held on Preliminary Issue One that:

(a) **Chase's** or Heaths' duty of utmost good faith had been negated by the Truth of Statement clause; or

(b) the right of the Insurers to avoid the contracts of insurance for breaches (by **Chase** and/or Heaths) of the duty of utmost good faith had been effectively excluded in relation to deliberate or negligent misrepresentations or non-disclosures by Heaths. In my view he was correct not to do so. Logically it cannot follow that if the parties have limited or excluded the right of one or both to rely on the one remedy that the court recognises, then a different remedy will arise that had not previously been recognised. Moreover, in the Banque Keyser Ullmann case there is no hint in the judgment that if the parties to the contract of insurance have limited or excluded the right to avoid for a breach of that duty then the right to avoid can be replaced by an entirely new remedy (damages) that was not previously available at all.

[84] In the light of Mr Cooke's concession I do not need to consider the second aspect of this sub-issue: ie whether a right to claim damages for the breach of a duty of utmost good faith has been excluded by the terms of the Truth of Statement clause.

Sub-Issue Two: do the Insurers have a right to claim damages for deceit; negligent misrepresentation; or under s 2(1) of the Misrepresentation Act 1967? General Points

[85] (1) As I have already pointed out this sub-issue applies, in theory at least, to both contracts of insurance and the contract for insurance (the **Phoenix** Facility Line Slip). Mr Cooke did not, I think, suggest that there could be any claim for damages against **Chase** for the negligent non-disclosure of material facts by Heaths in respect of either type of contract.

(2) If I am correct in concluding in Preliminary Issue One that, on the correct construction of the Truth of Statement clause, **HIH** has retained the right to avoid the contracts of insurance, then I cannot see why, in practice, **HIH** would wish to pursue a claim in damages against **Chase** as well. (Indeed if it can avoid the contracts of insurance, it must be arguable that **HIH** would be precluded from attempting to claim damages against **Chase** as well). However the issue of whether **HIH** could claim damages against **Chase** in respect of the contracts of insurance might arise if I am wrong on Preliminary Issue One, so I must consider it briefly. I will do so separately in relation to the contracts of insurance and the contract for insurance.

Contracts of insurance: claim for damages for deceit by Heaths for which **Chase** is responsible?

[86] Mr Edelman first submitted that there could not be a claim in damages at all in the context of a contract of insurance, even if based on the deceit of the agent to insure. He submitted that either there was a right to avoid for breach of the duty of utmost good faith or nothing. As I explain below, I agree with him in relation to any claim based upon breach of a duty of care. That is clear from the decision of the Court of Appeal in the Banque Keyser Ullmann case. However in that case the Court of Appeal also seem to have assumed that if a claim for damages in deceit had been made by Banque Keyser Ullmann against the employer of Mr Dungate (ie the insurers) then it would not have been barred simply because it was made in the context of a contract of insurance ([1990] QB 665 at 774A - B). So I am prepared to assume that (at least in theory) an insurer could bring a claim for damages in deceit against an insured in relation to pre-contract statements made by the insured's agent that induced the contract of insurance. If so, then the next question is whether the wording of the Truth of Statement clause excludes the liability of **Chase** for such a claim.

[87] I have held that the Truth of Statement clause does not limit the authority of Heaths to make statements which bind **Chase**. Therefore if Heaths made a fraudulent statement on behalf of **Chase, Chase** could be liable in damages for deceit to the Insurers if the other elements of the tort were proved. **Chase** then relies on the wording of Phrase Seven of the clause (set out in para 69 above) to exclude its potential liability in deceit. I would have rejected that contention for the reasons that I have set out at paras 72 and 73 above.

A right to claim damages for negligent misrepresentations or non-disclosures by Heaths?

[88] Negligent misrepresentations and non-disclosures can be considered together because in each case the answer is that there is no right at all. In the Banque Keyser Ullmann case the Court of Appeal held (see [1990] QB at p 801) that as the nature of a contract of insurance was one of the utmost good faith, it could not "be used as a platform to establish a common law duty of care". So special facts would be needed to create a duty of care as between an insurer and an insured. None are pleaded in the present Particulars of Claim. Therefore in relation to the contracts of insurance, there can be no duty of care as between **Chase and HIH** which could give rise to a right to claim damages if there was a breach of duty. Therefore the second aspect, ie whether liability has been excluded by the terms of the Truth of Statement clause, does not arise. If it had I would have held that there was no effective exclusion of liability, for the reasons given in paras 72 and 73 above.

