# EXHIBIT 12

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK:    IAS PART 27
-----------------------------------------------------------------------X
THE CHASE MANHATTAN BANK

          Plaintiff/Counterclaim:
          Defendant,

              -against-

NEW HAMPSHIRE INSURANCE COMPANY
and AXA REASSURANCE S.A.,

          Defendants.

INDEX NO.: 602759/01
P. C. # 15631

-----------------------------------------------------------------------X
AXA REASSURANCE S.A.,

          Third-Party Plaintiff,

              -against-

STIRLING COOKE BROWN HOLDINGS, LTD.,
STIRLING COOKE BROWN REINSURANCE
BROKERS LTD., AND SAWTANTAR SHARMA,

          Third-Party Defendants.

INDEX NO. 590872/01

-----------------------------------------------------------------------X
GAMMERMAN, J.:

## **INTRODUCTION**

This action involves a dispute over two insurance policies issued in connection with what is known as insurance backed gap financing of film production. The Chase Manhattan Bank ("Chase") provided funding to George Litto Pictures, Inc. ("GLP"), an entity established by producer George Litto ("Litto"), in two facilities: a $7.5M working capital facility insured by a contingent extra expense policy, and an $89M facility to fund the production of individual films. One film, "The Crew," was produced, insured by a cash flow policy for approximately $24M.

On the contingent extra expense policy, New Hampshire Insurance Company ("NH") was the fronting company and AXA Reassurance, S.A. ("AXA") was the reinsurer, with a cut-through

endorsement. On the cash flow policy, Underwriters Reinsurance Company ("URC") was the fronting company, and AXA and Royal SunAlliance ("Royal") were the lead reinsurers. That policy likewise contained a cut-through endorsement. Stirling, Cooke Brown Reinsurance Brokers, Ltd. ("SCB"), by its employee Sawtantar Sharma, served as Chase's broker. Stirling, Cooke Brown Holdings, Ltd. ("Holdings"), is the parent company of SCB.

Prior to the time claim could be made on either policy, AXA instituted an action seeking a declaratory judgment that it was not liable on the reinsurance policies. Subsequently, AXA asserted claims against, inter alia, SCB, Sharma and Holdings. Once a default occurred on the $7.5M policy and the right to assert a claim existed, Chase instituted an action to recover on that policy. The two actions were consolidated so that all issues could be resolved in one trial. As a result of the consolidation, Chase became the plaintiff; NH (which was granted leave to intervene), and AXA the defendants; and SCB, Holdings and Sharma, the third party defendants. In addition, a cross-claim was asserted by NH against AXA under the reinsurance policy. AXA resisted that claim contending that because of non-payment of the premium or the delay in its transmittal, AXA had no obligation to NH on the $7.5M policy.

The case was tried with a jury from October 29 to December 6, 2001. The jury found in favor of plaintiff Chase by finding that there was an agreement between AXA as reinsurer and URC as fronting company with respect to the language of the cut-through endorsement, and further that URC agreed to insure the loan advanced by the bank for the film The Crew on the policy terms that existed in the AXA reinsurance policy as of July 9, 1999.

With respect to the third-party action by both AXA and NH, the jury found that Sharma did not intentionally make any material statements that were either false or recklessly false, and did not intentionally and with an intent to deceive, fail to provide information to AXA that should have been provided in the exercise of "utmost good faith."

Both before and during the trial it was necessary to rule on several issues, including the effect of the "disclaimer" clauses, the choice of law applicable to the third party action, and the

2

defense of nonfortuity.  Rulings on these issues were placed on the record but deserve more detailed discussion.

In addition, certain issues were reserved for trial by the court:  the defense of equitable estoppel; the defense that no declaration was made by Chase as required by the cash flow policy; Chase's claim for attorneys fees; and NH's cross-claim.

### CHOICE OF LAW

In connection with the trial, AXA requested that I take judicial notice of French law as governing its claims against Sharma/SCB set forth in counts twelve and thirteen (negligence and fraud) .

For the purposes of this ruling I assumed, without finding, that French law differs from New York law, in that, _inter alia_, under French law AXA would not have to establish a special or fiduciary relationship with SCB/Sharma to establish its claims of fraud and misrepresentation based on non-intentional conduct.

While recognizing that the choice of law issue is governed by the governmental interest test, in its initial trial memorandum and reply memorandum of law on this issue, AXA's argument centered on the contention that for claims of fraudulent conduct and misrepresentation brought by a business entity, the applicable body of law is the of the place where the injury occurred, this being where the injured entity is located, and thus where the party has suffered the economic impact of the tort.

In its initial briefing, AXA identified no French interest in applying French law and pointed to no conduct within France to support the application of French law.  Instead, AXA relied merely on a formalistic argument:  AXA is located in France, therefore its injury occurred in France, therefore France is the location of the tort, therefore French law applies.  Thus, AXA asserted that "where, as here, an action concerns laws regulating allegedly fraudulent conduct, the proper body of law to be applied turns on the locus of the tort."

3

However, to conclude that French law applies on this basis would be to abandon the principles of governmental interest and revert, in effect, to the long-abandoned lex loci approach to conflict of laws.

"We must keep in mind that 'opinions must be read in the setting of the particular cases and as the product of preoccupation with their special facts,'" Danann Realty Corp. v Harris, 5 NY2d 317 (1959).   Seldom is this principle more important than in the fact-sensitive area of choice of law.  Mechanical application of general principles based on decisional language, without regard to the facts to which the language refers, threatens to corrupt the careful governmental interest analysis mandated by the Court of Appeals, and to allow it to degenerate into the very kind of simplistic rule approach rejected by that court in favor of governmental interest analysis.

In Schultz v Boy Scouts of America, 65 NY2d 189 (1985), involving alleged negligent supervision by entities allegedly resulting in sexual assaults on minors by a teacher, who also served as scoutmaster, the Court of Appeals discussed the abandonment of the lex loci rule in favor of the governmental interest test.  As the court explained, under the traditional lex loci rules, which the Court of Appeals abandoned in Babcock v Jackson, 12 NY2d 473 (1963),  the tort occurred where the injury occurred.   The cases cited for that proposition by the court in Schultz, predate Babcock.

New York now applies the law of the jurisdiction which "because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised," Babcock v Jackson, supra.  Thus, as the court explained in Schultz, under the governmental interest test:

> "[T]he law of the jurisdiction having the greatest interest in the litigation will be applied and * * * the [only] facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict". Under this formulation, the significant contacts are, almost exclusively,

4

the parties' domiciles and the locus of the tort. [emphasis added; citations omitted].

It is important to note that the court enumerated as "the significant contacts," not merely the locus of the tort, but the parties' domiciles as well, thus demonstrating that the locus of the tort is not dispositive.

The court reiterated, as law applicable to the case before it, the proposition that the locus of the tort is where the injury occurred. However, the court declined to follow the lex loci rule and instead, applied a governmental interest test both as to the claims based on injuries sustained in New Jersey and as to injuries sustained in New York. As to both of these sets of claims, the court concluded that New Jersey law was applicable.

Thus, Schultz does not stand for the proposition that the location of the injury determines the choice of law. It stands for the proposition that, while the locus of the tort is an important contact that must be analyzed, the significance of that contact depends on whether there is a state interest (in this case, a French interest) whose purpose would be served by applying that law to the particular issue in the particular litigation. In the absence of such an interest, the locus of the tort is not a factor of significance. While the site of the injury is a significant "contact," Schultz v Boy Scouts of America, supra, "[c]ontacts obtain significance only to the extent that they relate to the policies and purposes sought to be vindicated by the conflicting laws," Miller v Miller, 22 NY2d 12, motion denied 22 NY2d 722 (1968).

Schultz distinguished between choice of law questions where the law is loss-allocating, and where the law is conduct-regulating, holding that in the case before it, the law was loss-allocating. Subsequent to Schultz, in Cooney v Osgood Mach., 81 NY2d 66 (1993), and again in Padula v Lilarn Properties Corp., 84 NY2d 519 (1994), the Court of Appeals reiterated the importance of this distinction. In Cooney, the court observed that

If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because

5

> that jurisdiction has the greatest interest in regulating behavior
> within its borders [emphasis added].

