The flaw in this argument is that <u>allowing</u> producers not to make presales, cannot be said to make them <u>unable to make</u> presales.  It may make it more likely that the producers will not make presales, but a mere enhanced risk does not constitute an "inevitable" result which predictably and necessarily results from the insured's action.  Therefore, it does not constitute nonfortuity under Texas law.

AXA contends that under Texas law a loss is nonfortuitous if it is the "natural and probable" consequence of intentional conduct"; that "Texas courts will not allow coverage where intentional conduct results in foreseeable harm, even if the insured did not intend to harm the injured individual"; that "[t]he fortuity doctrine precludes insurance coverage where offending conduct was intentional"; and that "the natural and probable consequences of an insured's intentional acts cannot be fortuitous."  The cases cited by AXA for these propositions demonstrate that, while the courts use the terms "natural and probable" in this context, they construe these terms, at least in the context of first party claims, as meaning inevitable.[23]

In <u>Bituminous Cas. Corp. v Vacuum Tanks</u>, 75 F3d 1048 (5th Cir 1996), cited by AXA, the court held:

> under Texas law <u>the focus is not on whether the insured's conduct or actions were intentional, but on whether the insured intended the damages or injuries which are the subject of the underlying claims</u>.  As we explained in <u>Meridian Oil Production Co. v Hartford Accident and Indem. Co.</u>, 27 F.3d 150 (5th Cir 1994):
>
> > Texas courts afford coverage for fortuitous damages but deny coverage when damages are the natural and probable consequence of intentional conduct.  Regardless of whether the policies involved are worded to cover "accidents" or "occurrences," all offer minor variations of the same essential concept; coverage does not exist for <u>inevitable results which predictably and necessarily emanate from deliberate actions</u>.

---

[23]In the context of third party claims, different public policy issues come into play, against indemnifying an insured for his intentional harm of a third person.

Id. at 152 (footnote omitted, emphasis added). We held that there was no coverage in <u>Meridian</u> because "the damages to the Marshalls' land were not unexpected from the standpoint of the insured." <u>Id.</u> (emphasis added). See also <u>Gulf Chemical</u>, 1 F.3d at 370 (holding that relevant question in applying "expected or intended" exclusion is whether the injury which forms the basis of the claim is expected or intended by the insured); <u>Hartford Casualty Co. v Cruse</u>, 938 F.2d 601, 604-05 (5th Cir. 1991) (although insured's performance of its services might not be considered an accident, CGL policy covered claims for defective work, since "an occurrence takes place where the resulting injury or damage was unexpected, regardless of whether the policyholder's acts were intentional.") (citation omitted, emphasis added).

[emphasis in original and supplied]. <u>See also</u>, <u>Scottsdale Ins. Co. v Travis</u>, 68 SW3 d 72 (Tex App 2001) ("the doctrine [of fortuity] has its roots in the prevention of fraud; because insurance policies are designed to insure against fortuities, fraud occurs when a policy is misused to insure a certainty.")

<u>Inland Waters Pollution Control, Inc. v National Union Fire Ins. Co.</u>, 997 F2d 172 (6th Cir 1993), cited by AXA, applied Michigan, not Texas law, and does not, in any event, support AXA's contentions.

Cases such as <u>Southern Farm Bureau Cas. Ins. Co. v Brock</u>, 659 SW2d 165 (Tex App 1983) and <u>Ritchie v John Hancock Mut. Ins. Co.</u>, 521 SW2d 367 (Tex App 1975), which involve construction of policy language, involve different principles, <u>cf.</u>, <u>Stonewall Ins. Co. v Asbestos Claims Mgt. Corp.</u>, <u>supra</u>, 73 F3d 1178 ("known loss" defense is distinct from a defense based on policy language excluding coverage for injuries that were "expected or intended" by the insured).

I conclude that, as a matter of law, AXA's theory fails to support nonfortuity under Texas law. The additional grounds raised by AXA similarly do not support the defense of nonfortuity. To the contrary, by raising these additional factors, AXA tacitly admits that the failure or success of the venture from the standpoint of repayment of the loan, was dependent on a variety of factors and their interplay. This cannot be equated with the inevitability that is required for nonfortuity.

Even assuming arguendo that the issues discussed above did not preclude application of the fortuity doctrine to these policies, AXA's proposed expert testimony, as described by AXA, failed to satisfy the requirements of the fortuity doctrine.

AXA proposed testimony of Steven Sills, noting that "his analysis ... demonstrates that the probability of paying off the loans under any reasonable scenario was less than 1%". This is inadequate to demonstrate the "substantial certainty" required for nonfortuity.[24]

AXA asserted that Tekla Morgan would "testify that a claim under the insurance policy relating to 'The Crew' was highly probable, if not inevitable..." "Highly probable" bespeaks risk, not certainty.

AXA asserted that a third witness, William Shields, would testify that with respect to foreign sales, "it was inevitable that there would be a shortfall on the loan, a loss and a claim arising from "The Crew" for at least the following reasons: (1) the actual percentage of foreign presales necessary to recoup was substantially higher than estimated and represented; (2) rarely do all films sell in all foreign markets as GLP presumed; (3) rarely do they sell for the asking price; (4) GLP had no proven track record in international sales; (5) the representation that unidentified films anticipated to be made sometime in the future could not achieve on average the foreign sales levels represented to insurers; and (6) other factors set out in AXA's Supplemental Interrogatory Answers." The use of terms such as "rarely," and "on average" are the antithesis of "substantial certainty."

Thus, as a matter of law, the issue of fortuity was not material to the parties' rights, and the proposed evidence would not have been relevant to the issues to be tried.

---

[24]By way of illustration, if a manufacturer sold a beverage that it knew would kill nine of every thousand people who drank it, it could not be seriously argued that selling the product was substantially certain not to result in any deaths. Likewise, if there were a 0.9 "risk" that a loss would <u>not</u> occur, it cannot be said that the transaction was "substantially certain" to result in a loss; cf., <u>City of Johnstown v Bankers Standard Insurance Co.</u>, 877 F2d 1146 (2d Cir 1989).

## DISCLAIMERS

At the outset of the trial I granted Chase's motion in limine to bar evidence of fraud based on certain clauses in the policies (the "disclaimer" clauses).

The clauses are drafted with great precision. Each sentence and word within each clause serves a separate function. Some portions of the clauses are limited to representations/omissions about the risk, while others are not.[25] Given the sophistication of the parties, I decline to read into the contractual language limitations that are not stated in the plain text of the parties' agreements. Thus, AXA's contentions that the Truth of Statement clause in the cash flow policy is limited in scope to misstatements and nondisclosures in connection with Chase's declaration, that the Truth of Statement clauses do not encompass misrepresentations made by SCB as Chase's agent, and that the clauses do not apply to nondisclosure of matters as to which the law imposes a duty to disclose, are not persuasive.

The Truth of Statement clauses are not mere disclaimers of reliance. While portions do contain disclaimers of reliance, other portions function as waiver and exculpatory clauses, affirmatively relieving Chase of any obligation to disclose.[26] Silence in the absence of a duty to

---

[25]For example, the first provision in the Truth of Statement clause in the contingent extra expense policy that "[t]he Insurer hereby acknowledges that the Insured was not requested by the Insurer to provide it with any information relating to its risk under this Policy other than [specified documents]," [emphasis added] is limited in its scope to information relating to its risk. In contrast, the second statement in that clause, providing that "to the extent [the Insurer] has received any information from Stirling Cooke, the Company or George Litto ... any misstatement or omission therein shall not be the responsibility of the Insured or constitute a ground for avoidance of the Insurer's obligations under or cancellation of the Policy," is not limited to information "relating to the risk." If the first reference in the clause to "risks" limited the scope of the entire clause, the use of the word "risks" in the third sentence would be unnecessary.

