possibility, and I credit Sharma's testimony that she did not advise the insurers about the prospective funding of Dancing in the Dark because she saw no point to it.

URC was being replaced by Royal, which was already one of the two lead reinsurers. Thus, the entities exercising decision-making power were already on the policies. I find that AXA's decision making would not have been different had it been told that Dancing in the Dark was a potential substitute for Standing Room Only as the second film.[43]

I find that Smith's open working relationship with Sharma was not inconsistent with his loyalty to AXA, and that it furthered Smith's ability to serve AXA's interests. I find that Sharma's willingness to share concerns with Smith was the product of her desire to ensure that the insurers were satisfied with the transaction, and of the understanding of both Smith and Sharma that both the insurers and Chase wanted to work cooperatively to consummate the transaction. This approach is fully consonant with AXA's view as expressed in Guillot's above-quoted August 21, 1999 fax in which he stated:

> Although there may be a theoretical conflict of interest between Chase 'the insured' and Chase 'representing the insurers' interest', I consider Chase's reputation and fair attitude to be satisfactory. It is to their benefit that they recoup from the sale of the film rather than from the insurers.

**SCB Advice and Representation**

I find there was no conflict of interest, or substantial risk of a conflict of interest, resulting from Richards Butler's relationship with SCB/Sharma.

While the concept that the insured's agent appoints counsel to represent the interests of the insurer may be somewhat foreign to American custom, AXA's own first amended complaint makes

---

[43]Pursuant to the Decisions Clause in the policy, any amendment or endorsement to the cash flow policy, required the active consent of both Royal and AXA, as lead reinsurers, and of the fronting company. Thus, to the extent that the use of Dancing in the Dark as the second film would have required any modification of the existing cash flow policy, it would have required the affirmative consent of AXA and Royal.

the judicial admission that "[i]n the London Market where this insurance was to be placed, it was not uncommon for the policyholder's broker to appoint attorneys or other outside consultants to protect insurers' interests," and I so find. I find that, as Litto and Sharma testified, Richards Butler had a reputation as a very fine, well-established and highly regarded law firm in the entertainment business in England; and I find that Smith enjoyed a like reputation.[44]

It is undisputed that in the course of the negotiations, Sharma told Guillot that Richards Butler was SCB's corporate lawyer, but would not be representing SCB in the Litto transaction. I find that this statement was truthful when made, and that it was made without any intent to deceive.

Nevertheless, it is undisputed, and I find, that on certain occasions, Richards Butler, and Smith in particular, did provide advice and representation to SCB as a client on matters relating to the Litto transaction, and that neither Sharma nor Richards Butler informed AXA of this.

Perhaps, having made the affirmative representation that Richards Butler would not be representing SCB in the Litto matter, Sharma should have affirmatively informed AXA that Richards Butler did render certain advice to Sharma relating to the Litto transaction. The jury's finding, with which I concur, establishes that any such omission was, if the correction was required to be made in the exercise of utmost good faith, not intentional. That issue is moot, however, because I find that the advice given was not prejudicial to AXA, and because I find that had the disclosure been made, AXA's conduct relating to the transaction would not have been different.

---

[44]While not a basis for my findings, I take judicial notice that Barry Smith and Richards Butler are listed in the credits to the recent, acclaimed film Gosford Park.

**SCB/Chase retention agreement**

A primary focus of AXA's claim that Smith was disloyal, is that Smith reviewed, on behalf of SCB, a retention agreement drafted by Chase, for Chase's retention of SCB in connection with the Litto transaction.[45]

I credit Sharma's testimony that she did not believe she had an obligation to disclose this to AXA because the retention involved only SCB and Chase. However, her belief is not dispositive, since equitable estoppel may be based on negligent conduct.

Flint testified that certain provisions in the retention agreement that had been drafted by Chase, were detrimental to AXA's interests.

Paragraph 7 of the retention agreement provides:

> Stirling Cooke will submit to the Insurer any document or information that the Agent specifically requests in writing that it submit in connection with the placement of the Contingency Expense Insurance Policy, the making of a claim or in furtherance of the Agent's obligation to provide information in connection with any claim made by the Agent. To the extent that Stirling Cooke provides any other material to the Insurer it will inform the Insurer that it is providing such material in a capacity other than as the Agent's agent.

Paragraph 6 provides:

> Stirling Cooke has satisfied itself that each of The New Hampshire Insurance Company and AXA Reassurance holds appropriate licenses in its respective jurisdiction to write the Contingency Expense Insurance Policy. In the placement process, Stirling Cooke has informed The New Hampshire Insurance Company and AXA Reassurance that the only material being provided to them by it as the agent to the Agent is the material attached hereto as Annexes I, II and III and that any other material provided by it was not provided on behalf of the Agent.[46]

---

[45]There were two such agreements, one in connection with the contingent extra expense policy and one in connection with the cash flow policy. AXA's discussion focuses on the first.

[46]Smith's comments relating to this clause were (relating to the first sentence) essentially that it was not appropriate for a broker of SCB's size to undertake such a representation. I find

A central tenet, indeed, the sine qua non, of the transaction, was to protect Chase from liability for any misrepresentations or omissions except as to specified communications. This is reflected throughout the record.

I find that Smith made sure that Guillot understood that under the transaction as negotiated, Chase would not be liable for any such misrepresentations or omissions, and that, in fact, Guillot did understand this.[47]

This central tenet is expressed in the disclaimer clauses in both policies and, in addition, e.g., in the waiver letter annexed to the January 1999 extension commitment.[48]

---

that this proposed modification had no impact or potential impact on AXA's interests. Flint's sole comments on this clause related to the remainder of the clause, and were essentially akin to his comments on paragraph 7.

[47]Smith's initial August 18, 1997 letter to Sharma, which she transmitted to Guillot, cautions about the need for AXA to make its own independent investigations, and cautions that there is "a divergence of interest as between the bank and insurers which means that the insurers need to make their own investigations..." I find, as reflected in Smith's attendance note for November 20, 1997 and as testified to by Smith, that in a telephone call with Chapnick, Brennan, Sharma and Guillot, in which Chapnick was attempting to set up a face to face meeting including Sharma, Litto, Chapnick and Guillot, Smith explained that Chase's intention was to put the insurers in the position of never being able to deny a claim on the basis that they didn't understand what was going on or they had not had sufficient information.

[48] It also found expression in the August 5, 1997 draft term sheet, which AXA approved prior to Smith's appointment to represent AXA, and which AXA so emphatically insisted was not to be renegotiated. The term sheet provided, at p 14 ¶ 1, that Chase expected to see in the wording of the cash flow policy:

> A specific statement that Chase has not presented to the Insurers
> any material other than listed items and that Chase has no
> obligation to make any other disclosure with regard to the
> placement of the risk, the Insurers having acknowledged that they
> have made their own credit analysis and have not received from
> Chase any projections, etc. and that Chase need not make any
> additional disclosures.

That same provision is found in the January 20, 1999 term sheet as annexed to Sharma's February 1, 1999 fax to Derotte along with the documentation for the commitment extension. Thus, such

The contingent extra expense policy, which was negotiated directly between AXA and Chase, contains, under "list of schedules," the handwritten notation:

> Please note that the only information received from Stirling Cooke
> Brown Reinsurance Brokers Limited as Agents of the Insured is:
>
> 1. Loan Agreement (as above)
>
> 2. Summary of the terms and conditions of the US$100 million Revolving Credit Facility;
>
> 3. Contingent Extra Expense Insurance Policy Wording.

I find the restrictions on SCB's authority contained in the retention letter were consonant with the restrictions to which AXA contractually agreed; that such restrictions were contemplated by AXA from the early stages of the transaction; that AXA knew that these restrictions were of the essence, without which Chase would not have consummated the transaction; and that the presence of the restrictions in the retention agreement did not adversely affect AXA's rights.

The retention agreement provides, in pertinent part:

> 3. .... Notwithstanding the fact that Stirling Cooke is acting as the Agent's [Chase's] agent for the placement of the Contingency Expense Insurance Policy, the Agent makes no representations or warranties to Stirling Cooke and the Agent shall have no obligation to indemnify Stirling Cooke with regard to any claims which may be made against Stirling Cooke by third parties.

Flint opined that this prejudiced AXA because in the event that AXA recovered a judgment against SCB, but SCB failed to pay the judgment, AXA would not be able to pursue Chase because SCB had waived any right to indemnification. However, as Flint admitted upon further questioning, the right to indemnification matures only after the indemnitee pays a judgment. Therefore, waiver or no waiver, if SCB did not pay the judgment, AXA could not pursue Chase for a judgment against SCB but not paid by SCB.

