# EXHIBIT 16

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 27
-----------------------------------------------------------x
JPMORGAN CHASE BANK (formerly known as
THE CHASE MANHATTAN BANK), As Agent,

            Plaintiff,

- against -

AXA REINSURANCE UK PLC, GENERAL STAR
INTERNATIONAL INDEMNITY LTD., ROYAL &
SUNALLIANCE INSURANCE PLC, NEW HAMPSHIRE
INSURANCE COMPANY, GIO INSURANCE LTD.,
GREAT LAKES REINSURANCE (UK) PLC, ODYSSEY
RE (LONDON) LTD., MONEGASQUE DE
REASSURANCES S.A.M., and NRMA INSURANCE
LTD.,

            Defendants.
-----------------------------------------------------------x
[AND THIRD-PARTY ACTIONS]

Index No. 606096/01

P.C. No. 17665

**GAMMERMAN, J.:**

**INTRODUCTION**

    By notice of motion, in motion sequence no. 006, plaintiff JPMorgan Chase Bank ("Chase") moves to dismiss the affirmative defenses and counterclaims asserted by the defendant insurers.[1]

---

[1] This action has been consolidated with a similar action involving different films, formerly bearing index no. 604628/02. The present motion involves only the films at issue in the action originally bearing index no. 606096/01. The action names the following insurers as defendants: AXA Reinsurance UK PLC ("AXA"); General Star International Indemnity Ltd. ("GS"); Royal & SunAlliance Insurance PLC ("Royal"); New Hampshire Insurance Company ("New Hampshire"); Great Lakes Reinsurance (UK) PLC ("Lakes"); Odyssey Re (London) Ltd. ("Odyssey"); Monegasque de Reassurances S.A.M. ("Monde Re"); GIO Insurance Limited [now known as Gordian Runoff Limited] ("Gordian"); and NRMA Insurance Ltd. ("NRMA"). Lakes and Odyssey have submitted a joint set of opposition papers. Gordian and NRMA have submitted a joint set of opposition papers. However, Chase has settled its claims against Lakes, Royal and NRMA, and the motion is accordingly deemed withdrawn as to Lakes, Royal, and NRMA. Monde Re is not a party to the present motion.

## CONTRACTUAL STRUCTURE

The policies were issued for films in what is known as the Paramount IV and Paramount V slates ("Paramount IV" and "Paramount V," respectively.) The contractual background of the present dispute is as follows.[2]

Chase and ICE Insured Finance III, LLC ("ICE III"), entered into a Credit and Security Agreement (the "Paramount IV Loan Agreement") dated as of August 7, 1998, pursuant to which the Lenders provided ICE III, as borrower, with certain credit facilities to be used to acquire revenue participations from Paramount Pictures Corp. ("Paramount") in specified feature-length theatrical motion pictures, including A Simple Plan, A Civil Action, and The Out-of-Towners ("Simple Plan", "Civil Action," and "Out-of-Towners"). Each of the participating defendants (AXA, Royal, New Hampshire, GS, Gordian, Lakes and Odyssey) agreed to the Contingent Extra

---

As stated in AXA's answer,

> Defendant AXA Re UK, is a foreign corporation duly organized and existing under and by virtue of the laws of England, which, at all relevant times, acted as a direct insurer of Chase and a front/reinsured for its parent company, AXA Corporate Solutions, known at all relevant times as AXA Reassurance S.A. ("AXA Re"), which was not authorized to issue policies of direct insurance in New York. Jean-Michel Guillot, an underwriter employed by AXA Re, performed the underwriting for AXA Re UK.

The AXA party in The Chase Manhattan Bank v New Hampshire Ins. Co., 304 AD2d 423 (1st Dept), lv denied ___ NY2d ___ (2003) (the "Litto action" or "Litto") was AXA Reassurance S.A. However, for purposes of simplicity, in the present decision I refer at times to both AXA entities as AXA. Nothing herein is intended to constitute a holding that the two entities are not legally distinct.

In the course of this opinion I refer to various documents on file in this and other New York actions. I take judicial notice of the documents thus referred to.

[2]The following two paragraphs are adapted from Chase's memorandum of law in support of its motion to dismiss affirmative defenses and counterclaims and other relief in motion sequence no. 014. It is provided in this decision as informational background only, and is not intended as an adjudication of any facts that may be disputed.

