way of saying that as to the seller in that case -- the only party involved -- no representations ever existed. That being so, there could be no reliance. There was nothing upon which to rely"). [19]

## RMs Not Chase's Agents (The "Non-Agency" Clause)

Under MISCELLANEOUS the policies provide:

> Insurers understand and agree that ICE Media Limited, Peter Hoffman, Graham Bradstreet and Company are not agents or representatives of the Insured or Distributor and that Heath is not an agent or representative of the Distributor, all with respect to the Questionnaire, this Policy or otherwise.

This clause precludes the insurers from contending that representations by the RMs were made on behalf of Chase, or that Chase is responsible for the RMs' alleged omissions.

## "Agreements Irrevocable" Clause

Also under MISCELLANEOUS, the policies provide:

> Lead Insurers and the other insurers agree that the agreements, representations, warranties and confirmations set out in this Policy are irrevocable and shall enure to the benefit of the respective officers, employees and representatives of Distributor and its affiliates, each of which are declared to be third party beneficiaries with respect to the matters contained herein.

This clause precludes the insurers from disavowing their stipulation in the above quoted "non-agency" clause, and thus from basing claims of fraud against Chase on the alleged misrepresentations/omissions of the RMs. In addition, as discussed more fully below, this clause precludes the insurers from basing their claims of fraud on clauses in the policies that they mischaracterize as "representations" by Chase.

## Dereliction of Duty

---

[19]Thus, as discussed more fully below, it precludes the insurers from claiming reasonable reliance on any representations concerning the expectation that the films would not result in claims. This includes the alleged representations that no claims were expected, that the policies were not expected to be working facilities, and that Chase viewed the policies as a secondary source of security. Other than the insurers' attempt to characterize certain policy language as a representation by Chase, discussed below, no other affirmative misrepresentations by Chase itself are alleged with the requisite specificity.

20

Under MISCELLANEOUS the policies provide:

> Insurers understand and agree that no dereliction of duty by the Lead Insurers or their designated representatives or breach of their obligations by the Lead Insurers or their designated representatives at any time under this Policy shall affect the rights of the Insured under this policy.

Chase contends that the RMs are "designated representatives" of the insurers within the meaning of this clause. Nothing in the policies or the moving papers establishes that the RMs were the "designated representatives" within the unambiguous scope of this clause.

Chase's reply papers include parol evidence that tends to support the contention that the "designated representatives" in the clause refers to the RMs. As movant relying on the policy clauses, it is Chase's burden to establish in its moving papers that the clause unambiguously supports Chase's motion. Here, at best, the clause is ambiguous, and the ambiguity cannot be resolved on this motion based on material supplied, for the first time, in reply papers, thus precluding the insurers from responding with such other parol evidence as may support their position.

However, Chase's inability to rely on this clause on this motion does not affect the result. The affirmative defenses/counterclaims at issue are based on alleged misrepresentations and omissions for which the insurers attempt to hold Chase responsible. As discussed above, the "No Agency" clause expressly provides that the RMs are not Chase's agents, and therefore Chase cannot be responsible for any omissions or misrepresentations of the RMs. Moreover, under both the Truth of Statement clause and common-law principles, Chase had no affirmative duty to speak, and in the absence of such an agency relationship, had no responsibility for misstatements or omissions of others, including the RMs.

## RMR Disclaimers

In addition to the policy disclaimers, there are disclaimers in, inter alia, the May and November 1998 Risk Management Reports ("RMRs") themselves:

> Nothing herein constitutes a warranty or representation either by the Insured, Paramount Pictures Inc. (Paramount), Heath Insurance Broking Limited (HIBL) or ICE.

Such a disclaimer is comparable to the disclaimers in the illustrations in Gaidon, supra, which were held sufficient, in combination with the general merger clauses, to preclude the lay purchasers in Gaidon from asserting claims of fraud, even though the insurers there knew the illustrations and presentations were misleading. The statement in the RMRs that "[n]othing herein constitutes a warranty or representation" precludes reasonable reliance on any "representation" contained in them.[20]

---

[20]To the extent that language in China Trust Bank of New York v Standard Chartered Bank, PLC, China Trust Bank of New York v Standard Chartered Bank, 1998 WL 574391 (SD NY 1998), is to the contrary, I decline to follow it. In that case, plaintiff, suing for fraud, sought dismissal of an affirmative defense that was based on a disclaimer contained in the allegedly fraudulent representation. Denying the motion to dismiss, the court held that it "need not decide the legal effect of the disclaimer at this time," holding that reliance should be determined by the trier of fact after discovery. The court stated that "[a] perpetrator of fraud ought not be able to immunize itself from liability for its misrepresentations by publishing a disclaimer in the instrument by which the fraud was perpetrated," citing a 1981 decision of Supreme Court, Suffolk County, and a 1987 decision of Civil Court, New York County.

The former, Malerba v Warren, 108 Misc 2d 785 (Sup Ct Suffolk County 1981), modified 96 AD2d 529 (2d Dept 1983), cited Bridger, supra, Sabo, supra, and Tyler Realties v Roper, 17 Misc 2d 765 (Sup Ct, Putnam County, 1959), which was decided March 23, 1959, just 18 days after Danann, and which does not cite Danann. Moreover, no money damages were granted on the fraud claim; the equitable relief granted was available on other theories as well. The Appellate Division did not address the fraud issues. No reported case appears to have cited Malerba for this proposition.

The second case cited by China Trust Bank, is Newmark & Co. Real Estate, Inc. v C & A Trimming Corp., 134 Misc 2d 371 (Civ Ct, NY County 1987). The sole authority cited for the proposition at issue is Bridger. The dispute turned on a boilerplate escalation of rent clause in a lease that provided that a statement consisting of "data prepared for the Lessor by a firm of Certified Public Accountants" will be furnished to the tenant which statement shall compute the additional rent and which "shall constitute a final determination ... of the real estate taxes and operating expenses for the period represented thereby." The court held that such a clause "is nevertheless subject to the right of the tenant to demonstrate, in a plenary action, that the computation was made in error or was made fraudulently." Thus, the crux of the action was not a claim for fraud, and the relief available to the tenant was available regardless of whether or not fraud was involved.

Newmark & Co. was adjudicated by Hon. Charles E. Ramos. Notably, by order dated November 1, 2001, in The Chase Manhattan Bank v New Hampshire Ins. Co., 600996/00, an

22

## Absence of Revenue Clause

The policy provides under MISCELLANEOUS:

> Insurers confirm that the absence of Revenue in circumstances
> which would not otherwise entitle insurers to reject any claim will
> not give insurers grounds to avoid this Policy or to reject any
> claim.

Thus, the policy contemplates that there might be an absence of revenue to repay the loans. The policy thus contemplates that the shield provided by the Truth in Statement clause extends to circumstances where there is no revenue generated by the film to repay the loan.

## General Merger Clause

Also under MISCELLANEOUS, the policies contain a general merger/integration clause[21]:

> This Policy supersedes all previous discussions and understandings
> between the parties hereto and this Policy together with the
> Schedules attached hereto constitutes the entire understanding of
> the parties.

I conclude that even in the absence of the other disclaimer clauses, in the particular facts of this case, this clause itself suffices to defeat the insurers' allegations of fraud in the inducement.

---

action involving claims and issues similar to the present case, Justice Ramos denied New Hampshire's renewed motion to amend its answer to assert a counterclaim for fraud, holding, inter alia, that such a claim was barred by the "express and detailed disclaimers, as were included in the agreements at issue," citing Plapinger and National Union Fire Ins. Co. of Pittsburgh, Pa. v Robert Christopher Associates, 257 AD2d 1 (1st Dept 1999).

