not contend that the clauses were inserted without their knowledge.  An insurer, as much as an insured, has a duty to read the policy, and is chargeable with knowledge of its terms.  Any "engineering" of the policies on which the insurers now seek to place the blame for their exposure, was a joint effort in which the insurers actively participated.

Indeed, the motion papers demonstrate that. far from concealing its purpose in negotiating for the disclaimer clauses, Chase had publicly announced this purpose as early as March 16, 1998, well before the instant policies were issued.  The industry newsletter Daily Variety carried an article about insurance backed gap financing of films, entitled "Pic clunker insurance facing test." The article stated that "claims are already on the horizon," and that

> Chase has lent money to indies like Phoenix with insurance policies adding collateral.  But Miller said Chase's attorneys scrutinize the policies carefully to ensure the policies are "bulletproof" and don't contain loopholes insurers could use to avoid paying claims.

## ALLEGED EXTRA-CONTRACTUAL MISREPRESENTATIONS BY CHASE ITSELF

### Allegation That Chase Viewed the Insurance Only as a Second or Third Layer of Recovery but Would Not Have Issued the Loan Without Insurance

Citing <u>Schlansky v United Merchants and Mfrs. Inc.</u>, 443 F Supp 1054 (SD NY 1997), the insurers contend that the waiver in the Truth of Statement clause has no application to representations made voluntarily by Chase, However, discounting allegations not complying with

---

I found:

> in a telephone call with Chapnick, Brennan, Sharma [the broker] and Guillot in which Chapnick was attempting to set up a face to face meeting including Sharma, Litto, Chapnick [Chase's counsel] and Guillot, Smith explained that Chase's intention was to put the insurers in the position of never being able to deny a claim on the basis that they didn't understand what was going on or they had not had sufficient information.

(<u>Litto</u> opinion at 73 n 47).  Thus, as early as 1997, AXA was aware that Chase's intention was to structure the policies so as to preclude the insurers from denying claims on such a basis.

50

CPLR 3016(b), the only instance of such a statement by Chase (other than the provisions in the policies themselves, discussed above), suggested by the insurers is the assertion, as in AXA's pleading at ¶ 118, that "Chase representatives" represented that Chase viewed the insurance as a secondary and even third source of recoupment. The insurers contend this was false and/or misleading because Chase viewed the insurance as the primary source of recoupment, and because, as stated, e.g., by GS in its memo of law:

> Chase candidly admitted the fraud in a public speech after the Policies were issued: according to Chase's Managing Director of Securities [sic], John Miller, Chase would <u>never have entered these transactions without insurance!</u> (at 71[d]; emphasis in original).

However, the two propositions are not contradictory,[48] and the

---

[48]As noted above, one of AXA's Re's proffered grounds of fraud in <u>Litto</u> was its contention that

> on January 29, 1997, during a meeting at Chase offices to discuss the George Litto Pictures deal, Chase Managing Director John Miller falsely represented to AXA Re underwriter Jean-Michel Guillot, that Chase viewed insurance as a secondary, and even a third, source of recoupment for its insurance-backed film finance loans,

This was one of the alleged direct misrepresentations expressly referenced by AXA Re in the <u>Litto</u> appeal, <u>see</u> Brief of AXA Reassurance S.A. at 43; Reply Brief of AXA Reassurance S.A. at 8 [citing AXA's Proffer, R 5856, ¶ 1]. It is very similar to the one made in AXA's present pleading at ¶ 118. While not the basis for my determination of the present motion, I note that during the <u>Litto</u> trial, the following deposition testimony was introduced of AXA's underwriter, Guillot:

> Q: Do you recall [John Miller of Chase] saying at this meeting with Sawtantar Sharma and George Litto that Mr. Miller viewed the insurance as a secondary or even a third source of recoupment?

> A: It was a second - well, it was - it was not the primary source of recoupment. It was an additional security, additional. So that's to say that he viewed to act as though there was no insurance, that is to say, that it will get all the usual - all the usual security, so that's - so the first legal charge on the copyright and the receivables, and that as additional security, he would - he was having the insurance (<u>Litto</u> Record on Appeal at 1472-73).

51

insurers do not assert that Chase ever represented to them that Chase would have entered these transactions without insurance.[49]

A very similar assertion was rejected as a matter of New York law in <u>National Westminster Bank USA v Advanced Interactive Video, Inc.</u>, 1994 WL 681746 (SD NY 1994):

> These defenses are all based on Celeste's allegation that he was "assured" that the bank was looking to the other guarantors, not to Celeste, for repayment and that he was required to sign the Guaranty only in order to "demonstrate [his] commitment to remain with AIV as its Chief Executive Officer" ....
>
> The Magistrate Judge correctly concluded that, given the unambiguous language of the Guaranty, defenses of estoppel and waiver based on prior oral assurances are unavailable under New York Law.

Even if otherwise actionable, Chase's views as to the expected efficacy of the other sources of recoupment fall within the Revenue Analysis disclaimer as a "projection."

## AFFIRMATIVE DEFENSES/COUNTERCLAIMS

"The pleader of the defensive matter can't immunize herself from a 3211(b) motion by omitting to separately state and number her defenses, see CPLR 3014, or by giving them a

---

Thus, in context, the alleged representation simply meant, as Guillot understood, that the transaction was structured to provide Chase with customary forms of security, with the insurance providing protection only in the event the customary forms failed to do so. It cannot be construed as a representation that Chase perceived no real need for the insurance, or that Chase was satisfied that the customary forms of security were sufficient to protect Chase. The alleged representation is entirely consistent with the statement by Chase that Chase would not have entered into this transaction without insurance, a statement that, contrary to the insurers' mischaracterizations, is not an "admission" by Chase of fraud. It is not inconsistent to state that one would not drive without a seatbelt, and at the same time state that one considers defensive driving, not the seatbelt, to be the primary defense against injury.

[49] I note that in its reply papers (Ex 12), Chase has supplied an undated document that Chase describes as an internal AXA document, from the <u>Litto</u> trial, evidently generated as early as 1996, stating that "the coverage is an essential condition for the bank to grant financing." While I decline to base my decision on it, it underscores the lack of any allegation complying with CPLR 3016(b), that the insurers were misled by Chase (or, for that matter, by Heath or the RMs) to believe anything to the contrary.

52

different label," Siegel, Practice Commentary 3211:38. Here, while pleaded as a single "defense," many of the affirmative defenses lump together multiple affirmative defenses. For example, a defense stating that Chase failed to comply with various terms and conditions of the policy, is not properly a single affirmative defense. In adjudicating this motion, I treat the various defenses as if they complied with CPLR 3014.

## Declaratory Relief

To the extent that the insurers' counterclaims seek declaratory relief as to the efficacy of the policies, they are dismissed on the ground that such declaratory relief is unnecessary since the issues raised are subsumed in the adjudication of Chase's claims.

## Conspiracy to Defraud

These counterclaims are dismissed. As adjudicated in J&M order at 4, New York law does not recognize a separate tort for conspiracy, to defraud or otherwise. See also, Alexander & Alexander v Fritzen, 68 NY2d 968 (1986).

## Equitable Estoppel

The equitable estoppel defenses, while ostensibly couched in different terms than the fraud claims, fail for the same reasons. Equity will not permit the insurers to avoid their contractual obligations by raising contentions that are barred by the very contract whose obligations they seek to avoid.

## Aiding and Abetting

Assuming, without deciding, that after their appointment the RMs owed a fiduciary duty to the insurers, to the extent that any of Chase's conduct occurred prior to the time that the RMs were appointed, these contentions fail. As I held in my September 9, 2002 order dismissing the counterclaims in J&M, the RMs owed no fiduciary duty to the insurers until after their appointment. Actions by Chase before the duty arose, including the alleged "engineering" of the appointment, cannot constitute aiding and abetting a breach of a duty that did not yet exist.

Further, absent a duty to speak, silence does not support a cause of action for aiding and abetting breach of fiduciary duty or fraud. As discussed above, even absent the policy disclaimers, Chase had no duty to speak.

53

The insurers assert in conclusory fashion that Chase played a role in the preparation of the RMRs. However, this was not contrary to any representation identified by the insurers. The RMRs state:

> The report has been written and compiled by ICE Media Limited (ICE) with information which ICE believes, but does not warrant, to be accurate having been provided from various sources. Nothing herein constitutes a warranty or representation either by the Insured, Paramount Pictures Inc. (Paramount), Heath Insurance Broking Limited (HIBL) or ICE [emphasis added].

Since Chase is listed, and since the disclaimer cautions that the report was compiled "from various sources," the insurers were on notice that Chase potentially played a role in the generation of the RMRs. Moreover, the last quoted sentence precludes reasonable reliance on anything in the RMRs.

