# EXHIBIT 17

# Memorandum

| | |
|---|---|
| **To:** | Steve Mitchell |
| **CC:** | Sal Nociforo      A.I.E., New York |
| | John Keogh       Lexington, Boston |
| **From:** | Keith Peacock |
| **Date:** | 30/10/98 |
| **Re:** | Film Finance Business |

---

This will confirm our conversation of this morning that we henceforth will not be accepting any further Financial Guarantee Insurance.

This decision is taken despite the strong contractual control, very conservative Net Retention and rigid selective process we have exercised.

My interpretation is that this decision is not negotiable.

Regards,

Keith J. Peacock

59/AIG/KP1 -
00184

1 of 4

# URGENT

FOR THE ATTENTION
of Mr K.H. KELLEY
Mr J. KEOGH

FAX: 001 212 809 0638

59/AIG/KP1 -
00176

LEX-01 006952

Lexington Insurance
Company.

# facsimile transmittal

| To: | Kevin Kelley | Fax: | 001 212 809 1533 |
|-----|-------------|------|------------------|
| From: | Keith Peacock | Date: | 4th November, 1998. |
| Re: | Film Finance Business | Pages: | 2 |
| CC: | Sal Nociford, John Keogh, Steve Mitchell. | | |

{ ☐} Urgent    { ☐} For Review    { ☐} Please Comment    { ☐} Please Reply    { ☐} Please Recycle

We've had a modest involvement in this business from firstly in 1996 in terms of a "following line".

Following the arrival of Steve Mitchell who we felt had a lot to offer in this particular class and was one reason for his joining us. We took a higher profile, writing bigger programmes, but heavily backed by facultative Reinsurance.

59/AIG/KP1 –
00177

LEX-01 006953

Prior to my meeting on Friday 30th October, 1998 with Mr. Greenberg we had recently

committed to Lloyd Thompson on a new slate of 32 films financed by Credit Suissa First

Boston to a total value of $ 100,000,000 generating Gross Premiums of $10,000,000. We

will keep

$ 250,000 net per film.

Given our current position and withdrawing from his business I would appreciate your

advices.

Best Regards

Keith Peacock.

59/AIG/KP1 –
00178

LEX-01 006954

| BROKER | INSURED | FILM | PERIOD | TOTAL SUM INSURED | TOTAL PREMIUM | OUR SHARE | COMM. | OUR SHARE (%) | OUR SHARE (£) | FAC RI |
|---|---|---|---|---|---|---|---|---|---|---|
| Pinnacle Heath Group | Chase Manhattan | Sing Dogs | 01 06 98 to 36 months | 67,798,912.00 | 4,084,648.00 | 112,369.00 | HL | 2.770% | 1,876,717.00 | HL |
| | Chase Manhattan | Apt Pupil | 13 12 98 for 36 months | 10,741,135.00 | 18,782.00 | 19,782.00 | HL | 2.770% | 284,159.00 | HL |
| | Chase Manhattan | The people vs Larry Flint | 10 07 97 for 36 months | 16,660,337.00 | 329,937.00 | 14,034.00 | HL | 2.770% | 286,915.00 | HL |
| | Chemical Bank | Amy Foster | 02 09 96 for 36 months | 8,308,850.00 | 445,815.00 | 13,427.00 | HL | 2.770% | 243,380.00 | HL |
| | Chemical Bank | The winter has two faces | 01 08 98 to ? | 17,402,279.00 | 1,196,967.00 | 33,036.00 | HL | 2.770% | 484,781.00 | HL |
| Paramount One Heath Group | Chase Manhattan Bank | The Phantom | 02 09 96 to 3 yrs after release | 8,446,008.00 | 682,210.00 | 42,325.14 | 20% | 5.556% | 491,800.00 | HL |
| | Chase Manhattan Bank | Barabbas and the Beast | 23 09 96 to 3 yrs after release | 7,653,720.00 | 827,455.00 | 38,066.02 | 20% | 5.556% | 425,178.00 | HL |
| | Chase Manhattan Bank | In 'n' Out | 23 08 96 to 3 yrs after release | 6,371,657.00 | 965,714.00 | 30,478.20 | 20% | 5.556% | 353,981.00 | HL |
| | | The Truman Show | 27 03 97 to 3 yrs after release | 9,000,000.00 | | | 20% | 5.556% | 500,000.00 | HL |
| | | **Sub Total** | | 31,472,185.00 | 3,991,317.66 | 83,204.00 | | | 1,770,769.00 | |
| Paramount Two Heath Group | Chase Manhattan Bank | The Saint | 03 04 97 to 3 yrs after release | 13,972,477.00 | 854,698.00 | 25,594.00 | 20% | 2.600% | 374,462.00 | HL |
| | | Magic Hour | 16 05 97 to 3 yrs after release | 15,041,110.00 | 1,026,072.00 | 27,551.00 | 20% | 2.600% | 403,104.00 | HL |
| | | Face Off | 18 05 97 to 3 yrs after release | 18,000,000.00 | 1,352,400.00 | 33,116.00 | 20% | 2.600% | 484,440.00 | HL |
| | | Event Horizon | 11 08 97 to 3 yrs after release | 18,000,000.00 | 1,332,400.00 | 33,116.00 | 20% | 2.600% | 484,440.00 | HL |
| | | **Sub Total** | | 66,958,317.00 | 4,575,231.00 | 121,724.00 | | | 1,771,446.00 | |
| Paramount Three Heath Group | Chase Manhattan Bank | Kiss the Girls | 03 10 97 to 3 yrs after release | 8,937,178.00 | 298,698.00 | 8,925.00 | 20% | 2.337% | 130,578.00 | HL |
| | | Snake Eyes | 17 12 97 to 3 yrs after release | 15,423,769.00 | 1,064,972.00 | 24,824.00 | 20% | 2.337% | 363,260.00 | HL |
| | | A night at the Roxbury | 17 12 97 to 3 yrs after release | 7,314,125.00 | 490,971.00 | 11,600.00 | 20% | 2.337% | 161,260.00 | HL |
| | | Odd Couple II | 17 12 97 to 3 yrs after release | 14,043,729.00 | 920,362.00 | 22,230.00 | 20% | 2.337% | 325,422.00 | HL |
| | | **Sub Total** | | 43,976,259.00 | 2,937,364.00 | 44,713.00 | | | 961,487.00 | |
| MGM United Artists | | Welcome to Woop Woop | 08 01 98 to 2 1/2 yrs after release | 2,050,508.00 | 232,187.00 | 42,213.00 | 20% | 18.18% | 372,746.00 | HL |
| | | Lbeltch | 08 01 98 to 2 1/2 yrs after release | 298,921.00 | 33,513.00 | 6,092.00 | 20% | 18.18% | 53,786.00 | HL |
| | | Hustler | 08 01 98 to 2 1/2 yrs after release | 452,124.00 | 51,203.00 | 9,303.00 | 20% | 18.18% | 82,190.00 | HL |
| | | Music from another room | 08 01 98 to 2 1/2 yrs after release | 1,491,150.00 | 168,497.00 | 30,628.00 | 20% | 18.18% | 271,410.00 | HL |
| | | Hurricane Streets | 08 01 98 to 2 1/2 yrs after release | 336,195.00 | 38,301.00 | 6,963.00 | 20% | 18.18% | 61,461.00 | HL |
| | | One Man's Hero | 08 01 98 to 2 1/2 yrs after release | 2,367,364.00 | 264,104.00 | 48,014.00 | 20% | 18.18% | 425,367.00 | HL |
| | | I love you, don't touch me | 08 01 98 to 2 1/2 yrs after release | 341,273.00 | 38,305.00 | 7,144.00 | 20% | 18.18% | 63,300.00 | HL |
| | | Bed Many | 08 01 98 to 2 1/2 yrs after release | 1,882,032.00 | 188,300.00 | 34,233.00 | 20% | 18.18% | 303,277.00 | HL |
| | | Hanging Garden | 08 01 98 to 2 1/2 yrs after release | 211,372.00 | 23,938.00 | 4,352.00 | 20% | 18.18% | 38,427.00 | HL |
| | | **Sub Total** | | 4,418,841.00 | 819,648.00 | 84,472.00 | | | 824,189.00 | HL |
| Lloyd Thompson | Tristan Fm | T.V. Series | 08 12 96 for 24 months | 1,900,000.00 | 160,000.00 | 24,000.00 | HL | 18.18% | 240,000.00 | HL |
| | Fides Verna | | | 33,000,000.00 | 3,360,000.00 | 3,360,000.00 | 20% | 18.18% | 33,000,000.00 | HL |
| | Credit Suisse from Boston | Flamworks | 03 06 99 for 29 months | 5,600,000.00 | 2,240,000.00 | 2,240,000.00 | HL | 100.00% | 5,600,000.00 | Per Film bel |
| | | State of 4 Films | | 22,400,000.00 | | | | 100.00% | 22,400,000.00 | Per Film bel |
| | | **Sub Total** | | | | | | | | |
| Sedgwick | | Repeat | 01 09 98 for 24 months | 5,000,000.00 | 2,500,000.00 | 2,500,000.00 | 20% | 100.00% | 5,000,000.00 | HL |
| | | State of 6 Films | | 28,000,000.00 | | | | | 28,000,000.00 | Per Film bel |
| | | **Sub Total** | | 33,000,000.00 | 8,248,000.00 | 8,224,000.00 | | | 82,240,000.00 | 26,000,000.00 Per Film bel |
| | Village Road Show | Village Road Show | 01 09 98 for 24 months | 55,000,000.00 | 5,362,500.00 | 160,875.00 | 20% | 2.270% | 750,000.00 | HL |
| | State of 6 Films | State of 6 Films | | 73,000,000.00 | 7,312,500.00 | 148,250.00 | 70% | 1.670% | 1,290,000.00 | HL |
| | | **Sub Total** | | 138,000,000.00 | 12,675,000.00 | 207,125.00 | | | 250,000.00 Per Film bel | HL |
| Sterling Cooke | Cineworld Productions | Kimberly | 30 09 98 for 18 months | 2,500,000.00 | 252,000.00 | 46,600.00 | 70% | 20% | 1,750,000.00 Per Film bel | HL |
| | Cineworld Productions | I Love You I Love Me I Love | 31 10 98 for 18 months | 3,000,000.00 | 3,000,000.00 | 27,064.00 | 70% | 20.00% | 560,000.00 | HL |
| | | **Sub Total** | | 5,310,000.00 | 3,151,000.00 | 82,414.00 | | | 880,000.00 | |
| **TOTAL** | | | | 432,481,784.00 | 45,376,444.00 | 9,199,482.17 | | | 92,314,637.00 | 85,500,000.00 |

