# EXHIBIT 23



CMS Cameron McKenna   T  +44 (0)171 367 3000
Sceptre Court         F  +44 (0)171 367 2000
40 Tower Hill         E  info@cmck.com
London EC3N 4BB       DX 135316 BARBICAN 2

**106/004/00450**

**Private and Confidential**

David Forrest Esq
Flashpoint Limited
67 Pall Mall
London
SW1Y 5PA

Your ref:                                                    21st February 2000
Our ref:   JEH/LLO6.19/0Z6642.00013

Dear David

**Rojak**

As you will be aware, Insurers have agreed to pay the Insured's claim in this matter.

During the course of the investigations into the claim, however, it has become apparent that significant non-disclosures and misrepresentations were made to Insurers, notably in and relating to the Rojak presentation document which, but for the terms of the policy, would have entitled Insurers to avoid. Insurers have their remedy, however, against Flashpoint by virtue of clause 8(1)(h) of the Agreement dated 3rd August 1998 and the purpose of this letter, therefore, is to advise you that Insurers now formally reserve the right to make such claim, without further notice.

Without prejudice thereto, since there appears to be some optimism that there will continue to be significant sales in respect of the films insured under the slate, Insurers are prepared to defer pursuing the claim for a period to enable them to ascertain the progress of the sales. In such circumstances, you will appreciate that it will be in Flashpoint's interest to maintain the momentum of the sales efforts. It would be appreciated if you could continue to report to Insurers in this respect on a regular basis.

In the meantime, I am disappointed to note that I have not heard from Susan Wright with copies of the two correspondence files referred to in my letter to her of 27th

〈cms〉

(1129926.01)                    TRANSNATIONAL LEGAL SERVICES

**CMS law firms: CMS Cameron McKenna I CMS Derks Star Busmann Hanotiau I CMS Hasche Sigle Eschenlohr Peltzer
CMS Strommer Reich-Rohrwig Karasek Heinz I CMS Tiseli & Co**

CMS OFFICES  BERLIN  BRUSSELS  LONDON  STOCKHOLM  UTRECHT  VIENNA  ABERDEEN  ALMATY  AMSTERDAM  ARNHEM  BEIJING  BRISTOL  BUCHAREST  BUDAPEST  CHEMNITZ  DRESDEN
DUSSELDORF  FRANKFURT  HAMBURG  HILVERSUM  HONG KONG  LEIPZIG  MOSCOW  MUNICH  PRAGUE  SINGAPORE*  STUTTGART  TASHKENT  TORONTO*  WARSAW  WASHINGTON DC*

CMS Cameron McKenna principal office: Mitre House, 160 Aldersgate Street, London EC1A 4DD  A list of the names of the partners and their professional qualifications is open to inspection
at the principal office.  The partners are either solicitors or registered foreign lawyers.  The firm is regulated in the conduct of investment business by the Law Society.  *Associated offices.

**LEX-01 093303**

CMS Cameron McKenna
**106/004/00451**

January (copy enclosed). Please could I hear from you in this respect without further delay. If it would assist for me to borrow the files and arrange for them to be copied, I am happy to do this.

Yours sincerely

**J E Hall**

- 2 -

(1129926.01)

LEX-01 093304

# EXHIBIT 24



| | |
|---|---|
| **CMS Cameron McKenna** | T  +44 (0)20 7367 3000 |
| Sceptre Court | F  +44 (0)20 7367 2000 |
| 40 Tower Hill | E  info@cmck.com |
| London | W  www.cmck.com |
| EC3N 4BB | DX135316 BARBICAN 2 |

**106/004/00447**

**Private and Confidential**

David Forrest Esq
Flashpoint Limited
67 Pall Mall
London
SW1Y 5PA

Your ref:                                                                                    12th June 2000
Our ref:    MEC/JEH/0Z6642.00016

Dear Mr Forrest

**Award**

As you will be aware, Insurers have agreed to pay the Insured's claim in this matter.

During the course of the investigations into the claim, however, it has become apparent that significant non-disclosures and misrepresentations were made to Insurers, notably in and relating to the Award presentation document which, but for the terms of the policy, would have entitled Insurers to avoid.  Insurers have their remedy, however, against Flashpoint by virtue, among other things, of clause 5(h) of the Agreement dated 3rd August 1998 and the purpose of this letter, therefore, is to advise you that Insurers now formally reserve the right to make such claim, without further notice.

Yours sincerely

Maxine Cupitt

⟨cms⟩

TRANSNATIONAL LEGAL SERVICES

(1177912.01)
CMS law firms:  CMS Cameron McKenna  I  CMS Derks Star Busmann Hanotiau  I  CMS Hasche Sigle Eschenlohr Peltzer
CMS Strommer Reich-Rohrwig Karasek Hainz

CMS OFFICES:
BERLIN  BRUSSELS  LONDON  UTRECHT  VIENNA  ABERDEEN  ALMATY  AMSTERDAM  ARNHEM  BEIJING  BRISTOL  BUCHAREST  BUDAPEST  CAPE TOWN*  CHEMNITZ  DRESDEN  DÜSSELDORF
FRANKFURT  HAMBURG  HILVERSUM  HONG KONG  JOHANNESBURG*  LEIPZIG  MOSCOW  MUNICH  PRAGUE  SINGAPORE*  STUTTGART  TASHKENT  TORONTO*  WARSAW  WASHINGTON DC*

CMS Cameron McKenna principal office:  Mitre House, 160 Aldersgate Street, London EC1A 4DD.  A list of the names of the partners and their professional qualifications is open to inspection
at the principal office.  The partners are either solicitors or registered foreign lawyers.  The firm is regulated in the conduct of investment business by the Law Society.  *Associated offices.

LEX-01 093300

# EXHIBIT 25

Edward P. Krugman (EK-7523)
Ira J. Dembrow (ID-7231)
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, New York 10005
(212) 701-3000

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NEW HAMPSHIRE INSURANCE COMPANY, | No. 04 Civ. 5840 (PKL) (KNF) |
| Plaintiff, | **AFFIDAVIT OF EDWARD P. KRUGMAN IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND APPLICATION FOR A TEMPORARY RESTRAINING ORDER** |
| v. | |
| GENERAL STAR INTERNATIONAL INDEMNITY LTD., | |
| Defendant. | |

STATE OF NEW YORK      )
                                           : SS.:
COUNTY OF NEW YORK  )

EDWARD P. KRUGMAN, being first duly sworn, deposes and says:

1.    I am a member of the bar of this Court and of the firm of Cahill Gordon & Reindel LLP, attorneys for plaintiff, the New Hampshire Insurance Company ("New Hampshire"). I make this affidavit in support of the New Hampshire's motion for a preliminary injunction and application for a temporary restraining order to enjoin defendant, General Star International Indemnity Ltd. ("GenStar"), from seeking or enforcing in the courts of the United Kingdom an anti-suit injunction against the prosecution of this action. New Hampshire seeks this "anti-anti-suit injunction" solely to preserve the status quo with respect to the lawsuits described below and to prevent any attempt by GenStar to strip this Court of its jurisdiction.

2.    On July 27, 2004, New Hampshire instituted this action to recover monies due and owing to New Hampshire by GenStar arising out of an agreement known as the Schader-Montross Agreement, which was negotiated in this District by representatives of the parties.

This Agreement pertains to the obligations of the parties under certain contracts of reinsurance in which GenStar reinsured New Hampshire. A copy of New Hampshire's Complaint is annexed hereto as Exhibit A.

3.    There currently are pending in the United Kingdom several lawsuits and/or arbitrations brought by GenStar against New Hampshire with respect to the same liabilities that are at issue in the suit before this Court. (The filing of GenStar's lawsuits in England is discussed below in paragraphs 10 and 11.) *New Hampshire does not seek to enjoin GenStar's prosecution of its English proceedings.* Rather, the sole relief sought by New Hampshire on this motion is to prevent GenStar from seeking to enjoin this action. In other words, New Hampshire is seeking an "anti-anti-suit injunction." New Hampshire is proceeding *ex parte* because of its very real and justified concern, based on GenStar's conduct to date with respect to these various lawsuits, as discussed below, that providing notice to GenStar of this application will result in GenStar itself proceeding *ex parte* in England to obtain the anti-suit injunction that this motion seeks to prevent.

4.    As set forth in the Complaint, on or about January 29, 1999, New Hampshire and GenStar entered into a contract of reinsurance, referred to as "Project Kraut," pursuant to which GenStar reinsured New Hampshire's obligations as an insurer on a large number of film finance insurance policies. (In very general terms, film finance insurance policies provided insurance for the risk that a given motion picture would not obtain enough funds from sales revenues to repay money loaned by banks and others to finance the production of the motion picture.) The Project Kraut agreement was entered into in connection with New Hampshire's exit from the business of insuring film finance transactions and constituted a transfer, by way of reinsurance, of substantially all of New Hampshire's film finance portfolio to GenStar. (Complaint ¶¶ 7-9)

5.    During 1999 and 2000, disputes arose between New Hampshire and GenStar on film finance reinsurances between them, both under Project Kraut and under various

open-market facultative contracts in which GenStar reinsured New Hampshire. After initial discussions between the parties were unsuccessful in resolving these disputes, the negotiations moved to a more senior level. I am informed by my client (and was in general terms contemporaneously aware) that Charles Schader, a Senior Vice President of American International Group, Inc., acting on behalf of New Hampshire, met, spoke, and corresponded with Franklin Montross IV, the Vice Chairman and Chief Underwriting Officer of General Reinsurance Corporation, acting on behalf of GenStar, in an effort to resolve the disputes. (Complaint ¶¶ 10-11) AIG and General Re are the corporate parents of the parties to this action.

6.  I am informed (and was in general terms contemporaneously aware) that these discussions and negotiations took place through letters and e-mail messages exchanged between Mr. Schader's office in New York City and Mr. Montross's office in Stamford, Connecticut and by face-to-face meetings among Mr. Schader, Mr. Montross, and others (principally Timothy McCaffrey, the general counsel of General Re) at Mr. Schader's office in New York City. In April 2001, the discussions culminated in the Schader-Montross Agreement. The Schader-Montross Agreement made certain financial arrangements and established a going-forward protocol with respect to claims both under Project Kraut and under "non-Kraut" facultative reinsurances. (Complaint ¶ 12)

7.  Disputes have arisen between New Hampshire and GenStar as to the interpretation of the Schader-Montross Agreement. In attempting to resolve these disputes, numerous meetings have taken place, and correspondence has been exchanged, between representatives of the two parties.

8.  The most recent meeting between the parties took place on June 24, 2004 at the offices of Howard Fischer, Esq., of Schindler Cohen & Hochman, GenStar's attorneys in New York. At this meeting, which I attended along with other representatives of New Hampshire, New Hampshire presented a proposal to resolve all of the existing disputes between the

parties. This proposal was rejected by GenStar, but shortly after GenStar proposed further dis-
cussions. Among other things, Mr. Fischer called me the next day (June 25) to broach a further
proposal, and I have seen various e-mails among the parties' principals over the course of the
ensuing weeks. In particular, GenStar wanted to engage in talks with the English brokerage firm
that GenStar believed should contribute a substantial portion of the amount of money that New
Hampshire was seeking from GenStar pursuant to the Schader-Montross Agreement.

       9.    New Hampshire was prepared to file this action immediately after the
June 24 meeting but held off because of GenStar's continuing settlement efforts. On July 27,
2004, however, GenStar made it clear that it was prepared to initiate suit in London (Ex. B), and
New Hampshire therefore commenced this action

       10.    It turns out, however, that GenStar had actually commenced an action in
London on July 5. Insofar as is relevant here, GenStar's London actions (there are more than
one) seek negative declarations — i.e., that GenStar is not liable to New Hampshire — on the
two matters covered by the Schader-Montross Agreement that are sued on here. The claim forms
in the two London actions in which GenStar seeks relief related to the Schader-Montross Agree-
ment are annexed hereto as Exhibits C and D.

       11.    During the extended discussions in the period after the June 24 meeting,
GenStar never said it had commenced suit in England. In contrast, I advised Mr. Fischer of the
filing of this lawsuit, and provided him with a courtesy copy of the Complaint, on July 28, 2004,
the day after the Complaint was filed. New Hampshire's first knowledge of the English action
was when it received service of process on July 29 — the day after my conversation with
Mr. Fischer.