Damages for misrepresentation by Heaths based on s 2(1) of the Misrepresentation Act 1967?

[90] The basis of this claim would be that **HIH** was induced to enter into the contracts of insurance by representations made by Heaths (which bound **Chase**) and Heaths had no reasonable belief in the truth of the statements they had made. Mr Edelman for **Chase** expressly reserved the question of whether The Misrepresentation Act 1967 applied to contracts of insurance at all. But if it did, he accepted that **Chase** could be liable under the Act for the misrepresentations made by its agent, Heaths (based on the conclusion of Mustill J in Resolute Maritime Inc v Nippon Karji Kyokai (The "Skopas") [1983] 2 ALL ER 1, [1983] 1 Lloyd's Rep 431, especially at 433 of the latter report). I think Mr Edelman also accepted that in the Banque Keyser Ullmann case the Court of Appeal assumed that a claim for damages for misrepresentation based upon s 2(1) of the 1967 Act could be made in the context of a contract of insurance (the point was considered under "Issue 7": see: [1990] QB at pp 789 - 790. The CA dismissed the claim on the facts as not establishing all the ingredients for such a claim). So the issue would be whether the wording of the Truth of Statement clause, particularly the words of Phrase Seven, would exclude such a liability. In my view the wording would have to be clearer than it is. It would have to state that there was no liability on the Insured even if there was no reasonable belief in the giver of the information to the Insurers.

Contract for insurance (the **Phoenix** Facility Line Slip): how might Preliminary Issue Two arise?

[91] (1) The circumstances in which there might be a claim for damages against **Chase** in relation to the Line Slip were not fully explored in argument. In particular I did not hear full argument on the difficult question of what the rights and liabilities of the parties might be in the following situation: assume that the contract for insurance ie the **Phoenix** Facility Line Slip, was induced as a result of a negligent or fraudulent misstatement by Heaths; then declarations are made under the Line Slip creating the individual contracts of insurance; then assume that the Insurers could avoid those contracts of insurance; would they also be able to pursue a claim damages for negligent or fraudulent misrepresentation in relation to the contract for insurance if they so wished (the Amended Particulars of Claim, paras 53 - 57, are certainly broad enough to encompass such a claim)?

(2) If, as I have held, **HIH** can avoid the contracts of insurance I find it difficult to see what further claims there might be for damages for misrepresentation in relation to the contract for insurance. (Even more so if the contract for insurance can be rescinded). However if, contrary to my conclusion on Preliminary Issue One, the position is as follows:

(a) in relation to the contracts of insurance, Heath's duty to disclose is negated; or

(b) in relation to the contracts of insurance, **HIH's** right to avoid for a breach of the duty of utmost good faith is excluded; and/or

(c) in relation to the contract for insurance **HIH's** right to rescind is excluded,

then the question of whether there is a right to claim damages for misrepresentations in relation to the contract for insurance might become important. So I have been asked to consider briefly whether **HIH** could, in those circumstances, make claims in damages for the various types of misrepresentation alleged.

Contract for insurance: claim in damages for deceit by Heaths and claim based on fraudulent or negligent misstatement by Heaths

[92] In relation to the contract for insurance, Mr Edelman accepted that, generally, there must be a right by the "insurer" (**HIH**) to pursue the "assured" (**Chase**) for damages in deceit if the contract for insurance has been induced by the fraudulent statement of the assured's agent, Heaths. It is also clear that there must, generally, be a duty of care by the "assured" or its agent in making statements to the "insurer" in relation to the proposed contract for insurance (in relation to negligent misstatement see the Pryke case [1991] 1 Lloyd's Rep 602 at 618 per Waller J). The issue in this case therefore, is whether the terms of the Truth of Statement clause exclude **Chase's** liability for damages for a negligent or fraudulent misstatement by Heaths. **Chase** relies particularly on the words of Phrase Seven:

". . . the Insured . . . shall have no liability of any nature to the insurers for any information provided by any other parties . . ."

But it is well established that clear words are needed in a contract to exclude liability for a negligent misstatement (see: eg the statement of Lord Goff of Chieveley in Henderson v Merrett Syndicates Ltd [1995] 2 AC 145, [1994] 3 All ER 506 at 183D of the former report: "clear words are required to exclude liability in negligence . . ."). The words must be even clearer (if possible) to exclude liability for the fraudulent misstatements of an agent. My view is that this wording is insufficiently clear to exclude a liability for either a fraudulent or a negligent misstatement.