The interest in regulating <u>behavior</u> taking place within a state's borders, is not vindicated by applying the law of a jurisdiction in which the <u>behavior</u> being regulated <u>did not occur</u>.[1] "We will not blindly apply a rule, disregarding its reason for being, to achieve a result it was created to avoid," <u>In re Drexel Burnham Lambert Group, Inc.</u>, 138 BR 687 (SD NY 1992).

A number of courts have tacitly or expressly recognized that since the purpose of applying the law of the government where the conduct occurred is to vindicate that government's interest in regulating conduct within its borders, applying the law where economic injury occurred, when different from where the conduct occurred, fails to fulfill the purposes of the governmental interest test, <u>see</u>, <u>AroChem Intl. Inc. v Buirkle</u>, 968 F2d 266 (2d Cir 1992); <u>Saab v Citibank, N.A.</u>, 2001 WL 1382577 (SD NY 2001); <u>Sussman v Bank of Israel</u>, 801 F Supp 1068 (SD NY 1992), <u>affd</u> 990 F2d 71 (2d Cir 1993); <u>LaSalle National Bank v Duff & Phelps Credit Rating Co.</u>, 951 F Supp 1071 (SD NY 1996); <u>see also</u>, <u>Zweig v National Mortgage Bank of Greece</u>, 1993 WL 227663 (SD NY 1993).

These decisions support the conclusion that where the law is conduct-regulating, the state where the conduct occurred, has a greater interest in applying its law, than the state where the plaintiff was located and thus sustained its economic injury.

Cases involving CPLR 202 have no application to the adjudication of substantive choice of law questions, <u>Global Financial Corp. v Triarc Corp.</u>, 93 NY2d 525 (1999).[2]  In light of

---

[1] In an analogous, albeit distinguishable, issue of long-arm jurisdiction, New York does not extend its long arm jurisdiction to conduct occurring outside New York, merely because that conduct results in economic injury within New York, <u>see</u>, <u>The Chase Manhattan Bank v AXA Reinsurance UK PLC</u>, 603080/00 and 591030/00, order dated July 26, 2001 (citing <u>Bank Brussels Lambert v Fiddler Gonzalez & Rodriguez</u>,171 F3d 779 [2d Cir 1999] and <u>Hermann v Sharon Hospital, Inc.</u>, 135 AD2d 682 [2d Dept 1987]).

[2] In <u>Global</u> the Court of Appeals explained that CPLR 202 analysis is entirely unrelated to choice of law issues involving substantive matters.  CPLR 202 analysis, the court explained,  is a

Global, cases adjudicating CPLR 202 issues, such as Smith, Barney, Harris Upham & Co. v Luckie, 85 NY2d 193, reargument denied 85 NY2d 1033, cert denied sub nom Manhard v Merrill Lynch, Pierce, Fenner & Smith, 516 US 811 (1995) are wholly inapposite to the substantive choice of law question in this case. Likewise, cases that apply a formalistic test to substantive issues, relying on cases adjudicating CPLR 202 disputes or cases citing such cases,[3] are not good authority for adjudication of choice of law as to substantive issues.

Courts subsequent to Global have so recognized, see, e.g., Bank Brussels Lambert v Credit Lyonnais, 2001 WL 492363 (SD NY 2001); Dar El-bina Engineering & Contracting Company, Ltd. v The Republic of Iraq, 79 F Supp 2d 374 (SD NY 2000); In re Gaston & Snow, 243 F3d 599 (2d Cir), cert denied sub nom Erkins v Bianco, ___ US ___, 122 S Ct 618 (2001).

A superficial reading of Ackerman v Price Waterhouse, 252 AD2d 179 (1st Dept 1998), might lend support to AXA's position, but, even disregarding that Ackerman was decided prior to Global, a closer reading does not.

Ackerman adjudicated a motion for class certification. There were two proposed classes: a class of New York residents, and a class of global residents. The issue involving choice of law was whether plaintiffs had met their burden to show that common issues predominated.

As to the class of New York residents, since the defendant's main offices were in New York as well, all the critical factors pointed to New York. That the court did not view the locus as dispositive, is indicated by its discussion of the governmental interest test as controlling, and by its observation that where the law is conduct-regulating "the law of the jurisdiction where the

---

matter of statutory construction: by the terms of the statute, the relevant inquiry is where the cause of action "accrued." The Court of Appeals explained that the statute has its roots in a time before modern day choice of law principles were developed, and therefore the statute must be construed without reference to choice of law principles applicable to other issues.

[3]See, e.g., Rosenberg v Pillsbury Co., 718 F Supp 1146 (SD NY 1989) (citing Sack v Low, 478 F2d 360 [2d Cir 1973], a CPLR 202 case, to adjudicate a substantive choice of law issue).

tort occurred will <u>generally</u> apply [emphasis added]" because of the governmental interest in regulating conduct within the government's own borders. Thus, the application of the law of the locus is not a rule with a viability of its own; it is merely the usual result of applying the governmental interest test because the "locus" of the tort is "generally" where the subject <u>conduct</u> occurred. As to the New York plaintiffs, all three critical factors favored New York.

The court discussed the choice of law as to the global class. A careful reading of the decision demonstrates that the court did not base its holding on a determination that the law of the locus/place of injury applied. The court's decision was that plaintiffs had not met their burden on the motion for class certification "of establishing that the relevant choice of law principles will not ultimately require application of widely divergent laws of multiple jurisdictions concerning the claims and defenses in this action."

Indeed, far from holding that the governing law would be the law of each plaintiff's residence (which would likewise be the "locus" of the economic injury and hence of the tort), the court expressed its "reservations concerning the IAS court's summary finding that the substantive law of the jurisdiction of each plaintiff's residence will apply to the contract claims of the global class." The court did not determine which body of law would apply, a complex issue that would have required a governmental interest analysis as to a multitude of potential jurisdictions. The court also considered the potential effect of different applicable time bars under CPLR 202.

Thus, far from supporting AXA's position, <u>Ackerman</u> actually demonstrates that the location of the injury cannot, standing alone, be dispositive, in the absence of an affirmative showing that France's interests will be vindicated by applying French law.

<u>Parrott v Coopers & Lybrand, L.L.P.</u>, 263 AD2d 316 (1st Dept), <u>affd</u> 95 NY2d 479 (2000), decided after <u>Global</u>, further demonstrates that the governmental interest analysis has not been superceded by a formalistic "place of injury" rule. <u>Parrott</u> involved a former officer-shareholder's negligence action, seeking damages for economic injury, against an

8

accounting firm that valued the company's stock. The court reasoned that New York, rather than

California law, applied because

> [a]lthough the claim arose from conduct occurring in California,
> New York is the common domicile of plaintiff and defendant,
> which maintains its principal place of business here. New York
> has the greater interest in extending the protection of its own laws
> to its own domiciliaries.

The dissent agreed that New York law governed.[4] Both the majority and the dissent

based their conclusions that New York law applied, on a governmental interest analysis which

did not enumerate the locus of the economic injury (New York) as a factor.

The importance of identifying the governmental interest and determining whether

application of the locus government's law would serve the interests of that government, is

demonstrated in <u>Odyssey re (London) Ltd. v Stirling Cooke Brown Holdings Ltd.</u>, 85 F Supp 2d

282 (SD NY 2000), <u>affd</u> 2001 WL 46565 (2nd Cir 2001), a case bearing remarkable similarities

to the case at bar. In <u>Odyssey re</u>, a British reinsurer sued an American reinsurer and others,

including various Sterling Cooke Brown entities, alleging a scheme to fraudulently funnel

unprofitable American worker's compensation reinsurance business to the British reinsurer. The

court held that Britain was where the British insurer suffered its economic damages, and held

further that even though under New York choice of law rules, British law governed the overall

structure of the British workers' compensation reinsurer's fraud claim against the American

reinsurer, American law governed the issue of the nature of the duty that the American reinsurer

owed. The court reasoned that duties owed by American reinsurance companies had to be

---

[4]The dissent observed that "[t]he Court of Appeals has abandoned the traditional conflict-of-laws analysis which invariably applied the law of the State where the alleged tort occurred" in favor of the governmental interest test, and that "the interest of the State where both parties are domiciled may outweigh the interest of the State where the tortious conduct happened to occur," and asserted that California was the situs of the injury even though plaintiff was domiciled in New York.