[26]For example, the second sentence in the Truth of Statement clause in the contingent extra expense policy, providing that "any misstatement or omission" in any information from, inter alia, SCB, GLP or Litto," "shall not be the responsibility of the Insured or constitute a ground for avoidance of the Insurer's obligations...", constitutes an affirmative waiver by the insurers of any right to avoid their obligations based on such misstatements or omissions, and

disclose cannot support a claim of fraud or negligent misrepresentation.  The net effect of these clauses is to effectively shield Chase from any claim of fraud or misrepresentation, whether by affirmative statement or by omission, and whether by any other entity or by Chase, and, as to the latter, only if the statements are within the scope of the communications expressly enumerated in the clauses (such as the Loan Agreement.)  AXA's claims are not based on the expressly enumerated communications.

The insurers contend that the clauses cannot be construed as shielding Chase from its own fraudulent representations or nondisclosures, but only from innocent or negligent misrepresentations.

There is some older case law supporting this contention, see, Scruggs v Dean, 47 SW2d 378 (Tex App 1932); and Young Fehlhaber Pile Co. v State, 265 App Div 61 (3d Dept 1942).  However, subsequent, higher appellate authority is to the contrary, see, Citibank, N.A. v Plapinger, 66 NY2d 90 (1985), reargument denied, 67 NY2d 647 (1986), itself applying and expanding on the rule expounded by the Court of Appeals in Danann Realty Corp. v Harris, supra, 5 NY2d 317 (1959).  Likewise, in Schlumberger Tech. Corp. v Swanson, 959 SW2d 171 (Tex 1997), the Supreme Court of Texas held that the disclaimers and  representations of nonreliance, precluded claims based on fraudulent misrepresentation.

AXA's reliance on Texas cases applying the "express negligence" test, is misplaced.  Those cases require express language where a party seeks to be contractually indemnified by another for the party's own negligence and has no application here.  Chase is not seeking to be indemnified for its own negligence.  Moreover, the purpose for that test is to avoid unknowing contracts for such

---

relieves Chase of any obligation to correct any such misstatements or omissions.  Likewise, the provision in the Truth of Statement clause in the cash flow policy that, with certain provisos, "the Insured will not have any duty or obligation to make any representation, warranty or disclosure of any nature, express or implied (such duty and obligation being expressly waived by the Insurer and the Re-Insurers) ...," relieves Chase of any obligation to communicate.   The contractually binding acknowledgments that Chase provided only the information specified in the clauses likewise preclude the insurers from contending that Chase provided any other information, and hence from contending that such other information was misleading.

39

indemnification.  Here, the negotiated, express disclaimers, fulfill the reason for the "express negligence" test.

AXA contends that the disclaimers cannot apply to facts within the peculiar knowledge of the party making the alleged misrepresentation.  There is some support for this proposition in the case law.  In Tahini Investments, Ltd. v Bobrowsky, 99 AD2d 489 (2d Dept 1984), the Second Department read Danann Realty Corp. v Harris, supra, 5 NY2d 317 (1959) as recognizing an exception to the efficacy of a specific disclaimer, where the subject of the misrepresentation is within the representor's peculiar knowledge.[27]  Federal courts, citing Tahini, have likewise recognized this exception, as has the First Department in Steinhardt Group Inc. v. Citicorp, 272 AD2d 255 (1st Dept 2000).

---

[27]This would appear to be a misreading of Danann.  The language in Danann, (5 NY2d at 322), that appears to be the authority relied on in Tahini, describes general principles applicable to fraud claims and cites Schumaker v Mather, 133 NY 590 (1892), a case that involved neither a disclaimer nor the effect of a disclaimer.  (Tahini also cited O'Keeffe v Hicks, 74 AD2d 919 (2d Dept 1980), a case involving a non-specific, general merger and disclaimer clause.)

Under those general principles, "[a] claim of fraud will not lie if, inter alia, the misrepresentation allegedly relied upon was not a matter within the peculiar knowledge of the party against whom the fraud is asserted, and could have been discovered by the party allegedly defrauded through the exercise of due diligence," Cohen v Cerier, 243 AD2d 670 (2d Dept 1997) (citing Danann).  Therefore, if a disclaimer did not protect against a misrepresentation within the peculiar knowledge of the speaker, it would provide no more protection than would no disclaimer at all.

However, assuming, arguendo, that this principle is good law in the First Department[28], it

---

[28]The holding in Tahini appears inconsistent with First Department precedent.  In Benjamin Goldstein Productions v Fish Ltd., 198 AD2d 137 (1st Dept 1993), the alleged fraud was that "defendant Peter Fish, a former employee, had fraudulently induced the plaintiffs into executing a Settlement Agreement terminating their business relationship by orally misrepresenting that he would not thereafter be employed by defendant National, plaintiffs' major competitor," something within Fish' own peculiar knowledge.  The First Department held that the claim was barred by the disclaimer clause.

Tahini also appears inconsistent with the decision of the Court of Appeals in Gaidon v Guardian Life Ins. Co. of America, 94 NY2d 330 (1999), in which the insureds, rather than the insurer, claimed that they were fraudulently induced to enter into "vanishing premium" insurance policies based on misrepresentations relating to projected financial performance.  In Gaidon, the insureds alleged that the defendant insurers "lured them into purchasing policies by using illustrations that created unrealistic expectations as to the prospects of premium disappearance upon a strategically chosen 'vanishing date.'"  The plaintiffs alleged, inter alia, that the insurers knew that the dividend/interest rates were not sustainable at the illustrated level; that the projected "vanishing" of the premiums was unrealistic; that one of the insurers was aware of this unlikelihood based in part on the insurer's own knowledge of its own transactions and on its heightened knowledge of its own financial condition; and that one of the insurers' dividend rate was based in part on non-recurring transactions that skewed the projections.

The defendants relied on disclaimer and merger clauses.  As described by the court, the insurers:

> have directed our attention to the policies' merger clauses, which
> seek to confine their representations to the four corners of the
> policies.   They also point to the above-quoted disclaimer language
> stating that illustrated dividend/interest rates "are neither
> guarantees nor estimates of future results" or that such rates may be
> "higher or lower * * * depending on the company's actual future
> experience."

The court observed that

> the disclaimers, though more particularized than the merger
> provisions, do not speak to the true, unrevealed relationship
> between dividend/interest rates and the vanishing dates as
> represented,

and that

> [c]onsumers vary in their level of sophistication and their ability to
> perceive the connection between a fluctuation in dividend/interest
> rates and a vanishing date, or to make the necessary arithmetic

41

is not applicable here.

_____

        adjustments.

      Nevertheless, while upholding claims under the consumer fraud statute, General Business Law § 349, the Court of Appeals held that the arguments based on the disclaimer and merger clauses were "compelling when resisting plaintiffs' claims of fraud." It would appear anomalous to allow <u>insurers</u> to rely on disclaimer clauses to shield themselves from claims of fraud as to matters within the <u>insurers'</u> peculiar knowledge, while at the same time hold that the <u>insured</u> in this case may not rely on disclaimer clauses as to matters allegedly within the <u>insured's</u> own peculiar knowledge.

      <u>See also</u>, <u>Frith v Guardian Life Ins. Co. of America</u>, 9 F Supp 2d 744 (SD Tex 1998) (cited by the New York Court of Appeals in <u>Gaidon</u>, <u>supra</u>; applying Texas law; dismissing fraud claims in vanishing premium case based on disclaimer and merger clauses).

      More recently, in <u>Societe Nationale D'Exploitation Industrielle Des Tabacs Et Allumettes v Salomon Bros. Intl.</u>, <u>supra</u>, 268 AD2d 373 (1st Dept 2000), the First Department rejected a "peculiar knowledge" argument on two grounds. First, the Court held that there was no support in the record for the contention that plaintiff was unable to acquire the relevant information to assess the risks and benefits of the transaction. In addition, however, the Court held:

               Moreover, plaintiff's claims of justifiable reliance is further
               conclusively refuted by the disclaimer of representations of value
               contained in the 1992 Business Terms provision setting forth the
               general terms governing the parties' transactional relationship.

      Thus, the First Department viewed the specific disclaimer as "conclusively" refuting a justifiable reliance claim regardless of whether the plaintiff could demonstrate that the facts were in the peculiar knowledge of the adversary.