---

limitations on SCB's agency were acknowledged and accepted by AXA as part of the transaction.

I find that the retention agreement was understood by AXA to be a substitute for AXA's acceptance of the broker as its own agent,[49] the purpose of which was to afford Chase protection akin to that it would have had if SCB/Sharma had been accepted as AXA's own agent. Equitable estoppel being, ipso facto, a defense founded on equity, see, e.g., Texas Enterprises, Inc. v Arnold Oil Co., 59 SW3d 244 (Tex App 2001) ("The linchpin for equitable estoppel is equity - fairness"), AXA cannot base the defense on a complaint whose essence is that it should have been allowed to get through a back door, what it understood it could not have. I find that Smith's action in reviewing a document containing terms contemplated by AXA from the early stages of the transaction was not an act of disloyalty to AXA.

I conclude that there was nothing in the retention agreement, or Smith's review of it, that created a conflict of interest, or a serious risk of a conflict of interest, as to Smith's representation of AXA.

**Other advice**

Smith reviewed a side agreement whereby SCB was to receive a portion of GLP's deferred sales fee.

---

[49]Similarly, in addition to the provisions discussed above, the August 5, 1997 draft term sheet provided, at p 14 ¶ 3 that the insurers would expect in the policy

> An acknowledgment that none of the various parties to the transaction are agents of Chase. If insurers are unwilling to accept the broker as their agent, Chase will require a written retention agreement between it and the broker.

These provisions were also included the term sheet as enclosed with Chase's December 12, 1997 initial commitment letter; at p 18 in the term sheet as stamped by AXA on February 23, 1998; and at p 17 in the January 20, 1999 draft term sheet as faxed to Derotte by Sharma on February 1, 1999 in connection with the January 1999 extension.

I find that the funds thus payable to SCB did not reduce the sums earmarked for payment of the loans. Flint testified that Smith's review of the this side agreement was "of no great damage to AXA." AXA offers no theory as to how Smith's review was detrimental to AXA's interests.

I find that AXA has failed to show that any discussions that Sharma had with another Richards Butler attorney, regarding insurance premium taxes, or that attorney's advice, were prejudicial to AXA, or represented any disloyalty to AXA by Smith. The result of those discussions was that SCB agreed to accept responsibility for any such taxes that might become due. AXA has failed to demonstrate that this prejudiced AXA. Indeed, Flint testified that this did not harm AXA.

In July 1999, Sharma consulted counsel at Richards Butler when she "needed a little bit of advice regarding what I was doing from an insurance standpoint." It is undisputed that Smith was not experienced in insurance law, but that other attorneys at Richards Butler were. I find that Sharma testified truthfully that she could not recall the substance of those conversations other than that they were nothing of substance. I find that such consultation was consistent with Sharma's role as agent for Chase and Richards Butler's role as counsel for AXA. AXA has not demonstrated that any advice received by Sharma from Richards Butler attorneys was prejudicial to AXA's interests.

I find that Smith's judgments and services were motivated solely by a desire to serve his client loyally, in the manner in which his client instructed him to serve. Assuming, without deciding, that Smith should have affirmatively verified that AXA was aware that Richards Butler, including Smith, was providing certain advice to SCB in connection with the Litto transaction, I find that Smith believed, accurately and in good faith, that there was neither a conflict of interest nor a serious risk of a conflict of interest posed by the advice thus rendered; and I find that the services rendered did not prejudice AXA's interests.

**Duty to speak**

Even if, arguendo, it could be found that Smith's actions constituted disloyalty, I find that neither Chase nor Sharma was under any duty to bring this to AXA's attention.[50]

Absent a showing of intentional fraud, an insured is not required to disclose information that is not plainly and directly asked for, see, e.g., H.B. Singer, Inc. v Mission Natl. Ins. Co., 223 AD2d 372 (1st Dept 1996); Home Ins. Co. of Ill. (New Hampshire) v Spectrum Info. Tech., Inc., 930 F Supp 825 (ED NY 1996); Hanover Fire Ins. Co. v Nash, 67 SW2d 452 (Tex App 1934). Under Texas law, "[i]f nothing is concealed and the company makes no inquiry, it cannot complain that the situation was different from the supposed state of facts," 46 Tex Jur 3d Insurance Contracts and Coverage § 542. Mere silence, absent a duty to speak, does not support a claim of fraud, see, e.g., Bank of New York v Murphy, 230 AD2d 607 (1st Dept 1996), lv dismissed 89 NY2d 1030 (1997); Storms v Tuck, 579 SW2d 447 (Tex 1979); Clifton v Ogle, 526 SW2d 596 (Tex App 1975). Under New York law, "[if] there is concealment without an actual misrepresentation, estoppel is appropriate only where there is a fiduciary relationship that "gave the defendant[s] an obligation to inform [plaintiff] of facts underlying the claim," Niagara Mohawk Power Corp. v Freed, 288 AD2d 818 (4th Dept 2001).

I find that AXA never "plainly and directly" asked for the subject information, and therefore, in order to show a breach of duty by Chase (through Sharma as Chase's agent, or by Chase directly), AXA must show intentional fraud, either by affirmative misrepresentation, or by silence where there was a duty to speak.

I conclude that neither Sharma's recommendation of Smith to AXA, a multinational entity with substantial resources to obtain its own counsel, nor any other circumstance herein, made

---

[50]For the purpose of this discussion, I assume arguendo, without deciding, that the representations and omissions by Sharma on which AXA relies, were made in her capacity as Chase's agent.

Sharma, SCB, or Chase, a guarantor of Smith's legal services or imposed on them a duty to oversee, monitor, or report on his services to AXA.[51]

I find that neither Chase nor Sharma as Chase's agent, actively procured any disloyalty by Smith. I credit Chapnick's testimony that he had "no idea what [Smith] did with his clients."

**"AXA's lawyer" / "broker's lawyer"**

In an attempt to establish misrepresentation, AXA points to various instances in which Chase and/or Sharma, in statements directed to AXA, referred to Smith as being AXA's lawyer.[52]

This argument is unpersuasive and borders on the frivolous. Even assuming arguendo that Smith was disloyal, the reference to Smith as being AXA's lawyer cannot be deemed false. He was appointed, at AXA's behest, to represent AXA's interests, and he was, in fact, AXA's lawyer. Making the statement that a person is another person's lawyer, does not constitute a warranty as to the lawyer's performance or ethics. The correspondence in which Sharma represented that Smith had reviewed specified documents as AXA's lawyer referred to documents that Smith had reviewed on AXA's behalf. The fact that, on SCB's behalf, Smith had reviewed other documents, does not affect the truth of the statement that he reviewed the specified documents as AXA's lawyer.

---

[51]Under some circumstances, an attorney may have an ethical obligation to report to the appropriate tribunal, a conflict of interest of opposing counsel, see, Estates Theatres, Inc. v Columbia Pictures Industries, Inc., 345 F Supp 93 (SD NY 1972). However, that obligation is imposed on the attorney, not on the attorney's client, and any breach of it is a matter of professional discipline. An ethical violation by an attorney does not support a claim by the adverse client against the attorney or the attorney's client, see, Drago v Buonagurio, 46 NY2d 778 (1978).

[52]As stated by AXA in its Trial Brief:

> Necessarily implicit in her representation that Barry Smith was "your lawyer" was of course, the representation that Barry Smith was not acting as "her [i.e., Sharma's] lawyer" on the Litto transactions.

78

Similarly, the instances to which AXA points, in which Chase referred to Smith as Sharma's or SCB's lawyer or the "broker's" lawyer or the like, do not constitute "admissions," as AXA contends, that Smith was not AXA's lawyer. I find that those references merely reflect the parties' recognition that Smith's involvement in the transaction had its origins in Sharma's recommendation.[53]

Here, if Chase knew that Richards Butler was performing services for Sharma and knew that AXA was unaware of this, arguably Chase might have had an obligation to speak. However, I find that, while Chase's attorneys were aware that Smith was reviewing the documents for Sharma, Chase was not aware that AXA was not informed of this. In any event, as discussed above, I find that these activities were not prejudicial to AXA's interests, and, as discussed below, I find that AXA would not have conducted its affairs differently had it known of these services. I find further that at all times, Sharma and Chase viewed Smith as acting loyally to represent AXA's interests. Hence, even if a belief that Smith was acting disloyally would have given rise to a duty to inform AXA, no such duty arose here.