2

Expense Insurance Slip (Policy No. 0L093A) (the "Paramount IV Slip"), pursuant to which the Paramount IV defendants agreed to provide insurance for up to six films. The Paramount IV Slip provided that both the wording of the policies and the individual film productions attaching under the slip were to be determined by AIG Europe (UK) Ltd. only. Three declarations were accepted by AIG Europe, as well as each of the other insurers on the Paramount IV slate. New Hampshire, the lead insurer on Paramount IV, acted through AIG Europe (UK) Ltd. It appears that, except as to the amounts insured, and the identity of the films, the Paramount IV policies are substantively identical.

The Paramount V facility was similarly structured. The borrower was ICE Insured Finance IV, LLC ("ICE IV"). The Paramount V films at issue on this motion are Star Trek: Insurrection ("Star Trek") and Election. The lead insurer was Royal rather than New Hampshire. For Star Trek there was both a primary and an excess layer of insurance.[3] The insurers on the primary Star Trek layer and for Election were Royal, AXA, GS, Monde Re, NRMA, and Gordian. The insurers on the excess layer for Star Trek were Royal, AXA, GS, and Monde Re. The broker was Roger Bassett, of Heath.[4]

ICE III and ICE IV are referred to as the Special Purpose Vehicles ("SPVs").

ICE Media, Ltd. was the Risk Manager on both slates.[5]

---

[3]There are accordingly some language differences in the policy. There are other differences as well. None of these differences are of consequence for purposes of the present motion.

[4]Three Heath entities are named in the pleadings: Heath Lambert Group, Heath Insurance Brokers Ltd., and Heath North America and Special Risks Ltd. For purposes of the present motion, all three are collectively referred to as "Heath."

[5]ICE Media, Ltd.'s principal is Graham Bradstreet. Third-party actions have been asserted against ICE Media, Ltd., Bradstreet, and, additionally, CineVisions, Inc. and Peter Hoffman. Hoffman is the principal of CineVisions, Inc., which has served as Risk Manager for other films. Throughout this decision, for the sake of simplicity, I refer to ICE Media, Ltd. and Bradstreet, and, additionally, CineVisions, Inc. and Peter Hoffman, collectively, as the "Risk Managers" or "RMs." This is not intended as an adjudication as to the role or relationship of Bradstreet, CineVisions, Inc. or Hoffman.

3

Each of the insurers has served its own pleading, and, with the exceptions noted above, has individually briefed opposition to the motion. Neither the pleadings nor the arguments are identical. However, there is substantial similarity and overlapping, and the insurers adopt by reference arguments raised by others. In the interests of simplicity, I will refer generally to the arguments and assertions made by the "insurers."

**CPLR 3016(b)**

The insurers' affirmative defenses and counterclaims focus heavily on fraud and related theories. CPLR 3016(b) requires that

> [w]here a cause of action or defense is based upon misrepresentation, fraud, mistake, wilful default, breach of trust or undue influence, the circumstances constituting the wrong shall be stated in detail.

Therefore, the content of alleged fraudulent representations must be set forth with specificity, Masada Universal Corp. v Goodman System Co., 121 AD2d 518 (2d Dept 1986); Andre Strishak & Associates, P.C. v Hewlett-Packard Co., 300 AD2d 608 (2d Dept 2002).

A mere allegation of a misrepresentation does not, by itself, meet the specificity requirement of CPLR 3016(b), unless the pleading sets forth "circumstances" in sufficient detail to demonstrate that the representation was made in "circumstances" sufficient to support a fraud cause of action.

In determining whether a fraud pleading complies with CPLR 3016(b), courts consider the documents governing the parties' rights and obligations, see, Longo v Butler Equities II, L.P., 278 AD2d 97 (1st Dept 2000); Chemical Bank v Ettinger, 196 AD2d 711 (1st Dept 1993).

Here, whether a particular representation or omission is actionable as fraudulent, is heavily dependent on the "circumstances," since the issue turns in large part on whether the alleged representation/omission is within the scope of the very detailed disclaimer clauses that the parties negotiated to govern their respective obligations.