Moreover, in Gaidon, supra, decided after China Trust, the Court of Appeals gave effect to disclaimers unilaterally inserted into a statement, precluding reasonable reliance on the statement.

[21]The Litto cash flow policy did not contain a general merger/integration clause, other than to the extent that the Truth of Statement clause functioned as such.

23

Distinguishing <u>Danann Realty Corp. v Harris</u>, 5 NY2d 317 (1959), the insurers contend that a general merger clause is ineffective as to any subject matter not specifically delineated as being disclaimed. However, subsequent case law, most notably the Court of Appeals' holding in <u>Citibank, N.A. v Plapinger</u>, <u>supra</u>, 66 NY2d 90 (1985), <u>rearg denied</u> 67 NY2d 647 (1986), has modified the rule, and even a general merger clause may bar claims of fraud in the inducement as between sophisticated business entities negotiating at arms length.[22] Moreover, the Court of Appeals in <u>Gaidon</u> allowed a boilerplate general merger clause, combined with disclaimers in certain written materials, to bar claims of fraud by lay purchasers of insurance policies based not only on misleading written materials but on oral misrepresentations as well.

The disclaimer in <u>Plapinger</u> did not specifically delineate the representations being disclaimed. The Court of Appeals held that:

> Here <u>it cannot be said</u>, as in <u>Danann</u>, that the defendants have "in the plainest language announced and stipulated that [they were] not relying on any representations as to the very matter [the additional line of credit] as to which [they] now [claim they were] defrauded" (5 NY2d at p 320) [emphasis added].

Nevertheless, the Court of Appeals held that it was "sufficiently specific" to bar what would otherwise be cognizable claims of fraud in the inducement:

> We agree with [the dissent in the Appellate Division] that <u>defendants' affidavits contained evidence, uncontradicted by plaintiffs, sufficient to raise a triable issue concerning fraud in the inducement</u>, but also agree with Special Term and the Appellate Division majority that <u>the language of disclaimer in the guarantee is sufficiently specific</u> to foreclose as a matter of law the defenses and counterclaims [fn omitted] based on fraud, negligence or failure to perform a condition precedent asserted against plaintiff banks, under the rule of <u>Danann Realty Corp. v Harris</u> (5 NY2d 317) [emphasis added].

---

[22] <u>Sabo v Delman</u>, 3 NY2d 155 (1957), cited by the insurers, was decided prior to both <u>Danann</u> and <u>Plapinger</u>.

24

Thus, the court used the word "specific" in the same sense as did the Supreme Court of Texas in Schlumberger, and as urged by the amicus brief in Gaidon, not in the "delineation" sense of Danann.  As the court explained in Plapinger:

> here we do not have the generalized boilerplate exclusion referred to by the commentators.   Rather, following extended negotiations between sophisticated business people, what has been hammered out is a multimillion dollar personal guarantee proclaimed by defendants to be "absolute and unconditional."
>
> ***
>
> Though not the explicit disclaimer present in Danann, the substance of defendants' guarantee forecloses their reliance on the claim that they were fraudulently induced to sign the guarantee by the banks' oral promise of an additional line of credit.   To permit that would in effect condone defendants' own fraud in "deliberately misrepresenting [their] true intention" (Danann Realty Corp. v Harris, 5 NY2d, at p 323) when putting their signatures to their "absolute and unconditional" guarantee [emphasis added].

Following Plapinger, both New York and federal courts applying New York law have enforced general merger clauses to bar assertions of fraudulent inducement.[23]

JPMorgan Chase Bank v Liberty Mutual Ins. Co., 189 F Supp 2d 24 (SD NY 2002), is not to the contrary, even assuming, arguendo, that the case correctly applies New York law.[24]

The facts in JPMorgan were highly unusual.  As the court explained in Valley Natl. Bank v Greenwich Ins. Co., supra, 254 F Supp 2d 448  (SD NY 2003), discussing JPMorgan:

> JPMorgan involved an unusual case of fraud at the extreme, embodied in the deceptive business practices of the now defunct Enron Corporation.  In JPMorgan, the sureties believed that they were insuring a sale of assets, and, more specifically, the delivery by Enron of gas and oil. Instead, Enron had created a scheme

_____

[23]See, e.g., Nancy Neale Enterprises, Inc. v Eventful Enterprises, Inc., 238 AD2d 322 (2d Dept 1997); Bank Leumi Trust Co. of New York v Block 3102 Corp., 180 AD2d 588 (1st Dept), lv denied 80 NY2d 754 (1992); Marine Midland Bank, N.A. v Maloy, 174 AD2d 994, 994 (4th Dept 1991); Valley Natl. Bank v Greenwich Ins. Co., 254 F Supp 2d 448 (SD NY 2003) (surety bond); Minuteman Press Intl., Inc. v Matthews, 232 F Supp 2d 11 (ED NY 2002).

[24]The court in JPMorgan made no mention of the Court of Appeals' holding in Gaidon, and does not appear to have been cited by any reported New York State decision.

whereby it sold gas and oil to Mahonia for a lump sum paid all at once (and lent to Mahonia by JPMorgan), then repurchased the gas and oil from another company, which had the same director and shareholders as Mahonia, for a larger sum that was paid over time. This scheme created a simple loan from JPMorgan to Enron, but by disguising it as a sale of assets, Enron could book it as revenue and induce the sureties to issue bonds that guaranteed the loans would be repaid, which the sureties would not have been able to do under New York law.

Distinguishing JPMorgan the Valley court explained:

By contrast, the instant case involved a loan of money from Valley to National to finance insurance premiums. While it is questionable whether the money was ever used to actually purchase the insurance premiums, this transfer of the Funds did occur exactly as described in the Transaction Documents, with money being transferred from Valley to National Program Services, Inc. ("NPS"), which served as National's insurance broker.

In JPMorgan, the court held:

nothing in the broad disclaimer language of the Bonds excludes the defense--whether characterized as a defense of fraudulent inducement or fraudulent concealment--that the insured arrangements were a total sham whose reality was totally concealed from the Sureties.

Here, in contrast, it is undisputed that the loan funds were distributed as specified by the documents supplied to the insurers. The Revenue Participation Agreement, which contains the terms that the insurers contend were unfair to them because they did not provide the insurers with adequate protection, were not merely exhibited to them, but are annexed to the policies themselves. There is no suggestion that the involvement of the films was a sham. The credits of the films include talents of considerable recognition, including, without limitation (and in no particular order) Patrick Stewart, Richard Gere, John Goodman, Tommy Lee Jones, Emily Watson, Martin Scorsese, Nicholas Cage, Matthew Broderick, and John Travolta. While the insurers complain about the manner in which the financing was structured, and of the size of the fees charged by various participants, they do not contend that either the structure or the size of the fees were concealed from them. In fact, it appears that the policies themselves contained a

26

table entitled Calculation of Premium and Risk Manager's Fee, which showed the net amount to be paid to Heath, calculated from the gross premium, deduction for federal excise tax, brokerage commission for Heath, and Risk Manager's Fee. [25]  The insurers' dissatisfaction with the success of the films, or with the services of the RMs, or with what they now claim is the unfairness of the terms, or even their contention that they were misled as to the likelihood of claims, does not transmogrify the underlying contracts into something fundamentally different than what they were represented to be.[26]

The court's holding in JPMorgan regarding the disclaimer was based on the highly unusual facts in that case.  As the court explained in Valley Natl. Bank v Greenwich Ins. Co., supra, describing JPMorgan:

> As part of its findings, the court held that the broad disclaimers in
> the bonds--which seemingly made the bonds enforceable regardless

---

[25] While not a basis for my decision, I note that motion papers filed in Heath's motion to dismiss the third-party actions against it, include Bassett's deposition testimony that the RMs were appointed only if the insurers agreed, and that the risk management fees were agreed to by Bradstreet and the insurers.  Bassett testified that the fees were proposed by Bradstreet to the lead underwriters, who agreed to the fees as a percentage of the sum insured.