If the insurers' participation was based on a belief that Chase was not one of the "various sources" providing the information thus compiled by ICE, and which was in any event stated not to constitute a representation to be relied on, and if that belief was material to their decision to participate, it was incumbent on the insurers to obtain appropriate clauses. Hence, any claims of aiding and abetting by participating in the generation of the RMRs, fail for lack of reasonable reliance.

The insurers contend that Chase's issuance of the loans constituted aiding and abetting. The policies contemplated the issuance of the Loan, and the Loan Agreements provide that the making of the loan is subject to the condition precedent that the policy be in full force and effect. Chase's conduct in issuing the loans was squarely within Chase's rights within the scope and contemplation of the policies, and hence cannot support a claim of tort, cf. Levine v Yokell, 245 AD2d 138 (1st Dept 1997) (dismissing claim for tortious interference, where conduct alleged was "specifically contemplated in the contract of sale"); Chu v Dunkin' Donuts Inc., 27 F Supp 2d 171 (ED NY 1998). A party may not contractually confer on another a right to perform a specified act, and then complain that the performance of that act is tortious. By so contracting, the insurers consented to Chase's issuance of the loans. That consent vitiates any claim of tort based on the conduct consented to.

Rolf v Blyth, Eastman, Dillon & Co., 570 F2d 38 (2d Cir 1978), does not support the insurers' contentions. The insurers identify no conduct by Chase intended to assuage any misgivings expressed by the insurers about the RMs, comparable to the "handholding" in Rolf. In fact, the insurers identify no communication in which they expressed any such misgivings to Chase.

The other cases relied on by the insurers are likewise distinguishable on their facts.

## Alleged Failure to Inform GS of Alleged Dual Loyalty

GS asserts in its thirteenth affirmative defense that the policies should be rescinded because Chase failed to inform it of the supposed dual loyalty of the RMs. This defense fails for reasons akin to the "aiding and abetting" and fraudulent omission contentions. Both under common law principles, and under the express disclaimers in the policies, Chase had no duty to speak, and therefore its silence is not actionable.

## Unclean Hands, Waiver, Estoppel and Laches

To the extent they are based on the alleged fraud, these fail for the same reasons as the fraud-based affirmative defenses and counterclaims. No other facts are alleged to support these defenses. Moreover, unclean hands and laches are applicable only to equitable relief, not to claims for money damages. Accordingly, these defenses are dismissed.

## General Exclusions: Fraud

The affirmative defenses based on the "fraud" general exclusion fail.

The clause states:

> This policy will not indemnify the incurring of Contingent Extra Expenses directly or indirectly arising out of, contributed by or resulting from:

A subsection labeled "Fraud" provides:

> 1. Any fraud, misrepresentation, or concealment against the insurers by the Insured, any employee of the Insured, or the Distributor or any agent of Distributor, it being acknowledged that the only information that Distributor has provided upon which insurers are relying is contained in Section I of the Questionnaire. This exclusion shall not however limit, impair or affect the disclaimers set forth in "Conditions Precedent - Truth of Statements" and "Revenue Analysis" herein, the terms of which are

intended to supersede this exclusion to the extent set forth in those clauses.

"An exclusion, in insurance parlance, serves the purpose of taking out persons or events otherwise included within the defined scope of coverage, <u>Edwards v Motor Vehicle Acc. Indemnification Corp.</u>, 25 AD2d 420 (1st Dept 1966).[50]

Thus, the "Fraud Exclusion" goes to the scope of the coverage: contingent extra expenses[51] that are incurred as the result of the fraud of the insured, are not within the scope of the coverage. This is conceptually entirely different from the premise that the insured may not

---

[50]The cautionary reference in the clause to pre-contractual representations of the Distributor, is insufficient to change the essential nature of an exclusion. Nor is the phrase "against the insurers" inconsistent, since, <u>inter alia</u>, the Due Diligence clause contemplates representations to the insurers by Chase.

[51]The Insuring Clause states:

> This Policy is to indemnify the Insured for their Ascertained Net Loss in respect of the Film Production, up to but not exceeding the Sum Insured hereunder.

The policies typically (though not uniformly) define Ascertained Net Loss as:

> all amounts of Contingent Extra Expenses outstanding and unpaid on the Claim Determination Date (but no more than the Sum Insured). The Revenue shall be applied wholly to reduce all Contingent Extra Expenses outstanding and unpaid after first being used to pay any out-of-pocket costs incurred under the Due Diligence Clause and the Claims Procedure (which to the extent they exceed $50,000 in the aggregate shall be subject to the approval of the Lead Insurer, such approval not to be unreasonably withheld or delayed).

The policies define "contingent extra expenses" as

> the aggregate amount advanced by the Insured and/or the Lenders under the Loan Agreement with respect to the Film Production plus all amounts payable to them as fees, reasonable costs, Interest or other financing charges under the Loan Agreement in connection therewith.

56

enforce the policy because the policy was <u>issued</u> as the result of the insured's fraud.  Such fraud can result in <u>avoidance</u> of a policy, but it does not affect the scope of the <u>coverage</u> of a policy. The scope of coverage is moot if the policy is avoided due to fraud in the inducement.

This construction is consistent with the other exclusions listed in the "General Exclusions" section: War, Civil Commotion, Custom Seizure, Government or Civil Intervention, Radioactive Contamination, and Financial Causes.[52]

Odyssey argues that Chase required the issuance of the Contingent Extra Expense Insurance policies as a condition for making the loans, and that but for the fraud of Chase and its brokers, the insurers would not have issued the policies and Chase would not have incurred Contingent Extra Expenses.  Therefore, it argues, <u>all</u> the contingent extra expenses incurred are the result of the alleged fraudulent inducement of the policies.  While this contention has some facial appeal, it does not withstand analysis, even disregarding the rule of New York law that an exclusion is to be construed strictly against the insurer.

First, as discussed above, the insurers have not pleaded any actionable fraud by Chase. To the extent that any actionable fraud is otherwise alleged with the requisite particularity, the claims are barred by the Truth of Statement and Revenue Analysis clauses, and the Fraud Exclusion clause states that those clauses supersede the Fraud Exclusion clauses.

Second a crucial link in this theory is the premise that the policies were obtained fraudulently.  However, if that were the case, the policy would be avoided.  Therefore, there would be no coverage.  Without coverage, there would be nothing to exclude from coverage, and the clause would be superfluous.

The net result of Odyssey's construction would be that even though the allegations of fraud do not survive the disclaimer clauses, and that therefore there is a policy that provides coverage, the <u>entirety</u> of the coverage provided by the policy is swallowed by an exclusion based on the very same allegations of fraud, even though the Fraud Exclusion clause states that it is subject to the very disclaimers that preclude the defense of fraud in the inducement.

---

[52]"With regard to the Distributor and the Insured, failure to pay, financial failure or default, insolvency, bankruptcy, liquidation, winding up, administration or arrangement with creditors."

Such a construction would violate the axiom that, if possible, a contract should be construed so as to avoid an unreasonable result, see, NY Jur2d Contracts § 219 and cases there cited.

The clause would, of course, permit an exclusion defense based on allegations of fraud occurring subsequent to the policies, giving rise to the loss. However, the insurers have failed to plead any such facts, let alone with the requisite particularity.

**Breach of Contract**

### Due Diligence Clause

Chase has failed to meet its burden to show that it is entitled to dismissal of the defenses based on the Due Diligence clause. However, nothing in the clause supports the contention that (absent a showing that the breach is responsible for the entire amount of the loss), its violation would operate as a bar to Chase's claims. Failure to exercise due diligence as defined by the clause would operate to reduce Chase's damages to the extent that the breach resulted in a greater loss than would otherwise be the case.

### Claims Procedure Clause

This clause is discussed more fully in my adjudication of motion sequence no. 016. In accordance with that discussion, the Notice clause is not a condition precedent, and therefore any defense based on its alleged breach requires proof of prejudice. The clause does not require Chase to give notice based on experiences with other slates, other films, and/or the inherent structure of the transaction.

### Audit Clause

Nothing in the Audit clause requires Chase to initiate an audit unless and until the Lead Insurer so requests in writing. No such written request is alleged, and therefore, Chase's failure to request an audit is not a violation of its obligations under this clause. Likewise, while the clause requires Chase to supply the Lead Insurer with copies of specified documents, etc., received by Chase from specified sources, it does not affirmatively require Chase to obtain such materials. Accordingly, to the extent that the affirmative defenses are based on the contention that Chase failed to conduct an audit, or failed to obtain documents, they are dismissed.

However, Chase has failed to meet its burden to establish that there are no facts otherwise provable within the scope of the audit clause affirmative defenses that would establish a breach of this clause.

### Implied Covenant of Good Faith and Fair Dealing

These defenses and counterclaims are dismissed.

To the extent they are based on conduct allegedly in violation of the Due Diligence clauses, they are duplicative of the defenses and counterclaims based thereon.