59/AIG/KP1 - 00179

# EXHIBIT 18

HF4-5/LEX/596 - 00247

| LEXINGTON INSURANCE COMPANY |
|:---:|
| 200 STATE STREET |
| BOSTON, MASSACHUSETTS 02109 |

Kevin H. Kelley
Chairman and Chief Executive Officer

Page 1 of __2__

Fax # __011-44171-480-6266__

## FACSIMILE COVER SHEET

TO: __Mr. keith Leacock__

FROM: Kevin H. Kelley

DATE: __July 20, 1999__

RE:. __AI Entertainment / Lex London Film Finance Accounts__

WITH ANY INQUIRIES. PLEASE CALL
CAROLINE MULLIN:  (617) 330-8203

## FOR IMMEDIATE DELIVERY PLEASE

Let's discuss.

LEX-01 037933

HF4-5/LEX/596 –
00248



July 19, 1999



TO:   Kevin Kelley

FR:   T. R. Tizzio

RE:   *AI Entertainment/Lexington London Film Finance Accounts*

    I have discussed with Sal Nociforo reinsuring the in force business.  I understand the difficulty – and suggest that you get involved as well to see what can be done..

    I find it hard to understand how this business was written against company guidelines.  Were any audits ever conducted of the office?  If so, why wasn't it picked up that we were writing the business?

    Let's discuss.

cc:   Sal Nociforo

TRT:maj

LEX-01 037934

DEC 21 '98 11:31 FR AI ENTERTAINMENT    213 689 3841 TO 16173454152    P.01/07

HF4-5/LEX/596 - 00250

30 Pine Street, 3rd Floor
New York, NY 10005
TEL: 212-770-8910
FAX: 212-809-1532


AI ENTERTAINMENT

# Fax



DEC 21 1998
KEVIN KELLEY

| To: | John Keogh-FAX: 617-772-4571 | From: | SAL NOCIFORO |
|---|---|---|---|
| | Kevin Kelley-FAX: 617-345-4152 ✓ | | |

| Fax: | | Pages: | 7 |
|---|---|---|---|
| Phone: | | Date: | 12/21/98 |
| Re: | | CC: | |

☐ Urgent    ☐ For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

● **Comments:**

See attached from Steve Mitchell.  I believe this clears up some of our questions, however, please advise any other questions you might have and I will make sure they get answered in a timely fashion.

LEX-01 037935

DEC 21 '98 11:31 FR AI ENTERTAINMENT    213 689 3841 TO 16173454152    P.02/07
21/12 '98 MON 11:20 FAX 01712048769    LEXINGTON LIME ST.

HF4-5/LEX/596 - 00251

# AI ENTERTAINMENT
# 40 LIME STREET
# LONDON
# EC3M 7AY
## TEL: 0171 204 8711
## FAX: 0171 204 8769

### FACSIMILE TRANSMITTAL SHEET

| TO: | FROM: |
|---|---|
| SAL NOCIFORO | STEVE MITCHELL |
| COMPANY: | DATE: |
| AIE (NEW YORK) | 12/21/98 |
| FAX NUMBER: | TOTAL NO. OF PAGES INCLUDING COVER: |
| | 6 |
| PHONE NUMBER: | SENDER'S REFERENCE NUMBER: |
| RE: | YOUR REFERENCE NUMBER: |
| FILM PROJECTS | |

☐ URGENT    ☐ FOR REVIEW    ☐ PLEASE COMMENT    ☐ PLEASE REPLY    ☐ PLEASE RECYCLE

NOTES/COMMENTS:

Sal,

Further to the discussions with Keith Peacock please see below the list of placements relating to film finance duly reconstituted.

There are a couple of points that need to be recognised:-

1.  The claim determination date of any slate of films where we have highlighted the names of productions, films already being released, is the period post the last released date of any film on the slate. For example under the Phoenix placement Apt Pupil was the last film released on 10.02.97 which means that the period in full runs to 10.02.00.

2.  On those cases where we have purchased Fac R/I we are effectively fronting the entire placements. This earns $ 717,613.00 in overrider. Further, we were paid $100,000.00 to cover our share of the work with solicitors to set up collateral and various other agreements.

LEX-01 037936

HF4-5/LEX/596 -
00252

3.    You will notice a sheet headed PIPELINE and these are films where we have
      currently indicated a participation which have yet to come to slip.

4.    The last sheet relates to very early placements of TVC policies, being those
      projects that predated the later real 'Film Finance' deals.

I hope the above and the following is now clear for your purposes. No doubt you will
give me a ring should it be otherwise.


Regards.



Steve Mitchell.