       12.    Although we do not believe there is a basis for it on the facts of this case,
we are concerned that GenStar will ask the English court to enjoin New Hampshire's prosecution

-4-

of this action. English courts frequently issue such anti-suit injunctions, and have done so at GenStar's behest:

- In *General Star International Indemnity Ltd.* v. *Stirling Cooke Brown Reinsurance Brokers Ltd.*, [2003] EWHC 3 (Q.B. (Commercial Court) Jan. 17, 2003) (Exhibit E hereto), the English court enjoined proceedings in Supreme Court, New York County notwithstanding that they were related to a trial that had just been completed before Justice Gammerman.

- In *Tonicstar Ltd.* v. *American Home Assurance Co.*, [2004] EWHC 1234 (Comm), at 2 (Q.B. (Commercial Court) May 26, 2004) (Exhibit F hereto), the English court entered an "order without notice [in which the defendants] were restrained from proceeding with or taking any steps (other than to abandon or discontinue) in pursuit of its Petition to compel arbitration in the New York federal court for the Southern District."

- In *Society of Lloyd's* v. *White*, 144 SJ LB 190 (Q.B. (Commercial Court) Mar. 3, 2000) (Exhibit G hereto), the English court enjoined proceedings in Australia on the basis of a contractual exclusive-jurisdiction clause, notwithstanding that the Australian suit sounded in tort and the Australian court had already denied a request to stay its own proceedings.

- In *HIB Ltd.* v. *Guardian Insurance Co.*, [1997] 1 Lloyd's Rep. 412 (Q.B. (Commercial Court) Dec. 11, 1996) (Exhibit H hereto), the English court enjoined a Virgin Islands insurer from suing its reinsurers in the Virgin Islands because the English court was of the view that English law governed and it expressed distaste for the fact that the Virgin Islands court might award punitive damages.

As a frequent and interested observer of English legal proceedings, albeit I am not admitted to practice in that jurisdiction, I believe that each of these cases (and others of which I am aware) is distinguishable and does not provide a basis for an English anti-suit injunction on the facts of this case. There is obviously no certainty in matters such as this, however, and New Hampshire needs, and believes it is entitled to, protection against the risk that my educated guess as to the outcome of a GenStar application would turn out to be wrong.

13. Accordingly, New Hampshire is moving for a preliminary injunction against GenStar's seeking an anti-suit injunction in England. *New Hampshire does not seek to enjoin or in any way affect the action that GenStar instituted in England. Both that action and the action before this Court should proceed pursuant to the appropriate procedures in the*

*two forums.*[1]  All that New Hampshire is seeking is to be allowed to pursue the action that is pending before this Court (and not to be enjoined from doing so).

14.  Because English courts have been known to issue *ex parte* restraints against proceedings in other forums (see *Tonicstar*), New Hampshire is proceeding on an *ex parte* basis here to prevent ouster of this Court's jurisdiction between the signing of the Order to Show Cause and the hearing on the motion for preliminary injunction.  (It appears that that is what happened in *GenStar* v. *Stirling Cooke Brown*, where Justice Gammerman apparently did not enter a TRO.)  We respectfully request that the Court enter the temporary restraining order and set the matter down for a preliminary injunction hearing as soon as practicable.

15.  To the extent New Hampshire's likelihood of success on the merits of the forum choice is relevant to this motion, I note that the Schader-Montross Agreement is a simple matter, which is reflected in exchanges of e-mails and correspondence.  I believe there will be perhaps half-a-dozen relevant documents in this case and three witnesses:  Messrs. Schader, Montross, and McCaffrey.  All of these witnesses are either in New York or within 100 miles of this courthouse and thus within the subpoena power of this Court.  None of them is in England.  I believe the trial will take about a half-day of court time.

16.  GenStar was served with process in the lawsuit pending before this Court on August 2, 2004.  Copies of the affidavit and Hague Convention Certificate attesting to such service are annexed hereto as Exhibit I.

---

[1]    New Hampshire will in due course move in the English actions to dismiss or stay those proceedings in favor of this one.

17.    No application for the relief sought in the Order to Show Cause has previously been made to this or any other Court.

Edward P. Krugman

Sworn to before me this
5th day of August, 2004

Notary Public

NICHOLAS J. MARCANTONIO
Notary Public, State of New York
No. 31-81MA4517278
Qualified in New York County
Commission Expires March 30, 2006

-7-

# Exhibit A

Edward P. Krugman (EK-7523)
Ira J. Dembrow (ID-7231)
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, New York 10005
(212) 701-3000

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

NEW HAMPSHIRE INSURANCE COMPANY,

Plaintiff,

v.

GENERAL STAR INTERNATIONAL INDEMNITY LTD.,

Defendant.

**04 CV 5840**

No. 04 Civ.

**COMPLAINT**

JUDGE LEISURE

RECEIVED
JUL 27 2004
S.D.C. S.D.N.Y.
CASHIER

Plaintiff alleges:

1.      This is an action to recover certain monies due and owing to New Hampshire Insurance Company ("New Hampshire") by General Star International Indemnity Ltd. ("GenStar") arising out of an agreement known as the Schader-Montross Agreement. The Schader-Montross Agreement was negotiated in this District by representatives of the parties. It pertains to the obligations of the parties under certain contracts of reinsurance in which GenStar reinsured New Hampshire.

### PARTIES, JURISDICTION, AND VENUE

2.      New Hampshire is a Pennsylvania corporation with its principal place of business at 70 Pine Street, New York, New York. New Hampshire is an admitted property and casualty reinsurer in the State of New York.

3.      Upon information and belief, GenStar is a company organized under the laws of England and Wales, with its principal place of business in London, England.

4.    The amount in controversy exceeds the sum of $75,000, exclusive of interest and costs. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(2) because New Hampshire is a citizen of the State of New York and the Commonwealth of Pennsylvania, and GenStar is a citizen of a foreign state.

5.    GenStar is subject to personal jurisdiction in the State of New York because, as set forth below, GenStar representatives participated in negotiations and meetings in New York with respect to the contract at issue.

6.    Venue is proper in this District under 28 U.S.C. § 1391(a).

## BACKGROUND

### The Project Kraut Reinsurance

7.    On or about January 29, 1999, New Hampshire and GenStar entered into a contract of reinsurance, referred to as "Project Kraut," pursuant to which GenStar reinsured New Hampshire's obligations as an insurer on a large number of film finance insurance policies.

8.    In very general terms, film finance insurance policies provided insurance for the risk that a given motion picture would not obtain enough funds from sales revenues to repay money loaned by banks and others to finance the production of the motion picture.

9.    The Project Kraut agreement was entered into in connection with New Hampshire's exit from the business of insuring film finance transactions and constituted a transfer, by way of reinsurance, of substantially all of New Hampshire's film finance portfolio to GenStar.

### The Schader-Montross Agreement

10.    During 1999 and 2000, disputes arose between New Hampshire and GenStar on film finance reinsurances between them, both under Project Kraut and under various open-market facultative contracts in which GenStar reinsured New Hampshire.

-2-

11.    After initial discussions between the parties were unsuccessful in resolving these disputes, the negotiations moved to a more senior level. Charles Schader, a Senior Vice President of American International Group, Inc., acting on behalf of New Hampshire, met, spoke, and/or corresponded with Franklin Montross IV, the Vice Chairman and Chief Underwriting Officer of General Reinsurance Corporation, acting on behalf of GenStar, in an effort to resolve the disputes.

12.    These discussion and negotiations took place through letters and e-mail messages exchanged between Mr. Schader's office in New York City and Mr. Montross's office in Stamford, Connecticut and by face-to-face meetings among Mr. Schader, Mr. Montross, and others at Mr. Schader's office in New York City. In April 2001, they culminated in the Schader-Montross Agreement. The Schader-Montross Agreement made certain financial arrangements and established a going-forward protocol with respect to claims both under Project Kraut and under "non-Kraut" facultative reinsurances.

13.    The terms of the Schader-Montross Agreement that are relevant here are as follows:

(a)    GenStar agreed to pay to New Hampshire its *pro rata* share of losses with respect to a certain film finance policy known as "Destination," subject only to certain contingencies that have not here eventuated.

(b)    New Hampshire agreed to assume complete responsibility for legal expenses on all film contracts ceded to GenStar under Project Kraut, contrary to the normal practice whereby a *pro rata* reinsurer (such as GenStar under Project Kraut) shares proportionately in the legal expenses incurred by a reinsured.

## FIRST CLAIM FOR RELIEF

14.    New Hampshire paid losses under the Destination policy.

15.    GenStar had two reinsurances of New Hampshire with respect to that policy — one via Project Kraut and one "non-Kraut" open-market facultative reinsurance. It has paid its *pro rata* share of New Hampshire's loss with respect to the Project Kraut piece, but it has re-

fused to pay its *pro rata* share under the non-Kraut piece, contending that one of the contingencies under the Schader-Montross Agreement has in fact taken place with respect to the non-Kraut piece.

16.    GenStar's contention is incorrect.  By reason of the Schader-Montross Agreement, GenStar owes New Hampshire the sum of $3,169,648.64 with respect to the non-Kraut Destination reinsurance, plus prejudgment interest at the statutory rate of 9% in the amount of $244,043.78 to July 27, 2004 and $781.66 per day thereafter.

### SECOND CLAIM FOR RELIEF

17.    In connection with the April 2004 settlement of certain film finance litigation then pending in England, the terms of which settlement are confidential, New Hampshire paid, among other things, $1,694,317.60 to reimburse its insured for costs (including attorneys' fees) in the English action. This payment was made pursuant to the "English Rule," under which the prevailing party is entitled to receive reimbursement for such costs.

18.    The "legal expenses" for which New Hampshire assumed responsibility in the Schader-Montross Agreement are New Hampshire's *own* legal expenses, and not taxable costs payable to the insured. GenStar, however, contends that the term "legal expenses" under Schader-Montross does include taxable costs payable to the insured, and on that basis has refused to reimburse New Hampshire for the "costs" portion of the settlement.

19.    GenStar's contention is incorrect.  By reason of the Schader-Montross Agreement, GenStar owes New Hampshire the sum of $1,694,317.60 with respect to the costs component of the foregoing settlement, plus prejudgment interest at the statutory rate of 9% in the amount of $37,600.02 to July 27, 2004 and $417.78 per day thereafter.

WHEREFORE, New Hampshire demands judgment against GenStar:

-4-

A.    on the First Claim for Relief in the amount of $3,169,648.64, plus prejudgment interest in the amount of $244,043.78 to July 27, 2004 and $781.66 per day thereafter;

B.    on the Second Claim for Relief in the amount of $1,694,317.60, plus prejudgment interest in the amount of $37,600.02 to July 27, 2004 and $417.78 per day thereafter; and

C.    for the costs of this action, together with such other relief as the Court deems just and proper.

Dated: New York, New York
        July 27, 2004

CAHILL GORDON & REINDEL LLP

By: _____
        Edward P. Krugman (EK-7523)
        Ira J. Dembrow (ID-7321)
        80 Pine Street
        New York, New York  10005
        (212) 701-3000

*Attorneys for Plaintiff*

-5-

# Exhibit B

**Krugman, Edward P.**

| | |
|---|---|
| **From:** | Yvonne Jefferies [yjefferies@blg.co.uk] |
| **Sent:** | Tuesday, July 27, 2004 2:01 PM |
| **To:** | francis.mackie@nortonrose.com |
| **Cc:** | ncanelos@genre.com; Eric.Kobrick@AIG.com; Tom.Ripp@AIG.com; HFischer@SCHlaw.com; njohnson@genre.com; Kiran Soar; ekrugman@cahill.com |
| **Subject:** | Destination |

Francis

I've tried to reach you on the phone a number of times this afternoon, but without success. As you know, our respective clients have been discussing how to resolve their differences on a number of issues, including Destination. My instructions are that Eric Kobrick has agreed to the following immediate action:

> BLG are to be given access to your clients files concerning the Destination matter, this to include any settlement agreement entered into by your clients with their other reinsurers and/or Willis. We should also wish to review relevant correspondence leading up to these agreements and any tolling agreement between your clients and Willis. When do you think we can have these? It might be faster if we came to review the documents in your office and get copies asap after this. Does this suit you?;

> A meeting is to be arranged with Willis's representatives as soon as possible. In the first instance, we propose that BLG, Norton Rose and Lovells (who we believe act for Willis) meet to discuss the dispute in London. How soon can this be done do you think?