Contract for insurance: claim based on s 2(1) of the Misrepresentation Act 1967

[93] Lastly there is the question of whether this wording excludes a liability on **Chase** for damages under s 2(1) of the Misrepresentation Act 1967 if it is proved that Heaths made a statement (in relation to the contract for insurance) for which they had no reasonable grounds for believing that they were true. Once again Mr Edelman relied on the wording of Phrase Seven. For the reasons I have given in relation to the contracts of insurance, set out at para 92 above, I would hold that the wording did not exclude a liability of **Chase** for such damages.

[94] There is also the question of how s 3 of the Misrepresentation Act operates in the context of contracts of or for insurance. That point was deliberately excluded from argument.

Conclusions on Preliminary Issue Two

[95] In summary my conclusions are:

(1) The Insurers have no rights to claim damages against **Chase** for a breach of the duty of utmost good faith. That issue arises only in relation to the contracts of insurance.

(2) The Insurers would, on the proper construction of the contracts of and for insurance, have a right to claim damages for deceit based upon the intentional or reckless misrepresentations of fact by Heaths, whether in relation to the contracts of insurance or the contract for insurance.

(3) The Insurers would not have a right to claim damages for the negligent misstatements of Heaths in relation to the contracts of insurance. But the Insurers would have a right to claim damages for the negligent misstatements of Heaths in relation to the contract for insurance.

(4) The Insurers would, on the proper construction of the contracts of or for insurance, have a right to claim damages under s 2(1) of the Misrepresentation Act 1967.

Preliminary Issue Three

[96] The question is:

"On the true construction of the contracts of or for insurance pleaded in the Particulars of Claim . . . and on the assumption that the facts and matters pleaded are true, are the Claimants entitled to damages from Heaths for non-disclosure."

This question was posed as a result of the amendment to the Particulars of Claim which added paras 58 and 59. They allege that the Claimants (**HIH**) have suffered loss and damage as a result of entering into the contracts of or for insurance as a result of the fraudulent, reckless or negligent failure of Heaths to disclose material facts.

[97] It was agreed between Mr Cooke for **HIH** and Mr Butcher for Heaths that under this third Issue it is not intended to deal with claims based on allegations of deceit or any kind of positive misrepresentation, including misrepresentations of the "Pryke" variety. Therefore the argument is confined to two points, which are:

(1) whether, assuming that, upon the proper construction of the Truth of Statement Clause, there is a duty of disclosure upon Heaths as part of the duty of utmost good faith, then if Heaths is in breach of it as alleged, can that give the Insurers a right in damages against Heaths;

(2) whether, apart from any duty of disclosure upon Heaths arising out of the duty of utmost good faith, there is a right in the Insurers to claim damages against Heaths for non-disclosure of material facts as alleged.

The submissions of the Insurers

[98] Mr Cooke submitted as follows:

(1) Heaths, as agents to insure, owed an independent duty of utmost good faith to **HIH,** in particular a duty to disclose material facts under the non-marine equivalent of s 19 of the MIA. This duty arose in connection with contracts of insurance.

(2) The decision of the Court of Appeal in the Banque Keyser Ullman case ([1990] QB 665 at 779 to 781) that damages cannot be recovered from a principal party to a contract of insurance does not apply to a claim against an agent to insure that has been found in breach

of its independent duty of disclosure.

(3) If the agent owes an independent duty to disclose to the other party then if there is a breach there must be a remedy and the remedy should be damages. None of the four reasons why damages for breach of the duty of utmost good faith may not be recovered against a principal party, as set out by Slade LJ in the Banque Keyser Ullman case (at pp 780 - 781 of the report) apply to the agent.

(4) In relation to both contracts of insurance and also the contract for insurance (where there can be no duty of utmost good faith as such) there is a common law duty to speak. Heaths, as the agent to insure "assumed the risk" and so owed a duty of care to speak up. Alternatively there was the necessary foreseeability of economic loss; the necessary proximate relationship and it was fair, just and reasonable that there should be a duty of care on Heaths to speak up. A breach of that duty must sound in damages.

The Submission of Heaths

[99] Mr Butcher for Heaths submitted as follows:

(1) In relation to contracts of insurance, the obligation of disclosure placed upon an agent to insure is not a duty which is owed by the agent to the insurer which, if broken, can lead to a right to claim damages against the broker. The duty of disclosure is simply an aspect of the duty of utmost good faith, the breach of which gives only a right to avoid the contract of insurance.