9

governed according to one set of rules, and concluded that the United States had the greatest substantive interest in determining those rules.

AXA states that Sharma "has admitted" "that at all times while procuring the insurance for Chase, her conduct was governed by the Code of Practice for Lloyd's Brokers." Even if Sharma's conduct as to AXA were governed by that Code, this does not support the contention that French law should be applied. This, and the considerations discussed in Odyssey Re, suggest that the broker's duty and liability might well be governed by British law. Accordingly, during the trial I invited the parties to address this issue. While both AXA and SCB/Sharma submitted affidavits of English law and memoranda of law, neither side's briefing asked that English law be applied rather than New York law.[5]

"[I]n the absence of a manifest injustice, the court will allow the parties by default in pleading or proof to agree or acquiesce that forum law be applied, Watts v Swiss Bank Corp., 27 NY2d 270 (1970); see also, Lerner v Karageorgis Lines, Inc., 66 NY 2d 479 (1985), reargument denied 67 NY2d 758 (1986); AIG Trading Corp. v Valero Gas Mktg. L.P., 254 AD2d 117 (1st Dept 1998); Public Adm'r of County of New York v Frota Oceanica Brasileira, S.A., 222 AD2d 332 (1st Dept 1995), lv dismissed 88 NY2d 920 (1996). Here, while the parties disputed whether AXA acquiesced in applying New York law as opposed to French law, neither party contended that it has ever sought to apply English law. Especially in view of the sophistication of the parties and counsel

---

[5]AXA's own memo on English law stated "[n]one of the parties sought the application of English law with respect to AXA RE's tort claims against the Stirling defendants." In that memo, AXA continued to argue that French law applies, affirmatively stating that "virtually everything of significance as regards the dealings between AXA Re and the Stirling defendants took place elsewhere [than in England]," and that "other than the fact that the Stirling defendants are located in England, and that they made some mailings from there, that jurisdiction has little connection with the tort claims in this action."

SCB/Sharma argued that I should not apply English law.

in this case, and the very real potential for prejudice if I were to apply (with no notice till mid-trial) a body of law not raised by the parties, I determined that English law would not be applied.

While the choice of law provisions in the insurance policies themselves are not necessarily dispositive of the tort claims, they are significant in that they reflect the parties' expectation that French law would not govern their contractual disputes. Chase, the insured, is an American entity. Other factors support this conclusion. First, despite the provisions in CPLR 3016(e) for pleading of foreign law, no French law is asserted within any of the 218 paragraphs in the counterclaim/third party complaint, a factor which implies that AXA did not have French law in mind when it dealt with the broker.

As noted above, in its initial trial memo of law, and in its reply trial memo of law on the applicability of French law, AXA pointed to no conduct within France and identified no French interest. It stated only that Sharma's communications were "directed" to AXA in France. Subsequent to my ruling that French law would not be applied, in its memo of law on the applicability of English law, AXA revisited this issue and pointed to two meetings between Sharma and AXA that took place in Paris. I concluded that in the context of the extensive dealings between the parties, these two visits are insufficient to support a French governmental interest. Indeed, the fact that AXA omitted any mention of them in its initial briefing, underscores their relative lack of importance.

This dispute arises from an international transaction in which a sophisticated French-based reinsurer, engaged in international business dealings, entered into an extremely complex business transaction with an American bank. AXA, while based in France, is the subsidiary of a British entity.

Any interest that France might possess in protecting its citizens from allegedly misleading conduct by a broker, is not applicable in the context of the present case, involving a sophisticated entity engaged in complex international business dealings. Any such interest is outweighed by the substantial interest of France in ensuring that companies, and brokers in particular, seeking to enter

11

into sophisticated international financial transactions, are not dissuaded from choosing French companies, lest they find themselves subject to duties imposed by a body of law which their reasonable expectations did not contemplate would govern their actions. Concomitantly, New York has an interest in this action in which a New York bank is a principal in an international transaction of this complexity and sophistication, against applying a body of law to the New York bank's agent that was unanticipated by the parties. Such application would tend to chill the willingness of other brokers to work with potential business contacts overseas, lest they find themselves subject to laws beyond their expectations.

## FORTUITY

Defendants AXA and NH both contend that they are not liable on the policies at issue because the losses were not fortuitous.

As stated in the scholarly article by Cozen and Bennett, Fortuity: The Unnamed Exclusion, 20 Forum 222 (January 1985), "[d]espite the age of the fortuity doctrine and its relatively universal acceptance by the courts ... there are few cases which hold that a particular loss is, indeed, nonfortuitous and, therefore, excluded from coverage for that reason." I conclude that this case weighs in favor of the correctness of that assessment.

Insurers contend[6] that the loss under the Contingent Extra Expense policy is not fortuitous because 1) it was inevitable, as was known to Chase, that the loan could never be repaid, because of the structure of the transaction[7]; and 2) the loss was within Chase's own control. Insurers contend

---

[6]The precise arguments made by AXA and NH are not identical. Moreover, NH's arguments are directed only toward the contingent extra expense policy. For the sake of simplicity, however, I will refer to the arguments as having been made by "insurers."

[7]While older cases held that a loss resulting from the innate structure of the insured property was nonfortuitous, "[l]oss caused by an inherent defect that made the damage inevitable has nonetheless been held to be fortuitous under the modern rule," Cozen and Bennett, supra, Fortuity: The Unnamed Exclusion, 20 Forum 222 (January 1985). Cases such as Vasile v Hartford Acc. & Indem. Co., 213 AD2d 541 (2d Dept 1995), involving the effect of time on the producing capabilities of a 22 year old well, are factually distinguishable. The decision in 525

that any loss under the Cash Flow Policy would be nonfortuitous under Texas law, because Chase did not require Litto to presell to foreign distributors, and therefore it was inevitable that foreign sales would be inadequate to prevent a loss.

By their terms, the contingent extra expense policy is governed by New York law, and the cash flow policy by Texas law.

Under New York law, the issue whether a loss is fortuitous is one of fact for the jury, unless there is a dearth of evidence on which a rational juror could decide in favor of the insurer, A & B Enterprises, Inc. v Hartford Insurance Company, 198 AD2d 389 (2d Dept 1993). For purposes of this discussion, I assume, without deciding, that the insurers would have introduced evidence at trial from which the jury could conclude that the losses were inevitable, or substantially inevitable, because of the inherent structure of the transactions; and that, as a result of the way the transactions were structured, Chase controlled whether the loss under the policy occurred.

It is hornbook law that, if possible, a contract should be construed so as to avoid an unreasonable result, see, NY Jur2d Contracts § 219 and cases there cited.

Further, it has long been the rule in New York that if a contract "may be construed in more senses than one, such construction should be adopted as will be more beneficial to and as understood by the promisee," M. O'Neil Supply Co. v Petroleum Heat & Power Co., 280 NY 50, motion denied 280 NY 687 (1939); see also, Posner v United States Fid. & Guar. Co., 33 Misc 2d 653 (Sup Ct, Sullivan County 1962), affd sub nom Posner v New York Mut. Underwriters, 16 AD2d 1013 (3d Dept 1962) (involving insurance policy).