      Subsequently, however, <u>Tahini</u> was cited with approval by the First Department in <u>Steinhardt Group Inc. v. Citicorp</u>, <u>supra</u>, 272 AD2d 255 (1st Dept 2000). As in <u>Societe Nationale</u>, this issue was an alternative ground for the court's decision, and was thus not dispositive: In <u>Steinhardt Group</u> the First Department held that the disclaimer in question was not specific enough to meet <u>Danann</u> standards. Thus, the issue of whether the disclaimer was otherwise effective was moot. <u>Steinhardt</u> was issued a mere four months after <u>Societe Nationale</u> by a bench that included two Justices who were on the bench in <u>Societe Nationale</u>, (one of whom was also on the two First Department benches whose decisions were affirmed (as to the fraud claims) by the Court of Appeals in <u>Gaidon</u>. Yet <u>Steinhardt</u> does not purport to distinguish or overrule <u>Societe Nationale</u>, nor does it purport to distinguish <u>Gaidon</u>. The state of the law on this issue is thus not entirely clear.

In <u>Rodas v Manitaras</u>, 159 AD2d 341 (1st Dept 1990), the First Department, citing <u>Tahini</u>, referred to the "exclusive knowledge" exception, but held

> where, as here, a party has been put on notice of the existence of material facts which have not been documented and he nevertheless proceeds with a transaction without securing the available documentation or inserting appropriate language in the agreement for his protection, he may truly be said to have willingly assumed the business risk that the facts may not be as represented. Succinctly put, a party will not be heard to complain that he has been defrauded when it is his own evident lack of due care which is responsible for his predicament.

In <u>Rodas</u>, plaintiffs requested examination of business records and were refused access. The First Department held this put them on notice "that the income of the business was a material fact of which they had received no documentation." There was no actual notice, however, that the information given to them was false. <u>Rodas</u> was cited on this issue by the First Department in <u>Schwartz v Ross</u>, 233 AD2d 229 (1st Dept 1996); in <u>Meltzer v G.B.G. Inc.</u>, 176 AD2d 687 (1st Dept 1991); and, more recently, by Judge Sweet in <u>Emergent Capital Inv. Management, LLC v Stonepath Group, Inc.</u>, ___ F Supp 2d ___, 2002 WL 575647 (SD NY 2002).

<u>Meltzer</u> is especially analogous. In <u>Meltzer</u>, the plaintiffs accepted a copy of a relevant contract in redacted form. The court held that "[t]he plaintiffs, by fully accepting the Conjo contract in a redacted form as part of the sales contract, willingly assumed the business risk that the facts might not have been as represented."

The disclaimers here are not mere disclaimers of reliance. AXA contractually recognized that there might be misstatements or omissions, waived any obligation on Chase's part to speak, acknowledged that only very limited specified information had been provided by Chase, and agreed that the policy could not be avoided even if, e.g., SCB/Sharma were guilty of misstatements or omissions. This constituted, in effect, acceptance by AXA of a "redacted" form of the facts, to wit, the very limited information that, under the clause, was acknowledged as having been provided by

Chase.  The insurers will not be heard to complain that Chase did not do what the insurers contractually agreed Chase did not have to do, and that Chase is responsible for what the insurers contractually agreed Chase was not responsible.

In contrast to the protections afforded to Chase by these clauses, the clauses do not preclude AXA's third-party claims against SCB/Sharma for misstatements or omissions. The only clause that speaks of liability of Chase's agents is the Revenue Analysis Clause, but this clause cannot be stretched to shield the broker from liability for other misrepresentations or nondisclosures. The fact that the Truth of Statement clause expressly speaks of shielding Chase, and only the Revenue Analysis clause speaks of shielding Chase's agents, supports the conclusion that the Truth in Statement clause does not provide any shield to SCB/Sharma.  Since there are no claims based on any representations within the scope of the Revenue Analysis clause, that clause does not come into play.

NH's claims are based on the premise that NH relied on AXA's decision making, and therefore can assert fraud and misrepresentation based on misstatements and omissions made to AXA, in effect, riding on AXA's coattails.  As such, it is unnecessary to decide whether NH could otherwise maintain a fraud claim independently.  NH's "coattail" contention fails unless, at least, AXA can maintain its own fraud/misrepresentation claim.  As demonstrated above, AXA cannot, and NH's claims fail accordingly.

Thus, I conclude that the clauses bar the fraud/misrepresentation claims against Chase, but not those against SCB/Sharma.

## EQUITABLE ESTOPPEL[29]

As limited by AXA's January 11, 2002 memo of law, the defense of equitable estoppel is not based on any alleged misrepresentations or omissions as to "facts material to the risk."

Instead, AXA bases the defense on two grounds.

The first is its contention that Barry Smith, of the law firm Richards, Butler, who was appointed to represent AXA, was disloyal to AXA, and, out of disloyalty, failed to provide input to AXA that he should have provided; that this was known to SCB/Sharma and Chase; and that neither SCB/Sharma nor Chase informed AXA of the facts allegedly demonstrating Smith's alleged disloyalty. In addition, AXA contends that Chase's and Sharma's references to Smith as being AXA's lawyer were misleading because, AXA contends, Smith was serving SCB's interests rather than those of AXA.

The second is that Chase, both directly and through SCB/Sharma, failed to affirmatively tell AXA prior to the issuance of the cash flow policy, that the transaction had materially changed from its initial form. AXA focuses primarily on the alleged failure to tell AXA that the nature of Chase's commitment was modified in the January 1999 commitment extension; and, subsequently, to tell Erick Derotte of AXA that the use of a two-picture bridge facility constituted a "new" transaction. In its more recent briefing, AXA also adds that the Sonnenfeld/Josephson agreement constituted a modification of the transaction and that this was not disclosed to AXA.

---

[29]There is a substantial body of case law dealing specifically with the effect on an insurer's obligations of alleged fraud or misrepresentation by the insured or the insured's agent. Therefore, a question might well be presented whether case law on equitable estoppel in general should be applicable to such a case. However, neither of the parties have questioned the applicability of this body of law to this issue and have thus charted their own course.

## COLLATERAL ESTOPPEL

Chase contends that the equitable estoppel defense is barred, at least in part, by collateral estoppel, based on the jury's factual findings relating to the fraud claim against Sharma/SCB; on my ruling that there was insufficient evidence of a special relationship between AXA and SCB/Sharma to submit the negligent misrepresentation claims against SCB/Sharma to the jury; and on my grant of Chase's motion in limine, based on the policy disclaimers, to preclude evidence of fraud as against Chase.

AXA does not dispute that collateral estoppel is procedurally applicable even in the absence of entry of a final judgment, but contends that it does not apply because the issues previously decided are not identical to the ones now presented.

While I agree with the jury's findings, I am not persuaded that the questions presented to the jury entirely resolve the equitable estoppel defense. The term "intentionally" was included in the jury charge relating to utmost good faith at AXA's own request, without objection from any party. However, under both New York and Texas law, equitable estoppel can be supported by conduct that is not intentional, <u>see, e.g.</u>, <u>Houston Furniture Distributors, Inc. v Bank of Woodlake, N.A.</u>, 562 SW2d 880 (Tex App 1978); <u>Tannenbaum v Provident Mut. Life Ins. Co. of Phili.</u>, 53 AD2d 86 (1st Dept 1976), <u>affd</u> 41 NY2d 1087 (1977); <u>but see</u>, <u>Matter of Allstate Ins. Co. [Michel]</u>, 167 AD2d 208 (1st Dept 2000).

My holding that there was insufficient evidence of a special relationship between AXA and Sharma/SCB to submit the claim for negligent misrepresentation to the jury, turned on whether there was sufficient evidence of a <u>duty running from Sharma/SCB</u> to AXA. The equitable estoppel defense presents a different question: whether there was a duty running <u>from Chase</u> to AXA, that was breached by actions of Chase through its agent, Sharma. Hence, collateral estoppel does not apply.

Collateral estoppel applies, however, to the extent that AXA bases its defense on any alleged intentional misstatement or omission by Sharma acting as Chase's agent.