As noted above, the jury's findings, with which I concur, are dispositive of any contention based on intentional misrepresentation or concealment by Sharma of any material fact. Independent of the jury's findings, to the extent that AXA bases its contention on any affirmative misrepresentations relating to Smith by Sharma, as Chase's agent[54], I find that Sharma did not make

---

[53]I find that on the October 16, 1997 fax from Sharma to Guillot, urging that Richards Butler's "role should be clearly defined to ensure that they do not assume responsibilities which just increase their fees," and also stating "I have passed all of these comments together with the wording of the documents to Richard's Butler that he can ensure that your interests with regards to the $6m facility are secured," Guillot himself circled "Richards Butler" and wrote "Stirling Cook Brown's lawyer." By AXA's reasoning, this would constitute an "admission" by AXA that AXA (through Guillot) "knew" that Smith was SCB's lawyer, not AXA's. As such, it would preclude AXA's contention that AXA was unaware that Smith was acting on SCB's behalf rather than on AXA's behalf.

[54]As noted above, I do not reach the issue whether Sharma's representations or omissions at issue were made by Sharma as Chase's agent.

any such affirmative misrepresentations. To the extent that AXA bases its contention on any failure of Sharma, as Chase's agent, to communicate material information to AXA, I find that Sharma did not intentionally fail to make any such disclosures. I find that Sharma made no effort to conceal any material fact from AXA and that she attempted to share all information that she considered material information with AXA and/or Smith.

I find that Sharma recommended Smith because she felt that AXA should have its own attorney and that she believed that Smith was a competent attorney experienced in media law. I find that Sharma fully expected and intended that Smith and Richards Butler would represent AXA's interests motivated solely by loyalty to AXA. I credit Sharma's testimony that she recommended Richards Butler because of the firm's expertise and because she "couldn't think of a better firm to represent them."

**Changes in Transaction**

**January 1999 extension**

In support of its contention that Chase/Sharma did not, themselves, convey to AXA the changed nature of the transaction[55], AXA complains that Sharma's February 1, 1999 fax to Derotte stating, inter alia, "[you recently approved the extension of the commitment date on the above," was misleading; that Sharma/Chase failed to inform AXA that the change in the January 1999 extension was material; that Sharma/Chase failed to inform AXA that the use of a bridge facility constituted a material change and was a new transaction; and that Chase/Sharma failed to inform AXA that the S/J agreement was a material change.

As stated above, I find that at the time that Guillot committed AXA to the January 1999 extension, he (and thus AXA) was fully aware of the changed nature of Chase's commitment and that he was fully aware that this was a material change. In addition, Smith's January 29, 1999 letter,

---

[55]In any event, of course, notice to Smith constituted notice to AXA.

forwarded by Sharma to Derotte by that same February 1, 1999 fax, expressly pointed out the change to best efforts and that the altered commitment letter "specifies the portion' which Chase themselves intend to take."   Also included with Sharma's fax was the January 1999 amended commitment extension letter itself, which expressly defined Chase's commitment as limited to $12M of the Facilities, and as being subject to commitment from other lenders for the remaining $95.5M. The disclaimer immediately over Derotte's signature on the January 1999 waiver letter, expressly states that the extension is "on a best efforts basis."  I find that Chase/Sharma fulfilled any obligations they had to advise AXA of the change.

**Bridge financing**

Subsequent to the January, 1999 extension on a "best efforts" basis, but prior to the issuance of the cash flow policy, another situation arose.

Because Litto needed prompt financing but additional lenders had not yet been enlisted, Chase, which was not obligated to provide more than $12M from its own resources, nevertheless agreed to provide $89M as bridge financing to fund two films, to be rolled over into the $100M facility once syndication had been established.   Ironically, AXA, which complains that Chase's obligation to provide the funding itself had been limited in the January 1999 commitment extension to $12M, complains that this arrangement, in which Chase agreed to fund $89M (just $11M short of the $100M), was not presented to AXA as a "new" agreement.

I find that AXA was fully informed of this proposal by, inter alia, Sharma's May 28, 1999 fax to Derotte, which in turn included  Smith's May 27, 1999 letter to Sharma and Chase's April 23, 1999 letter to Sharma.

I find that it was Chase's intent, and Sharma's understanding, that the bridge loan would be folded into a five-picture loan as represented.

I find that there was no misrepresentation or omission as to the changed status of the transaction relating to the use of a bridge facility.

81

**Sonnenfeld/Josephson agreement**

I find that the S/J agreement did not constitute a revision of the transaction. In essence, the S/J agreement involved issues relating to how the monies budgeted for the film production would be spent by GLP. I find that it was the intent of the parties, including AXA, that such matters were to be left to GLP without oversight by AXA or Chase, and therefore, even discounting the modifications resulting from Smith's discussion with Brennan and incorporated in the interparty agreement, the S/J agreement, including the provisions for compensation and credit to S/J, was not a material change to the transaction.

I conclude that AXA has failed to meet its burden to show any material misrepresentations or omissions by Chase, or by SCB/Sharma as Chase's agent, sufficient to support equitable estoppel.

## Reliance

Even if AXA had met its burden, as a matter of fact, to prove reliance on the alleged misstatements and omissions, any claim of reliance is barred, not only by the policy disclaimers, but by other disclaimers as well. These include the disclaimer in the waiver letter executed by Derotte in connection with the January 1999 commitment extension immediately preceding Derotte's signature; and the disclaimer in Smith's May 27, 1999 letter to Sharma, which was forwarded to Derotte by Sharma on May 28, 1999, and to de Lacroix on July 2, 1999 just prior to the execution of the cut-through endorsement. Derotte did not respond to this letter, thus acquiescing in this limitation. I credit Derotte's testimony that this letter was in his file as of July 9, 1999, the date of the execution of the cut-through endorsement for the cash flow policy.

However, even absent the disclaimers, AXA has failed to prove reliance.

Citing <u>Tekni-Plex, Inc. v Meyner and Landis</u>, 89 NY2d 123 , <u>reargument denied</u> 89 NY2d 917 (1996), AXA contends that New York law presumes that a client has an expectation of loyalty in its attorney. However, the issue is not merely whether AXA relied on Smith's advice (and even as to this, AXA's evidence does not meet its burden), but whether its actions would have been

82

different had it known of the facts that, according to AXA, were chargeable to Chase and demonstrate Smith's supposed disloyalty. Thus, by way of example, while one of AXA's focal contentions is that Sharma failed to tell AXA that Richards Butler, and Smith in particular, provided certain advice to SCB in connection with the Litto transaction, AXA has failed to establish that, had AXA known that Richards Butler gave this advice to SCB, AXA would have proceeded any differently than it did.

As noted above, AXA makes the judicial admission that it "temporarily suspended Guillot on or about January 15, 1999, and eventually dismissed Guillot by letter dated February 24, 1999." I credit Derotte's testimony that the suspension was only of Guillot's authority to write new business. I credit Guillot's testimony that when he came to his office on February 1, 1999, Derotte told him to take vacation time pending his receipt of an invitation to a dismissal hearing, and that, at Derotte's direction, he went right home. This occurred on the same date that Sharma faxed to Derotte the documentation for the January 1999 extension, sending it with the February 1, 1999 cover fax that AXA contends was misleading.

I find that Guillot was very familiar with the terms of the transaction, and that, at least up to the date of his termination, he was available to AXA for consultation, including both Derotte and Cordier, had AXA wished to avail itself of his knowledge.

Yet, like the boy who kills his parents and then demands special privileges because he is an orphan, AXA contends that because Guillot was no longer providing input to AXA as to the history, terms and status of the transaction, that duty was somehow shifted to Sharma and Chase.

What was known to Guillot was, ipso facto, known to AXA, at least while Guillot was still employed by AXA. Moreover, even discounting this principle, AXA had Guillot's knowledge and understanding of the transaction readily available to it. Having chosen not to make use of that knowledge and understanding, AXA cannot show reasonable reliance as to any supposed omissions

83

or misrepresentations without showing that Guillot was unaware of the truth. AXA has failed to meet this burden.

Likewise, AXA complains that Guillot's files were left in "disarray." I credit Guillot's testimony that he did not follow standard practice regarding his files, but instead kept them in his office because there was often daily activity on them. Any "disarray" was caused while Guillot was still employed by AXA and is thus AXA's responsibility. I find that AXA did not seek to obtain Guillot's assistance in organizing his files before his unwilling departure and that AXA did not seek to obtain a complete file from either Sharma or Smith. I find that it was not until April of 1999 that AXA first informed Chase that Guillot's files were disorganized. Since Derotte knew that Guillot's files were not reliable, I find that it was reckless for AXA to make decisions concerning this multimillion dollar transaction without reconstructing the file. To the extent, at least, that the matters at issue would have been disclosed by the complete file, that recklessness precludes any claim of reasonable reliance.