In many instances, it is impossible to tell from the pleading whether a representation attributed to Chase was made by Chase directly, or by someone whom the insurers claim was

4

acting on behalf of Chase. Allegations that fail to thus particularize the circumstances fail to comply with section 3016(b).[6]

In addition, many of the allegations are pleaded "on information and belief," without disclosing the source of the "information and belief." Such a pleading fails to comply with CPLR 3016(b), see, e.g., Kanbar v Aronow, 260 AD2d 182 (1st Dept 1999); Wall Street Transcript Corp. v Ziff Communications Co., 225 AD2d 322 (1st Dept 1996).

The importance of the specificity requirement is further underscored by the fact that even a cursory review of documentation on file in this action demonstrates that to a troubling extent, the insurers' allegations wrench statements out of context, cf., Sidamonidze v Kay, 304 AD2d 415 (1st Dept 2003) (affirming dismissal of fraud claim where "Plaintiff-appellant's attempt to set forth a new theory in opposition to summary judgment was unavailing, since the remark relied upon was taken out of context") and/or mischaracterize them.[7] In addition, the alleged fraudulent nature of at least some of the allegations appears to be contradicted by documentary evidence.[8]

Thus, while as a whole the pleadings survive the challenge under CPLR 3016(b), in determining whether the allegations subject to CPLR 3016(b) are dismissible on other grounds, I will consider only those allegations made with the required specificity.

**ALLEGATIONS**

---

[6]In federal practice, governed by Fed R Civ P 9(b), the federal analog to CPLR 3016(b), a fraud pleading must state the time and place the statements were made and the identity of the person who made them, see, McLaughlin v Anderson, 962 F2d 187 (2d Cir 1992); Cosmas v Hassett, 886 F2d 8 (2d Cir 1989).

It is unnecessary to decide whether CPLR 3016(b) generally imposes the same requirement. It is sufficient that, given the facts of this case, generalized assertions that Chase "represented" something, fail to meet the specificity requirements of the CPLR.

[7]Some examples are set forth in Appendix A.

[8]Some examples are set forth in Appendix B.

5

To the extent that the pleadings, as supplemented by the exhibits in the opposing papers, allege misrepresentation/fraud claims sufficiently to comply with CPLR 3016(b), they fall into essentially six categories:

1. Representations/omissions allegedly made by Heath;

2. Representations/omissions allegedly made by the risk managers;

3. Omissions by Chase;

4. Provisions in the policies that the insurers characterize as misrepresentations by Chase.

5. Representations allegedly made by Chase; and

6. Alleged misrepresentations in Section 1 of the Questionnaire.[9]

I conclude that the disclaimer clauses in the policies, construed in accordance with the First Department's decisions in Chase Manhattan Bank v New Hampshire Ins. Co., supra, 304 AD2d 423 (1st Dept 2003) and Chase Manhattan Bank v AXA Reinsurance UK PLC, 294 AD2d 245 (1st Dept), lv denied 98 NY2d 612 (2002) (affirming, for the reasons stated below, my order dated July 26, 2001, dismissing claims asserted against J&M Entertainment Ltd. in actions bearing index nos. 603080/00 and 601068/00) ("J&M"), as well as other applicable case law, preclude the fraud claims to the extent they fall into the first five categories. I conclude further that, even discounting the disclaimers, the insurers have not effectively pleaded any actionable affirmative misrepresentation by Chase itself. Nor have the insurers alleged any misstatement in Section 1 of the Questionnaire sufficient to support relief.

In Litto, the First Department held:

> Under both New York law, which governs the contingent extra expense policy,[10] and Texas law, which governs the cash flow

---

[9] Since the policies provide that the truthful completion of Section 1 of the Questionnaire is a condition precedent, the insurers need not establish the elements of fraud in connection with any untruthful statements contained therein. For the purposes of this motion, I assume, without deciding, that defenses based on the Section 1 of the Questionnaire are not subject to CPLR 3016(b).

[10] In Litto, there were two facilities, each separately insured, both with reinsurance. The "contingent extra expense" policy, with a cut-through endorsement, related to a $7.5M working

6

> policy, fraud claims cannot be brought by a contracting party who specifically disclaimed reliance on extracontractual representations and indicated that it would make its own investigation of the risks involved (e.g. Mahn Real Estate Corp. v Shapolsky, 178 AD2d 383, 385-386 [1st Dept 1991]; Schlumberger Tech. Corp. v Swanson, 959 SW2d 171, 179-181 [Tex Sup Ct 1997].[11]

capital facility. The "cash flow" policy, also with a cut-through endorsement, related to a facility to fund the film "The Crew." Care must be taken to avoid confusion, in that the present policies, each of which relates to a specific film, are referred to as "contingent extra expense" policies.. These contingent extra expense policies are very similar to the Litto cash flow policy, rather than to the Litto contingent extra expense policy.