[26] The insurers' briefing seems to imply that because improper conduct was imputed to JPMorgan in that case, such impropriety should somehow be imputed to it in the present case. That premise is without support, much as it would be improper for me to impute wrongdoing to New Hampshire in the present case based on A.I.G'.s conduct in connection with Brightpoint, Inc., a subject of recent SEC action relating to a transaction worked out between A.I.G. and Brightpoint in 1998, around the same time that the present policies were issued.  According to the New York Times web article posted on September 11, 2003, A.I.G. played a "role in fashioning and selling what the [SEC] referred to as an 'insurance' product that helped Brightpoint overstate its earnings by 61 percent," thus misleading investors.  According to the Times' article posted September 12, 2003, the SEC asserted that it imposed a proportionately more severe penalty on A.I.G .than had been imposed on JPMorgan because:

> S.E.C. investigators said they were infuriated both by what they
> regarded as the initial deception and by A.I.G's withholding of
> documents.  A.I.G. eventually turned over the requested material,
> commission documents show. But at one point, the commission's
> account of the investigation indicates, A.I.G. misled investigators
> by providing an explanation that two months later was contradicted
> by company documents.

27

of the validity of the Enron contracts--did not preclude a defense of fraudulent inducement because the alleged fraudulent arrangements were negotiated separately from the bonds at issue without the defendants present, making it virtually impossible that the defendants could have had knowledge of the purported fraud. See [JPMorgan] at 27. The court also noted that the Enron contracts themselves contained potentially material misrepresentations because they referred to the sale and delivery of commodities, which never happened. See id. at 28.

As the JPMorgan court explained:

> in Plapinger, even though the disclaimer language may have been broad and general, it was negotiated as part of the same negotiations in which, the defendants later claimed, they were orally promised an additional line of credit, so that, in agreeing to the disclaimers, the corporate officers had to know that, at a minimum, the disclaimers precluded reliance on any specific oral promises made during the defendants' negotiations with the lenders.

This key distinction is explained in Consolidated Edison, Inc. v Northeast Utilities, 249 F Supp 2d 387 (SD NY 2003). Distinguishing JPMorgan, the court held:

> As Judge Rakoff explained [in JPMorgan], because of the proximity [in Plapinger] between the disclaimer and the alleged oral representations, "in agreeing to the disclaimers, the corporate officers had to know that, at a minimum, the disclaimers precluded reliance on any specific oral promises made during the defendants' negotiations with the [plaintiffs]." JPMorgan, 189 F.Supp.2d at 27. Similarly, the disclaimers in the Confidentiality Agreement in this case explicitly addressed the information provided to Con Edison during due diligence and Con Edison must have known, in agreeing to that provision, that it was giving up the right to rely on the August Policies turned over during due diligence[27] or any alleged oral statements made during that same period unless Con Edison chose to include specific representations and warranties in the subsequent definitive agreement that covered those alleged representations.

---

[27]This type of pre-contractual due diligence should not be confused with the post-contractual due diligence required by the present Due Diligence clause.

28

The efficacy of a nondelineated general clause to bar claims of fraud is demonstrated further by the Court of Appeals' decision in <u>Gaidon v Guardian Life Ins. Co. of America</u>, 94 NY2d 330, <u>supra</u>, in which general boilerplate clauses were held to shield the insurers from fraud claims by lay purchasers of "vanishing premium" life insurance.  The fraud alleged was in the form of affirmative misrepresentations by the insurers' agents, both oral and through printed illustrations, that led the lay purchasers to believe that after payment of a small number of large premium payments, further premium payments would be self-funded by the policy.

The insurers in <u>Gaidon</u> relied on disclaimer and merger clauses[28], contained in policies that were not negotiated and that were not exhibited to the purchasers at the time of the sales presentations, but which were sent to the purchasers subsequently, on a "take it or leave it" basis.  As described by the court, the insurers:

> have directed our attention to the policies' merger clauses, which seek to confine their representations to the four corners of the policies.   They also point to the above-quoted disclaimer language [in the illustrations] stating that illustrated dividend/interest rates "are neither guarantees nor estimates of future results" or that such rates may be "higher or lower ... depending on the company's actual future experience."

While such disclaimers were contained in the written illustrations, there were no comparable delineated disclaimers in the policies relating to oral representations.  Thus, the only disclaimers as to oral representations were the general clauses in the policies.  Referring to the disclaimers in the written illustrations, the court held:

> the disclaimers, though more particularized than the merger provisions, do not speak to the true, unrevealed relationship between dividend/interest rates and the vanishing dates as represented,

and that

> [c]onsumers vary in their level of sophistication and their ability to perceive the connection between a fluctuation in dividend/interest

---

[28]<u>See</u> n 11, <u>supra</u>.

29

rates and a vanishing date, or to make the necessary arithmetic adjustments.

The court held further:

> By stating that the illustrated dividend/interest rates are not guaranteed and that they may be higher or lower than depicted, defendants made a partial disclosure. They revealed the possibility of a dividend/interest rate decline, <u>but did not reveal its practical implications to the policyholder.</u> Although they did not guarantee that interest rates would remain constant, <u>they failed to reveal that the illustrated vanishing dates were wholly unrealistic</u> [emphasis added].[29]

Nevertheless, the Court of Appeals affirmed the dismissal of the fraud claims, holding that "defendants' disclaimers, although insufficient to defeat plaintiffs' [General Business Law] section 349 claims, are sufficient to absolve them of fraud."[30]

The policies here were individually negotiated at arms length by sophisticated business entities, a fact reflected in the difference between the disclaimer clauses in the various policies that have been the subject of related litigations. (As noted above, there was no general merger clause in the cash flow policy in <u>Litto</u>.)[31] Under these circumstances, there is no reason to exempt the clause from the general rule that "courts cannot read policy provisions to be meaningless," <u>Jefferson Ins. Co. of New York v Travelers Indem. Co.</u>, 92 NY2d 363 (1998).

A comparison of <u>Gaidon</u> and the present case demonstrates striking similarities and differences, some of which are set forth in the margin.[32] I am unaware of any legal or public

---

[29]The inability of the lay purchasers to understand the implications of the material, is especially pertinent in view of the insurers' contentions herein that they were too unsophisticated to understand the material provided to them.

[30]<u>See also, Frith v Guardian Life Ins. Co. of America</u>, 9 F Supp 2d 744 (SD Tex 1998) (cited by the New York Court of Appeals in <u>Gaidon</u>, <u>supra</u>; applying Texas law; dismissing fraud claims in vanishing premium case based on disclaimer and merger clauses).

[31]It is also reflected in the clause that waives the contra proferentem rule, a rule normally favoring a construction in favor of the insured.