To the extent they are based on alleged fraud occurring prior to the effective date of the policies, they fail because the covenant does not come into effect prior to the effective date of the contract from which it arises.

To the extent, if any, that they can be construed as based on any alleged fraudulent conduct occurring after the effective dates of the policies, they are not pleaded with the requisite specificity.

Moreover, they fail because they seek to impose on Chase a duty (disclosure) that was expressly waived in the policies. No obligation can be implied under the covenant that would be inconsistent with other terms of the contractual relationship, see, Murphy v American Home Prods. Corp., 58 NY 293 (1983).

### Unilateral Mistake:

GS asserts as its twelfth affirmative defense that Chase concealed the true nature of the policies from the insurers. GS alleges that to the extent that the Court construes the policies as financial guaranties, the insurers, including GS, executed the insurance under the mistaken belief that they were policies of contingency insurance, and that Heath marketed the policies as insurance policies rather than financial guarantees.

This defense fails. First, under the disclaimer clauses, Chase is not responsible for any such alleged misrepresentation by Heath, and Chase had no duty to speak. Second, what makes a contract a financial guaranty, or an insurance policy, are its provisions as construed under the applicable law. The insurers, like insureds, are charged with knowledge of both.[53]

---

[53]"Financial guaranty" is defined by Insurance Law § 6901. Fortuity or the lack thereof is not a defining factor, unless the "the loss is payable only upon the occurrence of ... a fortuitous

**NY Insurance Law § 3105**

GS contends in its fourth affirmative defense that the policies are void ab initio under NY Insurance Law § 3105 for the reasons set forth in GS's fraud counterclaim.  That statute contains certain substantive provisions relating to life or accident and health insurance, but otherwise merely codifies certain principles as to what constitutes a misrepresentation and what constitutes materiality.  Those codified definitions do not provide a substantive basis for voiding the policies.

**Fortuity**

The insurers assert that the transactions were structured in such a way that a loss was substantially inevitable.  In fact, however, as set forth in the papers supplied in connection with Chase's motion for summary judgment, it is undisputed that of the twelve films in the Paramount IV and V slates, three passed the claim determination date without generating a claim.  That is, a full one-fourth of the policies which, according to the insurers, were "substantially certain" to result in claims, did not do so.  By any standard, this fact alone precludes any contention that the losses were "substantially certain" to result in claims, and mandates dismissal of the defenses to the extent based on that premise.

Even were this not the case, however, the fortuity defenses (with the one exception noted below) would be dismissed.

Contrary to the insurers' contention, there is no requirement in New York law that an insured affirmatively plead that the loss was fortuitous.

What distinguishes these cases from others in which nonfortuity was held to bar a claim on an insurance policy, are two key factors.

The first factor is that each of the policies provides coverage for but a single event (which also constitutes the loss): the insufficiency of the earmarked revenues to repay the loan <u>as of the claim determination date defined in the policy</u>.  Under MISCELLANEOUS, the policies provide:

> It is understood and agreed that only one claim may be made under this Policy.

_____

<u>physical</u> event [emphasis added]." § 6901(A)(2((a)(i).

The second factor is the manner in which the New York Insurance Law defines "insurance policy" and "fortuity."

The issue of fortuity, including the "known loss" doctrine[54], is discussed in the Litto opinion at 12-37.[55]   On appeal, regarding the contingent extra expense policy, which was

---

[54]While I do not base my decision on it, I note that according to the New York Times article of September 12, 2003 relating to the heavy fine levied against AIG by the SEC, insurance companies will issue policies even though they know that claims will be made on the policy. According to the article:

> In the legitimate version of this kind of transaction, a company pays a quite high premium for insurance against a loss that has already occurred, but for which the total amount and the timing are uncertain. The company will pay, say, $80 million for $100 million of insurance. The corporation gets certainty that its cost will not exceed its premium. The insurance company hopes that the actual cost of the loss will be less than the $100 million and that it will earn considerable income by investing the $80 million. But in this case, the risk has been shifted to the insurance company.

[55]The insurers' contention in Litto was that the loss insured against, was nonfortuitous ab initio because the structure of the financial arrangements was such that it was inevitable that a loss would occur, and that this was within Chase's control due to the way Chase had structured the transaction.

As discussed in the Litto opinion at 15, it was undisputed that it was the intention of all parties that the contract was an insurance policy as defined by New York law.

Insurance Law § 1101(a) defines an "insurance contract" as

> any agreement or other transaction whereby one party, the "insurer", is obligated to confer benefit of pecuniary value upon another party, the "insured" or "beneficiary", dependent upon the happening of a fortuitous event,

and defines "fortuitous event" as

> any occurrence or failure to occur which is, or is assumed by the parties to be, to a substantial extent beyond the control of either party [emphasis added].

Therefore, in order for the contract to be what the parties intended it to be, to wit, an insurance policy as defined by New York law, the event  that is the sole subject of the policy had to be either factually substantially beyond the control of either party, or assumed by them to be

governed by New York law, AXA Re's Appellate Brief asserted at 59-60:

> The events which caused the alleged losses under the CEE Policy
> and the Cash Flow Insurance Policy were not random events, but
> were events engineered and controlled by Chase or which Chase
> knew inevitably would result in a loss, and thus fall outside the
> coverage afforded under the policies.
>
> ***
>
> With regard to the CEE Policy, AXA Re alleged that Chase,
> knowing that repayment of the Working Capital Facility (the loan
> insured by the CEE Policy) was contingent upon GLP [the
> producer] commencing five pictures in three years, deliberately
> withdrew its five-picture financing commitment to GLP a year
> after AXA Re had entered into the CEE Policy.[56]  AXA Re further
> alleged that unbeknownst to it, Chase knew that GLP would be
> unable to obtain sufficient production fees to timely repay the
> Working Capital Facility, thus making a claim under that policy
> inevitable.

AXA asserted further, at 64-65:

> Second, while AXA Re alternatively alleged that Chase knew from
> the outset that GLP would be unable to repay the loan by its
> maturity date, it is not true that AXA Re alleged that this
> inevitability was solely the product of the "structure of the deal." ...
> nor was there a basis for the Court to assume that GLP's loan
> default was foreordained by "facts on which the insurers were on
> notice at the time the policy was issued." ... Loss under the Policy
> was inevitable because of circumstances that were known to Chase
> (which had a longstanding, association with GLP ..., including the
> rate at which GLP could acquire qualifying film product from
> Chase's major studio clients ... but which were not known to
> insurers.  The Court erred in assuming that merely because AXA

---

substantially beyond the control of either party.  Absent one of these two alternatives, the
contract was not an insurance policy.  Therefore, if, as the insurers argued, the sole event/loss
insured against was nonfortuitous in the factual sense, it was necessarily contractually assumed
by the parties to be substantially beyond the control of either party and therefore, by statutory
definition, fortuitous as defined by New York law as the parties intended.  If it was not so
contractually assumed, then the contract was not an insurance policy as the parties intended.

[56]As I held in Litto, at 59-61, Chase did not "withdraw" its commitment.  Rather, the
commitment came to its predetermined end, and Chase had no obligation to extend it.

Re knew the "structure of the deal" (e.g., that it involved a working capital loan that had to be repaid in three years), AXA Re further knew of those extrinsic circumstances that made repayment within that structure impossible.

See also, Litto, Reply Brief of AXA Reassurance S.A. at 12 n 8 ("Though many fortuitous causes may be insured under the terms of the Policy, if the insured arranges matters so as to guarantee a loss, the resulting loss is nonfortuitous"); Litto, Reply Brief of New Hampshire Ins. Co. at 13 ("New Hampshire must once more emphasize that the loss under the Contingent Extra Expense Insurance Policy was inevitable ... the three-year term of the Working Capital Facility was too short to permit GLP to commence the required number of motion pictures to avoid a claim...").

However, at the same time, straddling the fence, AXA Re argued, at 63, that the policy, at is inception, envisioned a loss from both fortuitous and nonfortuitous causes:

under the CEE Policy the "single potential loss" (a shortfall on repayment of a particular loan) could have resulted from any number of causes, or risks, and thus a finding that the loss here resulted from a nonfortuitous cause does not render the policy "illusory." For example, had Chase conducted itself differently, a default by GLP might have resulted from nonpayment by a film distributor of sums owed to GLP that otherwise would have been dedicated toward repayment of the loan. In answers to interrogatories, Chase itself described events, such as the "success of the motion picture(s) with the public," that could be a fortuitous event leading to a loss ... Market conditions, alternatively, might have prevented GLP from acquiring and producing sufficient film product to repay the loan. Likewise, unexpected weather, actors' guild strikes, indeed a panoply of other contingencies, could have caused production delays that would have forestalled film projects sufficiently to cause a loan default and trigger coverage under the CEE Policy. The CEE Policy would have been illusory only had its terms provided but for a single cause of loan nonrepayment - "embezzlement," for example - and it then had been contended that any and all embezzlement was nonfortuitous. But here, as described above, an unlimited number of fortuitous events "assumed by the parties to be beyond their control!" could, in other circumstances, have resulted in a covered loss under the CEE Policy.