2

LEX-01 037937

DEC 21 '98 11:32 FR AI ENTERTAINMENT    213 689 3641 TO 16173454152    P.04/07
21/12 '98 MON 11:21 FAX 01712048769

HF4-5/LEX/596 -
00253

0171284

PAGE. 02

| BROKER | INSURED | PROJECT | FILM | PERIOD | TOTAL SUM INSURED | OUR SHARE (I) | FAC RI | NETT SHARE | TOTAL PREMIUM | OUR SHARE | NET PREM |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Group | Chemical Bank | PROJECT | The Wind Beneath Rees | 01/08/98 for 36 months | 17,043,070.00 | 440,751.00 | NIL | 459,761.00 | 1,190,962.00 | 32,808.00 | |
| | Chemical Bank | | Amy Foster | 07/09/98 for 36 months | 9,500,000.00 | 285,000.00 | NIL | 285,000.00 | 469,619.00 | 13,457.00 | |
| | Chase Manhattan | | The People -v- Larry Flint | 02/08/98 for 20 months | 18,000,397.00 | 441,482.00 | NIL | 441,482.00 | 1,110,405.00 | 31,895.00 | |
| | Chase Manhattan | | Hot Pepil | 18/07/97 for 38 months | 10,441,300.00 | 298,915.00 | NIL | 298,915.00 | 526,027.00 | 14,394.00 | |
| | Chase Manhattan | | Stray Dogs | 13/11/98 for 36 months | 14,041,457.00 | 380,120.00 | NIL | 390,130.00 | 714,195.00 | 18,702.00 | |
| | | | Sub Total | | 67,846,918.00 | 1,679,717.00 | | 1,879,717.00 | 4,040,618.00 | 112,399.00 | 172,349.00 |
| Group | Chase Manhattan Bank | PARAMOUNT ONE | The Phantom | 07/20/98 to 2 yrs after release | 4,446,968.00 | 491,600.00 | NIL | 491,600.00 | 992,315.00 | 42,225.14 | |
| | | | Beautifene and the Beast | 27/08/98 to 3 yrs after release | 7,803,270.00 | 425,178.00 | NIL | 425,178.00 | 822,625.00 | 36,604.00 | |
| | | | In 'n' Out | 07/11/98 to 2 yrs after release | 6,371,967.00 | 303,061.00 | NIL | 303,061.00 | 853,710.00 | 39,478.00 | |
| | | | The Truman Show | 77/63/97 to 3 yrs after release | 9,400,000.00 | 500,000.00 | NIL | 500,000.00 | 1,353,457.00 | 63,294.00 | |
| | | | Sub Total months | | 31,813,250.00 | 1,779,708.00 | | 1,779,788.00 | 3,595,337.00 | 194,091.35 | 195,609.00 |
| Group | Chase Manhattan Bank | PARAMOUNT TWO | The Saint | 03/16/97 to 3 yrs after release | 13,972,417.00 | 374,492.00 | NIL | 374,492.00 | 624,506.00 | 25,514.00 | |
| | | | Magic Hour | 16/05/97 to 3 yrs after release | 15,041,316.00 | 402,194.00 | NIL | 402,194.00 | 1,018,623.00 | 37,991.00 | |
| | | | Face Off | 14/05/97 to 3 yrs after release | 18,415,156.00 | 495,492.00 | NIL | 495,402.00 | 1,285,498.00 | 24,960.00 | |
| | | | Event Horizon | 11/08/97 to 3 yrs after release | 18,000,000.00 | 496,490.00 | NIL | 496,490.00 | 1,322,592.00 | 35,218.00 | |
| | | | Sub Total | | 64,599,937.00 | 1,775,668.00 | | 1,771,448.00 | 4,379,319.00 | 123,294.00 | 123,784.00 |
| Group | Chase Manhattan Bank | PARAMOUNT THREE | Kiss the Girls | 03/10/97 to 3 yrs after release | 5,932,170.00 | 159,578.00 | NIL | 159,578.00 | 366,996.00 | 4,073.00 | |
| | | | Switchback | 17/12/97 to 3 yrs after release | 18,545,560.00 | 349,390.00 | NIL | 349,399.00 | 1,294,472.00 | 38,000.00 | |
| | | | A Night at the Roxbury | 17/12/97 to 3 yrs after release | 7,214,125.00 | 181,900.00 | NIL | 181,900.00 | 408,817.00 | 11,040.00 | |
| | | | Odd Couple II | 17/12/97 to 3 yrs after release | 14,492,097.00 | 329,700.00 | NIL | 329,200.00 | 990,520.00 | 32,110.00 | |
| | | | Sub Total | | 48,373,259.00 | 891,447.00 | | 881,647.00 | 3,047,560.00 | 85,713.00 | 85,713.00 |
| Group | United Artists | MGM | Welcome to Woop Woop | 06/01/98 to 2 1/2 yrs after release | 2,600,306.00 | 372,746.00 | NIL | 372,746.00 | 222,187.00 | 42,213.00 | |
| | | | Lolita | 06/01/98 to 2 1/2 yrs after release | 299,821.00 | 83,180.00 | NIL | 83,180.00 | 32,513.00 | 6,062.00 | |
| | | | Disturbing | 06/01/98 to 2 1/2 yrs after release | 892,154.00 | 82,390.00 | NIL | 82,390.00 | 31,309.00 | 8,360.00 | |
| | | | Mark Twain another movie | 06/01/98 to 2 1/2 yrs after release | 1,077,130.00 | 271,461.00 | NIL | 271,461.00 | 14,129.00 | 50,747.00 | |
| | | | Handsome Devest | 06/01/98 to 2 1/2 yrs after release | 336,185.00 | 61,464.00 | NIL | 61,464.00 | 24,381.00 | 6,469.00 | |
| | | | One Man's Hero | 06/01/98 to 2 1/2 yrs after release | 2,307,364.00 | 430,387.00 | NIL | 430,387.00 | 200,169.00 | 44,711.00 | |
| | | | I Love you, Don't touch me | 06/01/98 to 2 1/2 yrs after release | 391,873.00 | 63,098.00 | NIL | 63,098.00 | 30,300.00 | 7,148.00 | |
| | | | Red Men | 06/01/98 to 2 1/2 yrs after release | 1,982,492.00 | 502,217.00 | NIL | 502,217.00 | 200,230.00 | 34,133.00 | |
| | | | Marching Garden | 06/01/98 to 2 1/2 yrs after release | 311,332.00 | 26,437.00 | NIL | 26,437.00 | 25,938.00 | 4,553.00 | |
| | | | Sub Total | | 8,318,177.00 | 1,076,844.00 | | 1,076,844.00 | 3,943,908.00 | 195,397.00 | |



HF4-5/LEX/596 -
00254

LEX-01 037939

DEC 21 '98 11:35 FR AI ENTERTAINMENT     213 689 3841 TO 16173454152     P.06/07
21/12 '98 MON 11:22 FAX 01712048769     LEXINGTON LIME ST.

HF4-5/LEX/596 - 00255

PIPELINE:

1.     Royal Bank of Canada iro 'Monster by Mistake'

| | | | |
|---|---|---|---|
| TSI | $ 1,290,000 | Lex = | $300,000 |
| Premium | $ 129,000 | | $30,000 |

2.     Cinerenta iro 'Map of the World'

| | | | |
|---|---|---|---|
| TSI | $ 5,500,000 | Lex = | $500,000 |
| Premium | $ 550,000 | | $50,000 |

3.     Silicon Valley Bank iro 'Letters from a Wayward Son'

| | | | | |
|---|---|---|---|---|
| TSI | $ 8,350,000 | Lex = | $1m?? | $500,000 |
| Premium | $ 835,000 | | | $50,000 |

4.     Silicon Valley Bank iro 'The Calling'

| | | | |
|---|---|---|---|
| TSI | $ 2,900,000 | Lex = | $500,000 |
| Premium | $ 290,000 | | $50,000 |

5.     Cinerenta iro 'The Innocents/Dark Summer'

| | | | |
|---|---|---|---|
| TSI | $ 4,995,000 | Lex = | $250,000 |
| Premium | $ 449,500 | | $25,000 |

LEX-01 037940

DEC 21 '98 11:35 FR AI ENTERTAINMENT    213 689 3841 TO 16173454152    HF4-5/LEX/596-00256
21/12 '98 MON 11:22 FAX 01712043769    LEXINGTON LIME ST.

Early TVC policies via C.E. Heath. (Likely that all cases will be void due to the number and circumstances of claims)

| | Period | TSI | Premium | LEX | SI | Premium |
|---|---|---|---|---|---|---|
| Mayfair iro 'Richard III' | 24 months @ 30/06/95 | $3,000,000 | $270,000 | 6.521% | $195,630 | $17,606.70 |
| Royal Bank of Scotland iro 'They Shoot Horses Don't They' | 24 months @ 26/04/95 | £186,000 | £5,580 | 6.521% | £12,129.06 | £363.87 |
| Royal Bank of Scotland iro 'In Sunshine or in Shadow' | 12 months @ 17/07/95 | £170,419 | £5,112 | 6.521% | £11,113.02 | £333.35 |
| Royal Bank of Scotland iro 'The Other Peak Practice' | 12 months @ 06/02/95 | £341,766 | £9,954 | 7.79% | £26,623.57 | £775.42 |
| Klondike Films iro 'Young Classics' | 12 months @ 27/07/94 | $13,367,105 | $1,025,257 | 7.67% | $1,025,256.95 | $78,637.21 |
| Bank Nova Scotia iro 'Deadly Wake' | 24 months @ 13/03/96 | $900,000 | $81,000 | 8.1081% | $72,972.90 | $6,567.56 |
| Berliner Bank iro 'Neon Bible' | 1993/1994 | $948,588 | $85,873 | 9.23% | $87,554.67 | $7,926.08 |
| Berliner Bank iro 'Les Jardins des Plantes' | 1993/1994 | $500,000 | $45,000 | 9.23% | $46,150.00 | $4,153.50 |