We are conscious that there may well be limitation issues round the corner. Accordingly, I propose that our respective clients enter into a standstill agreement. As indicated above, we understand from Ed Krugman that your clients already have a tolling agreement with Willis. We would wish to have a standstill in place by the end of this week. If this is not something you can agree or do not think can be achieved in time, please confirm by return whether or not you are instructed to accept service of proceedings on behalf of New Hampshire Insurance Company and AIG Europe (UK) Limited. Please understand that GSIIL have no desire to proceed through the courts with this unless they are left with no other option. The goal is to obtain recovery from Willis. GSIIL need to ensure that there is no technical impediment to GSIIL seeking recovery from Willis via your clients and would not wish to fall foul of any limitation issue.

Please could we have an urgent response.

Kind regards

Yvonne Jefferies
Barlow Lyde & Gilbert
Direct tel: 0207 643 8820
Direct fax: 0207 071 9301.

*****************************************************************
Barlow Lyde & Gilbert
Beaufort House, 15 St.Botolph Street, London EC3A 7NJ. Telephone : +44 (0)20 7247 2277 Fax

: +44 (0)20 7643 8500 Web Site : http://www.blg.co.uk CONFIDENTIALITY NOTICE This e-mail
is intended only for the addressee named above.  As
this e-mail may contain confidential or privileged information, if
you are not the named addressee or the person responsible for
delivering the message to the named addressee, please
telephone us immediately.

The contents should not be disclosed to any other person nor
copies taken.  A list of the names of Partners and their
qualifications is available at the address above.

The Partners are either solicitors or registered foreign lawyers.

The firm is regulated by the Law Society.
*********************************************************************

# Exhibit C

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**
**ROYAL COURTS OF JUSTICE**

| | *for court use only* |
|---|---|
| Claim No. | 2004 FOLIO 553 |
| Issue Date | 5 July 2004 |

**Claimant(s)**

GENERAL STAR INTERNATIONAL INDEMNITY LIMITED
Corn Exchange
55 Mark Lane
London
EC3R 7NE



**Defendant(s)**

(1)  AIG EUROPE (UK) LIMITED
The AIG Building
58 Fenchurch Street
London
EC3M 4AB

(2)  NEW HAMPSHIRE INSURANCE COMPANY
1700 Market Street
Suite 2000
Philadelphia
PA 19103
USA

Does, or will your claim include any claim under the Human Rights Act 1998?

☐ Yes        ☑ No

AIG EUROPE (UK) LIMITED

The AIG Building, 58 Fenchurch Street, London EC3M 4AB

NEW HAMPSHIRE INSURANCE COMPANY

1700 Market Street, Suite 2000, Philadelphia PA 19103, USA

| | |
|---|---|
| Amount claimed | To be assessed |
| Court fee | £180 |
| Solicitor's costs | To be assessed |
| Total amount | £180 |

court office at the Admiralty and Commercial Registry, Royal Courts of Justice, Strand, London WC2A 2LL is open between 10am and 4.30pm Monday to Friday. When ponding with the court, please address forms or letters to the Court Manager and quote the claim number.

C) Claim form (CPR Part 7) (03.02) (Expandable)                                    Laserform International 3/02

394.2.doc

| | Claim No. | |
|---|---|---|

Brief details of claim

## GENERAL ENDORSEMENT

The Claimant claims:

(1) A declaration that the Claimant is not liable to indemnify the Defendants pursuant to a contract of reinsurance with policy number MCC1031, scratched by the Claimant on 7 August 1998 ("the Contract"), relating to a slate of 10 films to be made by Destination Film Distribution Company Inc, on various grounds including but not limited to the fact that the Defendants are in breach of a contractual reinsurance warranty which provided that Destination Film Distribution Company Inc maintain a contract of employment with Mr Steve Stabler.

(2) Alternatively, if, which is denied, the Claimant is liable to indemnify the Defendants under the Contract, a declaration as to the proper amount of the Claimant's liability.

(3) Further or other relief.

Particulars of claim will follow if an acknowledgment of service is filed that indicates an intention to defend the claim

Statement of Truth
*The Claimant's solicitor believes that the facts stated in this claim form are true.
*I am duly authorised by the Claimant to sign this statement

Full name    Yvonne Jefferies

Name of Claimant's Solicitor: Barlow Lyde & Gilbert

signed _____    position or office held    Partner
*                                                    (if signing on behalf of firm, company or corporation)

*delete as appropriate

Barlow Lyde & Gilbert
Beaufort House
15 St Botolph Street
London EC3A 7NJ
DX 155   London
Fax: 0207 071 9309
Email: yjefferies@blg.co.uk
Ref: 45602-4/YJ/KS/7.60

194.2.doc



**WILLIS FABER & DUMAS**
**GLOBAL BROKING SERVICES**

GLOBAL
**FINANCIAL RISKS**
DIVISION

576
WFD

Willis Faber & Dumas Global Broking Services is a business name of Willis Faber & Dumas Limited

Policy Number: MCC1031

Reinsured:      AIG Europe (UK) Limited

Type of Risk:   Contingency Reinsurance
                As Original

Period:         As Original



For LPSO use

For ILU use

For LIRMA use



**TYPE:**    Contingency Reinsurance - As Original

Distribution, Production and Acquisition Facility

**FORM:**    J1 NMA 2037 and/or Companies equivalent

**REINSURED:**    AIG Europe (UK) Limited
120 Fenchurch Street
London
EC3M 5BP

**ORIGINAL
INSURED:**    The Trustees (as approved by Original Insurers) in respect
of:

Finance provided under Destination Film Distribution Co, Inc
- 1401 Ocean Avenue, Suite 301, Santa Monica, California
90401 U.S.A., (Destination) Distribution, Production and
Acquisition Facility for their respective rights and
interests.

**PERIOD:**    To accept Film Declarations made under Destination Film
Distribution Co. Inc., Distribution, Production and
Acquisition Facility, during the policy period of 5 years
from date to be agreed - As Original.

**INTEREST:**    To indemnify the Reinsured in respect of their obligations
under original policy no. MCC1018.

**ORIGINAL
INTEREST:**    "Whereas Destination intends to invest in various motion
pictures for the purpose of acquiring North American
distribution rights for the slates or portfolio of
cross-collateralised feature films either own produced or
acquired and

Whereas the said distribution rights will be acquired for
sums not exceeding 40% of the total negative cost and

Whereas Destination have agreed that on all projects there
will be a cap of USD 7,200,000 on the acquisition cost for
domestic rights of any one film prior to uplift.

Whereas the international distribution rights will be
acquired by the strategic partners of Destination for a sum
not less than 60% of the total negative cost and

Whereas  Destination intends to raise USD 100,000,000 for
their Distribution, Production and Acquisition Facility via a
bond issue or bank financing and

---

Whereas the Trustees for the bondholders or lenders will be the Named Insured under the Policy and

Whereas the bonds or bank financing will be issued for a period of five years and subject to the payment of semi-annual coupons/interest and

Whereas an "in principle" agreement has been reached with Columbia/Tri-Star for the current slate of films in respect of Home Video and Destination intends after 3 years to handle their own video sales and

Whereas an "in principle" agreement has been reached with a Film Laboratory for a Film Processing deal with an advance payment feature and

Whereas an agreement will be sought by Destination with a major cable supplier (e.g. HBO, Showtime or Encore) and

Whereas all of Destination's Distribution fees will be deferred until Insurers are off risk and

Now this Policy is to indemnify the Insured in respect of any shortfall in revenue necessary to satisfy the obligations due to the bond holders or lenders arising from the failure of recoupment of the approved films described within the "Operating Agreement" between Destination and Insurers."

**ORIGINAL SUM INSURED:**

a)  Up to USD 14,250,240 (not exceeding 197.92% of negative cost) any one film being Destination's maximum investment of 40% in any one film in respect of films for US Distribution only.

b)  In respect of non-origination risk only USD 121,000,000

In no event however, shall Insurers maximum aggregate indemnity hereunder exceed USD 121,000,000 being 197.92% of negative cost of insured film slates.

**SUM INSURED HEREON:**

40% part of 60% part of 100% of Original Limits

Ceding Company retains 20% (with Reinsurance)

As set forth in the original Policy and Operating Agreement.

CONDITIONS:        Full Reinsurance Clause

Simultaneous Settlements Clause

As per Original Policy to be issued

Claims Co-operation Clause

Film declarations and Prints and Advertising expediture
falling outside of the parameters set forth in the "Operating
Agreement" between Destination and the Original Insurers to
be approved by Reinsurers.

In years two through five overhead will be deducted from
revenues.

Contracts of employment in respect of Steve Stabler as Chief
Executive Officer and Brent Baum as Chief Operating Officer
to be maintained for the duration of the Policy.

Reinsurers shall be entitled to their pro-rata proportion of
the adjustment premium calculated at an amount equal to 5% of
the Net Profit in perpetuity in the form of annual
dispersements as defined in the Operating Agreement (Nil
Brokerage).

Destination shall be entitled to roll revenues earned within
36 months of the inception of this Policy into new projects
to be declared hereunder subject otherwise to the approval of
Insurers.

INTERNAL
CONDITIONS:        Not to form part of Policy Wording or Cover Notes.
It is noted and agreed that this placement may be transferred
to EPS at a later stage, at the discretion of Willis Faber &
Dumas Ltd.

ORIGINAL NET
PREMIUM:           USD 10,285,000 in all for period.

REINSURANCE
PREMIUM
HEREON:            USD 4,114,000 beng 40% part of 60% part of 100% of original
net premium.

OVER-RIDER
COMMISSION:        5% of original net premium - plus tax if applicable.

BROKERAGE
HEREON:            NIL

INFORMATION:       All information as seen and agreed by Reinsurers hereon, as
contained in the Original "Underwriting Information" package
dated 5 August 1998.

Original pre approved initial Acquisition Slate for insurance facility

**Slate 1**

|  | NEGATIVE COST | COST TO AQUIRE | PERCENTAGE OF NEGATIVE COST |
|---|---|---|---|
| Blackout | $8m | $1.00m | 12.50% |
| Loved | $7.5m | $1.00m | 13.33% |
| Eye of Beholder | $17m | $5.00m | 29.41% |
|  | $32.5m | $7.00m |  |

**Slate 2**

|  | NEGATIVE COST | COST TO AQUIRE | PERCENTAGE OF NEGATIVE COST |
|---|---|---|---|
| This is my Father | $11m | $2.00m | 18.18% |
| Free Money | $17m | $4.50m | 26.47% |
|  | $28m | $6.50m |  |

Each film cross-collateralised within each individual slate; each slate cross collaterised across the slates and treated as one overall slate.

Note:    All figures shown above are Exclusive of uplift.

Signed
Line 8



10% of Whole.    5-8-98
T B C



3% 77    CX01087A1998
Whole    7/8/98
NCAD



6%    10/4/98
of
Whole    00282    LIRMA    NCAD
Annual Signing

18%    CysPolaLo    Kemper Re    10/9/98.

# Exhibit D



**Claim Form**

IN THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION
COMMERCIAL COURT
ROYAL COURTS OF JUSTICE

| | for court use only |
|---|---|
| Claim No. | |
| Issue Date | 2 August 2004 |

**Claimant(s)**

GENERAL STAR INTERNATIONAL INDEMNITY LIMITED
Corn Exchange
55 Mark Lane
London
EC3R 7NE



**Defendant(s)**

(1)    AIG EUROPE (UK) LIMITED
The AIG Building
58 Fenchurch Street
London
EC3M 4AB

(2)    NEW HAMPSHIRE INSURANCE COMPANY
1700 Market Street, Suite 2000, Philadelphia, PA 19103,USA
c/o Branch Office
The AIG Building
58 Fenchurch Street
London
EC3M 4AB

Does, or will your claim include any claim under the Human Rights Act 1998?

☐ Yes          ☑ No

Name and address of Defendant receiving this claim form
AIG EUROPE (UK) LIMITED
The AIG Building, 58 Fenchurch Street, London EC3M 4AB

NEW HAMPSHIRE INSURANCE COMPANY
The AIG Building, 58 Fenchurch Street, London EC3M 4AB

| | |
|---|---|
| Amount claimed | To be assessed |
| Court fee | £180 |
| Solicitor's costs | To be assessed |
| Total amount | £180 |

The court office at the Admiralty and Commercial Registry, Royal Courts of Justice, Strand, London WC2A 2LL is open between 10am and 4.30pm Monday to Friday. When corresponding with the court, please address forms or letters to the Court Manager and quote the claim number.

N1(CC) Claim form (CPR Part 7) (03.02) (Expandable)                    Laserform International 3/02

3958845.3.doc

| | Claim No. | |
|---|---|---|

Brief details of claim

## GENERAL ENDORSEMENT

The Claimant claims:

(1) A declaration that pursuant to a contract of facultative reinsurance with policy number AHA123298, scratched by the Claimant on 23 December 1998, relating to the "Letters from a Wayward Son" film ("the Contract"), the Claimant is not liable to indemnify the Defendants for any legal fees, interest or any other costs and/or expenses incurred or paid by the Defendants to the original assured.