(2) In relation to both contracts of insurance and the contract for insurance, there is no common law duty on the agent to "speak up" and so no right to damages unless special facts exist which have not been pleaded in this case.

Sub-Issue One: can an insurer claim damages from an agent to insure who is in breach of its duty to disclose material facts as part of the duty of utmost good faith

[100] This issue can only relate to the contracts of insurance. This is because I have held that there is no duty of utmost good faith as such in relation to the contracts for insurance. For the purposes of this issue I must assume that I am correct in concluding that, upon the proper construction of the Truth of Statement clause, Heaths had a duty to disclose material facts. I will also assume, (as I have held), that the Insurers' right to avoid for Heaths' non-disclosure remains. Can the Insurers also claim damages from Heaths for their non-disclosure? I wondered why it might be necessary to pursue Heaths for damages if the Insurers have the right to avoid the contracts of insurance; but I will assume that this claim has a practical utility.

[101] In my view the argument of Mr Cooke must fail because of the decision of the Court of Appeal in the Banque Keyser Ullmann case. The reason that the agent to insure has an obligation to disclose material facts is that contracts of insurance are contracts of the utmost good faith. As Mr Cooke himself stated, the law holds that an agent to insure has an independent obligation to make disclosure of material facts because, if it did not, then an assured could employ an agent to negotiate the insurance and evade the obligation to disclose material facts. I accept that the agent independently owes to the insurer its duty of disclosure, as was pointed out by the Court of Appeal in SAIL v Farex [1995] LRLR 116 at 142 (Dillon LJ); 150 (Hoffmann LJ). But the agent's duty of disclosure arises out of the obligation of the assured, acting personally and through its agent to insure, to exercise the utmost good faith. Once that is recognised, as it must be, then it must also be recognised that one is dealing with a breach of one, ultimate, duty (of utmost good faith). The Court of Appeal, as approved by the House of Lords, has stated that the only remedy for breach of that duty is avoidance of the contract of insurance.

[102] It has also been expressly stated by Staughton LJ in the PCW case ([1995] 2 Lloyd's Rep 241 at 255) that the duty of an agent to make disclosure that is imposed by s 19 of the MIA is not one that could be enforced by an order for specific performance; nor does a breach give rise to a remedy in damages. He continued:

"In effect it [the duty imposed by section 19] provides that if the agent does not disclose what he should, the insurer may avoid the contract."

With respect I entirely agree with this conclusion, for the reasons I have set out in the previous paragraph.

[103] Mr Cooke suggested that Waller J had arrived at a different conclusion in the Pryke case ([1991] 1 Lloyd's Rep 602 at 616). I disagree. In the passage on which Mr Cooke relied Waller J was dealing with the issue of whether there were any obligations on a broker in relation to a binding authority, which he had just held was not a contract of utmost good faith. Waller J held, on the same page, that the broker may owe a duty of care not to make negligent statements. He further held that there was a duty to disclose unusual features of the underlying transactions that would give rise to the insurance, because otherwise the non-disclosure would amount to a misrepresentation. But he was not suggesting that a breach of the duty of utmost good faith on the part of the broker would give rise to a remedy in damages at the suit of the insurer.

[104] Mr Cooke also attacked the four reasons which led the Court of Appeal in the Banque Keyser Ullmann case to conclude that the only remedy for a breach of the duty of utmost good faith in relation to a contract of insurance was avoidance of the contract. He said that they could not or should not apply to agents. There may be force in some of the points he made. But I think that, at least before me, that argument is irrelevant. The Court of Appeal has concluded that the only remedy for breach of the duty of utmost good faith in relation to a contract of insurance is avoidance of the contract. The House of Lords has approved that conclusion. I am bound by it. If, as I hold, the agent's duty to disclose, in relation to a contract of insurance, is founded on the duty of utmost good faith, then the remedy for breach of that duty - avoidance of the contract of insurance - must remain the same. That must be so whether the particular breach is by the agent or the principal.

[105] Would my conclusion have been any different if I had held that the duty of Heaths to disclose material facts remained, but HIH were not entitled to avoid the contracts of insurance if there was a breach of that duty by Heaths? In my view those circumstances could not result in a different answer. The law is that there is only one remedy for the breach of the duty of utmost good faith in relation to contracts of insurance. If the parties agree that the insurer shall not have that remedy then that factor cannot, by itself, create not only a new type of remedy but also one against a different party when the law has otherwise held there is no such remedy.