More specifically with regard to insurance policies, it has long been the law in New York that an insurance policy "must be given a fair and reasonable interpretation to cover the risks which the

---

Fulton Holding Corp. v Mission Natl. Ins. Co., 256 AD2d 243 (1st Dept 1998), lv dismissed 93 NY2d 1012, reargument denied 94 NY2d 839 (1999) implies that had the damage been caused by pipe corrosion, i.e., resulting from the inherent quality of the structure itself, the loss would have been fortuitous.

parties had reason to anticipate, and had reason to believe would be met by the policy," <u>Underwood v Globe Indemnity Co.</u>, 245 NY 111 (1927). As stated by Couch on Insurance § 21:9, a policy should be construed so as to

> carry out and effectuate to the fullest extent the intention of the parties to provide an effective contract of insurance, with no portion receiving such a construction as will defeat the obvious intent. Construction in the interest of effectiveness of the contract calls for a reasonable interpretation. It must be kept in mind that presumably it is the intention of the insurer to have the insured understand that in the event of loss, he or she will be protected to the full extent that any fair interpretation will allow. Only legal necessity warrants a construction that defeats the intent of the parties to provide protection against loss, thereby precluding a recovery on the policy, or that limits the effect of the contract so that it is practically valueless.

As stated by the Second Circuit in <u>National Union Fire Insurance Co. of , Pa. v The Stroh Companies, Inc.</u>, 265 F3d 97 (2d Cir 2001):

> Broadly stated, the fortuity doctrine holds that "insurance is not available for losses that the policyholder knows of, planned, intended, or is aware are substantially certain to occur." Barry R. Ostrager & Thomas R. Newman, <u>Handbook on Insurance Coverage Disputes</u> § 8.02, at 248 (5th ed. 1991) (collecting cases). <u>New York has codified a somewhat narrower version of the doctrine</u> ... [emphasis added].

That codification is set forth in New York Insurance Law § 1101(a):

> 1101. Definitions;  doing an insurance business
>
> (a) In this article: (1) "Insurance contract" means any agreement or other transaction whereby one party, the "insurer", is obligated to confer benefit of pecuniary value upon another party, the "insured" or "beneficiary" dependent upon the happening of a fortuitous event in which the insured or beneficiary has, or is expected to have at the time of such happening, a material interest which will be adversely affected by the happening of such event.
>
> (2) "Fortuitous event" means any occurrence or failure to occur which is, <u>or is assumed by the parties to be</u>, to a substantial extent beyond the control of either party [emphasis added].

14

The insurers assert, based in part on Chase's own statements, that the contract creating the contingent extra expense policy was intended by all parties to be an insurance policy, governed by New York law. The parties do not dispute that the policy was intended to be an insurance policy as thus defined by Section 1101. Therefore, ipso facto, the contract must be construed, if reasonably possible, to give effect to the parties' intent that it be an insurance policy as thus defined.

What distinguishes this case from the cases cited by the insurers, typically involving all risk or general liability policies, is that here, each of these two policies provided coverage for only a single potential loss. Therefore, if the contingent extra expense policy did not provide coverage for the loss because, as the insurers contend, any loss was nonfortuitous, it provided coverage for nothing.

Under the above-quoted definition in Insurance Law § 1101(a), a contract is not an insurance policy unless it covers some fortuitous event. Therefore, to give effect to the parties' intent, including AXA's intent, that the contract constitute an insurance policy, it must be construed as covering a fortuitous event. Otherwise, under New York law, it is not an insurance policy as the parties intended.

Assuming, arguendo, that the sole loss that is the subject of the policy was, as the insurers contend, inevitable because of the inherent structure of the transaction (whether or not known to Chase), or under Chase's own control, this does not mean that under New York law the event resulting in the loss was not "fortuitous." As quoted above, an event resulting in a loss is "fortuitous" under New York law so long as it "is <u>assumed</u> by the parties to be, to a substantial extent beyond the control of either party [emphasis added]" even if, in fact, it was not.

Accordingly, the only reasonable construction of the policy is that under it, the parties contractually assumed the loss - the sole loss contemplated by the policy - to be "to a substantial extent beyond the control of either party."

This conclusion is compelled even if, as AXA posits alternatively and hypothetically, the loss was not inevitable under the policy's initial inception, but became so later on because of changes in

15

the transaction.[8]  Fortuity is judged from the outset of the policy, <u>see</u>, <u>CPH International Inc. v</u> <u>Phoenix Assurance Company of New York</u>, 1994 WL 259810 (SD NY 1994); <u>see also</u>, <u>Stonewall</u> <u>Ins. Co. v Asbestos Claims Mgt. Corp.</u>, 73 F3d 1178 (2d Cir 1995), <u>modified on other grounds</u>, 85 F3d 49 (2d Cir 1996).

Therefore, whether, as the insurers contend, the loss was, in actual fact, inevitable, and whether, as the insurers contend, the loss was, in actual fact, within Chase's own control, are moot issues for purposes of this action.  As a matter of New York law, the loss was "fortuitous" because the parties contractually assumed it to be "to a substantial extent beyond the control of either party."  Any other result, rendering the coverage provided by this single-loss policy, illusory, would be an unreasonable result and would be inconsistent both with the parties' undisputed intent that the contract be an insurance policy as defined by New York law, and with the other above-stated rules governing contractual construction.

Even in the absence of this portion ("assumed by the parties to be") of the statutory definition, and even if, arguendo, the insurers could establish that the loss is not fortuitous within the common law meaning of the term, I conclude that under New York law, nonfortuity is not available to the insurers here to withstand the claim.

---

[8]If, as the insurers contend, the loss was inevitable ab initio because of the innate structuring of the transaction, any modifications to the transaction, including any factors placed within Chase's own control, could not have made the loss "more inevitable."  There are no degrees of inevitability.  If the "inevitability" could be increased, then, <u>ipso facto</u> the initial "inevitability" was not "inevitability" but merely risk, which, regardless of how high, is not nonfortuity.

The "known loss" doctrine and its variants constitute one branch or variation of the fortuity doctrine.[9] It is generally, though not universally[10] accepted. Its particulars may vary from jurisdiction to jurisdiction. The general principles are set forth in Couch on Insurance 2d, at § 102:8:

> The policy rationale for the fortuity doctrine is simple. When parties enter into an insurance contract, they are, in effect, making a wager as to the likelihood that a specified loss will occur. If the loss has already occurred, or the insured knows that the loss is certain to occur for reasons not disclosed to the insurer, then the insurance contract is not a fair bet.

CPH International Inc. v Phoenix Assurance Company of New York, supra, 1994 WL 259810 (SD NY 1994); Missouri Pac. R.R. v American Home Assur. Co., 286 Ill App 3d 305, 675 NE2d 1378 (Ill App), rehearing denied, lv denied, 173 Ill 2d 527, 684 NE2d 1336 (Ill App 1997).

Therefore, as stated in Couch, supra,

> Given the underlying basis of the doctrine, and the right of the parties to agree to cover existing losses, it has been recognized that the known loss doctrine does not apply if the insurer also knew of the circumstances on which it bases the defense [emphasis added].

See also, e.g. General Housewares Corp. v National Surety Corporation, supra, (citing Couch, and holding, "[t]his is not to say, however, that parties may not explicitly agree to cover existing losses").

---

[9] "The 'known loss' doctrine is a common law concept deriving from the fundamental requirement in insurance law that the loss be fortuitous," General Housewares Corp. v National Surety Corporation, 741 NE2d 408 (Ind App 2000) citing Pittston Co., Ultramar America Ltd. v Allianz Ins. Co., 124 F3d 508 (3d Cir 1997); see also, National Union Fire Insurance Co. of Pa. v The Stroh Companies, Inc., supra, 265 F3d 97 (2d Cir 2001) ("the 'known loss' defense is a variation on the fortuity theme"); Two Pesos, Inc. v Gulf Ins. Co., 901 SW2d 495 (Tex App 1995) ("The fortuity doctrine not only concerns whether the offending conduct is accidental or intentional, but also incorporates the 'known loss' and 'loss in progress' principles.")

[10] See, Owens-Corning Fiberglas Corp. v American Centennial Insurance Company, 74 Ohio Misc 2d 183, 660 NE2d 770 (Ct Com Pls Ohio 1995) (declining to recognize "known loss" as a defense under Ohio law).