My ruling granting Chase's motion in limine was a decision on an evidentiary motion, not a motion for partial summary judgment or dismissal. Chase cites no case in which the granting of a motion in limine was accorded collateral estoppel effect on an issue other than an evidentiary one. The effect of the motion was to exclude evidence. Failure to object to excludable evidence constitutes a waiver, see, e.g., Forrester v Port Authority of New York and New Jersey, 166 AD2d 181 (1st Dept 1990); Marine Trust Co. of Buffalo v Willis, 240 App Div 176 (4th Dept 1934). Moreover, the motion in limine was made to exclude evidence of fraud, not evidence of negligent misrepresentation. Accordingly, the decision on the motion in limine does not preclude AXA from asserting the equitable estoppel defense based on evidence admitted at trial.

## THE MERITS

While, as indicated above, I find that the disclaimer clauses preclude AXA from establishing the equitable estoppel defense, even if the disclaimer clauses did not so operate, I conclude that AXA has failed to prove any of the elements of this defense, see, generally, Clifton v Ogle, 526 SW2d 596 (Tex App 1975); Brelsford v USAA, 289 AD2d 847 (3d Dept 2001).

## Alleged Attorney Disloyalty

As noted above, AXA contends that Smith was disloyal to AXA, and that Chase, or Sharma as Chase's agent, was aware of this but failed to disclose the facts allegedly demonstrating the alleged disloyalty.

AXA takes issue with a number of Smith's actions, contending that he failed to provide appropriate input.

## Smith's Role

A fundamental flaw in AXA's contention that Smith failed to carry out his duties toward AXA, is that AXA fails to acknowledge the limited scope of his duties. A number of the issues that

AXA raises relate in substantial part to Smith's failure to bring to AXA's attention various matters that go to the commercial viability (and hence advisability) of the transaction.

I credit Smith's testimony that the first time he met with Jean-Michel Guillot[30] of AXA, Smith concluded that he had an understanding of the transaction and of how the industry worked, that it was his understanding that Guillot had personally negotiated the terms of the transaction himself, and that Guillot was comfortable with the terms as he had negotiated them, I find that Smith warned Guillot from the outset of his involvement, that the transaction was a very risky one. I find that Guillot was fully aware that the Litto transaction was a risky one, but made the business judgment that, notwithstanding the risks, it should be pursued and consummated.

I find that Smith was not appointed to provide general advice to AXA in connection with the Litto transaction, but rather, to carry out specifically delineated functions. While Guillot advised Sharma on May 28, 1997 that Smith should be appointed, I find that it was the intent of both Sharma and Guillot that Smith would not begin working on behalf of the insurers until the terms and conditions of the proposal had been agreed upon. As reflected in Sharma's August 18, 1997 correspondence to other proposed insurers, the draft term sheet for the cash flow policy was negotiated and approved by AXA before Smith was appointed to represent it.

In a letter dated August 18, 1997, written after AXA had (by fax dated June 12, 1997) already signed off on the draft term sheet, Smith, having met with Steve Mitchell of HIH Casualty & General Insurance Limited ("HIH")[31], outlined (relating to HIH) what he proposed as the scope of his role.

---

[30] Guillot's understanding and actions, of course, constitute AXA's understanding and actions. Moreover, as discussed more fully below, I find that Jean-Paul Cordier, Guillot's supervisor, was involved in the transactions and approved of Guillot's actions.

[31] At that time in the negotiations, HIH was a potential additional lead participant in the transaction.

48

I find that Smith's own reasonable understanding was that his responsibilities were limited to legal, as opposed to business, advice, and did not encompass advice as to the commercial viability of the transaction, including the advisability of the terms from a business point of view. He testified,

> I would not have considered it my place to interfere with the deal. That is what the client -- that is what the client does in this country. My role would be to protect their interests as best I could, to create documentation which put into place what the client had agreed to do. We do not, here, as English solicitors, I believe, interfere with the commercial deal the client has done.[32]

In fact, as discussed below, when Smith attempted to protect AXA's interests by suggesting changes that were perceived as attempts to renegotiate terms already agreed on, the result was a harsh rebuke from Guillot.

I find that neither Derotte nor Guillot understood Smith to have an obligation to advise AXA as to the desirability of the structure or terms of the transaction from a business, rather than a legal, point of view, and that neither of them, nor anyone else at AXA, sought or expected Smith's advice or opinions relating to the commercial advisability of the transaction or its components.

Smith's August 18, 1997 letter, also included, with reference to HIH, his initial comments on the August 5, 1997 draft term sheet. Smith's letter pointed out what he perceived to be problems with the terms and offered comments as to how the insurers' position could be better protected. Among his comments were that the policy and insurers' documents should be governed by English law. English law is generally viewed as more favorable to insurers than New York law. He commented further:

---

[32]Our own jurisprudence, which is derived from British roots, continues to recognize a fundamental distinction between an attorney's legal advice and an attorney's business advice. Rendering the former is the traditional role of an attorney. Rendering business advice is not. Concomitant with that distinction, communications relating to an attorney's legal advice are privileged, whereas communications relating to an attorney's business advice are not privileged, even if relating to the same transaction and arising out of the same retainer.

It is perfectly well understood that Chase will be looking to protect their own position and satisfying themselves as to much of the above but there is, as we discussed at the meeting a divergence of interest as between the bank and insurers which means that the insurers need to make their own investigations and satisfy themselves as to progress on each of the pictures.[33]

Any doubt about the limited scope of what AXA expected of Smith was quickly dispelled by Guillot's ensuing August 21, 1997 fax to Sharma. The content and tone of Guillot's fax prompted Sharma, when forwarding it to Smith, to apologize for Guillot, stating:

please forgive his [Guillot's] tone, he has spent a lot of time on this project and needless to say the amount of capacity committed by AXA represents AXA's largest participation on any movie deal so far. He wants the process to be expedited and he probably felt that your comments would create a major setback.

Guillot's fax was very critical of Smith's comments. He stated that he was

surprised by some of [Smith's comments]. My feeling is that the amendments to the Term Sheet he suggested constitute a material change and do not reflect the philosophy of the transaction. Additionally, I consider that these changes are simply not re-negotiable.

---

[33] Another comment, especially pertinent in view of AXA's complaints concerning presales, is the following:

This Term Sheet certainly looks as if Chase are expecting to see some exclusions and I would have thought it perfectly reasonable to include some fairly standard ones ... I would have thought you need to consider the usual insolvency or financial failure exclusions and an exclusion related to the withdrawal insufficiency or lack of finance for any marketing or promotion expenses relating to the sales agent. Once of the problems as we all know is endeavouring to impose upon the sales agent an obligation to sell and promote the film in order to achieve the best possible commercial return and this requires expenditure.

Among Guillot's comments, the following is especially pertinent in view of AXA's accusations of disloyalty by Smith to AXA's interests:

> Although there may be a theoretical conflict of interest between Chase 'the insured' and Chase 'representing the insurers' interest', I consider Chase's reputation and fair attitude to be satisfactory. It is to their benefit that they recoup from the sale of the film rather than from the insurers.[34]

Notwithstanding Guillot's testimony that he never "put any pressure or particular recommendation" on Smith, Guillot ended his letter by stating that Smith should "reconsider his opinion."

It is against this backdrop that the remainder of Smith's efforts to represent AXA's interests, must be viewed. Smith was made to understand by AXA, as embodied in Guillot, that AXA's primary goal was to consummate the transaction as quickly as possible and issue the policies,[35] not

---

[34]By way of further example, in response to Smith's comments regarding the lack of any exclusions in the policy, Guillot responded:

> the absence of exclusions had been negotiated at the beginning and all underwriters have accepted it.

Further, Smith had posited that Chase, not the insurers, would take the risk on payment of presales. Guillot rejected that, asserting that the agreed upon terms were that the insurers were covering the whole of the cost of production, including the risk on presales.

[35]Guillot's approach is reflected in his December 2, 1997 fax to John Miller and Clark Hallren, both of Chase, copied to Litto, Gary Concoff (Litto's counsel), Sharma, Michael Chapnick (Chase's counsel), and Smith, marked "VERY URGENT," stating:

> Please accept this letter as authority to open the US$6 million capital account to George Litto. I understand that some issues are still outstanding but I realize that we have reached a point where it is absolutely necessary to go ahead with the start up of the pictures. My philosophy is that all outstanding issues will have to be dealt with after the US6 million facility is released. Further delays will simply do more harm to the deal than good to AXA Re.