I find that in April 1999, at a meeting with Derotte and Cordier, which occurred when Derotte and Cordier were in the United States on other business, Chase's John Miller affirmatively invited Derotte to spend time physically in Chase's own offices to learn the area of film financing. I credit Miller's testimony that he invited Derotte to do so if AXA decided to go forward with this line of business. Derotte testified that he declined to take advantage of this opportunity because "we had this problem with George Litto Production." That is, the reason that AXA chose not to take advantage of Chase's offer to allow AXA to learn this area of business from the inside, was that AXA was dealing with the Litto problem - the problem for which it now seeks to blame Chase for AXA's alleged lack of understanding of the transactions. I credit Miller's testimony that after that meeting he left messages for Derotte, offering to introduce him to a Columbia executive whom Miller had introduced to Guillot, to provide assistance to Derotte, and that Derotte failed to take advantage of this opportunity.

84

I find that at no time did Derotte make any effort to contact Smith to fill in any gaps in Derotte's understanding of the transaction. I find further that on March 23, 1999 Smith wrote to Derotte offering his help. I find that AXA could, at its option, at any time, have contacted Smith directly.[56] However, at no time thereafter did Derotte, or anyone else on behalf of AXA, contact Smith for any purpose, choosing instead to direct its questions to de Lacroix, who, as AXA knew, had little familiarity with film financing.

I conclude that, having deliberately shut itself off from means of knowledge readily available to it, AXA may not avail itself of the equitable estoppel defense, see, e.g., Clifton v Ogle, supra, 526 SW2d 596 (Tex App 1975); Schumaker v Mather, supra, 133 NY 590 (1892); Rodas v Manitaras, supra, 159 AD2d 341 (1st Dept 1990).

As discussed above, I find that Guillot's approval of the January 1999 extension was with knowledge of the intended modifications. Thus, at the time that Sharma sent the February 1, 1999 fax asking Derotte to execute the documentation for the extension, AXA was already bound. Therefore, any claimed misrepresentation or omission as to the changed nature of the extension commitment is moot, since the net result was merely that AXA did what it was already bound to do, see, e.g., Bank Leumi Trust Co. of New York v D'Evori Intl., Inc., 163 AD2d 26 (1st Dept 1990); New York State Urban Development Corp. v Marcus Garvey Brownstone Houses, Inc., 98 AD2d 767 (2d Dept 1983); 37 Am. Jur. 2d Fraud and Deceit § 283 (2001).[57]

---

[56]This is demonstrated by Guillot's November 5, 1997 fax directly to Smith.

[57]Even aside from the actual legal binding effect of Guillot's approval, I find that Derotte made the affirmative decision to honor Guillot's commitment without regard to whether it was legally binding. I find, based on Derotte's testimony, that Derotte believed that as a layman he did not necessarily know whether a transaction was or was not legally binding. I credit Derotte's testimony, that when he took over Guillot's files, and divided them into "in force, not in force," this determination was made by himself and Philippe Altmeyer, an AXA underwriter, alone, without the assistance of any attorney. I find that Derotte decided to treat the Litto transaction as "in force" because Guillot had issued the approval of the January extension. I credit Derotte's testimony that at the April 1999 meeting at Chase's offices in Los Angeles, Derotte expressly told Miller, in a general context, not specifically referring to the Litto transaction, that AXA would

I find that prior to execution of the documentation on July 9, 1999, Derotte was affirmatively advised by de Lacroix that the change to Texas law and jurisdiction was a material change and that therefore, AXA was not bound to issue the policy.[58] This is a crucial event, because it demonstrates that Derotte knew, before signing, that AXA was no longer bound, yet chose nevertheless to sign. Far from backing out of the transaction, faced with the prospect of losing the transaction because AXA was unwilling to be committed to the transaction as it was then proposed because of the problems posed by the cut-through endorsement, he signed an endorsement containing language proposed by AXA itself, in order to salvage the transaction. This fact alone precludes any reliance by AXA on equitable estoppel relating to the cash flow policy.[59]

I find that Derotte's decision to go forward with the transaction was based on his very understandable belief, that AXA's interests were best served by enabling GLP to produce films.

I find that Cordier had familiarity with the transaction; that he had supervisory authority over it; and that he understood its premises and basic structure. I find that he was aware of the potential risks, and concluded that, despite these risks and problems, he wanted AXA to be involved in this line of business, and in this project in particular.[60]

––––––––––––––––

honor whatever commitment Guillot had made. I find that Derotte did not personally review the documents forwarded by Sharma on February 1, 1999 to be signed, giving them instead to Altmeyer, because Derotte viewed this as in force business.

[58]Derotte testified that he did not recall this. Whether this is due to a genuine lack of recollection (from which I would infer that he did not consider the issue to be important, since he was not interested in excuses for withdrawing from the transaction), or otherwise, I find that de Lacroix did so advise Derotte.

[59]I do not reach the issue whether AXA was bound to issue the cash flow policy or whether, as some witnesses opined, the insurer had the right to reject a declaration for an individual picture even if it met the policy definition. I note that this is an issue of insurance policy construction, an area in which de Lacroix had substantial experience.

[60]I find that in suggesting that AXA's participation in the working capital phase of the transaction be in the form of an insurance policy rather than a guaranty, Guillot stated that one of

86

Cordier never testified and no excuse was offered for his failure to do so. I draw the inference that his testimony would have been adverse to AXA. Since Cordier's knowledge and understanding are imputed to AXA, I find that AXA did not rely on any of the alleged misrepresentations and omissions that are the basis of the equitable estoppel defense.[61]

To the extent that the defense is based on decisions by Guillot, there is a wholesale dearth of any evidence of reliance.

Referring to Guillot's deposition testimony, AXA asserted in its trial brief that Guillot

> testified that he believed that Smith was zealously representing AXA Re and giving his undivided loyalty[62] It is evident from Guillot's testimony that, quite naturally, had he learned that Smith was in fact acting for Chase's broker, Guillot would not have executed the Contingent Extra Expense Policy transaction, or at a minimum, would have taken steps to bring in independent counsel.

---

the advantages would be that this would keep the program in Guillot's department, which would mean that future approvals could be authorized by Guillot's superior, Cordier, very quickly.

I credit Guillot's testimony that he kept Cordier apprized of the progress of the transaction and received such approvals from Cordier as were necessary; that he discussed the transaction with him on many occasions; and that he explained to Cordier that repayment of the working capital loan depended on films being made and that there was no collateral protecting AXA on the contingent extra expense policy.

As noted above, prior to the time that the contingent extra expense policy was increased in April of 1998 from $6M to $7.5M, an increase which was authorized by Cordier personally, Cordier had personally attended a January 20, 1998 meeting with Litto, Sharma, and Guillot and actively participated in a discussion in which the Litto transaction was discussed in detail.

[61]I would come to this conclusion based on the evidence in the record even if Cordier's absence had been satisfactorily explained.

[62]As noted above, the testimony on which this assertion is based was in response to a question as to Guillot's present state of mind at the time of his deposition.

In effect, in lieu of supplying the evidence required to support its contention, AXA asks me to infer that Guillot would have acted differently. I decline to draw an inference as to what Guillot would have done, to fill in this crucial gap left by AXA's failure to elicit testimony to that effect from Guillot himself. To the contrary, I find that Guillot's actions, including his approval of the January 1999 commitment extension, would have been no different had he been informed of any and all of the matters on which AXA bases this defense.

In its trial brief, AXA predicted that Derotte, its own key witness

> will testify that he would not have signed any document in connection with the George Litto Pictures transactions had he known either (1) that Smith was representing Stirling on the Litto transaction, or (2) that Smith was not conveying to AXA Re the information coming to him, and his associated concerns, regarding the Cash Flow Insurance Policy transactions, or was otherwise failing to protect AXA Re's interests.

In addition, referring to the use of the bridge facility, AXA predicted that Derotte

> will testify that, had Sharma duly presented to AXA Re a "new" form of transaction, not previously agreed, he would immediately have rejected it -- just as, on April 16, 1999, he had advised Chase he would.[63]

Derotte did not so testify.