[11] In Schlumberger, the Supreme Court of Texas held that the fraud and nondisclosure defenses (which had gone to jury verdict in favor of the Swanson defendants based on fraud in the inducement) were barred by the following broad disclaimer clause:

> [E]ach of us [the Swansons] expressly warrants and represents and does hereby state ... and represent ... that no promise or agreement which is not herein expressed has been made to him or her in executing this release, and that **none of us is relying upon any statement or representation of any agent of the parties being released hereby. Each of us is relying on his or her own judgment** and each has been represented by Hubert Johnson as legal counsel in this matter. The aforesaid legal counsel has read and explained to each of us the entire contents of this Release in Full, as well as the legal consequences of this Release ....[emphasis in original].

There was no statement that the Swansons had made their own investigation.

The court held:

> [A] disclaimer, where the parties' _intent_ is clear and _specific_, should be effective to negate a fraudulent inducement claim. As an example, a disclaimer of reliance may conclusively negate the element of reliance, which is essential to a fraudulent inducement claim.[emphasis added].

Thus, the Texas court viewed the broad disclaimer of reliance as a "specific" disclaimer, even though it did not expressly delineate the precise subject matter that was later claimed to have been misrepresented.

7

As discussed more fully below, New York law as it has developed since <u>Danann Realty Corp. v Harris</u>, 5 NY2d 317 (1959), permits, in appropriate circumstances, enforcement of general merger clauses in contracts negotiated between sophisticated business entities, no longer requiring the delineation described in <u>Danann</u>. Moreover, in <u>Gaidon v Guardian Life Ins. Co. of America</u>, 94 NY2d 330 (1999), the Court of Appeals gave effect to boilerplate general merger clauses, thereby shielding the insurers from common-law fraud claims, even though the conduct was so deceptive as to support statutory consumer fraud claims.

The use by the Texas Supreme Court in <u>Schlumberger</u> of the term "specific" for the disclaimers there at issue, is consistent with the arguments presented to the Court of Appeals in <u>Gaidon</u>.

As described in insurer Guardian's Brief in <u>Gaidon</u>, the policy clauses stated:

> The entire contract consists of this policy and the attached application.
>
> The actual provisions set forth the full details and conditions of this policy, only the actual provisions will control.
>
> Only the President, a Vice President, or the Secretary of Guardian may make or modify this policy. No agent has the authority to change this policy or to waive any of Guardian's requirements, no agent may waive an answer to any question in the application. Guardian will not be bound by any promise or statement made by any agent or other person except as stated above.

In addition, the applications stated, above the signature line:

> I (We) agree:
>
> (a) that this application (Parts I and II, if any) and any supplement to the application [if required] shall form a part of any policy issued; and
>
> (b) that no information acquired by any representative of the Company shall bind the Company unless it shall have been set out in writing in the application; and
>
> (c) that only the President, a Vice President, or a Secretary of the Company has the authority to bind the Company by any promise or statement or to waive or modify any of the Company's

8

**COLLATERAL ESTOPPEL**

Chase contends that AXA and GS are barred by collateral estoppel as to the efficacy of the disclaimers. Contrary to AXA and GS' contentions, they had a full and fair opportunity to litigate the effect of the disclaimer clauses in the prior actions.[12] However, the efficacy of the disclaimers is a question of law, not of fact, and therefore collateral estoppel does not apply, see, American Home Assur. Co. v International Ins. Co., 90 NY2d 433 (1997); Avon Development Enterprises Corp. v Samnick, 286 AD2d 581 (1st Dept 2001).

The First Department's decisions stand as stare decisis as to many of the issues raised in the present motion, both as to the construction of policy language and as to the legal principles applicable to such clauses in general. Many of the key legal issues raised on this motion were raised unsuccessfully by the insurers before the First Department in the appeals in Litto and J&M. Therefore, in adjudicating the motion it is necessary to apply the binding precedent of those decisions as stare decisis.

However, merely because Chase obtained effective clauses in the J&M and Litto policies does not, ipso facto, mean that the disclaimer clauses in the present policies are equally effective.