[32]Here: documents containing projections and analysis on which insurers contend they relied contained disclaimers stating:

30

---

> Nothing herein constitutes a warranty or representation either by the Insured, Paramount Pictures Inc. (Paramount), Heath Insurance Broking Limited (HIBL) or ICE.

and the insurers were provided with the contracts setting forth the fees and transactional structure that they now contend made it virtually certain that claims would be made on the policies. The insurers contend that, while they were provided with the underlying documentation setting forth the structure, they were too unsophisticated to understand the import of those fees and transactional structure.

Gaidon; Plaintiffs claiming fraud were laypersons. They were provided with misleading illustrations presented to them in misleading oral presentations, and the Court found that they could not be expected to appreciate the significance of the disclaimers in the illustrations.

Here: Disclaimer clauses were bargained for at arm's length between sophisticated business entities.

Gaidon: Boilerplate disclaimer clauses were placed in policies that were not provided to the lay purchasers until after they purchased the policies, and were presented to the lay insureds on a "take it or leave it" basis.

Here: Policy disclaimers expressly stated that the disclaimers would be effective against misrepresentations or omissions that would otherwise be grounds for avoiding or canceling the policies.

Gaidon: Policy disclaimers were general merger clauses. Nothing communicated to lay purchasers suggested that the general merger clauses would shield the insurer from liability for misrepresentations that would otherwise constitute fraud.

Here: Policy provisions expressly provide that the RMs are not agents of Chase.

Gaidon: Sales agents who misled the lay purchasers were agents of the insurers.

Here: Sophisticated insurers were represented by counsel.

Gaidon: No indication that lay purchasers were represented by counsel.

Here: Insurers claim they had no way of knowing what Chase and Heath knew, yet admit in their pleadings that Lloyd's syndicate and CNA were able to learn from first Phoenix Risk Manager why that Risk Manager withdrew.

Gaidon: No suggestion in decision that lay purchasers had practical means at their disposal to

31

learn the truth.

Here: According to assertions by counsel in this action, the Heath broker who participated actively in the Phoenix transaction, and was therefore necessarily familiar with Heath's alleged fraudulent concealment of Phoenix flaws and of the RMs' alleged disloyalty, acted as the lead underwriter for the lead insurer on Paramount IV transaction.

Gaidon: No indication that any of the lay purchasers employed persons who were familiar with the fraudulent nature of the vanishing premium policy sales program.

Here: The insurers contend that Chase, the RMs and Heath knew that due to the transactional structure, claims on the policies were virtually inevitable, but failed to disclose this to the insurers in order to generate fees for themselves.

Gaidon: One of the arguments presented by the purchasers was as follows:

> Senior management knew that MONY could not continue to pay more dividends than it was earning on its investments ... Given the sensitivity of vanish dates to slight variations in the illustrated dividend rate and the fact that illustrations project policy values over periods of 20 years or more, it was fraudulent for MONY to assume a dividend rate in its vanishing premium illustrations that was not supported by the Company's current experience.

> MONY recognizes that the use of exaggerated dividend rates in policy illustrations was deceptive. In its own words:

>> Deceptive sales presentations and duplicitous use of sales illustrations have probably generated more complaints of unethical agent behavior than any other activity ... What about using a policy illustration that shows excessive projected dividends or unrealistic interest rate assumptions or presenting current values as if they were guaranteed? .... While any of these ploys might help make the sale, they are all misleading and unethical.

> Senior management, however, was more concerned with generating short-term profits than the long-term consequences of MONY's actions. Throughout the Class Period, MONY's senior management was compensated, in part, on the basis of the Company's short-term financial performance.

policy principle cognizable under New York law that would provide more protection to sophisticated insurers who are charged with fraud by their lay insureds, than to insureds who are charged with fraud by their sophisticated insurers.

## INSURERS' ARGUMENTS AS TO THE SCOPE AND ENFORCEABILITY OF THE DISCLAIMERS

In addition to attempting to limit the scope of the disclaimer clauses through construction of the clauses, the insurers raise several legal arguments as to their enforceability and legally permissible scope, some of which merit discussion.

### Peculiar Knowledge

The insurers contend that under New York law, the clauses cannot extend to matters within the peculiar knowledge of the insured.[33]

---

\*\*\*

Because MONY's dividend rates were artificially inflated to levels that were not based on current experience, the illustrations portrayed a "vanish date" that would not occur even if existing conditions did not change ... [B]y virtue of MONY's surplus manipulations, the Class purchased vanishing premium policies that were not simply doomed to fail, they were dead on arrival ... Those Class Members who cannot or choose not to pay the additional cash premiums demanded by MONY have lost or will lose their insurance coverage. The 'reality of [Class members'] losses, and the purity of their outrage" was recognized by the Supreme Court.

(Brief for appellant Goshen at 24-26).

[33]While not the basis for my decision, I note that at least a very appreciable portion of the insurers' assertions would appear to be well within their own ability to investigate. Some examples are set forth in Appendix C.   In addition, as discussed more fully below, in a separate motion, Heath alleges, without contradiction, that the underwriter for New Hampshire on the Paramount IV slate (on which New Hampshire was the lead insurer) had been employed by Heath and had acted as broker for Heath on the Phoenix transaction, and was thus presumably aware of all the circumstances that the insurers contend were fraudulent concerning the Phoenix slate, including the characteristics of this type of transaction that, according to the insurers, were characteristic of the Phoenix and Paramount slates alike, making them a bad risk for insurers. New Hampshire's underwriter's knowledge would appear to be imputed to New Hampshire and

33

That same contention was raised unsuccessfully by the insurers in Litto, and is discussed in my Litto opinion at 40-44. The insurers briefed the "peculiar knowledge' issue on appeal in both J&M[34] and Litto.[35]

---

would appear to be fatal to the insurers' claims.

[34] See, GS Brief at 37-39; AXA's Brief at 37-39; J&M's Brief at 23, and AXA's Reply Brief at 22-23.

[35] See, Brief of AXA Reassurance S.A. at 54-57; Brief of New Hampshire Insurance Company at 11-15.

The "Proffer of Defendant AXA Reassurance S.A. With Regard to Grounds for Fraud", in Litto asserted the following "Facts Preventing AXA Re from Ascertaining Truth / Peculiar Knowledge of Chase," which are comparable to those relied on herein:

> 1. That, on January 29, 1997, during a meeting at Chase offices to discuss the George Litto Pictures deal, Chase Managing Director John Miller falsely represented to AXA Re underwriter Jean-Michel Guillot, that Chase viewed insurance as a secondary, and even a third, source of recoupment for its insurance-backed film finance loans

> [This allegation appears virtually identical to the allegation in AXA's current pleading at ¶ 118 that

>> in January 1997, Chase representatives orally represented to Jean-Michel Guillot that Chase viewed the insurance as a secondary and even third source of recoupment. This representation was false and/or misleading because Chase in fact, viewed the insurance as the primary source of recoupment for its loans.

> This allegation is discussed at n 48, below.]

> 2. That, on April 16, 1999, during a meeting at Chase offices approximately one week before Chase authored a proposal to AXA Re to, inter alia, reinsure "The Crew," Chase Managing Director John Miller falsely represented to AXA Re representatives Jean-Paul Cordier and Erick Derotte, that Chase did not enter into

34

insurance-backed film financing transactions unless it had concluded it was likely there would be no claim on the insurance.

3. That, on May 3, 1999, John Miller of Chase sent to AXA Re, via Stirling defendants, a letter dated April 23, 1999 containing a materially misleading description of the proposed GLP motion picture production financing, which was designed by Chase to conceal from AXA Re that Chase had reduced its lending commitment to GLP and had materially altered the deal from that which had been presented to AXA Re's prior underwriter, Jean-Michel Guillot

[This mischaracterization by AXA Re is discussed in my Litto opinion at 80-81].