See also, Litto, Brief of New Hampshire Ins. Co., at 30 et seq.; Reply Brief of Axa Reassurance S.A. at 11 et seq.

Impliedly rejecting these arguments, the First Department held in Litto:

> the only reasonable construction of the policy, as the IAS court held, is that parties assumed that the risk that the production company might not be able to generate films quickly enough to provide funds with which to repay the working capital loan was beyond the control of either party (see Insurance Law § 1101 [a] [2]) [emphasis in original].

To the extent that the present insurers base a defense on the premise that the structure of the transaction was such that the event/loss under it was necessarily nonfortuitous, including the contention that it was caused by an action taken by Chase that was contemplated by the parties to the policies as being within Chase's contractual rights, the defense is foreclosed by the First Department's holding. An insurer will not be permitted to contractually agree that its insured may act in a certain way, and then disclaim because the insured did what it was contractually permitted to do.[57]

However, nothing in Litto precludes the insurers from asserting as a defense that, e.g., a particular act by Chase proximately caused the loss under circumstances that would render the loss nonfortuitous under ordinary principles of insurance law. Thus, the insurers posit that the loss may have resulted from some cause such as diversion of funds by Chase, or some other cause actually within Chase's control, not inherent in the structure itself, and not within the scope of Chase's contractual rights under the policies. The insurers are entitled to discovery before having to specify what acts by Chase, not permitted to Chase within the parties' agreement, support this defense.

The insurers' pleading of nonfortuity differ, and therefore the disposition of the motion differs.

**Fortuity - AXA**

---

[57]If the event/loss had been caused by something Chase did outside the scope of its contractual rights, different principles would apply.

In its present pleading, AXA takes the same "straddle" approach as AXA Re took in the Litto appeal. It asserts, at ¶¶ 141-43:

> At the time the Contingent Extra Expense policies were issued, the parties believed that a shortfall in the repayment of the bank's film production loans could arise from either a fortuitous or non-fortuitous event. The parties (including Chase) understood, contemplated and intended that in order for the insurance coverage to be valid, coverage only would be afforded for losses arising from fortuitous events.

> At the time Chase procured the Contingent Extra Expense Policies through its brokers, Chase knew that claims under the policies were substantially certain to occur due to the manner in which it had structured the Paramount program and Chase regarded claims under the policy as within its control. Chase and its brokers acting as agents for Chase represented to insurers that claims were not expected under the policies and therefore, insurers were not aware that claims under the policies were substantially certain to occur.[58]

> Even if the Contingent Extra Expense Policies issued in respect of the Paramount Slate IV and V transactions otherwise were valid and enforceable, there is no coverage thereunder because any loss that has occurred under the policies was non-fortuitous.

This being the same argument that AXA made unsuccessfully on appeal, I conclude that is barred by stare decisis. Even if this contention were not barred by stare decisis, I would reject it.

Conversely, if AXA were correct that because of the inherent structure of the transaction, the event/loss was nonfortuitous, and if the parties did not contractually assume that the loss was beyond either of their control, the contracts would not be insurance policies as defined by New York law. They would simply be contracts. If they were not insurance policies, then nonfortuity would not be a defense. While AXA could still defend on the ground that some action taken by Chase outside its contractual rights under the policies proximately caused the loss, that would be based on ordinary contract principles, not on fortuity principles of insurance law.

**Fortuity - Gordian and Odyssey**

---

[58]This contention is barred by the policy disclaimer clauses.

66

Gordian and Odyssey's pleading and arguments are essentially like AXA's and fail for the same reasons.

### Fortuity - GS

GS's fortuity affirmative defense states as follows:

> At the time it obtained insurance for the loans on the Paramount IV Facility and the Paramount V Facility, as the international leader in insured film finance transactions and as the developer of an extensive proprietary database regarding past film performance, Chase was best situated to understand not only how well a film was likely to perform financially, but also how that performance would affect the various participants in any film finance transaction, insured or otherwise. Chase therefore knew that, contrary to the representations made to insurers, regardless of whether or not the films insured under the Paramount IV Facility and Paramount V Facility earned in the mid-range of expected performance, insurers would suffer a claimed loss under the policies. Chase thus knew that a loss under the policies was not a chance event but was an inevitability.

> Chase also knew that it was inevitable that claims would be made under the respective policies for the films declared under the Paramount IV Facility and the Paramount V Facility by the claim dates thereunder, because the policies provided for a recoupment period that Chase knew was insufficient.

> Indeed, Chase has conceded that it believed that claims under the policies would be made by the claim date.

> On information and belief, Chase was able to and, in fact, did exercise control over the allocation of costs, expenses and overhead on films made under the Paramount IV Facility and the Paramount V Facility, and thus had the power in that fashion to determine whether or not there would be a loss on said films and the extent of such a loss.

> The policies of insurance at issue are thus void <u>ab initio</u> due to a lack of fortuity, a required element for an insurance contract and under New York statutory insurance law. Further facts concerning the lack of fortuity of the policies at issue are set forth below in General Star's counterclaims, which are incorporated herein by reference.

67

Since GS's contention is that the event/loss was inevitable because of the way Chase structured the transaction, and since this was the only event/loss for which the policies provided coverage, the defense fails. If GS is correct, then either the parties contractually assumed that the loss was not within either of their control, or there was no fortuitous event for which the policies provided coverage. In the latter event, the contracts were not insurance policies under New York law and the fortuity defense is inapposite.

### Fortuity - New Hampshire

New Hampshire asserts at ¶ 66

> To the extent that any claim is a result of a loss that was inevitable and non-fortuitous, it is not covered under the Policies.

To the extent that this defense is based on the premise that the insufficiency of the revenues to repay the loan (the sole event/loss for which the policies provided coverage) was inherently nonfortuitous, it is dismissed. To the extent that it is based on the contention that some action by Chase, outside the scope of Chase's rights under the policies, and other than the structuring of the terms, intentionally caused the event/loss, it withstands dismissal.

## QUESTIONNAIRE SECTION 1

The insurers raise three issues concerning Section 1 of the Questionnaire.

First, the insurers assert that Bradstreet, who signed the Questionnaires, answered question 14 untruthfully on each of the questionnaires in the Paramount IV slate. For example, GS pleads, at ¶ 197:

> For each of the films, Mr. Bradstreet indicated in answer to question 14 that he had never "found it necessary to come to an arrangement with his creditors." In fact, in 1995, Mr. Bradstreet had found it necessary to come to an agreement with the creditors of Bradstreet Media Limited, an entity wholly owned and controlled by him, in particular with HM Customs & Excise for failure to pay VAT and an order was issued by the High Court of England that the company would be wound up.[59]

_____

[59] As pleaded by AXA, at ¶ 121(e):

> Bradstreet's former entity, Bradstreet Media Ltd., had been compulsorily liquidated by HM Customs & Excise for non-

68

The insurers plead no facts and cite no case law to support the contention that the proceedings as thus described in the pleadings, involving HM Customs & Excise and a corporate entity, rather than Bradstreet personally, come within the reasonable scope of "found it necessary to come to an arrangement with [Bradstreet's] creditors." This defense fails.

### Producer

AXA and Odyssey contend that Part 1 of the Questionnaire was not answered truthfully because the "production company" was not accurately identified. AXA raises this defense as to Out of Towners, and Simple Plan.[60] Odyssey raises it as to Out of Towners.

The policies define the "Company" as ICE Insured Finance III, LLC, or ICE Insured Finance IV, LLC, as appropriate. They define the "Distributor" as Paramount Pictures Corporation. They do not define the term "Production Company." [61]

Regarding the Questionnaire for Simple Plan, AXA's complaint is merely that the Production Company was left blank. AXA asserts that the SPVs were not the "producers" or "production companies" and that the space should have been filled in.

---

payment of taxes.

and at ¶ 155:

> in 1995 Bradstreet had found it necessary to come to an arrangement with the creditors of Bradstreet Media Limited, an entity wholly owned and controlled by him, in particular with HM Customs & Excise for failure to pay VAT and an order was made by the High Court that the company be wound up.

[60]AXA makes this same contention as to Double Jeopardy, General's Daughter and Payback. However, those policies are not at issue on this motion.

[61]AXA's answer alleges, at ¶ 156, that the "producers" for Simple Plan were Paramount Pictures, Mutual Film Company and Savoy Pictures. That paragraph further lists the "production companies" for Out of Towners, the "producers" for Double Jeopardy, the "producers" for General's Daughter, the "producers" for Simple Plan, and the "producer" for Payback. The Questionnaire asks for the "individual producers" and the "production company" but does not ask for the "producers."