# EXHIBIT 19

106/022/00963

<u>CLAIM NO. 2000 Folio 552</u>

<u>IN THE HIGH COURT OF JUSTICE</u>
<u>QUEEN'S BENCH DIVISION</u>
<u>COMMERCIAL COURT</u>

|       |                                                          |
|-------|----------------------------------------------------------|
| (1)   | HIH CASUALTY AND GENERAL INSURANCE LIMITED               |
| (2)   | SPHERE DRAKE INSURANCE PLC                               |
| (3)   | INDEPENDENT INSURANCE COMPANY LIMITED                    |
| (4)   | A/S DET KJOBENHAVNSKE REASSURANCE-COMPAGNI               |
| (5)   | LIBERTY MUTUAL INSURANCE COMPANY (UK) LIMITED            |
| (6)   | NEW HAMPSHIRE INSURANCE COMPANY                          |
| (7)   | ROYAL & SUN ALLIANCE INSURANCE PLC                       |
| (8)   | CGU PLC                                                  |
| (9)   | FAI GENERAL INSURANCE COMPANY LIMITED                    |
| (10)  | GENERALI LLOYD VERSICHERUNG AG                           |
| (11)  | AXA COLONIA VERSICHERUNG AG                              |
| (12)  | KRAVAG-SACH VERSICHERUNG DES DEUTSCHEN KRAFTVERKEHRS VaG |

<u>Claimants</u>

- and -

|       |                                                          |
|-------|----------------------------------------------------------|
| (1)   | THE MATRIX 'NEW PROFESSIONALS' PARTNERSHIP (a Firm)      |
| (2)   | THE FIRST MATRIX 'NEW PROFESSIONALS' PARTNERSHIP (a Firm) |
| (3)   | THE SECOND MATRIX 'NEW PROFESSIONALS' PARTNERSHIP (a Firm) |
| (4)   | SOVEREIGN PICTURES LIMITED                               |

<u>Defendants</u>

PARTICULARS OF CLAIM

### Introduction

1.  The Claimants are insurance companies.

2.  The First and/or Second and/or Third Defendants are investors in a television series
    entitled 'The New Professionals', produced by David Wickes Television Limited. The
    Fourth Defendant is the sales agent for 'The New Professionals'. The Fourth
    Defendant's alter ego is David Lamping, a sales agent and marketing consultant.

(1172184 01)

106/022/00964

3.   In early 1997, the Claimants agreed to insure the Defendants against the risk of pecuniary losses in respect of 'The New Professionals'. The insurance was arranged on behalf of the Defendants by brokers, Lloyd Thompson.

4.   In this claim, the Claimants seek a declaration that the contracts of insurance have been, or are now, avoided by reason of misrepresentation and/or non-disclosure of material facts.

The New Professionals

5.   In 1996 David Wickes, a producer, proposed making a series for television, comprising 13 episodes, inspired by the 1970s/1980s hit series 'The Professionals'. This series ("the series") was provisionally entitled 'The New Professionals'.

6.   By a letter dated 16th September 1996 to Peter Hitchen of Media Affiliates Limited, a copy of which was received by Gordon Dawson of Lloyd Thompson, David Lamping gave a sales projection for the series based on David Wickes' proposed storyline and casting, the success of 'The Professionals' and the current financial position of the markets. This took the form of a schedule listing a low and high sales figure in US dollars per episode for different countries ("the First Schedule"). The total of the low figures was $1,327,000 per episode and the total of the high figures was $2,040,000 per episode. The letter did not give a time frame during which the projected sales could be expected to occur.

7.   By a letter dated 12th October 1996 to Peter Hitchen, David Wickes estimated production costs to make the series at $13,208,711 (or £8,521,749).

8.   By 28th November 1996:
   a.   The Fourth Defendant and/or David Lamping had been appointed sales agent for the series on a commission basis;
   b.   Flashpoint Limited ("Flashpoint") and Matrix Securities Limited ("Matrix") were arranging the financing of the series and acting as agents for the potential investors in relation to obtaining insurance, for a fee dependent upon the financing being raised;
   c.   The financing was dependent upon insurance cover being obtained against the risk of pecuniary losses.

· 2 ·

(1172184 01)

LEX-01 106709

106/022/00965

    d.    Lloyd Thompson had been appointed as the Defendants' insurance brokers to obtain such insurance cover.

9.    In a letter dated 28th November 1996 to Matrix, a copy of which was received by Gordon Dawson of Lloyd Thompson, David Lamping explained the low and high figures given in the First Schedule as follows:

> 'The "Low Target" is the minimum figure which can be achieved in each market for the first 13 episodes based on my expert knowledge ... not having a crystal ball .... I have set conservative and reachable figures accordingly.'
>
> 'The "High Target" is my projection over 26 episodes following the telecasting of the first series and taking full advantage of the ratings achieved.'
>
> 'Looking across the water at the USA I have allowed for the strong possibility of getting into a syndication there. Of course to make this occur will require the availability of a minimum of 22 episodes'

10.    At the beginning of 1997, Flashpoint and Matrix, acting on behalf of the Defendants, instructed Lloyd Thompson to approach the insurance market to obtain insurance cover of £12,047,970 against the risk of pecuniary losses being incurred over a 3 year period on the basis that projected revenue from the series was $26,520,000 (that is, the total of the high figures from the Schedule, per episode, multiplied by 13).

11.    On 20th January 1997, Gordon Dawson of Lloyd Thompson reported back to Flashpoint that potential underwriters were concerned that the margin between the projected revenue and the sum insured was too narrow.

12.    On 31st January 1997, David Lamping produced a further version of the First Schedule containing only the figures which had previously been described as high figures but omitting this description of them. The high figures were revised downwards slightly to $1,925,300 per episode. A copy of this schedule was received by Gordon Dawson of Lloyd Thompson.

13.    In a letter dated 5th February 1997 to Matrix, a copy of which was received by Gordon Dawson of Lloyd Thompson, David Lamping stated:

LEX-01 106710

'Traditionally , TV licenses are for 2 telecasts over 3 years or 3 telecasts over 5 years but, once a broadcaster had used up the number of telecasts agreed, the renewal potential exists immediately. It is standard practice for the purpose of establishing values for product within the television industry (and it is accepted by the top accounting firms) to add in a second and third cycle at 50% and 30% respectively of the original price.  So there is a significant value on top of the figures of which you are already in possession. I have not included this additional revenue potential in my figures, but it is an important additional element which you should now take into consideration'.

14.     This letter did not give a time frame during which the second and third cycle sales could be expected to occur nor did it state in which markets such second and third cycle sales could be expected to take place.

15.     By a fax dated 17th February 1997 to Flashpoint, Gordon Dawson of Lloyd Thompson reported that the Second Claimant, which he had intended to be the lead underwriter, remained unwilling to underwrite the risk because the margin between the projected revenue and the sum insured was too narrow.

16.     Thereafter, a further schedule of projected revenue ("the Second Schedule") was prepared by Gordon Dawson of Lloyd Thompson using David Lamping's high figures from the First Schedule as revised on 31st January 1997, but inflating those figures by 50%.  Less sales commission of 7.5%, the Second Schedule gave:

> 'Net Revenue available to Uwrs based
> on 13 episodes              $34,727,599'

Converted into sterling and taking into account a projected income of £500,000 from merchandising, the Second Schedule gave:

> 'Total Net Revenues available to
> Underwriters                £22,204,749'

There were two versions of the Second Schedule. One version contained the heading 'Projected 4 Year Revenues', the other omitted '4 Year' from the heading. The two versions were otherwise identical.

106/022/00967

The contracts of insurance

17.    On or around and after 17th March 1997, Gordon Dawson of Lloyd Thompson re-
presented the risk to the insurance market including the Claimants.   The slip set out the
proposed terms of the insurance (insofar as is relevant) as follows:

> Insured: The Matrix 'New Professionals' Partnership and/or
> Sovereign Pictures Ltd
> Period: 24 months with effect from 16th May 1997
> Interest: ... if at the expiry of the Policy Period the revenue
> collected is less than the  Sum Insured as a result of Force
> Majeure, as defined, then Underwriters will pay to the
> Assured, at the expiry of the Waiting Period, the difference
> between the Sum Insured and the revenue collected
> Sum Insured: £12,096,500
> Conditions: As per Pecuniary Loss Indemnity Wording tba
> L/U only
>                Waiting Period 630 days
>                UK law and jurisdiction

18.    On or after 14th May 1997, the Claimants entered into contracts of insurance with the
Defendants. The dates and amounts of each Claimant's participation are set out in
Appendix 1.  Save as appears in Appendix 1, the terms were as set out in the slip.

19.    The Claimants were induced to enter into the contracts of insurance by the
misrepresentation and/or non-disclosure of material facts, as set out below.

Misrepresentations

20.    Before the contracts of insurance were concluded, Gordon Dawson of Lloyd Thompson
made the following representations to the Claimants which were material to the risk:

 a.    It had been professionally estimated by David Lamping that, based on 13
 episodes, the net revenue available to underwriters from sales of the series within
 the 45 month period before any claim would fall to be paid (or alternatively
 within 4 years) would be £22,204,749.

 b.    This projection ("the projection") was or was reasonably to be considered
 conservative.