(2) Alternatively, if, which is denied, the Claimant is liable to indemnify the Defendants under the Contract as in (1) above, a declaration as to the proper amount of the Claimant's liability.

(3) Without prejudice to the Claimants' notice of arbitration dated 30 July 2004 and its primary submission that the issues mentioned in this paragraph are subject to an express London arbitration clause, the Claimant seeks in the alternative, should its primary case be wrong, a declaration that on the true construction of a letter dated 4 April 2001 from the Claimant to the Defendants ("the First Letter"), the Claimant is not liable to the Defendants in respect of any legal fees or any other costs and/or expenses incurred or paid by the Defendants to The Chase Manhattan Bank in relation to the Paramount 1, Paramount 2 and Paramount 3 slates of films.

(4) Alternatively, if, which is denied, the Claimant is liable to indemnify the Defendants under the First Letter as in (3) above, a declaration as to the proper amount of the Claimant's liability.

(5) Further or alternatively, the Claimant seeks a declaration that it is not liable under the terms of or pursuant to a second letter dated 4 April 2001 from the Claimant to the Defendants ("the Second Letter") to indemnify the Defendants in respect of payments made by the Defendants arising out of their insurance of the Destination Films project in or around October 1998.

(6) Further or other relief.

Particulars of claim will follow if an acknowledgment of service is filed that indicates an intention to defend the claim

Statement of Truth
*The Claimant's solicitor believes that the facts stated in this claim form are true.
*I am duly authorised by the Claimant to sign this statement

Full name   Kiran Soar

Name of Claimant's Solicitor: Barlow Lyde & Gilbert

signed _____   position or office held    Associate
*                                                         (if signing on behalf of firm, company or corporation)

*delete as appropriate

Barlow Lyde & Gilbert
Beaufort House
15 St Botolph Street
London EC3A 7NJ
DX 155   London
Fax: 0207 071 9309
Email: ksoar@blg.co.uk
Ref:  45602-4/YJ/KS/7.60

3958845.3.doc

# Exhibit E

General Star International Indemnity Ltd v Stirling CookeBrown Reinsurance Brokers Ltd and another
QUEENS BENCH DIVISION (COMMERCIAL COURT)

[2003] EWHC 3 (Comm), 2002 Folio 1085, (Transcript)

HEARING-DATES: 5 DECEMBER 2002, 17 JANUARY 2003

17 JANUARY 2003
This is a signed judgment handed down by the judge, with a direction that nofurther record or transcript need be made
pursuant to Practice Direction 6.1 toPart 39 of the Civil Procedure Rules (formerly RSC Ord 59, r(1) (f), Ord 68,r1). See
Practice Note dated 9 July 1990, [1990] 2 All ER 1024.

CATCHWORDS:
Conflict of laws - Jurisdiction - Forum with which action has most real and substantial connection - Restraint of
foreign proceedings

COUNSEL:
A Schaff QC and R Waller for the Claimant; R Millett for the First Defendants; Barlow Lyde & Gilbert; Eversheds

PANEL: LANGLEY J

JUDGMENTBY-1: LANGLEY J:

JUDGMENT-1:
LANGLEY J:

[1] This is more film finance litigation. The court is concerned with matters of jurisdiction. It involves what is referred
to as the Litto slate of films. For present purposes it suffices to record that the financing bank was Chase Manhattan
Bank, the providers of shortfall insurance were Underwriters Reinsurance Company (URC) and URC was reinsured by
(amongst others) Royal and Sun Alliance, Axa Reassurance SA, General Star International ("Genstar") and a retained
line of URC. There were also cut through clauses entitling Chase to seek recovery direct from Reinsurers. The main
covers were expressly subject to a non-exclusive Texas jurisdiction clause and to Texan law. The brokers concerned
were Stirling Cooke Brown Reinsurance Brokers Limited ("SCB") and, although their role is a matter in issue, the
English solicitors Richards Butler were concerned as advisers on the transaction to insurers and reinsurers.

[2] There have been proceedings in New York. Axa sought a declaration of non-liability under its cover against
Chase. Axa also made claims against SCB alleging fraudulent and negligent misrepresentations in the placement of the
reinsurance. Chase made a claim under a working capital facility policy against Axa. The case was tried before Justice
Gammerman and a jury from October 29 to December 6, 2000. Chase won and Axa lost not only against Chase but also
in its claims over against SCB (and others). Chase has subsequently taken proceedings in Texas against both Axa and
Genstar for payment under the reinsurance covers. Genstar was not a party to the New York proceedings. Nor were
Richards Butler.

[3] Following the jury's decisions on matters of fact Justice Gammerman prepared a judgment on some matters which
were reserved to him as well as recording his reasons for certain rulings made in the course of the trial. It is a substantial
and, if I may say so with unqualified respect, impressive document which plainly justifies SCB's submission that the
Judge has a close and detailed knowledge and appreciation of the issues which were involved and, of course, of the
questions of law which arose. In the present context it is relevant to note that in addressing the issues which arose on the
claims made by Axa against SCB the Judge ruled that New York law was to be applied to them. He did so, I think it is
fair to say, on the basis that Axa's contention for French law was to be rejected (Axa is a French company and a
subsidiary of an English company) and neither Axa nor SCB (which is an English company) sought the application of
English law rather than New York law, albeit there was a basis for suggesting that English law might well be the
governing law for consideration of SCB's duty and liability. The jury found that SCB had not deceived Axa and Justice

Gammerman ruled that there was insufficient evidence of a special relationship between Axa and SCB even to submit Axa's case of negligent misrepresentation to the jury. Axa is appealing the decision of Justice Gammerman and the Jury.

[4] After an exchange of correspondence between lawyers, on 11 October of this year Genstar issued a Claim Form in this court against SCB and Richards Butler. The Claim Form was served on SCB on 14 October. The claims are for damages and indemnification for such liability as Genstar may have to Chase and/or URC under the Litto cover. The claim against SCB is based on an alleged common law duty of care to advise Genstar about the transaction derived from an assumption of responsibility and/or proximate relationship. The duty alleged and its breach are set out in paras 60 and 61 of the Particulars of Claim. The claim against Richards Butler is based on an alleged retainer to act for reinsurers and/or a common law duty of care also based on an assumption of responsibility. Richards Butler have recently served a very full defence to the claim including a denial of any retainer or duty.

[5] On 1 November, a week before its defence was due, SCB issued a complaint against Genstar in the Supreme Court of New York in which SCB sought declarations that Genstar was liable under the cover, that SCB was not liable to Genstar and "a preliminary and permanent injunction restraining Genstar from prosecuting" its claim against SCB in these proceedings in any forum other than New York.

[6] On 11 November SCB then applied to this court for a stay of the claims made against it pending the determination by the New York court of its motion for an anti-suit injunction. SCB also sought an extension of time for its defence.

[7] The matter came before Thomas J on 15 November on SCB's application for time to serve its defence. Thomas J expressed considerable surprise that SCB should be seeking an anti-suit injunction in New York rather than applying to this court for a stay of the proceedings on the ground of forum non conveniens pursuant to Civil Procedure Rules Pt 11 and the principles in Spiliada Maritime Corporation v Cansulex Ltd [1987] AC 460, [1986] 3 All ER 843. Thomas J was in effect faced with the question on a time summons whether this court or the New York court should first decide whether this court was the appropriate forum for Genstar's claim. Granted that all the parties before this court were English and the proceedings had been validly and properly served in England, Thomas J decided that this court should address and decide the question whether it was the appropriate court to decide questions of forum and if it decided it was, then to decide which court was the appropriate forum. To that end he  enjoined  SCB from taking any further steps in New York until the determination of those issues and gave permission to Genstar to seek, as it has done by Application Notice dated 18 November, orders by way of an anti-suit  injunction  against the New York claims by SCB and for a declaration that England is the most appropriate forum in which to decide Genstar's claims.

[8] Essentially, therefore, SCB seeks a stay of the English proceedings to permit the New York court to decide questions of forum and Genstar asks this court to decide the question, to do so in its favour and to order SCB to withdraw its complaint in the New York court.

[9] I do not think the question of which court should act first and the question of whether this court is the appropriate forum can sensibly be considered in isolation. The fact now is that this court is seized of the issue and I, like Thomas J, and I would hope the court in New York, would think it plainly right that in a case involving proceedings in this country between parties each of whom is English and directly subject to this court's jurisdiction it is, absent some quite exceptional circumstance, for this court to address questions of forum. If one adds that I do not think it can even be seriously contested that the issues of the existence and incidence of a cause of action are ones governed by English law then the matter is even plainer. In no sense is this an extortionate claim to jurisdiction by this court. Indeed it is one which I would expect a New York court would readily accept and acknowledge as would this court if the roles were reversed. Mr Millett's submission that such an outcome would deprive SCB of their legitimate right to seek a decision from the New York Court begs the whole question in his favour. I see no such right where both parties are English and English law applies. Moreover I can see no justification for the course adopted by SCB in seeking to set on foot proceedings in New York after the issue of these proceedings rather than seeking to apply to this court to decline jurisdiction. If Mr Millett were right it would be open to any Defendant properly sued in an English court to take proceedings in another jurisdiction claiming an anti-suit  injunction  and to have the English proceedings stayed whilst the other court pronounced on the jurisdiction of this court. That cannot be right.

[10] In my judgment this court is plainly the appropriate court to determine issues of proper forum for this claim.

[11] What then are the factors which favour this forum? I have already mentioned the main ones. They are:

i) All the parties are resident and carry on business in England.

ii) The policies in question were broked and entered into in England.

iii) The negligent acts and omissions and the representations relied upon by Genstar against both SCB and Richards Butler took place in England.

iv) English law applies. The duties of a London broker placing a risk in the London market is in issue.

v) All the witnesses are ordinarily resident in England. Genstar and Richards Butler's documentation is in England. Insofar as SCB's documents are in New York for the Axa proceedings they will have been brought from England and can be returned here. It is a feature of the film finance litigation that transatlantic disclosure across multiple claims has been ordered and effected.

vi) Richards Butler have been properly sued in England. They have made no objection to jurisdiction. Genstar's case is that SCB retained Richards Butler to look after Genstar's interests and told Genstar as much. Richards Butler deny the retainer. That is an issue which in fairness to Genstar can best be decided in one court and the only possible court is this court.

[12] SCB seeks to put in the scale on the other side one major point: the fact that the New York court and Justice Gammerman in particular, is wholly familiar with the issues from the Axa proceedings such as to make it plainly more efficient and economic for Genstar's claim to be tried in New York. It is also said that by New York law it is at least arguable that Genstar would be estopped by the outcome of the Axa case from advancing the claims against SCB which it makes in these proceedings whereas the English law of issue estoppel would not be effective to achieve that.

[13] Whilst I readily accept Justice Gammerman's knowledge and grasp of the background facts and indeed some of the foreground facts it is a matter of record that this court and even this judge has more than a little familiarity with the matter. Whether I, or indeed Justice Gammerman, would describe that as good fortune is of no relevance. But I do not think such familiarity of itself can begin to outweigh the other factors to which I have referred. It would indeed be to claim an exorbitant jurisdiction if it were claimed solely on the basis of familiarity with the issues. There are also real doubts as to whether the New York court even has exercised or would exercise jurisdiction over Genstar.

[14] The overlap of issues is, I think, in any event, more apparent than real. Genstar's case depends inevitably on its own relationship with and what was said to it by SCB; the Axa proceedings were of course addressing Axa's relationships and Justice Gammerman plainly adverted to Axa's own and singular conduct in his reasoning on the question of duty. He, of course, decided nothing about Genstar's claims. Further, as I have said, in my judgment New York law has no application to the duty issues nor indeed to estoppel issues tried in this country. The laws of England and New York may well differ on both. But, again, SCB had and has no basis for expecting New York law to apply, rather the contrary. Moreover, its own evidence of New York law strongly suggests that New York law of collateral or issue estoppel would not provide it with the defence it asserts. The issues in these proceedings involve different facts and the application of a different law from those before Justice Gammerman. The only factual connection with New York is that some of the loan and insurance documentation was negotiated in New York and one of the covers was subject to New York law. But, as stated, the main cover was subject to Texan not New York law and hence the claims by Chase in Texas. The insurance itself is not in issue in these proceedings.

[15] In my judgment England is plainly the natural forum for the trial of these proceedings and disputes and Genstar is entitled to a declaration accordingly.