Sub-Issue Two: apart from the duty of utmost good faith, does the Insurer have any right to claim damages from Heaths for a failure to disclose material facts

[106] This issue arises (at least in theory) in relation to both the contracts of insurance and the contract for insurance. I note that the claim for damages against Heaths has not been pleaded as being dependent on whether or not the Insurers had a right to avoid the contracts of insurance because of non-disclosures by Heaths. I also note that Mr Butcher accepted (for the purposes of the Preliminary Issues) that Heaths could not rely directly on the terms of the Truth of Statement clause to escape any liability in damages if one otherwise existed.

[107] If the right to claim damages for non-disclosure is not based on the duty of utmost good faith, then it has to be based on a breach of a common law duty of care owed by the

agent. As this particular claim is founded on non-disclosures only, the Insurers have to say that Heaths owed them a duty, at common law, to "speak up" and they were in breach of it.

[108] Mr Butcher accepted (Outline Argument para 12) that if **HIH** had pleaded particular facts alleging that Heaths had assumed directly towards the Insurers a particular responsibility to make disclosure, then a duty of care could arise and if broken could result in a claim by the Insurers for damages against Heaths. But he said no such particular facts had been pleaded. Mr Cooke accepted this is the case. So, in the absence of such special facts, the questions are: (i) in relation to a contract of insurance, is there a common law duty on an agent to "speak up"; and (ii) in relation to a contract for insurance, is there a common law duty on an agent to "speak up"? It is easier to take these questions separately although I have concluded that the answer to both is "No".

A duty on an agent to insure to "speak up" in relation to a contract of insurance?

[109] There are two possible situations that I ought to consider. The first is where, as I have held on Preliminary Issue One, Heaths' duty to disclose remains and the Insurers have a right to avoid the contracts of insurance if there is a breach of that duty by Heaths. In that situation in my view there cannot be a common law duty on the agent to insure to speak up. As I have already noted in the Banque Keyser Ullmann case ([1990] QB 665 at 801A) the Court of Appeal made it clear that the fact that an insurer and an insured were negotiating a contract of utmost good faith could not be "used as a platform to establish a common law duty of care". They held that, as the only remedy available for a breach of the duty to disclose a material fact was avoidance of a contract of insurance, then:

"in those circumstances it is not, we think, open to the Court to assist [the insured in that case] by providing a supplementary remedy in tort." (at p 801B)

If that is so in relation to the principal parties to the contract of insurance, then the same reasoning should apply as between the insurer and the agent to insure. Mr Cooke has not provided me with any cogent reason why it should not.

[110] The second situation is where, contrary to my conclusions on Preliminary Issue One, Heaths do not have the duty to disclose as part of their duty of utmost good faith, by virtue of the terms of the Truth of Statement clause, or, if the duty remains, the Insurers have no right to avoid for breach of it because of the terms of the Truth of Statement clause. Here it seems to me that the position is even more difficult for the Insurers. The argument has to be that even if, following Banque Keyser Ullmann, there is no general duty (in tort) to speak up when there is a duty of utmost good faith, yet if that latter duty is negated by virtue of a contract between the principal parties, then a duty on the agent to speak up will arise. Mr Cooke was quite unable to explain why, if the contract terms between the Insurers and the insured had negated the duty of the agent to insure to disclose material facts, the general law should re-impose the duty in a form that gave a different remedy (damages) and against a different party (the agent). The existence of the duty to speak up cannot depend on the adventitious factor of whether the clause negating the duty of utmost good faith was effective or not. In my view if the duty to speak up does not exist in the general law when there is a duty of disclosure (as part of the obligation of utmost good faith), then it cannot exist when the parties have agreed that the scope of the duty of utmost good faith should be limited or excluded by contract. Of course, without a duty to speak up, then there could be no right to damages.

A duty on an agent to insure to speak up in relation to the contract for insurance?

[111] I have held, following the reasoning of Waller J in the Pryke case ([1991] 1 Lloyd's Rep 602 at 616), that there is no general duty of disclosure imposed on the principal in relation to a contract for insurance. (I am excluding from consideration the duty not to make ordinary or

"Pryke" type misrepresentations). In the absence of particular facts demonstrating a special assumption of responsibility to disclose by Heaths (as brokers) to the Insurers, why should the general law impose a duty to disclose on the agent, if not on the principal? Again Mr Cooke was not able to cite any cases in support of such a duty nor was he able to provide a rationale for such a duty.