Here, there is no triable issue as to whether the insurers "knew of the circumstances on which it bases the defense," Couch, supra. The structure of the transaction, and the scope of Chase's rights, as they existed at the time, were set forth in writing and fully disclosed to the insurers at the time the policy was issued, and, as discussed below, the disclaimer clauses in the policies preclude any claim of fraud. Since the insurers necessarily knew how the transaction was structured, the insurers cannot contend, for example, that, because it was inevitable that GLP would be unable to commence[11] five pictures so as to generate the funds to repay the loan, the loss was a "known loss" and therefore nonfortuitous.

The insurers' complaint that their underwriter and attorney[12] did not understand the transaction, is not grounds for depriving Chase of the benefits of the bargain it made, cf., Societe Nationale D'Exploitation Industrielle Des Tabacs et Allumettes v Salomon Bros. Intl. Ltd., 268 AD2d 373 (1st Dept), lv denied 95 NY2d 762 (2000). An insured's rights under the policy may not be avoided by the insurer's complaint that its own agent failed to adequately protect the insurer's interests.

In Lampke v Metropolitan Life Ins. Co., 279 NY 157 (1938), the insurer sought to avoid payment on the ground that the insured had made false statements in her application relating to her health. There was evidence that the insurer's agent had been given the correct information. The court held that the knowledge of the agent constituted knowledge of the insurer, and held:

> To permit an insurance company to accept the payment of premiums
> on a policy which it knew when issued was void from its inception
> would constitute a fraud on the policyholder.

See also, Holmes v Nationwide Mut. Ins. Co., 40 Misc 2d 894 (Sup Ct, Broome County), affd 19 AD2d 947 (3d Dept 1963).

---

[11]Throughout its papers, AXA refers to the transaction as requiring GLP to "complete" five films. In fact, the terms were that GLP was to repay the loan from the proceeds of the strike fees received when GLP started a film, regardless of when it was completed.

[12]This assertion refers to an attorney other than Barry Smith, discussed below.

18

This principle is even more compelling here, in view of the disclaimer clauses.

While the parties do not dispute that the definitions in Insurance Law § 1101 define "fortuitous" for purposes of the contingent extra expense policy, on the face of the statute the application of those definitions is limited to Article 11 (Licensing of Insurers), which governs what activities require licensing by the New York State Department of Insurance, see, Feinstein v Attorney-General, 36 NY2d 199 (1975).[13] Nevertheless, New York Appellate courts have applied the statutory definition to contractual disputes between insurers and insureds.

Neither the parties, nor the Second Circuit in its recent decision in National Union Fire Insurance Co. of , Pa. v The Stroh Companies, Inc., supra, 265 F3d 97 (2d Cir 2001), or its earlier decisions in City of Johnstown v Bankers Standard Insurance Co., 877 F2d 1146 (2d Cir 1989); and Stonewall Ins. Co. v Asbestos Claims Mgt. Corp., supra, 73 F3d 1178 (2d Cir 1995), cite any New York Court of Appeals case holding that, as a matter of law, even in the absence of a policy exclusion, a loss is not covered unless it is fortuitous.[14]

---

[13]In that case, the Court of Appeals held:

> The statute, in circumscribing the term to mean that which is to a substantial extent beyond the control of either party, is useful in relating regulation to insurance schemes as they have been known (see Insurance Law, § 46), but it is not exact in the consideration of agreements to provide services of various kinds. In this area it is easy to slip into metaphysical, even validly metaphysical, distinctions.

> But metaphysics is not the concern of section 41 of the Insurance Law; instead the licensure and regulation of insurance activity is.

[14]In City of Johnstown, the Second Circuit stated that "as a basic rule, recovery cannot be had on property that the insured knew was already destroyed at the inception of insurance." However, the sole case cited for that proposition was Hanover Fire Ins. Co. v Morse Dry Dock & Repair Co., 152 Misc 111 (Sup Ct NY County 1934), affd, 244 App Div 780 (1st Dept 1935), affd 270 NY 86 (1936). That case involved issues of fraud, not fortuity, cf., Stecker v American Home Fire Assur. Co., 299 NY 1, reargument denied  299 NY 629 (1949) (distinguishing, inter alia, Hanover Fire Ins. Co. because they "were fraud cases and dealt with as such."

Nevertheless, it is axiomatic that, in the absence of Court of Appeals authority to the contrary, I am bound by the decisions of the Appellate Division, <u>see</u>, <u>Cohoes Realty Associates v Lexington Insurance Co.</u>, 502594/96 (Sup Ct, NY County May 18, 2000), <u>modified on other grounds</u> ___ AD2d ___, 2002 WL 393128 (1st Dept 2002) and accordingly, those decisions must be followed in adjudicating this dispute. Moreover, subsequent to the conclusion of this trial, the Court of Appeals issued its decision in <u>Consolidated Edison Co. of New York, Inc. v Allstate Insurance Company</u>, ___ NY2d ___, 2002 WL 827174 (2002), discussing the issue of fortuity.

Cases in which the intermediary New York State appellate courts construe the doctrine are relatively few and say little about the particulars of the doctrine.[15] Among the principles that

———————————————

[15]In <u>525 Fulton Holding Corp. v Mission Natl. Ins. Co.</u>, <u>supra</u>, 256 AD2d 243 (1st Dept 1998), <u>lv dismissed</u> 93 NY2d 1012, <u>reargument denied</u> 94 NY2d 839 (1999), involving a claim for water damage under an all risk policy, the First Department held:

> The Referee correctly held that the burden is on plaintiff to prove that the water damage it sustained was caused by a "fortuitous" event within the meaning of the policy, and not on defendant to prove the contrary .... The record supports the Referee's finding that plaintiff failed to sustain this burden, plaintiff's attempt to show that pipe corrosion was the cause of the leak that caused the damage having been countered by defendant's showing that pipe corrosion would have caused a slow leak detectable as it gradually grew larger and not the gushing of water that admittedly occurred, and that a valve at or near the source of the leak had been smashed with a blunt instrument. Plaintiff's only rejoinder to this evidence of external physical force, that the valve deformity was caused when plaintiff's plumber struck the valve with a chisel while making repairs, was rebutted, and at best raised an issue of credibility for the Referee....

In <u>Vasile v Hartford Acc. & Indem. Co.</u>, 213 AD2d 541 (2d Dept 1995), the Second Department held:

> The plaintiffs seek to recover under an "all-risk" policy of homeowners' insurance for the claimed loss that their artesian well

> failed to produce a sufficient quantity, of potable water after many
> years of use. An insured seeking to recover for a loss under an
> insurance policy has the burden of proving that a loss occurred and
> also that the loss was a covered event within the terms of the policy
> .... Since the plaintiffs failed to demonstrate a fortuitous event
> causing the claimed loss separate from the nature and inherent
> qualities of the well itself, the court should have granted summary
> judgment to the defendant dismissing the complaint [citing 80
> Broad St. Co. v United States Fire Ins. Co., 88 Misc 2d 706 (Sup
> Ct NY County 1975), aff'd 54 AD2d 888 (1st Dept 1976), lv
> denied 42 NY2d 801 (1977)].

In Henry Modell & Co. v Gen. Ins. Co. of Trieste & Venice, 193 AD2d 412 (1st Dept
1993) the First Department held that certain property damage was not covered under the
commercial property policy because, inter alia,

> the damages claimed occurred prior to the inception of the policy
> and were fully known to the plaintiff more than eight months
> before the commencement of coverage (Insurance Law § 1101[a]
> [1], [2]).

Here, the Court', citing the statutory definition, viewed the loss as nonfortuitous, applying
the "known loss" doctrine, even though a loss that has already occurred would appear to be
beyond the control of the parties.  This implies that a loss may be nonfortuitous under the statute
even if it is "fortuitous" within the four corners of the statutory definition.