By way of further example, in a fax from Guillot to Sharma dated August 20, 1998,

to insist on terms protective of AXA's interests; that AXA had made a business decision to consummate the transaction even if this meant getting less protection than Smith might consider appropriate; and that AXA did not want Smith to do anything that could jeopardize the transaction. AXA's approach was, in effect, "damn the torpedoes, full steam ahead." In effect, AXA issued to Smith a "prime directive" to consummate the transaction quickly and conveyed to him that seeking additional protection for AXA's interests was secondary in importance. I find that at no time thereafter did AXA, through Derotte or any other person, communicate to Smith that AXA's "prime directive" had changed.

---

Guillot stated that he wanted to conclude the insurance part of the transaction even though Litto did not yet have a film to make. He stated:

> I understand that Chase don't want to syndicate until George Litto has a movie to make, but there is no reason why the insurance cannot be concluded. I am now getting quite anxious as, as you will appreciate, this deal has been outstanding for much too long and it is now imperative that it be concluded at the (re)insurers' best satisfaction in the shortest possible time.

> I am sorry to impose on you to put further pressure on Michael Chapnick. I trust you will appreciate my frustration.

Likewise, in a fax dated September 14, 1998 from Guillot to Sharma, Litto stated:

> I am extremely disappointed to note that, as of today, nothing has been finalised [sic] despite Barry Smith's best efforts.

> It is to be emphasized that all future delay will create suspicion in the market. You and I are aware that rumours are now spreading as to whether or not this project will come to fruition. I am extremely upset by this and will not tolerate any other damaging delay. This is the reason why I strongly recommend that the documents be signed now, and that any other issues will be dealt with after the documents are signed.

Subsequent to his August 18, 1997 letter, Smith sent a letter dated October 10, 1997, addressed to Chapnick and copied to Sharma, Mitchell, and Guillot. In this letter, referring to himself as representing "the prospective insurers who are being led, as you know" by AXA and HIH, he raised a number of issues to protect the insurers. In that letter, he again outlined his suggested role, essentially along the same lines as in his August 18, 1997 letter.

By fax dated October 16, 1997 to Guillot, Sharma urged that Richards Butler's "role should be clearly defined to ensure that they do not assume responsibilities which just increase their fees," and that this should be done as soon as possible "so that I can advise the syndicate of insurers and obtain their permission." By fax to Guillot dated October 22, 1997, Sharma again reiterated that

> Another issue that needs to be resolved is that of Barry Smith's role to review documentation. This is something that you and Steve need to discuss so that we can then give Barry the parameters.

By letter dated December 12, 1997, addressed to Chapnick, copied to Guillot, Mitchell, Sharma and Concoff, Smith continued to press for protections of the insurers' interests. Inter alia, he continued to press for an acknowledgment that Chase was expected to act as a prudent lender and as if it were uninsured, stating that these were standard provisions in the insurance business.[36] In response, Litto phoned and shouted at Smith in the middle of the night. Both Litto and Litto's counsel, Concoff, sent angry faxes, both dated December 1, 1997 (Litto's being copied to Guillot) that, inter alia, rejected Smith's proposal that Chase be held to the standard of a prudent lender and of an uninsured lender, complained that Smith was attempting to renegotiate the transaction, threatened to make demands for additional terms if Smith continued on his course, and threatened to withdraw. I find that Guillot gave his tacit endorsement to Litto's harsh rebuke.

---

[36]This standard protection was not, however, part of the transaction as negotiated. I credit Chapnick's testimony that Chase would not have done this transaction at all if there had not been insurance; that Chase expected the insurers to, inter alia, make their own analysis; and that the insurers were not to assume that Chase had done what it would have done had there been no insurance.

53

As a loyal attorney, serving a sophisticated and knowledgeable business client, Smith was bound to respect AXA's wishes as communicated to him. Since AXA's goal was to consummate the transaction, and since AXA's philosophy was that protections beyond those already negotiated were of secondary importance, Smith was obligated to conduct himself accordingly, to walk a fine line between negotiating to protect AXA's interests while avoiding doing anything in the negotiations that could jeopardize the transaction, a restriction that made it impossible for him to take an unyielding position during the negotiations. I find that despite the severe limitation placed by AXA on Smith's ability to insist on provisions protecting AXA, Smith attempted to protect AXA's interests, working diligently to negotiate within the limits set by AXA. The record contains numerous examples of specific changes that Smith sought to bring about. That he managed, despite this handicap, to negotiate successfully for terms that protected AXA's interests, reflects his skill and diligence as a negotiator and his determination to serve AXA's interests.

Smith's May 27, 1999 letter to Sharma, forwarded to Derotte by Sharma on May 28, 1999 and, additionally, to Joelle de Lacroix, AXA's counsel, on July 2, 1999 (just prior to the execution of the cut-through endorsement), expressly states, in pertinent part:

> My involvement has been to advise upon and secure improvements and clarifications to the documents. I have not therefore advised and should not be taken to have advised on (a) the commercial viability of the arrangements; (b) whether or not benefits will accrue to the insurers as a result....

Derotte did not respond, thus acquiescing in this limitation.[37]

---

[37]As discussed more fully below, any contention that AXA relied on Smith's failure to bring to AXA's attention various matters relating to the commercial viability or advisability of the transaction or its components in making the decision to issue the cash flow policy, is precluded by this express disclaimer in Smith's letter.

In addition to crediting Smith's own testimony regarding his loyalty to his client, AXA, I find that those people who worked directly with Smith believed him to be serving AXA, his client, loyally. I credit Chapnick's testimony that Smith

> clearly was knowledgeable in the industry; he was diligent; he read the papers; he understood the papers; he was constantly in my face, asking for changes favorable to the insurers.

Of special significance is Guillot's testimony regarding Smith.

In its brief seeking to exclude evidence relating to Guillot's termination, AXA makes the judicial admission that

> [t]he dismissal letter sent to Guillot ... did not indicate that AXA Re had dismissed him "for cause,"[38]

and, further, that

> [s]ubsequent to his dismissal from AXA Re, Guillot filed an action in French Labor Court against AXA Re alleging wrongful termination.

Thus, Guillot had a genuine stake in establishing that AXA's dismissal of him was, in reality, based on AXA's dissatisfaction with the transactions that had been negotiated (with Cordier's knowledge and approval) and that Guillot had been the victim of a disloyal attorney.

----

[38]As there stated by AXA:

> AXA Re temporarily suspended Guillot on or about January 15, 1999, and eventually dismissed Guillot by letter dated February 24, 1999, for, inter alia, failing to maintain his files in proper order and violating the underwriting criteria which he himself proposed and which AXA Re management adopted for Guillot with respect to underwriting reinsurance of insurance backed film finance policies...

I credit Derotte's testimony that the suspension was solely of Guillot's underwriting authority.

However, at his deposition in October 2000, when asked as to his present opinion as to whether Smith gave AXA his undivided loyalty and commitment, Guillot unequivocally testified that he did.

Litto, whose own views of Smith's efforts were expressed in his angry letter of December 1, 1997, discussed above, testified that his own dealings with Smith were sometimes constructive, sometimes competitive, and sometimes very intense and adversarial.  He testified that Smith

> was being very aggressive in behalf of his clients, trying to change the terms of the deal ... particularly as it related to the development fund, he was trying to get a right for the insurers to approve what projects were developed and what money was spent.

Litto testified that Smith's efforts to secure these rights for the insurers made him, Litto, angry and impatient. Given AXA's prime directive, Smith was bound to tread very carefully so as to avoid any action that could result in Litto's withdrawing from the transaction.

**Expert witness**

AXA called as an expert witness in film finance and British legal ethics, Michael Flint.  Flint testified as to his opinion that Smith acted unethically and was disloyal to his client AXA.

At the outset of Flint's testimony Flint testified that his opinion regarding Smith's conduct was based on his review of "the entire Richards Butler files," depositions of unspecified witnesses, and the pleadings and exhibits referred to in the depositions.