"Estoppel, like laches, includes an element of change of position in reliance on the conduct of other parties," Stergios v Forest Place Homeowners' Assn., Inc., 651 SW2d 396 (Tex App 1983); see also, Brelsford v USAA, supra, 289 AD2d 847 (3d Dept 2001). The testimony cited by AXA as establishing reliance fails to meet AXA's burden because, contrary to the prediction in its trial brief,

---

[63]This refers to AXA's advice on that date that while AXA would honor any deals to which it had committed, it would not commit to any others and was placing a "moratorium" on any new film financing transactions.

it fails to establish the necessary element: that AXA changed its position as the result of the alleged misrepresentations and/or omissions.[64]

I find that AXA's conduct would have been no different had Derotte known of the alleged misrepresentations/omissions.

Regarding the changed nature of the transaction under the January 1999 commitment extension, Derotte testified:

> If we had been told that there were changes when we were asked to extend the master facilities, I would have loved to have the choice of paying perhaps a loss of $5 million at that time and stop everything. But we were told there was an extension, and we were told we are committed.
>
> ***
>
> Jean-Michel Guillot had confirmed an extension of the master facility, and then later, we were real firm in writing that we were committed, and our commitment was envisioned on the different layers.
>
> ***
>
> I would have loved if we had been advised, in fact, that Chase deal had changed, and that we were -- the extension in fact was not a real extension. Because in that case we would have had a chance to make a choice. Either limiting the exposure to the 5.2 million because I remember there was still money not spent or continuing on the deal. But it's not the case. We were never told about this.

---

[64]By way of example, Derotte testified that he "relied" on certain correspondence. However, Derotte's conclusory statement that he "relied" is insufficient, under both Texas and New York law, to support the defense, in the absence of evidence that AXA's conduct would have been different had he been aware of the claimed omissions and misrepresentations.

In some instances, AXA's counsel attempted to elicit testimony from Derotte as to reliance through leading questions. AXA's counsel made no attempt to rephrase those questions when objections to them were sustained.

In fact, on the date (February 1, 1999) that Derotte was asked by Sharma to sign the January 1999 commitment extension documentation, he also was informed that AXA's exposure at that point was not the full $7.5M but only $5,155,000, less than "5.2 million".[65]

This means that even if, arguendo, AXA were not already bound to the approval of the January 1999 commitment extension, AXA did have the very opportunity to choose, that Derotte complained it ("we") did not have. As of February 1, 1999, AXA knew that its exposure was less than $5.2M. I find that Guillot, who had not yet been fired, knew that the "best efforts" represented a material change. Thus, the only factor preventing AXA from making that "choice" was AXA's own wilful failure to utilize Guillot's knowledge and understanding because, on February 1, 1999, the date that Derotte received the documentation for the January 1999 extension from Sharma, Derotte chose to tell Guillot to go home on vacation. AXA cannot avail itself of equitable estoppel where, as here, it had the means available to it to ascertain the truth but failed to use those means, and, indeed, what was known and understood by Guillot is necessarily imputed to AXA.

I find, however, that at that time, AXA had no interest in withdrawing from the transaction and, in fact, was still intent on consummating it and providing funding for the films.

To the extent that AXA bases this defense on other grounds, I find that AXA has likewise failed to sustain its burden.

In conclusion, I find that AXA did not reasonably rely on any of the representations or omissions on which it posits this defense. I find that, had AXA been informed of any of the matters of which it contends Smith, Sharma and/or Chase should have informed it, AXA's conduct would not have been different. I find that any such reliance would have been unreasonable. I find that neither Sharma/SCB nor Chase took any measures to prevent AXA from learning the truth. I find that both Sharma and Chase reasonably believed that AXA knew of the actual status of the

---

[65] This is demonstrated by Sharma's February 1, 1999 fax to Derotte, including Bullard's January 26, 1999 letter, referred to in a portion of the testimony that AXA cites as to reliance.

transaction when it decided to fire Guillot. I find that AXA was fully aware of the risks and problems that are the basis of the equitable estoppel defense. I find that Derotte and Cordier's conduct, after Derotte began taking over Guillot's authority on the transaction, was reckless so as to render any such reliance unreasonable as a matter of law.

In his summation, AXA's counsel argued:

> You get choices in this world. Everyone has got choices. But with every choice comes a consequence, and you got to pay the consequences if you make the wrong choice.

AXA made choices. It chose to issue the contingent extra expense policy with the potential of no protection against its exposure if no films were made. It chose to fire Guillot without making provision for utilizing his familiarity, knowledge, and understanding of the transaction. It chose to ignore Smith's advice, chose to fail to contact him after firing Guillot, and chose to ignore his offer of assistance. It cannot invoke equity to protect it from the consequences of those choices.

In view of the foregoing, I conclude that AXA has failed to meet its burden to establish this defense.

## **DECLARATION**

AXA contends that coverage for The Crew never attached because Chase did not provide a Declaration of that film in the form required by the policy.

The policy provides, in pertinent part:

| | |
|---|---|
| CONDITIONS PRECEDENT | It is a condition precedent to the effectiveness of this contract of insurance with regard to each declared Film Production under this Policy that: |
| Premium Payment | The premium for that Film Production described in Schedule 1 hereto is paid. |
| Declaration | A completed Declaration for that Film Production is presented to and accepted by the Insurer and the Lead Re-Insurers. |

The term "Declaration" is defined by the policy as follows:

> A declaration made by the Insured and accepted by the Insurer and the Lead Re-Insurers for the coverage of a Film Production under this Policy, in the form of Schedule 2 hereto.

The policy defines "Film Production" as "[a] Qualifying Picture which is the subject of a Declaration."

The policy defines "Qualifying Picture" as a Film Production that satisfies five enumerated requirements.[66]

Thus, within the four corners of the policy itself, the term "Qualifying Picture" is closely related to the term "Declaration".  When a Qualifying Picture is made the subject of a Declaration, it then becomes a Film Production.  Since it is the Declaration that makes a Film Production a Qualifying Picture, it might be anticipated that that Declaration would be referred to as a Qualifying Picture Declaration, and I find that the parties did use that term in referring to the Declaration required by the policy.  However, the term "Qualifying Picture Declaration" does not appear in the policy.  The policy uses only the term Declaration (hereinafter "policy Declaration").

The term Qualifying Picture Declaration does, however, appear in the Loan Agreement.  That Agreement requires GLP to supply a Qualifying Picture Declaration ("QPD") to Chase in connection with the making of the loan and defines its contents.

While the required contents of the two declarations  (the policy Declaration and the QPD) are similar, they are not identical.  In addition, the policy Declaration is required to be made by Chase, not by GLP.  However, the Schedule 2 form for the policy Declaration does not contain any signature line.

---

[66]On its face, there is a circularity among these definitions:  "Film Production" is defined as Qualifying Picture" that meets certain criteria; "Qualifying Picture" is defined as a "Film Production" that meets certain criteria.

It is undisputed that no document in the form of Schedule 2 was presented to the insurers at or before the closing. Instead, the document that was presented was in the form of the Qualifying Picture Declaration that GLP was required to present to Chase.

However, shortly prior to the July 9, 1999 date, AXA issued Endorsement no. 1, which states:

> ATTACHING TO AND FORMING PART OF CONTRACT No.: AH 0129799
>
> The declaration to the original policy in respect of "THE CREW" is seen, noted and agreed by the Lead Reinsurers.
>
> Full documentation held on Stirling Cooke Brown's file seen, noted and agreed by the Lead Re-Insurers.
>
> All other terms, clauses, conditions and warranties remain unaltered [emphasis added].

Relying on parol evidence, AXA argues that this endorsement means only that AXA approved the QPD as a QPD, as is contemplated by the Loan Agreement at §4.2(e). However, parol evidence may not be used to vary the terms of a policy or endorsement thereto in the absence of ambiguity. Under Texas law, a contract is ambiguous if it is subject to two or more reasonable interpretations; and whether a contract is ambiguous is a matter of law, see, e.g., Fein v R.P.H., Inc., 68 SW3d 260 (Tex App 2002).

Here, the endorsement unambiguously refers to its subject as the "declaration to the original policy." This cannot reasonably be construed as meaning merely approval of GLP's declaration to Chase functioning as GLP's declaration to Chase. Only Chase, not GLP, would have any occasion to make a declaration "to the original policy."