---

    requirements.

In support of the insurers' position, the amicus brief of the Business Council of New York State, argued, at 9-10, that these clauses were "specific disclaimers" within the meaning of Danann, citing Citibank, N.A. v Plapinger, 66 NY2d 90 (1985), rearg denied 67 NY2d 647 (1986), for the proposition that

> The merger and integration clauses and "no authority" provisions set in clear, crisp language that the policy was the "entire contract" and that no change could be made, except in a writing signed by a person specified by the insurer. These provisions consist of a "specific disclaimer" within the rule this Court set down in [Danann] [emphasis added].

[12]Inter alia, the effect of the disclaimer clauses on the claims asserted was a matter of law, litigable at the Appellate level.

9

Each case turns on the specific contractual language and the specific allegations made in that case.

Chase's moving papers mischaracterize one of the clauses in the present policies, describing it as having content that, on its plain face, it does not. While at pp 5-6 and 13, Chase accurately quotes the Fraud Exclusion clause, at page 14 of its moving memorandum, Chase asserts that "the fraud exclusion provides that the only information that the insurers relied upon is contained [in] Section 1 of the Questionnaire." But the clause does not so provide. Rather, it acknowledges that

> the only information <u>that Distributor has provided</u> upon which insurers are relying is contained in Section 1 of the Questionnaire [emphasis added].

The clauses in <u>J&M</u> and in the contingent extra expense policy in <u>Litto</u> are too dissimilar to support the contention that the affirmances in those cases stand generally as stare decisis that the present clauses bar the fraud claims.[13] There is no clause in the present policies that is

---

[13]In comparison to the present policies, the comparable clause in the contingent extra expense policy in <u>Litto</u> provided:

> This policy will not indemnify the Insured from any loss arising out of any fraud, misrepresentation, or concealment by the Insured or any employee of the Insured, <u>it being acknowledged that the Insured did not provide any information prior to the issuance of this Policy other than the Loan Agreement</u>. This exclusion shall not limit, impair or affect the disclaimers set forth in "General Conditions - Truth of Statements" and "Revenue Analysis" herein, the terms of which are intended to supersede this exclusion to the extent set forth in those clauses [emphasis added].

In <u>J&M</u>, the comparable clause read:

> Any fraud, misrepresentation or concealment against the Insurers by the Insured, any employee of the Insured, or the Production Company, or any employee of the Production Company, it being acknowledged that the only information that the Production Company has provided upon which the Insurers are relying is contained in Section 1 of the Questionnaire. This exclusion shall not in any way limit, impair or affect the disclaimers set forth in

10

comparable to the clause in the contingent extra expense policy in <u>Litto</u> acknowledging "that the Insured did not provide any information prior to the issuance of this Policy other than the Loan Agreement."

**LITTO CASH FLOW CLAUSES**

However, the clauses in the <u>Litto</u> cash flow policy, and the allegations made in that case, are similar to the present policies and allegations.[14] Indeed, to the extent there are differences, the present clauses are even stronger than those in <u>Litto</u>.

While the cash flow policy is governed by Texas law, the First Department's holding reflects its view that the clauses are effective under both New York and Texas law for essentially the same reasons. In addition, several of the contentions raised by the insurers on this motion, were litigated and impliedly rejected by the First Department in both <u>J&M</u> and <u>Litto</u>.

---

> "Conditions Precedent - Truth of Statements" and "Revenue Analysis" herein, the terms of which are intended to supersede this exclusion.

Thus, like the present clause, it did not contain an express statement that Chase did not provide any information prior to the issuance of the policy other than that specified. However, the Revenue Analysis clause in <u>J&M</u> provided:

> Insurers acknowledge that they have not relied upon any revenue analysis performed by the Insured or its agents. In addition, Insurers acknowledge that in making their underwriting decision they have relied upon their own advisors or credit analysis and revenue projections and that <u>as between the Insured and the Insurers, the Insurers have not relied on any information other than as contained in Section 1 of the Questionnaire and in the Loan Agreement</u>. Any revenue analysis or financial projection for the Film Production upon which Insurers are relying were prepared for them by their agents or independent contractors and not by the Insured or any of its agents and the Insured shall have no liability whatsoever for any such revenue analysis or financial projection. Insurers acknowledge that they and the Risk Manager as their risk manager have made whatever independent investigation they deemed appropriate in assessing the risks in underwriting this Policy [emphasis added].