4. That Chase induced AXA Re to rely upon a film financing attorney who in fact was representing Chase's broker and who in fact proceeded to disregard AXA Re's interests and failed to protect AXA Re during the George Litto Pictures negotiations.

[This issue, including items 4, 5 and 6, is addressed in my Litto opinion at 47-58].

5. That, between December 1997 and July 1999, including specific instances on or about December 15, 1997 and July 22, 1999, Chase learned that the attorney for AXA Re was secretly representing Chase's broker in connection with the George Litto Pictures transactions in which he was purporting to represent AXA Re.

6. That, between December 1997 and July 1999, Chase repeatedly learned of instances in which the attorney for AXA Re had failed to protect AXA Re's interest in connection with the George Litto Pictures transaction.

7. That, following AXA Re's termination of its underwriter in January 1999, it was dependent upon a full and honest account by Chase of the status of negotiations up to that point, and Chase knew AXA Re was dependent on Chase making a full and fair presentation of any change in the deal that Chase intended to propose.

8. That, knowing that, as of early 1999, AXA Re's underwriter was

35

The First Department's holding that the disclaimers barred the fraud claims implies, at least, that the doctrine does not apply to facts such as those presented in these cases.

---

estranged from AXA Re (though still in close and frequent contact with Chase's broker), Chase exploited its superior knowledge of the status of negotiations, to falsely represent that the former AXA Re underw[riter] had agreed to the Cash Flow Insurance Policy transaction, notwithstanding that Chase had materially altered that transaction subsequent to the departure of AXA Re's underwriter.

[This issue is discussed in my <u>Litto</u> opinion at 83-84].

9.  That Chase had superior knowledge regarding the George Litto Pictures transaction because it had begun to structure it with George Litto no later than 1994 -- two years prior to AXA Re's entry into the film financing line of insurance -- and had engineered changes such as the requirement that George Litto assign domestic distribution rights to a major U.S. motion picture studio.

10.  That Chase had, without AXA Re's knowledge, marketed the insurance-backed film financing deals, including the George Litto Pictures deal, to Chase's independent studio clients on the premise that the deals would allow them to refrain from making presales. Presales were the sole form of security for insurers under the Cash Flow Insurance Policy transaction.

36

The "peculiar knowledge" exception was also argued unsuccessfully in <u>Gaidon</u>.[36] The facts in <u>Gaidon</u> include misrepresentations as to matters within the peculiar knowledge of the insurers in the sense argued by the insurers herein. The court recognized that the purchasers could not be expected to perceive the misleading nature of the illustrations and representations, and thus, in effect, that the true nature of the policies was within the "peculiar knowledge" of the insurers. The Court of Appeals' holding, which does not distinguish <u>Tahini</u> or its progeny, must be viewed as impliedly rejecting any "peculiar knowledge" knowledge exception to the efficacy of an otherwise enforceable disclaimer clause, at least where the facts are similar to those in <u>Gaidon</u>.

As discussed in my <u>Litto</u> opinion at 40-41, the supposed "peculiar knowledge" exception is based on a misreading of <u>Danann</u>.[37] Moreover, even if the principle is good law, here, as in

_____

[36]<u>See</u> Brief for appellant Goshen at 32 ("even if MONY's policies contained a specific disclaimer clause - which they do not - that disclaimer would not preclude parol evidence of MONY's fraudulent inducements because only MONY knew that its vanishing premium illustrations were based on inflated dividend rates and that the policies therefore would not perform as illustrated" [citing <u>Danann</u>; <u>Ward v Hanley</u>, 130 AD2d 742 (2d Dept 1987) and <u>Rodas v Manitaras</u>, 159 AD2d 341 (1st Dept 1990)]; and at 46 ("When, as in this case, the facts are peculiarly within one party's knowledge, New York courts have refused to enforce even significantly more exacting disclaimers" [citing <u>Stambovsky v Ackley</u>, 169 AD2d 254, 259 (1st Dept 1991) and <u>Tahini Investments, Ltd. v Bobrowsky</u>, 99 AD2d 489, 490 (2d Dept 1984)]. In <u>Gaidon</u> the plaintiffs alleged, <u>inter alia</u>, that the insurers knew that the dividend/interest rates were not sustainable at the illustrated level; that the projected "vanishing" of the premiums was unrealistic; that one of the insurers was aware of this unlikelihood based in part on the insurer's own knowledge of its own transactions and on its heightened knowledge of its own financial condition; and that one of the insurers' dividend rate was based in part on non-recurring transactions that skewed the projections. These facts are comparable to the insurers' assertions herein that Chase and its agents knew that the projected sufficiency of the revenues to repay the loan by the claim determination date, was unrealistic.

[37]As there explained, "peculiar knowledge" is a requirement for any fraud claim, since reasonable reliance cannot be established if the facts were ascertainable by the party claiming reliance. The language in <u>Danann</u>, 5 NY2d at 322, that appears to be the authority relied on in <u>Tahini Investments, Ltd. v Bobrowsky</u>, <u>supra</u>, 99 AD2d 489 (2d Dept 1984), describes general principles applicable to fraud claims and cites <u>Schumaker v Mather</u>, 133 NY 590 (1892), a case that involved neither a disclaimer nor the effect of a disclaimer. (<u>Tahini</u> also cited <u>O'Keeffe v Hicks</u>, 74 AD2d 919 [2d Dept 1980]), a case involving a non-specific, general merger and disclaimer clause.)

Litto, see Litto opinion at 42-43, it does not apply here, because of the principles expressed in cases such as Rodas v Manitaras, supra, 159 AD2d 341 (1st Dept 1990), Meltzer v G.B.G. Inc., 176 AD2d 687 (1st Dept 1991); and Warner Theatre Associates Ltd. Partnership v Metropolitan Life Ins. Co., 149 F3d 134 (2d Cir 1998).

In any event, contrary to the insurers' contention, they had a readily available means of ascertaining the truth of the representations or omissions they claim to have relied on. In the context of the extensive disclaimers of the negotiated policy, enumerating certain representations as being within Chase's responsibility, as well as the disclaimers in the RMRs themselves, the insurers could have required express, binding representations about those matters that they now assert they relied on. In the face of disclaimer clauses, the failure of a sophisticated business entity to do so, can preclude claims of fraud even where the true facts are not reasonably ascertainable by the plaintiff.[38]

Thus, in Black v Chittenden, 69 NY2d 665 (1986), a case in which there were no disclaimers, the Court of Appeals held:

> Whether, pursuant to the rule of [Schumaker], the condition of the lanes was a matter "peculiarly within [defendant's] knowledge" ... and whether plaintiffs could have discovered the truth about them through the "exercise of ordinary intelligence" likewise present questions of fact mandating the denial of defendant's summary judgment motion [internal citations omitted].

See also, P.T. Bank Central Asia v ABN AMRO Bank N.V., 301 AD2d 373 (1st Dept 2003) (as to alleged misrepresentations that were outside the scope of the disclaimers, "[w]hile the evidence might ultimately demonstrate that the information ABN allegedly had regarding the true value of the loan collateral was either nonexistent or available to plaintiff with the exercise of reasonable diligence--and thus that ABN did not misrepresent what it knew about the value of the collateral or that plaintiff was not justified in relying on ABN's misrepresentations...").

Therefore, if a disclaimer did not protect against liability for a misrepresentation within the peculiar knowledge of the speaker, it would provide no more protection than would no disclaimer at all.