69

Finally, Odyssey (though not AXA) complains that Bradstreet signed and/or completed Section 1 of the Questionnaire on behalf of the respective SPV as "PRODUCER (SPV)" thus indicating, according to Odyssey, that the SPV was the producer, which, Odyssey asserts, is not the case.   However, that recitation appears on the left side of the form, which evidently contains the text of the blank Questionnaire itself, not on the part filled out by Bradstreet, which is on the right side.   The draft Questionnaires, as included in the motion papers filed in Heath's motion to dismiss the third party actions, contains this same use of the words "PRODUCER (SPV)" as the completed questionnaires.   The Truth of Statement Clause requires that Section 1 be filled out by the Company (viz, the respective SPV), and no other space is provided for the signature of the Company other than this space.   Bradstreet's signature appears on the right hand side of the completed form as follows:

> ICE Insured Finance III, LLC
> By: ICE Insured Finance Management, Inc.
>
> By: *Graham Bradstreet*
> Name: Graham Bradstreet
> Title: President
> Date [filled in].

The insurers' own motion papers, and their pleadings themselves, establish beyond dispute that the insurers were fully aware of the respective roles of the SPVs.  Since they accepted the premiums while on notice of what they now claim to be an inaccuracy in the Questionnaire, these deficiencies, if such they be, were waived as a matter of law.

Accordingly, these affirmative defenses are stricken.

## CONDITIONS PRECEDENT

The sole conditions precedent listed in the policies is the truthful completion of Section 1 of the Questionnaire by the Company, and, in some of the policies (such as Out-of-Towners) the payment of the premium to Heath upon closing of the Loan Agreement.[62]  The former is discussed above.  The insurers raise no contention that the premium was not duly paid.

---

[62]The first and second layer policies for Star Trek: Insurrection do not list premium payment as a condition precedent.  It is listed under General Conditions.  The content of the clauses also differs.

70

Gordian argues that because the lineslip states, under "Conditions," "Risk managers for Insurers are ICE Media Ltd." this means that it is a condition precedent that the risk managers acting "for Insurers" will be loyal to the insurers and will not conspire with Chase to defraud the insurers.

This contention fails for multiple reasons.

First, even assuming arguendo that the term "conditions" means "conditions precedent," the mere statement that "Risk Managers for Insurers are ICE Media Ltd." does not create any implied or express warranties as to the quality of their services or otherwise. Such a construction is wholly without support in the policy and is at odds with its express terms.

Second, the rights and obligations of the parties are governed by the individual policies, which necessarily supersede the lineslip to the extent they are inconsistent. The policies contain no such "condition." Far from supporting Gordian's construction, the policy precludes it. Under the principle <u>expressio unius est exclusio alterius</u>, the failure to include such a provision where the policy lists "CONDITIONS PRECEDENT" precludes such a construction.

Third, the general rule is that it must clearly appear from the contract itself that the parties intended a provision to operate as a condition precedent, <u>see, generally,</u> 22 NY Jur 2d, Contracts, § 234). Where there is ambiguity in a contractual term, the law does not favor a construction which creates a condition precedent, <u>Lui v Park Ridge at Terryville Assn, Inc.,</u> 196 AD2d 579 (2d Dept 1993).

None of the other matters addressed by the insurers are conditions precedent.

**Failure to Provide Timely Notice**

As discussed more fully in my opinion adjudicating Chase's motion to dismiss affirmative defenses and counterclaims in motion sequence no. 016, the Notice clause contained in the Claims Procedure clause is not a condition precedent. Accordingly, any defense based on alleged breach of this clause requires proof of prejudice.

Chase has failed to meet its burden to demonstrate that these defenses should be dismissed. To the extent, however, that these defenses are based on the premise that Chase's notice requirements were triggered by matters relating to other slates, other films, or by Chase's

71

knowledge of the inherent structure of the transactions, or that a breach results in a per se bar to Chase's claims, they are not supported by the policies and are dismissed.

## DISPOSITION OF DEFENSES/COUNTERCLAIMS

In view of the foregoing, the disposition of the motion is as follows:

1. To the extent that the affirmative defenses are based on the Fraud Exclusion, they are dismissed.

2. To the extent that the affirmative defenses are based on the Audit clause, they are dismissed to the extent they are based on the contention that Chase failed to request an audit, or that Chase failed to request or obtain documents, and the motion is otherwise denied.

3. To the extent that the affirmative defenses are based on the Due Diligence clause, they are dismissed to the extent that the insurers assert that breach of the clause constitutes a per se bar to Chase's claims, and the motion is otherwise denied.

4. To the extent that the affirmative defenses are based on the contention that Chase violated the requirements governing Questionnaire Section 1, they are dismissed.

5. To the extent that the affirmative defenses are based on the Notice clause (contained in the Claims Procedure clause), they are dismissed to the extent that they are based on notification based on performance or experience of prior slates or other films, or on allegedly inherent flaws in the transactions, or on the contention that the Notice clause is a condition precedent whose breach is a per se bar to Chase's claims; and the motion is otherwise denied.

6. To the extent that the affirmative defenses are based on any alleged breach of the implied covenant of good faith and fair dealing, they are dismissed.

7. To the extent that the affirmative defenses are based on any alleged breach of conditions precedent or conditions subsequent, they are dismissed.

8. To the extent that the counterclaims seek a declaratory judgment, they are dismissed.

9. To the extent that any of the surviving defenses are based on the contention that any of the alleged breaches would bar Chase's claims, rather than limit damages, they are dismissed.

## AXA - AFFIRMATIVE DEFENSES

1st Affirmative Defense - failure to state a claim upon which relief can be granted - dismissed.

2d Affirmative Defense - misrepresentation and concealment - dismissed.

72

3d Affirmative Defense - equitable estoppel - dismissed.

4th Affirmative Defense - fortuity - dismissed.

5th Affirmative Defense - unclean hands - dismissed.

6th Affirmative Defense - Due Diligence clause - motion granted in part and denied in part, in accordance with the foregoing.

7th Affirmative Defense - failure to comply with terms and conditions of policy- motion granted in part and denied in part, in accordance with the foregoing.

8th Affirmative Defense - conditions precedent - dismissed.

9th Affirmative Defense - section 1 of Questionnaire - dismissed.

10th Affirmative Defense - claims barred to extent that complaint seeks relief not allowed under applicable law - dismissed.

11th Affirmative Defense - Fraud Exclusion - dismissed.

12th Affirmative Defense - failure to mitigate damages - motion denied.

13th Affirmative Defense - attorneys fees - decision reserved.

## AXA - COUNTERCLAIMS

1st Counterclaim - aiding and abetting fraud of Bradstreet/ICE/Hoffman - dismissed.

2d Counterclaim - aiding and abetting breach of fiduciary duty of Bradstreet/ICE/Hoffman - dismissed.

3d Counterclaim - breach of the implied covenant of good faith and fair dealing - dismissed.

4th Counterclaim - conspiracy to commit fraud - dismissed.

## GS - AFFIRMATIVE DEFENSES

1st Affirmative Defense - failure to state claim on which relief can be granted - dismissed.

2d Affirmative Defense - failure to provide timely notice - motion granted in part and denied in part, in accordance with the foregoing.

3d Affirmative Defense - fraudulent inducement - dismissed.

73

4th Affirmative Defense - policies void ab initio by statute - dismissed.

5th Affirmative Defense - claims barred to extent that complaint seeks relief not allowed under applicable law - dismissed.

6th Affirmative Defense - unclean hands - dismissed

7th Affirmative Defense - waiver - dismissed

8th Affirmative Defense - failure to comply with clauses - motion granted in part and denied in part, in accordance with the foregoing.

9th Affirmative Defense - conditions precedent/subsequent - dismissed.

10th Affirmative Defense - fortuity - dismissed

11th Affirmative Defense - equitable estoppel - dismissed

12th Affirmative Defense - Chase knew that GS was not authorized to write policies having the effect of a guaranty but marketed policies under cash flow or contingent extra expense policies - dismissed.

13th Affirmative Defense - dual agency - dismissed.

## GS - COUNTERCLAIMS

1st Counterclaim - fraud - dismissed.

2d Counterclaim - aiding and abetting breach of fiduciary duty of the RMs - dismissed.

3d Counterclaim - aiding and abetting fraud of the RMs - dismissed.

4th Counterclaim - conspiracy to commit fraud - dismissed.

5th Counterclaim- breach of the implied covenant of good faith and fair dealing - dismissed.

## NEW HAMPSHIRE - AFFIRMATIVE DEFENSES

1st Affirmative Defense - failure to state a claim for which relief can be granted - dismissed.

2d Affirmative Defense - conditions precedent - dismissed.