LEX-01 106712

    c.    Lloyd Thompson and the Defendants believed and had reasonable grounds for believing that the projection was realistic and likely to be achieved.

    d.    Lewis Collins, who had starred in "The Professionals", was contracted to appear in the series.

21.    These representations were contained in, or implied by, the following:

    a.    the Second Schedule; and/or

    b.    a document prepared by Lloyd Thompson headed 'Re: Pecuniary Loss Indemnity - The New Professionals' stating:

        'The New Professionals is .... employing ... Lewis Collins as Bodie'

        'The amount we are seeking to place under the policy is £12,096,000 against anticipated revenues available to retire underwriters on a first out basis, of £22,204,749. The revenue figures, it has to be noted, are considered to be pretty conservative'; and/or

    c.    a document prepared by David Wickes entitled 'The New Professionals' in which he outlined the story lines and casting for the series and which stated that:

        'We already have Lewis Collins (one of the stars of the original series) to reprise his role as Bodie.'; and/or

    d.    the inclusion in the presentation of reference to, or letters from, David Lamping.

22.    The documents referred to in paragraph 21, or the substance thereof, were shown, given or sent to each of the Claimants by Lloyd Thompson before the Claimants entered into the contracts of insurance. Further:

    a.    the Twelfth Claimant received those documents under cover of a fax dated 21st April 1997, which was also received by the Seventh Claimant. The fax also stated that the projected revenues were 'professionally estimated'.

    b.    the Eleventh Claimant received those documents under cover of a fax dated 12th May 1997. In a fax dated 15th May 1997, Lloyd Thompson also stated to the Eleventh Claimant that

        'The projected revenues are put together by The David Lamping Company'

        'The figures are only medium range with low being a 'fire sale' disaster situation.'

        'We are confident that the figures given are on the conservative side...'

106/022/00969

c.    the Tenth Claimant received those documents under cover of faxes dated 9th January 1997 and 17th March 1997, save that, in the document headed 'Re: Pecuniary Loss Indemnity - The New Professionals', the amount sought was £12,047,970 and the anticipated revenues were £15,898,710. By a fax to the Tenth Claimant dated 17th March 1997, Lloyd Thompson informed the Tenth Claimant of changes to the original presentation including the 45 month policy period and estimated revenues of £22.2m. The fax stated:

'By extending the overall 'recoupment' period for underwriters out to 45 months we bring in the potential of a second cycle of telecasts and therefore an additional 50% on top of the estimated revenues.'

d.    the Ninth Claimant received those documents in the same form as the Tenth Claimant;

e.    the Sixth Claimant received those documents, save for the document headed Re: Pecuniary Loss Indemnity - The New Professionals. Instead the Sixth Defendant received a document headed 'The New Professionals Pecuniary Loss Indemnity' which stated:
'48 month revenue estimates are £22,204,749..'
'Edward Woodward, Lewis Collins are taking the two lead roles..'

23.    As Gordon Dawson of Lloyd Thompson knew or ought to have known and/or as the Defendants ought to have known, the above representations were untrue and were not made in good faith.

## PARTICULARS

a.    The projection had not been made by David Lamping and had not been professionally estimated. It had been made by Lloyd Thompson who had no professional competence or expertise in estimating sales revenues from television series;

b.    The projection was not supported by nor was it consistent with the figures which had in fact been estimated by David Lamping but on the contrary was inconsistent with those figures. In particular;

i.    The projection was based on David Lamping's "high" figures, which assumed that there would be 26 episodes and a strong possibility of syndication in the USA (which itself required the availability of a minimum of 22 episodes). Those figures did not apply to a series of 13

LEX-01 106714

106/022/00970

    episodes and exceeded the maximum sales which David Lamping believed could be achieved from such a series.

  ii.    In arriving at the projection, David Lamping's "high" figures had been further uplifted by 50%. Such an uplift could be justified, if at all, only on the assumption that there would be a second cycle of sales in all markets within the relevant period. Lloyd Thompson had no or no reasonable ground for making such an assumption.

  iii.    Further, the figures which David Lamping considered to be conservative were, as Gordon Dawson of Lloyd Thompson knew from the letter of 28th November 1996 referred to in paragraph 9 above, the "low" figures given in that letter and not the "high" figures.

  c.    In the premises, the projection was not nor was it reasonably to be considered to be conservative.

  d.    Further, Gordon Dawson of Lloyd Thompson cannot have believed in good faith and/or neither he nor the Defendants had reasonable grounds for believing that the projection was realistic or had any real likelihood of being achieved.

  e.    Lewis Collins was not contracted to appear in the series.

## Non-disclosures

24.    Further and in the alternative, on 12th May 1997, before the contracts of insurance were concluded, Travers Smith Braithwaite, solicitors for the First Defendant, sent a copy of the proposed policy wording to Gordon Dawson of Lloyd Thompson. The wording contained provisions for underwriters to pay into an escrow account at the end of the policy period (2 years) the difference between the revenue collected from the series at that point and the Sum Insured and thereafter to credit that account quarterly with interest at LIBOR less 0.5% until the end of the waiting period. During the waiting period sums could be withdrawn by underwriters from the escrow account equivalent to any further revenue collected, and at the end of the waiting period the balance of the account would be released to the Defendants. This arrangement was not mentioned in and was inconsistent with the slip.

25.    The existence of this proposed wording and/or the intention that the insurance policy should contain such wording were facts material to the risk which ought to have been disclosed to the Claimants.

26.    Further, Gordon Dawson of Lloyd Thompson was aware that these facts were material and ought to be disclosed. In support of this contention the Claimants will rely on a fax

LEX-01 106715

dated 14th May 1997 from Gordon Dawson of Lloyd Thompson to Flashpoint, in which
he stated:

> '(1) The most worrying thing is that the PPM and wording
> state that Underwriters are to pay a claim into a separate
> interest earning account at the expiry of the Policy Period
> (24 months) and not at the end of the Waiting Period (45
> months) as originally understood and agreed.
> Underwriters are working on 4 year revenue estimates and
> therefore have been relatively relaxed about being asked to
> pay up after only 45 months but will not agree to being
> expected to pay after only 24, albeit into a separate
> account, just for the purpose of earning the investors
> interest. The interest earned during the 21 month Waiting
> Period (on Underwriters' money) should belong to
> Underwriters and this new concept is (a) new to me, (b)
> new to and un-agreed by underwriters and (c) against the
> original principle/ reason for introducing the Waiting
> Period.'
>
> '.. they are important issues especially (1) which I
> assume is crucial for Matrix as it potentially raises
> another £1.48m for investors. Underwriters will need to
> be made aware of this and they won't like it.'

27.    Notwithstanding the above, the facts referred to in paragraph 25 were not disclosed to
the Claimants before the contracts of insurance were made.

28.    Further, by a fax dated 16th May 1997 to the Eleventh Claimant, Lloyd Thompson
represented in response to a request to explain the Waiting Period:

> 'The Waiting Period on the slip is simply a method of
> extending the period available to underwriters in which to
> recoup adequate revenues to be released from liability. On
> this basis there cannot be an actual paid claim to the
> Assured until 24 months and 630 days from 16th May 1997.
> If there is a shortfall between the revenues collected in
> that 45 month period and the Sum Insured, then that will
> be the claim paid.

106/022/00972

> We introduced the Waiting Period on the basis that some
> of the companies writing this policy are not allowed to
> write a Policy Period of more than 24 months.'

29.  In the light of the proposed policy wording, and as Gordon Dawson of Lloyd
     Thompson knew or ought to have known and the Defendants ought to have known, this
     was a misleading and false explanation of the Waiting Period in that it omitted all
     mention of interest.

30.  Further, the Second Claimant, alternatively the First and Second Claimants, were lead
     underwriters and, as Gordon Thompson of Lloyd Thompson knew or ought to have
     known and as the Defendants ought to have known, were considered by the Third to
     Twelfth Claimants (inclusive) to be experienced in this field of underwriting such that the
     Third to Twelfth Claimants were also induced to underwrite the risk by the fact of their
     participation. Lloyd Thompson failed to disclose to the Third to Twelfth Claimants
     (inclusive) that the Second, alternatively the First and Second, Claimants had been
     induced to underwrite the risk by the misrepresentations and non-disclosures referred to
     above.

Policy Wording

31.  On or about 3rd June 1997, and notwithstanding that the First Claimant was not the lead
     underwriter, or alternatively was not the sole lead underwriter, Gordon Dawson of Lloyd
     Thompson on behalf of the Defendants presented the proposed policy wording referred
     to in paragraph 24 herein to the First Claimant for agreement.