[16] The conclusion that England is the natural forum is not as a matter of law sufficient of itself for this court to grant an anti-suit injunction. That requires the extra ingredient that I must be satisfied that the complaint in New York is vexatious and oppressive or unconscionable: see Airbus Industrie v Patel [1999] 1 AC 119, [1998] 2 All ER 257. But in my judgment further pursuit of the New York Complaint would indeed be vexatious and oppressive. It was an attempt by SCB to hi-jack the hearing of forum issues to New York rather than England despite the logical and normal course, if thought to be sustainable, of arguing the matter in these courts in these proceedings which were of course begun first. To permit the two sets of proceedings to continue would, I think, plainly be oppressive. On the basis of my decision it

would involve SCB, an English company subject to the jurisdiction of this court, not only pursuing parallel proceedings in an inappropriate forum but also seeking to restrain another English company from pursuing its claim in what I have held to be the natural forum. That SCB should not be permitted to do. I am of course conscious of the need for caution and observance of comity in this court granting anti-suit injunctions. It requires exceptional circumstances to grant such an injunction and there is always the alternative of leaving the New York court to decide for itself with such benefit as it might derive from my decision. But not only is it, as I have said, open to serious question whether the New York court even has claimed or would claim jurisdiction over Genstar but I would, with due diffidence and respect, expect the New York court to have the same distaste for parallel proceedings as this court and indeed to acknowledge this court's decision that the claim is properly brought and will be pursued here. It is also, I think, the reality of SCB's Complaint in New York that it seeks an anti-suit injunction and I can see no legitimate interest in SCB continuing to seek that relief or indeed pursuit of its claims on the merits in New York once it has been decided that the claims are to proceed in this jurisdiction. To do so would, I think, readily qualify as vexatious and oppressive. I shall therefore, as I said at the conclusion of the hearing, grant Genstar the anti-suit injunction which it seeks.

[17] I will hear the parties on costs and any other ancillary matters when this judgment is handed down.

DISPOSITION:
  Judgment accordingly.

# EXHIBIT 26

FROM LATHAM & WATKINS LA (215)391-8703 39FL    (WED)12. 20 00 15:58/ST. 15:57/NO. 4861917570 P  2

1  LOEB & LOEB LLP
   ROBERT A. MEYER (State Bar No. 066847)                    106/075/02184
2  LISA L. HORLICK (State Bar No. 174639)
   1000 Wilshire Boulevard, Suite 1800
3  Los Angeles, California 90017-2475
   Telephone:   213-688-3400
4  Facsimile:   213-688-3460

5  MOUND, COTTON & WOLLAN
   STUART COTTON (Pro Hac Vice Pending)
6  DANIEL MARKEWICH (Pro Hac Vice Pending)
   DAVID W. KENNA (Pro Hac Vice Pending)
7  One Battery Park Plaza
   New York, New York  10004-1486
8  Telephone:   212-804-4200
   Facsimile:   212-344-8066

9
   Attorneys for Plaintiff
10 New Hampshire Insurance Company

11              UNITED STATES DISTRICT COURT

12              CENTRAL DISTRICT OF CALIFORNIA

13                   WESTERN DIVISION

14 NEW HAMPSHIRE INSURANCE              )  Case No.  00-1320 TRSW (RNBx)
   COMPANY,                            )
15                                     )  COMPLAINT FOR:
              Plaintiff,               )  (1) FRAUDULENT INDUCEMENT;
16                                     )  (2) NEGLIGENT MISREPRESENTATION;
        vs.                            )  (3) FRAUDULENT INDUCEMENT;
17                                     )  (4) NEGLIGENT MISREPRESENTATION;
   JLT RISK SOLUTIONS LTD., IT HAD TO  )  (5) NEGLIGENCE;
18 BE YOU PRODUCTIONS, INC., NEIL      )  (6) BREACH OF CONTRACT;
   KAPLAN, MARTIN FINK,  COMPLETE      )  (7) NEGLIGENCE;
19 FILM COMPANY LLC, FLASHPOINT (UK)   )  (8) BREACH OF FIDUCIARY DUTY;
   LIMITED, CONDOR COMMUNICATIONS      )  (9) NEGLIGENCE;
20 LLC, CONDOR ENTERTAINMENT           )  (10) NEGLIGENT MISREPRESENTATION;
   CORPORATION, and IAN JESSEL,        )  AND
21                                     )  (11) FRAUD AND DECEIT.
              Defendants.              )
22                                     )  [JURY TRIAL DEMANDED]

23

24        Plaintiff, New Hampshire Insurance Company (hereinafter "New Hampshire") alleges as

25 follows:

26        1.    New Hampshire is a corporation organized and existing under the laws of the

27 Commonwealth of Pennsylvania and having its principal place of business in the State of New

28 York.

LA2SI356.1
201SI8610012
12/15/2000 mgo

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

ENTERED ON ICMS
DEC 1 9 2000
CV                    COMPLAINT

ORIGINAL

FROM LATHAM & WATKINS LA (213)891-8763 39FL    (WED)12. 20 '00 15:58/ST. 15:57/NO. 4860191751'0  P  5

106/075/02185

2.    On information and belief, defendant JLT Risk Solutions, Ltd. (hereinafter "JLT") is a corporation organized and existing under the laws of the United Kingdom, having its principal place of business in the United Kingdom, and authorized to do business in the State of California.

3.    On information and belief, defendant It Had To Be You Productions, Inc. is a corporation organized and existing under the laws of the State of California and having its principal place of business in the State of California.

4.    On information and belief, defendant Neil Kaplan is a citizen of the State of California and was Co-President of It Had To Be You Productions, Inc.  (It Had To Be You Productions, Inc. and Neil Kaplan are hereinafter referred to collectively as "IHTBY.")

5.    On information and belief, defendant Martin Fink is a citizen of the State of California.

6.    On information and belief, defendant Complete Film Company LLC (hereinafter "Complete") is a corporation organized and existing under the laws of the State of California and having its principal place of business in the State of California.  (Martin Fink and Complete are hereinafter referred to collectively as "Fink.")

7.    On information and belief, defendant Flashpoint (UK) Limited (hereinafter "Flashpoint") is a corporation organized and existing under the laws of the United Kingdom, having its principal place of business in the United Kingdom, and authorized to do business in the State of California.

8.    On information and belief, defendants Condor Communications LLC and Condor Entertainment Corporation are corporations organized and existing under the laws of the State of California and having their principal place of business in the State of California.

9.    On information and belief, defendant Ian Jessel is a citizen of the State of California and was a principal of Condor Communications LLC and Condor Entertainment Corporation.  (The three are hereinafter referred to collectively as "Condor.")

10.    On information and belief, Film Finances, Inc. (hereinafter "FFI"), not a defendant herein, is a corporation organized and existing under the laws of the State of California and having its principal place of business in the State of California.

Latham & Lynn
A Limited Liability Partnership
Including Professional
Corporations

LA258356.1
2015B610012
12/15/2000 expo

2
COMPLAINT

LEX-01 136915

FROM LATHAM & WATKINS LA (215)891-8765 59PL      (WED)12. 20 00 15:39/ST. 15:37/NO. 4001917570 P 4

1    11.    On information and belief, NewStar Media, Inc. and NewStar Worldwide, Inc.

2    (hereinafter collectively "NewStar") are corporations organized and existing under the laws of the

3    State of California and having their principal place of business in the State of California.  On

4    information and belief, both corporations are in bankruptcy reorganization and are, therefore, not

5    named as defendants herein.

6    12.    Each of the defendants sued herein, as well as NewStar, had a legal duty toward

7    New Hampshire and is in some manner responsible in whole or in part for the wrongdoing that has

8    occurred, is occurring, and will occur as alleged herein.

9    13.    On information and belief, at all material times herein, each defendant, as well as

10   NewStar, was in law and in fact the agent of every other defendant, and the acts and omissions of

11   each defendant, as well as NewStar, were within the course and scope of their agency with each of

12   the other defendants.

13                            **JURISDICTION AND VENUE**

14   14.    This Court has jurisdiction of the subject matter of this action under 28 U.S.C.

15   Section 1332(a) in that the amount in controversy exceeds $75,000 exclusive of interest and costs

16   and the matter in controversy is between citizens of different states and the subjects of a foreign

17   state are additional parties.

18   15.    Venue lies in this District under 28 U.S.C. Section 1391(a) in that a substantial part

19   of the events and omissions giving rise to the claims asserted herein occurred in this District.

20   16.    This action is related to Silicon Valley Bank v. New Hampshire Insurance

21   Company, et al., Case No. CV-00-06096 RSWL (RCx), which is proceeding in this Court.

22                            **GENERAL ALLEGATIONS**

23   17.    Sometime prior to December 16, 1997, IHTBY acquired the rights to a screenplay

24   entitled *It Had To Be You*, and sought financing in order to produce a feature-length motion

25   picture based on the screenplay (hereinafter the "Picture").

26   18.    On or about December 5, 1997, IHTBY engaged Condor to act as the sales

27   representative for the Picture.  Condor was responsible for providing initial sales estimates for the

28   Picture and for marketing and selling the Picture to distributors.

Latham & Watkins
A Limited Liability Partnership
Including Professional
Corporations

LA258356.1
20158610012
12/15/2000 mpo

3
COMPLAINT

FROM LATHAM & WATKINS LA (215)891-8765 39FL    (WED)12. 20 00 15:59/ST. 15:57/NO. 4801917570 P 5

106/075/02187

19.    On or about December 16, 1997, IHTBY entered into a Loan and Security Agreement (hereinafter the "Loan Agreement") with Silicon Valley Bank (hereinafter "SVB"), pursuant to which SVB provided a $10,000,000 loan to IHTBY to fully finance the production of the Picture.

20.    On or about December 16, 1997, pursuant to the terms and conditions of a completion agreement executed by IHTBY and FFI, IHTBY engaged FFI as the completion guarantor for the Picture.  FFI issued to SVB a completion guaranty against cost overruns and the failure to complete and timely deliver the Picture to the distributors.

21.    On or about December 16, 1997, IHTBY, Condor, SVB, and FFI entered into an Inter-Party Agreement setting forth their rights and responsibilities in connection with the financing and production of the Picture.

22.    The Inter-Party Agreement also defined, at Paragraph 12, delivery of the Picture and set forth a Delivery Date of September 30, 1998 (hereinafter the "Delivery Date").

23.    As a condition precedent to SVB's obligation to advance the loan proceeds to IHTBY, Paragraph 6.1(n) of the Loan Agreement required that SVB have received a fully executed "Pecuniary Loss Indemnity Policy," naming SVB as the sole insured (hereinafter the "Policy").

24.    By reason of the aforesaid requirement of the Loan Agreement, SVB, through its broker, JLT, approached New Hampshire's agent, AIG Europe (UK) Limited (hereinafter also sometimes included in "New Hampshire"), to obtain the Policy.

25.    To induce New Hampshire to issue the Policy, JLT presented to New Hampshire various documents and information, including a production budget prepared by IHTBY and sales estimates prepared by Condor, purporting to support the terms and amount of SVB's loan to IHTBY.

26.    On information and belief, IHTBY's proposed budget for production of the Picture was $5,438,521, inclusive of the bond fees and contingency.

Latham & Latham
A Limited Liability Partnership
Including Professional
Corporations

LA251356.1
20158610012
12/15/2000 tropo

4
COMPLAINT

LEX-01 136917

FROM LATHAM & WATKINS LA (213)891-8765 39FL    (WED)12. 20 '00 13:39/ST. 13:37/NO. 4561917570 P 6

106/075/02188

27.     The total amount of the loan was $10,000,000, which sum included the production budget as well as bank fees, interest, insurance premiums, risk managers' fees, and producer's fees.

28.     Condor's preliminary sales estimates for the Picture (hereinafter the "Sales Estimates") totaled $15,802,000, which, according to Condor, represented the gross receipts that the Picture was anticipated to yield worldwide.

29.     On information and belief, the Sales Estimates were disproportionately high by industry standards and excessive. For example, the $8,000,000 sales estimate for the United States and Canada was grossly inflated, amounting to over 140 percent of the Picture's original budget.

30.     On information and belief, pursuant to standard industry practice an appropriate sales estimate for North America would be between fifteen and fifty percent of a film's budget.

31.     On information and belief, contrary to industry custom and practice, Condor presented only the most optimistic estimates of the Picture's sales potential rather than, as is typical in the industry, providing at least two sets of estimates, one high, the other low, in order to project an optimistic and a more pessimistic view of a film's potential to realize receipts.