[112] In my view all the factors are against such a general duty to speak up. The most important is the fact that the general law does not impose such a duty in the absence of special facts (Chitty on Contracts 28 Edn vol 1 para 6 - 013). The second is that Heaths are acting as agents for **Chase** in relation to the contract for insurance. Their position is, I think, analogous to the solicitor who is responsible for making enquiries (for his client) in connection with the sale of land. Thus in Gran Gelato Ltd v Richcliff (Group) Ltd [1992] Ch 560, [1992] 1 All ER 865 at 569 - 571 of the former report Sir Donald Nicholls V-C held that a solicitor (acting for the vendor) did not owe a duty of care (in relation to alleged negligent misstatements) to the purchaser where the vendor itself could be sued. He said (at p 571):

". . . in the field of negligent misrepresentation caution should be exercised before the law takes the step of concluding, in any particular context, that an agent acting within the scope of his authority on behalf of a known principal, himself owes to third parties a duty of care independent of the duty of care he owed to his principal."

[113] With respect, I entirely agree. The caution must be all the greater in relation to the suggestion that the law should impose on an agent a general duty to speak up, as opposed to a duty to take care with statements actually made.

[114] Further, in Williams v Natural Life Health Foods Ltd [1998] 2 All ER 577, [1998] 1 WLR 830 at p 835, Lord Steyn emphasised that only in special circumstances would an agent (in that case the director of a company) owe a duty of care in relation to statements made when acting for his principal. In that case the House of Lords held that a director of a small company did not owe a personal duty of care to a franchisee in the absence of proof of an assumption of personal responsibility by the director himself.

[115] I therefore conclude that the law does not impose a duty to speak up on an agent in relation to a contract for insurance. Accordingly there can be no right to damages for non-disclosure in that case.

Conclusion on Preliminary Issue Three

[116] I have therefore concluded that the answer to the question:

"On the true construction of the contracts of or for insurance pleaded in the Particulars of Claim and on the assumption that the facts and matters pleaded in those Particulars of Claim are true, are the Claimants entitled to damages from Heaths for non-disclosure,"

is "No".

Answers to all three Preliminary Issues

[117] I would like to hear from Counsel on the precise terms that any order should take. However I will summarise my conclusions to the three Preliminary Issues. On the true construction of the contracts of and for insurance and on the facts pleaded in the Amended Particulars of Claim:

(1) On Preliminary Issue One:

(a) On the pleadings as they stand, the Claimants have the right to avoid or rescind the

contracts of or for insurance.

(b) However I note that the Amended Particulars of Claim only plead negligent or fraudulent misrepresentations and/or non-disclosures by Heaths and do not plead "innocent" misrepresentations or non-disclosures. I have concluded that on the true construction of the Truth of Statement clause it would exclude the right of the Insurers to avoid the contracts of insurance for "innocent" misprepresentations or non-disclosures by Heaths. In relation to the contract for insurance, on the correct construction of the Truth of Statement clause it would not exclude the right of the Insurers to rescind the contract for insurance for a representation of fact made without Heaths having a reasonable ground to believe that the fact was true.

(2) On Preliminary Issue Two:

(a) The Insurers have no rights to claim damages against **Chase** for a breach of the duty of utmost good faith. That issue arises only in relation to the contracts of insurance.

(b) The Insurers would, on the proper construction of the contracts of and for insurance, have a right to claim damages against **Chase** for deceit based upon the intentional or reckless misrepresentations of fact by Heaths, whether made in relation to the contracts of insurance or the contract for insurance.

(c) The Insurers would not have a right to claim damages against **Chase** for the negligent misstatements of Heaths in relation to the contracts of insurance. However the Insurers would have a right to claim damages against **Chase** for the negligent misstatements of Heaths in relation to the contract for insurance.

(d) The Insurers would, on the proper construction of the contracts of or for insurance, have a right to claim damages against **Chase** under s 2(1) of the Misrepresentation Act 1967.

(3) On Preliminary Issue Three: The Claimants have no right to claim damages from Heaths for non-disclosure on the basis of the present paras 58 and 59 of the Amended Particulars of Claim.

[118] I am very grateful to all counsel for their very helpful and enjoyable submissions on these interesting topics.

**DISPOSITION:**
Judgment accordingly.

**SOLICITORS:**
CMS Cameron McKenna; Morgan Lewis Bockius; Eversheds

Source:  Legal > Legal (excluding U.S.) > United Kingdom > Case Law > **UK Cases, Combined Courts**  i
Terms:  **hih and chase and phoenix**  (Edit Search)
View:  Full
Date/Time:  Wednesday, February 16, 2005 - 4:41 PM EST

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.