In New York State Electric & Gas Corporation v Lexington Ins. Co., 204 AD2d 226 (1st
Dept 1994), the First Department held:

> where plaintiff deliberately removed the blower spacer component
> from its generating plant for diagnostic testing and preventive
> maintenance, the resulting downtime cannot be deemed a
> fortuitous event within the meaning of the subject all risk policies,
> i.e., an event beyond plaintiff's control [citing A & B Enterprises v
> Hartford Ins. Co., supra and 80 Broad St. Co. v United States Fire
> Ins. Co., 88 Misc 2d 706 (Sup Ct NY County 1975), aff'd 54 AD2d
> 888 (1st Dept 1976), lv denied 42 NY2d 801 (1977)].

In A & B Enters. v Hartford Ins. Co., 198 AD2d 389 (2d Dept 1993), the Appellate
Division, reversing the lower court, held that the subject loss - the taking of equipment by the
insured's subcontractor - was fortuitous because

21

may be discerned from those decisions, are the following:

a. The fortuity doctrine is part of New York law;

---

> [t]he contract between the plaintiff and the subcontractor required the plaintiff to provide the subcontractor with ready access to the equipment. Thus, the loss was "to a substantial extent beyond the [plaintiff's] control" (Insurance Law § 1101[a][2]; see also, David Danzeisen Realty Corp. v Continental Ins. Co., supra, at 433). The fact that the plaintiff may have had a monetary dispute with the subcontractor is irrelevant to the issue of fortuity, since the record does not contain evidence that the subcontractor had a legal claim to the equipment (see generally, Intermetal Mexicana, SA v Insurance Co. of North Amer., 866 F.2d 71).

In David Danzeisen Realty Corp. v Continental Ins. Co., 170 AD2d 432 (2d Dept 1991), the insurer disclaimed coverage under an all risk policy for a loss resulting from a sliding roof, contending that the loss was not fortuitous because it was caused by the plaintiff's failure to adequately repair the roof following a prior fire. The Appellate Division held that the loss was fortuitous. Citing the statutory definition, the court held:

> There is no evidence in this record that the sliding of the roof was within the control of either party. The plaintiff hired Wald Roofing Company (hereinafter Wald) to make the repairs following the 1980 fire. The plaintiff did not have any expertise in this area, and therefore relied upon Wald to do whatever was necessary to properly complete the job. Further, the owner of Wald testified that he would not have done the repair if there were any danger to the structure. Thus, the loss was "to a substantial extent beyond [plaintiff's] control" (Insurance Law § 1101[a][2] ).

Cases involving application of express policy language, e.g., 80 Broad St. Co. v United States Fire Ins. Co. supra, while sometimes cited on the fortuity issue (see, e.g., New York State Electric & Gas Corporation v Lexington Insurance Company, supra,; Vasile v Hartford Acc. & Indem. Co., 213 AD2d 541 (2d Dept 1995), arguably provide only limited support for the application of the doctrine as a matter of common law, see, Stonewall Ins. Co. v Asbestos Claims Mgt. Corp., supra, 73 F3d 1178 ("known loss" defense is "distinct" from a defense based on policy language excluding coverage for injuries that were "expected or intended" by the insured); but c.f., Consolidated Edison Co. of New York, Inc. v Allstate Insurance Company, supra (citing statutory definition in determining burden of proof in case involving construction of policy language).

b. The definition set forth in section 1101 constitutes a substantive codification of the rule and is applicable to disputes between insureds and insurers; and

c. As between insurers and insureds, a loss may be nonfortuitous even if it is "fortuitous" within the four corners of the statutory definition. A known loss is nonfortuitous.

In Consolidated Edison Co. of New York, Inc. v Allstate Insurance Company, supra, one of the issues before the Court of Appeals was who had the burden of proof. As stated by the Court of Appeals:

> Is the issue before us, then, a matter of a matter of coverage (placing the burden on Con Edison to establish an accident or occurrence) or a matter of exclusion (placing the burden on the insurers to establish that the resulting property damage was intended)? The answer to that question centers on the language of the policies.
>
> ***
>
> each of the policies speaks of damages caused by or arising from either an "accident" or an "occurrence." None of the policies contains an exclusion for intended or expected harm [emphasis added and in original.]

Con Edison argued that because the practical effect of those coverage terms is to create an exclusion for intended harm, the burden of proof should be on the insurers, a result supported by the Second Circuit's decision in Stonewall.[16]

The Court of Appeals rejected that argument, holding:

> In our view, the contention that the requirement of an "accident" or "occurrence itself operates as an exclusion is unpersuasive. Any language providing coverage for certain events of necessity implicitly excludes other events. Indeed, virtually all of the language in the policies following the initial grant of coverage has the effect of

---

[16]In Stonewall, the policy defined "occurrence" as "an accident or a continuous or repeated exposure to conditions which results during the policy period in personal injury, property damage or advertising liability neither expected nor intended from the standpoint of the insured." The Second Circuit held that despite its placement in the definitions, this provision was, in reality, an exclusion. The Court of Appeals in Consolidated Edison disagreed with the conclusion that the requirement of an "accident" or "occurrence" itself operates as an exclusion.

23

limiting the scope of coverage in one way or another.... Insurance policies <u>generally</u> require "fortuity" and thus implicitly exclude coverage for intended or expected harms. [emphasis supplied and in original].

The court then cited the definitions of "insurance contract" and "fortuitous event" in Insurance Law § 1101(a), and stated further:

<u>Thus</u>, the requirement of a fortuitous loss is a necessary element of insurance policies <u>based on either an "accident" or "occurrence."</u> The insured has the initial burden of proving that the damage was the result of an "accident" or "occurrence" to establish coverage where it would not otherwise exist [citing <u>Northville Indus. Corp. v National Union Fire Ins. Co.</u>, 89 NY2d 621 (1997)]. Once coverage is established, the insurer bears the burden of proving that an exclusion applies. [emphasis supplied].

This holding, while of course binding on all New York courts, does not precisely resolve the issue presented in this case, which is whether the contingent extra expense policy is enforceable even if (disregarding the "assumed to be" portion of the statutory definition) the loss herein was nonfortuitous. The court's observation that insurance policies "generally" require "fortuity" necessarily implies that fortuity is not an absolute requirement. Moreover, while the Court might have stated that "the requirement of a fortuitous loss is a necessary element of all insurance policies," it did not do so: on its face, the court's holding is restricted to "insurance policies based on either an 'accident' or 'occurrence.'"

The Court of Appeals' use of the word "thus," immediately following the definitions in § 1101(a), confirms that those definitions are relevant to contractual disputes between insurers and insureds, even though on the face of the statute, the definitions apply only to issues of whether an entity must be licensed by the Department of Insurance.

The issue of fortuity and known loss under New York law was addressed by the Second Circuit in <u>City of Johnstown v Bankers Standard Insurance Co.</u>, <u>supra</u>, 877 F2d 1146 (2d Cir 1989); <u>Stonewall Ins. Co. v Asbestos Claims Mgt. Corp.</u>, <u>supra</u>, 73 F3d 1178 (2d Cir 1995), <u>modified on other grounds</u>, 85 F3d 49 (2d Cir 1996) and, very recently, in <u>National Union Fire Insurance Co. of</u>

24

Pittsburgh, Pa. v The Stroh Companies, Inc., supra, 265 F3d 97 (2d Cir 2001). While not binding, and while decided prior to Consolidated Edison, these decisions contain useful discussions of New York law.

While noting that New York law "does not leave us entirely without guidance on this issue," citing Insurance Law § 1101(a)(1)-(2) and Henry Modell & Co., supra, and while observing that

> [i]t is but a short leap from these formulations to a more specific rule, articulated in other jurisdictions, that fortuity and known loss principles are integral to the nature of insurance and thus apply as a matter of public policy, irrespective of specific policy terms,

the court in National Union ultimately declined to reach the issue whether under New York law the "known loss" doctrine overrides policy provisions.[17] Rather, the court concluded that the doctrines of fortuity and known loss were inapplicable to the facts before it, because:

> [i]f, on July 1, Stroh or Heileman knew of a broken glass problem that made a recall likely, it does not follow that the recall, and therefore the expenses in connection with the recall, were known on July 1. In other words, National Union seems to argue that the fortuity doctrine bars coverage not only for known losses but for likely losses, i.e., known enhanced risks. We have expressly rejected the existence of such a "known risk" doctrine under New York law. See City of Johnstown, 877 F.2d at 1152-53.