I cautioned AXA's counsel that since some of the material on which Flint's opinion was based was not in evidence, whatever he reviewed in reaching his opinion had to be introduced in evidence, although it did not have to be done immediately and could be done after the end of the trial. AXA's counsel stated unequivocally, "We'll put it in."  I permitted Flint's testimony to continue based on that assurance.

Notwithstanding this express assurance, AXA never offered the materials in evidence. Instead, in response to Chase's post-verdict motion to strike Flint's testimony, AXA merely argues

that Flint's opinion as to Smith's supposed disloyalty, was based on three points that were supported by documents in evidence.

"[A]n expert's opinion testimony must be based upon facts personally known and testified to by the witness or disclosed by the evidence in the record," Kracker v Spartan Chem. Co., 183 AD2d 810 (2d Dept 1992); see also, DeTommaso v M.J. Fitzgerald Constr. Corp., 138 AD2d 341 (2d Dept), lv denied 73 NY2d 701 (1988). To the extent that AXA seeks to rely on the exception to the rule where the out-of-court material relied on is "of a kind accepted in the profession as reliable in forming a professional opinion," People v Sugden, 35 NY2d 453 (1974), AXA has failed to introduce "evidence establishing the reliability of the out-of-court material," Hambsch v New York City Transit Authority, 63 NY2d 723 (1984). In any event, the material would not qualify under the Sugden rule.

However, even if I were to deny Chase's motion to strike Flint's testimony, it would not change the result.

Flint was called as an expert witness for the purpose of establishing that Smith's conduct violated the Law Society Guide to the Professional Conduct of Solicitors, particularly with regard to conflict of interest.

Flint testified on cross-examination regarding the standard set forth in the Guide, as follows:

> Q: There must be either a conflict or a significant risk of a conflict, right, in order for there to be a problem, under the solicitors rules?
>
> ***
>
> You need a conflict or significant risk of conflict for the rules to come into play; is that right?
>
> A: Risk or conflict, yes. Not significant. The word is risk.

Only when pressed further did he admit:

> I guess you're right. You're reading the papers. I haven't got them in my head, the papers all the time.

57

Notwithstanding his credentials, Flint's lack of familiarity with the standard of conduct as to which he was called to testify as an expert, persuades me that his opinion should be afforded minimal weight.

Even considering Flint's testimony, I would conclude that Smith's services to AXA were at all times motivated by loyalty to his client, AXA.

### Payment of Fees

AXA complains that Smith had a conflict of interest because the parties had agreed that Richards Butler's fees would be paid by GLP if the transaction were consummated.

I credit Sharma's testimony that this arrangement was discussed by Sharma and Guillot before Smith was appointed, and that such arrangements are routine in industry practice. I credit Guillot's testimony that this was agreed to, and further, that "in any other deal, whether with Heath, Stirling Cooke Brown or any other broker the lawyers fees have always been supported by the production company or the end user of the facilities." Smith's December 15, 1997 fax to Patty Brennan (a Chase attorney) containing Smith's request for the wording of the funding instructions for payment of the insurers' legal fees, was copied to Guillot, further demonstrating that AXA was fully aware of this arrangement.

I find, as I observed during the trial, based on the notation on Richards Butler's January 13, 1999 invoice, that Richards Butler was to be paid regardless of whether the transaction closed. Payment was to be made when the transaction closed or, if it did not close, in March of 1998. I find that had such an alternative arrangement for payment of Richards Butler's fees not been made, the fees would have been payable by AXA, and that therefore the arrangement inured to AXA's benefit. I conclude that there was no conflict of interest, or substantial risk of one, arising from the agreement regarding payment of Richards Butler's fees by GLP.

58

**January 1999 extension**

The January 1999 extension of the commitment, which was approved by Guillot by fax dated January 14, 1999, with the formal documentation executed subsequently by Derotte, contained a significant modification. Up to that point, Chase was obligated to fund the $100M revolving facility (as well as the $7.5 million working capital facility) regardless of whether it was able to syndicate the loan. However, the January 1999 extension did not require Chase to fund the entire $100M. Instead, as expressly stated in the waiver letter signed by Derotte on behalf of AXA, Chase was now required only to exercise its "best efforts." In the restated and amended January 1999 commitment letter, Chase committed itself to putting up $12M subject to other lenders putting up $95.5M. Smith's own notes reflect that he recognized that this was a significant and, potentially, material change.

While the documentary evidence establishes that Smith conveyed this change to AXA, AXA contends that Smith, motivated by disloyalty, failed to convey it forcefully enough and failed to expressly tell AXA that the change meant that AXA was not bound to continue with the transaction.

In order to appreciate the significance of the events in early 1999, it is necessary to consider the development of the transaction.

In the early stages of the transaction, AXA contemplated providing funding for the initial expenses directly. Subsequently, a guaranty was discussed. However, AXA advised that it did not want to issue a formal guaranty, and proposed using an insurance policy instead. The ultimate result, agreed upon prior to Smith's involvement, was that Chase was to provide funding to GLP through two separate facilities: the working capital facility of $6M, to fund GLP's operating and startup expenses, and a $100M revolving facility (the "master facility") to fund the production of individual films. The working capital facility was to be insured by a contingent extra expense policy. The $100M revolving facility was to be insured by individual cash flow policies for each individual

film.[39]  The contingent extra expense policy was drafted by AXA and Chase directly; Smith was not heavily involved in that process.

The contingent extra expense policy expressly provides that the Insurer

> understands that the Loan Agreement ... does not impose upon the Insured the obligation to make loans to produce Insured Film Productions.

However, the initial December 12, 1997 commitment letter did impose on Chase the obligation to make such loans, subject to specified conditions.  That commitment letter provides that it expires if the definitive documentation relating to the master facility is not executed by February 27, 1998, and that such extension is in Chase's sole discretion.  While not required to do so, Chase issued several extensions.  None of the extensions bound Chase to issue any further extensions.

As the direct result of the way that AXA had chosen to structure the transaction:

- Chase had no obligation to issue extensions, and, concomitantly, no obligation to issue extensions on the same terms as the initial commitment; and

- GLP was obligated to repay the working capital loan only from funds it received as strike fees for individual pictures, and would receive no strike fees unless individual pictures were funded and produced; and

- if no pictures were funded, AXA was necessarily left exposed on the contingent extra expense policy.

I find that Guillot fully understood that unless films were funded, the working capital loan would not be repaid, and AXA would be left exposed on the contingent extra expense policy.  I

---

[39]In his August 21, 1997 fax to Sharma responding to Smith's comments, Guillot stated:

> Coverage:  Before AXA Re accepted the separate $6 million pre-production loan, this amount, together with all relating fees and legal expenses, were included within the exposure of the insurers. The exposure they had initially accepted was higher than it is now. Therefore, once this pre-production is removed from the facility, we cannot say that the relating expenses are 'burdening' the exposure of the insurers.  Please, also note that, had the expenses not been covered by the insurers, AXA Re would certainly not have written the $6 millions.

credit Smith's testimony that once he became involved in the transaction, he explained to Guillot that if the $100M facility were not put in place, the $6M would be exposed, and that Guillot expressed his understanding.

Subsequent to this initial structuring, the venture was discussed in detail in a meeting between Litto, Guillot, Sharma, and Cordier, in which Cordier actively participated. Subsequent to that meeting, by endorsement faxed to Sharma by Guillot on April 27, 1998, the basic transaction was modified still further: the amount of the working capital facility was increased to $7.5M, and the strike fee for the first film was no longer to be used to repay the working capital loan.

I credit Guillot's testimony that he, Guillot, personally explained to Cordier that the working capital loan would not be repaid unless films were funded, and I find that Cordier fully understood this.

I find that AXA made a conscious decision to enter into the transaction thus structured, despite the obvious risk that if no films were made, it would be unprotected from exposure on the policy.

With the January 12, 1999 expiration approaching, Chase was under no obligation whatsoever to extend the commitment further, and was at liberty to dictate the terms on which it would agree to extend it. The last extension was to expire January 12, 1999 and as of January 13, 1999 had not been renewed. Chase was no longer willing to issue further extensions on the same basis as before, but was willing to issue an extension on modified terms. Rather than a full commitment to fund the $100M facility, Chase was willing only to commit to providing partial funding from its own resources and to exercise its "best efforts" to syndicate the remainder.