By this endorsement, AXA ipso facto accepted the documentation that was presented, as fulfilling the requirement of a policy Declaration. To the extent that the documentation that was presented did not fulfill the policy definition of a Declaration, any such defect was waived by this

93

endorsement. "Waiver is an intentional relinquishment of a known right or intentional conduct inconsistent with claiming a right. A condition precedent may be waived, and the waiver of a condition precedent may be inferred from a party's conduct" [citations omitted], <u>Bekins Moving & Storage Co. v Williams</u>, 947 SW2d 568 (Tex App 1997); <u>see also</u>, <u>Roberts v Clark</u>, 2002 WL 253802 (Tex App 2002); <u>Broughton Associates Joint Venture v Boudreaux</u>, 2002 WL 192344 (Tex App 2002); <u>Dairyland County Mut. Ins. Co. v Keys</u>, 568 SW2d 457 (Tex App 1978); <u>Bituminous Cas. Corp. v Vacuum Tanks, Inc.</u>, 975 F2d 1130 (5th Cir 1992).

While the Endorsement alone stands independently as a waiver of any defects in the declaration that was provided, the parties' conduct also would independently stand as a waiver. I find that it was the communicated intent and understanding of all involved in the closing that a fully effective policy would be in place at the end of the closing so long as the issues relating to the cut-through endorsement were resolved. I find that by this conduct, even independent of the issuance of the Endorsement, AXA waived any defect in the declaration that was provided.

Even were the foregoing not dispositive, the result would be no different. I find that as the result of the very hectic circumstances during the final days leading to the issuance of the policy, combined with the confusion generated by the use of similar and overlapping terminology, Chase mistakenly believed that the document it was submitted fulfilled the policy requirements for a policy Declaration. I find that AXA, which was on notice of the form required by the policy that it issued, realized the difference but issued the Endorsement because it decided to waive the policy requirements of a conforming policy Declaration.

I find further that but for AXA's issuance of Endorsement no. 1 accepting the proffered documentation as the policy Declaration, Chase would not have advanced funds to GLP. While Chase unquestionably had the means at its disposal to ascertain that the proffered documentation did not satisfy all the policy requirements for a policy Declaration, I find that Chase reasonably relied on AXA's issuance of Endorsement no. 1 and on AXA's conduct because Chase reasonably understood the Endorsement and conduct to mean that AXA had accepted the documentation as the

94

policy Declaration. The Endorsement was, itself, a communication on which Chase reasonably relied, regardless of whether or not AXA gave any other assurances or lulling communications.

AXA argues that because Texas law requires that the policy form conform to the policy form as filed with and approved by the Texas Department of Insurance, acceptance of the policy Declaration in a form not complying with Schedule 2 would violate Texas law. Therefore, AXA argues, construing the document to have been accepted as the policy Declaration, would render the contract illegal, in violation of the principle that contracts should be construed to avoid a construction that renders the contract illegal.

This contention is not persuasive, for several reasons.

First, the policy form was not changed by the waiver of the requirements of the policy set forth in the policy form as filed. The policy, as approved, prescribes the form in which the insured is to provide the policy Declaration. The blank form is, ipso facto, substantively different than a filled in form, but I conclude that Texas law did not require that the completed form be filed for approval after it was received from Chase or prohibit waiver of the requirement that the specified form be used, c.f., Henry v Aetna Cas. and Sur. Co., 633 SW2d 583 (Tex App 1982).

Second, even if AXA's acceptance of the policy Declaration in a form other than that prescribed by the policy could somehow be considered a violation of Texas law, the Texas statute was enacted to protect the insured, not the insurer. The Supreme Court of Texas has expressly held that a policy issued using a form not approved by the Superintendent of Insurance, is voidable at the option of the insured, not void, see, e.g., Urrutia v Decker, 992 SW2d 440 (Sup Ct Tex), cert denied 528 US 1021 (1999); Travelers Ins Co v Chicago Bridge & Iron Co., 442 SW2d 888 (Tex App 1969). While violation of the Texas statute may subject the insurer to penalties, a contract that is enforceable at the option of the insured is not illegal, "[t]o void the insurance provisions in the Texas rental agreement under these circumstances would penalize the innocent insured, not provide him more protection," Urrutia, supra.

Third, Endorsement no. 1 was filed with the Texas Department of Insurance and thereby made part of the policy form that was properly issuable in full compliance with Texas law.

AXA argues that the sum insured cannot be discerned from the four corners of the policy in the absence of a policy Declaration conforming to Schedule 2. I credit Lessman's testimony that there was an agreement as to the sum insured at the time of the closing. Under Texas law, the principle that the sum insured may not be left to future negotiation, has no applicability where, as here, the sum insured is determinable from external sources.[67] Here, the manner in which the sum insured is to be calculated is contractually established, and the figures on which the calculations are based in accordance with the parties' contract, are objectively determinable.

Accordingly, I find that AXA may not avoid the policy on the ground of failure to file a Declaration.

## ATTORNEYS FEES

Chase's claim for attorneys fees is based on policy provisions, on New York case law involving actions for declaratory judgment, and on two Texas statutes.

---

[67]This is demonstrated by <u>Southern Casualty Co. v Flowers</u>, 23 SW2d 507 (Tex App 1929), <u>affd</u> 38 SW2d 570 (Tex Com App 1931), cited by AXA for the principle that in the absence of a stated insured sum, there is no enforceable policy. In that case, the plaintiff insured prevailed against the insurer as to liability. No policy had been issued, but plaintiff alleged that a policy had been contracted for. As held by the 1931 affirmance by the Commission of Appeals, which held that the 1929 affirmance by the Court of Appeals (on which AXA relies) was, in part, for the wrong reasons, the ground for affirmance was that the contract was for a policy in the same amount as the prior policy. Thus, while there was no contract expressly stating the sum insured, that sum was ascertainable by reference to external sources. <u>See also</u>, <u>Pan American Insurance Co. v Santos</u>, 295 SW2d 254 (Tex App 1956) (identity of insurer determinable from external sources).

## PLEADING

While Chase's complaint seeks attorneys fees in the ad damnum clauses, it does not otherwise plead such claims, and Chase did not reply to NH's counterclaims. AXA/NH complain that Chase has not adequately pleaded its claims for attorneys fees and therefore may not recover them.

> A "cause of action" is a set of operative facts which gives rise to a separate and distinct legal right and to a right to seek separate and distinct redress for a violation of that legal right. It does not matter what linguistic trappings the set of operative facts is clothed in, or by what legal labels it is denominated.... The controlling factors are the physical facts and it is the unity of the transaction or the occurrence that determines whether there is only a single cause of action or more,

Benson v Cohoes School Bd., 98 Misc 2d 110 (County Court, Albany County 1979). A pleading is required to set forth facts supporting a cause of action, CPLR 3014.

However, a particular remedy is not part of a "cause of action." Pursuant to CPLR 3017, "the court may grant any type of relief within its jurisdiction appropriate to the proof whether or not demanded, imposing such terms as may be just."

Here, the operative causes of action are breach of contract and declaratory judgment. Attorneys fees are a remedy potentially available as damages for the former, and as an incidental procedural remedy for the latter.

I conclude that Chase's pleading is procedurally adequate to support an award of attorneys fees.

## CONTINGENT EXTRA EXPENSE POLICY

### Costs of Collection

> Inasmuch as a promise by one party to a contract to indemnify the other for attorney's fees incurred in litigation between them is contrary to the well-understood rule that parties are responsible for their own attorney's fees, the court should not infer a party's intention to waive the benefit of the rule unless the intention to do so is unmistakably clear from the language of the promise,

Hooper Associates, Ltd. v AGS Computers, Inc., 74 NY2d 487 (1989). In Hooper the agreement expressly provided for attorneys fees, and the language used could reasonably be construed as including within its scope attorneys fees incurred in litigation between the contracting parties. However, the Court of Appeals held that in the absence of unmistakably clear language, that provision could not be construed as applying to attorneys fees incurred in litigation between the parties to the contract, as opposed to litigation with third parties.

Chase, a sophisticated entity, expressly bargained for the contingent extra expense policy to be governed by New York law.  It was on notice of this holding, and, concomitantly, of the importance of spelling out with precision any entitlement to attorneys fees expended in litigation with an adversary from whom fees are sought. It failed to do so.  There is no language in the policy providing for attorneys fees in the event of litigation between Chase and the insurers/reinsurers. The sole language on which Chase relies refers to "any costs incurred by the Insured in collecting such claims."

Citing Hooper, in Utilisave Corp. v Benjamin Shapiro Realty Co., L.P., 282 AD2d 403 (1st Dept), lv dismissed 97 NY2d 677 (2001), the First Department held that "collection costs" did not include attorneys fees.[68]

----

[68]The contract in that case provided that

> Should Client unreasonably withhold UtiliSave's Fee then Client
> shall be responsible for any collection costs incurred by UtiliSave
> in collecting Fees.  Interest shall be charged and accrue at 1.5% per
> month on payments late more than 30 days from invoice date.