[14]A comparison of the two sets of clauses is included as Appendix D to this decision.

11

However, even were that not the case, I would conclude that as a matter of New York law, the present clauses bar the present claims.

## THE CLAUSES

The clauses in question are not merely "disclaimer" clauses in the strict sense. They contain exculpatory and waiver provisions as well. For the sake of simplicity, however, I refer to the clauses collectively as "disclaimer" clauses.

### Truth of Statement

The Truth of Statement clause provides:

> The Company [the borrower] has truthfully completed Section 1 of the Questionnaire to the best of its knowledge. Any reference in the Questionnaire to the Revenue Participation Agreement is qualified by reference to such agreement, a copy of which has been provided to the Lead Insurers. In completing the Questionnaire, the Company and/or the Insured may rely on certificates of third parties to the extent such reliance is disclosed on the Questionnaire; it being acknowledged that Distributor has not and is not providing any such certificates.
>
> Any misstatement in any part of the Questionnaire (other than Section I thereof) by any party (other than the Insured) providing information for the purpose of completing the Questionnaire shall not be the responsibility of the Insured or the Distributor and will not constitute a ground for avoidance of the insurers' obligations under or cancellation of the policy. In addition, the failure of the Company to update Section I of the Questionnaire for a Film Production shall not be the responsibility of the Insured or the Distributor or constitute a ground for avoidance of the insurers' obligations under, or the cancellation of, the Policy. Notwithstanding the obligations of the Insured under the Due Diligence Clause (which obligation is not a condition precedent), the Insured or the Distributor will not have any duty or obligation to make any representation, warranty or disclosure of any nature, express or implied (such duty and obligation being expressly waived by the insurers) and shall have no liability of any nature to the insurers for any information provided by any other parties, and any such information provided by or nondisclosure by other parties including, but not limited to, Heath (other than Section 1 of the Questionnaire) shall not be a ground for avoidance of the insurers' obligations under or the cancellation of the Policy.

12

Thus, the Truth of Statement clause relieves Chase of responsibility for any "information provided by or nondisclosure" by "any other parties," except as to Part 1 of the Questionnaire, and relieves Chase of any obligation to speak. It does not, however, expressly relieve Chase of responsibility for Chase's own affirmative misrepresentations.

The insurers attempt to restrict the facial scope of this clause in four ways:

A. They contend that the clause applies only to the Questionnaires;

B. They contend that the clause applies only to the Due Diligence clause;

C. They contend that the clause applies only to representations/omissions occurring after the inception of the policies;

D. They contend that the scope of the clause depends on who is the source of the information, not on who presents it. That is, they contend that the clause does not encompass misrepresentations by Chase that were "merely communicated" by or passed through the third-party defendants.

**Truth of Statement - Only to Questionnaires**

On its plain face, the heading of the section is "Truth of Statement," not "Questionnaire."

The first five sentences address Chase's responsibilities regarding the Questionnaire. In contrast, the sixth sentence provides that "the Insured or the Distributor will not have any duty or obligation to make <u>any</u> representation, warranty or disclosure <u>of any nature</u>, express or implied (such duty and obligation being expressly waived by the insurers) and shall have no liability of any nature to the insurers for <u>any</u> information provided by any other parties [emphasis added]."

The sixth sentence includes a reference to the Due Diligence clause, a reference that would be meaningless if the sole scope of the Truth of Statement clause were the Questionnaire. If the sixth sentence were limited in scope to the Questionnaire, the final portion (commencing with "and shall have no liability of any nature...") would be superfluous.

AXA contends that the Fraud Exclusion clause demonstrates that the Truth of Statement and Revenue Analysis clauses are limited in scope and do not preclude AXA's fraud-based defenses. AXA asks, "Otherwise, why would the parties have included an exclusion for fraud,

13

misrepresentation and concealment by Chase while at the same time rendering the exclusion meaningless?"

However, as discussed more fully below in connection with the affirmative defenses based on the Fraud Exclusion clause, the Truth of Statement and Fraud Exclusion clauses perform different functions in the policies. The policies provide coverage as defined in the policies; the Fraud Exclusion clause carves out and excludes from that coverage, those contingent extra expenses that result from the fraud of the insured and other persons there mentioned.