[38]See, e.g., Curran, Cooney, Penney, Inc. v Young & Koomans, Inc., 183 AD2d 742 (2d Dept), lv denied 80 NY2d 757 (1992); Lazard Freres & Co. v Protective Life Ins. Co., 108 F3d 1531 (2d Cir), cert denied 522 US 864 (1997) ("the failure to insert such language into the

P.T. Bank Central Asia v ABN AMRO Bank N.V., supra, 301 AD2d 373 (1st Dept 2003) is not to the contrary. The allegations of fraud in that case were outside the plain facial scope of the disclaimer. The "special facts" doctrine is not an exception to the rules governing the efficacy of disclaimers. It is, rather, a ground giving rise to a duty to speak. As described by the court in P.T. Bank Central Asia:

> Under that doctrine, a duty to disclose arises "where one party's superior knowledge of essential facts renders a transaction without disclosure inherently unfair.

The cases cited by the court in P.T. Bank Central Asia on this issue did not involve disclaimers or their effect; the rule goes only to the duty to speak. Here, the disclaimers expressly waive any such duty.

## Own Fraud

The effectiveness of appropriate disclaimers as against what would otherwise constitute knowing fraud, is demonstrated in Gaidon, supra, in which boilerplate disclaimers were held to shield the insurers from claims of fraud.

Nevertheless, citing Bridger v Goldsmith, 143 NY 424 (1894), the insurers contend that under New York law, a party may not use a disclaimer to insulate himself against his own affirmative fraud.

---

contract--by itself--renders reliance on the misrepresentation unreasonable as a matter of law"); Consolidated Edison, Inc. v Northeast Utilities, 249 F Supp 2d 387 (SD NY 2003) ("Con Edison chose to enter into an agreement without including such language or specifically including any representations or warranties with respect to the August Policies or alleged oral representations made during due diligence, both of which were disclaimed by the Confidentiality and Merger Agreements"); DynCorp v GTE Corp., 215 F Supp 2d 308 (SD NY 2002) ("Sophisticated parties to major transactions cannot avoid their disclaimers by complaining that they received less than all information, for they could have negotiated for fuller information or more complete warranties"); Emergent Capital Inv Management, LLC v Stonepath Group, Inc., 195 F Supp 2d 551 (SD NY 2002) (citing Rodas; "Given the extensive and comprehensive sections detailing the representations, warranties and covenants, Emergent should have ensured that this representation was also covered"); Bibeault v Advanced Health Corp., 2002 WL 24305 (SD NY 2002) ("If Hochberg's representation regarding his lack of knowledge of the fair share value had been essential to Bibeault's decision, the parties could have easily included that representation in the Offering Documents"); Western Intermodal Services, Ltd. v Singamas Container Industry Co., 2000 WL 343780 (SD NY 2000).

39

This same contention was rejected by me in <u>Litto,</u> at 39, and raised unsuccessfully on appeal, <u>see</u> Brief of AXA Reassurance S.A. at 45-48.

Decisions of the Court of Appeals subsequent to <u>Bridger</u> have overruled, or at least so narrowed, <u>Bridger</u> as to render it inapplicable to the present case. The plaintiff in <u>Danann</u> sought damages for fraud, not merely negligent misrepresentation. The clear intent of the Court of Appeals was to permit a contracting party to shield itself from claims of fraud through effective disclaimers. The court held:

> If the language here used is not sufficient to estop a party from claiming that he entered the contract <u>because of fraudulent representations,</u> then no language can accomplish that purpose. To hold otherwise would be to say that it is impossible for two businessmen dealing at arm's length to agree that the buyer is not buying in reliance on any representations of the seller as to a particular fact [emphasis added].

That <u>Danann</u> permits disclaimers to shield a party from allegations of actual fraud, is underscored by the dissent in <u>Wittenberg v Robinov,</u> 9 NY2d 261 (1961), where Judge Fuld wrote:

> I still believe -- as I wrote in dissent in [<u>Danann</u>] that a party who has induced another to enter into a contract by means of fraud should not be permitted by insertion of a clause in that contract to shield himself from its consequences. However, since I consider myself bound by the court's decision in that case, I must perforce join in the judgment dismissing the complaint against the defendant owner. [39]

---

[39]Judge Fuld's dissent in <u>Danann</u> cited not only <u>Bridger,</u> but also, <u>inter alia,</u> the English case <u>Pearson & Son v Dublin Corp.,</u>[1907] A. C. 351. <u>Pearson</u> was cited in the House of Lords' recent adjudication in <u>HIH Casualty and General Insurance Ltd and others v Chase Manhattan Bank and others,</u> [2003] 2 Lloyd's Rep 61, <u>supra.</u>

It appears that in the British case, the insurers do not allege that Chase itself was guilty of fraud. Their contention is that Chase is responsible for the alleged fraud of Heath. Thus, the issue was whether the Truth of Statement disclaimer shielded Chase from avoidance of the policy based on Heath's alleged fraud. The House of Lords, applying British law, held it did not.

A reading of the House of Lords' opinions demonstrates fundamental differences between British and New York law. Inter alia, under British law, an insured has a duty of utmost good

faith, a duty imposed on insureds under New York law only in marine insurance policies. Moreover, the British construction is based on British statutes. In addition, British law is similar to pre-<u>Danann</u> New York law with regard to the effect of disclaimers on a party's own fraud.

> As Lord Scott observed in <u>HIH</u>:

>> Does phrase 7 of the truth of statement clause make it clear that fraudulent misrepresentation by Heaths, by PML, or by another agents of Chase would be covered? Does phrase 8 make it clear that dishonest non-disclosure by Heaths or anyone else with a duty to disclose would be covered? The language is certainly wide enough for the purpose. Why should it not be given its literal meaning? <u>No coherent reason has, in my opinion, been given once the proposed rule of law, barring on public policy grounds, the efficacy of such contractual provisions, has been discounted</u> [emphasis added].

> Lord Hoffman observed:

>> Your Lordships were not referred to any [British] case in which the language of the contract has been held to bar a remedy for inducing fraud, whether by the contracting party or his agent.

> The Court of Appeals' decisions in <u>Danann</u>, <u>Plapinger</u> and <u>Gaidon</u>, however, do precisely that.

> In <u>HIH</u>, Lord Bingham observed that in <u>Pearson</u>, the question "was whether a clause in a building contract which provided that the contractor should satisfy himself as to the dimensions, levels and nature of all existing works excluded an action based on alleged fraudulent misrepresentations by the council's engineers as to the position of an existing wall." Under <u>Danann</u>, such a clause would bar such claims of fraud.

> Lord Hoffman noted the difference between New York and English law, citing <u>J&M</u> and <u>Litto</u>:

>> a different approach would be taken in New York. In Chase Manhattan Bank v AXA Reinsurance UK plc (26 July 2001, unreported) [the <u>J&M</u> order] Gammerman J. considered the effect of a truth of statement clause in a film-finance insurance contract and observed (at p 7): 'Under well-established New York law, such express, detailed disclaimers preclude a claim of fraud based on misrepresentations within the scope of the disclaimers.' The

41

Under New York law, clauses that negate a duty to disclose and/or negate reasonable reliance, essential elements of fraud, do not exonerate a party from fraud.  Rather, conceptually, they prevent the fraud from occurring by contractually barring, e.g., reliance.[40]

---

> judge's decision was upheld by the Appellate Division of the Supreme Court on 23 May 2002.  In a judgment also of that date in Chase Manhattan Bank v New Hampshire Insurance Co (2002) 749 NYS 2d 632) [the Litto opinion] the same judge, construing (it would appear) similar clauses, in a similar context, said (at p 38):
>
>> 'The clauses are drafted with great precision. Each sentence and word within each clause serves a separate function. Some portions of the clauses are limited to representations/omissions about the risk, while others are not. Given the sophistication of the parties, I decline to read into the contractual language limitations that are not stated in the plain text of the parties' agreements.'
>
> As these citations make plain, the law in our respective jurisdictions has a different point of departure.