3d Affirmative Defense - failure to comply with terms and conditions - motion granted in part and denied in part, in accordance with the foregoing.

74

4th Affirmative Defense - Due Diligence clause - motion granted in part and denied in part, in accordance with the foregoing.

5th Affirmative Defense - fortuity - motion granted in part and denied in part, in accordance with the foregoing.

6th Affirmative Defense - unclean hands - dismissed.

7th Affirmative Defense - waiver and estoppel - dismissed.

8th Affirmative Defense - fraud and concealment; policies void ab initio - dismissed.

9th Affirmative Defense - fraud exclusion - dismissed.

## NEW HAMPSHIRE - COUNTERCLAIMS

1st Counterclaim - rescission due to misrepresentations, omissions and concealment - dismissed.

2d Counterclaim - aiding and abetting breach of fiduciary duty - dismissed.

## GORDIAN - AFFIRMATIVE DEFENSES

1st Affirmative Defense - failure to state a claim for which relief can be granted - dismissed.

2d Affirmative Defense - fraudulent inducement - dismissed.

3d Affirmative Defense - unclean hands - dismissed.

4th Affirmative Defense - waiver and equitable estoppel - dismissed.

5th Affirmative Defense - fortuity - dismissed.

6th Affirmative Defense - claims are barred or limited by terms, conditions and exclusions including Due Diligence clause, Claims Procedure clause, Fraud Exclusion, Audit clause - motion granted in part and denied in part, in accordance with the foregoing.

7th Affirmative Defense - conditions precedent - dismissed.

8th Affirmative Defense - claims barred to extent that complaint seeks relief not allowed under applicable law - dismissed.

9th Affirmative Defense - attorneys fees - decision reserved.

75

10th Affirmative Defense - failure to mitigate damages - motion denied.

## GORDIAN - COUNTERCLAIMS

1st Counterclaim - Aiding and abetting breach of fiduciary duty - dismissed.

2d Counterclaim - Breach of contract - dismissed..

## ODYSSEY - AFFIRMATIVE DEFENSES

1st Affirmative Defense - Failure to state a claim on which relief may be granted - dismissed.

2d Affirmative Defense - fraudulent inducement - dismissed.

3d Affirmative Defense - conditions precedent - dismissed.

4th Affirmative Defense - claims barred and/or limited by terms, conditions, limitations and exclusions - motion granted in part and denied in part, in accordance with the foregoing.

5th Affirmative Defense - fraud exclusion - dismissed.

6th Affirmative Defense - laches, waiver, estoppel - dismissed.

7th Affirmative Defense - failure to mitigate damages - motion denied.

8th Affirmative Defense - dismissed.

9th Affirmative Defense - attorneys fees - decision reserved.

## ODYSSEY - COUNTERCLAIMS

1st Counterclaim - fraud - dismissed.

2d Counterclaim - conspiracy to defraud - dismissed

3d Counterclaim - declaration of no coverage based on equitable estoppel - dismissed

4th Counterclaim - breach of contract ("misrepresentations" in policy; "independent agents") dismissed.

5th Counterclaim - covenant of good faith and fair dealing - dismissed.

6th Counterclaim - aiding and abetting breach of fiduciary duty - dismissed.

7th Counterclaim - fortuity - dismissed.

This constitutes the decision and order of the court.

Dated: September 18, 2003

ENTER:

_____
J.S.C.

IRA GAMMERMAN

**APPENDIX A - EXAMPLES OF STATEMENTS QUOTED OUT OF CONTEXT AND MISCHARACTERIZED**

1. AXA complains that the May 1998 report by ICE contained the statement:

> It should also be stressed that this cover is not expected to be a working facility and the intention therefore is not to have any claims at all (at ¶ 176[a]).

GS's pleading similarly asserts:

> Chase, Heath and the Risk Managers <u>assured</u> General Star and the other insurers that the proposed insurance would be "non-working facility[ies]" - <u>i.e.,</u> that they would not be subject to losses as of the dates for determining claims. (at ¶ 3).

<u>See also</u> New Hampshire's pleading at ¶¶ 75, 156(a).

The sentence quoted from the May report is taken from the following paragraph:

> It should also be stressed that this cover is not expected to be a working facility and the intention therefore is not to have any claims at all. <u>If a [claim] does however materialise</u> [sic] then upon payment the Insurers will be placed in first position from the Bank's revenue corridors for recovery purposes, as well as benefiting [sic] from cross collateralization provision of the cover [emphasis added].

The report contains additional references to the possibility that a claim would be made:

> p. 6 - "<u>If a claim is paid,</u> Insurers will be placed in first position to recover further revenue income from the bank's ongoing corridors" [emphasis added].

> p. 17 - Risk Managers have also negotiated with Paramount an[] 'excess' of $2 million, which means that if there is a loss on this slate of films, Paramount will bear the cost of such loss up to a maximum of $2 million in the aggregate across the slate [emphasis added].

AXA also complains that the November report contained the statement that "the facility is structured with the intention of not having a claim."

This sentence appears in the following paragraph:

> Although the facility is structured with the intention of not having a claim, <u>if a claim does materialise [sic], then upon payment the Insurers will be placed in first position from the Bank's revenue corridors for recovery purposes, as well as benefiting from the cross colateralisation [sic] [provisions] existing within the facility</u> [emphasis added].

The November report states further, at p. 6, "[if] a claim is paid, Insurers will be placed in first position to recover further revenue income from the bank's ongoing corridors."

Moreover, the reports contain the following disclaimer:

> Nothing herein constitutes a warranty or representation either by the Insured, Paramount Pictures Inc. (Paramount), Heath Insurance Broking Limited (HIBL) or ICE.

A party may not claim to have "reasonably relied" on a "representation" that is accompanied by the warning that it is not a "representation." Such reliance is unreasonable as s matter of law.   ____

The policies contain forum selection clauses, provisions for the insurers to be reimbursed from future deposits to the Collection Account or future revenues after payment of claims, a two-page clause governing Claims Procedure, a nearly three-page clause governing mediation, invocable by the Lead Insurer at its option if Chase, at its option, gives notice of an anticipated claim and if the Lead Insurer anticipates disputing the amount of the claim. The Absence of Revenue clause, quoted above, anticipates the possibility that there would be insufficient, or even no, revenue generated by the films. The proposition that the insurers negotiated and incorporated such clauses into the policies believing that no claims were anticipated, is untenable on its plain face.

GS' pleading states, at ¶ 49, that the May 14, 1998 report

> represented ... that [the RMs] would recommend that insurers approve a declaration only <u>after determining that the film would be</u>

<u>successful and would not result in a claim</u>.  This representation was false [emphasis added].

This assertion is presumably based on the following statement in the May 14, 1998 RMR:

> [The Risk Managers will] assess the adequacy of the budget, including the contingencies, and give their view on the potential earnings of the film, based upon the cast, script, and director and world-wide revenue estimates.  If risk managers feel the film will be successful then they will recommend to Insurers they support the financiers in order to proceed.

Even without the disclaimers, quoted above, set forth on the very first page of the RMR, this statement does not support Gordian's mischaracterization of it.  A "feeling" is not a "determination," and the RMR does not contain the words "and would not result in a claim."

## APPENDIX B. - EXAMPLES OF ALLEGATIONS CONTRADICTED BY DOCUMENTATION

1. The insurers complain of an "implied" representation that the three-year claim determination date was too short to allow recoupment.

In fact, the policies contemplate that a longer recoupment period could be necessary. Defining "Claim Determination Date," the policies provide:

> The date three (3) years after the initial theatrical release of the Film Production in the United States.  In addition, if requested by the Insured, the insurers will consider extending the Claim Determination Date for up to one additional year, subject to the Lead Insurers having been provided with sufficient documentation to indicate that there is a reasonable expectation that the amount of Revenue to be received in the Collection Account during such extended period will exceed the incremental interest that will accrue during such extended period on the Contingent Extra Expenses outstanding during such extended period, which Distributor shall be responsible for paying subject to the Revenue Participation Agreement.

80

Since the policies contemplate that the three-year period may be inadequate, and since the policies address this possibility, the insurers' contention that they were misled as to the adequacy of the three-year period, would not support relief.

The insurers complain that Chase did not request that the insurers thus extend the claim determination dates. However, the policy does not require Chase to make this request, and, moreover, nothing in the policies precludes the insurers from initiating such a dialogue. Nevertheless, nothing in the motion papers suggests that, even after litigation was commenced over the films with earlier claim determination dates, the insurers ever raised with Chase a potential extension of the claim determination dates for the remaining films.