32.  Despite the knowledge of Gordon Dawson as as set out in paragraph 26 herein, Lloyd
     Thompson orally represented to the First Claimant's underwriter, Steven Mitchell, that
     the policy wording was on the same terms as appeared in the slip and failed to disclose
     the facts referred to in paragraph 25 herein which were known to Gordon Dawson and
     ought to have been known by the Defendants. The representation was untrue for the
     reasons set out in paragraph 26.

33.  In consequence, Steven Mitchell scratched the policy wording on behalf of the First
     Claimant which he would not have done if the facts referred to in paragraph 25 had been
     disclosed and/or the representation referred to in paragraph 32 had not been made.

LEX-01 106717

106/022/00973

34.   In the circumstances, no true agreement was reached with the First Claimant as to the policy wording and/or any agreement reached was voidable by reason of misrepresentation and non-disclosure and/or does not bind the other Claimants.

35.   Further, notwithstanding the conditions referred to in Appendix 1 hereto, the proposed policy wording referred to in paragraph 24 herein has not been agreed with the Third and Eleventh Claimants.

Avoidance

36.   In the circumstances, the Claimants are entitled to and have avoided the contracts of insurance, alternatively do so now.



AND THE CLAIMANTS DO CLAIM:

A declaration that the contracts of insurance between the Claimants and the Defendants are void ab initio.

GEORGE LEGGATT QC

MARION EGAN

The Claimants believe that the facts stated in these Particulars of Claim are true.

I am duly authorised by the Claimants to sign this statement

..............................................

John E Hall

Partner CMS Cameron McKenna

(11721X4 05)                                   - 11 -

LEX-01 106718

106/022/00974

## APPENDIX 1

| Claimant | Amount in £ | Conditions attached | Date Scratched |
|---|---|---|---|
| (1) HIH | 3,925,000 | Subject to reinsurance of 3.5m | 14.5.97 |
| (2) Sphere Drake | 300,000 | All amendments to be agreed notwithstanding slip | 19.5.97 |
| (3) Independent | 1,250,000 | | 2.6.97 |
| (4) Kjobenhavnske | 350,000 | | 15.5.97 |
| (5) Liberty Mutual | 400,000 | | 15.5.97 |
| (6) New Hampshire | 1,293,161 | | 27.5.97 |
| (7) Royal & Sun | 100,000 | | 29.5.97 |
| (8) CGU | 250,000 | | 30.5.97 |
| (9) FAI | 325,000 | | 15.5.97 |
| (10) Generali Lloyd | 1,500,000 | Inclusive of 500,000 fronting for Cologne Re | 30.5.97 |
| (11) Colonia | 1,677,549 | Subject to agreement to policy wording | 28.5.97 |
| (12) Kravag | 725,790 (6%) | | 28.5.97 |

00172154.01

LEX-01 106719

# EXHIBIT 20



## JLT RISK SOLUTIONS
#### Limited

| | | |
|---|---|---|
| To | Keith Peacock | 6 Crutched Friars<br>London EC3N 2PH<br>Telephone  0171 528 4000<br>Direct Line  0171 558 3569<br>Facsimile  0171 556 3623 |
| Company | Lexington, London | |
| Fax No | 480 6266 | |
| Date | 1 November 1999 | |
| From | Mark Drummond Brady | |
| | Financial Risks | |

No. of Pages
Inc. front sheet        **3**          **Facsimile**

Int:
Ref:

### FLASHPOINT MARKET MEETING

At JLT's Offices

10.30 Tuesday 2nd November 1999.

Please find attached a proposed agenda for the meeting.

We feel that the agenda should centre around the transactions where expiry is imminent, even though some of these do not directly affect all of those attending.

The aim of the meeting is to establish, across the board, how the Market wish to deal with Flashpoint (and Flashpoint projects) in principal, going forward.  The reason for looking at specific cases is to examine, in each case, the efficacy (or otherwise) of Flashpoint's performance and to arrive at a consensus among the major market players as to how the market wishes to proceed in this relationship.  Therefore, we hope to avoid discussion on any specific differences of opinion among those present on the specific case issues, concentrating instead on the market vis a vis Flashpoint.

I am happy to chair the meeting and to address the agenda, whilst recognising that discussion may flow fairly freely.

Please also find attached a list of attendees for your information.

Best Regards

*Jenny Flanagan*

**MARK DRUMMOND BRADY**

---

**CONFIDENTIALITY NOTICE**

The information contained in this facsimile message is confidential and JLT Risk Solutions Limited reserves any and all possible rights to privilege in respect thereof.  It is intended only for the use of the addressee designated above.  Any reader of this message, who is not the addressee, is hereby expressly forbidden to copy, disseminate, distribute or in any other way use any of the information contained in this facsimile message.

If you have received this facsimile transmission in error, please immediately notify the sender by telephone so that we can arrange for its return.

---

JLFRAX214E

This facsimile copy is for information only and we do not accept any responsibility for differences between the original and the transmission copy. If all pages not received clearly please contact us on the above number.

Lloyd's Brokers. A member of the Jardine Lloyd Thompson Group
A company incorporated with liability limited by shares
Registered Office: 6 Crutched Friars, London EC3N 2PH. Registered in England No. 1836540. Vat No. 244 2321 96

59/AIG/KP1 -
00030

LEX-01 006949



*FLASHPOINT MARKET MEETING*

*JLT's Office*
*10.30 a.m.*
*Tuesday 2ⁿᵈ November 1999.*

*ATTENDEES*

| | |
|---|---|
| Richard Jervis | HIH |
| Cecelia Polato | Kemper |
| Chris Burbridge | GenStar |
| Andrew Cox | GenStar |
| Eric De Rott | Axa |
| Mrs. Nimhran | Axa |
| Mrs. De La Croix | Axa |
| Rob Wood | AIG |
| IBA KJP | Lexington |

59/AIG/KP1 -
00031

LEX-01 006950



## *FLASHPOINT MARKET MEETING*

### *JLT's Office*
*10.30 a.m.*
*Tuesday 2nd November 1999.*

### *AGENDA*

| | | |
|---|---|---|
| 1. | Introduction | MDB |
| 2. | 7.23 – The Flashpoint Offer | All |
| 3. | Rojak – The Flashpoint Offer | All |
| 4. | It Had To Be You | All |
| 5. | Award | All |
| 6. | Market Consensus on Flashpoint Relationship | All |
| 7. | Loss Adjusters / Auditors | All |
| 8. | Summing Up | MDB |
| 9. | Any Other Business | All |

59/AIG/KP1 -
00032

LEX-01 006951

# Meeting
## 2nd November 1999 – 10.50 a.m.
### Flashpoint

See Agenda
See Listing of Attendees – "Not all Underwriters were represented."

M.D.B.          Happy to host the meeting but pointed out JLT remains the insured's
                representative. N.B. JLT are Lex's Agent in placing our rein's

                (1)   In some cases Flashpoint of Agents
                (2)   In some cases Flashpoint of Principal as respects the Colatorial
                      Agreement which complicated the issue.

JLT's view is that Flashpoint is desperately keen to make insurers whole, but does the
market want to work with Flashpoint.   Appears "some" insurers are very anti
Flashpoint.

Reports on          7.23)
                    Rojack)        Available at the meeting
                    Awards)

## 7.23 (Hollywood Funding #1)

Claim has been paid.  $15m total loss.  Paid by HIH, some R/I not paid as yet
Offer from Flashpoint is that because Flashpoint has no beneficial ownership as claim
has been paid.

(1) They will match offer for residual value.
(2) Reimburse U/W's over a period of time to the amount of 2m per annum if their
    financial position allows up to $10m.

GEN STAR:  ? Original (when Underwriting) sales estimates, how arrived, ?
fraudulent.

AXA:        Why are Flashpoint being so generous

Y2K:        Because Flashpoint are building a business and will need insurance
            going forward.

GEN STAR:  View is that Flashpoint have on interest in building a LIBRARY!
            Why not more than $10m – say all of the 15m plus interest.
            Residual value of 10m s on the high side.
            ICE Media's value views.