32.     On information and belief, Condor knew or had reason to know that the Sales Estimates were high and that they were not formulated or presented in accordance with the custom and practice in the industry.

33.     The Sales Estimates created by Condor and presented to New Hampshire by JLT provided the basis for New Hampshire's assessment of the risk.

34.     IHTBY and Condor knew or had reason to know that New Hampshire would rely upon the Sales Estimates in order to assess the risk.

35.     As New Hampshire's risk managers for this transaction, Flashpoint and Fink, purportedly acting on New Hampshire's behalf, also reviewed JLT's presentations in order to assess and advise New Hampshire as to the risk.

36.     On or about December 18, 1997, New Hampshire issued the Policy to SVB. A copy of the Policy is annexed hereto as Exhibit "A."

Lamb & Lamb
A Limited Liability Partnership
including Professional
Corporations

LA2583356.1
20152610012
12/15/2000 mpo

5

COMPLAINT

FROM LATHAM & WATKINS LA (213)891-8765 39FL    (WED)12. 20  00 15:40/ST. 15:37/NO. 4861917570 P  7

106/075/02189

37.    By the terms of the Policy, New Hampshire agreed, inter alia, to indemnify SVB under certain circumstances for any loss resulting from the failure of the Picture to generate net receipts by the last day of the Policy equal to or in excess of SVB's $10,000,000 loan to IHTBY.

38.    The schedule annexed to the Policy defined the last day of the Policy as December 16, 1999.

39.    The Policy further provided that New Hampshire would not pay any loss arising out of the failure to deliver the Picture by the Delivery Date as set forth in Schedule I of the completion guaranty, viz., September 30, 1998.

40.    As a result of agreement among the parties to the Inter-Party Agreement and JLT, and without notice to New Hampshire, documents were prepared and executed that purported to extend the Delivery Date well beyond September 30, 1998.

41.    These extensions and other actions and omissions by these defendants had the effect of ensuring that little or no revenue would be generated prior to the December 16, 1999 expiration of the Policy, with the result that there would be no net receipts from sales of the Picture to repay SVB's loan and that a claim against the Policy would necessarily follow.

42.    On information and belief, on or about September 8, 1998, IHTBY attempted to extend the Delivery Date to November 1998 by contacting FFI, which thereupon advised IHTBY that Condor and Complete (through Fink) must also agree to any amendment of the Delivery Date.

43.    On information and belief, on or about September 8, 1998, Ian Jessel, who through Condor had been supplied with a copy of FFI's response to IHTBY, objected based on the view that any extension of the Delivery Date would delay London screenings planned for late October 1998, which delay could prejudice the Picture's prospects with potential distributors.

44.    Although, on information and belief, Flashpoint and Complete (through Fink) received copies of Condor's letter objecting to the extension, they did not inform New Hampshire of these events and circumstances.

45.    On information and belief, on September 24, 1998, six days prior to the Delivery Date, IHTBY terminated Condor as sales representative for the Picture.

Latham & Watkins
A Limited Liability Partnership
Including Professional
Corporations

LA2583356.1
20158610012
12/15/2000 mpo

6
COMPLAINT

LEX-01 136919

FROM LATHAM & WATKINS LA (213)891-8763 39FL    (WED)12. 20' 00 13:40/ST. 13:37/NO. 4561917579 P 8

106/075/02190

46.    On information and belief, Condor was not replaced for over a year thereafter, and the Picture was not delivered in the interim.

47.    During this time, New Hampshire did not know that Condor had been terminated or that Condor had not been replaced.

48.    On or about January 15, 1999, without New Hampshire's knowledge, IHTBY, SVB, and FFI executed an amendment to the Inter-Party Agreement that purported to extend the Delivery Date until ten days after notification to FFI of the designation of a new sales representative but in any event no later than May 15, 1999, with SVB to designate a new sales representative if none had been named by April 30, 1999.

49.    On or about May 12, 1999, without New Hampshire's knowledge, another amendment to the Inter-Party Agreement was executed by IHTBY, SVB, and FFI that purported to extend the Delivery Date to August 15, 1999 and to extend the date to designate a new sales representative to August 15, 1999.

50.    On or about September 15, 1999, without New Hampshire's knowledge, IHTBY, FFI, and SVB executed a third amendment to the Inter-Party Agreement that purported to extend the Delivery Date to September 24, 1999 and to extend the date to designate a new sales representative to October 1, 1999.

51.    Not only was New Hampshire not afforded an opportunity to accept or reject these amendments to the Inter-Party Agreement, but New Hampshire was not even made aware that these amendments were made or of the consequences thereof.

52.    The effect of these three purported extensions was that, for a full year, there was no sales representative designated for the Picture and, thus, few or no efforts were made to sell the Picture.

53.    Moreover, for a full year after the Picture was supposed to be delivered, delivery did not occur, rendering recoupment of net receipts by the last day of the Policy a virtual impossibility.

Loeb & Loeb
A Limited Liability Partnership
including Professional
Corporations

LA253356.1
20158610012
12/15/2000 taps

7

COMPLAINT

LEX-01 136920

Case 2:02-cv-04435-AB    Document 142-20    Filed 02/18/2005    Page 49 of 65

FROM LATHAM & WATKINS LA (213)891-8763 59FL    (WED)12.20 00 13:41/ST. 13:37/NO. 4861917570 P 9

106/075/02191

54.  On information and belief, Flashpoint and Fink were aware of the purported extensions and of the absence of a sales representative, and they failed to inform New Hampshire thereof.

55.  Flashpoint and Fink failed in their duty to review the entire circumstances and to protect New Hampshire's rights in respect of the untimeliness of the delivery, which constituted a failure of an essential condition of coverage under the Policy, given the absence of a sales representative for an entire year.

56.  On or about November 30, 1999, NewStar was designated, at the instance of, inter alia, Flashpoint and Fink, to be the sales representative for the Picture.

57.  On information and belief, at the time NewStar was designated, Flashpoint and Fink knew or should have known that NewStar's primary experience was in "event" television programming, and it was a relative newcomer to motion picture distribution.

58.  The November 30, 1999 agreement designating NewStar as sales representative purported to extend the Delivery Date for the Picture to December 13, 1999, only three days before the last day of the Policy.  New Hampshire was not notified of this purported extension.

59.  On or about December 8, 1999, without New Hampshire's knowledge, IHTBY, SVB, FFI, and NewStar entered into an Amended and Restated Inter-Party Agreement (hereinafter the "Restated Agreement") that also purported to extend the Delivery Date for the Picture to December 13, 1999.

60.  The Restated Agreement contained NewStar's acknowledgment that, as of December 8, 1999, delivery had been effected pursuant to the terms of the Restated Agreement and that the acceptance notice was deemed given by the sales representative.

61.  On or about December 13, 1999, without New Hampshire's knowledge, IHTBY, SVB, FFI, and NewStar executed a Notice of Acceptance and Delivery, whereby NewStar confirmed that FFI had satisfied its obligations pursuant to the Restated Agreement and that delivery had been effected.

62.  On information and belief, in light of the lack of sales owing to the purported extensions of the Delivery Date and the absence of a sales representative for one year, the Notice

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA258356.1
201S8610012
12/15/2000 repo

**8**
COMPLAINT

LEX-01 136921

FROM LATHAM & WATKINS LA (213)891-8763 39PL    (WED)12. 20'00 13:41/ST. 15:37/NO. 4861917570 P 10

106/075/02192

1   of Acceptance and Delivery was a clear attempt to shift the sole burden of ultimate repayment of

2   the loan to New Hampshire.

3       63.    As part of the negotiation and execution of the sales agreement with IHTBY and

4   SVB, NewStar was required to sign off on the delivery schedule that was Exhibit "A" to the Inter-

5   Party Agreement.

6       64.    In requiring NewStar to sign off on the delivery schedule, and by NewStar's so

7   doing, IHTBY, SVB, FFI, and NewStar intended to terminate the obligations of the completion

8   guaranty.

9       65.    The delivery schedule was not strictly adhered to, and the representations contained

10  in the Restated Agreement that there had been delivery were made before the items on the delivery

11  schedule had been delivered to NewStar.

12      66.    In a letter dated April 21, 2000, months after it had acknowledged delivery in the

13  Restated Agreement and the Notice of Acceptance and Delivery, NewStar informed SVB that

14  NewStar still had "not secured delivery on the . . . film," and NewStar attached a list of items from

15  the delivery schedule that had not been delivered to NewStar.

16      67.    New Hampshire's purported risk managers Flashpoint and Fink never provided

17  New Hampshire regular or analytical reports on the status of the production of, or advance sales

18  for, the Picture, and took no measures to monitor or otherwise facilitate the marketing of the

19  Picture, but instead relied on the inaccurate and exaggerated representations of IHTBY, Condor,

20  and NewStar.

21      68.    As a result of the foregoing, according to SVB there were no net receipts for the

22  Picture as of December 16, 1999 — the last day of the Policy.

23      69.    On or about January 11, 2000, when purportedly there were still no net receipts for

24  the Picture, SVB made a claim against New Hampshire under the Policy for the alleged shortfall

25  in net receipts of $9,387,000.

26      70.    On or about June 6, 2000, SVB commenced an action in this Court (the "related

27  action") alleging that the defendants therein, New Hampshire and AIG Europe (UK) Limited,

28  failed to indemnify SVB for alleged losses resulting from the failure of the Picture to generate net

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2583356.1
201586IG012
12/15/2000 mpo

9

COMPLAINT

LEX-01 136922

FROM LATHAM & WATKINS LA (215)891-8763 39FL    (WED)12. 20 '00 15:42/ST. 15:37/NO. 4861917570 P 11

106/075/02193

1   receipts.  Said defendants have denied the material allegations of SVB's complaint and have

2   alleged, inter alia, that SVB's loss, if any, was caused by the failure to deliver the required

3   materials to their respective designated recipients by the Delivery Date.

4        71.    In the event it is determined that SVB's loss alleged in the related action is covered

5   under the Policy, New Hampshire's liability would arise, inter alia, from the acts or omissions of

6   the defendants in the instant action.

## COUNT I
## FRAUDULENT INDUCEMENT AGAINST JLT

7

8        72.    New Hampshire repeats and realleges the allegations contained in paragraphs 1

9   through 71 of this complaint as if fully set forth herein.

10

11       73.    JLT, through its agents, servants, and employees, on information and belief

12   knowingly, misrepresented material facts upon which New Hampshire's underwriters reasonably

13   relied, on information and belief with the intent to deceive New Hampshire, and with knowledge

    that New Hampshire would rely upon the misrepresentations.  These misrepresentations included,
14
    inter alia, that Sales Estimates for the Picture had been calculated in accordance with standard
15
    industry practice when in fact the Sales Estimates provided to New Hampshire were inflated and
16
    not calculated in accordance with standard industry practice, in order to induce New Hampshire to
17
    issue the Policy in the amount for which it was issued.  On information and belief, at the time the
18
    Sales Estimates were supplied to New Hampshire, JLT knew or should have known that these
19
    estimates could not be achieved.
20
         74.    New Hampshire was justified in relying on such representations because, relative to
21
    JLT, New Hampshire had limited knowledge regarding the motion picture business.
22
         75.    JLT had a duty to disclose to New Hampshire all facts material to the risk
23
    presented, and not to misrepresent or conceal facts material to the risk.  Further, JLT had a duty,
24
    arising out of its unique and specialized expertise in the area of film financing as it related to the
25
    subject insurance and its superior knowledge of information not available to New Hampshire, to
26
    provide correct and true information.  JLT was aware that, relative to JLT, New Hampshire had
27

28

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA258356.1
20138610012
12/15/2000 mqw

10
COMPLAINT

FROM LATHAM & WATKINS LA (215)691-8703 JYFL     (WED)12. 20 00 15:42/ST. 15:57/NO. 4601917570 P 12

106/075/02194

1  limited knowledge and expertise concerning motion picture financing. JLT encouraged New

2  Hampshire to rely upon JLT's expertise and the expertise of others.

3      76.    But for the aforementioned misrepresentations, concealments and/or omissions,

4  New Hampshire would not have agreed to issue the Policy.

5      77.    As a direct and proximate result of the aforementioned misrepresentations,

6  concealments and/or omissions, New Hampshire has suffered significant present damages and is

7  likely to suffer substantial future damages for which it is entitled to be indemnified, and it is

8  entitled to an award of punitive damages.

9  **COUNT II**<br>**NEGLIGENT MISREPRESENTATION AGAINST JLT**

10      78.    New Hampshire repeats and realleges the allegations contained in paragraphs 1

11  through 77 of this complaint as if fully set forth herein.