> [7] In City of Johnstown, an insured landowner sought coverage under a liability policy for cleanup costs associated with contaminated land. The landowner allegedly knew of the contamination when it purchased insurance, but did not know whether and to what extent it would be held liable for the contamination. We noted that New York law bars coverage for known losses but does not recognize the "broader proposition that a risk, once 'known' is uninsurable." Id. at 1153; see also Stonewall, 73 F.3d at 1215 (holding that New York law did not bar coverage of damages even though the insured knew, before the inception date of its policies, "that its products risked

---

[17]Unlike a lower New York court, a Federal court is not bound by the decisions of the Appellate Division, but is charged, instead, with predicting how the New York Court of Appeals would rule on an issue.

asbestosis and cancer diseases and had received a large number of claims").[18]

[8] In Stroh's case, similarly, there had been no "Loss" at the time Heileman was added to the policy; there was only the risk of a "Loss." Even if the risk was known, and known to be high, at that time--a question hotly in dispute--the known loss doctrine does not bar coverage.

The court observed further:

The rule announced in City of Johnstown does not leave insurers unprotected under New York law when insuring such risks. It simply makes clear that such protection lies not in a "known risk" rule but in narrower and better-established doctrines, such as rules barring recovery (1) where the insured fraudulently conceals or misrepresents a loss, imminent loss, or other material fact, and (2) for "damages that are 'expected' or 'intended' by the insured" where the policy so provides. City of Johnstown, 877 F.2d at 1153.

The Second Circuit then considered whether, absent an express exclusion, a loss that had not yet occurred, but which was known by the insured to be inevitable at the time the coverage was obtained, is barred.[19]  The court did not reach the legal issue, as it resolved that question on factual grounds, finding that no reasonable jury could find in favor of the insurer on that issue.

-----

[18]While I do not reach this issue, I note that, analogously, here even if it were inevitable that the funds earmarked for payment of the working capital facility would be insufficient to repay the entire loan by the claim date, there would arguably still be fortuity in the sense that the scope of the deficiency could not be predetermined.  This factor is significant because of the unusual structure of this transaction, in which the claim was based on the amount owed as of the claim date, but the insurers, after paying such claim, were entitled to be repaid thereafter from proceeds of the films, channelled to them.  Thus, potentially, the insurers could fully pay a claim and yet be reimbursed thereafter pursuant to the transaction as drafted.

[19]Courts in other jurisdictions apply different tests to determine the scope of a "known loss" where the loss has not yet occurred at the time of inception of the policy, see General Housewares Corp. v National Surety Corporation, supra, and cases there cited.

The Second Circuit then considered whether the loss was barred under another branch of the fortuity doctrine, because it was not "beyond the control of either party," quoting N.Y. Ins. Law § 1102(a)(2). The court held:

> Of course, the recall was "intentional" in the sense that it was a purposeful and willful act, and the resulting "Loss" was in that limited sense non-fortuitous. But the "Loss" was nevertheless "fortuitous" in the sense that it resulted from an accidental or unintended event: the glass inclusion problem at the Perry plant.

Rejecting the insurer's argument that allowing the insured to recover for such a claim would leave insurers vulnerable to misconduct, the Second Circuit held:

> the insurer in National Union's example may protect itself by requiring the insured to disclose any problems with buildings added to the policy after the original inception date, just as National Union was free to ask Stroh of any known or potential problems associated with Heileman's assets prior to adding Heileman's assets to Policy coverage.

Here, far from requiring the insured to disclose facts relevant to the risk, the insurer expressly waived such a requirement.

In its reply memo of law, AXA complains that GLP never acquired the rights to any film other than The Crew, that could have been the subject of a declaration. In particular, AXA complains that GLP did not acquire the rights to Standing Room Only. However, the transaction was not contingent on GLP's acquiring rights to Standing Room Only, or, for that matter, on GLP's acquiring the rights to any additional films. Indeed, by making this argument, AXA underscores that the loss was fortuitous. Given that the success of the transaction depended on GLP's acquisition of rights, then, ipso facto, it was fortuitous, since whether GLP acquired such rights was within the control of entities other than Chase and the insurers.

The doctrine that an insured may not recover under an insurance policy for a nonfortuitous loss is grounded in public policy, and is a corollary of the principle that one may not recover on an

illegal contract.[20]  In applying the doctrine, it is accordingly necessary to consider Court of Appeals'

authority regarding the role of public policy in contract claims.

> [i]t is well to remember too that 'the right of private contract is no
> small part of the liberty of the citizen, and the usual and most
> important function of courts of justice is rather to maintain and
> enforce contracts than to enable parties thereto to escape from their
> obligation on the pretext of public policy, unless it clearly appears
> that they contravene public right or the public welfare,

Miller v Continental Ins. Co., 40 NY2d 675 (1976) (quoting Baltimore & Ohio Ry. Co. v Voight,

176 US 498 [1900]).  That is,

> the Court must balance the weight of the public policy at issue, and
> the extent to which enforcement of the contract undermines the
> policy, against the public interest in seeing private agreements
> enforced. See New England Mutual Life Ins. Co. v Caruso, (73 NY2d
> 74 [1989]) (finding that penal statute sufficiently deterred disfavored
> conduct so public interest did not require voiding contract).

Hoffman v Empire Blue Cross and Blue Shield, 1999 WL 782518 (SD NY 1999).[21]

     The decision of the Court of Appeals in New England Mutual Life Ins. Co. v Caruso, 73

NY2d 74, reargument denied 74 NY2d 651 (1989), provides an instructive analogy.  At issue was

whether the insured had an insurable interest in a policy, and whether the insurer could assert that

the policy was void because of the lack of such insurable interest notwithstanding the passage of the

statutory contestability period.  The concept of "insurable interest" is inherent in insurance, is

grounded in public policy against wagering, see, Holmes v Nationwide Mut. Ins. Co., supra, 40 Misc

―――――――――――――――

     [20]Contracts against public policy are deemed illegal, see, Johnson v Fargo, 184 NY 379
(1906).

     [21]Accord, Twin City Pipe Line Co. v Harding Glass Co., 283 US 353 (1931), where the
court held:

> The principle that contracts in contravention of public policy are
> not enforceable should be applied with caution and only in cases
> plainly within the reasons on which that doctrine rests.

2d 894 (Sup Ct, Broome County 1963), affd 19 AD2d 947 (3d Dept 1963); New York Life Inc. Co.

v Baum, 700 F2d 928 (5th Cir), on rehearing 707 F2d 870 (1983) (applying New York law; citing

Holmes), and, like fortuity, is included in the statutory definition contained in Insurance Law § 1101

("a fortuitous event in which the insured or beneficiary has, or is expected to have at the time of such

happening, a material interest which will be adversely affected by the happening of such event"

[emphasis added]).

      Rejecting the insurer's arguments that based on public policy the insurance policy was void

ab initio and hence not subject to statutory periods of contestability, the Court of Appeals held:

> Generally, parties may contract as they wish and the courts will
> enforce their agreements without passing on the substance of them.
> Their promises are unenforceable only when statute or public policy
> dictates that the interest in freedom to contract is outweighed by an
> overriding interest of society. Courts refuse to enforce contracts in
> such cases because they wish to discourage undesirable conduct by
> the parties or others and to avoid use of the judicial process to give
> effect to an unsavory transaction. Freedom of contract itself is deeply
> rooted in public policy, however, and therefore a decision to refrain
> from enforcing a particular agreement depends upon a balancing of
> the policy considerations against enforcement and those favoring the
> encouragement of transactions freely entered into by the parties
> [emphasis added].