AXA attempts to mischaracterize Chase's offer of a modified January 1999 extension as a "withdrawal" by Chase of its "preexisting commitment." I find that there was no "withdrawal" of Chase's commitment, because there was nothing to "withdraw." Rather, the commitment was set to expire by its own terms.

I credit Brennan's testimony that Guillot was party to phone calls in early to mid January on the issue of the change of the commitment and what portion of the commitment Chase was going to commit for, that Smith was a party to those discussions as well, and that the change to best efforts and the effect that might have on the insurers' rights was a "huge issue" in those discussions.

I find that subsequent to those discussions, on January 13, 1999 - after the commitment had expired by its own terms - Derotte sent a fax to Guillot enclosing faxes received on January 11 and 12, 1999 from Litto and Chase regarding the expiration on January 12, 1999. Derotte's fax, marked "!!!!!!!!!! TOP URGENT !!!!!!!!!!", requested that Guillot call Derotte upon Guillot's arrival "chez AXA" to discuss this with Derotte. Guillot had not yet been suspended or fired. Thus, at a time when Guillot was still employed by AXA, and before Guillot was suspended, Derotte was aware of the situation regarding the expiration of the commitment and had a full opportunity to learn from Guillot, whatever Guillot knew and understood.

On January 14, 1999 Guillot sent a fax to Sharma agreeing "to extend the bank's commitment period."

Notwithstanding that the formal documentation for the extension had not yet been presented, I find that Guillot was fully aware, when he approved the extension, that the renewed commitment would be on a "best effort" basis, and was fully aware that the modification represented a material change. That being the case, Guillot's unconditional written approval of the commitment extension necessarily constituted acceptance of the changes that had been discussed. Guillot's approval is entirely consistent with AXA's central focus on consummating the transaction and issuing the policy.

I find that, as reflected in his two attendance notes for January 26, 1999, Smith carefully analyzed and researched the new extension letter (to which AXA had already bound itself before seeing Smith's written comments). Inter alia, he memorialized his concerns over what the insurers' position would be if the syndication exercise did not raise the full $100M and, if so, what effect that would have on AXA's $7.5M exposure on the working capital facility. It also memorialized Smith's

concern that the change might be "very material indeed." AXA complains that Smith did not convey these thoughts to AXA.

The key, however, is Smith's conclusion, stated in the second attendance note as follows:

> However, the upshot of all of this was really that the time allocated by Chase for drawdown in accordance with their documentation had run out, and the basis upon which Chase was prepared to go forward for another six months and hold the facility available was on the basis set out on the amended and restated commitment letter, and that was the deal on offer though everybody understood there were attendant risks that Chase might not be able to syndicate. However, that was better than the certainty of everything grinding to a halt in February.

I credit Smith's testimony that the reason he did not "communicate[] the back and forth of the pros and cons of this view" to Derotte was that

> [i]t has to be said it is fairly self-evident....This is not, in all modesty, fantastic insight. This is -- the period in which they would allow drawdown was coming to an end, that point at which everything would stop.

On January 29, 1999, (after Guillot's fax approving the extension) addressed to Sharma, Smith advised, inter alia, that

> As you will see, the Commitment Letter (Amended and Restated from December 12th, 1997), has also been altered and now reflects the detail of the intended syndication of the loan and specifies the proportion which Chase themselves intend to take. The obligation to syndicate itself (as is described in the waiver letter) becomes best efforts which I understand reflects the fact that Chase are not charging the usual fee of 1% of the Facility in relation to the six month extension.
>
> As I understand it from Jim Bullard and the conversations he has had with Chase this represents a sensible extension without incurring an additional fee to underwrite the syndication.
>
> I have no further comments.
>
> May I take it that you will arrange for signature direct with AXA and Patty Brennan [emphasis added].

Smith's January 29, 1999 letter was forwarded by Sharma as part of Sharma's February 1, 1999 fax to Derotte, along with the documentation for Derotte's signature.

63

As noted above, while it is thus undeniable that Smith expressly advised AXA that the commitment was now on a "best efforts" basis, AXA's contention is, essentially, that Smith, motivated by disloyalty to AXA, failed to affirmatively tell AXA that this was a material change and that therefore, AXA could withdraw from the transaction.

Based on my review of the evidence, including the videotapes played for the jury of Smith's deposition, I conclude that Smith's professional demeanor is reserved and low key and (in marked contrast to AXA's briefing in this action) devoid of hyperbole. I find that the low key statement in his January 29, 1999 letter is entirely consistent with his honest, reasonable, and correct belief that AXA was aware of the significance of the change. I find that Smith had no reason to believe that AXA's "prime directive" had changed, and that he reasonably -- and correctly -- believed that AXA was not interested in leaving itself exposed on the contingent extra expense policy by withdrawing from the transaction. I find that Smith's failure to do anything more than he did was reasonable under the circumstances, and that in Smith's honest judgment, AXA's interests were best protected by agreeing to the extension with the modified terms. I find that his judgment was not affected by any supposed disloyalty to AXA.

The extension was executed "as of" January 12, 1999 in order to avoid a gap, but the actual execution was chronologically at a later date.

The waiver letter, signed by Derotte, itself expressly states

> each of the undersigned hereby acknowledges receipt of a copy of the Amended and Restated Commitment Letter, dated as of December 12, 1997, as amended as of February 26, 1998, May 29, 1998, August 31, 1998 and as further amended as of January 12, 1999 (the "Commitment Letter") pursuant to which, among other things, The Chase Manhattan Bank has agreed to extend its commitment on the $100,000,000 Master Facility through July 30, 1999 (on a best efforts basis) [emphasis added]..

64

Derotte's signature, dated February 3, 1999, on the waiver letter just below the above-quoted disclaimer, thus constitutes his acknowledgment, on behalf of AXA, of actual notice that the extension amended the prior commitment; and that the extension was on a "best efforts" basis.[40]

### BVD / Sonnenfeld/Josephson Agreements

One of AXA's complaints relates to the advisability of the April 26, 1999 Buena Vista Distribution Agreement ("BVD agreement") between GLP and Buena Vista Pictures Distribution Inc. ("Buena Vista"), a subsidiary of Disney Studios, whereby Buena Vista would be the domestic

---

[40]AXA's primary complaint about the modification to "best efforts" is that it affected the prospect of cross-collateralization. While this is a legitimate concern, it must be evaluated in the context that the transaction prior to the January 1999 extension, recognized that the anticipated five films might not be made.

This possibility is reflected, for example, in the August 5, 1997 draft term sheet providing that

> the Lenders will not advance loans for a film until it is in active preproduction and a completion guaranty and the cash flow insurance have been put in place for that film.

The draft term sheet defined "qualified picture" as, inter alia, having a United States distribution agreement from an approved distributor whereby the distributor pays an advance equal to at least 35% of the Domestic Cost Basis. Since these criteria depended on the decisions of third parties, there was necessarily the possibility that there would be no qualifying pictures.

That preliminary term sheet provided further:

> Failure of Insurers to get any specific number of Qualifying Pictures in the cross-collateral pool will not be a defense to the Agent's [i.e., Chase] rights under a policy issued for any specific Qualifying Picture.

Thus, as reflected in Sharma's testimony, "if they couldn't get five pictures, it was not to be a defense."

65

distributor for The Crew; and the related Sonnenfeld/Josephson ("S/J") agreement. While separate agreements, the BVD agreement and the S/J agreement are closely related and must be construed and evaluated in tandem.

I credit Litto's testimony that Litto was sent the script for The Crew by Sonnenfeld/Josephson. Sonnenfeld is a very prominent filmmaker whose directing credits include "Men in Black," "Get Shorty" and "The Addams Family" films. The Crew had been developed by Sonnenfeld initially at Dreamworks and then at Disney Studios, which had not gone forward with it. Sonnenfeld wanted to produce the film as an independent venture.[41] In return for the financing to be provided through the Chase transaction, Disney agreed to be the distributor and provide the necessary 35 percent to make it a qualifying picture. As further part of that arrangement, Litto agreed to credit Sonnenfeld/Josephson as additional producers.