Utilisave Corp. v Benjamin Shapiro Realty Co., supra, Record on Appeal at 457.  The trial court found that plaintiff Utilisave had earned its fee, that defendant Shapiro "unreasonably withheld Utilisave's fee," and that plaintiff Utilisave had incurred "reasonable attorney's fees" of $56,233.93.  Based on these findings, the trial court awarded that sum as "collection costs," id at 18-19.

Thus, the First Department viewed the term "collection costs" incurred in collecting the fees owed, to have a meaning other than attorneys fees incurred in collecting the fees owed.

98

In the face of this authority, Chase cites no appellate New York cases construing "costs" or "collection costs" or like terms as impliedly including "attorneys fees," relying instead on decisions from other jurisdictions and distinguishable decisions of lower New York courts. In the absence of New York appellate authority, I decline to deviate from the rule as announced by the Court of Appeals in Hooper and by the First Department in Utilisave.

Chase's reliance on Breed, Abbot & Morgan v Hulke, 139 AD2d 71 (1st Dept 1988), affd 74 NY2d 686 (1989), is misplaced. That case involved the scope of an indemnification agreement, and involved attorneys fees incurred in defending against an action brought by a third party. The case has no application to the scope of the American rule regarding attorneys fees incurred in litigation with the party from whom attorneys fees are sought.

In marked contrast to the policy, provisions in the Loan Agreement expressly provide for attorneys fees in specified situations. Even assuming arguendo that under some circumstances, a contractual agreement for costs or collection costs could be expansively read as including attorneys fees, here the use of the precise term in related documents underscores that there was no agreement between Chase and the insurers that in the event of litigation between Chase and the insurers, attorneys fees were recoverable, cf, News Limited v Australis Holdings Pty. Ltd., ___ AD2d ___, 2002 WL 501112 (1st Dept 2002).

**Section 10.5**

Chase argues that under Section 10.5 of the Loan Agreement, GLP is responsible for the attorneys fees incurred by Chase in the instant litigation, and that under the policy provisions, those sums owed by GLP are included as part of the claim insured by the policy. Assuming, without deciding, that this is the proper construction of those agreements, such sums would constitute part of the claim. As such, they are necessarily included within the scope of the policy provision limiting the claim to the "sum insured," which, as reflected in Chase's May 16, 2001 claim letter demanding

99

payment, is $7.5M.[69]   Since Chase's claim already meets the maximum sum of $7.5M, any entitlement to attorneys fees via this route is moot.

Cases in which interest was allowed above and beyond the amount of the insurance claim itself, are inapposite.  Interest for breach of contract is allowed by statute, and is not part of the underlying claim under the policy.  Likewise inapposite are <u>Acquista v New York Life Ins Co</u>., 285 AD2d 73 (1st Dept 2001) and <u>Pavia v State Farm Mutual Auto Ins. Co.</u>, 82 NY2d 445 (1993), <u>reargument denied</u>  83 NY2d 779 (1994).  Both these cases involved claims of bad faith in connection with defense of third party actions.  They do not support expansion of the contractually capped Sum Insured to include sums which, if due at all, would be due as part of the Sum Insured.

### Defense of Declaratory Judgment Action

An insured may recover attorneys fees incurred in defending an action for a declaratory judgment brought by an insurer seeking to avoid its obligations under a liability policy.  However, controlling First Department authority holds that this exception to the American rule does not extend to actions for a declaratory judgment involving first party benefits, <u>Chase Manhattan Bank v Each Individual Underwriter Bound to Lloyd's Policy no. 790/004A89005</u>, 258 AD2d 1 (1st Dept 1999). This exception to the American rule is premised on the theory that such litigation is an incident of defense, and is hence within the insurer's obligations under the policy, <u>see</u>, <u>Mighty Midgets, Inc. v Centennial Ins. Co.</u>, 47 NY2d 12 (1979), a principle that does not apply to litigation involving first

---

[69]The clause as amended provides:

> This Policy is to indemnify the Insured for amounts due and payable to them on the Claim Date pursuant to the terms of the Loan Agreement, up to but not exceeding the Sum Insured <u>and requires the Insurer to make payment of an amount up to Sum Insured as provided under "Claims Procedure."</u> [emphasis added].

I note that this important protection of the insurers' interests was not included in the initial draft of the policy, but was included in the revised draft as the result of Barry Smith's advice.

party claims.   Chase's attempts to characterize this policy as providing third party benefits is not persuasive.

## CASH FLOW POLICY

Under Texas law, "unless provided for by statute or by contract between the parties, attorneys' fees incurred by a party to litigation are not recoverable against his adversary either in an action in tort or a suit upon a contract, <u>Cupples Coiled Pipe, Inc. v Esco Supply Co.</u>, 591 SW2d 615 (Tex App 1979).

Chase cites no policy language in the cash flow policy providing for attorneys fees incurred by Chase in litigation with the insurers.

## Section 13.5

As indicated above, Chase argues that it is entitled to attorneys fees because under the Loan Agreement, its legal fees herein are owed to it by GLP, and the sums owed to GLP are part of the risk that is insured by the cash flow policy.

The Insuring Clause of the cash flow policy states that the policy provides insurance coverage for Chase's "Ascertained Net Loss," which is "all amounts outstanding and unpaid under the Loan Agreement ... after application of the Revenue therefore received."   Section 13.5 of the Loan Agreement entitles Chase to:

> an amount equal to all costs and expenses, including reasonable attorney's fees and disbursements ... growing out of or resulting from any litigation, investigation or other proceeding relating to the Collateral, this Credit Agreement, the Copyright Security Agreements and the Pledgeholder Agreements, the making of the Loans, any attempt to audit, inspect, protect or sell the Collateral, or the administration and enforcement or exercise of any right or remedy granted to the Administrative Agent or Lenders hereunder or thereunder but excluding therefrom all claims, demands, losses, judgment, liabilities, costs and expenses arising out of or resulting from [specified causes].

101

Thus, while the policy itself does not directly provide for payment of attorneys fees incurred in litigation between Chase and the insurers, it does provide for coverage for sums due to Chase by GLP under the Loan Agreement, and those sums include Chase's litigation expenses, including attorneys' fees, incurred in litigation falling within the specified categories.

Chase argues that attorneys fees incurred in this litigation come within the scope of this clause. However, I conclude that given the high degree of specificity with which this clause is drafted, and the inclusion of, e.g., the term "Collateral," but not "cash flow policy," litigation over the subject policies is not within the scope of this clause. If litigation over the insurance policies were within the scope of litigation over "this Credit Agreement," or the "making of the Loans," then litigation over, e.g., the Collateral would also be within its scope. The parties' separate enumeration of Collateral implies that litigation relating to, e.g., "this Credit Agreement" means litigation in which the Credit Agreement is the direct subject of the litigation, that is, where the purpose of the litigation is to obtain adjudication of a dispute about the Credit Agreement itself.[70]

## Section 8.7

Chase argues that Section 8.7 of the Loan Agreement indirectly obligates the insurers under the cash flow policy to reimburse Chase for its attorney's fees and expenses, at least in so far as a portion of the insured loan remains outstanding on the claim date. Chase argues that Section 8.7 has this effect because when Chase applies the proceeds from a Qualifying Picture to offset its fees and expenses, the insurers' potential liability under the cash flow policy is not reduced as it would be if the proceeds were applied to reduce the amount of the loan outstanding. Chase argues that by allowing it to use the proceeds to reimburse its fees and expenses, Section 8.7 in essence shifts responsibility for those fees and expenses to the insurers.

Section 7(e) of the Loan Agreement provides that the following is an Event of Default:

---

[70]In view of the foregoing, I do not reach the issue whether attorneys fees incurred in litigation within the scope of section 13.5 would otherwise be includable within a claim under the cash flow policy.

> a Default or an Event of Default shall have occurred and be
> continuing under the Working Capital Credit Facility and such default
> shall not be remedied, cured, waived or consented to within the
> period of grace with respect thereto.

Under section 7(f) of the working capital credit facility, an event of default as to that agreement occurs when

> a default by the insurers (or anticipatory breaches) shall be made with
> respect to the Contingency Expense Insurance, or in the performance
> of any other obligation incurred in connection with the Contingency
> Expense Insurance.

Therefore, Chase argues, the occurrence of an Event of Default initially occurred in May 2001 when both AXA and NH failed to pay Chase's claim under the working capital policy and the related cut-through endorsement. Chase argues that it is therefore entitled to apply the proceeds from "The Crew" to offset the attorneys fees and expenses it has incurred in this litigation.