That is conceptually very different from the kind of fraud encompassed in the Truth of Statement clause, which includes misrepresentations and omissions that would otherwise provide grounds for "avoidance of the insurers' obligations under or the cancellation of the Policy." If a loss is within the scope of a fraud exclusion, the reason that the insured cannot recover under the policy is not that the policy is voided or canceled due to the fraud, but merely because the loss is not within the scope of the coverage that the policy provides.

**Truth of Statement - Only to Post Policy**

The disclaimer in the Truth of Statement clause states that "[n]otwithstanding the obligations of the Insured under the Due Diligence Clause" -- which expressly take effect only after the "date hereof" of the policies -- "the Insured ... <u>will not have</u> any duty or obligation to make any representation, warranty or disclosure of any nature ... <u>and shall have</u> no liability of any nature for any information provided by any other parties [emphasis added]."

The insurers contend that the use of the word "will" means that this clause applies only in futuro: i.e., that it applies only to omissions and misrepresentations after the effective date of the policies, which is when the Due Diligence clause becomes applicable.

I rejected this same contention in <u>Litto</u>.[15]

---

[15]This same language was used in the <u>Litto</u> cash flow policy, which provided:

> Subject to the obligation of the Insured under "GENERAL CONDITIONS - Due Diligence Clause," the insured <u>will not have</u> any duty or obligation to make any representation, warranty or disclosure of any nature, express or implied (such duty and

14

>obligation being expressly waived by the Insurer and the Re-insurers) <u>and shall have no</u> liability of any nature to the Insurer and the Re-Insurers for any information provided by any other parties and any such information provided by or nondisclosure by other parties and any such information provided by or nondisclosure by other parties including, but not limited to, Stirling Cooke Brown (unless provided to it by the Insured in writing for presentation to the Insurer and the Re-Insurers) shall not be a ground for avoidance of the Insurer and the Re-Insurers' obligations under the Policy or the cancellation thereof [emphasis added].

My May 23, 2002 decision and order in <u>Litto</u> is reported in edited form at 193 Misc 2d 580 (Sup Ct, NY County 2002). Appeal from that order was subsumed in the <u>Litto</u> appeal adjudicated at 304 AD2d 423 (1st Dept), <u>lv denied</u> ___ NY2d ___ (2003). Page references herein to my May 23, 2002 decision and order are to the original, unpublished version.

I held, at 19 n 26,

>the provision in the Truth of Statement clause in the cash flow policy that, with certain provisos, "the Insured will not have any duty or obligation to make any representation, warranty or disclosure of any nature, express or implied (such duty and obligation being expressly waived by the Insurer and the Re-Insurers) ...," relieves Chase of any obligation to communicate.

On appeal, AXA Re argued the same construction that AXA now urges:

>When the sentence is read as a whole, it is clear that Chase, which "will not have" any duty of disclosure, is relieved of a disclosure duty only prospectively; i.e., in connection with film declarations made under the Policy after the Policy is issued, whereas insurers only waive as a "ground for avoidance" such defenses as arise from misinformation from "other parties." (AXA Re's Brief on Appeal, at 51 n 20).

Whether the First Department's affirmance constitutes a rejection of this contention, or whether it is based on the principle that, even absent an express waiver of an obligation to speak, there is no duty to speak in the absence of a fiduciary or special relationship, the First Department's holding in <u>Litto</u> stands as stare decisis that Chase's alleged omissions in <u>Litto</u>, which are similar to those asserted here, did not violate any duty owed to the insurers.

15

It appears that an AXA entity made the same argument in the British Court of Appeal, in HIH Cas. and General Ins. Ltd. v Chase Manhattan Bank, 2 Lloyd's Rep 483 [CA 2001], involving the same clause. The court rejected that argument.[16] It was evidently abandoned before the House of Lords, see, HIH Cas. and General Ins. Ltd. v Chase Manhattan Bank, [2003] 2 Lloyd's Rep 61.[17]

---

[16]The court held, at ¶ 127:

> This submission is a nice conceit, but in my judgment cannot be sustained. The language of the whole clause from beginning to end, with the single exception of the reference to the due diligence clause, is redolent of the period before the inception of contract. The second half of the clause is just too elaborate for any concern relating to the period post-contract. The reference to the questionnaire again in phrases 7 and 8 ties the whole clause together and shows that it is not divided into pre- and post-contractual periods. The "will" of phrase 6, which becomes "shall" in phrases 7 and 8, is not a future tense but the mandatory language of contract; it is also found in phrases 3 and 4. The reference to Heaths, the agent to insure, in phrases 7 and 8 is also more compatible with the period before the inception of contract. The reference to the due diligence clause is a natural precaution, given the width of the wording which follows.