In effect, New York public policy requires that policy concerns about fraud be balanced against other public policy concerns.  This public policy is reflected, in another context, in Trainor v John Hancock Mut. Life Ins. Co., 54 NY2d 213 (1981), in which the insurer's failure to comply with certain regulations was held to estop it from raising the insured's actual fraud in the inducement.  The specificity requirements of CPLR 3016(b) reflect a recognition that claims of fraud are prone to be asserted without good ground.

Danann and its progeny reflect the recognition of the New York Court of Appeals that there is a legitimate public policy in allowing persons contracting at arms length, to protect themselves, through enforceable disclaimers, from the expense of litigation over allegations of fraud.  Unlike litigants in British courts, a defendant who prevails at trial in a New York court must normally bear its own legal fees.  The Litto litigation, in which a six week trial ended in a jury verdict for the broker, suggests that concern over such expenses can be a legitimate one.

[40]As the Court of Appeals explained in Wittenberg v Robinov, supra, 9 NY2d 261 (1961):

> Our statement in the Danann case (supra) that the legal consequence of the disclaimer provision was to negate reliance was, in essence, only a concise way of saying that as to the seller in

42

P.T. Bank Central Asia v ABN AMRO Bank N.V., supra, 301 AD2d 373 (1st Dept 2003) is not to the contrary. The reason why claims based on the "representations that ABN made to plaintiff that ABN allegedly knew were false," were actionable despite the disclaimer, was not due to any general principle, but merely to the facial language of the disclaimer itself, which did not encompass the representations alleged.

**Failure to Mention Fraud:**

The insurers argue that the disclaimers do not mention "fraud." This same argument was made unsuccessfully by AXA on appeal in Litto, see, Brief of AXA Reassurance S.A. at 52-54. The disclaimers in Gaidon did not mention fraud, yet the Court of Appeals held that they effectively insulated the insurer from claims of fraudulent inducement. Indeed, it does not appear that any of the clauses in the cases cited above in which disclaimers were held to preclude claims of fraud, expressly mentioned fraud.

In fact, here the parties expressly contemplated that statements/omissions made by Heath and/or the RMs, could be such that, under common law principles, they would permit the insurers to avoid the policies. The insurers agreed that Chase

> shall have no liability of any nature to the insurers for any information provided by any other parties, and any such information provided by or nondisclosure by other parties including, but not limited to, Heath (other than Section I of the Questionnaire) <u>shall not be a ground for avoidance of the insurers'</u>

_____

> that case -- the only party involved -- no representations ever existed. That being so, there could be no reliance. There was nothing upon which to rely.

> In the instant case, the representations -- which plaintiff in his complaint alleges were made by the agent -- were similarly declared nonexistent by the seller; and the purchaser expressly agreed to consummate the transaction on those terms. Such a declaration in the agency context here presented means, from the seller's point of view, that any agent's representations were unauthorized. An unauthorized representation of an agent does not exist insofar as a principal is concerned. As to the agent, however, the noncontracting party, any unauthorized representation remains real and existent -- and if fraudulent he may be subjected to liability.

43

<u>obligations under or the cancellation of the Policy</u> [emphasis added].

**ALLEGED MISREPRESENTATIONS/OMISSIONS BY THE BROKER**

The insurers contend that Chase is responsible for Heath's misrepresentations because the fraudulent acts of an agent will be imputed to the principle if the principle ratifies the fraud by accepting the benefit of those acts. Here, however, the insurers expressly waived any right to hold Chase responsible for Heath's alleged misrepresentations and omissions, including those that would otherwise permit avoidance or cancellation of the policies

**ALLEGED MISREPRESENTATIONS/OMISSIONS BY THE RMS**

For the purpose of this motion, I assume, without deciding, that the term "representatives" in the "dereliction of duty" clause does not include the RMs. It is unnecessary to reach that issue because the Truth of Statement clause bars the counterclaims and defenses based on the alleged misrepresentations/omissions of the RMs other than in Section 1 of the Questionnaire. In addition, the "non agency" clause bars the insurers from contending that statements made by the RMs were made by the RMs as agents for Chase. Further, any contention by the insurers that they reasonably relied on representations in the RMR's, is barred by the express disclaimers in the RMRs themselves, quoted above.

**ALLEGED MISREPRESENTATIONS/OMISSIONS ABOUT THE "INDEPENDENCE" OF THE RMS**

The May 1998 RMR report states, at p. 6:

> The Risk Manager for Insurers on this facility is Graham Bradstreet of ICE Media Limited who will be assisted by Peter Hoffman of CineVisions (both resumes enclosed). <u>Heath Film Consultants will be assisting ICE Media Ltd.</u> and have their independent lawyer - Richard Fletcher, who will also review all documentation [emphasis added].

44

Thus, the insurers were on actual, express, notice that a Heath entity would be providing assistance to the risk manager, ICE Media Ltd.[41]

Moreover, the retention agreement between Heath and Chase contains an acknowledgment by Chase that

> associated companies of Heath within the Heath group of companies may carry out risk management or other duties on behalf of insurers.

Chase has demonstrated that this retention agreement was included in the closing binder, and that, in fact, it was produced by the insurers in discovery.

Nevertheless, the insurers base their claims of fraud on the premise that Heath participated in preparing the RMRs; on the longstanding business relationship between Heath and the RMs, including a "verbal handshake" agreement; and on the preexisting relationship between Chase, Heath and the RMs on prior slates. The insurers attempt to construe statements in the policies and elsewhere, as representations that the RMs were wholly independent of Chase and Heath, and that Chase and Heath fraudulently concealed the relationship from them.[42]

---

[41]While the lawyer is described as "independent," no such representation is made concerning the RMs.

[42]By way of example, GS' pleading asserts at ¶ 96:

> Chase is also chargeable with the knowledge of its agent Heath, which knew or recklessly disregarded the falsity of the foregoing representations and the true and material circumstances that it failed to disclose to General Star as evidenced, inter alia, by the following:

Among the factors listed is the following:

> (a) Heath was aware that the Risk Managers were not independent and that Bradstreet worked out of Heath's London office.

I note that policies in other slates, included as exhibits in motion sequence no. 001 in The Chase Manhattan Bank v AXA Reinsurance UK PLC, Index no. 600299/01, on which policies New Hampshire was a lead insurer, provide that notice to the Lead Insurers (including New Hampshire) shall be given at the addresses there designated with a courtesy copy to "ICE Media

45

Thus, the insurers contend that the statement in the Revenue Analysis clause that

> [any] revenue analysis or financial projections for the Film
> Production upon which insurers are relying on (sic) were prepared
> for them by their agents or independent contractors and not by the
> Insured ..., or [its] agents.

is a misrepresentation <u>by Chase</u> because, the insurers assert, the RMs were not acting as independent agents.

However, the policies do not contain any statement, whether by Chase or otherwise, that the RMs are "independent." In fact, the only use of the word "independent" in this phrase is in the term "agents or independent contractors." The latter term has a well-established meaning, <u>see</u>, <u>generally</u>, 2A NY Jur 2d Agency and Independent Contractors § 12 that indicates, essentially, that the contractor is not under the direct control of the person who hires him.