I note that a "claim" under the policies is based on the revenue shortfall as of the specified claim determination date. However, the films may generate revenue after the claim determination date, and if a claim is paid, any such revenue is paid to the insurer until it has been reimbursed. This is pointed out by AXA's underwriter in the memorandum annexed to Chase's reply papers as Ex 12, in which he states:

> Even in case of loss, the distribution of the film will continue to generate revenues. [63]

2.  AXA asserts, at ¶ 75:

> In the fall of 1998, Peter Hoffman and Chase <u>renewed discussion to extend the claim dates</u> for the films in the Paramount program in order to delay the inevitability of additional Chase claims and <u>to conceal from insurers their true exposure</u> on the Chase book of insurance-backed film financing business in order to induce them to continue underwriting insurance-backed film financing deals [emphasis added].

The May 1998 Placement Report for the Paramount IV slate, a document on which the insurers heavily rely to support their fraud claims, states:

---

[63]If the insurer paid the claim as of the claim determination date, and the film continued to generate adequate revenues to reimburse the insurer for the full amount of the claim thus paid, the insurer would, despite paying the claim, potentially realize a significant gain based on the large premiums charged (and the claim-free use of those funds for the three years prior to the claim determination date) despite payment of the claim.

The second slate, however, is not expected to fully recoup the
insured loans, and it is expected that there will be a claim on
insurers, although Risk Managers are seeking to defer any payment
past the current claim determination date based on a potential
refinancing. Risk Managers will continue to work with Paramount
to minimise the level of any anticipated loss. It is too early to
anticipate any result on the third slate with only two films released
- one performing well above expectations, and one below
[emphasis added].

Thus, the insurers were on actual notice both of the anticipated loss and the extension
negotiations, prior to the issuance of the present policies.[64]

In fact, as discussed above, the present policies expressly contemplate negotiation of a
delayed claim determination date if a loss is anticipated.

3. AXA asserts at ¶ 50:

As further evidence of Chase's knowledge of the disloyalty of the
risk managers, Chase's Clark Halllren circulated an internal e-mail
note on June 25, 1998 in connection with the Paramount IV
transaction in which he stated "[t]he financing is increasing to a six
picture deal to include "The General's Daughter." (I think Peter
Hoffman is scamming even more fees by being a producer on the
picture!!!).

However, AXA does not assert that Hoffman was made the producer, or paid any fees for
services as producer. The credits of the film as produced, of which I take judicial notice, list
Mace Neufeld as producer, and AXA's own pleading states, at ¶ 156, that the producers for
General's Daughter were Paramount Pictures, MFP Munich Film Partners, and Neufeld Rehme
Productions. The fact that Chase expressed this disapproving view of Hoffman's potential role as

---

[64]Ironically, in their affirmative defenses and opposition papers in the action that was
consolidated with the present one, the insurers argue that Chase failed to comply with its
obligations under the Due Diligence Clause because it did not seek to extend the claim dates:
Thus, GS's memo of law in opposition to Chase's motion in motion sequence no. 016, states at 8:

Chase failed to perform any analysis to determine if the loans could
be restructured so as to extend the claim dates. Chase's witness has
testified that for loans where Chase was uninsured, it frequently
restructured the terms of the loans to help avoid or diminish losses.

producer, and that Hoffman's role as producer evidently did not materialize, does not support the insurers' contentions of fraud.

    4.  Gordian asserts in its memo of law, at 9:

> Inspired by the resounding success of their scheme to defraud a number of insurers into issuing policies in the Phoenix transaction that have resulted in more than $60 million in claims against those insurers, Chase and the Third-Party Defendants moved swiftly - lest the Phoenix claims materialize and reveal their deceit - to form a new conspiracy to defraud NRMA Gordian and the remaining insurers into issuing policies insuring loans in connection with 24 Paramount films.

Since the fraud-based defenses and counterclaims are being dismissed on other grounds, and given the procedural nature of the present motion, I have no occasion to reach the factual merits of such allegations. However, I note that it appears that by the time the Paramount IV slate policies were issued, the Phoenix losses had not only been reported in the media, but had also been expressly reported to insurers, including AXA. It appears that AXA's own files contain the report to insurers by the leader, XL, dated May 6, 1998, of the potential $33 million loss on just the first four Phoenix films, together with a cover letter dated June 8, 1998 from Heath to Guillot (AXA and AXA Re's underwriter), enclosing XL's report, and beginning with the statement, "Heath and ICE Media have already discussed with you the probability that there is likely to be a significant loss under the Phoenix Pictures' insurance placement." The letter states further:

> Four of the five films insured under the Phoenix program have been released with the final picture, Apt Pupil, scheduled for release in October, 1998. The box office results to date have been extremely poor and barring extraordinary results from Apt Pupil, a significant loss is expected under this cover [emphasis added].

Indeed, while I do not reach the factual issue, I note that it appears that, well prior to the issuance of the policies, the anticipated claims on the Phoenix policies had not only been communicated to AXA, they had been announced publicly in the media.

As early as March 16, 1998, the industry newsletter, Daily Variety, carried an article with the headline "Pic clunker insurance facing test."  The article stated that "claims are already on the horizon," and that:

> CE Heath, the London insurance broker which has done the most business in Hollywood over the past two years, expects to receive claims on a policy it wrote covering the first five pics released by Mike Medavoy's Phoenix Pictures, said Roger Bassett, managing director for special risks at Heath North America.  He added that Heath had established a reserve to pay the claims.

The article, which includes criticisms of the use of the policies, states:

> Bassett said Heath has paid claims on policies written for a couple of independents he declined to identify.
>
> But the biggest claim to date is looming on Phoenix's policy, which covered pics such as "The People vs.  Larry Flynt" and "The Mirror Has Two Faces."  Bassett says that while income is flowing in from those pics, "at this point in time it looks like there will be a claim on that slate of films."

It would appear somewhat unusual, not to mention counterproductive, for a member of a conspiracy to defraud, to endeavor to conceal information from the targeted victim yet announce it to the media.

4. Gordian asserts at ¶ 110 that the Paramount IV and V slates

> were structured by Chase so that not one Paramount asset would be at risk if Paramount failed to repay the Chase loans.  Paramount's sole obligation was to pay a percentage of the net proceeds earned from the films to Chase to the extent the films earned such proceeds.

In fact, the documentation on file in the motion of the RMs to dismiss, demonstrates that, unlike in the prior slates, Paramount was required to pay the first $2 million of claims in the Paramount IV and V slates, thus placing $2 million of Paramount's assets at risk.[65]

---

[65]This was stated in the May 14, 1998 RMR at p. 17, as follows:

5. The insurers complain that there was no mechanism in the Revenue Participation Agreement or other transaction documents for ICE or Chase to control Paramount's expenditures, but that they were led to believe that there was such a mechanism. However, the rights as between Chase and Paramount were set forth in the Revenue Participation Agreement, which was not only provided to the insurers but was annexed to the policies.

In fact, by letter dated July 31, 1998, annexed to GS's papers in opposition to Heath's motion to dismiss the third-party actions against it, responding to drafting comments by Richard Fletcher (the insurers' counsel), Michael Chapnick (Chase's counsel) stated:

> Page 16 -- those are in fact the only rights that the insured has. The insured has no right of consultation with or control over Paramount's actions. All the insured can do is demand statements, dispute statements, cause audits to be done and sue for money damages for failure to repurchase a picture which is not released or for false negative cost statements or receipts reports. If I have missed anything in the paragraph, please let me know and we will add it. However, I believe that the requested paragraph accurately states the limited rights that Chase has. If you believe Chase has any additional rights, I would appreciate your revising the paragraph rather than rejecting it in total.

This letter was written well before the insurers were bound to the Paramount V slate, thus implying that they did not view this issue as material.

---

Risk Managers have also negotiated with Paramount an[] 'excess' of $2 million, which means that if there is a loss on this slate of films, Paramount will bear the cost of such loss up to a maximum of $2 million in the aggregate across the slate.

## APPENDIX C - MATTERS CAPABLE OF BEING ASCERTAINED

Among the allegedly concealed facts listed in AXA's ¶ 121, the following, without limitation, would appear to have been ascertainable:

> Bradstreet's former entity, Bradstreet Media Ltd., had been compulsorily liquidated by HM Customs & Excise for non-payment of taxes;

> Hoffman was indicted in the United States on tax charges; and

> the reasons why the Lloyd's market withdrew from prior transactions.

The latter, and a similar contention regarding the withdrawal of CNA, is a theme that figures prominently in the insurers' papers, and relates to the much earlier Phoenix slate. Essentially, the insurers assert that the initial risk manager, Screen Partners, disapproved of the way in which the Phoenix slate was structured; and that Chase/Heath therefore replaced Screen Partners with the present RMs, and gave the insurers false information about why Screen Partners left. They also assert that Screen Partners told a Lloyd's syndicate and CNA that the project was a bad risk, and that based on that input, the Lloyd's syndicate and CNA withdrew and that Chase/Heath misrepresented to the insurers why the Lloyd's syndicate and CNA had withdrawn, see, e.g., AXA's pleading at ¶¶ 34-623; Gordian's pleading at 137; New Hampshire's pleading at ¶¶ 100, 109-110; GS's pleading at 75.