AIG:        Questioned also the veracity of the original value.                **HF4-6/LEX/386 -
                                                                                00034**

| | |
|---|---|
| JLT: | Big problem with the Underwriting was that there was not enough time allowed contractually, in the insurance policy, to bring the individually film revenues to a given level. |
| ROJAK: Hollywood Funding #2 | Claim due Tuesday 8th November 1999 Claim due mid December 1999 –amount $15m |
| KEMPER: | Promotional and expenses generally for marketing is HIGH so how can they not have sales. Why have FLASHPOINT NOT done better in actual sales. |
| AIG: | Original slat completed 7 out of 10 – very little funds left in their budgets. |
| JLT: | When slats put together it is a Joint Venture with an often at the behest of the sales agents which takes into account he available of certain stars. This sometimes reduces the number of films in a slat. Flashpoint have had problems with sales agents and have changed them income cases. |
| GEN STAR: | ? Completion bond insurers responsibilities |
| AXA: | |
| JLT: | Offer is to that Flashpoint will re-finance for a further 12 months at the own cost. |
| GEN STAR: | How will Flashpoint do this |
| JLT: | They will raise a new bond. There is only a brief window in time available because of the Y2K issue. Re-issue will involve the duplication of legal effort i.e. like the original deal. |
| | ?? Cost and to whom |
| KEMPER: | Will the film not still be a loss after the extension period. |
| JLT: | Pointed out that because of the S & P rating insurers must meet payment obligations on the appointed days not to do so could invoke a "rating" problem. |
| GEN STAR: | From whom was the original money raised? We have the opportunity to audit US sales so far and likely future sales. |
| HIH: | Have brought in adjuster -     - Auditors. Adjusters are very good at beginning the process. The Adjusters involved are G.W.T. – Howard Diamont, Cameron McKenna – John Hall. |

**HF4-6/LEX/386 - 00035**

LEX-01 041258

Forensic Auditors – TBA. HIH          the market and reinsurers with no response as respects the above companies – HIHI are applying this to whole of their Film Business portfolio.

HIH view s that until they get a view from the above firms it is unlikely to agree to an extensive on policy re-issue.

JLT:        Agree that FLASHPOINT should start the process pending the insurers investigating.

HIH:        Stated that FLASHPOINT would meet all the costs. Financial costs are the main costs and we should proceed with the process even if insurers ultimately and because of the Adj etc advice decline to get involved in any extension on re-financial.

AIG:        Will seek Senior Managements view and respond today.

HIH:        There appears to be revenues coming through, so 12 months may be in order – 24 months would be better

AXA:        Still concerned about the revenue/sales reporting. They do not find FLASHPOINT in any way reliable on anything.

JLT:        All of these arguments are fine, but is there a consensus subject to contract to extend.

IT HAD TO    Similar to ROJAK
BE YOU
AWARD

HIH         7.23 Offer – Would FLASHPOINT guarantee the offer and what expectation have we that they can meet these payback schedules. Is there anybody else unlikely to bid (Jean Mitchell involvement).

GEN STAR:   May not ROJAK investigations influence any deal considered on 7.23. They feel they have a possible $250m loss.

JLT:        Repeated that FLASHPOINT would look to match any other offers.

HIH:        Does the meeting feel that HIH should go ahead and get alternative offer. FLASHPOINT need to make a stronger promise.

JLT:        Meeting FLASHPOINT on the 3rd November to report on this meeting.

KEMPER:     Concerned that FLASHPOINT do not respond to letter etc. Why have JLT not gone to the banks involved as they're the insured.

AXA:        There is a need to CLARIFY – RISK BY RISK – who are the respective players, what are their responsibilities.

**HF4-6/LEX/386 -
00036**

AIG        )    Why would we not expect all of the FLASHPOINT projects to be a
KEMPER  )    loss.  So should we not let HIH proceed as mentioned above.
GEN STAR)

JLT:          Pointed the importance of insurance doing something new!

BREAK - WITHOUT JLT

GENSTAR:   Pointed out HIH & LEX are the issuing companies

AIG:          Want to investigate across the board.

AXA:          Assets are the movies!  Need to consider the value.

GEN STAR:  Cameron McKenna – am subject to conflict.  They have a contact in
             California who could be of assistance in valuing and dispensing f
             not divulged.  Ice Media are another possible solution finder.

AIG:          Through investigation in all maters.

GEN STAR:  Not happy with GWT
             ICE Media am also under question.

             Chuk "IT HAD TO BE YOU" as respect our interest and that of
             KEMPER RE.  They went approved SILICON VALLEY BANK.

AIG:          Feel that closing down the FLASHPOINT operation –

AXA:          JLT love an E&O problem.

AXA:          Statements made by FLASHPOINT that earlier films ROJAK for
             instance would make enough to carry the slat.

GEN STAR)
AIG        )    We should conduct an overall investigation
KEMPER  )

GEN STAR:  Should we not introduce a third party to "Run Off"
             FLASHPOINT and all of their films.

KEMPER:    Problems on the Sales Agents ("Arthur Camenack") they can't sell - ?
             also "Artists View".

AIG:          Let HIH run with it for the moment.

KEMPER:    Have told JLT to tell HIH that they will not be paying claims until
             further notice.

HIH:          To fax the meeting within 24 hours – details of how he will progress
             matters.

HF4-6/LEX/386 -
00037

LEX-01 041260

GEN STAR:   Who (Lawyer) should be – NOT INCE – Go for Cameron McKenna –
Go for John Hall – Get a resume – he is already on ROJAK.

HF4-6/LEX/386 –
00038

LEX-01 041261

C9.3

3. NOV

JCT

Meeting — FLASHPOINT —    2-NOV-99 - 10.30

See Agenda
See Listing of attendees.    — "Not all v/w's were represented."

N.D.B.  Happy to host the meeting but pointed out JCT remains the
insured's representative.  NB: JCT ARE LEX'S AGENT IN PLACING OUR REINS

① In some cases Flashpoint of Agents
②  —— " —— " ——      Principal as respects the COLLATERAL
●                        Agreement which complicates the
                          issue

JCT's view is that FLASHPOINT is desperately keen to make
insurers Whole, but does the market want to work with FLASHPOINT.
Appears "some" insurers are very anti FLASHPOINT.

Reports on    7.23
              ROTAK      } available at the meeting.
              AWARDS

                          #15m total loss. Some R/I's not paid as yet    HF4-6/LEX/386-
                          paid By HIH.                                    00039

7.23 - Claim has been paid. Offer from FLASHPOINT is that
[Hollywood Funding #1]   (F) because FLASHPOINT has no beneficial
                          ownership as claim has been paid.

                          (1) they will match offer for residual
                              value
                          (2) Reimburse v/w's over a period
                              of time to the amount of 2m per
                              annum of their financial position
                              albeit up to $10m.

GEN STAR:  ? original (. Then v/wing) sales estimates, how arrived, ? fraudulent
AXA     :  why are FLASHPOINT being so generous
JCT     :  Because —— are building a business and will need us going
           forward.

**LEX-01 041262**

GEN STAR : – Views that FLASHPOINT have an interest in building a
LIBRARY!
– Why not more than $10m – say all of the 15m plus interest.
– Residual value of claim is on the high side.
– ? ICE MEDIA's value view.

HIG : – Questioned also the veracity of the original value.

JCH : – Big problem with the underwriting was that there was
not enough time allowed contractually, & in the insurance
policy, to bring the individual film revenues to
a given level.

● 

POJAK :
bllgased
Ending #2

~~Tstopo.~~ Claim due Tuesday 8th Nov.99 Claim due
Mid Dec 99 –. Amount $15m

KEMPER : Promotional and expenses generally for marketing is HIGH so
how can they not have sales. Why have ~~FLASHPOINT~~ NOT done
better in actual sales.

HIG : Original Slate completed 7 out of 10 – very little
funds left in film budgets.

JCH, When Slates put together it is a Joint Venture with on
offer at the behest of the Sales Agents which takes into
account the availability of certain States. this sometimes
reduces the number of films in a slate. Flashpoint have had
problems with Sales Agents and have changed them in some
cases.

GEN STAR : ? Completion Bond insurers responsibilities.
9XA :

HF4-6/LEX/386 –
00040

JCH : Offer is to that Flashpoint will refinance for a

further 12 Months at the own cost.

?aShn — How will flashpoint do this

FLT — They will raise a new bond. There is only a brief
window in time available because of the Y2K issue.
Reissue will involve the duplication of legal effort
ie: like the original deal.

?? Cost and to them.

Kemper — Will the film not still be a loss after the
extension period

• — Pointed out that because of the S+P rating Insurers
must meet payment obligations on the appointed day, not
to do so could invoke a "rating" problem.

?aShn — From Skn was the original money raised?

" — We have the opportunity to Addit vs Sales so far
and likely future sales.

HH — Have brought in Adjuster — Lawyers — Auditors. Adjusters
are very good at beginning the process. The adjusters involved
are C.W.T — Howard Dismont
Cameron McKenna — John Hall

Forensic Auditors — TBA

HH covered the market the insurers with no response as respects the
above companies — HH are applying to Stole of their
Film Business portfolio.
HH view is that until they get a view from the above
firms it is unlikely to agree to an extension on policy
re-issue.