12      79.    JLT had a duty to disclose to New Hampshire all facts material to the risk

13  presented, and not to misrepresent such facts. Further, JLT had a duty, arising out of its unique

14  and specialized expertise in the area of film financing as it related to the subject insurance and its

15  superior knowledge of information not available to New Hampshire, to provide correct and true

16  information. Relative to JLT, New Hampshire had limited knowledge and expertise concerning

17  motion picture financing, a fact of which JLT was aware. JLT encouraged New Hampshire to rely

18  upon JLT's expertise and the expertise of others.

19      80.    On information and belief, JLT, with full knowledge that the information it was

20  providing to New Hampshire would be utilized and relied on by New Hampshire in determining

21  whether to issue the Policy, and with knowledge that New Hampshire was relying on that

22  information, negligently misrepresented material facts and failed to provide additional material

23  information. New Hampshire relied to its detriment on JLT's misrepresentations.

24      81.    But for the aforementioned misrepresentations, concealments and/or omissions,

25  New Hampshire would not have agreed to issue the Policy.

26      82.    As a direct and proximate result of the aforementioned negligent

27  misrepresentations, concealments and/or omissions, New Hampshire has suffered significant

28

LATHAM & LATHAM<br>A Limited Liability Partnership<br>Including Professional<br>Corporations

LA2583356.1<br>30158610012<br>12/15/2000 mpo

11<br>COMPLAINT

LEX-01 136924

106/075/02195

1    present damages and is likely to suffer substantial future damages for which it is entitled to be

2    indemnified.

3                                    **COUNT III**
                          **FRAUDULENT INDUCEMENT AGAINST IHTBY**
4                          **AND KAPLAN (hereinafter also "IHTBY")**

5        83.    New Hampshire repeats and realleges the allegations contained in paragraphs 1

6    through 82 of this complaint as if fully set forth herein.

7        84.    IHTBY, through its agents, servants, and employees, on information and belief

8    knowingly, misrepresented material facts upon which New Hampshire's underwriters reasonably

9    relied, on information and belief with the intent to deceive New Hampshire, and with knowledge

10   that New Hampshire would rely upon the misrepresentations.  These misrepresentations included,

11   inter alia, that Sales Estimates for the Picture had been calculated in accordance with standard

12   industry practice when in fact the Sales Estimates provided to New Hampshire were inflated and

13   not calculated in accordance with standard industry practice, in order to induce New Hampshire to

14   issue the Policy in the amount for which it was issued.  On information and belief, at the time the

15   Sales Estimates were supplied to New Hampshire, IHTBY knew or should have known that these

16   estimates could not be achieved.

17       85.    New Hampshire was justified in relying on such representations, because, relative

18   to IHTBY, New Hampshire had limited knowledge regarding the motion picture business.

19       86.    IHTBY had a duty to disclose to New Hampshire all facts material to the risk

20   presented, and not to misrepresent or conceal facts material to the risk.  Further, IHTBY had a

21   duty, arising out of its unique and specialized expertise in the area of film financing as it related to

22   the subject insurance and its superior knowledge of information not available to New Hampshire,

23   to provide correct and true information.  IHTBY was aware that, relative to IHTBY, New

24   Hampshire had limited knowledge and expertise concerning motion picture financing.  IHTBY

25   encouraged New Hampshire to rely upon IHTBY's expertise and the expertise of others.

26       87.    But for the aforementioned misrepresentations, concealments and/or omissions,

27   New Hampshire would not have agreed to issue the Policy.

28

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA258356.1
20158610012
12/15/2000 mpo

12

COMPLAINT

LEX-01 136925

FROM LATHAM & WATKINS LA (215)891-8703 3YFL    (WED) 12. 20 '00 15:45/ST. 15:57/NO. 4801917570 P 14

1    88.    As a direct and proximate result of the aforementioned misrepresentations,

2    concealments and/or omissions, New Hampshire has suffered significant present damages and is

3    likely to suffer substantial future damages for which it is entitled to be indemnified, and it is

4    entitled to an award of punitive damages.

5                              **COUNT IV**
                  **NEGLIGENT MISREPRESENTATION AGAINST IHTBY**
6                  **AND KAPLAN (hereinafter also "IHTBY")**

7    89.    New Hampshire repeats and realleges the allegations contained in paragraphs 1

8    through 88 of this complaint as if fully set forth herein.

9    90.    IHTBY had a duty to disclose to New Hampshire all facts material to the risk

10    presented, and not to misrepresent such facts. Further, IHTBY had a duty, arising out of its unique

11    and specialized expertise in the area of film financing as it related to the subject insurance and its

12    superior knowledge of information not available to New Hampshire, to provide correct and true

13    information. Relative to IHTBY, New Hampshire had limited knowledge and expertise

14    concerning motion picture financing, a fact of which IHTBY was aware. IHTBY encouraged New

15    Hampshire to rely upon IHTBY's expertise and the expertise of others.

16    91.    On information and belief, IHTBY, with full knowledge that the information it was

17    providing to New Hampshire would be utilized and relied on by New Hampshire's underwriters in

18    determining whether to issue the Policy, and with knowledge that New Hampshire was relying on

19    that information, negligently misrepresented material facts and failed to provide additional

20    material information. New Hampshire relied to its detriment on IHTBY's misrepresentations.

21    92.    But for the aforementioned misrepresentations, concealments and/or omissions,

22    New Hampshire would not have agreed to issue the Policy.

23    93.    As a direct and proximate result of the aforementioned negligent

24    misrepresentations, concealments and/or omissions, New Hampshire has suffered significant

25    present damages and is likely to suffer substantial future damages for which it is entitled to be

26    indemnified.

27

28

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA258356.1
20158610012
12/15/2000 mpo

13

COMPLAINT

LEX-01 136926

FROM LATHAM & WATKINS LA (213)891-8763 39FL    (WED)12.20 00 15:43/ST. 15:37/NO. 4801917570 P 15

106/075/02197

**COUNT V**
**NEGLIGENCE AGAINST IHTBY AND**
**KAPLAN (hereinafter also "IHTBY")**

94.     New Hampshire repeats and realleges the allegations contained in paragraphs 1 through 93 of this complaint as if fully set forth herein.

95.     At all material times, IHTBY undertook a duty to New Hampshire to exercise reasonable care in the discharge of its duties as the producer.

96.     IHTBY carelessly, negligently, and/or recklessly discharged its duties as producer with respect to the Picture. The negligence, carelessness, and/or recklessness of IHTBY consisted of the following:

        a.     failing to exercise reasonable care with respect to the expenditure of funds for the production of the Picture;

        b.     permitting the expenditures for the production of the Picture to drastically surpass the budget for the Picture;

        c.     delaying production of the Picture such that delivery, as that term is defined in the Inter-Party Agreement, could not be made in a timely manner;

        d.     failing to maintain control over the sales representative, Condor, and to monitor Condor's activities;

        e.     failing to advise New Hampshire that Condor was not properly performing the functions of a sales representative;

        f.     failing to monitor the sales progress of the Picture in a reasonable and timely manner;

        g.     failing to undertake the duties it expressly assumed;

        h.     failing to minimize any potential loan shortfall;

        i.     failing to advise New Hampshire that the Sales Estimates could not reasonably be expected to be achieved;

        j.     failing to retain a replacement sales representative in a timely manner after the termination of Condor;

Loeb & Loeb
A Limited Liability Partnership
including Professional
Corporations

LA253356.1
20158610012
12/15/2000 mpo

14
COMPLAINT

FROM LATHAM & WATKINS LA (213)891-8763 39FL    (WED)12. 20 00 15:44/ST. 15:37/NO. 4861917570 P 16

106/075/02198

k.      failing to advise New Hampshire that the Picture was without a sales

representative for over a year; and

l.      otherwise failing to exercise due care under the circumstances.

97.    As a direct and proximate result of the carelessness and negligence of IHTBY, New Hampshire has suffered significant present damages and is likely to suffer substantial future damages for which it is entitled to be indemnified.

**COUNT VI**
**BREACH OF CONTRACT AGAINST FINK,**
**COMPLETE (hereinafter also "FINK"), AND FLASHPOINT**

98.    New Hampshire repeats and realleges the allegations contained in paragraphs 1 through 97 of this complaint as if fully set forth herein.

99.    On or before December 16, 1997, Flashpoint and Fink (hereinafter the "Risk Managers") undertook certain obligations and duties as risk managers with respect to the Policy.

100.    Among the duties arising out of that undertaking, the Risk Managers were obligated to:

a.      review the financing documentation for the Picture;

b.      oversee distribution and sales of the Picture, including, but not limited to, supervising the sales representative and approving proposals;

c.      provide New Hampshire with periodic reports, on an ongoing basis, as to the status of the financing, distribution, and recoupment of net receipts with respect to the Picture;

d.      provide New Hampshire with an opinion formed in good faith on the commercial potential of the Picture and, in that connection, provide such explanation or clarification of the budget and revenue projections as appropriate on an ongoing basis;

e.      monitor the performance of the producer, sales representative, and others associated with the completion, delivery, and sale of the Picture;

f.      identify anything that was reasonably likely to have a negative impact on the production, distribution, or recoupment of net receipts of the Picture;

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA258356.1
20158610012
12/15/2000 mpo

15
COMPLAINT

LEX-01 136928

FROM LATHAM & WATKINS LA (213)891-8763 SYFL    (WED)12. 20 00 15:44/St. 15:57/NO. 4601917-6 : 17

106/075/02199

g.    identify and advise New Hampshire of possible courses of action that could be taken either by New Hampshire, the Risk Managers, the sales representative, or others to reduce New Hampshire's exposure to risk;

h.    advise and assist New Hampshire with respect to the exercise of New Hampshire's audit and inspection rights under the Policy;

i.    seek to reduce New Hampshire's exposure by presenting and implementing measures that would provide financial and other protections for New Hampshire's benefit; and

j.    in the event of a claim under the Policy, use all reasonable efforts to assist in recovering any loss sustained by New Hampshire.

101.    The Risk Managers have failed to fulfill each and every one of the foregoing obligations for which the Risk Managers were responsible both individually and collectively.

102.    As a direct and proximate result of the Risk Managers' breaches of the aforementioned obligations, New Hampshire has suffered significant present damages and is likely to suffer substantial future damages for which it is entitled to be indemnified.

**COUNT VII**
**NEGLIGENCE AGAINST FINK, COMPLETE**
**(hereinafter also "FINK"), AND FLASHPOINT**

103.    New Hampshire repeats and realleges the allegations contained in paragraphs 1 through 102 of this complaint as if fully set forth herein.

104.    At all material times, the Risk Managers purported to act as risk managers for New Hampshire and undertook a duty to New Hampshire to exercise reasonable care in the discharge of their duties as risk managers.

105.    The Risk Managers carelessly, negligently, and/or recklessly discharged their duties as risk managers with respect to the Picture. The negligence, carelessness, and/or recklessness of the Risk Managers consisted of the following:

Lord & Lords
A Limited Liability Partnership
Including Professional
Corporations

LA258356.1
20158610012
12/15/2000 mpo

16
COMPLAINT

LEX-01 136929

FROM LATHAM & WATKINS LA (213)891-8763 3PFL     (WED)12.20'00 13:43/31.13:37/NO.4581917379 P 18

106/075/02200

1     a.     recommending to New Hampshire that the Picture be insured under the

2     Policy when they knew, or should have known with the exercise of reasonable care,

3     that the production would result in a significant loss to New Hampshire;

4     b.     failing to exercise reasonable care to ascertain the accuracy and/or validity

5     of the Sales Estimates supplied by the sales representative;

6     c.     failing to advise New Hampshire that the Sales Estimates supplied by the

7     sales representative were grossly inflated and unachievable;

8     d.     failing to advise New Hampshire that Condor was not properly performing

9     the function of a sales representative;

10     e.     failing to advise New Hampshire of the commencement, by the producer, of

11     a lawsuit against Condor;

12     f.     failing to advise New Hampshire of the settlement of the lawsuit by the

13     producer against Condor;

14     g.     failing to advise New Hampshire of the absence, for over one year, of a

15     sales representative for the Picture;

16     h.     failing to monitor the sales progress of the Picture in a reasonable and

17     timely manner;

18     i.     failing to monitor recoupment of the net receipts in a reasonable and timely

19     manner;

20     j.     failing to undertake the duties they expressly assumed;

21     k.     failing to minimize any potential loan shortfall;

22     l.     making recommendations contrary to the interests of New Hampshire;

23     m.     consenting to three purported extensions of the Delivery Date without first

24     consulting New Hampshire or requesting New Hampshire's approval;

25     n.     failing to advise New Hampshire of the purported extensions of the

26     Delivery Date;

27     o.     failing to advise New Hampshire that the Sales Estimates had not been

28     derived from an estimate of the Picture's production value; and

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA253256.1
20158610012
12/15/2000 mpo

17
COMPLAINT

FROM LATHAM & WATKINS EX (215)897-8765 39FL    (WED)12.20'00 15:45/ST.15:37/NO.4887917578 P 19

106/075/02201

1    p.    otherwise failing to exercise due care under the circumstances.