      This is consistent with Court of Appeals precedent on the issue of illegal contracts in general,

even where the public policy has been expressed in a statute. In Lloyd Capital Corp. v Pat Henchar,

Inc., 80 NY2d 124 (1992), the Court of Appeals held:

> Illegal contracts are, as a general rule, unenforceable. However,
> "[w]here contracts which violate statutory provisions are merely
> malum prohibitum, the general rule does not always apply. If the
> statute does not provide expressly that its violation will deprive the
> parties of their right to sue on the contract, and the denial of relief is
> wholly out of proportion to the requirements of public policy * * *
> the right to recover will not be denied." [citing Rosasco Creameries
> v Cohen, 276 NY 274 (1937)].

***

29

> As a general rule also, forfeitures by operation of law are disfavored, particularly where a defaulting party seeks to raise illegality as "a sword for personal gain rather than a shield for the public good."

The Court of Appeals reiterated these principles in <u>Denburg v Parker Chapin Flattau & Klimpl</u>, 82 NY2d 375 (1993), citing <u>Lloyd Capital</u> and holding:

> While some bargains are so offensive to society that courts will not entertain the action -- essentially leaving the parties where they are -- in other cases an illegal agreement is not so repugnant and may be enforced.  It is all a matter of degree [citations omitted].

The First Department applied these principles in <u>General Venture Capital Corporation v Wilder Transportation, Inc.</u>, 26 AD2d 173 (1st Dept 1966), holding:

> If perchance it could be found that the loan agreement in some respect violated any of these regulations it would not necessarily follow that such invalidity would result in a denial of relief to plaintiff.  Neither regulations nor statute state that loans made in violation thereof are void or unenforceable.  "If the statute does not provide expressly that its violation will deprive the parties of their right to sue on the contract, and the denial of relief is wholly out of proportion to the requirements of public policy or appropriate individual punishment, the right to recover will not be denied" [citations omitted].

See also, <u>Wowaka & Sons, Inc. v Pardell</u>, 242 AD2d 1 (2d Dept 1998) ("the violation of a statutory provision will render a contract unenforceable only when the statute so provides, and the loss of judicial recourse would not be out of proportion to the requirements of public policy or appropriate individual punishment"); <u>cf.</u>, <u>Abramovitz v Kew Realty Equities, Inc.</u>, 180 AD2d 568, (1st Dept), <u>lv denied</u>, 80 NY2d 753 (1992) (applying equitable principles to permit recovery on criminally usurious loan).

Clearly, agreements to pay a lender if a borrower defaults, are not malum per se.  Here, while the parties opted to cast their agreement in the form of an insurance policy rather than an outright guaranty, the terms of the loan as they then existed were fully disclosed to the insurers, who affirmatively contracted to rely on their own investigation and analysis, thus precluding any

contention of fraud. Therefore to the extent that the public policy against insurance of nonfortuitous losses is grounded in concerns relating to fraud, they are not applicable.

I do not read the Court of Appeals' holding in <u>Consolidated Edison</u> as overruling or limiting these holdings, or holding them inapplicable to fortuity issues. To the contrary, in rendering its decision, the Court of Appeals held:

> Especially in the environmental pollution context, such a result [placing the burden to establish an accident or occurrence on the insured] "provides the insured with an incentive to strive for early detection that it is releasing pollutants into the environment." In addition, it "appropriately places the burden of proof on the party having the better and earlier access to the actual facts and circumstances surrounding the discharge," including information about its own intentions and expectations. [citation omitted].

This demonstrates that in analyzing issues relating to fortuity, the Court of Appeals took public policy balancing into account.

Here, important competing public policy considerations militate against permitting the insurers to assert any claimed nonfortuity to avoid payment.

As noted above, in <u>Lampke v Metropolitan Life Ins. Co.</u>, 279 NY 157 (1938), the Court of Appeals held

> To permit an insurance company to accept the payment of premiums on a policy which it knew when issued was void from its inception would constitute a fraud on the policyholder.

<u>See also</u>, <u>Holmes v Nationwide Mut. Ins. Co.</u>, <u>supra</u>, 40 Misc 2d 894 (Sup Ct, Broome County 1963), <u>affd</u> 19 AD2d 947 (3d Dept 1963); <u>New York Life Inc. Co. v Baum</u>, <u>supra</u>, 700 F2d 928 (5th Cir 1983) (applying New York law; citing <u>Holmes</u>).

The policy here was issued in the context of a multifaceted, highly sophisticated, complex transaction whose focused purpose was to provide funding for GLP's business plans. The purpose of the working capital loan (the subject of the contingent extra expense policy) was to provide that working capital to GLP, not to fund films. Under the transaction as negotiated by the parties, the

31

failure to generate sufficient revenue to repay the working capital loan would be borne by AXA, not Chase.

Unlike typical insurance scenarios, where the insurer issues a policy in return for a fixed, stated premium, a side agreement between GLP and AXA gave AXA a right to a fixed percentage of GLP's net profits, in the form of "deferred premiums." In effect, by issuing the policy as a substitute for collateral or a guaranty, AXA induced Chase to issue a loan to provide funding for an entity in which AXA had an appreciable investment interest.

To allow the insurers to use fortuity as a sword, rather than a shield, to avoid their obligations under the policy would mean they issued a supposed "policy" that afforded <u>no coverage whatsoever</u> because of facts on which the insurers were on notice at the time the policy was issued, facts that the insurers affirmatively contracted that the insured was not required to disclose. It would mean that the document that the insurers insist is a policy of insurance, lacked the fundamental characteristic that they assert a policy of insurance must have: a sharing of risks. Under this argument, there was no risk to the insurers at all. It would mean that AXA induced Chase to provide uncollateralized funding for an endeavor in which AXA had a risk-free investment.

Public policy does not tolerate such a result.

While courts in other jurisdictions have viewed nonfortuitous claims under insurance policies as barred by public policy, and while decisions of the New York subordinate appellate courts, binding on me, have held nonfortuitous claims barred, I note that authority of the New York Court of Appeals, not cited in those decisions, might support a different conclusion. While I do not base my decision on this issue, it merits mention.

In <u>Joseph R. Loring & Assocs. Inc. v Continental Cas. Co.</u>, 56 NY2d 848 (1982), the Court of Appeals rejected a contention that a provision in an insurance policy violated public policy. The court held:

> Inasmuch as the particular clause in question did not violate any statutory mandate or prohibition or any regulation of the

32

> Superintendent of Insurance, this court cannot say that the clause was violative of public policy.

See also, American Home Assurance Company v McDonald, 274 AD2d 70 (1st Dept 2000); Kern v John Hancock Mut. Life Ins. Co., 8 AD2d 256 (1st Dept 1959), affd 8 NY2d 833 (1960).

Here, the legislature has codified fortuity in Insurance Law § 1101. However, entering into a contract to indemnify another against a nonfortuitous event, does not "violate" this statute. The definitions in Insurance Law § 1101 are, ipso facto, only definitions. An entity that engages in the insurance business, by, for example, selling policies as defined in section 1101 in New York, without being licensed to do so, violates the law. However, the "violation" is not of the definition, but of Insurance Law § 1102, the substantive statute that prohibits doing insurance business as thus defined, without being licensed to so, see, Feinstein v Attorney-General, 36 NY2d 199 (1975); see also, Electronic Realty Associates, Inc. v Lennon, 94 Misc 2d 249 (Sup Ct, Duchess County 1978), mod on other grounds, 67 AD2d 997 (2d Dept), lv denied 47 NY2d 705 (1979). An entity that sells what purports to be an insurance policy, but which "insures" against nonfortuitous events, does not "violate" any statute.

The Court of Appeals' decision in Joseph R. Loring, supra, supports the conclusion that, since issuance of a contract in the form of an insurance policy but covering nonfortuitous losses does not violate any statute or regulation, it does not violate public policy.

Moreover, it is a principle of statutory construction that "[t]he failure of the Legislature to include a matter within a particular statute is an indication that its exclusion was intended," Pajak v Pajak, 56 NY2d 394 (1982). Here, the legislature focused on fortuity, defined it, but chose to limit its applicability to defining what kinds of contracts could be entered into only by entities licensed to do insurance business. By implication, insurers that fail to protect themselves from nonfortuitous