Smith was on notice of problems posed by the S/J agreement by virtue of Brennan's May 26, 1999 fax to Smith, Wilson and Sharma, enclosing a draft of the S/J agreement stating "[n]ote in particular section b," and inviting him to forward his comments. He recognized the problems and recorded his thoughts about them in his own attendance notes and discussed them with Brennan by phone in Sharma's presence, as reflected on a May 27, 1999 note written by Sharma while in Smith's office. Yet, according to AXA, Smith did nothing about them. As reflected in Flint's testimony, AXA's contention that Smith did nothing about the problems is based on the absence of written communications from Smith about the issues.

However, I find that Smith took reasonable steps to protect AXA's interests.

I credit Brennan's testimony that in the wake of her discussion with Smith, Brennan spoke further with Litto's counsel. As a result, it was agreed that the sums payable to the additional

---

[41]I credit Litto's testimony that such "turnaround" is not uncommon in the film industry and that among successful movies that were the result of such turnaround are "Star Wars" and "Home Alone."

producers would be subordinated, and that the gross participation would be paid to Chase directly by Disney, so only the net would be paid to the new producers. These modifications were incorporated in the interparty agreement.

I credit Chapnick's testimony explaining that the net result of the negotiations was a benefit to the insurers. I find that, as reflected in Litto's testimony, the final result of the negotiations was that the 5% that would otherwise have gone to S/J, was assigned to the bank until the bank was paid off and the insurers were off risk.

Thus, the fundamental premise of Flint's opinion was incorrect: Smith did, in fact, provide input on the issues that concerned him, and in the wake of Smith's input, the transaction was adjusted to AXA's benefit.

Furthermore, the issue over these agreements relates to how the budget money was to be allocated and spent. I find that AXA did not contemplate that it was to dictate how the budget monies were to be spent.

I find that a refusal to provide for payment to S/J would likely have killed the transaction, that Smith took reasonable steps to protect AXA's interests, and that his handling of this issue was not motivated by any disloyalty to AXA.

**Jefferies memo**

AXA relies further on Smith's receipt on June 1, 1999, by fax, of a critique of the cash flow policy transaction from a Kemper Reassurance lawyer, Yvonne Jefferies. Kemper had been approached as a potential participant in the cash flow policy. Smith understood that Jefferies likely had greater insurance expertise than he did, but that she was not experienced in film financing or film financing insurance.

Jefferies' memo was based on a preliminary review, and included the express caveat that "I have been given very little time to review the underlying documents, I have not been given copies of all of them and I have not been privy to any of the preceding negotiations."

67

As noted above, Smith was counsel for all the insurers. The Jefferies memo states, on its face:

> This fax is intended for the addresse(s) named above .... The contents should not be disclosed to any other person nor copies taken.

I find that Smith and Sharma discussed circulating the Jefferies memo, but that both Smith and Sharma were concerned that because it was from one attorney for Kempner (Jefferies) to another lawyer for Kempner (Smith) there was a potential problem if it were circulated.

Contrary to AXA's contention that SCB exercised "control" over Smith, I find that Smith and Sharma maintained a harmonious working relationship, but that Smith exercised his own judgment. I credit Smith's testimony that he did not take Sharma's comment regarding how to deal with the Jefferies memo as an "instruction from a client."

Especially given the posture of the transaction at that stage, and Smith's reasonable and correct belief that AXA's focus was on putting the policy in place, not to renegotiate it, I find that Smith gave appropriate consideration to the issues raised by Jefferies, as reflected in his June 2, 1999 and June 4, 1999 attendance notes.[42] I find that AXA fully understood that not every insurer that was

---

[42]By way of example, one of the issues raised in the Jefferies memo is:

> this Agreement seems not to give Insurers/Reinsurers any control over the activities of GLP. Since at the end of the day, it is Insurers/Reinsurers who are bearing the real risk in the transaction, it seems to me advisable to provide for this.

One of Smith's December 1, 1997 comments on the term sheet was that identification of projects should commence because, inter alia, "this would be useful from the insurers point of view given the exposure on the Working Capital Facility and the need to identify the amounts to be spent and, indeed, what they will be spent on."

This December 1, 1997 comment by Smith resulted in the angry responses by Litto and his counsel, that "[n]either Chase nor AXA is to micro-manage the release of funds pursuant to the Working Capital Facility," and that "I see that you choose to control these expe[n]ditures and micromanage our development funds and involve the bank in this process which they have always made clear is not their responsibility." As discussed above, I find that Guillot gave his tacit endorsement to Litto's comments.

approached as a potential participant in the policies, would opt to participate, and that insurers would have reasons for deciding not to participate. I find that AXA did not expect Smith, Sharma or Chase, to convey to AXA the reasons given by the various potential insurers for their decisions not to participate. The fact that Sharma and Smith at one point considered whether to circulate the memo, did not impose a duty to do so.

**Dancing in the Dark**

Flint also commented on a October 11, 1999 fax from Sharma to Chapnick, copied to Wilson, Litto, Bullard, Concoff and Smith, relating to replacement of URC as a fronting company and, in particular, relating to the proposed replacement of Standing Room Only as the second film, with Dancing in the Dark. This fax was sent well after July of 1999 when the cash flow policy that is the subject of this action came into being.

Flint pointed to the fact that Sharma felt comfortable in sending this fax to the insurers' own counsel, and that Smith did not communicate this situation to AXA.

I find, however, that viewed in context, this fax reflects no attempt to conceal anything from AXA. Sharma was dealing with the situation that arose when the fronting company, URC, had to be replaced. The cash flow policy form, on its face, referred to only two films: The Crew and Standing Room Only, and only The Crew had been funded.

I find that as of the time of the October 11, 1999 fax, problems had arisen regarding the use of Standing Room Only as the second film and that it appeared likely that Dancing in the Dark could be put in place more quickly. I find that it was in AXA's interests to put a second film in place. I find that as of October 22, 1999 (after the date of the subject fax), there was as yet no term agreement for Dancing in the Dark. Thus, the availability of Dancing in the Dark was merely a

---

Thus, Jefferies was raising an issue, in connection with the cash flow policy, that Smith himself had raised, and lost. Smith's attendance note of June 2, 1999 reflects that Smith researched this issue and concluded that the problem that Jefferies raised had been part of the transaction since before Smith's participation.

possibility, and I credit Sharma's testimony that she did not advise the insurers about the prospective funding of Dancing in the Dark because she saw no point to it.

URC was being replaced by Royal, which was already one of the two lead reinsurers. Thus, the entities exercising decision-making power were already on the policies. I find that AXA's decision making would not have been different had it been told that Dancing in the Dark was a potential substitute for Standing Room Only as the second film.[43]

I find that Smith's open working relationship with Sharma was not inconsistent with his loyalty to AXA, and that it furthered Smith's ability to serve AXA's interests. I find that Sharma's willingness to share concerns with Smith was the product of her desire to ensure that the insurers were satisfied with the transaction, and of the understanding of both Smith and Sharma that both the insurers and Chase wanted to work cooperatively to consummate the transaction. This approach is fully consonant with AXA's view as expressed in Guillot's above-quoted August 21, 1999 fax in which he stated:

> Although there may be a theoretical conflict of interest between Chase 'the insured' and Chase 'representing the insurers' interest', I consider Chase's reputation and fair attitude to be satisfactory. It is to their benefit that they recoup from the sale of the film rather than from the insurers.

## SCB Advice and Representation

I find there was no conflict of interest, or substantial risk of a conflict of interest, resulting from Richards Butler's relationship with SCB/Sharma.

While the concept that the insured's agent appoints counsel to represent the interests of the insurer may be somewhat foreign to American custom, AXA's own first amended complaint makes

---

[43]Pursuant to the Decisions Clause in the policy, any amendment or endorsement to the cash flow policy, required the active consent of both Royal and AXA, as lead reinsurers, and of the fronting company. Thus, to the extent that the use of Dancing in the Dark as the second film would have required any modification of the existing cash flow policy, it would have required the affirmative consent of AXA and Royal.

70