This contention fails.

Section 8.7 of the Credit Agreement provides:

> During the continuance of an Event of Default, the balances in the
> [various listed accounts and other stated sources of income] shall be
> applied first toward payment of the reasonable out-of-pocket costs
> and expenses paid or incurred by [Chase] in enforcing this Credit
> Agreement, in realizing or protecting any Collateral and in enforcing
> or collecting any Obligations or any Guaranty thereof, including,
> without limitation, court costs and the reasonable attorney's fees and
> expenses incurred by [Chase], then to the payment in full of the
> Obligations in such order as determined by the Required Lenders, and
> thereafter to the payment in full of the Obligations under the Working
> Capital Credit Facility....

In order to come within this section, Chase's legal expenses in this litigation would have to be encompassed within the scope of the enumerated expenses.

Since no claims were asserted by Chase to enforce Chase's rights against GLP under the Credit Agreement, and since the rights that Chase has sought to enforce arise from the insurance

103

policies, not the Credit Agreement, I decline to find that attorneys fees were incurred "enforcing this Credit Agreement."

"Collateral" is defined in great detail at p. 6-10 of the Loan Agreement, as including the right, title and interest of a Credit Party in "the proceeds of the Cash Flow Insurance." However, "Credit Party" is defined as the Credit Party Debtor and the Borrower. Thus, "collateral" does not include Chase's own rights under the cash flow policy, both because Chase's intangible rights are not the equivalent of the "proceeds," and because Chase is not a Credit Party. While the "Collateral" definition also includes "all insurance policies and completion bonds connected with each Film Asset and item of Product and all proceeds which may be derived therefrom",[71] this is expressly limited to such rights and properties "to the extent they are owned or hereafter created or acquired by such Credit Party," and hence do not include Chase's rights under the policies.

Nor do the present litigation expenses come within the scope of "enforcing or collecting any Obligations or any Guaranty thereof." "Obligations" are defined as specified obligations of the Credit Parties. The policy cannot be deemed to be a "Guaranty" of the obligations within the scope of this clause, especially since other clauses expressly refer to the cash flow policy.[72]

## Section 38.001

Tex Civ Prac & Rem Code Ann § 38.001 provides for attorneys fees incurred in a valid claim based on an oral or written contract, which includes claims for the breach of an insurance contract, Grapevine Excavation, Inc. v Maryland Lloyds, 35 SW3d 1 (Sup Ct Tex 2000). Such fees are mandatory, not discretionary, Bud v Gay, 846 SW2d 521 (Tex App 1993).

---

[71]The use of both these terms in this clause underscores the conclusion that "proceeds" does not include intangible rights in the policies in the earlier clause.

[72]In view of the foregoing, it is unnecessary to reach the issue of whether such attorneys fees would have to be attributable solely to the prosecution of Chase's affirmative claims for breach of the contingent extra expense policy, and not to Chase's defense of the action for a declaratory judgment. Nor is it necessary to reach the effect of the capping provision.

Under Texas law, statutes providing for attorneys fees "are in derogation of the common law, are penal in nature and must be strictly construed," Modine Mfg. Co. v North East Independent School Dist., 503 SW2d 833 (Tex App 1973).

Section 38.002 provides:

To recover attorney's fees under this chapter:

(1) the claimant must be represented by an attorney;

(2) the claimant must present the claim to the opposing party or to a duly authorized agent of the opposing party;  and

(3) payment for the just amount owed must not have been tendered before the expiration of the 30th day after the claim is presented.

Neither the filing of a suit, nor the allegation of a demand in the pleadings, can alone constitute presentment of a claim or demand that it be paid, Carr v Austin Forty, 744 SW2d 267 (Tex App 1987).  The party bringing suit must plead and prove presentment of the contract claim and that the defendant failed to tender performance within 30 days, Harrison v Gemdrill Intl., Inc., 981 SW2d 714 (Tex App 1998).  The purpose of presentment is to allow an opportunity to pay without incurring attorneys fees, Jones v Kelley, 614 SW2d 95 (Sup Ct Tex 1981).

Here, the claim date had not as yet occurred, and Chase's claim had not matured. at the time litigation was started or, indeed, at the time of trial.  Therefore, there could not have been the presentment that is a condition precedent for attorneys fees under this statute.  While the presentment may be made after the suit is commenced, it must be made at least thirty days before the trial, see Board of County Commrs of County of Beaver Okl. v Amarillo Hosp. Dist., 835 SW2d 115 (Tex App 1992); Peissel v Peissel, 620 SW2d 796 (Tex App 1981); Sterling Constr. Co., Inc. v West Texas Equipment Co., Inc, 597 SW2d 515 (Tex App 1980), or judgment, see, Shearer v Allied Live Oak Bank, 758 SW2d 940 (Tex App 1988).  The Texas courts have held that attorneys fees may not be awarded under this section in a declaratory judgment action, see, Gorman v Gorman, 966 SW2d 858 (Tex App 1998); see also, Kenneth Leventhal & Co. v Reeves, 978 SW2d 253 (Tex App 1998)

105

(attorneys fee award under section 38.001 requires an award of money or recovery of something of value).[73]  Accordingly, this statute does not support Chase's claim for attorneys fees.

I have no occasion to reach the issue whether, and under what circumstances, Chase would be entitled to attorneys fees under this section in the event that, after the claim date, a presentment is made, payment is not forthcoming, and further attorneys fees are incurred.

**Section 37.009**

Tex Civ Prac & Rem Code Ann § 37.009 provides for a discretionary award of attorneys fees in an action for a declaratory judgment, see Stable Energy, L.P. v Newberry, 999 SW2d 538 (Tex App 1999).  However, this statute is procedural, not substantive, and does not provide an independent substantive right to attorneys fees, see, Utica Lloyd's of Texas v Mitchell, 138 F3d 208 (5th Cir), rehearing denied (1998); National Union Fire Ins Co. of Pittsburgh Pa. v Care Flight Air Ambulance Service, Inc., 18 F3d 323 (5th Cir), cert denied sub nom General Elec. Capital Corp. v National Union Fire Ins. Co. of Pittsburgh, Pa., 513 US 916 (1994).

In sum, there is no contractual or statutory provision pursuant to which Chase may recover its attorneys fees incurred in this litigation.

### NEW HAMPSHIRE'S CROSS CLAIM

NH's cross-claim against AXA will be moot if Chase successfully exercises its right under the cut-through endorsement to payment from AXA directly with regard to the contingent extra expense policy.  Accordingly, NH's cross-claim is severed and decision on that issue is held in abeyance.

---

[73]In Schnabel v Philadelphia American Life Ins Co., 807 F Supp 1268 (SD Tex 1992), the court awarded attorneys fees under this section in an action for a declaratory judgment. However, in that case, the court based its award on three separate statutes: § 38.001, § 37.009, and ERISA.  The statement that attorneys fees were available under 38.001 was not supported by any discussion.   In any event, in that case there had been a breach because the insurer had failed and refused to issue a conversion policy as required by the policy that had been issued.

106

## CONCLUSION

AXA's approach in litigating this case was to leave no stone unturned. However, with the dust clouds from all this stone-turning now settled, all that remains is many turned stones. I conclude that AXA's claims of fraud and negligent misrepresentation as to Chase are contractually barred; that even if they were not, AXA has failed to establish its claims or defenses; that as a matter of law AXA is unable to maintain its claims and defenses of fortuity; that AXA waived Chase's failure to provide a Declaration in the form required by the cash flow policy; that the defense of equitable estoppel is barred by contractual provisions; that even if the contractual provisions did not bar the defense, AXA has failed to establish it; that the third-party claims are not governed by French law; and that AXA has waived any contention that English law should apply. I find that NH's claims and defenses (other than as between NH and AXA) are similarly unavailing. I find that Chase is not entitled to attorneys fees incurred in this litigation.

To the extent that the insurers seek declaratory relief relating to the contingent extra expense policy, those branches of their pleadings are dismissed, as the resolution of the breach of contract claims eliminates the need for declaratory relief.

Settle judgment, providing for monetary recovery on the contingent extra expense policy, declaratory relief consistent with the foregoing as to the cash flow policy, dismissal of the causes of action seeking declaratory relief as to the contingent extra expense policy, denial of Chase's claims for attorneys fees, dismissal of the third-party claims, and severance of New Hampshire's cross-claim against AXA.

This constitutes the decision and order of the court.

Dated: May 23, 2002

ENTER:

_____

J.S.C.

107  IRA GAMMERMAN