[17]As stated by Lord Hoffman, in that case:

> [t]he insurers admit that the general intention behind the truth of statement clause is to prevent Chase from losing the benefit of the policies because it failed to disclose material circumstances which it was 'deemed to know' for the purposes of its own obligations under [applicable British statute] or because of non-disclosures or misrepresentations on the part of its agents in general and Heaths in particular. The main purpose, it was said, was to 'distance' Chase from responsibility for anything said by or known to the other players [emphasis added].

16

In <u>HIH</u>, unlike the present case, the insurers did not assert that Chase's own conduct was fraudulent. Rather, they sought to charge Chase with responsibility for Heath's alleged fraud. Ultimately the House of Lords concluded that under British law, the disclaimers were ineffective as to actual fraud by Heath, British law differing from New York law. However, it is instructive that the discussion of the clause viewed it as including within its scope representations and omissions occurring prior to the inception of the policies.[18]

I conclude that the scope of the clause includes representations and omissions that would otherwise support the defense of fraud in the inducement. But even if the use of the word "will" could be construed to mean that the clause applies only to representations and omissions after the effective date of the policies, the word "shall" cannot be so construed. Thus, even if the "will" part of the clause (duty to speak) is discounted, the "shall" part of the clause (responsibility for misrepresentations/omissions of others) would remain.

---

[18]Thus, Lord Bingham of Cornhill stated:

> Read literally, those words [in clause 7] would cover liability [including avoidance of the policy] for fraudulent misrepresentation, or deceit. If Chase's security for its loan is to be cast-iron, the policy must stand even if induced by the deceit of Heaths.

Lord Hobhouse of Woodborough stated:

> This provision is to be given full effect to. The duty which would otherwise rest upon the assured to disclose fully all material circumstances is negatived.

Lord Scott of Foscote stated:

> The language used in the truth of statement clause was in very wide, all-embracing, terms. Phrase 6 is expressed to absolve Chase from "any duty or obligation to make any representation, warranty or disclosure of any nature."

17

Even in the absence of a "no obligation to speak" clause, Chase would still have no obligation to speak. "If there is concealment without an actual misrepresentation, estoppel is appropriate only where there is a fiduciary relationship that 'gave the defendant[s] an obligation to inform [plaintiff] of facts underlying the claim,'" Niagara Mohawk Power Corp. v Freed, 288 AD2d 818 (4th Dept 2001); see also, e.g., Shomar Constr. Svcs. Inc. v Lawman Constr. Co., 262 AD2d 956 (4th Dept 1999). The insurers have failed to plead facts sufficient to support such a relationship. Accordingly, even if the "will" portion of the Truth of Statement clause could be construed as the insurers contend, it would not change the result.

### Truth of Statement - Only Relates to Due Diligence Clause

The contention that the Truth of Statement clause relates only to the Due Diligence clause, finds no support in the policies. The reference to the Due Diligence clause merely ensures that the Due Diligence clause cannot be construed to override the Truth of Statement clause.

### Truth of Statement - Source Not Deliverer

The insurers contend that the clause does not encompass misrepresentations by Chase that were "merely communicated" by or passed through the third-party defendants. This contention is not supported by the plain language of the clause, which waives responsibility of Chase for the truth of "any information provided by any other parties [emphasis added]," and contains no such limitation.

### Revenue Analysis Clause

The Revenue Analysis clause provides:

> Insurers acknowledge that they have been informed by the Insured that it has neither requested nor received nor intends to request any projections from the Distributor for the Film Production. In addition, insurers acknowledge that the insurers have received no projections from the Insured, the Distributor or any of their respective agents and that such parties did not participate in the preparation or compiling of information of, or review or approve, Section II or III of the Questionnaire. Any revenue analysis or financial projections for the Film Production upon which insurers are relying on [sic] were prepared for them by their agents or independent contractors and not by the Insured, the Distributor or their respective agents, and the Insured, the Distributor, and their

18