The provision in the Revenue Analysis clause that "[i]nsurers acknowledge that they and their risk managers and the Company have made an independent investigation in assessing the risks of underwriting this Policy," is an acknowledgment by the insurers, not a representation by Chase. Especially in view of the "irrevocable agreements" clause, the insurers will not be heard to repudiate that to which they contractually agreed, <u>see</u>, <u>Warner Theatre Associates Limited Partnership v Metropolitan Life Ins. Co.</u>, 1997 WL 685334 (SD NY 1997), <u>affd</u> 149 F3d 134 (2nd Cir 1998) ("Having signed the Agreement acknowledging that MetLife had not agreed to 'any of the basic terms' of the mortgage, 'including ... the conditions upon which any subordinate mortgage financing would be permitted, Warner cannot now be heard to assert reliance upon any alleged representations to the contrary by MetLife").

<u>JPMorgan</u> is not to the contrary. As discussed above, the crux of the court's holding in <u>JPMorgan</u> was that Chase had obtained surety bonds that actually insured transactions that the sureties were prohibited by law from insuring, but which were misrepresented to be transactions within the lawful scope of what the sureties could insure. The bonds referred to the transactions in terms that were not compatible with the actual nature of the transactions.

---

Limited, in care of Heath Insurance Broking Limited, 133 Houundsditch, London EC3A 7AH ENGLAND, Attention: Graham Bradstreet...."

46

In <u>JPMorgan</u> the court held:

> Here each of the Bonds is expressly premised on Mahonia's having entered with Enron into a gas or oil "Inventory Forward Sale Contract" and expressly recites that once all the contracted-for gas or oil "is fully delivered" the Sureties' obligations will cease .... Plainly implicit in these representations is the assertion that the Sureties are being asked to insure the sale and future delivery of a commodity, rather than being asked to insure, unlawfully, a disguised loan transaction.

Here, the underlying transaction documentation was disclosed to the insurers, and, as discussed above, the insurers' post-claim dissatisfaction with the agreement they entered into, does not transmogrify the transaction into something it was not.

In addition to their contentions based on the policy clauses, the insurers allege similarly that the RMs were represented to them to be independent.[43] Notwithstanding the insurers' characterizations, the insurers have failed to allege, with the specificity required by CPLR 3016(b), any instance in which Chase (or, for that matter, Heath), represented that the RMs were "independent" of Chase and/or Heath.

The insurers assert that they were unaware that the RMs and Heath had a "handshake" agreement in approximately 1998 whereby, according to the insurers, Heath would appoint ICE/CineVisions as risk managers for insurers in its insurance backed film finance transactions, in exchange for ICE/CineVisions agreement to share part of the risk management fee with Heath

---

[43] <u>See, e.g.,</u> New Hampshire pleading at ¶ 140 (complaining that Heath represented that "Bradstreet/ICE and CineVisions would act as independent "risk managers" for the insurers in assessing the risks incident to underwriting the films of the Paramount IV Slate").

GS's pleading at ¶ 7 quotes (without any identification of the source, an alleged representation by Heath that

> [e]ach risk must be <u>independently</u> assessed by risk managers ... Heath will not place a risk that has not been structured and approved by the risk managers, ICE Media Limited.

However, the reference to an independent "assessment" by the RMs is not the equivalent of a representation that an entity has no business relationship with the entity that performs the assessment.

47

whereby and ICE/CineVisions would refer insurance-backed film finance transactions to Heath to act as broker.  The insurers contend that Chase knew or had reason to know of this arrangement because Chase knew that Heath appointed ICE/CineVisions in every insurance-backed film transaction it brokered for Chase. [44]

Unless enforceable under the applicable body of law as to statute of frauds, it would appear that such an agreement would have no more of a "conflict of interest" effect than the obvious interest of two entities who had (as insurers were indisputably aware) done business in the past and had an ongoing business relationship.  Bradstreet's resume annexed to the RMR includes his risk managing for the Phoenix slate and for three prior Paramount slates.  The insurers do not contend that they were unaware that these four slates had been broked by Heath, or that this was not ascertainable by them. [45]

New Hampshire (at ¶ 143) asserts "upon information and belief," without identifying the source thereof, that this arrangement was reduced to writing in a document drafted by the attorney who, subsequently, represented the insurers.  However, as discussed above at p 5. allegations on "information and belief" that do not state the source of the "information and belief," do not comply with CPLR 3016(b), and these allegations therefore may not be considered in assessing the efficacy of the pleadings. [46]

_____

[44] As noted above, the agreement between Heath and Chase states that Heath "may have undertaken contractual commitments with one or more" of ICE and Graham Bradstreet.  (Answer ¶ 120).  Chase has demonstrated that this document was provided to the insurers in the closing binder and was produced by them in discovery.  The "verbal handshake" agreement was within the scope of that disclosure.

[45] HIH Cas.  and General Ins.  Ltd.  v  Chase Manhattan Bank, [2003] 2 Lloyd's Rep 61, supra, involves the Phoenix slate.  As noted above, an AXA entity is involved in that insurance.

[46] The motion papers on file in Heath's motion to dismiss the third-party actions against it, contain testimony of Bradstreet and Bassett from other actions, concerning this arrangement.  According to that testimony, the agreement was that insurance backed film finance transactions that came to Bradstreet would be referred to Heath as a broker if there was no other broker already attached, and that insurance backed film finance transactions that came to Heath would be risk managed by Bradstreet subject to the approval of the underwriters.  Bassett described the informal agreement as a "verbal handshake" subject to both parties being comfortable with the

A central premise of the insurers' contentions about the RMs alleged lack of "independence" and lack of loyalty to the insurers is that they had a conflict of interest because they stood to benefit if the insurers issued the policies, thus enabling the RMs to earn risk management fees.  However, the insurers do not contend, nor could they, that they were unaware that the RMs' earning of fees was dependent on the policies being issued, thereby enabling the loans to be made, not on the success of the film or the repayment of the loans.  As noted above, the amount of the RMs' fees are contained in each of the policies.

**ALLEGED OMISSIONS BY CHASE**

As discussed above, both the Truth of Statement clause and, independently, principles of common law, preclude any fraud claim based on omissions by Chase.

**ALLEGED "ENGINEERING"**

The insurers attempt to avoid the effect of the clauses by contending that Chase "engineered" a fraudulent scheme that included putting the disclaimer clauses in the policies.

Procuring a disclaimer provision by fraud "refer[s] only to a situation where the party against which the disclaimer is asserted is entirely unaware of the existence of the disclaimer - for example, where the disclaimer is inserted surreptitiously into the final draft of the contract," Grumman Allied Indus., Inc. v Rohr Indus., Inc., 748 F2d 729 (2d Cir 1984).[47]  The insurers do

---

arrangement.  If there is any other basis for the insurers' suppositions other than their mischaracterization of this testimony, they have failed to identify it.

[47]While I do not base the present decision on it, I note that in Litto I found, at 73:

> A central tenet, indeed, the sine qua non, of the transaction, was to protect Chase from liability for any misrepresentations or omissions except as to specified communications.  This is reflected throughout the record.

> I find that Smith [AXA's attorney] made sure that Guillot [AXA and AXA Re's underwriter, who also underwrote the Paramount IV and V transactions for AXA] understood that under the transaction as negotiated, Chase would not be liable for such misrepresentations or omissions, and that, in fact, Guillot did understand this.

49