However, nowhere do the insurers assert any facts to show that they could not have obtained this information directly from Screen Partners, as did the Lloyd's syndicate and CNA; or, for that matter, from Lloyd's and CNA.

## DIXON

I note that it appears from the papers on file in Heath's motion to dismiss the third-party action, that the lead underwriter for New Hampshire on the Paramount IV slate, Rupert Dixon, worked as a broker for Heath on the Phoenix slate.

I do not base the present decision on Heath's assertions, which are not supported by admissible evidence. However, I note that the Paramount IV policies provide that notices to New Hampshire, the lead insurer on the Paramount IV slate, are to be sent to "New Hampshire

Insurance Company per AIG (Europe) UK Limited, 120 Fenchurch Street, London EC3M 5BP, ENGLAND, Attn: Rupert Dixon." I note further, that the circumstances alleged by Heath would strongly imply that the insurers could not only have ascertained the facts that they complain were withheld, but that in fact, their own Lead Insurer already knew them.

## APPENDIX D - COMPARISON OF <u>LITTO</u> CASH FLOW POLICY CLAUSES WITH PRESENT CLAUSES

A comparison of the present policy with the clauses in the <u>Litto</u> cash flow policy demonstrates that they contain no differences that would support a different outcome in the present case.

### TRUTH OF STATEMENT CLAUSE

Unlike the present policies, in the <u>Litto</u> cash flow policy, the Truth of Statement clause is listed under GENERAL CONDITIONS. The Truth of Statement clauses differ in that the <u>Litto</u> clauses refer to a Declaration rather than a Questionnaire, and there are references in the <u>Litto</u> policy to the Reinsurer as well as the Insurer. The present clause makes express that misrepresentations in the Questionnaire will not be grounds for cancellation, as well as avoidance, of the policy, whereas the <u>Litto</u> clause refers only to avoidance of the insurers' responsibilities under the policy. Neither clause contains any express disclaimer as to affirmative representations made by Chase itself.

### FRAUD EXCLUSION CLAUSE

The present policy Fraud Exclusion refers to "contingent extra expenses," while the <u>Litto</u> cash flow policy refers to "loss." The present policy specifies that such fraud must be "against the insurers." The present clause expressly states that the Truth of Statement and Revenue Analysis clauses supercede the exclusion clause.

The <u>Litto</u> clause is limited to fraud by the Insured, while the present policy adds fraud by the Distributor and the Distributor's agents, and adds "that the only information that Distributor has provided upon which insurers are relying is contained in Section 1 of the Questionnaire." This is significant, because Chase's present moving papers mischaracterize the present clause as referring to information provided by the <u>Insurers</u>. Read in context, however, the reference to "the

87

only information that Distributor has provided" in the present clause does not distinguish <u>Litto</u> from the present case vis a vis the effect of this clause as to Chase's responsibility for its own misstatements.  Since the <u>Litto</u> clause did not exclude losses resulting from fraud by the Distributor, there would appear to be no reason to include a provision in the same clause as to what was provided by the Distributor.

Nevertheless, the failure of the present clause to specify what information provided by Chase the insurers are relying on, means that contingent extra expenses resulting from affirmative misrepresentations by Chase to the insurers, if otherwise reasonably relied on, would fall within the scope of the exclusion - except to the extent they are within the scope of the Truth of Statement or Revenue Analysis clauses.

## DERELICTION OF DUTY CLAUSE

The first section of the "Nonperformance" clause in the <u>Litto</u> cash flow policy ("Nonperformance by GLP") has no counterpart in the present policies.  I note that in <u>Litto</u> there were contractual arrangements directly between GLP and the insurers in that case.

The second section, relating to dereliction of duty by the lead insurers or their representatives, contains minor differences, primarily due to the presence of a lead reinsurer in <u>Litto,</u> but is substantively essentially to the same effect.

## NO AGENCY CLAUSE

The "NO AGENCY" clauses in the two policies differ.  In particular, the present clause states that ICE, CineVisions, Bradstreet and Hoffman, are not agents of Chase, and that Heath is not an agent of the Distributor.  While the present clause does not state that Heath is not an agent of the insured, neither did the <u>Litto</u> cash flow clause.

## REVENUE ANALYSIS CLAUSE

The <u>Litto</u> clause refers to reinsurers; the present clause does not.  The <u>Litto</u> clause refers to the insured's lack of request for, or receipt of, projections for "a Film Production <u>or any other film production into which Insurer and Re-Insurers may have crossing rights</u>," whereas the present policy refers only to such for the Film Production.  However, the present clause states that "insurers acknowledge that the insurers have received no projections from the Insured, the Distributor or any of their respective agents."  This latter is broader in scope than comparable provisions in the <u>Litto</u> clause.  Unlike the <u>Litto</u> clause, the present clause contains an

88

acknowledgment that the insured, the distributor, and their agents "did not participate in the preparation or compiling of information of, or review or approve, Section II or III of the Questionnaire." The final portion in <u>Litto</u> states:

> Any revenue analysis or financial projections for any Film Production existing at the time such Film Production is submitted for a Declaration upon which Insurer and Re-insurers are relying will have been prepared for them by their agents or independent contractors and not by the Insured or the Administrative Agent or their respective agents,

whereas the final portion in the present policy states:

> Any revenue analysis or financial projections for the Film Production upon which insurers are relying on [sic] were prepared for them by their agents or independent contractors and not by the Insured, the Distributor or their respective agents, and the Insured, the Distributor, and their respective agents shall have no liability whatsoever with respect to any such revenue analysis or financial projections. Insurers acknowledge that they and their risk managers and the Company have made an independent investigation in assessing the risks of underwriting this Policy.

These clauses differ in various respects. Inter alia, the present clause contains the "independent investigation" representation by the insurers, which is absent in the <u>Litto</u> cash flow policy. At the same time, however, the present clause is narrower in describing the "revenue analysis or financial projections" on which the insurers are relying, limiting it to those relating to the Film Production, whereas the <u>Litto</u> clause refers to additional films as well. That difference is mooted out, however, by the statement in the present clause that "insurers acknowledge that the insurers have received no projections from the Insured, the Distributor or any of their respective agents," a broad clause that covers all "projections."

**DUE DILIGENCE CLAUSE**

The Due Diligence clauses are essentially the same, with language differences primarily relating to the mention of reinsurers in the <u>Litto</u> clause. As to the scope of the duty, the <u>Litto</u> clause states:

> The Insured shall at all times do and concur in doing all things reasonably necessary <u>after the date of acceptance by the Insurer and</u>

89

> the <u>Lead Re-Insurers of a Declaration</u> to avoid or diminish a loss to
> Insurer under this Policy with regard to the Film Production so
> declared [emphasis added],

whereas the present clause states:

> The Insured shall at all times do and concur in doing all things
> reasonably necessary <u>after the date hereof</u> to avoid or diminish a
> loss to insurers under this Policy [emphasis added].

## ABSENCE OF REVENUE CLAUSE

Other than language differences due to the inclusion in the <u>Litto</u> policy of references to reinsurers, the clauses are substantively identical.

## GENERAL MERGER CLAUSE

The present policies contain the following general merger clause:

> This Policy supersedes all previous discussions and understandings
> between the parties hereto and this Policy together with the
> Schedules attached hereto constitutes the entire understanding of
> the parties.

The <u>Litto</u> policy contains no general merger clause, except to the extent that the Truth of Statement clause functioned as such.

In affirming in <u>Litto</u>, the First Department was necessarily aware that there was no express representation in the cash flow policy that the insurers had relied solely on their own representation, and that in neither policy was there an express disclaimer of reliance on statements made by Chase itself, other than as to financial analysis. AXA Re's Brief stated, at 44-45:

> [N]one of the fraud allegations concerned "revenue analysis or
> financial projections for a Film Production," which was the <u>only</u>
> <u>matter</u> regarding which reliance was specifically disclaimed under
> the Cash Flow Insurance Policy.
> ***
> The Court rejected even the hardly disputed principle that the
> clauses do not shield Chase from its own misrepresentations,
> abusing its discretion by ruling, essentially <u>sua sponte,</u> that waivers

that pertain to "others" than Chase should be construed to apply to
Chase also.

AXA Re stated further, at 49-50:

> The only specific disclaimer[] of any kind in either policy at issue
> below was that found in a line in the Revenue Analysis Clause of
> each policy, providing that "[a]ny revenue analysis or financial
> projections for any Film Production existing at the time such Film
> Production is submitted for a Declaration upon which ... Re-
> Insurers are relying will have been prepared for them by their own
> agents or independent contractors and not by the insured...."

See. also AXA Re Brief at 51-52.  AXA Re's fraud allegations in Litto were comparable
to those herein.

91