FLT: Agreed that Flashpoint should start the process pending the
insurers investigating.

HH stated that Flashpoint would meet all the costs. Financial
Costs are the main costs and we should proceed with the process when

HF4-6/LEX/386-00041

4

of insurers ultimately, and because of the Adj etc advice
decline to get involved in any extension on XL-financed.

AIG - Will seek Senior Management's view and ~~get back~~ [respond] today.

HIH - there appears to be less revenues coming through, so 12 months
may be in order — 24 months would be better —

AXA - Still concerned about the revenue/sales repeating. They
do not find Freshpoint in any way reliable on anything.

JLT - All of these arguments are fixed, but is there a consensus
unjust to contract to extend.

[box] ...D TO BE YOU AWARD      Similar to ROSAK

HIH - 7.23 offer - Would Freshpoint guarantee the offer and that
expectation have[we] that they can meet their payback schedules.
Is there anybody else likely to bid.   [box: Is Michell involvement ???]

CONSTAR - May Rosak investigation influence any deal ~ [box: $250m] loss
considered on 7.23. They feel they have a possible loss

JLT - Repeated that Freshpoint would look to match any other offers.

HIH - Does the meeting feel that HIH should go ahead and get alternative
offer. Freshpoint need to make a stronger promise.

JLT - Meeting Freshpoint on the 3rd Nov to report on this meeting.

KEMPER - Concerned that Freshpoint do not respond to letters etc. Why have
JLT not gone to the banks involved or they're the insured.

AXA - There is a need to clarify — Risk by Risk — who are the
respective players, what are their responsibilities.

HIH-KEMPER } = Why would we not expect all of the Freshpoint projects to be
in Sum } a loss. So should we not let HIH proceed as mentioned above.

JLT ≡ Pointed the importance of insurance doing something now!

BREAK - WITHOUT JLT                    HF4-6/LEX/386 - 00042

CONSTAR = Pointed out that HIH + LOX on the firing companies
AIG - Want an investigate across the board.

LEX-01 041265

AXA    —    Asset are the movies. I do need to consider the value

Gen SVen —    Cornish McKenna - are subject to conflict
They have a contact in California who could be of assistance in valuing and disposing of same not divulged [ ICE MEDIA are ~~their~~ another possible solution finder.

AIG    —    Thorough investigation in all matters

Gen SVen    Not happy with GWT
ICE MEDIA are also under question.

●——→    Check "IT HAD TO BE YOU" is ~~taped~~ our interest and that of KEMPER Re. They went approach SILICON VALLEY BANK

AIG —    Feel that closing down the FLASHPOINT operation —
AXA —    Jd have an E+O problem.
AXA —    Statement be made by ~~Flashpoint~~ that earlier films Royal you instance wouldn't make enough to carry the slot.

AIG
AXA     }    We should conduct an overall investigation
KEMPER

Gen SVen    — Should we not introduce a third party to "turn off" Flashpoint and all of their films.

Kemper Re —    Problems on the Sales Agents ("Artists Connection") they can't sell — ? also "Artists View".

AIG —    Let HHH run with it for the moment.

Kemper —    Have told Jd ~~that~~ to tell HHH that they will NOT be paying Claims until further advice.

HF4-6/LEX/386 - 00043

LEX-01 041266

HIH. - to fix the meeting with 2 herus - details of how he
with pregress the matters.

GingStar - Who (lawyer) should be - NOT INCE - Go for Cameron
McKenna - Go for John Hall - Get a resume' - He is
already on ROTAK.

HF4-6/LEX/386 -
00044

LEX-01 041267

# EXHIBIT 21



**GENERAL STAR**

General Star International Indemnity Ltd
First Floor, 50 Mark Lane, London EC3R 7QH
Telephone: (0171) 553 8800
Facsimile: (0171) 553 8801

## FACSIMILE TRANSMISSION

| TO | Richard Jervis |
|---|---|
| COMPANY | HIH Casualty & General Insurance Limited |
| FACSIMILE NO | 020 7458 2400 |
| DATE | 05 November 1999 |
| NO. OF PAGES (INCLUDING COVER) | 1 |
| SUBJECT | Flashpoint Meeting on 2 November 1999 |

**Remarks** ☐ URGENT  ☐ For your review  ☐ Reply ASAP  ☐ Please Comment

Thank you very much for your fax of 3 November.

We are content with your proposals and I thank you for your thoughtful approach to these difficult issues.

You will appreciate that our confidence as to whether Flashpoint will be able to produce firm and meaningful proposals within your time scale is not high. Thus, I trust that involved Underwriters will resolve collectively to take firm action to mitigate their exposure from Flashpoint's activities as a whole.

With regard to legal assistance, I think it would be helpful if John Hall of Cameron McKenna could attend your proposed meeting on 18 November and advise the attendees how he and his firm can assist us in relation to Flashpoint generally. It would seem sensible for Underwriters involved to have a single legal representation although I recognise that Underwriters including ourselves may need to appoint our own counsel.

Regards

Christopher Burbidge
Managing Director

cc. Rob Wood - AIG (280 8840)
Eric Derotte - Axa (33 156 439 089)
Keith Peacock - Lexington (480 6266)
Cecilia Polato - Kemper Re (00324 232 1996)

— Noted

HF4-6/LEX/386 - 00033

CONFIDENTIALITY NOTICE - This communication contains information that is proprietary and/or confidential. If you receive this communication by mistake, please notify the sender by calling +44 171 553 8800. Please destroy all copies and do not otherwise copy, disclose or distribute it.

# EXHIBIT 22

# ˙Flashp●int

St James
LONDON
SW1Y 5PA

**106/004/01104**

Tel: +44 (0)207 930 9315
Fax: +44 (0)207 930 9316
E-mail: swright@flashpointuk.com
Web site: www.flashpointuk.com

## FACSIMILE TRANSMISSION

| TO | DOMINIC COLLINS | FROM | DAVID FORREST |
|---|---|---|---|
| COMPANY | JLT RISK SOLUTIONS | COMPANY | FLASHPOINT (UK) LTD |
| LOCATION | LONDON | LOCATION | LONDON |
| FAX NO | | FAX NO | +44 (0)207 930 9316 |
| PAGES | 1 | DATE | November 18. 1999 |

## U R G E N T – PLEASE DELIVER IMMEDIATELY

**SUBJECT:    HOLLYWOOD FUNDING NO 2 – ROJAK**

Dear Dominic

A serious situation has arisen during the recent discussions relating to a claim due on 29th November 1999 for Hollywood Funding No 2 – Rojak. I understand that whereas HIH are not prepared to say that the claim is not covered, they are sending a signal to your claims department (Chris Geggus) that they will, in all probability, not pay the claim because they cannot collect under the reinsurances placed by JLT on both Hollywood Funding No.1 and anticipated to be the case on Hollywood Funding No.2. In particular, it is reported to me that AIG, who are a significant reinsurer of HIH on this account (and also on the previous claim), are refusing to pay under the reinsurance placed by JLT. Hence HIH are suggesting that they will NOT be in a position to be able to make the full payment of the claim on the due date. This is unacceptable and will result in a default under the bond issue that may well start a chain of litigation.

It would appear that AIG's decision not to pay a reinsurance claim to HIH is tied up with their decision to retrocede their entire book of film financing to GenStar. It appears that GenStar is creating bad feeling amongst the remainder of the reinsuring panel and preventing the achievement of a commercial resolution to this matter. I believe that Chris Geggus needs the help of his colleagues and that perhaps the time has come for JLT to discuss this matter at a higher level. This has an implication for the later and larger deals broked by JLT and led, as you know, by Lexington. I understand that the entire Board of Genstar attended a meeting with HIH this morning and are, as a retroactive retrocessionaire, preventing HIH from dealing with the issue at hand. The AIG must deal with HIH independently of their retrocession to GenStar – that is AIG's problem, not HIH's.

Please can you assist in bringing whatever pressure JLT can on the senior management of both HIH and AIG to deal with the reinsurance claim in a professional and correct manner so that we can all move forward in a constructive way.

Warmest regards

DAVID FORREST

The information contained in this facsimile and any attachments is confidential. It is intended for the use of the addressee only. If you are not the addressee please do not disclose any of the information contained therein nor make copies of any of this transmission.

Please notify us immediately if you have received this transmission in error.

Flashpoint (UK) Limited: Registered in England & Wales: Registered Office: 67 Pall Mall, London, SW1Y 5PA Company No. 3525088

**LEX-01 093370**