2    106.    As a direct and proximate result of the carelessness and negligence of the Risk

3    Managers, New Hampshire has suffered significant present damages and is likely to suffer

4    substantial future damages for which it is entitled to be indemnified.

5    **COUNT VIII**
    **BREACH OF FIDUCIARY DUTY AGAINST FINK,**

6    **COMPLETE (hereinafter also "FINK"), AND FLASHPOINT**

7    107.    New Hampshire repeats and realleges the allegations contained in paragraphs 1

8    through 106 of this complaint as if fully set forth herein.

9    108.    As New Hampshire's Risk Managers, Flashpoint and Fink owed to New

10    Hampshire the duty to act in the best interests and for the benefit of New Hampshire.

11    109.    The Risk Managers, through their agents, servants, and employees, breached the

12    fiduciary duty they owed to New Hampshire by, on information and belief knowingly,

13    misrepresenting material facts upon which New Hampshire reasonably relied, on information and

14    belief with the intent to deceive New Hampshire, and with knowledge that New Hampshire would

15    rely upon the misrepresentations. These misrepresentations were made orally and in documents

16    that, upon information and belief, the Risk Managers, in collaboration with the other defendants,

17    drafted and submitted to New Hampshire and included, inter alia, that the Sales Estimates for the

18    Picture were calculated in accordance with standard industry practice and were reasonable when in

19    fact the Sales Estimates provided to New Hampshire were inflated and not calculated in

20    accordance with standard industry practice in order to induce New Hampshire to issue the Policy

21    in the amount for which it was issued. On information and belief, at the time the Sales Estimates

22    were supplied to New Hampshire, the Risk Managers knew or should have known that these

23    estimates could not reasonably be expected to be achieved.

24    110.    The Risk Managers, through their agents, servants, and employees, on information

25    and belief knowingly, misrepresented, omitted, and/or concealed certain material facts including,

26    inter alia, that:

27

28

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA258336.1
20158610012
12/15/2000 mpo

18
COMPLAINT

FROM LATHAM & WATKINS LA (213)891-8763 59FL    (WED)12. 20 00 13:45/ST. 13:37/NC 9651917571   20

106/075/02202

1       a.    agreements were executed purporting to extend the Delivery Date of the

2    Picture at least three times without the approval and/or knowledge of New

3    Hampshire;

4       b.    Condor was terminated on or about September 24, 1998 although the Policy

5    specifically designated Condor as the sales representative for the Picture;

6       c.    a new sales representative was not retained to replace Condor until

7    November 30, 1999, over a year after Condor's representation was terminated.

8    New Hampshire was not notified of Condor's termination or of the replacement

9    over a year later; and

10       d.    the Risk Managers were subject to conflicts of interest that compromised

11    their loyalty to New Hampshire.  Specifically, T. Beauclerc Rogers, IV and David

12    Forrest, principals of Flashpoint, were also executive producers of the Picture.

13    111.    In addition to owing to New Hampshire the fiduciary duty emanating from their

14    retention as risk managers, the Risk Managers:

15       a.    possessed superior knowledge that was not available to New Hampshire;

16       b.    took positive actions to conceal the true facts;

17       c.    knew that New Hampshire was acting under a mistaken belief; and

18       d.    created a false impression by providing some facts but concealing others.

19    112.    As a direct and proximate result of the aforementioned breaches of the fiduciary

20    duty owed to New Hampshire by the Risk Managers, New Hampshire has suffered significant

21    present damages and is likely to suffer substantial future damages for which it is entitled to be

22    indemnified.

23               **COUNT IX**
                **NEGLIGENCE AGAINST CONDOR**

24       **AND JESSEL (hereinafter also "CONDOR")**

25    113.    New Hampshire repeats and realleges the allegations contained in paragraphs 1

26    through 112 of this complaint as if fully set forth herein.

27

28

Latham & Watkins
A Limited Liability Partnership
Including Professional
Corporations

LA258356.1
20158610012
12/15/2000 espo

COMPLAINT

LEX-01 136932

106/075/02203

114.   At all material times, Condor purported to act as sales representative for the Picture and undertook an obligation to exercise reasonable care in the discharge of its duties as sales representative.

115.   As sales representative for the Picture, Condor knew or should have known that New Hampshire expected Condor to exercise reasonable care in performing all of the duties of a sales representative.

116.   Condor knew or should have known that New Hampshire was relying upon Condor's exercise of reasonable care in marketing and selling the Picture.

117.   Condor carelessly, negligently, and/or recklessly discharged its duties as sales representative with respect to the Picture.  The negligence, carelessness, and/or recklessness of Condor consisted of the following:

   a.   providing New Hampshire with Sales Estimates that Condor knew, or should have known but for its own negligence, were not prepared in accordance with standard industry custom and practice;

   b.   failing to exercise reasonable care to ascertain the accuracy and/or validity of the Sales Estimates;

   c.   failing to use reasonable care in ensuring that screenings of the Picture were undertaken to the largest audience possible at each of the film festivals during the Policy and after;

   d.   failing to maximize public exposure and awareness of the Picture;

   e.   failing to undertake the duties it expressly assumed;

   f.   failing to minimize any potential loan shortfall;

   g.   failing to advise New Hampshire that the Sales Estimates had not been derived from an estimate of the Picture's production value; and

   h.   otherwise failing to exercise due care under the circumstances.

118.   As a direct and proximate result of Condor's carelessness and negligence, New Hampshire has suffered significant present damages and is likely to suffer substantial future damages for which it is entitled to be indemnified.

LEX-01 136933

·106/075/02204

## COUNT X
### NEGLIGENT MISREPRESENTATION AGAINST
### CONDOR AND JESSEL (hereinafter also "CONDOR")

119.   New Hampshire repeats and realleges the allegations contained in paragraphs 1 through 118 of this complaint as if fully set forth herein.

120.   As the designated sales representative for the Picture, Condor had a duty to disclose to New Hampshire all facts material to the risk presented, and not to misrepresent such facts. Further, Condor had a duty, arising out of its unique and specialized expertise in the area of film financing and distribution and its superior knowledge of information not available to New Hampshire, to provide true and correct information. Relative to Condor, New Hampshire had limited knowledge and expertise concerning motion picture financing and distribution, a fact of which Condor was aware. Condor encouraged New Hampshire to rely upon Condor's expertise and the expertise of others.

121.   On information and belief, Condor, with full knowledge that the information it was providing would be utilized and relied on by New Hampshire in determining whether to issue the Policy, and with knowledge that New Hampshire was relying on that information, negligently misrepresented material facts and failed to provide accurate information. New Hampshire relied to its detriment on Condor's misrepresentations.

122.   Specifically, Condor, on or about November 19, 1997, presented a document entitled "Estimates," which was identified as Exhibit "E" to the sales representation agreement of December 5, 1997.

123.   In the "Estimates" document, Condor presented a figure of $15,822,000 as its Sales Estimates for the Picture. In order to induce New Hampshire to issue the Policy, this figure was grossly inflated, not prepared in accordance with standard industry practice, and did not reflect the actual sales potential of the Picture.

124.   But for the aforementioned misrepresentations, concealments and/or omissions, New Hampshire would not have agreed to issue the Policy.

Leyb & Leyb
A Limited Liability Partnership
Including Professional
Corporations

LA258256.1
20158610012
12/15/2000 espo

21
COMPLAINT

LEX-01 136934

FROM LATHAM & WATKINS LA (215)891-8765 59PL     (WED)12. 20 00 13:47/ST. 13:37/NO. 4561917570 : 22

106/075/02205

125.    As a direct and proximate result of the aforementioned misrepresentations, concealments and/or omissions, New Hampshire has suffered significant present damages and is likely to suffer substantial future damages for which it is entitled to be indemnified.

## COUNT XI
### FRAUD AND DECEIT AS TO IHTBY,
### KAPLAN (hereinafter also "IHTBY"), CONDOR,
### JESSEL (hereinafter also "CONDOR"), AND JLT

126.    New Hampshire repeats and realleges the allegations contained in paragraphs 1 through 125 of this complaint as if fully set forth herein.

127.    In order to perpetrate the scheme set forth with particularity hereinabove, on information and belief these defendants colluded with one another and others, and acted separately and in concert, with the intent to defraud and deceive New Hampshire.  On information and belief, these defendants had as their separate and common purposes an intent to generate substantial commissions, fees, and other monies for themselves while at the same time shifting the costs and entire risk of loss with respect to the Picture from themselves to New Hampshire.

128.    On information and belief, these defendants' separate and common goals and purposes also were, inter alia, to conceal the facts that delivery of the Picture did not occur; that the sales representative designated in the Policy had been terminated; that the Picture was without a sales representative for over one year; and that the Delivery Date was extended on three occasions, improperly and without New Hampshire's knowledge and consent.

129.    If it is determined that New Hampshire is liable to SVB for SVB's purported loss because it is found that delivery timely occurred and that net receipts have not been recouped, then each and all of these defendants have caused damage to New Hampshire as follows:

a.      Condor, JLT, and IHTBY, on information and belief knowingly, formulated and presented to New Hampshire Sales Estimates that did not reflect the true sales potential of the Picture but instead inflated the estimate of the net receipts that were expected to be recouped from sales of the Picture;

b.      IHTBY and others, with JLT's knowledge and concurrence, purported to extend the Delivery Date of the Picture three times by amending the Inter-Party

Latham & Watkins
A Limited Liability Partnership
Including Professional
Corporations

LA258156.1
20158610012
12/15/2000 mpo

22
COMPLAINT

LEX-01 136935

106/075/02206

1   Agreement, for the purpose of terminating the obligations under the completion

2   guaranty and, thus, casting liability under the Policy upon New Hampshire;

3       c.      NewStar, with the knowledge and concurrence of IHTBY and JLT, sought

4   to terminate the obligations under the completion guaranty and, thus, to cast

5   liability under the Policy upon New Hampshire by executing the Restated

6   Agreement, which contained an acknowledgement of delivery, and also by

7   executing the delivery acknowledgment when, on information and belief, all

8   parties knew that delivery, as defined under the Inter-Party Agreement and the

9   completion guaranty, had not occurred; and

10      d.      IHTBY and JLT allowed a full year to pass without a sales representative

11  and without delivery with the result that there would necessarily be no net receipts

12  by the last day of the Policy, and then concurred with each other and others that

13  delivery had timely occurred eight days before the last day of the Policy, on

14  information and belief for the purpose and with the intent of casting liability under

15  the Policy upon New Hampshire.

16      130.    As a direct and proximate result of the aforementioned, which was undertaken for

17  the benefit of the defendants and others, New Hampshire has suffered significant present damages

18  and is likely to suffer substantial future damages for which it is entitled to be indemnified, and it is

19  entitled to an award of punitive damages.

20

21

22

23

24

25

26

27

28

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA258336.1
201586100012
12/15/2000 mpo

23
COMPLAINT

LEX-01 136936

FROM LATHAM & WATKINS LA (213)891-8763 39FL   (WED)12. 20 00 13:48/ST. 13:37/NO. 4861917579 P 25

106/075/02207

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff New Hampshire Insurance Company demands judgment in its favor and against all defendants, for all damages incurred by it and all damages that are, in the future, incurred by it as a result of the wrongful acts of the defendants as set forth herein. Those damages include compensatory damages, punitive damages, and attorneys' fees, with pre- and post-judgment interest as allowed by law, and the costs and disbursements of this action. New Hampshire further demands, pursuant to Federal Rule of Civil Procedure 38, that all issues be tried to a jury.

Dated: December 15, 2000

LOEB & LOEB LLP
ROBERT A. MEYER
LISA L. HORLICK

MOUND, COTTON & WOLLAN
STUART COTTON
DANIEL MARKEWICH
DAVID KENNA

By: _____
Robert A. Meyer
Attorneys for Plaintiff
New Hampshire Insurance Company

Loeb & Loeb
A Limited Liability Partnership
including Professional
Corporations

LEX-01 136937